# Health Care Monitor
# 6th Report
# Lippert v. Jeffreys

March 13, 2023

Prepared by Lippert Monitor
Dr. John Raba
Monitor's Consultants
Michael Puisis, D.O.
Catherine Knox MN, RN, CCHP-RN

## Table of Contents

Executive Summary ........................................................................................................... 4

Statewide Issues: Leadership and Organization ........................................................... 5

    Leadership Staffing ....................................................................................................... 5

Staffing Analysis and Implementation Plan ................................................................. 9

    Staffing Analysis .......................................................................................................... 10

    Implementation Plan ................................................................................................... 13

    Vendor Relationships ................................................................................................... 13

Statewide Internal Monitoring and Quality Improvement ....................................... 15

    Audits ........................................................................................................................... 21

    Performance and Outcome Measure Results ............................................................ 26

    Adverse Event and Incident Reporting Systems ...................................................... 31

    Vendor Monitoring ..................................................................................................... 31

    Mortality Review ......................................................................................................... 32

Medical Records ............................................................................................................. 37

Policies and Procedures ................................................................................................ 38

    Medical & Dental ........................................................................................................ 38

Facility Specific Issues ................................................................................................... 41

Facility Staffing .............................................................................................................. 41

    Credentialing of Physicians ....................................................................................... 47

Oversight over Medical, Dental, and Nursing Staff .................................................. 51

    Oversight over Medical and Dental Staff ................................................................ 52

    Oversight over Nursing Staff .................................................................................... 54

Operations ...................................................................................................................... 56

    Clinical Space .............................................................................................................. 56

    Equipment and Supplies ............................................................................................ 58

    Sanitation ..................................................................................................................... 60

    Onsite Laboratory and Diagnostics .......................................................................... 61

    Dietary ......................................................................................................................... 64

Facility Implementation of Policies and Procedures ................................................. 65

    Medical and Dental .................................................................................................... 65

Intrasystem Transfers .................................................................................................... 67

Medical Reception .......................................................................................................... 73

    Nurse and Dental Intake Screening .......................................................................... 73

Health Assessments ........................................................................................................ 79

Nursing Sick Call ................................................................................................................... 83

Chronic Care ........................................................................................................................... 89

Urgent and Emergent Care.................................................................................................... 91

Infirmary Care ..................................................................................................................... 100

Specialty Consultation ........................................................................................................ 113

Specialty Referral Oversight Review ............................................................................ 121

Hospital Care ....................................................................................................................... 122

Preventive Services ............................................................................................................. 124

Influenza Vaccinations .................................................................................................. 124

Adult Immunizations ..................................................................................................... 125

Cancer and Routine Health Maintenance Screening................................................... 133

Mammography Screening .............................................................................................. 138

Pharmacy and Medication Administration ....................................................................... 140

Discharge Planning ............................................................................................................. 148

Infection Control ................................................................................................................. 154

Dental Care ........................................................................................................................... 173

Dental Staffing ............................................................................................................... 173

Dental Documentation................................................................................................... 174

Dental Support................................................................................................................ 176

Dental Intake .................................................................................................................. 182

Dental Hygiene............................................................................................................... 183

Comprehensive Dental Care.......................................................................................... 186

Facility Internal Monitoring and Quality Improvement ................................................. 187

Audits .............................................................................................................................. 190

Performance and Outcome Measure Results ............................................................... 191

Adverse Event and Incident Reporting Systems ......................................................... 192

Vendor Monitoring......................................................................................................... 193

Mortality Review............................................................................................................ 193

# Executive Summary

*Addresses items II.A;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

IDOC has made progress and improvements in several areas[1]. But, IDOC is approaching the fourth year under the Consent Decree that is expected to last ten years. After nearly four years, few of the major deficiencies and fewer of the essential elements that resulted in the Consent Decree have been corrected and some have worsened. Though IDOC said it needs more than 300 additional staff, there are fewer health care staff working now than before the Consent Decree was signed. Fifty percent of physician positions are vacant. Forty six percent of total health care positions are currently vacant. There are significant vacancies of supervisory staff at all levels including facility Directors of Nursing, supervising registered nurses, Medical Directors, and Health Care Unit Administrators. The statewide Infection Control Coordinator and Quality Improvement Coordinator positions are both temporarily assigned and lack qualifications for the position. Neither of these programs are fully operational. This staffing shortage is critical and results in patients not receiving adequate care.

The electronic medical record is still not implemented, furthermore there is no contract for an electronic record vendor. If a contract were signed today, it will likely take an additional two or more years to effectively implement the electronic record. This would likely be in the seventh year of Consent Decree.

The Monitor has not been told of any capital improvements to physical plant in medical units[2] though on the recent tour to Dixon and previous tours of the Lincoln, Logan, Menard, Stateville, Robinson, Sheridan, and Pontiac facilities[3], there were numerous capital improvements that are necessary. Physical plant deficiencies extend to medical housing for the aged and disabled and the survey of the functional needs of this group has not yet been conducted. IDOC still has not communicated any plans to evaluate the extent of the necessary capital improvements.

---

[1] IDOC has continued development of its relationship with Southern Illinois University Office of Correctional Medicine to assist with the quality program. It has continued the relationship with University of Illinois Chicago Medical Center in telehealth for HIV and Hepatitis C consultations. It has expanded the relationship with University of Illinois Chicago Medical Center by adding endocrinology telehealth consultation in the area of diabetes care. IDOC has also continued aggressive efforts to provide the curative treatment of patients with active Hepatitis C. IDOC has also ensured that all new physician hires have board certification or have completed a residency in a primary care residency.

[2] The Monitor did receive a capital improvement list in IDOC which included 103 items. Eight items were medical and included improvement of medical office space, correction of isolation rooms and dental operatories as required by IDPH related to COVID respiratory transmission. These were not explained and this information was obtained too late to meaningfully use for the report. However, IDOC has not yet provided any progress in obtaining a consultant to review physical plant and equipment in medical units.

[3] Lincoln, Logan, Robinson, Sheridan, Dixon and Pontiac were reviewed since initiation of the Consent Decree. Menard, Stateville and Stateville NRC were evaluated with respect to the 2018 Expert review.

4

IDOC is not close to completing a comprehensive set of policies and procedures. Development and implementation of these policies is sporadic and disorganized. The Monitor has been informed of only four policies having been implemented and three of those policies were written and implemented without any assistance from the Monitor which is required by the Consent Decree.

Access to specialty care is still poor. Though the obstructive collegial review process has ended, timeliness of specialty referral and follow up remains problematic. The Monitor was told at a recent site inspection[4] that about 15% of persons don't receive ordered specialty appointments on an ongoing basis and backlogs for specialty care are as bad, or worse, than before the Consent Decree. Other facilities report these delays and backlogs as well.

The most essential element of the Consent Decree is the Implementation Plan which is IDOC's plan for the steps it will take to obtain compliance with this Decree. Four years into the expected ten year Consent Decree, and three years after it was due, IDOC had failed to produce an adequate plan which resulted in a contempt charge. The Court was compelled to resolve disagreements of the IDOC with the Monitor regarding this plan. Included in those disagreements is the design of the quality and audit programs. These programs were to have been completed with assistance from the Monitor, but IDOC is moving these plans forward without fully receiving the required input and assistance. The current IDOC design of the audit program, will not ensure timely or satisfactory compliance with the Consent Decree.

At the end of year four, the lack of progress towards compliance with the Consent Decree can be summarized as a failure by the State to establish the foundations of an adequate medical program in the IDOC. The root cause of failures in hiring staff, obtaining qualified physicians, enacting capital improvements including for the elderly and disabled, getting a contract for, and implementing an electronic medical record, are due to practices not controlled by OHS that concern funding, personnel and contracting. Without the ability to hire, manage the workforce, make capital improvement, or obtain contract services much more expeditiously, it will be extremely difficult to achieve any semblance of compliance with the Consent Decree. The Monitor cautions Parties and the Court that IDOC will not attain compliance with this decree in the ten years that is specified for completion unless significant changes occur. The State should explain to the Court what changes they will make to bring IDOC into compliance within the remaining six years.

Further details on these essential concerns are provided in the different sections of the report.

# Statewide Issues: Leadership and Organization

**Leadership Staffing**
*Addresses item II.B.2; II.B.3; III.A.1; III.A.8; III.A.9*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

---

[4] Dixon CC site inspection December 3-5, 2022.

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.1** *The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, below. The Deputy Chiefs of Health Services shall either be board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, below.*

**III.A.8.** *Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.*

**III.A.9.** *Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

Fifteen documents were requested but two documents were received: a table of organization of the vendor and of OHS. On 1/19/23 an additional eight documents were received but only one could be examined as the documents were received so late.

In its 12/31/21 Implementation Plan, IDOC planned to obtain a consultant to survey all health care units and clinical spaces and develop recommendations to ensure these spaces are sufficient to meet medical needs. This has not been done nor has the Monitor been told that this is planned. While some capital improvements are occurring, the Monitor has requested but has not received information related to funding or expenditures for capital improvements for the medical program. IDOC has not formally committed to capital improvements to physical plant necessary to provide adequate medical care.

The Monitor requested documentation of any changes, since the last report, related to the organizational structure. No information was provided. However, the table of organization[5] provided has significantly changed. The Monitor will need further discussion with OHS related to the organizational structure to clarify what the current organizational structure is.

The OHS Director of Nursing reports directly to the Chief OHS instead of reporting through the Medical Coordinator. This improves contact of the Director of Nursing and Regional Coordinators with the Chief OHS and eliminates one layer of barrier between the Director of Nursing and the Chief OHS. The table of organization still demonstrates a hybrid medical program without clear lines of clinical or administrative authority. This creates ambiguities with respect to leadership between custody, the vendor, and OHS. For example, the Wardens still are administrative supervisors of the Health Care Unit Administrators (HCUA).

---

[5] Titled 03-000 Health Services dated October 2022, received by the Monitor on 11/7/22

The Medical Compliance Administrator reports to the Chief Compliance Officer[6] (which is a non-OHS position) and is responsible for "**developing** and implementing policy affecting standards of care, ethics, and licensing requirements for health and mental health services statewide"[7]. The Chief of Health Services is also responsible for "the formulation and implementation of statewide policy for Health Services and Mental Health Services; supervises activities of the Office of Health Services which includes statewide Medical-Nursing Services, Environmental Services, Prevention Programs and Statewide Dietary Services".[8] It appears that both the Medical Compliance Administrator and the Chief of Health Services are authorized to develop and implement medical policy. Also, the responsibility of the Chief OHS to supervise the Statewide Dietary Services is a new responsibility. These changes need to be clarified. Authority to approve and formulate policy should reside with the Chief of Health Services. The Monitor is uncertain what responsibility for dietary services consists of but this is typically not a clinical operation. The position description for the Chief of Health Services does not include a requirement for board certification in a primary care field. Even though the current Chief is board certified the position description should be corrected to be consistent with the Consent Agreement. The Chief of Health Services still does not have authority to supervise and manage the medical program as HCUAs supervision is still under Wardens.

The 9/16/22 request for proposal (RFP) for vendors for the medical program does states that the vendor is to provide health services under the direction of the IDOC Medical Director, which is appropriate, but there continues to be supervisory ambiguity at sites where both vendor and state employees work side by side. This creates parallel supervision which makes managing care difficult. Approximately one third of facility employees are state staff. Fourteen facilities have a significant number of state staff. None of the tables of organization show lines of authority integrating state and vendor staff. All physicians are hired by the vendor. But the vendor table of organization does not show a clear line of supervision for physicians to a clinical leader. The vendor table of organization shows that the three vendor regional Medical Directors report to the Vice President of Operations. Facility physicians appear to be supervised by the vendor Regional Managers. There is no clinical line of supervision over vendor physicians.

The combined vendor and state employee arrangements result in similar ambiguity. For example, at Dixon, vendor licensed practical nurses and certified nurse assistants report to a vendor site manager but not to an onsite registered nurse. Medication administration is therefore not supervised onsite by a registered nurse. The state registered nurses will not sign off on certified nurse assistant flow sheets and so the work of the certified nurse assistants has no higher-level registered nurse oversight. This hybrid system continues to be dysfunctional as there is not a unified clinical structure with clear clinical lines of authority or supervision. In prior reports, the Monitor has explained the problems with supervision of the HCUAs by Wardens extensively. This has not changed.

There continue to be very high vacancy rates in leadership positions which have reached the danger

---

[6] The Chief Compliance Officer is an IDOC employee who has administrative oversight of internal and external compliance reviews and evaluation of facility operations. This office has performed these reviews for decades including during the period of time when IDOC entered into the Lippert Consent Decree.
[7] CMS Position Description Medical Compliance Administrator effective 9/1/20.
[8] CMS Position Description, Chief of Health Services effective 8/16/22

level. For the 29 facilities with allocated HCUAs, six (21%) have vacancies. Of the 30 facilities with allocated Medical Director and Directory of Nursing positions, 13 (48%) of 27.29 Medical Director positions are vacant; five (81%) of 6.175 physician positions are vacant, and 14 (45%) of 31 Director of Nursing positions are vacant. East Moline and Centralia have all three leadership positions vacant and three facilities (Vienna, Robinson, and Jacksonville) have two of three leadership positions vacant. This is a disturbing gap in facility leadership that places inmates at significant risk of harm. IDOC has no plan for how to address this gap except to continue current hiring practices.

As can be seen in the graph below, leadership positions are worse in absolute numbers and in vacancy rates than they were in 2019. Without leadership, it will not be possible to implement the changes necessary to attain compliance with the Consent Decree.

| Differences in Working Positions of Key Leadership Staff from 2019 to 2022 * | | | | | | | |
|---|---|---|---|---|---|---|---|
| Position | Budgeted and Recommended 11/23/19** | Vacancies 11/23/19 | Working staff 11/23/19 | Budgeted 9/12/22 | Vacancies 9/12/22 | Working Staff 9/12/22 | Difference in working positions 2022-2019 |
| Physicians*** | 46.2 | 13.6 (29%) | 32.575 | 33.465 | 18 (54%) | 15.465 | -17.11 |
| HCUA | 30 | 3 (10%) | 27 | 29 | 6 (21%) | 23 | -4 |
| Dentists | 35.1 | 10.9 (31%) | 24.2 | 36.15 | 15.35 (42%) | 20.8 | -3.4 |
| Director of Nursing | 31 | 11 (35%) | 20 | 31 | 14 (45%) | 17 | -3 |
| Nurse Supervisor | 26 | 17 (65%) | 9 | 29 | 22 (76%) | 7 | -2 |
| Totals | 168.3 | 45.5 (27%) | 112.775 | 158.615 | 75 (47%) | 83.265 | -29.51 |
| * This data is from the Staffing Analysis 11/23/19 and the Staffing Update provided 9/12/22 by IDOC | | | | | | | |
| ** In 2019 IDOC did not yet budget all recommended positions. This number includes all budgeted and all recommended | | | | | | | |
| *** This is from the 2019 statewide totals provided by IDOC. We noted that when individual facilities are added, the total physicians was 40.7 positions. We presumed that the additional 5.5 physicians was due to the SIU physicians that IDOC intended to add but this was not confirmed. | | | | | | | |

The Monitor has recommended that IDOC needs to augment OHS staff with project manager consultants but this has not been done. A Deputy Medical Director position remains vacant and it appears from the table of organization that another Deputy Medical Director position has been created and it remains vacant as well. Leadership staff still do not have time to engage in the implementation of the Consent Decree and must prioritize what projects will be undertaken which has considerably delayed implementing the Consent Decree.

Position descriptions for OHS staff were received too late to review for this report. The actual responsibilities within the health program of the Environmental Services Coordinator and the Environmental Services Program Director are not clear and it now appears that these positions are no longer within OHS. The job descriptions do not clarify the confusion.

In summary, there is a dangerous level of vacancies in key facility leadership positions that threatens the safety of inmates. This high level of vacancies in leadership staff is worse than in 2019. Additional contract staff have been added to perform mortality review. The table of

organization has changed and needs clarification. A partial compliance is continued but IDOC is cautioned to reduce vacancies in leadership positions.

**RECOMMENDATIONS:**
1. Identify a Director of Nursing Services at each facility who is accountable to the Statewide DON for clinical practice and quality. Line authority would remain with the HCUA for daily operations.
2. IDOC is requested to provide quarterly up-to-date vacancy reports that include OHS and HCUA positions.
3. IDOC should formally document that the Chief OHS is responsible for managing the health program of the IDOC as evidenced by a communication by the Executive Director to the Wardens communicating this new relationship. This responsibility needs to include authority to hire, fire, and appoint replacements for all medical personnel within the health program. With the exception of the Chief OHS, who reports to a deputy director, all medical staff report to medical supervision and not through custody, (e.g., the Warden). A table of organization should reflect these changes.
4. Physicians and other providers need to report through physician leadership ultimately reporting to the clinical direction of the Chief OHS.
5. Nursing staff need to report through a facility Director of Nursing at each facility who, for clinical issues, reports to the statewide OHS Director of Nursing.
6. HCUAs need to report for all matters (clinical and operational) to OHS administrative leadership (Regional Coordinators) who report to the senior OHS administrator (Medical Coordinator)
7. The OHS DON, OHS Medical Coordinator, Deputy Chiefs, and OHS Dental Director should report to the Chief OHS.
8. OHS needs to further augment its leadership and support staff to address the provisions of the Consent Decree and to adequately fulfil its responsibilities as IDOC's health authority.
9. The IDOC staffing and particularly the leadership staffing (Medical Directors, DONs, HCUAs, Dentists, OHS) is critically low. The vendor and the State must expeditiously intensify their recruiting efforts.
10. IDOC needs to clarify its organizational structure to the Monitor.

# Staffing Analysis and Implementation Plan

*Addresses items IV.A.1-2; IV.B;*

**IV.A; IV.A.1; and IV.A.2.** *The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum: (1) Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree; and (2) Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.*

**IV.B.** *Within 120 days [July 1, 2019] from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis. Within sixty (60) days after submission of the staffing analysis, Defendants shall draft an Implementation*

*Plan. In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.*

**OVERALL COMPLIANCE:** Noncompliance

**FINDINGS:**

**Staffing Analysis**

The Monitor requested eight documents but only received two documents: an updated facility and OHS staffing document and an update of budgeted versus actual dental hygienists. Recommendation #17 was removed because IDOC modified the table of organization so that the Director of Nursing reports to the Chief OHS.

The 1st audit[9] recently submitted by IDOC does not address implementation of the staffing analysis and provides no proof of practice that appropriate staffing is place nor that there is a plan for hiring the necessary staff. The audit should include a review of staffing adequacy.

IDOC submitted to the Court a final Staffing Analysis on 8/19/21[10]. Though the Staffing Analysis is meant to be associated with the Implementation Plan, no evidence was provided that implementation plans for certain areas include staffing to support the task. IDOC has added no project manager or leadership staff, as recommended by the Monitor, with respect to implementation of the plan. This has contributed to the slow progress with implementation of the Consent Decree. The IDOC has also not utilized a meaningful methodology to determine staffing.

IDOC has allocated and budgeted all recommended positions in the staffing analysis but has not committed to hire all staff as soon as possible or has been unable to hire staff. The graph below shows that no progress has been made since the last report. The number of working staff is less today than it was in 2019. The absolute number of vacancies has steadily increased since 2019. The vacancy rate has increased since 2019.

---

[9] The Monitor requested any audits related to provision II.B.9 of the Consent Decree. The FY23 Clinical Quality Measures Audits were sent. Later, OHS said that these audits were not related to II.B.9 and instead were related to performance and outcome measures. IDOC currently does not perform an audit related to II.B.9.
[10] IDOC provided staffing updates on 3/21/22 and 9/12/22.

| Total Allocated and Recommended positions with Working Staff and Vacancy Rates Based on IDOC Staffing Analyses and latest Staffing Submission. 2019-2022 | | | | | | |
|---|---|---|---|---|---|---|
| Staffing Analysis Version | Total Allocated/ Recommended Positions | Vacant Positions | Vacancy rate | Working* Staff | Percent Increase of Working Staff from 2019 | Total Positions |
| Nov-19 | 1583 | 609 | 38% | 974 | | 1583 |
| Jun-20 | 1566 | 632 | 40% | 934 | 4% | 1566 |
| Sep-22 | 1580** | 727 | 46% | 864 | 11% | 1580 |
| *Working staff = total positions - vacant. | | | | | | |
| ** The IDOC 9/12/22 staffing submission has a error of 10 in total staffing. It is 1580 not 1590 | | | | | | |

Though the total number of working staff is the same as it was six months ago[11], there have been changes in the number of filled or vacant positions in various areas. Over the past six months, IDOC has performed slightly better than the vendor both in terms of hiring higher level staffing and in terms of total hires. The vendor's performance has not been good particularly with critical positions, especially physicians and registered nurses[12]. Not including OHS staffing, IDOC has hired a net of 12 staff and the vendor has a net increase of 12 vacancies. As examples of the types of positions hired, IDOC has hired two additional Directors of Nursing and nine additional registered nurses statewide. The vendor has hired mostly clerical staff but has hired an additional 5.25 dental hygienists. The vendor has increased vacancies in dentists (2.5); LPNs (16.9); Medical Directors (3.86); staff physicians (1.825); medical record clerks (7); and registered nurses (18).

---

[11] Comparison of staffing updates from 3/21/22 and 9/22/22.

[12] Based on the 9/12/22 staffing update provided by IDOC, the vendor had 542 vacancies for 1079 positions or a 50% vacancy rate. IDOC had 185 vacancies for 511 positions or a 36% vacancy rate.

| 9/12/22 Clinical Staffing in IDOC Sorted by Vacancy Rate | | | |
|---|---|---|---|
| Position | Budgeted | Vacant | Vacancy Rate |
| Nurse Supervisor | 29 | 22 | 76% |
| LPN/CMT | 331 | 222.5 | 67% |
| Director of Nursing | 31 | 18 | 58% |
| Certified Nurse Assistant | 126 | 70 | 56% |
| Medical Director/ Physicians | 33.465 | 18 | 53% |
| Physical Therapy Assistant | 10.7 | 5.5 | 51% |
| RN | 539.4 | 259.4 | 48% |
| Dentist | 34.15 | 14.35 | 42% |
| HCUA | 29 | 8 | 28% |
| Dental Assistant | 44.9 | 7.5 | 17% |
| DentaL Hygienist | 22.25 | 3.25 | 15% |
| Nurse Pactitioner/ Physician Assistant | 48.6 | 6.5 | 13% |
| Physical Therapist | 4.55 | 0 | 0% |

Both IDOC and the vendor have ongoing difficulties in hiring and retaining staff as set forth in the IDOC's staffing plan. The IDOC still has a combined vendor and IDOC 46% vacancy rate, which is astronomical. The Monitor has recommended over multiple reports, and continues to recommend, that IDOC develop a recruitment task force with IDOC, CMS, and the vendor. IDOC does meet with the vendor and CMS regularly but these meetings are not achieving the intended goal of decreasing the vacancy rate. Tracking monthly vacancy rates for all positions specifically tracking key positions on a dashboard is an additional step we recommend to draw attention to this problem. This problem should be elevated to a higher authority level.

In summary, after final submission of a staffing analysis, IDOC and the vendor have been unable to hire staff and there are now less staff working than in 2019. A workload analysis has not been used to verify and develop staffing needs. IDOC has not addressed or responded to concerns of the Monitor with respect to the staffing analysis. While a Staffing Analysis has been provided, limited, if any[13], progress has been made with respect to hiring. The Monitor agrees with the IDOC that the Staffing Analysis will need revision over time, especially as programs of the Implementation Plan are put into place and especially after IDOC acquires the capacity to adequately assess workload. As this document is submitted to the Court, the Monitor would advise that IDOC be required to complete a workload analysis within a year to address staffing deficiencies and account for any changes implicit in the Implementation Plan that will eventually be submitted. It should also be required to hire the staff recommended by the Monitor or show how it will otherwise fulfill those functions. Because of the inability to increase the staff level to a safe level, the worsening vacancy of the leadership positions including the facilities' Medical Director, Director of Nursing, and supervisory nurse positions, and the inability of IDOC to develop an effective plan for hiring staff, this provision has reverted to noncompliance. Additional

---

[13] In aggregate there are less people working, higher overall vacancy rates, and less leadership working than in 2019. There have been advances in some categories of workers as can be seen in the table in the facility staffing section of this report.

analysis is provided in the facility staffing section below.

Two additional recommendations were made. One was that the audit (II.B.9) should review adequacy of staffing for every facility. The second was that IDOC should institute a dashboard to include monthly or quarterly vacancy rates of all staff by position type. This should be monitored by those responsible for hiring and IDOC leadership and should be sent to other parties (e.g., CMS, Attorney General, Governor's counsel involved with IDOC).

**Implementation Plan**

The Monitor asked for three documents. The latest version of the Implementation Plan was provided. The name of the person responsible for coordinating the Implementation Plan was not provided. IDOC, therefore, provided no information that anyone is responsible for managing the Implementation Plan. To not have a responsible leader of this effort reflects on the disorganized approach to this critical function. IDOC did not provide a table showing the percent completed of items of the Implementation Plan. IDOC did not say whether the information was available or not. The recent IDOC audit[14] did not address the Implementation Plan and provides no proof of practice that any progress has been made on the Implementation Plan. The audit should address all aspects of the Consent Decree.

The difficulties of IDOC in developing its Implementation Plan are documented in numerous Court Filings. This document was due in September of 2019. After over a two year delay, IDOC failed to submit an acceptable Implementation Plan and was found by the Court to be in contempt for that reason. The Court ordered the Monitor to use the 12/31/21 version of IDOC's Implementation Plan and submit any disagreements with the plan. IDOC was directed to respond to those disagreements with comments. The Court is reviewing the plan and disagreements with respect to resolution as is directed by the Consent Agreement. For these reasons, a noncompliance rating is warranted. Parties await the resolution of the Court.

**Vendor Relationships**

The Monitor asked for three documents; two documents were provided. The third document requested was the new vendor contract or update on the RFP. IDOC communicated on a recent call that the request for proposal (RFP) for medical services was released 1/25/23 and bids will open on proposals on 4/24/23. IDOC sent a link to that RFP. The Monitor has not had an opportunity to review this document.

**RECOMMENDATIONS:**

1. The Executive Director with the Chief OHS need to agree on a strategic plan for the design of the IDOC health services. They may need to discuss this with the Governor's office.

---

[14] The Monitor requested any reports related to the audit related to provision II.B.9, and was sent a number of clinical quality measures audits. IDOC subsequently stated that these were not related to provision II.B.9, but were performance and outcome measures. No audits have been completed consistent with provision II.B.9. The clinical quality measures audits did not address the Implementation Plan.

Our recommendation would be to implement a university-based program.

2. After a strategic plan is developed and agreed to, IDOC can flesh out details in their Implementation Plan.

3. Additional nurse manager positions proposed in the staffing analysis should be established to enable the close supervision that will be necessary to make the changes in practice required by the Consent Decree.

4. Add a relief factor for all staff.

5. Continue to refine the Staffing Analysis to consider recommendations from the Monitor to include dedicated positions for infection control, quality improvement, a relief factor, use of the state nursing home standards for infirmary, ADA and other specialized housing for the care of frail and or elderly inmates, and development of workload standards.

6. Continue to refine the Staffing Analysis to ensure that health care needs of the IDOC incarcerated population are adequately provided including nurse and provider sick call, chronic care, urgent care, specialty consultation, dental care and cleaning, optometry care, and physical therapy.

7. Given the significant delay in completing the Implementation Plan, the Monitor recommends increased regular contact with IDOC focusing on key structural elements, particularly the audit, of the Implementation Plan initially.

8. IDOC needs to hire positions in their staffing analysis as soon as possible.

9. Vendor contracts should conform and require adherence to requirements of the Consent Decree.

10. A recruitment task force needs to be established to reduce the vacancy rate to less than 12 percent.

11. A standardized methodology for analyzing workload should be developed to determine and standardize position needs for every position. This includes staffing infirmaries based on skilled nursing and nursing home experience; optometry services; physical therapy services; dental hygienists; and physicians all of which appear understaffed. The Monitor has had significant concerns about insufficient numbers of physicians, nurse practitioners, physician assistants, dental hygienists, optometrists, and physical therapists. A workload analysis needs to inform the hiring of dieticians sufficient to address needs in IDOC and clinical pharmacists to provide support for safe and effective medication therapy.

12. Hire additional information technology and data team consulting staff consistent with recommendations in the Monitor's 2nd Report.

13. Key consulting positions (in the quality program and data team) were not included in the Staffing Analysis and this should be done. The IDOC staffing plan and the OHS table of organization should be revised to include data, medical record support, and quality consultant teams.

14. Facility positions should be officially titled by responsibility (quality improvement coordinator, infection control nurse, etc.) and label nursing positions by assignment so that workload can be properly assigned.

15. The Staffing Analysis needs to be augmented to include expected workload at the proposed Joliet Treatment Center.

16. All state, vendor and contract position descriptions for OHS and facility positions need to be provided

17. IDOC should respond to the Monitor's recommendations on staffing.

14

18. IDOC needs to consider all of the Monitor's recommendations for the Implementation Plan and respond why they do not believe they are necessary.
19. IDOC needs to permit the Monitor to provide timely input as required by the Consent Decree.
20. The IDOC audit, related to provision II.B.9., should include an evaluation of staffing.
21. Staffing vacancies by position type should be tracked on a monthly or quarterly dashboard and sent to key leaders of IDOC and the State (e.g., CMS, Attorney General, the Governor's counsel assigned to IDOC) until vacancy rates are 12%.

# Statewide Internal Monitoring and Quality Improvement

*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*
**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*
**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor asked for six documents. One document was provided: the FY23 CQI Plan. A second document request was partially provided. Meeting minutes of the System Leadership Council were requested. Only the September 2022 minutes were provided. The June 2022 minutes were not provided. The remaining four documents[15] were not provided nor did IDOC state that the information was available or not. IDOC also provided a revised position description for the agency quality improvement coordinator, which was a recommendation in three of the previous reports.

---

[15] 1) Any data or information to update work of the system leadership council on the quality improvement program including: statewide quality; corrective action process; audit function; performance and outcome measures; adverse event reporting; patient safety; process improvement; mortality review; vendor monitoring; data management  2) List and details of all identified deficiencies by facility and corrective actions directed by system leadership council given to facilities; 3) Training plans and accomplishments of statewide CQI program with respect to facility programs; 4) List of all process analysis projects initiated by System Leadership Council, SIU, or OHS with latest report of their work. List should include status of project and percent completed.

The position description for the agency quality improvement coordinator has minimum qualifications of: a registered nurse license, four years of college with coursework in nursing, and three years of nursing experience. This work of a quality improvement professional does not necessarily require a nursing degree but does require someone with significant quality improvement training and experience. It is a *senior quality improvement position* yet has no requirement for training or experience in quality improvement. It does "prefer" candidates with experience in quality management and experience with external auditors and internal controls and compliance issues. This position description, as written, is unacceptable for a senior quality improvement position. IDOC also advised the Monitor that they have appointed a statewide Quality Improvement Coordinator. During the Monitor's Dixon visit, on 12/5/22, an individual was announced as temporarily assigned to be the systemwide CQI coordinator but still holds the designation of HCUA at Stateville. The curriculum vitae of this person indicates that she has no prior training in quality improvement methodology nor any experience in quality improvement. This is the second appointed IDOC systemwide quality improvement coordinator who has no training or prior experience in quality improvement. This is also unacceptable.

On 6/1/22, the IDOC produced their V.G. report which had an exhibit attached which was a Quality Improvement Plan that the Monitor had not seen before it was made public and was not asked to provide input into. The author of the IDOC V.G. report put it succinctly when stating "With the assistance of SIU and consultant Dr. Jane Leonardson, the Department has made significant progress towards finalizing the quality improvement plan….. once finalized, the plan and associated policies will be shared with the Monitor for feedback"[16]. Feedback in this case was not obtained and the Monitor was not asked to provide any assistance or input into this plan. IDOC System Leadership Council minutes[17] from September documented that on 6/9/22, eight days after it was made public, the Quality Improvement Plan was approved by IDOC. IDOC did not solicit input or assistance from the Monitor before it was approved.

Regarding the quality improvement policy, IDOC sent a quality improvement policy to the Monitor on 8/11/21 and the Monitor submitted comments to IDOC on 2/25/22., Nothing further was heard from IDOC. On 9/14/22, IDOC emailed the Monitor a group of policies that included a quality improvement policy. Six days later, on 9/20/22, before the Monitor could give comments on the policy, IDOC notified the Monitor that the policy would be implemented on 10/1/22. IDOC continued the practice of giving the Monitor no opportunity for input and gave no time for comments on a CQI policy that the Monitor had no input on. The Monitor did subsequently send comments on the policy to IDOC on 10/27/22 but has received no response.

The Monitor's team had 30 comments on the quality improvement policy. None of these were addressed and there was no response back to the Monitor about any of the comments. No changes were made to the policy. Key comments included:
1. Missing in the "Purpose statement" is mention of the Consent Decree and the quality improvement components that are required in the Consent Decree. The policy does not address major items such as performance and outcome measures, adverse event reporting, or patient safety and how they are integrated into the quality program.

---

[16] Page 15 in Quality Improvement section of Lippert V.G. Report 6.1.22 FINAL w exhibits
[17] From 9/8/22

16

2. The audit function (II.B.6.) is not clearly defined and is confusing. The auditing that is described is not consistent with what the Consent Decree requires.

3. The procedure of using a small number (12) of indicators and performance measures annually as the entire audit will not be sufficient to identify and correct all deficiencies in a timely fashion and will considerably delay obtaining compliance. The audit should be standardized, comprehensive, and repeated annually. By comprehensive we mean that it should address all aspects of the Consent Decree.

4. Performance measures should be continuously obtained not just for one year. Performance measures should be continuously displayed on a monthly or quarterly basis.

5. The audit should be developed with the Monitor but the current IDOC audit was not.

6. Because the policy does not define the term "audits", it isn't clear whether the term audit referred to in this policy is meant to satisfy provision II.B.9.

7. All grievances should be studied as patient complaints. Only grievances "upheld" are studied but this may result in significant bias and IDOC will not learn what their patients' concerns are.

8. The HCUA is responsible for managing the quality improvement committee. This can be appropriate but there should be a full time facility CQI coordinator at each facility.

9. The healthcare compliance coordinator, who reports to the Chief Compliance Officer, is given significant control over multiple functions that should be controlled by OHS, senior audit or quality personnel. This includes:
   a. Design and oversight of audits,
   b. Assignment of indicators, methodology and scoring of audits,
   c. Updating healthcare policy and procedure,
   d. Ensure quality improvement activity takes place and to write the annual agency-wide quality improvement reports, and
   e. Make and assign corrective action assignments

The use of the IDOC healthcare compliance coordinator to lead these functions is no change to existing arrangements and will not promote the change necessary to obtain compliance with the Consent Decree.

The FY23 Quality Improvement Plan was also implemented without input or assistance from the Monitor. The Monitor inserts Attachment A which includes comments to that plan. Major issues with the document are as follows:

1. There should be a plan for the statewide CQI program and facilities' CQI programs. We suggest the the 1st year plan should include as tasks our recommenations #1-12 in the Statewide Internal Monitoring and Quality Improvement Section of the Monitor's 6th Report; recommendations #1-2 of the Statewide Audits section of the Monitor's 6th Report; and recommendations #1-4 of the Performance and Outcome Measure section of the Monitor's 6th Report.

2. For the 1st year plan for the facilities' CQI program we suggest recommendations #1-8 in the Facility Internal Monitoring and Quality Improvement section of the Monitor's 6th Report.

3. The Quality Improvement Plan is not a plan. It is a description of what has already been done. By the time the plan was submitted to the Monitor on 9/20/22, the first 24 facility

audits were completed. Also, most of the document reads like policy and procedure statements. Many of these statements would be better suited in the policy and procedure. As a plan, it suffers from the same problems as the Implementation Plan. It is not a plan based on similar instructions as the Implementation Plan which is to "Establish with the assistance of the Monitor, specific tasks, timetables, goal, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree".

4. IDOC, by its actions, does not make use of the Monitor's assistance and has developed and implemented its own plan. We suggest the IDOC take advantage of assistance from the Monitor team.

5. The plan does not include an audit process that will provide the proof of practice required by the V.G. provision to provide data and information sufficient to evaluate compliance and progress towards compliance with the Consent Decree. In this respect, the Quality Improvement Plan ignores the Consent Decree.

6. The plan does institute some positive changes by creating a system leadership council and a clinical quality group. However, the changes described are modest and not comprehensive. If not significantly enhanced, the audits described in this plan assess such a limited number of programmatic areas annually that identification and correction of deficiencies necessary to reach compliance will take decades. It is inconceivable that this plan will reach the goal of compliance within the ten years (with only six years remaining) intended by the Consent Decree. IDOC should describe how this plan will result in compliance in six years.

7. OHS dissociates itself from compliance auditing, a significant component of the audit process, and cedes this function to the IDOC compliance unit which is discussed in the audit section to follow. We believe this is a mistake. The II.B.9. audit should be viewed as central to the quality program and to providing proof of practice to IDOC and to the Monitor with respect to compliance to the Consent Decree. Giving responsibility for compliance auditing to the Medical Compliance Unit that has been for years a failed practice that did not improve the IDOC health delivery system to a level of care that would have averted the Consent Decree. It does not appear to notably change current practices and will be closely scrutinized by the Monitor to assess its impact on the administrative components of the Consent Decree. It is highly unlikely, even inconceiveable, that the addition of the healthcare compliance coordinator to the existing Compliance Team will be able to have any measureable improvement to the quality of clinical care in the IDOC.

The Healthcare Compliance Coordinator plays a critical role in the quality program based on the FY23 Quality Improvement Plan. The individual acting in this position is a nurse who was previously an assistant warden (for two years), a HCUA (for 14 months), Director of Nursing (for 7 months), and a registered nurse in a variety of locations. The following are abstracted from her position description.

- Principal policy administrator developing and implementing policy, affecting standards of care, ethics, and licensing requirements for health and mental health statewide.
- Audits administrative directives and consent decree compliance language.
- Directs the development and implementation of systemic monitoring and assessment of processes and procedures related to standards of care, ethics, and licensing requirements

for health and mental health and serves as the spokesperson for the department committing the agency to specific courses of action relative to standards of care.

- Ensures compliance with all applicated laws, rules, decrees, regulations and directives.
- Institutes administrative directives to guide the direction of service.
- Develops, implements and monitors policies and procedures related to standards of care for health and mental health.
- Manages health and mental health related contracts; tracks and reports on contract performance; ensures compliance with all aspects of contract requirements; develops corrective action plans and provides briefings to the administration related to the contracts.

The hiring of the IDOC healthcare compliance coordinator to lead these functions is no guarantee that the changes necessary to obtain compliance with the Consent Decree will be advanced. This appears to be no different than the existing process of external audits that have not resulted in any positive changes to the medical program.

IDOC had made a prior commitment to the phase II UIC quality plan[18] that the Monitor, OHS, and UIC had developed together. This was abandoned. At a 1/31/23 call with IDOC, the UIC plan was described as the "distant past". The UIC plan was constructed with assistance and input from the Monitor and OHS and SIU should reconsider this plan.

The differences between the Monitor and IDOC on the quality improvement process and the audit and the misunderstanding of the audit and performance and outcome measures demonstrates a significant lack of effective communication. On 11/15/22, the Monitor sent IDOC a letter stating that the audit was initiated without assistance or input from the Monitor as required by the Consent Decree and asked for further discussion. On 1/9/23, IDOC responded to the Monitor arguing that their belief is that the Monitor has given assistance to IDOC on both the quality program and the audit. IDOC was unable to provide reasonable examples of what they believe the assistance of the Monitor has been. Since the UIC phase II plan there has been minimal assistance.

IDOC, in collaboration with SIU, has initiated work on mortality review which will be discussed in a subsequent section of this report. This work is positive. To be effective, the findings of the mortality review team must now result in corrective action plans that will be integrated into the IDOC quality program.

In summary, IDOC ignores the Consent Decree requirement to implement a quality improvement program with the input and assistance of the Monitor. The newly appointed CQI coordinator is not qualified as she has no training or experience or training in CQI. The position description requires no prior quality improvement experience or training and is limited to only registered nurses. The CQI plan suffers from the same deficiencies as prior IDOC Implementation Plans; it is not a plan and reads more like policy statements. The audit component of the quality plan will not comprehensively audit which will not, in our opinion, result in compliance at the end of the ten year expected Consent Decree tenure. IDOC has initiated work on the mortality review process which is positive but incomplete. The lack of progress and regression in the audit process puts IDOC on a path toward a rating of noncompliance. The rating of partial compliance is cautiously

---

[18] This is found in Attachment B of this report.

continued due to IDOC's continued involvement with SIU medical center and its Office of Correctional Health, the establishment of the System Leadership Council, the formation of an independent mortality review process staffed, in part, by SIU providers, and the initiation, albeit modest, of systemwide performance and outcome measurements.

**RECOMMENDATIONS**:

1. ***IDOC needs to permit the Monitor to determine the manner to provide assistance and input to IDOC including the agenda, the schedule, and attendees. IDOC counsel should not be responsible for controlling the schedule, manner of meeting, or attendees of meetings the Monitor needs in order to provide input or assistance on the quality improvement program or Implementation Plan. The Monitor has recommended and continues to recommend a working group for this purpose***.

2. The quality program implementation plan needs to include assistance and input from the Monitor to include:
   a. Structure of the statewide and facility level quality programs including quality committees at both the State and facility level.
   b. Development of an audit instrument;
   c. Hiring of audit teams and development of the audit instrument;
   d. Implementation of the audit function;
   e. Implementation of integrating audit findings into the quality program;
   f. Determining the need and hire personnel for a data team to extract data from the electronic medical record and other sources for purposes of validating performance. Staffing recommendations are found in the Monitor's 2nd Report in the Medical Records section.
   g. Include expert system engineering consultation in augmenting quality improvement efforts;
   h. Develop and maintain through its data team a performance and outcome dashboard;
   i. Develop and implement a standardized adverse event system statewide; and
   j. Implement consultation and training expertise to facilities on how to perform quality improvement.

3. Revise the position description of the statewide Quality Improvement Coordinator.

4. Revise the Implementation Plan and Staffing Plan to address the requirements of the Consent Decree with respect to quality improvement taking into consideration the need for statewide efforts.

5. The current statewide Quality Improvement Coordinator and facility quality improvement coordinators should undergo Institute for Healthcare Improvement Open School training on quality improvement capability and patient safety and undergo six sigma green belt training sufficient for a senior level quality leader.

6. Incorporate data team, quality improvement consultants, and process improvement staff into the Staffing Analysis and the OHS table of organization.

7. Utilize concepts of the UIC draft quality program in new quality proposals including:
   a. An OHS statewide quality committee to oversee quality statewide.
   b. Audit teams to audit facilities once a year and identify opportunities for improvement that form the corrective action items for facility quality teams.

    c. Mortality review teams embedded in audit teams.

    d. Data and information technology teams that work centrally and support the electronic record and obtain data for statewide quality efforts.

    e. Inclusion of process improvement staff (system engineers) who work statewide to solve systemic issues, improve quality, improve processes, and reduce cost.

    f. Quality improvement consultants who train facility staff and mentor them in their quality projects.

8. Dental Director to work with QI to determine adverse reporting, audit instrument, process improvement, outcome and performance measures, and quality improvement reporting requirements for the dental program.

9. SIU should memorialize a statement of work with IDOC and update that statement as their responsibilities change.

10. The quality improvement policy needs to include definitions of the audit (II.B.9.), the performance and outcome measures (II.B.7.), and address all other provisions of the Consent Decree that relate to quality (II.B.6.i.; II.B.6.l.; II.B.6.m.; II.B.6.n.; II.B.6.o.; II.B.7.; II.B.9.; III.L.1.; III.M.2.).

11. Hire a qualified quality improvement coordinator.

12. The Monitor asks that IDOC describe how their Quality Improvement Plan will result in compliance with the Consent Decree in the six remaining years of the Decree.


**Audits**
*Addresses item II.B.9*
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:** The Monitor requested two documents from IDOC and both were provided. These were the audits related to provision II.B.9. and the audit instrument. The Monitor asked to meet with the team that performs the clinical quality measures audit. IDOC did not do this. Instead, Defendant's counsel arranged a meeting with the Chief OHS and the SIU head of the correctional medical program. The Monitor still wants to meet with the team that actually performs the audits.

IDOC has partly implemented two of the 13 recommendations from the last report. None of the other recommendations were completed.

1. One recommendation was to hire the audit team. The Monitor recommended two audit teams for **comprehensive** audits. Since SIU is not performing comprehensive audits, the number of staff necessary is considerably less. Because it has not been made clear what else these staff will do, the Monitor has no opinion on the SIU staffing.

2. The Monitor recommended that IDOC integrate performance and outcome measures and adverse event monitoring into audit results. Instead, IDOC directed SIU to develop and assess 12 performance and outcome measures as their "clinical quality audit".

IDOC has confirmed in a conference call that they have not developed or initiated any audit related to the Consent Decree requirement in II.B.9. There has been confusion related to the use of the word audit. The Monitor has expected that the audit is related to II.B.9., but IDOC has been using the word audit in a colloquial sense and not in a legal sense related to the Consent Decree.

The Monitor views the audit (II.B.9.) as the systematic review and analysis used to evaluate the IDOC medical program against all requirements of the Consent Decree and assess IDOC's movement toward compliance with the Consent Decree. The specific provisions of the Consent Decree (provisions III.A-M.) do not call out all elements required to obtain adequate medical care as described in the general requirements of the Decree. For example, the Consent Decree does not specifically require heat or running water in the clinic, gynecological examination tables, appropriate numbers of dental hygienist, an infection control program, a dental operatory, administrative office space, medication carts, a vehicle to transport inmates for specialty appointments, wheelchairs for the disabled, sanitary processes to administer medication, dental chairs, adequate mangement of patients with chronic disease, pharmacy support so medications can be managed safely, etc. But these are all components or necessities in order to have an adequate medical program. The responsibility to determine whether compliance with the Consent Decree has been met requires a judgement as to whether the aggregate services provided are adequate based on what an adequate medical program should have and this judgment is assigned by the Consent Decree to the Monitor. A representation of the scope of monitoring required to evaluate whether a medical program is adequate is seen in the table below.

| Elements of a Health Program Needed For Compliance with Consent Decree | | |
|---|---|---|
| **Element** | | **Examples of evidence** |
| Structural Adequacy | Physical | Sufficient staff to perform, rooms sufficient to conduct health and dental operations, specialized housing, electronic record, vehicles to transport inmates for offsite appointments, equipment, supplies, medical references, access to specialists, etc. |
| | Staff Related Processes | Scheduling appointments, policies and procedures, movement of patients for appointments, medication administration processes, drawing labs, taking x-rays, scheduling specialty appointments, coordinating vaccinations and preventive care and tracking same, etc. |
| Population performance and outcomes | Performance | Measurement of rates of persons appropriately screened for cancers, receive age/disease related vaccinations, receive age/gender related preventive screenings, receive timely appointments related to their need, etc.. These include many HEDIS measures. |
| | Outcome | Rates of disease control, some HEDIS-like measures, etc. |
| Adequate individual care | Clinical Care | Care for the individual patient is adequate for sick call, chronic and acute care, infirmary care, follow up of specialty and hospital care including timely referral for specialty or hospital care when indicated, etc. |
| Evidence of Analysis of Care | Quality Improvement | Effective quality improvement. Analysis and actions on: adverse event reporting, performance and outcome measures, patient safety issues, audits, surveillance and other data, and any operational data or monitoring reports. Effective corrective actions based on analysis of data and audits |

The Consent Decree also required IDOC to provide proof of practice for the Consent Decree requirements.

> *Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance,*[19]

The Monitor has asked that the audit (II.B.9.) provide the proof of practice for progress towards compliance required in provision V.G. This requires that the audit be comprehensive because the proof of practice is against all requirements of the Consent Decree.

---

[19] Item V.G of the Consent Decree

The Monitor has offered and continues to offer assistance to design and develop the audit instrument and to train the audit staff in performance of audits. Both offers have been declined. IDOC designed its own audit, but it is unrelated to provision II.B.9. This has not produced an audit that satisfactorily audits against all provisions of the Consent Decree. IDOC's quality improvement policy and the FY23 Quality Improvement Plan do not specifically state how IDOC conforms to the audit requirement (II.B.9) of the Consent Decree. It describes audit processes, one by SIU and one by the IDOC's Division of Compliance, but neither describes an audit process that satisfies provision II.B.9. Apparently, neither is intended to do so.

IDOC has separated its audit process into two components[20]. One component is a compliance audit performed by IDOC's existing Compliance Unit and the second component is a "quality" audit performed by SIU auditors. The Compliance Unit is not under OHS direction and OHS does not oversee the compliance audit process. IDOC has provided the Monitor no information on the Compliance Unit methodology and the only information the Monitor has about the Compliance Unit is what can be gleaned from the Internet and nine FY22 External Reviews conducted in 2021 and provided to the Monitor for his 5th Report. The Compliance Unit audits are referenced in IDOC's FY23 Quality Improvement Plan. IDOC has provided no recent reports of this group as proof of practice of their work.

The Compliance Unit has audited IDOC facilities for decades. In 2019, IDOC entered into a Consent Decree under Federal Court supervision despite continuous auditing by the IDOC Compliance Unit which verifies that the Compliance audits were ineffective[21] in establishing or contributing to a constitutionally adequate health program. These audits do not assess quality of care, only that an episode of care occurred. The questions these audits ask do not appear designed to actually improve services and are not critical to important processes in a health program. IDOC has not informed the Monitor of any changes to the Compliance Unit's methodology or actual audit instrument. Its audits would not be consistent with requirements of the Consent Decree and do not provide the proof of practice required in the V.G. provision. IDOC added a nurse[22] to the Compliance Unit but has not provided information about the group's current methodology, current practices, or current audit results. Prior audits did not address the critical deficiencies of the

---

[20] The audits described in the FY23 Quality Improvement Plan include audits as described in this paragraph. On a conference call in February 2023, OHS stated that the audits performed by SIU are not part of the audit related to provision II.B.9. of the Consent Decree. OHS further stated that OHS is not involved in auditing with respect to II.B.9. This is in conflict with the description of audits in the FY23 Quality Improvement Plan. IDOC should clarify their definition of audits in its FY23 Quality Improvement Plan and define what audit represents the audit related to II.B.9.

[21] Audits from 2021 question whether physicians and nurse write the inmates name, identification number, date, time and signature on their notes. The most common type of question is whether an event required by the administrative directive was accomplished. For example, one question asked whether acute inmates admitted to the infirmary units are seen by a provider at intervals directed by the administrative directive which for acute patients is 3 times a week. However, as our medical record reviews show, many infirmary notes often fail to address the patient's actual problems so even if three visits a week are documented, the care might be inadequate. Also, if the patient's problem warranted daily visits the additional monitoring needed will not have been identified. Another question asks whether persons with certain diseases are seen in certain months of the year correlating with particular chronic disease clinic schedules. The Monitor has found this practice to be harmful and has recommended that all diseases be monitored at each chronic clinic visit and that they be scheduled as often as is clinically necessary to control their disease. The audit also fails to monitor whether all of the patient's chronic illnesses are monitored.

[22] This nurse's title is Medical Compliance Administrator

medical program. The Monitor has requested the current audit tools utlized by the Compliance Unit and asked for a meeting with the Medical Compliance Administrator.

The remainder of the audit process in the FY23 Quality Improvement Plan is described as a "clinical quality audit". This audit is not comprehensive and fails to monitor or audit most requirements of the Consent Decree[23]. It will not identify or correct most existing program deficiencies that are barriers to compliance. Neither the compliance nor the clinical audits developed by IDOC address physical structural, staff related proceses, audits of individual quality of care, or audits of the quality improvement program. Individual clinical care is modestly addressed in mortality review but that is not clearly integrated into the audit process. Individual care including in sick call, chronic care, infirmary care, and management of specialty care are not addressed in IDOC "clinical quality audits". Many deficiencies will remain unresolved. IDOC acknowledged in a recent conference call, that this clinical quality audit consists of performance and outcome measures and is not the audit required in the Consent Decree in provision II.B.9.

Recently, from July to September of 2022, IDOC completed its first set of clinical quality measures audits of each facility. The Compliance Unit portion of the audit was not included in the results. IDOC's "clinical quality audit" consisted of a review of ten medical records to answer 12 performance/outcome measure questions. IDOC anticipates performing this audit four times a year so that 40 records for each of 12 questions will be assessed annually at each correctional center. The measures are mostly versions of HEDIS measures[24] which are performance and outcome measures and by themselves do not verify an adequate medical program.

Attachment D to this report is a comparison of the IDOC findings of their audit of Dixon with findings from the Monitor's recent visit to that facility and shows a large gap in findings and shows why a comprehensive audit is necessary to provide proof of practice of compliance with the Consent Decree to satisfy provision II.B.9. Based on the findings of this first clinical measures audit, IDOC believes it will develop corrective actions to address deficiencies in colorectal cancer screening. This will be determined after the annual audits are completed. The Monitor advised IDOC that at this rate of corrective actions, it is inconceivable that compliance with the Consent Decree will be attained within the remaining six years and it will likely take decades. IDOC believes that this is the maximum auditing that they can now reasonably perform. Their principle is based on incremental change.

Because IDOC does not now have an audit process satisfying requirements of provision II.B.9, because existing audits are not comprehensive, because IDOC fails to provide proof of practice against requirements of the Consent Decree, because IDOC fails to include assistance and input from the Monitor, and does not timely move the IDOC towards compliance with the Consent Decree this provision is found noncompliant.

**RECOMMENDATIONS:**
1. Implementation of the audit function needs to include:

---

[23] Attachment C shows a side by side comparison of an audit the Monitor was planning to propose and the current IDOC clinical quality measures audit.
[24] Ten of the 12 measures are HEDIS outcome and performance measures. Two measures: sick call and COVID vaccination are not HEDIS measures.

    a. OHS, SIU, and Monitors to develop audit instrument.
    b. Determine the scope of work for the audit team.
    c. Hire the audit team.
    d. Audit team to train with Monitor on site visits.
    e. OHS, the audit team, and the Monitor need to develop a contract monitoring instrument based on audit, performance and outcome measures, staffing, and adherence to Consent Decree.
    f. Audit team to deliver contract monitoring reports to Monitor and OHS leadership; obtain feedback; and take any necessary corrective action.
    g. Develop infection control monitoring elements to be part of safety and sanitation audits.
    h. Develop safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.
    i. Test safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.
    j. Develop questions necessary to demonstrate compliance with dental program items III.K.1-13. Consider and determine who is to perform dental audits.
    k. Include mortality review and vendor monitoring as part of audit team responsibility.
    l. Integrate performance and outcome measures and adverse event monitoring into audit results.

2. Audits should result in a report that lists opportunities for improvement that are addressed through the quality improvement process. Follow up should occur until a problem is satisfactorily resolved.

**Performance and Outcome Measure Results**

*Addresses items II.B.7*
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor had only one document request: any documentation of progress in development of statewide performance and outcome measures and a dashboard. No information was provided for this request. However, OHS confirmed in a conference call that their information sent as the audit (II.B.9.) was actually a group of performance and outcome measures. These 12 measures were received and are discussed below.

Recommendation two was partly accomplished. IDOC has developed a group of 12 performance and outcome measures but have not yet initiated the process of corrective actions through the quality program. The remaining three recommendations were not addressed.

Similar to the audit (II.B.9.) IDOC has not defined in policy or in its quality plan what its performance and outcome measures (II.B.7.) are. Because IDOC is being monitored under a Consent Decree these definitions do matter and cannot be ignored. For verification purposes, IDOC needs to specifically state what constitutes their audit (II.B.9.) and performance and outcome measures (II.B.7.) which has not yet been done.

IDOC has developed 12 performance and outcome measures which are defined in a glossary. Three of the measures are outcome measures and nine are performance measures. Ten records are evaluated for each measure four times a year. The glossary does not include a sample size determination. Standardize tracking of the data is not incorporated into IDOC operations nor is an electronic medical record available. Therefore, manual record review is used to obtain data. Currently, SIU sends nurses and nurse practitioners to facilities to obtain data from paper records. This level of clinical staff is probably wasteful to obtain this data because clinical judgment is unnecessary to obtain the data on these measures. This might be different in an audit where, for example, the quality of the nurse evaluation should be assessed. If only the timeliness of the sick call response is being assessed a nurse evaluation is unnecessary. The Monitor has repeatedly encouraged IDOC to obtain data staff so that when the electronic medical record is put into place, measures can be obtained electronically for 100% of the population.

For each measure IDOC established a goal. The basis for the goal was not stated but for half the measures, the goal does not measure what is required by the Consent Decree. For five measures, the Consent Decree requires that all inmates be ***offered*** certain services but the performance measures have a goal related to whether they ***received*** the service not whether they were offered the service. This makes it difficult to determine whether IDOC is compliant with the Consent Decree. While receipt of the service is the critical feature, the performance measure can't be used to verify the Consent Decree. Both the offer and the receipt of service should be measured. This may be easier to verify when an electronic record is implemented. The rate of receiving the service is a useful measure, but has to be separately interpreted by the Monitor. This is shown in the table below.

| Comparison of Consent Decree Requirement and IDOC Performance Measure Goal | | |
|---|---|---|
| **Consent Decree Requirement** | **IDOC Measure** | **IDOC Goal** |
| *III.K.8. Routine and regular dental cleanings shall be provided* **to all prisoners** *at every IDOC facility. Cleanings shall take place at least once every two years or as otherwise medically indicated.* | Percentage of patients who had a dental visit, including examination and cleaning, within the last 2 years. | 90% |
| *III.M.1.a.* **All prisoners will be offered** *an annual influenza vaccination .* | Percentage of patients who received the flu vaccine between August 1st and July 31st of the previous year. | 50% |
| *III.M.1.b.* **All prisoners with chronic diseases will be offered** *the required immunization as established by the Federal Bureau of Prisons .* The 01/15/21 Administrative Directive on Immunization recommends: Hib, Hep A, Hep B, HPV, Influenza, MMR, Meningococcal vaccine, Pneumococcal vaccine, Shingles, Tdap, Td | Percentage of adults aged 66 years or older who report ever having received one or more pneumococcal vaccinations. | 50% |
| *III.M.1.b.* **All prisoners with chronic diseases will be offered** *the required immunization as established by the Federal Bureau of Prisons.* The FBOP recommends COVID vaccine for **all inmates.** IDOC should not restrict COVID vaccination to just chronic illness patients but should have a goal of vaccination of 100% of inmates for COVID. | Percentage of patients who received the COVID vaccine. | 50% |
| *III.M.1.c.* **All prisoners ages 50-75 will be offered** *annual colrectal cancer screening* | Percentage of patients 41-75 years of age who received colorectal cancer screening (in the form of a fecal immunochemical test (FIT), FIT-DNA, sigmoidoscopy, colonography, or colonoscopy) within the appropriate timeframe. | 90% |
| *III.M.1.d.* **All female prisoners age 45 or older will be offered** *a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated* | Percentage of women 51-74 who had at least one mammogram to screen for breast cancer in the past two years. | 90% |

There was one measure that appeared inaccurate. The Consent Decree requires that colorectal cancer screening begin at age 50, which was the previous recommendation of the United States Preventive Services Task Force (USPSTF). They have since modified their recommendation to age 45 which is also the recommendation of the American Cancer Society. The IDOC colon cancer screening measure defines 41 as the age when colon cancer screening begins. If age 41 was used, the IDOC measure may have overestimated the number of persons not screened. The Monitor recommends that the Consent Decree should be changed to state that IDOC will follow the USPTF cancer screening A and B recommendations[25].

Another issue involved mammography screening. The Consent Decree requires that females over age 45 be offered a mammography at baseline and then every 24 months. The USPSTF recommends to start biennial screening at age 50 and that screening between ages 40-50 should be an individual decision based on a discussion of risks and benefits. The American Cancer Society recommends annual screening between ages 45-54 and biennial screening after age 55. The IDOC mammography measure is consistent with the USPSTF but is not consistent with the Consent Decree. The Monitor recommends using the A and B recommendations of the USPSTF and agrees with IDOC mammography screening. The Parties should discuss modification of the Consent Decree to state the IDOC should adhere to the A and B recommendations of the USPSTF on cancer screening which would also eliminate PSA testing for prostate cancer screening. The reason to use the A and B recommendations is that these guidelines periodically change based on new data and the Consent Decree should not recommend a dated practice.

---

[25] IDOC's consultant concurred that the USPSTF standard does recommend initiation of colon cancer screening at 45 years of age. IDOC said they would make this correction.

OHS leadership has communicated that these measures are the first effort to put a measuring process into place. They have currently chosen to focus on these twelve measures and that additional or different measures will be considered and measured in the future. The measures do not yet sample a wide range of performance measures that are barriers to compliance.[26] The measures are currently slanted towards diabetes care (33% of measures) and vaccination (25% of measures). The Monitor recommends IDOC to expand the measures to include all areas that are barriers to compliance.

Measures will be obtained quarterly for a year and may or may not be continued. The Monitor recommends measures be continuously obtained and discarded when they have steadily shown compliance and/or no longer serve a useful purpose. The FY23 Quality Improvement Plan states that when clinical audit thresholds are not met, SIU will assign a corrective action. Though seven of the 12 measures scored below the IDOC goal, the Monitor has received no documentation that corrective actions have been initiated based on the initial quarterly measurements. On a conference call, the OHS said that the initial measurements were used as baseline data and that after the second quarterly batch of measurements OHS has decided to initiate a correctional action on colon cancer screening that will focus on staff education and training and the availability of the FIT testing kit in the facilities. No information was provided that corrective actions have been planned yet for the other six measures that are not meeting the IDOC goals. This misses the opportunity to make improvements based on the data.

IDOC does not define how these measures will be used. Measures are not used on a dashboard for all facilities to view. The results should be shared with all facilities and staff. The data could easily be imported to an electronic dashboard that could be available to all sites. The purpose of performance and outcome dashboards is to provide a quick look at performance measures that identify positive and negative trends and give users an indication of where staff need to focus attention. The Monitor continues to recommend that IDOC display their results on an electronic dashboard shared with all facilities. The Monitor has also recommended a data team to obtain data automatically from the electronic medical record.

IDOC is currently providing the data from these performance and outcome measures (II.B.7.) to the Monitor as evidence of the audit (II.B.9.). OHS leadership was clear that this data is not the audit related to II.B.9.[27] The performance and outcomes data is unacceptable as the audit (II.B.9.) because it does not comprehensively evaluate the medical program.

In summary, IDOC has initiated performance and outcome measures. There is internal confusion, within IDOC, regarding what audits relate to II.B.9. and what data is related to II.B.7. IDOC has initiated a small set of performance and outcome measures. Data is captured manually by SIU

---

[26] Examples of important non-clinical measures not currently used include percent of scheduled appointments that are completed and percent cancelled due to custody, time to complete a routine specialty care appointment and number and percent of specialty appointments extending beyond recommended time to completion, staffing vacancy rate, time to hire an employee, whether appropriate equipment is available, number of grievances, or whether patients obtain appropriate housing consistent with their medical condition.

[27] In response to the data request "any reports or audits related to Consent Decree item II.B.9." IDOC counsel sent the 1st quarter clinical quality measures audit which the Chief OHS said was not the audit referred to in the Consent Decree. He added that these measures were performance and outcome measures. II.B.9. and II.B.7. should be defined in IDOC policy so that it is clear to the Monitor what IDOC is doing.

RNs and advance practice nurses but almost all of the data for this set of measures can be acquired by trained clerical staff. There is no electronic methodology currently to obtain the data. The vaccination and cancer screening measures should include an accompanying measure to document the number of inmates who were offered the service as well as a measure that documents the number who received the service. Sample size is not considered but may be an issue for some of the measures. IDOC should work to incorporate into the new electronic record methods to capture data for these measures electronically. These measures are not currently utilized in a continuous manner which should be done. Insufficient measures are in place and existing measures do not measure many key components of the medical program or existing problem areas within IDOC's medical program. This is an initial start at obtaining performance and outcome measures. Much work remains. Partial compliance is warranted. Recommendations five to eight are new recommendations.

**RECOMMENDATIONS**:

1. The performance and outcome measures should be centralized and based on obtaining data automatically from the electronic record, laboratory, and other sources. Measures should be presented on an electronic dashboard that can be viewed at any workstation in any facility statewide.
2. Performance and outcome measures should be used by facilities as a guide to their performance and to inform the quality program of necessary improvements.
3. Include performance measures in the Implementation Plan which should include:
   a. Who will maintain this dashboard?
   b. How will data be displayed to staff and how OHS intends staff to use the dashboard?
   c. Development of a glossary of definitions including
      i. A narrative definition of the metric
      ii. Numerator and denominator
      iii. How the metric is calculated
      iv. The data source
      v. Reporting frequency
      vi. A goal.
   d. How will measures be integrated into the quality program.
4. Include this provision in a quality improvement work group.
5. Performance and outcome measures should be presented monthly or quarterly on a continuous basis.
6. Data that relates to specific Consent Decree requirements should be captured in a manner to verify the requirement of the Consent Decree. In the case of vaccinations and cancer screening both the offer and receipt of the service should be obtained.
7. IDOC, in preparation of implementation of an electronic medical record should anticipate how it will be able to capture data for its dashboard electronically from the medical record.
8. Additional performance and outcome measures should be provided as IDOC increases capacity to do so. Non-clinical measures pertinent to the Consent Decree should be added.

**Adverse Event and Incident Reporting Systems**

*Addresses Items II.B.6.m; II.B.6.n*
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

No information requested by the Monitor with respect to adverse event monitoring has been provided. None of the recommendations in the last report were accomplished. An adverse event reporting program has not been proposed or implemented. The recent audit of IDOC provided no proof of compliance for this provision. This provision remains noncompliant.

**RECOMMENDATIONS:**
1. IDOC needs to develop an adverse event and incident reporting system. This system should be electronic and centralized. This can be through 3rd party software or internally developed through the quality committee using the internal data team.
2. Adverse event reporting needs to have capacity to allow anonymous reports. Staff need to be encouraged to reports errors and believe that report of errors will not result in discipline.
3. Adverse event reporting needs to be supported and maintained by the OHS. Data from this reporting system must be integrated into the quality program.
4. Implementation of the adverse event reporting system should be integrated into a quality improvement work group.

**Vendor Monitoring**

*Addresses II.B.2.*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

IDOC sent the Monitor the contract monitoring database.

31

From January through September of 2022 monthly monitoring was done for only seven facilities.[28] Seven facilities had no monthly monitoring completed. The remaining 15 facilities had monitoring performed, on average, five of the nine months.

The contract monitoring data is not effectively presented. It lists 1,087,795 gross hours of work not provided since October of 2019 or about 523 full time equivalent employees vacant over the last three years or about 174 full time equivalents not provided per year. The information about vacancies is tracked in a staffing table provided to us by IDOC and the vendor vacancies including in key positions is known but there no evidence was provided that shows that any action is being taken for persistently high vacancy rates[29]. There were 34,837 noncompliance citations for either the administrative directives or the contract. A list of every citation is listed by number but these are not collated or described so it wasn't clear what were the deficiencies of the vendor and there was no effort in the document to identify key deficiencies. Despite the poor performance with staffing, there are no corrective actions or penalties documented. Despite the citations for administrative directive and contract noncompliance there are no corrective actions. It was not clear if there were any citations for individual clinical care though the Monitor has found multiple examples of these. The recent IDOC audit only audits 12 HEDIS like measures; a comprehensive audit is needed.

Current monitoring is ineffective in changing staffing deficiencies and apparently contract and administrative directive deficiencies. Insufficient information was provided to understand administrative directive and contract deficiencies. In any case monitoring is ineffective as there is no evidence of improvement.

**RECOMMENDATIONS**:
1. IDOC needs to develop a meaningful vendor monitoring system that monitors quality of care, physician quality, and ability to hire contracted staff against contract requirements. This can be joined with the audit process. Monitoring should be standardized across facilities so comparisons can be made. The Monitor's recommendation is to provide this service through the audit team.

**Mortality Review**

*Addresses items II.B.6.i; III.M.2;*
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

---

[28] This information was provided in document request #45 and was titled "Contract Monitoring Database". It was not clear who performs this monitoring.
[29] Nevertheless, OHS has initiated regularly scheduled meetings with Central Management Services (CMS), the medical and dental care vendor, and IDOC to address IDOC health care vacancies.

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor asked for the following information with respect to this report.

1. IDOC sent a mortality list for deaths through part of October 2022. The list does not include all information requested including date of incarceration, whether the autopsy was done with the date of the autopsy, and information as to whether the mortality review was completed. We also asked for the cause of death but only 25 (38%) of 66 persons who died in 2022 had a cause of death provided. In some cases, the cause of death is pending the autopsy. However, autopsy reports are rarely sent to the Monitor and do not appear to be performed or obtained for most deaths.

2. Copies of the mortality review committee meeting minutes to date. These were not provided.

3. Copies of each death summary completed by the Responsible Facility Healthcare Provider as they are generated. These were not provided. ]

4. Copies of mortality reviews completed by the mortality review committee including mortality check list, taxonomy, and autopsy reports as mortalities occur. Thirty one mortality reviews were provided.

5. Autopsies for every death as soon as it is available. None were provided.

6. Copy of 2 years of chart for all deaths as they occur. Thirty six of 66 death records were provided but many records had missing documents.

7. List of all deaths reviewed by mortality review committee as they are reviewed. This has not been provided.

8. List of all peer reviews performed as a result of mortality reviews. Include the actual peer review. None were provided so presumably there were no referrals to peer review.

9. Latest REDCap mortality data. This was not provided.

10. System-wide corrective actions or process analyses initiated due to mortality reviews. None were provided so presumably no corrective actions have been initiated.

The Monitor asked to meet with the group that performs the mortality reviews. Instead, Defendant's counsel scheduled a meeting with the Chief OHS and the SIU Director of the Correctional Medical Program. The Monitor still wants to meet with the SIU clinical staff that performs the mortality reviews. The Monitor team has asked to attend mortality review meeting and IDOC said they would consider that request.

IDOC provided a spreadsheet of deaths but does not yet track date of incarceration, whether an autopsy was done, the date of autopsy, and whether a mortality review was completed. This information, and other data, is tracked by SIU in their Research Electronic Data Capture (REDCap) system but the Monitor does not have access to this information. The Monitor needs to have access to REDCap as it is the repository of mortality review information. Death records sent to the Monitor team do not include the mental health record, some prescriptions, and occasionally other record documents which should be sent. Mental health records are important when comorbid mental health disease is present and are especially important to understand who prescribed medications.

Over the first ten months of 2022, there were 66 deaths. The decline in deaths is likely related to

the reduction in COVID deaths. The number of deaths will likely be lower on average for a year or two post-COVID. If the number of deaths for 2022 is pro-rated for the ten months, the average death rate for the past 6 years is 90 deaths a year but has varied considerably due to the COVID pandemic. The following table gives a summary of deaths up to October of 2022.

| Annual Deaths IDOC 2017 to 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 through October | 2022 pro-rated |
| Deaths | 104 | 83 | 94 | 168 | 125 | 66 | 79 |
| Cause of Death Stated * | 100 | 80 | 86 | 138 | 115 | 25 | |
| Mortality reviews done | 0 | 0 | 0 | 0 | 0 | 31 | |

IDOC submitted a draft mortality review policy 9/14/22. A final policy was sent to the Monitor 9/20/22 with notification that it would be implemented 10/1/22. The Monitor sent comments on the policy to IDOC on 10/27/22 but there has been no response.

Key comments from the Monitor to the mortality policy included the following:
1. The policy implies but does not state that all deaths are reviewed. It should clearly state that all deaths are reviewed.
2. The policy documents that process problems are referred to the Compliance Quality Group which reports to the Chief Compliance Officer. This group is not part of OHS and is not under medical supervision. The Monitor does not agree with having this group address process problems of the medical program except as they relate to custody operations such as transporting inmates for appointments.
3. Findings of mortality review are documented in REDCap. This is a formatted data entry software program. The formatted options for opportunities for improvement should be more open ended so that a broader array of deficiencies can be identified.
4. An additional comment is that the mortality review committee is mentioned in the policy but the policy is silent with respect to who is on the committee, what is discussed at the meetings, and what the function of this committee is.

Aggregate data from REDCap was not made available to the Monitor. The Monitor needs access to this data to evaluate what has been learned from these reviews.

IDOC provided 31 mortality reviews performed by SIU clinical staff and staff from the office of correctional medicine. These reviews are a positive development. IDOC has not made the SIU mortality review team accessible to the Monitor team so the Monitor team has, so far, been unable to question them about their work. The Monitor reviewed 14 death records that were also reviewed by the mortality committee. In only two records were there no common findings. Most records had one or more common findings. The reviews are written in different formats so comparisons are difficult. The Monitor and SIU do not review the identical records. It appears that SIU receives more mental health notes than are made available to the Monitor; SIU had more findings in the area of mental health. The Monitor reviews two years of records in order to assess chronic care, specialty care, infirmary care, and nursing care. This is in line with the Consent Decree requirement to identify deficiencies and to undertake corrective actions on those deficiencies. SIU

only reviews a year of the record so the findings of the Monitor are more numerous and include a greater span of deficiencies. Monitor findings extend into chronic care, specialty care, infirmary care, medication management, and staffing. It would be extremely useful for SIU to expand their scope on these reviews as it would assist IDOC in movement towards compliance. It would also be consistent with the Consent Decree requirement to identify deficiencies. This is a reasonable start to this project. The Monitor looks forward to meeting this group.

The SIU reviews included no referrals to peer review. In one mortality review[30], the Monitor identified a physician who, based on provision III.A.3., should not be working in IDOC. OHS has previously been verbally notified about this physician who has multiple prior issues found on mortality review.

According to the recently implemented policy on mortality review, data from the mortality review findings are entered into the REDCap database and these completed reviews are then made available to OHS staff. The IDOC Quality Improvement Coordinator is to include the minutes of the mortality review committee at the next System Leadership Council meeting to discuss findings. The Monitor has asked for but not yet received the mortality review meeting minutes. The System Leadership Council is to review the findings and make policy or staffing changes. The Chief OHS told the Monitor that these reviews will result in corrective actions. He said that OHS was in the process of providing summary feedback to facilities. OHS is developing a report on mortalities for the first year of work. None on the corrective action information has been provided to the Monitor.

The Monitor reviewed 17 records in detail.[31] Numerous opportunities for improvement were identified.

In summary, IDOC has begun implementation of a mortality review policy The reviews are a positive development. Findings are being identified. The Monitor suggests the scope of review be widened to include other aspects of care that are not specifically related to the cause of death. The Monitor has not been provided all requested information. It is unclear how deficiencies will translate into corrective actions but IDOC states an annual summary with corrective actions are being developed. A partial compliance is warranted.

**RECOMMENDATIONS**:

1. Provide all death records to the Monitor as they occur. These should include two years of all aspects of the paper record. The Monitor and his consultants should all have remote access to the electronic record for every site that implements the electronic record.
2. All deaths should include an autopsy.
3. Provide a tracking log of all deaths at least quarterly. This log should include name, IDOC #, date of death, age, date of incarceration, facility at time of death, category of death, cause of death, whether the death was expected or unexpected, whether an autopsy was

---

[30] Mortality review patient 5
[31] Presented as Attachment E to this report.

done and the date of the autopsy. The log should also include whether a mortality review has been completed.

4. A mortality review should be performed for each death by an audit team. The mortality review needs to include at a minimum:
   a. Date of review
   b. Patient name
   c. IDOC number
   d. Date of death
   e. Age and date of birth
   f. Facility at the time of death
   g. Place of death (e.g., hospital, infirmary, etc.)
   h. Category of death (natural, homicide, suicide, etc.)
   i. Expected or unexpected death
   j. Cause of death
   k. Mental health diagnoses
   l. Medical diagnoses
   m. IDOC problem list
   n. Medications at facility at the time of death
   o. Case summary[32] that includes both nursing and physician input, a summary of the care of the patient for their illnesses and care related to the cause of death or care that identifies opportunities for improvement.
   p. Autopsy diagnosis
   q. Documentation of opportunities for improvement and recommendations for corrective action when appropriate
   r. Identified opportunities for improvement need to be evaluated by the OHS quality committee. That committee needs to decide if corrective action and what corrective action is appropriate and assign responsibility for corrective action either to the facility quality committee or to an OHS responsible party. The OHS quality committee should monitor progress on resolution of the corrective action until it is completed. The facility quality improvement meeting minutes need to document their progress in resolving corrective action.

5. The quality improvement discussion regarding mortality review should be educational with a goal towards improving care.

6. Line staff employees should have an opportunity to provide anonymous information regarding events surrounding a death with an aim toward improving patient safety. A process for this should be established.

7. The quality improvement coordinator and audit teams[33] should conduct follow up with facility quality programs to monitor actions taken to improve care based on information learned from mortality review.

---

[32] For deaths that involve suicide

[33] By this the Monitor intends that the audit team is the team that performs audits related to II.B.9. The Monitor was under the assumption that this would be SIU. If the audit team that performs audits related to II.B.9. is the Compliance Unit, then the Monitor would not make this recommendation as the Compliance Unit is not capable of conducting this follow up. This recommendation is therefore contingent on how IDOC decides to implement the audits related to provision II.B.9.

8.  SIU should begin using the mortality review template in an iterative manner to initiate mortality review.
9.  The opportunity for improvement section should be open ended to include findings in the record.  These should be captured as data elements if possible.
10. A nurse and a pharmacist should be added to the group of SIU physicians who will complete the template.  The pharmacist should be utilized on patients with polypharmacy or on patients determined by the physicians or nurses who have pharmacy issues.
11. SIU and the Monitor should establish a working group on quality to include mortality review.
12. IDOC needs to make REDCap accessible to the Monitor and his team.
13. The mortality review committee meetings should be open to the Monitor and his team.

# Medical Records

*Addresses item II.B.4; III.E.3; III.E.4; III.G.3*

**II.B. 4.**  *No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities.  Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract.*

**III.E.3.**  *IDOC shall abandon "drop-filing".*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**OVERALL COMPLIANCE RATING:**  Noncompliance

**FINDINGS:**

The Monitor asked for the following information with respect to this report.

1. Request 6.  **Any documents or summary of plans for a new electronic record.**  No documents received.

Approximately three and a half years after IDOC was to have a contract with a medical record vendor, IDOC still does not yet have a contract for an electronic medical record.  IDOC released a request for proposal on 1/19/23 with bid opening 3/13/23.  This likely means that the medical record will not be fully implemented until sometime in 2025.

IDOC has provided no evidence that "drop-filing" has been eliminated.  Information regarding tracking of receipt of offsite medical providers' reports was asked for but not received.  IDOC has provided no proof of practice for these provisions.

In summary, the signing of the contract for the electronic record will be approximately four years late.  IDOC provides no data or information to verify its compliance with any of the provisions regarding the medical record.  These provisions remain noncompliant.

**RECOMMENDATIONS:**

1. Base the roll out and device needs on expected numbers of employees and expected workflows and not on current employee numbers or existing workflows.
2. Modify the Staffing Analysis and Implementation Plan to include staff to manage and support the electronic medical records including initial and ongoing training for users and a help desk function.
3. Ensure that point-of-care[34] devices are integrated into the electronic medical record.
4. Ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record.
5. Ensure that the new electronic medical record has the capability to track and report clinical and operations data that is needed to assess IDOC's compliance with the Consent Decree and data that is vital to IDOC's ongoing efforts to track and improve the delivery of quality care.

# Policies and Procedures

**Medical & Dental**

*Addresses item II.B.8; III.K.4; III.K.5*

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
.
**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
On 9/14/22, IDOC sent the Monitor twelve new policies and on 11/9/22, IDOC sent an update with all current administrative directives. No other documents were requested for this provision.

Development of policies has been sporadic and disorganized. About two and a half years ago, IDOC was to have completed and implemented a comprehensive set of policies. In the beginning of the Consent Decree, IDOC provided the Monitor 25 draft policies to which the Monitor gave comments. These policies did not result in finalized policies and IDOC provided no further

---

[34] Point-of-care devices are small devices that provide a diagnostic test locally and which can be used by nursing or provider staff where care is delivered. These devices include glucometers to test blood glucose, or devices to test blood to determine whether anticoagulation (INR) is sufficient. Electronic vital sign machines are similar to point-of-care devices in so far that they can be connected to the electronic medical record and the testing results can be automatically directed to the appropriate place in the electronic medical record.

updates on these policies and they appear to have been discarded.  On 1/19/21, IDOC counsel sent the Monitor a final "draft" of an immunization and cancer prevention screening administrative directive.  This document was not on standard administrative directive format.  IDOC informed the Monitor that this administrative directive will be part of a Clinical Preventive Services policy that has not yet been written.   Presuming that this draft administrative directive will be the IDOC policy, there is limited evidence in record reviews that staff are consistently acting in accordance with the new policy.  The Monitor had given comments on this policy prior to its implementation and agrees with and supports its implementation.

On 9/14/22, IDOC counsel sent the Monitor a new set of 12 policies.  A week later, on 9/20/22, before the Monitor could send comments as required by the Consent Decree (II.B.8.), IDOC counsel sent an email stating that three of these policies (quality improvement, mortality and morbidity, and peer review), sent on 9/14/22 would be effective 10/1/22. This violates the directions of the Consent Decree for the Monitor to assist in development of the policies.  On 10/27/21 the Monitor sent comments[35] on the group of 12 policies, including the quality improvement policy but has received no further information about the comments or the policies. With the exception of a revised Administrative Directive titled Dental Care for Offenders,[36] IDOC has not provided any dental policies.

The twelve recent policies sent by IDOC read more like standards than policies and procedures specifically for IDOC.  For some policies, statements appear to be paraphrased or similar to National Commission on Correctional Healthcare (NCCHC) Standards.  Policies need to state specifically how IDOC facilities are to operate and not be generic statements similar to a standards manual.  An example is the policy A.02.01 Responsible Health Authority which is item II in the policy statement which states:

> The facility medical director's responsibilities are documented in a written agreement, contract, or job description

The NCCHC standard states:

> The RHA's [responsible health authority] responsibilities are documented in a written agreement, contract, or job description.

The IDOC policy states:

> The responsible health authority will be on-site at least weekly.

The NCCHC standard states:

---

[35] 12 comments on the morbidity and mortality policy, 29 comments on the quality improvement policy and 2 comments on the peer review policy.
[36] Administrative Directive 04.03.102, Dental Care for Offenders, effective dater 1/1/2020.  The Monitor has provided input on this administrative directive focusing on section F.6.b., which requires incarcerated persons to pay dental laboratory fees for replacement of dental prostheses, lost or broken due to the patient's negligence (as determined by the dentist).

The RHA [responsible health authority] must be on-site at least weekly.

Medical Directors must be on site the entire week not just weekly and HCUAs and not the Medical Directors are the responsible health authority. IDOC must write policies that are specific to IDOC and are not paraphrased from the NCCHC manual.

IDOC has notified the Monitor of no other implemented policies or draft policies. To date, there are now nine draft policies and 4 implemented policies, three of which the Monitor has not had an opportunity to provide assistance on before implementation. The Monitor has disagreements with three of the implemented policies. IDOC has therefore regressed from having 25 draft policies to now having 11.

The immunization and cancer prevention screening administrative directive has apparently been in effect since January of 2021 but IDOC provides no proof of practice that it has yet been implemented effectively.

The Monitor has not been informed of a person who will be responsible for writing policies and to whom the Monitor can communicate about policies. Early in the Consent Decree, the Monitor would communicate with the OHS Medical Coordinator on policies, but the recent set of policies was sent by IDOC counsel. When comments are sent to IDOC counsel, the Monitor is not certain that OHS has received the comments.

The IDOC has named a nurse to be the Healthcare Compliance Administrator. This person's official position description includes the responsibility of the following:

> "policy administrator developing and implementing policy affecting standards of care, ethics and licensing requirements for health and mental health services statewide; develops, implements and monitors policies and procedures related to established standards of care"

The position description of the Chief OHS effective 8/16/22 states that this position,

> "exercises principal programmatic responsibility for the formulation and implementation of statewide policy for Health Services and Mental Health Services"

These apparently conflicting position descriptions should be clarified. The Chief OHS should be responsible for medical policy and procedure.

In summary, two and a half years after they were due and four years after the start of the Consent Decree, IDOC is further from completing a comprehensive set of its policies than they were in 2021. Development and implementation of policies and procedures is disorganized. For the four policies that have been implemented, there is no proof of practice that they have been effectively implemented[37]. The Monitor has not been provided with the point of contact with the IDOC on

---

[37] Three policies (peer review, quality improvement, and mortality review) were recently implemented. IDOC has not provided evidence of the effectiveness of implementation. The immunization and cancer screening administrative directive has not been effectively implemented based on limited record reviews. For none of these four policies has IDOC provided evidence of effective implementation.

policies and the Monitor has not yet received comments back on all policies to which the Monitor has commented on. IDOC counsel asked to receive all communications but policy comments the Monitor sends to counsel appear to be ignored and the Monitor does not know if these are forwarded to the appropriate party because there is no response. IDOC position descriptions give conflicting statements regarding who is in charge of policies but a compliance employee is described in her official position description as responsible for development of IDOC medical policies and standards of care. IDOC has informed the Monitor of only four implemented policies, three of which were written without assistance of the Monitor. None have been effectively implemented. There are fewer draft policies now than existed in 2021. A partial compliance rating was given in the 5th report, but there is little evidence of progress. A partial compliance rating will be continued but some evidence of progress needs to be evident to continue this rating.

**RECOMMENDATIONS:**
1. Re-establish a timeline for completion of the comprehensive medical policies and include this in the Implementation Plan.
2. Complete the process of finishing drafts of policies.
3. Finalize the recommended changes to the policies.
4. Develop a plan to implement and disseminate policies. Include this in the Implementation Plan.
5. Start the Dental policies.
6. Eliminate the fee for replacement of dental prostheses as noted in Administrative Directive 04.03.102.II.F.6.b.
7. Ensure that policies describe changes necessary for compliance with the Consent Decree.
8. Provide to the Monitor all administrative directives, policies, and guidelines.
9. Provide the Monitor and his team access to SharePoint and any other internal shared server that contains policies, administrative directives, or guidelines.
10. Improve medical record organization, particularly the specialty consults and hospital records.
11. Hire a full-time project manager to oversee development of policies and procedures.
12. The Monitor should be either told which OHS person coordinates policy development or IDOC should inform the Monitor to whom comments on policies should be sent.

# Facility Specific Issues

# Facility Staffing

*Addresses items II.B.2; II.B.3; III.A.10;*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may*

*use licensed practical nurses in sick call, but only with appropriate supervision.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested five documents but received only two. We asked for the following.

1. Any plans for an academic medical center to provide physicians. We received no documentation for any plans, but were told that IDOC started a project with UIC to provide endocrinologists to provide diabetes consultation via telemedicine at a few facilities.
2. Any plans to obtain credentialed physicians other than through an academic center. No information was provided nor did IDOC state there was no information.
3. Assignments for physician, nurse practitioner, and physician assistant at each facility on a six month basis to include the facility name and hours worked per week at the facility to include whether the physician was a staff physician, Medical Director, "traveling medical director", etc. This is a repeat request that was not provided timely. It was received in late January, after this section had been written.
4. Assignments of providers in reception centers, infirmaries, urgent care clinic, and chronic clinics. This was not provided.
5. A list of HCUAs with contact information. For vacant HCUA positions we asked for the coverage HCUA. This was provided.

From November, 2019 to 9/12/22, there are about the same number of budgeted employees: 1583 in 2019 and 1580 in September, 2022. However, staffing has deteriorated. The table below gives a graphic picture of the deterioration. The number of staff working has decreased by almost 122 positions from 2019 to 2022. The vacancy rate has increased steadily from 38% in 2019 to 46% in 2022. Leadership positions have decreased in absolute numbers of staff and increased vacancy rates. There can be no effective supervision or implementation of programs when almost half of the Directors of Nursing, a fifth of the HCUAs, and 75% of the nurse supervisor positions are vacant. The following table represents changes from 2019 to 2022.

A dramatic change that the Monitor is deeply concerned about is physician staffing. On 11/23/19 IDOC proposed a staffing analysis with a statewide total of 46.2 physicians (28.8 Medical Directors and 17.4 staff physicians). Individual facilities had a total of 40.7 physicians. The difference of the 46.2 physician total and the 40.7 in individual facility totals is not accounted in the staffing analysis. The Monitor had assumed that this difference was for the 5 physicians that SIU was to provide at several facilities. The SIU contract did not materialize. In the 6/18/20 staffing analysis, the number of physicians decreased from a proposed 46.2 physicians in the 11/23/19 staffing analysis to 35.375 physicians in the 6/18/20 staffing analysis; there was no explanation. Physicians were further reduced in absolute numbers to 33.465 in the 9/12/22 staffing plan. All of this reduction in physician staffing was without explanation. The table below shows the number of physicians proposed or budgeted with facility-associated deaths, census, population over 55 years of age, and infirmary beds.

| Position | Budgeted/. Recommended 11/23/2019 | Vacancies 11/23/19 | Working Positions 11/23/19 | Budgeted / Recommended 6/18/20 | Vacancies 6/18/20 | Working positions 6/18/20 | Budgeted 9/12/2022 | Vacancies 9/12/22 | Working Positions 9/12/22 | Difference in Working Positions 2022-2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Licensed Practical Nurse/ CMT | 320 | 121.8 (38%)** | 198.2 | 327 | 142.8 (44%) | 184.2 | 331 | 222.5 (67%) | 108.5 | -89.7 |
| RN | 548.6 | 187.6 (34%) | 361 | 529.4 | 192 (36%) | 337.4 | 539.4 | 259.4 (48%) | 280 | -81 |
| Physicians | 46.2 | 13.6 (29%) | 32.575 | 35.375 | 10.375 (29%) | 25 | 33.465 | 18 (54%) | 15.465 | -17.11 |
| HCUA | 30 | 3 (10%) | 27 | 29 | 6 (21%) | 23 | 29 | 6 (21%) | 23 | -4 |
| Dentists | 35.1 | 10.9 (31%) | 24.2 | 34.6 | 9.8 (28%) | 24.8 | 36.15 | 15.35 (42%) | 20.8 | -3.4 |
| Director of Nursing | 31 | 11 (35%) | 20 | 31 | 8 (26%) | 23 | 31 | 14 (45%) | 17 | -3 |
| Nurse Supervisor | 26 | 17 (65%) | 9 | 28 | 18(64%) | 10 | 29 | 22 (76%) | 7 | -2 |
| CNA | 101 | 59 (58%) | 42 | 121 | 78(64%) | 43 | 126 | 70 (56%) | 56 | 14 |
| Dental Assistants | 45.9 | 8.75 (19%) | 37.15 | 44.4 | 6.85 (15%) | 37.55 | 44.9 | 7.5 (17%) | 37.4 | 0.25 |
| Physical Therapy Assistant | 9.7 | 7 (72%) | 2.7 | 10.7 | 5.5 (51%) | 5.2 | 10.7 | 5.5 (51%) | 5.2 | 2.5 |
| Physical Therapist | 6.1 | 4.15 (68%) | 1.95 | 4.55 | 2.45 (54%) | 2.1 | 4.55 | 0 (0%) | 4.55 | 2.6 |
| Dental Hygienists | 21 | 9.65 (46%) | 11.35 | 20.25 | 8.9 (44%) | 11.35 | 22.25 | 3.25 (15%) | 19 | 7.65 |
| Med Room Assistants/ Technicians | 45.6 | 13.5 (30%) | 32.1 | 44.1 | 11 (25%) | 33.1 | 43.6 | 2(4%) | 41.6 | 9.5 |
| Nurse Practitioner/ Physician Asst. | 49.9 | 27.8 (56%) | 22.1 | 46.9 | 24.9 (53%) | 22 | 48.5 | 6.5 (13%) | 42 | 19.9 |
| Clerical/ Administrative Assistant/ Med | 213.2 | 90.1 (42%) | 123.1 | 200.6 | 71.8 (36%) | 128.8 | 219.6 | 66.1 (30%) | 153.5 | 30.4 |
| Miscellaneous Positions | 53.7 | 24.15 (45%) | 29.7 | 60 | 35 (58%) | 25 | 30.416 | 9.171 (30%) | 21.245 | -8.455 |
| **Totals** | **1583** | **609 (38%)** | **974.13** | **1566.88** | **632 (40%)** | **934** | **1579.53** | **727.271 (46%)** | **852.26** | **-121.87** |

Position  Differences from the 3 Staffing Analyses Arranged According to  Greatest Decrease in Working Positions Since 2019

** All percentages in parentheses pertain to the vacancy rate

43

| Factors to Consider in Staffing of Physicians Sorted by Number of Deaths | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Proposed 2019 Staffing | | Actual 2022 Staffing | | | | |
| | Physicians | NP/PA* | Physician | NP/PA | Deaths Since 2010 | Population Sept 2022 | # > 55 Years | Infirmary Beds |
| JITC/Elgin | 0.8 | 1 | 0.02 | 1 | 0 | 7** | NA*** | 0 |
| Murphysboro | 0 | 0.4 | 0.02 | 0.4 | 0 | 113** | NA*** | 0 |
| JTC | 1 | | 1 | 0 | 1 | 212 | 87 | 0 |
| Kewanee | 1.5 | | 0.25 | 0.6 | 4 | 220 | 77 | 4 |
| Southwestern | 1 | 0 | 1 | 0 | 8 | 284 | 79 | 5 |
| Vandalia | 1 | 2 | 1 | 1 | 10 | 496 | 143 | 9 |
| Decatur | 1 | 1 | 1 | 0 | 11 | 450 | 125 | 6 |
| Lincoln | 1 | 1 | 1 | 1 | 13 | 771 | 198 | 5 |
| Vienna | 1 | 1 | 1 | 1 | 13 | 572 | 209 | 0 |
| Jacksonville | 1 | 1 | 1 | 1 | 16 | 1032 | 294 | 8 |
| Sheridan | 1 | | 1 | 1 | 19 | 1086 | 282 | 10 |
| Robinson | 1 | 0 | 1 | 0 | 21 | 607 | 235 | 8 |
| E Moline | 1 | 1 | 1 | 1 | 24 | 896 | 180 | 16 |
| Logan | 2 | 4 | 2 | 4 | 29 | 990 | 269 | 15 |
| Taylorville | 1 | 1 | 1 | 1 | 30 | 1061 | 551 | 7 |
| Danville | 1 | 2 | 1 | 2 | 32 | 1520 | 464 | 15 |
| Centralia | 1.4 | 1 | 1.175 | 1 | 36 | 1262 | 393 | 18 |
| IL River | 1 | 2 | 1 | 2 | 37 | 1727 | 461 | 15 |
| Western | 1 | 2 | 1 | 2 | 39 | 1692 | 567 | 15 |
| Hill | 1 | 2 | 1 | 2 | 42 | 1577 | 597 | 16 |
| Shawnee | 1 | 1.5 | 1 | 1.5 | 42 | 1556 | 388 | 15 |
| Pinckneyville | 1 | 2 | 1 | 2 | 71 | 1972 | 608 | 15 |
| Lawrence | 1 | 2 | 1 | 2 | 75 | 549 | 188 | 14 |
| Pontiac | 2 | 4 | 2 | 3 | 76 | 803 | 288 | 12 |
| BMRCC | 2 | 2 | 1 | 2 | 85 | 1211 | 532 | 18 |
| Graham | 1 | 2 | 1 | 3 | 96 | 1645 | 442 | 21 |
| Menard | 3 | 3 | 2 | 3 | 128 | 2015 | 704 | 24 |
| Stateville **** | 6 | 7 | 4 | 6 | 154 | 2129 | 611 | 52 |
| Dixon | 3 | 4 | 2 | 4 | 181 | 1553 | 621 | 28 |
| Totals ***** | 40.7 | 49.9 | 33.465 | 48.5 | 1293 | 29888 | 9593 | |
| * NP/PA = nurse practitioner/physician assistant | | | | | | | |
| ** Population data for JITC/Elgin and Murphysboro were from November of 2022 not September | | | | | | | |
| *** Data for persons over 55 at these two facilities was not available. | | | | | | | |
| ****Stateville is combined with NRC because IDOC tracks their deaths together and does not give separate population numbers for these facilities.  NRC had 3 physicians and 4 nurse practitioners proposed in 2019 with 2 physicians and 4 nurse practitioners in 2022.  Stateville had 3 physicians and 3 nurse practitioners proposed in 2019 but 2 physicians and 2 nurse practioners in 2022.  With respect to deaths, almost all deaths are at the Stateville not the NRC facility but no data is available.  Stateville has 32 infirmary beds and NRC has 20 of the 52 combined beds. | | | | | | | |
| ***** The total physicians documented in the 11/23/19 staffing analysis was was 28.8 Medical Directors and 17.4 physicians for a total of 46.2 physicians.  The actual count in the individual facilities was 40.7.  The difference of 5.5 we believe was due to the SIU contract for an additional five physicians which never was accomplished. | | | | | | | |

44

The graph above shows physician and nurse practitioners/physician assistants (NP/PA) staffing with respect to four variables. The Monitor views the number of deaths as a proxy for acuity. Acuity, census, percent of elderly, and the number of infirmary beds all increase physician work. Facilities on the lower end of this table need more physicians than those above. IDOC has not performed any analysis with respect to why it chose the number of physicians it budgets. Nor has it performed any analysis of why NP/PAs are hired as opposed to physicians.

Based on record reviews, and review of the data in the table above, the Monitor recommends that IDOC budget and hire more physicians. IDOC has appropriately hired more NP/PAs but it has not hired a corresponding increased number of physicians to supervise the NP/PAs and to manage the burden of high acuity patients. Budgeted NP/PAs have been about the same in 2019 as in 2022 but working NP/PAs have increased from 22.1 in 2019 to 42, an increase of 20 NP/PAs. There was a corresponding decrease of 17 working physicians over the same time period. NP/PAs are not as well trained as physicians and are therefore less well suited to manage high acuity patients. As a result of the severe physician shortage, the NP/PAs are being given an outsized responsibility. In record reviews,[38] the Monitor noted lack of ability or willingness of NP/PAs to consult with a physician; NP/PAs managing the most complex cases; and NP/PAs managing many high acuity patients. This resulted in a deterioration in care in some cases and is a dangerous development that places inmates at risk of harm and in some cases has caused harm.

During the Dixon visit, we found NP/PAs managing most of infirmary care and all of chronic disease care including for very high acuity problems. They were unsupervised and had no formal relationship with the physician with respect to consultation and referral of complex cases. This situation is not safe nor is it consistent with the advanced practice nurse regulations. In some respects, this is a failure to create an expectation of what the Medical Director and physicians are to do with respect to clinical care. At a recent Dixon visit, the Medical Director did not perform any review of the work of NP/PAs; this was confirmed by the nurse practitioners. The Medical Director did not provide any oversight over chronic care. He did not appear aware that this was an expectation.

Based on our own experience, including record reviews, and analysis of data, including the table above as well as data on the number of intake evaluations at reception centers[39] we believe the budgeted increase in nurse practitioners is appropriate. However, the Monitor recommends an increase of one budgeted physician at each of Dixon, Stateville, NRC, Menard, Graham, BMRCC and Pinckneyville. These facilities were all in the top ten with respect to deaths and numbers of persons older than 55 years. All except BMRCC were in the top 10 in census and BMRCC was number 12. All of the facilities were in the top ten with respect to the size of the infirmary though Pinckneyville was tied with six others for ninth place. Graham has a special function as the major dialysis center for the entire state so its acuity is thereby higher. NRC is the largest intake center in the state managing five times the number of intakes per month as the other reception centers. Menard was built in the 19th century and Stateville in the early 20th century and their facility structure impedes delivery of appropriate care; this results in less efficient care management and

---

[38] Dixon, Pontiac, and Menard
[39] See tables in the section on Medical Reception in 3rd and 4th Reports.

therefore more staff. Menard and Graham are also reception centers though at a fifth of the volume of NRC.

The Monitor sent IDOC an email on 1/13/23 warning IDOC that the staffing issues are at a crisis level, are negatively impacting health care, and must be urgently addressed. At a subsequent call with IDOC, OHS stated that OHS and IDOC legal met with the vendor. The vendor was told that the vacancies were unacceptable and OHS is awaiting the vendor's response. OHS indicated that staffing was "outside the sphere of their influence" meaning that other state agencies control the hiring process. When asked when IDOC expected a change based on the current efforts, OHS had no answer. OHS did state that the vendor said medical directors were in the approval process for three facilities and there were several locum tenens physician positions in the process of being hired.

The lack of dentists is equally concerning. There is a 42% dentist vacancy rate. This has resulted in significant backlogs and delayed dental care. There was a small increase in dental assistants and a larger increase in dental hygienists but without dentists, these staff are unable to work or work at less efficiency.[40]

Over 32 percent of the IDOC population is currently over 55 years of age and the health of incarcerated persons is known to be worse that would be expected for persons of a similar chronological age. Access to physical therapy continues to be problematic in the IDOC. Only ten of the thirty facilities have onsite physical therapy services. Five of the 10 facilities that have a physical therapist have services only one day or less per week. Two sites have one half-day session every other week. The availability of physical therapy services is further exacerbated due to physical therapy assistant (PTA) positions at five sites being vacant.[41] Physical therapists are responsible for performing the initial assessments and creating a plan for the types and modalities of therapy. PTAs under the supervision of the therapist then provide the bulk of the hands-on physical therapy. At Dixon, the part-time physical therapist works alone. The current wait to evaluate routine referrals is now approximately four months. It was communicated to the Monitor that the budgeted full time PTA position is needed to address the physical therapy needs of Dixon's geriatric, infirmary, disabled, and general population. The Monitor recommends that the current priority is fill the vacant PTA positions at those five sites lacking PTA staffing. IDOC also must begin to evaluate the need for physical therapy services at five additional correctional health centers with populations over one thousand and infirmaries with 15 or more beds and at the Pontiac the only maximum security facility without onsite physical therapy staffing. These six additional sites house a total of 7,550 men and have 90 infirmary beds.

In summary, staffing is worse than at the start of the Consent Decree and it has become a crisis and is dangerous because the greatest deficiencies in staffing are at supervisory and higher skilled levels. There are 17 fewer physicians working in IDOC now than in 2019. The Monitor recommends that the physician staffing budget be increased at several facilities. Supervision and oversight over nurse practitioners must occur but there is no evidence that it occurs. There is no

---

[40] IDOC informed the Monitor that due to a state regulation, a dental hygienist cannot see a patient unless a dentist has seen the patient. Because of the lack of dentists, many of the newly hired dental hygienists have a significantly reduced schedule.
[41] Dixon, Graham, Hill, Stateville, and NRC lack PTA services due to vacant positions.

plan on the horizon to improve this situation. This warrants a noncompliance rating for this section. One recommendation is added to budget additional physicians.


**RECOMMENDATIONS:**

1. Develop a recruitment plan with the explicit mission to reduce the rate of vacancies. Responsible parties include OHS, Wexford, Human Resources, and the Office of Budget and Management. The recruitment plan needs to include clearly defined benchmarks to monitor progress toward specific objectives set out in the plan. In addition to vacancy, turnover and retention rates suggested metrics to evaluate progress include: the number and outcome of recruitment activities, time from inquiry to first contact, and time from job offer to start date.

2. A first recruitment priority should be to recruit and hire into vacant Director of Nursing and Nurse Supervisor positions to increase accountability for performance improvement.

3. Prioritize recruitment of nursing positions at the facilities with the lowest ratio of RNs and the lowest actual nurse staffing.

4. The number of mandatory overtime assignments should be reported to OHS by each facility monthly.

5. Monitor patient care quality and health outcomes more closely at facilities with the most turnover, highest vacancy rates and largest number of mandatory overtime assignments.

6. Develop job descriptions that define the training and experience necessary for each position and provide them to the Monitor for input before finalization. Establish positions at each facility responsible for Infection Control and Quality Improvement.

7. Establish a database that includes the number of nursing positions by type, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.

8. Identify performance and health outcome measures to compare with staff mix and staffing levels to identify desirable staffing ratios and patterns. Measures to evaluate staffing adequacy include quality patient care parameters (numbers of emergencies, patient falls, acquired infection etc.), risk management information (deaths, grievances, errors etc.), time taken to fill vacant positions and retention in registered nurse positions as well as compliance with items III.A.10, III.I.1, III.I.2 and III.I.3 of the Consent Decree.

9. Add at least one additional physician to the budgeted physicians each at Dixon, Stateville, NRC, Graham, Menard, BMRCC, and Pinckneyville.


**Credentialing of Physicians**

*Addresses items II.B.6.r; III.A.2-7*

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**III.A.2.** *All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully*

*completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.*

**III.A. 3.** *Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter*

**III.A.4.** *If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.*

**III.A.5.** *Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 6, below.*

**III.A.6-7** *Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department. The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested two documents.

1. The first document request was a spreadsheet listing all physicians with name, facility, highest level of post-graduate education, residency type completed, date residency completed, internship/residency training sites, license expiration date, DEA expiration date, board certification type, board certification date, re-certification date, and expiration date of board certification. **We asked that this listing should be updated and provided to the Monitor every quarter or sooner if new physicians are hired and when physicians leave the IDOC. IDOC should automatically provide timely notification when physicians leave employment in IDOC and when new physicians are hired.** As soon as physicians are hired their training and credentials packets are to be forwarded to

the Monitor. There is a specific tracking sheet used for this purpose which is the vendor Training and Credentials spread sheet. The Monitor received the Training and Credential spreadsheet but it does not appear to be accurate as will be described.

2. Another request was Primary source verification of all facility physician credentials. Primary source verification is to include: an official document from the original source (residency training program or specialty board, etc.) verifying completion of training or board certification status, National Practitioner Data Bank, any prior disciplinary reports, or actions including sanctions by state licensing agencies, AMA Profiles, Medicare/Medicaid, US military, VA, and US Department of Justice, and a recent CV. Primary source verification of license and DEA license can be a photocopy of the licenses with home address and license # blacked out. If AMA report is used it must be a recent AMA profile or the license and DEA license must be separately verified. Osteopathic physicians must have the osteopathic boards verified with primary source verification. This data should be included in the Wexford training and credential spread sheet. Primary source data was not provided for one physician on the credential spreadsheet and several physicians had returned to work for Wexford but an update of their credentials was not provided.

It has not been possible to identify how many physicians are working in IDOC based solely on review of the credential spreadsheet. The Monitor understands that staff come and go. To verify credentials, given turnover of staff, the Monitor has asked for regular updates of the physician list whenever there is a change in staffing and at least quarterly. This is not done and as a result both the assignment and vendor's credentials spreadsheet are frequently out of date and not in sync. This makes timely verification of new physician credentialing impossible. Frequently, the Monitor becomes aware that a new physician has been hired only when their name appears on the facility assignment or on the Training and Credentials spreadsheet.

The September staffing update sent to the Monitor by IDOC documents that IDOC only has 18 physicians working as of 9/12/22, but the credentialing spreadsheet sent by the vendor on 10/22/22 contains 27 physicians. Many of the physicians on the credential spreadsheet are temporary or locum tenens physicians but the spreadsheet does not provide that information. The Monitor cannot verify credentials for every physician on the most recent credentials spreadsheet including two providers who appear to have returned to work with IDOC after an absence but their credentials have not yet been re-presented. Based on information provided to the Monitor IDOC appears to have only hired new physician with appropriate credentials since the signing of the Consent Decree.

49

| Physician With Primary Care Credentials* in IDOC | | | | |
|---|---|---|---|---|
| | 2/1/20 | | 11/11/22 | |
| Board Certified (BC) | 15 | 42% | 15 | 56% |
| Completed 3 year Primary Care Residency - Not Board Certified | 10 | 27% | 8 | 30% |
| **Total Qualified (III.A.2.)** | **25** | **69%** | **23** | **89%** |
| Not Board Certified and Did Not Complete a Primary Care Residency | 11 | 31% | 4 | 15% |
| **Total Physicians\*\*** | **36** | | **27** | |
| * Primary care credentials include board certified or completed a residency in Family Medicine, Internal Medicine, or Emergency. | | | | |
| ** The 9/12/22 staffing data provided by IDOC documents 18 full-time-equivalent (FTE) physicians but there are 27 physicians on the vendor's credential spreadsheet. The Monitor was not informed how much time each of the 27 physicians are working. This may change the percent of credentialed physicians. No explanation was provided by IDOC. | | | | |

After a draft of this section was written, and too late for the Monitor to evaluate, the Monitor received data on physician assignments of physicians with the hours worked at each facility. This information is difficult to fully verify since, due to vacancies, a number of physician providing "on-call" and "as needed" coverage do not have specific hours of service documented. This makes the above table less reliable.

The Monitor team noted that on the list of 27 physicians on the credential spreadsheet, there are at least three individuals who do not have credentials required by the Consent Decree. IDOC provided no evidence that physicians without credentials are practicing in a safe and clinically appropriate manner as required by the Consent Decree (III.A.3. and III.A.4). Nor has there been any evaluation of physician quality, in either the clinical quality measures audit or elsewhere to evaluate that physicians are performing in a safe and clinically adequate manner that does not place patients at risk (II.B.6.r., III.A.3.) At least one of these physicians has repeatedly been identified in the Monitor's mortality reviews as someone who is practicing in an unsafe and clinically inappropriate manner. IDOC has been verbally advised that this physician should not be practicing based on criteria of the Consent Decree. Mortality reviews have identified his unsafe and clinically inappropriate care.[42]

**RECOMMENDATIONS**:

1. IDOC needs to routinely provide the following information to us three months prior to the due date of each upcoming Monitor report.
   a. A table of current physicians in a spreadsheet format with physician name, internship or residency completed, date internship or residency completed, board

---

[42] See mortality review patients 3 and 5 in the 6th Report Mortality Reviews and mortality review patients 5, 6, and 7 in the 5th Report Mortality Reviews.

certification, date of board certification, current status of board certification, primary source verification for these credentials, and an AMA profile.

    b. When the AMA profile does not support the physician's credentials because the credentials are with an Osteopathic Board primary source information must be provided.

    c. All peer reviews including any disciplinary peer review or actions taken with respect to privileges.

    d. Professional performance annual evaluations for all physicians, nurse practitioners, and physician assistants.

    e. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6-month period.

    f. Notification when a new physician is hired with credentials of the physician as provided to IDOC.

    g. Notification when a physician leaves employment with the State or the vendor

    h. Any monitoring being provided for any physician, nurse practitioner, physician assistant.

2. When AMA profiles are being used to verify credentials, the AMA profile should be current.

3. Current license information and DEA registration information needs to be provided.

4. Any sanctions on a license and a report detailing the plan for monitoring should be reported to both OHS and the Monitor

5. IDOC's health care vendor should continue to hire only physicians who are Board Certified and/or have completed a residency in a primary care field.

6. All physicians need to be required to use a stamp that contains their name which needs to be used for all of their paper medical record notes and orders so that their medical record entry can be verified as theirs. This practice should continue until the EMR is fully installed.

7. IDOC should vigorously explore opportunities to expand affiliations with academic medical centers in Illinois to include the recruitment and hiring of physicians

# Oversight over Medical, Dental, and Nursing Staff

*Addresses II.B.6.q; II.B.6.r;*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and, as to any vendor effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**OVERALL COMPLIANCE RATING:** Non Compliance

**FINDINGS:**

**Oversight over Medical and Dental Staff**

The Monitor asked for three documents.

1. Physician, nurse practitioner, physician assistant, and dentist monitoring reviews over the past year. Peer reviews include professional practice reviews and evaluation of privileges connected with a significant adverse clinical practice event. **IDOC states that these reviews are conducted yearly and therefore there are no peer reviews for this report.**

2. Any evaluations of annual performance for physicians, nurse practitioners, physician assistants, dentists, dental hygienists, dental assistants that are done in addition to peer reviews. **IDOC states that these reviews are conducted yearly and therefore there are no peer reviews.**

3. Physician, nurse practitioner, physician assistant, and dentist disciplinary actions over the past year. **List of three providers disciplined between 12/1/21 and 12/12/22 was provided to the Monitor on 1/20/23[43]**

The Monitor's 4th Report listed eight recommendations. The IDOC has provided no information that these recommendations were acted on. IDOC has not communicated any modifications to the processes or forms used to evaluate the clinical competency and performance of medical, nursing, and dental staff.

IDOC has not provided verification that it has established effective peer review or monitoring of physician and mid-level provider staff.

The monitor has not received any peer reviews or performance evaluations of any type[44] for medical physicians, nurse practitioners, physician assistants, dentists, and dental hygienists for calendar year 2022. The Monitor understands that these evaluations are generally done annually but IDOC could have but did not provide the 2021 evaluations for physicians, nurse practitioners, physician assistants, and dental hygienists. The dentist peer reviews for 2021 were previously provided in early 2022 and were reported in the 5th Court Report. The dental peer reviews are done by other dentists in the system and have previously been completed annually between August and

---

[43] Four written disciplinary actions were issued by the medical vendor to two medical physicians and one dentist between 12/1/21 and 12/12/23. One medical physician was disciplined twice, once for misconduct and again for policy violation. The dentist was disciplined for attendance. The other medical physician was cited for performance; this physician is no longer employed by the vendor. Details on the reason for the disciplinary action were not provided. This list was provided to the Monitor on 1/20/23.

[44] The vendor evaluates physicians, NPs/PAs, dental hygienists, and dental assistants using its annual Salary Compensation Calibration Worksheet which focuses on administrative issues and does not evaluate clinical performance. Outside the dental peer reviews, the vendor has never provided the Monitor with peer reviews for any other clinical providers. The State uses a different method of annual evaluation for its dental hygienists and dental assistants using position specific Individual Development and Performance System reports. Vendor dentists evaluate other dentists in the system using an established 17 category audit which includes some clinical performance measures.

October but the Monitor did not receive any dentist peer reviews that were completed in 2022.

There was evidence during the Dixon CC visit that the Medical Director does no monitoring of the nurse practitioners under his supervision. The nurse practitioners confirmed there was no formal review of their work.

A policy for peer review was made effective 10/1/22. The Monitor was not provided an opportunity to review this policy prior to its implementation. The policy is inadequate as it does not describe how peer review will be managed; instead, it refers the reader to the quality improvement plan which is not a policy document. The policy needs to describe what its policy is.

The FY23 Quality Improvement Plan describes a peer review committee which can include vendor physicians which, at this point in time, the Monitor disagrees with as there is no evidence of vendor physicians honestly or critically assessing other vendor physicians in the past. As well, at least for unqualified physicians (III.A.3.) the Chief OHS is to determine if their quality of work is adequate. Given the responsibilities of the Chief OHS, we can understand another party assuming this responsibility but the Monitor will not accept vendor physicians as satisfying that responsibility.

The Chief OHS has an obligation to review the work of non-credentialed physicians to determine if their practice is safe and clinically appropriate. That is not being done. The Monitor has verbally advised OHS of a provider who is not practicing in a safe or clinically appropriate manner. To date, the Monitor has not been informed that there has been any evaluation of this physician.

For at least the last 12 months there has been a significant shortage of physicians in the IDOC. The medical director positions at thirteen facilities are currently vacant. Seven medical directors are providing coverage at additional sites. One medical director of a facility with over 2000 incarcerated men and no onsite backup physician provides onsite care at four additional facilities and is on-call or available, as needed, at two other facilities.

Seven facilities have a physician onsite for one day per week or less. Three other sites have only one to three days per week of telehealth physician services.[45] This has resulted in nurse practitioners and physician assistants essentially managing the vast majority of all care at 13-15 facilities albeit with some assistance by phone consultation, telehealth, limited, if any, onsite physician presence, and varying and inconsistent physician coverage. There can be no oversight, when there are insufficient or no physicians. At a recent Dixon visit, one nurse practitioner wrote nursing diagnoses in her notes instead of medical diagnoses when evaluating patients as a practitioner. In other mortality reviews from Menard[46], Pontiac[47], and Dixon[48], there was no oversight over nurse practitioners who appeared to be working without physician supervision and were not practicing in a safe and clinically appropriate manner.

---

[45] Staffing Analysis 9/12/22 and provider vacancy report 1/25/23
[46] Mortality review patient 17, 6th Report
[47] Mortality review patient 12, 6th Report
[48] Mortality review patient 13

A partial compliance was previously assigned to this section based on limited peer review being performed[49]. No peer review was done since the last report as peer review is only done annually. The peer review policy is unacceptable as it isn't a policy and its policy statement is to refer to a quality improvement plan. IDOC has provided no data or information to show that it provides oversight or monitoring of physicians or mid-level providers. The lack of physicians results in an appreciable lack of oversight over nurse practitioner staff. For these reasons a noncompliance rating is assigned.

**Nursing Staff**

The Monitor requested for review the following documents to evaluate the assignments, credentialing, training, and competency reviews of nursing staff:

- Updated table of organization of OHS in relation to all parts of organization responsible for health care services with incumbent names.
- Any updates to the following IDOC job descriptions: Facility DON, Nurse Supervisor, RNII, RNI, CMT. Vendor job descriptions for DON, Nurse Supervisor, RN, LPN, and certified nursing assistant.
- List of all peer reviews performed as a result of mortality reviews. Include the actual peer review.
- Nurse staffing. Provide training and credentials' verification in the last 12 months for 6 individuals from: Pinckneyville, Stateville, Lawrence, Sheridan, JTC, and Centralia.
- Plan, administrative directive, or documentation of an annual assessment of nursing competency consistent with the Consent Decree II. B. 6. q.[50]

An updated table of organization was received effective October 2022 the Statewide Director of Nursing reports directly to the Chief of Health Services. The Regional Coordinators report directly to the Statewide Director of Nursing. These changes are applauded in that they remove an organizational layer between the Chief and the staff expected to implement the changes called out in the Consent Decree.

Revised job descriptions were sent for the state nursing positions. Of note the position description for Director of Nursing includes supervision of contractor personnel.[51] The vendor has provided no job descriptions for its nursing positions. The Monitor has no critique of these position descriptions except to note that there are no explicit expectations of annual assessment of competency as required by II.B.6.q.

Verification of nursing licensure was received from five facilities with nurses who are employed by the vendor. License verification was not sent for the one facility whose nurses are state employees. No information was provided about the training received by any of these nursing staff. The CE requirements for maintaining licensure are not sufficient for the employer to ensure that personnel have initial or continuing competency to perform the work assigned.

---

[49] Dentist peer review reports provided in 2019, 2020, 2021.
[50] Monitor's documentation request dated 10/20/2022, items 11, 22, 53, 83, 84.
[51] At the Dixon site visit the Director of Nursing and HCUA were both clear that supervision of the vendor's LPNs was the responsibility of the vendor site manager and that clinical supervision was provided by the vendor's regional manager. Therefore it appears that implementation of the revised state job description for DON had yet to be in effect.

No information was received about peer reviews that were performed as a result of mortality reviews. No information was received about an annual assessment of nursing competency consistent with the Consent Decree II. B. 6. q.

The Defendants Implementation Plan dated 12/20/2021 includes tasks to provide a training program including demonstration of competency in delivery of health care. There are additional tasks to ensure initial and continued competency and clinical proficiency in urgent care and sick call. [52] However at this time the Implementation Plan provides no additional description of what will be included in the assessment of competency and clinical proficiency, how it will be accomplished, identification of resources needed or how the assessment will be documented and recorded.

These recommendations have been modified slightly since the last report and the last recommendation has been added.

**RECOMMENDATIONS:**

1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of *all clinical staff*.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. An independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation.
4. Clinical professional performance evaluations should be shared with the employee who should sign the review after discussion with the reviewer.
5. Involve the Chief of Dental Services and the SIU audit teams in the re-assessment of the existing dentist, dental hygienist, and dental assistant annual evaluations so as to include metrics that evaluate the quality of dental care and clinical skills of the dental team.
6. The Chief of Dental Services should establish clear guidelines concerning antibiotic prophylaxis for dental procedures, obtaining x-rays prior to dental extractions to ensure the utilization of x-rays meets existing dental standards of care, and for signed consent forms prior to dental care. These guidelines would also allow for more objectivity in the dentists' peer review evaluations.
7. An independent review of dentist care should be used to avoid the potential bias and lack of objectivity when the reviewer is a co-worker or colleague in the same system.
8. Annual peer reviews not Salary Compensation Calibration of the onsite Medical Director, staff physicians, nurse practitioners, and physician assistants should be provided to the Monitor.
9. Add more detail to the 12/20/21 Implementation Plan including what the scope of the assessment will be, how assessments will be accomplished, identification of resources

---

[52] Defendants' Implementation Plan dated 12/20/2021, tasks 7, 38, 51 and 102.

> needed, how the assessment will be documented and recorded, and the steps taken when competency is not demonstrated.
> 10. Establish by policy and procedure and implement standardized practices for credential verification.
> 11. The facility Director of Nursing must demonstrate clinical supervision of all nursing personnel assigned to work at the facility (state and vendor employed staff).

# Operations

**Clinical Space**

***Addresses item II.B.2 in part; III.B.1; III.C.2; III.F.1;***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**III.B.1.** *IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*

**III.C.2.** *IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*

**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**OVERALL COMPLIANCE RATING Non Compliance**

**FINDINGS:**

The following information[53] was requested from the IDOC to evaluate progress toward compliance with the items of the Consent Decree in the clinical space section:

- Provide allocated funding and expenditures for capital improvements associated with medical program
- Provide an inventory for each facility of the rooms used by health care personnel for patient examination
- Progress of consultation on status of physical plant issues statewide and by facility
- Report of physical space consultant's analysis of existing space with respect health care.
- Copy of renovation plan as described in the Implementation Plan.
- List of construction, remodeling, or physical plant improvements for any of the health care units

---

[53] Monitor document requests #8, 85, 86, 87, 88, and 96

Incomplete data was received for the first two of six information requests. The remaining information was not received. For one request[54], IDOC provided a list of all capital improvements to facility infrastructure most of which appeared to pertain to non-medical related improvements (cooling towers, lock replacements, roofing, hot water distribution, etc.). This list was provided late and before it could be adequately evaluated. There were 103 entries totaling over $270 million. Of the 103 projects, eight projects totaling just over $7 million appeared related to medical: provide medical office space[55], dental room upgrades, and creating isolation rooms throughout the IDOC. The dental upgrades and isolation rooms were to meet new IDPH airborne disease protective requirements with respect to preventing COVID transmission. The Monitor was not provided further information explaining these improvements including what they consisted of.

The Monitor asked for an inventory of rooms used for patient examination with a list of types of uses for each room.[56] Twenty of 30 facilities returned an inventory but these were not standardized and varied in level of detail from site to site. Even given the variable survey formats, it was still easily discernible that a number of health care centers lacked sufficient numbers of examination rooms to ensure private and confidential examinations and evaluations. In many facilities there are fewer exam rooms than there are medical staff who need to use a room including physicians, nurse practitioners, physicians, sick call nurses, and chronic care nurses. The surveys also noted facilities that have to share exam rooms. One facility reported that an exam room was shared by staff needing to perform nurse sick call, urgent care, and tele-health staff. Another facility noted that an exam room was shared by staff needing to perform nurse sick call, physician clinic, and chronic care clinics. A third facility had an exam room shared by staff needing to perform nurse sick call staff, vital sign nurses, and phlebotomy services. A fourth facility documented that nurses used the optometry clinic room for nursing sick call even though this room does not have an exam table. The lack of sufficient number of exam rooms is a barrier to access to care in IDOC's correctional centers.

During multiple site visits, the Monitor team has identified existing space needs that hampered the delivery of health care services to the incarcerated population. The deficiencies observed have included insufficient number of exam rooms to accommodate the number of clinical staff at the facility,[57] the lack of adequate workspace for nursing staff,[58] the lack of sufficient dental chairs to accommodate dentists and dental hygienists, the inadequate space to provide needed services and programs for infirmary patients, undersized waiting rooms,[59] and inadequate space to house physical therapy services.

In its 12/30/21 Implementation Plan, IDOC committed to hire consultants to survey all clinical spaces at all facilities and to develop structural space requirements for all clinical activities necessary to provide adequate medical and dental care and to assess the health care and health-

---

[54] Monitor document request #8
[55] Monitor Document Request for 6th Report #8: Capital Improvements 11/27/22 will include, but not limited to, BMR, Danville, Graham, Pinckneyville, Shawnee, and Taylorville. This project will develop temporary modular structures that will be used while permanent medical offices are constructed
[56] Monitor Document Request for 6th Report #85
[57] Sheridan, Lincoln, Logan, Robinson, and Dixon site visits by Monitor
[58] Shawnee, Dixon, Lincoln
[59] Dixon, Lincoln, Logan, Robinson, and Shawnee.

care related housing and clinical care needs of the disabled and elderly population. IDOC has not informed the Monitor of progress on obtaining a consultant for either of these purposes. The completion of a consultant report including their survey of structural space and fixed equipment for all clinical activities necessary to provide adequate medical and dental care is necessary for the IDOC to attain partial compliance of this provision. This report should be performed before IDOC proceeds with any extensive remodeling, renovation, or construction of the health care space.

**RECOMMENDATIONS:**

1. The IDOC needs to conform to requirements of its implementation plan with respect to physical plant.

**Equipment and Supplies**

*Addresses item II.B.6.p; III.B.2; III.I.4;*
**II.B.6. p.** *IDOC agrees to implement changes in the following areas: Adequately equipped infirmaries;*
**III.B.2.** *These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer.*
**III.I.4.** *All infirmaries shall have necessary access to security staff at all times. (See Infirmary Section)*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
Eleven data and information items were requested from IDOC for this section of the report. IDOC has provided one item[60]; a list of dental equipment purchased from September, 2021 to September, 2022. In late January, IDOC sent six additional items that were not able to be thoroughly evaluated.[61] Four items were not provided.[62]

Information for the durable equipment[63] was not standardized and varied widely in the number and type of equipment reported. Some sites provided a long list of the inventory of equipment. Others provided lists with as few as ten items and some provided the list of equipment serviced by contracted biomedical companies. Information on equipment requiring calibration[64] was received from ten of the thirty IDOC sites. The number of equipment items calibrated[65] varied from ten to forty-eight at ten facilities. One facility only provided the list of calibrated dental equipment and

---

[60] Document request #97
[61] Document requests #s 90-94 and # 100
[62] Document requests #s 95, 96, 98, and 99.
[63] Document request #90
[64] Document request #91
[65] Equipment needs to be periodically serviced and checked to ascertain whether it is functional and operating as intended. Typically, this is done annually or every six months and is done by trained biomedical technicians. This process is not standardized within IDOC.

two facilities only gave their inventory list, not their calibrated equipment list. Of the eight facilities that listed the date of the most recent annual calibration, six had been calibrated within the last 12 months; the other two provided lists of equipment that was serviced in 3/14/19 and 9/1/21. This equipment should be calibrated at least annually. Combining the durable equipment and the calibrated equipment, the Monitor identified that four sites [66] appear to have only a single automated external defibrillator (AED), The Monitor has strongly recommended in previous reports that each IDOC facility should have at least two AEDs to ensure that there a functional AED always available for emergencies. The list of newly purchased equipment[67] in 2022 was of interest in that three sites purchased five additional AEDs and three purchased a new dental chair. One of the dental chairs was cited as being purchased to open a second dental hygienist room at Logan CC.

The equipment lists provided have limited value without having a systemwide standardized list of equipment that is expected to be available in each of the different clinical rooms and areas in all IDOC facilities. The number of pieces of equipment would, of course, vary based on the number of exam rooms, urgent care room, dental suites, infirmary beds, specialized treatment services (dialysis, physical therapy), special equipment needed to support disabled and infirm patients, and whether the facility is an intake center. In the 12/30/21 Implementation Plan, IDOC committed to ensuring that there is adequate fixed, mobile, medical, and dental equipment. Developing a standardized list of expected equipment is the first step necessary to accomplish this goal. The Monitor has recommended that a consultant assist in developing this standardized list.

There has been essentially no change in the status of this item since the Monitor's 4th report. The Monitor previously provided comments on the draft Health Care Inspection Checklist and Equipment Survey and returned it to IDOC. There has been no further information provided to the Monitor about this tool. A draft of medical equipment by facility in December 2021 was again returned with comments to IDOC. The Monitor did not receive information in response to any of the other requests for information made for the 5th report. [68]

The IDOC does not yet have a standardized equipment list required for each facility including for the infirmary. The Monitor did comment on the draft of a list of emergency supplies in October 2021.[69] No further information about this draft or any efforts to standardize other equipment has been provided by IDOC. The Monitor's recommendation from previous reports remains the same.

**RECOMMENDATIONS:**

1.  IDOC must establish a systemwide standardized list of equipment that must be available and maintained in each of the different clinical service rooms (examination rooms, telemedicine rooms, urgent care, infirmary, dental suites, specialty rooms, etc.) at all correctional centers.
2.  IDOC must implement a systemwide annual calibration and evaluation of the clinical

---

[66] BMR, Decatur, Graham, Jacksonville, and Pinckneyville had only one AED listed on either the durable or the calibrated equipment lists.

[67] Document request #97

[68] Lippert IDOC Document Request for 5th report 01.18.2022, items 55-59, 79, and 109.

[69] Email from Dr. Raba dated 10/14/21.

equipment and incorporate a replacement or repair plan to ensure that all sites have functional equipment at all times. This annual calibration evaluation should be provided to the Monitor and auditors (II.B.9).

3. The IDOC should focus attention on the condition of infirmary beds in all IDOC facilities and replace defective beds with electrically operated hospital beds with safety railings and the ability to adjust the height of the bed and elevate the health and leg sections as needed.[70]

4. IDOC should develop and implement a monthly inspection checklist focused on the condition of the physical space, furniture, and the presence and functionality of equipment including negative pressure units in the Health Care Unit and any other clinical spaces including satellite nurse and provider sick call rooms, intake screening areas, etc.

5. IDOC should utilize the consultant who IDOC planned to survey clinical space to provide consultation on required equipment that is needed in all health care service rooms and areas in the IDOC.

**Sanitation**
*Addresses item III.J.3*
**III.J.3.** *Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Three documents were requested for this report.[71]
- Safety and Sanitation Reports.
- Each Facility's cleaning and sanitation schedule for health care areas. This was not provided.
- Copy of each facility's procedures for sanitizing infirmary bedding and linens. This was not provided.

Results and/or reports of monthly Safety and Sanitation inspection reports continue to be provided to the Monitor on a quarterly basis for nearly all facilities. Most monthly reports include some type of safety and sanitation inspection at IDOC facilities. The existing Safety and Sanitation inspection reports appear to be the only process in place to evaluate the physical plant, plumbing, lighting, ventilation, and cleanliness of the housing units, kitchen, cafeteria, and laundry. It also occasionally assesses the physical conditions and operability of some equipment and furniture. For this report the Safety and Sanitation reports from third quarter of 2022 from fifteen IDOC facilities were reviewed. There continues to be notable variation in what is reported and most Safety and Sanitation Reports do not contain the detail necessary to adequately evaluate the space, equipment, safety, and sanitation of the medical areas. The Reports commonly do not identify the presence of safety concerns that impact on the health and safety of both the patient population and

---

[70] The Monitor noted that Dixon had replaced the infirmary with new electronic beds with beds donated by IEMA that were purchased to use during the expansion of community quarantine centers during the pandemic. OHS has communicated to the Monitor that all infirmaries have now replaced their defective infirmary beds with these electronic beds.
[71] Document request #s 101-103

the health care and correctional staff throughout the IDOC.

Physical plant deficiencies in the housing units and service areas were identified with similar prevalence as cited in previous Monitor reports.[72]  IDOC has made no progress on improvements to sanitation or inspections.

The Defendant's draft implementation plan in December 2021 committed to development of a tool to inspect sanitation of clinical spaces and to test the tool with the Monitor at multiple facilities to ensure its accuracy. IDOC also committed to updating the job description for the Environmental Services Coordinator, then posting and filling this position.[73] The current safety and sanitation rounds do not adequately review and document the condition or operability of clinical equipment, furniture, emergency response bags and equipment, the negative pressure units, and infirmary beds in the health care unit (HCU) and in satellite clinical spaces in the housing units and thus this section is rated as noncompliant.

**RECOMMENDATIONS:**

1.  The Safety and Sanitation inspections do not, but should, include a more detailed evaluation of the HCU and all other clinical treatment areas that would include the functioning of medical, dental, and radiology equipment, the condition of gurneys, examination tables, chairs, and infirmary beds, the emergency response bags, functionality of the negative pressure rooms, and the sanitation of all clinical spaces.
2.  IDOC OHS should finalize with the input of the Monitor their draft of standardized systemwide Health Care Unit/clinical space audit instrument that would focus on all the key safety and sanitation issues in all clinical areas.   If the existing Safety and Sanitation rounds are unable to incorporate this more detailed review of the clinical spaces and equipment into its schedule, a separate audit focused on the health care areas should be established.
3.  The IDOC must expeditiously address and track the deficiencies noted in Safety and Sanitation reports prioritizing those work orders that have an impact on preventing disease and injury to inmates and staff.
4.  Also see recommendation #4 in the above Equipment and Supplies section.
5.  The Implementation Plan should include a plan to develop safety, sanitation, equipment and clinical space audits that include a reporting system that is standardized across all facilities.

**Onsite Laboratory and Diagnostics**

*Addresses item II.B.6.g;*
**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

---

[72] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 73;  3rd Report, February 15, 2021 pages 51-52; 4th Report, page 73, 5th Report pages 66-68.
[73] Defendants' Implementation Plan dated 12/30/21, tasks 59-63.

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
The Monitor requested two items.
- Any tool used to audit laboratory or other diagnostic services with an audit schedule that describes what is audited and how often.
- Results of any audits of onsite laboratory or other diagnostic services with corrective action plans.

Neither of these items were provided.

For this report, the Monitor reviewed ten Quarter 3 2022 QI minutes.[74] Five contained data on labs drawn and the number that had to be redrawn. Four of the five had zero redraws out a cumulative 827 during a one month period. All lab specimens are sent to UIC Medical Center. During the December 2022 site visit to Dixon CC the Monitor verified that the turn-around-time (TAT) for lab reports was between 24-48 hours with panic value results being directly called to the Dixon HCU. Similar TATs for lab reports have been identified at each of the seven other facilities[75] inspected by the monitor team since the initiation of the Consent Decree.

The plain Radiology Unit at Dixon was inspected by the Monitor during the December 2022 site visit. The x-ray unit was replaced by an upgraded and refurbished device in the last two to three years. As at all other IDOC facilities visited the x-ray unit is not digital.[76] An x-ray caution/hazard sign was posted on the entrance door to the radiology suite. The leaded aprons were noted to be in good condition. The x-ray technician takes all films while standing behind a leaded glass shield. Dosimeters had started to be worn in July 2022 and the first badges have been sent out for analysis of any radiation exposure; the results had not been received at the time of the site visit. As noted in the Dixon CQI minutes there had been a lengthy one to two week or more TAT for x-ray readings and reports in mid-2022 through September 2022. In October 2022, the radiology service contract was shifted to Springfield Illinois Imaging Center. The TAT has now dropped to 2-4 days, which is acceptable except for urgent films. The x-ray logs of 30 films taken in November and December 2022 [77] were reviewed and the TAT was verified to be 2-4 days. This TAT is now consistent the TAT found at the other sites visited since the Consent Decree was signed.

In September 2022, the sole technician who provides onsite ultrasound services for all IDOC correctional centers left the employment of the contracted vendor.[78] All IDOC facilities have now had to refer individuals to outside medical centers for ultrasonography (US) tests. This has created a delay in accessing US for all IDOC facilities. This has occurred at a time when there are high correctional officer vacancies which has already strained IDOC's ability to provide escorts for

---

[74] The Safety and Sanitation reports in the monthly CQI minutes from either August or September 2022 were reviewed for this Report.
[75] Lawrence, Lincoln, Logan, Pontiac, Robinson, Shawnee, and Sheridan.
[76] The Dixon dental suite has recently been provided with a single chair-side digital dental x-ray unit. This is the first site visited by the Monitor that has any digital x-ray capability.
[77] Six films taken on 11/16/22, and 14 films taken on 12/1/22
[78] Precise Imaging also provides onsite fibroscan testing which is performed by another technician.

offsite medical appointments. The contracted vendor must be pressured to expeditiously hire another US technician to re-start this onsite service.

In October 2021 the IGRA tuberculosis screening blood test replaced tuberculin skin test (TST) at all Reception Centers.[79] The Chief of Health Services has since indicated that the IGRA blood test will be continue to be utilized in IDOC's four Reception Centers.[80] To this date, due to cost concerns, IGRA testing has not been expanded for use in the other correctional centers. The Monitor continues to recommend that the nursing time consuming, logistically cumbersome, finger stick risk prone, and human error misreading TB skin test be discontinued and IGRA blood be utilized at all IDOC facilities.

IDOC nurses provide point-of-care rapid Strep, rapid flu, urine dipstix, finger stick blood glucose, and rapid COVID testing at facilities. These point-of-care tests were available at Dixon during the latest site visit.  It was verified by the Monitor that Dixon had a valid CLIA license that expires on 6/13/23.

The IDOC has initiated cancer screening with the assistance of additional diagnostics. The Monitor continues to recommend that IDOC initiate an electronic tracking log for colon cancer screening that includes:
- The patient name,
- Patient number,
- Date of birth,
- Indication for screening,
- Type of testing
- Result
- Date result communicated to patient,
- For abnormal test results,
  - Date of referral for endoscopy,
  - The date endoscopy was done, and
  - The result of the endoscopy.

**RECOMMENDATIONS:**

1. IDOC must begin the process to convert all of its non-digital medical and dental radiology units to digital equipment.
2. Expand tuberculosis skin testing (TST) with IGRA blood testing to all facilities.
3. IDOC should evaluate the need for radiation exposure monitoring badges in all its facilities providing radiology services and, in addition, investigate and implement any needed safety measures for the panorex units at Logan CC and Menard CC.
4. Create a log to track the results of point-of-care colorectal cancer screening and report this data on a regular basis to the facility's CQI committee meeting.
5. IDOC must work closely with its onsite ultrasound vendor to expeditious reinstitute onsite US through the prison system.

---

[79] This blood test was first recommended by the Monitor in the 2nd report, dated July 2020, pages 79-80.
[80] OHS-Monitor Monthly Conference call 5/19/22.

**Dietary**

*Addresses item II.B.6.j.*
**II.B.6.j.** *IDOC agrees to implement changes in the following areas: Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:** The Monitor requested the following data and information.
1. Provide each facility's dietary plan including nutritional content. This should include the typical ingredients used and the name of the consulting nutritionist who signs off on the plan.
2. Any documents or data on diet and therapeutic diet analysis.
3. Dietician consultant hours provided to IDOC in last year.
4. Commissary list for each facility.
5. List of persons on therapeutic diets at Stateville, Menard, Logan, Pinckneyville, and Graham.
6. Number of individual and group dietary consultations and patient information sessions listing names and #s of inmates and the facility the consultation took place at.

None of this information was initially provided. IDOC did provide items 1, 4, and 5 above in late January 2023, but the information was received late and after this section had already been written. None of the twelve recommendations were undertaken. No proof of practice was provided for this provision. Though IDOC has stated that a consultant dietician has been hired, a provider at Dixon told us that she was unaware of any process for obtaining a nutritional consult. A provider at Menard referred a patient[81] for a telemedicine nutrition consultation and it was approved on 12/23/21. This patient was dependent on tube feeding and it was recommended at the hospital that he receive 70 ml per hour of a specific liquid nutritional product or 1680 ml per day. Flow sheets rarely documented receiving in excess of 1000 ml a day and the patient received as low as 350 ml per day. The patient was not receiving sufficient tube feeding and there was no recognition of this nor was lack of feeding addressed. The consultation was referred to evaluate his nutritional status but it was referred as a routine consultation but should have been urgent. The appointment was ordered 12/23/21 but was made for over six months later in June of 2022. The patient died on 3/28/22 before the patient was evaluated. This is not timely access to a nutritional consult for an urgent matter. Nutritional care was well below standard as the severely ill patient appeared underfed.

In summary, IDOC sent some information requested by the Monitor late. No proof of practice was provided to verify compliance. The audit, developed by IDOC, provides no proof of practice for this provision. It does not appear, based on record review and our interview at Dixon, that nutritional consultation is available within IDOC. This provision remains noncompliant.

---

[81] Mortality review patient #1

64

**RECOMMENDATIONS:**

1. The percentage of fat, protein, carbohydrates and sodium in diets should be calculated and documented for all master menus.
2. Inmates should have access to information on food components in their meals so that those inmates who must choose components based on their medical conditions can do so. This is especially true for diabetics but is also true for those with hypertension and high blood lipids.
3. A registered nutritionist/dietician should be on staff of IDOC to supervise dietary analysis to ensure that all meals contain acceptable nutrients and components based on the latest version of the Food and Drug Administration Dietary Guidelines for Americans.
4. Diet managers at facilities need supervision by and consultation access to a registered nutritionist/dietician.
5. Physicians and inmates with conditions requiring nutritional expertise must have access to a registered nutritionist/dietician for consultation on these needs. These consultations need to be documented in the medical record. Policy, procedure and practice should be modified to ensure this occurs.
6. Access to dietician/nutritionists can be by telemedicine or in person (individual and group) via hiring registered nutritionists/dieticians.
7. The therapeutic diet manual should be rewritten to include all therapeutic diets so, in its entirety including master menus, it is contemporary.
8. Mealtimes should be adjusted reasonably so as not to be a barrier to participation in meals.
9. The commissary food and snack panels must be evaluated and adjusted to include healthy choices appropriate for all inmates including those with diabetes.
10. The extremely low participation in eating meals and astronomical use of commissary should be studied to evaluate how to improve consumption of healthy food. IDOC should analyze timing of meals, behavior, recipes, and preparation factors that may be resulting in the extremely low participation in meals.[82] Reasonable adjustments should be made to encourage healthy dietary patterns. This must be done in a manner that permits both a secure environment and nutritious meals that are eaten.
11. Policy, procedure, and practice should be established to ensure persons with diabetes have access to a registered nutritionist/dietician consistent with American Diabetes Association guidelines.
12. Policy, procedure and practice for all chronic care conditions should include evaluation of diet and access to appropriate referral to a registered dietician/nutritionist when indicated.

# Facility Implementation of Policies and Procedures

**Medical and Dental**

*Addresses item II.B.8.*

---

[82] An example of how this was done, albeit for schoolchildren, is the Centers for Disease Control School Health Guidelines to Promote Healthy Eating and Physical Activity found in Morbidity and Mortality Weekly Report Sept 16, 2011 as found at https://www.cdc.gov/healthyschools/npao/pdf/mmwr-school-health-guidelines.pdf. This document shows how behavior, food preparation and presentation promoted healthy eating.

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested three documents but none were provided. One of the requested documents was the list of policies newly implemented with date of implementation. IDOC did not provide this information but confirmed by email in late September, 2022 that three policies have been made effective.[83] The Monitor has asked but IDOC has not confirmed that one policy, the Immunization and Cancer Prevention Screening Administrative Directive, has been made effective.

For the three policies that were definitely made effective, IDOC provided no data or information regarding training or steps taken to implement the policies. The is no evidence of facility level implementation for these policies. For the Immunization and Cancer Prevention Screening Administrative Directive, record reviews confirm that this policy has not been effectively implemented at the facility level.

In the Implementation Plan of 12/31/21, IDOC stated it would:
- Ensure training on policies is provided to all sites;
- Provide training on how facilities will take corrective actions;
- Develop written procedures for expectation of training to include on new policies;
- Hire a training coordinator;
- Establish a plan to provide standardized training and centralized reporting of training completion and subject knowledge of existing staff, orientation of new staff, annual evaluation of staff knowledge and compliance with policy and procedure;
- Finalize the quality improvement policy and develop a training plan to be used for facility staff;
- Develop a standardized safety and sanitation policy and outline necessary training;
- Training on dental policies and procedures; and
- Standardize urgent/emergent policies and procedures and include expectations for training and validate staff competency.

There is no evidence that any of these policy implementation tasks in the Implementation Plan have been initiated.

A complete set of policies is not yet accomplished. Three policies have been confirmed as being made effective but no policies have been shown to be effectively implemented at the facility level. This item continues to warrant a noncompliance rating.

---

[83] On 10/1/22 IDOC made the quality improvement, peer review and mortality review policies effective. On 1/19/21, IDOC sent the Monitor a final draft of an immunization and cancer screening prevention screening administrative directive. IDOC was asked but has not confirmed whether this administrative directive is an effective policy.

**RECOMMENDATIONS:**

1. IDOC needs to follow the Court-ordered Implementation Plan with respect to training at the facility level for all newly developed policies. This should result in a standardized methodology for implementing policies and procedures that ensure that all employees are properly trained for those procedures that they will need to fulfill their job responsibilities.

# Intrasystem Transfers

*Addresses item III.D.1; III.D.2*

**III.D.1.** *With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.*

**III.D.2.** *When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The Monitor requested the following information from IDOC to aid in evaluation of compliance with III. D. 1 and 2 for this report:

- List of persons referred per facility for specialty care and placed on transfer hold from April 2022 through September 2022 listing the date the medical hold was placed. The Monitor suggests adding a column to the log of off-site specialty referrals to document the date a transfer hold is placed.
- For all incoming transfers who arrived at Stateville, Illinois River, Dixon, Hill, and Western, during the 3rd and 4th week of September 2022 provide copies of the intersystem transfer form, nurse reception note, documentation of documents received at receiving facility including medical record, problem list, MAR, health summary, active medications, and any referrals to chronic care clinic of If the patient was referred directly to a physician by the receiving nurse, the physician's note should be provided.[84]

Neither of these documents were received from IDOC. Thus, this evaluation of compliance is based upon review of records during the site visit to Dixon December 5- 7, 2022, monthly reports, memos to the Monitor, other documents provided for review and review of the records of persons who died in IDOC custody during the period covered by the 6th Report.

No further work has been accomplished in the development of a policy and procedure on intrasystem transfers that incorporates the requirements of III.D.1 or III. D. 2. The 5th Report noted

---

[84] 10/20/2022 Monitor's document request for the 6th Report, items 115 and 116.

that comments and suggested revisions on a draft policy and procedure had been returned to IDOC in August 2020.[85]

We also noted in the last report, a preference for the 12/30/2021 version of the implementation plan and task (39) to develop policy for medical holds which included seven subtasks. These were development of guidelines and forms, procedures for transferring facilities to reconcile medications, problem lists, in-house referrals, coordinate continuity of care, documentation of handoff communication, coordination by OHS of patients with complex care needs, standardized procedures for transfer to ensure care continuity, and development of an audit instrument and education of staff. Our feedback to Defendants on this task was that we agreed with all of the subtasks but suggested that it could be subsumed under task 38 that dealt with development of comprehensive medical policies, with the assistance of the Monitor. [86]

We reviewed the facility reports that are provided quarterly, in particular the transfer study and CQI meeting minutes. Dixon's CQI minutes document discussion that they were receiving increased numbers of patients with open referrals on transfer.[87] The CQI minutes from Vienna[88] report a study to see if transfer holds are removed following resolution of treatment. They looked at 100 persons who had transfer holds in the 0360 Medical Maintenance Report. Thirty-one individuals had transfer holds which should have been removed. Compliance with removal of the transfer hold within a month of the referral's resolution was 69%. The recommendation was to discuss and develop a procedure to track resolution of specialty referrals and remove transfer holds. Pontiac's CQI minutes also reflect a discussion that there are patients who want holds lifted so they can transfer elsewhere but many have serious conditions that require lifelong treatment. They also noted that they have received many individuals at the facility with open authorizations or pending appointments who had their hold lifted or the hold was never placed. They identified the need to elevate the issue to OHS.[89]

The Monitor asked about medical holds and intrasystem transfer while at the Dixon site visit in December. The Director of Nursing explained that a medical hold is put into the 360 system (Offender Management System) by providers, health care managers and the writ office whenever an incarcerated person has a specialty referral (including those not yet scheduled). This system identifies any incarcerated person scheduled for transfer to another facility who has a medical hold. The person cannot be transferred unless cleared by OHS. If the transfer is approved there must be person to person contact between the sending facility and the receiving facility health care programs. The Monitor followed up with a request to the HCUA for any written guidance on the practice of placing and removing medical holds and received a response that there was no written guidance regarding placement or removal of medical holds. [90]

---

[85] Health Care Monitor 5th Report, Lippert v. Jeffreys, June 22, 2022, page 72.
[86] Monitor's redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.
[87] May 2022
[88] July 2022
[89] August 2022
[90] Email from Special Litigation Counsel dated 12/22/2022.

The Monitor recently received correspondence from an advocacy group for people with disabilities that the application of medical holds was causing individuals to be held at a facility when it was not in their best interests and specifically cited problems at Pontiac, similar to the discussion in the CQI minutes cited in the preceding paragraph.[91]

The monitor communicated to IDOC that he was not opposed to IDOC developing a policy or protocol that addresses incidences where intra-system transfers should occur in spite of the existence of a medical hold. These exceptions to III.D.1 should be decided on an individual, case-by-case basis, in consultation with the OHS clinical leadership, with the justifying rationale documented in the medical record.[92]

It is clear that IDOC has a mechanism to place medical holds as required by III.D.1 but has issued no guidance about their use. It is also clear that medical holds are not placed when they should be, as evidenced by complaints of receiving patients on transfer who had pending referrals. One of the mortality review patients also had a pending referral at the time of transfer which was not communicated to or otherwise noted by the receiving facility.[93] It is also clear that medical holds are not removed when they should be, as evidenced by the study completed by Vienna in July 2022.

IDOC does have an audit tool that receiving facilities can use to evaluate the condition of the record and whether the health status transfer summary was completed and sent with the record. During this past six month period, however only East Moline and Kewanee have reported audits using this tool. East Moline reported 100% performance on 325 transfers received from April through September 2022. Kewanee audited 47 transfers during this same six month period but reported only 55% of the health status transfer summaries were completed or sent with the record. However, the tool does not address *continuity of care* as called out in III.D.2. The Monitor has recommended that this tool be expanded[94] to include the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary, whether the MAR was transferred concurrently, and that care was continued without interruption (medications, pending appointments and completion of referrals).

At the Dixon site visit the Monitor team was told that transfers are brought to the HCU for initial screening and are scheduled the next day for a more thorough review of the chart and health screening.[95] No timeframe was given for this initial review but in the Monitor's opinion it should be completed within six hours of arrival.[96] There is no documentation on the HSTS of the time of arrival and the time of the screening encounter is not always noted. So, it is not possible to monitor the time elapsed from arrival at the receiving facility to receiving screening in the health care unit.

[91] Email from Amanda Antholt to Dr. Raba dated January 9, 2023.

[92] Email from Jack Raba to the Parties dated January 11, 2023.

[93] Mortality Review Patient # 15. The pending referral was for a sleep study.

[94] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, pages 78-79, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 57, Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 92, Health Care Monitor 5th Report, Lippert v. Jeffreys, June 22,2022, page 73.

[95] Interview with the Director of Nursing at Dixon on December 6, 2022.

[96] This is so that patients receive timely continuity of scheduled treatment and to identify any patients with acute conditions for immediate intervention and disposition.

Documentation of transfer screening and continuity of care in the medical records of 11 transfers received at Dixon was reviewed. Nine of eleven included a Health Status Transfer Summary (HSTS) completed by the sending facility[97] and one of the HSTS was incomplete (or 73% compliance).[98] In addition, one chart had loose filing. Dixon health care staff do not complete the receiving facility portion of the HSTS, a progress note is written instead. We commented in the 5th report that documentation on the receiving portion of the HSTS appears to be voluntary and there is no standardized practice for documentation of receiving screening and cited Dixon as an example of this variation.[99]

One patient refused a transfer-in screening, and the refusal was documented in the progress note.[100] It would appear, that because of the refusal, no other information was reviewed, and no additional information collected. We recommend that in the event of a refusal, a note be written to indicate the nurse's review of the HSTS form and the contents of the medical record, and that the nurse document objective observations of the individual (cognition, mood, gait, skin condition etc.) as well as the disposition. Simply noting the refusal is incomplete transfer of care.

The sample consisted of eight persons on the mental health caseload. There also were four persons enrolled in a chronic clinic. One person missed medication on the day of transfer[101], others were either not on medication or it was continued without interruption. Documentation of diagnoses did not match the problem list in three charts reviewed.[102] The DON stated that accuracy of the problem list is an area that they have identified as an opportunity for improvement.

Three of the mortality records reviewed also indicate that persons are transferred before expected evaluations are completed and that information which should be provided to the receiving facility is missing or inaccurate.

Mortality Patient 15 was 69 years old and had a history of COPD with asthma and hypertension. He was transferred from NRC to Danville on 11/28/21. It was noted earlier in this section that he had a pending referral at the time of transfer. The transfer summary also failed to note that he had been discharged from the infirmary earlier in the month, after a stay of 33 days for difficulty breathing. He was on 10 medications at the time of transfer, of which only three were "Keep on Person". Medications were not listed on the transfer summary, but the statement "See MAR" was, so presumably the MAR was transferred as well. All these medications, with the exception of albuterol solution used with a nebulizer, were transcribed correctly to a Danville MAR for October 28-31, 2021. Documentation on this MAR indicates that he received none of these seven medications "dose by dose" medications, except for one dose of atorvastatin given on 10/31/2021.[103] The patient had been issued enough albuterol solution at NRC to use with his

[97] There was no HSTS in Intrasystem Transfer Patients # 10 and 11.
[98] Intrasystem Transfer Patient # 1.
[99] Health Care Monitor 5th Report, Lippert v. Jeffreys, June 22, 2022, pages 73-74.
[100] Intrasystem Transfer Patient # 10.
[101] Intrasystem Transfer Patient # 1.
[102] Intrasystem Transfer Patients # 2, 5, 3.
[103] Missed medications included three doses of atorvastatin, four doses of montelukast and Spiriva, eight doses of dulera.

nebulizer until 10/30/2021. The MAR at Danville for the following month (November 2021) changed the seven "dose by dose" medications to "Keep on Person". There is no documentation that the patient's ability to be responsible for taking these medications was assessed nor did he receive any education to ensure that he knew when and how to take them. On 11/1/2022 two inhalers were discontinued, and two new inhalers were prescribed by the provider. There is no documentation that the discontinued inhalers were obtained from the patient when the new inhalers were issued on 11/4/2021. It appears that the use of albuterol solution with the patient's personal nebulizer was allowed to expire, but there is no provider documentation of the rationale or that it was intentional.

Mortality Patient 9 arrived at NRC on 6/3/2021 and had been prescribed three psychotropic medications while in jail.[104] A 30 day bridge order was obtained to continue these. He refused to see the psychiatrist on 6/29/21 and 6/30/21. The patient received the last dose of the bridge medications two days later on 7/2/21. He was transferred to Shawnee on 7/8/2021 with a transfer summary that omitted the fact that his bridge order for psychotropic medication expired six days earlier and that he refused to see the psychiatrist on two consecutive days the week before. Also omitted was the fact that he had been jumped by another individual six days earlier and sustained minor injuries. A nurse at the receiving facility identified the expired medication orders the day after transfer, during record review. Another bridge order was written on 7/9/21 for the same medications but he did not receive these. It is not until 7/15/21 that he began receiving psychotropic medication again or a lapse of 13 days.

Mortality Patient 9 was transferred to Menard six months later on 12/8/21/21. The transfer note written by an LPN did not give the correct dose of Lamictal.[105] It also did not specify that the patient had back surgery, just back symptoms. Other pertinent information missing from the transfer summary was that he was extremely non-compliant with prescribed psychotropic medication. The fact that he had been on crisis watch from 10/30/21 until 11/10/21 and had been involved in a cell extraction four days earlier was also not included on the HSTS. This person was placed in segregation and for the next two months refused nearly most of the psychotropic medications prescribed. One medication expired in February without a new order; it is not clear if this was intentional. This patient had a clearly declining mental health condition when he was transferred from Shawnee to Menard which was not evident on the transfer summary. After arrival at Menard his mental condition continued to decline until his death by suicide three months later. He was judged by the psychiatrist as not having symptoms sufficient to warrant involuntary treatment although it is not apparent that the patient ever allowed the psychiatrist to evaluate him. The suicide review identified that the record sent from Shawnee at the time of transfer was missing documentation that would have indicated the need for crisis follow up with the patient.[106]

Mortality Patient 11 was a 24 year old, sentenced to 26 years and this was his first term of incarceration at a state prison. He was received at NRC on 3/15/2022 with a history of intermittent asthma, depression, substance use disorder and a gunshot wound in 2018. He was prescribed mirtazapine, an antidepressant, Xopenex, an inhaler for asthma, and acetaminophen for pain as a

---

[104] Buspar 15 mg. QD, Zyprexa 7.5 mg @ HS, and Zoloft 100 mg QD.
[105] Lamictal is an anticonvulsant medication which can also be used to treat bipolar disorder.
[106] Review of Suicides and Self Injuries Report dated March 7, 2022.

bridge order from the county jail. The psychotropic medication was reordered on 4/14/2022 without seeing a psychiatric provider. He was transferred to Menard eleven days later (4/25/2022) without having any mental health contact other than the initial mental health screen. At Menard a second bridge order for the same medications was written but he did not receive any of these doses. Instead, a new order for a lower dose of the antidepressant medicine was written on 4/26/2022. He received his first dose of the antidepressant 11 days after transfer. He was found hanging four days later. He was at two IDOC facilities in the first 50 days of incarceration and had yet to see a psychiatric provider, even though prescribed an antidepressant medication. He also was never seen for a baseline evaluation of asthma by a chronic clinic provider.

There does appear to be an institutional practice that allows medical holds to be placed, however there are no written instructions to guide this practice. There are reports and records that indicate patients are transferred with pending referrals and other patients are held when it would be in the better interest of their care to be transferred. The IDOC does not monitor this practice. We also found failures to seamlessly transfer complete and relevant information about the patient along with the medical record and medication administration record (MAR) with notable risk in the interruption of needed care. Neither does IDOC monitor continuity of care when patients are transferred from one facility to another. Recommendations 3 and 4 below were added to the Monitor's recommendations from previous reports.[107]

**RECOMMENDATIONS:**

1. Finish the policy and procedure and ensure that the means and methods to carry out III.D. 1 & 2 are detailed, develop performance measures, and monitor performance to document compliance with the Consent Decree. The procedure should define what steps the sending facility is to take in documenting pending referrals, identifying tasks not yet completed, reconciliation of medication lists, and detailing current medical and mental health problems. The procedure needs to do the same with regard to specifying the receiving facility's obligation to verify the transfer information, examine the patient and document actions taken to continue ongoing care and address new problems.

2. Augment the scope of the Medical Record Transfer study to include the concurrent transfer of the MAR, evaluate the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary and whether there is any discontinuity in the plan of care in the immediate days after arrival at the receiving facility.

3. The receiving screening form should include the time the person arrived at the receiving facility in addition to the time receiving screening was completed. The time elapsed from arrival to receiving screening should be less than six hours.

4. If someone refused receiving screening the nurse should document observation of the person's condition, review of the records sent from the sending facility, and the disposition of the person when this review is completed. A documentation simply that receiving screening was refused is insufficient.

---

[107] Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, pages 91- 92, Health Care Monitor 5th Report, Lippert v. Jeffreys, June 22, 2022, pages 72-75.
.

# Medical Reception

**Nurse and Dental Intake Screening**

*Addresses Items II.A; II.B.1; II.B.6.a; III.C.1*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment*
**III.C.1.** *IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

In the Monitor's 5th report, the compliance rating for medical reception was changed to partial because IDOC had produced a second draft of a policy on medical reception, an increase in allocated positions, and the initiation of IGRA testing in screening for tuberculosis infection at Reception Centers. There has been no further forward progress by IDOC implementing changes to initial intake screening (II.B.6.a) or staffing sufficient to complete medical evaluations within seven days of admission (III.C.1).

Information[108] requested by the Monitor for this report included:
- Handbook provided to persons in custody of IDOC.
- Documentation of which nurses by name and licensure were assigned to complete intake screening during the month of September 2022.
- A log of all persons received at intake facilities.
- Until IDOC develops performance audits on these service components, send the Monitor intake charts from 20 new admissions to NRC and 10 new admissions to each of Menard, Logan, and Graham.
- Any tool developed by defendants to self-monitor performance of intake screening by nurses.
- Any CQI or performance audits with results of study, analysis, and corrective action for intake screening.

---

[108] 10/20/2022 Monitor's document request items 117, 74, 119, 118, 40, and 174.

The Monitor received seven of 20 intake records requested from NRC, and eight of ten records from Logan, and ten records each from Graham and Menard.[109] While IDOC provided copies of audit tools in use as IDOC Clinical Quality Measures none provide any information about the quality or performance of intake screening. Therefore, this evaluation of compliance is based upon review of review of 35 records, review of mortality records, monthly reports, memos to the Monitor, and other documents provided since the last report.

The 5th Report noted that the Monitor had provided comments on a second policy draft of a revised policy and procedure on medical reception.[110] No further drafts of a revised policy on medical reception have been received. The Monitor suggested that the Defendants' draft implementation plan include tasks related to training, the revision of forms, evaluation of additional equipment or supplies needed to implement revisions to medical reception, and monitoring implementation of the new process. These comments were provided in the Monitor's redlines and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.[111]

IDOC has continued the practice initiated in 2021 of replacing the tuberculin skin test with IGRA testing at Reception Centers however this practice is not formalized in policy, procedure or other written directive. IGRA testing was universally present in the intake charts reviewed.

IDOC has allocated an additional 53.45 positions at the four reception centers since December 2020.[112] These additions included a physician at Logan, and nurse practitioner/physician assistants at NRC and Menard. [113] However there has been a net loss of <u>filled</u> positions at the reception centers. In December 2020 a total of 221.4 positions were filled, while in September 2022 only 195.75 positions were filled. There are 25.65 fewer people working in health care at the four reception centers compared to two years ago. Vacancies exceed 15% for primary care providers and nursing staff at all four reception centers, and for dentists at three of the reception centers. Managers are necessary to lead change and to ensure accountability and yet vacancies among these positions exceed 15 % at all reception centers.

| Vacancies as a percentage of allocated positions 9/12/2022 | | | |
|---|---|---|---|
| | NRC | Graham | Menard | Logan |
| Primary care providers | 17% | 25% | 40% | 21% |
| Dentists | 0% | 38% | 66% | 85% |
| Nursing staff | 31% | 55% | 59% | 79% |
| Management | 30% | 60% | 71% | 50% |

In the 5th Report we noted the dramatic decline in the number of intakes because of efforts to control COVID transmission and commented that this mitigated the impact of unfilled positions on the timeliness and quality of medical reception.

---

[109] Logan also sent 10 records but two were damaged and the file could not be opened.
[110] Page 76.
[111] See redline and comments on tasks 2, 7, and 38.
[112] Staffing update 12/15/2020.
[113] NRC added 1.5 NP/PA and Menard added 1 NP/PA.

| | Average intake per month | | | |
|---|---|---|---|---|
| | NRC | Graham | Menard | Logan |
| 2022 | 737 | 167 | 45 | 99 |
| 2021 | 149 | 20 | 12 | 10 |
| 2020 | 368 | 81 | 13 | 27 |
| 2019 | 935 | 251 | 51 | 112 |

It appears that intakes are returning to pre-pandemic rates.[114] However IDOC has only filled a net of 6.5 positions out of the 175 that were vacant six months ago.

The lack of a phlebotomist at NRC also has not been addressed by the IDOC.[115] The other reception centers have fewer intakes, and each has dedicated phlebotomy staff. In less than half the intake records from NRC were lab results available. [116] The Monitor noted the phlebotomy position at Menard is vacant and labs were not available when the assessment was done in 30% of the charts reviewed.[117] As stated in the last report, the effectiveness and accuracy of health assessments is greatly compromised by not having laboratory data available at the time of the encounter. [118]

There are currently no metrics or performance measures for receiving screening, and it is not discussed or reviewed at CQI meetings. One metric, apparent in the Consent Decree, is that there must be sufficient staff to complete medical evaluations within seven business days.[119] This metric is not tracked, monitored, or reported by IDOC. Of 35 intake charts reviewed for this report 51% of the medical evaluations were not completed within 7 business days.[120] Failure to timely complete medical evaluations and lack of lab results at the time of the health assessment suggest staffing at reception centers is insufficient.

Credit for adding needed positions cannot be sustained if there is little or no forward progress filling them. The Monitor insists on a more robust recruitment program to fill vacant health care positions than was outlined in the 12/31/21 version of the Defendants draft implementation plan.[121]

The findings from review of 35 intake records are displayed in the following table:

---

[114] The numbers in this table were calculated using the Prison Admission Data Sets for CY 22, CY 21, CY 20 and CY 19 available at Prison Admission Data Sets - Reports (illinois.gov).
[115] The Monitor has commented on the disparity in staffing phlebotomy repeatedly. See the Health Care Monitor 4th Report, September 16, 2021, page 94 and the 5th Report, June 22, 2022, page 77.
[116] Reception Patients 32, 33, 34, 35 labs not available at the time of the Health Assessment.
[117] IDOC Facility Staffing as of 9/12/2022. Reception Patients 19, 22, 28 labs not available at the time of the Health Assessment.
[118] Health Care Monitor 5th Report, June 22, 2022, page 77.
[119] III.C.1.
[120] Reception Patients 1 - 18.
[121] See redline and comments on tasks 2 – 3.

|  | NRC | Menard | Graham | Logan | Total |  |
|---|---|---|---|---|---|---|
| Number of intake records reviewed | 7 | 10 | 10 | 8 | 35 | Percent Accomplished |
| Complete set of vital signs taken | 7 | 9 | 10 | 0 | 26 | 74% |
| Vision screening completed | 6 | 8 | 0 | 5 | 19 | 54% |
| Lab and diagnostic work initiated | 6 | 10 | 10 | 8 | 34 | 97% |
| Immunization history taken | 3 | 9 | 10 | 0 | 22 | 63% |
| COVID vaccine offered | 0 | 5 | 10 | 1 | 16 | 46% |
| Flu vaccine offered | 0 | 0 | 0 | 0 | 0 | 0% |
| Previous records requested | 0/5 | 1/6 | 0/4 | 2/7 | 3/22 | 14% |
| Essential meds ordered | 1/1 | 1/2 | 1/1 | 2/4 | 5/8 | 63% |
| All medical conditions were identified at intake | 5 | 6 | 6 | 8 | 25 | 71% |
| Referral to provider appropriate? | 5 | 9 | 9 | 3 | 26 | 74% |
| STI screening completed | 7 | 10 | 10 | 8 | 35 | 100% |
| Additional labs were ordered for evaluation of chronic illness | 0/4 | 1/3 | 0/1 | 3/6 | 4/14 | 29% |

The only results from record review that were acceptable were the initiation of lab and diagnostic work and screening for STDs. The records received were from intakes that took place in August, September, and October. Influenza vaccine would not normally be offered in August. However, influenza vaccine was recommended to take place as early as September this year and yet no intakes in September or October were offered this vaccine as part of the medical reception process. Graham was the only facility that documented a review and determination if COVID vaccine should be offered. COVID vaccine was not consistently offered to eligible individuals at the other reception centers.

Documentation of an immunization history is done consistently at Graham and Menard but only accomplished sporadically at NRC and not at all at Logan. There was no evidence in any of the intake records reviewed from reception centers that I-CARE, the Illinois vaccine registry was checked. One of the mortality records reviewed had an I-CARE vaccine history but it was not obtained at part of reception screening but only after the person transferred to another facility six months later.[122] Of two other mortality review patients with recent admissions neither had a vaccine history or I-CARE obtained. [123]

At Logan vital sign results are not documented as part of the intake screening note completed by the nurse. Vital sign results are included on the physical exam completed by the provider and are dated as having been taken the day intake screening was completed. It is unclear if the nurse is aware of the vital signs when determining the urgency of the referral to a provider for the health assessment since they are not documented as part of the intake screening note. Vision screening is not consistently performed at reception centers.

There is no protocol to guide nurses as to which conditions reported during intake screening should

---

[122] Mortality Review Patient 9.
[123] Mortality Review Patients 11 and 15.

prompt a request to obtain previous records. Patients whose medical records should have been obtained include individuals who were awaiting spinal surgery when detained, current treatment for hiatal hernia, current treatment for a wound, recent suicide attempt, current treatment for multiple chronic conditions, or current treatment for psychiatric disorders. [124]

There is little to no documentation of follow up questions to elicit more information or an examination when patients report a physical or mental health condition. Three persons[125] reported taking mental health medications previously and the nurse did not elicit what the medications were or when they were last taken. Another person [126]complained of a rash and was urgently referred to the provider whose diagnosis was dry skin. The nurse apparently did not look at the "rash" since there is no description of it or its location. The wounds reported by another person[127] which were being treated while at jail, were not described or the size noted, just that they were located on the left upper and lower extremities. There is no documentation that the wounds were examined by the intake nurse. Another person[128] reported being on four medications to treat hypertension. However, the nurse did not inquire or document what the medications were, the dosage, or the last dose taken. Another person[129] wore corrective lens but the nurse did not document both uncorrected and corrected vision.

There were numerous examples of persons with abnormal vital signs, for whom there was no follow up or the problem was not identified. Most of these were elevated blood pressures[130]- the standard is to repeat the reading later in the encounter and if still abnormal either contact the provider for orders (needs urgent treatment) or initiate serial readings and schedule review by a provider a week or so later. Abnormal weights[131] (obesity) also were not identified for four persons during intake screening. There were two persons who reported taking medication for hypertension for whom medication was not ordered timely.[132] One person had a prior PPD of 20 mm which the nurse did not note at intake screening but was picked up at the physical exam.[133] When these omissions are considered individually they may not be significant, however the collective frequency indicates that intake screening does not accurately and thoroughly identify the health status of persons arriving for a term of incarceration for the purpose of initiating essential care.

There were several inappropriate referrals to providers. These include patients who had conditions for which an urgent referral was indicated but were referred routinely.[134] The person who reported a rash would likely have been a routine referral, if the rash had been evaluated by the nurse, instead he was referred urgently. This was also an inappropriate referral.[135]

---

[124] Reception Patients 5- 6, 8- 9, 11, 13- 14, 15, 18 -20, 24, 27- 28, 34. Mortality Review Patient 15.
[125] Reception Patients 4, 35
[126] Reception Patient 35.
[127] Reception Patient 13.
[128] Reception Patient 9.
[129] Reception Patient 31.
[130]Reception Patient 4, 5, 7, 16, 22, 26, and 32. Mortality Review Patient 15.
[131] Reception Patient 6 with BMI of 33, Reception Patient 16 with BMI of 39, and Reception Patient 24 with a BMI of 38. Mortality Review Patient 15 with a BMI of 31.
[132] Reception Patient 31 and 33.
[133] Reception Patient 21.
[134] Reception Patients 13, 15, 17, 18, 28, 29.
[135] Reception Patient 35.

No receiving facilities were visited during the time covered by this report, so the physical facility, space or equipment devoted to intake screening was not observed. The tools used for safety and sanitation rounds at the four reception centers remain unchanged and do not uniformly evaluate privacy and confidentiality of clinical space, operability of equipment, and infection control risks and there is little change documented as a result of these rounds.

OHS has yet to establish an improved process for intake screening and assessment or to sufficiently account for the staffing necessary to accomplish this work as called for in II.B.6.a. and III.C.1 of the Consent Decree. The loss of filled positions since December 2020, the lack of progress on policy and procedure since August 2020, and the lack of progress in making needed changes to intake screening put this section at risk of noncompliance on II.B.6 and III.C.1. The Monitor intends to visit an intake facility before the next report to further review these processes.

The Monitor's recommendations remain unchanged from the 5th Report.

**RECOMMENDATIONS:**

1. Map out the steps that need to be included in receiving screening to ensure that it identifies, treats, and ensures the appropriate care and housing of persons with acute and chronic medical and mental health conditions as well as establishing and carrying out plans to achieve and maintain individual health during incarceration and upon return to the community.[136]
2. Develop a staffing standard for receiving screening that is workload driven.
3. Develop metrics to provide information on the timeliness and thoroughness of medical reception (III. C. 1, 3 & 4).[137] Reception Centers should report their performance results to CQI on a regular basis.
4. Finalize the policy and procedure on medical reception consistent with the process map and metrics; then implement it.
5. The Monitor acknowledges that IDOC has piloted IGRA testing at Reception Centers since October 2021 and recommends that IDOC adopt by policy that tuberculin skin testing will no longer be relied upon to screen for tuberculosis.
6. Privacy and confidentiality of space used for clinical encounters should be included in safety and sanitation rounds of the health care program. These rounds should also account for inoperable or unsafe equipment and condition of the space, infection control risks and uncleanliness.
7. Develop a clinical audit tool that evaluates the appropriateness, quality, and continuity of health care during medical reception as well as compliance with the policy and procedure. Audit medical reception with this tool (s) at least quarterly until performance is better than 90% on each criteria for three successive quarters.
8. Establish a more robust recruitment plan and fill vacant positions at Reception Centers.

---

[136] Raba, J. (2006) Intake Screening and Periodic Health Evaluations. In M. Puisis (Ed.), Clinical Practice in correctional medicine. Page 42. Philadelphia: Mosby Elsevier.
[137] Recommended metrics were provided in the Monitor's 5th Report, page 78.

**Health Assessments**

*Addresses items II.A; II.B.6.a; III.C.3; III.C.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*

**III.C.3.** *IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.*

**III.C.4.** *If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor's request for data and information from IDOC is the same as that listed for the preceding section on Medical Reception. A total of 35 records of persons received at the reception centers in the month of August – October 2022 were reviewed.[138] There also were four mortality reviews which included records of recent admissions which were considered in this review. While IDOC also provided copies of audit tools in use as IDOC Clinical Quality Measures none provide any information about the quality or performance of health assessments. With respect to recommendations from the Monitor's 5th Report, the Monitor has received no information that any of the recommendations were acted on. Therefore, this evaluation of compliance is based upon review of review of 37 records, monthly reports, memos to the Monitor, and other documents provided since the 5th report.

The Monitor has recommended that IDOC re-design the medical reception process so that the work of nurses and providers is integrated to result in a thorough evaluation of every patient to establish a complete inventory of their chronic and acute illnesses. The Implementation Plan submitted 12/30/2021 does contain a task to develop a standardized protocol for patient treatment in reception centers. We have recommended[139] that the standardized protocol ensure:

- Medical and dental history and physical exams are completed.
- Problem lists are completed by providers.
- Panorex x-rays will be performed on all new admissions to the IDOC.
- Intake screening dental examinations include intra- and extra-oral tissue examination.
- Chronic and acute illnesses and dental conditions are listed on a problem list.

---

[138] Seven intake records were received from NRC, ten records each from Graham and Menard. Logan also sent 10 records but two were damaged and the file could not be opened.

[139] See the Monitor's comments on task 94 of the redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/22. See also comments on tasks 52, 27 and 84.

- Patients receive initial medical and dental treatment plans and timely referrals for evaluation and development of comprehensive medical and dental treatment plans based on acuity.

In the 5th report the Monitor noted that comments had been returned on drafts of policy and procedures for receiving screening and health assessment. This was in August 2020. The Monitor has not been advised of any further progress concerning these documents. Furthermore, the draft policy on Immunization and Cancer/Preventive Screening Programs does not appear to have been finalized. It was not among the list of updated Administrative Directives sent in response to the Monitor's request and was not included among the list of directives in the 2023 RFP for a medical vendor.[140] Please see the Monitor's comments on existing policy and practice with regard to the initial health assessment made in the 4th report.[141] There has been no progress addressing the criticisms or recommendations made to improve the initial health assessment.

IDOC currently conducts no clinical quality reviews of the initial health assessment and has provided no plans for this in the near future. Of the 35 intake records that were available for review it is clear that observations and findings made in earlier reports remain unchanged. With regard to III.C.3 that a clinician or Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner. Problem lists vary widely in how they are completed and what problems are listed. For example, approximately half of the charts reviewed indicated whether the person had a drug allergy, half did not. Sometimes the problem list indicated if the person was a smoker or gave a history of drug use. One patient's problem[142] was listed as "impaired vision", rather than stating the person was myopic and wore corrective lenses. There is no clear definition of what the problem list is used for and what content is to be listed.

Problem lists are wholly inaccurate for the purpose of summarizing of the person's health status. For example, with the exception of Logan, mental health diagnoses are seldom listed, even when the patient is prescribed psychotropic medication.[143] Sometimes the word "psych" is listed on the problem list, but this is neither a diagnosis nor problem. Diagnosed medical conditions are often not listed on the problem list either.[144] For example, a 52 year old[145] who gave a history at intake screening of taking medication for hypertension, his right foot had been reconstructed and used a cane, and he gave a history of mental health treatment. The problem list includes no known drug allergy, hypertension, depression/anxiety, insomnia, post-traumatic stress disorder and low back pain. However, the physical exam lists GERD[146] as one of his problems, which he was treated for but was not added to the problem list. Also, he is prescribed Lipitor[147] without any corresponding diagnosis on the problem list. The problem list does not include anything about the reconstructed right foot.

---

[140] 10/20/2022 Monitor's document request item 67.
[141] Health Care Monitor 4th Report, September 16, 2021, pages 97-100.
[142] Reception Patient 4.
[143] Reception Patients 4 -6, 8, 28, 33 and 35 gave a history of prior mental health treatment but there is no diagnostic statement on the problem list. Reception Patients 9, 20 and 25 have orders for psychotropic medication with no corresponding diagnoses on the problem list.
[144] Reception Patients 10, 11, 14, 16, 19, 29, 30, 33 and 34.
[145] Reception Patient 31.
[146] Gastroesophageal reflux disease
[147] Lipitor is commonly used to treat abnormal lipid levels in the interest of preventing cardiovascular disease.

With regard to III.C.4 providers failed to work up some problems that were identified in intake screening and did not routinely comment on abnormal lab results.[148] For example, one patient received at NRC gave a history of hypertension and seizure disorder at the initial intake screening. The patient's report of seizure disorder was not addressed in the history, physical examination, or plan of care, although it was listed on the problem list.[149]

Examinations were incomplete. For example, a provider documented that a patient's ears were abnormal without describing the abnormality.[150] Another documented that a person's lung sounds were diminished, again with no description or additional examination.[151] Another patient gave a history a recent knee injury treated surgically. The physical examination simply stated that he had a knee injury with surgery and noted presence of a surgical scar. There was no evaluation of range of motion, weight bearing ability, sensation etc. Yet the problem list includes the diagnosis, neuropathy, and he was prescribed gabapentin.[152] There were three persons with a body mass index greater than 30 who did not have obesity identified as a problem.[153] There were three individuals who should have been evaluated for cognitive disabilities. One of these was a 22 year old, who was on SSI because of an intellectual disorder; his mother was his guardian.[154] Health care providers should at least have identified him as vulnerable in general population and referred him for an intellectual assessment. Two others should have been evaluated for traumatic brain injury as they each gave a history of head injury in the last two years. [155]

The intake physical examination of another individual[156] identified COPD, Parkinson's disease, high blood lipids, and an unknown heart condition. Yet the provider for this patient failed to include any history of the patient's conditions including Parkinson's disease or COPD. The patient's gait, neurologic examination, or neurocognitive evaluations were not completed to determine the status of his Parkinson's disease. The patient was not referred to a neurologist. The provider did not determine whether the patient could reasonably perform activities of daily living given his Parkinson's disease. The patient entered IDOC on prednisone, presumably for COPD but there was no history to indicate why the patient was on prednisone. A history of the COPD was not taken, and pulmonary function testing was not ordered for his COPD. Old records were not requested. Colorectal cancer screening was not done. A smoking history was not taken, let alone the number of pack-years, and it was unclear whether the patient needed lung cancer screening.

Another patient[157] was 59 years old and gave a history of COPD, was a smoker, had hypertension, a gunshot wound to the stomach, and a swollen left leg for one and a half months for which he was receiving an antibiotic. All of the physical systems on the physical exam form are marked "normal"

---

[148] Mortality Review Patient 16 and 17. Reception Patients 1, 5, 6, 10, 11, 15, 21, 26, 28, 29, 30 and 33.
[149] Mortality Review Patient 16.
[150] Reception Patient 33.
[151] Reception Patient 31.
[152] Reception Patient 32.
[153] Reception Patients 6 with BMI 33, 16 with BMI 39, and 24 with BMI 38.
[154] Reception Patient 5.
[155] Reception Patients 16 and 29.
[156] Mortality Review Patient 17.
[157] Mortality Review Patient 15.

even though he was assessed by the provider to have cellulitis of the left leg, his blood pressure is elevated, and his oxygen saturation is low. The provider ordered treatment for these conditions but did not examine the patient thoroughly. Although the patient named his primary care provider and a pulmonologist, these treatment records were not sought. The lab results show that the patient also had high blood lipids and was anemic neither of which were identified by the provider as problems. This patient also was not offered screening for colon or lung cancer[158] and there was no documentation that vaccines were offered, including the COVID booster that was due.

Follow up care is also not timely.  Of ten charts reviewed of persons who had a chronic illness diagnosed, only two were seen for follow up baseline chronic care clinics within 30 days.[159] Two patients had EKGs ordered and one of these took a month to obtain. Another patient had a referral for mammography, but it took almost two months to complete.[160] Another patient had a mammogram ordered but there was no record of its completion in the material sent.[161]

In more than half the records reviewed from NRC, the patient was seen without lab results. NRC has the highest volume of intakes, so this is a noteworthy shortcoming.  In two of ten records reviewed from Menard, the patient was seen without lab results. At both NRC and Menard, the average number of days elapsed from intake to completion of the physical exam is less than seven. At Logan the average number of days elapsed from intake to the initial physical exam is 17 and at Graham it is 45 days. At both of these reception centers the records reviewed showed that physical exams always included review of lab results. Reception screening needs to be completed within seven days[162] but the provider must have labs and other pertinent diagnostic results available for review in order to thoroughly assess the patient's health status and determine the plan of care. This is a good example of why the Monitor has suggested the reception process be re-designed.

Completion of the immunization history and the offering of COVID and flu vaccine is sporadic as discussed in the preceding section. IDOC revised the Offender Physical Examination form, DOC0099, in March 2020 to include documentation of provider review of the vaccine history and added space to order needed vaccines. Only Menard and NRC use this revised form. Logan and Graham do not. Of records reviewed, the immunization history would indicate in 34 that one or more vaccines should be offered, only six patients were offered vaccine.  The revised form does not include a prompt for the provider to offer colorectal cancer or other cancer screening measures. Of six individuals over the age of 45 in the charts received, none was offered screening for colon cancer; it was not even discussed during the physical exam. Screening for lung cancer was not ordered although there were several patients whose history likely warranted such screening.

In summary, no work has been initiated on IDOC's plan to re-design medical reception, no further progress has been made on the policy and procedure for the initial health assessment and the IDOC does not evaluate the timeliness or thoroughness of the initial health assessment. The review records indicate that the medical issues a newly admitted person has, are not all identified, evaluated, and a plan of care developed which addresses each issue identified. The policy on

---

[158] The patient had a 50 pack year smoking history and only recently stopped smoking.
[159] Reception Patients 9, 11, 13- 14, 16, 18, 31, 33-34. Mortality Review Patient 15.
[160] Reception Patient 14.
[161] Reception Patient 18.
[162] Consent Decree III.C.1

Immunization and Cancer/Preventive Screening Programs, established two years ago has not been implemented with any degree of consistency by medical reception centers. The finding of noncompliance is continued. The Monitor's recommendations for achieving compliance remain the same.

**RECOMMENDATIONS:**
1. Ensure that intake providers request prior records as needed.
2. Providers must perform an adequate history regarding chronic problems and complications, including hospitalizations. This should include a past medical history for all conditions with chronic disease markers, documentation of the most recent civilian therapeutic plan, and medication history.
3. Providers must develop an initial problem list along with clinically appropriate assessments, and diagnostic and therapeutic plans for each listed problem.
4. As part of the Implementation Plan, re-design the medical reception process in order to develop adequate intake procedures that ensure:
   a. All nurse identified positives are evaluated by providers,
   b. All medical problems are identified and entered onto a problems list by providers,
   c. For every medical problem ensure that providers document an adequate history, focused physical examination, assessment and therapeutic plan,
   d. All intake laboratory tests are evaluated by providers as part of the intake process, and
   e. Patients are enrolled in chronic clinic for all of their chronic medical conditions.
5. Immunization history should be designed into the reception screening process and by protocol or physician review, immunizations should be updated and vaccines provided based on the Advisory Committee on Immunization Practice (ACIP) and Center for Disease Control (CDC).
6. The intake screening should document the patient's history of smoking, the number of pack-years smoked, and if the patient has quit smoking, the year that smoking was stopped. Without this information on tobacco use, it will be impossible to determine which individuals require screening for lung cancer.
7. IDOC needs to develop a mechanism to evaluate clinical care provided during intake by nurses and providers.

# Nursing Sick Call

*Addresses Items II.A; II.B.1; III.A.10; III.E.2; III.F.1; III.F.2;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**III.E.2.** *Lists and treatment plans will be amended pursuant to the order of a clinician only.*
**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*
**III.F.2.** *There shall be no set restrictions on the number of complaints addressed during a specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
The following information was requested from IDOC to evaluate progress towards compliance with the items of the Consent Decree listed immediately above:

- Documentation of which nurses by name and licensure were assigned to complete sick call during the month of September 2022.
- Provide daily assignment sheets used at the facility to assign nurse staff to their daily work. Daily assignment sheets for any 7 day period in August or September 2022 from Danville, Illinois River, Hill, Western, Shawnee, Big Muddy, and Lincoln. [163]
- Provide training and credentials' verification in the last 12 months for 6 individuals from: Pinckneyville, Stateville, Lawrence, Sheridan, JTC, and Centralia. [164]
- Plan, administrative directive, or documentation of an annual assessment of nursing competency consistent with the Consent Decree II. B. 6. q. [165]
- Any update of the Nursing Treatment Protocol Progress Notes since 9/2022. Any written guidelines other than AD 04.03.121 on the use of nursing protocols. [166]
- Primary Medical Services Report of sick call utilization. [167]

In addition to the material received from the list above, CQI minutes from quarter 2 and 3, 2022 were reviewed as well as the results of a performance audit conducted by SIU that included responsiveness to health care requests. In addition, the records of 17 patients who died during this report period were reviewed. During the site visit to Dixon, December 5-7, 2022, sick call was observed, and records of sick call encounters were reviewed.

In February 2022 the Monitor provided comments on a second draft of a policy and procedure[168] to address the availability and operation of sick call at facilities. The Monitor has seen no further drafts of policy and procedure concerning non-urgent requests for health care attention (sick call).

The Defendants' December 2021 Implementation Plan includes a process improvement project to

---

[163] 10/20/2022 Monitor's document request, item 74 which was modified to the assignment sheets for any one week period in August or September 2022 from seen sites. The Monitor received this information from all but Logan.
[164] 10/20/2022 Monitor's document request, item 83. Only credential verification was provided not training records.
[165] 10/20/2022 Monitor's document request, item 84. No information was provided.
[166] 10/20/2022 Monitor's document request, item 121. No information was provided.
[167] 10/20/2022 Monitor's document request, item 120. Information was received through July 2022.
[168] Email from Mike Puisis to Janette Candido dated 2/25/2022.

improve sick call with eight subtasks. [169] These subtasks were to identify barriers to access and inefficiencies in the sick call process, prompt encounters with a nurse, methods and practices to fully address patient requests, review and update to nursing protocols, how patient requests are documented in the health record, determining continuing competency of nurses assigned to sick call and establishing tools to monitor performance and quality of sick call. The plan also has several additional tasks concerning staffing, space, and equipment that are relevant to access to care via the sick call process. The Monitor agreed with the approach to changing sick call and added language with comments that address the requirements of the Consent Decree.[170]

## II. B. 1. Access to an appropriate level of primary care.

During this report period patients with non-urgent requests for health care attention were not seen timely at sick call. Patients referred by nurses from sick call to a provider have also not been seen timely. The IDOC, with its partner SIU, initiated a set of 12 performance and outcome measures during this report period; one of these was the documentation of timeliness in following up on sick call requests.[171] This tool measures whether sick call is completed according to the timelines set out in AD 04.03.103 Health Care Services.[172] Performance results reported for the first quarter (July through September 2022) was that the statewide average for sick call responsiveness was that 38% met the expectations in the AD.[173]

The CQI minutes and record reviews corroborate the results of the performance audit. [174] During the site visit to Dixon in December 2022 copies of nursing sick call logs were provided for dates from early September through mid-November. There were approximately 880 entries. The date the request was received and reviewed, and the date seen by a nurse exceeded the 24 hours stipulated by NCCHC E-07 in at least 18% of the entries. In addition to the logs, seven medical records were selected for review randomly from the sick call logs for September. Two of these patients were never seen. One was a patient who complained of dizziness and the other complained of an earache. [175] Any person making a request for health care attention to a symptom (i.e., dizziness, earache) must be evaluated promptly by an appropriately qualified professional. There was no progress notes stating the reason these patients were not seen and if rescheduled, the date. Staff vacancies and shortages, lockdowns and backlogged requests are attributed as reasons for lack of timely access to non-emergent health care attention.

Timely access to a provider when referred from sick call is also evaluated by the performance measure tool developed by SIU. However, these results are not separated from the responsiveness

---

[169] Defendants' Implementation Plan dated 12/30/21, task 51.

[170] Lippert IDOC Implementation Plan Monitor's Redline and Comments 8-24-2022.

[171] SIU, Office of Correctional Medicine, IDOC Clinical Quality measure Tool #1 dated 7/6/2022.

[172] The methodology for the performance tool only looks at 10 sick call encounters, which is a small sample for sick call which is a high volume activity.

[173] The expectations in the AD are more lenient than those set forth in the NCCHC standards (P-E-07 Nonemergency Health Care Requests and Services, pages 98-99). The AD and the performance and outcome tool should be revised to reflect the standards of the NCCHC.

[174] CQI minutes for Graham (July), Hill (July and September), Taylorville (July), and Western (July). Reporting information on sick call timeliness has not been required so no assumption can be made that the problem was limited to these facilities.

[175] Dixon patients # 12, 13.

of nurse sick call.[176] There is no tool, other than this performance audit, that monitors the timeliness with which providers saw patients referred from nurse sick call. The Primary Medical Services Report was designed to accomplish this but due to issues that were not resolved prior to implementation cannot be used as a reliable measure of timely responsiveness to sick call requests.[177]

### III.A.10. Registered nurses shall conduct sick call.

There is no uniform measure used by IDOC to document that only registered nurses conduct sick call. Record review indicates that LPNs continue to be assigned responsibility to conduct sick call.[178] In one of the charts reviewed, the patient was seen only by LPNs for sick call.[179] There also was no evidence that the LPNs with this responsibility have appropriate supervision. With more than half (55%) of all nurse positions vacant, conducting sick call timely, if at all, is more of a priority than having appropriately qualified personnel to conduct it.[180]

Previous reports from the Monitor have discussed concerns about the development, use and review of nursing treatment protocols.[181] These have included failure to update the protocols, misuse of protocols, failure to refer to a clinician when clinically indicated, use of the wrong protocol, particularly the protocol for nonspecific discomfort. We also expressed concern about the inappropriateness of using nursing protocols in the treatment of patients in the infirmary or who have complex medical problems.[182] There have been no changes to the training, staffing, or clinical oversight of staff using treatment protocols. Our record reviews reinforce these previously stated concerns.[183]

Three of the records reviewed serve as examples of some of these continuing concerns. The first was a patient who had hernia surgery on 9/1/22 and two weeks later was complaining of pain in the groin which shot down the buttocks. The nurse used the Non-Specific Discomfort Treatment Protocol. He was noted to have an order for pain medication and a post-operative follow up appointment scheduled. The protocol did not suggest a provider referral and the nurse did not exercise independent judgement to make a referral or to contact a clinician which would have been appropriate for this particular complaint. The nurse also did not find out if the patent was actually

---

[176] As this tool is revised some of the Monitor's input is to specify the timeframes in the tool itself rather than refer to the AD and to report performance on a. b. and c. separately rather than a combined score.

[177] Issues with implementation include 1. Not all sites are required to report. 2. Only services provided by the vendors' employees are entered. 3. There was no training provided to persons responsible for data collection and entry. 4. There is no oversight or monitoring the validity of the information in the report. Information obtained from an interview with the vendor's site manager at Dixon on 12/7/22.

[178] Mortality review patients # 2-4, 10, 14, 16-17.

[179] Mortality review patient # 17. There are five encounters for nursing sick call, each documented by an LPN, each used the protocol for non-specific discomfort. Several of these were inappropriate protocol choices.

[180] Staffing update dated September 2022.

[181] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 72-75; Health Care Monitor 4th Report Lippert v Jeffreys September 16, 2021) page 109; Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) pages 87 - 89.

[182] The use of a nursing protocol delegates responsibility to a nurse to exercise independent clinical judgement in the care of a patient. The Monitor's opinion is that this is counterproductive when the care medically complex or acute patients should be determined by a clinician.

[183] Mortality review patients # 3, 7, 15, 16, 17.

receiving pain medication as ordered.[184] The second patient submitted a sick call request for stomach issues but wasn't seen for 10 days. The nurse used the treatment protocol for indigestion/heartburn and provided the patient with an antacid per protocol. However, the nurse also gave the patient milk of magnesia which is not part of the protocol. This action was outside scope of practice. The patient was referred to a provider and eventually ordered omeprazole.[185] The third patient was seen for nausea and vomiting. The BP was 152/85, the pulse was 102 and respirations 22. The nurse noted shortness of breath but other than the respiratory rate provides no other symptom evaluation. He was given a nebulization treatment although this is not an intervention listed on the protocol. The nurse did not contact or refer to a provider for the abnormal vital signs, shortness of breath or indigestion.[186]

### III.F.1. Privacy and confidentiality of sick call conducted in designated clinical areas.
The Monitor has recommended evaluation of the privacy and confidentiality of rooms where clinical encounters take place during safety and sanitation rounds of the health care areas.[187] The December 2021 implementation plan include tasks to identify the number of examination rooms needed and to ensure that there is sufficient workspace.[188] However the December version did not address whether the designated clinical areas will provide sufficient privacy and confidentiality. The Monitor has suggested IDOC could measure compliance with III.F.1. by incorporating these elements into the tool used to audit the health care areas at each facility.[189]

Documentation reviewed for this report indicates that individuals are seen cell side by nurses and clinicians.[190] We observed at Dixon that patients are seen in an office on the housing unit that is used for multiple purposes. While it provides auditory privacy, there were no curtains for visual privacy and no examination table or task lighting necessary for physical examination.

### III.F.2. No restriction on the number of complaints addressed at a single sick call encounter.
In the Monitor's review of records for this report we did see evidence of patients being treated for more than one complaint. However, the IDOC does not have a mechanism to offer proof of practice that this is so.

Methods that have been suggested to provide evidence of compliance with III.F.2. are to document the patient's statement of why they want to be seen as the first entry on the treatment protocol. The alternative is to include the written request in the health record. Finally, a measure of whether more than one complaint was addressed at the encounter should be included in the audit tool for sick

[184] Dixon patient # 12.
[185] Dixon patient # 13.
[186] Mortality patient # 15.
[187] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 87-89, Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 page 77, Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021 page 109, Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) page 89.
[188] Defendants Implementation Plan dated 12.30.21, tasks 103-110.
[189] Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021 page 109; Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) pages 89 -90.
[190] Chart review and CQI reports document cell side services.

87

call.[191]

The Monitor has the following recommendations slightly revised from earlier reports to address the requirement for sick call in the Consent Decree.

**RECOMMENDATIONS:**

1.  Address the Monitor's comments on the draft of 06.03.E.07 Non-Urgent Health Requests and Services. Include a statement that sick call encounters shall take place in a clinical setting as described in the definitions.  See also recommendation # 9.

2.  Establish a plan and set a goal to achieve substantial compliance with III.A.10. Narrow the circumstances for when an LPN may be assigned to perform sick call and describe how RN supervision is accomplished and documented in the administrative directive.

3.  Complete revisions of the Primary Medical Services Report and clarify the expectation that the report is to be completely filled out, include services delivered by all personnel not just the vendors', and provide written definitions or instructions, as necessary.

4.  Reassign other duties that interrupt nurse sick call. OHS should establish a workload driven staffing standard for sick call and identify the number of registered nurse positions needed to comply with this aspect of the Consent Decree. This would also aid in the calculation of space and equipment that is needed for nurse sick call.

5.  Assess the validity and reliability of the audit of nursing treatment protocols. This audit only needs to be done quarterly if performance on all criteria exceeds 90%. Revise the tool to include more measures related to the quality of the assessment and appropriateness of the nurses' clinical judgement and whether more than one complaint was addressed.

6.  Sick call access should be monitored at each IDOC facility. If requests received daily are less than 5% of the population or patients are not seen within 24 hours of receipt of the request, an examination of potential barriers (failure to move individuals to nurse sick call, failure to document refusals in person at the HCU, insufficient nurse staff, etc.) to access should be conducted. The examination should include identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.

7.  The privacy and confidentiality of rooms where clinical encounters take place should be evaluated during safety and sanitation rounds of the health care areas.

8.  Reduce the number of nursing treatment protocols as per previous advice. Eliminate the use of nursing treatment protocols for patients who need close physician monitoring and a comprehensive plan of care including patients in the infirmary, persons who are elderly, those with multiple comorbidities, those who are frail, or those with mental or cognitive impairments. Eliminate the protocol for Non-specific Discomfort.  Establish limitations to the use of nursing treatment protocols in the policy and procedure 06.03.E.07 Non-Urgent Health Requests and Services and revise Administrative Directive 04.03.121 Treatment Protocols.

---

[191] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 76, Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, page 108-109, Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) page 90.

9. Document the patient's presenting complaint(s) in their own words as the initial entry on the nursing treatment protocol. Add this requirement to the draft policy and procedure on Non-Urgent Health Requests and Services and revise the Administrative Directive on Treatment Protocols accordingly.

# Chronic Care

*Addresses Items II.A; II.B.1; II.B.6.f; III.E.1*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.f.** *IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia*

**III.E.1.** *IDOC shall maintain a list of prisoners' current medical issues in their medical charts.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested three items. None were provided. Chronic care rosters were sent in late January but this section was already written.

IDOC submitted a draft policy on chronic disease to which the Monitor submitted comments in April of 2021. IDOC has not responded to the comments and a finalized policy has not been developed.

IDOC provided no proof of practice with respect to instituting any changes in management of chronic care. There was no evidence in record reviews of mortality charts that any changes have occurred to the chronic care program.

The current IDOC audit submitted 10/24/22, provided results that four of the five measures that relate to primary care are not at goal. Four of the five measures relate to diabetes and one measure relates to hypertension. This audit showed poor results. Multiple aspects of chronic care were not addressed in this audit including:

- Taking an adequate history,
- Performing sufficient examinations for the patient's conditions,
- The quality of care provided during chronic care visits,
- Evaluation of all of the chronic conditions of the patients,
- Integrating specialty care consultations into a documented therapeutic plan of care, and
- Documenting an effective therapeutic plan to address all of the patient's chronic

conditions.

No changes have been made to the current chronic care form which continues to be an impediment to appropriate care. It does not even have sufficient space to document a history or physical examination. The formatted questions for immunization history and ASCVD[192] risk score would be useful but these questions are seldom used and when used are not used effectively. The form does not result in effective documentation of an adequate clinical note.

There is no written procedure for enrollment of patients into chronic clinics. It appears that nurses are responsible for enrollment into the chronic care program but there is no procedure for how to do so. Many patients are not monitored for all of their chronic illnesses and IDOC needs to determine why this occurs.

Mortality reviews show no evidence of any change or improvement in chronic care management. Mortality reviews can be reviewed to see examples of chronic care.

In summary, there is ***no evidence that any progress has been made*** to change chronic care to bring it into compliance with the Consent Decree. A policy is still not completed. Record reviews show no improvement in the clinical care of patients with chronic disease. The audit fails to evaluate essential elements of the chronic care program. This item remains noncompliant.

**RECOMMENDATIONS:**
1. Finish the chronic illness policy. Ensure that it addresses the essential principles of a chronic disease program as listed above.
2. Use national standards as guidelines for care instead of writing guidelines for all common health conditions.
3. Make UpToDate® available on all electronic medical record devices in IDOC.
4. Support for chronic disease management needs to improve as soon as possible.
5. Change chronic illness clinic scheduling so that a person is evaluated for all of their chronic illnesses at each chronic illness scheduled visit. The interval of visits should be based on the least controlled disease and as early as clinically necessary.
6. The chronic clinic roster needs to list all diseases of each patient.
7. Standardize procedures for entries onto the problem list. Permission to enter problems on a medical problem list should be restricted to physicians, physician assistants, and nurse practitioners. Psychiatrists and licensed mental health professionals should have permission to enter mental health diagnoses. The problem list should include medical and mental health diagnoses.
8. For physicians without appropriate credentials based on Consent Decree requirements, monitoring should be done to ensure that they are capable of managing patients according to contemporary standards.
9. When any provider does not know specifically how to manage a patient's condition, the provider should refer the patient to an appropriate specialist for management consultation, including for gerontology.

---

[192] Atherosclerotic cardiovascular disease risk is a calculation to determine need for lipid treatment.

10. Discontinue prescribing sliding scale Regular Insulin with 70/30 insulin for insulin requiring diabetics.
11. A team approach to chronic care needs to be instituted. Daily and weekly huddles need to be instituted to improve communication amongst staff. Huddles should include nursing, schedulers, and a pharmacist.
12. The lack of physicians with appropriate credentials is resulting in significant harm to patients. The Monitor recommends an arrangement with a university-based program to include onsite and telemedicine physician support.

# Urgent and Emergent Care

*Addresses Items II.A; II.B.1; II.B.6.b; III.E.4; III.G.1; III.G.2; III.G.3; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.b.** *IDOC agrees to implement changes in the following areas: Urgent care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.1.** *Each facility HCUA shall track all emergent/urgent services in a logbook, preferably electronic.*

**III.G.2.** *Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

Information requested by the Monitor to evaluate compliance with the items listed above from the Consent Decree included:

- List of all emergency medical response bags at each facility. Each list should include the facility, the location of the bag, the contents of the bag including medication, and whether the bag is sealed.[193]

---

[193] 10/20/2022 Monitor's document request, item 92. Received late.

- Documentation from each facility of inspecting the emergency response equipment and supplies.[194]
- Blank copy of the tool used to inspect emergency equipment and supplies.[195]
- Documentation of any progress towards standardization of emergency equipment and supplies.[196]
- The Primary Service Report.[197]
- Log of persons seen for an emergency on-site but not sent to a hospital.[198]
- Date, time, and location of any medical emergency response drills conducted at each facility including the debriefing and review documents.[199]
- List of persons sent to the emergency room the past six months.[200]
- Quality Improvement Committee meeting minutes.[201]

The Defendants' implementation plan from December 2021 [202] includes two tasks concerning urgent/emergent services. One is to standardize the equipment and supplies and to establish a process to ensure that these items are maintained and securely stored.[203] The second item is to change and standardize practices to correspond with the requirements of the Consent Decree. [204] The Monitor has provided comments and suggested revisions to these both of these items.[205]

## II.B.6.b. Changes in urgent care.

There has been no forward progress with regard to improvements in the provision and documentation of urgent/emergent services since the last report and minimal progress was reported that time. The Monitor has received no policy proposals for review since August 2020 when comments on a draft were made. The Monitor also provided comments to IDOC in 2021 on a standardized list of items proposed to be kept in emergency bags but has not received any further proposals or a final document on this subject.[206]

The Administrative Directive 04.03.108 Response to Medical Emergencies has not been updated since 2017. Review of the material provided to the Monitor indicates that three sites evaluated compliance with the Administrative Directive (AD) for emergency services during this report period.[207] Of these, two facilities were noncompliant with the AD, the primary reason was the

---

[194] 10/20/2022 Monitor's document request, item 94. Received late.
[195] 10/20/2022 Monitor's document request, item 93. Received late.
[196] 10/20/2022 Monitor's document request, item 95. Not received.
[197] 10/20/2022 Monitor's document request, item 120. Received.
[198] 10/20/2022 Monitor's document request, item 125. Received late.
[199] 10/20/2022 Monitor's document request, item 126. Not received.
[200] 10/20/2022 Monitor's document request, item 132. Received.
[201] 10/20/2022 Monitor's document request , item173. Received.
[202] Defendants' 12/30/2021 draft Implementation Plan.
[203] Task 74.
[204] Task 102.
[205] See the Monitor's comments on tasks 74 and 102 in the redline and comments on the 12/31/21 version of the draft implementation plan, submitted to Defendants on 8/24/22.
[206] Email from Jack Raba dated October 14, 2021.
[207] CQI minutes from April through September 2022.

failure to conduct drills as specified. [208] In the last report 18 facilities were evaluated and five were considered noncompliant. [209]

Only 11 facilities reported one or more emergency response drills in the CQI minutes reviewed for this report period. Reports of these drills are usually not accompanied by a critique of the response except response timeliness and if the proper equipment was brought. Code 3 reports from Hill and Logan[210] Were provided to the Monitor. This form is completed whenever there is a Code 3 called. Each facility uses a different form and collects different information. Of the forms sent for review, it is evident that they usually are incomplete, without detail, have limited or no critique of the response and no evidence of supervisory review.

The CQI minutes document four sites drilled a possible fentanyl exposure. Three indicated staff needed more training in how to use Narcan.[211] In the 4th report we noted that only eight facilities listed this as one of the drugs available in the emergency supplies.[212] The review of emergency equipment and supply lists for this report document availability of Narcan at 16 facilities. During the site visit to Dixon during this report period, we observed Narcan in each of the emergency response bags but it is not on the list of equipment and supplies.

In the 4th report we also described the variation from facility to facility in emergency supplies and equipment as well as how these are monitored for readiness in the event of an emergency. This same information was provided for this report and evidence the same variation reported a year and a half later. [213] For example, some form of instant glucose should be available in the emergency supplies maintained in the HCU. Of 23 facilities that responded to the Monitor's request for the contents of emergency bags only 18 list this item as included.[214]

During the site visit to Dixon CC the records of three emergent responses were reviewed.[215] The only documentation of the emergency was on the incident report which is filed under the miscellaneous tab. This practice was confirmed by the facility Director of Nursing. We noted in our review of death records[216] that the documentation concerning the emergency and any subsequent decision to send a patient to the emergency room were sometimes absent, and if present, extremely brief and nonspecific. Notes are written retrospectively and there is no detailed timeline of events that took place. Once a provider determines that a patient is to be taken to the hospital emergency room there seldom is any further documentation. It is customary for a nurse to write a progress note indicating the time the patient left the facility and the method of transport.

---

[208] Danville and Lincoln.
[209] Health Care Monitor 5th Report, Lippert v. Jeffreys, July 22, 2022, page 97; these were Graham, Hill, Illinois River, Robinson, and Sheridan.
[210] This was in response to item 125 of the Monitor's 10/20/2022 document request.
[211] Centralia, Danville, and Pinckneyville.
[212] Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 118.
[213] Documents provided in response to items 92-94 of the Monitors' requests for documents dated 10/20/2022.
[214] Facilities that did not list instant glucose as among the items maintained for emergency response were Big Muddy, Decatur, Pinckneyville, Pontiac, and Vandalia. The Monitor suggests that IDOC follow up with each of these facilities, as well as those that were not responsive, to ensure that this item is included in the emergency response supplies and documented as so.
[215] Dixon patient # 5 – 7.
[216] Mortality patients 2-4, 7-11, 13 -17.

It is also customary to document periodic assessment of the patient's condition and the status of any support measures (oxygen use, IV fluids, splinting etc.) in the interim until the patient is transported. Neither of these were evident in the record reviews. For all resuscitative efforts a timeline must be kept documenting the assessment, what was done, by whom, when, how, and the result documented until the patient either recovers or is taken to the hospital. This staff person need not be a health care provider but should be capable of observation and note taking.

The medical record documentation reviewed was insufficient to determine the appropriateness and timeliness of the response to the medical emergency however there are two observations about emergent response that are cause for concern. One of these is the availability of Narcan. One patient did not have Narcan administered for an estimated 17 minutes after medical staff responded and only because the nurse practitioner arrived and gave it.[217] Three other patients were found unresponsive and cardiopulmonary resuscitation was started, however at no time was Narcan administered.[218] Another concern is untimely medical response. One patient was observed to have a bedsheet tied around his neck and secured to a coat hook.[219] After being unable to elicit a verbal response from the inmate the officer called the emergency response team. Only after the emergency response team geared up, entered the cell, restrained the inmate with handcuffs and leg restraints, untied the sheet and checked for a pulse that a Code 3 was activated. From this description it appears that the officers did not have a cut down tool and failed to follow the institutional directive on response to medical emergencies which would have allowed entry into the cell as soon as the number of staff on scene outnumber the individuals in the cell.[220] Code 3 should have been called as soon as the officer noted the inmate with the bedsheet around his neck. Another patient was observed to be unresponsive by a nurse during morning medication rounds.[221] The nurse did not enter the cell until after command staff had been notified, arrived at the cell, failed to elicit a response, and gave the nurse permission to enter the cell. Only then did the nurse request assistance from other medical personnel and to bring the AED, oxygen and Ambu bag. There was no timeline so the exact wait time is undeterminable however the nurse could have requested additional staff and the emergency equipment when the patient was initially observed as nonresponsive rather than wait until the cell was entered.

Greater attention needs to be paid to staff readiness to use Narcan and factors that contribute to delays in emergency first response. The purpose of reviewing the documentation of emergency response is to identify repeated instances or trends in care that can be addressed by training, practice, or change in equipment or procedure to improve the timeliness and appropriateness of emergent/urgent care. There is little to no evidence that IDOC has this capacity.

### III.G.1 Emergent/urgent services logbook.
IDOC facilities were provided with an electronic log to list patients sent to the emergency room. However, the log is not used by seven facilities.[222] Of the sites that do keep the log there is

---

[217] Mortality patient # 7.
[218] Mortality patient # 6, 8 and 10.
[219] Mortality patient # 9.
[220] Menard Correctional Center Institutional Directive 04.03.108 Response to Medical Emergencies.
[221] Mortality patient # 8.
[222] Dixon, JITC, Lincoln, Pinckneyville, Shawnee, Sheridan, and Southwestern. This is up from four sites that did not keep the log in 2019 at the time of the Monitor's 2nd Report.

considerable variation in how complete the log is. For example, some sites only document the trip out to the emergency room but may not document the reason why or the discharge diagnosis or whether discharge paperwork was received. Only 11 sites note the date the provider saw the patient upon return to the facility. The Monitor has previously recommended some additional data columns, but this has yet to be accomplished. [223]

Besides the log being incomplete it is also inaccurate. There were 13 emergent offsites among the death records reviewed for this report period. Of these, only six appeared on the corresponding ED log. [224] Of 13 Code 3 reports from Hill Correctional center that indicated the patient was sent offsite to the emergency room, only six were listed on the log. [225]

There still is no standardized log kept of emergencies or urgent care requests that are treated onsite.[226]   Only three facilities provided a log of onsite emergency responses. [227] Each log differed from the others, so these are clearly the efforts of individual facilities rather than by direction from OHS. The Consent Decree clearly states that each facility HCUA shall track ***all*** emergent/ urgent services in a log, preferably electronic *(emphasis added)*.  Recommendation 4 in this section lists the data that should be tracked on a log of emergencies that were resolved on site.[228]

To achieve compliance with III.G.1 IDOC must 1. Establish a log, preferably electronic of all onsite and offsite-referral emergent/ urgent episodes of care. 2. Require every facility HCUA (or designee) complete the log (s) 3. Audit the information on the log to verify that it is complete and reliable. Item 102 in the Defendant's December 2021 implementation plan includes a subtask to accomplish this. No steps have been taken by IDOC in the interim since the last report to implement these steps or to otherwise progress toward compliance with III.G.1.

We recommend using the log to monitor emergency care more proactively.[229] The information from the emergent/urgent services log can be used in a daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of acute or at-risk patients in the population. We recommend the Director of Nursing be responsible for monitoring the completion of the emergent urgent services log. Others who should contribute to the

---

[223] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 119, Health Care Monitor 5th Report, Lippert v. Jeffreys, July 22, 2022, page 98.
[224] Three of the facilities whose death records were reviewed kept no log of urgent/emergent off site visits; these were Lawrence, Pinckneyville, and Dixon.  One offsite emergency room visit was not found on the Menard log (Mortality review patient # 4).
[225] Code 3 reports provided in response to item 125 of the Monitor's 10/20/2022 document request.
[226] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, pages 119-120, Health Care Monitor 5th Report, Lippert v. Jeffreys, July 22, 2022, page 99.
[227] Dixon, Menard, and Vandalia responded to item 125 on the Monitor's documentation request dated 10/20/22. The log kept by Menard is the most complete of the three.
[228] This recommendation has been made since the Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100.
[229] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 120, Health Care Monitor 5th Report, Lippert v. Jeffreys, July 22, 2022, page 99.

information that goes into the log may be delegated members of the nursing staff (i.e., shift charge nurse) and medical records (receipt of discharge report).

### III.G.2. Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.

The Administrative Directive states that each shift the Chief Administrative Officer is to designate an emergency response team consisting of three members trained in first aid and CPR. Where available, one member may be a member of the health care staff. What this team does and how it performs is not described in the AD. In urgent and emergent situations, it is essential for one person to clearly be the leader and provide direction to other members of the team. There also should be a clear delineation of when and how that leadership can be assumed by another, for example a more qualified clinician. There was no evidence that these teams are operational nor clear delineation of leadership in any of the records reviewed for this report. We did find evidence in charts reviewed for this report of correctional officers who initiated CPR before medical staff arrived. [230] The Warden is not qualified to identify the member of the health care staff to respond to medical emergencies. It should be the sole responsibility of the HCUA to designate the health care staff responsible for urgent or emergent response.

Nearly every record reviewed during this report period had episodes of emergency care provided to the patient. A primary responsibility of nurses and providers is triage and assessment of the urgency of patient complaints. Failure to recognize the urgency of medical situations was one of the findings of our record review for this report. [231] One of these was a 62 year old man [232] with renal failure and liver impairment. On 2/8/22 the lab called because he had a critical potassium level of 6.5, which is a potentially dangerous level and requires immediate attention. Instead of calling a physician immediately, the nurse wrote that she would "inform" the doctor but did not until three hours later, at 9am. Even then immediate action was not taken (EKG or immediate medication to lower serum potassium) although the doctor ordered Lokelma, a drug to lower serum potassium. This drug was not ordered "stat" and in fact was never given. Another patient had been on suicide watch for three days [233] and when a nurse came to draw blood at 5am described the patient as extremely confused and somewhat catatonic. While the note indicates that the Director of Nursing was informed of the patient's state, he was not seen again for six and one-half hours when a nurse practitioner saw him for altered mental status; he was unresponsive verbally, and pupils were dilated. The patient was sent to the emergency room and subsequently died of a lethal dose of acetaminophen.

Peer review should be conducted to determine if providers are appropriately qualified, and their performance meets standards of care. Root cause analysis would help to identify corrective action that would improve nurses' and providers' clinical judgement. Consideration should also be given to the adequacy of staffing and the workload metrics necessary to provide adequate medical care at prison facilities. Inadequate staffing contributes to adverse patient care events such as falls and other injuries, seizures, dehydration, and other emergency episodes as reviewed

---

[230] Mortality review patient # 4, 9, 11.
[231] We also reported this finding in the Monitor's 5th report, see page 100. Mortality review patients # 1, 4, 5, 12, 13, 16, 17.
[232] Mortality review patient # 16.
[233] Mortality patient # 12.

in records for this report.

We have suggested in prior reports [234] retrospective clinical review of emergent/urgent services including multiple emergency department admissions or hospitalizations for the same patient for the same problem, symptom cascade, and pre-emergent care for conditions that are considered best managed in a primary care setting.[235] At a minimum these reviews should be discussed among providers, opportunities for improvement identified and improvement plans developed. We found numerous examples among the death charts reviewed for this report of poor patient care preceding urgent or emergent transfers to a hospital.[236] One of these was a patient with six hospitalizations for heart failure from July 2021 through May 2022.[237] Readmission for heart failure is considered a poor outcome and should be reviewed clinically.

The medical program operated by the IDOC does not demonstrate the ability to determine the urgency of a clinical situation and to take appropriate clinical action consistent with III.G.2 and has demonstrated no effort to address deficiencies identified in clinical care provided in urgent emergent situations.

**III.G.3 Best effort to obtain emergency report or document reason report not obtained.**
**III.E.4 Track receipt of offsite reports and ensure filing in the patient's medical record.**

None of the facilities record what type of discharge document was received from the emergency room or hospital after a patient receives a service. Patient discharge instructions or comments on IDOC transfer documents are insufficient for compliance with this requirement because they do not provide the level of clinical information required to transfer responsibility for care of the patient back to the facility provider. The Monitor's chart review found several examples of patients whose offsite emergency room record was not obtained nor was there documentation of efforts to obtain the record.[238]

IDOC has indicated in their Implementation Plan an intent to define what acceptable documentation is but no details as to how this task will be accomplished have been provided to the Monitor and no single individual is identified as responsible for completing this task.[239] Further there is no documentation on the log or elsewhere that "*creates a record as to why these reports were not obtained*" per II.G.3. The Monitor included this requirement in the redline and comments made on the December draft of the Implementation Plan.[240]

IDOC has not acted upon any of the Monitor's suggestions in the 5th Report or independently

---

[234] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 89; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 119, Health Care Monitor 5th Report, Lippert v. Jeffreys, July 22, 2022, page 100-101.
[235] These conditions include seizures, asthma, substance withdrawal, deep tissue infection, diabetic ketoacidosis, abdominal pain, and chest pain.
[236] See Mortality Review Narrative attached to this report.
[237] Mortality patient # 13.
[238] Mortality review patients # 2, 3, 14.
[239] Defendants' Implementation Plan, 12.30.21 item 102.
[240] Monitor's redline and comments on the 12/31/21 version of the draft implementation plan, submitted to Defendants on 8/24/22.

initiated efforts to comply with III.E.4 or III.G.3 of the Consent Decree.

**III.G.4 Provider follow up after emergent/urgent services.**

III.G.4 requires all persons returning from the emergency room be seen for follow up by a medical provider or clinician within 48 hours of return to the facility. A medical provider is defined in the Consent Decree as any licensed professional providing medical care to prisoners in IDOC facilities.[241] However NCCHC 2018 standards for accreditation[242] require that patients are seen *upon return* from hospitalization, urgent care, or the emergency department, not within 48 hours. The purpose of this encounter is to obtain orders and initiate treatment that is recommended. A follow up appointment is scheduled with a clinician at this initial return encounter. II.B.6.e requires that patients who are evaluated after an offsite visit have informed care. This requires a visit with the patient that effectively communicates what happened during the offsite event and how that might change the ongoing plan of care. A review of records by a clinician without seeing the patient is not sufficient.

The date the patient was seen by a provider following emergent/urgent services is entered by only 11 of 23 sites that use the log.[243] Only five of the 11 facilities report that all patients are seen within 48 hours of return. Two additional facilities see 95% or more within 48 hours. Only one facility reports seeing patients within 48 hours of return from an emergency offsite. The accuracy of information concerning clinician follow up after an offsite emergency room visit has not been verified so should be viewed with caution.[244]

The December 2021 version of Defendants' Implementation Plan has a task to develop workload metrics to ensure patients are seen and their plan of care reviewed within 48 hours.[245] The Monitor agrees with this task and has stated that it should be relatively simple to develop this metric.[246] The Monitor also suggests consideration be given to the use of telehealth technology to accomplish this especially on weekends and at smaller facilities with relatively healthy populations and less frequent onsite provider presence.

IDOC has taken no steps in the interim since the 5th Report to comply with III.G.4 of the Consent Decree.

**CONCLUSION**

IDOC has made no progress since the 5th Report toward compliance with the requirements of the Consent Decree for urgent emergent services. The Monitor has revised slightly the recommendations for emergent/urgent care made in previous reports.

---

[241] Consent Decree Lippert v Baldwin 2018, page 3.

[242] National Commission on Correctional Health Care, Standards for Health Services in Prisons, 2018, E-09, page 102.

[243] In the Monitor's 5th report we noted that 18 facilities tracked this information, page 101. There are fewer facilities tracking this information a year later.

[244] We have already established that the log is inaccurate in that not all emergency offsites are listed on the log.

[245] Defendants' Implementation Plan, 12.30.21 item 102.

[246] "There is ample data to calculate average numbers of patients needing this type of follow-up each month and expert opinion could be used to establish an average amount of time for this encounter. With this, it is possible to calculate how much time is needed to perform this function at each site on a monthly basis." Health Care Monitor 5th Report, Lippert v. Jeffreys, July 22, 2022, page 103.

**RECOMMENDATIONS:**

1. Document the timeline of assessment and interventions in every Code 3 as part of the documentation in the patient's record of care. Narrative charting by responding health care staff after the emergency is resolved is acceptable if there is a timeline that can be used as reference. Any patient seen urgently should have subsequent assessments to evaluate whether the urgent/emergent intervention was effective.

2. Ensure that health care staff have current training in emergency response and demonstrate competency annually.

3. Finalize and implement the policy and procedure on emergency services. Implementation will require additional support and coordination by OHS so that facilities standardize equipment, supplies and so forth. Implementation should proceed and be monitored according to a statewide plan outlining the steps to be taken, persons responsible and timeframes for completion.

4. Emergency response that does not result in transfer to the emergency room also needs to be tracked on a log. The criteria to be tracked differ from that kept on the emergent/urgent services log. Suggested data to track on an emergency response log include the date, time and location of the emergency, the time and name of the first health care responder, the nature of the emergency, the patient's acuity, disposition, and date the response was reviewed by a supervisor.

5. Information recorded on the emergent/urgent services log needs standardization to include definition of what is considered an acceptable report from the emergency room and the expectation that a date is entered on the log when the report is received and when the patient is seen by a physician. Consideration should be given to adding columns that identify when documentation was requested and by what means, and the type of documents received (i.e., patient discharge summary, clinical discharge summary, future appointment, or a prescription).

6. The Monitor recommends that a column after discharge diagnosis be added to the emergent/urgent services log to document the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc.

7. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.

8. The logs should be used to review emergency response and any trips to the emergency room, the next day at least in a daily huddle, to make decisions about the priority of services, need for communication, and follow through in the care of these patients. If a daily huddle is not initiated, a different method to ensure daily review of emergency response events and emergency hospital trips must be developed.

9. The Director of Nursing should be responsible for monitoring the completion of the emergency response and emergent urgent services log. The information on these logs should be reviewed and updated daily, in real time, not retrospectively.

10. Each compartment of the emergency bag should be sealed with a numbered tag to indicate that all required items are present and in working condition. The integrity of the seal should be checked daily and documented on the log along with the presence of other equipment, verification of pads and operational battery in the AEDs and sufficient supply of oxygen.

11. Every facility needs to have at least one AED reserved as a backup for dysfunction of other AEDs. A supply of batteries and pads should be kept on hand so that replacement takes place soon.

12. At a minimum all IDOC emergency response bags must be stocked with nasal naloxone. Only 16 of 23 responding facilities have this currently listed as included. Glucagon also needs to be included in all emergency response bags. Only 18 of 23 responding facilities have this currently listed as included.

13. Emergency response and the use of emergency room services need to be reviewed clinically. These reviews are for the purpose of identifying opportunities to improve primary care which is known to reduce emergency room use as well as ensure appropriate oversight and follow up care for patients after discharge. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results. The Emergency Services Audit Tool needs to be revised to reflect III.G 1-4.

14. Schedule a follow up appointment with a physician, nurse practitioner, or physician's assistant to take place within 48 hours of a patient's return from offsite emergency services or hospitalization. Follow up is an encounter with the patient to review the findings and discuss any updates to the treatment plan. A review of records without seeing the patient is not sufficient.

# Infirmary Care

**Addresses Items II.A.; II.B.1; II.B.6.k; III.I.1-5**

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.k.** *IDOC agrees to implement changes in the following areas: Appropriate staffing, physical conditions, and scope of services for infirmary care;*

**III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.*

**III.I.2.** *At every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.*

**III.I.3.** *All facilities shall employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital.*

**III.I.4.** *All infirmaries shall have necessary access to security staff at all times.*

**III.I.5.** *All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.*

**OVERALL COMPLIANCE RATING:** Noncompliant

**FINDINGS:**

The Monitor requested the following information from IDOC:

- Documentation of physician and nurse assignments to the infirmary during a four week period.[247]
- Copy of the procedure for each facility for sanitizing infirmary bedding and linens as well as any drafts not yet finalized. [248]
- For each facility, their list of infirmary patients on a date/dates selected by the Monitor to include the name, age, DOC#, diagnoses, and date of admission to the infirmary.[249]

IDOC provided information that was only partially responsive to this request. Other material reviewed for this section included the records of patients who died during this report period, minutes of meetings, reports, and draft documents. The Monitor also completed a site visit to Dixon Correctional Center which included a thorough tour of the infirmary, interviews with staff and patients, as well as record review.

In the 5th Report, the Monitor found the Defendants noncompliant with the requirements of the Consent Decree related to infirmary care.[250] While steps were taken to identify tasks that need done to come into compliance, there has been no forward progress during this report period accomplishing these. Infirmary care has been described as perfunctory, without appropriate clinical focus on patients' needs.[251] Unacceptable conditions were identified in the last report that included patients who died from dehydration and malnutrition, who experienced falls, and other injuries or were allowed to deteriorate without intervention.[252] These findings are unchanged this report.

The Defendants' Implementation Plan dated 12/30/2021 addressed many of the recommendations made by the Monitor previously in these reports. [253] [254] The Monitor did have areas of disagreements with some items or had additional comments which were forwarded to Defendants.[255] No steps have been taken by IDOC to proceed with implementation of any tasks related to achieving compliance with the Consent Decree concerning infirmary care.

---

[247] Monitor's Documentation Request dated 10/20/2022 item 71 and 74. No documents were provided indicating providers assigned infirmary rounds for a one month period. No documents were sent indicating names of nurses and their licensure assigned to the infirmary.

[248] Monitor's Documentation Request dated 10/20/2022 item 103. Three facilities responded to this request; however, the information was not sent to the Monitor until 1/20/2023 after much of this report was written.

[249] Monitor's Documentation Request dated 10/20/2022 item 127. Nineteen of 26 facilities with infirmaries provided information on infirmary patients for September 2022. The information was not sent to the Monitor until 1/20/2023.

[250] Health Care Monitor 4th Report Lippert v Jeffrys (September 16, 2021) page 116.

[251] Health Care Monitor 4th Report Lippert v Jeffrys (September 16, 2021) page 134.

[252] Health Care Monitor 5th Report Lippert v Jeffrys (July 22, 2022) page 116.

[253] Health Care Monitor 4th Report Lippert v Jeffrys (September 16, 2021) pages 134-136.

[254] Items 64– 70 describe an approach to evaluating the needs of the aged and infirm in IDOC facilities. Item 72 is setting guidelines and benchmarks related to infirmary care and includes several subareas of focus that correspond to six of the Monitor's recommendations. Item 84 is an annual review of providers' clinical care including the provision of care to patients in the infirmary. Item 105 is an analysis of the space and equipment needed at each facility providing infirmary services.

[255] These were first provided to Defendants on 1/14/2022 and submitted again in the 8/24/22 Monitor's redline and comments on the 12/31/21 version of the draft implementation plan.

**Policy and Procedure**

The existing Administrative Directive on Infirmary Services is not in conformance with the Consent Decree and does not describe the scope of services provided in the infirmary setting or give clinicians guidance about patient conditions which should be referred a hospital.[256] Comments and suggested revisions to a draft policy on infirmary care were submitted to IDOC a year ago. [257] See the Monitor's 5th report for a discussion on needed policy defining the level of care that IDOC needs capacity to provide.[258]

**Performance Monitoring and Quality Improvement**

Thirteen of the 30 IDOC facilities reported on compliance with Administrative Directive (AD) 04.03.120 Infirmary Services in the six months from April through September 2022.[259] Six facilities were considered compliant with the AD and six were not.[260] Areas of non-compliance included not making rounds consistent with the schedule laid out in the AD, not documenting daily vital signs, and no admission or discharge note. Non-compliance did not result in a documented corrective action plan in many instances. There was little to no discussion of corrective action or analysis of root causes of poor performance. There were two CQI studies reported during the period of review for this report. One audited whether rounds were completed in the infirmary on acute patients per the AD[261] and the other evaluated whether follow up appointments occurred timely following discharge from the infirmary.[262] *There were no quality improvement studies of clinical care on the infirmary.*

From our chart review it is apparent that performance of staff responsible for providing infirmary care is directed primarily at compliance with the tasks outlined in the AD[263], not the patient's clinical needs. The fact that performance monitoring is almost exclusively devoted to measuring compliance with the AD and not quality or patient outcomes only reinforces this practice.

**Access to Services**

Access to infirmary care is required by II.B.1[264] but there is no accurate or reliable mechanism to ascertain that this is so. What evidence we do have is from review of reports and records. These reviews indicate that access to infirmary care is insufficient for the needs of the population.

---

[256] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 68-69; Health Care Monitor 3rd Report Lippert v Jeffreys September 16, 2021) page 92; Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 122, Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) page 107.

[257] Email from Mike Puisis to Janette Candido dated 2/25/2022.

[258] Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) pages 107-108. Based upon the Monitor's review of records, Illinois correctional facilities need to have capacity to provide inpatient diagnostic services, pre-operative supervision and monitoring, convalescence from surgery or injury, skilled nursing care and rehabilitative services, custodial care, care for those who have cognitive disorders, palliative care, and hospice.

[259] Centralia, Danville, Dixon, East Moline, Hill, Kewanee, Menard, Lawrence, Lincoln, Pinckneyville, Shawnee, Sheridan, and Western.

[260] Facilities considered non-compliant were Centralia, Danville, Kewanee, Pinckneyville, Shawnee, and Sheridan. Lawrence did not report findings on the internal audit.

[261] Southwestern CC.

[262] East Moline CC.

[263] For example, the timeframe for completion of the physician admitting note or frequency of provider rounds.

[264] II.B.1. *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care.*

The Primary Medical Services Reports have previously provided information about infirmary capacity. The Monitor requested revisions to this report, but these have been ignored.[265] Instead the data on infirmary use has been deleted.[266] At this point there is no method in place for IDOC or its vendor to monitor infirmary utilization.

As noted in prior reports infirmary utilization is not discussed as a regular part of the facility CQI meetings. If it is discussed, the information reported in the minutes varies from facility to facility. Various admission categories[267] are used at the sites and there is no clear definition of what is meant by use of the term. The variance in reporting diminishes their value and clearly demonstrates the lack of definition in the scope of infirmary services across the state.

Inappropriate use of infirmary beds has been discussed in previous reports.[268] This practice continues as evidenced by the minutes of CQI meetings. In August 2022 at the Pontiac CQI meeting cancellation of offsite procedures was discussed. The cause was attributed to lack of infirmary beds in which to place patients who had to prepare for a scheduled procedure. The lack of beds was due to having people housed in the infirmary beds for non-medical reasons. Dixon's CQI minutes also reflect discussion in August and September, 2022 about the number of people housed in the infirmary for non-medical reasons. [269] The minutes from NRC reflect discussions in April and May, 2022 that patients with acute conditions were instead kept in cells because the infirmary was full. We also reviewed the chart of a 64 year old man who had advanced COPD and was admitted to the infirmary for wheezing and difficulty breathing. A month later he was discharged from the infirmary, even though his oxygen saturation was only 90%, because a bed was needed for someone else.[270]

Nineteen of 26 sites with infirmaries provided a snapshot of the infirmary census in September 2022.[271] People in the infirmary for non-medical reasons include two in segregation, another had a metal brace, one was PC (we assume this is protective custody), one was security housed for ADA reasons, one was a temporary placement, and one was a guest. The absolute number of admissions for non-medical reasons was not large, however the impact of these admissions is significant, especially when patients needing this care are denied admission due to lack of beds. The continued practice of allowing non-medical admissions denies access to infirmary care as required by II. B.1 of the Consent Decree. We discussed the inappropriate use of infirmary beds for non-medical reasons at some length in the last report. [272]

---

[265] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021), recommendation # 10, page 135.
[266] July 2022 Primary Medical Services Report.
[267] These terms include security hold, administrative hold, live ins, permanent housing, and housing only.
[268] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 101; Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 92; Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 122, Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) pages 108-109.
[269] According to the minutes non-medical reasons includes restraints and restrictive housing when RHU placement is contraindicated.
[270] Mortality review patient # 15.
[271] This was in response to the Monitor's Documentation request dated 10/20/2022, item 127. This information was not received until 1/20/2023. Facilities that did not respond were Centralia, Danville, East Moline, Illinois River, Menard, Southwestern, and Stateville.
[272] Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) pages 109-110.

Based upon the snapshot of the infirmary census in September, 2022, acute patients[273] represented 52% of all admissions. However, 44% of the beds were filled by patients who had been in the infirmary more than a month and half of these more than a year. Facilities that exceeded this average were Western with 53% of the infirmary population admitted more than a month earlier. At Lincoln the percentage of long stay patients was 50% and at NRC it was 45%. As infirmary beds are filled with patients who require protective housing or long term skilled or intermediate nursing care reduce access for other patients who also need infirmary level services.

We have recommended for 24 months that infirmary capacity be monitored and managed at the statewide level by OHS.[274] This includes retrospective review for appropriateness and timeliness of services, as well as prospective review of all persons expected to need more than two weeks of infirmary care. The IDOC indicated an intent to do so in the Implementation Plan provided in December 2021. [275]

No additional information has been provided about the scope of services and structure of the new facility planned for Joliet, Illinois for two years. [276] This facility that was originally to have included 50-52 new medical beds and a clinic. The scope of services has never been defined and is not included in the implementation plan or staffing analysis provided by IDOC to the Monitor.

### Scope of Services

As stated earlier in this section there is no clarity or definition of the scope of care or service to be provided in the infirmary. The existing Administrative Directive merely states that the infirmary is for the observation or treatment of health related conditions and that the scope of services is based upon the nature of the population and prevalence of disease that might benefit from infirmary services.[277]

There is no evidence that the nature of the population or prevalence of disease have been used to determine the scope of infirmary services. The Monitor found ample evidence of this lack of definition during the site visit to Dixon Correctional Center in December 2022 and in record reviews for this report. Of 17 mortality records provided for review, eight concerned patients who received infirmary care.[278] Please see the Mortality Reviews in Attachment E for the description of the course of care and the opportunities for improvement that were identified for each. We also reviewed the records of four patients in the infirmary at Dixon during the site visit.[279]

---

[273] These include patients who experienced a recent injury or illness, or are recovering from surgery, people on 23 hour observation, admitted for procedural preparation, or who are on watch or hunger strike.
[274] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 107; Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 99; Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 135, Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) page 110, 117.
[275] Defendant's Implementation Plan 12.30.21, item # 72.
[276] OHS-Monitor Monthly Conference Call, 4/28/22.
[277] AD 04.03.120 effective 10/1/2019, II. Procedure, E. Definitions and F. General provisions 1.
[278] Mortality patients # 1, 5, 8, 13 – 17.
[279] Dixon patients # 1, 3, 4, 23.

Problems identified from these reviews with clinical care and support services in the infirmary are the same as those identified in earlier reports[280] representing no progress toward compliance with II.A, II.B, or II.B.6.k. The mortality reviews of 17 records in Attachment E include a summary of the patient's care with opportunities for improvement identified. Infirmary care was episodic, sporadic, and reactive rather than preventative, curative, or rehabilitative. The following summarizes major findings and concerns in four areas about infirmary care. These areas are clinical care, patient safety and preventable adverse events, the elderly and infirm, and end of life care.

*Clinical Care*

1. Provider histories were focused on episodic and urgent issues and failed to address the patient's chronic conditions and serious medical issues. Most of the patient's significant chronic diseases were not addressed in chronic clinic visits either. Even for episodic issues, providers often failed to take a history.
2. Examinations were often inadequate for the patient's stated complaints and problems.
3. The medical conditions of the patient could not be identified by reading progress notes.
4. Patients were not discharged from the infirmary when admitted to the hospital.
5. Upon return to the facility, they were placed on the infirmary without an assessment or acknowledgement of change in the patient's condition.
6. Hospital reports and consultant reports were missing. When reports were available there was often no documentation that they were reviewed nor was the therapeutic plan modified in accordance with the consultant or hospital's recommendation.
7. Nursing assessments were incomplete, the plan portion of the nursing note was also incomplete and varied from nurse to nurse and shift to shift. There was no comprehensive assessment, no goals, or objectives for treatment of the patient, and no plan available to guide daily care.
8. Physicians were not involved in any comprehensive planning for the care of infirmary patients.
9. Patients were not provided physical therapy to prevent deconditioning or contractures.
10. Patients were not provided sufficient assistance with daily living activity.
11. Patients failed to have their weight monitored in an effective manner or lost significant weight without acknowledgement or evaluation of weight loss. Patients in need of nutritional assessment, did not have an appropriate nutritional evaluation.
12. Patients on the infirmary needed skilled nursing level care but were not receiving it.
13. Physician and nursing coverage was not always available on the infirmary unit.
14. Patients on the infirmary did not have access to a dentist consistent with Consent Decree requirements. This was true also for patients assigned to live on the 3rd floor of Dixon's Health Care Unit.

*Patient Safety and Preventable Adverse Events*

---

[280] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) pages 123-130, Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) pages 111-112.

1.  Falls

    Three of the mortality review patients had a total of 23 falls. Five of these falls took place before the patient was placed in the infirmary. Also, among 21 men interviewed who were assigned to live on the 3rd floor of the Health Care Unit at Dixon CC, six men reported multiple falls and another four had ambulation or gait impairment putting them at risk for falls. [281] Specific fall prevention plans should be documented for any patient with fall risk. Though nurses frequently document "fall prevention", no specific instructions are provided. Of the charts reviewed the only fall prevention intervention was to "monitor for falls" and one nurse practitioner took the time to rearrange the furniture in a patient's room to make the call light accessible. Based upon the frequency of patient falls the existing fall prevention program appears ineffective. Falls should be studied to identify the reason for the fall so as to reduce any bedding, structural, or facility impediments that increase risk of falls. These impediments should be eliminated.

2.  Pressure Ulcers

    Four of the mortality review records and one record reviewed at Dixon documented the presence of decubiti or pressure sores.[282] Pressure injuries are a major source of morbidity and expense in health care settings. Risk factors for pressure injury are immobilization, malnutrition, sensory loss and decreased circulatory perfusion. Patients admitted to the infirmary are not assessed for risk of skin breakdown and preventive measures are not listed in the plan of care. Periodically there may be documentation of urging patients to change position frequently or plans to reposition the patient if unable to do so for themselves, but these are after skin breakdown has already taken place.

3.  Accidental ingestion of cleaning products

    Two patients on the infirmary ingested cleaning products. One of these was at Pontiac where a soda bottle filled with cleaning bleach was left in a patient room. The patient thought it was a soft drink and ingested it.[283] Another patient was at Dixon on the infirmary and drank a cup of laundry detergent.[284] Neither patient appeared to suffer permanent injury, however these are preventable adverse events. Housekeeping needs to maintain track of its inventory and every container used by housekeeping must be appropriately labeled and the material data sheet needs to be kept on file. Any accidental ingestion or misuse of a cleaning substance must be reported with appropriate evaluation by medical staff and appropriate contact with poison control. There is no documentation in either case that these were considered reportable adverse events or that the MSDS was consulted, or Poison Control contacted.

---

[281] The third floor consists of 66 beds housing elderly prisoners who do not need an ADA accessible shower. This information comes from interviews with 21 men during the site visit to Dixon CC December 2-5, 2022. Their medical charts were not reviewed.
[282] Mortality review patients# 1, 5, 13 17. Dixon patient # 4.
[283] Mortality review patient # 13.
[284] Dixon patient # 23.

*Elderly and infirm*

Statistical data and reports from the IDOC website indicate nearly 22% of the prison population are 50 years of age or older as of December 2022. Of these, over 1,100 persons are 65 years of age or older.[285] Defendants have included an assessment of the needs of this population in their Implementation Plan.[286] The Monitor endorses the need for such an assessment but has disagreements with the scope and details of this project which were submitted to Defendants.[287] Problems with services for the aged population placed in infirmary care, specifically those with cognitive disabilities, identified by the Monitor's record review are in addition to those already identified and include:

1. Persons in custody with cognitive difficulties and infirmity need placement other than in general population but may not need infirmary care. However, these placements need to be sufficient in number for patients to access as needed. Any placement of patients with cognitive impairment or physical disability (infirmary or other location) must include access to physical activity, outdoor environments, structured and unstructured leisure activities, and social interaction. Absent these factors patients with cognitive impairment or physical decline become isolated and this confinement contributes to decline in mental and physical health. Twenty-one persons assigned housing on the geriatric unit (3rd floor) at Dixon were interviewed during the site visit. Of these, 16 men appeared to have needs that exceeded those available on the unit. These needs included assistance with daily living, access to more appropriate hygiene facilities, closer medical monitoring, memory care, and at least two needed to be in the infirmary.

2. Patients with cognitive deficiencies and apparent dementia never had a cognitive evaluation to establish the nature and diagnosis for the cognitive deficiency to guide subsequent care.[288]

3. Patients with dementia did not have periodic monitoring of this disease as a chronic disease.

4. Patients with dementia were placed on security hold on the infirmary and therefore were not monitored as an infirmary patient.

5. Patients with dementia had symptoms or complaints that were disregarded, minimized, or disbelieved by staff. This included not being given sufficient fluid for hydration, not helping with eating, not monitoring the patient's nutrition, and providing insufficient supervision for the patients in order to prevent harm to the patient. At times these beliefs contributed to the appearance of neglect and bear similarities to the definition of elder abuse.

---

[285] Illinois Department of Corrections, Inmates 50 Years of Age and Older on December 31, 2022; obtained at CY22-50-plus-Fact-Sheet.pdf (illinois.gov).

[286] Defendant's Implementation Plan 12/30/21, tasks Items 64– 70 describe an approach to evaluating the needs of the aged and infirm in IDOC facilities.

[287] These were first provided to Defendants on 1/14/2022 and submitted again in the 8/24/22 Monitor's redline and comments on the 12/31/21 version of the draft implementation plan.

[288] A suggested resource for development of guidance in the assessment and planning of care for persons with cognitive impairment developed by the California prison health care system may be accessed at this summary site Cognitive Impairment/Dementia (ca.gov) and more detailed guidance at DEMENTIA Care Guide 2014 FINAL VERSION.pub (Read-Only)

*End of life care*

1. Physician Orders for Life Sustaining Treatment (POLST) were often not completed until the patient was near death or were not completed at all.  For patients with dementia, this meant that medical care was provided or was not provided without a willfully cognizant adult's consent.  This included refusals of care.  Patients with dementia need to have a guardian.[289]
2. Palliative and comfort care is undefined and appears to be the same as usual care.  These should be defined with appropriate procedures.[290]
3. Pain medication was not appropriately managed at end-of-life.[291]
4. Staff appeared to make light of patient complaints when their complaints were indicative of serious medical conditions.  Staff appeared to lack empathy with the patient.[292]

**Registered Nurse Staffing**

The Monitor requested nurse assignment sheets to evaluate registered nurse staffing of the infirmary at each facility. These were provided by seven facilities.[293] However the assignment sheets do not indicate the employee's credential, so it was not possible to verify the availability of registered nurses in the infirmary as required by III. I.1 through 3 of the Consent Decree.

We do know of one instance when a patient had a bronchoscopy and could not obtain an adequate blood oxygen level afterwards. The hospital called the prison infirmary to make sure that oxygen was available and was informed by a member of the nursing staff that he could not be cared for in the infirmary because no RN was on staff. The patient was discharged when his oxygen saturation improved; the physician cleared the patient for general population housing. Eventually a correctional major contacted the HCUA, and the patient was placed in the infirmary on 23 hour observation, even without the requisite RN coverage.[294]  In addition to this incident, the CQI minutes from Pinckneyville in July, 2022 reflect a discussion that no staffing was available for the infirmary.

The CQI minutes reflect continued concern about the number of nurse vacancies and use of agency contract nurses. Internal audits and CQI studies report noncompliance with nursing responsibilities as outlined in the Administrative Directive for infirmary care to include failure to document nursing admission and discharge notes, daily graphics, and periodic progress notes. Mortality record reviews found similar results and in addition issues with medication administration, failure to provide needed assistance, incomplete assessments, and care plans.

---

[289] Mortality review patients # 1, 13.
[290] Mortality review patient #16. A suggested resource for the development of guidance for palliative care developed by the California prison health care system may be obtained at this summary site Palliative Care Guide Summary and more detailed guidance at CCHCS Care Guide: Palliative Care
[291] Ibid.
[292] Mortality review patients # 5, 16.
[293] Big Muddy, Danville, Hill, Illinois River, Lincoln, Shawnee, and Western.
[294] Mortality patient #17.

Dixon, Menard, and perhaps other facilities are using incarcerated persons as helpers for elderly or infirm persons in the infirmary or other units. Our observations, interviews, and record review confirm that these individuals are expected to monitor the condition of assigned individuals in custody and provide personal care as well.[295] It is inappropriate for one incarcerated person to be responsible for monitoring the condition of another, particularly vulnerable patients. NCCHC states that "Inmates are not substitutes for regular program or health staff [296]." This is clearly not the case in IDOC based upon the evidence observed by the Monitor. The Monitor supports the participation of incarcerated persons in peer support programs and hospice but is concerned that in the absence of clear definition and oversight these individuals are serving in roles that should be performed by program or health staff.

Infirmaries are not staffed by enough nursing personnel to provide the level of care that should be expected. The staffing sheets that were sent by facilities show nursing staff assigned to the infirmary also have other assignments which means that their availability on the infirmary is sporadic depending on the other assignment.[297] These staffing sheets also indicate numerous shifts where nurses assigned the infirmary had been mandated to work overtime. One nurse at Danville was documented as working 16 hours, taking eight hours off, then working another 16 hour shift.[298]

At Dixon staffing on 12/6/2022 was one Registered Nurse and one C.N.A for a 28 bed infirmary. In the 14 days of assignments provided for review during the site visit (11/20/22 to 12/3/22) six of 14 possible shifts were covered by RNs working overtime (43%). All of these were the overnight shift (5:30 pm to 6 am) and all were voluntary. The nursing assistant who worked the day shift on 12/6/2022 was scheduled to at 10 pm to work another 8 hour shift, but on overtime. During the fourteen days of assignments reviewed there were 14 overtime shifts worked, two of which were mandatory. We were told that minimum staffing is two nursing assistants on days and evening shift. However actual staffing reviewed (from 11/20/22 through 12/3/22) had only one C.N.A. on duty four of 14 day and evening shifts and nine of 14 night shifts.

Items III.I.1 and 2. of the Consent Decree requiring the presence of a registered nurse in the infirmary were met at Dixon. With regard to III.I.3 there is one registered nurse on each shift, however the needs of patients well exceed the staffing assigned to the infirmary. In our opinion nursing and other support positions needed in the infirmary, geriatric and ADA units should be calculated using the standards for staffing set for skilled and long term care facilities in Illinois. [299]

**Physician Staffing**

There are insufficient physician staff to ensure that patients on infirmary units are properly managed. Based on record reviews, nurse practitioners or physician assistants have provided coverage due to the lack of physician staff at Pontiac, Dixon, Stateville and Menard. The lack of

---

[295] Mortality review patients # 1, 13, 17. Interview with Dixon HCUA.

[296] NCCHC Standards for Health Services in Prisons, P-C-06 Inmate Workers, page 59-60.

[297] For example, the infirmary nurse at Danville also was assigned segregation coverage on night shift and administering medication on swing shift. At Hill the infirmary nurse was also responsible for labs and restrictive housing. At Lincoln this assignment also is responsible for nursing sick call. At Shawnee the infirmary nurse on night shift is also responsible for labs and at Western is responsible for segregation and count in addition to the infirmary.

[298] Half of each 16 hour shift was assigned to the infirmary.

[299] https://www.ilga.gov/commission/jcar/admincode/077/077003000F12300R.html

staffing appears to have contributed to the inadequate care. The evidence for this is in the record reviews completed during this report period. [300] One patient had to be hospitalized because there was no physician on duty and the coverage physician was not available.[301] The IDOC's own reporting of noncompliance with the AD provides evidence that physician staffing is insufficient to meet requirements for writing admission and discharge notes and rounding.[302] Physicians and not nurse practitioners or physician assistants should be responsible for care of patients on the infirmary as these are typically the highest acuity patients at the facility.

**Ancillary and Support Personnel**
The allocation of positions for physical therapy increased in March 2022 to 15.25 FTE. This included a combined total of 4.55 FTE physical therapists and 10.7 FTE physical therapy assistants. Of these all the physical therapist FTEs have been filled and half the physical therapy assistants (5.5 of 10.7 FTE). As discussed in the 5th Report there are still many facilities with no physical therapy positions so there remain many patients who do not have access to this service.[303]

Physical therapy services were identified as problematic in three of the death records reviewed.[304]

The Monitor strongly recommends focusing on filling the vacant physical therapy FTEs, and assessing the actual need of patients for access to physical therapy particularly facilities with populations of 900 or more.

**References**
In nearly all of the mortality reviews, providers caring for patients on the infirmary did not always know how to manage patient conditions, failed to understand drug-drug interactions, etc. For this reason, the Monitor continues to recommend that all providers have access to UpToDate® an online medical reference, which was reported in the past to have been made available by the vendor at all IDOC sites. Interviews with providers completed during the site visit to Dixon verified that this resource was available on the computer in their office but not in the clinical location where patients are evaluated. Providers stated that they consulted it when necessary. An analysis should be completed to identify reasons why the resource is not used, and a plan made to improve access to reference material. Additional decision support material should be considered in the development of the standardized list of equipment to be available in every health care unit. [305]

**Access to Security Staff in the Infirmary**
Compliance with the requirement for access to security staff (III.I.4) has been evident at each of the sites visited by the Monitor thus far.[306] The draft policy and procedure on Infirmary Services included a requirement that whenever the infirmary is occupied there must be a custody post. After the policy and procedure is in effect a tool or method to document compliance must be established.

---

[300] Mortality review patients # 1, 12, 13, 14, 17.
[301] Mortality review patient # 14.
[302] Minutes of CQI meetings for Q 2 and Q3 2022.
[303] Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) pages 114-115.
[304] Mortality review patients #1,13,17.
[305] Defendants Implementation Plan, Lippert Consent Decree, 12.30.21 item # 104.
[306] Robinson, Sheridan, Shawnee, Logan, Pontiac, Lincoln, Lawrence.

**Bedding and Linens**

Three facilities responded to the Monitor's request for procedures from each facility for sanitizing infirmary bedding and linens as well as any drafts not yet finalized.[307] Each of the procedures received addressed only the handling of laundry soiled with blood or other body fluids in conformance with AD 04.03.116. None of the procedures sent defined the amount of clean linen to have on hand, how it is transported and received, how it is stored, or how laundry is handled once it has been used, if not contaminated with blood or other body fluids, how it is laundered etc.

III.I.5. of the Consent Decree requires that all infirmaries and HCUs shall have sufficient and properly sanitized bedding and linen for the infirmary. The footnotes include reference material from the Centers for Disease Control and Prevention that address the requirements for handing linens in health care settings.[308] This or other references from IDPH or the Association for Professionals in Infection Control and Epidemiology (APIC) should be used to develop a standardized procedure for the inventory, storage, handling, and laundering of all linens used in the health care setting not just those that are contaminated with blood or other body fluids.

Task 62 in the Defendants' 12/30/21 Implementation Plan includes a task (61) to develop safety and sanitation policy. The Monitor has commented that this general task must include policy and a monitoring tool to demonstrate compliance with III.I.5.[309]

**RECOMMENDATIONS**[310]:

1. Infirmary beds should be reserved only for medically necessary care. *Alternative solutions to the use of security holds in the infirmary must be sought.* Reasons for administrative holds need to be understood. Housing more appropriate to the diverse needs of individuals who incarcerated in the IDOC needs to be provided. The infirmary should only be used to house persons who need 24 hour monitoring and access to nursing and medical care.
2. Complete the assessment of the elderly, mentally and physically disabled persons housed in IDOC facilities as stated in the implementation plan. Each person meeting these criteria should be assessed using a standardized tool appropriate for this population and the data analyzed by persons with expertise with this area of service. Use the results to determine appropriate alternatives to incarceration as well as develop and implement appropriate housing, programming, staffing and safety standards for those who should remain incarcerated.
3. Fill vacant physical therapy FTE positions. Evaluate the need for physical therapy services at each institution with an infirmary. The Monitor continues to recommend that physical therapy services be provided at all facilities with infirmaries that house over 900 incarcerated persons.

---

[307] Monitor's Documentation Request dated 10/20/2022 item 103. Hill, IRCC, and Pinckneyville responded to this request. However, the information was not sent to the Monitor until 1/20/2023 after much of this report was written.
[308] Laundry | Background | Environmental Guidelines | Guidelines Library | Infection Control | CDC and Appendix D: Linen and Laundry Management | Environmental Cleaning in RLS | HAI | CDC.
[309] 8/24/22 Monitor's redline and comments on the 12/31/21 version of the draft implementation plan.
[310] None of the recommendations listed in the section of infirmary care in the 5th report were acted upon by the IDOC. Infirmary care remains the same and harms patients' well-being.

4. Evaluate the workload of the physicians at each facility to ensure that the physician coverage is adequate to meet the needs of the patients requiring infirmary care.

5. Clarify the scope of medical services that will be provided at the renovated Joliet Treatment Center. If this facility will have a medical focus, then admission criteria, scope of services and so forth should be described in the policy and procedure for infirmary services.

6. Complete the policy and procedure for infirmary services to include defining the scope of services provided and expectations for referral when a patient's need exceeds the capability of infirmary care. The IDOC should refer to existing Illinois Administrative Codes to define the scope of services for infirmary services. These include those codes developed for nursing homes and long term care facilities, hospice, and care for special populations including care for those who have cognitive disorders, palliative care, and hospice.

7. Infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admissions to infirmary beds should be reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long term plan of care reviewed, and most appropriate placement determined (including consideration of parole or commutation or transfer to a more appropriate facility).

8. A methodology should be established for staffing infirmaries which includes perspectives from skilled nursing and intermediate care settings as appropriate for the patient panel of each infirmary.

9. Revise the information contained in the primary medical services report to coincide with the definitions in the new policy and procedure and include average daily population and average length of stay by type of admission, the number of patients in the infirmary for more than two weeks, and the number housed in the infirmary for reasons other than delivery of health care.

10. Revise tools used to monitor performance for delivery of infirmary care to coincide with the new policy and procedure. Set expectations for the frequency of monitoring, reporting results, and corrective action.

11. An analysis should be completed to identify reasons why Up-To-Date® resource is not used and a plan made to improve access to reference material. Additional decision support material should be considered in the development of the standardized list of equipment to be available in every health care unit.

12. Complete the annual survey of all facilities to ensure there is adequate physical space as described in the Implementation Plan.[311]

13. Begin to track all falls including the name, date and conditions involved with the fall (e.g., fell out of bed, while in shower, transferring to toilet, etc.). Reports of falls should be studied from the perspective of patient safety.

14. Evaluate barriers in access to dental services by patients in the infirmary. The Monitor suggested a quality improvement study be conducted to evaluate whether patients on the infirmary have access to dental care.

15. Develop procedures that establish inventory control of linen for the infirmary, direct the conditions and practices for transport and storage of clean line, as the handling and

---

[311] Defendants Implementation Plan, Lippert Consent Decree 12.30.21, items #103-110.

laundering of dirty linen that are in accordance with contemporary standards for control of transmissible diseases.

# Specialty Consultation

*Addresses Items II.A; II.B.1; II.B.6.e; II.B.6.g; III.E.4; III.H.1-4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.e.** *IDOC agrees to implement changes in the following areas: Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;*

**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.H.1.** *Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.*

**III.H.2.** *Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.*

**III.H.3.** *If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained.*

**III.H.4.** *Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments.*

**OVERALL COMPLIANCE RATING:** Non Compliance

**FINDINGS:**

The 3rd quarter specialty tracking logs were requested and were received.

The current policy on specialty care is administrative directive O4.03.103 Offender Health Care Services (effective 1/1/20). This administrative directive is dated and still refers to the collegial review process that has been abandoned. This administrative directive does not address the Consent Decree so there is no guidance on how to enact Consent Decree requirements.

The audit process[312] established by IDOC provides no proof of practice for any of the specialty care provisions. With the exception of elimination of the "collegial review" process, there has been no change or improvement with respect to specialty care since the beginning of the Consent Decree.

Access to specialty care (II.B.1. and II.B.6.g.) is modestly improved due to elimination of collegial review. These modest improvements are overshadowed by multiple barriers to *timely* specialty care.

IDOC provided no data or information to verify their compliance regarding timely consultations. We therefore reviewed 29 specialty consultations from Pontiac and Menard[313]. Of these, 13 appointments were not completed. Of the 16 completed consultations at Pontiac and Menard, only seven (44%) were completed in a timely timeframe. Four of five of the Pontiac completed appointments were judged as not timely. In the first of these, a patient had a drop in hemoglobin from 12.1 to 10.3 over ten days. This is evidence of acute gastrointestinal bleeding. This was accompanied by abdominal pain. Instead of referring the patient to a hospital or ordering prompt endoscopy, the patient was scheduled for gastrointestinal consultation that occurred 44 days later. The gastroenterology consultant recommended endoscopies which should have been ordered urgently; instead, endoscopies did not occur for 158 days from the date of gastrointestinal consultation. At the follow up of the colonoscopy, the gastroenterologist recommended a three month follow up. Instead, the patient was scheduled at UIC and the consultation was delayed. The patient was seen 238 days after the appointment should have occurred. At this appointment, the patient was sent to the wrong clinic (an interventional gastroenterologist not a gastroenterologist specializing in inflammatory bowel disease). The interventional gastroenterologist recommended a repeat colonoscopy and an appointment with an inflammatory bowel clinic gastroenterologist. The colonoscopy didn't occur for three months which we deemed untimely due to the long prior delays in getting care for this patient. The patient died before the inflammatory bowel clinic gastroenterology appointment could be completed. The review of this patient's medical record demonstrated that there are serious problems at Pontiac that require prompt OHS intervention. There are insufficient providers, care is disorganized and care appears unsafe.

Four facilities (Dixon, Stateville/NRC, Sheridan, and Pontiac) utilize UIC for the majority of their specialty care. Specialty appointments scheduled at UIC typically have delayed schedule dates. Delayed appointments has been present since at least 2018[314]. While IDOC does not track how long it takes to complete specialty consultations, the Monitor confirmed that at least at Dixon specialty care scheduled at UIC is excessively delayed. The scheduler at Dixon told us that UIC orthopedic appointments were pending since the prior year and orthopedic appointments are

---

[312] The audit process refers to the audit related to provision II.B.9. IDOC has not initiated this process yet. There has been some confusion in that IDOC calls the initial attempt to obtain performance and outcome data a "clinical quality measures audit" which the Monitor initially thought was related to provision II.B.9. It was not and IDOC has no current audit related to II.B.9.

[313] Mortality review patients 1 and 12. These patients had 29 referrals for specialty care of which only 16 were completed.

[314] See Dixon Correctional Center, 2nd Court Appointed Expert Report April, 2018 and Stateville Correctional Center, 2nd Court Appointed Expert Report, March 2018

difficult to obtain.  Gastroenterology and ophthalmology are also difficult to schedule.  IDOC should, but does not, track the length of time to complete a scheduled appointment and has no requirement in policy for the expectation for how long it should take to complete a consultation. Routine appointments to UIC that are delayed more than two months should be scheduled locally. IDOC needs to complete its policy on specialty care which must address the expectation for the length of time to complete consultations.  When specialty consultations are delayed, the vendor should identify additional local consultants.

There are other reasons for delayed and canceled appointments.  At our recent visit to Dixon, we were told that about 15 referrals are produced a working day or about 300 per month.  Staff also told us that only 12 people a day or approximately 240 per month can be transported for specialty care.  If there are about 300 referrals a month but only 240 can be transported to their appointment then there should be an accumulation of approximately 60 referrals every month that are not completed on the tracking log.   IDOC staff agreed that a 15% estimate of uncompleted current referrals is probably accurate but the tracking log does not confirm when a consultation is not completed nor why it was not completed. Accurate tracking of completed consults and why some referrals are not completed is not consistently done throughout IDOC.  The completion rate of consultation referrals should not have to be estimated, the rate should be known and should be tracked.

At Dixon, the reason for limiting visits to 12 a day is lack of transportation vehicles and lack of officers to accompany inmates on transports particularly on the 2nd shift.  Both the Warden, the scheduling clerk and numerous other staff confirmed that these deficiencies exist and are frequent and significant.  All facilities should have adequate vehicles and officers to transport patients for their appointments.

Additional barriers to access to specialty care are the failure to refer and schedule a patient for specialty care when it is medically indicated or failure to schedule based on the urgency of the need.  On mortality reviews one patient with chronic obstructive lung disease[315] was not referred for pulmonary function testing.  This test is considered a baseline test that should be performed on all patients with this condition but we have noted in past mortality reviews that patients with this condition do not typically receive pulmonary function testing unless ordered by a specialist. Another patient[316] with Parkinson's disease   was not provided appropriate monitoring for that condition onsite and neither was he referred to a neurologist for consultation on how to monitor and manage the patient.  One patient[317] with sudden blood loss was referred electively to a gastroenterologist instead of being referred urgently for endoscopy.  There is also is no evidence that nutritional consultations are available to IDOC providers.  IDOC has informed the Monitor that an arrangement was established for dietary consultations.  But the Monitor asked for the number of individual and group dietary consultations that have occurred and no information was provided presumably meaning that no consultations have taken place.  Providers at Dixon said they were unaware of ability to obtain a dietary consultation.  Lastly, access to specialty care appears to have worsened due to vacancies in physician staff.  Physician vacancies were noticed

---

[315] Mortality review patient 3,
[316] Mortality review patient 17
[317] Mortality review patient 12

in several record reviews.[318]. When physician vacancies exist, clinically-needed patient referrals are less likely to occur.

IDOC has made no changes to the tracking log (III.H.1.). These logs are maintained by the vendor staff, not by the HCUA as required by the Consent Decree. IDOC has provided no evidence that the HCUA is responsible for maintaining the logs. At every facility we have visited, including the recent visit to Dixon, the vendor scheduler maintains the log.

Since the Monitor's 2nd Report, the Monitor has recommended the following items be tracked in the specialty offsite log.

- The patient name and IDOC number;
- The original date that a provider referred the patient for a consultation or for offsite testing. This should include all referrals including ones that do not result in a completed offsite consultation or diagnostic study;
- The reason for referral;
- The referral location;
- The date the appointment was made;
- The date the appointment occurred or was not kept (cancelled, not transported, lockdown, refused, etc.);
- If the appointment was canceled, the cancellation should be documented on the log and the re-schedule date needs to be documented. This needs to be done for every cancellation until the appointment occurs. Each cancellation needs to be in the same row for each unique referral;
- The date the facility received the consultant or testing report;
- The date the medical provider reviewed the consultant or testing report; and
- The date of the follow up visit with a provider.

These are not all accomplished.

Tracking logs are not maintained in a standardized manner and each scheduler develops their own methodology and apparent definition of some terms used to complete the log. The following are noted.

1. Appointments that are not completed are inconsistently documented as not completed. Often the completion date is merely left blank. Only a few facilities provide a reason for not completing an appointment.
2. No logs include a space to document receipt of the report which is required by the Consent Decree (III.E.4.). If the log is not to be used for this purpose IDOC needs to develop another method of tracking receipt of the report which is not currently done.
3. Verification that a provider follow up appointment with a patient is completed (III.H.2.) is tracked on all logs but this information is often not filled out and sometimes is filled out with a "Yes" response that does not indicate that the follow up was timely. For those logs that respond to this question with "yes" or "no", the date of the follow up is not provided so there is no verification that the follow up is completed within five days. There are no instructions to guide completion of the log, nor are logs standardized with respect to what

---

[318] Mortality review patients 1, 2, 5, and 14

is an acceptable entry onto the log.  Thus, IDOC has no means to verify this Consent Decree requirement.

4.  Most logs do not have a space to record the date the provider reviewed the documentation from the consultation (III.H.2 ).   Nor does a policy exist that defines what documentation is to be reviewed and when it is to be reviewed.  IDOC has no existing process to track this required review.

IDOC provides no information to verify that medical records staff tracks receipt of specialty care reports (III.E.4.) so it is not able to be verified.  There is no policy on how reports are obtained, recorded as received, reviewed by a provider, and filed into the medical record. Policy on tracking specialty care reports needs to be developed so that the process is standardized.  There is also no definition of a report .   A report should be defined as a typewritten communication of the consultant evaluation that includes their findings and recommendations.  Patient instruction sheets or referral forms with brief handwritten comments should not be considered a report.  Some consultants who use the EPIC medical record send a patient "after summary" instead of a report. This does not typically give findings or recommendations but does give upcoming appointments and sometimes medications.  These do not constitute a report with respect to III.E.4.

The Monitor reviewed 16 completed consultations at Pontiac and Menard.   We could find only 12 (75%) full reports and one partial report.  Two consultations only had comments on a referral form and one had no information returned at all.  The date of receipt of the report is not tracked but should be documented on the log.  IDOC has also provided no information that it uses best efforts to obtain these reports (III.H.3.).  IDOC could document on the log each attempt to obtain the report until it is received.

One facility[319] still enters a collegial review date on the log.  We have found no evidence that collegial reviews occur any longer and what this facility is tracking is unclear.

The Consent Decree requires that follow up of specialty care is conducted within five days of the appointment and sooner if indicated (III.H.2.).  The Consent Decree also requires that care for a patient who receives specialty care be informed (II.B.6.e.).   In our opinion, this means that the findings of the consultation, the consultant's recommendations, and the changes to the therapeutic plan are discussed with the patient.  This discussion and what was discussed need to be documented in the medical record.  This documentation needs to be sufficient so other clinicians using the record are informed of new findings and changes to the therapeutic plan.  This discussion with the patient needs to occur no later than five days.  At this time, if any new diagnoses are identified, *the provider* should update the problem list and enroll the patient in the appropriate chronic clinic(s).

IDOC provided no evidence to verify progress toward compliance of provisions III.H.2 and II.B.6.e.  IDOC has yet to define in its policy and procedure what "informed care" means and provides no direction in procedure on how providers are to provide informed care.  The tracking logs used by facilities have a column for documenting whether the consult was reviewed with the patient.  Almost all facility tracking logs have this entry as a binary "Yes/No" question which does

---

[319] Pinckneyville

not answer provisions II.B.6.e or III.H.2. Many facilities opt to not even fill this question out. The tracking log should verify the date of the follow up appointment with a provider which would answer the five day requirement. II.B.6.e. needs to be answered qualitatively by way of an audit of the medical record. IDOC provides no data or information to verify II.B.6.e.

We looked at five consultations from Pontiac. Based on examination of the record, there was no evidence that any of the five included a follow up visit *with* the patient. Of five consultations one had no report, two had comments from the consultant on a referral form, and two (40%) had complete reports from UIC. The two complete reports that were found were signed as reviewed one month and six days respectively from the date of the consultation. In only two of the consultations did a provider document review of the consultation referral form. In both of these, the physician documented the findings and recommendations but did not document a discussion with the patient. Therefore, in none of the five did the provider document a discussion with the patient. However, for all five, the tracking log documents that the consult was reviewed with the patient. Based on these findings, the documentation on the log is not accurate and is not consistent with requirements of the Consent Decree and cannot be used to verify III.H.2. This care is also not informed in the sense that the patient did not understand what care was being provided to him. Review of records verifies that IDOC scheduling clerks can track whether a complete report is received and can document the date a follow up appointment was completed, but are not capable to evaluate whether an effective post-consultation visit between a provider and the patient has occurred. In the Pontiac case, the scheduling clerk tracking log could not even effectively verify that a post-consultation visit occurred. Record reviews of the Monitor show that informed care seldom, if ever, occurs.

Mortality reviews attached to this report provide numerous other examples of disorganized specialty care that fails to coordinate care with the consultants. The Monitor has recommended for some time a process analysis of specialty care as evidenced in recommendations 3, 4, and 7 of the Monitor's 5th report. These have not been acted on. Root cause is suggested because this is a complex problem. Since those recommendations have not been done, a recommendation has been added that providers, the scheduling clerk, and the chronic care nurse meet weekly in a huddle to discuss all new and pending consultations to discuss timeframes for appointments and follow up. This may ameliorate some of the disruption of follow up care until a more thorough analysis of specialty care is completed.

IDOC needs to develop a specialty care policy. The policy should be geared towards attaining compliance with the Consent Decree. It needs to include at a minimum:

1. Timeframes acceptable for timely completion of an appointment. We suggest:
   a. Urgent referrals be completed within two weeks or earlier if clinically indicated.
   b. New routine consultation be completed at a clinically appropriate date as ordered by the provider but no later than two months.
   c. Follow up consultation be based on recommendation of consultant.
   d. Annualized screening evaluations (colonoscopy, CT scan, mammography, PAP smear) be based on reasonable community access timeframes.
2. Instructions for what to do when appointments are scheduled outside acceptable timeframes.

3. Instructions for establishing medical holds.
4. Detailed instructions and expectations for completing the specialty tracking log.
5. Definitions of terms used in specialty tracking log.
6. Specific guidelines for how and when UIC can be used for referrals. Setting guidelines on when delayed consults at UIC must result in using an alternative local consultant.
7. Detailed instructions for how each Consent Decree provision regarding specialty care will be addressed.
8. Guidelines for telemedicine consultations.
9. Instructions and guidelines for steps to take upon return to the facility after specialty consultation to ensure prompt institution of recommended medication changes and to address other recommendations.
10. Instructions for onsite specialty care.
11. Instructions for how the consultation report is to be obtained and who is responsible for obtaining the report.
12. Instructions for provider review of the documentation that returns with the patient and provider review of the full report.
13. Process for physician follow up of a specialty consultation that resulted in informed care.
14. Process for physicians to update problem list after new identification of problems based on consultation.

An additional issue was identified on a mortality review.[320] A patient had severe mental illness to the extent that he was incapable of making an informed decision. He was sent to UIC with a probable diagnosis of multiple myeloma. He needed a bone marrow biopsy and treatment. Because of his severe mental illness, UIC said he needed a guardian to approve an enforced procedure because he did not have full understanding of the implications of his decision. Apparently, the Warden is, by default, the guardian when an inmate cannot give informed consent and a family member cannot be located. IDOC would not discuss details of their decision, due to attorney client privilege, but no permission to enforce treatment was given and this 43 year-old man with schizophrenia died untreated from his disease. IDOC must develop a standardized procedure for addressing consent for those patients unable to give informed consent.

Lastly, IDOC provides no proof of practice, no data, and no information to verify III.H.4. that providers document findings and proposed treatments related to specialty appointments in the medical record. The audit process of IDOC does not provide this verification either.

In summary, except for providing tracking logs IDOC provided no data or information to verify their compliance with provisions related to specialty care. Based on record reviews and examination of the tracking logs, patients are not consistently provided timely nor appropriate access to specialty care or specialty diagnostic testing (II.B.1, II.B.6.g.) which results in inadequate care (II.A.).[321] There is no proof of practice provided that, after a consultation, providers review the consultation report within three days or that they have an effective and informed conversation with the patient about the consultation result within five days (III.H.2., II.B.6.e.). On a small sample, about 75% of reports were available. The date reports are obtained is not tracked (III.E.4.)

---

[320] Mortality review patient 8
[321] Mortality review patient 1

and IDOC provides no proof of practice that reports are reviewed (III.H.2.). IDOC had no proof of practice related to III.H.3. The tracking log is optionally filled out, is a convenience log for schedulers, and does not effectively measure items that should be verified to obtain compliance with the Consent Decree (III.H.1.). IDOC does not have a standardized procedure to document in the medical record that an offsite procedure has occurred (III.H.4.). Nor has IDOC provided any proof of practice that III.H.4. is completed. IDOC has not yet developed a methodology to provide proof of practice for any of these provisions. None of the eight recommendations from the last report have not been addressed. Mortality reviews continue to show lack of coordination of care with specialists that resulted in morbidity. This section was given partial compliance in the last report due to elimination of collegial review. However, since the last report no progress has been made including no effort to even develop a policy on the specialty care process. Given the lack of progress into year five of the Consent Decree a noncompliant status is warranted.

Three additional recommendations are given to address deficiencies identified.

**RECOMMENDATIONS:**

1. Create a tracking log which contains information in the list in the report above.
2. Despite termination of collegial review, the HCUA must maintain the tracking log. The log must be a log maintained for purposes of assessing access to specialty care and must include all referrals with the information specified in the report above.
3. Use quality improvement to study whether patients in need of specialty care are being referred for care; whether patients referred for offsite specialty care have received timely care; and whether diagnostic studies and consultations are being appropriately integrated into the patient's overall therapeutic plan. This should include, as only one example, review of records to see if the follow-up visit with the primary care provider describes a discussion between the patient and the provider, revolving around the findings at the offsite service and the plan of care.
4. A root cause analysis of specialty care needs to be promptly performed to determine why the specialty care referral process is resulting in considerable morbidity and mortality.
5. The vendor's prior methodology of utilization review has institutionalized diagnostic referral practices in a manner that do not contribute to timely evaluation of serious medical conditions. A re-evaluation of diagnostic efforts for serious conditions needs to occur.
6. IDOC needs to re-train all provider staff on the appropriate algorithm[322] to work up unintentional weight loss. This will require a critique and abandonment of the current referral practices that result in delayed diagnosis and therapy.
7. A root cause analysis needs to be done to identify why operational practices involving communication with consultants is so defective. Corrective actions to streamline and reduce errors in communication between consultants and practitioners within IDOC must occur.
8. Until and electronic record is put into place, a root cause analysis of obtaining and filing medical records needs to be done to ensure accuracy of filing of consultant and hospital reports in an orderly, coherent, and chronologic fashion that is readable and facilitates

---

[322] This can be found in UpToDate in the section on unintentional weight loss. Focus needs to be on promptly obtaining diagnostic studies for the area of concern.

understanding of consultant and hospital episodes of care. The lack of organized specialty and hospital reports in the medical record results in morbidity and mortality.

9. Institute a required huddle between providers, the offsite scheduling clerk and the chronic disease nurse to discuss all new referrals with expected timelines; recently returned consultations to include necessary follow up; discuss report availability and review; and update on all pending reports, pending consults that exceed expected timeframes, and any other specialty care question impacting clinical care.

10. IDOC should evaluate adequacy of transportation vehicles and transportation officers to ensure that sufficient officers and vehicles are available to ensure inmates have access to timely specialty care appointments.

11. When specialty care appointments to UIC are delayed, alternate local appointments must be used.

## Specialty Referral Oversight Review

*Addresses III.H.5*

**III.H.5.** *Within six (6) months after the Preliminary Approval Date of this Decree [July 2019]or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendations or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph. (see Specialty Care Section)*

**OVERALL COMPLIANCE RATING:** Substantial Compliance

**FINDINGS:**

IDOC no longer requires a utilization review of specialty referrals. Therefore, this provision is found compliant.

**RECOMMENDATIONS:**

1. The Monitor fully supports the IDOC decision to terminate the current collegial review specialty care and diagnostic testing referral process.

2. The termination of the collegial review must also pertain to referrals for subcontracted onsite ultrasonography services.

3. IDOC must immediately develop a tracking system to ensure that the vendor's demand for a summary of clinical information on the Special Services Referral and Report form

does not result in administrative denials of providers' referrals for specialty consultation, diagnostic testing, and procedures.

4. IDOC must also simultaneously develop a tracking system to ensure that the peer-to-peer clinical discussions are truly at the volition of the facility Medical Directors and do not become regular mandatory calls with the vendor's utilization management physicians that result in denials or restrictive alternate treatment plans.

5. The IDOC must conduct a review of the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services. Examples of current restrictive vendor practices include limiting cataract surgery to only one eye, categorizing ostomy reversal surgery as an elective, and others.

## Hospital Care

***Addresses Items II.A; II.B.1; III.G.4***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The one document requested was provided. IDOC provided the list of persons hospitalized with the quarterly data.

The IDOC audit does not provide any information to verify compliance with the three items associated with this item. IDOC provide no aggregate data or information to verify compliance with these three items. The tracking logs give information that is frequently inaccurate and are sometimes not provided with the quarterly data reports. The date the report is received is frequently documented "Yes" without a date. The date the provider saw the patient is not consistently accurate. This is similar to the tracking log. This makes the data unreliable.

The Monitor reviewed 25 hospitalizations occurring in 17 mortality records. In three of these hospitalizations the patients died in the hospital so there was no follow up and in another the patient was re-admitted to the hospital before 48 hours had elapsed. In the remaining 21 hospitalizations, only three met criteria of being evaluated by a provider within 48 hours and implementing

122

necessary treatment. Eighteen (86%) of 21 were noncompliant with provision III.G.4. Ten[323] of these were related to seeing the patient longer than the 48 required hours. However, all ten also had other problems with respect to implementing necessary treatment. Eight patients[324] were seen in follow up timely but did not have necessary treatment implemented.

Eight of the hospitalizations were potentially preventable. These included:

1. One patient[325] had chronic constipation and abdominal pain for six months prior to the hospitalization. The constipation was not managed well and there was no evaluation for his abdominal pain. He developed small bowel obstruction and had a stool ball in the rectum with ischemic necrosis. Earlier management and evaluation of the abdominal pain may have prevented this.

2. Another patient[326] had dizziness and headaches for months without work up before becoming unresponsive and apparently had new onset seizures. There was no discharge note but depending on the diagnosis this may have been preventable.

3. Another patient[327] had two preventable hospitalizations for low serum sodium that cause seizures and aspiration pneumonia. The low serum sodium was due to excessive water ingestion which was a result of dry mouth from his psychotropic medication. The patient had schizophrenia. Water restriction was recommended for this patient but there was no evidence that water restriction was implemented.

4. Another man[328] with severe mental illness was given acetaminophen keep-on-person and overdosed. Patients with severe mental illness should not be given medication keep-on-person that have potential for harm.

5. Another patient[329] was end-of-life but did not have his POLST status clarified nor did this person have his cognitive status determined. He had two hospitalizations for which he should probably not been admitted as he was in hospice or should have been in hospice.

6. Another patient[330] had a potentially preventable hospitalization if his heart failure was managed better at the facility.

All of these errors resulted in lack of necessary services and inadequate primary care (II.A, II.B.1)

In summary, IDOC has provided no proof of practice to demonstrate compliance. The IDOC audit provides no proof of practice for these provisions. Review of death charts continue to show problems with pre and post hospital care. No change is evident in access to hospitalization or follow up after hospitalization. Noncompliance is warranted.

---

[323] Mortality review patients 4 on 2/3/22 hospitalization, 7 on 1/21/22 hospitalization, 8 on 1/13/22 hospitalization, 10 on 11/19/19 and 3/11/21 hospitalizations, 13 on 12/23/20, 8/27/21, 1/5/22, and 2/18/22 hospitalizations, 17, on 6/14/21 hospitalization.

[324] Mortality review patients 1 for 11/2/21 hospitalization, 10 for 10/22/19 hospitalization, 13 for 1/25/21 hospitalization, 13 for 7/25/21, 3/10/22, and 5/10/22 hospitalizations, 16 for 1/31/22 hospitalization, and 17 for 8/4/21 hospitalization.

[325] Mortality review patient 2

[326] Mortality review patient 7

[327] Mortality review patient 10

[328] Mortality review patient 12

[329] Mortality review patient 13

[330] Mortality review patient 14

**RECOMMENDATIONS:**
1. Providers must continue orders promptly after hospitalization or document why recommendations will not be continued. Immediately upon return from hospitalization, nurses must consult with providers regarding recommended hospital orders. Within 2 days a provider must revise the therapeutic plan of the patient consistent with the hospital findings and recommendations. The provider must discuss the revised plan and how it will be implemented with the patient.
2. As part of the audit system, IDOC needs to evaluate whether the process of chronic care management results in preventable hospitalization. The audit system must also evaluate all provisions of the Consent Decree including II.A., II.B.1., and III.G.4. If systemic problems are identified these should be corrected through the quality improvement programs.
3. The statewide quality unit should perform a process analysis to determine why hospitalization is delayed for patients found in mortality reviews. Problems identified need to be corrected through the quality improvement program.

# Preventive Services

*Addresses items III.M.1.a-d*

**III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination.*

**III. M.1.b.** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**Influenza Vaccinations**

**III.M.1.a** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination*

**Overall compliance:** Partial Compliance

**Findings:** The Monitor requested one document: any log or tracking mechanism verifying immunization and any reports that track the percentage of eligible candidates for each adult immunization recommended by CDC. This was not provided.

The Consent Decree requires that IDOC is to produce an annual report based on data and information sufficient to verify compliance. IDOC has previously asserted compliance with III.M.1.a. but provided no systemic data for verification. Neither does the IDOC audit provide

124

verification of compliance with this provision[331]. IDOC must provide comprehensive data to demonstrate its compliance with this element of the Consent Decree.

As reported in the 3rd, 4th and 5th Court Reports the Monitor is aware that influenza vaccination is annually offered to many of the IDOC patient population in all correctional centers. For the current report (6th) the monitor has only received the CQI minutes from January through September 2022. The IDOC CQI minutes report data and findings from the previous month. The influenza season begins around September and therefore vaccinations will not be reported until the October CQI meetings. The monitor was provided with the October, 2022 CQI minutes (reporting on September 2022 data) for only a single site[332] which documented that 605 flu vaccines were offered and only 188 (31%) were accepted. There were 577 men housed at this facility in November 2022[333] which suggests but does not verify that most if not all incarcerated individuals who were at this facility in that time period were offered the flu vaccine. This is a low acceptance rate. The Monitor has also received vaccination orders filled by the vendor pharmacy from 2/2/22 through 9/1/22 but these did not include influenza vaccine. The IDOC reported no systemwide aggregate data to the Monitor on influenza vaccinations offered, accepted, or refused in 2022 flu season.

Review of multiple medical records during previous site visits at a number of facilities verified that many but not all patient-inmates had documentation on the medical record database page that they had been offered influenza vaccines and that the refusal rate was quite high. Access to influenza vaccination is available at all facilities but is not yet tracked based on requirement of the Consent Decree *to offer* influenza vaccination to all inmates. IDOC needs to track the influenza vaccination offer, refusal, and vaccination for all inmates. IDOC must begin this effort now and not wait for implementation of the electronic record. The failure to gather basic vaccination data speaks to the current lack on an established, comprehensive systemwide infection control program and the lack of staff to implement this task. Because of the high rate of refusal of vaccination, IDOC needs to focus educational efforts to increase the rate of acceptance of the influenza vaccine.

**Recommendations:**
1. IDOC must track and report annual influenza vaccination rates and refusals by site.
2. IDOC should institute an annual health information campaign to educate the incarcerated population about the health benefits of the annual influenza vaccine and the COVID-19 vaccine.

**Adult Immunizations**

**III.M.1.b** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**Overall Compliance:** Partial compliance

---

[331] The IDOC audit includes a sample of ten records at each site quarterly of how many persons *received* influenza vaccine but does not show how many persons were offered the vaccine which is required by the Consent Decree. Statewide their sample shows 45% of charts reviewed demonstrated vaccination.
[332] Vienna CC: October 2022 CQI minutes
[333] IDOC Population at Correctional Centers November 2022

**Findings:**

The Monitor requested four documents. Two documents were provided. The Monitor asked for vaccination orders filled by Boswell from 2/2/22 to 9/1/22. These were provided.

The second document requested that was provided was the COVID booster and initial vaccinations provided to inmates and employees.

IDOC did not provide a requested tracking log verifying immunization of eligible candidates for each adult immunization recommended by the CDC. They did provide certain medical record sections from 10 patients over age 65 from five facilities from the previous 12 months. This information was provided late in January, too late to use in this report.

In January 2021 IDOC submitted to the Monitor a draft administrative directive on Immunization and Cancer/Preventive Screening Programs for review and comment. The Monitor had given input on the clinical components of the draft. This draft was modified later in 2021 to include the updated national recommendation for earlier screening for colon cancer.[334] IDOC told the Monitor that draft would be included in a Clinical Preventive Screening policy but this policy has not yet been submitted to the Monitor for review. The Clinical Preventive Screening policy will need revision to include additional updated national recommendations concerning pneumococcal vaccination and lung cancer screening.[335]

As noted in the 4th and 5th Reports the immunization history, found in reception screening, chronic illness clinics, periodic examinations, and in transfer documents, is not consistently completed and is unreliable. Individuals are unlikely to remember all of their vaccination history and therefore these histories are difficult to obtain. IDPH has instituted I-CARE[336] to confirm individual vaccination history. IDOC still makes no attempt during patient encounters, such as the initial health assessment and baseline chronic clinic visit to obtain an individual's immunization history from public health records such as I-CARE. This State of Illinois registry of vaccinations should be used by IDOC to verify vaccination status on all new admissions to the IDOC and should be used by the chronic care nurse to verify vaccination status. It is unclear if IDOC has formulated plans to use I-CARE.

The 12/30/21 Implementation Plan committed IDOC to implementing an interval immunization tracking system to be used until the electronic health record was functional, to modify policies to allow nurses, acting under protocol, to immunize patients, to ensure that adult immunizations (and routine health maintenance and cancer screening) are offered for all at risks patients, to consider

---

[334] USPSTF lowered the age to begin screening for colon cancer from 50 to 45 years of age.

[335] CDC's Adult Immunization Schedule, United States 2022 now recommends the administration of initial administration of pneumococcal-20 or pneumococcal-15 vaccines for all adults. Pneumococcal-13 vaccine is no longer recommended and pneumococcal-23 is only used in tandem when P-15 in used. The USPSTF now recommends that lung cancer screening begin at age 50 for individuals with a 20 pack-year history of smoking not at age 55 with 30 pack-years of tobacco use.

[336] The IDOC website at https://dph.illinois.gov/topics-services/prevention-wellness/immunization/icare states the following. "I-CARE, or Illinois Comprehensive Automated Immunization Registry Exchange is a web-based immunization record-sharing application developed by the Illinois Department of Health (IDPH). The application allows public and private healthcare providers to share the immunization records of Illinois residents with other physicians statewide".

use of I-CARE to obtain a more accurate history of patient's vaccination history, and multiple additional steps needed to develop a comprehensive immunization program.[337] The most recent IDOC Implementation Plan[338] eliminates many of the interval steps noted in the 12/30/21 plan including developing a bridge immunization tracking system that would be done prior to the implementation of an electronic health record which is now years away from full implementation and an expanded, defined role of nurses in the vaccination program.

As noted in the 5th Report, vaccination practice is proceeding with considerable variation and is left up to each facility or individual staff member to figure out how to conduct this program. An effective Implementation Plan would standardize the process, create effective policy, ensure appropriate forms were in place with staff training on use of the forms, assign specific personnel and ensure there were sufficient staff to carry out the policy, ensure sufficient supplies were present where they need to be, train staff on the policy and use of equipment, supplies, and documentation, ensure that tracking mechanisms are effective and in place, establish timelines for implementation and ensure that all facilities have implemented appropriately, and to reflect on an ongoing basis as to the effectiveness of the implementation. Most of this is not evident in the latest Implementation Plan.

The Monitor has repeatedly discussed with IDOC that the management of the Immunization Program be placed under the control of nursing with a single nurse who directs and manages the program under standing orders approved by IDOC clinical leaders; this is a common practice throughout the USA for influenza and recently for COVID-19 immunization. Nursing staff at Decatur CC have reportedly been trained in soliciting and documenting vaccine information.[339] Both female facilities, Decatur CC and Logan CC have also implemented Human Papilloma Virus vaccination programs for women twenty-six years of age or younger. Placing the immunization program under the umbrella of nurse leadership offers IDOC the best option for successfully providing recommended adult immunizations to the IDOC population which will prevent morbidity and even mortality within the prison system and ultimately in the communities of Illinois. The latest Staffing Analysis[340] does not specify facility staff that would be responsible for this planned effort at the facilities.

As noted in previous reports, aside from COVID-19 vaccination statistics[341], IDOC has not provided systemwide data on vaccine administration. With limited exceptions[342], the only data IDOC provides to the Monitor regarding vaccines is the pharmacy vendor's [343] dispensing data but this data is inadequate to verify actual administration of the vaccines. Since the Consent Decree was signed, IDOC providers have ordered a number of previously unavailable adult immunizations

---

[337] IDOC Implementation Plan 12/30/21, items 26, 27, 54
[338] IDOC Implementation Plan received by Monitor on 6/1/22
[339] Decatur CC Continuous Quality Improvement Minutes, September 2020
[340] IDOC Facility Staffing, 9/12/22
[341] IDOC has intermittently provided systemwide data on COVID-19 vaccination of the incarcerated population and staff.
[342] Logan CC and Decatur CC have previously provided data on the administration of HPV vaccines to females 26 years of age or younger.
[343] Boswell Pharmacy Services, Jennerstown, PA

for individual patients from Boswell Pharmacy. Thirteen vaccines[344] are now available for providers to order on a patient-specific basis or via stock orders. Based on the pharmacy vendor dispensing data[345], eight of the thirteen available vaccines[346] have also been filled as stock orders at the correctional facilities.

Since the beginning of the Consent Decree, IDOC has not reported data on the vaccinations given or vaccination rates; it only provides lists of dispensed stock and individually ordered patient-specific vaccines[347] ordered from Boswell Pharmacy.[348] During the 39 months after OHS expanded the number of nationally recommended vaccines in the IDOC staff have begun to order an increasing numbers of adult vaccines.[349] Data on the quantity of stock and individual vaccine orders dispensed by the pharmacy vendor does not document the number of individuals who actually receive the ordered vaccinations. Data is also lacking on individuals who have previously been vaccinated, and those who have been offered vaccination but refused. With the exception of HPV vaccination program at Logan CC and Decatur CC, IDOC has been unable to provide aggregate data to verify the number of individuals vaccinated; this is especially true for vaccines that require a series of 2-3 shots[350]. Still, based on dispensing data there are indications that vaccinations are becoming more accessible in the IDOC (see table below). Accessibility still needs to be improved and IDOC needs to verify actual administration of vaccination. As also noted in the table below, there is a wide variation between the thirty IDOC facilities in the ordering of vaccines. This needs to be investigated to determine the reasons for this variation.

---

[344] Diphtheria-tetanus, HPV, haemophilus influenzae B (HIB), hepatitis A, hepatitis B, influenza, measles-mumps-rubella (MMR), meningococcal ACWY, meningitis B, pneumococcal 13, pneumococcal-23, recombinant herpes zoster (RZV), and varicella immunizations.

[345] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-9/1/22

[346] Tetanus-diphtheria (TD), hepatitis B, hepatitis A, pneumococcal 23, pneumococcal 13, recombinant Zoster (shingles), human papilloma (HPV), and influenza vaccines have been ordered as stock supplies.

[347] Stock medication is a general supply of vaccine and is not an order for a specific patient. Patient-specific vaccines are orders for a specific patient. Patient specific orders are more likely to indicate that a patient has received the vaccine but only documentation of administration can confirm this.

[348] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-9/1/22

[349] See included Table: Adult Immunization Doses Ordered 11/1/19 – 9/1/22

[350] CDC Recommended Adult Immunization Schedule 2022: Meningococcal ACWY, HPV, recombinant Herpes Zoster (Shingrix), HiB, Hepatitis B, and Hepatitis A require multiple doses.

| Adult Immunization Doses Ordered  11/1/19-9/1/22 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | P-23 | P-13 | RZV | HPV | Hep B | Hep A | Menin. |
| | | | Shingles | Three shots | Three shots | Two Shots | ACWY 2 shots |
| BMR | 137 | 0 | 584 | 1 | 0 | 0 | 2 |
| CENTRALIA | 142 | 0 | 148 | 0 | 0 | 0 | 0 |
| DANVILLE | 54 | 3 | 43 | 0 | 0 | 0 | 21 |
| DECATUR | 72 | 0 | 146 | 142 | 11 | 2 | 0 |
| DIXON | 56 | 1 | 157 | 3 | 0 | 0 | 0 |
| East Moline | 74 | 3 | 54 | 0 | 0 | 0 | 1 |
| JITC/ELGIN | 10 | 0 | 2 | 0 | 0 | 0 | 0 |
| GRAHAM | 101 | 2 | 120 | 0 | 1 | 0 | 2 |
| HILL | 264 | 16 | 276 | 0 | 0 | 0 | 6 |
| IRCC | 155 | 5 | 178 | 0 | 0 | 0 | 0 |
| JACKSONVILLE | 151 | 0 | 59 | 2 | 12 | 0 | 1 |
| JTC | 20 | 0 | 9 | 0 | 0 | 0 | 0 |
| KEWANEE | 84 | 3 | 53 | 1 | 0 | 0 | 0 |
| LAWRENCE | 127 | 1 | 78 | 2 | 0 | 0 | 0 |
| LINCOLN | 45 | 1 | 79 | 0 | 0 | 0 | 0 |
| LOGAN | 131 | 162 | 504 | 420 | 0 | 0 | 0 |
| MENARD | 68 | 8 | 106 | 0 | 0 | 0 | 0 |
| Murphysboro | 18 | 0 | 27 | 0 | 0 | 0 | 0 |
| NRC | 21 | 1 | 0 | 0 | 0 | 0 | 0 |
| PINCKNEYVILLE | 31 | 0 | 238 | 0 | 0 | 0 | 0 |
| PONTIAC | 51 | 2 | 73 | 0 | 0 | 0 | 0 |
| ROBINSON | 83 | 0 | 40 | 0 | 0 | 0 | 0 |
| SHAWNEE | 246 | 1 | 72 | 0 | 0 | 0 | 0 |
| SHERIDAN | 88 | 0 | 2 | 0 | 10 | 2 | 2 |
| SOUTHWESTERN | 4 | 0 | 2 | 0 | 4 | 2 | 0 |
| STATEVILLE | 34 | 2 | 32 | 0 | 0 | 0 | 1 |
| TAYLORVILLE | 69 | 0 | 219 | 0 | 0 | 0 | 0 |
| VANDALIA | 56 | 2 | 29 | 0 | 0 | 0 | 0 |
| VIENNA | 52 | 0 | 109 | 0 | 3 | 3 | 0 |
| WESTERN | 106 | 0 | 38 | 0 | 0 | 2 | 0 |
| TOTALS | 2503 | 213 | 3477 | 571 | 41 | 11 | 36 |

Since November 2019, pneumococcal 23 vaccination has now been ordered at all thirty IDOC correctional centers but pneumococcal 13 was only ordered at sixteen sites.[351] Recombinant zoster vaccine (shingles vaccine) was requested by twenty-nine of the thirty facilities. Although HIV patients who are candidates for meningococcal ACWY vaccination are housed at almost all IDOC correctional facilities, only eight centers have ordered this vaccine over the last three years. Hepatitis B vaccine was only requested by six facilities and hepatitis A vaccine by five centers. Both vaccines are recommended for all patients with hepatitis C or other existing liver disease and HIV infection and should be provided to all inmate-porters and "hospice workers"[352]. CDC also

---

[351] Based CDC Adult Immunization Schedule 2022 pneumococcal 13 vaccine will be entirely eliminated and pneumococcal 23 predominantly replaced by pneumococcal 20 and pneumococcal 15.
[352] See Infection Control Recommendation 12 narrative. IDOC currently requires all inmate workers to obtain hepatitis B vaccination and has recommended that all individuals with liver disease and HIV receive the hepatitis A

129

recommends that hepatitis B vaccine be offered to all incarcerated persons.[353] Human papilloma virus vaccine (HPV) is recommended for all 26 years of age or younger females and males. The two female correctional centers have ordered a combined five hundred sixty-two HPV vaccines but only five of the twenty-eight male correctional centers have ordered a cumulative nine doses of HPV vaccines. HPV vaccine decreases the incidence of vulvar, vaginal, anal, and cervical cancer in females and penile and anal cancer in males.[354] Failure to provide nationally recommended vaccines to the incarcerated population is a missed opportunity to prevent infection and cancers in the IDOC and ultimately in all communities in Illinois.

During the most recent correctional center inspected by the monitor team[355], randomly selected medical records were reviewed to assess the delivery of adult immunizations at this site. A small number of records were reviewed given time constraints. Results are shown below.

| Vaccination of Sample of Eligible Patients at Dixon Site Visit December 5-7, 2022 | | | | |
|---|---|---|---|---|
| Age or Other Eligibility Category | Pneumococcal-23 Vaccnine | RSV Vaccine | Meningococcal. ACWY Vaccine | Human Papilloma Vaccine |
| ≤ 26 years of age (+/- chronic illness) | | | | 0/7 |
| 45-64 years of age | 1/3 | N/A | | |
| ≥65 years of age | 2/6 | 1/6 | | |
| HIV infection | 0/2 | 0/1 | 0/2 | |
| *Total Vaccinated* | 3/11 | 1/7 | 0/2 | 0/7 |
| *Percent Vaccinated* | 27% | 14% | 0% | 0% |

The databases from an additional (not randomly selected) eight medical records of patients fifty years of age or older from one[356] of the two female facilities were reviewed for the administration of adult vaccines. Six (75%) of the eight eligible women were offered recombinant Zoster vaccine (shingles), five (50%) accepted the vaccine. Two ( 50%) of the four eligible patients[357] have received the pneumococcal 23 vaccine. The IDOC clinical audit showed that of 300 charts reviewed 45% of individuals received influenza vaccination and 47% of individuals over 65 received pneumococcal vaccine. This audit did not assess the number of patients were offered the vaccine only whether they received it.

---

vaccine. However, IDOC has yet to address the need for hepatitis A vaccination in inmate porters and hospice workers whose duties constantly out them at risk for exposure to fecal-oral pathogens.
[353] CDC: Recommended Adult Immunization Schedule, United States, 2022
[354] HPV vaccination also decreases the incidence of genital warts and head and neck cancers in both females and males.
[355] Site inspection by Monitor team at Dixon CC 12/5-7/2022
[356] Decatur CC records received on 11/9/22
[357] The four patients eligible for P-23 vaccination had COPD, asthma, diabetes, or prediabetes.

Over 6,000 men and women in the IDOC over 50 years of age[358] are eligible for the two-shot recombinant zoster vaccine (RZV) to prevent the occurrence of shingles; 3,477 doses[359] have been ordered from 11/1/19 through 9/1/22. Twenty-nine[360] of the thirty IDOC correctional centers have submitted orders to Boswell pharmacy for the RZV vaccine. Although there continues to be notable ordering of RZV throughout IDOC, there are still opportunities to improve access to this important vaccine. Once again, the data is mostly inferential and needs to be strengthened to ensure that the IDOC has accurate data on how many men and women are actually offered and received the ordered RZV.

As noted in the 4th and 5th Court Reports, at any one time an estimated 100-150 females eligible to receive the cervical cancer preventing HPV vaccine series[361] are housed at Decatur CC and Logan CC.  From January 2020 through September of 2022, a confirmed 127 women have started and/or completed the three shot HPV vaccination series.[362] The method of reporting the HPV vaccinations at the two female facilities is not standardized and makes it difficult to verify the exact number of women who have started HPV vaccination and the exact number who completed the three shot HPV series. However, based on the pharmacy vendor's filled orders[363], 562 individual and stock orders of HPV vaccine have been delivered to the two female facilities which would theoretically have been adequate to fully vaccinated an estimated 187 females.   These two facilities planned and implemented catch-up HPV vaccination campaigns that have been successful and should serve as templates for provisions of nationally recommended adult immunizations throughout the IDOC. However, IDOC must continue to improve its data collection processes so that they know and can verify how many eligible women have been offered, refused, started, and completed HPV vaccination.  This process requires ongoing data collection because in IDOC, individuals are continuously being incarcerated and paroled.  Therefore, audits are a point in time analysis that must be confirmed on an ongoing basis.

As noted in the 4th and 5th Court Reports, OHS has appropriately expanded access to nationally recommended adult vaccines for the IDOC population and there is evidence that the medical providers at some IDOC correctional centers are beginning to order some of these vaccinations for their patient populations. However, the IDOC population is still under-vaccinated for many CDC-recommended adult immunizations. IDOC needs to finalize its policy and procedure and implement it to ensure that vaccinations are offered to all eligible at-risk candidates.

The Monitor has strongly advised IDOC to develop nurse managed and standing order-based immunization programs at each facility to maximize the effectiveness of the provision of adult immunizations to IDOC's at-risk individuals. IDOC must ratchet up the pace of vaccine administration to provide adequate protection for the incarcerated population. The development of

---

[358] IDOC "Parent Institution and Age Range of Individuals in Custody on 2/24/2022".

[359] The 3,484 RZV doses ordered from 11/1/19 through 9/1/22 include 2,835 doses for individual patients and 649 doses placed in a facility's stock supply.

[360] The Northern Reception Center (NRC) has not to date ordered the RZV vaccine.

[361] HPV vaccine also decreases the incidence of vulvar, vaginal, anal, and head and neck cancers and genital warts in women and penile, anal, and head and neck cancers in men.

[362] IDOC emails to Monitor 8/4/2021 with HPV vaccine data from Decatur CC and Logan CC and additional data from Boswell Pharmacy orders of HPV vaccine. Some the data provided to the Monitor simply stated the number of doses of HPV vaccine that were administered.

[363] Boswell Pharmacy filled orders for HPV vaccine from 11/1/19 to 9/1/22

a vaccination program directed by nursing staff has the best potential to effectively coordinate the catch-up and ongoing vaccination of incarcerated persons in the IDOC.

IDOC currently cannot verify vaccination rates because standardized data on vaccination is not gathered and reported. IDOC has proposed that this will be available when the electronic medical record is developed. However, until the electronic medical is implemented, IDOC needs to establish a manual tracking system to record the number and percentage of eligible individuals offered, administered, and refused nationally recommended adult immunizations. Because of the lack of data verifying vaccine administration, a partial compliance rating continues to be warranted.

**Recommendations:**
1. The structure of the vaccination program must be addressed in the Implementation Plan. This program should be rolled out with standardized practices, staffing, equipment, supplies, and training. Timetables should be established for key benchmarks. Responsible persons should be assigned for tasks.
2. The IDOC has promulgated standard operating procedures for a comprehensive adult immunization program and must continue to implement processes that ensures that all patient-inmates are offered nationally recommended age and risk appropriate adult immunizations. This process will include the provision of immunizations at the various clinical encounters noted in the revised January 2021 Administrative Directive but also in special catch-up vaccine campaigns.
3. The Immunization Program should be placed under the administrative umbrella of nursing leadership and managed by each facility's infection control nurse or a dedicated immunization nurse using approved standing orders to administer recommended adult immunizations.
4. The IDOC must track and report the percentage of fully vaccinated incarcerated individuals for each nationally recommended vaccine and the ongoing offering, administration, and refusal of all adult immunizations, and the percentage of eligible individuals who are offered and received recommended adult immunizations to the CQI committees at each site.
5. The new EMR vendor should incorporate data points and clinical prompts which electronically remind, record, track, and report all adult immunizations offered and administered and the identified clinical indication (age, clinical condition, etc.)
6. The HPV vaccination campaigns at Decatur and Logan CCs should serve as the model for the delivery of nationally recommended adult vaccinations in the IDOC.
7. HPV must be offered to all incarcerated women and men 26 years of age or younger.
8. The database and Immunization, Screenings, and Exam tracking table in the medical record must accurately document all vaccinations, screenings, and exams that are offered, administered and performed, and refused.
9. The IDOC immunization and cancer screening program guidelines must be reviewed and updated as needed to assure that updates to Center for Disease Control recommendations for adult immunizations and United States Preventive Services Taskforce recommendations for routine health maintenance and cancer screening are expeditiously incorporated into the IDOC guidelines. IDOC's current guidelines for pneumococcal vaccination and lung cancer screening are outdated.

**Cancer and Routine Health Maintenance Screening**

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

As noted in the 4th and 5th Court Reports, in October 2019 the IDOC Office of Health Services distributed systemwide "Standard Operating Procedures: Cancer Screening" which detailed IDOC Routine Health Maintenance and preventive screening recommendations for breast, cervical, colon, and prostate cancer. In January 2021 the OHS and IDOC submitted a draft Immunization and Cancer/Preventive Screening Programs Administrative Directive appropriately adding lung cancer and abdominal aortic aneurysm (AAA) screening that had not been included in the 2019 guidelines and providing increased guidance on gathering and documenting an inmate's prior cancer and routine health maintenance screening history, ordering the recommended screenings during intake screening at Reception & Classification Centers, and reviewing the need for cancer and routine health maintenance (RHM) screenings upon arrival at parent facilities and during sick call appointments, chronic clinic visits, and annual (and bi-annual) physical exams. Later in 2021 based on revised USPSTF guidelines, IDOC appropriately lowered the age at which routine colon cancer screening was to begin from 50 to 45 years of age.

The United States Preventive Services Task Force (USPSTF)[364] and the IDOC 2021 guidelines[365] recommend that colon cancer begin at age 45 for asymptomatic, average risk patients.[366] Colorectal cancer was the second leading cause of cancer mortality from 2017-2021 among the IDOC incarcerated population[367] and four of the thirteen reported colorectal cancer deaths were under the age of fifty. Review of quality improvement committee minutes from the 2nd and 3rd quarters of 2022 found no evidence that any IDOC facilities were regularly reporting the offering of colonrectal cancer screening[368]. Tracking and reporting of colorectal cancer screening started at Logan CC in 2020 and continued in 2021. We were not able to verify continuation in 2022. This tracking should be replicated throughout the IDOC with data modified to include the type of screening test utilized and the actions taken for individuals with abnormal screening tests.

The IDOC clinical quality measures audit reviewed a sample of 10 records of those eligible for colorectal cancer screening from every IDOC facility and found that only 14% received

---

[364] United States Preventive Services Task Force cancer screening guidelines date released May 2021. Age for colon cancer has been lowered to 45 years of age (B Recommendation), Colon cancer screening from 50-75 years of age remained as an A recommendation.

[365] OHS Standard Operating Procedures: Cancer Screening October 24, 2019 and Administrative Directive IDOC Immunization and cancer/preventive Screening Program, January 2021 draft

[366] Colon cancer was the second leading cause of cancer death in the IDOC from 2017-2021. The IDOC Adult Institution Inmate Deaths Calendar Year listed 66 deaths as of 10/26/22. The cause of death was noted on only 26 of the mortalities; one of the 26 deaths was due to metastatic colon cancer in a 55 y/o.

[367] IDOC Mortality spread sheets 2017-2022. This mortality data is incomplete with 139 of the 636 deaths not listing the cause of death

[368] In the 5th Court Report, it was noted that Logan CC had reported data on colon cancer screening in the October-December 2021 QI minutes. The Logan CC QI minutes in the April-September 2022 were provided but not be opened for verification of continuation of data being reported on colon cancer screening.

appropriate colorectal cancer screening statewide. This was confirmed during a facility inspection to Dixon in December 2022. The Monitor reviewed 14 randomly chosen medical records of individuals 45 to 75 years of age to assess the compliance with colorectal cancer screening. Zero (0%) of the fourteen eligible patients were offered a nationally recommended colorectal cancer screening test.[369] Since October 2019, IDOC has recommended that eligible patients be screened for colorectal cancer using a fecal immunochemical test (FIT). However, as recently as 7/22/22 IDOC providers at this facility have continued to offer digital rectal exam (DRE) and a single stool guaiac test obtained during the rectal exam to screen for colon cancer; a method of screening for colon cancer that has been deemed ineffective and discontinued nationally 15-20 years ago. All seven of the 14 patients offered the invasive DRE and single stool guaiac test refused this methodology. A baseline audit of ten medical records at this same facility by Southern Illinois University health care consultants in the summer of 2022 reported that only one (10%) of the ten patients has been screened for colon cancer.

For the 6th Court Report seventeen (not randomly selected) medical records of women 50 – 61 years of age were reviewed for documentation of colorectal cancer screening.[370] Seven (40%) were offered the recommended fecal immunochemical test (FIT) screening; one refused the FIT test, three had negative FITs test, and three had FIT ordered in April 2022 but there were no results in the medical record. Four (24%) were screened in 2021 using the three hemoccult card method; this testing method is no longer recommended by the USPSTF due to lack of sensitivity and specificity. Six (35%) additional individuals were either not screened or were screened using a screening method that is not nationally recommended.[371]

Two of the seventeen female patients had reported a previous history of colon polyps detected by colonoscopy prior to incarceration. Patients with a history of colon polyps should be directly referred for repeat colonoscopy. Instead, these two patients were offered colorectal cancer screening tests that were not clinically warranted. The methods of screening offered were not recommended by the USPSTF. This is not the standard of care for patients with a history of colon polyps. Colonoscopy was eventually performed on one patient after an avoidable 15 month delay.[372] The other patient[373] with a history colon polyps was twice offered, most recently on 8/24/22, a long discontinued screening test for colon cancer screening [374]; after five years this patient still has not received a colonoscopy.

---

[369] The USPSTF recommends one of the following six screening tests: 1) High-sensitivity guaiac fecal occult blood test (HS-gFOBT) or fecal immunochemical test (FIT) every year; 2) Stool DNA-FIT every 1 to 3 years; 3) Computed tomography colonography every 5 years; 4) Flexible sigmoidoscopy every 5 years; 5) Flexible sigmoidoscopy every 10 years + annual FIT; 6) Colonoscopy screening every 10 years

[370] Medical charts of patients at IDOC's two female correctional centers: Decatur CC and Logan CC
[371] Two of the three individuals offered the discontinued DRE and single stool blood test method refused this test. This test is not a valid screening test for colorectal cancer.
[372] This patient (Decatur patient #1) with a history of colon polyps was screened three separate times with the outdated three hemoccult method was eventually referred to GI specialty and had a negative colonoscopy after a delay of 15 months.
[373] Logan patient #1
[374] Digital rectal exam and a single stool test for blood. This method of screening was discontinued 15-20 years ago.

Even though IDOC initially recommended colon cancer screening with FIT testing in October 2019 and again in a draft Administrative Directive in January 2021, it was not until the 5th Court Report (June 22, 2022) that the Monitor was provided with any data that FIT testing had been initiated in the IDOC.[375] As on August 24, 2022 the Monitor is still identifying the use of methods of screening for colon cancer that are not recommended by the USPSTF[376] or even by IDOC's clinical guidelines.

IDOC currently does not have an effective program to screen eligible patients for colorectal cancer. Based on the data presented in this section, there is widespread variation in IDOC's thirty correctional centers in offering screening and utilizing nationally recommend screening modalities. IDOC must put additional effort into developing and reporting systemwide evidence that nationally recommended colon cancer screening tests are been offered at the recommended intervals to all eligible patient-inmates in all IDOC correctional facilities. It is hoped that the inclusion of the provision of colorectal cancer screening in the performance and clinical outcome measures being done semiannually by SIU consultants will provoke needed staff training and identify corrective actions that will the improve colorectal cancer screening in the IDOC.

As noted in the five previous Court Reports, the USPSTF recommends that selective screening for prostate cancer using PSA testing in average risk males 55-69 of age be based on patient preferences and that patients be provided with relevant clinical information by their provider about the pros and cons of PSA screening. The frequency of screening is not clearly defined. Prostate cancer screening should not be done for men 70 years of age or older or with a life expectancy less than 10 years. Routine annual PSA screening for asymptomatic men and digital prostate palpation via a rectal exam is not a national recommendation. OHS's revised 2021 prostate cancer screening guidelines are fully aligned with the USPSTF standards. Interviews with IDOC providers in June 2021[377] revealed that providers were still offering digital rectal screening (DRE) as a screening test for prostate cancer. The review of 52 medical records provided for the 5th Court Report in 2022[378] documented twenty-seven incarcerated persons who were offered DRE screening as the screening test for prostate cancer; this is not recommended by the USPSTF or by the IDOC administrative directive.[379] The IDOC must discontinue the utilization of the outdated and ineffective digital rectal examination as a screening test for prostate cancer and the use of a single

---

[375] 5th Court Report 6/22/22: Medical records of patients over 45 years of age from seven facilities were reviewed by the Monitor. Only two, Decatur and East Moline, of the seven facilities were found to have screened eligible individuals for colon cancer using the recommended FIT test. The other five facilities, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC, and Vandalia CC, either did not screen patients or used methods of screening that were not recommended by the USPSTF.

[376] Dixon CC patient # 1 DRE/single stool guaiac offered in 6/2022, Dixon patient #2 DRE/single stool guaiac offered 7/22/22, Logan patient #1 DRE/single stool guaiac offered 8/24/22. DRE/single stool guaiac is not recommended as a colon cancer screening method by the USPSTF and was discontinued as a valid screening test 15-20 years ago.

[377] Shawnee CC 6/21-23/2021

[378] Review of 2021-2022 5-10 medical records at six IDOC facilities revealed that digital rectal exams (DRE) with the collection of single stool guaiac continue to be practiced in the IDOC: East Moline CC: 7 DRE's offered, 4 refused, Jacksonville CC: 10 DRE's offered, 10 refused, Pinckneyville CC: 4 offered, 3 refused, Robinson CC: 3 offered, 1 refused, Shawnee: 1 DRE offered, 0 refused, Vandalia CC: 2 DRE's offered, 2 refused.

[379] Administrative Directive IDOC Immunization and Cancer/Preventive Screening draft January 2021

stool guaiac test gathered at the time of the rectal exam to screen for colorectal cancer.

As also reported in the 4th and 5th Court Reports, the USPSTF and the IDOC administrative directive recommend a one-time screening with ultrasonography for abdominal aortic aneurysm (AAA) on all males 65-75 years of age who have ever smoked. The Monitor has identified, to date, only one male between 65-75 years of age who has been screened for AAA[380] nor has the any additional data been provided by IDOC concerning screening for AAA screening in the IDOC. A review of the databases and medical reception screening medical history forms of 42 incarcerated men at six facilities for the 5th Report and an additional 19 medical records and databases for this Report[381] revealed that information on the use of tobacco was not documented for 20 (33%) of the sixty-one patients, 14 (23%) were non-smokers, and 27 (44%) gave a history of tobacco use. The lack of documentation on whether an age-eligible male smoked or not is a barrier to IDOC's ability to identify the unmet need for AAA screening as well as lung cancer screening.

As previously reported in the 5th Court Report, the USPSTF currently recommends annual low dose computerized tomography (CT) screening for early detection of lung cancer for individuals 50-80 years of age who have 20 pack year history of tobacco smoking.[382] IDOC's January 2021 Administrative Directive, Immunization and Cancer/Preventive Screening Programs which advised screening of individuals 55-80 years of age with 30 pack year history of tobacco use needs to be updated. To date, the Monitor has not identified or been provided information of a single asymptomatic incarcerated person who has been screened for lung cancer. The provider's decision to determine an individual's risk of lung cancer and eligibility for low dose CT lung screening continues to be hampered by the poor documentation of tobacco use and the number of total pack years [383] in the medical history or database section of the medical record and the problem list. Besides not having documentation in the chart if an individual ever smoked or not in 33% of the medical records reviewed as noted in the previous paragraph, the number of "pack-years" of tobacco use was documented for only 5 (19%) of the twenty-seven confirmed tobacco smokers. The amount and duration of tobacco use is a key piece of health information that should be solicited and documented during the intake screening process. Without this data IDOC will not be able to determine whether it is effectively offering lung cancer screening to at-risk incarcerated men and women.

---

[380] Medical record reviews during previous site visits to Lincoln, Lawrence, Pontiac, and Robinson identified no individuals who were screened for AAA. Medical record reviews from 2021-2022 from Shawnee CC, East Moline CC, Jacksonville CC, and Pinckneyville CC in June 2022 revealed eleven men between the age of 65-75, three had documented use of tobacco, the medical records of seven did not document whether the individual had or had not ever smoked tobacco, and one patient had no history of tobacco use. Only one (Pinckneyville CC) of these ten had been screened for AAA and that individual's chart lack any documentation that he had or had not ever smoked tobacco. Medical record reviews at Dixon CC in December 2022 identified three individuals between the age of 65-75 with a history of tobacco use: none of these three have been screened for AAA. One additional man at Dixon, age 71 years, did not have any documentation that he had or had not ever smoked.

[381] 5th Report: 42 records (50-80 years old) form East Moline CC, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC, and Vandalia CC and 6th Report: 19 records (50-80 years old) from Dixon CC and Decatur CC.

[382] USPSTF revised lung cancer screening March 9, 2021. IDOC needs to revise its January 2021 administrative Directive which recommended lung cancer screening for men and women aged 55-80 years who smoked tobacco for 30 pack years. This criteria is now 50-80 years of age with 20 pack years of smoking and who have not quit smoking for 15 years or more.

[383] Pack-years is determined by multiplying the number of packs of cigarettes smoked per day times the numbers of years smoked. Example: Smoking ½ pack per day times 30 years = 15 pack-years

The current practice in the USA is to do liver ultrasonography every six months in patients with a variety of risk factors for the development of hepatocellular carcinoma including hepatitis C with advanced cirrhosis (F3 and F4 fibrosis).[384] The Monitor has identified no systemwide evidence of this screening being performed on high risk incarcerated persons or data being reported in facility QI minutes. In the 5th Report, only two of IDOC's thirty correctional facilities provided data in their Chronic Care Rosters indicating that liver ultrasonography screening is being performed on small numbers of patients with hepatitis C; this data is not presented to the facilities' monthly quality improvement minutes.[385]

Lung cancer, colorectal cancer, and hepatocellular carcinoma are the three leading causes of cancer mortality in the IDOC.[386] These three cancers can be diagnosed and treated at an earlier stage with effective screening programs and can even be prevented or cured if detected in an early or precancerous stage. IDOC needs to more aggressively develop and track the effectiveness of its cancer/preventive screening program. Effective cancer and routine health maintenance screening in the IDOC for at-risk incarcerated persons has the potential to positively impact on avoidable morbidity and mortality.

IDOC has not yet fully completed or implemented policy and procedure on cancer and other disease screening, has not developed systemwide data tracking for cancer and other disease screening, and provided only limited data to the Monitor related to its cancer and disease screening efforts. However, based on the verification in the medical records at three facilities that FIT testing is being offered to eligible patients and the limited establishment of a liver ultrasound screening reminder process for patients with advanced liver fibrosis/cirrhosis to ensure that screening is done every six months, a rating of partial compliance is very tentatively assessed.

**RECOMMENDATIONS:**
1. The IDOC must begin to track and report the rates of cancer and Routine Health Maintenance preventive services screenings including colon cancer, lung cancer, hepatocellular cancer, and abdominal aortic aneurysm screenings offered, performed, and refused and report these results to the facility CQI committees.
2. The colorectal cancer screening data table initiated in the last quarter of 2021 at Logan CC and reported to its monthly quality improvement committee is a model for use throughout the IDOC but should be modified to note the type screening utilized and the action taken to make a definitive diagnosis on patients with abnormal screening test results.
3. The IDOC should track and report on the percentage of eligible men and women who are current with all nationally recommended cancer and routine health maintenance screening standards.

---

[384] 2018 Practice Guidelines of the American Association for the Study of Hepatocellular Carcinoma.

[385] 5th Report or in 2022 2nd and 3rd quarter CQI reports

Dixon CC chronic care roster listed 8 patients (6 with treated hepatitis C and 2 with "cirrhosis') who were to receive semi-annual liver sonography (US) screening for hepatocellular carcinoma; three had liver US done in 2021 with the next US to be done in early 2022. One other unidentified correctional facility's chronic care roster listed one patient with treated hepatitis C who required every 6 month liver US screening. This data was provided to Monitor on 3/28/22

[386] 2017-2022 IDOC mortality spread sheets.

4. The IDOC should continue to incorporate all the A and B recommendations of the USPSTF into the RHM/Preventive Services program.

5. The IDOC should provide ongoing education to providers on the nationally recommended preventive screening standards.

6. The wording of III.M.1. (c) in the Consent Decree should be modified so that the PSA testing recommendation is in align with the prostate screening recommendations of the USPTF. PSA testing is now recommended to be discussed with men ages 55-69 and colon cancer screening is now recommended for ages 45-75.

7. IDOC must immediately discontinue the outdated and not recommended use of digital rectal exams with the collection of a single stool guaiac test as screening tests for prostate cancer and colorectal cancer in the IDOC.

8. The preventive cancer screening program needs to be included in the Implementation Plan so that IDOC's administrative directive is properly implemented.

9. IDOC should solicit and accurately document in the medical record an individual's history of tobacco use including the number of years smoked and the number of packs smoked per day. If the patient has quit smoking, the number of years since tobacco use has been discontinued should be documented in the database so that IDOC staff can determine eligibility for ling cancer screening.

10. The IDOC cancer screening program guidelines must be reviewed and updated as needed to assure that updates in United States Preventive Services Taskforce recommendations for routine health maintenance and cancer screening are expeditiously incorporated into the IDOC guidelines. IDOC's current guidelines for lung cancer screening are outdated.

11. IDOC should update its criteria for lung cancer screening to include individuals 50 years of age or older with 20 pack years of tobacco use who have not stopped smoking for 15 years or more. This revision would align IDOC lung cancer screening criteria with United States Preventive Services Task Force's most current recommendations.

**Mammography Screening**

*Addresses items III.M.1.d*
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

**Breast and Cervical Cancer Screening**
Normal mammograms are to be repeated every 2 years on women between 50 and 75 years of age; normal PAP smears are to be done every 3-5 years in females between 21 and 65 years of age

138

based on age and results of HPV cultures.[387] Abnormal mammograms and PAP smears require more frequent imaging and testing.

As reported in the 2nd Court Report staff interviews and limited chart reviews performed during the February 2020 site visit at the Logan CC female facility revealed that women were being regularly screened for breast and cervical cancer. In the 4th Court Report, medical reception record reviews of ten records provided by IDOC from Logan showed that all ten women were screened with a PAP smear and two of two women who needed mammography were screened. In the 5th Report, reviews of eighteen medical records of women at the two female correctional facilities documented that 17 women (94%) had received a mammogram within the last two years and 15 women (83%)[388] were offered cervical cancer screening in the last three years.

For this Court Report, the medical records (not randomly chosen) of seventeen women between the ages of 50 and 61 housed at Decatur CC and Logan CC were provided to the Monitor to audit breast and cervical cancer screening.[389]

Fourteen (93%) of the fifteen eligible[390] women were offered mammograms with the last two years. Twelve (80%) accepted breast cancer screening; two (13%) refused. One (7%) patient's last mammogram was done in November 2019 and there was no documentation that she had been offered follow-up screening in the last 3 years. All five patients requiring additional studies or views had the specialized views or ultrasounds performed.

Fourteen (93%) of the fifteen eligible[391] women had been offered cervical cancer screening in the last three years. Thirteen (87%) accepted the PAP screening[392]. Two women (13%) refused scheduled PAP test, and one (7%) had no documentation in the reports provided that cervical cancer screening had been performed or offered in the last three years[393]. Thirteen (93%) of the performed thirteen PAP tests were negative for cervical cancer or dysplasia.

As previously discussed in the 3rd, 4th, and 5th Court Reports, the data of mammogram screenings and PAPs only reported the volume of screening tests performed; they did not indicate the percentage of eligible women who were offered, accepted, and refused these screenings.

IDOC needs to track these two cancer screening modalities based on the percentage of eligible women who are offered, received, and refused testing within the established timeframes. This data should be reported to the CQI committees and corrective action taken as indicated. There is

---

[387] United States Preventive Task Force reviewed 2/9/23 and IDOC Draft Administrative Directive January 2021. The Consent Decree III.N.1.d states that mammography is to start at the age of 45 is not in align with the USPSTF recommendations.

[389] Illinois.gov, File Transfer Link, Audit Data, Women's Health data 11/9/2022
[390] One women had a bilateral mastectomy for a non-cancer condition. A second patient has just turned 50 years of age and had not yet been offered a mammogram.
[391] Two women previously had hysterectomies.
[392] One female's last PAP smear was in 2017 (approximately five years prior). It is possible that this patient had a negative PAP test along with a negative human papilloma virus test in 2017 and thus would not require a repeat PAP test for another five years. There was no documentation provided to verify this.

evidence that mammograms and PAP tests are being regularly performed at both female institutions. However, appropriate data and tracking to assure that all eligible women are being testing in accord with nationally cancer screening standards needs to be established. This is currently not being done by the IDOC.

**RECOMMENDATIONS:**
1. Monitor and report the offering, provision, and refusal of breast and cervical cancer screening to the Quality Improvement Committees
2. Report Women's health data based on the percentage of eligible incarcerated women who receive breast and cervical cancer screenings within the established national USPSTF guidelines.
3. Report and track the actions initiated to address abnormal mammograms and PAP smears.

# Pharmacy and Medication Administration

*Addresses items II.A; II.B.1; II.B.6.c; II.B.6.d;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care.*

**II.B.6.c.** *IDOC agrees to implement changes in the following areas: Medication administration records-both for directly administered medications and KOP.*

**II.B.6.d.** *IDOC agrees to implement changes in the following areas: Medication refusals;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
- The Monitor requested the following items specifically to evaluate pharmacy services:. State job descriptions for Pharmacy Technician and Vendor job descriptions for Medication Room Assistant.
- List all facilities which do or do NOT pre-pour medication. Report on progress made toward elimination of pre-pouring.
- List facilities that do or do NOT document medication administration contemporaneously. Report of any progress made toward contemporaneous charting of medication administration. Contemporaneous means that nursing personnel documents administration of medication at the time that the medication is administered rather than before or after.
- Provide all pharmacy inspection reports and any medication administration audits with documented corrective action for non-performance. These are completed by the consulting pharmacist for each facility.
- Provide minutes of the meetings of the pharmacy and therapeutics committee to include discussion of formulary, analysis and discussion of errors, utilization etc.
- Any facility medication administration record (MAR) audits completed in addition to those completed by the consulting pharmacist.

- The results of any process mapping and or evaluation to improve pharmacy services or medication management. [394]

The Monitor received a partial response to item 22; job descriptions were provided for two of three pharmacy technician positions allocated by the State. The vendor did not provide job descriptions for the 40 medication room assistants. Other than a few pharmacy inspection reports and MAR audits attached to facility CQI minutes no other information was provided by IDOC.

The Monitor's evaluation of compliance with the items in the Consent Decree listed above consisted of the review of CQI minutes (which on occasion included the pharmacy inspection report), other documents provided by IDOC, and review of the health record of patients who died that were sent by IDOC to the Monitor during this report period.

The Defendant's 12/30/2021 version of the implementation plan[395] included two process improvement projects, one on medication management that listed seven targets and another on chronic disease management that included implementing recommendations for enhanced medication administration. It also has a more robust plan for implementation of a patient safety program which includes reducing medication errors. The Monitor's disagreements or suggested revisions to this plan have been provided to the Defendants.[396]

In the last report the Monitor noted that SIU had been engaged[397] to evaluate medication management, had visited two facilities for this purpose, and developed a survey questionnaire. SIU also informed the Monitor that a pharmacist had been hired to serve as Director of Pharmacy Standards & Operations for the Office of Correctional Medicine beginning June 2022.[398]  No further information has been provided by SIU or IDOC about the evaluation of medication management or the results of the survey. There is no evidence that the pharmacist ever arrived.

The Monitor provided detailed feedback on two draft policies pertaining to pharmacy and medication management in February 2022.[399]  We indicated at that time that both drafts would benefit from the review and expert advice of an experienced pharmacist who is familiar with state and federal law. The drafts also made Wardens responsible for operational details for which they are not qualified, such as management of controlled substances.  The policies drafted by IDOC allowed current practices to continue. The Monitor has seen no further drafts of policy and procedure concerning pharmacy services and medication management.

There is no forward progress with regard to compliance with II.B.6.c and II.B.6.d. The absence of work product for any of the initiatives described above indicates not just inertia, but retrenchment by IDOC.

---

[394] 10/20/2022 Monitor's document request, items 22, 145-150.
[395] Defendants Implementation Plan 12.30.21, task 53 concerns medication management and task 52 concerns improvements to the provision of chronic care.
[396] Lippert IDOC Implementation Plan Monitor's Redline and Comments 8-24-2022.
[397] SIU's activities concerning pharmacy and medication management started in June 2021.
[398] Email from Kelly Presley dated 5/19/2022.
[399] Email from Mike Puisis to Janette Candido dated 2/25/2022.

**II. B. 6.c. Medication Administration**

No information was provided by IDOC about the number of facilities that still pre-pour medication.[400] Despite requests, IDOC has not provided this information for two years.[401] Contemporaneous documentation of patients' receipt of medication continues to be problematic as evidenced by review of the pharmacists' audits of the medication record, medication errors described in the minutes of CQI meetings and review of patient records. During the site visit to Dixon Correctional Center, we observed preparations for medication administration and found no change in practices since the 2018 2nd Court Appointed Expert Report in 2028.[402]

In the last report the Monitor tabulated medication errors by type and frequency, noting that medication errors are common in order processing, administration, and documentation.[403] For this report period 21 health care programs reported on medication errors during at least one of the monthly CQI meetings.[404] The most common types of medication errors are failure to document or delay in medication administration, transcription errors, continuing to administer the medication after an order has been discontinued and administering the wrong medication or the wrong dose of medication.[405] A high priority is to discontinue handwritten entries on the MAR.[406] Necessary corrections to reduce these errors include: a) an automated order entry system with capacity to print labels to place on the Medication Administration Record (MAR) until the monthly MAR could be printed b) use of two part identification with the MAR and documentation at the time medication is administered c) administering directly from pharmacy dispensed, patient specific unit dose containers.[407] The Defendants December 2021version of the implementation plan[408] included tasks that incorporated two of these corrections and the Monitor recommended an addition to include automated order entry.[409]

---

[400] 10/20/2022 Monitor's document request, item 145.

[401] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 121 -122; two thirds of all IDOC facilities pre-pour medication in advance of administration.

[402] Dixon Correctional Center, 2nd Court Appointed Expert Report, Lippert v. Godinez, April 2-April 5, 2018, pages 72, 75-77.

[403] Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) pages 142-143.

[404] It appears that facilities can choose whether or not medication errors are reported at CQI. The type of reporting varies from just an enumeration to listing the type and frequency of each error. There is no consistency in the analysis, trending, or documentation of corrective action.

[405] At Danville (CQI minutes for July and August 2022) nurses failed to check the incoming inventory resulting in patients missing up to a week of medication. At Graham (August 2022 CQI minutes) an order for forced medication was not transcribed to the MAR and the patient missed two doses. Dixon reported a patient went without medication for a month because the order was not transcribed to the MAR (September 2022 CQI minutes). At Hill more than a third of the MARs of patients who received "Keep on Person" medication had no date the medication was issued. At Pontiac there were 60 doses of scheduled medication that were undocumented (August CQI 2022 minutes). At Shawnee (September 2022) one patient was reported as receiving double the dose of a diuretic that was prescribed.

[406] The NCCHC recently reissued a White Paper on Patient Safety which recommends computerized order entry with the caveat to use caution when selecting an "off the shelf" system. Patient Safety, Stern, Marc, (February 3, 2023) page 6 available at Microsoft Word - Patient Safety White Paper.docx (ncchc.org).

[407] Health Care Monitor 2nd Report Lippert v Jeffreys (July 6, 2020) page 122; Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 121, 123, 126-127; Health Care Monitor 4th Report Lippert v Jeffreys September 16, 2021) pages 158-159, 163-164, Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) pages 141-143, 147-149.

[408] Defendants Implementation Plan 12.30.21.

[409] Lippert IDOC Implementation Plan Monitor's Redline and Comments 8-24-2022.

Chart review completed for this report period found many of the same types of errors as reported in the CQI minutes. As an example, one patient with hypothyroidism had lab results indicating the need to reduce the dose of thyroid hormone. At chronic clinic on April 29, 20221 the dose was decreased from 250 to 200 mcg. The order was transcribed in handwriting correctly to the May 2021 MAR. However, the June, preprinted MAR still had the earlier (and discontinued) dose of thyroid hormone on it. The patient received the wrong dose of medication all of June through 7/5/2021.  Neither the pharmacy nor nursing staff discovered the error.[410] Another example is a patient with COPD, asthma, hypertension, anemia, and high blood lipids who was prescribed ten different medications, of which seven were administered "dose by dose" by nursing staff. With the exception of one dose of atorvastatin, he received none of the "dose by dose" medications for four days. On the fifth day all of the "dose by dose" medications were changed to "Keep on Person" and the patient was responsible for taking them himself. There was no evaluation of this 61 year old man's knowledge and ability to take these medications by himself correctly.[411]  Not only did he go without necessary medication for several days he was placed in a dangerous position of being responsible for self-medication without any training or evaluation of his capacity to do so. In addition to these two examples, medications errors resulting from faulty order processing, administration, and documentation were noted in many of the records reviewed for this report.[412] Documentation on the MAR was problematic in nearly all of the charts reviewed.[413]

In the last report the Monitor raised the problem of not offering PRN or "as needed" medication when the patient expressed a need, or an assessment of their symptoms warranted it. [414]  The most egregious example from records reviewed for this report was a patient with cancer who had "as needed' orders for pain medication as well as medication to ease anxiety.[415] There is clear evidence in the last 19 days of his life that he was in pain and obvious distress yet was not offered the "as needed" medications that were available. Nurses need to assess patients for symptoms regularly but especially at intervals to coincide with the time medication effects are expected to dissipate and determine if another dose of medication is needed. This is not the practice in IDOC.

Another poor practice is prescribing medication without examining the patient. This was discussed as a problem in the last report and identified as a patient safety risk.[416]  There were a number of charts reviewed where not examining the patient before prescribing medication was problematic.[417] The extensive use of covering physicians adds to this risk because they are not familiar with the patient's condition.

Patient well-being has also been compromised by delays and failures to supply medications timely. The CQI minutes and pharmacy inspection reports also denote issues with supply and inventory control. In June 2022 Dixon reported delays filling prescriptions and Hill reported the same in

---

[410] Mortality review patient # 3
[411] Mortality review patient # 15
[412] Mortality review patients # 9, 11, 16, and 17.
[413] See also the reports of the MAR audit completed by the consulting pharmacists and sometimes included with or in CQI minutes.
[414] Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) pages 143-144.
[415] Mortality review patient # 1 & 16.
[416] Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) page 146.
[417] Mortality patients # 1, 2, 4, 12.

September 2022.[418] One of the charts reviewed was of a patient[419] who had multiple myeloma for whom the physician ordered on 3/12/2020 two new chemotherapeutic agents after an offsite oncology visit took place. One of these medications, pomalidomide was delayed more than a month before the first dose was offered on 4/21/2022. There also was a gap in treatment with chemotherapeutic agents of a week. Another patient was discharged from the hospital after diagnosis of hepatocellular carcinoma on 1/31/2022.[420] The doctor wrote orders for several medications. Of these he noted that until oxycodone could be obtained from the pharmacy to use hydrocodone. One dose of oxycodone was given and it was another five days before oxycodone was next given. There is a progress note indicating this was a result of the pharmacy being unable to deliver the medication due to extreme weather and IDOC alternatively being unable to pick it up. The provider also wrote orders for a titrating downward dose of amiodarone and because of weather and lack of security staff the first dose of this medication was not provided for seven days. Finally, a chemotherapy agent, sorafenib, was ordered 1/31/2022 and never administered. There is no progress note indicating the reason this medication was never provided. The same with Lokelma, a potassium lowering agent that was ordered 2/8/2022 after receiving notice of dangerously high levels from the lab. Inventory and supply failures like these are evidence of systemic problems throughout the pharmacy and medication management system.

Four facilities of seven providing results of internal audits reported noncompliance with the Administrative Directive on Control of Medications and Instruments during this report period.[421] Noncompliance with the AD was attributed to failure to document receiving inventory from the pharmacy packaging vendor and not having staff to receive deliveries. Other findings reported in pharmacy inspections or CQI minutes included medication stored at the wrong temperature, refrigerator temperatures not taken, count discrepancies, controlled substances unlocked, and missing emergency medications. Finally, outdated medication on hand or in use and the failure to label multidose vials were frequent citations. This is the same list of problems as identified in the last report.[422] Problem analysis and resolution is inadequate or nonexistent. The CQI program needs to emphasize development of skills in problem analysis and effective methods to achieve performance improvement.

There were two patients among the mortality records reviewed for this report who were prescribed medications that contributed to a preventable death. One of these was a patient with severe mental illness who had been receiving involuntary psychotropic medication for two years.[423] On 10/22/2021 a provider ordered acetaminophen at 500 twice a day for 6 months and this medication was provided to the patient to keep on his person. From 10/26/2021 through 12/15 he received a total of 180 500-mg tablets (10/26 received 60 tablets, 11/23 received 60 tablets, and 12/15 received 60 tablets). He was placed on crisis watch 1/8/2022 after a hanging attempt. Acetaminophen was administered twice on 1/9 and once each morning on 1/10 and 1/11. He was

---

[418] Dixon reported ordered medication was not arriving the next day if ordered before 2pm – waiting up to 72 hours instead. Hill reported there were 881 orders not filled within 24 hours in September 2022.

[419] Mortality patient # 2.

[420] Mortality patient # 16.

[421] See CQI minutes for Centralia, Danville, East Moline, and Sheridan. Dixon, Kewanee and Pinckneyville reported compliance with the AD.

[422] Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) page 144.

[423] Mortality patient # 12.

hospitalized later the morning of 1/11/2022 and was found to be in liver failure due to acetaminophen toxicity. He died two days later. Clearly someone on enforced psychotropic medication should not be given potentially lethal medication to "keep on person". The other patient was 67 years old and had a history of COPD and several other chronic conditions. For a period of months this patient was prescribed two and at times, three long acting beta-agonists that were never identified as medications that should not be used together by the pharmacy.[424] On the day of his death he received doses of two different long acting beta-agonist medications at 7 pm. He was short of breath, so a nurse also gave him the second treatment that day of albuterol by nebulizer. Within 40 minutes of receiving the long acting beta-agonists and 20 minutes of the nebulizer treatment he became non-responsive and shortly thereafter expired. Without additional information from an autopsy, this death was possibly a result of an adverse drug reaction.

There were a number of other charts reviewed of patients prescribed medications for which they experienced adverse effects, were at risk of an adverse effect and were not monitored or were clinically inappropriate.[425] These included unconventional instructions for dosing antibiotics and steroids and long term use of steroids, antiepileptics, narcotic medications, and medication to treat constipation.

The 4th report also raised the problem of polypharmacy and reported the vendor's response that there was no process to identify and review patients proactively who are on multiple prescriptions for appropriateness and to provide recommendations to reduce medication burden.[426] There continue to be patients among charts reviewed for this report who are on multiple medications where there is no meaningful evaluation of the medication burden or efforts made to simplify the patient's medication regime. Many of these are patients with suspected cognitive impairment.[427]

The Monitor has voiced concerns since the 3rd report about the lack of meaningful participation by the pharmacy in identifying problems with medications being prescribed and in consulting with prescribers to achieve more effective treatment.[428] The December 2021 implementation plan has an expansion of clinical pharmacy among the list of objectives for improving medication management and cites the HIV clinic as a prototype. There also is a task in the chronic care project to increase the ability of providers to evaluate current medications.[429] OHS has initiated a telemedicine clinic with an endocrinologist at UIC to consult regarding patients with diabetes that is difficult to control. The Monitor has been informed that these consultations have resulted in changes to the medications available to manage diabetic conditions and that the outcomes from this clinic are viewed as positive.

## II.B.6.d.  Medication Refusals

[424] Mortality patient #17.

[425] Mortality review patients # 1, 2, 6, 13, Dixon patient #1

[426] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 162.

[427] Mortality review patients # 3, 4, 6, 13, 15.

[428] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 125; Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 162; Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) page 146.

[429] Defendant's Implementation Plan dated 12.30.21, task 53 (items 7 & 8), task 52, item 14.

145

We discussed the draft administrative directive on Medication Service in the last report.[430] The Monitor has not been informed of any further work to complete the Administrative Directive. The Defendants implementation plan from December included one task to comply with II.B.6.d. which was to build a mechanism to notify providers of non-adherence within the electronic health record.[431] The Monitor found this single item not actionable and recommended a series of subtasks to establish in policy as well as development of a process to notify providers of patient nonadherence and to document the provider's response to such notification.[432] The Court will provide further direction with regard to this matter.[433]

There were two studies of medication adherence reported in CQI minutes during the period this report covers. One study found that as individuals' discharge date grew near adherence with prescribed mental health medication increased. There was no further discussion of the finding nor were there any other study questions identified for further inquiry.[434] Another study wanted to know if patients requested their inhalers refilled them too frequently. Findings were that 80% of the subjects refilled their inhalers as per the recommended schedule. The discussion indicated that results were limited by the number of patients who had been at the facility long enough to qualify for a refill, but no further information was given. There was no further inquiry of those who requested a refill too early to determine if there were obstacles or issues in their plan of care that resulted in early refill requests (appropriate treatment, lack of education, other influences, etc.).[435] Two studies looked at documentation and notification regarding refusals. One study found that 44% of the medication documented as refused on the front of the MAR did not have the required documentation on the back of the MAR.[436] The other was an analysis of a medication that was not given, and the provider not notified of the missed doses. There was no documentation of additional follow up or corrective action.[437]

From chart review it is apparent that medication records are not reviewed by providers or adherence summarized and providers do not address adherence during important patient-provider encounters such as chronic clinic or infirmary rounds.[438] At a minimum, the provider should have a copy of the most recent MAR to review at the time of any provider appointment. In the absence of this, the provider should have a summary of medication adherence provided in advance of the appointment. As suggested in the last report making this happen now would be a simple step to better inform providers and is an example of low hanging fruit in improving patient care.

No tangible outcome has yet been achieved in the direction of compliance with the items in the Consent Decree related to medication services, so the compliance designation has not been changed. The following are the Monitor's updated recommendations.

---

[430] Ibid.
[431] Defendant's Implementation Plan, dated 12.30.21, task 28.
[432] Lippert IDOC Implementation Plan Monitor's Redline and Comments 8-24-2022.
[433] Transcript of Status Hearing, Lippert v. Gosh, 10-CV-4603, August 5, 2022
[434] Dixon CQI minutes July and August 2022.
[435] Vandalia CQI minutes August 2022.
[436] Dixon CQI minutes July 2022.
[437] Graham CQI minutes August 2022.
[438] Mortality review patients # 9, 10, 12, 14.

146

**RECOMMENDATIONS:**

1. Move forward with item 52 and 53 in the December 2021 Implementation as recommended in the Monitor's Redline and Comments, submitted 8/24/2022.
2. Facility operations need to be engaged in the process improvement project called out in task 53 of the December 2021 Implementation Plan to engage in problem solving that results in improved patient safety and within therapeutic timeframes. This includes responsibilities for custody assistance and maintenance of the equipment and the physical plant.
3. Demonstrate the ability of the pharmacy to identify drug-drug interactions, medication combinations to avoid, warnings and contraindications and to document in the patient record the communication of this information to the prescribing provider. The pharmacy should also assist providers in evaluation of polypharmacy.
4. Revise the two draft administrative directives on Pharmaceutical Services and Medical Services incorporating the Monitor's comments. These comments include obtaining the input and assistance of a pharmacist familiar with Illinois law and federal regulations in policy development.
5. It is further recommended that an outline be developed of the additional topics related to pharmaceutical management that need to be addressed in policy and procedure. Most state correctional systems have more than two directives on this subject. Examples of topics to consider for inclusion are provider orders, monitoring and supporting adherence, inventory control etc. Then establish a timeframe and responsibilities for development, review and finalization of the pharmacy policies and procedures and carry it out.
6. Develop a workload driven staffing standard to account for the nursing staff necessary to carry out orders for medication treatment.
7. Further revise the draft administrative directive pertaining to medication non-adherence and incorporate feedback provided by the Monitor. In particular, non-adherence must be defined. The Monitor has suggested that it be defined as three consecutive doses or more than four non-consecutive doses in a seven-day period of critical medications only.[439] The Monitor also recommended narrowing the group of medications that must be monitored weekly to a smaller group of "critical" medications.[440] The Monitor has suggested that more detailed guidance be included in the administrative directive about expectations for the provider to discuss adherence with the patient, collect additional information as necessary (labs, meet with the dietician or nurse etc.), document the discussion in the health record as well as the consideration of change (or not).
8. Eliminate expiration of non-formulary requests once approved. Investigate other reasons for medication discontinuity and develop solutions to eliminate these.
9. Implement CPOE (computerized physician order entry) and automate the MAR early in the implementation of the electronic health record. Develop automated reports of patients with medication orders which expire in the next seven days and notification to providers of non-adherence.

---

[439] The Monitor believes this is consistent with the metric used by IDOC currently to monitor adherence with mental health medications. Using one metric for both mental health and somatic medication is advised especially if notification will be automated.

[440] Critical medications are defined as those for which the patient cannot go without, without an immediate risk to their health.

147

10. Establish the expectation that each medication order include the reason the medication was prescribed.
11. Provide a copy of the current and preceding month of medication records (MARs) to the provider to review at any chronic care or scheduled follow up appointment.
12. Continue to build on existing experience with clinical pharmacy personnel in the HIV clinic and specifically expand access to clinical pharmacy for chronic pain and geriatric medicine.
13. Document development and implementation of corrective action plans to address results of the pharmacy inspection and MAR audit. Trend medication errors over time and conduct root cause analysis of high frequency, high risk medication errors. Use these methods to identify causes of medication errors.
14. Provide training on problem solution and performance improvement processes to include structural, equipment and procedural changes to correct problems rather than reliance on reminders at staff meetings, verbal counseling, and written memos.
15. Establish an observational tool to be used by nursing supervisors to monitor compliance with medication administration procedures and include this study on the CQI calendar.

# Discharge Planning

***Addresses Items II.B.5; II.B.6.s; II.B.6.t;***
**II.B.5.** *Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.*
**II.B.6.s.** *IDOC agrees to implement changes in the following areas: Summarizing essential health information for patient and anticipated community providers; and*
**II.B.6.t.** *IDOC agrees to implement changes in the following areas: Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The following are the documents requested from IDOC by the Monitor to evaluate compliance with requirements for discharge planning contained in the Consent Decree:

- Any audit instrument developed by defendants to self-monitor performance.
- Any more recent versions of the Administrative Directives that were listed in Appendix A. Also provide any other administrative directives that pertain to medical and dental care not listed in Appendix A.
- Update the status of each of the draft policies and procedures A.01.01 – A.10.01. Provide drafts of any additional policies and procedures for review and comment by the Monitor.
- List of individuals discharged from IDOC. Until a list can be provided alternatively provide a sample of records for review.
- Provide discharge planning records for 10 individuals in chronic care clinics, released from Danville, Illinois River, Decatur, Western, Sheridan, and Robinson, in the month of July

148

2022. Discharge documents requested include pre-discharge planning notes, discharge summary, receipt for medication, prescription for refill of medication, any documents accompanying the discharge summary, progress notes by physician or other health care staff related to the discharge.[441]

IDOC provided copies of records of persons discharged from Danville, Decatur, Sheridan, and Western.[442] No records from Illinois River or Robinson were provided. The IDOC did not provide requested updates to policy or procedure and administrative directives, or an audit instrument or results of monitoring discharge planning. The Monitor reviewed eight additional records of persons discharged in November 2022 during a site visit to Dixon Correctional Center December 5-7, 2022. Finally, monthly reports and other correspondence provided to the Monitor for the time period this report covers were reviewed.

Policy and practices of the IDOC with regard to discharge planning for the purposes of continuity of medical care upon return to the community is unchanged since the Monitor's 3rd report.[443] To summarize from previous reports, the IDOC has yet to finalize policy and procedure for discharge planning. There is considerable variation among facilities in the documentation and practice of discharge planning. There is almost no evidence of provider [444] involvement in discharge planning or clinical review of need for medications or referral. Medical summaries are incomplete or inaccurate, information about tuberculosis screening is incomplete, vaccination status or risk- or age-based health screenings or recommendations, and the status and control of chronic disease and other information from the most recent chronic disease clinic was not included in the discharge summary. While medication is provided to many persons being released, these practices lack consistency and there is no assessment of individuals' knowledge and ability to manage the medication regime that is prescribed at discharge. HIV testing is not always offered or documented as offered before release.

The Implementation Plan submitted by Defendants on 12/30/2022 includes two tasks.[445] One was to ensure that all traditional releases receive a medical release summary by developing a list of information to be provided at the time of release. The other task is to ensure any appropriate medications are provided at discharge and then repeats the requirements of II. B. 6.t. No detail is provided about how either task will be completed, and implementation will take place.

In the Monitor's opinion, discharge planning in the IDOC needs to be more purposeful and focused on the patient's considered need for continuity of care. The Monitor has suggested revisions to the implementation plan that describe how needs for II.B.5 (continuity of care) are determined, and these arrangements made, including clinician review of medication to be provided at release (II.B.6.t). We also view the policy and procedure, which has yet to be finalized, as needing to

---

[441] 10/20/2022 Monitor's document request items 40, 67-68, 151-152.
[442] Danville sent two records, Decatur and Sheridan sent 10 each, and Western sent eight records for a total of 30 records. No records were received from Illinois River and Robinson.
[443] Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) pages 127-131; Health Care Monitor 4th Report, Lippert v Jeffreys (September 16, 2021) page 164-166; Health Care Monitor 5th Report, Lippert v Jeffreys (June 22, 2022) pages 149 - 152.
[444] Specifically physician, nurse practitioner, or physician's assistant.
[445] Defendants Implementation Plan submitted 12/30/2021, tasks 30 and 31.

clearly establish expectations of staff for providing information (II.B 6.s) and supplies (II.B.6.t) to support continuity of care. Finally, the implementation plan needs to include tasks which establish the metrics and tools to document compliance with these items in the Consent Decree. These comments were provided in the Monitors redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.[446]

The following are the results of the Monitor's review of discharge records from Danville, Decatur, Sheridan, and Western Correctional Centers. All but one of the 30 records reviewed were for persons who had chronic medical and or mental illnesses.[447] Of the 30 people released, 25 had documentation of discharge planning. At Sheridan, the encounter for discharge planning is listed on the problem list. At Decatur a discharge planning template is used to document the encounter in the electronic record. At Western sometimes a narrative progress note documented the discharge planning encounter – sometimes not. Both charts from Danville were of patients with HIV who were referred for follow up in the community under the Ryan White Act. A form titled IDOC Transitional Tracking Referral is used. A HIV Discharge Planning Needs Assessment is also completed by the IDOC Discharge Planner. These discharged persons also completed a satisfaction survey about discharge planning. There is no standard format for documentation of discharge planning at IDOC.

Discharge planning is an important part of reducing the higher risk of mortality following release, and in particular deaths from overdose.[448] The importance of discharge planning can be emphasized in two patient examples from the record review. One was a 59 year old with multiple chronic conditions who was released with 15 different medications.[449] No evaluation or determination was made during discharge planning that she was capable of managing this medication burden and if not, measures taken to address any inability before release.[450] Another was a patient who had hepatitis C and was being treated with antipsychotic and antidepressant medications, who simply had a list of local agencies put into the release packet because she was in restrictive housing.[451] The Monitor recommended in the 3rd report that a slightly revised version of a pre-release planning form used at Lawrence CC be adopted, at all facilities because it documents physician and psychiatry review of patient's needs for continuity of care upon release.[452]

There was a medical discharge summary (as opposed to documentation of planning for discharge) in all 30 records reviewed – all but the ones from Danville had the same content. Discharge planning took place within a month of release at Danville and within a week of release at Decatur and Sheridan. However, at Western, if discharge planning took place, it occurred as much as four

---

[446] See redline and comments on tasks 30 and 31.

[447] Discharge Patient #27 from Western had no chronic illnesses listed on the problem list, was taking no medications, and had no recommendations for follow up care in the community.

[448] Binswanger, I.A., et.al. (2016) Clinical risk factors for death after release from prison in Washington State: a nested case control study. Addiction. 111 (3): 499-510.

[449] Discharge Patient # 9 had diagnoses of hypertension, diabetes, COPD, hyperlipidemia, osteoarthritis, and cellulitis of the leg.

[450] These would include reducing the number of medications, reducing dosage frequency, patient teaching, pill reminders etc.

[451] Discharge Patient # 11.

[452] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 130.

months in advance of release. The Discharge Summary and the discharge medication receipt at this facility were most often incongruent. One patient with hypertension had no recommendations for follow-up in the community on the discharge summary completed in April 2022 and no labs or recent diagnostic results listed and yet had been seen in hypertension clinic, had labs completed and an EKG the month before release in July 2022.[453] The Monitor recommends that discharge summaries be completed no more than a day or two in advance of release to ensure accuracy. None of the discharge summaries were reviewed by a provider.

The only facility which obtained a prescription from a provider at release was Decatur (7 of 10 charts reviewed). It is not clear from the documentation provided that a provider actually reviewed the patient and decided about the medication to be provided at release and wrote an order or if the nurse simply prepared the script for signature, based upon current orders. Western referred to a script for Simvastatin for one patient but there is no evidence in the record provided of such a script.[454]

The list of diagnoses on the discharge summary was correct in only five of 30 charts reviewed. Usually this was because not all diagnoses were listed.[455] The narrative section of the summary sometimes indicated conditions that were not listed as problems earlier on the summary form or the person was discharged on medication to treat diseases that were not listed as problems either on the discharge summary or problem list.

Of the 30 charts reviewed there were 25 who had lab or diagnostic results that were pertinent to the person's ongoing care. Of these only nine had specific results documented on the discharge medical summary.[456] No one is documented as having received copies of labs or diagnostic at the time of release. Documentation of tuberculin skin testing included the date of the test and results in millimeters in only 11 of 30 charts reviewed. This appears to be nurses' personal habits of not documenting test results in millimeters and lack of direction or oversight in completion of the medical discharge summary.

There were 27 persons eligible[457] for HIV testing just prior to release; there was documentation that 11 had been offered the test. All ten charts from Decatur had this step in release planning documented. No documentation of consent or refusal was provided by Sheridan for this test. At Western, either documentation of consent or refusal was absent, or the HIV test had been offered a month or more in advance of release, so could not be considered an accurate measure of HIV status at the time of release. We noted from the monthly reports wide variation in acceptance rates

---

[453] Discharge Patient # 29.
[454] Discharge Patient # 30.
[455] Specific psychiatric diagnoses were most frequently missing. Other omissions include not listing all the patient's medical problems or dates of surgical interventions. For example, one HIV patient also had hypertension but only HIV was listed as a medical problem (Discharge Patient # 2). Another patient is listed as taking NPH insulin but there is no corresponding problem on the discharge summary (Discharge Patient # 18).
[456] Examples include Discharge Patient # 17 which the summary documents a list of abnormal lab results but gives no dates, or Discharge Patient # 9 whose problems include hypertension, diabetes, chronic obstructive pulmonary disease, hepatitis C, hyperlipidemia, osteomyelitis, and cellulitis of the leg has only the statement "abnormal labs" on the medical discharge summary. Patients with HCV were not provided any specific results for labs or other diagnostics related to their disease.
[457] Three patients were HIV positive and there was no need for HIV testing.

151

for HIV testing upon release. Sheridan reports acceptance rates of half or more for July, August, and September 2022, Western reported only 25% acceptance. Acceptance rates at Dixon for January through September 2022 are much lower (four out of 243 persons or 1.6%). At some point the variation in HIV test acceptance at time of release should be an area of inquiry for possible improvement.

Neither a complete vaccination history nor recommendations for future vaccines are documented on the discharge summary. [458] There was documentation that persons received their COVID vaccination card in six of ten charts reviewed from Sheridan but not in the records from the other sites. In only nine discharge summaries did the recommendations for follow-up care in the community coincide with the persons documented problems. For example, one woman with hepatis C, as well as HPV infection and at risk for cervical cancer was given no follow up recommendations. [459] Another person was given the wrong advice; to have a screening mammogram in eight years, when an annual mammogram should have been recommended.[460] With one exception, patients with mental health problems received no recommendations for follow-up on the medical discharge summary.[461] There may be a different process of discharge planning for persons on the mental health caseload but the medical discharge summary should at least document the primary mental health diagnoses and that there is a mental health discharge plan in process. Only one person had a specific referral to a provider in the community out of the 30 records reviewed.[462]

During the site visit at Dixon eight records of patients discharged in November 2022 were reviewed. Three patients had no medical or mental health problems being treated at the time of release.[463] Of the remaining five charts reviewed, three had problem lists that were not up to date,[464] and one patient was discharged without any discharge documentation.[465] One patient had abnormal labs which were listed on the discharge form, but it did not appear that a copy of the lab report was provided. [466] In none of the five records of patients currently receiving medical care was a specific referral made to a community provider and no medical information other than the discharge summary was provided.

With regard to continuity of medication called for in II.B.6.t of the records reviewed from the four sites, 22 of 29 discharge patients had medication orders which listed dose, frequency, and route on

---

[458] The IDOC Transitional Tracking Referral in the two charts reviewed from Danville (Discharge Patients 1 & 2) inquire about hepatitis A and B and pneumovax immunization history but no other vaccinations.
[459] Discharge Patient # 10.
[460] Discharge Patient # 7 was 52 years old.
[461] Discharge Patient # 22.
[462] Discharge Patient # 1 had a specific appointment date for HIV follow-up care. Another HIV patient was given contact information to make an appointment once his county of residence had been determined (Discharge Patient # 2) and another was given the telephone number to make an appointment for cardiac follow up at UIC (Discharge Patient # 18). Other persons were routinely given a list of county health department numbers to contact and arrange for further follow up care.
[463] Discharge Patients # 37, 38, 31.
[464] Discharge Patients # 33, 35, 31
[465] Discharge Patient # 31 had previously been on the mental health caseload and prescribed psychotropic medication.
[466] Discharge Patient # 32

the discharge summary. This information is important to convey to subsequent providers as well as the patient. Furthermore, without this information, it is not possible to determine if the person received a sufficient quantity at release.

No information was provided about the amount of HIV medications supplied at the time of release for the two persons discharged from Danville. The third person with HIV who was discharged from Western received a 30 day supply.

In five of the six records of patients with chronic diseases, the medications supplied by Western at release did not coincide with the discharge summary. Three patients were offered no medication at release.[467] One patient was listed on the discharge summary as taking hydralazine, hydrochlorothiazide, clonidine, and lisinopril for hypertension, as well as Claritin for seasonal allergy, and tamsulosin for prostatic hypertrophy, but at the time of release was only offered clonidine.[468] The fifth patient was noted to take simvastatin, NPH insulin, and had a Xopenex inhaler. He was provided no medication at release; there is a note that he received a script for simvastatin but there is no documentation of it in the record that was sent.[469] The Monitor has recommended that a copy of the script be placed in the medical record.

The Consent Decree II.B.6.t stipulates that persons be provided access to 42 days of medications after release.[470] At Sheridan, the practice is to provide persons at release with 30 days of most medications.[471] No scripts were provided. Therefore persons releasing from Sheridan do not have access to the supply of medication stipulated by the Consent Decree. At Decatur, nine of ten patients received a 30 day supply of most medications, plus a script for 14 days with one refill. Persons releasing from Decatur therefore receive access to 58 days of medication, which exceeds the requirements of the Consent Decree.[472] Clearly, facility practices vary with regard to supplying medication at discharge and none are consistent with the language of the Consent Decree. Only Decatur provided access to the quantity of medication that is described in the Decree.

At Dixon among the eight records reviewed during the site visit, five documented preparation of discharge medications, but none of the documentation indicated practices consistent with the language of the consent decree. One patient had four mental health medications listed received on discharge, but no quantities were documented. The script was also without quantities.[473] Another patient was taking three mental health medications which show as issued on 10/18/22 but the release is dated 11/21/22. There is no documentation of the quantity of medications provided at

---

[467] Discharge Patients # 24, 28 and 29.

[468] Discharge Patient # 25.

[469] Discharge Patient # 30.

[470] A 14 day supply, plus a script for 14 days with one renewal of 14 days, if medically appropriate.

[471] Discharge Patient # 18 received only 16 days of amiodarone and did not receive an SSRI or blood thinner. No scripts were provided to this person releasing from Sheridan. There was no explanation for the discrepancy between the discharge summary and medication receipt.

[472] At Decatur Discharge Patient # 4 did not receive Excedrin Migraine and Discharge Patient # 11 did not receive Pepcid. Yet at the same facility Discharge Patient #10 received a 30 day supply of Tylenol and ibuprofen. The variation in providing a supply of over the counter medications seems to be random and suggests standardization via policy is needed. We observed the same inconsistency in whether a supply of over the counter medications are provided at Sheridan.

[473] Discharge Patient # 33

discharge. There was a script written for 14 days with no refill.[474] One patient had orders for five medications (3 psychotropic, 1 hypertension, 1 GERD). He was discharged with varying quantities of each (3 were quantities for 15 days, 1 was 21 days, 1 was 27 days). This patient had no script for additional medication.[475] Two patients received 30 days of prescribed medication and a script for an additional 14 days.[476] This is equivalent to the amount described in the consent decree.

The actual practice of discharge planning by the IDOC is not consistent with the language of the Consent Decree and there is no clinical oversight for continuity of care at discharge. The Monitor's recommendations are the same as those in the 3rd through 5th Reports.

**RECOMMENDATIONS:**

1. Initiate a review to determine why the practices for supplying medication and prescriptions vary from the Consent Decree. Pertinent questions to ask include who determines what medications are provided at discharge, how are discharge prescriptions obtained, who is involved in preparing medications for discharge and how do they go about this task. There needs to be better evidence that the clinician's responsible for the person's medical and mental health care determine what medications the patient receives upon release, and they provide a prescription for an additional two weeks and determine if a two-week refill is medically appropriate.

2. Implement use of the pre-discharge planning worksheet that was used at Lawrence CC and incorporate it into the policy and procedure. If planning for continuity of care will be necessary, use of this worksheet should initiate a referral to the responsible medical and mental health clinician to review the patient chart and see the person as necessary to make determinations about medical and referrals to the community.

3. All releases should have a Discharge Medical Summary completed no more than a day or two before release. The Discharge Medical Summary should provide a thorough, accurate, and legible summary of the person's current condition and need for ongoing care.

4. Finish the policy and procedure for discharge planning. Incorporate what was learned from completing the first recommendation and use of the discharge planning worksheet.

5. Enhance continuity of care into the community for discharged individuals by providing copies of pertinent diagnostic tests, recent chronic care progress notes, vaccinations, and routine health maintenance screenings in the discharge packet. When these are included, it should be so noted on the Discharge Medical Summary.

6. A copy of the actual prescription with refills should be placed or scanned into the medical record to verify the information on the Medication Receipt at Discharge form.

# Infection Control

*Addresses items II.A; III.J.1; III.J.2*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois*

---

[474] Discharge Patient # 34
[475] Discharge Patient # 35
[476] Discharge Patients # 36, 32

*Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*
**III.J.1.** *IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree [June 2020].*
**III.J.2.** *Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested the following documents and information from IDOC to evaluate the provisions listed above concerning infection control and disease prevention:

- Any updates to State job descriptions for the Statewide Infection Control Coordinator.
- Any audit instrument developed by defendants to self-monitor performance.
- Any administrative directives that pertain to medical and dental care not previously provided.
- Update the status of each of the draft policies and procedures.
- Nursing personnel at each site assigned the duties of Infection Control, Chronic Care, Quality Improvement listing their names, licensure (RN, LPN), percentage of time assigned to these duties.
- Provide a hepatitis C treatment list or a standardized Hepatitis C clinic report (in facility's monthly QI minutes report) from each facility.
- Provide updated UIC treatment tracking sheet through October 2022.
- Logs documenting checks of the negative pressure rooms in the infirmary.
- Progress in establishing an infection control plan.
- Surveillance data on infectious and contagious disease.
- Plan to ensure that persons with contagious disease who are released have appropriate community referral.
- List of all reports to IDPH of reportable communicable disease.
- Meeting minutes of infection control meetings.
- List facilities that have a budgeted and filled infection control nurse position.[477]

The material requested, either had previously been received and has not changed, or was not

---

[477] 10/20/2022 Monitor's document request items 22, 40, 67-68, 76, 153-156, 158-162. Please note that while vaccinations are considered an important part of infection control, they also are measures meant to prevent infectious disease and are therefore addressed in the Preventive Services section of this report, for purposes of brevity.

provided. The monthly reports from facilities for 2022 quarters 2 and 3, memos to the Monitor, and other documents provided since the 5th report, including meeting notes were reviewed to evaluate compliance with the provisions listed at the beginning of this section on Infection Control.

An infection control program is an essential component of any correctional medical program and will be necessary for IDOC to establish in order to comply with II.A and II.B.3 of the Consent Decree.[478] The seven essential elements of an infection control program include:

1. A statewide infection control coordinator who is trained and certified in infection control.
2. An infectious disease physician consultant to provide easily accessible expert advice that is beyond the scope of knowledge or expertise of the statewide infection control coordinator.
3. Dedicated infection control nurses at every facility, who have received training in infection control.
4. An infection control policy, procedure and manual that are specific to IDOC needs.
5. A prioritization of infection control as an essential element of the IDOC program.
6. Data support to track infectious and contagious diseases.
7. A qualified physician staff that can effectively participate in infection control activities at a facility level.[479]

IDOC has some notable accomplishments in managing COVID infection which were elaborated in the 5th Report.[480] With regard to hepatitis C, IDOC has greatly increased access to treatment during this report period. The calculated monthly hepatitis C treatment rate increased from 7.2 patients per month in treatment to 25.9 patients per month; this is a 360% increase in the monthly provision of hepatitis C treatment in the IDOC.

However other aspects of the infection control program are not yet existent or remain fragmented, inconsistent and unreliable in performance. The status concerning each of the recommendations from the 5th Report are discussed in the following paragraphs.

### <u>Recommendation 1:</u>  Develop a comprehensive, system wide infection control program. Not addressed

Lack of an infection control program has required IDOC medical program personnel to dedicate significant time and effort during the COVID 19 pandemic to the extent that IDOC failed to make progress with requirements of the Consent Decree.[481]  More recently IDOC received a significant grant from the Department of Justice/Center for Disease Control (CDC) to enhance pandemic staffing, plan for response to future pandemics, and potentially strengthen IDOC's infection control efforts.[482]  The Monitor understood this to be an opportunity to use some of these grant

---

[478] The National Commission on Correctional Health Care (NCCHC) standard P-B-02 Infectious Disease Prevention and Control is an essential standard. It states, "There is a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease".

[479] Health Care Monitor 3[nd] Report Lippert v Jeffreys (February 15, 2021) page 143; Health Care Monitor 4th Report, Lippert v Jeffreys (September 16, 2021) page 167.

[480] Health Care Monitor 5th Report, Lippert v Jeffreys (June 22, 2022) pages 153-155, 156-158, 159, and 163.

[481] Defendants' Response in Opposition to Plaintiffs' Omnibus Motion to Enforce, filed by IDOC on 7/15/21 in which IDOC describes the burden of COVID-19 on their operations.

[482] IDOC was awarded a $7 million grant from the Department of Justice/ Centers for Disease Control to enhance

resources to establish a systemwide, functioning infection control program that would protect the health of the incarcerated population and the IDOC staff. [483]

The 12/30/21 IDOC draft implementation plan only committed to development of infection control and vaccination acceptance reporting within the electronic record, training of existing personnel in infection control, an undefined relationship with IDPH for consultation, and revisions to screening for tuberculosis infection.[484]

The Monitor disagreed with the substance of these tasks and provided feedback to Defendants as recently as September 2022.[485] The Monitor also suggested modifications to improve the draft implementation plan for infection control consistent with advice that has been provided since inception of the Consent Decree.

**<u>Recommendation 2:</u>  The statewide Communicable and Infectious Disease Coordinator shall be trained and credentialed in infection control as evidenced by obtaining and maintaining certification in infection prevention and control through the Board of Infection Control and Epidemiology.  Not addressed**

The position description for the Infectious Disease Coordinator was revised effective 3/1/2022.[486] The job duties state that the person in the position serves as "point of authority and source of knowledge for area expertise directing, coordinating and providing guidance to staff in all phases of the infection control process." The minimum qualifications are three years of nursing experience, of which two must be in the area of infection control. The revised job description does not require training or certification in the area of infection control.[487] How does someone who has no training or certification serve as an *authority* and *source of knowledge* in *all phases of infection control*?

Sections II.A and II.B.3 and of the Consent Decree state that IDOC must provide *enough trained clinical staff… to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.*  The lack of training and certification requirements for the infection control position do not comply with II.B.3.

---

pandemic staffing, plan for response to future pandemics, and strengthen IDOC's infection control efforts, page 153 Monitor's 5th Report, Lippert v Jeffreys (June 22, 2022) page 154.

[483] At a minimum, IDOC should use funds to hire an infectious disease physician who would have dual responsibilities to be the infection control physician for IDOC yet be on staff with IDPH.  This person should guide development of an infection control manual, assist in development of policy, develop surveillance strategies, and lead the infection control program.  IDOC should also use funds to establish an interface with the Illinois Comprehensive Automated Immunization Registry (I-CARE) which would permit IDOC to get baseline data on immunization status of incoming inmates.

[484] Defendants draft implementation plan dated 12/31/21, Office of Health Services narrative, tasks 7, 8, 27, 29, and 55.

[485] Monitor's redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.

[486] Statewide responsibilities for quality improvement were removed so the position is solely responsible for infection control.

[487] Certification in infection control is among preferred qualifications.

Furthermore, the IDOC has filled the position on an acting basis since 2020 with an individual who did not meet even the minimum requirements of the position. [488] The Monitor has advised the IDOC since 2020 that the position requirements should include, in addition to infection control experience:

- Certification in infection control and prevention through the Certification Board of Infection Control and Epidemiology and maintenance of certification,
- Proficiency with electronic software systems for surveillance and use of an electronic health record and use of electronic surveillance reporting systems,
- Six Sigma green belt certification within 3 years of hire. [489]

The Monitor advised the IDOC in the 3rd - 5th Reports that the incumbent individual should at least obtain certification by the Certification Board of Infection Control and Epidemiology. [490] This certification is available online and is based upon the text of the Association for Professionals in Infection Control & Epidemiology (APIC).[491] In order to be considered IDOC's authority on infection control some such recognized training or certification is necessary.

**Recommendation 3:** **IDOC hire or contract with an infectious disease consultant to advise the infection control program when issues arise.**[492] **Partially addressed**
The Monitor has recommended since the 2nd Report that IDOC formalize a relationship with Illinois Department of Public Health (IDPH) or a university to provide physician guidance on the spectrum of infection control responsibilities including immunization, screening, disease prevention, and other public health matters.[493] The circumstances of the COVID-19 pandemic caused IDOC to work closer with IDPH, however this relationship remains undefined and informal.[494] The Monitor has indicated that the implementation plan should include a task to formalize a relationship with a consulting organization (UIC, IDPH) or hire a physician to provide physician expert advice and guidance on control of communicable and infectious diseases.[495]

**Recommendation 4:** **Maintain the COVID-19 vaccination program, provide education on the value of COVID-19 vaccination, and offer initial and ongoing vaccination of the incarcerated population. Addressed**
IDOC continues to provide regularly scheduled COVID primary and booster vaccination days at all correctional facilities. The vaccination rate for the incarcerated population peaked at 75% and has recently declined to approximately 68%[496] which is lower than the State of Illinois adult

---

[488] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (undated) page 4.
[489] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 127.
[490] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 131; Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, pages 168-169; Health Care Monitor 5th Report Lippert v. Jeffreys, June 22, 2022, pages 155-156.
[491] About CBIC
[492] This physician would optimally be from an academic institution or from the IDPH.
[493] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 131.
[494] There exists no policy, interagency agreement or memorandum of understanding between IDOC and IDPH defining the agencies relationship to each other nor the mechanism for providing IDOC consultation or guidance.
[495] Monitor's redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.
[496] OHS-Monitor monthly call 1/23/23.

COVID vaccination rate of 79%.[497]  Video and peer education by vaccine ambassadors and a protocol to allow vaccinated incarcerated persons to have enhanced access to face-to-face civilian visits contributed to the initial higher than anticipated vaccination rate in the IDOC population. This decline in primary vaccination rate is likely due to diminished vaccination acceptance rate in new admissions to the IDOC.

As demonstrated in the table below, vaccination of inmates has been successful, Although less than current civilian rates, this has contributed to reduced hospitalization and mortality rates during later variant surges. Improving the current acceptance rate (58%) of booster vaccinations will provide enhanced ongoing protection of the incarcerated persons in the IDOC.  The current booster vaccine provided in IDOC is the updated bivalent COVID vaccine.

| COVID-19 Vaccination of Incarcerated Persons in IDOC | | | | | |
|---|---|---|---|---|---|
| Date | IDOC Population | # Vaccinated | % Vaccinated | # Boosted | % Boosted* |
| Mar-21 | 28,511 | 18,779 | 65% | | |
| Jul-21 | 27,927 | 19,180 | 69% | Not Applicable | Not Applicable |
| Oct-21 | 28,230 | 19,795 | 70% | Not Applicable | Not Applicable |
| Dec-21 | 27,890 | 20,805 | 75% | 12,149 | 58% |
| Feb-22 | 26,696 | 20,211 | 75% | 11.915 | 59% |
| May-22 | 28.804 | 20,385 | 71% | 12,177** | 60% |
| Jan-23 | 27600*** | 18,768**** | 68% | 10,890 | 58% |
| *Calculated based on number boosted divided by number vaccinated | | | | | |
| **12,135 first booster plus 42 second booster | | | | | |
| ***November 2022 IDOC population | | | | | |
| ****Calculated from vaccination rate provided at OHS-Monitor monthly call 1/23/23 | | | | | |

**Recommendation 5:**  **Implement the Governor's mandate that all correctional center employees receive COVID-19 vaccination and all contractors, visitors, and volunteers who enter IDOC facilities be required to have proof of COVID-19 vaccination. Addressed**

As noted in previous Court Reports, the pattern of COVID infection in IDOC facilities strongly indicated that IDOC employees and contracted staff were the primary vectors for the entry of COVID-19 infection into IDOC facilities and the exposure of the incarcerated men and women to the different variants of COVID-19.

On August 4, 2021, Governor Pritzker issued a statewide COVID-19 vaccine mandate for state workers and contractors in state prisons and other facilities as Illinois experienced an increase in cases due to the contagious delta variant. The primary vaccination of staff initially lagged behind that of the incarcerated population but has steadily improved over time to a current rate of approximately 80% (see table below) with a booster rate of 81% of those staff who were vaccinated as verbally reported to the monitor.[498] The Governor's mandate was a moving force in increasing

---

[497] Illinois Department of Health COVID-19 Vaccine Administrative data 1/27/2023 dph.illinois.gov.
[498] OHS-Monitor monthly call 1/23/2023

the rate of IDOC staff receiving COVID-19 vaccination. IDOC informed the Monitor that some unvaccinated employees whose exemption requests were denied or who refused vaccination have been disciplined including suspension without pay.[499] IDOC did not provide any data to the Monitor on the number of employees whose waiver requests were denied or approved or who have been disciplined.[500]

| COVID-19 Vaccination of Employees in IDOC | | | | | |
|---|---|---|---|---|---|
| Date | IDOC Employees | # Vaccinated | % Vaccinated | # Boosted | % Boosted |
| Apr-21 | 11,864 | 4,271 | 36% | Not available | Not Available |
| Oct-21 | 12,868 | 5,892 | 46% | Not available | Not Available |
| Dec-21 | 12,979 | 8,559 | 65% | Not available | Not Available |
| Feb-22 | Not Available | Not Available | 75% | Not available | Not Available |
| Jan-23 | 12,000 | 9,600 (est) | 80% | 7,776 (est) | 81% |

In June 2021 the IDOC implemented a Phase 2 COVID-19 Visitation Plan that established different visiting hours for vaccinated visitors/inmates and unvaccinated visitors/inmates. Only vaccinated visitor/inmate visitations allowed physical contact visits. The incentive of physical contact visits resulted in an increase in the vaccination numbers for incarcerated persons.

Although there continues to be ongoing COVID-19 infections detected by surveillance screening of staff and incarcerated persons in almost all IDOC facilities, there have been very few hospitalizations and no deaths in the incarcerated population for many months. Based in part on this data, in January 2023, IDOC eliminated mandatory COVID-19 vaccination for employees and vendors. However, it is imperative that IDOC continues to educate and encourage its staff about the personal and public health benefits of COVID-19 vaccination and to be poised to reinstitute mandatory vaccination based on the emergence of new variants with increasing lethality.

The employee vaccination mandate was a potent incentive that contributed to the increase in the number of employees receiving COVID-19 vaccination and thus diminished the potential for the transfer of COVID-19 from the community into IDOC correctional centers. IDOC in conjunction with IDPH needs to carefully monitor the morbidity and mortality of future COVID variants to determine if and when vaccination needs to again be mandatory for staff and vendors.

**Recommendation 6:** Track and report data by facility for health care workers, non-health care staff, and incarcerated persons on the number of COVID-19 vaccines offered, administered, refused, and vaccine series completed. Partially addressed

IDOC has intermittently provided the Monitor with updates on the number of employees and incarcerated persons that have been vaccinated (see vaccination tables in recommendations four and five). The vaccination data were initially reported by facility and detailed the number vaccinated to date. A few reports detailed the number of employees to whom the vaccine was offered which allowed refusal rates to be calculated. The last vaccination numbers by facility for

---

[499] OHS-Monitor monthly call 3/7/2022

staff was received by the Monitor on 12/21/22 and for incarcerated persons on 5/26/22.

Although requested by the Monitor, the category of vaccinated employees co-mingles the vaccination data of health care workers and non-health care correctional staff, which makes it impossible to ascertain the vaccine acceptance rate for these two disparate groups of employees who might require different modes of health education and supervision.

**Recommendation 7:  Continue COVID surveillance testing of employees and incarcerated person with the scope and intervals determined in junction with IDPH. Addressed**

Since IDOC initiated surveillance (screening not symptom-based) testing of employees and incarcerated persons in mid-late 2020 through January 25, 2023, 518,198 COVID tests on employees and 1,424,025 tests on IDOC's incarcerated population have been performed. Since the 5th Court Report in June 2022 through January 25, 2023, 48,864 COVID screening tests were done on employees with 2,699 (5.5%) positive results and 213,268 tests on incarcerated persons with positive test results on 4,773 (2.2%). This ongoing screening for asymptomatic COVID infection, has resulted in restricting employees from entering correctional facilities and quarantining incarcerated men until they are deemed non-contagious, thus minimizing the spread of COVID-19 in the high risk congregate housing of the IDOC.  IDOC closely collaborated with its IDPH consulting physician to determine the amount and frequency of staff and inmate testing based on the rates of COVID in the correctional facility and in the surrounding counties that would optimally protect the incarcerated population and the staff and their families.  IDOC has complied with this surveillance recommendation.  The Monitor continues to recommend that surveillance testing of staff and inmates continue until the pandemic no longer puts the IDOC population at heightened risk of morbidity and mortality from COVID-19 infection.

The ongoing vaccination and surveillance testing of staff and incarcerated men and women has been invaluable in preventing hospitalizations and deaths in the congregate setting of IDOC's prisons.

**Recommendation 8: Ensure that every facility has a dedicated and appropriately trained infection control nurse. Not addressed**

IDOC Staffing Analyses submitted thus far have not identified positions designated for infection control at the institutions.[501] This is in spite of recommendations from the Monitor to do so since the 2nd report.[502] The IDOC indicated an intention to assign from amongst existing allocated positions personnel to be responsible for coordinating infection control in the draft implementation plan.[503]   This only proliferates IDOC's practice of assigning staff duties for which they are not appropriately trained, contrary to II.B.3.  The Monitor has indicated that the implementation plan needs to include dedicated positions at each institution responsible for infection control and the individuals selected for these positions must have qualifications and training pertinent to infection

---

[501] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/19, 6/18/20, 12/15/20, 5/3/21, 7/7/202, 8/17/21, 3/12/22, 9/22/22.
[502] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 131.
[503] IDOC Implementation Plan: Hiring Process, Task 4., Submitted to the Court on December 30, 2021.

control.[504]

Assigning infection control responsibilities to facility staff without appropriate training and oversight contributes to inaccurate surveillance and monitoring. As an example, shingles (herpes zoster) is not a condition reportable to IDPH and yet one facility reported two cases. Another facility considers MRSA an IDPH reportable condition and yet it is not among those listed as reportable by IDPH. [505] Another facility reported an occupational exposure to blood borne pathogens, an important metric in workplace safety. However, the exposure was an individual who had recently received a tattoo-not a work related exposure.[506] At Sheridan positive cultures for MRSA (methicillin resistant Staphylococcus aureus) were reported in July (2 cultured, 1 positive), August (2 cultured, 2 positive), and September (5 cultured, 3 positive) and yet in each case a finding of no cluster was reported. There was no discussion as to why a finding of no cluster was made. There are no instructions for how to determine if there is a cluster, so it is curious how staff are qualified to make this determination.

**Recommendation 9:** **Develop an infection control policy to establish standardized methods of surveillance and infection control activities**. **Not addressed**

IDOC has no policies on infection control. The medical vendor has an infection control manual but as discussed in previous reports, it is out of date and incomplete. [507]

The defendants draft implementation plan has one task, to develop a method to report specific communicable diseases via the electronic record. [508] The Monitor disagreed with the task as written and revised it to include establishment of an infection control *program*, development of written guidelines on all operational aspects of infection control in facilities as well as establishing a standardized surveillance report format used to analyze and report on infection control in CQI meetings at the facility and agency level. Surveillance reports are to begin with manual tabulation and covert to electronic reporting once the electronic record is functional.[509]

Currently facilities may or may not report surveillance and other infection control activity and if they do report, the information is widely varied in content and format.[510] For example, there is no standardized reporting or tracking of tuberculosis infection which is used to determine risk of TB transmission and the frequency of follow up screening as recommended by the Centers for Disease

---

[504] Monitor's redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.

[505] Shawnee August and September 2022 CQI minutes. Shawnee also considers a person testing positive on a tuberculin skin test as a reportable condition which it is not. Illinois Reportable Disease Poster

[506] Centralia reported in the March, April, and May CQI minutes. Graham September 2022 CQI minutes.

[507] We were provided the vendor's infection control manual in 2020 and have not received any more recent versions. Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 126. Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 132-133; Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, page 173; Health Care Monitor 5th Report Lippert v. Jeffreys, June 22, 2022, page

[508] IDOC Implementation Plan, Task 29, Submitted to the Court on December 30, 2021.

[509] Monitor's redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.

[510] Facility Monthly CQI Minutes, April through September 2022.

Control.[511]  Even though the importance of the surveillance of contagious and infectious disease was demonstrated during the COVID-19 pandemic and IDOC eventually did develop a method to report this information, it has not translated to other areas of communicable disease control. For example, legionella bacteria was reported in the water at 12 IDOC facilities this spring[512], yet infection control reporting had no documentation of efforts to identify and protect vulnerable patients from infection. There was only one facility that reported a case of legionella, although the narrative minutes of the minutes reflect one other individual who tested positive at a second facility, but was not identified as reported to IDPH, and at least two other individuals at a third facility who had been exposed.[513] There is no standardized reporting of legionella exposure or infection although this bacteria was found in many of IDOC's facilities.

During the life of the Consent Decree IDOC has issued guidance in the form of memos concerning COVID, treatment of HCV, and immunizations but these have yet to be incorporated into a policy manual with procedures and performance expectations for implementation.  A standardized methodology for surveillance is not present and IDOC has not committed to an infection control policy.

**Recommendations 10 and 11:  Monitor all negative pressure rooms consistent with III.J.2 of the Consent Decree, reporting results monthly to the Communicable and Infectious Disease Coordinator.  Not addressed**

Twenty-six IDOC facilities[514] have infirmaries with negative pressure rooms, however as of September 2022, only 13 facilities were regularly reporting on the status of negative pressure rooms in their CQI meeting minutes. This reporting is quite limited and generally does not comment on the test used, the correlation of the tissue test with the control panel, and the room number.  Five sites[515] have not reported on the functionality of the negative pressure units even once in the last 39 months. In September 2022, seven sites did not report negative pressure testing information.[516]

During the Monitor's site visit to Dixon the negative pressure room in the infirmary was checked. Nursing staff assigned to the infirmary that day did not know how to turn on the negative pressure. Security were able to unlock the window and switch on the negative pressure fan; the tissue paper test failed.[517] CQI reports from Dixon consistently report negative pressure checks as 100%. It is not clear if this refers to the checks done or the results. It is clear that the field test during the site visit did not verify the accuracy of the checks reported in the CQI minutes. The fact that nursing

---

[511] Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC (July 7, 2006) MMWR 55(RR09); 1-44.
[512] Originally this bacteria was reported at two correctional centers in March 2022, however by May the bacteria had been identified at 12 IDOC facilities. Legionella bacteria detected at two Illinois DOC facilities (newschannel20.com); Illinois Prison Water Contamination Keeps Getting Worse - The Appeal.
[513] Pontiac, September 2020 CQI minutes, NRC CQI minutes and Stateville CQI minutes March 2022.
[514] Elgin, Joliet Treatment Center, Murphysboro, and Vienna CC do not have infirmaries or negative pressure rooms.
[515] Danville CC, Decatur CC, East Moline CC, NRC, and Pinckneyville CC.
[516] CQI minutes September 2022:  Danville CC, East Moline CC, NRC, Pinckneyville CC, Robinson CC, Stateville CC and Taylorville CC did not document negative pressure test results in CQI minutes.
[517] Dixon CC Site Visit, December 5-7, 2022.

staff on duty did not know how to activate the negative pressure room calls into question whether those responsible for completing these checks are appropriately trained and monitored.

In order to demonstrate compliance with III. J. 2 IDOC needs to provide proof of practice that negative pressure rooms are monitored, and steps taken to timely correct any malfunction identified. The Monitor has recommended that a reporting log be established and submitted with the other Lippert reports by each facility. The log should indicate the status of each negative pressure room (occupied or not), the type of check that was done, the correlation of the tissue test with the control panel (if one exists), the date and person completing the check and the result. These results should be reported in the facility CQI meeting minutes noting any corrective action needed and taken. The reliability of the information on the log will then have to be verified by periodic inspection at the facility. Even though this recommendation has been made by the Monitor since the 3rd Report, IDOC has yet to provide any evidence of compliance with III.J.2.[518]

The failure to regularly monitor and report on the functionality of the negative pressure rooms puts staff, patients and others in the infirmary at risk of exposure to contagious airborne illnesses.

### Recommendation 12: Immunize inmate workers, including porters and hospice workers, who have ongoing risks of exposure to body fluids for hepatitis A.[519] Not addressed

IDOC's administrative directive on blood borne pathogens recommends hepatitis B vaccination for all its inmate workers (porters). This administrative directive should be expanded to include hepatitis A vaccination for inmate workers at risk for exposure to fecal-oral transmitted pathogens. Porters have been observed cleaning soiled bedding of patients in the infirmary and the walls and floors smeared with feces in mental health crisis rooms. Review of systemwide vaccine orders filled by Boswell Pharmacy Services from November 2019 through September 2022 (34 month period) documented that only six correctional facilities and 2 camps[520] ordered Hepatitis B vaccines and only five correctional facilities[521] ordered Hepatitis A vaccines. The entire IDOC ordered only sufficient Hepatitis B vaccine to immunize 31 patients and only hepatitis A doses sufficient to immunize 5 individuals in the last 34 months.[522] This quantity of hepatitis A and B vaccines are grossly insufficient to meet the vaccination needs of the inmate porters let alone to vaccinate incarcerated persons with active liver disease or cirrhosis who do not have immunity against hepatitis B and A. IDOC has provided no systemwide about information that inmate workers have been vaccinated for hepatitis A or B.

---

[518] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 144; Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, page 184; Health Care Monitor 5th Report Lippert v. Jeffreys, June 22, 2022, page 167.

[519] This recommendation has been made in the Health Care Monitor's 2nd, 3rd, 4th, and 5th Reports Lippert v. Jeffreys.

[520] Only Decatur, Graham, Jacksonville, Sheridan, and Western plus camps Greene and Pittsfield ordered Hep B vaccines in the last 3 years

[521] Only Decatur, Sheridan, Southwestern, Vienna, and Western ordered Hep A vaccines in the last 3 years

[522] Boswell Pharmacy Services filled individual and stock orders 11/1/19-9/1/22.

**Recommendation 13:** R**eplace tuberculosis skin testing (TST) with interferon-gamma release assay (IGRA) testing such as QuantiFERON® TB, to screen for tuberculosis infection.**[523] **Partially addressed**

As stated in the 5th Report, IDOC initiated use of the IGRA test[524] in lieu of tuberculin skin testing at the four Reception & Classification Centers in October 2021.[525] There has been no further progress or articulation of a decision about expanding the use of IGRA testing to other prison facilities for periodic screening of latent tuberculosis infection. The Monitor has strongly voiced support for switching to QuantiFERON for reasons of increased accuracy, elimination of human error in reading the TST, minimization of the potential for accidental needle sticks of staff and decreased nurse labor costs. This is a good example of incorporating newer technologies to redirect a limited supply of labor to other duties in the face of the ongoing shortage of nursing personnel in the IDOC. (See previous reports for an elaboration on the reasons for the recommendation.)

**Recommendation 14:** **Continue monitoring and reporting of access to HCV treatment as outlined in the revised Screening and Treatment HCV Guidelines March 2021. Addressed**

IDOC does not have a systemwide, standardized internal surveillance system to track HCV infection or treatment of the infection.[526] The majority of facilities report HCV clinic data in the monthly QI minutes, but they do not uniformly track the same data. Some clinics continue to follow treated patients in the HCV clinic and others discharge treated patients at heightened risk of hepatocellular cancer to chronic care clinics where ongoing ultrasound testing is ordered and tracked. Some do not report the number of treated patients still on their HCV clinic roster. This lack of standardized data on whether treated patients are included in HCV clinic roster makes it impossible to know the true percentage of untreated HCV patients in the IDOC and the number of HCV patients who have been treated.[527] The Monitor has chosen to use the data provided by the UIC Hepatitis C telehealth clinic to accurately the assess and track the number of incarcerated patients who have been treated for hepatitis C. IDOC needs to develop and implement a standardize protocol or guideline on discharging successfully treated HCV patients from the facility's HCV clinic that assures that those individuals with advanced liver fibrosis be placed in another chronic clinic (e.g., General Medicine Clinic) to assure that ongoing liver cancer screening is ordered at nationally recommended intervals.

---

[523] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, pages 128 & 131. Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, pages 133 – 4 & 144.
[524] QuantiFERON is the name of the test used.
[525] Health Care Monitor 5th Report Lippert v. Jeffreys, June 22, 2022, page 161. The reception centers are NRC, Logan CC, Menard CC, and Graham CC.
[526] See the discussion of the need for surveillance tracking, the Defendants implementation plan and Monitor's response in Recommendation 9.
[527] Dixon CC discharges treated HCV patients from the HCV Clinic but those with high fibrosis scores are placed in the General Medicine Clinic to assure that biannual liver ultrasounds to screen for Hepatocellular Cancer (HCC) are ordered and performed. Shawnee CC has treated 80 HCV in the last two years but still has 62 patients on its HCV clinic roster; it does not report the # of treated patients in its QI minutes. Shawnee very likely is continuing to follow treated patients in its HCV clinic. The Q3 2022 minutes for 5 facilities (Graham, Kewanee, Lawrence, Robinson, Sheridan, Southwestern) still list treated patients on their HCV clinic roster.

Since the IDOC does not provide data on patient with hepatitis C and their treatment the following table was developed by the Monitor manually counting information provided in IDOC quality improvement meeting minutes.

| Quarterly Status of HCV Data from QI Minutes* | | | | | |
|---|---|---|---|---|---|
| Date | HCV Clinic Rosters | On HCV Treatment | % on Treatment | Not on Treatment** | % Not on Treatment |
| Jun-20 | 1374 | 17% | 1.2% | 1357 | 93.8% |
| Sep-20 | 1205 | 25 | 2.1% | 1180 | 92.6% |
| Dec-20 | 1217 | 15 | 1.2% | 1202 | 94.9% |
| Mar-21 | 1015 | 20 | 2.0% | 995 | 98.0% |
| Jun-21 | 963 | 75 | 7.8% | 889 | 92.3% |
| Sep-21 | 829 | 78 | 9.4% | 751 | 91.6% |
| Dec-21 | 844 | 55 | 6.5% | 789 | 93.5% |
| Sep-22*** | 778 | 73 | 9.4% | 629 | 80.8% |
| *Given that lack of standardized and consistent HCV clinic reporting in facility QI minutes there are inaccuracies in this data. | | | | | |
| ** Not on treatment includes the HCV clinic roster minus patients who have been treated and cured. | | | | | |
| ***The Quarter 3 QI data is incomplete. IDOC did not provide the QI minutes for 5 facilities (BMR, Menard, Lawrence, Lincoln, Murphysboro), the QI minutes for Logan could not be opened, the QI minutes for 3 facilities did not include any HCV Clinic data (IRCC, Taylorville, Western), the QI minutes for Vienna only noted the # of patients enrolled in the HCV Clinic without any details. The Monitor used the HCV clinic data in the June 2022 QI minutes for Lawrence, Lincoln, and Murphysboro. | | | | | |

IDOC revised the Screening and Treatment Hepatitis C Guidelines in March 2021 and the Monitor noted an increase in the number of individuals being treated in June 2021.[528] After the revised HCV guidelines were implemented in June 2021, more patients began to be referred to UIC and treated. The percent of HCV clinic patients who are in treatment or have completed treatment increased from under 2 percent to over 9 percent. Consistent with treatment trends represented on the graph above, treatment more than doubled from 2020 compared to 2021 and continues to increase in 2022 as shown in the table below.

---

[528] The initial increase in HCV treated patients was documented at the Shawnee CC site visit 6/21-23/2021.

| HCV Treated via UIC Telehealth | |
|---|---|
| Year | # Treated |
| 2018 | 79 |
| 2019 | 82 |
| 2020 | 98 |
| 2021 | 246 |
| 2022* | 301 |
| **Total Treated** | **806** |
| * As of 10/28/22 | |

In the last twenty months IDOC, in collaboration with UIC Telehealth, has accelerated HCV treatment significantly. The increasing elimination of active hepatitis C has a positive impact on the present and future health of the incarcerated population and will decrease the risk of transmission of hepatitis C in the IDOC.

As noted in the 5th Report the increase in cumulative HCV patients treated in 2021and 2022 continues to vary dramatically between facilities. The size of the facility does not necessarily correlate with the number of treated HCV patients. Decatur, a female facility with a census of 411 had 42 patients treated for HCV, Vandalia (population 532) treated 23 patients, and East Moline (population 470) treated 19 individuals for HCV. On the other hand, in 2021-2022 Pinckneyville (population 1,921) treated only 2 patients and Taylorville (population 1,059) treated only one patient for HCV. Although the volume of facilities that have achieved a double-digit increase in the number of patient treatments increased to seventeen IDOC sites in 2021-2022, the reasons for this site-to-site variability needs to continue be monitored by the quality improvement committees and IDOC quality improvement leadership. It is again the Monitor's firm opinion that the lack of dedicated infection control nurses at each facility is a significant contributing factor to the failure of many sites to complete the initial evaluation and refer HCV patients for treatment. The quality improvement program and the infection control coordinator should investigate whether systemic or operational barriers to treatment exist. Any systemic barriers to treatment need to be corrected. The facility variation in treatment is shown in the table below.

| HCV Patients Treated by UIC in 2021 and 2022 by Facility | | |
|---|---|---|
| **Facility** | **Number Treated\*** | **Population\*\*** |
| Shawnee | 80 | 1548 |
| Sheridan | 70 | 1200 |
| Decatur | 42 | 411 |
| Lincoln | 39 | 790 |
| Logan | 33 | 941 |
| Dixon | 32 | 1,558 |
| Robinson | 26 | 854 |
| Jacksonville | 25 | 797 |
| Menard | 25 | 1,977 |
| Vandalia | 23 | 532 |
| East Moline | 19 | 470 |
| Lawrence | 17 | 550 |
| Centralia | 14 | 1,245 |
| Danville | 14 | 1,497 |
| Graham | 13 | 1,368 |
| IRCC | 13 | 1,586 |
| Stateville | 12 | 1,253 |
| Kewanee | 9 | 222 |
| Hill | 8 | 1,585 |
| BMRCC | 6 | 1,178 |
| Southwestern | 6 | 332 |
| Western | 6 | 1,686 |
| Pontiac | 5 | 804 |
| Vienna | 4 | 577 |
| NRC | 2 | 1,270 |
| Pinckneyville | 2 | 1.921 |
| JTC | 1 | 169 |
| Taylorville | 1 | 1,059 |
| JITC/Elgin | 0 | 7 |
| Murphysboro | 0 | 113 |
| **Total Treated** | **547** | |
| \*UIC Hepatitis C Telehealth Treated Patient spreadsheet 2021 and 2022 up to 10/8/22 | | |
| \*\*IDOC population correction centers November 2022 | | |

**Recommendation 15:** Provide treatment to HCV patients with all levels (F0-F4) of fibrosis/liver scarring, not just those with advanced fibrosis. Addressed

168

Prior to 2019, HCV treatment had been limited in the IDOC to incarcerated persons with more advanced levels (F3, F4) of fibrosis. Although patients with higher levels of liver fibrosis are given priority for treatment, the Monitor previously recommended that HCV patients with lower levels of liver fibrosis (F0, F1, F2 fibrosis scores) be offered treatment before, not after, extensive liver scarring and cirrhosis had developed.  IDOC now refers all patients, regardless of their fibrosis scores,  who have completed prerequisite tests to UIC Hepatitis Telehealth clinic where the prioritization for treatment is determined. This has expedited and expanded the provision of treatment.  HCV treatment is not inexpensive but delaying curative treatment until the liver has become increasingly cirrhotic is clinically unacceptable and is not cost ineffective.  The treatment and management of advanced liver cirrhosis is expensive and significantly more costly than early curative treatment HCV.

The January 2019 revised HCV Guidelines allowed treatment referral for patients with fibrosis scores of F2.  In March 2021 these were again modified to include consideration of persons with fibrosis scores of F0 and F1 for treatment eligibility.

| Treatment Based on Fibroscan Scores | | | | | |
|---|---|---|---|---|---|
| Year | Fibrosis level 1 or less | Fibrosis level 2 | Fibrosis level 3 | Fibrosis level 4 | Total treated |
| 2017 | 0 | 0 | 1 | 1 | 2 |
| 2018 | 5 | 9 | 18 | 35 | 67 |
| 2019 | 3 | 35 | 25 | 19 | 82 |
| 2020 | 2 | 37 | 23 | 36 | 98 |
| 2021 | 119 | 72 | 21 | 30 | 242* |
| 2022** | 209 | 52 | 21 | 19 | 301 |
| *Four fibroscan reports were unavailable in 2021 | | | | | |
| **This includes data for 2022 through 10/28/22.  There was another batch of HCV treatment that was started in mid-December 2022, but this data has not yet been received. | | | | | |

IDOC still needs to develop and implement a protocol or guideline to direct and track ongoing liver ultrasound screening for hepatocellular cancer of treated or untreated HCV patients with advanced liver fibrosis and cirrhosis. This screening is currently recommended to be performed every 6 months.

## Recommendation 16: Establish quality metrics to measure treatment of HCV annually.  Not addressed

The Monitor continues to recommend performance measures and an outcomes dashboard to measure hepatitis C treatment.[529]  This dashboard or its equivalent should include the number of HCV patients treated over a specified time period in the numerator and the total number of

---

[529] Monitor's redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.

untreated HCV patients over the same time period in the denominator. The number of untreated HCV patients should be separately tracked on a dashboard and would permit staff to see whether the number decreases consistently over time. IDOC has yet to develop performance measures and outcome studies that are satisfactory to the Monitor.[530]

**Recommendation 17:** **Track and report offering, acceptance or refusal of nationally recommended immunizations. Not addressed**

With the exception of a Human Papilloma Vaccination program at the two female facilities[531] that reports how many women twenty-six years of age or younger have received the HPV series, IDOC has not generated any comprehensive data or reports on the provision of adult immunization.

The Defendants implementation plan includes several tasks that would establish a mechanism to assess immunization status, establish a policy on immunizations to allow their offer by protocol, track immunizations independently until the electronic record is in place, and to report immunization progress.[532] The Monitor has commented that such tracking must include both the volume of specific vaccines offered, administered, and refused per facility and the percentage of eligible patients who have been offered, accepted, and refused specific vaccination and that IDOC must implement an interval immunization [533] tracking system prior to the full implementation of the EHR.

**Recommendation 18:** **Document identification of infection control opportunities for improvement and demonstrate whether corrective action has taken place in quality improvement minutes. Not addressed**

IDOC infection control reports in quality improvement meeting minutes present data that is not actionable and without any analysis. For example, none of the CQI minutes reviewed for this report contain any analysis of performance in relation to implementing revised HCV treatment guidelines, assessing immunization status, offering recommended immunizations, percent of population offered and accepting influenza vaccine, acceptance of HIV testing upon release. Each of these are areas that could be subjects of analysis by health care programs with a culture self-critical inquiry in the interest continued improvement. Quality improvement meeting minutes do not include descriptions of opportunities for improvement, identification of problems in infection control or prevention, or actions taken, based on data presented, that result in an improved program. A good example of this is the lack of discussion about ways to prevent legionella infection or the persistent problem of bird and rodent infestations in the infirmary which were documented in CQI minutes but never analyzed or discussed.

**Recommendation 19:** **Provide data support to track infection control activity. Not addressed**

---

[530] Monitor's Letter on IDOC Quality Audit and Outcomes and Performance Measures sent by email 11/19/2022. See also the discussion of Outcome and Performance Measurement Results in this report.
[531] Decatur CC and Logan CC.
[532] IDOC Implementation Plan, Tasks 26-27 and 52. Submitted to the Court on December 30, 2021.

[533] Monitor's redline and comments on Tasks 26-27 and 52 of the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.

170

The Defendant's draft implementation plan submitted 12/31/2021 and now before the Court does include a commitment to establishing IT positions to collect and manage health care data for use in quality improvement and to monitor compliance with the Consent Decree.[534] The Monitor has provided extensive comments to IDOC on this version of the implementation plan.[535]

**Conclusion**

The Monitor continues the rating of partial compliance on Infection Control based on 1) the increased number and percentage of incarcerated individuals with active HCV who are being treated since March 2021, 2) the continuation of IDOC's relationship with IDPH in the management of COVID-19 related issues, the ongoing management of COVID-19 surveillance and mitigation testing during the various surges; 3) the ongoing systemwide COVID-19 primary and booster vaccination rollout for inmates and staff; and 4) the focus, albeit poorly documented and tracked, on the provision of adult (non-COVID) immunizations in the IDOC.

However, IDOC still has not addressed the most substantive requirements of the Consent Decree and the Monitor's recommendations regarding each of these. Substantial compliance will not be achieved until the IDOC has provided proof of practice that it has:

- A comprehensive, system wide infection control program.
- Implemented infection control policy with standardized methods of surveillance and infection control activities.
- Trained, qualified and credentialed personnel in the roles of statewide infection control coordinator and facility infection control coordinators.
- Effective monitoring of all negative pressure isolation rooms and timely corrects identified malfunction.
- Reliable and valid data on infection control activity to include immunizations rates, annual HCV treatment rates, and immunization of inmate workers and volunteers at risk of body fluid exposure.
- Demonstrated identification and follow through on opportunities for improvement in infection control.

The recommendations from the 5th report are repeated below with the addition of a recommendation to monitor patients with hepatitis C with high fibrous levels for hepatocellular cancer.

**RECOMMENDATIONS:**

1. Develop a comprehensive, systemwide infection control program.
2. Ensure the statewide infection control coordinator obtains and maintains certification in infection prevention and control through the Certification Board of Infection Control and Epidemiology. Requirements of this position should also include proficiency in

---

[534] IDOC Implementation Plan. Submitted to the Court on December 30, 2021. Narrative, Tasks 2, 27, 29, 37.
[535] Monitor's redline and comments on the 12/31/21 version of the Defendant's draft implementation plan submitted 9/27/2022.

surveillance software and familiarity with use of an electronic medical record to support surveillance activity. It would be preferable for this person to obtain Lean Six Sigma certification within two years of hire.

3. Hire or contract with an infectious disease physician consultant to advise the IDOC on their infection control program as issues arise. Optimally, this physician should be from an academic institution or from the IDPH.

4. Maintain the COVID-19 vaccination program that provides systemwide education on the value of COVID-19 vaccination and offers initial and ongoing vaccination for men and women incarcerated in the IDOC.

5. Implement the Governor's mandate for all IDOC employees to receive the COVID-19 vaccination. All contractors, volunteers, and service groups who enter IDOC facilities should be required to have proof of COVID-19 vaccination.

6. Track and report data by facilities for health care workers, non-health care employees, and incarcerated individuals on the number of COVID-19 vaccines offered, the number administered, the number refused, and the number who have completed a vaccine series.

7. Continue COVID-19 surveillance testing of employees and incarcerated individuals with the scope and intervals of testing determined in conjunction with IDPH.

8. Ensure that every facility has a dedicated and appropriately trained infection control nurse.

9. Develop infection control policy to establish standardized methods of surveillance and infection control activity.

10. Establish expectations for independent verification of negative pressure in respiratory isolation rooms, monitoring, and documentation of the status of negative pressure rooms, reporting to the Infection Control Coordinator and to the monthly facility quality improvement committee and corrective action to be taken when the rooms are not functional.

11. Perform Safety and Sanitation or regular other inspections of the infirmary negative pressure units monthly and equally crucial daily (when negative pressure rooms are occupied) or otherwise weekly tissue paper testing of the isolation rooms be conducted by the health care staff to verify that these units are always operational.

12. Provide both hepatitis A and hepatitis B vaccinations to inmate workers who have risks of exposure to blood and fecal borne pathogens and to inmate kitchen workers.

13. Replace tuberculosis skin testing (TST) with IGRA blood testing, which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.

14. Continue to monitor and report access to HCV treatment as outlined in the revised Screening and Treatment Hepatitis C Guidelines March 2021 that streamlined HCV eligibility and screening criteria. Develop standardized hepatitis clinic data reporting in the facility monthly QI minutes.

15. Continue to ensure access to HCV treatment for individuals with F0 and F1 fibrosis levels.

16. Establish a quality metric that significantly increases the annual number of HCV treatments that would result in the total elimination of HCV within the next 2-3 years.

17. Track and provide detailed reports on the offering and provision of nationally recommended adult immunizations including the percentage of eligible candidates who have been offered and received the required immunizations at each site.

18. Ensure that quality improvement activity identifies infection control and prevention

172

opportunities for improvement and takes steps to ensure that improvements occur.
19. Provide the data support to allow for tracking of infection control activity.

Additional recommendation added this report:
20. Develop a system to monitor whether HCV patients with high levels of fibrosis have liver ultrasound screening for hepatocellular cancer (HCC).

# Dental Care

**Dental Staffing**

*Addresses item II.B.6.q; III.K.9*

**II.B.6.q.**  *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**III.K.9.** *Within twenty-one (21) months of the Preliminary Approval Date of this Decree [October 2020], IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor's 5th Court Report listed six recommendations. The IDOC provided no information that these recommendations were addressed.

Annual peer reviews for twenty-seven dentists were performed in 2021.[536] These dentist peer reviews primarily addressed process and documentation issues but also audited the adequacy of dental history, the appropriate use of prophylactic antibiotics, the appropriate ordering of required x-rays, diagnostic tests, and consultations. Peer reviews are done by dentists working in the IDOC system and thus have the risk of lacking objectivity.  As recommended in previously reports, IDOC and its vendor should consider having an independent dentist perform the annual dentist peer reviews.  This can be accomplished in the audit process, which is a required provision of the Consent Decree. Annual dentist peer reviews for 2022 have not yet been provided to the Monitor,

Annual evaluations of vendor or State employed dental hygienists and dental assistants were not completed in 2020. In 2021 only evaluations of the vendor employed dental hygienists and dental assistants were provided to the Monitor.  Vendor dental hygienists and dental assistants are evaluated using the Salary Compensation Calibration Worksheet; this worksheet focuses primarily on administrative and business issues and does not satisfy Consent Decree requirements to assess clinical staff competence and performance. This vendor evaluation is not allowed to be shared with the employee. These vendor evaluations have not yet been provided for the 2022 calendar year.

The IDOC uses the State of Illinois Individual Development and Performance System to evaluate state employed dental hygienists (2) and dental assistants (8); this form is individualized for each of these positions and must be discussed with each employee.  Evaluations of the State dental

---

[536] See Oversight of Medical, Dental, and Nursing Staff section of this report for more detailed information

hygienist and dental assistants for 2020 and 2021 were not given to the Monitor. The State evaluations for 2022 have not yet been provided to the Monitor.

With the exception of a few sections of the dentist peer reviews,[537] none of the annual performance evaluations for both State and vendor dental staff qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dentists, dental hygienists, and dental assistants.

See Oversight of Nursing, Dental, and Medical Staff section for further details.

**RECOMMENDATIONS:** (Same as noted in Oversight of Nursing, Dental, and Medical Staff section) with two recommendations addressing dental staffing and coverage.
1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. Engage an independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional to perform the annual evaluations of dentists and dental hygienists.
4. Share clinical professional performance evaluations with the employee who should sign the review after discussion with the reviewer.
5. Evaluate the dentist staffing at each of the IDOC facilities with onsite dental services to ensure that the FTE dentist staffing is in accord with each facility's average daily census and dental care needs of its incarcerated population.
6. Develop arrangements including contracted private dental services to provide emergency and routine dental services to IDOC's patient population until the dentist staffing is fully recruited and hired.


**Dental Documentation**

*Addresses item III.K.1; III.K.10.c; III.K.11; III.K.12*
**III.K.1.** *All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.*
**III.K.10.c.** *A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.*
**III.K.11.** *Each prisoner shall have a documented dental health history section in their dental record.*

---

[537] The Wexford Peer Review Form for Dentists does assess the adequacy of the history of the current problem, whether appropriate x-rays were done, whether the anesthetic used and its dosage and mode of delivery were documented, the appropriateness and timeliness of consultations, and whether the appropriate diagnostic procedures were ordered.

174

**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

The monitor has received and utilized previous dentist peer views reports, dental charts of patients having dental extractions, and dental records identified during the review of mortality medical records to evaluate this section.

Analyses of the 2020 and 2021 dentist peer reviews[538] documented a high level of compliance with the use of the SOAP format[539], the completion of required consent and refusal forms, the documentation of an adequate history of the current dental problem, the documentation of the treatment plan for the visit, the ordering of the appropriate diagnostic procedures, and the completion of an appropriate x-ray before an extraction. However, an audit of dentist intake screening notes in mortality charts identified a low level of compliance with the use of SOAP format.

The dental charts of six individuals who had a dental extractions in 2022 at a single IDOC facility[540] were reviewed by the Monitor to assess the presence of pre-procedure signed consent forms, to determine if appropriate x-rays were taken prior to the extractions, and whether dental notes were written in the SOAP format. All six dental records had signed consent forms for the extraction and each dental note used the SOAP format. Four had dental x-rays done within 4 months of the extraction, two were taken, respectively, 13 months and 66 months prior to the extraction.

As noted in previous reports, the Monitor was also unable to identify a national standard concerning when dental x-rays must be taken or repeated prior to an extraction in order to protect the health of the patient and minimize the risk of post-extraction complications. The OHS Chief of Dental Services must establish the best practice standard for the length of time prior to dental extractions that x-rays are deemed valid and do not need to be repeated. If there is a justifiable reason why the length of time standard is not utilized, the dentist should document the reason in the dental record. Without this clarification, it is difficult to assess whether timely x-rays are available for dentist review prior to dental extractions.

**RECOMMENDATIONS:**

1. Identify and establish the best practice standard for the length of time prior to dental extractions that previous x-rays are judged to be adequate to minimize complications and protect the health of the patient-inmate.
2. Identify, establish, and disseminate the national guidelines for the use of prophylactic antibiotics pre-dental procedures.

---

[538] The 2022 dentist peer reviews are done in the Fall and early Winter and were not available for review.
[539] Subjective, Objective, Assessment, Plan (SOAP) documentation format
[540] Dixon CC, site inspection, 12/3-5/22

3.  Define the dental services and procedures that require written consent prior to delivery of the dental care.

**Dental Support**

*Addresses items III.K.4-5; III.K.13*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*

**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*

**III.K.13.** *IDOC shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor has been provided with the Dental Care for Offenders administrative directive[541] but this policy did not address the routine disinfection of all dental examination areas, the use of lead aprons with thyroid collars, or the posting of radiological hazard signs in the areas where x-rays are taken. During previous site visits[542] the Monitor verified the presence of lead aprons with thyroid collars at all four facilities that were evaluated for this provision. At two of the site visits the thyroid collars were stored in the health care unit radiology suite and not immediately available to the dental team. The IDOC has not provided the Monitor when any information on a systemwide survey that audits the facility-by-facility presence of lead aprons with thyroid collars, posting of radiological hazard signs, and evaluation of the presence and operational state of dental equipment. A radiological hazard was posted in the dental area during the Monitor's most recent site inspection.[543] To date, the Monitor has not received Administrative Directives on the routine disinfection of all dental examination areas nor a copy of any policy relating to dental radiology hygiene.

IDOC provided the Monitor with six to seven different lists of dental equipment at twenty-four of the twenty-eight facilities with dental suites; each of the lists provided varying details on the condition and presence of dental equipment.[544] Some of the lists reported on the presence and condition of only 4-7 different dental apparatuses, other were more comprehensive even noting the number of drills and hand pieces. IDOC needs to develop a standardized equipment audit tool

---

[541] IDOC Administrative Directive 04.03.102 Dental Care for Offenders Effective Date 1/1/2020
[542] Robinson CC and Lawrence CC 2019, Shawnee CC 2021, and Dixon CC 2022 site inspections
[543] Dixon CC site visit 12/3-5/2022
[544] Denman Biomedical Services, Henry Schein Services and Repairs, Cross Tech Biological Monitoring, CliniTech Group, State of Illinois Central Management Services (annual inventory of equipment), Biomedical Medical Services, and an unidentified electrical safety inspection contractor.

that creates site-specific lists of the quantity of every dental device, instrument, and equipment needed at each facility and then annually surveys and reports the variance between the actual volume of equipment identified compared to the quantity required at each facility.

During the recent site visit to Dixon CC,[545] the Monitor noted that one of the three dental stations had a digital dental x-ray unit. This is first digital dental x-ray device that the Monitor identified as being used in an IDOC facility. The presence and functionality of digital dental x-ray capability should be audited during the annual dental equipment surveys.

IDOC provided the Monitor with lists of dental equipment repairs or replacement equipment ordered from sixteen of the twenty-eight facilities with dental suites. The lists included thirteen chairs that required repairs or replacement, 16 handpieces and attachments needed repairs or replacement, and a variety of other defects. Repairs of some equipment were completed or pending at two facilities; work orders were submitted at two other facilities. Forms were submitted for repair and/or replacement of three dental chairs. The data present did not consistently document the date the defective equipment was identified, the date the work order was submitted and approved, and the date the equipment was repaired or replaced.

Review of September 2022 CQI meeting minutes showed that 12 (43%) of the 28 IDOC facilities with onsite dental services reported that sterilization of the dental equipment using spore testing was regularly performed to confirm that their autoclaves were effectively sterilizing dental equipment.[546] Spore testing at ten additional correctional centers with dental services did not report on the performance of this important infection control measure in the September 2022 CQI minutes.[547] Six of these nine non-reporting facilities had not reported on spore testing in quarterly CQI minutes since June 2020[548] one additional facility reported the results on spore testing only once and two other facilities reported these results only thrice over the last 27 months. The effectiveness of dental equipment and instrument sterilization must be performed, monitored, and reported on a regular basis for all sites with dental services. This same recommendation was previously made by the Monitor in the 3rd, 4th, and 5th Court Reports. As of yet, no action has been taken to address this lack of systemwide monitoring of a potentially serious infection control deficiency. This indicates the lack of an effective systemwide infection control program in the IDOC.

The Monitor has not yet received information that a standardized, systemwide, annual system-wide surveys of both dental space and dental equipment have been done. Three and ½ years

---

[545] Dixon CC, site visit 12/3-5/2022

[546] September 2022 CQI meeting minutes at Centralia, Dixon, East Moline, Graham, Hill, Jacksonville, JTC, Kewanee, Shawnee, Sheridan, Southwestern, and Western reported that spore testing was being performed and that the autoclaves were functional.

[547] September 2022 CQI minutes at Danville, IRCC, NRC, Pinckneyville, Pontiac, Robinson, Stateville, Taylorville, Vandalia, and Vienna did not report the results of spore testing by the dental team. There were no QI reports provided from BMR, Decatur, Lawrence, Lincoln, Logan (QI not able to be electronically opened), and Menard.

[548] CQI Minutes for June 2020, Sept 2020, Dec 2020, March 2021, Sept 2021, Dec 2021, March 2022, September 2022: BMR, Danville, Lawrence, Pontiac, Robinson, and Vienna did not report results of spore testing on six quarterly CQI minutes over a 27 month period. Vandalia reported spore testing results only once and NRC and Stateville only three times over the last 27 months.

have passed since the signing of the Consent Decree and IDOC has yet to conduct an initial, let alone an annual, survey of dental space and equipment. A preliminary dental survey should not be delayed waiting for IDOC to hire consultants to initiate a systemwide assessment of all the clinical spaces in the IDOC. The Monitor has not received any facility-specific data on the number of dental chairs in the IDOC. It is the Monitor's concern that the lack of dental hygiene and dental services may be related to a lack of dental chairs and equipment at multiple sites. This type of survey is foundational to a safe and functional dental program.

**RECOMMENDATIONS:**

1. Provide each dental suite with its own leaded thyroid collar.
2. Disseminate and follow CDC infection prevention guidelines including for dental care. including instrument sterilization (spore testing).
3. Report regularly to CQI committee on the effectiveness of the dental equipment sterilization at all facilities with dental suites
4. Develop a site-specific audit tool that notes the quantity of dental equipment, devices, furniture, and instruments needed at each facility with dental services
5. Perform an annual facility-specific survey of dental equipment, furniture, and space that includes the number of dental chairs. Provide the monitor with the space and equipment inventory when it is completed.
6. Develop a tracking list or spread sheet which records the date when broken dental equipment is  identified, the work order or ASR submitted, the work order or ASR approved, the purchase order approved, and date equipment is repaired or replaced.

**Dental Access**

*Addresses items II.B.6.h; III.K.2*
**II.B.6. h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care;*
**III.K.2.** *Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

At the time of writing this Report, dental services that were restricted during the first two years of the COVID-19 pandemic had been fully reinstituted. Lengthy waiting times and backlogs to get on the waiting lists for dental care appointments that started during pandemic have not been fully resolved at many IDOC facilities. Dentist vacancies, along with some dental hygienist vacancies, are currently the primary contributing factor to decreased access to dental services in the IDOC. Access to dental hygiene services will be addressed in the dental hygiene section.[549]

---

[549] Consent Decree, K.3.7 and K.3.8

178

Twenty-eight IDOC correctional centers have onsite dental suites and services.[550] Budgeted dentist positions range from 0.25 FTE to 3.0 FTE at the twenty-eight different sites.[551] Nine facilities have greater than 1.0 FTE budgeted dentist positions.[552]     The staffing data provided by IDOC for September, 2022[553] show a cumulative 34.15 FTE dentist budgeted positions; 19.8 (58%) were filled, and 14.35 (42%) were vacant. Six (21.4%) of IDOC facilities with dental suites do not currently have any filled budgeted dentists.[554] These six facilities house 6,504 incarcerated persons. Seven other facilities housing 8,665 incarcerated persons do not currently have their fully allotted  FTE dentist staffing.[555] 15,169 individuals at these thirteen IDOC facilities have no dedicated dentist coverage or are understaffed due to dentist vacancies; this puts 55% of IDOC patient-inmates at clear risk for limited if any access to dental services.

In an attempt to address the dental care gap caused by the high dentist vacancy rate, IDOC has implemented an opaque patchwork of dental coverage utilizing dentists assigned to one facility providing dental services on 1-2 assigned days or "prn as needed" at additional sites. An additional five dentists without permanent assignments at IDOC facilities are also providing a variable amount of "as needed" dental care. The Monitor has not been advised whether these five "only prn" dentists are filling part time positions, are locum tenens dentists, or are employees of dental staffing agencies. In addition to dentists who are assigned to cover 1-2 scheduled days at another facility, ten dentists are reported to be providing a variable amount of "prn" services at eleven different correctional centers. Based on the data provided to the Monitor it is virtually impossible to even estimate the amount of "as needed" dentist coverage that is actually being provided to fill the dentist vacancy chasm. However, it is apparent that seven, possibly eight, facilities[556] have onsite dentist coverage for only a single day a week.

During the latest site visit by the monitor team[557], the two budgeted dentist positions at this facility had been respectively vacant for 12 and 17 months.  For the past year, a fulltime dentist at another IDOC facility has been staffing a Friday dental clinic at this site which focused on patients with dental pain and performing dental extractions. Annual dental assessments, dental fillings, and denture repair and fittings were rarely if ever done. This facility's Quality Improvement meeting notes[558] documented 64 week (2 years 4 months) waiting times for dental extractions with 68

---

[550] Two small IDOC correctional centers, Elgin and Murphysboro do not have onsite dental services.

[551] 9/12/22 IDOC Staffing Update

[552] IDOC Staffing Analysis 9/12/22 and 10/19/22 Medical Providers Table: Budgeted dentist staffing greater than 1.0 FTE: Dixon 1.4 (population 1,558 with large geriatric census), Graham CC 1.6 (intake center, population 1368), Lawrence CC 1.5 (population 550), Logan CC 2.0 (intake center, population 941), Menard 3.0 (maximum security, intake center, population 1,977), NRC 1.6 (intake center, population 1,270), Pinckneyville CC 2.25 (population 1,921), Shawnee CC 1.4 (population 1,548), Sheridan CC 1.5 (population 1,200), and Vandalia CC 1.5 (population 532).

[553] IDOC Facility Staffing September 2022

[554] Six facilities without any filled budgeted dentist positions: BMR CC (pop. 1,178), Dixon CC (pop.1,558), Hill CC (pop. 1,585), Jacksonville CC (pop. 797), Robinson CC (pop. 854), Vandalia CC (pop. 532).

[555] Seven facilities with less than fully budgeted dentist positions: Danville CC (1,497), Decatur (pop.411), Graham (pop.1,368), Lawrence (pop.550), Logan CC (pop.941), Menard (pop.1,977), Pinckneyville CC (pop.1,921)

[556] BMR, Dixon, Hill, Jacksonville, Robinson, Shawnee, Taylorville, and possibly Vandalia have only a single per week of dentist services.

[557] Dixon CC, site visit 12/3-5/22, houses 1,558 incarcerated men including a large geriatric population

[558] Dixon CC CQI Committee meeting minutes September 2022

patients backlogged[559] just to be put on the waiting list, 104 week (2 years) wait for dental fillings with a backlog of 211 patients, and 38 weeks (8 ½ months) wait for dentures with a backlog of 38 patients. The access to dental care at this facility is totally unacceptable. It is the Monitor's strong opinion that poor access to dental care would be found at all of facilities with single day per week onsite dentist services and at other understaffed correctional centers.

The dental services sections in the September 2022 CQI minutes[560] provided sufficient data at only ten sites and partial and incomplete data from an additional three sites to evaluate the dental waiting times and backlogs for dental filings and extractions. Thirteen sites reported no data on dental waiting times and backlogs. It is of concern that seven of the eight facilities with only one day a week onsite dentist services failed to report on dental waiting times and backlogs in their monthly CQI meeting minutes.

| Data From Sites That Report Dental Delays in CQI Minutes | |
|---|---|
| **Range of Waiting Times ( 11 Sites)*** | |
| Dental Fillings | 7-104 weeks |
| Dental Extractions | 0-100 weeks |
| **Facilities with Waiting Times ≥ 24 Weeks (11 Sites)** | |
| Dental Fillings | 7 Facilities |
| **Facilities with Waiting Times ≥ 12 Weeks (11 sites)** | |
| Extractions | 5 Facilities |
| **Range of Backlogged Patients Waiting to be Placed on the Waiting List (12 Sites)** | |
| Dental Fillings | 0-408 patients |
| Dental Extractions | 0-102 patients |
| * August/Septembver 2022 CQI Minutes: Centralia, Decatur, Dixon, East Moline, Graham, JTC, Kewanee, Menard, Sheridan, Western, Stateville, and Southwestern for range of backlog patients. | |

It was reported to the Monitor during the recent correctional center inspection that there was a significant (38%) vacancy rate for correctional officers.[561] This shortage of correctional staff was interfering with both offsite and on-campus movement of patients to health care services including onsite dentist and dental hygienist services. Data provided by IDOC revealed that a number of IDOC correctional centers were having high vacancy rates of correctional staff that

---

[559] Backlog as used in IDOC means that group that extends beyond a wait list time period. Patients are first put on a wait list and when the wait list is filled, they are placed in backlog status. The Monitor is not informed of the wait list time period.
[560] Only ten facilities reported the waiting times and backlogs for both dental fillings and backlogs. Thirteen facilities did not report any dental waiting times and backlogs. The data in three sites that was reported was incomplete, difficult to interpret, and not standardized. The QI minutes from two sites could be electronically opened.
[561] Dixon CC site inspection, 12/3-5/22. It was reported that approximately 200 of the 526 correctional officer positions were vacant.

may be contributing to increased lockdowns and the inability to escort patients in offsite specialty consultation and diagnostic testing and on-campus health care services.

To date the Monitor has not received IDOC's existing orientation manuals. As noted in the previous Court Reports, interviews with incarcerated individuals at sites visited in 2019, 2020, and 2022 indicated that the men and women were knowledgeable about the established process to access dental and medical services. IDOC's last draft Implementation Plan[562] stated that a policy will be written by February 2023 that outlines the contents of orientation material including access to dental care to be given to all patients in the Reception & Classification Centers. As of February 2, 2023, the Monitor has not been provided an updated orientation manual.

The Administrative Directive Dental Care for Offenders states that "Offenders who have lost or broken a dental prosthetic through negligence shall be required to pay the dental laboratory fee for replacement."[563] It has been communicated to the Monitor that the facility dentist is directly involved in the determination of the patient's negligence. This places the treating dentist in a position that is not aligned with his/her role as the provider of care and an advocate of the patient. The Monitor has become aware of a modest number of individuals who have not received needed prosthetics replacement or repair because of their concerns about the cost. In the past few years, the Illinois legislature banned fees in the IDOC for sick call visits. It is the Monitor's recommendation this rule concerning the repair or replacement of broken prostheses (dentures, bridges) is a barrier to needed dental care and may jeopardizes the health of the involved patients. IDOC should re-evaluate and eliminate this provision in the Dental Care for Offenders administrative directive.

The dental needs of incarcerated populations are extensive and, at this time, primarily due to dentist vacancies, these needs are not being consistently met in all correctional centers in the IDOC. IDOC must expeditiously recruit and hire dentists in order to address the lengthy waiting times and hefty backlogs and provide a reasonable access to the full range of dental services in the entire Illinois prison system. Given the high dentist vacancy rates and lengthy waits for dental services in the IDOC, an overall compliance rating for dental care access has been assessed to be noncompliant.

**RECOMMENDATIONS:**
1. Expeditiously recruit and hire dentists to fill all current and ongoing dentist vacancies.
2. Evaluate the dentist staffing at each of the IDOC facilities with onsite dental services to ensure that the FTE dentist staffing is in accord with each facility's average daily census and dental care needs of its incarcerated population.
3. Continue to provide emergency dental services and those basic dental services that can be safely provided during any ongoing or future infectious outbreaks that may occur.
4. Initiate planning on how to prioritize and address the backlog of dental care that during increased during the COVID-19 pandemic and during current dental staff shortages.

---

[562] 5/31/22 Implementation Plan
[563] Administrative Directive 04.03.102, II.6.b

5. Standardize the data on the waiting times and backlogs for dental services and report this data in the CQI meeting minutes at all IDOC facilities with dental suites.
6. Provide the Monitor with the current and the revised IDOC orientation manual that includes the process to access dental care in the facilities.
7. Eliminate the fee for replacement or repair for dental prosthetics in Administrative Directive 04.03.102 Dental Care for Offenders.
8. Monitor and report data on cancellations, restrictions, rescheduling of offsite and on-campus health care services due to lockdowns and shortage of correctional staff.

**Dental Intake**
*Addresses items III.K.3*
**III.K.3.** *IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
The Monitor has not inspected any of the intake centers since the beginning of the COVID-19 pandemic but will be scheduling an inspection of the medical and dental screening processes at one of IDOC's Reception and Classifications centers in 2023.

IDOC Administrative Directive Dental Care for Offenders[564] states that each offender shall receive a complete dental examination by a dentist within ten working days of admission to an IDOC reception and classification center. The examination is to include charting of the oral cavity and the categorization of the status and treatment needs in accordance with the American Public Health Association prioritization of dental patients[565] and the completion of a full-mouth dental panorex x-ray reviewed by a dentist that will be placed in the patient's medical record.

Thirty-four charts were reviewed that included information on various aspects of the dental screening provided at the four medical reception facilities.[566] The cumulative data identified from these chart reviews are noted in the table below.

---

[564] IDOC Administrative Directive Dental Care for Offenders 04.03.102 II.2.b Initial Examination
[565] APHA dental patient categorizations: I. Emergency Treatment. II.-IV decreasing levels of dental urgency, V. Radiological absence of caries and lack of clinically visible gingival lesions, VI. No symptoms of apparent need for dental treatment.
[566] NRC 7 charts, Menard CC 10 charts, Graham CC, and Logan CC 7 charts

| Dental Screening at IDOC Medical Reception Centers with Dental Vacancies | | |
|---|---|---|
| | Number | Percent |
| Charts reviewed | 34 | |
| Dental exams within 30 days | 25 | 74% |
| Oral hygiene instructions provided | 20 | 59% |
| Treatment plan developed after exam | 26 | 77% |
| Documentation of dental status and need consistent with IDOC policy 04.03.102.II.2.a and b | 20 | 59% |
| Soap charting used | 10 | 29% |
| Panorex x-ray taken | 26 | 77% |
| | | |
| Dentist positions budgeted/vacant | 8.2/4.3 | 52% |
| Dental Asst positions budgeted/vacant | 8.0/2 | 25% |
| Dental Hygienists positions budgeted/vacant | 3.0/0 | 0% |

The chart reviews suggest there are opportunities to improve the quality and comprehensiveness of the dental screening that is to be performed on all admissions to IDOC's Reception and Classification Centers. The CQI committee of the four intake centers do not currently measure or report on the adequacy or compliance with the dental screenings for new admissions to the IDOC.

The dental health of the new admissions to the IDOC is deemed to be extremely poor. The completion of a thorough and comprehensive dental screening and the development of an individualized treatment plan to address oral health deficiencies are important components of the intake screening process and will be a valuable element in improving the overall health of the IDOC population.

**RECOMMENDATIONS:**
1. Monitor, report, and document key elements of the dental intake screening processes in the facilities' monthly CQI meeting
2. Evaluate the FTE allocation of dentists at NRC and the other intake centers to ensure that dental screening in the Reception & Classification Centers can be performed thoroughly and timely.

**Dental Hygiene**
*Addresses III.K.7; III.K.8;*
**III.K.7.** *Dental hygiene care and oral health instructions shall be provided as part of the treatment process.*

**III.K.8.** *Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated.*

**OVERALL COMPLIANCE RATING:** Partial Complianc**e**

**FINDINGS:**

The COVID-19 pandemic significantly impacted the provision of dental hygiene care and dental cleanings throughout the IDOC. At the present time, IDOC facilities with dental hygienist staff are now providing dental hygiene services and addressing the increased waiting times and backlogs for dental cleanings that accumulated during the height of the pandemic.

IDOC provided logs on the dental cleanings provided at four facilities[567] In addition to cumulative 824 cleanings performed at these four sites, there were 51 reschedules, 26 refusals, 8 no shows, and 2 no escorts. Reschedules were made for a variety of reasons including commissary, off campus for medical furlough, segregation, lockdowns, no pass issued, school, illness, quarantine, and visit. Besides the two "no escorts" there were no reasons given for "no shows". Two different types of logs were used at the four sites. One type of log was labeled "Daily Dental Report" which had an easy-to-use check list detailing multiple categories of dental procedures including "scaling and prophylaxis"; the other log was a simple appointment log that was titled "Hygienist" or "Dental Hygiene" which resulted in a variety of different hand written abbreviations and comments. The Daily Dental Report is very comprehensive and should be used at all IDOC centers with dental services.

| Data from Dental Cleaning Logs | | | | | | |
|---|---|---|---|---|---|---|
| Dates | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Total | FTE Dental Hygienists |
| Centralia | 110 | 87 | 77 | 56 | 330 | 1 |
| IRCC | 55 | 25 | 27 | 55 | 162 | 1 |
| Pinckneyville | 67 | 47 | 74 | Not Available | 188 | 1 |
| Robinson | 46 | 35 | 27 | 36 | 144 | 0.5 |
| Total | 278 | 194 | 205 | 147 | 824 | |

Based on the most recent Staffing Analysis and Medical Providers Table[568] provided to the Monitor, twenty-five of the 28 IDOC facilities with dental suites now have budgeted dental hygienist positions. Three facilities have not been allocated any dental hygienist positions.[569] Five additional facilities do not currently provide dental hygiene services due to vacant dental hygienist positions.[570] Another three facilities have dental hygienist staffing levels that are less than

---

[567] Centralia, IRCC, Pinckneyville and Robinson CCs
[568] IDOC Staffing Analysis 9/12/22 and IDOC Medical Providers Table 10/19/22
[569] Stateville NRC (population 976), Vienna CC (population 395), and Western CC (1,599) do not have budgeted dental hygienist positions.
[570] Decatur (population 306), East Moline (population 369), Jacksonville (population 617), Joliet Treatment Center, (pop.169), Sheridan (1,116).

budgeted.[571]   The eight facilities that currently lack onsite dental hygiene services house 5,547 incarcerated individuals.[572] Twenty percent of the IDOC population currently lack access to dental hygiene services. The three facilities with partial vacancies will further negatively impact the access of the incarcerated persons to dental cleanings. The monitor continues to recommend that *all* 28 IDOC facilities with dental suites should have a dental hygienist on the dental team.

Since the June 2020 staffing report,[573] IDOC has increased the budgeted FTE dental hygienists from 12.35 to 22.25 FTEs; facilities with budgeted dental hygienist staffing have increased from eighteen to twenty-five facilities; sites with filled dental hygienist positions increased from eighteen to twenty facilities, and the percentage of the IDOC population that has access to dental cleanings has increased from 45% to 80% of the IDOC population.  This are positive trends. However, three correctional centers still lack budgeted dental hygienist positions and thus lack access to dental cleanings. IDOC must revise its staffing plan to include dental hygienists at all twenty-eight facilities with dental suites.

IDOC has also committed to but has not yet performed a survey of space and equipment at all of dental facilities.  Lack of dental chairs in multiple facilities may be a driver of lack of access to dental hygienists (and dentists).

During the most recent site inspection,[574] the Monitor identified that the lack of onsite FTE dentist staffing was significant barrier to the access to dental cleaning by dental hygienists. The dental hygienist at this site communicated that she was not allowed to do dental cleaning on patients who had not had a documented visit with the dentist and a time-limited order from the dentist to offer dental cleanings to a patient and that only patients who had been in IDOC for two years were eligible for routine dental cleanings. The IDOC Dental Care for Offenders administrative directive does not mention dental hygienist duties nor address these two barriers to scheduling dental cleanings by dental hygienists. The monitor has not been provided with any IDOC administrative directives that restrict dental cleaning to individuals who have been incarcerated in IDOC for at least two years.  It was communicated to the Monitor that at the time of the inspection only 180 of the 1,558 men housed in this facility were eligible for dental cleanings. The Illinois Dental Practice Act does state that "the dentist shall personally examine and diagnose the patient…and determine which services are necessary to be performed, which shall be contained in an order to the hygienist and in a notation in the patient's record. Such order must be implemented within 45 days…" This section of the Dental Practice Act poses a significant barrier to IDOC's incarcerated men and women who are badly in need of dental cleanings.

During this same site inspection, due to shortage of correctional officers to escort scheduled patients to the dental clinic, the access to dental cleanings have been diminished.  The dental appointments were decreased by 33% (from 6 to 4 appointments per day). From September through November 2022, facility lockdowns due to correctional staff shortages resulted to 10% of the dental hygienist full day sessions being cancelled.

---

[571] IRCC (pop.1,586 budgeted for 1.0 currently with 0.5 staffing), Logan (941, budgeted for 2.0 FTE currently with 1.0 staffing), Taylorville (pop.1,059, budgeted for 1.0 FTE currently with 0.75 staffing)
[572] Census data by IDOC for November 2022
[573] IDOC Staffing Analysis 6/18/20
[574]

Unless the IDOC and its vendor continues to expeditiously recruit and hire dental hygienists and addresses the other barriers (noted above) to the access of dental cleanings, it is highly unlikely that many of the fourteen IDOC facilities currently lacking full staffing of dental hygienists will be able to comply for a number of years with III.K.8 to provide dental cleanings at a minimum of every two years to the entire IDOC population.

**RECOMMENDATIONS:**
1. Hire at least one dental hygienist for each IDOC facility that has a dental suite.
2. Evaluate whether every facility has sufficient dental chairs and equipment to accommodate a working dental hygienist.
3. Expeditiously fill all vacant dental hygiene positions
4. Track and report the number of dental cleanings provided at each site on a monthly basis
5. Report annually by facility on the number and the percentage of individuals who been offered and received or refused dental cleaning in the last two years.
6. Clarify and request a waiver, if necessary, to the Illinois Dental Practice Act section that requires that a dentist examine the patient and place a time-limited order for dental services that then may be performed by the dental hygienist in a State prison.
7. Verify whether there is an IDOC rule that dental cleanings will not be offered to individuals who have been incarcerated for less than two years.
8. Monitor and report data the facility CQI committee meetings on cancellations, restrictions, rescheduling of dentist and dental hygienist appointments due to lockdowns and lack of escorts caused by shortage of correctional officers.

**Comprehensive Dental Care**

*Addresses item III.K.6; III.K.10.a-b; III.K.12*
**III.K.6.** *Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.*
**III.K.10.a.** *Diagnostic radiographs shall be taken before every extraction.*
**III.K.10.b.** *The diagnosis and reason for extraction shall be fully documented prior to the extraction.*
**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:** See Dental Documentation section

**RECOMMENDATIONS:** See Dental Documentation section

# Facility Internal Monitoring and Quality Improvement

*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1.*

**II.B.2.**   *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care.  This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.6.l.**  *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*

**II.B.6.o.**  *IDOC agrees to implement changes in the following areas: Training on patient safety;*

**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Material requested by the Monitor[575] to review facility quality improvement included:

- Nursing personnel at each site assigned the duties of Quality Improvement listing their names, licensure (RN, LPN), percentage of time assigned to these duties.[576]
- QI meeting minutes for each facility for each month- as provided currently in IDOC quarterly submissions.[577]
- Any facility CQI or performance audits with results of study, analysis, and corrective action.[578]
- Documentation of any facility-specific training on CQI provided for each facility.[579]
- Any reports of facility-specific analyses of process problems.  If analysis was done but no report written, documentation of the analysis should be provided.[580]

Fourteen of 30 facilities reported results of 36 CQI studies in the third quarter of 2022. This is compared to 18 of 30 facilities which reported 40 CQI studies the first quarter of 2022.  CQI is not reliably completed by facility health care programs. There is no perceptable change in the quality of analysis or problem identification reported in the minutes of CQI meetings. Eleven studies resulted in audit scores of 100% and so no further action was taken. Only 18 studies identified problems but in half of these no action was taken to address the problem. There were seven studies completed which had a sample size too small to yeild meaningful results.

---

[575]  Monitor's Documentation Request dated 10/22/2022.
[576] Request # 76
[577] Request # 173
[578] Request # 174
[579] Request #175
[580] Request #176

A preponderance of studies report on timeliness of care, documentation completion, or compliance with policy and procedure. [581] Examples include whether patients were rounded on in the infirmary timely, if x-rays results were returned timely, if documentation on the medication administration record was complete. Studies are also very simple, looking at a single item rather than the context of care provided. For example, one study looked only at whether documentation required when people are on hunger strike was completed. The corrective action was to educate nurses on the documentation required. However the minutes document that nurses are not notified when someone is on hunger strike. Educating nurses to follow policy on documentation during hunger strike completely misses the finding that they are not notified. [582] The predominance of facility CQI studies do not identify opportunities to improve the quality of patient care but focus soley on compliance with exsting policy.

When problems are identified, half the studies had no plan to improve or solve it. For example, one facility reported that none of the x-ray results were returned within the required timeframe. Corrective action was to make the vendor aware of the problem. There was no review to determine root causes and no expectation that the vendor submit a plan of correction with dates for achieving compliance with expected timeframes. [583] Another facility reported only half the patients discharged from the infirmary were seen timely by a physician in follow up. [584] Again no there was no discussion of solutions to the problem or plans to improve, instead the minutes indicate the facility was awaiting direction from OHS Regional.

On those occaisions that corrective action is identified the steps taken to improve are known not to be very effective. These include having staff read and sign a memo of understanding, reviewing the issue at a staff meeting, or just re-studying in the future to see if the results change. One facility was having trouble completing nurse sick call timely because of a severe staff shortage. The study found that a third of the sample reviewed had no documentation that they had been seen in nurse sick call. The corrective action stated that two memos had already been sent out and so a third memo would be sent which staff would be required to sign. [585] A signed memo does not address the underlying cause of not seeing patients at sick call timely.

There is no standardization as to the topics addressed at the CQI meetings. Almost all facilities report the volume of outpatient activity including trips to the ER, mental health services, dental activity, hospitalizations, numbers of persons with reportable infectious disease, and listing of medical furloughs. However even when the statistics present problems, they are unrecognized and not addressed. For example, lab tests that are cancelled and have to be redrawn because the necessary permission was not received from the vendor in advance. [586]

In July 2022, an hour and a half of training in quality was provided at the OHS quarterly meeting and in September another hour and 15 minutes was provided. No specific curriculmum or training

---

[581] These observations and comments are made based upon review of the minutes from CQI meetings.
[582] Joliet Treatment Center, July and August 2022 CQI minutes.
[583] Southwestern, September 2022 CQI minutes.
[584] Sheridan, July 2022 CQI minutes.
[585] Graham, July 2022 CQI minutes.
[586] Hill, August 2022, Illinois River, August 2022, Vienna August 2022, Western July, August and September 2022 CQI minutes.

outine has been provided, it is simply listed on the agenda as having been provided. There is no attendance or evidence of participation in the training. The September 2022 minutes of the System Leadership Council indicate that the quality plan, a revised and pared down administrative directive and OHS policies on quality were to be sent to facilities when available, and that questions about these were to be directed to OHS Regional Coordinators. These individuals were responsible for ensuring that facilities implemented the QI/QM plan.

The Monitor's input since the first draft of the Staffing Analysis has included the recommendation that positions at each facility be identified as responsible for quality improvement.[587]   IDOC has ignored these recommendations for the staffing needed at each facility for quality improvement work.

Instead IDOC produced a Quality Improvement Plan effective October 1, 2022 that described the Health Care Unit Administrator as responsible for "ensuring that the facility Quality Improvement Plan is maintained and assigns the coordination of the QI/QM meetings and activities to a staff member, identified as a "Facility QI/QM Coordinator". This staff member will manage the occurrence and content of the monthly QI/QM meetings and organizes the audits assigned by IDOC Healthcare Compliance and the Clinical Quality Group (SIU-SOM)." Only 13 sites have identified someone responsible for CQI at the facility.[588]  Of these, the HCUA is responsible for CQI at ten of the sites. The percentage of time these individuals report spending on CQI ranges from four to 30 hours a week. There is no correlation between the amount of time spent on CQI and the volume or quality of CQI studies.[589]

The Plan also describes the members of the facility quality committee, its duties and provided a template for documentation of facility CQI meetings. The QI/QM plan became effective 10/1/2022; no material has been provided since to evaluate its implementation or effectivess.
However from a review of the the 3rd quarter of 2022 facility CQI minutes it is clear that actual practices are not even close to that envisioned by the QI/QM plan.  Only eight facilities document participation by the facility medical director at CQI meetings, there is no evidence that medical providers are involved in the identification of topics for CQI study, and no studies were completed by providers. There also was no evidence of participation by an identified facility infection control authority. Only 18 facilities made any report of grievances, most, simply gave the number received without any evaluation of recurring subjects, analysis or trending.[590] Responsibility for implementation of the facility portion of the QI/QM plan falls to the OHS Regional Coordinators. No additional resources have been added to facilitate CQI at the facility level.

The Monitor has had no input or participation in the development of the QI/QM plan for FY 23 and the IDOC policy on quality that were put in place in October 2022.  The IDOC has ignored

---

[587] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 23.
[588] Material provided by IDOC in response to item 76 of the Monitor's Documentation Request dated 10/22/2022.
[589] The Jacksonville HCUA – acting reported spending the most time on CQI (75%) yet no study results were reported in the 3rd quarter CQI minutes. The HCUA at Robinson reported spending the least amount of time on CQI (1 %) also reported no CQI studies in the 3rd quarter minutes.
[590] The FY 23 Healthcare Quality Improvement Plan lists review of upheld grievances as one of the subjects the facility QI/QM Committee is to include in its meetings. NCCHC P-A-10 states that grievances should be tracked through the CQI program and are reviewed to identify recurrent issues which are evaluated, and corrective action implemented, if indicated. Standards for Health Services in Prisons, 2018, page 25.

the Monitor's input on the implementation plan and prior drafts of quality policies. Actual practice shows no evidence of the new relationship with SIU or integration of the audit program, mortality review, performance measures, adverse event monitoring, or statewide quality program with the facility quality programs. See the section on Statewide Internal Monitoring and Quality Improvement earlier in the report for more specific comments and suggestions on the facility specific portions of the IDOC implementation plan, quality policy and QI/QM plan for FY 23.

In summary, there has been no demonstrated change with respect to quality improvement at the facility level. This items remains noncompliant.

**RECOMMENDATIONS:**

1. Provide leadership and develop the expertise of facility staff to participate in meaningful continuous quality improvement.
2. Establish positions at each facility responsible for the CQI program.
3. Develop the job description for these positions with training and experience qualifications pertinent to leading and managing local CQI processes.
4. Revise the draft Implementation Plan to include tasks regarding facility CQI recommended by the Monitor.
5. Revise the policy on CQI to be consistent with the Consent Decree and the as yet to be finalized Implementation Plan.
6. Train local staff how to perform quality improvement studies including analyses, trending, and reporting results and how to achieve meaningful and sustained change.
7. Improve statewide data resources to provide every facility with the data necessary to perform adequate quality improvement.
8. Provide mentoring of facility quality programs.

**Audits**
*Addresses item II.B.9*
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Material requested by the Monitor[591] to review the independent audit function of health care programs at facilities included:

- Any facility audits related to Consent Decree item II.B.9 (design of audit function for IDOC's QA program which provides for independent review of all facilities QA programs) from November 2021 to September 2022 and any other medical audits. These should be provided when they are completed.[592]

---

[591] Monitor's Documentation Request dated 10/22/2022.
[592] Document request # 177

190

- Any facility CQI or performance audits with results of study, analysis, and corrective action.[593]

IDOC and its partner, SIU, have implemented what they describe as a "clinical quality audit" this report period. The first round of the audits have been completed at each correctional facility and the results published. Health care programs at each facility have been instructed to do nothing with the results of these audits as they are meant to establish a "baseline". See the Statewide Internal Monitoring and Quality Improvement-Audits section for a description of this 'audit' and the position of the Monitor that this is not in conformance with the Consent Decree. More recently OHS has stated that what SIU does is not an audit but are performance and outcome measures instead.

OHS excused the failure to have developed a clinical quality audit process by stating that "we still have the compliance unit audits."[594] This is in reference to the process of internal and external review of facility compliance with written directives that is managed by the Office of Administrative Directive Standards. The problem with this approach is that the compliance office already demonstrated its ineffectiveness in establishing or maintaining "adequate" health care in that these compliance audits which preceded the Consent Decree. IDOC has not identified any change in methodology or tools used by the Compliance Unit to evaluate compliance with the Consent Decree. See the section on Statewide Internal Monitoring and Quality Improvement, Audits for additional discussion related to the need for change in internal monitoring.

**RECOMMENDATIONS:** See the recommendations in the section on Statewide Internal Monitoring and Quality Improvement, Audits.

**Performance and Outcome Measure Results**

*Addresses items II.B.7*
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Partial compliance
**FINDINGS:**

Material requested by the Monitor[595] to review facility based performance and outcome measurements included:
- Any documentation of progress in development of facility performance and outcome measures.[596]

---

[593] Document request # 174
[594] Notes from a meeting with OHS and SIU on January 3, 2023.
[595] Monitor's Documentation Request dated 10/22/2022.
[596] Document request # 178

- All facility performance and outcome measure results for March 2022 to September 2022.[597]

No information was sent in response to the two items listed above. However OHS recently identified the twelve items they termed "Clinical Quality Measures" and provided in relation to item 40 on the Monitor's request as performance and outcome measures instead.[598] The Monitor agrees that with some revision these can be considered a starting point for a comprehensive set of performance and outcome measures. The compliance rating has therefore been changed to partial compliance. For a more thorough discussion of these measures, see the earlier section titled Statewide Internal Monitoring and Quality Improvement, Performance and Outcome Measure Results.

**RECOMMENDATIONS:** See recommendations made in Statewide Internal Monitoring and Quality Improvement, Performance and Outcome Measure Results.

**Adverse Event and Incident Reporting Systems**
*Addresses Items II.B.6.m; II.B.6.n*
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested information on any progress at the facility level toward an adverse event reporting system to review for this report.[599]

The IDOC FY23 Quality Improvement Plan called for the reporting of adverse, sentinel, and any process identified as increasing risk for a negative outcome by email to the Office of Correctional Medicine at SIU. Any reports are assigned to a member of the Morbidity and Mortality (M&M) Committee for review and presentation at a subsequent committee meeting. The minutes of the System Leadership Council[600] indicate that the OHS Regional Coordinators have responsibility to release the Quality Manual and policies which direct facilities on the process for reporting adverse events to the email address at the Office of Correctional medicine beginning October 1, 2022. No information has been provided since pertaining to the adverse event reporting system.

The FY 23 Quality Improvement Plan and related policy make no mention of medication errors, although some errors would meet the definition of an adverse event according to the definition in

---

[597] Document request #179
[598]  Notes from a meeting with OHS and SIU on January 3, 2023.

[599]  Monitor's Documentation Request dated 10/22/2022, item 180.
[600] System Leadership Council minutes dated 9/8/2022.

the OHS plan. There is no recognition in the plan of the existing process used by the pharmacy vendor for medication error reporting. There is great variation among facilities in the reporting and analysis of medication errors based upon review of the monthly CQI reports.

**RECOMMENDATIONS**: See recommendation made in the section on Statewide Internal Monitoring and Quality Improvement, Adverse Event and Incident Reporting Systems.

**Vendor Monitoring**
*Addresses II.B.2.*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

Material requested by the Monitor[601] to review facility quality improvement included:
- Any vendor monitoring reports for each facility from November 2021 to September 2022.[602]

A vendor monitoring data base was sent. See comments regarding it in the previous section of this report on Statewide Internal Monitoring and Quality Improvement, Vendor Monitoring.

**RECOMMENDATIONS:** See recommendations made in the section of this report on Statewide Internal Monitoring and Quality Improvement, Vendor Monitoring.

**Mortality Review**
*Addresses items II.B.6.i; III.M.2;*
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

---

[601] Monitor's Documentation Request dated 10/22/2022.
[602] Document request #182

Material requested by the Monitor[603] to review facility-based mortality review included:

- Documentation of any facility-specific recommended corrective actions or discussions on deaths. This includes any corrective actions assigned by the system-wide quality committee with documentation of facility follow up.[604]

No documentation of facility-specific corrective action or discussion regarding deaths was provided by IDOC in response to this request. IDOC and its partner SIU have initiated a mortality review process that is a positive change from previous reports. However this work has yet to be translated into any corrective action at the facility level[605] therefore the rating of noncompliance remains.

**RECOMMENDATIONS:** See recommendations in the earlier section on Statewide Internal Monitoring and Quality Improvement, Mortality Review.

---

[603] Monitor's Documentation Request dated 10/22/2022.
[604] Document request #183
[605] Notes from a meeting with OHS and SIU on January 3, 2023.

THE ILLINOIS DEPARTMENT OF CORRECTIONS SHALL MAINTAIN QUALITY IMPROVEMENT PROGRAM AND REQUIRE EACH CORRECTIONAL FACILITY TO PARTICIPATE IN THE SYSTEMATIC, ONGOING, OBJECTIVE MONITORING AND EVALUATION OF THE QUALITY AND APPROPRIATENESS OF HEALTHCARE SPECIFIC TO THE NEEDS OF INDIVIDUALS IN CUSTODY AND PROGRAMS OFFERED AT THE FACILITY.

ADMINISTRATIVE DIRECTIVE 04.03.125
QUALITY IMPROVEMENT PROGRAM

# ILLINOIS DEPARTMENT OF CORRECTIONS

OFFICE OF HEALTH SERVICES: FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**Commented [Monitor1]:** This document does not read like an annual plan but reads like a mix of policy, procedure, and and descriptive statements. This document is supposed to be a plan and similar to the Implementation Plan should have specific tasks, timetables, goal, programs, plans, projects, strategies, and protocols to ensure fulfillment of the requirements of the consent decree.

**Commented [Monitor2]:** The first year plan should consist of systemwide and facility plans.

Suggestions for systemwide plan

1. Create plans to address
   a. Recommendations #1-12 in the Statewide Internal Monitoring and Quality Improvement Section of the Monitor's 6th Report.
   b. Recommendations #1-2 of the Statewide Audits section of the Monitor's 6th Report
   c. Recommendations #1-4 of the Performance and Outcome Measure section of the Monitor's 6th Report.

Suggestions for facility plan
   1. Create plans to addres recommendations $1-8 in the Facility Internal Monitoring and Quality Improvement section of the Monitor's 5th Report.

These plans should have action steps similar to the Implementation plan.



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

### TABLE OF CONTENTS

I. PREFACE ........................................................................................................... 2

II. HEALTHCARE LEADERSHIP AND COLLABORATING QUALITY IMPROVEMENT TEAM MEMBERS ................. 2

    A. IDOC OFFICE OF HEALTH SERVICES .................................................................. 2

    B. IDOC COMPLIANCE UNIT ............................................................................... 3

    C. SOUTHERN ILLINOIS UNIVERSITY OFFICE OF CORRECTIONAL MEDICINE .......................... 3

III. GLOSSARY OF TERMS ........................................................................................... 3

IV. MISSION AND GOALS ............................................................................................ 5

V. GOVERNANCE, ORGANIZATION AND PROCESS ............................................................. 6

    A. GOVERNING BODY ....................................................................................... 6

    B. ORGANIZATION ........................................................................................... 6

    C. GENERAL PROCESS ..................................................................................... 14

VI. PROCEDURES ................................................................................................... 15

VII. IMPLEMENTATION .............................................................................................. 16

VIII. PROGRAM EVALUATION ....................................................................................... 17

IX. POLICY AND STANDARDS ..................................................................................... 18

XI. BIBLIOGRAPHY ................................................................................................. 18

ATTACHMENT A: OVERVIEW OF QUALITY IMPROVEMENT (FLOW DIAGRAM) ............................... 19

ATTACHMENT B: MORTALITY AND MORBIDITY REVIEW PROCESS (FLOW DIAGRAM) .................... 20

ATTACHMENT C: PEER REVIEW PROCESS (FLOW DIAGRAM) ............................................... 21

ATTACHMENT D: FY23 IDOC CLINICAL QUALITY MEASURES ............................................... 22

ATTACHMENT E: TEMPLATE FOR FACILITY QI/QM MEETINGS* ............................................. 35



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

## I. PREFACE

This document replaces "From QUALITY ASSURANCE to CONTINUOUS QUALITY IMPROVEMENT for CORRECTIONAL HEALTH PROGRAMS: A Manual of Practical Applications and Guidelines", authored by Illinois Department of Corrections, Howard A. Peters, Director and Ronald M. Shansky, MD., M.P.H., Agency Medical Director. The date of publication is not known but is circa 1992 by context.

The Illinois Department of Corrections (IDOC) provides a continuum of health care services to all patients housed in its facilities. IDOC historically has contracted with a healthcare vendor to provide this healthcare. IDOC's Office of Health Services (OHS) provides oversight of this contract to guarantee that the reliability and quality of the care provided to patients is of a constitutional level and complies with the requirements of the contract with the healthcare vendor.

The Office of Health Services supports quality improvement through a continuous evaluation of the health care system, to improve processes, to sustain the improvements and to establish a self-modulated and self-perpetuating cycle of improvement. The goal of this Quality Improvement plan is to inform the IDOC's decision-making in order to meet or exceed the standards set by the National Commission on Correctional Health Care (NCCHC) and other nationally recognized correctional healthcare standards organizations, to reinforce the continuity of care, to improve communication at all levels of the organization, and to enhance the coordination of care within the IDOC.

The short-term goal of this plan is to comply with the immediate need for the quantitative audit feedback mandated by ongoing litigation. The process for producing actionable data for the use in improvement activities will also be outlined.

The plan contained in this Quality Improvement Manual, is the work of the Office of Health Services IDOC leadership and associated personnel hired to assist with the implementation and fulfillment of a Quality Improvement program.
The organization, distribution of duties, oversight structure and steps for providing healthcare quality are outlined in this document. This manual should be used as a reference and to guide quality endeavors.

## II. HEALTHCARE LEADERSHIP AND COLLABORATING QUALITY IMPROVEMENT TEAM MEMBERS

### A. IDOC OFFICE OF HEALTH SERVICES
1. Steven H. Bowman, MD - Agency Medical Director

**Commented [Monitor3]:** This does not define the goal of this year's plan. At the end of the year, what does IDOC hope to accomplish relative to its CQI program?

As a policy, the goal should be to improve the program in order to gain compliance with requirements of the Consent Decree. The goal is the Consent Decree, not specifically NCCHC, HEDIS, or any other organization. Specific Consent Decree requirements that are not met in this plan or in CQI policy include:

• It does not establish an independent audit program.
• It has not developed this plan with the assistance and input from the Monitor.
• The Plan should use Consent Decree definitions of physician performance (III.A.3 and III.A.4) with respect to referral to peer review.



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

2. Lamenta Conway, MD - Deputy Chief of Health Services
3. Russel Austin DDS, - Chief of Oral Health Services
4. Janette Candido, - Agency Medical Coordinator
5. Susan Griffin, RN - Agency Director of Nursing
6. Agency QI Coordinator (currently vacant)
7. Joseph Ssenfuma, RN - Acting Infection Control Coordinator (TA)
8. Tina Jepsen, RN, Office of Health Services, Northern Regional Coordinator, State of Illinois
9. Lisa Johnson, RN, Office of Health Services, Central Regional Coordinator, State of Illinois
10. Mary Klein, RN, Office of Health Services, Southern Regional Coordinator, State of Illinois

**B. IDOC COMPLIANCE UNIT**
Kelley Lawshea, RN, Medical Compliance Administrator

**C. SOUTHERN ILLINOIS UNIVERSITY OFFICE OF CORRECTIONAL MEDICINE**
1. Dawn DeFraties, Executive Director
2. Jennifer Harris, Director, Quality Management & Operational Excellence

## III. GLOSSARY OF TERMS

A. **ACA:** The American Correctional Association, a private, nonprofit organization that administers the only national accreditation program for all components of adult and juvenile corrections. Its purpose is to promote improvement in the management of correctional agencies through the administration of a voluntary accreditation program and the ongoing development and revision of relevant, useful standards.

B. **Adverse Clinical Event or "sentinel event":** An event that reaches the patient and results in death, severe harm, or permanent harm not primarily related to natural course of illness.

C. **Aspect of Care:** Care activities or processes, which occur frequently or affect large numbers of patients, that place patients at risk of profound consequences if not provided correctly, if incorrect care is provided, or if correct care is not provided; that tend to produce problems for patients or staff and/or are costly. Such activities or processes are deemed most important for purposes of performance improvement activities.

D. **Champion:** The person assigned primary responsibility for the monitoring and evaluation functions of a particular Aspect of Care.

E. **Clinical Quality Group:** A group of academic healthcare experts, quality experts, audit design experts, data analysis experts and process revision experts overseen by SIU School of Medicine, who are tasked with carrying out the clinical aspects



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

of the Quality plan and reporting to the System Leadership Quality Council. Refer to the Organization Section, V.B.1.a.

F. **Customer:** The recipient of services, information and/or materials, from others. Customers may be from inside or outside of the organization and may be any person who is requiring information or action in a process to perform their work.

G. **Facility Quality Improvement/Quality Management (QI/QM) Committee:** Refer to the Organization section V.B.5.b.

H. **Facility Quality Improvement Coordinator:** A member of the Facility QI/QM Committee who is responsible for the operational functions of the Facility QI/QM Committee as described in the Organization section.

I. **Healthcare Professional:** A licensed member of the healthcare staff, who provides healthcare services.

J. **IDOC Healthcare Compliance:** The branch of IDOC Compliance that is devoted to the audit and evaluation of the policies governing the medical care in IDOC and the oversight of the healthcare vendor contract. Refer to the Organization section V.B.1.b.

K. **Indicator (also called a "measure"):** A tool used to measure, over time, an organization's performance of functions, processes, and outcomes.

L. **Morbidity:** Medical problems caused by a treatment.

M. **Morbidity Review:** A review conducted by the Mortality and Morbidity Committee, that examines an unexpected outcome or occurrence involving serious physical injury, or risk thereof, for a patient. This includes "near misses" and sentinel events, which may be reported to the Mortality and Morbidity Committee Coordinator by any person involved in healthcare delivery within IDOC.

N. **Mortality Review:** A review conducted by the Mortality and Morbidity Committee, that examines the circumstances of the individual death of a patient which occurs in the Illinois Department of Corrections facilities, in order to explore root causes and identify interventions to prevent future deaths or other risk to patients.

O. **Mortality and Morbidity Review Committee (M & M):** Organized and managed by Southern Illinois University Office of Correctional Medicine; Refer to Section V.B.2.c.

P. **NCCHC:** The National Commission on Correctional Health Care is a not-for-profit organization working toward improving health services provided by the nation's jails, prisons and juvenile detention and confinement facilities.

Q. **Peer Review:** The process by which a professional review body considers whether a licensed staff member's clinical privileges will be adversely affected by their behavior or whether an intervention is required to improve a licensed staff member's behavior.



**OFFICE OF HEALTH SERVICES**
**FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN**

R.    **Peer Review Committee:** Organized and managed by Southern Illinois University Office of Correctional Medicine; Refer to Section V.B.2.d.

S.    **Provider:** A physician, dentist, physician assistant or nurse practitioner, optometrist, who provides and oversees healthcare services and is professionally licensed. Nurses without advanced practice designation are not considered providers despite having responsibility for overseeing others.

T.    **Responsible Facility Healthcare Provider:** The medical director at the facility or the healthcare provider in the patient's facility of assignment who is most familiar with the patient who is deceased or with the adverse event which has occurred or may occur.

U.    **Scope of practice:** The procedures, actions, and processes that a healthcare employee is permitted to undertake in keeping with the terms of their professional license.

V.    **Standard:** A statement of expectation that determines the structures and processes that must be in place in an organization to improve the quality of care.

W.    **Supplier:** Provider of services, information and/or materials to others. They may be from inside or outside of your organization.

X.    **System Leadership Quality Council (SLQC):** Refer to the Organization section, V.B.2.a.

Y.    **Threshold (also called a "benchmark"):** The level at which a stimulus is strong enough to signal the need for an organization response to indicator data and the beginning of the process to determine why the organization has not reached the pre-established level.

Z.    **Value:** A product or outcome of a service that is useful to the customer, or end user of that product or outcome.

## IV.    MISSION AND GOALS

The mission of the Office of Health Services (OHS) is to provide high-quality healthcare to all patients within IDOC. To do this, IDOC must address key goals:

A.    Provide IDOC patients with timely access to care consistent with correctional standards.

> **Commented [Monitor4]:** From a policy perspective, this cites "correctional standards" as the benchmark for quality of care standards without defining what that means. This term should be eliminated as it has no meaning with respect to clinical care. This should be replaced by the phrase in the IDOC CQI policy that states that the goal of quality improvement is "to assure compliance with recognized community standards of care". We would understand community standards of care as generally defined in UpToDate with an "access benchmark" consistent with Medicaid benefits.

B.    Maintain a quality of care that meets accepted correctional standards.

C.    Maintain a focus on the patients' experience and welfare.

D.    Promote consistent team-based care, using evidence-based guidelines.

E.    Continuously strive to improve and update the care that is provided through evaluation of outcomes and processes

F.    Provide comprehensive healthcare to the patients in IDOC, thus providing a high value to the taxpayers of Illinois.



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

G.   Foster a culture of Quality Improvement at all levels of the organization. A tenet of this is granting the freedom to report problems with processes or quality without fear of blame or retaliation.

E.   Foster a culture that recognizes that employees want to do an excellent job and are doing their best in their current situation.

F.   Foster a culture that recognizes the need for and participation in a quality improvement program which will create processes and methods to allow employees to produce higher quality work (less variation, fewer errors).

G.   Recover objective and measurable data, which can be used to guide improvement.

## V.   GOVERNANCE, ORGANIZATION, AND PROCESS

This Quality Improvement program encompasses all aspects of care and services provided by IDOC and its agents. Participating disciplines shall include all disciplines. Auditing the requirements of the health care vendor contract and the services delivered by them, compliance to health care policies and clinical outcomes and compliance to disease management guidelines will be a priority. The Quality Improvement effort shall also consider substantial risk or problem-prone health care areas a priority.

### A.   GOVERNING BODY

1.   OHS is responsible for oversight of the entire health care program and for updating the IDOC governing body as needed. All aspects of health care delivery are subject to review by this governing body. OHS will assign the authority for the functional operation of the quality program to the System Leadership Quality Council.

2.   OHS leadership will participate in the System Leadership Quality Council.

3.   At local levels, the Health Care Unit Administrator is responsible for ensuring that the facility Quality Improvement Plan is maintained and assigns the coordination of the QI/QM meetings and activities to a staff member, identified as a "Facility QI/QM Coordinator". This staff member will manage the occurrence and content of the monthly QI/QM meetings and organizes the audits assigned by IDOC Healthcare Compliance and the Clinical Quality Group (SIU-SOM).

### B.   ORGANIZATION

Two (2) groups will coordinate the activities of IDOC Quality Improvement. They are the:

1.   Clinical Quality Group, managed by Southern Illinois University School of Medicine

2.   IDOC Healthcare Compliance Group.

Four (4) committees will oversee, act upon, and carry out the quality improvement activities:

1.   System Leadership Quality Council,

---

**Commented [Monitor5]:** This whole section belongs in the policy and is not a plan. From a policy perspective, the role of the OHS CQI coordinator is not mentioned. As part of the plan, IDOC should hire a qualified, trained and experienced employee to be their system wide CQI coordinator. The plan should also describe responsibilities of this position in this year's work. This persons role should be elucidated in policy.

**Commented [Monitor6]:** Disagree with this term. This implies that a person with full time other responsibilities is "assigned" to be the Facility CQI coordinator. The facility CQI coordinator should be a full time responsibility.

**Commented [Monitor7]:** To manage the content of CQI meetings some knowledge of quality improvement methodology is necessary. The "assigned" person would not have that training.

**Commented [Monitor8]:** The compliance group reports to the Chief Compliance Officer. Quality improvement activities of the medical program should be under supervision of the Chief of OHS.

**Commented [Monitor9]:** This group reports to the Chief Compliance Officer and the Monitor believes OHS should direct medical CQI activities. The compliance unit does not currently audit based on Consent Decree requirements and already performs external audits of medical care yet IDOC entered into a Consent Decree and decades of auditing were shown to be ineffective in establishing or contributing to a constitutionally adequate program. This is not an effective program. Moreover, it fails to audit custody barriers to appropriate medical care such as:
1. The number and percent of persons who miss appointment because they are not brought by custody for their appointment (both onsite and offsite)
2. The number of percent of persons who miss medical appointments due to lockdowns.
3. The barriers to security support when nurses administer medication to ensure safety of staff and cooperation of inmates.
4. The number of security holds on infirmary unit. We note that this may be as much a medical as a custody problem.
5. Timing of meals for persons with diabetes is a barrier to control of their diabetes.

These items should be tracked but the compliance unit has not demonstrated that it can change. It's possible that a similar type group could perform the audits (II.B.9.) but the process would have to change.



**OFFICE OF HEALTH SERVICES**

**FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN**

2. Facility QI/QM Committee,
3. Mortality and Morbidity Review Committee and
4. Peer Review Committee

A flow diagram of the interoperability of these groups and committees can be found in attachments A, B and C.

**C. GROUPS**

1. **SIU CLINICAL QUALITY GROUP**

   i. This group, contracted by IDOC and coordinated by Southern Illinois Office of Correctional Medicine, associated with the SIU School of Medicine, is comprised of a coordinator, academic healthcare professionals, and experts trained in quality, audit design, data analysis, and process revision. External audit teams consisting of physicians, mid-level providers, and nurses, will initially conduct facility audits and gather data until facility staff are trained to perform their own audits as part of an interactive quality improvement program.

   ii. This group will implement and oversee the clinical quality audits, the Mortality and Morbidity Committee and the Peer Review Committee.

   iii. identified in the Lippert litigation and compliance to clinical practice guidelines (disease management and preventive health). The long-term goal is for IDOC OHS to have participation in quality activities by staff at all levels of the organization (self-auditing and serving as subject- matter experts in process revision) as this has been shown to be the best method for promoting a vibrant quality improvement culture.

   iv. The SIU Clinical Quality Group will also provide staff trained in process review to review the processes associated with sentinel events and any process identified as increasing the risk for a negative outcome. The report of sentinel events or increased risk will be received through employee reports or through identification in the Mortality and Morbidity Committee. *To report any concerns about processes that increase risk to patients, including, but not limited to:*
      a. *incidents*
      b. *morbidities*
      c. *negative outcomes in patient care, which did not result in death*

**Commented [Monitor10]:** These attachments are not included but should be available to adequately evaluate this plan.

**Commented [Monitor11]:** The audit should evaluate whether adequate care as required by the Consent Decree is provided. This requires a comprehensive audit: having sufficient structural elements (clinics, a medical record, staff, etc.); processes of care (policies and operational processes); demonstration of effective performance and outcomes measures for the population of inmates (vaccinations, preventive screenings, testing, etc.); adequate individual care (sick call, adequate clinical chronic care management, mortality review, etc.); and population care (outcome and performance measures). All of these elements should be included in the audit but instead only a limited number of performance and outcome measures are gathered. The mortality review group is involved in evaluating some individual quality of care evaluations but the audit is severely limited. The lack of a ... [1]

**Commented [Monitor12]:** The Monitor disagrees with self-auditing by facilities with respect to the audit (II.B.9.). Self-auditing is what IDOC facilities currently do and self-auditing has not produced an honest or effective review nor has self-auditing produced movement toward compliance. Self-monitoring is ... [2]

**Commented [Monitor13]:** What is an "interactive" program.

**Commented [Monitor14]:** The mortality group does some audits of the effectiveness of individual care, but the clinical audit group only gathers limited performance and outcome measures; it does not evaluate the totality of the health care system. It ignores most elements of the Consent Decree by ... [3]

**Deleted:** *In the immediate future,* this group *will perform* the audits to assess compliance to policies, processes

**Commented [Monitor15]:** This is not realistic with the existing staff. For the foreseeable future the current group of physicians should not be considered subject matter experts in quality of care who audit themselves. This is actually the current state of affairs as current providers and nurses audit themselves in their mo ... [4]

**Commented [Monitor16]:** The 12/31/21 Implementation Plan developed by IDOC included process analysis in 4 areas: medication administration, sick call, improving access to specialty care, and improving chronic care. We agree with these analyses. These are ideal items for a first year plan, yet, wh ... [5]

**Commented [Monitor17]:** What is the plan for IDOC to get employees to report these events. There is no history of this being done and it's unlikely staff will just do this. There should be a policy/procedure (on reporting any non-conformity) for how this is to be done but this plan should be more directive as to what v ... [6]



# OFFICE OF HEALTH SERVICES

## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

     d.     *sentinel events, or "near-misses"*
     e.     *reportable errors*

v.     *Healthcare staff shall use the following email: ocm_quality@siumed.edu.*

vi.     The Clinical Quality Group will be guided in their choice of indicators or measures to be assessed by the SLQC and will report findings and recommendations to SLQC at the quarterly meetings. See attachment A for more specific duties and the relationship to the other group and committees.

vii.     The functional responsibilities of this group are as follows:

     a.     Annual designation of recommended clinical audit indicators with an audit methodology, and the desired audit thresholds.

     b.     Development of training materials for the SIU audit team to use in performing the audits and to inform the unit staff about the goals of the audit activity (short-term solution) or for facility staff (long term goal) to perform the prescribed audit.

     c.     Designation of the audit population or pool for each facility, with contingencies when a member of the audit pool does not meet the specifications for inclusion in the group.

     d.     Availability for fielding facility questions about the assigned audits.

     e.     Review of facility audit findings and the request of Corrective Action Plans from facility staff, when thresholds are not met.

     f.     Evaluation of Corrective Action Plans and provision of guidance, when necessary, to assist the Facility QI/QM in achievement of the designated thresholds.

     g.     Formation and organization of the Mortality and Morbidity Committee.

     h.     Formation and organization of the Peer Review Committee.

     i.     Management and oversight of the process revision cycle, when indicated.

     j.     Communication of all activities with the IDOC Medical Compliance Coordinator and with the IDOC Agency Medical Director (when indicated).

**Commented [Monitor18]:** This is an acceptable reporting system but will not allow anonymous reporting which is important. This method is also considerably more labor intensive with respect to managing and sorting incidents. Would consider an off-the-shelf product like GE MERS.

**Commented [Monitor19]:** Don't understand what this means. What are they guided by?

**Commented [Monitor20]:** This is a major flaw in this plan as discussed above. The audit should be a comprehensive review of the structural, process, operational and clinical care elements of a facility on an annual basis that is annually repeated to gain performance that is sufficient for compliance with the Consent Decree. Instead, it has become sampling 12 performance measures which will NOT provide a status review of the facility's medical care performance with respect to the Consent Decree. This needs to be changed to more appropriate audit. This should be discussed further with Monitor

**Commented [Monitor21]:** The Monitor recommends that a comprehensive audit be used and that the Monitor assist in training on how to conduct this audit. SIU does not have experience in auditing correctional facilities particularly against criteria of a Consent Decree.

**Commented [Monitor22]:** This implies that the goal of the audit is to have facility staff complete the audit. The goal of the audit should be to move toward compliance with the C.D. Allowing for self-audits will not advance movement toward compliance as IDOC already self-audits with results that are unacceptable for compliance.

**Commented [Monitor23]:** Deficiencies may be facility specific or systemic. For example, sick call requests may not be evaluated timely. That finding may result from lack of staffing, lack of space to evaluate patients, or some other reason. The root cause of each deficiency should determine the corrective action. When systemic deficiencies are identified, the SLC should address the problem not the facility. Systemic deficiencies include staffing, equipment, space, policy, or process deficiencies which are not under control of the facility. When a facility deficiency is identified, a corrective action should be assigned. However, at this juncture, it is questionable whether facility staff have the capacity to design their own corrective actions. Determining the root cause of a deficiency is critical but is not addressed here. All of these possibilities should be addressed in determining the procedure for assignment of corrective actions. As with other areas, this is more of a policy statement than a plan for the upcoming year.



## OFFICE OF HEALTH SERVICES
### FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

    k.    Attendance and involvement in System Leadership Quality Council and presentation of issues to that council, when pertinent.

    l.    Periodic reviews of charts and facility visits for the performance of the audits and to verify the accuracy of audit results, if unit staff participate in data-gathering as part of a long-term goal.

**2. IDOC OFFICE OF COMPLIANCE**

i. This group is a led by the Medical Compliance Administrator, an individual who has correctional healthcare experience, who will design and implement audits of each facility healthcare unit's compliance to healthcare Administrative Directives and policies, and to established correctional healthcare guidelines for access to care. They will be guided by the System Leadership Quality Council on measures to be assessed and will report audit findings to the SLQC. See attachment A for more specific duties and the relationship to the other group and committees.

ii. This group will also maintain data, reports, audit results, and record of all IDOC Quality Improvement activities. Their responsibilities include:

    a.    Review of and archiving all minutes and reports from SLQC, SIU Clinical Quality Group, Compliance Audits, Mortality and Morbidity Committee, Peer Review and Facility QI/QM meetings.

    b.    Annual designation of required process and compliance audit indicators, audit methodology, and the desired audit thresholds for all facilities to perform.

    c.    Development of training materials for facility staff to perform the audits they require.

    d.    Designation of the audit population or pool for each facility, with contingencies when a member of the audit pool *does not* meet the specifications for inclusion in the group.

    e.    Availability for fielding facility questions about the assigned audits.

    f.    Review of facility audit findings and request of Corrective Action Plans when thresholds are not met.

    g.    Evaluation of Corrective Action Plans and provision of guidance, when necessary, in order to assist the Facility QI/QM in achievement of the standard thresholds.

**Commented [Monitor24]:** The Monitor does not view the compliance unit audits as an "independent review" which is a requirement of the Consent Decree with respect to provision II.B.9. The compliance unit reports to the Chief Compliance Officer. Its purpose is to audit against administrative directives. The purpose of this audit is to audit against requirements of the Consent Decree. IDOC has not provided the Monitor information about the Compliance audit methodology or questions, audit results, frequency of audits, or who performs all audits. The Monitor reserves his opinion until IDOC is transparent about this unit and more information is obtained. Having said that, this unit has been auditing for decades and the existing conditions, resulting in the Consent Decree, occurred during the time when this unit audited. No information or evidence has been provided verifying that anything has been changed with respect to audits by the Compliance Unit. This appears to be a business-as-usual strategy that will not result in any meaningful or effective change and will not move IDOC towards compliance with [... [7]

**Commented [Monitor25]:** This is a Compliance Unit employee who does not report to a Medical superior. Because this person is a nurse who does not have a medical supervisor, this person is lacking in appropriate medical direction.

**Commented [Monitor26]:** Having a person who monitors the Consent Decree design the audit that reports to the Compliance Unit violates the Consent Decree insofar that the Monitor was not involved in the design of the audit function. Also, the Compliance Unit has shown no ability to design an acceptable audit.

**Commented [Monitor27]:** This merely restates the compliance audit process that already exists. This process has failed in the past to result in meaningful change and resulted in a medical program that is under a Federal Consent Decree. Something different is needed. In the past an HCUA or Regional Nurse performed these audits; not much has changed.

**Commented [Monitor28]:** The Monitor is not confident that the Compliance Unit can perform this. The Compliance Unit has been auditing for decades. What now will change that will result in them being able to design an audit appropriate for the Consent Decree and without assistance from the Monitor? Does the Compliance Unit know what appropriate monitoring is for the medical program? The compliance audit should be designed by medical personnel with assistance [... [8]

**Commented [Monitor29]:** This presumes that the facility staff is to figure out what their corrective actions should be. Currently, they are incapable of designing their own corrective actions as is demonstrated in their current quality improvement meeting minutes. Having staff design their corrective actions replicates the existing failure of IDOC quality programs. External audits described in current quality improvement minutes describe most corrective actions as re-re [... [9]



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

h.   Attendance and involvement in System Leadership Quality Council and presentation of issues to that council, when pertinent.

i.   Periodic reviews of charts and facility visits to verify the accuracy of audit results.

> **Commented [Monitor30]:** This isn't clear. What is being verified?

**D.   COMMITTEES**

1.   **The System Leadership Quality Council**

i.   Comprised of leadership from all involved entities in healthcare delivery in IDOC and including staff from the regional OHS staff, through OHS highest level leadership. The chairperson of the SLQC will be the Agency Medical Director, or designee.

> **Commented [Monitor31]:** Should list the members by their title. Who is required to be present?

ii.   This Committee will meet at least quarterly and will submit minutes for archiving. The meetings may be held in-person or by teleconference.

iii.   The members of this committee will support and endorse a system-wide quality initiative.

iv.   The functional responsibilities of SLQC are:

a.   Monitor aspects of care across the system and identify high-risk or high-return systemic issues that would benefit from a quality review.

> **Commented [Monitor32]:** All of these statements are policy statements and do not define an annual plan. For this item, the annual plan should list the annual initiatives. This statement, like many others that follow in this section, should be in the policy and procedure but not in an annual plan. The annual plan should document what you are doing specifically this year which this plan does not quite do.

> **Commented [Monitor33]:** Quality review should be explained or defined.

b.   Provide philosophical direction by supporting and endorsing the system-wide Quality Improvement Plan.

c.   Utilize the data provided by committee representatives to identify the most strategically impactful and significant aspects of clinical care, compliance, and contractual aspects of care to study.

d.   Maintain an information exchange with the Facility QI/QM Committees via reports and feedback about performance and outcomes. This shall be done through the corresponding regional staff.

e.   Receive and evaluate facility performance reports to determine the need for continuation or resolution of corrective action plans currently in place.

> **Commented [Monitor34]:** This isn't clear. What are the facility performance reports? These are undefined and not mentioned anywhere in the document.

f.   Take minutes of each meeting, which will be retained by the IDOC Medical Compliance Administrator. The minutes will be clearly labeled as "Privileged and Confidential" and are prepared at the request of and for sole distribution to the SLQC committee and Quality resources of IDOC, in accordance with The Illinois Medical Studies Act ("Act"), 735 ILCS 5/8-2101 et seq.



## OFFICE OF HEALTH SERVICES

### FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

v. Annually, the SLQC shall review this Quality Improvement Plan, amend if needed, and ratify the revised plan. The SLQC shall also annually, and no later than at least one month prior to the beginning of a new fiscal year, or more often, if necessary, identify and approve indicators for auditing the following year, based on identified priorities. See attachment A for more specific duties and the relationship to the other group and committees.

2. **Facility Quality Improvement/Quality Management (QI/QM) Committee:**
   i. This committee will be comprised of the following members:
      a. Facility Medical Director
      b. Facility Dental Director
      c. Facility Behavioral Health Authority
      d. Facility Infection Control Authority
      e. Facility Nursing Director
      f. Health Care Unit Administrator
      g. Facility Warden or designee
      h. Facility Quality Improvement Coordinator (see V.A.3)
      i. Other staff as required.
   ii. The chairperson and designated Facility Quality Improvement Coordinator shall be designated by the HCUA or designee.
   iii. The facility QI/QM Committee shall meet monthly, at a minimum.
   iv. Functional Responsibilities will include:
      a. Review of results from assigned clinical quality and compliance/process audits
      b. Discussion of mitigation measures for audit thresholds not met (Corrective Action Plans).
      c. Review Infection Control issues affecting the unit.
      d. Review pertinent findings from the Mortality and Morbidity Committee and address these findings, if applicable.
      e. Review reported Morbidities, sentinel events or near misses, reportable errors, or incidents which have been noted on the facility and need to be brought to the Clinical Quality Group for process revision.
      f. Review upheld grievances.
      g. Completion of minutes and submission of the minutes to the IDOC Medical Compliance Administrator and retention

**Commented [Monitor35]:** This design of the audit process is to use annually-changed performance indicators as the audit when a comprehensive audit that is standardized should be used. Performance and outcome measures should be obtained monthly and continuously but should not be used as the audit. The design of this process will not result in compliance with the entire Consent Decree within the proposed ten-year period. This system of audits is not designed to succeed within the specified timeframe of the Decree.

**Commented [Monitor36]:** This document is not attached.

**Commented [Monitor37]:** This is not a *plan* for the upcoming year.

**Commented [Monitor38]:** This should be a dedicated position and not appointed or designated to someone hired for other responsibilities

**Commented [Monitor39]:** This reads like a policy but should be a plan. The plan for facilities should be to hire qualified quality improvement coordinators for each facility; training of quality improvement coordinators on their responsibilities and on corrective action methodologies; introducing corrective action methodologies; standardizing policy and procedure for quality improvement meeting minutes.

**Commented [Monitor40]:** This sounds vague and unlike a plan. A policy should describe who writes corrective action plans and how they are written. But the plan should discuss what will be done in the upcoming year with respect to corrective actions. With respect to corrective actions, a reasonable plan for the 1st year could be to develop methodology on how to use root cause analysis to identify the root cause of deficiencies so that corrective actions can be specifically tailored to the problem. This would prepare for subsequent years.

**Commented [Monitor41]:** Grievances are essentially customer complaints and it is useful to evaluate all grievances by sorting the grievances by type and attempting to understand what the customers are complaining about. Realistically, this is feedback on how well the system is performing. A 1st year plan can be to develop a methodology to sort all medical grievances by type, analyze them, and attempt by root cause analysis to determine a reason for the grievance. This can lead to problem resolution. This is probably something that facilities cannot reasonably accomplish in their first year and is probably best initiated on a systemwide level.



## OFFICE OF HEALTH SERVICES
### FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

of a copy of the minutes at the facility. The minutes shall be identified as Privileged and Confidential.

h. Identification and study of additional process or practice improvement items that are facility specific and are not required by the Clinical Quality Group or the IDOC Healthcare Compliance.

i. Participation in training on Quality Improvement, when it is offered.

j. Review the status of Correctional Officer training in medical issues

k. Review training of medical staff competency on required healthcare topics

l. Review and track Staff CEU and licensure compliance

m. Plan disaster drills as required by policy.

**3. Mortality and Morbidity Review (M & M) Committee (see att. B):**

i. The M & M Committee shall be comprised of members of the Clinical Quality Group, including providers, nurses, and allied healthcare professionals, when indicated, and Representative IDOC/Vendor Providers and Nurses assigned by OHS leadership.

ii. The Chairperson of the M & M Committee shall be assigned by the Coordinator of the SIU Clinical Quality Group.

iii. The M & M Committee shall meet monthly.

iv. Functional responsibilities shall include:

a. The Coordinator of the Clinical Quality Group or designee will be notified by facility staff of a new case for review and of the completion of the death summary by the Responsible Facility Healthcare Provider.

b. The Coordinator of the Clinical Quality Group or designee will assign the case to a member of the M & M Committee for review and presentation to the committee at the next meeting.

c. The Coordinator of the Clinical Quality Group or designee will add the case to the agenda for the next M & M Committee meeting (the assigned reviewer should be given at least a week to review the case).

d. The Coordinator of the Clinical Quality Group or designee may be notified of a risky process, near-miss, morbidity, reportable error, or incident, which requires evaluation. When these are received, they will be assigned to a member of the M & M Committee for review and

> **Commented [Monitor42]:** This should not be something done at the QI meeting. If it is meant to be something in policy or procedure then do that.

> **Commented [Monitor43]:** This probably does not need to be addressed in a quality meeting but should be assigned to an individual or group to perform. It sounds like an administrative assignment.

> **Commented [Monitor44]:** These do not need to be done in a CQI meeting and are not part of a reasonable facility CQI plan. These tasks are assignments to be distributed by the HCUA.

> **Commented [Monitor45]:** This also reads like a policy and procedure not a 1st year plan. What does the organization expect the mortality and morbidity committee to accomplish in its 1st year? The plan for the 1st year should be developed.

> **Commented [Monitor46]:** Does only one person review the death? At a minimum a physician and nurse should review the death.



**OFFICE OF HEALTH SERVICES**

**FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN**

presentation to the committee at the next M & M Committee meeting (the assigned reviewer should be given at least a week to review the reported problem).

e.   The M & M Committee member assigned a mortality review will complete the fields in the REDCap database. This can be accessed by facility staff for review, if needed.

f.   The committee will hear a presentation of the assigned cases of Morbidity and Mortality from the committee member assigned to review them and the committee will discuss the cases with the goal of identifying factors that may have prevented the death or contributed the death, for the purposes of improving the quality of the healthcare of IDOC patients in the future.

g.   The committee will agree on a disposition for the review and will document the decisions in minutes, which shall be submitted to the IDOC Medical Compliance Administrator for sharing with SLQC and for archiving. The minutes shall be identified as PRIVILEGED AND CONFIDENTIAL.

h.   If it is determined that a healthcare professional may have been negligent in the patient's death, the healthcare professional is to be notified and an explanatory response requested. The healthcare professional will be referred to the Peer Review Committee for their profession. The Agency Medical Director shall be immediately notified of the referral of a healthcare professional to Peer Review and may determine that the employee may not be allowed to work in the IDOC facilities until the issue has been reviewed and further determination is made.

i.   The facility CAO shall be immediately notified of the Agency Medical Director's determination that the employee should not be allowed to work in IDOC facilities until further review and a final determination is made.

j.   If systemic risk is identified in the process of the case review, it will be referred to the Process Revision experts associated with SIU's Clinical Quality Group for evaluation and recommendations.

**4.   Peer Review Committee (see att. C):**

i.   The Peer Review Committee is comprised of members of the SIU Clinical Quality Group, who are in the same professional role as the healthcare professional being reviewed. Representative

**Commented [Monitor47]:** The view of the Monitor on mortality review is somewhat different. The chart is reviewed for *any* defect or abnormality that impairs movement towards compliance. So, medication errors that did not affect the death, sick call errors that did not affect the death, etc., etc. should be identified so these can be corrected so the program can move towards compliance. Any opportunity for improvement that evidences a defect in the health program should be identified. Mortality review should be also used as a vehicle to assess quality of care for all staff including nurses, support, ancillary and provider staff.

**Commented [Monitor48]:** This misses the requirement of the Consent Decree that all physicians who do not have residency training in FP, IM or ER are to be "reviewed" by the Monitor and IDOC to determine if the quality of their care they actually provide is consistent with a physician who has the described (FP, IM, ER residency trained) credentials and who is practicing in a "safe and clinically appropriate manner". If a physician's performance is "questionable or potentially problematic "that physician should also be identified. So, with respect to mortality review any provider who is practicing in an unsafe, clinically inappropriate, questionable, or potentially problematic manner should also be identified. This is not to say that all these episodes should be referred to peer review but they should be referred to the Chief OHS and the Monitor. We agree that negligent acts resulting in death should be reported to peer review as well as to the Chief OHS and the Monitor. This obviously is a different methodology for mortality as compared to a hospital or HMO but in civilian group practices, appropriate credentialing is performed whereas in IDOC it is not. The Chief OHS should decide whether persons practicing in an unsafe, clinically inappropriate, potentially problematic or questionable manner should be referred to peer review.



# OFFICE OF HEALTH SERVICES

## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

IDOC/Vendor members, who are not associated with the staff member under review may be assigned by OHS leadership to participate in the review, when applicable.

> **Commented [Monitor49]:** The Monitor strongly disagrees with allowing vendor physicians to participate in peer review based on their history. Any OHS physician can and perhaps should participate.

ii. The chairperson of the Peer Review Committee will be assigned by the Coordinator of the SIU Clinical Quality Group.

iii. The Peer Review Committee will meet as needed, but within 30 days of being notified of a case requiring review.

iv. Functional Responsibilities include:

a. Review of referred cases where there is a question of negligence or deficient performance of a licensed healthcare professional. The reviewer will have the findings of the M & M Committee (where applicable), the reviewed staff member's explanation of the events, and the patient's chart available to them (where applicable) for the review.

b. Determine whether the healthcare professional was negligent or performed poorly and whether this healthcare professional's behavior contributed negatively to a mortality or morbidity or was a source of increased risk to patients. If so, a recommended follow-up action will be determined. The action may include a verbal intervention/reminder, an educational program, a report to the appropriate state board and/or to the National Practitioner Data Bank, referral to EAP or a recommendation to terminate.

c. The findings of the Peer Review Committee will be placed in minutes labeled PRIVILEGED AND CONFIDENTIAL and will be submitted to the Agency Medical Director.

d. The findings upon review of the employee's actions will be communicated immediately after the meeting to the IDOC Medical Director.

e. The healthcare professional under review will be notified of the Committee's findings as soon as possible by the IDOC Medical Director.

### E. GENERAL PROCESS

IDOC and its partners, while open to various proven quality schools of thought, agree with the Joint Commission's statement that, "Tested and proven improvement tools and methodologies can make the difference between an actual improvement with lasting change versus a quick fix that is just as quickly forgotten. Knowing that highly reliable processes provide for a zero-harm environment for patients, organizations must explore



**OFFICE OF HEALTH SERVICES**
FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

available tools and methodologies and determine what will best facilitate and sustain their improvement successes."

We endorse the following steps, outlined in "The Joint Commission 2022: Standards for Ambulatory Care:

1. Performance improvement priorities are identified by leaders and audit tools are created to evaluate the processes or outcomes identified.
2. The organization has a performance improvement plan.
3. The organization compiles and analyzes data.
4. The organization uses the analyzed date to guide improved performance.
5. The organization uses improvement tools or methodologies to improve its performance.
6. The organization acts when it does not achieve or sustain planned improvements.

## VI. PROCEDURES

IDOC will practice in a manner that is consistent with public health care industry standards and will maintain a Quality Improvement Program to evaluate and improve the quality of the health care it provides. The Quality Improvement Program will utilize recognized quality improvement philosophies and principles to achieve this. IDOC OHS leadership strongly endorses the administrative oversight of a state-of-the-art quality improvement program and will meet quarterly with quality improvement staff to support the goals, the design and the methods of quality improvement activities. Leadership will use the findings from quality improvement activities to promote improved health care outcomes and processes on a systemic level. The following steps will be used by the Quality Improvement program of IDOC:

A. Identify priorities for quality improvement at the system level (SLQC).
B. Design an objective method of studying the identified problem (IDOC Healthcare Compliance and the Clinical Quality Group, managed by SIU Department of Correctional Medicine).
C. Create the process and tools for studying the problems and identify the techniques for analyzing the findings (IDOC Healthcare Compliance and the SIU Clinical Quality Group).
D. Provide instruction and training to staff on Quality Improvement tools in order to move toward a long-range, self-sustaining Quality Improvement program (SIU Clinical Quality Group).
E. Provide feedback to the facility level about the objective findings of the audits and assist in improvement of the healthcare at the facility level. (SLQC, regional management, IDOC Healthcare Compliance and the Clinical Quality Group).
F. Measure and control the new processes after a change has been implemented (IDOC Healthcare Compliance and the SIU Clinical Quality Group).

**Commented [Monitor50]:** This appears to be a policy and procedure statement but it is intended as a 1st year plan. This section should be eliminated or revised.

**Commented [Monitor51]:** What does this mean? What public health care industry standards are you talking about. IDOC must practice in a manner that meets Consent Decree requirements. It would be acceptabe to state community standards of care.

**Commented [Monitor52]:** Should state what these are.

**Commented [Monitor53]:** The design of the quality program is to be done with the assistance of the Monitor which is not mentioned nor was it done.

**Commented [Monitor54]:** At this juncture of the Consent Decree many of the facility deficiencies are the results of systemic issues (staffing, physical plant, no place to house elderly or infirm, equipment, lack of an electronic record, lack of standardized policy and procedure, lack of training, etc.) so a 1st year focus should be predominantly on systemic and structural corrective actions that are at the IDOC executive and OHS level. The system leadership group also needs to become informed on how corrective actions will be determined which will require some degree of root cause analysis to determine specifically why something doesn't happen like it should.



**OFFICE OF HEALTH SERVICES**
FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

G.   Use chart reviews and facility visits to perform the audits and to ensure that the data quality is high (IDOC Healthcare Compliance and the SIU Clinical Quality Group).

## VII.   IMPLEMENTATION

A.   This plan reflects the adoption of a systemic approach to problem identification, collection of data, analysis of data, acting on the data with corrective action, and following the correction to control the new process. In the immediate future, the SIU Clinical Quality Group will perform the audit activities with the direction and approval of the System Leadership Quality Council and in association with IDOC Compliance.

B.   In the short-term, Clinical Quality Group, directed by the SIU Department of Correctional Medicine and the Office of Compliance will manage and perform the Audit process and the collection of data.

C.   In the long term, the provision of systemwide training and the development of a Quality Improvement Program is the ideal goal. This process begins with the training of leadership. The plan must have an ongoing process for monitoring, evaluating, and improving the quality of healthcare provided to IDOC patients. In addition, it must meet the needs of its customers, provide a level of healthcare consistent with constitutional standards, and be in accordance with ACA, NCCHC, and Joint Commission standards.

D.   Once formalized, and prior to implementation, key leadership personnel (experts), who have had prior experience and training in Quality Improvement methods and theories, are identified. Training in the process of Quality Improvement will be provided to the leaders of IDOC OHS by the experts in Quality Improvement to solidify the Quality Improvement philosophy embraced by IDOC and its associates. The importance of having a coherent goal of Quality Improvement across the partnership is to ensure the focus of the program is to improve the quality of services and to prevent errors in the delivery of healthcare.

E.   The training of staff in Quality Improvement must include the encouragement to be continually vigilant for opportunities to redesign workflows to improve the product produced and to avoid the negative outcomes which may result from variance in the delivery of health care. A step to improve service requires that departmental and employment stratification barriers be broken down and a team approach is utilized. For instance, when a process involves many different job descriptions and levels of management, all are represented as subject matter experts and will have input into the workable solutions.

F.   Ideally, all health service staff are educated in the philosophy of quality improvement and will participate in quality activities. Attaining a quality-

**Commented [Monitor55]:** This should be discussed with the Monitor as part of a discussion on audits.

**Commented [Monitor56]:** The use of the Compliance Unit and gathering data on 12 performance or outcome measures as a systemic approach will not move the organization timely to compliance with the Consent Decree. This needs to be discussed with the Monitor.

**Commented [Monitor57]:** The plan ignores the Consent Decree which it must adhere to and which should be a primary goal. The Consent Decree says, "The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor." It does not say that the audit function can be conducted by facility staff which is implied here despite all the jargon.

**Commented [Monitor58]:** This is a 1st year plan but IDOC has completed its 4th year into the Consent Decree. This sound like IDOC doesn't know at this point who its quality "experts" are. Does IDOC believe it currently has sufficient staff who have expert training in quality improvement methodology? This is a problem and IDOC should hire experts to manage the program if they don't have them. There probably are leaders who can be trained but don't they have other full time responsibilities? The hiring should start with hiring an expert, trained CQI coordinator. SIU was to be the source of these experts. Is that not happening?

**Commented [Monitor59]:** Not sure what this paragraph means but it implies that facility staff will engage in modification of workflows. The kinds of problems that exist system wide are not suited for having every facility modify workflows. For key processes, IDOC instead needs to standardize workflows across the organization and ensure that sufficient staffing and equipment is available to conduct the workflow. It will be chaos to expect every facility to start modifying workflows. It will be difficult enough to standardize system wide workflows. This concept currently for facility staff participation is the adverse event or nonconformity reporting in which any employee can complain about any defect they see (including staffing, equipment, unsafe conditions, supplies, lack of sanitation, broken chairs, etc.). Management should review these complaints and by systemwide analysis see if there are systemic issue. Facilities are understaffed and at this juncture asking them to redesign workflows is not reasonable. Senior management should address the problem of wor... [10]

**Commented [Monitor60]:** This is something an advanced workforce can do. IDOC is not at this point yet and it is unrealistic to expect staff to engage in this manner. As commented above, would advise to start with an adverse event or nonconformity report system.



**OFFICE OF HEALTH SERVICES**

**FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN**

oriented culture of this type entails fundamental changes in thinking, training, and encouragement of positive changes in individual and group behaviors and time. Healthcare quality experts opine that a transition to a culture of quality that includes training all staff in the philosophy and process of an Improvement theory (such as Lean Six Sigma training) takes years. The beginning of such a program is to obtain the upper managements' agreement on the initiation of a Quality Improvement approach that establishes that Quality goals are identified, and that study is required, and that goals are being met. There is commitment to the improvement of these processes if goals are not being met.

G. Despite not having the full organization trained in quality study design initially, the adoption of a Quality Improvement culture by OHS leadership will be introduced immediately and the ability to identify areas needing evaluation should occur early in the program. Facility-level staff will learn about areas that need improvement through the participation in self-monitoring using prescribed audit tools provided to them by the overarching leadership of the Quality Improvement initiative.

H. The goal at first is to set up "best practices" across the enterprise and to avoid variation in processes among the facilities delivering healthcare to patients in IDOC. The avoidance of variation in healthcare delivery is imperative in establishing the thresholds for determination of Quality, avoiding errors in healthcare delivery, and allowing an audit of these indicators. Establishing non-varying "best practices" also allows for a smooth transition when a modification of the "best practice" is required.

**VIII. PROGRAM EVALUATION**

A. The system-wide Quality Improvement plan will be reviewed at least annually by the System Leadership Quality Council and revised or updated to reflect the current institutional needs and goals. This evaluation will be based on analysis of the Quality Improvement Program organization, scope of quality activities, and effectiveness of all monitoring activities. Facility plans will be reviewed accordingly at the appropriate facility.

B. This evaluation will include a review of the number and type of significant problems identified and resolved. In addition, any portion of this plan may be modified or amended at any time to maintain compliance with American Correctional Association, National Commission of Correctional Health Care, or other defined standards and to improve the effectiveness and quality of the services delivered.

**IX. POLICY AND STANDARDS**

**Commented [Monitor61]:** Precisely, and that is why OHS should not be expecting facility staff to audit themselves or to design workflows or corrective actions. Leadership should focus on hiring staff, renovating and making capital improvement to health care units, ensuring equipment is available, finding adequate space to house the frail and elderly, obtaining qualified physicians, getting an EMR. Upper management needs to support the program by supporting OHS's ability to make the necessary structural changes. Upper management's agreement is not a vacuous and empty commitment.

**Commented [Monitor62]:** This document is more of a policy and procedure. Facility plans are not discussed in this document. The document should be revised to be a subset to the implementation plan with the same requirements as the Implementation Plan. Facility plans should be based on what their audit shows and what correctable deficiencies are present on the findings. The distinction between the system wide plan and facility plan is significant. System wide plans need to be connected to system wide process improvement efforts, major initiatives, staffing, equipment, EMR implementation, etc. that are barriers to the Consent Decree. Facility plans need to be connected to local issues that are barriers to compliance with the Consent Decree. These distinctions are not evident in this plan.

**Commented [Monitor63]:** An annual review should include a review of the status of compliance with the Consent Decree and what prioritized steps need to be taken in the coming year to advance the effort towards compliance.

**Commented [Monitor64]:** It is remarkable that the Consent Decree is ignored entirely. Using the search function in Word, the Consent Decree is not mentioned in this document. Is this not an important aspect of the quality plan? Is it less important than the ACA?



## OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

Administrative Directive 04.03.125 Quality Improvement Program
ACA Standard 5th Edition 5-ACI-6D-02 (M)
NCCHC Standard P-A-06 Continuous Quality Improvement Program (Essential)
OHS Medical Policy "Mortality and Morbidity Review Process"
OHS Medical Policy "Provider and Nurse Peer Review"

## X.     BIBLIOGRAPHY

"A Framework for Safe, Reliable, and Effective Care: IHI." *Institute for Healthcare Improvement*, http://www.ihi.org/resources/Pages/IHIWhitePapers/Framework-Safe-Reliable-Effective-Care.aspx.

California Department of Corrections and Rehabilitation. (n.d.). *health care department operations manual*.

Deming, W. Edwards, et al. *The Essential Deming: Leadership Principles from the Father of Quality*. McGraw-Hill, 2013.

The Joint Commission. (2022). *2022 Standards for Ambulatory Care*. Oakbrook Terrace, IL: The Joint Commission.

Joshi, Maulik S., et al. *The Healthcare Quality Book*. Health Administration Press, 2014.

National Commission on Correctional Health Care. (2018). *Standards for Health Services in Prisons*. Chicago, IL: National Commission on Correctional Health Care.

Stern, T. (2018). *Lean Six Sigma: International Standards and Global Guidelines*. Productivity Press.

Texas Department of Criminal Justice. (n.d.). Retrieved from Correctional Managed Health Care Quality Improvement Plan FY 2022.

Walton, M. (1986). *The Deming Management Method*. New York, NY: Pedigree Books.



# OFFICE OF HEALTH SERVICES

## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

ATTACHMENT A: OVERVIEW OF QUALITY IMPROVEMENT PLAN



# OFFICE OF HEALTH SERVICES

## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

ATTACHMENT B: MORTALITY AND MORBIDITY PROCESS



# OFFICE OF HEALTH SERVICES

## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT C: PEER REVIEW PROCESS**



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D: FY23 IDOC CLINICAL QUALITY MEASURES**

1. Sick call response*
2. Breast cancer screening
3. Colon cancer screening
4. Dental cleaning
5. Controlling high blood pressure
6. Diabetic care – HgbA1C < 8%
7. Diabetic care - Blood pressure control
8. Diabetic care - Screened or treated nephropathy
9. Diabetic care - Annual eye exam
10. Annual flu vaccine
11. Pneumococcal vaccine
12. COVID vaccine*

All measures can be benchmarked against HEDIS comparatives except those indicated with an *.



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| DOMAIN | Access/Availability of care. |
| MEASURE | Sick call responsiveness by healthcare services |
| DEFINITION | Percentage of sick call documentation with timely follow up by healthcare services, per policy/AD. |
| DENOMINATOR | The number of patients who submitted sick call requests. |
| NUMERATOR | The number of patients who submitted sick call and had follow up by healthcare services within the timeframe specified in IDOC AD/policy. Sick call request should be documented in the patient's medical record and supplemented with IDOC documentation of action(s) taken. |
| RATE CALCULATION | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100. Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| DATA SOURCE | Electronic Health Records (Pearl) Paper health records (sick call request by patient and healthcare professional documentation of action(s) taken). List of all sick call requests, per institution, per month. |
| REPORTING FREQUENCY | Quarterly |
| BACKGROUND | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% or more of all sick call requests will be documented in each patient's chart with appropriate and timely follow up by healthcare services. |
| GOAL/RANKING | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| COMMENTS | |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| **DOMAIN** | Effectiveness of Care - Prevention & Screening |
| **MEASURE** | Breast Cancer Screening (Women only) |
| **DEFINITION** | Percentage of women 50-74 years of age who had at least one mammogram to screen for breast cancer in the past two years. Excludes patients who have had a diagnosis of a total mastectomy. |
| **DENOMINATOR** | The number of female or eligible transgender patients who are 50-74 years of age on the last day of the 12-month measurement period and continually in custody during the 12-month measurement period. |
| **NUMERATOR** | The number of patients from the denominator who received a mammogram within the previous two years. |
| **RATE CALCULATION** | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100.<br>Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| **DATA SOURCE(S)** | Electronic Health Records (Pearl)<br>Paper health records, including the mammogram report. |
| **REPORTING FREQUENCY** | Quarterly |
| **BACKGROUND** | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Medicaid= 53.7) or more of all eligible patients will receive a mammogram screening. |
| **GOAL/RANKING** | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| **COMMENTS** | HEDIS Measure<br>Eligibility begins at age 51 rather than 50 so that all patients had a minimum of 12 months of eligibility for screening to have occurred. |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| **DOMAIN** | Effectiveness of Care - Prevention & Screening |
| **MEASURE** | Colon Cancer Screening |
| **DEFINITION** | Percentage of patients 50-75 years of age who received colorectal cancer screening (in the form of a fecal immunochemical test (FIT), FIT-DNA, sigmoidoscopy, colonography, or colonoscopy) within the appropriate timeframe. Excludes patients who have had a diagnosis of colon cancer or total colectomy. |
| **DENOMINATOR** | The number of patients who are 50-75 years of age on the last day of the 12- month measurement period and continually in custody during the 12-month measurement period. |
| **NUMERATOR** | The number of patients from the denominator who received at least one of the following tests:<br>  A. Fecal immunochemical test (FIT) within the last twelve months<br>  B. Flexible sigmoidoscopy within the last five years<br>  C. Colonoscopy within the last ten years |
| **RATE CALCULATION** | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100.<br>Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| **DATA SOURCE(S)** | Electronic Health Records (Pearl)<br>Paper health records, including POC result documentation<br>UIC laboratory results<br>Sigmoidoscopy, or colonoscopy reports |
| **REPORTING FREQUENCY** | Quarterly |
| **BACKGROUND** | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Lowest Comparative= 60.7) or more of all eligible patients will receive a colon cancer screening. |
| **GOAL/RANKING** | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| **COMMENTS** | HEDIS Measure<br>Eligibility begins at age 51 rather than 50 so that all patients had a minimum of 12 months of eligibility for screening to have occurred.<br>ACS recommends to begin screening at age 45 |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| **DOMAIN** | Effectiveness of Care - Prevention & Screening |
| **MEASURE** | Dental Cleaning |
| **DEFINITION** | Percentage of patients who had a dental cleaning within the last 2 years. |
| **DENOMINATOR** | The number of patients in custody who are eligible for dental cleaning. |
| **NUMERATOR** | The number of patients from the denominator who received at least one dental cleaning in the last 24 months. |
| **RATE CALCULATION** | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100.<br>Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| **DATA SOURCE** | Electronic Health Records (Pearl)<br>Paper health records<br>Institution list of all individuals in custody for more than 24 months. |
| **REPORTING FREQUENCY** | Quarterly |
| **BACKGROUND** | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Medicaid = 42.8) or more of all eligible patients will receive a dental cleaning every two years. |
| **GOAL/RANKING** | High: $\geq$ 90% - Moderate: 75-89% - Low: $\leq$ 74% |
| **COMMENTS** | IDOC AD 04.03.102 = dental cleaning every two years |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

ATTACHMENT D CONTINUED:

| | |
|---|---|
| DOMAIN | Effectiveness of Care - Cardiovascular |
| MEASURE | Controlling high blood pressure |
| DEFINITION | Percentage of patients 18 - 85 years of age with hypertension whose average blood pressure was less than 140/90 mmHg. |
| DENOMINATOR | The number of patients who are 18-85 years of age and who do not meet the following exclusions:<br>1. Patients in hospice or palliative care<br>2. Patients with an MCC indicating they are on active dialysis<br>3. Patients who were newly incarcerated within the last 365 days<br>4. Patients who arrived to the institution within the last 365 days<br>5. Female patients who have a pregnancy diagnosis within the last 365 days<br>6. Patients 66 and older who have an active diagnosis identified within the HEDIS value set for 'Advanced Illness', or have had 2 or more ER visit in the past year, or had one or more inpatient hospital visits in the past year, or are on active prescription for a dementia medication as defined by the HEDIS "Dementia Medication" value set. |
| NUMERATOR | The number of patients from the denominator who have both an average systolic blood pressure< 140 mmHg and an average diastolic blood pressure<br>< 90 mmHg. |
| RATE CALCULATION | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100.<br>Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| DATA SOURCE | Electronic Health Records (Pearl)<br>Paper health records |
| REPORTING FREQUENCY | Quarterly |
| BACKGROUND | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Medicaid= 55.9) or more of all eligible patients will have adequate blood pressure control (<140/90 mmHg). |
| GOAL/RANKING | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| COMMENTS | HEDIS Measure<br>Average blood pressure is calculated by averaging up to five of the most recent blood pressure readings recorded within the past year. Only one blood pressure reading per calendar day is used and the last blood pressure reading from each day is used.<br>If no blood pressure is recorded in the past year, the patient will be labeled "not controlled." |



**OFFICE OF HEALTH SERVICES**

**FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN**

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| DOMAIN | Effectiveness of Care - Diabetes |
| MEASURE | HgbA1C < 8% |
| DEFINITION | The percentage of patients age 18 - 75 years with diabetes whose most recent HgbA1C test result in the last 12 months was less than 8% (controlled). |
| DENOMINATOR | The number of patients 18-75 years of age (as of the last day of the 12-month measurement period), who have been continuously in custody for the last 12 months, and have been diagnosed with diabetes. |
| NUMERATOR | The number of patients from the denominator whose most recent HgbA1C test result, in the last 12 months, was less than 8%. |
| RATE CALCULATION | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100. Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| DATA SOURCE | Electronic Health Records (Pearl) Paper health records UIC laboratory results |
| REPORTING FREQUENCY | Quarterly |
| BACKGROUND | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Medicaid= 45.0) or more of all eligible patients will have adequate control of diabetes based on the HgbA1C results. |
| GOAL/RANKING | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| COMMENTS | HEDIS Measure |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| DOMAIN | Effectiveness of Care - Diabetes |
| MEASURE | Blood pressure <140/90 mmHg |
| DEFINITION | The percentage of patients age 18 - 75 years with diabetes whose most recent blood pressure reading in the last 6 months was less than 140/90 mmHg (controlled). |
| DENOMINATOR | The number of patients 18-75 years of age (as of the last day of the 12-month measurement period), who have been continuously in custody for the last 12 months and have been diagnosed with diabetes. Excludes patients with diagnoses of polycystic ovaries, steroid induced diabetes, or gestational diabetes. |
| NUMERATOR | The number of patients from the denominator whose most recent blood pressure reading, in the last 6 months, was less than 140/90 mmHg. Excludes patients who did not have a blood pressure check in the most recent 6 months, the lowest systolic blood pressure reading was greater than or equal to 140, or the lowest diastolic blood pressure reading was greater than or equal to 90. |
| RATE CALCULATION | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100. Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| DATA SOURCE | Electronic Health Records (Pearl) Paper health records |
| REPORTING FREQUENCY | Quarterly |
| BACKGROUND | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Medicaid= 58.2) or more of all eligible diabetic patients will be in good control of their blood pressure. |
| GOAL/RANKING | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| COMMENTS | HEDIS Measure |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| **DOMAIN** | Effectiveness of Care - Diabetes |
| **MEASURE** | Screened or treated nephropathy |
| **DEFINITION** | The percentage of patients age 18 - 75 years with diabetes who had a nephropathy screening test or evidence of attention to nephropathy in the last 12 months. |
| **DENOMINATOR** | The number of patients 18-75 years of age (as of the last day of the 12-month measurement period), who have been continuously in custody for the last 12 months and have been diagnosed with diabetes. |
| **NUMERATOR** | The number of patients from the denominator who had any of the following:<br>1. Microalbumin testing in the last 12 months<br>2. Were prescribed an ACEI or ARB medication on the last day of the measurement period.<br>3. On dialysis during the last 60 days. |
| **RATE CALCULATION** | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100.<br>Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| **DATA SOURCE** | Electronic Health Records (Pearl)<br>Paper health records<br>UIC laboratory results |
| **REPORTING FREQUENCY** | Quarterly |
| **BACKGROUND** | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Medicaid= 89.7) or more of all eligible diabetic patients will be screened or treated for nephropathy. |
| **GOAL/RANKING** | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| **COMMENTS** | HEDIS Measure |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| **DOMAIN** | Effectiveness of Care - Diabetes |
| **MEASURE** | Annual eye exam |
| **DEFINITION** | The percentage of patients age 18 - 75 years with diabetes who had an eye exam in the last 12 months. Clarification: A diagnosis of retinopathy or an eye exam with an unknown retinal status requires an annual exam. If negative for retinopathy, a bi- annual (every two years) exam meets criteria. |
| **DENOMINATOR** | The number of patients 18-75 years of age (as of the last day of the 12-month measurement period), who have been continuously in custody for the last 12 months and have been diagnosed with diabetes. |
| **NUMERATOR** | The number of patients from the denominator who had an eye exam. |
| **RATE CALCULATION** | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100. Institution: Percentage is the numerator divided by the denominator multiplied by 100. |
| **DATA SOURCE** | Electronic Health Records (Pearl) Paper health records |
| **REPORTING FREQUENCY** | Quarterly |
| **BACKGROUND** | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 90% (HEDIS Medicaid= 50.6) or more of all eligible diabetic patients will have an annual eye exam. |
| **GOAL/RANKING** | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| **COMMENTS** | HEDIS Measure |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| DOMAIN | Effectiveness of Care - Flu vaccination |
| MEASURE | Annual flu vaccine |
| DEFINITION | The number of patients who received the flu vaccine between August 31st and July 31st of the following year. This measure resets compliance on August of each year. |
| DENOMINATOR | All patients at an IDOC institution except the following:<br>1. Hospice or palliative care<br>2. Prior anaphylactic reaction to the flu vaccine<br>3. History of encephalopathy due to vaccine and documented on problem list<br>4. History of chemotherapy and documented in diagnosis list<br>5. History of bone marrow transplant and documented on problem list<br>6. History of immunocompromising conditions, cochlear implants, asplenia, sickle cell anemia, or HB-S disease or cerebrospinal fluid leaks and documented on problem list |
| NUMERATOR | The number of patients in the denominator who have been administered the flu vaccine for the current season. |
| RATE CALCULATION | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100. Exclude those who have been at institution less than 365 days.<br>Institution: Percentage is the numerator divided by the denominator multiplied by 100. Exclude those who have been at institution less than 365 days. |
| DATA SOURCE | Electronic Health Records (Pearl)<br>Paper health records |
| REPORTING FREQUENCY | Quarterly |
| BACKGROUND | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 50% (HEDIS Medicaid= 40.0) or more of all eligible patients will have received the annual flu vaccine. |
| GOAL/RANKING | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| COMMENTS | HEDIS Measure |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| DOMAIN | Effectiveness of Care - Pneumococcal vaccination |
| MEASURE | Pneumococcal vaccine |
| DEFINITION | Assesses adults who report ever having received one or more pneumococcal vaccinations. |
| DENOMINATOR | All patients aged 65 years or older |
| NUMERATOR | The number of patients in the denominator who have been administered the pneumococcal vaccine. |
| RATE CALCULATION | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100. Exclude those who have been at institution less than 365 days. Institution: Percentage is the numerator divided by the denominator multiplied by 100. Exclude those who have been at institution less than 365 days. |
| DATA SOURCE | Electronic Health Records (Pearl) Paper health records |
| REPORTING FREQUENCY | Quarterly |
| BACKGROUND | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 50% (HEDIS Medicare 2018 = 72.7) or more of all eligible patients will have received the pneumococcal vaccine. |
| GOAL/RANKING | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| COMMENTS | HEDIS Measure |



**OFFICE OF HEALTH SERVICES**

**FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN**

**ATTACHMENT D CONTINUED:**

| | |
|---|---|
| DOMAIN | Effectiveness of Care - COVID vaccination |
| MEASURE | COVID vaccine |
| DEFINITION | The number of patients who received the COVID vaccine. |
| DENOMINATOR | All patients at an IDOC institution except the following:<br>1. Hospice or palliative care<br>2. Prior anaphylactic reaction to a vaccine<br>3. History of encephalopathy due to vaccine and documented on problem list |
| NUMERATOR | The number of patients in the denominator who have been administered the COVID vaccine (J&J = l dose; Pfizer & Moderna = 2 doses). |
| RATE CALCULATION | Statewide: Percentage is the sum of the numerators divided by the sum of the denominators multiplied by 100. Exclude those who have been at institution less than 365 days.<br>Institution: Percentage is the numerator divided by the denominator multiplied by 100. Exclude those who have been at institution less than 365 days. |
| DATA SOURCE | Electronic Health Records (Pearl)<br>Paper health records |
| REPORTING FREQUENCY | Quarterly |
| BACKGROUND | Healthcare services clinical quality measure improvement objective: By June 30, 2023, 50% or more of all eligible patients will have received the COVID vaccine. |
| GOAL/RANKING | High: ≥ 90% - Moderate: 75-89% - Low: ≤ 74% |
| COMMENTS | |



# OFFICE OF HEALTH SERVICES
## FY23 HEALTHCARE QUALITY IMPROVEMENT PLAN

ATTACHMENT E: TEMPLATE FOR FACILITY QI/QM MEETINGS*

(Facility Name) QI/QM Meeting

(Date and Time)

Attendees:

Old Business:

New Business:

1. Audit status and Corrective Action Plan (CAP) status, if applicable
   a. Clinical outcomes (SIU)
   b. Compliance audits
2. Issues with Infection Control Processes (Outbreaks, lapses in annual reviews and required care)
3. Facility processes identified as needing examination and revision.
4. Is the required licensure and certification documentation current (state board, CPR)? Are there licensed/certified employees who are going to lapse in the next month?
5. Is the CEU status of medical staff up to date (per state board)?
6. Is the security staff compliant with the need for health training? **
7. Status of facility disaster drill?

Action Items:

Date of next meeting:

* These minutes should be labeled as "Privileged and Confidential". A copy should be sent to the Medical Compliance Administrator and a copy kept in the facility records.

**Correctional Officers are trained to recognize the need to refer an individual in custody to a qualified health care professional. See NCCHC standard P-C-04 for details.

**Page 7: [1] Commented [Monitor11]          Monitor          12/31/22 1:57:00 PM**

The audit should evaluate whether adequate care as required by the Consent Decree is provided.  This requires a comprehensive audit: having sufficient structural elements (clinics, a medical record, staff, etc.); processes of care (policies and operational processes); demonstration of effective performance and outcomes measures for the population of inmates (vaccinations, preventive screenings, testing, etc.); adequate individual care (sick call, adequate clinical chronic care management, mortality review, etc.); and  population care (outcome and performance measures).   All of these elements should be included in the audit but instead only a limited number of performance and outcome measures are gathered.  The mortality review group is involved in evaluating some individual quality of care evaluations but the audit is severely limited.  The lack of a comprehensive evaluation of quality of care is a significant deficiency of this plan and the audit program in general.  The 6th report section on the audit should be reviewed and this plan should be discussed with the Monitor

**Page 7: [2] Commented [Monitor12]          Monitor          12/29/22 8:48:00 AM**

The Monitor disagrees with self-auditing by facilities with respect to the audit (II.B;9.).  Self-auditing is what IDOC facilities currently do and self-auditing has not produced an honest or effective review nor has self-auditing produced movement toward compliance.  Self-monitoring is business-as-usual which will not move IDOC towards compliance.

**Page 7: [3] Commented [Monitor14]          Monitor          12/29/22 8:52:00 AM**

The mortality group does some audits of the effectiveness of individual care, but the clinical audit group only gathers limited performance and outcome measures; it does not evaluate the totality of the health care system.  It ignores most elements of the Consent Decree by only sampling 12 performance measures which are an extremely limited view of the totality of medical care.  This is not an audit as required by the Consent Decree.  It is satisfactory as a sample of performance and outcome measures but is not an audit consistent with Consent Decree requirements.  The audit needs to evaluate each facility's programs as compared to requirements of the Consent Decree.  The current audit does not do that.  SIU and IDOC should meet with the Monitor to obtain assistance and input into the audit.  See 6th Report for details

**Page 7: [4] Commented [Monitor15]          Monitor          12/29/22 8:55:00 AM**

This is not realistic with the existing staff. For the foreseeable future the current group of physicians should not be considered subject matter experts in quality of care who audit themselves.  This is actually the current state of affairs as current providers and nurses audit themselves in their mortality reviews and CQI audits.  These are unsatisfactory.

**Page 7: [5] Commented [Monitor16]          Monitor          12/29/22 8:58:00 AM**

The 12/31/21 Implementation Plan developed by IDOC included process analysis in 4 areas: medication administration, sick call, improving access to specialty care, and improving chronic care.  We agree with these analyses.  These are  ideal items for a first year plan, yet, why are these process improvement initiatives not included in this annual Quality Plan?  They should be because they are key barriers in the current program.

**Page 7: [6] Commented [Monitor17]          Monitor          12/29/22 8:59:00 AM**

What is the plan for IDOC to get employees to report these events.  There is no history of this being done and it's unlikely staff will just do this.  There should be a policy/procedure (on reporting any non-conformity) for how this is to be done  but this plan should be more directive as to what will be done to implement any policy and this program including training on  any software that will be used.

**Page 9: [7] Commented [Monitor24]          Monitor          12/29/22 9:20:00 AM**

The Monitor does not view the compliance unit audits as an "independent review" which is a requirement of the Consent Decree with respect to provision II.B.9.  The compliance unit reports to the Chief Compliance Officer.  Its purpose is to audit against administrative directives.  The purpose of this audit is to audit against requirements of the Consent Decree.  IDOC has not provided the Monitor information about the Compliance audit methodology or questions, audit results, frequency of audits, or who performs all audits.   The Monitor reserves his opinion until IDOC is transparent about this unit and more

information is obtained.  Having said that, this unit has been auditing for decades and the existing conditions, resulting in the Consent Decree, occurred during the time when this unit audited.   No information or evidence has been provided verifying that anything has been changed with respect to audits by the Compliance Unit.  This appears to be a business-as-usual strategy that will not result in any meaningful or effective change and will not move IDOC towards compliance with the Consent Decree.

**Page 9: [8] Commented [Monitor28]          Monitor          12/29/22 9:50:00 AM**

The Monitor is not confident that the Compliance Unit can perform this.  The Compliance Unit has been auditing for decades.  What now will change that will result in them being able to design an audit appropriate for the Consent Decree and without assistance from the Monitor.  Does the Compliance Unit know what appropriate monitoring is for the medical program?  The compliance audit should be designed by medical personnel with assistance from the Monitor as required by the Consent Decree

**Page 9: [9] Commented [Monitor29]          Monitor          12/29/22 9:52:00 AM**

This presumes that the facility staff is to figure out what their corrective actions should be.  Currently, they are incapable of designing their own corrective actions as is demonstrated in their current quality improvement meeting minutes.  Having staff design their corrective actions replicates the existing failure of IDOC quality programs.  External audits described in current quality improvement minutes describe most corrective actions as re-reading the AD and signing a memo that they understand the AD and to do what they are asked to do.  There is no evidence that training occurs and there is also no evidence that any degree of "training" eliminates the problem.  The Compliance Unit has not previously been able to identify or correct root causes of problems sufficient to give any direction to staff and staff is incapable of designing their corrective actions.  A better method of corrective action needs to be developed that is based on identifying the root cause of the problem in order to determine a solution which should be specific to the root cause of the problem.  Discuss with the Monitor.

**Page 16: [10] Commented [Monitor59]          Monitor          12/29/22 6:43:00 PM**

Not sure what this paragraph means but it implies that facility staff will engage in modification of workflows.  The kinds of problems that exist system wide are not suited for having every facility modify workflows.  For key processes, IDOC instead needs to standardize workflows across the organization and ensure that sufficient staffing and equipment is available to conduct the workflow.  It will be chaos to expect every facility to start modifying workflows.  It will be difficult enough to standardize system wide workflows.  This concept currently for facility staff participation is the adverse event or nonconformity reporting in which any employee can complain about any defect they see (including staffing, equipment, unsafe conditions, supplies, lack of sanitation, broken chairs, etc.).  Management should review these complaints and by systemwide analysis see if there are systemic issue.  Facilities are understaffed and at this juncture asking them to redesign workflows is not reasonable.  Senior management should address the problem of workflows.  When that is done, employees will develop a sense that management supports their efforts to provide safe and adequate care.

`

## ATTACHMENT B





Proposal For:

# Quality Improvement Initiative Agreement
# Phase 2 - Implementation

## To:

Illinois Department of Corrections

Steve Meeks, MD Chief of Health Services
Illinois Department of Corrections
Thompson Center
100 W. Randolph St., 4th Fl.
Chicago IL. 60601

`

# Phase 2 – Implementation Proposal

## BACKGROUND

The University of Illinois at Chicago College of Nursing (UIC Nursing), through a consulting agreement with the Illinois Department of Corrections (IDOC), provided a comprehensive Quality Improvement Plan for the IDOC health care units in Phase 1 of the project.

UIC Nursing submitted a Phase 2 implementation proposal prior to having input from the Monitor, which is required by the Consent Decree[1]. The proposal was withdrawn to address the requirements. This proposal includes revisions based on discussions with the Monitor, the IDOC medical leadership and UIC stakeholders with respect to requirements of the Consent Decree, and incorporates principles and plans agreed upon in those discussions.

- *Phase 1*: Delivery of current state assessment and future state recommendations (*October 2018 – May 2020*)
- *Phase 2*: Begin implementation of a quality improvement approach to assist the IDOC to achieve compliance with the consent decree (*June 2020 – July 2023*)

## PURPOSE

The goal of this proposal is to assist the IDOC to more expeditiously obtain compliance with requirements of the Lippert Consent Decree by using a quality improvement approach. Our proposal therefore focuses on requirements of the Lippert Consent Decree with respect to medical and dental care programs.

Specifics of the Consent Decree pertinent to this contract that the UIC Nursing team will assist with includes:

1. Advise IDOC on the implementation of a comprehensive medical and dental quality improvement program for all IDOC facilities, with input from the Monitor[1];
2. Advise IDOC with development of a set of health care performance and outcome measurements and ability to compile data to facilitate those measurements[2];
3. Design, with the assistance of the Monitor, an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs either by the Office of Health Services or by another disinterested auditor[3];

---

[1] Item III.L.1 of Consent Decree
[2] Item II.B.7. of Consent Decree
[3] Item II.B.9 of Consent Decree

`

4. IDOC shall require, *inter alia,* adequate…. monitoring of health care by collecting and analyzing data to determine how well the system is providing care. UIC Nursing will consult on how to monitor health care to include meaningful performance measurement, action plans, and record review for the purpose of identifying opportunities for improvement and developing subsequent training[4];

5. IDOC is responsible for implementation of the electronic medical record (EMR), to be completed no later than 36 months after execution of the EMR contract. UIC Nursing will advise and assist IDOC on opportunities to improve the build of the EMR to facilitate data extraction, reporting and development of dashboards[5];

6. IDOC has responsibility to implement morbidity and mortality review[6]. UIC Nursing will advise on actions IDOC can take to augment their current process.

7. The IDOC agrees to implement effective quality assurance review[7], preventable adverse event reporting[8], action taken on reported errors (including near misses)[9], and training on patient safety[10]. UIC Nursing will advise and train on how to integrate these activities into current structure.

8. The Mortality review process shall identify and refer opportunities for improvement to appropriate IDOC staff, including those involved in the Quality Assurance audit function. UIC Nursing will assist in training IDOC on how to identify problems and to integrate identified problems into QI projects. Corrective action will be subject to regular Quality Assurance analysis and review[11]; and

9. Every 6 months for the first two years and annually thereafter, the IDOC is to provide the Monitor and Plaintiffs a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Consent Decree[12],[13]. UIC Nursing's audit findings and QI projects will help IDOC develop the report.

## APPROACH AND METHODOLOGY

The scope of work proposed here includes distinct workstreams interacting synergistically to assist the IDOC with quality improvement in the healthcare units. The work will initially be led by the UIC Nursing team and eventually transition to the IDOC. It is the intent of UIC Nursing that the quality efforts and staff incorporated in this proposal will become permanent features of the IDOC medical QI program.

---

[4] Item II.B.2 of Consent Decree
[5] Item II.B.4 of Consent Decree
[6] Item II.B.6.i of Consent Decree
[7] Item II.B.6.l of Consent Decree
[8] Item II.B.6.m of Consent Decree
[9] Item II.B.6.n of Consent Decree
[10] Item II.B.6.o of Consent Decree
[11] Item III.M.2 of Consent Decree
[12] Item V.G.
[13] We note that UIC Nursing will not produce the report specified in item 12, but through audits, performance measures, mortality review, etc. will substantially contribute material for this report.

`

UIC Nursing anticipates that this work may take IDOC several years to complete and to become fully compliant with the Consent Decree. We propose taking a stepwise approach, starting with a 3-year implementation plan. We will begin with a small-scale version of an approach that other correctional health systems have used successfully. This approach also offers an opportunity to learn and allow adjustment for next steps and future scale to fully meet the Consent Decree requirements.

We will use our connections with the UIC College of Nursing, UIC College of Medicine, UIC College of Engineering, UIC College of Dentistry and other non-university consultants in this effort. This provides to the IDOC a wealth of talent and expertise that is not currently available to them.

The workstreams and roles are summarized in the table below for the 3-year implementation period. We expect that staffing will need to increase for the full implementation.

| Roles/Workstreams | Staff | FTEs |
|---|---|---|
| Overall Continuous Quality Improvement (CQI) Program Management | CQI Program Director, Project Manager | 2 |
| Performance Improvement (Quality Improvement and Patient Safety) | CQI Manager, Process Improvement Consultants, Data Analysts | 6 |
| Electronic Medical Record | IT Services | 2 |
| Audit Team | Audit Team Manager, Auditors | 6 |
| CQI Training | CQI Trainers | 5 |
| Staff Support | Grad Assistant (1) HR Associate (1) Admin Support (1) | 3 |
| **Total** | | 24 |

The organizational chart identifies staff roles and consulting relationships. The communication flow is described below.

1. *Leadership structure*: There will be strong two-way communication between the IDOC and UIC leadership teams. UIC Nursing's work product will inform how the IDOC decides what to prioritize, and develop the metrics of interest.
   – OHS Leadership: IDOC Agency Medical Director, IDOC Deputy Chief of Health Services, Quality Improvement Coordinator (QIC), 3 Regional Directors, other?
   – UIC Nursing: CQI Director, CQI Manager, Audit team Manager
2. The IDOC Quality Improvement Coordinator, UIC Nursing CQI Program Director and UIC Nursing CQI Manager will communicate regularly and operate and monitor the program.

5

`

UIC Nursing will consult with the IDOC Deputy Chief of Health Services, in collaboration with the Federal Monitors.

3. The Audit Team Manager will share audit findings with the OHS leadership, facility-level QI teams, and the UIC Nursing process improvement (PI) and data analysis teams. Improvements will be advanced by the facility-level QICs.

4. OHS Deputy Chief of Health Services, IDOC QIC, UIC CQI Program Director and UIC CQI Manager will collaborate to prioritize system-level projects. Potential projects for UIC to advise, coach and train IDOC on include:

   - Optimizing screen builds to allow meaningful data capture in the implementation of the electronic medical record (EMR);
   - Improving the medication management process, including the electronic medication administration record (eMAR);
   - Improving the sick call process;
   - Developing a quality metrics dashboard.

5. *Process Improvement, Data Analysis and EMR* team: This team will consult with the IDOC to help optimize the EMR screen build to collect the data points and key metrics identified by OHS. The data analysis team will provide process and operational data needed by the audit team.

6. *CQI Training*: The CQI trainers focus on quality improvement and change management content with OHS leaders and frontline staff. The UIC PI team will inform the CQI Trainers about IDOC current state so they have relevant information prior to training offering.


## WORK TO BE ACCOMPLISHED: DELIVERABLES

UIC Nursing proposes providing staff and expertise to assist the IDOC to obtain the knowledge and skills needed to meet the Consent Decree requirements and to develop a QI program. The following activities are proposed:

Audit Instrument.  UIC Nursing will work collaboratively with the IDOC and use guidance from the Monitor to adopt an audit instrument. The audit instrument will be tested under Monitor supervision at multiple sites. The audit instrument will be consistent with the caliber of audits that would typically be performed by Court Experts in evaluations of health programs as determined by the Monitor.

`

Provide Audit Team Staff. Provide staff for an audit team which would include a manager[14], a physician[15], a dentist[16], a pharmacist, an advanced practice nurse or physician assistant, and up to 2 nurses. The team will perform audits of the major IDOC facilities in the Consent Decree. The IDOC will be able to use the findings from the audits to inform the IDOC reports to the Monitor. The team will travel to one facility approximately every 3 to 4 weeks, spending ~4 days to observe processes. Some audit functions such as chart review and data analysis will be done remotely. The audit team will share findings with the OHS and UIC leadership. The findings will be used by the IDOC to identify opportunities for improvement. The audit team will also follow up on whether corrective actions have been undertaken in a follow-up audit. The audit team's functions will expand to perform mortality review and preventable adverse event evaluations[17] which are required in the Consent Decree.

Provide Process Improvement, Data Analysis and EMR Staff.  Provide staff for a team which will include two full time Process Analysts, two EMR Application/ Training/ Support Specialists and three Data Analysts[18]. The process analyst will be trained in Industrial Engineering or similar process analytical discipline, experience or ability to be trained by the vendor in Information Technology system implementation, training and experience in data development and analysis, and formal training in a recognized Quality Improvement methodology.

The EMR staff and the Data Analysts[19] will have training and experience in extracting and analyzing data from a relational database, prior exposure to an EMR system, and in compiling and analyzing data to support managerial process/quality improvement efforts. The data team would assist in implementation of the EMR to ensure that screens in the record are appropriate for the needs of the IDOC; to recommend modifications to the record so that data elements needed to verify the Consent Decree are present in the EMR; to obtain and analyze data in the EMR to meet needs of QI activities; to consult and provide expertise on how to implement a dashboard based on performance and outcome measures as required by the Consent Decree; and to provide data to the audit team in order to verify the degree of compliance with the Consent Decree items.

---

[14] The manager would be a nurse, physician assistant, nurse practitioner, or administrative person who would be responsible for collating audit findings in a report, would perform final edits on audit reports, and would coordinate audit details with the team.

[15] This may be provided by several part time physicians.

[16] This may be provided by several part time dentists.

[17] As stipulated in item II.B.6.m

[18] While the IDOC has not requested that UIC address the Rasho Consent Decree, the IDOC should consider an option to include the needs of Rasho with respect to development of this quality improvement effort.  Future data needs with respect to reporting requirements should be considered in regards to getting information out of the electronic medical record for mental health matters.  We remain open to expanding the numbers of staff to include the ability to provide information necessary to verify compliance in the Rasho Consent Decree.  This would be separately negotiated and we remain open to including Rasho needs in this service we are providing.

[19] While the IDOC has not requested that UIC address the Rasho Consent Decree, the IDOC should consider an option to include the needs of Rasho with respect to development of this quality improvement effort.  Future data needs with respect to reporting requirements should be considered in regards to getting information out of the electronic medical record for mental health matters.  We remain open to expanding the numbers of staff to include the ability to provide information necessary to verify compliance in the Rasho Consent Decree.  This would be separately negotiated and we remain open to including Rasho needs in this service we are providing.

`

Provide a CQI Manager. UIC Nursing will provide an industrial engineer, Masters prepared nurse or MPH with significant quality improvement experience. This position will need to have cross-functional team management experience and will manage process improvement projects identified by IDOC OHS leadership that are critical for improvements related to the Consent Decree. This position will explore collaboration opportunities with the UIC College of Engineering to avail their expertise in assisting the IDOC.

Consult and Collaborate with IDOC and the Monitor in Development of Performance and Outcome Measures. These measures are required in the Consent Decree and will form the basis of a dashboard for facility use and to inform auditors on progress toward compliance.

Consult and Collaborate with IDOC and Monitor on How to Develop and Implement an Incident Reporting System. An incident reporting system is required in the Consent Decree. This information will be used in the quality program.

Provide Training and Mentoring of Leadership, Regional and Facility QI Staff to Ensure a Proper Roll Out of Quality Programs. UIC Nursing will provide leadership training in change management and promote a culture of continuous improvement. We will train IDOC facility CQI coordinators and other IDOC staff, as needed, in the basic principles and methods of CQI and coach them on their projects.

For frontline staff, we will provide training on how to identify barriers to health care delivery, escalation of barriers to senior staff, understanding of performance measures and how frontline work ties to IDOC quality goals.

The training team will be comprised of five trainers with CQI expertise. We will assist in selection of the appropriate methodology to study the problem, coaching the IDOC staff in the process, coordinate with the data team to obtain appropriate data, and involve the CQI Manager to consult on process improvement methodologies. We will use PDSA, Lean, 6-sigma[20] and other techniques in the training. Ultimately, CQI projects will focus on opportunities identified in audits, performance and outcome measures, mortality reviews, and in preventable adverse reporting events.

**CONSULTING RELATIONSHIPS**

UIC Nursing will hire staff and consultants with the understanding that these employees will ultimately report through the IDOC Deputy Chief of Health Services. While UIC Nursing will be responsible for human relations, employee issues, payment, and benefits, we will ensure that these staff will be integrated into the IDOC program.

**ASSUMPTIONS**

The College of Nursing assumes that IDOC will have the following elements in place to facilitate a successful implementation:

---

[20] Six Sigma is a widely accepted system of process improvement.

`

- Designated IDOC Office of Health Services lead to coordinate work of the UIC Nursing consulting team;
- Designated IDOC Quality Improvement Coordinator and/or Health Care Unit Administrator to lead local improvement efforts at each facility;
- Commitment of IDOC leadership and staff to lead and participate in improvement efforts;
- Adequate resources (electronic medical record, shared intranet availability, technology, equipment) for staff to deliver quality healthcare;
- Availability of approximately six regional prison locations for leader and staff training;
- Custody leadership will cooperate with quality improvement teams with respect to custody issues.

## STAFFING

*Refer to ProForma*

## TIMEFRAME

Three years, renewable on request, based on Intergovernmental Memorandum of Understanding.

## FEES

[Staffing needs to be determined and priced. Suggest an annual contract amount cost with benefits and any COL increases. The fees also need to include any costs associated with the College of Engineering participation. A rider should be inserted to account for any possible future changes.]

The UIC College of Nursing will invoice Illinois Department of Corrections at the end of each month and payment will be due within 30 days thereafter. One point seven five percent per month interest will be assessed on any balance outstanding after 30 days.

## CONTRACT

Upon approval of this proposal, an Interagency Agreement will be initiated by the UIC College of Nursing and the Illinois Department of Corrections. A fully executed agreement is required to start the consultation. Either party may exercise a 60-day written termination. In such an event, Illinois Department of Corrections would be obligated only for the salaries, benefits, and professional fees and expenses incurred prior to the time written notice of termination was received.

`

We are enthusiastic about the opportunity to be of service to you in this very important project.

Please sign and return one copy of this proposal if you wish to proceed with the project as described. Please do not hesitate to contact us if you have any questions.

## ATTACHMENT C

| Comparison Between Proposed Monitor and Actual IDOC Quality Measures Facility Audits | |
|---|---|
| **Monitor audit methodology proposal** | **IDOC designed audit process** |
| **Leadership and Organization: II.B.2, II.B.3, III.A.9.**<br>Document Request with review for adequacy and comments:<br>1. Leadership positions (HCUA, Medical Director, Director of Nursing, supervisory staff) that are filled.<br><br>Interviews:<br>**1.** With Medical Director, HCUA, Director of Nursing, select supervisory staff. Discuss operational issues at this facility that are barriers to compliance with Consent Decree and how the barriers are being addressed. Discuss facility corrective action plans with leaders.<br>2. Interview select other clinical staff (physical therapist, dentist, optometrist, line nurses, nurse practitioner/physician assistant, etc.) as needed to understand operational issues at the facility.<br>Audit measures: Tool 29 Custody collaboration with health care. | No analysis or auditing |
| **Staffing: II.B.2., II.B.3., III.A.10 1.**<br>Document Request with review for adequacy and comments: 1.<br>Current budgeted staffing including a list of vacancies the past 12 months. A list of all filled positions with the name and title of each individual and date of employment. Every employee who is required to have a license should have verification of their current license, CPR, orientation, continuing education and peer review.<br>2. Daily assignment sheets for all employee types (RNs, LPNs, nurse assistants, physicians, nurse practitioner/physician assistants, etc.) for the four weeks prior to the audit. May need to be compared to the list of filled positions by name to identify RNs. How many days is the RN assigned to sick call the last month? Calculate the percent of sick calls assignments are RNs per month. Calculate number of physicians and hours onsite by week.<br>3. A list of any temporary personnel (PRN or agency) with name and title of each individual.<br>4. Turnover report for nursing personnel if such document exists.<br><br>Interviews<br>With HCUA and other managers to discuss staffing needs. | No analysis or auditing |
| **Credentialing of physicians: III.A.2., III.A.3.**<br>Document Request with review for adequacy and comments 1.<br>List of all physicians with credentials. This is to include: a) Post graduate training if any with primary source verification for this training. b) Primary source verification of specialty board status | No analysis or auditing |

| | |
|---|---|
| **Oversight over nursing, dentists and physicians: II.B.6.q., II.B.6.r.,**<br><u>Document Request with review for adequacy and comments</u><br>1. Annual performance reviews of dentists, physicians, mid-level providers, and nurses.                              2. All peer reviews of any dentist, nurse, mid-level provider, or physician.    3. Any disciplinary actions against any nurse or physician at the facility over the past year.<br><br><u>Audit Measures </u>(These are a structured audit instrument developed by the Monitor that we recommend using.  We can give sample to IDOC).<br>1. Audit Tool 24, Nursing Personnel audit measures #1-8<br>2. Audit Tool 4, Nursing Sick Call- Observation of Nursing Sick Call audit measure #9<br><br><u>Interviews</u><br>1. Interview HCUA to discuss any actions that have been taken against any clinical staff regarding their professional performance.<br>2. Interview supervisory nurses and physician to determine whether supervision is<br>adequate.<br><u>Record Review</u><br>1.  Note if any record reviews demonstrate any egregious errors that should have required action but did not. | No analysis or auditing |
| **Clinical Space: II.B.2., II.B.6.g., III.B.1, III.C.2., III.F.1.**<br><u>Document Request with review for adequacy and comment.</u><br>1. List of all examination rooms and clinical spaces used by health care personnel.  The list should include the location of the room in the facility.<br>2. Safety and Sanitation reports<br><br><u>Audit Measures </u> Environmental audit not yet completed but includes tour of all spaces used by medical program to ensure adequacy.<br><br><u>Interviews</u><br>With HCUA and other managers to discuss space issues at the facility.  This is best done after a tour and review of staffing plans. | No analysis or auditing |

| | |
|---|---|
| **Equipment and supplies: II.B.6.p., III.B.2., III.I.4., III.I.5.,** <br> <u>Document Request with review for adequacy with comment.</u> <br> 1. Durable medical equipment list for facility to assess for adequacy based on mission of the facility. <br> 2 .Equipment list for facility with last date of calibration or inspection by an authorized medical equipment servicer. <br> 3. List of all emergency medical response bags at the facility with location, contents of bag, and whether bag is typically sealed. <br> 4. Blank copy of tool used to inspect emergency equipment and supplies. <br> 5. Inspection reports for emergency response equipment and supplies. <br> 6. List of dental equipment. <br> 7. Current dated IEMA radiological safety inspection report with any noted deficiencies. <br><br> <u>Audit Measures.</u> Environmental audit not yet completed but audits all clinical areas, pharmacy, and medical housing areas to ensure appropriate equipment and supplies are present. | No analysis or auditing |
| **Sanitation: III.J.3.** <br> <u>Document Request with review for adequacy with comment:</u> <br> 1. Safety and sanitation monthly reports. <br> 2. Facility cleaning schedule of all health care rooms. <br> 3. Facility procedures for sanitizing infirmary bedding and linens. <br> 4. Facility procedures for sanitizing medical spaces. <br> <u>Audit Measures-</u> Environmental audit not yet completed. But, ensures that health units are properly sanitized. | No analysis or auditing |
| **Laboratory and Diagnostics: II.B.6.g.** <br> <u>Documents Request with review for adequacy with comment:</u> <br> 1. Copy of any tool used to audit lab or other diagnostic services with the audit schedule. <br> <u>Audit Measures</u> <br> 1. Audit tool 11, Labs measures #1-6 <br> 2. Audit tool 6, Specialty Care Access Structural Review measures # 2 and 3 <br> 3. Audit tool 6, Specialty Care Access Chart Review measures #1, 2, 3, 5, 6, and 13. <br> 4. Audit tool 12, X-Ray measures 1-5 <br><br> <u>Record Reviews</u> <br> Record reviews show no barriers to obtaining diagnostic or specialty care and that providers are appropriately sending patients for diagnostic or specialty care as needed. | No analysis or auditing |

| | |
|---|---|
| **Dietary: II.B.6.j.**<br>Document Request with review for adequacy and with comments.<br>1. Meal plan with explanation of nutrition content by nutritionist.  Meal plan should contain nutritional content.<br>2. Dietician consultant hours provided to facility in past year.<br>3. Commissary list for the facility.<br>4. List of persons on therapeutic diets.<br>5. Number of individual and group dietary consultations provided at the facility over the past year.<br>Interviews  1) Interview nutritionist involved in establishing diet.  Have nutritionist explain how the diet is nutritionally sound.  2) Interview HCUA to determine hours of meals and where meals are served.  Obtain information on when meals are served to diabetics relative to when they are fed.<br>3) Interview a group of ten diabetics: five Type 1 and five Type 2.  Ask about food timing and quality related to their disease and their use of the commissary.  Ask about hypoglycemia episodes.<br>Record Reviews:   Note in mortality reviews whether any patients with complex medical conditions lacked nutritional consultation  when indicated. | No analysis or auditing |
| **Medical Records: II.B.4., III.E.1., III.E.2., III.E.3., III.E.4, III.E.4.**<br>Audit Measures<br>1) Tool 23, Health Record audit measures #1-5. | No analysis or auditing |
| **Policies and Procedures: II.B.8**.<br>Document Request with review for adequacy and with comments.<br>1. All current medical and dental policies and all new revisions over the past year that are in effect at this facility; this would include statewide policies and facility specific policies and procedures applicable to the medical or dental program.                                                     2. Are facility policies consistent with statewide policies.  Describe inconsistencies with statewide policies.<br><br>Review of Policies with Comments:<br>Policies submitted by IDOC are reviewed with comments.  The degree to which comments are accepted on final versions is addressed with comments.  Have facility policies been reviewed by the Monitor.<br><br>Audit Measures<br>1.  Measure #2 in Tool 17, Medication Accountability Audit<br>2. Measure # 1 in Tool 23, Health Record Audit<br>3. Measure # 1 in Tool 13, Infection Control Measures Audit<br>4. Measure # 4 and 6 of the Structural and procedure review in Tool 9, Infirmary Care Audit<br>5. Observation measures # 1 and 2 in Tool 4, Nursing Sick Call<br>Interview<br>With HCUA on steps taken to train persons on new or existing policies or administrative directives. | No analysis or auditing |

| | |
|---|---|
| **Specific dental policies: III.K.4., III.K.5.**<br>Document Request with review for adequacy and with comments.<br>1. Current policies available with respect to 1) routine disinfection of dental examination areas and 2) proper radiology hygiene with respect to lead apron/thyroid collar use and posting radiologic hazard signs where xrays are taken.                                                               2.<br>Comprehensive set of dental policies.  Are these reasonable?<br>Interview<br>1.Interview individuals who sanitize dental clinic to ensure procedures are adequate.<br>Tour/ inspection<br>1. On tour, dental unit appears appropriately disinfected. Disinfection process for instruments explained.<br>2. On tour lead apron and thyroid collar present and used.  Posting of radiologic hazard signs is present and appropriate. | No analysis or auditing |
| **Intrasystem Transfers:  III.D.1., III.D.2.**<br>Document request with review for adequacy and with comments<br>1. List of persons referred for specialty care and placed on hold for past year.<br>2. List of all incoming inmates for past 3 months.<br>Audit Measures<br>1. Tool 21, Continuity of Care on Transfer: Transfer Out measures<br>2. Tool 6, Specialty Care Access measure #3<br>3. Tool 21, Continuity of Care on Transfer: Transfer In measures<br><br>Record Reviews<br>On record reviews errors on intra-system transfer based on failure to ensure continuity of care are noted.  These errors may be clinical or operational. | No analysis or auditing |

| | |
|---|---|
| **Medical Reception: II.B.1., II.B.6.a., III.C.1.** <br><br> Document Request with review for adequacy and comments: <br> 1. Budgeted staffing positions with vacancies.   Examine whether the staffing levels permit adequate staff in intake for both nursing and providers. <br> 2. Log of all persons received as new intakes (intake facilities only) for past month.  Log to include date and time of arrival, date and time nurse intake screening performed, date TST read or IGRA completed, date of health assessment, chronic care problems identified, date seen by dentist, date scheduled for chronic care date of transfer and institution transferred to.  If this is not tracked give whatever in list is tracked. <br><br> Audit Measures <br><br> 1.Tool 1, Intake Screening measures # 1-11 <br> 2. Tool 2, Pregnant Women measures #1-10 <br><br> Interview <br> 1. Ask HCUA whether there is a backlog of intake provider examinations and how many extend beyond 7 days. <br><br> Record Review for Reception Centers <br><br> Include review of records for reception screening of persons with significant chronic illness.  Verify whether persons with chronic illness are appropriately assessed, have an appropriate therapeutic plan, and timely receive services. | No analysis or auditing |
| **Health Assessments: II.B.6.a., III.C.3., III.C.4.** <br> Audit Measures <br><br> 1. Tool 3, Health Assessment measures #1-15 <br> 2. Tool 2,  Pregnant Women measures # 5, 6, 9, and 11 <br><br> Record Reviews <br> Review records targeting complex medical conditions and evaluate whether patients receive a timely and appropriate evaluation for their condition and status and whether an appropriate therapeutic plan is established including ordering diagnostic testing, consultation, medication, etc. | No analysis or auditing |

| | |
|---|---|
| **Nursing Sick Call: II.B.1., III.A.10., III.E.2., III.F.1., III.F.2.**<br>Document Request with review for adequacy and comments: to analyze with respect to volumes of appointments<br>1. Aggregate data for appointments for sick call              2.<br>Primary medical service report on sick call encounters for past year.<br><br>Audit Measures<br>1. Tool 4, Nurse Sick Call – Observation of Nursing Sick Call measures # 1-11 and Nursing Sick Call Record Review measures # 1-10<br>2. Tool 24, Nursing Personnel measures #3-4 and 7-8.<br>3. Environmental Audit:  on adequacy of rooms used for evaluation.  This audit not yet complete.<br><br>Record Review<br>1. Review 20 requests for health care from mortality records with attention to potentially serious conditions using measures #1-10 of Nursing Sick Call to form an opinion. | Compliance audit  by IDOC Compliance Unit on timelinees of health service requests. |

| | |
|---|---|
| **Chronic Care: II.B.1., II.B.2., II.B.3., II.B.6.f.**<br>Document Request with review for adequacy and comments:<br>1. Chronic care roster<br>2. Any evidence of vaccination of persons with chronic illness.<br>3. List of persons with IDOC # for persons on these medications over past three months: Prednisone, warfarin, hydroxyurea, plavix, methotrexate, tumor necrosis factor (TNF) inhibitors.　　　　　　　　　　　　　　4.<br>Evidence of current backlog for chronic care clinics.<br>Interview<br>1. Interview chronic care nurse. Establish how chronic care program operates and what role the chronic care nurse plays in chronic care management. Identify backlog of chronic care appointments.<br>2. Interview provider(s) on how they manage chronic care and whether care is consistent with contemporary standard. Assess whether they have access to reference material and consultation with pharmacists and specialists.<br>Audit Measures<br>1. Tool 11, Labs measures #3-5<br>2. Tool 12, X-Rays measures #1, 4-5<br>3. Tool 25, Chronic Illness measures #1-11<br>4. Environmental Audit Dialysis measures not yet completed<br>Record Review<br>1. Review of at least ten patient records of high acuity chronic illness to determine if care is adequate. List opportunities for improvement. List of patients to come from a sampling of items below:<br>a. Targeted review of chronic clinic visits on mortality records.<br>b. Targeted review of a random sampling (minimum ten records) of persons on medications a-f above.<br>c. Targeted review of persons under cancer treatment.<br>d. Targeted review of additional patients on chronic illness rosters choosing diabetics on insulin, COPD patients, patients with coronary artery disease, etc. | Compliance only on whether diabetics have A1c < 8, controlled blood pressure, annual diabetic eye exam, annual nephropathy check, hypertensives have blood pressure control, No other aspect of chronic care addressed. |
| **Urgent and Emergent Care: II.B.1., II.B.6.b., III.G.1., III.G.2.**<br>Document Request with review for adequacy and comments:<br>1. Urgent Care Log<br>2. Appointment list for urgent or emergent care<br>3. Emergency response or man-down drill reports for prior year<br><br>Audit Measures<br>Tool 7, Urgent Care measures #1-3 and Urgent Care Chart Review measures 1-10<br>Record Review<br>Review records of persons receiving urgent care and determine opportunities for improvement and adequacy of care | No analysis or auditing |

| | No analysis or auditing |
|---|---|
| **Infirmary Care: II.B.1., II.B.6.k., III.I.1-5**<br>Document Request with review for adequacy and comments:<br>List of persons on the infirmary with diagnoses and reason for admission to infirmary.<br><br>Interviews<br>1. With DON to obtain evidence about RN coverage.<br>2. With provider in charge of infirmary care. Who is managed on infirmary and at what point are persons sent to a hospital? Are patients managed in general population who should be in the infirmary or in a hospital? Are there sufficient infirmary beds?<br>3. With infirmary nurses to identify how they develop their nursing plan of care and care for patients. Is it based on provider orders only? How do providers give them direction? How are they trained to document care? Are there rounds with the provider?<br><br>Audit Measures<br>Tool 9, Infirmary Care Chart Review Measures #1-11 and Infirmary Care Structure and Procedural Review measures #1-8<br><br>Record Reviews<br><br>Review ten records of high acuity patients housed on infirmary over the past 3 months. Evaluate both nursing and physician care to determine if care was adequate and whether there are opportunities for improvement. | No analysis or auditing |
| **Specialty Consultation: II.B.1., II.B.6.e., II.B.6.g, III.H.1-4**<br>Document list with review for adequacy and comments:<br>Specialty tracking log for past year.<br><br>Audit Measures<br>1. Tool 6, Specialty Care Structural Review measures #1-3 and chart audit specialty measures #1-13<br>2. Tool 21, Continuity of Care on Transfer (for patients returning from specialty appointment) measures #5-6<br><br>Record Review<br>1.Targeted review of minimum of ten patients drawn from specialty log or from mortality reviews who have high acuity issues. | No analysis or auditing |

| | |
|---|---|
| **Hospital Care: II.B.1., III.G.4.**<br>Document Request with review for adequacy and comments<br><br>1. List of persons hospitalized (exclude emergency room visits) over past year with:<br>a. Name<br>b. IDOC #<br>c. Date of admission to hospital<br>d. Date of discharge from hospital<br>e. Hospital discharge diagnosis<br><br>Audit Measures<br>1.Tool 7, Urgent Care Audit measures #6-10<br>2. Tool 8, Hospital Visit Ambulatory Sensitive Condition measures #1-5<br>Record Review<br>Review minimum of ten records targeting potentially preventable conditions and assess for opportunities for improvement and care adequacy.  These can be done as part of mortality review. | No analysis or auditing |
| **Preventive Care:  II.A., III.M.1.a-d.**<br>Document Request with review for adequacy and comments<br>1. Any aggregate surveillance data for vaccinations and cancer screening at the facility with patient name and IDOC number and the date and type of vaccination and date and type of cancer screening.<br>2. List of persons 1)20 or younger, 2)21-26, 3)27-29, 4)30-44, 5)45-49, 6)50-54, 3)55-64, 4)65-74, and 5)75 and older (These age breakdowns are currently needed to evaluate eligibility for certain immunizations and screenings.)<br>3. List of all persons over 50 by facility for past year<br>4. List of all females over 45 for past year<br><br>Audit Measures<br>1. Tool 10,  Preventive Care surveillance measures # 1-7 and Preventive Care chart review measures #1-12. | Audit whether females have breast cancer screening, whether inmates have colon cancer screening, annual influenza vaccination, pneumococcal vaccination, and COVID vaccination. No other aspects of preventive care addressed. |

| | |
|---|---|
| **Pharmacy and Medication Administration: II.B.1., II.B.6.c., II.B.6.d.**<br>Tour<br>Observe medication administration and identify any opportunities for improvement.<br>Interview<br>1. Interview the Director of Nursing regarding the medication administration process.<br>2. Interview a line staff nurse who administers medication to understand how the process works.<br>3. Interview the staff responsible for maintenance of the medication room.<br><br>Audit Measures<br>1. Tool 16, Medication Administration measures #1-17<br>2. Tool 17, Medication Accountability measures #1-8<br>3. Tool 18, MAR Review measures #1-11<br>4. Tool 19, Medication Continuity at Intake measures #1-2<br>5. Tool 20, Medication Non-adherence measures #1-2 | No analysis or auditing |
| **Discharge Planning and Continuity of Care: II.B.5., II.B.6.s., II.B.6.t.**<br>Document Request with review for adequacy and comments<br>List of individuals discharged from IDOC with the date they met with the IDOC discharge planner; their problem list including dialysis; the date of discharge; the date of their scheduled civilian appointment; whether they received their Health Status Summary Report; whether they received discharge medications and whether they received a prescription with refills, a copy of relevant lab and diagnostic reports, copy of relevant hospital and ED summaries and specialty consultations, and the database with immunizations and RHM screenings.  List by facility.  IDOC reported that it does not currently maintain this information. They should send whatever they track related to the above request.                                    Audit Measures<br>1. Tool 22, Discharge Planning measures #1-20<br>2. Tool 1, Intake Screening audit measure # 7.<br>3. Tool 19, Medication Continuity at Intake audit measures #1-2. | No analysis or auditing |

| | |
|---|---|
| **Infection Control: II.A., II.B.8., III.J.1., III.J.2.**<br>Document Request with review for adequacy and comments<br>1. Minutes of the Infection Control Committee for the past year.<br>2. Exposure control plan for blood borne pathogens.<br>3. Plan for communicable disease outbreak investigation.<br>4. List of all patients infected to hepatitis C to include name, #, fibrosis score, and whether they have been treated.<br>5. Log documenting check of negative pressure room.<br>6. Facility logs of spore testing results,<br>7. All surveillance data for infectious and contagious disease.<br>8 List of all reports to IDPH for reportable communicable disease          9. List of persons with hepatitis C, with name, ID #, fibrosis score, number completed treatment, number currently undergoing treatment, and number awaiting treatment.<br>Interview<br>1. Interview the Infection Control Nurse and identify if this position is a full time dedicated position?  If not, what other responsibilities does this nurse have?<br>2. What are the responsibilities of the infection control nurse?<br>3. Are the responsibilities in line with typical infection control nurse duties?<br>4. Are safety and sanitation rounds part of infection control evaluation responsibilities?<br>5. Have there been any outbreaks over the past year at this facility and how were they managed?<br>Audit Measures<br>1.Environmental Audit *not yet complete*<br>2. Tool 10, Preventive Care surveillance measure #1 and chart review measure #1<br>3. Tool 13, Infection Control measures #1-14<br>4. Tool 14, Tuberculosis Screening measures #1-6<br>5. Tool 15, STI measures #1-3 | No analysis or auditing |
| **Dental Care staffing and staff monitoring: II.B.6.q., III.K.9.**<br>Document list with review for adequacy and comments<br><br>1. Staffing plan with vacancies by facility and in aggregate.<br>2. Dental peer reviews<br>3. Annual performance evaluations of dental staff including dentists<br>4. Dentist, dental assistant, and dental hygienist hours worked in past year. | No analysis or auditing |
| **Dental Care documentation: III.K.1., III.K.10.c., III.K.11., III.K.12.**<br>Document list with review for adequacy and comments<br>1. List of inmates who had dental extractions in past year.<br><br>Audits<br>Tool 27, Dental Care measures #1, 2, and 4                    Tool 28, Dental Extractions measures 1-3 | No analysis or auditing |

| | |
|---|---|
| **Dental Support: III.K.4-5., III.K.13.**<br>Document list with review for adequacy and comments<br>1. List of all dental equipment with date of most recent calibration or inspection by an authorized dental equipment vendor. The list would identify any defective equipment that needs repair or replacement with the date of that repair or replacement. The name of the authorized dental equipment vendor is requested.<br>2. List of dental equipment pending repair with date repair requested.<br>3. Policy related to disinfection of dental areas.<br>Tour and Interview<br>With dental staff to assess dental disinfection and radiology protection in dental unit and equipment needs. | No analysis or auditing |
| **Dental Access: II.B.6.h., III.K.2.**<br>Document list with review for adequacy and comments<br>1. Current dental backlog<br>2. Current backlog in dental health requests<br>3. List of dental health requests for past year | No analysis or auditing |
| **Dental Intake: III.K.3.**<br>Document list with review for adequacy and comments<br>1. List of new intakes (for intake facilities) for past 3 months.<br>Audits<br>Tool 26, Dental Screening measures #1-3 | No analysis or auditing |
| **Dental Hygiene: III.K.7., III.K.8.**<br>Document list with review for adequacy and comments<br>1. "Service rendered log" of dental hygiene for prior year to include name, ID #, date of cleaning or refusal. 2. Dental hygienist hours worked in past year.<br><br>Audit<br>Tool 27, Dental Care measure 3 | Audit whether every inmate had dental hygiene every two years. No other aspects of dental care audited. |
| **Comprehensive Dental Care: III.K.6., III.K.10.a-b., III.K.12.**<br>Document list with review for adequacy and comments<br>1. Number of extractions in past year.<br>2. Number of restorations in past year.<br>3. Dental sick call list for past year.<br>Audit<br>Tool 27, Dental Care measure #2<br><br>Interview<br>With dentist regarding when x-rays are taken, ratio of extractions to restorations, whether every inmate has an individualized treatment plan which is scheduled until all identified issues are resolved. | No analysis or auditing |

| | |
|---|---|
| **Internal Monitoring and Quality Improvement: II.B.2., II.B.6.l., II.B.6.o., III.L.1.**<br>Document Requests<br>1. All Quality Improvement Meeting minutes for past year.<br>2. Any internal or external monitoring audits for past year.<br>3. All performance and outcome measure dashboard results for prior year.<br>4. All adverse event reports with analysis and corrective actions.<br>5. All patient safety training provided<br>6. All vendor monitoring reports                 7. 7.<br>Any facility specific training over past year on quality improvement<br>Interviews<br>Interview quality improvement coordinator.  1) Coordinator is asked to show how the program has identified problems and taken action in the quality committee to correct deficiencies and improve performance.  2) Determine what training on patient safety has occurred. | No analysis or auditing |
| **Audits:II.B.9.**<br>Document Requests<br>1. Any audits of medical care for the past year with any deficiencies identified with corrective actions taken. Which should be this entire document.<br>2. Any internal or external monitoring audits for past year.<br><br>Interviews<br>1. Interview the QI Coordinator and HCUA to discuss audit results for this facility and how the results were utilized by the organization to improve performance.<br>2. Interview the HCUA and QI Coordinator on corrective actions pending. | Consists of 12 audit questions that appear to be performance measures. Comparison of left colum with this column shows differences in proposed audits. |
| **Performance and Outcome Measures: II.B.7.**<br>Document Requests<br>1. Performance and outcome measures for past year for this facility as evidenced on dashboard. (reference CD item II.B.8)<br>Interviews<br>1. Interview the Quality Improvement Coordinator to discuss performance and outcome measure results for this facility and how the results were utilized by the organization to improve performance.         **Of note, Monitor recommended 51 performance and outcome measures to be displayed on a dashboard monthly and continuously.  IDOC proposes 12 performance and outcome measures to be used as the entire audit and only performed once a year and then discarded and replaced by a new set of "indicators".** | No analysis or auditing |

| | |
|---|---|
| **Adverse Event and Incident Reporting Systems: II.B.6.m., II.B.6.n.**<br>Document Requests<br>1. List of adverse events from past year.<br>2. List of "near misses" from past year.<br>3. List of sentinel event reviews from past year.<br>4. Documentation of any action taken on adverse events, near misses or sentinel events from past year. This may be in quality improvement reports.<br>5. List of grievances related to medical and dental with name, #, and grievance.<br>Interviews<br>1. Interview the Quality Improvement Coordinator to discuss adverse event reporting system at this facility and how results for this facility were utilized by the organization to improve performance. | No analysis or auditing |
| **Vendor Monitoring: II.B.2.**<br>Document Requests<br>1. Vendor monitoring reports for facility for past year.<br>Interviews<br>1. Interview the HCUA and Quality Improvement Coordinator to discuss vendor monitoring results for this facility and how the results were utilized by the organization to improve performance. | No analysis or auditing |
| **Mortality Review: II.B.6.i., III.M.2.**<br>Document Requests<br>1. List of all deaths at this facility for past year.<br>2. Mortality reviews for all deaths at this facility over the past year.<br>3. Quality Improvement meeting minutes for past year<br>4. Medical records of all deaths at this facility over past year.<br><br>Record Reviews<br><br>Review selected deaths at this facility and compare results with mortality reviews. Review care for more than just with respect to the cause of death but look at all aspects of care. Identify opportunities for improvement and compare facility identified opportunities for improvement. | Mortality reviews initiated somewhat in line with recommendations of Monitor. Results not yet clear. |

**Appendix D**
**Monitor's 6th Report**

**Comparison of IDOC Clinical Quality Measures Audit and Monitor's Finding During Site Visit to Dixon**

The IDOC clinical measures audit is provided below.  This was accomplished with a one day visit to Dixon by one person.  This was the report of the Dixon Clinical Quality Measures Audit.

| IDOC Audit of Dixon Correctional Center | | | |
|---|---|---|---|
| FY23 - 1st Quarter | | | |
| Measure: | Actual Performance | IDOC Goal | HEDIS Goal |
| 1) Sick call responsiveness | 30% | 90% | N/A |
| 2) Breast Cancer Screening | N/A | 90% | 53.0% |
| 3) Colon Cancer Screening | 20% | 90% | 60.7% |
| 4) Dental Visit | 0% | 90% | 42.8% |
| 5) Controlling High BP | 80% | 90% | 55.9% |
| 6) DM- Hgb A1C <8% | 80% | 90% | 45.0% |
| 7) DM- BP < 140/90 mmHg | 90% | 90% | 58.2% |
| 8) DM- Nephropathy check | 50% | 90% | 89.7% |
| 9) DM- Annual Eye Exam | 90% | 90% | 50.6% |
| 10) Annual Flu Vaccine | 90% | 50% | 40.0% |
| 11) Pneumococcal Vaccine | 40% | 50% | 72.7% |
| 12) COVID vaccine | 100% | 50% | |

The following are findings from the Monitor's three person, three day visit in December of 2022.

**Monitor Findings From Recent Dixon Visit: December 2022**

**Positive Trends**

1. The HCUA was engaged and knowledgeable about the operations of the health care program at Dixon CC.
2. Dixon CC filled one of two long standing vacant DON positions during the site visit. The new DON was promoted from a nurse supervisor position; she was already actively looking for opportunities to improve nursing services.
3. The monthly QI minutes (written by the HCUA) honestly documented some deficiencies that need to be addressed including rescheduling of offsite medical furloughs and onsite clinics due to lack of sufficient correctional staff, the discontinuation of onsite ultrasound service due to the vacancy of the technician, backlog of physical therapy services, lengthy delays in receipt of X-ray reports (this was corrected by changing the radiology vendor), and lack of a dentist with resultant significant backlogs for dental needs.

4.  The Dixon CC Hep C Clinic roster at the start of December 2022 has now decreased to 19 patients including 5 refusals, 1 on treatment, and 3 starting treatment in mid-December. Previous HCV clinic rosters (untreated and on treatment patients) were 87 in Dec 2019, 65 in Dec 2020, and 35 in Dec 2021. This decrease is due to the decrease in Dixon census during the pandemic and the treatment of 44 HCV patients since 2019 (28 in 2021).

5.  The process of collegial review has been discontinued at Dixon CC. The medical director stated that he has no regular calls with Wexford medical directors to discuss any offsite referrals. There are no alternate treatment plans being recommended by Wexford.

6.  The infirmary beds have almost entirely been replaced by new or barely-used electric beds donated to Dixon by IEMA that were purchased to temporarily quarantine COVID patients in the community. This is an upgrade for the infirmary.

7.  6-7 additional individuals have recently completed training increasing the "hospice worker" staffing to eleven. These workers are assigned to the infirmary to assist other inmates.

8.  Patients interviewed during the site visit were knowledgeable about the process to sign up for nurse sick call. They uniformly stated that they are generally seen within 2-4 days.

9.  Nurse sick call is primarily done on the 1st floor of the HCU and in X house (and in HU's during lockdowns). During the 2018 site inspection, two nurses were sharing a single exam room with 2 desks and 1 exam table. During this visit, each nurse now has their own exam room. This is an improvement.

10. The dental clinic is a bright and professional space.

11. This is first dental clinic that the monitor has found to digital dental x-ray capability. It is available only at one of the three dental stations. It is not clear if all dental suites in the IDOC now have digital dental x-ray devices.

12. A dental hygienist has now been hired at Dixon CC.

13. Since 2018, the facility's radiology unit and table have been upgraded albeit with a used and refurbished unit. This is an upgrade.

14. Dosimeters are now required to be worn in the dental clinic and by the radiology technician. The badges had only recently been sent off for reading of any radiation exposure.

15. Dixon's leadership communicated that all patients on the 2nd and 3rd floors of the HCU (infirmary, ADA, geriatric units) had been evaluated for the Joe Coleman bill criteria for early release. Ten patients met the medical criteria and some (# not provided) were released. Some patients were approved but placement in the community (family, nursing home, etc.) could not be identified. Dixon convenes regular meetings to discuss/identify other qualified applicants.

**Overview**
Housing arrangements
- Current population 1560
- General Population 1000
- Seriously mentally ill capacity 160 housed in X-house with a satellite clinic

2

- Health Care Unit 109 beds
  - o Infirmary 26 patients with capacity of 28
  - o ADA unit 15 beds
  - o Geriatric Unit 3rd floor 66 patients (no ADA accommodations yet housing ADA patients)
  - o Population > 50 years old = 451 (31.9%); >65 years old 124 (8.8%); > 75 years old 38 (0.7%)
  - o Unit 26 houses individuals 50 years of age or older who are presumably self-care. It is closer to the cafeteria and health unit. It is minimum security only and has no stairs.
  - o Unit 112 has 30 single cell rooms that now house all patients with CPAP machines.
  - o Dixon does not otherwise cohort any other high risk medical patients such as those with seizures, diabetes, heart faillure, etc.
- Programs include vocational, making eyeglasses for IDOC inmates, educational, voluntary faith based, mental health groups.
- There are no activities or specialized programs for the health care population or geriatric population housed in general population.
- "Hospice" workers: this group of 11 inmates were described as "uncertified" nursing assistants. This program is managed by a social worker. The inmates get credit toward release and are paid a stipend and are only assigned duties in the health care unit. Another category of worker is the ambulatory aide who push wheelchairs or assist inmates with walkers or canes as needed. They also assist in showering. We had concerns that these groups are traversing the boundry of providing clinical care to patients due to staffing shortages. The number of ambulatory aides was not obtained.
- Joe Coleman releases: Health care administration did an assessment of all men housed in the 2nd and 3rd floor of the health care unit (ADA, Infirmary, Geriatric units). Only 10 met the Joe Coleman criteria for possible early release to community. A few were released. Some were approved but community housing (with family or into a skilled nursing facility or nursing home) has been difficult to identify. To be released a destination in the community must be arranged. Many if not all nursing homes do not want ex-felons. Health care administration meets every Wednesday in the infirmary to discuss and review possible Joe Coleman eligible patients. Names of possible candidates are sent to the parole board for applications. The Warden stated that IDOC is revising its Administrative Directive concerning early releases.
- Joliet Inpatient Treatment Center (JITC) transfers: Two-thirds of the recently opened JITC is dedicated to mental health intensive care. Four individuals with serious mental illness have been sent from Dixon CC to JITC. There have been discussions about transferring high risk mental health with comorbid medical conditions JITC for integrative care.
- Correctional Staff Vacancies: We were told that there are 200 (38%) correctional officer vacancies of the 526 CO positions at Dixon CC. The Warden stated that this is a concern throughout the IDOC. A subsequent report on officer vacancies provided by IDOC shows

that at Dixon as of January 2023, there are 325 (61.3%) officers being paid[1] out of an authorized staff of 530, which equates to a 39% vacancy rate. Throughout IDOC, there is a 29% overall vacancy rate. The shortage of officers at Dixon CC has negatively impacted onsite and offsite access to health care. There are frequent lockdowns that interfere with movement of patients to on-campus medical/dental/physical therapy, lab/diagnostic services. For offsite services, security staff stated that they can transport only 12 individual appointments to offsite care (specialty appointments, treatments, specialized testing) per day. If 12 men have appointments and emergencies or urgent offsite consultations arise then the medical director has to try to identify which patients will be rescheduled. This creates delays in the provision of needed care and some patient fail to receive ordered care. The warden confirmed that there are only two ADA appropriate transportation vehicles and one is currently "down". This creates another barrier to offsite movement.

- Lockdowns may occur when staffing levels are reduced. The lockdown levels at Dixon include:
  - o Level 1: No movement, only emergencies moved
  - o Level 2: Workers can move, patients must be escorted to health care for services and medication pickup
  - o Level 3: Open movement, no escorts required.
- Access to onsite ultrasound testing: previously, onsite ultrasound and Fibroscan testing was available on a monthly as-needed basis. However, the sole ultrasound technician was locked out of a facility and subsequently banned from all IDOC facilities. Ultrasound testing must now be scheduled at offsite medical centers which further contributes to the number of patients who need to be moved by corrections. This adds another barrier to access to care.


**Leadership and Organization**
1. The Medical Director does not provide adequate leadership for the medical program. It did not appear that there was an expectation for the Medical Director to be responsible for the clinical medical program. He appeared either unaware or not engaged in significant clinical issues. It appears that the Medical Director is not informed of the expectations of the Medical Director position. Issues included:
   a. The Medical Director said he did no formal review of nurse practitioners. Nurse practitioners confirmed no formal oversight over their work. Required collaborative agreements were not reviewed, but there was no evidence of collaborative agreement monitoring which is required by the licensing regulation.
   b. The Medical Director wasn't sure if there were enough staff but admitted that he needed another physician.
   c. The Medical Director didn't know who made the nurse practitioner clinical assignments. The HCUA thought that the vendor site manager made nurse

---

[1] Some officers on medical or other leave are paid but are not working so this number inflates the actual number of officers working.

practitioner assignments, but the nurse practitioners said they made their own assignments and decided amongst themselve how they would divide up work. This group is unsupervised clinically and administratively. The Medical Director should arrange the schedule based on the clinical abilities of staff.

d. Though there are numerous falls on the infirmary, the Medical Director was unaware of any procedure to address falls.

e. Though quality improvement minutes describe significant delays is getting specialty care, the Medical Director thought that there was sufficient access to specialty care.

f. The nurse practitioners thought that the Medical Director was responsible for obtaining physician orders for life sustaining procedures (POLST), but the Medical Director was unaware of a procedure for who makes decisions on POLSTS.

g. The Medical Director was unaware that patients are not seen for all of their medical problems in chronic clinic. While he wasn't sure if all patient problems were monitored in chronic clinic he thought that the majority of time they were. He does not participate in chronic clinics and does not supervise chronic clinic performance.

h. The Medical Director said that doctors don't direct nuring care on the infirmary. While this does represent what occurs, it is inappropriate clinically for providers not to direct care on the infirmary.

i. When the Medical Director evaluated patients, he evaluated them without a medication administration record.

j. The Medical Director was not sure if there was sufficient housing for the aged. He had no recommendations for improving any processes at Dixon despite all of the findings in this report. He wasn't sure about what immunizations were available for inmates. He thought colorectal cancer screening was colonoscopy but the IDOC screening procedure is the FIT test. This makes it appear that he does not engage in colorectal cancer screening. He had no response about lack of appropriate provide notes on the infirmary.

2. More engagement is necessary and the vendor needs to improve its orientation so that position expectations are provided.

3. There are two Director of Nursing and five nursing supervisory positions for a total of seven nurse managers. Of these six (86%) are vacant. The absence of nursing managers is insufficient to supervise health care delivery and nursing practice at Dixon.

### Facility Staffing Issues

4. Overall, there was a 35% vacancy rate which is significant.

5. LPNs and Certified Nurse Assistants are vendor staff and there is no supervisory nurse above them. They are supervised by a non-clinical site manager. This is inappropriate.

6. 205 of 530[2] security position are vacant which causes lockdowns with reduced movement to health care, reduced programming, and inability to move all patients for specialty appointments.

---

[2] Based on the latest report from IDOC.

5

7. There are an insufficient number of physicians. Given the number of geriatric and medically complex patients at this facility the ratio of physicians to nurse practitioners is extremely low. We suggest a 1:1 to a 1:1.5 ratio at this facility; instead there is a 1:4 ratio.

8. Staffing is very low and Dixon has been using inmate "hospice" workers and ambulatory aides who were described as "non-credentialed nurse assistants". Our concern is that these inmate workers may be used as health care workers which would be inappropriate. We do strongly recommend this program despite our concern above.

9. Illinois has regulations that governs nurse staffing on skilled and intermediate care civilian units and these should be guidelines to develop IDOC's staffing plan for infirmaries but they are not used. Illinois requires skilled nursing patients (most infirmary patients) have a minimum of 3.8 hours of nursing personnel for each day for each resident and 2.5 hours per day per individual in an intermediate unit (equivalent to some infirmary beds and many patients on the geriatric unit). IDOC seems to be significantly below these recommendations. No nursing personnel are present on the 3rd floor where it is clearly indicated.

10. There is no nursing staff on the 3rd floor geriatric unit and minimal officer staff.[3] Inmates were noted to be helping each other. Many inmates on this unit require assisted living arrangements which were not being provided.

11. Staffing on the infirmary is not consistent with State of Illinois nurse staffing requirements for either skilled nursing care or intermediate level care. The patient census of 28 includes many who needed considerable nursing care. The infirmary nurse staff of one RN and one C.N.A was inadequate for this population. The typical assignment sheet was to have been one RN and two C.N.A.s, but we calculate that this was insufficient staffing based on the number of patients. The C.N.A.s work 8 hour shifts but the nurse who worked the day shift was scheduled to return at 10 pm to work another 8 hour shift on overtime. During the 14 day assignment sheet there were 14 overtime shifts, two of which were mandated. It appeared that minimum staffing is two C.N.A. staff on day and evening shifts but there was only one C.N.A. on two of the 14-day shifts.

12. There is an absence of clinical leadership on the infirmary. The Medical Director sees patients twice a week and a nurse practitioner sees patients the remaining three days of the week. When asked what does the physician direct with respect to nursing care, the Medical Director responded that doctors don't typically direct nursing care on the infirmary. When nurse practitioners were asked the same question, they responded that nurses make their own decisions about what care the patient needs. This is inappropriate for a higher-level-of-care unit.

13. There was no supervisory nurse on the infirmary and no one assigned for that position.

14. Due to staffing shortages, nurse assignments changed frequently. We examined 14 days of assignment and the nurse on the infirmary the day of tour had been assigned five of a possible six 12 hour shifts and worked two 12-hour overtime shifts in other areas and had been mandated to work another three hours overtime on three occasions (18 hours each). This nurse therefore worked 52 hours a week. Six (43%) of 14 possible 12 hour shifts were covered by nurses working overtime.

15. With overtime there was a nurse continuously on the infirmary but mandated overtime was necessary to meet this requirement.

---

[3] On the day of our visit there was one officer for the 61 patients on the 84 bed unit.

6

16. As described, officer vacancies are considerable and impair the ability of the facility to provide adequate access to medical and dental care and impair the ability to program on specialized medical housing units.

17. There has been no dentist for nine months creating significant backlogs which were evident on patient interviews.

18. There was only one 0.4 FTE (two days a week) physical therapist which is clearly inadequate for this elderly population. The physical therapy assistant position has been vacant for months.

**Credentialing and Oversight over nursing, dentists and physicians**

19. There is no oversight over the nurse practitioners. A physician can legally supervise four nurse practitioners but at a facility with so many complex patients a higher ratio of physicians should be in place. Collaborative agreements that are required by state regulations were not evaluated. The physician described no formal oversight over this staff. Nurse practitioners could "consult" with the physician but worked without any meaningful oversight and described no formal oversight. Record reviews demonstrate that for complex patients additional physician oversight was needed and many complex patients should have been managed by a physician.

**Clinical Space Issues**

20. Walkways outside, building entrances, hallways and rooms throughout the campus are notable for tripping hazards due to broken surfaces and missing tiles. It appears that missing tiles have been replaced on the first floor of the HCU clinic but other areas in the building appear to have floor surfaces that have deteriorated further.

21. The 1ˢᵗ floor health unit had the following deficiencies:
   a. The nursing desk is located in an open corridor and lacks privacy and confidentiality.
   b. The procedure room serves as a storage space for equipment which clutters the space and makes it clinically inappropriate. There should be a separate storage space. When emergencies occur, time is likely wasted clearing the space around the procedure table. The oxygen tanks were all in racks. The electrocardiogram and suction machines did not have inspection stickers. The automated external defibrillator had an expired inspection sticker (8/2022 expiration) indicating lack of an annual inspection. The defibrillator pads were current 10/22/2023 and 7/19/2023.
   c. There are insufficient examination rooms for the number of allocated physicians, nurse practitioners, and nurses who need to use them. There are three examination rooms with five providers (one doctor and four advanced practice nurses) and one physician vacancy.
   d. The lab room was organized.
   e. Three treatment cubicles in the hall lacked privacy and confidentiality.
   f. The conference room off the main corridor serves as the telehealth room for UIC consultants. When in use for telehealth there is no room for staff to conduct group discussions. This facility needs a conference room in which to conduct huddles, training, larger group meetings etc.

7

g. The medical record room appears to be organized. Drop filing and backlogs of filing were not assessed.

h. There is a separate corridor with individual staff offices. Sufficiency of office space was not assessed.

i. The dental suite had an entrance off the main hall. There were two dental chairs and and old optometry chair. This equipment needs to be refreshed. Only one chair had access to the new digital radiology screen. One counter was organized to allow proper cleaning, wrapping, and sterilization of equipment. Space was bright and professional. Boxes on the top shelf were close to the ceiling which is inappropriate. Staff removed these boxes before the end of the site visit but this demonstrates a non-standardized supply chain practice.

j. There was a single physical therapy room with eight patients currently in the room. Because we believe additional physical therapy staff is indicated, this room may need to be larger.

k. There were two elevators to the second floor (infirmary and ADA units) and the third floor (geriatric unit). One elevator is new and the other is under construction for replacement or renovation. In 2018 both elevators were broken during the site visit with patients having to be carried down the stairs if they needed health services on the 1st floor. It is a life safety issue that both elevators be functional.

l. Two nurse sick call offices are located in the area near the elevator corridor. In 2018 two nurses shared one of these rooms, now only one nurse is assigned to each room.

m. There is a 2nd telehealth room used for mental health telehealth with an examination table. This room is rarely used by nursing for sick call.

n. The optometry Room as clean and organized. The optometry chair is in good condition. The optometry and telemed room are used for sick call visits. This is inappropriate as they are not set up for sick call.

o. The radiology suite is neat, organized, had leaded aprons, and the Illinois Emergency Management Agency review current. The radiology unit/table (albeit 2nd hand) has been upgraded since the 2018 site visit,

p. The pharmacy area has two medication administration windows for medication pickup or directly observed therapy. These windows are connected to a medication preparation room and medication storage room. Medication pre-pouring is still conducted.

q. The medical supply room is cluttered with boxes approaching the ceiling. Ceiling tiles have fallen down and bare areas are covered with plastic sheet coverage. This space needs attention and organization.

r. There are several places in the health care unit where the ceiling tiles are rusted, broken out or missing. Some of these areas also have been covered with plastic appearing to reduce water leakage. A large one of these is outside the entrance to the pharmacy on the 1st floor and another is in the ceiling of the nurses station in the infirmary on the 2nd floor.

22. Health Unit 2nd Floor

8

  a. Unrepaired cracked glass in the central corridor near the security post.

23. Health Unit 2nd floor ADA unit.

  a. Multiple missing tiles – increasing risks of falls

  b. Patients eat in their rooms, promotes unsanitary conditions.

  c. The dayroom is sparse with nothing beside a TV and a few chairs/tables

  d. There was no American Disability Act (ADA) shower on the ADA unit. The showers are too small on this unit and do not accommodate use of a wheelchair. The seats in the shower are unsanitary and there is mineral buildup on the shower head and walls. One shower had no head; a bare pipe delivered water to the user. Shower curtains were cracked, torn and filthy with dirt. The HCUA stated that the Administrative Directive only requires Health Services to inspect areas where health care is delivered. Apparently, that does not include ADA housing or the Mental Health offices on 2nd floor or the geriatric unit on the 3rd floor.

  e. There are broken windows in the entry to the second floor. The HCUA was unable to state when they were broken or when they would be replaced when asked during the tour. The Safety and Sanitation Reports reviewed for 3rd quarter 2022 do not identify these broken windows.

24. Health Unit 2nd floor infirmary unit.

  a. The health unit had areas covered in plastic to reduce water leakage. The ceiling in the nursing station had significant water damage.

  b. All infirmary nursing station desk chairs are broken, two without backs. The space is too small for the number of working employees. Paper is posted on vertical surfaces without fire protection. Desk drawers were broken or missing. Ceiling tile was broken and had water damage.

  c. The infirmary had multiple missing and some loose tiles which create fall risks for the patients. The safety and sanitation report said the tiles should be tested for asbestos which does not appear to have been done.

  d. The infirmary treatment room is very cluttered and clinical space is used as storage.

  e. The temperature log in the sick call office was missing. An otoscope /ophthalmoscope was available and operational although not correctly assembled at the time of the visit.

  f. Ceilings throughout the unit had peeling paint and plaster.

  g. The dayrooms are sparse with nothing besides a TV and a few chairs and small tables.

  h. There are two caged dayroom spaces used by maximum security/crisis patients. When a maximum security inmate is in one of these spaces the dayroom cannot be used by other inmates. This creates lack of access to out-of-room time for non-maximum security inmates.

  i. The single negative pressure room was being used to house a patient who does not require negative pressure. The window unit was sealed with plastic. The nursing staff did not know how to turn on the negative pressure. Security came and unlocked the window to switch on the negative pressure fan; the tissue paper test failed. The HCUA said the engineer would be called.

  j. Electric hospital beds were obtained from IEMA recently. We verified that the bed, head, feet/leg sections can be electronically raised or lowered. These beds

are used for all the infirmary beds. There were a few old electric beds donated by a local private hospital. There were two fixed, concrete, restraint crisis beds on the infirmary; they were not in use at the time of the tour.

25. The geriatric (3rd floor) unit

    a. This unit housed elderly men. Though we were told that a requirement of the unit was ability to care for themselves, this unit obviously housed multiple individuals who were not able to manage self care or could only do so with extraordinary effort or with help from other inmates.

    b. Vents on the unit were dirty and rusty.

    c. This unit did not have an appropriate shower for the disabled (ADA) even though a significant number of patients have mobility disabilities. This created patient safety risks. There were five shower stalls on a unit with 84 beds, each with about a 2.5 foot entry and 2.5 foot depth inside. Inmates confirm that the one "ADA" shower stall on the unit has a seat that is broken and can't be safely used. The plastic covering on the broken seat is torn. The "ADA" shower has no shower head and the shower arm which is equivalent to a half inch pipe delivers water for showering. This apparently has been in disrepair for some time based on comments by inmates. These shower stalls are not ADA appropriate because they do not accommodate a person requiring a wheelchair. There was a six inch curb surrounding the showers so persons on a wheelchair couldn't access the stalls without enduring a fall risk. These showers need complete renovation. Illinois code[4] gives specifications on showers and lavatories in long-term protected housing. These specifications should be used for this housing unit. One inmate we spoke with had fallen in the shower.

    d. The toilets on the geriatric unit are also not ADA appropriate despite multiple disabled persons living on this unit. There is a very small lavatory in each patient room which is shared by two people. The room is very small and does not accommodate a wheelchair. Even the door is too small to accommodate a wheelchair so patients who have significant disability have to walk into the room, which for some patients creates a patient safety risk. Inmates complained about the grab bars in these toilets not being properly placed to ensure safety.

    e. The unit, like others throughout the building, has multiple tripping hazards due to broken surfaces and missing or loose tiles.

    f. Hospital beds on the 3rd floors were not operable as they had the cranks removed. These 3rd floor patients should be in an assisted living unit.

    g. Inmates in one shared room installed their own TV cables in a gerrymandered fashion which were hanging loosely throughout the room like clothesline. This should not be encouraged and can be prevented by proper maintenance by IDOC staff.

26. Building 26

    a. Building 26 is a single floor structure with no stairs or steps that houses minimum security men over fifty with some that need moderate ambulatory assistance. Some of these have ambulatory aides. Not all inmates on the 3rd floor geriatric unit who needed assistance had an ambulatory aide but we could not confirm that

---

[4] https://www.ilga.gov/commission/jcar/admincode/077/077003300M30900R.html

10

in this unit.  The building is the housing unit closest to the inmate cafeteria and the HCU.

    b.  The dayroom has four group tables, with a TV on the wall.  The dayroom looks much more accommodating and professional than the infirmary, ADA, or geriatric units

    c.  There is an office space where nurse sick call was done during the pandemic and now during  lockdowns but it was not equipped as a clinic space.

    d.  The four single person showers in the corridor had cracked plastic walls and no safety bars.

    e.  The sidewalk leading toward the health care unit was crumbling/deteriorating and created an obvious risk for falls.

27. Building X

    a.  Building X is an X-shaped, two story structure with four double celled housing units that has capacity to house 160 maximum security seriously mentally ill (SMI) men.  Dixon CC houses the largest number of SMI patient-inmates in the IDOC.

    b.  There is an examination room in the one of the units with a functional sink, an examination table, basic supplies, and an oto-ophthalmoscope (one bulb needs to be replaced.) that is primarily used by the nurse practitioner to do "medical" sick call.  Nurses also use this room as needed for nursing sick call if a more detailed exam is needed.

    c.  There was a nurse office in the central area of the X building which is also stocked with medical supplies.

    d.  There is a medication room in the central area that contains stock medications and additional supplies.  Medications are passed directly-observed at each cell.

    e.  An inmate porter was interviewed.  He understood the process to request sick call (complete the request form, give it to the officer on the wing or put it in the locked health request box in the central area). He stated that generally he would be seen within 2 to 3 days

    f.  Another inmate called me to his cell.  He showed me a fleshy growth on his upper gums between his two front teeth,  He complained that the medical team was not treating this problem.  His chart was reviewed.  He had been referred twice to an oral surgeon but refused to go once and refused biopsy.  The Dixon CC HCUA was aware of this patient and his condition.  There had been a staffing discussion about this patient.  She was advised to get the mental health team actively engaged in the plan for this patient.  It appeared that there may be a mental health staff that the patient seems to trust.

**Medical Records**

28. One discharge chart reviewed had loose filing. This was the second chart reviewed with loose filing.

29. The scheduling clerk estimated a report will be obtained for approximately 80-90% of specialty consultations.  A nurse practitioner thought that only some reports are missing.  The Medical Director does most of the writ returns.  He estimates that about 70% of the time he receives a single sheet of paper with brief comments but eventually full reports are

11

obtained. The status of what is received is not tracked.  Receipt of reports should be tracked. What is received and when it is received should be noted.  The doctor noted that full reports are infrequently present upon return.

30. Patients are evaluated in X-house and other non-health unit locations without a medical record.  All patients should be evaluated for scheduled visits with a medical record.

## Policies

31. There was no evidence of implementation of one of the few IDOC completed policies: the immunization and cancer prevention screening administrative directive.

## Equipment and Supply

32. Equipment was not checked on an annual basis.
33. Safe shower chairs were unavailable in all locations where disabled persons are housed.
34. There is no hoyer lift for very obese patients on the infirmary.
35. Instrument and controlled substance counts were not completed.
36. Paper covers on examination tables were not in use in two of three provider  examination rooms and in nurse sick call examination rooms.
37. Two rooms used for nursing sick call do not have an examination table.
38. The negative pressure room was not producing negative pressure.  Nurses did not know how to activate negative pressure or how to gauge pressure.
39. The X house examination room had randomly placed supplies.  The oto-ophthalmoscope was on the floor in a charger.  The otoscope worked but there were no ear covers in the room. The ophthalmoscope would not light and the reason was unclear.  We learned that examination table paper barriers are not used because pepper spray penetrates the paper. Instead, the exam table itself is cleaned between uses.
40. The x-ray unit has a number of leaded aprons in good condition but there is not a thyroid collar.
41. Dental unit has an optometry chair which needs to be a dental chair.
42. Dental x-rays are able to be taken in only one of three dental chairs.  All dental chairs should have capacity to perform a dental x-ray.
43. It did not appear that there was a procedure in place for re-supply of clinical areas.

## Sanitation

44. There are broken windows in the entry to the 2nd floor but the Safety and Sanitation report did not identify the broken windows.
45. Registered nurses are assigned to provide information about each area where health care is delivered to the HCUA for the Safety and Sanitation Report. The HCUA stated when asked that no training has been provided to the nurses about how to inspect or what to report. No guidance or tools have been provided for safety and sanitation inspections except a generic form that lists about 11 elements (i.e., sinks and toilets work) to be rated as good, fair, or poor condition.
46. The HCUA stated that the sanitation requirement does not include inspection of the ADA housing, or the geriatric unit on the 3rd floor even though these are specialized medical housing.

12

47. Staff told us that broken or inoperable showers, broken tile, and other physical plant issues are reported repeatedly but not consistently fixed. The unsafe showers on the 3rd floor had existed for a long time.

## Onsite Laboratory and Diagnostics
### Radiology

48. The hours of service for radiology are seven am to three pm, Monday through Friday.
49. Though the x-ray equipment was replaced with a used and refurbished device within the last three years, it was not replaced with a digital unit which is a barrier to timely return of x-ray reports.
50. Only plain x-ray films are taken.
51. There is a x-ray caution and hazard sign on the door to the x-ray unit.
52. The technician stands behind a leaded glass shield when she activates the radiation.
53. There is an undated IEMA certificate which expires on 8/31/2024.
54. There was a problem with return of x-ray reports earlier in 2022 (noted in the Dixon CC QI minutes). The contracted radiologist in Ohio did not return readings for 1-2 weeks. There also may have been a problem with FedEx pickup. Approximately two months ago the health care vendor contracted with Springfield Imaging Center in Springfield and Bloomington, Illinois. Films are shipped overnight to Springfield, read by the radiologist and reports are sent to the vendor who faxes the reports to Dixon CC. The hardcopy of the reports are shipped back to Dixon CC. The reports are now received in 4 days or less.
55. X-Ray logs were reviewed for the two days:
    a. On 11/16/22, six patients had x-ray studies. All six reports returned by 11/18/22.
    b. On 12/1/22, 14 patients had x-ray studies. The reports were dictated on 12/2/22, and all 14 reports were received by 12/5/22.
56. Approximately 10 films are taken per day
    a. There is a waiting time to take films after an order is placed. Urgent films are done on the same day during working hours. Routine orders are done on the next working day. On holidays/weekends, urgent requests are taken KSB hospital in downtown Dixon or to another hospital.
57. Dosimeters are now used by dental and radiology staff. This was initiated in July 2022 with the support and encouragement of the union. Results of the radiation exposure were not provided.

### Ultrasound and Fibroscan Vendor Services

58. The ultrasound vendor lost its technician around September 2022. This technician serviced the entire IDOC system doing ultrasounds at each site on as-needed monthly basis. In the last three months all ultrasound studies at Dixon CC and all other IDOC facilities have been referred to outside medical centers.
59. Fibroscans are done by a different technician and continue to be done onsite at Dixon CC and other IDOC sites.
60. Review of Offsite referrals from Dixon CC from 9/4 through 11/27/22 were reviewed:

| Dixon Ultrasound Referrals from 9/2/22 to 11/27/22 | |
|---|---|
| Date | # of Referrals |
| 9/4/22 | 0 |
| 9/11/22 | 0 |
| 9/18/22 | 0 |
| 9/25/22 | 1 |
| 10/2/22 | 2 |
| 10/9/22 | 1 |
| 10/16/22 | 2 |
| 10/23/22 | 2 |
| 10/30/22 | 1 |
| 11/6/22 | 2 |
| 11/13/22 | 1 |
| 11/20/22 | 6 |
| 11/27/22 | 0 |
| **Total** | 18 |

61. The 18 offsite ultrasound referrals were previously performed onsite and now place an additional burden on the ability of Dixon CC to transport individuals to their offsite appointments.  There is a concern that the delays in performing liver ultrasounds may slow down the initiation of treatment of active hepatitis C infected patients.  The Monitor strongly recommends re-institution of the onsite service.

**Laboratory**
62. The laboratory/phlebotomy room is in the main corridor on the 1st floor of the HCU near the exam rooms/nurse station.  The room is neat and organized.
63. The lab is staffed by a vendor employee who works from 4 am to noon M-F.
64. The process is as follows.  1) The tech checks the upcoming chronic care list and schedules patients for pre-set panels and also draws tests ordered from Dixon CC sick calls or follow-up test for offsite appointments.  2) The technician enters orders in the UIC lab system.   3) Three to four days later she collects chronic clinic and other specimens.   4) The specimens are spun to separate serum and the specimens are packaged.   5) The tubes/specimens are picked up daily.   6) The results are available on the UIC software available in the lab.   Results are printed out by the lab technician.   7) The printed lab results are given to nursing for provider review and signature. The turn-around time is generally 24-48 hours.
65. Panic values are called to Dixon CC by UIC labs.
66. The lab does not do any onsite testing but the technician does collect specimens for COVID testing as requested by some offsite specialty clinics.
67. Nurses do rapid strepococcus, influenza, urine dipstix, capillary blood glucose, and rapid COVID testing onsite.
68. The laboratory CLIA license is valid from 6/10/21-6/13/23
69. The lab centrifuges had inspection stickers that were dated 6/2021 and 12/2021.  Both were expired.
70. Phlebotomy tubes were selectively inspected. All tubes were current; none were expired.

14

71. Reportable infectious disease labs done at UIC are given to the Dixon CC chronic care nurse.

**72.** Labs done by offsite medical centers or specialists and returned to Dixon CC are given to the chronic care nurse by nurses or providers who receive the laboratory results.

## Dietary

73. A patient housed on the 3rd floor with diabetes and neuropathy had bottom dentures that didn't fit right and said he hadn't been able to see the dentist for over a year. He claimed to have lost weight and was eating mostly commissary items. We were told there is no ability to obtain a nutritional consultation at this facility but this patient would benefit from having his dentures fixed and a nutritional consult. We did not review his record to ascertain if his complaint of weight loss was addressed.

74. A provider said that there was no process for obtaining a nutritional consultation. IDOC has stated that nutritional consultations are available through SIU but if the providers do not know that they are available, the availability of consultation has not been disseminated to providers. IDOC should develop a mechanism through email to communicate with ***all*** providers. New initiatives should be communicated to every provider with instructions on the iniaitive.

75. Several patients we interviewed needed nutritional consultation but none were completed.

## Intrasystem Transfers

76. Staff said that they adhere to placing persons on a transfer hold if they have a pending specialty appointment, but proof of practice could not be provided.

77. Proof of practice of initial screening was also not available, although staff indicated that they did bring patients to the health unit for screening the day following transfer. Nine of 11 charts reviewed showed a Health Status Transfer Summary was completed by the sending facility. The Health Status Transfer Summary is not used by Dixon, a progress note is used instead. One person on medication missed medication when transferred.

## Nursing Sick Call

78. The nurse performing sick call had adequate supplies and equipment.

79. The examination table had no paper barrier but nurses clean the table between use. A paper barrier should be used.

80. All areas used for sick call ensured privacy and confidentialty.

81. Not all areas used for sick call included an examination table. Paper barriers were not observed to be used.

82. A nurse evaluated a patient in sick call for toenail clipping but we recommend just referring the patient to the treatment nurse instead of requiring a protocol document.

83. The sick call log showed that 82% of entries were evaluated timely which is not an adequate score. The SIU audit of Dixon showed that only 30% were timely evaluated but this did not appear accurate based on the review of the sick call log. This difference may be due to sample size or to some other data discrepancy.

84. Voluntary or mandatory overtime was required to staff all posts for nurse sick call over the two week period of evaluation. Sometimes only part of the shift was covered.
85. There was no evidence that LPNs participated in sick call.
86. There was no apparent restriction on the number of complaints that could be addressed in a health request.

## Chronic Care

87. All chronic care is managed by nurse practitioners.
88. There is no involvement of a physician in chronic care.
89. The Medical Director believed that all chronic care conditions were monitored in chronic care clinics which is inaccurate. Records we have reviewed from Dixon show that not all problems are evaluated.
90. In a discussion with two nurse practitioners they indicated that the purpose of the chronic clinic was to monitor "acute" problems. The nurse practitioners believed that all of a patient's problems are addressed in chronic clinics which is inaccurate. There is no expectation that an assesssment for every disease be documented including, for example, for heart failure. There is no expectation that a minimal history or physical examination is performed.
91. There is no specific management for a person with dementia and there is no management of fall risk in chronic care.
92. The chronic care nurse maintains the roster of chronic care from the list of patients with chronic illness who are identified upon transfer into Dixon with a chronic illness. This is based on the chronic clinic book maintained by the nurse who accepts persons as transfers into Dixon. Any other additions occur only when a provider notifies the nurse of an additional problem. This may account for the frequent missing of multiple chronic conditions identified on record reviews. A root cause analysis of the chronic care program should include how chronic care conditions are identified.
93. The chronic care nurse fills out the problems of the patient on the chronic care form and another nurse performs the vital signs.
94. Chronic care as evidenced in mortality reviews was inadequate.
95. Chronic care was evaluated on two infirmary patients. One patient had seven chronic clinic visits. Another patient had one chronic care visit. In none of the visits were all problems addressed. One patient with COPD was started on a dose of 40 mg of prednisone the first three days of the month for over a year. This is inconsistent with contemporary standards and is likely harmful to the patient and should not be used. The same patient had COPD but did not have evidence of a pulmonary function test, the baseline standard evaluation of patients with COPD. Another patient had only one chronic clinic visit but also did not have all of his problems identified. His anticoagulation was not managed well. His INR goal was not established. He was frequently not within an expected INR for his condition. He was sent to an emergency room twice for heart failure but was found to have supra-therapeutic INRs on both occasions (one of them 12.9). The supratherapeutic INR was not known by the site prior to transport to the hospital. In neither case were the conditions of the patient properly documented or assessed and therapeutic plans were not complete for the span of the patient's problems.

## Urgent/ Emergent Care

96. The standardized emergency supply and equipment list is not yet in place at Dixon.
    a. The list of contents for the emergency equipment case are not consistent with the list provided by OHS earlier in the year.
    b. The case contained nasal naloxone which was not named on the list.
97. Logs of checks and operability of equipment was in order in the dispensary and X house.
98. Code 3 logs were adequate and reviewed by the physician. The DON should also review these.
99. There are no daily huddles but these should be done at this facility
100. The annaul disaster drill was postponed due to our visit.
101. Documentation of emergency response is typically on the incident report but a progress note is not written. A chronological progress note should be written.
102. There is no timeline log of events that occur during an emergency response which is not good medical practice.
103. Of seven records reviewed, three were for dental, two patients were not seen for their complaints (dizziness and earache) but there was no progress note explaining why they were not seen and there was no rescheduled date. One patient had groin pain after hernia surgery but the nurse did not exercise appropriate judgment to refer to a physician and did not identify whether the patient was on or needed pain medication. Another patient had stomach issues but wasn't seen for ten days. The nurse used a indigestion/heartburn protocol and provided antacid which is appropriate for the protocol. Milk of magnesia was also given but this is not on the protocol and was outside the scope of practice. The patient was referred to a provider who ordered omperazole.

## Infirmary Care

104. Despite staffing shortages on the infirmary, inmates whose needs could not be met were not transferred elsewhere.
105. The nursing station was too small for the number of staff using the room. Given that inadequate staffing exists on this unit, if full staff were working, the space would be worse. This space increases potential for error and compromise of patient confidentiality especially given the number of officers in the work station.
106. There was role blurring between correctional officers and nursing staff in communication about patient care. A nurse should not ask an officer why a patient is being admitted. A correctional officer shouldn't convey the doctor's discharge decision to the nurse.
107. Health staff and officers were heard using derogatory and judgmental statements about patients.
108. The infirmary is not consistent with Illinois regulation with respect to what must be provided on a skilled nursing unit.
109. Nurses on the infirmary do not document a care plan.
110. There are no combined nursing and physician rounds on the infirmary for all staff (provider, RN, nurse assistant) to discuss patients. Rounds are conducted separately. We noticed no communication between providers and nursing staff. There should be a daily huddle on this unit to include all nursing staff, provider, and scheduling clerk to ensure follow up specialty appointments are appropriately timed and scheduled.
111. Access to security staff was available. Bed linens were sufficient but we could not verify sanitation of linens.

17

112.　　　On the 3rd floor unit, multiple persons described having experienced falls which are not tracked unless the fall results in a Code 3 emergency. Nor are physical plant saftey risks ameliorated. One patient on the 3rd floor was given a belt to place on his wheelchair that others could use to lift him up.

113.　　　On record reviews, we noted numerous falls on the infirmary unit as well. One mortality review patient on the infirmary had 20 falls. Lack of supervision and facility plant issues are clear risks for falls on these units but other equipment and patient safety hazards should be sought which has not been done. The Medical Director stated that there was not a current protocol for addressing falls. Falls are not documented in a progress note unless they result in a code 3 emergency in which case sometimes only an incident report is documented. Fall risks are widespread on the geriatric unit yet are not discussed clinically nor are fall risks identified and eliminated. Falls are not identified as a problem in quality improvement.

114.　　　There is insufficient housing for the elderly. The 3rd floor is used for some housing for the elderly. However, maximum security inmates cannot be housed on the 3rd floor so they are put on the infirmary which reduces the capacity of the infirmary. An assisted living unit is needed but there are no plans for such a unit.

115.　　　Though many geriatric patients and other disabled patients who need nursing assistance live on the 3rd floor, no nursing staff is assigned to the 3rd floor. Some inmates have an inmate "ambulatory aide" assigned to assist the inmate with activities of daily living. This assistance is provided only for four hours a day. The remainder of the day the inmate is unsupervised. Many individuals we viewed on tour did not appear capable of complete independence. Multiple patients we talked with on the 3rd floor said they asked for ambulatory aides because of functional disability but were unable to receive help.

116.　　　In part having an ambulatory aide is an accommodation to not having appropriate fixed accommodations (toilets, showers, etc.) and supervision. Inmates had to accommodate for themselves. In a few cases, other inmates were assisting the disabled person. One inmate on the 3rd floor used a wheelchair to wheel a patient with brain damage and a mobility disorder to a sink down the hall so he could wash daily as he felt unsafe trying to get into the shower. This had been ongoing for a long time without staff recognizing this. Functional assessments are not performed on any persons admitted to the 2nd floor infirmary, ADA unit or the 3rd floor medical unit. Currently, IDOC does not document the functional status of persons on these units and on the 3rd floor, patients with uncertain functional status are expected to care for themselves in an environment without ADA toilets or showers. This is a significant patient safety risk. Notably, training on patient safety is not evident at the facility.

117.　　　We talked to 21 inmates on the 3rd floor unit. Most of these patients had significant disability. Several of these inmates are described below.

　　　a.　One patient had advanced emphysema on continuous oxygen therapy. He became short of breath when sitting up and had shortness of breath at rest. He complained that his ambulatory aide paroled and he had not been assigned another ambulatory aide and felt he couldn't manage without one. This person needed an assisted living but the 3rd floor requires independence which this patient was not able to perform.

18

b.   Three additional patients with prior strokes and complications of stroke had an ambulatory aide for four hours a day.   The remainder of the day they were unsupervised.

c.   An amputee with diabetes receives morning insulin with everyone else at 4:30 in the morning.   For patients who are elderly and or with complex medical conditions, a more reasonable time schedule for morning insulin should be developed.   These patients should not be required to go to the first floor for their medication. Medication should be provided on the unit.

d.   An elderly man with a broken hip and "poor circulation" in his feet had an ambulatory aide in the past but no longer.   This person complained of difficulty taking a shower.

e.   Another diabetic with kidney disease, peripheral artery disease and neuropathy had a baseball sized diabetic foot ulcer on the sole of his foot.   Appropriate treatment for this condition is to off-load the foot which means to have no pressure on foot by being in bed, using a cast boot, or other similar mechanism.   He was going to the wound clinic at a local hospital but his dressing had come off and he was wearing shower shoes.   He was not off-loaded.   He had recently had the ulcer debrided at the wound center.   This patient should have been off-loaded and housed on the infirmary.   The 3rd floor was not the proper housing for a person with a diabetic foot particularly since he had to go downstairs for insulin, medication and walk to the shower.   He said he fell about twice a year.

f.   Another patient had herniated discs and was on continuous oxygen for COPD.   He had many other problems.   He complained of multiple falls.   He said he brings a plastic chair to the shower and said other inmates did the same.   He had no lower teeth.   He said he didn't lose his teeth in IDOC but said that IDOC wouldn't provide him false teeth.

g.   Another patient had avascular necrosis for uncertain reasons.   He said UIC recommended hip replacement several years ago which we were not able to confirm.   He said he used a chair when going to the shower and described repeated falls including one the past week.

h.   Another patient had no teeth and said he hadn't been able to see the dentist. He had a very large chest filled with commissary food which he uses because he can't eat the food served.   He has had cataracts for four years and it is hard to see.   He has balance problems and had fallen when in general population and on the unit.

i.   Another patient housed on the 3rd floor had cervical spine issues with neuropathy and had difficulty walking.   He complained about the difficulties with taking a shower on the unit.   He had not experienced a fall.

j.   Another patient had prior stroke with hemiparesis, hypertension and diabetes.   He said he had two recent falls.   He said he had physical therapy for six weeks but no further therapy.

k.   Another patient on the 3rd floor had prior brain damage with difficulty communicating and confined to a wheelchair indicating he could not walk due to balance problems.   His roomate said he hadn't showered in a long time and had an odor for which the roommate made homemade potpourri.   The roommate wheeled the person to a sink down the hall so he could wash.   His hospital bed had the cranks removed and were inoperable.   The inmate said he had six recent falls.

19

118.     Out of cell time on the infirmary is dependent on whether a maximum security inmate is on the unit and on security staffing.  Out of cell time on the infirmary consists of the inmate sitting in a chair in the day room.  We noticed no activity therapy or planned activities.   Ambulatory aides can be used for out of cell activity for the frail elderly but currently none appears to exist and there is no staff assigned for this purpose.

119.     There was no direct visual contact to patients on the infirmary unit but there is a call system which was not checked.  The 3rd floor unit has a call button system that is operational, but there was only one officer assigned on the day of our visit and the officer may not be present in the control room when the call button is pressed. Inmates, we spoke with, had difficulty in contacting an officer.

120.     There were 7 of 28 patients on the infirmary with dementia but the type or severity of dementia were not noted.

121.     Individual medical care on the infirmary is not good.  A nurse practitioner seeing patients on the infirmary repeatedly used nursing diagnoses (e.g. "deficit in self care" or "alteration in skin integrity") in lieu of medical diagnoses with a corresponding assessment. When a nurse practitioner is acting as a practitioner, the nurse practitioner needs to use medical diagnoses not nuring diagnoses.  It was difficult to determine the actual medical conditions and therapeutic plan of the patient by reading  the record because nursing diagnoses and assessments were used and the actual medical conditions of the patient were not being monitored.  Often the only way to understand the complete medical history of the patient is to find a specialist note. This is inappropriate and the nurse practitioner should be referred to peer review or counseled.   Specific examples include the following.

   a. In one patient, infirmary progress notes failed to document all of the patient's problems or document the therapeutic plan for those problems.  It appeared that in May of 2022 the patient was referred to UIC for an EMG test for bilateral carpal tunnel syndrom.  The test wasn't completed until September, 2022, five months later.  Infirmary progress notes fail to monitor this  condition or inform a reader of the therapeutic plan. One progress note did document on 5/17/22 a referral for hand surgery appointment and MRI of the hands but as of our visit in December this had not been completed.  This patient also had a pleural effusion but we could not find progress notes documenting why the patient had pleural effusion.  The subsequent appointment date with a pulmonologist  was not documented in progress notes.  The patient had two prior cardiac valve replacements.  The patient required anticoagulation but this was not monitored thoroughly.  The target INR was not documented. Multiple INRs appeared to be subtherapeutic and several appeared supratherapeutic.  On one occasion, the patient was hospitalized for possible cellulitis and was found to have a life-threatening INR of 12.9. This was unrecognized until the patient was hospitalized.   Care appeared episodic.  Infirmary progress notes need more detail and need to address all of the patient's conditions with history, examination, assessment and therapeutic plan.

   b. Another patient was documented as having asthma, COPD, hypertension and benign prostatic hypertrophy.  Though he was seen in asthma clinic, he appeared to have COPD and not asthma.  Progress notes were uninformative and laboratory tests showed an anemia on 2/1/22.  The patient was admitted to a hospital for stercoral colitis which resulted in perforation requiring surgery with colostomy.  Stercoral colitis is caused by severe constipation.  This was not entered onto the

20

problem list and not monitored going forward. The patient was seen in chronic clinic on 7/18/21 and had a colostomy but there was no documentation regarding why he had colostomy. On 1/24/22 the patient had colostomy reversal but again the reason for the colostomy was not documented. Though the patient was seen in chronic clinic for COPD, asthma, hypertension, and benign prostatic hypertrophy, one could not understand his chronic conditions until a specialty note from UIC on 8/1/22 was present documenting COPD/emphysema, hypertension, heart failure, GERD, basal cell carcinoma, chronic kidney disease and depression. The anemia was noted by the specialist who recommended a "broad anemia workup" for an anemia that had been present for at least six months. The recommended work up included multiple laboratory tests, protein electrophoresis, anc colonoscopy. Iron infusions were recommended but still the problem list was not modified. We could not identify that an anemia work up was initiated as of December 2022. The patient had COPD with heart failure and yet had no documentation of ever having a pulmonary function test which is the baseline study recommended for all patients with COPD. On 10/6/21, a provide wrote a prescription for 40 mg of prednisone for the first three days of every month for three months. This was renewed continuously to expire on 2/28/23. There is no clinical rationale for using prednisone for the first three months of every month for COPD. The care of this patient was unsafe and inadequate. Oversight over the providers caring for this patient should occur.

c. Another patient was 71 years old. He had multiple problems including hemiplegia from a stroke, hypertension, atrial fibrillation, history of pulmonary emboli, schizophrenia, hepatitis C, and cataracts. He had no evidence of shingles or pneumococcal vaccination. Colorectal cancer screening was not done. Nursing notes appeared to be the same on many days. The twelve provider notes reviewed during the 107 day review included no comprehensive notes. It was not possible, just reading progress notes, to identify the problem, assessments or therapeutic plan of the patient. The most common assessments were "self care deficit" or "deficit in self care", or "dementia, self care deficit", "continue present management", and "dementia". These entries were the entire progress note written on 10 of 12 provider notes. These notes are mostly nursing diagnoses and should not be used in a provider note. There was not a single provider note that comprehensively addressed the patient's current mental and physical status. None of the 12 problems noted in the 5/10/21 admission note (or the medical record) were ever mentioned in any of 107 days that infirmary notes were reviewed. It is not clear that the patient's infirmary medical record was also used in chronic care clinic. Dementia was not included on the patient's problem list. It was unclear if even a preliminary workup for dementia was ever done for this patient. Time restraints prevented an in-depth review of this patient's record.

122. One mortality review record reviewed was for a patient who spent a significant period of time on the infirmary at Dixon. This patient was elderly and had dementia. Care was not safe or adequate. The same uninformative provider notes were present as were seen during our Dixon visit. A nurse practitioner failed to write a note that documented all of his medical conditions with an associated therapeutic plan and frequently used nursing diagnoses for assessments such as "deficit in self-care". This nurse practitioner should be

21

counseled to used medical diagnoses when writing a provider note. This patient had 22 falls without having a fall prevention plan. He had numerous deficiencies evident in his care which can be reviewed (patient 13) in the mortality reviews appended to this report. There were numerous deficiencies related to infirmary care. Twenty two opportunities for improvement were documented in the mortality review.

Physical Therapy

123.    The physical therapy clinic is on the 1st floor of the health care unit. It has a number of exercise machines. Eight men were seen actively doing exercises in the room during the site visit. There are no cold or heat modalities. The therapist prefers hands-on therapy.

124.    The 40% time physical therapist position has been filled since 2007. He works by himself for eight hours every Tuesday and Thursday. He has an outside commitment and is not able to increase his time at Dixon CC. He clearly stated that the budgeted physical therapy assistant is needed to address the physical therapy needs of the Dixon CC geriatric, infirmary, ADA, and general population inmates. It appears that a full time therapist and two assistants should be hired.

125.    The central supply clerk does the scheduling for the physical therapy clinic. Referrals are generated by the physician, Dixon staff, offsite specialists, and hospital providers.

126.    The therapy schedule for each of the two scheduled days per week has 14 patient slots including two urgent slots in the morning and eight slots plus four evaluation slots in the afternoon. The therapist tries to see 26 patients per day. He did not give any reason why patients are "no shows" for appointments. Patients on the 2nd and 3rd floors are often incapable of coming to the clinic without assistance due to disabilities. The therapist does not know whether there are refusals or restricted movement due to officer shortages.

127.    The therapist's ultimate goal when a therapy assistant is hired is for the therapist to do more initial and follow-up evaluations with the therapy assistant providing the recommended treatment and even going to the 2nd and 3rd floors of the health care unit to perform bedside therapy. When hired the therapy assistant would work with the therapist on Tuesdays and Thursdays and then do treatments on Monday, Wednesday, and Friday.

128.    The current waiting time for routine referrals increased during COVID restrictions and the backlog is only now being steadily decreased. The current waiting time is close to 4 months. Urgent referrals have a much shorter wait list.

129.    The therapist tries to see all routine therapy referrals in less than 30 days. Urgent referrals would be seen more quickly. He initially assesses the patient and educates the patient on a home and self-exercise program. A follow-up evaluation is scheduled in two to four months and if needed, the patient would start treatment sessions in the clinic.

130.    Post-op, post-stroke, and other more acute conditions are expeditiously scheduled, evaluated, and started on active physical therapy within one week.

22

131.    Infirmary patients are given priority access to therapy. The therapist occasionally goes to the infirmary but this is extremely time consuming and results in longer wait times for other patients. During the pandemic's height, the therapist did go up to the infirmary or the patient was brought down one-on-one to the clinic. The therapist rarely went to the housing units. He described being reprimanded for doing this during the pandemic.

132.    The therapist (and the therapy assistant) will not do restorative care. There are multiple geriatric patients who need restorative care due to advanced frailty and/or dementia. Basic range of motion exercises should be done by the nursing staff or the hospice workers but, based on infirmary charts we have reviewed, we did not note this being done even when patients had contractures. Charts do not document restorative physical therapy being provided. The therapist does not deal with foot wear or mattress issues. He does occasionally advise security about the use black box restraints on individuals with certain orthopedic issues.

133.    In record reviews, immobile patients on the infirmary were, on several occasions, said to be no-shows for physical therapy when they were incapable of getting to physical therapy on their own. After consecutive no-shows the patient was discharged from therapy due to being a no-show. This is inappropriate access. An immobile patient either needs to be moved to physical therapy or the physical therapist should conduct physical therapy on the infirmary unit. These issues imply problems with access to physical therapy for infirmary patients.

**Specialty Care**

134.    Collegial reviews are no longer conducted. Referrals are all authorized.

135.    70% of the time, the physician who reviews returns from specialty consultations receives a brief single sheet with some discharge information. This confirms that insufficient reports are present. Eventually, full reports are received but only after staff make requests for reports. This is a signficant problem.

136.    The number of officers and available vehicles for transportation limits the number of offsite visits to 12 a working day or approximately 240 per month. Officer staffing particularly on the 2nd shift adversely affects bringing patient for their specialty care. Lockdowns affect writ return visits with providers. When the number of specialty appointments exceeds 12, the Medical Director decides who is cancelled. The number of 12 offsites a day is irresponsible. IDOC has a special mission to house the elderly population. Thirty two percent of the Dixon population is over 50 years of age. There is an infirmary with very ill patients, a large 3rd floor geriatric ward, unit 26 housing for the elderly, and a special unit to accommodate patient with CPAP units. A large volume of specialty care consultations should be expected. IDOC has created two barriers to access to specialty care. One is limiting specialty care visits to twelve a day. Given the population demographics, more than twelve specialty care visits per day should be expected and need to be accommodated. The second barrier is that about 80% of specialty care is provided at UIC which is 104 miles away and is a four hour round-trip ride. IDOC did not pick a optimal location to house the elderly and disabled. IDOC must develop alternative specialty care access closer to Dixon. UIC should be for specialized medical needs.

23

137.     The number of offsite specialty referrals in June was 242, in July 322, and August 321. This corresponds with the scheduling clerks estimate of about 75 referrals per week or 300 a month. Because only 240 inmates a month can be transported for their appointment, some appointments are not completed. Some inmates don't get seen but persons discharged before the appointment is completed and other types of incomplete referrals (transfers, refusals, paroled, etc.) are not tracked. The tracking log does not include persons who are transferred nor inmates who are paroled so it is unclear how many persons actually complete their appointments. The scheduler estimated that about 15% of patients never get their appointments. Scheduling data is not thoroughly tracked but could be a valuable source of quality improvement data.

138.     Because of the backlogs in referrals, providers appear to overuse the "urgent" designation as a way to get appointments more timely. However, the urgency designation is not tracked by IDOC.

139.     Dixon is a four hour drive to and from the UIC Medical Center which is a tertiary care medical center. However, because UIC care is at no charge, more patients are sent to UIC than need tertiary care. The scheduling clerk estimated that 85% of appointments are referred to UIC. On the 3rd quarter tracking log provided to the Monitor for the 6th report, in June of 2022 there were 270 onsite and offsite referrals from Dixon and 197 (73%) were to UIC. UIC is a tertiary care hospital and many appointments (CT scan, MRI, ultrasound, colonoscopy, orthopedic conditions, etc.) do not require a tertiary care consultation. Overuse of UIC has coincided with delayed treatment. There is a considerable backlog to UIC and appointments often take months. The scheduler had UIC orthopedic appointments pending since the prior year. Gastroenterology and ophthalmology are also difficult to schedule. IDOC does not track the length of time to complete a scheduled appointment based on the expected date of completion. This would be a useful performance measure systemwide but especially for this facility.

140.     Of the 197 referrals to UIC in June, 80 (41%) were completed as of the September (three months later). The overuse of UIC exists with considerable delays in service. This facility has a broken specialty care program. UIC use is not appropriately used for tertiary care services; instead it appears to be over used because care is not compensated. A root cause analysis should be performed on specialty care utilization to determine more efficient ways to obtain specialty care.

141.     IDOC has requested the vendor to send orthopedic patients locally and to establish a telemedicine program for specialty care neither of which have been done.

142.     Dixon has insufficient vehicles for transporting inmates for specialty care.


**Preventive Care**

**143.**     Vaccination and cancer screening programs have not yet been effectively implemented at Dixon. IDOC submitted its immunization and cancer screening administrative directive to the Monitor on 1/15/21. But it has not yet been effectively implemented. Since 2019 OHS has recommended that eligible patients receive FIT testing for colorectal cancer screening. As late as 7/22/22, providers at Dixon continue to offer digital rectal examination and single stool guaiac testing to screen for colon cancer. The following is a summary of our record reviews at Dixon and IDOC's record reviews for colorectal cancer screening and immunizations.

| Immunization and Cancer Screening | |
|---|---|
| **Test** | **# and Percent Who Received Service** |
| Our Chart Audit Received Pneumococcal Vaccine | 3/10 (30%) |
| IDOC Clinical Measures Audit  Received Pneumococcal Vaccine | 4/10 (40%) |
| Our Chart Audit HIV Patients Offered Meningococcal Vaccine | 0/2 (0%) |
| Our Chart Audit Offered Zoster Vaccine | 1/5 (20%) |
| Our Chart Audit Received HPV Vaccine | 0/7 (0%) |
| Our Chart Audit Colon Cancer Screening | 0/15 (0%) |
| IDOC Clinical Measures Audit  Colorectal Cancer Screening | 2/10 (20%) |
| Our Chart Audit Lung Cancer Screening | 0/2 (0%) |
| Our Chart Audit Abdominal Aortic Aneurysm Screening | 0/2 (0%) |

## Pharmacy and Medication Administration

144.    Medications are pre-poured and charted in advance of administration which is inappropriate and unsafe.

145.    There is no standardized policy or procedure on medication administration.

## Discharge Planning

146.    The DON stated that patients are brought to the HCU the night before release for discharge planning. This consists of offering an HIV test, providing a list of community resources for people with HIV, and ensuring any prescribed medication is prepared for the person to take after release until seen by a provider in the community. January through September 2022 infection control statistics show that no one accepted an HIV test in seven of the last nine months.

147.    In the months of May and July, four people accepted HIV testing out of a total of 243 people released.  This would be a good subject for quality improvement to discern why so few people accept the test.

148.    Seven records were reviewed from November 2022.  In three patients, the problem list was not up to date, three patients had no medical problems being treated at time of release and one patient was discharged without any discharge documentation.  One patient had abnormal labs which were listed on the discharge form, but it did not appear that a copy of the lab report was provided.  In none of the seven records reviewed was a specific referral made to a community provider and no medical information other than the discharge summary were provided.

149.    II.B.6.t of the Consent Decree states that upon release IDOC agrees to provide bridge medication for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate. Five records had documentation of

25

preparation of discharge medications but none of the documentation indicated practices consistent with the language of the consent decree. One patient had four mental health medications listed as received on discharge, but no quantities were documented. The script was also without quantities. Another patient was taking three mental health medications which show as issued on 10/18 but the MSR is dated 11/21. There is no documentation of the quantity of medications provided at discharge. There was a script written for 14 days with no refill. One patient had orders for five medications (3 psychotropic, 1 hypertension, 1 GERD). He was discharged with varying quantities of each (3 were quantities for 15 days, 1 was 21 days, 1 was 27 days). This patient had no script for additional medication. Two patients received 30 days of prescribed medication and a script for an additional 14 days. This is equivalent to the amount described in the consent decree, but more quantity is supplied in the beginning and less is available via script.

## Infection Control

150.     The HCUA is the infection control nurse but has too many responsibilities to adequately perform in this position.  A full time infection control nurse is needed.

151.     The chronic care nurse clinics coordinates the hepatitis C (HCV) telehealth clinic. There are currently only 19 patients in the HCV clinic including 1 patient in treatment for the 2nd and 3rd time, three men who will start treatment in mid-December 2022, and five individuals who have refused treatment. Individuals who have successfully completed treatment and have curative follow-up labs are discharged from the clinic.  Treated patients with advanced fibroscan scores (F2 to F5) are to be followed in the chronic care clinic and are supposed to be monitored for hepatocellular carinoma with semi-annual ultrasound of the liver. This number is not tracked.  This is lowest number of active HCV patients in the clinic for at least the last five years.  Previous HCV clinic rosters (untreated and on-treatment patients) were 87 in December 2019, 65 in December 2020, and 35 in December 2021.  This decrease is due to the drop in Dixon census during the pandemic and the treatment of 44 HCV patients at Dixon since 2019.  Twenty eight patients were treated in 2021.

## Dental Care

152.     The dental position is vacant.  There is an excessive backlog and untreated dental conditions.

153.     Of seven health requests reviewed from September three were for dental but only one had been seen by December which is consistent with complaints about patients not having access to a dentist.  One patient had dental pain 9/24/22 and was given Tylenol but was on a waiting list to see the dentist.  Another patient was also seen for pain and was given pain medication.  The lack of a dentist burdens sick call resources unnecessarily.

154.     The dental suite has three stations but only two fully operational dental chairs. The 3rd station has an old optometry chair and cannot be used for procedural dentistry. The dental clinic is clean, relatively well organized, and professional. Once a full time dentist is assigned to Dixon CC, both dental chairs will be used by the dentist. Wexford/IDOC should immediately initiate the process to replace the unusable dental chair.  This will require this additional chair to be fully equipped.

155.     Digital dental x-ray is now installed for only one dental chair.  IDOC needs to install digital x-ray at all three stations so each chair is functional.

156.     The dental team were not wearing the dosimeters on the days of the site visit because the dosimeters had been mailed for reading of the radiation exposure. The staff are not given a backup dosimeter when the meters are sent offsite. Dosimeters should be worn at all times.

157.     There were no inspection stickers on any of the dental equipment or on the sterilizer. All equipment needs to be regularly inspected.

158.     Dixon CC has not had a full time dentist for at least nine months. The staffing table provided to us documented that Dixon has 1.4 full-time-equivalent dentist positions that are vacant. On the 8/17/21 staffing list Dixon had only a 0.2 dental vacancy. Currently, dental services are only provided one day a week on Fridays. This single day coverage is provided by a dentist who works full time at Sheridan CC. The coverage dentist only sees emergencies (individuals with pain and dental extractions). Based on Administrative Directive 04.03.102 Dental Care for Offenders dated 1/1/2020, medium security facilities are to have one hour of onsite dental coverage for each 50 inmates. Dixon has a current census of 1560 but has 2527 capacity. It also has a maximum security mental health 160 individual and those individual are to have one hour of onsite dental coverage for each 40 inmates. The calculated minimum onsite dental coverage at Dixon CC should be 32 hours a week which we find to be substantially less than needed. Based on the 2527 capacity of which 160 are maximum security, the minimum coverage should be 51 hours per week or 1.275 dentists. The minimum coverage in the administrative directive is substantially less that the need. IDOC only provides 25% of the hours per week that are required by an administrative directive and the administrative directive substantially under staffs with dental hours. It is not surprising that there are growing backlogs for elective dental fillings and dentures replacements.

159.     Dixon's September 2022 QI meeting minutes documents that there is a 64 week wait for extractions; 78 patients are on backlog just to be placed on the waiting list; patients are waiting 104 weeks for a fillings; the filling backlog is 211; patients are waiting 38 weeks for dentures with 114 backlogged for that service. To be clear, the backlog is persons waiting to get on the waiting list. The vacant dentist position must be filled expeditiously.

160.     Dental emergencies on days when there is no dentist onsite are reportedly sent to Joliet Oral Surgery Center. Patient with regular dental complaints should be sent offsite if there is no available dentist.

161.     Dixon CC filled its dental hygienist position approximately 6 months ago. The dental hygienist works Monday through Friday from 8 am to 4 pm. It is anticipated that six dental cleanings could be performed on each work day but due to security inability to move patients to the clinic, only four cleanings are now allowed to be scheduled. The hygienist stated she has all necessary equipment and supplies required to do dental cleanings.

162.     It was reported that there are long waits and backlogs for dental cleaning but we received no data. The backlogs are only slowly being addressed due to a few factors. 1) The correctional officer vacancy rate is approximately 40%. This has resulted in lockdowns and delays escorting patients to the HCU for dental cleanings. 2) The Illinois

27

State Dental Society states that "…a dental hygienist may perform, under general supervision (i) the operative procedure of dental hygiene…. provided that the patient has been examined by the dentist within one year of the provision of dental hygiene services, the dentist has approved the dental hygiene services by notation in the patient's record and the patient has been notified by the dentist may be out of the office during provision of dental hygiene services."[5]  3) The Monitor was advised by Dixon's dental team that an IDOC administrative directive states that the dental cleanings will only be done on individuals who have been in IDOC for at least 2 years.  The administrative directive that we have states that "Dentists shall conduct routine dental examinations every two years regardless of age[6]".  This makes no mention of dental hygiene.  A copy of an administrative directive stating that dental hygiene is not provided until the patient has been incarcerated for two years has not been provided.

163.	Review of Health Service Encounter log for September through November 2022 noted that 36 cleanings were performed in Sept, 55 in October, and 36 in November. There were zero dental cleanings performed on 20 of 61 scheduled workdays. Lockdowns resulting in no movement to the dental clinic were documented on 6 of 61 days resulting in the inability of the hygienist to perform an estimated 24 dental cleanings. Due to officer vacancies, only four cleanings are allowed to be scheduled per day even though six can be accommodated by the hygienist. If six cleanings were done on each of the scheduled 41 days in September through November of 2022, 241 cleanings could have been done instead of the 127 that were actually completed. On 14 days with no dental cleanings, three did not document the reason and 11 appeared to be due to vacation or excused leave days.

164.	The full time dental assistant assists and chaperones the dental hygienist, schedules appointments, ensures supplies are ordered as needed, cleans, and sterilizes all dental instruments.  Supplies are requisitioned every 2 months.

165.	Panorex x-rays taken at the reception centers arrive with the patients' charts. Panorex films are also performed by the onsite radiology technician.  An intact leaded apron with a thyroid collar was present in the dental clinic.

166.	The dental assistant described the process to clean and sterilize dental equipment (clean, place in ultrasonic unit, wipe, bag, and place in sterilizer).  The process is done in one corner of the dental suite with precautions to avoid cross-contamination.

167.	Spore testing is performed every two weeks.  Results from 4/19/22 to 10/20/22 documented that all spore tests passed.

168.	An audit of five dental charts of patients (shown below) who had recent dental extractions shows that none of the x-rays were performed on the date of the extraction or even close to the date of extraction.  The Consent Decree requires that x-rays be taken before extractions.

---

[5] Found at ISDS.Org

[6] Illinois Department of Corrections Administrative Directive 04.03.102 Dental Care for Offenders, Effective 1/1/20

| Dental Extractions Based on Consent Decree Requirements | | | | | | | |
|---|---|---|---|---|---|---|---|
| Patient | Date of Extraction | Months Since Most Recent Dental X-ray | Consent Signed | Anesthesia Documented | Pain Management Documented | SOAP Note Used | Complications Addressed |
| Patient 1 | 11/18/22 | 5 | Yes | Yes | Yes | Yes | N/A |
| Patient 2 | 11/4/22 | 13 | Yes | Yes | No | Yes | N/A |
| Patient 3 | 10/21/22 | 66 | Yes | Yes | Yes | Yes | N/A |
| Patient 4 | 10/14/22 | 10 | Yes | Yes | No | Yes | Abscess 11/14/22. treated with clindamycin |
| Patient 5 | 10/21/22 | 3 | Yes | Yes | No | Yes | N/A |
| Patient 6 | 11/18/22 | 3 | Yes | Yes | Yes | Yes | N/A |
| Totals | | 16.6 average; range 3-66 months | 6 (100%) | 6 (100%) | 3 (50%) | 6 (100%) | I (100%) |

## Internal Monitoring and Quality Improvement

169.     The team complimented the HCUA and staff for being one of the few sites that documents actual problems and discusses opportunities for improvement to the service in their monthly CQI minutes.  Identifying problems and exploring solutions and corrective steps are integral components of a functioning quality program.  We add that the root cause of many of the deficiencies identified are systemic: staffing, medical record problems, housing and others that are dependent on systemic solutions beyond the capacity of the facility to correct.

170.     There is no CQI coordinator.  The HCUA acts in this position. The HCUA responsibility is considerable and this position would be unable to effectively act as the CQI coordinator.

171.     A new nurse assisant position was implemented to better document patient care on the infirmary.  It was initiated in November of 2021.  By April of 2021, CQI minutes documented decreased compliance with documentation expectations.  The nurse assistant stated that staff interpret instructions differently which is why documentation is inaccurate. Because the RNs are state employees, they will not supervise use of this form by nurse assistants because nurse assistants are vendor staff.  This quality problem has not been studied.  The root cause is likely that the IDOC table of organization lacks clear lines of authority.  State and vendor employees will not supervise or be supervised by the other group.  This is a systemic problem that creates dysfunction and inadequate care and is present at facilities with vendor and IDOC staff.

172.     Another initiative was to put infirmary admission notes in a clear plastic sleeve because these notes were missing in charts that were reviewed during an external audit. Medical records staff determined that by putting these pages in clear plastic sleeves would make them readily identifiable and would not be inadvertently removed when the chart was thinned.  This was a successful initiative.

173.     The HCUA believes that sick call numbers will decrease after the patient education handouts have been in population longer. A September CQI showed no change in sick call numbers since patient education handouts were provided by Wexford in July

29

2022. I saw no patient education handouts during the tour of the sick call area nor are they referred to in the charts of sick call visits in September that were reviewed.

174.     The only information reported in CQI data are services performed by Wexford employees. For example, at Dixon no data is entered about nurse sick call because this service is performed by registered nurses employed by the state. If facility has a state employed Chief Dentist and a Wexford staff dentist, the Primary Medical Services Report will only include services performed by the staff dentist. This dysfunction is another example of a faulty table of organization that needs to be corrected systemically at the level of OHS or above.

175.     The IDOC audit of this facility monitored only 12 measures which were performance and outcome measures.

176.     The numbers of offsite referrals was discussed in the quality improvement meeting minutes. It was noted that despite a decreasing population the number of referrals had not decreased. No data analysis accompanied this discussion. The root cause of issues of difficulties with specialty care were not identified except for one comment that providers were practicing defensive medicine. There was no objective analysis of this problem.


## **Recommendations**

**Leadership**

1. The Medical Director does not provide adequate clinical leadership. IDOC should work with the vendor to ensure that the position description for this position contains all of the responsibilities and that an expectation is created to perform to this expectation.

2. The Medical Director must supervise and provide oversight over the nurse practitioners. Review of clinical work of nurse practitioners should be performed. The Medical Director should make provider assignments based on capacity to perform.

3. Prompt and aggressive action is necessary to obtain supervisory staff in nursing to ensure appropriate supervision is present.


**Facility Staffing**

4. 43.8 (35%) of Dixon's 125.4 budgeted positions (IDOC and Wexford) are currently vacant. Nineteen of 50 RN positions, five of 12 LPN positions, and eight of 14 CNA positions are vacant. Thirty two (42%) of 76 nursing positions are vacant. This results in excessive overtime, mandatory extra shifts which contribute to high turnover. This is a crisis which should be aggressively addressed by IDOC leadership.

5. LPN and CNA staff need to have a clinical RN supervisor assigned over them. Currently, they are unsupervised.

6. Considerable correctional officer vacancies are resulting in multiple missed appointments for onsite services, missed specialty appointments, and delays in specialty care. Some specialty appointments are never completed which is lack of access to ordered care. Programing for inmates is also diminished. Custody staffing must be promptly addressed to ensure adequate access is established.

7. Given the complexity of patients at this facility, there are insufficient physicians and the ratio of physicians to nurse practitioners at this facility should be 1 physician to 1 or 1.5 nurse practitioners.

8. While supportive of the ambulatory aide program, inmate "hospice" workers and ambulatory aides must not be used to provide any direct patient care. Use of the term "non-credentialed nurse assistant" give us concern that inmates will be used to supplement lack of staffing. Bright line procedures should define their duties.

9. Infirmary staffing should be based on Illinois regulations for skilled nursing and intermediate care institutions.

10. The dental vacancy should be considered critical and be promptly filled.

11. Given the volume of elderly at this facility and the lack of attention to clinical issues of the elderly, this facility would benefit from access to a geriatrician.

## Credentialing and Oversight Over Nursing, Dentists, and Physicians

12. There is no oversight over nurse practitioners. The Medical Director needs to supervise and review clinical care of the nurse practitioners.

13. The nurse practitioner who writes nursing diagnoses when acting as a provider needs to be counseled.

14. All LPN and CNA staff need a RN nurse supervisor. This should be provided as soon as possible.

## Clinical Space Issues

15.  A consultant should be hired to survey the physical clinical space at this facility and any housing used for medical purposes and make recommendations to provide adequate space consistent with contemporary standards.  There are many physical plant and fixed equipment deficiencies that warrant a consultant review.  Many spaces were not built for their intended purpose and have need of re-design.  Buildings used to house the elderly and disabled (3rd floor geriatric, building 26, ADA unit 2nd floor, infirmary, and unit 112) should be evaluated to determine they are safe to use as intended.  The 3rd floor geriatric unit and the ADA unit are clearly unsafe.  ADA toilets and showers should be installed in these units.  Numerous physical plant deficiencies exist which impair ability to provide adequate care.  This makes the facility unsafe for the elderly. This is a systemic issue that warrants a statewide evaluation but particularly at this facility.

16. The sidewalks throughout the Dixon CC campus have cracked, uneven, and crumbling concrete.  These sidewalks are used by staff when they provide care in the housing units (lockdown, segregation, quarantine) and by the inmate population when they walk to the cafeteria and to the HCU for pill line/pickup, chronic clinics, diagnostic testing/services, nurse/provider sick-call.  The sidewalks present a barrier to the access to care and are a safety risk for staff and patients.  The monitor team walked on these sidewalks – they are dangerous for the frail elderly and persons with disabilities.  These need to be repaired.

17. We noted numerous physical deficiencies including damaged, ceilings, broken furnishings, walls in need of repair, showers in disrepair and not maintained, loose tiles,

31

missing tiles, water damage, plastic sheets hung to prevent water damage, etc. IDOC must improve maintenance and should track time to repair a documented physical plant issue.

18. Inmates in one shared room gerrymandered their own TV cable system with cables hanging loosely throughout the room like clothesline. This should not be encouraged and can be prevented by proper maintenance by IDOC staff.

## Medical Records

19. All patient evaluations must occur with a medical record. This include X-house and other areas not in the health care unit.

20. Full reports from consultants and hospitals should be obtained as soon as possible. Dixon should track what type of report is received and when it is received. This is not currently done.

## Equipment and Supplies

21. Dixon should develop a standardized list of all durable equipment expected or needed at the facility and track whether equipment is serviced annually. This needs to include dental equipment.

22. Equipment on the infirmary should be assessed to determine if adequate equipment for this population is available.

23. Obvious equipment deficiencies that should be addressed included: no safe shower chairs on the geriatric, ADA, or infirmary units; no Hoyer lift for morbidly obese patients; examination rooms without examination tables; nonfunctional negative pressure room; inoperable ophthalmoscopes; an optometry chair substituted for a dental chair; and all dental chairs need access to the dental x-ray unit.

## Sanitation

24. An appropriate standardized sanitation procedure should be developed.

25. All medical housing units, including the ADA and 3rd floor geriatric units should be inspected.

26. Dixon should track length of time to fix broken equipment or physical plant.

27. Showers should periodically have a deep cleaning to remove mold and accumulated debris.

## Onsite Laboratory and Diagnostics

28. IDOC should move to digital radiography.

29. Dosimeters should be used on a continual basis wherever x-rays are taken.

30. Laboratory centrifuges should be inspected annually.

## Dietary

31. Nutritional consultations are needed and need to be available at this facility.

## Nursing Sick Call

32. All rooms used for nursing sick call should have appropriate equipment, including an examination table.

32

33. Dixon, with assistance of OHS, needs to develop a procedure for evaluating clinical adequacy of nurse evaluation of health requests.

**Chronic Care**

34. The Medical Director needs to provide oversight over chronic care to ensure care follows contemporary standards of care.
35. All chronic medical conditions need to be monitored in chronic clinic visits and periodic notes should document all patient problems with a therapeutic plan for each problem.

**Urgent/Emergent Care**

36. Dixon should standardize their supply and equipment list based on OHS direction.
37. Emergency response needs to include a timeline of events documented in the progress note. All emergency response events should be documented in the progress notes.
38. A daily huddle (providers, scheduler, charge nurse) is suggested to address all overnight emergencies, new problem patients, and clinical updates of problem patients.
39. The Trauma/Treatment Room should not be used as a storage room. Excess stored items should be located in a different area.

**Infirmary Care**

40. 75% of the patients on the infirmary are permanently assigned to the infirmary creating difficulty with finding beds for acute more short-term admissions. Many inmates on the 3rd floor need assisted living housing but have to manage on their own. This is a result of lack of long-term assisted living, skilled nursing, or intermediate nursing housing for the aged and disabled. IDOC has committed to hiring but has not yet hired a consultant to survey the elderly and disabled to determine the needs of the population and to document findings and recommendations in a report. Appropriate housing and management options should be defined for this population. IDOC cannot intend Dixon to house the largest population of elderly and disabled in IDOC and not provide appropriate and safe housing or access to specialty care for them.
41. Inmates whose needs cannot be met on the infirmary should be transferred to an outside long-term care facility.
42. The elderly patients on the 3rd floor and infirmary should have access to a geriatrician. A geriatrician should consult on procedures for these units.
43. Patient safety issues are not tracked and there is no attention by staff to patient safety. All falls should be tracked. Patient safety risks are ignored by medical staff (no shower chairs, lack of ADA shower, missing or loose tiles, etc.) but should be identified and corrected. The length of time to respond to a patient safety issue and fix it and all falls should be tracked and displayed monthly at CQI meetings. We suggest the HCUA, assistant warden of programs, maintenance manager, and the DON alternating with the Medical Director join the safety and sanitation inspection once a quarter to perform safety rounds to identify patient safety risks on the health unit, 2nd floor ADA and infirmary, the 3rd floor geriatric unit, unit 122, and the CPAP unit. Findings of any safety issues should be documented to CQI minutes and tracked through to repair.

44. All patients entering the infirmary or 3rd floor geriatric unit should have a functional assessment to determine capacity to perform activities of daily living and what barriers exist for that individual. We suggest this be done by a physical/occupational therapist. This should guide the therapeutic plan for the individual. This should be repeated annually, or sooner if indicated, for all persons on the infirmary and 3rd floor.

45. The provider infirmary notes were not comprehensive providing extremely limited if any clinical information on the patient's status and condition. This is a significant risk for the patients housed in the infirmary especially the permanent admissions. Not all chronic illnesses were addressed in the chronic care clinics and were never addressed or even mentioned in the infirmary progress notes. A physician should be assigned to manage clinical care on the infirmary which needs significant clinical improvement.

46. Combined nursing and provider rounds should take place at least weekly but daily would be best. All medical conditions of the patient should be identified and discussed.

47. Counseling on professional behavior of all staff working on the infirmary should be instituted.

48. Dixon should staff the infirmary based on State of Illinois requirements for skilled nursing and intermediate levels of care.

49. The infirmary's only negative pressure unit was not operational during the site visit. The nursing staff did not know how to turn on the window unit. The QI minutes from April-December 2022 stated that the negative pressure unit was being checked. This raises questions about the adequacy and accuracy of this monitoring and reporting to the QI meeting. The negative pressure unit should be fixed.

50. There were no activities or therapeutic programs for the aging, disabled, demented patient population in Dixon's general population or in the HCU housing units. The dayrooms in the infirmary were completely lacking in space and activities. Age and cognitive appropriate programming should be instituted. Inmate ambulatory assistants can assist with some of this programming.

51. Officer staffing on the 3rd floor is inadequate. An officer is inconsistently available for emergencies and many persons on this unit belong in a long-term assisted living unit. There should be nurse staffing on the 3rd floor as multiple patients on this unit belong in skilled or intermediate nursing facilities.

52. All patients admitted to the infirmary should have a comprehensive nursing assessment and a concomitant plan of care documented that includes the goal of nursing care while in the infirmary (including preventive measures such as protection from falls, skin breakdown, deconditioning etc.), clear objectives and instructions for care to be provided, parameters for monitoring the patient's status, and indications for notifying medical staff regarding changes in the patient's condition. Reassessment of the patient's condition and revision of the plan of care is to take place at a frequency consistent with the patient's acuity and whenever the patient's condition has deteriorated or a preventable adverse event takes place.

**Physical Therapy**

34

53. There is a clear need for additional physical therapy services. There is a large backlog of referrals to the onsite physical therapy clinic. The 0.4 physical therapy position is filled but this is insufficient to meet the needs of the large geriatric and infirmary patient population at Dixon. The 1.0 physical therapy assistant position has been vacant for a long time and this creates a barrier to the provision of treatment recommended by the therapist. There is a backlog of physical therapy evaluation and treatment due to the failure to fill the physical therapy assist position. We believe at least a full time therapist and two physical therapy assistants are needed.

54. The physical therapist does not do restorative work but neither do nurses. As a result, elderly patients on the infirmary and 3rd floor are subject to disuse and contractures. The therapist should instruct nurses on performing restorative work for patients on the 3rd floor and infirmary to prevent contractures, deconditioning and their consequences. This work can be performed by nurse assistants. This work should be part of the therapeutic plan but providers appear disengaged from this aspect of patient need. Additional training is indicated.

55. Patients on the infirmary who are disabled, are documented, at times, of being no-shows for physical therapy sessions when they have mobility disorders. Physical therapy for infirmary patients should be tracked. The HCUA should evaluate why disabled bedridden persons on the infirmary should be documented as no-shows to therapy sessions.

**Specialty Care**

56. Given the special mission of housing a geriatric population, the need for specialty care is high. The limit of 12 patients a day for specialty care is to accommodate custody staffing and is not appropriate to ensure acceptable access. The number of persons transported should be increased to a level that ensures timely access to specialty care. Based on numbers of persons not seen per month, the correctional transportation staff should be increased by about 15% or sufficient to transport 3 additional patients a day.

57. 80% of specialty care is provided at UIC and the principal reason to utilize UIC is to save money. This decision results in significant delays in obtaining care. From a clinical standpoint, UIC should be used for tertiary care and specialized services but it is used for a wide range of services that can be provided elsewhere. Dixon must begin referring increased numbers of persons locally including to Rockford in order to accommodate the need and ensure timely specialty care.

58. The timing of specialty care based on patient need should be tracked monthly on a dashboard.

59. The tracking log for specialty care is still not standardized and does not track receipt of a full consultation report. The five day post writ visit is not qualitatively assessed. More patients are referred than are seen in specialty clinics but the tracking log does not account for the excess. The tracking logs should be standardized and accurately maintained.

35

60. The number of transport vehicles including ADA vans should be assessed to ensure availability of an appropriate transportation vehicle for offsite visits. Additional vehicles appear to be necessary.

61. There is poor access to multiple services of care at Dixon CC with long waits and backlogs for dental services, physical therapy, optometry, and offsite consultations and diagnostic services. This has reached crisis stage and prompt intervention should be undertaken.

## Preventive Care

62. The immunization and cancer screening programs are not functioning well at Dixon. This is evidence of implementation defects. The policy on immunization and cancer screening submitted 1/15/21 is adequate, but as of 12/1/22 its implementation is clearly ineffective. The implementation process should be studied to determine why an adequate policy has not been implemented. OHS will have to develop effective implementation given the number of projects that will need implementation in the future.

## Pharmacy and Medication Administration

63. Medication continues to be pre-poured and charted in advance of administration. A standardized procedure for medication management and administration should be developed. Staff should receive training on an appropriate standardized procedure.

## Discharge Planning

64. Problems are still identified in discharge planning. A standardized policy needs to be developed and staff trained on the standardized policy.

## Infection Control

65. This facility needs to hire a dedicated infection control nurse; have an effective infection control plan; and a standardized infection control policy and procedure.

## Dental Care

66. Until the facility obtains a dentist all patients with dental issues including hygiene should be sent to community dentists for care.

67. All scheduled patients, including for dental, should be tracked and documented on a tracking log whether the patient was seen or not seen. If not seen the reason for not being seen (not moved by security, refused, paroled, etc.) should also be tracked. These data should be reported monthly to the quality program. This needs to include the number of persons not brought for their appointment due to custody not moving the patient. This information should be presented to the Warden quarterly.

68. Patients in need of dental extraction should have x-rays completed within the day or week of the extraction. Digital x-rays should be available at all dental chairs which facilitates appropriate dental care.

## Quality Improvement

69. Hire a full time CQI coordinator who is trained in CQI for this facility.

70. Most of the critical problems at Dixon are related to systemic issues that need to be addressed by OHS and IDOC. OHS needs to be aware that initiating CQI at the facility level without basic support necessary to conduct business will be challenging. Training on CQI methodology will be useful but OHS must provide sufficient support for this facility in order that it can appropriately perform. The systemic issues include:

    a.  Getting adequate staffing hired.

    b.  Creating expectations for oversight by the Medical Director.

    c.  Hiring sufficient supervisory staff.

    d.  Establishing appropriate housing and management procedures for the elderly and disabled.

    e.  Rehabilitating, replacing or renovating existing physical plan that is past useful life or was not designed for the current purpose.

    f.  Hiring a dedicated CQI coordinator and infection control nurse.

    g.  Hiring a dentist and acquiring adequate dental equipment (chair, x-ray capacity for all chairs)

    h.  Identifying additional specialty care resources that are closer to Dixon.

    i.  Improving custody staffing and vehicles for transportation.

    j.  Getting an electronic medical record.

    k.  Completing a comprehensive set of policies and procedures and training on these.

71. Until these critical systemic issues are implemented effectively, training on CQI will be challenging.

72. Training in CQI is wasteful use of resources as long as there are not sufficient, permanent staff to participate meaningfully in such training.

**Attachment E**

**Monitor's 6th Report**
**Lippert v. Jeffreys**
**Mortality Reviews**
**March 6, 2023**

## Table of Contents

**PATIENT 1** ........................................................................................................................ **5**

FACILITY: MENARD ............................................................................................................. **5**
DATE OF DEATH-3/26/22.................................................................................................... **5**
CAUSE OF DEATH: DEMENTIA, ENCEPHALOPATHY, ANEMIA, HYPERTENSION.............................. **5**

**PATIENT 2** ......................................................................................................................**15**

FACILITY: LAWRENCE ........................................................................................................**15**
DATE OF DEATH: 1/20/22...................................................................................................**15**
CAUSE OF DEATH: ACUTE RENAL FAILURE ............................................................................**15**

**PATIENT 3** ......................................................................................................................**22**

FACILITY: PINCKNEYVILLE ..................................................................................................**22**
DATE OF DEATH: 3/12/2 .....................................................................................................**22**
CAUSE OF DEATH: ACUTE HYPOXIC AND HYPERCAPNIC RESPIRATORY FAILURE.........................**22**

**PATIENT 4** ......................................................................................................................**26**

FACILITY: MENARD ...........................................................................................................**26**
DATE OF DEATH: 4/4/22 .....................................................................................................**26**
CAUSE OF DEATH:  NOT IDENTIFIED......................................................................................**26**

**PATIENT 5** ......................................................................................................................**29**

FACILITY: PINCKNEYVILLE ..................................................................................................**29**
DATE OF DEATH: 4/20/22 ...................................................................................................**29**
CAUSE OF DEATH: RESPIRATORY FAILURE, AMYOTROPHIC LATERAL SCLEROSIS .......................**29**

**PATIENT 6** ......................................................................................................................**36**

FACILITY: DIXON...............................................................................................................**36**
DATE OF DEATH:1/21/22.....................................................................................................**36**
CAUSE OF DEATH: NOT IDENTIFIED ......................................................................................**36**

**PATIENT 7** ......................................................................................................................**37**

FACILITY: DIXON ............................................................................................................37
DATE OF DEATH: 3/25/22 ...............................................................................................37
CAUSE OF DEATH: NOT IDENTIFIED ...................................................................................37

**PATIENT 8** ..................................................................................................................**41**

FACILITY: DIXON ............................................................................................................41
DATE OF DEATH: 1/21/22 ...............................................................................................41
CAUSE OF DEATH: NOT IDENTIFIED ...................................................................................41

**PATIENT 9** ..................................................................................................................**44**

FACILITY: MENARD .........................................................................................................44
DATE OF DEATH: 2/24/22 ...............................................................................................44
CAUSE OF DEATH: NOT IDENTIFIED ...................................................................................44

**PATIENT 10** ................................................................................................................**47**

FACILITY: BMRCC ..........................................................................................................47
DATE OF DEATH: 3/6/22 .................................................................................................47
CAUSE OF DEATH: NOT IDENTIFIED ...................................................................................47

**PATIENT 11** ................................................................................................................**50**

FACILITY: MENARD .........................................................................................................50
DATE OF DEATH: 4/29/22 ...............................................................................................50
CAUSE OF DEATH: SUICIDE..............................................................................................50

**PATIENT 12** ................................................................................................................**52**

FACILITY: PONTIAC .........................................................................................................52
DATE OF DEATH: 1/13/22 ...............................................................................................52
CAUSE OF DEATH: ACETAMINOPHEN OVERDOSE ................................................................52

**PATIENT 13** ................................................................................................................**58**

FACILITY: DIXON ............................................................................................................58
DATE OF DEATH: 6/3/22 .................................................................................................58
CAUSE OF DEATH: NOT IDENTIFIED ...................................................................................58

**PATIENT 14** ................................................................................................................**74**

FACILITY: STATEVILLE .....................................................................................................74

DATE OF DEATH: 2/22/22 .................................................................................................................74
CAUSE OF DEATH: HEART FAILURE ..................................................................................................74

PATIENT 15 ..............................................................................................................................78

FACILITY: DANVILLE ........................................................................................................................78
DATE OF DEATH: 4/7/22 ...................................................................................................................78
CAUSE OF DEATH: STAGE 4 GERM CELL CANCER, GASTRIC PERFORATION ...........................................78

PATIENT 16 ..............................................................................................................................81

FACILITY: DANVILLE ........................................................................................................................81
DATE OF DEATH: 2/20/22 .................................................................................................................81
CAUSE OF DEATH: HEPATOCELLULAR CARCINOMA ............................................................................81

PATIENT 17 ..............................................................................................................................87

FACILITY: MENARD .........................................................................................................................87
DATE OF DEATH: 9/17/22 .................................................................................................................87
CAUSE OF DEATH: NOT IDENTIFIED ..................................................................................................87

Patient 1

    Facility: Menard

    Date of Death-3/26/22

    Cause of Death: Dementia, encephalopathy, anemia, hypertension

This was a 74 year old man with a history of high blood cholesterol and hypertension. The database form did not document either lung cancer or colon cancer screening. The patient was offered but refused influenza annually. The data base documented that patient was offered none of the other recommended vaccines appropriate for his age.

The patient had chronic care visits on 4/15/19; 10/25/19; 6/29/20; and 5/10/21. At none of the chronic care visits was an adequate history taken and on only two of these visits was a minimal examination performed. The patient experienced cognitive decline, contractures, and malnutrition none of which were addressed in chronic care clinics or other clinics.

As early as 12/16/19 the patient was placed on boost for "poor intake". We could not find documentation of weight change and the patient never had a nutritional consult or evaluation of his nutritional status even though he ultimately developed severe malnutrition.

The patient had a suprapubic catheter for unclear reasons. Apparently, the patient had prostatic hypertrophy and a prior urethral stricture making it difficult to urinate. Sometime prior to 2020 when this record began, the patient had a suprapubic catheter placed but the IDOC record does not list the indication and the problem list did not list a suprapubic catheter or the reason for it.

The patient was housed on the infirmary in early 2020 for unclear reasons. Physician notes were uninformative. A sample of a **typical** infirmary note by the physician on 3/9/20 was in its entirety, "S [subjective]: chronic conditions; O [objective] ∅ change, suprapubic in place; A [assessment] chronic condition; P [plan] nursing care". There was typically no history, no examination, no assessment of the status of the patient and no plans. These types of notes were typical from March of 2020 until October of 2021. The physician appeared to defer all care to nurses taking no responsibility for care of the patient.

Nursing care as expressed on the daily nurses note and the graphics sheet consisted of an inquiry of the patient for any complaints, a brief head to toe assessment of systems, with a nursing diagnosis that most consistently was self-care deficit. Once a week vital signs including weight was documented. He was considered able to do all activities of daily living by himself with assistance. However, the nature or degree of assistance is not specified. He had a walker. There was no evaluation of potential for falls or risk of skin breakdown. He had a dressing at the site of the suprapubic catheter but there were no instructions for dressing change.

On 2/26/21, the patient was referred to urology because the patient had a suprapubic catheter and had blood in his urine. The patient was seen by the urologist 4/5/21. There was documentation on this date that the consult occurred but only part of the report was obtained. Seven days later, the prison physician documented that the report was incomplete but referred the patient for a CT scan as recommended. The results of the urology consult nor the change in therapeutic plan was

5

documented as discussed with the patient. The CT scan was ordered on 4/12/21 and completed a month later on 5/10/21. There was documentation in the record that the consult occurred and there was a report. However, the report was not reviewed or discussed with the patient. Follow up with urology, after the CT scan, was ordered 4/16/21 and was completed over 3 months later on 7/28/21. We could not verify from the record sent to us that the appointment was documented as occurring nor that a provider evaluated the patient after the consultation. On 7/29/21 the patient was referred for a cystoscopy. This occurred on 8/13/21 which was timely. On 8/27/21, two weeks later, a nurse practitioner documented that the cystoscopy occurred and a report was present in the record, but the consultation report was not discussed with the patient. The patient was referred back to the urologist 8/27/21 to review the cystoscopy. The appointment was scheduled for 11/4/21 but the patient was in the hospital. The appointment was rescheduled for 1/19/22 but was cancelled because it wasn't approved. A rescheduled *urgent* urology referral was ordered 1/31/22 but wasn't scheduled until 3/2/22 and was cancelled due to the patient being hospitalized. It was rescheduled for 4/21/22 but the patient died before the appointment was made. This sequence of evaluations with the urologist took over a year and the final evaluation was not completed. It would have reasonably been completed in a few months as a civilian.

Beginning in April of 2020 nurses and the doctor began documenting that the patient was intermittently confused. There were days when the doctor would document that the patient was confused but the nurse's note would document the patient was alert and oriented times three. The etiology of the confusion was never thoroughly evaluated. By April 2020 the patient was presumed to have dementia without any attempt to identify treatable causes. A cognitive assessment was not performed. Steps were not taken to protect the patient from harm (supervised meals, fall prevention, nutritional assessment, specialized housing, etc.).

In late April 2020, the doctor thought that the patient's confusion could have been psychosis and discussed the case with a psychiatrist who recommended he obtain B12, folate tests and obtain a CT of the brain which the doctor ordered. However, on 8/17/20 about four months later the scheduling clerk documented that the doctor canceled the CT of the brain stating it wasn't necessary. The doctor never explained why the test was cancelled.

The patient's confusion gradually worsened. The patient also developed inability to sleep. For this problem, different providers prescribed Vistaril (May 2020 to July of 2021 ) and then mirtazapine (Feb 2021 to Oct 2021) without consideration or monitoring of adverse events. Hydroxyzine is identified as a potentially inappropriate medication to be avoided in patients 65 years and older due to potent anticholinergic properties resulting in risk for confusion and because it is a hypnotic. Mirtazapine is potentially inappropriate for persons over 67 due to potential for syndrome of inappropriate antidiuretic hormone (SIADH). If used, monitoring of serum sodium is recommended when initiating or adjusting dosage. The providers appeared unaware of these safety issues and we could identify no monitoring that occurred and the patients remained on the medication for an extended period.

On 3/8/21 the doctor noted the patient had low back pain. No history was taken and there was no examination for the pain. Yet the doctor started tramadol a narcotic medication without an apparent reasonable indication which was continued for almost a year without any monitoring. Tramadol has a black box warning for life threatening respiratory depression which this patient

subsequently developed in October. It is also considered a potentially inappropriate medication in persons over 65 due to SIADH[1] and has adverse reactions such as cognitive dysfunction and carries warnings related to use in older persons due to increased fall risk. There was no given indication for this medication and its use was never monitored.

On 4/16/20, a physical therapist evaluated the patient for contractures of the 4th and 5th fingers and documented that the presentation was similar to Dupuytren contracture. This had been ongoing for a year. The physical therapist recommended six weeks of therapy for range of motion. The patient was not seen again by the physical therapist until 7/23/20, when the physical therapist recommended consultation for a brace. It did not appear that the patient received six weeks of physical therapy. By 12/28/20 the patient had not yet received the brace and a doctor referred the patient back to the physical therapist for a brace but the physical therapist had already commented on his 7/23/20 note that he recommended a consult for the brace. So, apparently, neither the doctor nor the physical therapist knew how to obtain a brace for the patient. We couldn't find evidence that the patient received a brace. On the same day the doctor referred also to an orthopedic surgeon because of a "trigger finger". The patient wasn't seen for over three months (3/2/21) by the orthopedic surgeon. The orthopedic consult was documented in the IDOC medical record as having occurred. A report was present. A nurse practitioner at the orthopedic surgeon's office documented that the patient had contractures for three years and that she would talk to the attending regarding surgical and non-surgical options. Neither a diagnosis nor a plan was documented in the IDOC medical record. The physician at Menard did not ask the orthopedic surgeon what the options were and no plan for the contractures was documented post-orthopedic evaluation. The patient received no further physical therapy for the contractures which, based on a subsequent consultant note worsened over time. This series of encounters demonstrated lack of coordination with specialists and lack of attention to contractures. There did not appear to be a plan of care for the contractures.

On 5/4/20, a nurse documented that the patient had increased confusion and stated the patient was refusing to eat. This was only a few days after another nurse documented that the patient had difficulty swallowing medications. Previously in 2019 a history of aspiration was documented but not elaborated on elsewhere in records reviewed. Weight taken on 5/4/20 was 20 pounds less than that documented two weeks earlier with a body mass index of 17.7 which is considered underweight. The weight loss went unrecognized and not acted upon by nursing or providers. The patient should have been evaluated more thoroughly at this point and the plan of care revised to include diagnostic studies, more comprehensive neuropsychiatric evaluation, and closer monitoring of nutritional intake. The failure to act in the face of this patient's declining status satisfies criteria for neglect.

Beginning at the end of April 2020 nursing and mental health notes document that there was an inmate "caretaker" who appeared to assist and monitor the patient. The Monitor asked IDOC by email to clarify if inmates were assigned as caretakers for other inmates and received no response. Input from the intake caretaker was sought as to how the patient was sleeping and eating. Occasionally the inmate caretaker sought the attention of nurses about the patient's changing condition. There was no documentation of what the intake caretaker was expected to do or did in the care of this patient.

---

[1] Syndrome of Inappropriate Antidiuretic Hormone (SIADH)

Nursing documentation of care was poor. For example, "as needed" or PRN medications were charted as regularly dosed medications without any indication on the back of the MAR or in the progress notes as to the reason the medication was given and there was no documentation of follow up with the patient to see if the medication was effective. These "as needed" medications were given at a set time rather than when the patient expressed need or was assessed by nursing as needing the medication. Another example is that nurses' notes indicated the presence of a dressing but not the location. Accuracy of nursing documentation is also questionable. For example, on 11/17/20 the provider noted that the dressing on the area around the suprapubic catheter was removed. Nursing notes after that indicated a dressing was present on 12/25/21, 12/29/21 and 1/1/21, while all other nursing notes written from 12/19/20 through 1/11/21 indicate there was no dressing at the site of the suprapubic catheter insertion. Similarly, on 6/29/21 a nurse documented two decubiti; one 4.5 by 4 cm and another 5 by 4 cm. Two weeks later the same wounds were described by the same nurse on the wound flow sheet. These were the only two times the flow sheet was used even though the patient had wounds the remainder of his life. In addition, there are orders for dressing changes handwritten by nurses on the MAR, but these do not identify the ordering provider nor in all cases is the location of the dressing to be changed identified on the MAR. Finally, there are times when nursing documentation is missing in its entirety. See for example the I & O sheets which were left blank for one shift on four days in January 2022 and no vital signs were documented on graphics sheets the entire month of February 2022.

Nurses did document dressing changes on the medication administration record consistently but there was no evidence of a provider evaluation of the wounds and no provider orders for care of these wounds. On 6/29/21 when a nurse first noted two decubiti over the right and left sacrum, a roho cushion and egg crate mattress were ordered. Two weeks later a nurse documented the status of these two wounds on the wound flow sheet and again a roho cushion and egg crate mattress were ordered. There is no corresponding provider order or documentation that these items were received and provided to the patient. These two decubiti were never evaluated by a provider and their status unmonitored until the patient was hospitalized in October of 2021. The two decubiti were noted as present on admission to the hospital.

The graphics sheets are used to document when a patient has a bowel movement. In May 2021 the graphics sheets do not record a bowel movement for this patient from 5/4/2021 until 5/14/2021. However, there is no documentation indicating that the nurses were aware the patient had not had a bowel movement over this 10 day period. On 5/10/21 a CT scan ordered by a urologist showed large volume fecal retention indicating severe constipation. This finding went untreated. A stool softener had previously been prescribed as evidenced on the MAR until 6/22/20 when it was discontinued. There is no note or other documentation to indicate a reason for this decision. After the finding of constipation on the CT scan in May 2021 providers did not provide stool softeners, fiber, advise increased fluid intake, or follow up with advanced care if indicated. This individual who is becoming increasingly confused and needing assistance had constipation, a basic bodily function, that was ignored.

On 8/24/21, without any indication why, the patient was removed from the infirmary and sent to the 3rd floor on security hold. There was no documentation by a physician ordering the discharge. There is a discharge note written by a nurse which gives no indication why he is being discharged.

8

In fact, on the nurse's discharge summary, the reason for admission is exactly the same as the reason for discharge; "dementia, BPH with suprapubic catheter, scoliosis, osteoarthritis". This patient's condition was worsening (increased confusion and irritability, poor nutrition, contractures, and decubiti ulcers) rather than improving. To discharge this patient to a lower level of care is contradictory and resulted in patient neglect.

The patient was placed on "security hold" and housed in the infirmary. While on "security hold" the patient was not rounded on by physicians and nurses did not monitor or assess the patient's condition. Nurses did come into the room daily and ask the patient if he needed nurse sick call. The patient's response was typically documented as "no complaints". There is no documentation the patient was provided with assistance to complete activities of daily living and no instructions or monitoring of this assistance if it was provided. An inmate caretaker is documented as being present the last few days before his hospitalization in October 2021 but there is no documentation of the assistance or care provided the patient by this person. On 10/3/2021 a nurse wrote that the patient's "caretaker acknowledged to inform this writer of any changes". It is inappropriate for one inmate to be responsible for monitoring the condition of another inmate, particularly one as vulnerable as this patient.

While in security hold housing, on 10/2/21, the patient was found by a nurse staring at the ceiling, the patient was oriented only to self. The nurse documented in the progress note that it was not possible to obtain a pulse but a pulse of 88 was recorded in the vitals on the side of the note. While the nurse practitioner was informed, the patient was not evaluated nor was he moved to a higher level of monitoring or care. The following day, the patient complained of abdominal pain, his pulse and respirations were elevated and oxygenation was 95%. A telephone call was made to an on-call doctor who ordered labs but no change in housing. COVID was not considered, and no testing or symptom surveillance done. Given the altered mental status and no physician onsite, the patient should have been sent to a hospital for evaluation.

When labs returned, they showed dehydration (BUN 34 and sodium 152) but again no provider evaluation occurred. Instead, the doctor ordered a liter of intravenous fluid by phone. Rather than being hospitalized the patient remained on security hold for three more days when he developed abdominal pain and wheezing and wasn't eating meals. Oxygenation was not measured again until the morning of 10/5/21 and was only 92% with an elevated heart rate (113). When a doctor evaluated the patient a few minutes later he noted that the "care attendant" said that the patient had been feeding himself three days earlier but since then the care attendant had been feeding the patient. The attendant also stated that the patient hadn't had a bowel movement in three days, had been eating only 50% of his meals, and wasn't drinking fluids unless the attendant offered liquids. How much liquids were consumed was unclear. There are daily nurses notes during these three days but none of the documentation reflects any inquiry about intake and output, or alteration in patterns of eating or elimination and there is no indication that nurses monitored the care provided the patient by another inmate. The patient wasn't transferred to a hospital until later the afternoon of 10/5/21.

In summary a little more than a month earlier this patient was inappropriately discharged from chronic infirmary care. His condition after discharge was not monitored clinically and he deteriorated. At the subsequent hospitalization, he was found to have COVID-19 pneumonia

9

which was unrecognized. He was under the care of another inmate and deteriorated, not eating sufficient food or drinking sufficient liquid. By placing a cognitively impaired inmate under supervision of another inmate the IDOC was participating in neglect which is a form of elderly abuse.

The patient had been vaccinated for COVID-19 with the Johnson and Johnson vaccine on 8/19/21 which is a one dose vaccine. But on admission to the hospital, on 10/5/21, the patient was diagnosed with respiratory failure from COVID-19 with superimposed pneumonia. He also had an acute urinary tract infection. The hospital had to contact the facility to obtain permission to place a feeding tube because the patient failed a swallow test and was at risk of aspiration and the patient was unable cognitively to give consent. The prison had not contemplated the need to establish some form of guardianship for this patient as his cognitive impairment became more apparent and did not anticipate the need for someone to make medical decisions on his behalf. The Warden gave an emergency consent waiver for the procedure. The feeding tube was necessary because the patient was severely malnourished and cachectic at this point. The patient was unable to move his L upper arm and developed a clot in his arm likely related to his COVID infection. A CT scan of the brain showed atrophy and ischemic changes likely causing his dementia. The patient had a prolonged hospital course of almost a month and was discharged with recommendations for a neurology follow up, a speech therapy follow up to perform a swallow test, and a wound care follow up because the patient now had seven decubiti ulcerations over the sacrum, heels, hips, back, and shoulder areas.

The patient returned from the hospital on 11/3/21. A physician's admission note to the infirmary upon discharge from the hospital was on 11/3/21. The doctor documented there was no discharge summary available when the patient returned. It was received at some time later. Dressing change orders for the multiple decubiti weren't specified and there were no orders present in the record so it was unclear how nurses determined validation of a physician order.

On 11/6/21 a nurse called an on-call physician because the patient had crackles in his lungs. Without an evaluation or referring for prompt evaluation, the on-call doctor ordered Lasix but the patient had no documented condition for which Lasix would be an appropriate therapy. This physician is not credentialed and this care was unsafe.

On 11/8/21 an urgent referral to wound care was made. The tracking log had two referrals for wound appointments on 11/8/21. The tracking log documented that one referral from 11/8/21 was scheduled for 3/4/22 about four months later. It was also documented as cancelled because the patient was in the hospital. This appears to be a duplicate and inaccurate. However, the second wound clinic referral from 11/8/21 was completed on 12/8/21 about two weeks later than requested. Patient after-care instructions and a report were obtained. The wound specialist wanted to debride the wound but could not because there was no consent on file and the patient was unable to give consent. There was documentation that the patient went for his appointment. The doctor did review the report on 12/17/21 about nine days after the consultation. Another referral to wound was made 12/9/21 but didn't occur until 12/30/21 almost two months after the initial referral was made. The 12/30/21 consultation was not documented as completed in the medical record. A full report was not obtained. Recommendations were present on an aftercare summary and included referrals to urology, general surgery and neurology. These were not reviewed. It did not appear

that there was a physician at the site during this time and there was no documentation of review of the consultation. On 1/11/22 an urgent referral to wound care was made and was completed on 1/26/22. There was a report which a nurse practitioner documented as reviewed. The nurse practitioner did not document any findings or recommendations.

The first blood tests after return from the hospital showed albumin of 2.3 and hemoglobin of 10.7 both of which were abnormal and low. Yet these abnormal tests were not noted as problems. The low albumin indicated severe malnutrition which was consistent with a doctor's note documenting that the patient looked cachectic. .

The patient's only nutrition was by a gastric tube after returning from the hospital on 11/4/21. The input into the tube and the urine output were documented. The input and output flow sheets on the infirmary show widely varying tube feeding amounts. The recommendation on discharge from the hospital was for osmolyte feeding at 70 ML per hour which is 1680 ML per day. Yet, the flow sheets rarely documented in excess of 1000 ML and were as low as 350 ML. The flow sheets evidence that the patient was not fed sufficient nutrition by tube feeding and there was no recognition of this nor was the lack of feeding addressed. This continued for the five remaining months of his life. On 12/23/21 a doctor referred the patient for nutritional evaluation which was appropriate. This was initially scheduled for 6/1/22, six months later despite the patient needing immediate attention to his tube feedings. The initial appointment was rescheduled by SIU to 6/6/22 but this appointment was cancelled by a nurse practitioner. The patient had died on 3/25/22.

For five months the patient remained on the infirmary unit requiring total care. Dressing changes were mostly provided with a few misses but were documented only on the medication administration record. Flow sheets do not document that the patient received recommended tube feedings. Though the patient was cachectic and had multiple decubiti and needed protein calorie supplement as recommended by the wound specialist, the patient did not have a nutritional assessment at the facility to make an assessment of his tube feedings were adequate. The status of the decubiti were not thoroughly evaluated by the physician and nurses documented dressing changes on the MAR but did not document any findings in progress notes. Instead, nurses used formatted progress notes more appropriate for a physician and failed to document details of nursing care provided to the patient. On the medication administration record for December of 2021 nurses documented two different dressing changes one cleaning with Hibiclens and then using medical honey and another with Sandyl and aquacel. It wasn't clear if the different methods were for different decubiti wounds because it wasn't stated.

During the period from November 2021 to the patient's death in March of 2022, the patient was on the infirmary. When the patient developed abnormal liver function tests (ALT 806 and AST 604) the coverage physician ordered hepatitis tests and apparently considered whether any medications may have been causing the abnormal liver function tests. The hep B core antibody was positive and the hepatitis A antibody was positive indicating that the patient had probable hepatitis B infection and possible hepatitis A infection. These results were unrecognized and not identified as problems. When the patient saw a neurologist in January, the patient was bed-bound

11

and had spastic quadriparesis[2] making him unable to use his arms or legs. The neurologist said that the patient was not receiving physical therapy which should have been provided but was not done while the patient was on the infirmary.

A wound specialist initially saw the patient 12/8/21 but was unable to debride the wounds because the patient was unable to give consent and the facility had not determined who would have power of attorney. A two week follow up was recommended but the patient didn't go again to wound clinic until 12/30/21. Debridement of the wounds was delayed. Aside from two notes by a coverage physician who examined the decubiti on the infirmary, there were no provider examinations of the patient's decubiti in the medical record and there was no documented thorough wound description until provided by an outside wound care specialist. It did not appear that there was sufficient physician staffing at the facility.

On 2/23/22 a nurse documented an odor to the wounds. A provider did not examine the patient but a nurse practitioner gave a phone order for antibiotics without evaluation of the patient or performing a culture. Three days later a nurse documented that there was drainage and continued odor to the wounds. The patient was not responding to any stimuli. A blood count was ordered at some point but the order was not in the record. The results were available on 2/25/22 and showed a white count of 18.8 indicating serious infection. *The following day* the patient was sent to a hospital. He was described in the hospital as having fever, contractions of his limbs resulting in lying in a fetal position, had multiple deep malodorous ulcers over the hips and sacrum and had sepsis from infected decubiti or a urine infection. The patient's hospitalization was not timely. The patient had thrush, a fungal infection of the mouth. X-rays were consistent with osteomyelitis. None of these conditions had been noted at the prison demonstrating a lack of thorough examination of the patient. Due to the patient's frailty, the hospital contacted a sister of the patient who elected not to proceed with further treatment and the patient was sent back to the facility where he died about three weeks later.

This patient had 23 referrals for consultation. Twelve referrals were cancelled and 11 referrals were completed. A referral for CT can to evaluate altered mental status and possible dementia or psychosis was cancelled after not being completed in three months. No explanation was documented in the record. Dementia was presumed but neither neurologic evaluation nor cognitive evaluation were performed to assist in the diagnosis. Another referral to a urologist for follow up after cystoscopy didn't initially occur due to the patient being hospitalized. It was rescheduled but then cancelled due to lack of approval. One consultation was cancelled because of no available transportation. Several referrals were scheduled (some timely and some not timely) but were not completed because the patient died. One was particularly problematic. A referral was made for nutrition evaluation on 12/23/21 to evaluate tube feeding nutrition. This should have been an urgent consultation but was ordered as routine. The appointment was made for 6/1/22, more than six months later when it should have been urgent. The patient died before the consultation was completed.

---

[2] Spastic quadriparesis is an inability to use the limbs and body parts and is seen in cerebral palsy. This patient had an inability to functionally use his arms or legs. The reason for this condition was not known and the neurologist ordered additional tests.

In none of the 11 completed consultations was onsite follow up in accord with Consent Decree requirements which is to review the report within three days, meet with the patient in five days after the consultation (III.H.2.) to discuss findings and inform the patient of findings and all recommended treatments and changes in the therapeutic plan (II.B.6.e.). Obviously, in this patient with presumed dementia there could be no meaningful discussion but a discussion with a guardian to ensure that further care was desired would have been appropriate. In three of the 11 completed consults there was no documented review by a provider. This facility appeared to lack physician coverage. The remaining eight completed consult reviews by a provider either did not take place with the patient, were not documented as completed within five days, or did not document findings and the updated therapeutic plan. Two of the 11 completed appointments we viewed as not timely. A follow up with urology after a CT scan to evaluate blood in the urine did not occur for 103 days and a neurology consultation recommended in four weeks didn't occur for 76 days. The six cancelled appointments included several that would not have been timely[3] including:

- A CT scan to evaluate altered mental status with possible psychosis or dementia would have been scheduled for 110 days out.
- A wound care appointment for debridement of multiple decubiti wounds would have been scheduled for 116 days but was cancelled because the patient was in the hospital.
- A nutritional consultation for a patient on tube feedings to assess adequacy of tube feedings was scheduled for 165 days out. The patient failed to receive adequate nutrition by tube feedings during this time. The patient died before the consultation was able to be completed.

We did note incidentally four documents in this record that belonged to other patients demonstrating some degree of misfiling of paperwork in the medical records.

Opportunities for Improvement

1. The patient did not have all of his medical problems identified including dementia, the reason for the suprapubic catheter, contractions of limbs, and malnutrition. IDOC should develop a chronic disease program to address all problems at chronic illness visits.
2. The patient did not have appropriate vaccinations or cancer screenings documented. A procedure for documentation of vaccination and cancer screening needs to be developed.
3. This case describes neglect of an elderly man with dementia. Care of the elderly is not appropriate in IDOC facilities. A work group in conjunction with a gerontologist should be developed to develop appropriate protocols to manage care of the elderly and to determine appropriate housing for the elderly.
4. This patient failed to have his dementia evaluated or diagnosed properly. A protocol for doing so should be developed.
5. The patient had contractures, apparently from inactivity. He did not have appropriate follow up nor did he have physical therapy initiated when he was bed bound. Bed bound persons should have physical therapy to prevent contractures. This can be provided by nurse assistants and does not necessarily have to be provided by a physical therapist but should be done.

---

[3] The dates of referral and proposed scheduled appointment were taken from the tracking log provided by IDOC.

6. The patient failed to have documented management by providers of his decubiti. For one infirmary admission, this resulted in development of osteomyelitis. Providers appeared to not take any responsibility for care of the decubiti. Decubiti should be examined by providers and a care plan developed, if necessary, with a wound care expert.

7. The patient never had a nutritional assessment at the facility despite malnutrition and protein calorie deficits that affected management of his decubiti. When the patient's cognitive status changed, monitoring food intake was not done and it appeared that the patient wasn't eating well and developed malnutrition. When the patient was on tube feedings, it appeared from input/output flowsheets that he was not provided recommended feedings. This appeared to be a form of neglect. Protocols for nutritional consultations need to be developed and nutritional needs of the elderly particularly with dementia need to be included in those protocols.

8. There was failure to conduct appropriate history or physical examinations when indicated. As a general rule, IDOC physician generally do not draw clinical conclusions from appropriate history and physical examinations and physician leadership must take responsibility to ensure that this occurs.

9. Physician orders were not present in the medical record. The medical record needs to include verification of all physician orders.

10. The patient was on several medications which carry risks for the elderly but these risks were unnoticed or ignored. Use of a clinical pharmacist would help. A physician started and continued tramadol, a narcotic, without a bona fide indication. IDOC needs to utilize a consultant pharmacist who should be available for all correctional centers as needed.

11. Nursing notes did not reflect the needs of the patient. Nurses need to develop a plan of care for all infirmary patients.

12. The patient was treated by phone on several occasions when an in-person examination was necessary.

13. The patient who was unable to care for himself in August and was placed in security-hold housing where monitoring was less than adequate. The patient appeared to be monitored by an inmate attendant. IDOC needs to review use of inmate care attendants at all facilities to ensure their participation does not include medical monitoring of any sort. Protocols for use of inmate attendants must be developed. Also, Menard should eliminate security hold housing on the infirmary.

14. When a nurse found the patient with altered mental status, on 10/2/21, no examination took place, only a phone order for laboratory tests. When the labs showed significant dehydration, no examination took place only a phone order for IV fluid. It was only three days later when the patient developed wheezing and abdominal pain, that an examination by a provider occurred. Though the patient should have been admitted to the hospital on 10/2/21, he was not admitted to the hospital until 10/5/21. This should result in a sentinel event review.

15. Appointments with the wound specialist were not apparently scheduled as recommended or reports were unavailable in the record.

16. The patient's dentures may have affected ability to eat but the poorly fitting dentures were not corrected by a dentist.

17. There appeared to be a lack of physician coverage at this facility resulting in the patient not being evaluated when necessary, making it unsafe for the patient.

18. A CT scan showed large volume fecal retention but facility providers ignored or did not recognize this finding and never treated the patient's severe constipation.

19. IDOC facilities should institute a weekly huddle that includes the Medical Director and all providers, the scheduling clerk for offsite specialties, and the chronic care nurse. All pending specialty appointments should be reviewed. All completed appointments over the last week should be discussed to include future specialty orders, timeliness of scheduled appointments, and any absent or tardy reports. All referral information should be clarified. Any delayed appointments should be discussed with a corrective action.

20. Follow up review of consultation reports are not effectively communicated with the patient. IDOC only appears to track if an appointment with a provider is scheduled post consultation. For purposes of verifying compliance with the Consent Decree, IDOC should track whether a provider met with the patient, had a report from the consultant, reviewed findings and any changes to the therapeutic plan with the patient, and documented this in the medical record. The scheduling clerk can only track compliance issues such as whether a report was received and whether a post-consultation visit with the patient occurred. Whether the post-consultation visit included effective discussion of findings and change of therapeutic plans cannot be accomplished by the clerk and requires other auditing to determine.

21. All elderly patients should have a physician order for life sustaining treatment (POLST) on file. This should be obtained prior to development of dementia. If this is not done, treatment decisions should be with a guardian or family member.

### Patient 2

Facility: Lawrence
Date of death: 1/20/22
Cause of Death: Acute renal failure

This patient had multiple myeloma since 2015. Multiple myeloma is a blood cancer that results in accumulation of abnormal serum proteins. The accumulation of these proteins can cause a variety of complications which included for this patient chronic kidney disease and bone disorders. He developed lytic bone lesions that resulted in compression fractures of six vertebrae. He also had diffuse osteoarthritis and the fractures, lytic lesions and arthritis contributed to a significant chronic pain problem. He had been on chemotherapy since 2015 but in 2016 received a stem cell transplant at Barnes St. Louis Hospital. He was being followed by the transplant team at Barnes St. Louis, an oncologist at Carle Clinic in Illinois and by a nephrologist for his kidney disease also at Carle Clinic. His chronic kidney disease, osteoporosis, chronic pain, and compression fractures were not listed as problems nor were these conditions followed in chronic illness clinics on a regular basis.

The specialists regularly scheduled the patient for follow up as the patient was on chemotherapy and because the multiple myeloma remained active. The transplant specialists saw the patient every three months, the oncologist every two months and the nephrologist every three months.

After a 1/30/20 nephrology visit, there were two referrals to the nephrologist neither of which resulted in an appointment and after a 1/30/20 appointment, the patient was lost to follow up. The tracking log does not include a completed subsequent nephrology visit and the medical record

includes no subsequent report from the nephrologist. On 7/12/21, approximately a year and a half since the last visit, a nurse practitioner documented that the patient was just seen by the nephrologist but there was no report and no evidence on the tracking log of the third quarter of 2021 that the patient completed a nephrology visit. In addition to the lost nephrology follow up, the patient was late for two oncology visits and for two Barnes St. Louis visits. Concordance of dates of provider referrals for consultations with the tracking log was not consistently accurate. Also, only 3 of 13 consultant visits reviewed had a full consultant report. The remainder of visits had either or both of an aftercare summary or comments written on the referral form. Neither of these is an acceptable report as they do not include the full evaluation, assessment and recommendation of the consultant.

IDOC has provided no evidence of their progress in obtaining consultant reports. This results in practitioners lacking information so that the therapeutic plan at the prison is more difficult to conform to the consultant's recommendations and newly identified problems may go unrecognized. Also, the practice of IDOC practitioners does not include carefully reviewing the consultant's reports nor incorporating all new diagnoses and recommendations into the therapeutic plan. In this patient's case, the patient developed severe osteoporosis[4] which was occasionally acknowledged by a prison physician but was never incorporated as an ongoing problem into the problem list of the patient. The patient also had six compression fractures of his spine that were not listed as problems. Though the patient was being seen by a nephrologist for chronic kidney disease, this disease was never listed as a problem on the problem list and neither osteoporosis, compression fractures nor chronic kidney disease were consistently followed or thoroughly monitored in chronic disease clinic. Also, a recommendation of a specialist to evaluate abdominal pain was a significant miss that had implications for the patient. For that specialist's visit, which is discussed below, there was no report only comments on a referral form. The process of specialty care appeared to be managed by the scheduling clerk who is not a clinician. This process should be mapped and revised so that consultant reports are presented and completely reviewed by IDOC practitioners who then update the existing therapeutic plan and simultaneously update the problem list.

The patient was evaluated in four chronic clinic visits over two years of record review. The chronic kidney disease was mentioned during the first chronic clinic visit but no plan was provided specifically for that disease. The doctor failed to notice that the patient's follow up with the nephrologist had not occurred. The goal blood pressure was not documented and the actual blood pressure was 139/93 which is typically slightly high for a person with chronic kidney disease. The goal blood pressure should have been obtained from the nephrologist. Up-To-Date recommends a goal blood pressure of 125-130/80 for chronic kidney disease. Constipation was also mentioned at this chronic clinic visit but was not addressed in the history. Chronic pain was addressed with a history and in the physical examination and additional pain medication was prescribed. At a second chronic disease clinic a coverage doctor mistakenly wrote that the patient had malignant melanoma, not multiple myeloma. These are very different diseases. No history was documented except to check a box that there were no changes since the last visit and to document , "I am OK". None of the other conditions were addressed or acknowledged. No physical examination was documented and the assessment was malignant melanoma in fair, stable condition. Notably, between the first and second chronic clinic visits, the patient had 21 episodes when the blood

---

[4] Osteoporosis is demineralization of bone that results in brittle bones subject to increased risk of fracture.

pressure measured higher than the 130/80 goal for persons with chronic kidney disease but increased medication was not considered.

At a third chronic clinic the doctor documented seeing the patient for multiple myeloma but no other conditions were evaluated. The only history was "I feel fine". No examination was documented. The patient assessment was multiple myeloma with end-stage renal disease but the visit did not update the status of the patient's treatment for these conditions except to note that the patient was under the care of an oncologist. Notably the patient had missed his nephrology visit but that was unrecognized and not documented.

The final chronic clinic visit reiterated a patient complaint that his stomach hurt. But there was no further history nor was there an examination of the abdomen, nor an assessment or a plan for the stomach pain. Without having documented a plan in the record, the doctor did order a routine CT scan of the abdomen which was not done as a scheduled test. Medication for osteoporosis was mentioned as changed but there was no history of any of the patient's conditions or the status of any of the patient's other conditions. His chronic pain for which the patient was on narcotic medication, his long standing constipation, and chronic kidney disease were not addressed. This note documented a weight of 189 which was a 28 pound weight loss over approximately two years, but it was either ignored or not documented as reviewed. None of the chronic clinic visits thoroughly evaluated any of the patient's problems.

The patient developed COVID-19 in December of 2020. The patient was offered COVID-19 vaccination in February of 2021 but refused the vaccine. At no clinic visit did a provider discuss the importance of this vaccination. The transplant specialist at Barnes St. Louis sent the patient a letter by way of the facility strongly recommending booster vaccination for COVID-19, but this letter was not documented as discussed with the patient.

Recommendations of the specialists were not consistently timely reviewed by IDOC practitioners. The patient went to Carle oncology clinic on 2/21/20 and Barnes St. Louis on 3/2/20. There were no full reports for either consultation and little information except for an aftercare summary from Barnes St. Louis and a few comments on the oncology visit to state that the patient was still on Revlimid, a chemotherapy agent. There was no documentation about what communication with the oncologists prompted the facility physician to order two new chemotherapeutic agents. The patient did not receive either chemotherapeutic medication as ordered for a month but there was no documentation in the record about the failure to start the medication. A month later the physician again prescribed the medication which was then started. There was no explanation why the patient did not receive ordered medication in March and no report of the consultant or explanation from the consultant about the change in medication. This lack of coordination with specialists places patients at risk of harm.

The patient had five compression fractures, osteoarthritis and a few lytic lesions from myeloma and had pain. There were few provider encounters during which the physician took a thorough pain history. Oxycodone was started in March of 2020, increased to 180 mg per day in May of 2020 and continued at 180 mg a day until the patient's final hospitalization in January of 2022. Oxycodone causes constipation. The patient was also on calcitriol and calcium antacid both of which also can contribute to constipation. There were few notes that evaluated the patient's pain and a thorough pain history was not found.

The patient had chronic and longstanding constipation. The patient was started on magnesium citrate on a regular basis initially daily in February of 2020 and was on daily doses almost continuously until January of 2021 when he was changed to a three times a week dosing which was continued until he died. Magnesium citrate is indicated for treatment of *occasional* constipation and has an off-label use for bowel preparation. Magnesium citrate carries a warning for prolong use that serious side effects may occur. Physician supervision should occur for use in persons with kidney dysfunction due to potential magnesium intoxication; this patient had chronic kidney disease. Use with calcitriol may increase serum concentration of magnesium salts. These warnings were not acknowledged and the patient used this medication almost continuously for two years.

In addition to magnesium citrate, fiber was prescribed from January 2020 and stopped in January of 2021. Docusate was prescribed almost continuously from November of 2019 until he died in January of 2022. Senna was prescribed in January of 2021 until July of 2021. Yet, the patient continued to have constipation. The patient was given magnesium citrate as a keep-on-person medication and as many as seven bottles were sometimes documented as given in a month. On 1/21/21 a nurse practitioner wrote that the patient didn't have a bowel movement without using a laxative and had to use a whole bottle and wait a day before a result. Clearly, the patient was not using the laxative as directed. At this point, five ounces was to be used daily not a whole bottle. No discussion occurred about the misuse of the medication. The nurse practitioner added a stimulant laxative (Senna) but the patient continued to have constipation. There are a variety of other medications, other than magnesium citrate, that should have been tried but were not. The dose of oxycodone was not reduced nor was pain assessed. Constipation was not addressed as a problem and no provider documented a history of medications used for the constipation, or attempted to develop a more effective strategy for this problem.

Along with the persistent constipation the patient developed abdominal pain. On 2/19/21 a coverage doctor noted that the patient's "stomach gets queasy if he eats or drinks". The physician did not associate the stomach issues with the constipation nor was a thorough history of the stomach issues taken. During an oncology visit on 3/22/21 the patient complained of stomach pain; the report documented that the patient had trouble digesting things. In follow up of this visit the doctor documented that the patient was concerned about his "persistent epigastric pain that radiates around to both kidney areas". The doctor noted that the patient also had diarrhea. Doctor considered an EGD but it was not done. An EGD would have been an appropriate test or a CT scan of the abdomen.

On 4/20/21 a coverage doctor noted continued epigastric pain with generalized discomfort on palpation. The doctor ordered TUMS, docusate and increased fluid intake and an abdominal x-ray. An abdominal x-ray is not useful in a diagnostic test for abdominal pain. Endoscopy, CT scan, and ultrasound are typically recommended depending on the type of pain and the history.

On 5/13/21, a licensed practical nurse evaluated the patient for abdominal pain using a "non-specific discomfort" protocol which is not meant for abdominal pain. The LPN referred the patient to a provider. The coverage doctor saw the patient on 5/19/21 based on this referral. The abdominal x-ray previously ordered by this same physician had not yet been done as ordered. The

doctor noted that the patient had persistent abdominal discomfort described as a grinding in the middle of his abdomen and radiating to the back. The doctor wrote, "The pain has gotten so bad that it is now awakening him from sleep". The doctor also noted constipation with bowel movements only every other day. Mild abdominal discomfort was noted on exam but the doctor diagnosed chronic abdominal pain likely gastritis due to multiple medications and irritable bowel syndrome. The doctor also noted that the constipation was likely due to opiate use. The doctor again ordered a plain abdominal film, fluid, an anticholinergic (dicyclomine) used for irritable bowel and magnesium citrate three times weekly for six months. The patient had abdominal pain now for three months and more intensive testing was indicated as the pain was awakening the patient from sleep. Based on the history, endoscopy or a CT scan or both were indicated.

The doctor did see the patient in follow up of the x-ray which showed moderate constipation and documented that the pain was resolved with dicyclomine and no further action was taken.

Two weeks later, on 6/7/21, the patient went to Barnes St. Louis for follow up with the transplant oncologist and the consultant felt it important to mention the patient's abdominal pain. A full report was not present, but on the referral form the consultant wrote comments stating, "Abd pain ?etiology- if persists on Nexium/Prilosec then upper endoscopy is indicated, [assessment] ? Need for upper endoscopy. [recommendations] 1) upper endoscopy if abd pain persists, 2) no change in myeloma therapy for now, 3 ) no other recommendations".

The coverage doctor saw the patient in follow up of the consultation on 6/16/21 and signed the referral form acknowledging that the "recommendations of the specialist were reviewed and approved" but the doctor wrote in her note that "no other recommendations were made by the bone marrow transplant specialist in STL". The doctor failed to document the recommendation for upper endoscopy if abdominal pain persists. There was no evidence in the note asking about persistent abdominal pain. The doctor did not mention what occurred at the consultation and only addressed a skin lesion and a toenail infection of the patient. There was no report for the consultation visit only an IDOC referral form with comments on it.

On 10/26/21 a RN saw the patient using an abdominal pain protocol. The pain was documented as "constant"; "hurts all over" and was ongoing for "months" and the last BM was a day ago. The nurse spoke to a coverage doctor who said to place the patient on her schedule. This was the third coverage doctor at this facility since August of 2020. The physician saw the patient in chronic clinic on 11/2/21. The doctor's only documented history was to quote the patient "my stomach hurts" for 2-3 months. The weight was not commented on but was 189.6 pounds which would have been a 28 pound weight loss as compared to his weight in January of 2020, about two years previously. The weight loss was unrecognized. The doctor took no further history of the abdominal pain, did not document an examination of the abdomen, and made no assessment of the abdominal pain. No action was documented for the abdominal pain in the note but the same doctor referred the patient for a routine CT scan of the abdomen, and pelvis on 11/2/21 for "hx of MM which is stable with Xgeva. Pt has been on PPI, TUMS, dicyclomine".

By 12/30/21, almost two months later, the CT scan had not been done and a RN saw the patient and documented the patient's complaint as "stomach is burning and I've thrown up for hours". The pain was in the upper mid abdomen with tenderness to palpation. The nurse noted that the

19

patient had orders for TUMS and dicyclomine but hadn't taken any recently so advised him to take his medication. The nurse "educated" him about his medication and the adverse effects of stomach upset. The patient wanted another medication for his upset stomach. On the same day the coverage doctor prescribed Carafate without seeing the patient.

On 1/2/22 a nurse saw the patient using an abdominal pain protocol. The pulse was 119. The pain was constant with nausea and constipation. The nurse called a Regional Medical Director who apparently was covering and the patient was sent to the emergency room. Notably, the referral on 11/2/21 for a routine CT scan of the abdomen and pelvis was documented on the offsite tracking log as completed on 1/11/22. But on 1/11/22 the patient was in the hospital as an emergency for a presumed ischemic bowel. The routine CT scan was not completed as of 1/2/22 when the patient was admitted for an acute abdomen. The tracking log should not state that a routine referral was completed when the test requested was completed at a hospital for an emergency. The log should state that the scheduled test was not done.

The patient was admitted to a hospital and from that hospital was transferred to higher level hospital on 1/9/22 where the patient remained until 1/18/22. There was no report from the first hospital and only partial notes were available from the second hospital. It was difficult to determine what precisely happened to the patient while hospitalized but it appeared that he had an ischemic bowel with bowel obstruction and apparent perforation. The extent to which this was due to the patient's constipation was unknown because there were insufficient records. At the second hospital the patient left the hospital apparently against medical advice. The information about the ischemic bowel and leaving against medical advice was obtained from the ambulance transport report but a CT scan in the hospital noted bowel obstruction with a large stool ball in the rectum. Scattered notes confirm that the patient had an ileostomy placed and had complications after an initial surgery. A discharge summary was not present. Without a record one can only speculate what happened to the patient. It is possible that the constipation was responsible for the ischemic bowel[5] but in any case, the patient had ten months of abdominal complaints inadequately evaluated, weight loss of 28 pounds, and constipation for at least two years that was less than adequately managed or monitored. No one acknowledged his weight loss.

The patient returned to the facility after apparently signing out of the hospital against medical advice (there was no record verifying this- only the ambulance driver's documentation). The day following return to the facility, the nurse was unable to obtain blood pressure which was then manually obtained as 76/40 and the patient was sent back to a hospital where he died the following day. The notification form for transport documented he was being sent to the ER for abdominal pain, ischemic necrosis of the small bowel and multiple myeloma. His death was possibly preventable with earlier intervention with respect to his abdominal pain.

OPPORTUNITIES FOR IMPROVEMENT

---

[5] Several mortality reviews identified stercoral colitis which can result in bowel perforation. Stercoral colitis is a condition of severe constipation that can cause colitis or even bowl perforation. This patient had severe constipation that may not have been effectively treated. The hospital record should be obtained to determine what was actually diagnosed.

1. The problem list does not contain all of the patient's problems including chronic kidney disease, osteoporosis, compression fractures of his spine, and chronic constipation. IDOC should develop a workplan to correct the problem list issues.

2. Chronic disease clinic visits did not address all of the patient's chronic problems. History and physical examinations at these visits are inadequate. The implementation plan should address a restructuring of the chronic disease program.

3. The offsite specialty tracking log is not consistently accurate. The patient was lost to follow up for nephrology for about one and a half years. In July of 2021 a nurse practitioner documented a follow up visit post-nephrology consultation but there was no evidence of a report or evidence on the tracking log of a visit to nephrology. Especially problematic was the lack of full reports from the consultants which was not evident for multiple consultations. IDOC should initiate a root cause analysis of specialty care looking at every aspect including lack of appropriate referrals when indicated, tracking visits on the log, obtaining reports of consultations, and follow up of specialist's recommendations. IDOC had committed to such a study in their December 2021 Implementation Plan but eliminated that study in subsequent versions of their Implementation Plan.

4. Management of the patient's constipation was ineffective. The patient was maintained on a prolonged course of magnesium citrate despite warnings against the use of this product on a prolonged basis as serious side effects can occur. In any case, the constipation was ineffectively managed.

5. Pain histories were not thorough and there was no consistent documentation of why the patient's pain was sufficient to warrant a very high dose of oxycontin which was used for almost two years continuously. IDOC should develop a pain management protocol.

6. The patient had chronic kidney disease for which a blood pressure goal of 130/80 is recommended, but had multiple episodes of blood pressure above that goal. Those readings appeared to be ignored. Hypertension follow up should include a blood pressure goal and physicians should monitor interval blood pressures to benchmark progress towards the goal.

7. The patient refused vaccination for COVID-19. He was a high risk patient and should have been counseled by a provider about the need for vaccination and booster shots.

8. The patient complained of abdominal pain repeatedly beginning on 2/19/21. Initial diagnostic studies only included a plain abdominal film which is not a typically recommended study for abdominal pain. A specialist noted the abdominal pain on 6/7/21 and recommended upper endoscopy if it persisted. This recommendation was ignored. The patient described constant pain on 10/26/21 and had a 28 pound unrecognized weight loss. A doctor ordered a CT scan as a routine but it was not done for over two months when the patient developed an abdominal catastrophe that resulted in the patient's death. IDOC should perform a root cause analysis of this case to discover why a diagnostic imaging study or endoscopy were not performed earlier.

9. This patient was lost to follow up with nephrology for a year and a half. This may have been due to the Medical Director vacancy at this facility.

Patient 3

Facility: Pinckneyville
Date of Death: 3/12/2
Cause of Death: Acute hypoxic and hypercapnic respiratory failure

This 59 year old came into IDOC at NRC in September of 2018. The problem list documents asthma with COPD, insulin dependent diabetes, hypothyroidism, depression with anxiety, coronary artery disease with bypass surgery in 2016, high cholesterol, umbilical hernia, and sleep apnea on CPAP . The problem list does not include hypertension; otherwise, it is accurate. The initial laboratory tests show a hemoglobin A1c of 10 showing poor diabetes control.

The data base sheet documents influenza vaccine given annually from 2019 through 2021. The first dose of shingles vaccine was given in 2020; two doses of COVID vaccine were given in 2021. Pneumococcal vaccine was not documented on the data base as given.

On 4/3/20 the doctor evaluated the patient for confusion and memory loss with an onset of 3-4 months to a year ago. He noted that labs or medications would not contribute to his symptoms and assessed memory loss and confusion stating in his assessment, "memory loss ∇ confusion which is not related to chronic illness directly but indirectly may contribute to his dementia". Yet the doctor did not perform tests typically performed for a cognitive impairment or dementia evaluation. This 60 year old patient had no further evaluations for dementia or cognitive impairment and it was not mentioned again.

Though the patient had multiple problems identified at NRC in 2018, his sleep apnea was not carried forward as a problem when he arrived at Pinckneyville. Though the patient received CPAP equipment on 10/15/20 at Pinckneyville, it wasn't clear if the patient had this equipment at another IDOC facility or if it was his own. It did not appear that a Pinckneyville provider ordered the equipment. Even though the patient had equipment delivered he was never monitored for his sleep apnea in any chronic clinic and no one ever assessed whether the equipment was operable in housing unit. The problem was ignored. The patient had coronary artery disease with prior bypass surgery which was not noted as a problem at Pinckneyville and he was not followed for this condition in chronic clinic. The chronic clinic form has a check box for hypertension/cardiac which was checked but the providers never even documented that the patient had prior bypass surgery.

None of the chronic clinics included an adequate history. The chronic clinic notes did not mention that the patient had a prior coronary bypass surgery. Lipid studies were done and showed a low HDL. Using his laboratory results and blood pressure at the 4/1/20 chronic clinic the patient had a 16.5% 10-year-risk of a cardiovascular event and a high intensity statin is recommended. But the patient was not on a statin. Further management in chronic care clinics was as follows.

The patient was documented as having both COPD and asthma. With respect to COPD there was no baseline history nor was a pulmonary function test or spirometry conducted so staging of his COPD was never accomplished. The patient was never assessed for COPD in chronic clinics; instead, he was assessed using asthma criteria. But if the patient had asthma the providers took virtually no history of asthma except to ask at one chronic clinic visit about when his inhaler was

used.  Peak expiratory flow rates were done on the first two chronic clinic visits but not on the final three visits.  His asthma was assessed on four of his visits as good control and stable disease with two visits of these four also recording mild intermittent disease and one of these four visits recording mild persistent disease.  The other visits had no assessments.  There was no basis on any of these visits to make the asthma assessments that were made because the history was insufficient to do so. The patient was treated almost continuously over the two years with a short acting beta agonist inhaler, a steroid inhaler, a leukotriene receptor antagonist, and early in 2020 with "as needed" inhalation therapy.  The exception was that on 4/2/21 the patient's prescription for his rescue inhaler (Xopenex) expired.  This was unrecognized at the 4/29/21 clinic until renewed four months later at the 8/30/21 chronic clinic.  For a period of time the patient was also on both a beta agonist medication and ipratropium by inhalation . The latest staging of the asthma was on 8/30/21 when the patient was classified as having intermittent asthma which is defined as requiring only intermittent use of a beta agonist inhaler.  However, the patient was on two different maintenance drugs (montelukast and alvesco inhaler) which means either the physician did not understand the asthma staging terminology or was just checking a box.  The patient was on prednisone (40 mg) for four days on two occasions but there were no associated progress note .   Moreover, when the patient was hospitalized in March of 2022, the emergency room note documented that the patient was prescribed alvesco inhaler, montelukast tablets, and Xopenex inhaler but on bedside examination, the patient wasn't able to use the inhalers properly.  Whether this may have been due to a cognitive difficulty was not clear.  There was no documentation on any of the chronic illness clinics of the patient being given instruction on inhaler use.   Aside from providing medication, there was little evidence of appropriate monitoring, by way of history and testing) of either asthma or COPD.

Regarding diabetes there was no history regarding symptoms of hypoglycemia and no discussion with the patient about his weight.  The patient did not have a BMI on any of his chronic clinic visits.   On the chronic disease form, checkboxes were checked on five of the visits for diet, exercise, signs and symptoms of hypo/hyperglycemia and foot care.  What checking the box meant was unclear.  Though the patient was on insulin and metformin, the patient was on a regular diet with snacks and was morbidly obese.  No attempt was made to have a nutritionist evaluate the patient or to have the patient lose weight and there was no discussion documented in the record about a discussion about his diet.  The patient's weight appeared to stay about the same through the two years of incarceration at about 308 pounds.  Yet, there was no documented discussion with the patient regarding weight loss except for the check boxes.  Though the foot care box was repeatedly checked the patient had swollen feet with sores on his leg beginning in April of 2020 and at least through July of 2021 when he was documented as having large wounds on his legs based on a wound dressing flow sheet.  There was no documented foot examination on any of the chronic care visits.  What checking the box for foot care meant was unclear.  The foot care that was provided should be documented in the record especially since the patient had significant leg and foot problems.  In April of 2020, a nurse practitioner documented that the patient had diabetic neuropathy and wanted Neurontin.   Instead of Neurontin, the nurse practitioner prescribed Pamelor.  Yet, at none of the chronic clinic visits was diabetic neuropathy discussed or even mentioned as a problem.  The patient never had an examination that included monofilament testing or use of tuning fork to assess for neuropathy.  At one of the six chronic clinic visits[6] a doctor ordered referral for a diabetic eye examination but there was no eye examinations in the record

---

[6] One of these visits, on 12/9/20, there was a COVID lockdown and the doctor only reviewed the medical record.

reviewed sent to us. None of the other chronic clinic visits included any documentation of an eye examination. The care for this diabetic was not adequate. At the 8/7/20 and 2/17/22 chronic clinics the blood pressure was 160/84 and 151/79 respectively and assessed as in good control. These pressures are not good control.

The patient had hypothyroidism. Hypothyroidism is characterized by low thyroid hormone and is diagnosed when the thyroid stimulating hormone (TSH) is high. Treatment of hypothyroid is replacement with thyroid hormone. The goal of treatment is to keep the TSH in the normal range which for the UIC laboratory is 0.35 to 4 units per ml and medication is titrated up or down to attain a normal TSH level. This patient was on 225 mcg per day. On 2/18/21 the TSH was at the low limit of normal (0.35) but just before the next chronic clinic, on 4/19/21, the TSH was low (0.08) and the T4 was 12.1 which is minimally elevated. This would indicate that the dose of thyroid hormone should be slightly reduced or monitored more closely. The dose of thyroid hormone was ordered reduced to 200 mcg on the chronic care note. A hand written medication administration record for May shows that a nurse transcribed this order correctly on the hand-written medication record but a June medication administration record sent from the pharmacy shows a 225 dose was given for the month. It appears that the order was never carried out by the pharmacy. On 7/5/21 it appears that the thyroid hormone was renewed for six month so the patient remained on the 225 dose. Further laboratory tests were done on 8/27/21 and showed even lower TSH at 0.05 with a T4 of 12.3 indicating that the thyroid hormone should be reduced. Yet, at the next clinic on 8/30/21 the doctor ***ordered to increase*** the thyroid hormone to 250mcg instead of lowering the dose. Another hand-written medication record for September showed this increased dose as being given. This order was carried out by the pharmacy and the October medication record shows that the patient was receiving this higher dose. These compounded errors placed the patient at risk for harm because he was being over-medicated with thyroid hormone. The laboratory values were not documented on the 8/30/21 chronic clinic note and the doctor did not document the rationale for increasing the dose of medication. A follow up TSH should have been ordered to follow up on the change in medication but was not done. This physician has inadequate credentials and may not have understood how to manage hypothyroidism.

Though the patient had some confusion and memory loss starting several months to a year before April of 2020, this was not considered when prescribing medication. The patient was on fifteen medications for medical problems. It appeared that five of these (Tylenol, Alvesco inhaler, Xopenex inhaler, montelukast, and nitroglycerin) were keep-on-person. Nevertheless, if the patient had dementia, he should not have been responsible for managing his medications unless his dementia was insignificant which was not established. In any case, this should have been monitored but was not. The elderly, including patients with cognitive disorder, who are on large numbers of medication would benefit from a pharmacist evaluating their panel of medications to assess whether medications can be eliminated.

The IDOC chronic clinic form has a checkbox asking the yes/no question, "Is the medical history unchanged since the last clinic?". This question was answered yes on four of the six forms and on the remaining two wasn't answered at all. This question should be eliminated. It appears to encourage not taking a history. As well, there are only two lines on which to document the history and the form encourages not taking a history because there is no place to write the history.

24

The patient was being treated for mental illness, but those records were not included in the record sent to us. Mental health records should be sent because that care can impact the medical care of the patient.

There was limited health care contact with the patient dating from April of 2021. He was evaluated at a chronic clinic visit on 4/29/21. On 6/4/21 a L shoulder x-ray was done. The history on the x-ray report stated that the patient had a recent fall. There was no evaluation of the patient after this fall in the record. On 7/7/21 an LPN evaluated the patient for a low bunk. Due to his weight and problems with knee pain he asked for a low bunk. The doctor did write a permission for this. He was given compression stocking presumably for leg edema and leg wounds and also given shower shoes on 7/9/21. He placed a health request on 4/8/21 for bandages for swelling legs with wounds that were bleeding. There was no specific evaluation for this request. Wound care notes were completed from 7/12/21 to 7/22/21 indicating on 7/22/21 that the leg wounds had healed. There was a chronic clinic visit on 12/3/21 and on 2/17/22. No other health care interventions were documented until on 3/7/22 the patient fell twice, once in a shower on the health care unit and once in his housing. This was the second fall incident for this patient. An incident report documented abnormal vitals with pulse of 126, temperature of 100.2 and BP of 96/57 and the patient was sent to a hospital.

The patient was sent to a local hospital, then transferred to a second hospital for higher level care. From there he was transferred to another higher level hospital. He remained hospitalized for five days. The records of the hospitalizations appeared incomplete and a final discharge summary was not present. The hospital listed the patient as discharged on 3/13/22 but IDOC documented that he died on 3/12/22.

Opportunities for Improvement
1. Multiple problems with chronic clinic existed including the following:
    a. The patient was given a CPAP machine but was not being monitored for his sleep apnea in chronic clinic. All chronic conditions need to be monitored in chronic clinic.
    b. Coronary artery disease was not monitored during chronic clinic visits.
    c. The patient should have been on a high intensity statin but was not.
    d. Neither COPD nor asthma were monitored appropriately.
    e. Though the patient had COPD, pulmonary function testing was not documented as having been done.
    f. It did not appear that the patient received instruction on use of his inhalers.
    g. The chronic illness form is ill-suited for monitoring multiple chronic conditions and should be revised or replaced. Providers should document, in their chronic clinic notes, what they do at the clinic related to examinations or education.
    h. The patient did not have a diabetic eye exam for two years.
    i. The patient did not have a documented foot examination for two years.
    j. The patient was not evaluated for neuropathy despite being treated for it.
    k. The patient's obesity was never addressed . The patient did not receive nutritional counseling by a dietician and the dietary plan was not geared toward weight reduction.

    l.   The patient had leg wounds for at least a year but these were not evaluated in chronic clinic visits despite the patient also having diabetes.

    m.  The patient had hypothyroidism and appeared over-medicated but instead of decreasing, the doctor increased the medication without any follow up.

    n.   The patient's apparent dementia was not followed in chronic clinic visits.

    o.   All of these problems call for a root cause analysis of the chronic care program to result in a plan for developing a program such that all medical conditions are evaluated and monitored and done so according to acceptable standards of care. In particular, providers need to take sufficient history for each condition and examine the patient appropriately based on the conditions of the patient.

2. A doctor documented that the patient had dementia on 4/3/20 but there was insufficient history, evaluation, or follow up. This was not followed up in chronic illness clinic and the patient remained in general population housing. The patient had two subsequent falls. The first fall wasn't evaluated. If the patient had memory issues or dementia protective housing should have been provided. IDOC should undertake the Monitor's recommendations with respect to evaluation, management and housing for the elderly particularly those with dementia. This person should have received an evaluation of his cognitive status.

3. The patient's mental illness was not tracked by medical personnel even though it may have affected his medical problems. No mental health notes were included in the record sent to us. Mental health notes should be reviewed when pertinent to the patient's medical conditions. In this patient's case, the mental health notes should have been reviewed when the patient developed confusion and subsequently diagnosed with dementia.

4. When the patient had a fall in June of 2021 and given his history of "dementia", the patient should have been placed on a fall protection program to include protective housing. IDOC should develop a protocol for addressing housing for the elderly.

5. In 2021 there was a sick call request and other episodes where it appeared that the patient wasn't evaluated or followed up. It appeared that either medical record documentation was missing or there was insufficient staff.

6. The patient was on a large number of medications and had cognitive issues. Several of his medications were keep-on-person but it was not clear that the patient could reasonably administer his own medication and should probably not have been allowed to take his own medication. A pharmacy consultation regarding polypharmacy would have been appropriate.

7. The final discharge summary and final blood culture results were not available. Hospital records should be obtained to understand what happened to the patient.

8. There was also no autopsy and a cause of death was not established.

## Patient 4

    Facility: Menard

    Date of Death: 4/4/22

    Cause of Death: Not identified

This 43 year old had a problem list documenting asthma, Leiden factor V deficiency with associated deep vein thrombosis and pulmonary embolism. The problem list was accurate.

26

Only 15 months of medical record was sent. Over the 15 month the patient was seen in chronic illness clinic once on 1/26/21. The patient was seen for asthma and anticoagulation for Leiden factor V deficiency. Despite checking the box that the history had changed, the only history was no chief complaints. There was no history regarding inhaler use, asthma symptoms, or questions regarding any bleeding episodes. Influenza vaccine was documented as given in October of 2020. The INR tests were documented although the patient was on a direct oral anticoagulant (DOAC) and this test was unnecessary. There was no examination except for vital signs and to document that the patient was alert and oriented. The blood pressure was 150/92 and the provider ordered blood pressure checks twice weekly for four weeks but we could find no evidence that these were done or that there was any follow up. It appeared that part of the medical record might be missing. Peak flow rates were not checked. Despite no symptom or inhaler use history, the asthma was documented in good control. There was no documented evidence in this note to support good control. The note classified the patient as having intermittent asthma although the patient was on both Xopenex and Alvesco. This combination means that the patient should have had at least persistent asthma. The medication administration records were disorganized and incomplete and there was no record for this month, so it was not certain that the patient received medication at this time. Over the next 15 months the patient was not seen in chronic clinic. The patient continued to receive Eliquis until he died in April of 2022. The medication records present in the record provided to us had no evidence that the patient ever received either a Xopenex or an alvesco inhaler throughout his incarceration. The prescription for Alvesco expired 7/26/21 and the Xopenex expired on 1/27/22. Neither was renewed and there was no further evaluation whether these medications were necessary.

On 11/7/21 the patient was acting "funny" and a nurse saw the patient using a "drug overdose" protocol. Security said that the patient was unable to walk, was having difficulty standing up without swaying and was not answering questions appropriately. The nurse documented that the patient was able to stand by himself without swaying. The pupils were dilated and reacted sluggishly. The nurse documented that patient denied taking any illegal drugs. The nurse did not ask the patient if he took an overdose of prescribed medication. At this time, the patient was receiving gabapentin, amitriptyline, Eliquis, fluoxetine, lithium, and olanzapine all via directly observed therapy. Overnight observation on the infirmary and a drug screen would have been appropriate along with urgent mental health evaluation, but the nurse called the doctor who said to send the patient back to his housing unit.

A month later, on 12/8/21, a nurse saw the patient at 11:15 am using an altered mental status protocol. The patient said his psychotropics were recently changed. The nurse referred the patient to a nurse practitioner. The patient said that his psychotropic medication was recently increased. The nurse practitioner documented that the patient "appears to be high. But his psych meds were recently adjusted to a higher dose". The patient had slow speech but was appropriate. A more in depth neurologic examination was not done. The nurse practitioner did not evaluate what medications had been recently increased. On 12/3/21 the Zyprexa was increased to 12.5 mg, lithium was decreased from 600 to 200 daily, 2 mg of clonazepam was ordered at night for three days, and 10 mg of propranolol was started at night. Lexicomp shows multiple possible drug interactions that should be monitored but did not give recommendations to avoid using these medications in combination. The nurse practitioner ordered a routine psychiatric referral to review his medication but it would have been prudent to place the patient on the infirmary for observation

with an urgent mental health evaluation. This was the 2nd episode of altered mental status over the past month.

The patient was not seen by a mental health professional based on the 12/8/21 referral to mental health, when on 2/1/22 a nurse practitioner saw him because staff witnessed him ingest an indeterminate number of pills. At this time the patient was prescribed clonidine, Eliquis, fluoxetine, gabapentin, and olanzapine. The overdose was suspected to be acetaminophen. Because this medication was not prescribed to him, it was unclear how the patient obtained the medication. The patient was sent to a local emergency room. Poison control was called. At the hospital, the patient alleged he took 200 acetaminophen tablets. Mucomyst treatment was provided.

Upon return to the facility, the physician on call said that the patient could return to his housing unit. This was dangerous. The patient should have been placed in protective housing until his mental health condition was stabilized. At the same time a physician ordered that the patient could return to housing, a mental health professional documented a progress note placing the patient on a 15 minute watch, apparently in his housing unit. We could find no progress note documenting a mental health evaluation. There was no mental health progress note upon return from the hospital notes and it was unclear how long he remained on watch or even if the watch occurred.

A month after the hospitalization for acetaminophen overdose, on 3/1/22, a nurse practitioner saw the patient after receiving the 2/1/22 hospital report. This was untimely review of the report. The nurse practitioner documented that the on-call psychiatrist said that the patient was not to receive Elavil and was to follow up with the psychiatrist. The patient hadn't yet had a documented follow up with a mental health professional after a suicide attempt. The nurse practitioner did not arrange a more urgent mental health evaluation for this patient. This was a significant lack of access to mental health care.

On 4/2/22 a nurse responded to a code 3 call at 3:10 pm and the patient was found on his back unresponsive. Security staff was engaged in CPR. There was no timeline documenting what was occurring except for occasional episodes of care. At 3:17 shock was advised during transport to the health unit. Narcan spray was given at 3:17. The ambulance arrived at 3:30 pm and left at 3:42. A timeline should be given on cardiac arrests in-house.

The emergency room note documented that the information from the facility was that the patient collapsed at 3:09 pm and CPR was immediately instituted. The patient arrived at the emergency room at 4:14 pm. The patient was in electromechanical dissociation. The patient was intubated and transported to a higher level of care. The patient left the ER at 5:30 pm. The patient expired in the hospital.

Multiple months medication administration records were not available.

<u>Opportunities for Improvement</u>
1. Chronic care was inadequate for this patient. Whether the patient had asthma or not was not established. Peak expiratory flow rate testing was not done. Spirometry was not done. A reasonable history for asthma was not done. The medication record failed to verify that

the patient ever received any medication for asthma and this was unnoticed. Because of the lack of history, it wasn't clear that the patient even needed the medication. One of the medications expired and this was unnoticed for three months. A process analysis of the chronic care program should be done to determine its adequacy.

2. The patient had two episodes of altered mental status (11/7/21 and 12/8/21) one which was described as a possible drug overdose and another in which the patient complained about problems with his psychotropic medications that appeared to custody to be causing an altered mental status and inability to stand. This patient should have been placed under observation at least overnight but was sent back to his housing unit on both occasions. The patient was referred to mental health but there was no evidence in the record that this referral occurred. There appears to be lack of access to mental health care.

3. The patient overdosed on acetaminophen that resulted in hospitalization and intensive treatment. Upon return to the prison after this suicide attempt, a physician sent the patient back to regular housing. There was no documented psychiatric evaluation of the patient post-suicide attempt that we could find. The patient lacked access to a mental health professional for a life-threatening mental health crisis.

4. The patient required emergency resuscitation but there was no timeline of resuscitative events. IDOC policy should include that when an emergency occurs that requires emergent response and especially basic life support, that a timeline of what interventions occurred be kept as part of the medical record. The timeline should date and time each event that takes place.

## Patient 5

    Facility: Pinckneyville
    Date of Death: 4/20/22
    Cause of Death: Respiratory failure, amyotrophic lateral sclerosis

This 72-year-old man had schizophrenia and long-standing back and neck problems including prior surgery on his lumbar and cervical spines with implanted hardware. We asked for two years of records but received records that began in January of 2021 about 15 months before his death.

We noted that nurses did initiate pneumococcal, influenza, hepatitis A, hepatitis B, and shingles vaccines. Most of the vaccinations were in 2021 indicating some attention to vaccinations is occurring. The patient also received two doses of the COVID-19 vaccine. The problem list documented that the patient had hypertension, spinal stenosis with prior fusion, high blood lipids, bipolar disorder and prior COVID-19 infection in December of 2020. There were no annual health interventions so it appeared that the patient was not screened for age-specific cancers.

There were significant problems with specialty care for this patient. The tracking log did not consistently match medical record documentation with respect to when the patient went for care. There were some appointments on the tracking log that never occurred based on medical record documentation. There was an entry for referral for "revise neuroreceiver" on the tracking log, but it was unclear what specialty service this was for and there was no evidence in the medical record or in the tracking log that this appointment occurred or what it might be for.

It was not possible reviewing the record, as compared to the specialty tracking log, to determine all the specialty care the patient received. Nor were provider notes reflective of specialty care that occurred or might have occurred. Though the patient had multiple referrals to specialty care on the tracking log, there was only one report of specialty care in the medical record, a visit to orthopedic surgery on 11/22/21. The orthopedic surgeon recommended a cervical and lumbar myelogram and a referral for this was ordered. This appointment did occur but when the patient arrived for the myelogram, it was cancelled because the patient appeared sick. There were no other completed appointments documented in the record. We also found a referral form from 10/8/21 with consultant comments on it from an otologist documenting that the patient needed an audiogram, amplification evaluation and repeat visit in three months but the corresponding physician progress note on 10/8/21 stated only "OK post furlough" without any documentation of where the patient went or what occurred or what was to follow.

There were also problems with chronic clinic care. Though we requested two years of record and were told that the record we received was everything IDOC had for this patient, there was only one chronic clinic visit for the two years of requested records. This chronic clinic visit, on 10/21/21, was for hypertension. No history was taken but a box was checked that the history was unchanged since the last visit which was inaccurate because the patient had ongoing weakness for which he was referred to an orthopedic surgeon. This wasn't mentioned. Also, the patient was seen a week earlier by a nurse for lower extremity swelling and lower extremity "tremors". These problems were not identified on the provider's history but were of concern to the patient because he placed a health request for these complaints. On 10/21/21 the patient was on metoprolol, antacids, tamsulosin, omeprazole, long-term nonsteroidal medication, fiber and a stool softener. Medications were not addressed during the chronic clinic appointment but appeared to indicate that the patient also had GERD, BPH, and possibly chronic pain from arthritis which were not addressed by the provider during the chronic clinic visit. There was no examination. There was no history, no physical examination (except for vital signs), no evaluation of labs (the patient did not have a cholesterol test in the two years of record), and no documented plan though the patient had ongoing specialty appointments pending.

The patient had ***virtually no history*** taken by IDOC providers of his ongoing concerns and displayed progressive weakness which eventually incapacitated the patient without a provider documenting an adequate examination including a neurologic examination. Staff failed to address the patient's concerns as demonstrated in their documented notes.

- On 5/5/21 the patient described to a mental health staff that he was worried about his medical concerns. There was no documented evaluation of the patient around this time. From the beginning of the record provided to us dating from January of 2021, there were no provider examinations from January to October of 2021.
- On 10/8/21 the patient had mental health screening when going out for a specialty appointment. He described to a mental health screener frustration with his medical treatment and was upset with the doctor. He had complained of having hearing loss, and nerve damage in his legs. Because of these concerns, the mental health screener told the patient to write a health request regarding his health concerns.
- On 10/14/21, the patient wrote a letter to the facility Medical Director saying he needed to talk to the doctor about "my serious medical issues concerning my left leg, left hip, left foot, right foot, neck, shoulders, right arm, elbow, and hand. As well, my discussion with

my brain, spine doctor concerning her findings from the extensive nerve conductor test on 27th Sept 21. These issues are effecting my life activities hourly-they grow worse daily". We could find no evidence of nerve conduction tests in the medical record. In a subsequent visit, on 11/2/21, the doctor noted weakness in his lower extremities since May of 2021 not getting worse. The doctor did not take a history of the weakness and did no examination noting that the patient was scheduled to see a spine surgeon. The doctor presumed that the weakness was related to spinal disease but failed to perform an adequate evaluation.

- A nurse saw the patient on 10/15/21 for lower extremity swelling and tremors of the lower extremities. The nurse described "tremors" on observation. The patient asked questions about a neurosurgery appointment and "wanted to be heard" and wanted to know what was going on with his appointment. The specialty tracking log had no evidence of a neurosurgery or neurology appointment.

- On 10/21/21, the facility Medical Director saw the patient in chronic clinic but took no history, performed no examination, documented that there was no change in the patient's history since the last visit, and failed to address any of the patient's concerns.

- On 11/17/21 a nurse practitioner (NP) noted that the patient was awaiting a specialty care visit and wanted a neck brace. There was no examination of the patient.

- An orthopedic physician evaluated the patient of 11/22/21 stating the referral was for cervical and lumbar pain. The consultant noted that the patient had limited movement and assessed a failed back, referring to the prior surgery performed. He recommended a myelogram.

- A NP ordered a myelogram on 11/22/21.

- On 12/1/21, the facility Medical Director wrote an infirmary admission for rectal bleeding. On the same day the nurse infirmary admission note documented "body weakness rectal pain". The only examination for an admission for rectal bleeding was PERRLA (evaluation of the eyes), NSR (normal heart rhythm) and clear lungs. There was no rectal examination and no examination related to the nurse's finding of body weakness. Notably, the weight was documented on the nurse infirmary admission note as 130 which indicated significant weight loss (32 pounds over the past year and 15 pound weight loss since a 11/22/21 orthopedic consultation). The weight loss was ignored or unacknowledged. Also notable was the nurse documentation of giving the patient diapers "because of body weakness". There was no order for this and the doctor appeared unaware of the need for diapers or use of diapers. The doctor was unaware of the needs of the patient. Weakness significant enough to give the patient diapers is a serious medical need which was not addressed.

- On 12/3/21 a nurse documented stage 1 decubitus but providers had not yet acknowledged or documented a wound evaluation.

- On 12/7/21 the doctor performed the first evaluation since the admission note from 12/1/21. The only history was "weakness". There was no examination; instead, the doctor said that the patient was scheduled for a myelogram. The doctor did not follow up on the rectal issues, did not take any further history of the weakness, and without an examination, the doctor wrote in the assessment, "questionable if he truly has a weakness". The doctor's comment was unprofessional, particularly since the doctor had not completed an adequate history or physical examination of this patient including a neurologic examination.

- On 12/11/21 a nurse documented that the patient wasn't eating or drinking. His pulse was 108. The nurse documented the patient was "on the med board" to see the doctor. The

nurse did not notify the doctor. On the flow sheet the patient was still documented as self-care meaning he was to care for himself.

- There were no activity-of-daily-living orders from the physician for the 12/1/21 infirmary admission except "activity as tolerated". Nurses appeared to decide activity-of-daily-living care plans ad hoc. A nurse documented giving the patient diapers, on the infirmary admission note, "because of weakness". If the patient was too weak to get to the toilet, why wasn't a care plan developed to ensure that the patient was safe? Despite giving the patient diapers because of weakness, from 12/1/21 until 12/16/21 the patient was documented on infirmary flow sheets as self-care for all activities including toileting. But the patient was clearly unable to care for himself. Nurse progress notes document that fluid was within reach on 12/1/21; 12/5/21; 12/8/21; 12/9/21; 12/10/21; 12/11/21; and 12/14/21. On 12/7/21 a nurse documented giving water to the inmate who drank 240 cc of fluid. The nurse also documented that the patient ate 25% of his meal but there was no effort to determine why the patient wasn't eating. On 12/10/21 the patient told a nurse he wasn't eating or drinking and needed IV fluid. The nurse explained and encouraged oral fluids and noted that fluid was within reach of the patient. This appeared to be neglect as the patient wasn't eating or drinking and said he needed intravenous fluid, was not adequately evaluated for that, and had no physician intervention to see that the patient was appropriately cared for. Another nursing note on 12/11/21 describe the patient as not eating or drinking. The nurse documented that the patient was scheduled to see the doctor but did not notify the doctor of her concern. Though the patient was documented as self-care, the patient on numerous occasions asked to be repositioned in the bed, belying the plan for self-care. Nurse also, on occasion, documented repositioning the patient also belying the self-care designation. These individual and occasional appropriate responses of nurses to care for the patient were in the context of no recognition on a care plan that the patient was unable to care for himself and no nursing care plan that acknowledged the patient's inability to care for himself. The physician was ultimately responsible for this lack of direction of his care.

- On 12/15/21 a nurse documented that total care was provided to the patient although the infirmary flow sheets document self-care for all activities. On 12/15/21 the doctor documented that the patient was having difficulty swallowing . Aside from this comment by the doctor there was no history of the patient's status. Nor was there an examination. There was no examination of the rectal wound, no evaluation whether the patient was capable or was in fact eating, no evaluation of why he was having difficulty swallowing, no neurologic examination even though the patient was extremely weak, and no apparent concern about the status of the patient's nutrition. The physician did not order postural protection to prevent aspiration. This physician lacks credentials and is practicing in an unsafe and clinically inadequate manner.

- On 12/16/21 infirmary flow sheets begin documenting assisting the patient with activities of daily living. On 12/18/21 total care begins to be documented, although the patient was still on a regular diet. The physician did not address nutrition or fluid intake and inputs and outputs were not monitored. The patients fluid and dietary needs were being neglected. The physician was disengaged from the patient's condition and nurses were left to decide on how to manage the patient on an ad hoc basis. Infirmary flow sheets after 12/18/21 show a mix of total-care, assisted-care, and self-care in an apparent random sequence as

testament to the ad hoc nature of care. Care was not physician directed and individual nurses appeared to optionally provide care as they deemed appropriate.

- By 12/16/21, the patient was unable to swallow sufficiently that a nurse documented crushing his medication and placing it in pudding so that the inmate was able to take his medication. This was not ordered and did not appear on the medication administration record.

- On 12/21/21 the doctor ordered a soft diet for a month but there were no other comments in this progress note. The infirmary flow sheets documented the soft diet. One can of boost supplement was ordered on 12/21/21 and was given for one day but not thereafter as nurses were awaiting approval to give the supplement. The nutritional value of the soft diet was not determined. Because the patient had difficulty swallowing, a swallow study should have been ordered and a nutritional assessment should have been conducted but this was not done. The patient had weight loss which was unrecognized and not addressed.

- On 12/22/21 the doctor saw the patient and documented that the patient was unable to move his arm and had difficulty urinating. There was no examination of the patient including a neurologic examination. In the "objective" section of the note, the doctor wrote "nurse observed him drinking without a problem" and noted that the patient was scheduled for a myelogram. This was the 2nd documented comment by the doctor for this infirmary admission implying, in our opinion, that the patient was not being truthful about his symptoms. These comments were made without this physician ever having conducted a thorough history or completed a thorough examination including a neurologic examination.

- On 12/29/21 a nurse wrote that the patient was weak and unable to stand and needed to be assisted to the toilet and then to bed.

This patient went to a local hospital on 12/29/21 for a scheduled myelogram but on arrival the patient appeared sick with cough and sputum. The patient had an elevated white count so was sent to the emergency room to rule out COVID. The patient was screened in the ER and was noted to have dehydration, elevated white count, and a negative chest x-ray with the dehydration needing further work up. Vital signs were normal with an oxygen saturation of 100%. A COVID test was negative and ED notes documented that the patient was going to be sent back to radiology for the myelogram but this was delayed due to infusing intravenous fluids for the dehydration. The myelogram was eventually cancelled and the patient returned to the prison.

When the patient returned to the facility, on 12/30/21, a nurse practitioner reviewed the ER summary. The nurse practitioner saw the patient at 1 pm and documented a 9 pound weight loss based on an infirmary admission weight of 130 pounds on 12/1/21 and a current weight of 121. The patient had weighed 150 pounds on 10/15/21 and 155 pounds at an orthopedic appointment on 11/22/21, so the weight loss was actually much greater than 9 pounds and had not been tracked until this date. The nurse practitioner noted that the patient complained of difficulty swallowing but added that the patient was able to drink fluids and swallow without difficulty. Instead of taking a better history or performing a neurologic examination, the NP assessed only "weakness". He said he would evaluate the patient for an appetite stimulant and ordered a mental health consult and ordered a CT of the chest, abdomen, and pelvis. The reason for the mental health referral was not documented. These referrals were ordered without having completed a thorough history or physical examination, including a neurologic examination. Later that day the NP received laboratory tests showing dehydration (sodium 151, BUN 31) and elevated white count (18.4)

33

indicating an infection. The NP without any other testing and without examining the patient ordered IV fluids and empirically started antibiotics.

On 12/31/21 the patient developed trouble breathing and developed a pulse of 138 with an oxygen saturation of 90% which is abnormal. The doctor was called and he ordered 2-3 liters of oxygen for six months and to continue antibiotics. To order six months of oxygen for an acute problem was inappropriate. The patient needed a diagnosis and had unstable vital signs with oxygen desaturation and should have been sent to a hospital. About four hours later, the nurse again called the doctor when the oxygen saturation decreased to 85% and the patient was finally sent to the hospital.

The patient was first sent to a local hospital and then transferred to a higher level of care hospital. The patient had a protracted hospitalization from 12/31/21 until he died on 4/20/22. The hospitalist history and physical examination on 1/1/22 documented that the patient had dysphagia for a month with hoarseness and could barely make sounds. The hospitalist wrote that staff at the prison were crushing medications for a week and that the patient had difficulty taking the medication and had not been able to eat or drink and that the patient had lost significant weight of about 50 pounds over the past six weeks. Medication administration records for December of 2021 do not verify crushing medication so, if this occurred, it was an ad hoc decision on the part of the nurses. The hospitalist added that the patient had been unable to ambulate for about eight months due to lower extremity weakness but no workup had been done according to the patient and there was no known cause for the weakness. The patient was noted to be wheelchair bound. The patient had sensation in his lower extremities but could not move his legs against gravity or wiggle his toes. This history was consistent with the record. The patient was described in the hospital as having severe protein calorie malnutrition and dehydration. The nutritional deficiency was documented as due to insufficient food. A PEG tube inserted. The patient initially was noted to have aspiration pneumonia.

The patient was diagnosed with amyotrophic lateral sclerosis.[7] While this disorder is progressive and relentless, median survival from onset is three to five years. We did not ask for or review records earlier than April of 2020 so we don't know when symptoms may have started. We asked for two years of this patient's record (April 2020 until April of 2022) and were told that the record was given "with everything that we have". There was no physician examination of the patient in the record until October of 2021. If two years of the record was given then the patient had no evidence of a physical examination for almost a year and a half. From October of 2021 until the patient was hospitalized in late December 2021, there were 11 provider notes which appeared to be with the patient present. Although some of these notes included the patient's complaint, none included a thorough history and none included a thorough examination. At no time of in the record made available to us did the patient have a thorough neurologic examination although the hospital documented that the patient complained of progressive weakness for at least a year. The medical record documents weakness documented beginning in October of 2021 with multiple subsequent complaints related to weakness and still without evidence of a neurologic examination. The patient was admitted to the infirmary on 12/1/21 for rectal bleeding without an examination of the rectum.

---

[7] Also known as Lou Gehrig's disease. This is a motor neuron disease that is incurable, relentlessly progressive and causes muscle weakness, disability, and eventual death. Its symptoms include fasciculations which a nurse appeared to have described on 10/15/21; problems with dysphagia and swallowing which were documented on 12/15/21

Though the patient had a decubitus, as described by nurses notes, a physician never examined the patient's wound. To be admitted to a hospital for late stage amyotrophic lateral sclerosis without ever having a neurologic examination at the facility is a significant problem. The patient deteriorated progressively, lost weight, became unable to eat or drink, developed dehydration, severe malnutrition, and aspiration pneumonia.

Opportunities for Improvement

1. Screening for gender and age-specific cancers is not yet integrated into annual health evaluations but this should be done.
2. Specialty care remains an issue. Tracking is inaccurate, getting reports is still inconsistently done, follow up of the patient does not address the specialty visit or recommendations, and it is seldom clear that the findings are discussed with the patient. The Monitor continues to recommend a root cause analysis of the specialty care process with corrective action to ensure continuity of care.
3. Chronic clinic care is still not working well. The single chronic care visit for hypertension did not include adequate history or physical examination. The patient was on multiple medications other than for hypertension (antacids, tamsulosin, omeprazole, long-term nonsteroidal medication, fiber and a stool softener) that implied several other chronic medical conditions that were not addressed. The patient's significant long-term weakness was not addressed. The Monitor continues to recommend a root cause analysis of the chronic care program to identify corrective actions to ensure that all problems are addressed adequately.
4. The patient had obvious serious medical conditions, including debilitating weakness, inability to swallow, inability to eat or drink sufficient to maintain health, and inability to care for himself. The physician ignored or was unaware of these obvious developments. On two occasions the physician, without adequate history or physical examination, believed the patient did not actually have the complaints he was reporting. This physician failed to give appropriate direction to nursing staff, failed to take an adequate history or perform an adequate examination, and failed to appropriately address the patient's serious medical concerns. Over the entire course of his deteriorating neurologic condition, a neurologic examination was not performed and not understanding what needed to be done. This may be a result of the physician lacking credentials. He is practicing in an unsafe and clinically inappropriate manner and this should be addressed by OHS based on Consent Decree requirements.
5. There was no formal written nursing care plan for the infirmary and nurses appeared to develop their plan ad hoc and independent of direction or collaboration with the physician. A root cause analysis of infirmary care planning should be undertaken with appropriate corrective actions. The infirmary should be constituted as a skilled nursing unit with physician directed nursing care plans that resolve the needs of the patient.
6. Patients with difficulty eating, losing weight, or not eating or drinking need nutritional consultation to determine an appropriate nutritional plan.
7. There were no medical progress notes from April of 2020 until October of 2021. The patient died in April 2022. We requested records for two years though progress notes did not appear until October 2021. Either there is an issue with medical records, IDOC did not provide all records requested, or the 72 year old patient with hypertension was ignored or

not seen for a year and a half. If this was a medical records problem, IDOC should correct the medical record problem. However, this physician was covering multiple facilities and it appeared that there was no available physician. The lack of physicians is unsafe and places patients at risk of harm. IDOC must correct this problem.

## Patient 6

Facility: Dixon
Date of Death:1/21/22
Cause of Death: Not identified

This was a 76-year old with a history of hypertension, high blood lipids, alcoholism, hearing deficit, GERD, degenerative arthritis, and benign prostatic hypertrophy. In January of 2020 he had a lexiscan stress test which showed no evidence for ischemia, no reversible ischemia, and normal left ventricular function. This was essentially a normal stress test. The data base documented an influenza vaccine in 2017 but none since. No age specific cancer screening was accomplished.

The patient had cataracts and an optometrist documented in February that the patient went to the UIC retina clinic. The patient had surgery on one cataract but refused further surgery at UIC. The patient had epiretinal membrane and vitreomacular traction (retinal disease) and was to follow up at UIC for evaluation. He had some mild visual impairment.

Over the two years reviewed, the patient was seen four times in chronic clinic. The patient was on six medications continuously as keep-on-person medications for the two years. He received keep-on-person monthly packets 29 times for the 23 months for five of the medications and 28 packets for 23 months for amlodipine. The patient was receiving excessive amounts of medication yet there was no documentation in any chronic clinic of the excess medication nor was there a discussion with the patient regarding whether he was taking the medication appropriately. Given that the patient was 76 years old, there should have been greater monitoring of medication use. The patient had a negative lexiscan evaluating for coronary heart disease but it was not documented as reviewed at chronic care clinics. The patient was documented as in "good" control for hypertension at one chronic clinic visit when the blood pressure was 160/86 with a repeat of 158/86 yet medication was not adjusted. Also, for all four chronic clinics, the patient was prescribed aspirin when US Preventive Health Service Task Force guidelines suggest that the patient would not benefit from aspirin and was a bleeding risk. The indication for the aspirin was not documented. Also, the patient was on a low-intensity statin for the entire two years when his lipid levels indicate a moderate to high intensity statin was indicated.

There were no provider progress notes from 5/20/21 until a chronic clinic visit on 9/27/21 and then no progress notes until 1/20/21 when the patient became unresponsive. There was no documented timeline for the cardiac arrest and it was not clear if CPR was promptly started. The patient expired. There was no cause of death on the mortality list even though the patient expired in January of 2022. Nor was an autopsy completed.

Opportunities for Improvement

36

1. Chronic clinic notes continue to lack appropriate histories and examinations and should cover all of the patient's conditions (in this case retinal disease).
2. Providers kept the patient on aspirin when it was not clearly indicated increasing risk for bleeding adverse events.
3. Age appropriate cancer screening and vaccinations need to be offered.
4. The patient received six extra months of medication of keep-on-person medication over a two year period. Given that he was 76 years old, medication should have been evaluated more carefully at chronic clinics. Medication management should be evaluated.
5. Providers kept the patient on low-intensity statin medication when moderate to high-intensity statin was indicated.
6. The goal blood pressure was not stated but at one clinic the blood pressure was elevated but the medication was not stated.
7. The patient required emergency resuscitation but there was no timeline of resuscitative events. IDOC policy should include that when an emergency occurs that requires emergent response and especially basic life support, that a timeline of what interventions occurred be kept as part of the medical record. The timeline should date and time each event that takes place.
8. Autopsy did not appear to be done. An autopsy should be completed for all deaths.

### Patient 7

Facility: Dixon
Date of Death: 3/25/22
Cause of Death: Not identified

This 49-year-old man did not have a problem list or data base in the medical record provided to us. Vaccinations could not be evaluated.

The first chronic clinic visit was on 6/3/20 and listed constipation as the only chronic care problem. There was no history of the status of his constipation except the patient request to change from Dulcolax to milk of magnesia. There was no assessment of his constipation. There were multiple other issues related to chronic care problems documented prior to this chronic care visit none of which were addressed in this chronic care visit including the following.

- An urgent referral was written on 9/9/19 for the next optometry clinic because of cataracts. There was no consultant report but there were brief comments on the referral form, dated 9/12/19, that documented that the patient was not eligible for cataract surgery.
- On 3/9/20 a provider was scheduled to see the patient for dizziness. The provider did not evaluate the patient for dizziness; instead noted pain of the R hip and shoulder. The note had a mostly illegible examination which included documentation that there was no change in the examination. The assessment was "generalized osteoarthritis" and Tylenol #3 was increased. The patient was not evaluated for the patient complaint of dizziness.
- A nurse saw the patient for pain and inability to see on 3/15/20 and on 5/12/20 for continued pain. On 3/15/20 the nurse referred the patient to optometry. On 5/12/20 the nurse noted that the patient was recently approved for shoulder and hip surgery  a nurse saw the patient and documented that the patient couldn't see out of his right eye, noted cataracts, and referred the patient to the optometrist. There was no evidence that the patient was evaluated by optometry.

- On 5/12/20 a nurse documented the patient complaint of constant pain related to a recent decrease in pain medication. The nurse noted that the patient was recently approved for shoulder and hip surgery, had a small immobile mass on the back of his head, and had nosebleeds. The nurse asked the patient to return if the issues worsened.
- On 6/4/20 the patient was evaluated at UIC hepatitis C clinic. There was a recommendation to draw CBC and CMP and that if stable the patient could start treatment for hepatitis C.

On 6/29/20, another chronic clinic visit was documented, but the reason for the visit was not documented. The only history was that the patient was seen in the UIC liver clinic and had no concerns. There was documentation whether the patient would be treated. The patient was not examined. Some laboratory results were documented. There was no assessment except "seeing UIC".

On 9/21/20 an annual history was performed documenting substance abuse, eczema, degenerative arthritis, hepatitis C infection, psoriasis, history of positive PPD, and bell's palsy as problems but no update of the status of any of these problems. The nurse documented a visual acuity of 20/200 in the right eye and 20/100 in the left eye. This was legal blindness in the right eye. The patient was referred to optometry but the patient's cataracts were not identified as a problem. Given the hepatitis C, the patient should have been vaccinated for hepatitis A and B but this was not done. The listed problems were not being evaluated in chronic clinic, though the hepatitis C was mentioned in the 6/29/20 chronic clinic visit. Notably the patient was in the middle of treatment for hepatitis C, which was to conclude on 10/2/20 but this was not mentioned.

On 11/20/20 the patient was again seen in chronic clinic but only for constipation. The patient had completed treatment for hepatitis C but the follow up viral load was not mentioned. There was no history of the constipation and there was no examination. The patient was documented as in good control without having documented any history. The treated hepatitis C was not documented. The status of the patient's cataracts were not documented. The psoriasis, eczema, and degenerative arthritis documented on the 9/21/20 annual history were not documented or evaluated as problems.

On 5/27/21 a provider saw the patient for chronic clinic for constipation. There was no history and no examination documenting that it was not indicated. The assessment was stable constipation in good control despite no history having been taken. Since the last chronic clinic, the following episodes had occurred, none of which were addressed in this chronic care visit.
- On 1/19/21 a nurse evaluated the patient for constipation which was described as long-standing. The milk of magnesia was described as causing severe cramping. The nurse documented a tender and distended abdomen. The nurse plan of care was for the patient to report back to the health unit if the pain worsened. A provider was not informed.
- On 1/21/21 an optometrist documented that the patient was awaiting a UIC evaluation of his cataracts. The patient had been awaiting a UIC evaluation since 9/23/20. The cataracts were not assessed nor was the ability to function with decreased visual acuity.
- On 2/6/21 a nurse referred the patient to dental for a complaint of his jaw locking up when he ate but no evidence of a dental referral was found in the medical record provided.
- On 2/11/21 the patient was seen at UIC liver clinic. They noted that the patient had achieved sustained viral response as of 12/28/20 and recommended a fibroscan. If F3-4

fibrosis was detected, UIC recommended ultrasound every 6 months for hepatocellular carcinoma. They recommended pneumococcal vaccine which was not provided. This was followed up by Dr. Paul, a vendor physician following hepatitis C patients. A fibroscan was approved and completed on 3/10/21 showing F0 fibrosis. There was no formal documentation in the record of sustained viral response except in the consultation note.

- On 4/15/21 the patient wrote a health request saying his eyesight was worsening and that he was bumping into people on his right side. He also complained of pouring things on himself and on the floor presumably due to his failing eyesight. The referral to UIC ophthalmology was initiated 9/21/20 and it appeared no one was tracking this.
- On 5/7/21 a nurse evaluated the patient for dizziness which was severe enough to warrant giving the patient a wheelchair. The patient had a complaint of dizziness previously on 3/9/20 but was not examined for this complaint. The nurse referred the patient to a provider who saw the patient on 5/13/21. A nurse practitioner saw the patient and documented vertigo with associated nausea, vomiting, and chest tightness. A thorough history was not completed. A thorough neurological examination was not completed. An assessment was dizziness to rule out "cardio". The plan was to order EKG, renew the wheelchair for a year, refer for his cataract, refer to orthopedics, and labs (CBC, CMP, TSH, B12). The reason for the wheelchair was not stated. The EKG was not found in the medical record.

On 11/28/21 the patient had another chronic clinic visit for constipation and headaches but no history was taken for either condition. The only documented examination was that the patient was alert, wheelchair bound (reason not specified) and had a soft and non-tender abdomen. Without having taken any history the constipation was documented as in good control and the headaches documented as fair control without any history or examination. Since the last chronic clinic visit multiple issues related to his chronic care occurred none of which were documented in this note.

- The patient had an orthopedic consultation 6/11/21 at UIC and had a steroid injection for rotator cuff tendinopathy. Physical therapy was recommended but did not occur until October. Four physical therapy notes are illegible.
- The patient had an ophthalmology appointment finally on 7/1/21 almost a year after being ordered. The patient had hyper-mature cataract on the right and was only able to count fingers at 6 inches from his face. His inability to see was not accounted for at Dixon and no specialized housing or care was being provided. Surgery was done 7/20/21. UIC notes related to surgery and post operative visits were not timely reviewed by providers and with the patient. Complications (red eye and photophobia) were noted 9/6/21 but UIC was not contacted.
- The patient refused surgery on the left eye cataract.
- Physical therapy saw the patient four times but the notes were illegible.

There were no further chronic care visits. Several episodic visits subsequently occurred.

On 12/3/21 the patient told a nurse that Excedrin was no longer working to control the pain from his headaches. The patient wasn't seen due to a lockdown. But on 12/9/21 a nurse practitioner saw the patient. The patient had complained about headaches at the 11/28/21 chronic clinic visit but no history or examination was documented. At the 12/9/21 visit the patient said that the headache "does not go away" and was present for three weeks. There was no thorough neurologic examination. The examination was documented as no neurologic deficit being present. The

assessment was that the headache was "worse". An MRI was ordered as a routine. Inderal was added to the Excedrin.

On 12/20/21 the nurse practitioner saw the patient in follow up and noted no change. The MRI was approved but the date was not documented. No further history was documented. The only examination was that the patient was oriented and had "stable" vital signs. A neurologic examination was not performed.

On 1/21/22 the patient was found in his wheelchair unresponsive and apparently fell backward off the wheelchair. He appeared to be having a seizure. The patient was taken to KSB the local community hospital. The patient returned from the hospital the same day and was evaluated on 1/25/22 by a doctor but there was no complete ER report and the doctor merely related the nurse history. The emergency room record in the medical record was partly illegible due to the scanned copy being faded. A CT scan of the brain report was illegible and a CT scan of cervical spine showed degenerative disc disease with spondylosis and multilevel neural foraminal stenosis; cord compression was suggested and an MRI was recommended. The doctor on the 25th did not appear to know what was wrong with the patient. A brief examination of reflexes was documented and the doctor asked for the KSB record. There were no further provider notes for this patient.

On 2/17/22 a nurse documented that a telepsychiatry visit occurred but the actual psychiatrist's note was not in the medical record.

The patient was documented on the death list as dying on 3/25/22 but there appeared to be no reasonable follow up after the patient was sent to a hospital for apparent seizures that occurred after complaints of headache ongoing for months. The cause of death was not listed on the mortality list. An autopsy was either not done or not provided.

Opportunities for Improvement
1. This patient lacked consistent management of his chronic illnesses (psoriasis, eczema, degenerative arthritis, cataracts and ultimately headache) in chronic disease clinic or via episodic care. Care of hepatitis C and cataracts was mostly documented by specialists with poor follow up or acknowledgement of treatment by facility physicians.
2. The patient had cataracts that significantly affected vision. He was bumping into objects, spilling liquids, and when tested at UIC could only see fingers placed in front of his face. Yet there was no accommodation made for this disability and the patient remained in general population without appropriate accommodation. It took almost a year to obtain referral to UIC ophthalmology. Initially, with a 20/200 VA in the right eye and 20/100 in the left eye, the patient did not meet vendor criteria for referral for surgery.
3. The patient had dizziness on 3/9/20 but the provider did not evaluate the patient for his stated complaint. The patient complained of dizziness again on 5/7/21 which resulted in a provider evaluation on 5/13/21. At this visit, an appropriate history was not taken and there was an inadequate examination. No diagnosis was made. At a 11/28/21 chronic clinic visit, headache appeared as a new problem but there was no history or examination for this problem. An assessment of headaches in fair control was given without any evidence of an evaluation. The patient had apparent seizures on 1/21/22 and the patient went to a local emergency room. The report was illegible due to a faded scanned copy. In the only follow

up a doctor asked for the hospital record which was unavailable. What occurred at the hospital was unclear. A follow up MRI was ordered of the C spine which was not done. The patient wasn't seen again and there were no further medical progress notes. The mortality list documents death occurred on 3/25/22 but no cause of death was provided and there was no autopsy. Provider follow up and management of dizziness, headache, and subsequent seizure were not thorough. An autopsy should have been done because this was a middle aged man whose death was unexpected.

4. The medical record keeping was inadequate with some documents being illegible.
5. There were significant gaps in care with multiple episodes when follow up did not occur including after specialty visits or hospitalization. It appeared that there was no physician present at this facility.
6. The post ER visit on 1/25/22 did not include a copy of the hospital record and follow up was therefore inadequate. The follow up was also inadequate. Feedback should be given to the provider.

### Patient 8

    Facility: Dixon
    Date of Death: 1/21/22
    Cause of Death: Not identified

This patient was a 42 year old man with schizophrenia and major depression. His problem list documented substance abuse and "psych" as problems. None of his mental health progress notes were present in the medical record and it appeared that the record is not a unified medical record.

Two years of his medical record was requested but from April 2020 there were no progress notes until January of 2021 when a nurse practitioner wrote an admission note to the infirmary initiated by a psychiatrist for altered mental status. The patient hadn't eaten in 4-5 days and the patient refused a physical examination. Labs were drawn and the following day the patient was admitted to the hospital for renal failure and anemia. Those lab results did not appear to be in the record, but initial laboratory tests in the hospital showed a creatinine of 4.9 with serum sodium of 130, potassium of 3, total protein 10.5 (nl 6.3-8.2) and globulin 6.9 (nl 2.4-3.5).

The patient was discharged four days later on 1/13/21 with a recommendation for prompt nephrology follow up in Rockford. The patient went to the nephrologist on 1/28/21 who recommended a kidney biopsy, which the patient refused. The nephrologist recommended referral to a hematologist with a diagnosis of nephrotic proteinuria, chronic kidney disease and monoclonal gammopathy suspicious for multiple myeloma.

Because of the likelihood of cancer, referral to a hematologist should have been urgent; instead, the referral, made on 1/29/21 did not occur until 5/7/21, 98 days later. This was not timely. Myeloma was confirmed and a bone marrow biopsy was recommended.

On 5/21/21 an oncologist from UIC saw the patient and ordered additional tests and wrote that the patient refused the bone marrow biopsy and said he doubted the patient's understanding and needed to understand who makes the patient's medical decisions. Following this clinic there was no provider review of the report documented in the medical record. Though the PET scan was

41

ordered there was no determination of power of attorney. On 6/8/21 the patient had a PET scan as ordered. On 6/11/21 the UIC consultant hematologist noted that the patient refused a bone marrow biopsy. UIC recommended that health care at Dixon should discuss power of attorney as the patient was incapable of making a decision. When a nurse practitioner saw the patient on 6/15/21 after the oncology visit, the nurse practitioner plan was "awaiting deciding factors for possible restriction or rights". No plan for a power of attorney had been decided and there was no physician note documenting the plan of action. The patient had another hematology visit 7/9/21 and they again noted they were awaiting a decision from a designated decision maker regarding treatment. In that 7/9/21 note the hematologist wrote, "Currently he is refusing further investigation or treatment. We have made him aware that this will likely lead to worsening health and death within a few months. I am not sure that he had understanding of this and we have started to discuss these with the prison physician". There were no further physician progress notes in the record and no documentation of a plan for power of attorney. On 9/14/21 a nurse practitioner documented "HCUA aware of pts refusals and inability to make decisions" yet there was no plan for power of attorney. On 9/15/21 an IDOC nurse at Dixon wrote that "Email correspondence [with] OHS, legal and medical director. On-site psychiatrist previously determined patient is unable to make decisions for himself. Patient seeing off-site specialists that are requesting biopsy but patient refused. Legal determined IDOC is not able to consent for patient biopsy as this is a diagnostic test. Patient has no POA [power of attorney]/emergency contact/etc. Providers notified". In effect, even though the patient was incapable of decision-making, IDOC had authorized the patient to continue to make his own decisions. There was no documentation by a physician regarding this decision.

On 10/8/21 the UIC attending hematologist wrote, "Pt with likely MM [multiple myeloma]. He has not agreed to full evaluation and is not, in my opinion, fully understanding of the implications of his decision. We did attempt again to explain that ongoing refusal of treatment and investigation is life threatening. Previously, we had discussed this with the prison doctor who in turn had discussed this with prison leadership and informed us we should not intervene except in the case of imminent threat to the patient's life. We again sent communication to the prison physician regarding this. Therefore, we are forced again to continue without treatment at the patient's request".

IDOC was responsible for the medical care of this patient and when the patient become impaired and could not provide informed consent due to his mental illness, IDOC had an obligation to ensure the patient was protected but they left a person unable to understand or make a rational decision in charge of his own care. This was irresponsible.[8]

---

[8] In response to a request for information on the basis for the opinion of IDOC, they sent an email stating, "our legal department does not make determinations on a person's competency to consent to medical treatment. As you note below, that determination was made by medical professionals and UIC and IDOC. Legal was consulted after that determination was made. Any specific legal guidance provided by IDOC counsel to facility healthcare staff falls under attorney/client privilege. However below is the relevant statutory language. The Code of Corrections statute, 730 ILCS 5/3-6-1, provides that

(e) A person committed to the Department who becomes in need of medical or surgical treatment but is incapable of giving consent thereto shall receive such medical or surgical treatment by the chief administrative officer consenting

42

For the entire year that the patient was diagnosed with chronic kidney disease and probable multiple myeloma, the patient was not enrolled or seen in chronic clinic. The patient was seen by providers at Dixon mostly after UIC appointments but limited physical examination or monitoring of renal function occurred. The last physical examination occurred on 10/19/21 and consisted of "NAD [no acute distress] U/S gait, speech clear". Notably, when the patient visited specialty clinics, examinations were performed but were not consistently performed at Dixon and when performed were limited. The patient was sometimes said to refused evaluation but we could not locate refusal forms in the record and it was not clear that the patient was competent enough to refuse with informed consent. The chronic kidney disease was not monitored routinely.

On 1/22/22 the medication nurse noted that the patient did not come to his cell door for medication and was found unresponsive. There was no timeline of when CPR was started or the sequence of care delivered to the patient. When the emergency medical service arrived, CPR was stopped.

Notably, in the initial hospitalization in Dixon, a hospitalist wrote that, "Medical Staff from the Department of Corrections reports that the patient is not part of the medical team and only sees mental health at the Department of Corrections". Medical personnel did see the patient but inconsistently.

Opportunities for Improvement

1. This mental health patient was incapable of decisional capacity due to his apparent severe mental illness. This was known as early as May of 2021 and could possibly have been known earlier. The Code of Corrections, statute 730 ILCS 5/3-6-1, provides that the responsible decision-maker is the Warden who shall obtain advice from a physician. IDOC would not disclose any of the particulars about how this decision was made, but apparently this patient with severe mental illness and incapable of making decisions for himself was allowed to do so. IDOC should institute policy and procedures that govern power of attorney, including when a patient is severely mentally ill. In this case, a patient, incapable of medical decision making was left on his own.
2. There were no mental health progress notes in the medical record. The medical record should be unified with all medical, dental, and mental health staff using the same record. Mental health records should be available to medical providers and vice versa.

---

on the person's behalf. Before the chief administrative officer consents, he or she shall obtain the advice of one or more physicians licensed to practice medicine in all its branches in this State. If such physician or physicians advise:

(1) that immediate medical or surgical treatment is required relative to a condition threatening to cause death, damage or impairment to bodily functions, or disfigurement; and

(2) that the person is not capable of giving consent to such treatment; the chief administrative officer may give consent for such medical or surgical treatment, and such consent shall be deemed to be the consent of the person for all purposes, including, but not limited to, the authority of a physician to give such treatment.

3. There was a suggestion by a hospitalist that medical care was not provided to mental health patients at Dixon. While the hospitalist may have misunderstood IDOC staff, this patient was not enrolled in chronic clinic and he was not monitored in chronic clinic for his serious medical conditions. All patients with serious medical conditions need to be monitored in a chronic clinic.

4. We could find no documentation that a physician was in charge of the decision to allow the patient to refuse care as a result of his serious mental illness. It appeared to be a decision by the legal department without involvement of a physician. If such physician consultation occurred, we could not find evidence of it. We view this as no different than when a psychiatrist enforces medications for a person with serious mental illness. This should be addressed in policy and procedure.

5. The patient required emergency resuscitation but there was no timeline of resuscitative events. IDOC policy should include that when an emergency occurs that requires emergent response and especially basic life support, that a timeline of what interventions occurred be kept as part of the medical record. The timeline should date and time each event that takes place.

## Patient 9

Facility: Menard
Date of Death: 2/24/22
Cause of Death: Not identified

This patient was incarcerated at NRC on 6/1/21 and had history of bipolar disorder. The problem list was accurate. On 6/3/21 a nurse documented a bridge order for Zyprexa, Zoloft and Buspar, but there was no intake psychiatric evaluation in the medical record. He refused to see the psychiatrist on 6/29/21 and 6/30/21. On 7/2/21 the patient stopped receiving these medications and on 7/4/21 the bridge medications expired.

He was transferred to Shawnee on 7/8/2021 with a transfer summary that omitted the fact that his bridge order for psychotropic medication expired six days earlier and that he refused to see the psychiatrist on two consecutive days the week before. Also omitted was the fact that he had been jumped by another individual six days earlier and sustained minor injuries. A nurse at the receiving facility identified the expired medication orders the day after transfer, during record review. Another bridge order was written on 7/9/21 for the same medications but he did not receive these. It is not until 7/15/21 that he began receiving psychotropic medication again or a lapse of 13 days.

The patient was in segregation on 10/24/21 but it wasn't clear why. On 10/31/21, a licensed clinical social worker (LCSW) evaluated the patient who presented with psychosis, delusional thoughts, auditory and visual hallucinations. Security had concerns because the inmate was flooding his cell and damaging property. He was placed in a crisis cell with 30 minute watch. At this time, he was diagnosed with unspecified bipolar disorder. On 11/5/21 and 11/6/21 a mental health professional documented that the patient was evaluated. The fact that the evaluation occurred was documented on a progress note but the professional's evaluation was not in the medical record.

On 11/29/21, a LCSW saw the patient for a mental health disciplinary review. The LCSW documented that the patient was not on crisis watch and was stable. The patient received numerous "tickets" for sexual misconduct, intimidation, disobedience and had recently been released from restricted housing. The patient refused a mental health evaluation at the time. The LCSW documented that a psychiatrist saw the patient on 11/5/21 (there was no note in the medical record) and the LCSW wrote that the psychiatrist said "he is demonstrating a clear manic episode and would be hospitalized if not incarcerated". The LCSW also wrote that an RTU referral was being planned due to "continued decline in mental health/functioning". The LCSW wrote that psychiatry documented that his symptoms had worsened. The LCSW recommended that restricted housing should be considered but was not done. The only recommendation was to consider reduced restrictive housing time. The LCSW said that the patient had less confrontations in restricted housing and it was therefore not recommended to return to general population. Instead, a higher security level housing level was "more appropriate than RTU especially since he is not interested in programming or working with treatment team".

On 12/1/21 the patient appeared to have been discharged from the crisis watch. Two days later, a nurse was called to the segregation unit because the patient was being "extracted" from his cell. He was undressed in the shower. The nurse noted that there was no bruising.

On 12/8/21 the patient was transferred to Menard. The transfer note written by an LPN did not give the correct dose of Lamictal. It also did not specify that the patient had back surgery, just back symptoms. Other pertinent information missing from the transfer summary was that he was extremely non-compliant with prescribed psychotropic medication. The fact that he had been on crisis watch from 10/30/21 until 11/10/21 and had been involved in a cell extraction four days earlier is also not included on the transfer summary.

An I-CARE history on the Menard intake screening showed he was overdue for multiple vaccinations which were not ordered. Mental health staff saw the patient after transfer. He was placed in segregation and a nurse segregation flow sheet documented he was checked daily .

After his placement in segregation and for the next two months the patient refused most of the psychotropic medications prescribed. One medication expired in February without a new order; it is not clear if this was intentional.

On 2/16/22, a licensed clinical social worker filled out a suicide evaluation form but did not include a disposition. On 2/17/22, a psychiatrist filled out a Health Care Planning Discharge Screening form done prior to transfer to the community but there was no documentation regarding whether the patient was actually being paroled. The psychiatrist did not document that the patient was evaluated face-to-face.

Seven days later, on 2/24/22 at 2:35, security called the health care unit because the inmate was unresponsive. Security initiated cardiopulmonary resuscitation (CPR) but there was no timeline so it was unclear when CPR started. The emergency medical services were present and declared death at 3:07 pm. This man was 50 years old.

A post-mortem review of suicides and self-injury form was filled out by a PsyD on 3/7/22. It described that at the on the day of death, a lieutenant was supervising staff during medication administration when an officer noticed the inmate in the back of his cell with a bedsheet tied around his neck and secured to a coat hook. The note then documented that the lieutenant tried to get a verbal response from the inmate but was unsuccessful. The report continued,

> "[The lieutenant] activated the emergency response team consisting of [three officers]. ***The team dressed then responded to the cell front, opened the door, and entered the cell. The emergency response team restrained [inmate name] with handcuffs and leg restraints and untied the sheet from the coat hook. [Inmate name] was then checked for a pulse and the emergency response team didn't detect one. [The lieutenant] pressed his emergency alert button and toned a Code 3 medical emergency at 2:45 AM. At that time, life saving measures were performed and [the inmate] was carried to the double gate area where [four nurses] took over lifesaving measures".[9]***

The ambulance arrived at 2:55 and paramedics pronounced the inmate dead at 3:07 am. This sequence is not described in a timeline in the medical record. Officers did not immediately cut the inmate down but untied the bedsheet knotted to the coat hanger. They put on their emergency response team gear and handcuffed the arms and shackled the legs before initiating cardiopulmonary resuscitation (CPR). A cutting tool was not available to cut the hanging ligature. It appeared that CPR was not timely initiated. Nurses documented being notified ten minutes earlier that custody documented that they called the health unit. This resuscitation and hanging was not appropriately managed by onsite responders and documentation of events was improper.

Opportunities for Improvement
1. The patient was not evaluated by a psychiatrist in the intake center. This should be evaluated in a process analysis of the intake process.
2. There was no evaluation of the bridge medication and it expired without anyone noticing. Clearly mental health intake procedures should be re-evaluated. This should be included as part of a process analysis of medication management.
3. The transfer form from NRC to Shawnee was accurate but failed to document key features; specifically, that bridge medication expired without evaluation and that the patient had failed to receive a psychiatric evaluation at the intake center. This should be part of a process analysis of medication management.
4. There was no psychiatric evaluation evident at Shawnee and the patient was started on two different psychotropic medications at Shawnee without evidence of a psychiatrist seeing the patient. The patient did not appear to have access to mental health specialty services. This should be evaluated.
5. Though there was no evidence in the record of a face-to-face psychiatrist evaluation, a LCSW documented that the psychiatrist wrote that the patient would be hospitalized if not incarcerated and that he had declining mental health functioning. Yet, the patient was not placed in mental health housing and instead sent to a higher security level housing which appeared to be a maximum security housing arrangement at another prison. This should be evaluated by a mental health professional but appears to not be an appropriate housing assignment. It did not appear that the patient had access to mental health specialty services. This should be evaluated.

---

[9] This is our highlighting.

6. The patient was found hanging and custody did not use a cutting tool on the ligature. A procedure for deaths including suicide attempts should be developed. A person should not be left hanging until an emergency response team arrives.

7. Upon finding a patient hanging, custody called an emergency response team which fitted out in apparent riot gear and then shackled and handcuffed the inmate before initiating CPR which delayed the initiation of CPR that ensured a bad outcome would occur. How long it took for the emergency response team to dress and then report to the cell is unknown as no timeline was provided, but this appears to have delayed the onset of resuscitation efforts. It is advised that upon finding an unresponsive person, a carotid pulse check should not delay cardiopulmonary resuscitation by more than 10 seconds! A delay of more that 3 minutes is believed to result in death. Upon finding a nonresponsive inmate, officers should be instructed to immediately initiate CPR. Shackling an inmate prior to CPR is not understandable and is inappropriate. Custody procedures should be reviewed and corrected.

8. Mental health records should be included in death records sent to the Monitor.

## Patient 10

Facility: BMRCC
Date of Death: 3/6/22
Cause of Death: Not identified

We could not locate the problem list in the medical record provided to us.

We also could not locate the data sheet so preventive care could not be assessed.

Patient instructions from a November 2019 hospitalization list his discharge diagnoses as schizophrenia, aspiration pneumonia, psychogenic polydipsia, hyponatremia, seizure secondary to subtherapeutic anticonvulsant medication, severe sepsis, and left upper lobe pneumonia. A discharge summary was not present but discharge instructions recommended a follow up metabolic panel and three liter a day fluid restriction. We could find no evidence that fluid restriction was enacted.

On 1/21/20 the patient was reported to be eating feces and hearing voices. He was placed on crisis watch for disorganized and delusional thinking. It was documented that the patient reported drinking 40 cups of water daily. We could not locate a psychiatrist note and there were no orders we could find for fluid restriction.

The patient had hyponatremia from drinking too much water likely as a side effect of his psychotropic medications. There was no documented attempt we could locate to restrict water intake nor attempts to alleviate the dry mouth symptoms related to psychotropic use. Psychiatrist notes were infrequent and did not address alternate medications or symptomatic relief of dry mouth. Between 6/30/19 and 12/3/20 there were no psychiatry notes. On 12/3/20 there was an illegible psychiatrist note discharging the patient from the infirmary. The next psychiatry note was 7/28/21. The psychiatrist did review recent platelet count and documented that a prior reduction of the medication (Depakote) resulted in worsening of symptoms. The current platelets were slightly low (145 with normal 150-450). The psychiatrist also documented he was weaned off

lithium due to electrolyte imbalance and noted prior hyponatremia and suspected psychogenic polydipsia. However, there was no plan to attempt fluid restriction. On 9/28/21 the same psychiatrist evaluated the patient. He documented the most recent sodium level of 144 from May of 2021 and latest platelets of 120 (normal 150-450) from February of 2021 (however, there was a more recent platelet count of 121 from 8/18/21). The low platelet count was not addressed and polydipsia was not addressed. Neither the patient nor staff were questioned about the patient's water ingestion. The same psychiatrist evaluated the patient via telemedicine on 1/26/22. The laboratory tests reviewed were from February 2021. Only a brief update was documented. The patient's polydipsia was not addressed. Overall, psychiatric monitoring for his abnormal laboratory tests was minimal and not up-to-date and the polydipsia was not addressed.

The patient had chronic clinic visits for seizure disorder on 8/13/19; 7/6/20; 8/12/20; 2/25/21; and 2/24/22. The 8/13/19 chronic clinic visit only had the first page of the form. The history only documented no recent seizures. They type of seizures was never documented. It wasn't clear whether the seizures were due to the intermittent hyponatremia or from another cause. The medication being used for seizures wasn't stated. A physical examination was documented. The etiology of his seizures wasn't documented and, for this record, because there was no problem list the reader of this note wouldn't know what was the reason for his seizure disorder. The medication administration record for August 2019 showed that the patient was taking benztropine, divalproex, haloperidol, lithium, and olanzapine. Of these drugs divalproex does have an FDA indication for seizures but whether the patient was receiving the medication for this reason was not documented.

A second chronic clinic visit occurred 7/6/20. The history was that the patient experienced a seizure for which he was hospitalized in October of 2019. The doctor noted that Keppra was started for his seizures. The doctor failed to document that the serum sodium at the time was 116 and that the seizure may have been due to hyponatremia from polydipsia due to his psychiatric condition. Only the first page of the form was present so the assessment and plan were unavailable. There was no review of recent laboratory tests. On 6/9/20 there were two abnormal laboratory results including sodium of 129 (normal 136-145) and platelets 110 (150-450). Neither laboratory abnormality was addressed even though both were significant abnormalities. The patient had known polydipsia which was not being monitored.

Another chronic clinic was conducted on 8/12/20 in the housing unit due to quarantine. There was no history except that the patient had no seizures and was on levetiracetam although whether the patient was actually receiving the medication wasn't documented. The August medication administration record documented that the patient received medication until 8/11/20 with no documentation after that date. It appeared that during quarantine the patient received no medication. The platelets were 104 (normal 150-450) but this abnormality was not documented as reviewed. This should have been brought up with the psychiatrist so the dose of divalproex could be considered to be modified.

Another chronic clinic was conducted 2/25/21. There was very little history, only that the patient had no recent seizures and was getting levetiracetam. The medication administration records for January and February of 2021 were not in the medical record so administration of medication couldn't be verified. Platelets were still low. On 2/6/21 the platelets were 120 (normal 150-450)

but the abnormality wasn't addressed. The serum sodium was recently normal but the doctor did not ask about fluid intake or ask about dry mouth. The only assessment was good seizure control.

On 3/4/21 the patient had a second hospitalization for aspiration pneumonia, status epilepticus (multiple continuous seizures), and severe hyponatremia (sodium 116, normal 136-145). An electromyography (EMG) test of his brain showed no epileptiform activity indicating that perhaps his seizure was not due to an epilepsy syndrome but did show generalized slowing consistent with moderate encephalopathy. This was the second hospitalization for severe seizures, both with serum sodium levels of 116. Serum sodium below 120 is known to be associated with a significantly higher risk of seizure[10]. The patient required emergent treatment for his hyponatremia and had significant water diuresis that required treatment with desmopressin to ensure overcorrection of the serum sodium did not occur. The hospital recommended follow up with neurology and nephrology in a week but this was not done by the prison. The 1st and 2nd quarter specialty logs did not include a referral for either of these specialists. A physician saw the patient on 3/12/21, the day after return from the hospital. The hospital discharge summary from the hospital was not documented as reviewed but the doctor did document that the patient had hyponatremia. The doctor documented no therapeutic plan based on the hospitalization and did not comment on the recommendation to refer the patient to neurology and nephrology. Because the seizure was due to hyponatremia, a prudent course would have been to monitor water intake of the patient and to reduce fluids and to attempt treatment of his dry mouth caused by his psychotropic medication[11]. Neither the medical doctors nor the psychiatrists did this. Only three days later on 3/15/21, a doctor saw the patient in an isolation cell and the patient told the doctor he drank 25 cups of water that day. There was no action to reduce water intake and the only monitoring was to draw another serum sodium level. This was clearly ineffective.

The last chronic clinic was 2/24/22. The only history was that there were no recent seizures. The patient was noted to be on levetiracetam directly observed because of prior compliance issues. The medication administration record for January was not present in the medical record. A medication administration record for February showed that the patient did regularly receive medication. Recent laboratory results from 12/17/21 showed a white count of 2.8 and platelets of 116 (normal 150-450). These laboratory results were unnoticed but were significantly depressed and should have been addressed by notifying the psychiatrist. The assessment was seizure disorder but the polydipsia wasn't addressed. Nor was the low platelet count addressed.

About two weeks after the last chronic disease clinic on 3/6/22 the patient was found with no pulse. A nurse documented the note at 3:10 pm but the ambulance didn't arrive until 3:43 pm. Because there was no documented timeline, it was unclear if cardiopulmonary resuscitation was timely initiated.

---

[10] Imad Halawa, Thomas Andersson, Torbjorn Tomson; Hyponatremia and risk of seizures: A retrospective cross-sectional study; Epilepsia found at https://onlinelibrary.wiley.com/doi/full/10.1111/j.1528-1167.2010.02939.x

[11] Hyponatremia in psychotic patients on certain psychotropic medication is typically thirst caused by a dry mouth which is a side effect of many psychotropic medications. Because of the mental illness, these patients do not have the sense to communicate their behavior and drink excessive amounts of water. Water restriction, use of saliva substitutes, and non-sugared hard candy are some measures used to reduce fluid intake. Because most or many of these individuals are on monitored mental health units, their water intake can be strictly monitored and measured. This should have been done for this individual.

Because the death was in a 51 year old, was unexpected, and had uncertain cause an autopsy should have been done but no autopsy was completed. The cause of death on the mortality list is blank. The mortality review report documents that the onsite physician told them that the patient sustained head injury from the seizure causing the death. An autopsy should have been done. It is possible that a seizure from hyponatremia may have caused the death.

Opportunities for Improvement

1. IDOC failed to reduce psychogenic polydipsia by fluid restriction and monitoring it. This patient had significant hyponatremia possibly resulting in two serious seizures requiring hospitalization. His serum sodium was 116 during both hospitalizations. Sodium levels below 120 are significantly associated with seizures. So, treatment of his seizures involved reducing his fluid intake. His fluid intake was likely related to his psychotropic medication that caused his mouth to become dry. Yet, there was no effort by physicians or the psychiatrist to restrict fluid or to attempt other efforts to increase his saliva (non-sugar candy, saliva replacement, etc.), modification of psychotropic medication, etc.

2. There was no evidence of collaboration between psychiatry and the medical doctor with respect to his management which involved both disciplines.

3. Both the doctors and psychiatrist failed to carefully monitor the serum sodium. Both also failed to effectively monitor the platelet count which appeared to be a side effect of one of his medications.

4. The patient required emergency resuscitation but there was no timeline of resuscitative events. IDOC policy should include that when an emergency occurs that requires emergent response and especially basic life support, that a timeline of what interventions occurred be kept as part of the medical record. The timeline should date and time each event that takes place.

5. An autopsy should have been done to determine cause of death because the patient was only 51 years old and had an unexpected death that could not reasonably be explained. The IDOC mortality review documented that a head injury from a seizure caused the death but this should be confirmed.

6. Chronic disease care continues to be inadequate. In this case, the type and etiology of the patient's seizures was not documented. It is likely that they were contributed or caused by excessive water intake which was ignored. A therapeutic plan of decreasing and monitoring water ingestion in this severely mentally ill patient was not attempted. This was a possibly preventable death.

### Patient 11

Facility: Menard
Date of Death: 4/29/22
Cause of Death: Suicide

The patient was a 24 year-old man incarcerated on 3/15/22. The problem list was inaccurate. It listed asthma but did not document adjustment disorder which was the last mental health diagnosis we could find. He told the mental health specialist at the Cook County Jail that he was upset with his conviction; he was sentenced to 26 years. The NRC intake history form documented history of depression and asthma but the depression was not documented on the problem list. The intake

history also documented that the patient had no history of receiving any required immunizations but no action was taken to ensure he was vaccinated. The patient was discharged from the Cook County Jail on mirtazapine, an antidepressant, and albuterol inhaler for asthma and both were continued. The Cook County Jail had a pending psychiatric appointment when he was transferred to IDOC but there was no evidence that the patient ever saw a psychiatrist in IDOC.

The patient was evaluated on 3/15/22 by mental health. The note was mostly check-box entries, but the evaluation and summary were narratives and were mostly illegible. The signature, title and title of the assessor were illegible. The patient had no suicidal ideation and denied prior psychiatric treatment but said he had previously taken psychotropic medications. This contradiction was not clarified. A referral to a psychiatrist was made but there was no evidence that this occurred.

The medication administration record documented that in March the patient received mirtazapine daily from 3/15/22 to the end of month, but there was no evidence that the patient received albuterol though it was prescribed.

On 4/14/22 the mirtazapine was increased . The patient missed three doses of medication in April at NRC.

On 4/25/22 the patient was transferred to Menard. He did not receive mirtazapine the first two days after arrival at Menard. There was no evidence that he received an albuterol inhaler at Menard. On 4/26/22, the day after arrival to Menard an RN performed intake screening and referred the patient for asthma chronic clinic and to mental health. The mirtazapine was made directly-observed-therapy but there was no associated progress note by a psychiatrist.

On 4/29/22 at 5:58 pm, a nurse documented responding to a code 3 and found officers performing CPR. The nurse documented that officers found the inmate hanging and cut him down. A timeline was not documented except a gross timeline noting only the arrival of the nurse on the unit at 5:58 pm, the arrival of emergency medical technician responders at 6:25 pm and the time death was declared by emergency medical technicians at 6:31 pm. This is not an appropriate timeline which should precisely document start and stop of every activity that occurred. It appeared that emergency medical technicians pronounced death but this should be a physician. Documentation regarding pronouncement of death was unclear.

Opportunities for Improvement
1.  The problem list was inaccurate; the mental health condition was not documented. As mentioned repeatedly, IDOC should include the lack of accurate problem lists in the process analysis of the chronic care program.
2.  Vaccinations were not updated at intake even though a history documented not being up-to-date in any of the recommended vaccinations. The vaccination administrative directive has been apparently made effective in January of 2021 but evidently has not been effectively implemented. IDOC should re-implement this administrative directive.
3.  The patient was referred to a psychiatrist but there is no evidence that this appointment occurred. IDOC should evaluate whether this is a staffing or scheduling issue or whether the patient was transferred before intake evaluation by a psychiatrist occurred. Access to

psychiatry should be available. This patient who died of a suicide apparently was never evaluated by a psychiatrist.

4. The patient did not receive ordered medication. There was no evidence of receiving an albuterol inhaler. The patient missed multiple doses of mirtazapine, his antidepressant, including the four days before his death by suicide.

5. When the patient was found hanging and cardiopulmonary resuscitation was initiated, a timeline was not documented so it was not clear whether care was timely or effective. IDOC needs to establish policy and procedure on emergency response to include appropriate documentation of a timeline during resuscitation efforts.

6. It appeared that emergency medical technicians pronounced death. IDOC policy and procedure should be clear with respect to who has authority to pronounce death. IDOC should evaluate Illinois regulations in this regard.

### Patient 12

Facility: Pontiac
Date of Death: 1/13/22
Cause of Death: Acetaminophen overdose

This patient housed at Pontiac was 44 years old in 2019. His history included traumatic brain injury as a child from a fall from his bicycle. He also had bipolar disorder, depression, and schizophrenia. He was documented as having high blood lipids though none of the 10-year-risk calculations exceeded a 10% 10-year cardiovascular risk. He was on statin medication inappropriately but the statin drug was discontinued at the patient's request. The patient did not have hypertension or diabetes and it was not clear why the statin drug was initially started as it did not appear indicated.

The medication administration record that was available showed that as of 11/27/19, the patient was placed on naproxen, a non-steroidal medication but there was no documented pain syndrome warranting long term non-steroidal use. This medication was discontinued 1/3/20 but there was no stated reason for discontinuation though it may have been connected with development of abdominal symptoms and anemia.

On 1/3/20, laboratory tests showed a white count of 17.2 indicating possible infection or inflammatory condition and mild anemia (hemoglobin 12.1). That day, without documenting a progress note a provider ordered Augmentin and Flagyl antibiotics. The indications were unclear. On 1/6/20, again without a progress note, a provider ordered omeprazole an anti-reflux or anti-ulcer medication. The indications were not documented. On 1/10/20 a provider ordered Bentyl, an antispasmodic medication, again without documenting a progress note or indication. A subsequent blood test, on 1/13/20, showed worsening anemia (hemoglobin 10.5 with low iron) and low albumin suggesting a possible nutritional problem. On 1/15/20, a provider referred the patient to a gastroenterologist for gastrointestinal bleeding to rule out ulcerative colitis. This referral was made without an in-person evaluation of the patient but was nevertheless appropriate, however the referral was not timely. A patient whose hemoglobin decreased from 12.1 to 10.5 over ten days should have had *prompt* endoscopy. There were no progress notes describing the physician's thinking. To start antibiotics and multiple other medications for significant anemia and elevated

white count was not safe or clinically appropriate practice without evaluation of the patient. It appeared that there was no physician at Pontiac.

Instead of an urgent referral, the patient saw a GI nurse practitioner on 2/27/20, 45 days after anemia was noticed. The GI nurse practitioner took a history of bloody stool, diarrhea, weight loss, abdominal pain. This history was not documented by providers at Pontiac based on medical records sent to us. A prior chronic disease clinic on 11/25/19 did not include a history; the patient was only seen for high blood lipids.

The GI nurse practitioner's report was not in the medical record only the referral form with comments on it. The GI nurse practitioner recommended stool for C difficile, CRP, folate, B12 and both colonoscopy and upper endoscopy. The recommendations were not timely reviewed, the patient was not evaluated post specialty visit, and *routine* referrals for endoscopies were not made until 3/17/20, about three weeks after the GI appointment. A referral for GI bleeding should have been urgent, due to undiagnosed GI bleeding but this referral was not timely.

From 1/13/20, when the anemia was first noticed, until 2/27/20 when the patient went for a gastroenterology appointment, there were no physician examinations. After the gastroenterology appointment there were no provider evaluations until a nurse practitioner saw the patient on 5/13/20 for a chronic care visit for high blood lipids. The nurse practitioner took no history except to state that the patient was doing well, and failed to acknowledge that the patient had significant anemia. Though it was a chronic care visit, the nurse practitioner ignored the problem. The gastroenterology report wasn't reviewed and the nurse practitioner didn't check when the endoscopy was to take place.

On 5/18/20 a provider illegibly signed a prescription ordering Keppra, an antiepileptic medication for 3 months and prednisone 10 mg. The duration of the prednisone was illegible on the prescription but the medication administration record (MAR) stated the order was to start the medication on 5/18/20 and discontinue the medication of 8/18/20, a three month prescription. However, in the directions on the medication record it stated that the medication was to be given for two weeks. This contradictory MAR was hand written. The patient was given 14 pills keep-on-person despite being on an enforced psychotropic medication indicating severe mental illness. Moreover, there was no provider visit or progress note associated with these prescriptions. There was no indication for the Keppra and the patient did not have epilepsy. Why the patient received either medications was unclear. This was problematic because Keppra can cause CNS depression and psychiatric abnormalities including confusion, depression and suicidal ideation and tendencies.

The endoscopies were not done until 8/3/20, 203 days after the anemia of 2/13/20 was noticed and 139 days after the referral was made. This was not timely. The test showed ulcerative colitis throughout the entire colon with a normal upper endoscopy. The endoscopist recommended prednisone, mesalamine, multiple blood tests, with a follow up with the gastroenterologist in three months. The biopsy showed moderate ulcerative colitis throughout the entire colon. A follow up appointment with the endoscopist was also recommended in three days but the report was not reviewed and there was no follow up referral until 8/19/20 and the follow up appointment took

place on 8/27/20, 24 days later than recommended. There was no evidence we could find in the record that a physician initiated this referral. Up to this point a Pontiac provider had not evaluated the patient or examined the patient for his ulcerative colitis since the patient became anemic on 1/3/20. There are clearly insufficient physicians at this facility that result in risks to patients. The gastroenterologist placed the patient on a prednisone to taper over three months and mesalamine for the ulcerative colitis and recommended blood work in two months with a follow up appointment in three months.

Over a year after the initial diagnosis of anemia, on 1/22/21, a nurse practitioner saw the patient for his ulcerative colitis because the patient wanted to stop the Imodium which was being used to treat diarrhea. This was the first provider visit for this condition over the course of a year. The patient was not being followed in chronic clinics for his ulcerative colitis although it was a serious condition. Much of the prior care had occurred by writing orders remotely without examination of the patient. At this visit the nurse practitioner documented that the diarrhea had resolved and the patient was better. The nurse practitioner stopped the Imodium. The nurse practitioner wrote that the patient said the Keppra helped his shoulder pain and asked for an increased dose of the Keppra and so the nurse practitioner increased the Keppra to 500 mg twice a day. Keppra has no FDA indication for pain and no off-labeled use for pain and this medication was not being properly used. Additionally, this medication has potential for psychotic symptoms including depression and suicidal ideation and suicidal tendency which is considered a significant adverse reaction . A risk factor for this adverse reaction was prior history of psychiatric disorder which the patient had. The nurse practitioner was prescribing a medication with no approved indication which had significant potential to harm the patient.

Four days after this nurse practitioner visit, on 1/26/21, a physician saw the patient. The doctor took no history of the colitis, did not review labs, nor took a history of medications. Instead, the doctor wrote that the patient agreed to wait for a UIC visit instead of sending the patient back to the local gastroenterologist. The physician did not state how long the wait would be. The doctor did not document telling the patient that UIC visits typically take an extended time. This was unethical not to discuss this with the patient as the wait is significant. The doctor performed a brief examination and assessed ulcerative colitis but did not discuss therapy or review medications with the patient.

The patient was seen again in chronic clinic on 2/2/21 but only for high blood lipids. No history was taken. Heart and lungs were examined. The ulcerative colitis was not evaluated. Medications were not reviewed. This points out a significant deficiency in chronic care management, specifically that all conditions are not evaluated.

On 3/29/21 a doctor saw the patient for follow up of his ulcerative colitis. No history of symptoms was taken. The patient said he was out of his mesalamine. A brief examination was done. Without any history the doctor renewed the mesalamine and prescribed a 16-day course of prednisone. Doing this without a symptom history was inappropriate. The doctor mentioned that the patient would be referred to the UIC gastroenterology clinic. The referral for this clinic was written on this day not on 1/26/21 when a physician said he would refer to UIC. The patient was to have been seen in follow up for his ulcerative colitis with a gastroenterologist on 11/20/20 and the referral to UIC was not made until 3/29/21. The patient had a periodic history and examination

performed on 3/31/21 and high blood lipids, bipolar disorder, manic depressive disorder and ulcerative colitis were listed as problems but a therapeutic plan was not provided except that the patient was scheduled for a UIC gastroenterology clinic.

The UIC visit did not take place until 7/21/21, 328 days since the prior gastroenterology visit and 236 days later than recommended. These were not timely visits. There were no intervening evaluations of the patient's ulcerative colitis since the 3/29/21 visit which did not even include a symptom history. The delay was compounded by the patient being sent to the wrong gastroenterology clinic at UIC. He went to the interventional gastroenterology clinic instead of the inflammatory bowel disease clinic. Nevertheless, the consultant saw the patient and noted that the patient had been seen a year ago with a plan to start Remicade, if needed. The patient had gained some weight back but still had some diarrhea with intermittent bloody stools as breakthrough symptoms. The consultant evaluating the patient documented that he was not an inflammatory bowel disease (IBD) specialist so he referred the patient to an IBD specialist, ordered a colonoscopy and labs.

The patient was not referred to an IBD specialist but was scheduled for a colonoscopy which wasn't done until 10/22/21, 93 days later. In the interim, on 8/26/21, a provider saw the patient in chronic clinic for high blood lipids. The ulcerative colitis was again not addressed pointing out the deficiency of not evaluating all conditions in chronic disease clinic. The patient asked to be taken off the statin medication for high blood lipids and the provider discontinued the statin drug. We note that based on laboratory results and vitals this patient did not have an indication for a statin based on his 10-year cardiovascular risk calculation so this was appropriate but it was unclear if the provider recognized that this drug was not indicated. The patient was rescheduled for follow up chronic clinic and a lipid test was ordered prior to the next clinic.

The 10/22/21 colonoscopy showed pan-colitis with multiple small polyps that were biopsied. During the colonoscopy, polyps were visualized but the endoscopist wasn't sure if the polyps were adenomatous or pseudo polyps. If they were adenomatous polyps, the recommendation was to remove part or all of the colon, however, the endoscopist believed them to be pseudo polyps. The endoscopist recommended that the patient needed to be seen in the IBD clinic which never occurred.

There were no further gastroenterologist visits. A physician saw the patient the same day (7/22/21) of the colonoscopy when the patient returned to Pontiac. The doctor referred the patient to the IBD specialist, ordered labs and reviewed the comments on the referral form and started a higher dose of mesalamine and the recommended steroid medication. For reasons that were unclear the doctor wrote an order to discontinue Naprosyn which the patient had not been on since January of 2020 and ordered acetaminophen at 500 twice a day for 6 months. There was no history taken with respect to the need for the acetaminophen and the patient had no complaints of pain. Why the acetaminophen was started was unclear. The patient did not complain of pain with respect to his ulcerative colitis. It appeared that the acetaminophen did not have an indication and the provider did not document his thinking. In either case, this was inappropriate.

A summary of the six specialty appointments shows a completely broken specialty care program at Pontiac. One appointment did not occur because the patient died prior to the appointment date.

Of the five appointments, three had evidence of a report. One additional appointment had comments on a referral form but not report. The appointments were extremely untimely. The first appointment to gastroenterology for a drop in hemoglobin from 12.1 to 10.5 over two weeks with abdominal symptoms was completed in 45 days when the patient should have been referred urgently. The time from referral to colonoscopy took 139 days or 203 days from the time the hemoglobin of 10.5 was first noticed which was excessive given the sudden drop in hemoglobin. An urgent colonoscopy should have been ordered. After the colonoscopy, a follow up was recommended in three days but didn't occur for 24 days. A subsequent follow with gastroenterology recommended for three months (90 days) didn't occur for 328 days. This clinic was not only late but the patient was sent to the wrong clinic and a gastroenterologist did not evaluate the patient. A recommended repeat colonoscopy didn't occur for 93 days which based on the delayed visits should have been earlier. Subsequent follow up never took place because the patient died. Only two of the five appointments included a review of the consultation. None occurred as part of an in-person visit with the patient. It appeared that there was no physician at this facility for an extended period which is believed to have caused the lack of performance. The Pontiac specialty tracking log documented that each of the five visits included a provider review of the consultation with the patient for which there is no evidence in the medical record.

During the two years of this medical record, the patient was on *enforced* psychotropic medication (prolixin, Cogentin and Abilify) indicating a very serious mental illness. Despite having a very serious mental illness there were no psychiatrist or mental health professional progress notes in the record. It wasn't clear whether the patient had actually been seen or whether mental health medical records were not provided. IDOC should have a unified medical record that includes medical, mental health, dental records. Also, despite having very serious mental illness, the patient was permitted to take his own non-mental health medications which included iron for his anemia; mesalamine, prednisone, and acetaminophen. The patient received 60 Tylenol tablets each in November and December as keep-on-person-medication. Tylenol can result in lethal hepatic toxicity in overdose. The Keppra, for which there was no appropriate indication, and which can cause suicidal tendency, was given dose by dose and was regularly given.

After the 10/22/21 post-colonoscopy visit, the patient was not seen again by a provider for his ulcerative colitis.

On 1/8/22 security staff saw the patient in his cell with a sheet tied around his neck in an attempt to hang himself. The patient removed the sheet but was placed on a crisis watch and was to be seen every ten minutes. On 1/9/22 a nurse appeared to schedule the patient to see a doctor for a 20-pound weight loss. This did not occur. Notably, though the patient was on a suicide watch, a mental health professional did not evaluate the patient; nor did a medical provider evaluate the patient. Three days after the crisis watch was started (1/11/22) a nurse documented at 5 am that the patient became confused and was described as catatonic. A nurse practitioner in the infirmary saw the patient at 11:20 am, six hours later and his pupils were dilated. The patient left the facility at 11:35 according to the crisis watch log. A timeline of the medical response was not documented. The patient arrived at the hospital at 11:55 am.

At the hospital the patient was found to have liver failure and renal failure due to acetaminophen toxicity. The patient declined and died on 1/13/22 about two days after admission. How the patient

obtained a lethal dose of acetaminophen while in crisis watch was unclear and should be evaluated in mortality review.

Opportunities for Improvement

1. There did not appear to be a physician at this facility and the patient was not seen timely or regularly for monitoring of his serious medical condition (ulcerative colitis). The lack of a physician resulted in inadequate medical care.
2. The patient had apparent new onset gastrointestinal bleeding and the response was a routine and elective gastroenterology visit which didn't occur for six weeks. The patient should have been referred for prompt endoscopy. During this early time period a facility provider did not examine the patient.
3. Specialty appointments were significantly delayed. The Monitor continues to recommend a process analysis of specialty care
4. Providers at Pontiac did not monitor the patient's ulcerative colitis in chronic clinic or in any other clinic. Care of his ulcerative colitis was unsafe and inadequate. The chronic care program should be restructured.
5. Medication management was dangerous. Hand-written medication administration records were inaccurate. Multiple prescriptions were written without in-person evaluation of the patient. This included antibiotics (Augmentin and Flagyl), Keppra, omeprazole, Bentyl, Imodium, and iron. The patient appeared to be on a statin drug without indication. The patient was placed on Keppra for apparent shoulder pain but had no indication for this drug as pain is not an indication for this medication. Unfortunately, this drug can cause suicidal tendency as a significant adverse reaction which was the patient's cause of death. The patient was started on long-term acetaminophen without a stated indication and for which there did not appear to be a bona fide indication. The patient, despite being on enforced psychotropic medication, which indicates very serious mental illness, was allowed to self-medicate with multiple medications (prednisone, mesalamine, and acetaminophen); acetaminophen can be lethal and indeed caused his death. This was dangerous. The process of medication management is unsafe at this facility and should be evaluated promptly. This may be the result of lack of physician coverage, but some of the mistakes were not due to coverage issues. The medication management system as evidenced in this record review is unsafe and must be evaluated and restructured.
6. The patient had severe mental illness such that *enforced* medication was prescribed. Yet there were no documented progress notes by a psychiatrist or mental health professional for two years. Mental health notes should be included in the mortality records and should be in a unified medical record so that medical providers can review the mental health notes. The patient had severe mental illness and died of suicide but there was no evidence of a mental health evaluation in the two years of records provided.
7. The patient's (unresponsive with dilated pupils) transfer to a hospital was delayed for six hours. This should be subject to root cause analysis.
8. This was a preventable death.

Patient 13
> Facility: Dixon
> Date of Death: 6/3/22
> Cause of Death: Not identified

Problem List

This 80 year old man's medical record was reviewed beginning in July of 2020.  The problem list documented seizures, ventral hernia, hypertension, benign prostatic hypertrophy, prior stroke, dyslipidemia, reflux disease, diabetes, hearing loss, anterolisthesis of C4-5  with degenerative arthritis.  However, this problem list failed to include atrial fibrillation, coronary artery disease, prior prostate cancer, obstructive uropathy, hydronephrosis, heart failure, anemia, and normal pressure hydrocephalus on CT scan.  A couple months before the patient died, he developed DVT and pulmonary embolism which were not entered on the problem list.

Dementia

The patient was 80 years old and in the beginning of the two years of record reviews he had a few suggestions of dementia.  On 8/30/20 the patient pulled his Foley catheter out of his penis with the balloon inflated.  A nurse described him as having a knowledge deficit.  On 12/23/20 a CT scan showed normal pressure hydrocephalus which is associated with dementia.  There was no further work up for this.  On 2/20/21 a nurse practitioner described the patient as "disoriented per his norm" and made an assessment of dementia.  When hospitalized on 8/25/21, an infectious disease consultant documented that the patient did not know the day or month or who was the president of the U.S.  On 9/28/21 a nurse practitioner assessed dementia as a problem.  A provider progress note on 3/12/22 documented an assessment of dementia.  On 5/18/22, a psychiatrist documented the patient as "+/- disoriented, difficulty expressing self".  On 6/6/22, the patient told a doctor "terminate me".  *No cognitive assessment for dementia was conducted that we could find.  Nor was a therapeutic plan documented that provided the patient protections (fall prevention, diet management, end-of-life planning, etc.).*

End-of-life planning was not evident for this patient.  Because a practitioner order for life-sustaining treatment (POLST) was not completed prior to development of apparent later-stage dementia, it appeared that the POLST was obtained when the patient had dementia.  Moreover, on multiple occasions, the patient changed his POLST yet the patient's capacity to make an informed decision was not documented as formally established on any of these occasions.  There is no current IDOC policy or procedure for either evaluation of dementia or for obtaining a POLST including for those with dementia or other cognitive disorder.

On 7/26/21, the patient signed a POLST form for selective treatment.  However, there was no formal evaluation of capacity of the patient to make an informed decision despite the patient having some apparent degree of dementia at this time.    On 1/1/22 the patient was hospitalized, changed his mind, and asked for full code status.  The POLST at Dixon was not amended.  On 3/10/22 the patient signed a POLST for only comfort care but there was no documentation in the record of a discussion with the patient regarding the patient's capacity to make an informed decision.  On 3/16/22 a nurse documented that at a plan of care meeting an increase in activity of daily living care needs was brought up.  A subsequent discussion of a patient request for no further life sustaining treatment was brought up and the Medical Director was documented as saying he would

discuss this further with the patient. We could not locate that discussion in the record. On 5/12/22, a nurse documented that the patient was requesting no further treatment but a provider evaluation on this topic did not occur and subsequent provider visits did not include discussion with the patient about end-of-life concerns. These changing directives in a person with dementia and documented cognitive issues cause concern that effective communication with respect to the POLST may not have been obtained.

Early end-of-life planning is not evident in IDOC. Failure to appropriately diagnose dementia, to manage dementia, and to evaluate for capacity to make an informed medical decision prior to having a person with dementia sign a POLST are systemic problems in IDOC. Policy and procedure needs to be developed and implemented to correct these problems.

Care of elderly

Early in the period of record review the patient had the following conditions.
- Dense cataracts and had difficulty seeing documented by a UIC ophthalmologist as causing difficulty with activity of daily living;
- Was "hard of hearing" but had no hearing screening documented[12] and this was not monitored;
- Had normal pressure hydrocephalus which was not worked up and for which there was no therapeutic plan;
- Had gait abnormalities and a hospital physical therapist documented he was unable to walk with difficulty transferring. He did not have a mobility evaluation (gait, balance, strength, and fall risk) or functional activity-of-daily-living evaluation;
- Had likely dementia of uncertain severity without ever having a diagnostic assessment; and
- Had repeated falls without any fall prevention plan.
- Had anemia which was not properly evaluated.

The patient did have one cataract corrected and refused a 2nd cataract surgery. It is unclear if the patient received a hearing aide. The remainder of the problems listed above were not addressed. Problems of the elderly are not managed and IDOC should establish policy and procedure to ensure that annual health evaluations of the elderly include evaluations appropriate for the aged.

Over the two years of record review the patient had 20 falls either in general population or on the infirmary. The patient sustained injuries as a result of some of his falls, and one fall resulted in sending the patient to the hospital. There was not a documented fall prevention plan for this patient. IDOC does not evaluate for risk for falls but this 80-year-old patient had five risk factors for falls (age, cognitive impairment, balance problems, history of stroke, anemia). Other potential contributing risk factors for this individual included poor vision related to cataracts and hearing loss. Although one cataract was surgically corrected, the patient declined repair of his second cataract. It was not clear that the patient had hearing aids. The most consistent risk factor in falls is gait and balance impairment which was a key feature of this patient's presentation. Because the

---

[12] In reviewing the offsite specialty log for Dixon, this patient apparently had audiology screening in 2019. It was not clear if the patient received hearing aids but hearing loss was not documented as a medical problem.

gait abnormalities may have been a result of normal pressure hydrocephalus, the failure to further investigate this abnormality may have contributed to these falls.

Not all falls resulted in a provider evaluation. After any fall a provider should evaluate the patient at the next opportunity or sooner if clinically indicated. We identified one occasion when a fall resulted in a fall prevention strategy. A nurse practitioner had furniture rearranged so that the patient call light was more accessible but aside from this effort, preventive measures were not documented in the record. Moreover, whatever was being done, preventive measures clearly were not working for this patient and problems that resulted in falls were not corrected.

Failure to address falls by assessing risk for falls and development of a therapeutic plan that is integrated into a nursing plan of care is a systemic issue within IDOC. It needs to be corrected by appropriate policy and procedure that is implemented system-wide.

Infirmary care
Infirmary care as demonstrated in this patient failed to address the needs of the patient. The patient had 18 falls on the infirmary without any fall prevention plan or assessment of functional status. The patient needed skilled nursing care, a level of care not provided at this facility.

The patient, when on the infirmary, had ordered physical therapy on 2/2/21 which did not occur timely nor was it completed. During a prior hospitalization on 1/21/21, a physical therapist documented that the patient hadn't walked in a long time couldn't stand for more than a few seconds, couldn't reposition himself in bed, and had difficulty transferring. These disabilities were resulting in falls. The therapist recommended a gait assessment and skilled physical therapy. The initial therapy evaluation was delayed and the gait assessment was never done. After a few therapy sessions, therapy was stopped due to failure to show up for consecutive appointments on the 1st floor (the infirmary was on the 2nd floor) but the patient was immobile and could not move independently. The patient could not have been responsible for "showing up" for his appointment when he could not walk independently. He received no further physical therapy.

There was no documented nursing plan of care and individual nurses provided care ad hoc without a basis in physician orders or functional assessment. The only evidence of a nursing care plan are the infirmary flow sheets. These sheets document vital signs, weight, and whether assistance was provided with bathing, oral hygiene, PM care, bed positioning, range-of-motion exercises, and transfers. Infirmary Graphic Flow sheets were present from January of 2021 until 4/1/22. But after 4/1/22 no further infirmary graphic sheets were present in the record. In December of 2021 a CNA (nurse assistant) Infirmary Flow Sheet was present. The sheet was present for the remainder of the patient's incarceration. This CNA Flow Sheet documents an hour by hour assistance provided by the nurse assistant for bed mobility, transfers, toileting, bowel or bladder care, feeding, bathing, ambulation, and cognitive and behavior assessment. Because RN staff are state employees and CNA staff are vendor employees, the RN staff will not supervise or sign off on CNA work and the documentation on the flow sheets is not monitored and is left up to individual CNAs to manage.

For this patient, the nursing care as documented on the flow sheets did not appear to be guided by consultation with a provider or by a formal activity of daily living assessment. These flow sheets

appeared to be developed by nurse assistants who on an impromptu basis decided what would be done for the patient. It appears that instead of an RN performing a comprehensive assessment of the patient, staff with less training are left to decide how to manage the patients. The initial graphic flowsheets on 1/27/21 documented self-care with all activity except transfers. Yet, a hospital physical therapist during a late January, 2021 hospitalization documented multiple physical and functional deficits that were inconsistent with capacity for a self-care designation for all activities. This demonstrated that on admission to the infirmary at Dixon the recent functional assessment developed at the hospital was not used as a guide. We found no reasonable functional assessment of the patient performed on the infirmary and therefore, it appeared that the needs of the patient were not identified.

Over time, the assistance provided to the patient, as documented on the Graphic Flow Sheets, changed. Bathing assistance changed four times from no assistance to assistance and then back to no assistance yet there was no documented change of functional status. The same occurred for the other activities monitored on the Graphic Flow Sheet. With respect to transfers, the patient changed from no assistance to assistance three times. Yet, for almost two years of record review which was mostly in the infirmary, the patient experienced 20[13] falls. After the patient fell, Infirmary Graphic Flow Sheets were not revised to reflect a change in the level of assistance needed with transfers. Nor was there a fall prevention plan aside from documenting "watch for falls".

In our visit to Dixon, we noted lack of staffing on the infirmary unit. The number of persons needing skilled nursing called for a larger number of nurses. We noted CNA documentation that an inmate worker assisted in bathing this inmate. Use of inmate workers for work a nurse assistant should be performing is inappropriate.

For an extended period, it appeared that a physician was not available and nurse practitioners were managing all care on the infirmary. Insufficient physician staff exists at this facility. For over a year, a nurse practitioner managed care or contributed to care of the patient while on the infirmary. It was notable how often these encounters resulted in nursing diagnosis such as "deficit in self-care". When practitioners act as primary care providers, medical diagnoses need to be used. This practice was confirmed as still present on a recent visit to Dixon.

There were multiple episodes of the nurse practitioner not appropriately acting as a medical practitioner which warrants counseling and/or referral for peer review. Following are several examples.
- On 5/18/21 when the nurse practitioner evaluated the patient on infirmary rounds, the only history was "∅ concerns today. Denies abd pain esp. over bladder. Denies resp distress". The nurse practitioner noted a six inch abrasion with old ecchymosis on the back. None of the patient's chronic medical conditions were evaluated. The only assessment was alteration in self-care. This is a nursing diagnosis and shouldn't be used for a practitioner note. Despite noting bruising the nurse practitioner failed to evaluate for a fall or consider establishment of a fall prevention plan (the patient experienced falls on 5/7/21 and

---

[13] Two falls occurred on the 3rd floor which is a geriatric unit and 18 falls on the infirmary.

5/13/21). The reason for the bruising was not identified. None of the other chronic conditions were evaluated.

- On 11/2/21 the nurse practitioner saw the patient for concerns about "fluid" and weight loss. The patient had a recent August hospitalization for suspected upper GI bleed, **heart failure**, and anemia (hemoglobin 7.7 in the hospital). The nurse practitioner took virtually no history and did not address any of the patient's known chronic illnesses with respect to the patient complaint. The examination consisted of documenting no tenting of the skin, noting moist mucous membranes, and noting that the weight of 236 was stable. The post hospital weight was 242 which decreased to 220 on 10/4/21 on 40 mg of furosemide which was then decreased to 20 mg daily. The weight of 236 indicated an increase of 16 pounds since the furosemide was decreased, which should have prompted an evaluation of symptoms and signs of heart failure and an increase of furosemide, but this was not done. The only assessment was "deficit in self care" which was unrelated to the patient's stated complaints. This was not a competent evaluation.

- On 11/30/21, the nurse practitioner saw the patient for a concern about deteriorating strength in his legs and for a right hip wound. No history was taken for either condition including whether the patient had fallen. The practitioner documented a healing abrasion with old bruising. The nurse practitioner noted that the patient was not ambulatory "despite having a walker". Without any evaluation of his leg strength or evaluation as to whether the patient could actually walk (in January of 2021 a hospital physical therapist documented that the patient wasn't able to walk or even stand for longer than 5 seconds) the nurse practitioner told the patient to use his walker to stand and strengthen his leg muscles. At this juncture, these instructions would only increase the risk of falls as the patient did not previously have capacity to do what was being recommended. A neurologic examination with referral to a physical therapist for functional assessment and gait and strength analysis with therapy should have been done but were not done. The nurse practitioner assessment was "deficit in self care". The therapeutic plan was to leave the right hip wound open to air and to encourage the patient to use a walker. This advice was despite prior evidence that the patient couldn't walk, had gait abnormality and multiple falls. A specialized mattress and frequent turning of the patient to prevent decubiti was not recommended.

Medical care was episodic and only addressed a few of the patient's complaints at each episode of care or none at all. This was reactive medical care. At no time on the infirmary did a note document all of the patient's problems. Nor was a therapeutic plan for all of the patient's problems present. We could find no physician orders or documented nursing care plan to establish how to manage the patient's care and activities of daily living. Review of specialty care reports and follow up of hospital or specialty care recommendations were seldom documented in progress notes making it very difficult to determine if providers knew what the specialist's recommended therapeutic plan for the patient was. The patient's heart failure was known but not monitored adequately by providers and resulted in repeated preventable hospitalizations and placed the patient at risk of harm.

There was no evidence that nursing documentation was reviewed by providers and appeared inconsistently utilized. After a hospitalization for heart failure in August of 2021, the hospital

recommended titration of diuretic dosages based on weight as a measure of the degree of heart failure. Nurses maintained a daily weight flow sheet but this data was not consistently documented as reviewed or monitored by providers. Progress notes through September appeared to show review of this data, but from October through December the patient steadily gained weight totaling 28 pounds from 10/5/21 to 12/31/21. The furosemide was decreased to 20 mg daily on 10/4/21 but not adjusted upward as the patient gained 28 pounds from 10/4/21 and 12/31/21. The patient remained on the same dose of furosemide (20 mg). On 1/1/22 the patient was admitted back to the hospital with diagnoses that included heart failure and pleural effusion. This was a potentially preventable hospitalization if more attention to monitoring heart failure had occurred.

Chronic Care
The management of the patient's multitude of problems was inadequate. Though review of this record began in July of 2020, the first chronic clinic visit didn't occur until 3/12/21 about 9 months later. Over the two years of review there were four chronic clinic visits, none in 2020, three in 2021 and one in 2022. The second page of the chronic care form containing the assessment and plan portions was missing for all chronic clinic visits. At none of the chronic clinic visits were all of the patient's medical problems evaluated or monitored and several conditions were not monitored in chronic clinic visits. These included atrial fibrillation, coronary artery disease, prior prostate cancer, obstructive uropathy with hydronephrosis, heart failure, normal pressure hydrocephalus, and dementia. None of the chronic clinic visits included an adequate history and the physical examinations were not focused on the problems of the patient and therefore thorough evaluations were not done. The assessments were not present as the second page of the chronic clinic visit was not present in the medical record.

The patient was on the infirmary continuously dating from 1/25/21. While on the infirmary, only episodic care was provided and some significant chronic conditions (hydronephrosis, prostate cancer, atrial fibrillation, normal pressure hydrocephalus, deep vein thrombosis with pulmonary embolus, and dementia) were not monitored with an assessment and plan as part of infirmary rounds. None of the other problems were effectively monitored. An adequate history and physical examination was infrequently performed. This remains a serious systemic problem in IDOC and an evaluation of the chronic care program should be initiated.

Anticoagulation
The patient had atrial fibrillation for which anticoagulation is recommended. On 1/21/21, during a hospital admission, he was found to have atrial fibrillation with rapid ventricular response. The cardiologist noted that the patient had previously been on anticoagulation but had not been on anticoagulation at the prison. The patient was restarted on an anticoagulant (Eliquis) upon return to the prison and was continued on a baby aspirin presumably for prophylaxis for his coronary artery disease. Although at his age and with his dementia and fall risk, consideration should have been given to discontinue this medication.

The risk of anticoagulation is bleeding and this risk is heightened especially in persons who fall. The patient experienced a fall on 2/27/21 and the next day a nurse documented multiple bruises on his back from the falls but a provider did not examine the patient. The patient fell again on 3/2/21. On 3/3/21 a nurse practitioner saw the patient on infirmary rounds and noted an abrasion on his forehead and multiple bruises in various stages of healing throughout his back. The nurse

practitioner did not consider alternatives to anticoagulation (e.g., Watchman device[14]) nor was a more effective fall prevention plan put into place. The room furnishings were rearranged so that the patient could more easily reach the call light but no other fall prevention orders were given. A fall prevention assessment was not conducted. Risks for falls were not identified.

This patient had dementia which should have been considered in the therapeutic plan. Whether aggressive treatment was indicated should have included patient desires based on a timely POLST or discussion with family. Neither occurred. As a result, hospitalists and providers at the prison made ad hoc decisions about his care without clear informed decisions of the patient's wishes. This is not patient centered care. IDOC has responsibility to clarify the patient's desires for care in a timely fashion and before dementia develops.

At a chronic clinic visit on 3/12/21 the atrial fibrillation wasn't mentioned as a problem and anticoagulation, including its risk, wasn't evaluated. Apparently, atrial fibrillation is not a problem that is monitored at chronic clinics. This is a systemic issue within IDOC.

The patient had subsequent falls on 3/12/21, 3/21/21, 4/1/21, and 5/7/21. On 5/9/21 a nurse noted that the urinary catheter bag had blood in it and on 5/10/21 a physician saw the patient and then noted that the patient had a recent fall and discontinued the Eliquis without an alternative plan. Under the circumstances of inability to prevent falls, discontinuing the Eliquis was a prudent clinical decision, but the patient should have been referred to UIC or another hospital for consideration of a Watchman device. This was a complicated issue for which specialty consultation was indicated. This was especially complicated because of the patient's age and likely dementia. But none of these issues were documented as considered.

The patient remained off Eliquis and was only on a baby aspirin and was evaluated by providers on 5/18/21, 5/26/21, and 7/18/21 but the atrial fibrillation was not documented as part of the evaluation. The patient was sent to the hospital on 7/21/21 and was again in atrial fibrillation and the hospitalist re-started the Eliquis. After the hospitalization, the patient was seen in chronic clinic on 8/4/21 but the atrial fibrillation and anticoagulation were not monitored and it appeared at this chronic care visit that the atrial fibrillation wasn't recognized as a chronic problem. At this clinic visit the patient was documented as having anemia as a problem but the anemia was not attributed to bleeding as a result of the anticoagulation. This should have been considered. A diagnostic and therapeutic plan for the anemia was not documented and communication and coordination with the hospital specialists did not occur. Given the recent development of anemia both upper and lower endoscopy were medically indicated.

The patient was seen by a nurse practitioner again on 8/12/21 and 8/17/21 but the anticoagulation was not monitored or addressed. The patient fell on 8/23/21 and a doctor saw the patient and noticed swelling of the legs, testicles and scrotum which is consistent with anasarca. The doctor ordered increased diuretic and fluid restriction. Later that day, a nurse practitioner ordered the patient to go to the hospital but then cancelled the order. The following day a nurse called a physician for swollen testicles and the patient was hospitalized. At the hospital the patient was noted to have a hemoglobin of 7.7 which is a level requiring transfusion. Also, a guaiac test of

---

[14] A watchman device is a self-expandable cage place in the left atrium of the heart that mechanically traps clots that develop because of atrial fibrillation and is an alternative to using anticoagulation for atrial fibrillation.

stool was positive. The Eliquis was discontinued by the hospitalist. The cardiologist recommended that the patient be sent to UIC for evaluation for a Watchman device and the gastroenterologist recommended sending the patient to UIC to obtain upper and lower endoscopy given the anemia, age, and guaiac positive stool. None of these referrals were made after return to the prison. The patient was disoriented in the hospital and the patient had a DNR status from the prison and the hospitalist questioned whether further workup would be useful. It was essential for the IDOC to determine the capacity of the patient to provide informed consent but this was not done.

In this case, placement of a Watchman device would not have been futile, but may have extended life beyond what the patient desired given his condition. When no family members are available, IDOC is responsible for decision making for inmates who lack that capacity but they were unprepared to do so in this case, and so care for this patient developed ad hoc. This can give the appearance of being uncaring or dismissive. As a class, inmates are protected only by their jailers, and a clear procedure for how this is to occur needs to be in place. In this case, IDOC had no plan, had not obtained the inmate's wishes prior to development of dementia, and had not made contact with a family member.

The anticoagulation was discontinued after return to the prison, but the patient was not referred to UIC for consideration of a Watchman device. More importantly, a formal evaluation of capacity to give informed consent was not documented as completed which should have been the basis of medical decision making going forward. If the patient was incapable of making an informed medical decision, a guardian should have been identified. It would not be unreasonable for a guardian or for the patient to stop further work up and treatment at this stage but informed consent or assignment of a guardian is necessary. The patient was allowed to continue with an ad hoc end-of-life plan that failed to compassionately address the needs of the patient. This was wasteful care that lacked empathy toward the patient.

The patient remained off anticoagulation until he was hospitalized again for heart failure on 2/16/22 and was found to have a deep vein thrombosis and high probability of pulmonary embolism and was re-started on Eliquis.

The prison doctor seeing the patient post-hospitalization did not document and did not appear to know that the patient had thrombosis or pulmonary embolism or that he was now back on Eliquis. He also did not document that the hospitalist recommended that the patient go to UIC for colonoscopy and for evaluation of a Watchman device. Within two weeks of the hospitalization, the patient was re-admitted to the hospital for hypoxemia. At the hospital the patient was diagnosed with severe anemia of 6.2 and an upper endoscopy showed gastritis insufficient to account for the anemia. The hemoccult was positive. The patient refused colonoscopy. The Eliquis was discontinued. At this point, the patient was placed on comfort measures only. The hospital assume the responsibility of obtaining a new POLST but capacity of the patient to understand was not documented as obtained . This was IDOC's responsibility but they failed to undertake it. The patient continued to have falls on 3/14/22, 4/8/22, 5/15/22, and 5/20/22; a fall prevention plan was still not in place. He also had a chronic clinic visit on 4/6/22 but his atrial fibrillation was not addressed nor was his anemia. At this point the patient was at the end-of-life

but IDOC providers handled this so ineffectively that care lacked concern for the patient as a person.

Heart Failure

The patient was hospitalized on 1/21/21 and was noted by a cardiologist to have a prior diagnosis of heart failure but had only a moderately impaired ejection fraction of 45% in 2019. Whether the patient had heart failure with preserved ejection fraction was not determined. Acute heart failure was not diagnosed during this hospitalization, but the patient was discharged on furosemide 40 mg daily, a diuretic used in heart failure. For undocumented reasons, the prison provider started only 20 mg of furosemide at the prison and on 2/1/21, the patient wanted to stop the furosemide and a doctor agreed and stopped the furosemide without documenting a sound clinical reason for doing so. The heart failure was not monitored at the chronic clinic appointment on 3/12/21 nor was heart failure listed as a problem on the problem list.

Along with the failure to monitor the patient's heart failure, the patient had a history of hypertension which was not monitored well. From 5/22/21 until mid-July of 2021, the patient had 27 episodes where the blood pressure was elevated greater that 140/90. Medication was not adjusted. On 7/21/21 the patient developed anasarca (widespread edema) including to his penis and scrotum. Edema can be a result of heart failure or another condition. The nurse practitioner evaluating the patient noted that the urine flow in the catheter tubing was milky white and treated the patient for a urinary tract infection, but failed to come to a reasonable assessment for his systemic edema. The potential for heart failure or another edematous disorder was unrecognized. There was no evaluation for the source of the edema. This was not competent care and the nurse practitioner's care was unsafe and inadequate. Four days later, the patient was hospitalized for heart failure, community acquired pneumonia, urosepsis, and atrial fibrillation. The poorly managed blood pressure may have contributed to the heart failure. With closer monitoring of the blood pressure and for signs of heart failure, this hospitalization was preventable and was the 1st preventable hospitalization.

The patient was discharged from the hospital on 7/25/21. The hospital recommendation for 40 mg of furosemide was discontinued a day after arrival back to Dixon and changed to a lower dose without a documented rationale. The patient started gaining weight, a potential sign of worsening heart failure, and on 8/3/21 a nurse told a nurse practitioner that the patient had gained 8.5 pounds over two days but there was no review of systems for heart failure symptoms. The diuretic dose should have been increased. On 8/23/21 the patient fell and a subsequent evaluation documented shortness of breath, swollen penis scrotum, legs, and thighs but only a stat dose of 20 mg furosemide was ordered. The swelling was consistent with anasarca or generalized edema which called for a much higher regular dose of diuretic and, more importantly, an evaluation for why there was generalized edema. The following day, a nurse documented a 22 pound weight gain over 7 days on the infirmary and the patient was sent to the hospital. The patient's heart failure was not managed well from 7/25/21 to 8/25/21 and the patient's heart failure reoccurred necessitating a 2nd preventable hospitalization for heart failure. The weight at the hospital was approximately 269 pounds. A hospital note documented a weight gain of 23 pounds since the last admission a month ago, which is testament to inadequate diuretic. The hospital gave a diagnosis of heart failure with reduced ejection fraction. The patient had hemoglobin of 7.7 with a guaiac + stool in the ER and was transfused. The hospital recommended that the patient be sent to UIC

66

because he needed both upper and lower endoscopy and a Watchman due to the problems with using anticoagulation. These referrals were not made.

After the 8/25/21 hospitalization, the discharge recommendations for heart failure were to obtain daily weights. For weight gain of 3 pounds in a day or 5 pounds in a week an **extra** dose of 20 mg furosemide was to be given in addition to the regular dose of 40 mg twice a day. The 40 mg twice a day dose was given until 9/24/21. The weight declined from 235 to 226 and the doctor decreased the furosemide to a 40 mg daily dose. On 10/4/21 the patient wanted to stop furosemide and the doctor noted further weight loss to 220 pounds and the doctor decreased furosemide to 20 mg.

After this date nurses continued to weigh the patient but providers did not monitor the weights consistently and heart failure was not monitored adequately. On 11/2/21 a nurse practitioner saw the patient who was concerned about "fluid" and apparent weight loss but the weight was 236 which the nurse practitioner documented as "stable". The nurse practitioner did not examine the heart or lungs nor was the patient examined for edema which appeared to be the patient's complaint. The patient was gaining weight (having been 220 pound on 10/4/21) but the weight gain was unnoticed and there was no monitoring for heart failure. An increase of the furosemide would have been appropriate.

At a 12/5/21 chronic clinic visit the patient wasn't monitored for heart failure and though the patient was documented with 1+ edema there was no change in diuretic dosage. Though atrial fibrillation and anemia can complicate and worsen heart failure, these problems were also not addressed in this chronic care visit. From 10/4/21, when the diuretic dose was decreased, on through December the patient steadily gained weight from 220 pounds on 10/4/21 to 248 pounds on 12/31/21 or a gain of 28 pounds or about 10 pounds a month. On 1/1/21, nurses saw the patient for shortness of breath and the patient was sent to a hospital where heart failure with pleural effusion were diagnosed. This 3rd potentially preventable hospitalization draws attention to the lack of monitoring, including symptoms and examination findings, for heart failure.

The patient was discharged from the hospital on 1/5/22 but was not evaluated by a provider through the entire remainder of the month of January. The hospital discharge recommendation included furosemide but only on an as needed basis (20 mg as needed for weight gain of 3 pounds in a day or 5 pounds in a week). It appeared that the regular dosing of diuretic was not included because prior to discharge at the hospital the patient was on 40 mg twice a day of furosemide. This appeared to be an error of transcription in the hospital record. In any case, a provider should have noticed this error in the significant dosage reduction in a patient with repeated hospitalizations for heart failure and made an adjustment. This did not occur because a physician did not see the patient for a month post-hospitalization. This evidences the lack of physician coverage at this facility.

There were no physician orders in the Dixon medical record we received, but the medication administration record for January 2022 for furosemide was handwritten by a nurse for 20 mg daily as needed for weight gain of 3 pounds in a day or 5 pounds in a week. A provider evaluation might have picked up this apparent error in a patient with three prior admissions for heart failure, but no progress notes could be found for January and apparently the patient was not seen post hospitalization as is required by IDOC policy. During January, the patient's weight steadily

increased from 242 to 252 pounds. A thoracic spine x-ray was reported on 1/11/22, about a week after discharge from the hospital for acute heart failure, which was ordered for a history of congestive heart failure[15]. The radiologist's reading was enlarged heart with haziness which might indicate congestive heart failure. Underlying pneumonia and pleural effusion couldn't be excluded and a repeat film was recommended. It appeared that more diuretic was indicated but was not provided. There was no progress note that documented review of this x-ray and there was no progress note documenting a plan of action although the x-ray was initialed as reviewed on 1/12/22.

The patient remained on an "as needed" diuretic dose of 20 mg for a weight gain of three pounds in a day or five pounds in a week. About a month post-hospitalization, on 2/1/22, a nurse practitioner saw the patient for a post-hospitalization visit for heart failure. The patient was complaining of increasing shortness of breath and had received a single dose of furosemide for weight gain that day. The nurse practitioner did not take further history of the shortness of breath nor was a review of systems for heart failure completed. The patient had peripheral edema but vital signs were not even obtained. No further diuretic was ordered. The nurse practitioner ordered a chest x-ray but did not order any furosemide stating that the patient had already received a stat dose of 20 mg of furosemide. A prompt evaluation should have been undertaken or the patient should have been advanced to a higher level of care (an emergency room) but was not. This was inappropriate and unsafe clinical care. The x-ray was taken 2/1/22 but was not read until 2/5/22 and was not received or reviewed until 2/18/22. The film showed a moderate loculated pleural effusion with associated possible infiltrate. The patient was again evaluated for a complaint of shortness of breath on 2/4/22 and documented weight gain. Only two days of furosemide were ordered. On 2/9/22 a nurse saw the patient who asked about a pulmonary appointment in follow up of his pleural effusion at the recent hospitalization. The nurse documented that the patient complained of shortness of breath on exertion. The nurse documented that with activities of daily living, the oxygen saturation would drop to 84-89% but at rest goes up to 90%. The nurse didn't call a doctor. This degree of hypoxia is a red-flag that should have prompted immediate evaluation by a provider or hospitalization.

On 2/16/22 the patient went for a pulmonary appointment but was admitted directly to the hospital for hypoxemia (oxygen saturation of 86%) and shortness of breath. The hospital diagnoses were heart failure, pleural effusion, deep vein thrombosis and probable pulmonary embolism. This whole sequence of clinical encounters after the 1/5/22 hospitalization evidenced an inability to assess a set of changing clinical events that were not appropriately addressed resulting in a 4th consecutive hospitalization. If appropriate monitoring and diuretic therapy had been provided, this hospitalization would have been preventable.

On return from the hospital, on 2/18/22, the patient was started on daily furosemide as recommended. The hospitalist made a comment in the progress note that the furosemide should not be prn (as needed) confirming that regular doses of furosemide should be given. On 3/4/22 the oxygen saturation was 83% and the nurse called a physician who ordered that the oxygen be kept above 90% without any direction on how to do that. This was a red-flag desaturation and the patient should have been admitted to a hospital or at least immediately evaluated in person and

---

[15] This was an unusual x-ray for the stated history. Also, there was no associated progress note so the thinking of the ordering physician was unclear.

monitored on the infirmary. On 3/6/22 a nurse thought the patient was jaundiced and another nurse did an evaluation. The BP was 96/62 and the oxygen saturation was 82% on four liters of oxygen. It decreased to 76%. The nurse called a physician but no change in therapy was ordered and the nurse documented that the patient was to return to sick call for worsening symptoms. This was a red-flag desaturation and the patient should have been sent to a hospital. About an hour later the patient didn't improve. Another call was made to a doctor and the patient was finally sent to a hospital.

At the hospital, the hemoglobin was 6.2 and hemoccult was positive. The patient was hospitalized from 3/6/22 to 3/10/22. An upper endoscopy was done which showed gastritis which insufficient to account for the degree of anemia. A colonoscopy was offered but the patient refused. The patient received a transfusion of three units of blood. Another doppler study showed no thrombosis in the legs. On 3/9/22, the patient was obtunded and only minimally responsive. The progress note documented that the patient was unable to provide any meaningful history. Before and after this date the patient appeared responsive. The discharge summary documented that the POLST was changed from DNR with selective treatment to comfort focused treatment. On 3/10/22, the patient signed the POLST.

Two days after discharge from the hospital, a physician saw the patient and discussed the recent POLST. The doctor wrote that "I spoke [with] him today. No CPR or intubation. Continue meds/ labs as needed. If he gets worse, he would want to be sent out again 1 more time if needed". This implied a different level of care from what was represented on the POLST statement which stated,

> **Comfort-Focused Treatment: Primary goal of maximizing comfort**. Relieve pain and suffering through the use of medication by any route as needed; use oxygen, suctioning and manual treatment of airway obstruction. Do not use treatments listed in Full and Selective Treatment unless consistent with comfort goal. **Request transfer to hospital only if comfort needs cannot be met in current location.**

In the assessment the physician assessed anemia, presumed lower gastrointestinal bleed, pleural effusion, heart failure, history of DVT/PE off anticoagulation, and dementia. Given that the patient had dementia of an undocumented stage and had never received a cognitive test, a formal assessment of his cognitive status should have been done and the POLST should have included a more formal questionnaire to ensure that the wishes of the patient were observed or a guardian should have been identified.

The therapeutic plan of the patient didn't appear to change with the new designation of comfort care and the outcomes did not change. From 3/10/22 until his death on 6/30/22 the patient had four falls, a little more than one a month or slightly more than the average of 0.83 fall per month from 7/1/20 until 6/30/22, the period of time in the medical record we received for review. The patient continued to have anasarca with a swollen penis. The patient remained on only a daily dose of diuretic through March and April. In May twice a day dosing was given for about half the month but in June dosing returned to once daily but the patient refused about half of his medication and was not offered medication on three days. There was no documented discussion by a provider with the patient about reasons for refusing medication. On 5/10/22 a nurse practitioner noted weight gain and increased edema with tachycardia and sent the patient to an emergency room. At

the emergency room, the edema was suspected to be due to heart failure. IV furosemide was administered with a recommendation to see a cardiologist as soon as possible. The patient was referred and approved for UIC cardiology but the appointment was not completed.

A chronic care visit on 4/6/22 included little history except that the patient had no seizures, no concerns, and had "dementia to a point" which was an unclear diagnosis. The patient was documented as seen for diabetes, hypertension, seizures, and high blood lipids. There was no mention of recent hospitalizations nor was the patient evaluated for his heart failure, anemia, pleural effusion, end-of-life issues, or atrial fibrillation that caused the recent hospitalizations. Though the heart failure had resulted in anasarca, there was no mention of an attempt to ameliorate it to make the patient more comfortable. There was no questioning about pain or anxiety. There was no mention of the recent POLST. There was no documentation of the current status of the patient which included two recent falls, anasarca with excoriations around the testicles, and two decubitus ulcers on the buttocks. Aside from documenting vital signs there was no examination. Chronic care is clearly broken at this facility for persons with complex disease.

<u>Specialty Care</u>
The patient was not provided all necessary specialty referral or referral was not timely. Follow up was poor. On 8/29/20 a physician documented that the patient had a gait disturbance. Since the patient had history of falls, it would have been appropriate to refer the patient to physical therapy for a gait evaluation which was not done. The patient had normal pressure hydrocephalus identified on a 12/23/20 CT scan and clinical correlation was advised. A physician should have evaluated whether neurology or neurosurgical consultation was indicated but this was not done. After a 1/21/21 hospitalization, skilled physical therapy with a gait assessment was recommended. The gait assessment wasn't completed and only limited physical therapy was provided. During an 8/25/21 hospitalization, a cardiologist recommended UIC follow up for consideration for a Watchman device and the gastroenterologist recommended lower endoscopies at UIC in the future. Neither referral was made. On 1/1/22, the patient was hospitalized with discharge recommendations for pulmonary follow up in one to two weeks and follow up at UIC for colonoscopy. The UIC referral was not made and the pulmonary follow up was scheduled for six weeks instead of one to two weeks. When the patient showed for his pulmonary consultation, he was immediately referred to the emergency room because of extremely low oxygen saturation (86%) and shortness of breath. After a 2/16/22 hospitalization, a two to four week follow up with pulmonary was recommended but a referral was not made. At a 5/10/22 emergency room visit for anasarca due to heart failure, the ER provider gave IV furosemide and recommended "close follow up with cardiology". The consultation was approved but as of 6/30/22, when the patient died almost two months later, the appointment was not completed. Given the failure of the providers to control the patient's heart failure, this referral could have been timelier especially since they were not monitoring the heart failure well.

Many of these appointment may have been unnecessary depending on the POLST and desires of the patient but, as discussed, the POLST was not obtained timely or before dementia occurred and IDOC did not take responsibility that someone made an informed decision about specialty work up for the patient.

<u>Miscellaneous</u>

- On 12/23/20, the patient fell and was sent to an emergency room. A CT scan of the brain showed ventricle dilation consistent with normal pressure hydrocephalus and clinical correlation was recommended. This was not done upon return to the facility. On two subsequent occasions, CT scans were done in the hospital showing normal pressure hydrocephalus. No clinical correlation was done by Dixon providers. This condition is associated with dementia and gait abnormalities but the patient failed to have evaluation of this abnormality and it was just ignored.

- During an 8/25/21 hospitalization, this patient with dementia was documented as having no teeth. There was no evidence over the two years of medical records provided that the patient saw a dentist to evaluate whether dentures were appropriate. Nor was any nutritional assessment done to assess if the patient's diet was appropriate and whether he could eat it.

- On 7/18/21 a bottle with what the patient thought was Mountain Dew was on the patient's night stand **in the infirmary** and he drank it and it tasted like cleaning fluid and the nurse noted that about 18 ounces of liquid was in a Mountain Dew bottle and it smelled like bleach. The patient had dry heaves and took a Prilosec and the nurse encouraged him to drink water. A nurse practitioner saw the patient but did not attempt to identify what was in the bottle. Housekeeping was not notified to attempt an identification of what was in the bottle. Poison control was not notified. This patient had been previously assessed with dementia so cleaning fluids should not be kept in a soda bottle on his night stand. Once the incident occurred, staff should have determined what was in the bottle and poison control should have been notified. An incident report should have been written. This is a patient safety issue.

- The patient had chronic hyponatremia intermittently for the two years of record review. Including during three hospitalizations. There were 11 documented episodes of mild hyponatremia. Yet it was not acknowledged as a problem and never worked up. There are reports of hyponatremia being associated with normal pressure hydrocephalus but this was not investigated. Also, the patient was on sertraline, an antidepressant, which can result in hyponatremia but this was never evaluated. Because of the chronicity of the hyponatremia, it should have been evaluated. It was not an urgent or emergent issue.

- The patient had anemia for the entire period of record review. Later in the course of incarceration, a positive occult blood test was obtained on two occasions when hospitalized. The hospital recommended referral to UIC for upper and lower endoscopy but the prison providers did not initiate a workup for the anemia and gastrointestinal bleeding and it was not monitored as a medical condition. The patient was 82 and had dementia. Was a work up indicated? This should have been considered but the anemia was just ignored, giving the impression of failing to evaluate an abnormality.

- The record sent for review contained no physician orders so it was not possible to verify prescriptions. Also, mental health notes were not included in the record sent. This was significant with respect to evaluating the patients ability to provide informed consent.

- On 1/21/21 and 7/21/21 to 7/25/21, 8/24/21 to 8/27/21, 1/2/22 to 1/5/22, 2/16/22 to 2/18/22, and 3/6/12 to 3/10/22 the patient was hospitalized. The medication administration records for these dates included an initial which was circled. We understood the circle to indicate a refusal but the patient could not have refused as the patient was hospitalized. When discussing this with the HCUA during a site visit to Dixon, the HCUA stated that a circle

71

means to see the back of the medication administration sheet which was not provided to us in the scanned record. At other sites, a circle is used to indicate refusal. There is no standardized procedure we are aware of to describe expected nursing documentation on the medication administration record.

- On 3/25/22, a CNA documented that the patient received a bath with assistance of a hospice worker. Inmate workers should not be engaged in bathing immobile patients. This reflects the lack of staffing at this facility.

Opportunities for Improvement

1. The annual health evaluation for persons over 65 or those who demonstrate frailty or severe disability should include screening for risks including:
   a. Visual impairment -Snellen test
   b. Hearing loss – whisper test or screening audiometry
   c. Malnutrition – Body mass index and history of ability to eat
   d. Polypharmacy – Review medication with pharmacist to ensure medications are necessary, do not increase risks to elderly, and are being used and provided as ordered
   e. Osteoporosis – assess fracture risk
   f. Urinary incontinence – history and further testing as indicated
   g. Cognitive impairment – Mini-Cog or Mini-Mental State Examination
   h. Depression – Patient Health Questionnaire Nine Item
2. IDOC needs a policy and procedure with implementation for diagnosing and monitoring dementia. It also appears that dementia is not diagnosed using formal assessment of cognitive capacity. Dementia should be considered a chronic illness but it is not in IDOC.
3. End-of-life directives should be documented earlier in life and prior to development of dementia. End-of-life directive should be instituted to inform staff of the extent of intervention that the patient desires. This did not occur for this patient. IDOC needs policy and procedure with implementation for how and when to obtain a POLST including for those with dementia. In general, a POLST should be obtained prior to development of dementia and communication with next of kin should be established. A formal evaluation of capacity to make an informed decision regarding end-of-life decisions with formatted questions is suggested for those with dementia. The policy should include a procedure for how to assign a guardian for those who lack capacity to make an informed medical decision. It appears that current practice is to obtain "DNR" and POLST without knowing the capacity of the patient to give informed consent. Documentation of the discussion with the patient currently does not describe the capacity of the patient.
4. IDOC needs policy and procedure with implementation of a functional status assessment for the elderly. All elderly persons on the infirmary should have a functional status evaluation. RNs should complete a comprehensive assessment of the patient, which can include the functional status. Physical or occupational therapists may also complete the functional status assessment or, at a minimum, should contribute to the assessment. The functional assessment should be the basis for the nursing plan of care and should be developed in concert with the physician. Functional status should be periodically revised for permanent infirmary patients.

5. Frail adults need mobility assessments that include gait, balance, strength, fall risk pegged to the environment that the inmate lives in. This is performed in hospitals by a physical therapist but IDOC should determine how this is to occur[16].

6. This patient had 20 falls for which there was no prevention plan. IDOC needs policy and procedure implemented for fall prevention. Fall prevention should include cognitive and functional assessment; medication review; gait, mobility, and balance evaluation; visual and hearing assessment; cognitive assessment; muscle strength; evaluation for postural hypotension or any heart arrhythmia, foot and footwear issues and environmental hazards in the housing unit. Any problems identified in these categories should be addressed as part of the prevention plan.

7. Problem lists still do not include all of the patient's medical problems and a root cause analysis should be done to determine why this is still a problem.

8. IDOC still does not have a policy for infirmary care that explains the scope of infirmary services. This patient appeared to have needs that were not met on the infirmary that IDOC needs to improve including:

    a. Develop fall prevention standards and protocols

    b. Ensure physical therapy services are available for infirmary patients and ensure that bed-bound patients receive restorative therapy to prevent contractures.

    c. Develop a functional assessment protocol to identify assistance patients will need on in-patient units to overcome functional deficiencies

    d. Improve provider and nurse collaboration and consider combined rounds

    e. Ensure that all chronic diseases are managed and monitored on the infirmary. IDOC should consider that for chronic or permanent infirmary patients, that their chronic care needs are met by the infirmary providers.

    f. Improve pressure wound prevention and care to include involvement of providers.

    g. Develop for infirmaries a standard for nursing plans of care and for how the care plan is to be developed and documented.

    h. Standardize nursing documentation for flow sheets and ensure that it is synchronized with the nursing plan of care and with the functional status of the patient.

    i. Ensure that certified nurse assistants, including at Dixon, are supervised by a registered nurse.

    j. Medical care on this infirmary should be provided by a physician.

    k. Provider progress notes need to track and monitor all of the patient's medical conditions. The intervals of notes should be reconsidered and based on the clinical status of the patient. The acuity scale related to notes should be re-visited. Blanket three-times-a-week note requirements for all "acute" patients and once a week for "chronic" patients fosters meaningless episodic notes. This area deserves a root cause analysis. The assessment and plan sections of the note should give the present therapeutic plan for the patient.

9. *All* chronic care problems should be monitored in chronic clinics. On infirmary units, the infirmary physician should monitor all chronic care problems of the patient. A process analysis of the chronic care programs should be initiated to develop a safer way to manage chronic illnesses.

---

[16] Registered nurses in community or home health settings may perform mobility assessments, typically with advice and consultation with a physical therapist.

10. The chronic care form should be revised or discarded, especially with respect to implementation of the new electronic record.

11. At the Dixon facility additional physician coverage is critically necessary so that a physician can cover the infirmary and another can manage chronic disease patients. Supervision of nurse practitioners is needed as soon as possible.

12. UpToDate should be available in all clinical examination rooms and at nursing stations so that standard of care practices can be reviewed.

13. Each facility should track the percent of consultation and specialty care written reports that are obtained and report this through their CQI program.

14. IDOC must find an alternative to UIC consultation for outpatient specialty care for Dixon patients so that consultations are not delayed. The Monitor suggests using local providers and telemedicine consultations.

15. Nurse practitioners providing medical care must utilize medical diagnoses and not nursing diagnoses.

16. Red-flag vital signs or presentations (e.g., low oxygen saturation, abnormal vital signs, acute emergency presentations such as acute abdominal pain, vomiting, back pain with incontinence, etc.) should be tracked, evaluated to assess whether disposition was appropriate, and presented as aggregate data in CQI meetings.

17. Dixon must fill its dentist position.

18. This patient's record documented that a hospice worker bathed an immobile patient with dementia. These types of patient services must be performed by health care staff not inmates.

19. Housekeeping needs to maintain track of its inventory and every container used by housekeeping must be appropriately labeled and the material data sheet needs to be kept on file. Any accidental ingestion or misuse of a cleaning substance must be reported with appropriate evaluation by medical staff and appropriate contact with poison control.

20. All IDOC facilities need to establish standardized policy and procedure on how medication administration is to be conducted and documented to include a practice of contemporaneous documentation of medication administration.

## Patient 14

Facility: Stateville
Date of Death: 2/22/22
Cause of Death: Heart failure

Two years of medical record were requested but only approximately six months of record were sent. It appeared that the patient spent a part of those six months in the hospital. Hospital records during the time period from October 2021 through February 2022 were not included. This record demonstrates significantly disorganized medical record keeping. Because onsite providers did not document all of the patient's medical problems and offsite specialty consultants and hospital notes were not present it was not possible to determine the therapeutic plan for the patient nor what precisely was happening to the patient.

There were only six months of medication administration records and these appeared incomplete and did not appear to include all of the patient's medications.

74

The problem list for this 54 year-old patient was inaccurate. It documented atrial fibrillation, hypothyroidism and prior ventricular tachycardia requiring a life-vest. The patient also had heart failure, cardiomyopathy, deep vein thrombosis, hypertension, and diabetes.

The Data Base documented no offers of influenza vaccination since 2015 and no evidence of whether the patient was up to date with vaccinations. There was no evidence of colorectal cancer screening.

There were a series of five electrocardiograms (EKG) that were abnormal dating from 10/14/21 to 11/17/21. One of the EKGs from 10/14/21 included a comment that the patient was sent to a hospital. There were no associated progress notes and no hospital report accompanying these EKGs. There were physician verbal orders sending the patient to a local hospital on 10/14/21, 11/14/21 and 11/17/21. There were no progress notes from either nurses or providers associated with sending the patient to the hospital. There were no hospital reports for any of these hospitalizations.

Because there were no hospital or specialty consultation reports, the problems and therapeutic plan were unclear. Onsite providers failed to document a list of all of his problems with an associated therapeutic plan for each problem. During this period of time, there was no Medical Director and the additional physician position was also vacant; only coverage physicians were available. This led to lack of effective monitoring of the patient.

The first progress note was from 12/7/21 (approximately three months before he died) and was a nurse infirmary admission note. It documented that the patient was wearing a life-vest[17]. This nursing note did not document the patient's problems and the only plan was that the patient was to wear a life-vest. A subsequent nurse note documented that the patient was just discharged from the hospital with heart failure exacerbation, acute kidney injury, and cardiorenal syndrome. The physician admission note the following day did not document the patient's problems except for malignant cardiac arrythmias. The doctor noted that the patient was wearing a life-vest to determine if he was a candidate for an implantable defibrillator. The patient's medical problems were not all documented and the plan of care was not inclusive of all of the patient's documented problems. The recent hospitalization was not summarized. The plan of care was to wear the life-vest, weigh the patient weekly, restrict fluid to 2 liters a day follow up with cardiology, and refer the patient to mental health to evaluate for depression. The date of follow up was unclear. Medications weren't listed except for acetaminophen. The discharge summary from the recent hospitalization was not present and not documented as reviewed. The provider progress notes do not include all of the patient's problems and do not inform regarding all diagnoses made at the hospital. As a result, only episodic care was provided.

A progress note by a nurse practitioner on 12/10/21 was equally uninformative. The patient complained of chest pain and constipation. There was no history taken of the chest pain. The patient said he was being treated for a stomach infection. Indeed, the patient was on clarithromycin, amoxicillin, and metronidazole along with Carafate and pantoprazole which suggests treatment for helicobacter pylori but the nurse practitioner did not mention that the patient

---

[17] A life-vest is a wearable vest that is a defibrillator.

had peptic ulcer disease, gastritis, or helicobacter infection. No diagnoses were documented. The only assessment was "acute medical" and the nurse practitioner ordered Colace, senna, and magnesium citrate. There was no evaluation of the chest pain and the therapeutic plan did not document all of the patient's problems.

Another nurse practitioner note on 12/13/21 failed to include vital signs. The patient complained of swollen legs. The patient was not short of breath. The patient's heart and lungs were documented as normal and the assessment was only "acute medical". This was not an appropriate assessment. Laboratory tests and a chest x-ray were ordered. The chest x-ray was documented as done on 12/17/21 but the report was not returned until 12/21/21 and was not reviewed; it showed a right pleural effusion and marked enlarged heart. The laboratory tests were reported 12/20/21 and included multiple abnormalities including that the patient had significant liver abnormalities (bilirubin 4.7; alkaline phosphatase 134; ALT 63; and AST 46); new onset diabetes (A1c 7.7); chronic kidney disease (creatinine 1.63); and hypothyroidism (TSH 6.69). There was no documented evidence of review of these abnormalities.

A nurse practitioner saw the patient on 12/21/21 and noted edema of the extremities and gave a stat only dose of zaroxolyn and ordered daily weights. None of the laboratory tests nor the chest x-ray were evaluated.

On 12/27/21 a nurse practitioner saw the patient for fatigue. Vital signs were not obtained. The prior abnormal laboratory results were not documented as reviewed. The assessment of the patient was "acute medical nonadherence to treatment". The nurse practitioner documented that the thyroid levels would be retested after starting treatment. Levothyroxine was started. This appears to indicate that the thyroid test was reviewed but there was no documentation of the review. None of the other abnormal laboratory tests nor the chest x-ray were documented as reviewed. None of the patients other problems were evaluated.

On 12/28/21 the patient asked a nurse for oxygen because he had to sit up to breathe and had difficulty breathing lying down. The nurse obtained a phone order for oxygen. On 12/29/21 the patient asked a nurse to send him to a hospital. The nurse noted edema but no shortness of breath. The nurse called a doctor who said hospitalization was not indicated and the patient needed outpatient follow up at UIC. The following day, a doctor saw the patient who was described as having facial, hand and leg edema with a ten pound weight gain in a week with low blood pressure (96/63). The doctor sent the patient to a hospital. The contract ambulance was unavailable and 911 was called and the patient was sent to a local hospital.

The patient remained hospitalized for about three weeks and returned to Stateville on 1/21/21 and was admitted to the infirmary. A hospital discharge summary was not in the medical record; only patient discharge instructions. A nurse documented that the patient was seen for heart failure and thoracentesis with pleural effusion. A provider was not available and the patient wasn't evaluated by a provider on return from the hospital on 1/21/22. Medication was documented as starting 1/22/22, the day after return from the hospital but the patient continued to refuse medication. *__On 1/23/22 the patient was unresponsive with altered mental status. A nurse documented that there was no provider onsite and the on-call provider did not respond so the nurse sent the patient to a hospital.__*

Parts of the hospital record from the 1/23/22 hospitalization were available and indicated an echocardiogram with an ejection fraction of only 15% which is very low and indicated severe heart failure. The cause of the altered mental status was not discovered. A CT of the brain showed no intracranial bleed or mass effect. There was increased white matter consistent with mild to moderate "advanced age". The discharge summary documented that during the prior hospitalization the patient had a defibrillator placed, had a large parapneumonic[18] pleural effusion drained, and the patient received ablation for his atrial fibrillation during an October hospitalization. The patient had significant functional deficiencies. He was only able to walk about 12 feet with assistance. He required assistance for self-care. He was referred to Schwab Rehabilitation Institute with a discharge goal of 7-10 days. The patient was discharged on 1/31/22 to the rehabilitation hospital and then transferred to UIC hospital. There were no hospital records from either facility. It wasn't clear what happened to the patient. He died on 2/22/22 at UIC hospital.

Opportunities for Improvement

1. The medical record was disorganized and incomplete. Only three months of the record were present. Hospital reports for multiple hospitalizations were not present. Medication records were missing. This facility should have its medical record program evaluated and corrected.

2. There was no physician at this facility and it appeared that two nurse practitioners were managing the entire facility with occasional coverage physician assistance. This is dangerous. IDOC must provide access to a physician.

3. On 1/23/22, a nurse sent the patient to a hospital because there was no physician onsite and the on-call physician did not respond and the patient was unresponsive. The nurse acted appropriately but there was no available physician. IDOC needs to ensure that sufficient physicians are available to address onsite and on-call physician responsibilities.

4. There was not a single provider progress note provided in this medical record that documented all of the patient's problems with the associated therapeutic plan. The nurse practitioners were not monitoring all of the patient's problems and did not appreciate what had occurred during multiple hospitalizations nor what the therapeutic plan was for the patient.

5. On 12/13/21 a chest x-ray and laboratory tests were ordered. The x-ray report wasn't available for over a week and was abnormal but was not reviewed. The laboratory tests were also abnormal and showed new onset diabetes, significant liver abnormalities, and abnormal thyroid function. These laboratory results were not documented as reviewed. This may be due to lack of provider staff which emphasizes the danger with insufficient provider staff.

6. This facility appears disorganized and does not appear safe. IDOC should promptly evaluate whether it is safe for patients.

---

[18] Parapneumonic effusions are collections of fluid in the space lining the lungs that is due to pneumonia.

Patient 15
    Facility: Danville
    Date of Death: 4/7/22
    Cause of Death: Stage 4 Germ Cell Cancer, gastric perforation

This 61 year old man had a problem list that included stage III COPD, asthma and hypertension. This list was inaccurate as the patient also had anemia and high blood lipids. The anemia was not monitored.

Though the patient was 61 years old and had anemia there was no evidence of a colonoscopy. The Data Base had no information about his vaccinations or cancer screenings. Given his age he should have been screened for colon cancer. The patient had a 50 pack-year smoking history but was not referred for lung cancer screening. The intake immunization history documented he was not up to date for any of his immunizations but no vaccinations were ordered.

The patient was incarcerated on 8/17/21 and had intake screening at NRC. He was on prednisone at intake and it was continued for three days but he was not asked why he was taking prednisone. The physician performing the intake assessment did not take a history of the COPD but did note a recent (8/5/21) exacerbation but gave no details. Though the intake physician documented uncertainty about the COPD, spirometry was not ordered to clarify the status of this disease. Though atorvastatin was continued, high blood lipids were not identified as a problem. The history form documented that the patient received the first COVID vaccine and needed a 2nd dose but there was no evidence we could find that he received a 2nd dose.

Eleven days after admission, on 8/28/21, the patient experienced wheezing and hypoxemia (oxygen saturation of 89%) and a nurse contacted a physician who admitted the patient to the infirmary. On 9/1/21 a physician saw the patient and noted that the patient had daytime somnolence and reported the patient saying that others said he snored. The doctor ordered a sleep study. Also, because of the severity of his COPD a baseline pulmonary function test or spirometry should have been done but was not.

On 9/23/21 blood tests showed anemia (hemoglobin 12.2) but there was no follow up and though the patient was 61 years old colonoscopy was not ordered.

On 10/1/21 the patient was transferred back to general population. The oxygen saturation two days earlier was only 90% which is still low. The doctor wrote that he was discharging the patient without an examination because an ADA bed was needed for another patient. The lack of infirmary bed space is an issue. This is inappropriate. When IDOC has insufficient space to appropriately house patients, they should be sent to an alternate facility with capacity to provide the appropriate level of care.

On 10/28/21 the patient transferred from NRC to Danville. At the time of his transfer, he had a pending specialty referral for a sleep study. There is no documentation to determine whether a hold had been placed nor was there was any person to person contact between the sending and receiving facility about the pending referral. There was no evidence on the specialty log that the referral was documented but the doctor at NRC repeatedly documented that the study was pending.

The transfer summary failed to note that he had been discharged from the infirmary earlier in the month after a stay of 33 days for difficulty breathing. He was on 10 medications at the time of transfer, of which only three were "Keep on Person". Medications were not listed on the transfer summary, but the statement "See MAR" was, so presumably the MAR was transferred as well. All these medications with the exception of albuterol solution used with a nebulizer were transcribed correctly to MARS for October 28-31, 2021. Documentation on Danville's MARS indicate that except for one dose of atorvastatin on 10/31/2021, he received none of the seven medications which had been administered dose by dose when at the sending facility. The patient had been issued enough albuterol solution at NRC to use with his nebulizer until 10/30/2021. The MAR at Danville for the following month (November 2021) changed the seven medications which had been administered dose by dose to "Keep on Person". There is no documentation that the patient's ability to be responsible for taking these medications was assessed nor did he receive any education to ensure that he knew when and how to take them. Two inhalers were discontinued and two new inhalers had been prescribed by the provider. There is no documentation that the discontinued inhalers were obtained from the patient when the new inhalers were issued to the patient on 11/4/2021.

The patient had two chronic clinic visits (10/4/21 and 12/1/21). At the 10/4/21 visit, no history was documented. The form documented that the patient was seen for asthma, COPD (stage III), and hypertension. The patient was on four medications for his COPD (three inhalers and montelukast) and yet was diagnosed with mild persistent asthma despite apparently having COPD not asthma. Peak expiratory flow rates of 200 and 220 would have been inconsistent with mild persistent asthma and are not typically used in determining status of COPD. IDOC providers describe asthma and COPD as if they are interchangeable which they are not. This creates not only confusion but is clinically misleading. Also, the room air oxygen saturation was 97% which for good for COPD. Nevertheless, the patient was started on prednisone without a clear indication. The basis for starting prednisone was not documented; prednisone would not be used for mild persistent asthma. The doctor did not order a pulmonary function test which is the basis for evaluation of COPD. There was no evaluation of his high blood lipids. Vaccinations were not updated.

A brief history was taken in the 12/1/21 chronic clinic visit. The patient was described as taking his medication which were working well. The doctor reviewed labs and noted numerous abnormalities in the blood count. The last laboratory tests were on 9/23/21 and showed anemia. This should have resulted in referral for colonoscopy which did not occur. The patient was 61 years old and was documented as having a greater than 50 pack-year smoking history. However, lung cancer screening was not done. The glucose was elevated (155) on the 9/23/21 laboratory tests but follow up A1c testing or glucose testing was not done. The patient lost 17 pounds over three months but this wasn't noticed. There were no assessments of any of the patient's conditions, abnormal laboratory tests were not followed up, lung cancer screening, colonoscopy, and pulmonary function testing weren't ordered, and significant weight loss was unrecognized.

On 12/3/21 a nurse saw the patient for nausea, vomiting and shortness of breath. The nurse gave the patient a nebulization treatment though we could not find a  prescription for this. The nurse was acting out of the scope of her license. A provider was not contacted.

On 2/22/22, a nurse saw the patient for back pain. Weight was taken and was 173 or a 31 pound weight loss which was unrecognized. On 3/8/22, a doctor evaluated that patient for abdominal pain and was admitted to a hospital. At the hospital they noted unintentional weight loss and abdominal pain. A CT scan showed lymphadenopathy consistent with lymphoma. The final tissue diagnosis was not present in the medical record. The patient did follow up with oncology but on 3/30/22, the patient became hypotensive and hypoxemic and was sent to the hospital and died at the hospital on 4/7/22.

Opportunities for Improvement
1. The problem list continues to be problematic. This should be corrected when IDOC initiates changes to the chronic care program.
2. The Data Base failed to include vaccination and cancer screening information. IDOC should include whether patients are appropriately screened or not screened.
3. The patient was 61 years old with anemia, yet was not screened for colon cancer. IDOC needs to implement its policy on immunization and cancer screening.
4. The patient was 61 years old and was a 50 pack-year smoker. He should have had lung cancer screening with low dose CT scanning. IDOC needs to implement its policy on immunization and cancer screening.
5. The intake immunization history documented that the patient was not up to date on vaccinations. IDOC needs to implement changes to implement its policy on immunization and cancer screening.
6. The patient had advanced COPD, yet he failed to obtain pulmonary function testing which is considered a basis for managing COPD. IDOC should engage providers in training on this issue and monitor care to ensure recommended practices in care of COPD patients takes place.
7. The patient failed to obtain his 2nd COVID vaccine. This should be investigated.
8. A physician referred the patient appropriately for a sleep study on 9/1/21 but there was no evidence that the patient was scheduled for this appointment. The specialty log did not include this referral. IDOC should initiate a process analysis of specialty care to evaluate why patients don't get their ordered specialty care.
9. The patient had anemia but this abnormal blood test was not followed up. IDOC should evaluate why this occurred.
10. On 10/1/21, the patient was discharged from the infirmary to general population because there were no available infirmary beds and a bed was needed for a disabled patient. IDOC should engage a consultant to evaluate the elderly and disabled including related to their appropriate housing. This patient should have been sent to another infirmary or to a skilled nursing unit.
11. The patient transferred from NRC to Danville and the transfer information failed to include his referral for a sleep study. There was no hold placed on his transfer pending the study. The patient's medications were changed to keep-on-person without assessing whether the patient understood how to take his medication.
12. Chronic clinic visits continue to be less than adequate. Histories are not consistently taken. Not all diseases are monitored. Assessments were not appropriate. Therapeutic plans for this patient were inadequate, specifically related to COPD. Vaccinations were not updated. IDOC needs a process analysis of the chronic care program.

13. The patient had unintentional weight loss over multiple months which was unrecognized. IDOC should evaluate why this occurs and take corrective action.
14. On 12/3/21, a nurse gave a nebulization treatment when there was no order for this medication. This was outside the scope of the nurse's license and she should be notified of this and counseled.

## Patient 16

Facility: Danville
Date of Death: 2/20/22
Cause of Death: Hepatocellular carcinoma

His problem list documented hypertension, seizures, and hepatitis C infection but was incomplete as the patient also had chronic kidney disease and hepatocellular carcinoma.

He was 63 years old. His Data Base contained no information about cancer screening or vaccination status. His intake screening at NRC was 1/30/20. Initial blood work reported on 1/31/20 showed a creatinine of 1.73 consistent with chronic kidney disease, the serum protein was elevated to 8.5 (normal 6-8). Hepatitis C was positive. Though the intake was at NRC there were no subsequent progress notes at NRC for follow up of any abnormal labs, except a repeat metabolic panel was ordered.

The patient was transferred to Danville but there was no intrasystem transfer form completed. The date of transfer is not evident in the record. On 2/10/20, ten days after incarceration, the patient received a suicide screening at Danville.

Follow up laboratory tests were ordered at Danville. The creatinine was still elevated at 1.91 and hepatitis A and B tests were positive for the antibody but the hepatitis B antigen was negative. Initially, there was no follow up of the hepatitis C to determine fibrosis level. There was no follow up of the kidney disease and a work up of this was not pursued.

The first chronic clinic at Danville was 3/19/20. The history was no chest pain, shortness of breath or dizziness. The patient was documented as not having a pneumococcal vaccine but he was not offered vaccination. The creatinine was 1.9. The blood pressure was 112/71 . The doctor did note that the zestoretic might have to be monitored due to elevated creatinine and the creatinine was repeated. The chronic kidney disease was documented as a problem but not entered on the problem list and the etiology of the kidney disease was not investigated; it was attributed to his medication but the medication was not changed. There was no evaluation of the elevated serum protein. The hepatitis C infection was not addressed as a chronic illness and the fibrosis level was not determined.

A second chronic clinic was conducted via telemedicine on 6/26/20 and the patient wasn't examined; nor was a history taken. This was during the height of the COVID pandemic. Laboratory test results showed continued elevated creatinine on 5/26/20 (1.97) consistent with chronic kidney disease. The test was repeated on 6/15/20; creatinine was 1.62 with GFR of 44. This was not worked up. The provider evaluating the patient documented that the sick call provider should follow up on the elevated creatinine, but this never occurred. The chronic care doctor was,

81

in effect, the primary care provider and action to initiate a workup should have been undertaken. The serum protein on 6/15/20 was again elevated at 8.2 and serum protein electrophoresis should have been done but was not. The blood pressure was 120/80. The only assessment was good hypertension control. The etiology of the chronic kidney disease should have been determined and the patient should have been referred to a nephrologist. The hepatitis C was addressed by referral to the chronic care nurse for hepatitis C treatment work up and a fibroscan was ordered. The fibroscan was completed three months later on 9/18/20 and showed a F0/F1 fibrosis level that did not warrant screening for hepatocellular carcinoma.

Follow up laboratory testing on 7/8/20 continued to show elevated creatinine (1.89) but follow up evaluation did not take place. Another laboratory test on 10/14/20 showed continued elevated creatinine of 1.76 and elevated serum protein (8.3) but again these were not evaluated. Another test on 10/31/20 showed elevated creatinine (1.61) and elevated serum protein (8.2). This test also showed elevated liver function tests (AST 43 and ALT 67) but none of these abnormalities were addressed. Another laboratory test on 12/8/20 showed elevated creatinine (1.62) and elevated liver function tests (ALT 79 and AST 46). A fibroscan was completed on 9/16/20 showing F0/F1 fibrosis; nevertheless, the liver tests showed active hepatitis. These tests were not followed up.

On 12/16/20 the patient was positive for COVID infection. There was no evidence of isolation or monitoring for this patient. He was vaccinated on 3/9/21 with one dose of Moderna COVID vaccine but we could not find evidence for the 2nd shot.

On 9/11/21, laboratory tests showed worsening renal failure (creatinine 2.16) with continued elevated serum protein (8.1). A urinalysis showed elevated protein. A blood count showed mild anemia (hemoglobin 13). A third chronic clinic was conducted on 9/14/21 only for hypertension and did not include evaluation of his hepatitis C nor his abnormal laboratory tests (anemia, elevated creatinine, elevated protein in the urine, or elevated serum protein). There was no history except that he was taking medications. The only assessment was hypertension in good control. The worsening chronic kidney disease, elevated serum protein, and anemia were not addressed. All diseases should be evaluated in chronic clinic.

On 10/23/21, the patient saw a nurse for constant abdominal pain and had a 10 pound weight loss which was unrecognized. The abdomen was distended. The patient was not referred to a provider but should have been due to the distended abdomen. Unrecognized weight loss continues to be problematic in IDOC. This should have been investigated further but was not.

On 11/24/21, he complained to an LPN of mucous-like substance coming from his rectum. The nurse scheduled the patient for a physician evaluation but there was no evidence that this occurred. The patient had continued weight loss. The weight appeared to be 170 pounds which would have been about a 14 pound weight loss. Two consecutive visits with a doctor were cancelled one due to a lockdown and a second due to no doctor. The patient did not see a doctor in follow up of his abdominal issue.

On 1/20/22 the patient was sent to an emergency room for acute abdominal pain. The hemoglobin was 10.1 and a CT scan showed diffuse metastatic disease in the liver with a tumor thrombus in the inferior vena cava extending to the right atrium and pulmonary emboli. The patient's creatinine

was elevated to 2.51.  The diagnosis was hepatocellular carcinoma.  Palliative chemotherapy was recommended.  We received only odd page numbers of the palliative care note, oncologist notes, and the discharge summary.  The patient told a palliative care physician that he should be given compassionate release so he could spend his last days with his family.  There was no agreement to enter hospice.  The hospital recommended 15 mg oxycodone every four hours as needed for pain.  On discharge follow up was recommended with cardiology, gastroenterology, oncology and interventional radiology for weekly drainage of fluid from the abdomen.  Monitoring of the INR was recommended.  The patient was discharged 1/31/22.

Upon return from the hospital, on 2/1/22, the patient was placed on the infirmary.  The doctor wrote that the patient was on hospice and palliative care though there was no evidence that the patient agreed to hospice care.    Follow up appointments were made for cardiology, gastroenterology, oncology and for interventional radiology to drain fluid from his abdomen.  Though the hospital recommended oxycodone 15 mg every four hours as needed, the medication was nonformulary and was unavailable for seven days due to weather.  The patient received no pain medication the first day.

On 2/2/22, the doctor documented starting hydrocodone 20 mg, a lower morphine equivalent drug at a lower dose (60% equivalency[19]) until the oxycodone arrived.  The doctor noted that the patient was a full code and wanted to think more about code status; he documented the patient was on palliative treatment.  No counseling was offered to the patient with respect to his decision on end of life issues.  Nurses offered the medication twice instead of six times a day on the second day.

On 2/3/22, the doctor documented that extreme weather was preventing the pharmacy from delivering the oxycodone and the patient reported that the hydrocodone was ineffective.  The doctor ordered hydromorphone at 4 mg every four hours as needed.  This dose was 75% the morphine equivalent compared to the hospital recommendation.  On the third through sixth days, it was only offered at most four times a day, instead of six, and sometimes only two times a day.  Beginning on the 7th day post-hospitalization, the medication that was initially ordered was received by the facility.  It was only offered four times a day at most instead of six times a day.  It appeared that the patient's medications were maximally offered only four times a day instead of six as ordered.

On 2/4/22 a laboratory test was ordered and on 2/5/22 the laboratory reported a worsening creatinine of 3.55 and potassium of 5.8.   This was signed as reviewed on 2/7/22 and on 2/7/22 a repeat metabolic panel was ordered.

On 2/7/22, the patient said he was ready to die but his family wanted everything done and he was planning to talk to his family about his code status.  There was no assistance in helping the man arrange a discussion with his family.

On 2/8/22 at 5:11 am the laboratory reported calling the Medical Director but a nurse took the call.  The nurse documented at 5:35 am that the potassium was 6.5, a potentially dangerous level that requires immediate attention.  Instead of calling a physician immediately, the nurse wrote that she

---

[19] This was determined using a morphine milligram equivalents calculator as found at https://www.mdcalc.com/calc/10170/morphine-milligram-equivalents-mme-calculator

would "inform" the doctor. The doctor was informed about three hours later, at 9 am, and the doctor asked that the labs be faxed to the oncologist. Immediate action was not taken (EKG or immediate medication to lower serum potassium) but the doctor ordered Lokelma, a drug to lower serum potassium. This drug was written on a medication administration record but never given. The patient left the facility for a paracentesis procedure and returned just after noon but the potassium was not rechecked and the Lokelma was not administered that day or the next day. A psychiatry visit was rescheduled on 2/8/22 because the patient was getting paracentesis.

On 2/9/22 the laboratory called the facility twice at 2:25 am and at 2:33 am to notify that the specimen showing high potassium was not hemolyzed and was therefore accurate. The call was received on both occasions by a nurse. The doctor was unaware or did not document that the patient was not receiving the Lokelma. A follow up stat potassium level was not drawn and an EKG was not performed, which should be done at that level of potassium.

On 2/9/22, the doctor wrote that the patient did not want a DNR status and wanted to talk to his daughter first. The doctor wrote he would revisit the code status in the morning. The doctor offered to send the patient to a hospital, presumably for the hyperkalemia, but the patient refused.

The following day, on 2/10/22 at 8:30 am a nurse documented that the patient didn't want further treatment and asked that the nurse call his daughters to explain his terminal diagnosis and said he wanted to be put to sleep and not be in pain any longer. The nurse documented that the patient signed DNR paperwork. About half hour later, the doctor wrote that the patient didn't want to go to the hospital, presumably for the hyperkalemia, and that the HCUA was discussing the advanced directive with the daughter. At 11:30 am the patient rescinded the DNR saying he wanted to speak with his daughter before making an end-of-life decision. A nurse practitioner was notified and "OHS" was called and they recommended a mental health consult. The HCUA wrote a consult request to mental health documenting that the patient had conflicting feelings about end of life decisions and described the patient as "tearful and afraid". At 1:45 pm a clinical social worker saw the patient who said he was afraid of dying. The mental health professional discussed relaxation techniques which the patient declined. There was no call to a psychiatrist or to the physician for antianxiety medication nor was there an effort to arrange for the patient to speak with his daughter. At 2:43 pm, a nurse documented that the patient agreed to go to the hospital "to address kidney issues" and a nurse practitioner "gave permission for patient to have therapeutic leg restraints once hospitalized". At 3:30 pm the patient was ordered sent to the hospital. A psychiatry appointment for that day was rescheduled due to a "medical condition". The psychiatrist wrote that there were no acute psychiatric issues. The psychiatric appointment was rescheduled for a week but did not occur.

The hospital discharge summary from the 2/10/22 hospitalization was not present in the medical record. Upon arrival to the prison from this 2nd hospitalization, on 2/17/22, the patient was confused, was only oriented to person, and had slurred speech and delayed responses. A doctor wrote that, at the hospital, the patient visited with his daughter and had a palliative care consult and was now on DNR status with a "comfort care" designation. At discharge, the hospital recommended oxycodone 15 mg every four hours and fentanyl patch 25 mg every 72 hours and lorazepam 1 mg every four hours as needed. These medications were ordered. The oxycodone was offered three times on 2/17/22 and once on 2/18/22 with no further offers. There was no

evidence that the fentanyl patch was given. There was no evidence that lorazepam as ordered on 2/17/22 was given and it was not present on the medication administration record.

Nurses documented evaluating the patient twice on 2/17/22 but did not document evaluation of the patient on 2/18/22. Though oxycodone and lorazepam were to be offered every four hours, the medication administration record documented that oxycodone was offered twice each day but the antianxiety medication was not offered. There was one progress note on 2/17/22 that the patient was confused. This note documented that the patient had a fentanyl patch on but the medication administration record did not document that it was given.

On 2/19/22, a Saturday, at 7:38 am a nurse observed the patient on the edge of the bed with his foot dangling on the floor. The nurse offered to reposition the patient who refused; he asked to be left alone. The nurse left him alone. At 7:56 am the nurse observed the patient kneeling on the floor in front of his bed. The nurse offered to help but the patient was on the floor screaming. Though there was an order for lorazepam, an anti-anxiety medication, as needed, the patient was not offered lorazepam despite the patient screaming and obviously in distress. The nurse was unable to reach the Medical Director. At 8:35 am the patient pulled his foley out and was bleeding from his penis. The nurse documented, "Entered pt cell per protocol" to remove the Foley catheter. It is unclear what protocol is used to enter a patient's room on the infirmary. The patient also had a bowel movement and was lying in his feces. The nurse described the patient as agitated and oriented with periods of confusion. The nurse documented that the patient "refused care despite teaching and encouragement". The nurse notified the major. Lorazepam, an antianxiety agent had been ordered as needed and was needed due to the patient's presentation but was not offered. The nurse was unable again to reach the facility Medical Director. At 8:58 am the nurse called the regional medical director. He said he would call back. At 9:16 he called back and ordered lorazepam 2 mg IM for only one dose. But this medication was already an existing order though it appeared unrecognized as an existing order. This anti-anxiety medication was ordered every four hours as needed. The lorazepam was documented as being given at 9:16 am for only one dose. After giving the medication, the nurse offered to provide hygiene care to the patient but he refused "despite teaching and encouragement". The nurse wrote, "will continue to monitor pt".

At 9:46 am the patient was still on the floor apparently lying in his feces. The nurse "offered" to assess vitals and offered the patient his lunch tray but the patient refused.

At 11:15 am the patient was still on the floor lying in his feces and he refused lunch "despite teaching and encouragement". At 1:33 pm the patient was still on the floor refusing to be cleaned. At 2:43 pm the patient was still on the floor refusing care. At 5:35 pm the patient refused care asking to be left alone. The nurse did not ask the patient about pain or anxiety. A mental health professional did not see the patient. The patient was not offered pain medication (oxycontin), and was not asked if he wanted something for anxiety (lorazepam). The nurse checked the patient again at 7 pm. At 10:30 pm the patient was still on the floor and refused assistance. He wanted to be left alone. He was noted to be dead at 1:40 am the following morning.

Opportunities for Improvement
1. Problem lists are still inaccurate. A process analysis of chronic care should result in development of accurate problem lists.

2. The Data Base should accurately describe vaccinations and cancer screening but does not. IDOC needs to implement its policy on immunization and cancer screening.

3. An initial and subsequent laboratory results showed elevated serum protein which should have been investigated but was not.

4. The patient should have had colorectal cancer screening but did not. IDOC needs to implement its policy on immunization and cancer screening.

5. Multiple laboratory tests showed kidney disease and the patient should have had further work up. An etiology for his chronic kidney disease should have been established. Referral to a nephrologist was indicated as it did not appear providers at the prison knew how to work this up.

6. The patient transferred to Danville from NRC sometime in early February but the transfer screening form was not completed. Why this was not done should be investigated.

7. The patient had abdominal pain on 10/23/21. Associated weight loss was unrecognized. On 11/24/21, the patient had complaint of mucous coming from his rectum. There was continued associated unrecognized weight loss. The nurse referred to a physician but the appointment never occurred. These should have resulted in physician evaluations. An earlier appointment may have picked up his liver cancer sooner, however, it may not have affected his outcome.

8. Chronic care visits had many opportunities for improvement. Adequate history was not obtained for two visits. Status of hepatitis C management was not addressed in two clinics. Abnormal laboratory results were not adequately addressed in any of the clinics. The patient should have been referred for colonoscopy due to age and anemia but was not. Chronic kidney disease was not investigated as to a cause in any of the clinics. Abnormal serum proteins were not evaluated as to a cause. These clinics systemically do not address all of the chronic problems of the patient and need systematic change.

9. The patient had terminal cancer that included pain. But pain management was not good. He was offered less pain medication than recommended through his last days on palliative care. Pain management on infirmary units should be addressed systemically as it is substandard in many record reviews.

10. During the final infirmary stay, the patient returned from the hospital confused and dying. The patient had expressed anxiety about dying but was not treated palliatively for this. He was not evaluated by a mental health professional. Two days after return from the 2nd hospitalization, the patient was anxious and confused. He pulled his Foley catheter out and was found kneeling on the floor near his bed. He began screaming. He was bleeding from his penis and was lying in his feces. A nurse asked repeatedly if the patient wanted help but the patient refused. He did not appear rational and was described as agitated and confused yet he was treated as if he were rational and capable of making a rational decision. The patient's anxiety about death was not addressed and the nurse did not offer to medicate the patient for anxiety as ordered. The patient died lying on the floor in his excrement. Staff should have provided a more empathetic response to his dying. It should have been realized that he had agitation, confusion, and fear of death and needed to be cared for humanely. Systemically, palliative care needs to improve.

11. This patient had terminal cancer and expressed desire to die with his family but was not permitted to do this. IDOC did not facilitate a patient discussion with the family. This was done at the hospital. End of life care needs systemic improvement.

Patient 17

Facility: Menard
Date of Death: 9/17/22
Cause of Death: Not identified

This man was 68 years old with a history of Parkinson's disease, COPD, high blood lipids, and bronchiectasis[20].

There were  multiple problems with the medical record sent to us.
1. Two of nine consultant or hospital reports were not available,
2. The Menard scheduling clerk places a formatted progress note in the medical record when the consult was received, when the consult was approved, when the consult was scheduled, and when the report was received.  Providers use the formatted notes to document their evaluation of the consult with the patient.  Given the paper record, this is a reasonable way to document this requirement in the medical record but it lacks ability to track aggregate data which makes it difficult to use to verify compliance with the Consent Decree.  Also, the date the report was received is not documented only the date the provider reviews the report.
3. Fourteen of 24 months of medication administration records were not filed in the record, and
4. Multiple physician medication orders were not present in the record.
5. Multiple medical records were not in chronologic order.

The database sheet had no evidence for COVID vaccination but progress notes did document two COVID vaccinations and one booster.  These should be present on the database but were not. The database did document vaccination for shingles and there was an order for shingles vaccine.  There was no documentation of pneumococcal vaccination.    The patient was 68 years old but there was no evidence of colorectal cancer screening and no evidence of specific lung cancer screening which should have been done.  The patient did have multiple chest CT scans for other purposes but the lung cancer screening was not documented.  Several of these CT scans had suspicious findings. We would consider his CT scans as screening for lung cancer but it wasn't documented on the Data Base.

The problem list documented Parkinson disease, COPD, and high blood lipids.  However, the patient also had bronchiectasis, decubitus ulcers, and osteoarthritis.

The reception history form was performed 9/8/20 and included history of COPD, Parkinson's disease, prior removal of a testicle due to a tumor, and injury with internal fixation of his right hip with pins.  The intake physical examination form, on 9/15/20,  identified COPD, Parkinson's disease, high blood lipids, and an unknown heart condition.  The intake history and physical examination were deficient in that no history of either COPD nor Parkinson's disease was obtained.  For neither condition was prior treatment or management included.  Old records for any of his conditions were not obtained but should have been.  The physical examination did not

---

[20] Bronchiectasis is an abnormal widening of the breathing tubes in the lungs with development of pouches that become easily infected.  This leads to chronic infection and destruction of lung tissue.

include a cognitive assessment or functional status assessment related to his Parkinson's disease. Pulmonary function testing wasn't ordered, and the status or staging of the patient's COPD was not obtained. Based on intake evaluation the patient had a 15% 10 year cardiovascular risk and should have been treated with a moderate to high intensity statin but was being treated with a low intensity statin for a year until it stopped being given. The reason for discontinuation was unclear. Multiple medication administration records are missing but after September of 2021 it appeared that the patient was no longer on a statin. It appears that the medication expired without refill. The patient failed to continue to receive further statin medication.

About three months after intake, on 12/31/20, a nurse practitioner documented that an x-ray done on 12/22/20 showed pneumonia and an antibiotic was started. There was no follow up of the x-ray. The patient's COPD was not assessed. This should have been followed up.

The patient did not have an adequate evaluation for his COPD or Parkinson's disease for seven months after incarceration when, on 4/7/21, a physician saw the patient for his only chronic care visit during the entire incarceration of two years duration. The physician took no history of the Parkinson's disease except that the patient was on Sinemet. The only history of the COPD was that the patient had occasional cough and dyspnea. This is inadequate as a chronic illness history. The chronic clinic documented that the patient was on Sinemet, Xopenex, Zocor, and Incruse Ellipta but there was no medication administration record documentation whether the patient was actually receiving the medication. Though the patient had indication for the statin medication he was being given, used to treat high blood lipids, the patient was not diagnosed with this condition and was not documented as monitored for high blood lipids at this clinic visit. It was also being given at too low a dose. Aside from vital signs, and documenting decreased breath sounds there was no examination. Pulmonary function testing, which is a standard of care for persons with COPD, was not ordered. The doctor made no comment as to why the patient was initially on prednisone upon incarceration, and made no mention of the prior treatment for pneumonia in December. Nor was there a follow up x-ray or imaging study to assess follow up. With respect to Parkinson's disease, there was no cognitive assessment, no neurologic examination, and no history. Because the patient had already described difficulty eating due to tremors, a functional assessment of activity of daily living was indicated but not done. The doctor did not solicit old records to obtain information on prior work ups for this patient. Despite the lack of testing and history the doctor documented stable COPD and Parkinson's disease. This was extremely poor chronic care follow up and was not the current standard of care. Systemically, IDOC facilities do not follow all of patients' problems in their chronic care program and this needs to be done.

This patient was housed at Menard and it was clear that there was no physician at this facility for a considerable time. After an apparent physician evaluation on 6/30/21 to review an offsite emergency room visit with the patient, we could find no further physician face-to-face evaluations of the patient for the next 15 months when the patient died. No chronic clinic visits were conducted after the 4/7/21 chronic clinic visit. Episodic nurse practitioner encounters occurred. Intermittently, there were physician chart reviews but physician face-to-face evaluations of the patient did not occur.

Parkinson's disease

A month after incarceration, on 10/5/20, the patient asked a medical technician to have a permit to eat in his cell because, due to his Parkinson's disease, it took a longer time for him to finish eating his food. This was a reasonable request but was not permitted. On 2/10/21 the patient again asked for a permit to eat in his cell and a doctor approved the permit but a functional assessment for activities of daily living was not done. On 4/7/21, at the only chronic clinic visit for this incarceration, the doctor did not ask about his Parkinson's disease and did not order a functional or cognitive assessment. Thus, the patient did not have an adequate assessment of his Parkinson's disease and was left to fend for himself.

On 7/11/21, the patient wrote a note to health care stating he had fallen "over a dozen times trying to crawl or climb upon the top bunk, I also have a circulation problem with my right leg and swollen ankle that causes difficulty when climbing. I also have Parkinson disease, extreme shaking and have many times also fallen off the top bunk and I am 68 yrs of age and in poor health. I cannot risk falling and severely hurting myself or possibly breaking bones or damaging my back". The patient had yet to have a functional assessment of his Parkinson's disease and should have been in protective housing. He did receive a low bunk but care was inadequate and did not protect the patient from harm. Provision of protection for this patient was reactive and did not consider the needs of the patient which needs to be done.

On 8/28/21 a nurse saw the patient for difficulty walking which the patient said he had for a year. The nurse documented "unbalanced walking, disturbed gait, shuffle walking" and "multiple falls, hit head, denies reporting to staff" and referred to a physician as a priority. About a week later, on 9/7/21, the patient told a nurse practitioner that he had difficulty keeping his balance. The nurse practitioner said that this had been ongoing for a year. The nurse practitioner documented a "very unstable" gait but did not document a thorough neurologic examination. Instead of referring for a functional assessment and performing a neurologic examination, the nurse practitioner referred the patient to a physical therapist for a wheelchair. A cognitive evaluation was not conducted. Because the patient never had a functional assessment, it is unclear when protective housing was indicated but it appeared, based on the presentation, that this patient needed protective housing with assisted living arrangements. It was not provided; nor was assessment done to determine whether it was needed. Because the providers did not appear to have capacity to evaluate the patient's Parkinson's disease, neurology referral was indicated.

On 9/16/21 a physical therapist evaluated the patient and documented that the patient had progressive difficulty walking and both feet were numb and the patient had already been using a wheelchair for all transport. The patient was able to transfer from sitting to standing and could ambulate 15 feet in a walker. The therapist's assessment was gait instability and he recommended a wheelchair due to a fall risk even with use of a walker. No further physical therapy was planned.

An undated health request filed near to a 9/23/21 progress note, documents a request for a wheelchair permit and stated "I am having so much trouble standing and walking that I need a walker. P.S. I am tired of falling". A permit for a wheelchair was written on the same day.

On 10/25/21, the patient fell at 3:30 am and was evaluated by a nurse at 10 am and had sustained three abrasions on his face. The patient was not referred to a provider.

On 7/6/22, a licensed practical nurse documented that the patient had fallen out of bed and hit his chest on his property box during the fall.

On 7/15/22, a nurse practitioner documented that the patient fell trying to get into his jumpsuit and hit his head on the floor. There was a lump on his scalp with two small superficial lacerations. The patient was sent to a local emergency room but was returned with a recommendation to observe the patient for at least 23 hours. Upon return to Menard, the patient couldn't recall his medications or which cell house he resided in. This indicates possible cognitive disability due to his Parkinson's disease, yet he was not evaluated for his cognitive status. He was described as "deconditioned" and a practitioner ordered physical therapy. The patient was discharged from the infirmary two days later with an inmate caretaker and a physical therapy order. On 7/25/22, the physical therapy appointment was cancelled due to no available ADA van. On 7/27/22, the patient was described as very weak, physically declining, unable to raises up or stand and would fall if unassisted. A neurologic examination was not conducted. A wheelchair cushion was provided but the patient should have been placed in protective housing that had an assisted living arrangement other than an inmate caretaker.

On 8/2/22, a nurse documented that the patient was unable to be housed on the infirmary because the ADA van was unable to transport the inmate to the infirmary. He was subsequently admitted to the infirmary on 8/4/22. The nurse practitioner again ordered physical therapy. Later that day the patient was to be admitted to the hospital but an ADA van was unavailable and the HCUA became involved in getting the patient transferred via the local EMS ambulance. On 8/5/22, a physical therapist saw the patient but only for strengthening. On 8/9/22, the physical therapist documented that the patient required maximal assist from supine to sitting with intermittent assistance to maintain sitting posture. The patient attempted to stand twice but on both attempts he was unable to progress to standing with risk for falling. He required assistance to scoot his buttock back on bed. Strengthening exercises were completed. The assessment was that the patient had inability to complete tasks with poor quality of muscle contractions. Through all these incremental mobility changes, IDOC was not proactive but were reactive and took protective clinical action only after harm had occurred to the patient.

Standard of care for Parkinson's disease includes an evaluation of cognitive status. Throughout his incarceration, his cognitive status was not assessed. Nor did the patient ever have a thorough functional assessment or placement in protective housing. Medication management based on symptoms was not documented. In summary, no usual care was provided for his Parkinson's disease. He had only one chronic care clinic visit and other episodic care did not address his Parkinson's disease. He should have been referred to a neurologist.

COPD Specialty Care
The patient was identified as having COPD at intake but was not initially referred for pulmonary function testing. Nor was an adequate history taken of his disease. The patient was sent to a hospital for leg swelling on 6/14/21 but there was no hospital report. A doctor at the facility wrote that a doppler of the leg was negative but the chest film showed patchy opacities and follow up was recommended. CT angiogram at the hospital showed no pulmonary embolism but bronchiectasis was noted. As early as 6/14/21 the patient was known to have bronchiectasis which complicated his COPD.

The following is a sequence of specialty referrals for the patient's COPD and bronchiectasis.

- A coverage doctor ordered a CT scan on 8/26/21 after review of two chest x-rays that were consistent with bronchiectasis. This CT scan was done 46 days later on 10/11/21 which is not timely. A doctor wrote on 10/26/21 that he couldn't review the CT because it was on a disc. A typed report was in the record but we could not verify that it was reviewed. The CT scan showed complex pulmonary findings including moderately severe cystic bronchiectasis with multiple nodules including a 1 cm nodule. Neoplastic nodules were not excluded.

- On 9/7/21 a nurse practitioner referred the patient to a pulmonologist because of incidental findings of bronchiectasis on a hospital CT angiogram done in June of 2021. This referral was not timely, as the CT findings were evident in June. This appointment didn't occur until 12/7/21 (91 days) which was not timely. A nurse practitioner reviewed initial orders from the pulmonologist on 12/22/21 (15 days from the consult) and reviewed the full report on 1/29/21 (53 days from the consult). Neither the initial orders nor the full report were reviewed with the patient. On 12/7/21, the consultant recommended CT scan and pulmonary function tests and after these were completed a follow up evaluation. These specific instructions were not adhered to.

- CT scan recommended on 12/7/21 by the pulmonologist was ordered on 12/22/21 (15 days after the recommendation). The scan was completed 1/4/22 (28 days after the recommendation). It was reviewed by a provider on 1/21/22 (17 days after test) but was not reviewed with the patient. The CT scan was timely.

- The pulmonary follow up recommended 12/7/21 was to be scheduled after the CT scan and pulmonary function tests were done but occurred before the pulmonary function test was completed. It took place on 2/10/22 (65 days from recommended) which is not timely. Comments on the transfer form were reviewed the same day as the consult. The report from this visit was reviewed 3/14/22 (32 days after visit). The pulmonologist acknowledged that the patient needed closer follow up stating, "*Patient is moderate complexity and moderate risk for morbidity and mortality because of the above mentioned problems that were addressed at this visit. Their symptoms are uncontrolled requiring therapy changes and or further work-up. Without these changes there is a higher risk of running into complications. We will need relatively closer follow up*". At this visit the pulmonologist re-referred for pulmonary function testing and recommended another CT scan and multiple blood tests with follow up after completion of these.

- The pulmonary function test initially recommended 12/7/22 and recommended again on 2/10/22 was completed 2/28/22 (83 days from the initial recommendation which was not timely) and the report was reviewed on 3/14/22 (14 days after test) but was reviewed without discussion with the patient. The test was supposed to have been completed prior to the pulmonary visit of 2/10/22 but was not. Test showed severe obstructive lung disease with reduced diffusion capacity and minimal bronchodilator response consistent with stage III COPD.

- Blood tests recommended at the 2/10/22 pulmonary visit were completed 2/23/22 and reported by the laboratory on 3/2/22. These were timely. There was no progress note documenting review of the laboratory results nor how the results fitted into the therapeutic plan but the laboratory test results were initialed as reviewed on 3/7/22 (five days after tests completed).

- A CT scan recommended at the 2/10/22 visit was ordered 3/14/22 (32 days from recommendation). It was completed 5/9/22 (88 days from recommendation which was very untimely). New infectious nodules were present in left upper lobe consistent with pneumonia or bronchiolitis. This CT was documented as reviewed on 8/22/22 (193 days from the recommendation and 105 days from completion of the test; these were unacceptably delayed). It was not reviewed with the patient.
- Referral back to the pulmonologist was recommended after the pulmonary function test. The pulmonary function test was recommended initially on 12/7/21 and again on 2/10/22. The pulmonary function test was done 2/28/22 and an urgent referral to pulmonary was made on 3/4/22. This urgent appointment didn't occur until 4/8/22 (35 days) which is inconsistent with an urgent consult. Handwritten comments from the consultant were present on the referral form. An incomplete report was present in the medical record. The report was documented as reviewed on 5/27/22 (49 days from consultation) but was not reviewed with the patient. It was not clear whether the report that was reviewed was complete. The consultant apparently recommended bronchoscopy. This consultation resulted in a serious medication error that may have contributed to the patient's death.
- Bronchoscopy recommended on 4/8/22 was completed on 7/14/22 (97 days later which is also very untimely). Fungal testing performed at bronchoscopy was reviewed 7/30/22 but the patient was not sent back to pulmonary for follow up. Tracking logs after the first quarter of 2022 from Menard were not provided so it could not be confirmed whether an appointment was made. Follow up with pulmonary was indicated but it appeared that the patient was lost to follow up.

This sequence of specialty appointments shows a very dysfunctional and dangerous system. Coordination of care between the specialist and providers was very poor. Appointments were not timely. Care was not coordinated with the recommendations of the specialist. An urgent referral was completed in a month. A follow up pulmonary appointment occurred before a recommended test (pulmonary function test) was completed. It appeared that the prescription of two long-acting beta agonist medications was an error. This was not appreciated. Review of full reports are considerably delayed. Reports are not reviewed with the patient so the patient is uninformed of care being provided. The lack of a physician at this facility likely contributed to the dysfunction. Services to support clinicians appear dysfunctional and inadequate including obtaining reports. It was not clear that transportation officers to take patients to their appointments were sufficient but many appointments did not appear timely and this should be evaluated. The Monitor continues to recommend a process analysis of specialty care system wide to ensure timely access, availability of consultant reports, and appropriate clinical coordination with consultants.

The following is a timeline of care at the facility after June of 2021.

On 6/24/21, the patient went to a local emergency room for edema of his right lower extremity and COPD. He had a chest x-ray that showed patchy opacities and follow up was recommended. A CT angiogram done to exclude pulmonary embolism *incidentally* identified bilateral bronchiectasis and a cystic lesion on the right lung. Bronchiectasis was not added to the problem list. Two months later, on 8/26/21, a doctor reviewed two prior chest x-rays that showed persistent opacities and ordered a CT scan.

On 9/7/21, a nurse practitioner saw the patient and documented that the patient had increased coughing with sputum and had dyspnea with exertion. The nurse practitioner ordered cough medication, ordered laboratory tests (CBC, BNP, and CMP), a chest x-ray, and appropriately made a referral to a pulmonologist. The abnormal CT scan was noted. It appeared that this was an exacerbation of bronchiectasis or COPD and a course of antibiotics would have been appropriate but was not ordered. The referral to a pulmonologist was appropriate but the appointment was delayed.

The same nurse practitioner saw the patient again two weeks later on 9/23/21 but neither the blood tests nor the chest x-ray, ordered on 9/7/21, were done. The blood tests weren't available until 10/9/21, 32 days after the order. This is an excessive wait for a routine laboratory test. The chest x-ray ordered 9/7/21 wasn't done because there was no available x-ray technician. But the patient had coughing and shortness of breath. The nurse practitioner again ordered a chest x-ray on 9/23/21, this time ASAP and treated the patient empirically for pneumonia, without benefit of a chest film. Because the chest x-ray was needed for an acute condition, the patient should have been sent to a hospital if there was no technician available. The delay in laboratory testing is something that should be evaluated through the quality committee.

The chest x-ray initially ordered on 9/7/21 and re-ordered on 9/23/21 as a stat, appeared to have been taken on 10/12/21 and read by a radiologist on 10/18/21 (41 days after the original order and 25 days from the stat order). This radiology services is inadequate. Patients should be sent offsite for x-rays when delays are anticipated. It showed changes consistent with bronchiectasis but underlying pneumonia could not be excluded and clinical correlation was advised. A stamp on the x-ray report documented review of the report on 11/6/21 (19 days after the report was completed) with a hand-written order on the x-ray report to repeat the chest x-ray. We could not verify that clinical action was taken based on the abnormal x-ray.

The repeat chest x-ray was taken on 3/29/22 (143 days from the order) and showed bibasilar pneumonia. This x-ray was stamped as reviewed on 4/21/22 (23 days after the x-ray report) by a physician. But a nurse practitioner wrote a progress note on 4/4/22 documenting review of the chest x-ray from 3/29/22, acknowledging the pneumonia. The nurse practitioner ***prescribed an antibiotic for ten days for pneumonia without examining the patient***. A two month follow up was ordered. This sequence demonstrates dangerous care and a very dangerous situation at Menard that needs prompt attention.

At a 2/9/22 evaluation with a nurse practitioner for the purpose of renewing his medication for his Parkinson's disease, the nurse practitioner noted rapid respirations with wheezing and coarse sounds throughout. The patient didn't have an inhaler on his person. The nurse practitioner told the patient to use his inhaler when he arrived back in his cell and to keep his inhaler on his person. This implied that the inhaler should be used when symptomatic. The nurse practitioner did not check what medications the patient was on. However, at that time, the patient was on fluticasone-salmeterol inhaler, which is meant to be used on a fixed twice a day schedule and should not be used more frequently than directed. The patient was not on a rescue inhaler. This instruction to the patient was unsafe.

On 5/31/22, a nurse practitioner documented that the patient complained of leg swelling since January of 2022. The weight was 212 pounds which was a 37 pound weight increase since a pulmonary consult on 4/8/22 (weight documented as 175 pounds). The oxygen saturation was documented as 77-93%. The oxygen saturation wasn't documented as at rest or exertional but nevertheless, it was a red-flag sign and the patient should probably have been sent to a hospital or at least monitored more closely on the infirmary but was not. The patient had increased shortness of breath. He complained of daytime somnolence even when sitting on the toilet. The nurse practitioner documented congestion and abnormal breath sounds (ronchi) to all lobes of the lungs with unsteady gait and prior bouts of pneumonia. An inmate helper assigned to the patient said that the patient did not elevate his legs and sometimes slept in his chair. He was unable to breathe when lying in bed. The nurse practitioner diagnosed pneumonia and "dependent edema" which is not a diagnosis. Pneumonia cannot be diagnosed without a chest x-ray or CT scan. The plan included: BNP[21] as-soon-as-possible, Lasix 40 mg a day, potassium, an antibiotic for ten days, a tapering dose of steroids, ted hose, weekly weights, repeat oxygen saturation tests daily for two weeks, and follow up in two weeks. This was a shotgun approach with empiric treatment for apparent heart failure, pneumonia and exacerbation of COPD without having made a diagnosis. This was unsafe.

With an oxygen saturation as low as 77% the patient should have been sent to an emergency room for diagnostic testing or had prompt diagnostic workup, but this patient wasn't even admitted to the infirmary. The patient needed a chest CT scan and chest x-ray and possibly other diagnostic testing which was unavailable at the prison. There was no follow up of this patient for this episode except for a brief phone call between the nurse practitioner and a nurse. Notably, there did not appear to be a physician at this facility and all care was being managed by nurse practitioners for whom there was no evident supervision.

At the 4/8/22 pulmonary consultation, the pulmonologist recommended Breztri,[22] an inhaler, for his COPD. This inhaler contained a long-acting beta agonist but the patient was already on a long-acting beta agonist inhaler (fluticasone-salmeterol). Breztri and fluticasone-salmeterol both contain the same warning. The warning[23] states, "Do not exceed recommended dose; serious adverse events, including fatalities, have been associated with excessive use of inhaled sympathomimetics". In Lexicomp, a drug interaction software, users are advised to avoid this combination which is an X rating. This was unrecognized by the nurse practitioner and the consultant apparently was unaware of the patient being on another long-acting beta agonist.

When the consultant recommended Breztri, the nurse practitioner did not understand the prescription as written on the referral form and because the report was not immediately available, the nurse practitioner called the pulmonary office on 4/8/22 for clarification of the medication. No one responded to the nurse practitioner and he called back on 4/11/22, 4/12/22, 5/27/22, and 5/31/22. On 5/27/22 the vendor pharmacy messaged the nurse practitioner asking whether a substitute inhaler could be used instead of Breztri. The nurse practitioner tried to contact the pulmonologist but was unable to reach the pulmonologist. There was no physician onsite which

---

[21] Brain natriuretic peptide or BNP is a test that measures a protein made by the heart and blood vessels that is higher than normal in heart failure.

[22] This is a combination inhaler with a long-acting beta agonist, a steroid, and an anticholinergic.

[23] In UpToDate in the warning section of the Breztri drug information section.

left the nurse practitioner without a supervising consultant physician. On 5/27/22, the nurse practitioner wrote that a prescription for Breztri was sent to pharmacy. The vendor pharmacy filled both prescriptions for long-acting beta agonists and for three days the patient was on three long-acting beta-agonist inhalers. IDOC should investigate how this could have happened.

Medication administration records were disorganized. On the May medication administration record, nurses hand-wrote an entry on 5/6/22 to start Breztri aerosphere two puffs twice a day to end 11/6/22. When nurses hand-write prescriptions on medication records, those prescriptions are not verified by the pharmacy as safe. This prescription was not confirmed by a pharmacy label. However, the medication was not documented as given to the patient. In May, the patient was documented as receiving one fluticasone-salmeterol inhaler which lasts a month. At this point, the medication was keep-on-person. In June, the medication administration record had a pharmacy label prescription for Breztri but it was not documented as given. There was also a nurse hand-written entry to administer Trelegy[24], another long-acting beta agonist combination which inhaler was administered as keep-on-person on 6/23/22. A pharmacy labeled fluticasone-salmeterol inhaler prescription was administered as keep-on-person on 6/12/22. There was no July medication administration record. In August medication administration was being given dose by dose because of the patient's cognitive and physical decline. Breztri was documented as being administered the evening of 8/5/22 and then twice a day from 8/6/22 to 8/7/22 and on the morning of 8/8/22. Fluticasone-salmeterol was administered the evening of 8/5/22 and then twice a day through 8/31/22. Trelegy[25] was documented as being given daily from 8/6/22 through the end of the month on 8/31/22. The patient was also documented as receiving two nebulized treatments with albuterol, a short acting beta agonist on 8/27/22 and 8/28/22.

In September, the patient received daily inhaled doses of Trelegy through 9/17/22 and daily twice a day doses of inhaled fluticasone-salmeterol through 9/17/22. One medication administration record also documented receipt of three doses of short-acting beta agonist albuterol on 9/13/22 and another medication administration record documented receipt of short-acting beta agonist albuterol at 3 pm and again at 7:10 pm on 9/17/22. Thus, the patient was on two long-acting beta agonists medications and received additional short acting medication in August and September of 2022.

The patient was in general population but had an inmate helper. On 7/5/22 an inmate (possibly the inmate-helper) wrote a health request stating " My cellie … needs to see medical and psyc ASAP, his health and mental health has gone down hill fast. And this heat has made it get worse faster! Please get him in for both ASAP". The note was signed by his cellmate. This person, with what appeared to be advanced Parkinson's disease and bronchiectasis, was in general population and it was not clear it was safe to be housed there.

The following day, on 7/6/22, a licensed practical nurse evaluated the patient for shortness of breath. The nurse documented that the patient fell out of bed and hit his head on the property box and was short of breath with coughing. The nurse documented that his symptoms were worse due to the hot weather. An oxygen saturation was 91-92% and respiratory rate 24. The nurse called a nurse practitioner who ordered an albuterol inhaler to be used four times a day. The reason for the

---

[24] Trelegy is an inhaler combination of three drugs: budesonide (a steroid), glycopyrrolate (an anticholinergic), and formoterol (a long-acting beta agonist)
[25] Trelegy is used only once a day.

fall was not assessed. The nurse practitioner did not evaluate the status of his Parkinson's disease or his COPD that day but asked to see the patient the following day. The medication administration record for July was not provided in the medical record so whether the patient received the albuterol was unclear.

A nurse practitioner evaluated the patient on 7/7/22, referred for decreased appetite and weight loss. There was wheezing on the right upper lung. The oxygen saturation was 97%. The patient had coarse cough but no obvious shortness of breath. The nurse practitioner ordered a chest and abdominal x-rays, labs (CBC, CMP, and A1c), and a tapering dose of steroids with follow up in two weeks. A fall described by the nurse the day before was not evaluated. There was no evaluation as to whether it was safe for the patient in general population housing and his cognitive and functional status were not assessed.

The laboratory tests were not drawn until 7/21/22. On 7/22/22, the laboratory tests were returned. Two weeks is too long to obtain laboratory tests ordered for an acute problem and IDOC should evaluate its phlebotomy services. A hemoglobin A1c test returned with a value of 6.7 which is diagnostic of diabetes which was unrecognized as a problem. The tests were initialed as reviewed but the abnormal values were not recognized. The x-rays were completed on 8/2/22 (26 days later) and showed diffuse fecal stasis (constipation) and osteopenia; a C-spine was done that showed osteopenia; and the chest x-ray showed bilateral pulmonary infiltrates, congested lungs and enlarged heart. These were documented as reviewed on 8/3/22. None of these identified problems were addressed. Providers do not have access to timely laboratory or radiology testing. There appears to be insufficient phlebotomy services and insufficient radiology technicians. Digital x-rays should be installed and sufficient technicians be hired. Laboratory tests are not timely reviewed and results not integrated into the therapeutic plan for the patient.

On 7/14/22 the patient went for bronchoscopy. The hospital called the prison because the patient was hypoxemic and asked whether oxygen was available at the prison because the oxygen saturation couldn't be kept above 92% after the bronchoscopy. The prison nurse documented "I informed the Carbondale Hospital that we did not have an RN on staff to care for him on the infirmary". The nursing plan was to await further input from the hospital who called back later saying they were able to stabilize the oxygen saturation at 96-98% and he was returned to the prison. The prison nurse documented calling the HCUA about the patient's return and staffing concerns. Upon return to the prison the oxygen saturation was 95% and the nurse called the on-call physician who said the patient could return to general population. This was unsafe. Subsequently, the nurse called the major who called the HCUA and told her that the patient would be housed on the 3rd floor infirmary for observation. In this episode custody overruled the physician and the custody decision appeared to be a better clinical decision. The physician, does not have appropriate credentials and has been referred to OHS as someone who should not be practicing in IDOC.

After the bronchoscopy, the patient was lost to follow up with the pulmonologist and no further referrals to pulmonology were made. Menard did not provide its 2nd or 3rd quarter specialty logs so we couldn't confirm if a follow up pulmonary consultation was ordered.

On 7/15/22 the patient fell trying to get his clothes on. His head hit the floor and he sustained superficial lacerations and a 4 cm bruise to his skull. The patient was sent to a local hospital where the patient had an oxygen saturation of 88%. The patient returned the same day and was placed on the infirmary for 23 hour observation. The hypoxemia noted at the hospital should have been a concern because the day before, on 7/14/22, after his bronchoscopy, the hospital staff couldn't maintain the oxygen saturation above 92%. The patient should have been evaluated for continuous oxygen therapy.

The following day a nurse practitioner documented that the patient *had been declining for the past 4-6 months and couldn't recall his cell house or medications*. The nurse practitioner assessment was deconditioning and ordered physical therapy and infirmary admission. There was no further history to document status of either his Parkinson's disease nor COPD. The nurse admission note documented that physical therapy was to evaluate the patient for a possible caregiver and ADA evaluation. The hospital discharge summary was documented as reviewed on 8/6/22, 22 days later.

On 7/18/22 the nurse practitioner discharged the patient back to general population documenting that the patient appeared stronger and able to step onto the scale. The oxygen saturation was 75% which warranted possible continuous oxygen therapy, yet the patient was discharged to general population. This was unsafe as the patient was hypoxemic and three days before was unable to safely dress himself. A care-taker was assigned to the inmate and he was discharged with an order for physical therapy for leg strengthening.

On 7/25/22 physical therapy was not completed because there was no ADA van available to take the patient to the health unit.

On 7/27/22, a nurse practitioner evaluated the patient for follow up of shortness of breath and deconditioning related to the recent infirmary admission. The NP documented that the patient was recently hospitalized for physical decline and fell while hospitalized. The patient answered all questions and the nurse practitioner documented,

> "upper extremity coordination is good but overall very weak, f[r]ail, + physically declining quickly, unable to raise himself from a seated position from the w/c [wheelchair], unable to on his own accord- sways side to side when standing, requires full assist with physical transfers, unable to raise or stand, unable would fall if left unassisted. NOTE, Pt told this NP "I fell out of my bed about a year ago, I didn't say anything but I fell on my tailbone and lower back"".

The nurse practitioner's only physical examination was that the patient had lower leg edema attributed to immobility. There was no assessment. The nurse practitioner ordered Lasix 20 mg daily for a week, again ordered physical therapy, ordered an extra pillow for his bed, a urinal, naproxen, Tylenol for 3 months, and a CBC and CMP in two weeks. The indication for the Lasix was apparently dependent edema. Blood tests x-rays of the entire spine and bilateral hips, and a wheelchair cushion was ordered. The nurse practitioner explained these orders as pressure relief items ( wheelchair cushion and pillow to prevent decubitus). The nurse practitioner documented notifying the ADA clerk and HCUA for further evaluation for proper care. A copy of the note was

given to the ADA coordinator and HCUA. This patient was unable to care for himself and was left in general population, (possibly with a caretaker). This patient had advanced Parkinson's disease complicated by bronchiectasis and COPD and should be been promptly sent to a supportive housing arrangement; in this case the infirmary. If there was no capacity to care for him at Menard, OHS should have been called for an alternative placement.

On 8/4/22 at 8 am, a nurse practitioner admitted the patient to the infirmary for gradual physical decline, documenting that the patient couldn't stand from his wheelchair without assistance and required full assistance with activities of daily living. He was admitted to the third floor as a chronic patient. Physical therapy was ordered. Though the nurse practitioner said that the patient needed total care, no directions were given to nurses regarding that care. Later, at 10:30 am, the nurse practitioner documented that the patient had been admitted to the infirmary on Monday (presumably 8/1/22) but the ADA van was unavailable to take the inmate to the infirmary so the admission was not completed and the nurse practitioner instructed the furlough clerk to check with other facilities for an ADA van. The nurse practitioner then wrote that the patient had 3+ edema with weeping of edema from his legs so apparently, the nurse practitioner sent the patient to the local hospital.

The patient returned from the hospital to the prison the same day and was admitted to the infirmary. The nurse admission note documented bruising across his back. There was no hospital discharge summary but a patient instruction sheet documented diagnoses of hypo-osmolar hyponatremia and hypoalbuminemia. There was a recommendation to follow up with cardiology for an echocardiogram. On the infirmary admission note, the nurse practitioner did not document what was identified at the hospital and the hyponatremia, hypoalbuminemia nor cardiology referral were addressed.

The hospital report was obtained on 8/6/22 and documented hyponatremia (sodium of 127 with normal 135-145), mild anemia (hemoglobin 13.5 with normal 14-18), and mild hypoalbuminemia (albumin of 3.4 with normal 3.5-5). The pro-BNP was elevated at 527. The chest film showed bilateral interstitial markings corresponding to bronchiectasis with no significant interval change. A CT scan was recommended to better evaluate the bronchiectasis. A CT of the lumbar spine showed multilevel osteoarthritic changes consistent with Baastrup disease. The hospital recommended follow up with a cardiologist for echocardiogram. On 8/6/22 a nurse practitioner reviewed the 8/4/22 emergency room note. The nurse practitioner documented Baastrup disease but none of the other findings were documented and the plan of care was not modified.

On 8/5/22 a nurse practitioner saw the patient on the infirmary. He documented a decubitus ulcer on the buttock and bruising on the upper back. A dressing for the decubitus was ordered and for unstated indication an indwelling Foley catheter was placed. It is not recommended to insert an indwelling urinary catheter without a specific indication. A nursing wound flow sheet documented three decubiti on the buttock and low back. The patient had decubiti ulcers verifying the need for medical housing earlier than what was provided. The nurse practitioner ordered a metabolic panel in a week.

98

On 8/12/22, the laboratory reported a serum sodium of 121 which is very low and should have been immediately addressed. This is a red flag value because serum sodium below 120 is severe and can result in central nervous system complications. This needed closer attention because the patient had recent falls including head injury. This test should have been repeated promptly. The laboratory result was initialed as reviewed on 8/13/22, but there was no associated progress note and the patient was not evaluated. A nurse practitioner evaluated the patient on 8/15/22 but did not address the abnormal laboratory result and only addressed the decubiti.

On 8/19/22, the laboratory reported a serum sodium of 130 which is improved from the 121 value but still low. This test was signed as reviewed on 9/12/22. There was no evaluation to determine the cause of the hyponatremia.

On 8/22/22, a nurse practitioner documented that the patient was lying in bed on his back and there were rhonchi throughout his lungs . The buttock wounds were described as diminished but worsening with skin peeling back at multiple levels appearing as a shearing wound 4 by 2 cm stage II to the right mid back. Pneumonia[26] and "wounds" were diagnosed. The nurse practitioner cautioned the patient to roll side to side to avoid worsening of the decubitus wounds, but the physical therapist had already documented the patient had difficulty doing this. A pressure-relief bed was not provided. A dressing was prescribed. Levaquin was ordered for 7 days presumably for the pneumonia but the indication was not stated. The NP did not document any evaluation of the laboratory results so the hyponatremia remained unrecognized.

A urine culture was taken 8/19/22 and the results provided on 8/23/22 showing elevated protein, blood, leukocyte esterase and WBCs indicative of infection. The culture grew pseudomonas infection resistant to most antibiotics except levofloxacin. The day before, the nurse practitioner had already started levofloxacin presumably for pneumonia. There was no progress note documenting acknowledgement of the urinary tract infection. The patient received levofloxacin from 8/23/22 to 8/31/22.

On 8/24/22, a psychiatrist saw the patient. The patient was on the mental health caseload for depression and bipolar disorder and was on Depakote and Zoloft for these condition. The psychiatrist documented that the patient had worsening depression because of his physical pain, Parkinson's disease and non-healing buttock wounds. He asked for more help with his depression. The psychiatrist increased the Zoloft dose.

During the infirmary admission nurse practitioners did not thoroughly evaluate his COPD status. After the bronchoscopy the patient was lost to follow up with pulmonary.

On 9/17/22 the patient received his morning dose of fluticasone-salmeterol and at seven pm received his second dose. He also received his pm dose of Trelegy at the same time and had thus been receiving two long-acting beta agonists simultaneously for over a month and a half. He was short of breath with an oxygen saturation of 88% so a nurse gave the patient an ordered nebulization treatment with albuterol, which is a short-acting beta agonist. The patient had an

---

[26] In a separate note on 8/22/22, the nurse practitioner also reviewed the CT scan from 5/9/22, over three months ago, which showed a ground glass appearance consistent with pneumonia. The progress note for the review of the CT scan was in a different section of the medical record from this current progress note.

earlier dose of short-acting beta agonist at 3 pm. Within forty minutes of his last long-acting doses of medication and twenty minutes after the short-acting nebulization was initiated, the patient became unresponsive (7:20 pm) with blood pressure of 60/40 and agonal respirations. The on-call doctor was called and he ordered the patient sent to a hospital. Between the initial request for a breathing treatment and the initiation of cardiopulmonary resuscitation (7:25 pm), vital signs were not monitored. The electrocardiogram tracing or automated external defibrillator was placed on the patient at 7:25 about five minutes after he became unresponsive. Ambulance medics arrived at 7:45 pm and they stopped resuscitation efforts at 8:05 pm.

Unless additional information from autopsy is provided, this patient's death should be considered a possible sudden death due to an adverse drug reaction to prescription of two long-acting beta agonists contributed to by administration of a short acting beta agonist. This should be reported to the Food and Drug Administration (FDA) as an adverse drug reaction as required by the U.S. Department of Health.[27]

The Monitor noted in the 5th Report that the vendor pharmacy uses only a generic computer application to identify medication interactions and contraindications, however seven patients were identified on chart review, who were on drugs that were of the same class, were on drugs, in combination, that could lead to drug-drug interactions, or presented a risk of adverse effects from the panel of drugs used. Yet there was no evidence that these were identified as so by the dispensing pharmacy.[28] Furthermore the Monitor has recommended, for several reports, that IDOC initiate a process analysis of medication management that should include development of appropriate procedures for production and management of medication administration records, oversight by pharmacy of potential adverse drug reactions, and appropriate procedures for administration of medication. The Director of Pharmacy Standards & Operations, SIU Office of Correctional Medicine should be consulted in relation to compliance with regulations, policies, procedures, protocols, etc. in general but particularly in this case, the need of the pharmacy to inform clinical staff on potential adverse drug reactions, the practices of handwritten medication records, and overwriting prescriptions on the medication administration record.

Opportunities for Improvement
1. IDOC needs an electronic record. Until that happens, they should address multiple medical record issues with corrective actions. These include:
    a. Misfiled documents,
    b. Failure to obtain consultation reports or obtaining these reports late, and
    c. Failure to have filed medication administration records and all prescription orders.
2. The Data Base does not accurately document vaccinations and this patient did not appear to receive indicated vaccinations. When the IDOC immunization and cancer screening

---

[27] The Department of Health Order No. 2011-0009 entitled "National Policy and Program on Pharmacovigilance" Section VII, D. states that, "*Healthcare professionals are required to report to the FDA any suspected adverse event arising from the use of pharmaceutical products*". This is quoted from an FDA bulletin found at: https://www.fda.gov.ph/fda-advisory-no-2021-2290-reporting-of-adverse-reactions-to-drugs-and-vaccines/
[28] Health Care Monitor 5th Report, Lippert v Jeffreys , June 22, 2022, page 145. See mortality review patients 2, 3, 10, 11, 14, 20, 24 in 5th Report.

policy is implemented, it should effectively address documentation of vaccination and cancer screening.

3. This patient did not receive appropriate cancer screening for his age (colon). When the IDOC immunization and cancer screening policy is implemented, it should effectively address cancer screening.

4. The problem list was inaccurate. IDOC should perform a process analysis of chronic care to include the problem list which was not accurate.

5. Intake screening policy requires nurses to take the medical history of patients. This should end and providers should take their own history when the patient has a chronic illness. In this case there was no history taken in intake regarding the patient's COPD or Parkinson's disease. Policy should be changed to ensure that providers take an adequate medical history for persons with any chronic or acute illness.

6. The patient had Parkinson's disease yet failed to have an adequate cognitive or neurologic examination nor was a functional assessment performed to monitor the patient's ability to conduct activities of daily living. Because the patient was not referred to a neurologist no one was monitoring the patient's Parkinson's disease and care was reactive. IDOC needs to decide who will monitor this disease (a neurologist or facility providers) but monitoring needs to be thorough.

7. The patient had a 15.1% 10-year cardiovascular risk and a moderate to high intensity statin. A low intensity statin apparently was started but medication administration records were missing and it appeared that the low-intensity statin was stopped in 2021. This patient should have been on a statin but this was not done and the patient was not followed for this.

8. The patient had only one chronic care visit over the two year time period. At that sole visit, there were innumerable deficiencies that can be review in the case review. Given that there was no effective chronic clinic for this patient, his chronic illnesses were not monitored and were treated reactively when deterioration occurred. In 2021-2022 care was episodic and a therapeutic plan of all his conditions was not documented in any single note. A process analysis of the chronic care program should be conducted with resultant corrective actions.

9. There was a severe lack of staffing at Menard. There was no physician for almost a year and nurse practitioners were managing the facility. Many mistakes occurred and there was a lack of effective monitoring that resulted in harm to this patient. It appeared that nurse practitioners were without a supervising physician for about a year. When no full time physician was available, it did not appear that nurse practitioners had physician supervision or consultative support. At one point, the patient couldn't be housed on the infirmary due to lack of nursing staff. The infirmary couldn't be operated due to insufficient staffing. The staffing shortage in IDOC is critical and need immediate correction.

10. Support services were inadequate to support an adequate medical program.
    a. There was no ADA van to transport the patient on several occasions. This is harmful. IDOC needs to ensure that appropriate ADA vehicles are available for every institution.
    b. Ordered laboratory tests and radiology tests were significantly delayed. In one case, there was no available radiology technician to take a chest x-ray. This affected care. When an ordered x-ray cannot be completed in the ordered timeframe, the patient should be sent offsite to an emergency room for the x-ray.

    c. It appeared that phlebotomist to draw blood were unavailable delaying laboratory tests.

    d. A physician wanted to read a CT scan on a disc but apparently equipment wasn't available to do so. Information from the CT scan wasn't available to the physician.

    e. Reports for most specialty consultations were not obtained timely.

11. This patient appeared to have been instructed to use a long-acting beta agonist inhaler on 2/9/22 as if it were a rescue inhaler. Providers in chronic clinics should have the current medication record to assess current medications and should give appropriate instruction to patients on how and when to use their inhalers.

12. The patient had multiple falls without having a fall prevention plan or appropriate housing for most of his incarceration. Because of his Parkinson's disease and mobility disability, this patient should have been in an assisted living environment since shortly after incarceration but was not. Instead, he was managed reactively after adverse clinical events occurred. The Monitor continues to recommend a survey of the elderly and disabled to assess their housing needs against existing housing arrangements.

13. The patient never had a thorough cognitive assessment and showed intermittent signs of cognitive deficiency. IDOC would benefit from training on cognitive assessment and when to perform these assessments. An in-house gerontologist (consultations can be conducted via telemedicine) is suggested.

14. The patient received some, but insufficient physical therapy. Physical therapy staff is clearly inadequate based on need.

15. This patient did not have a pulmonary function test to assess his COPD until he saw a pulmonologist. IDOC should institute a procedure that all patients with COPD are to have at least a baseline pulmonary function test.

16. For this patient, specialty care was disorganized and dysfunctional. IDOC should institute huddles between providers, the Medical Director at the facility and the scheduling clerk. These huddles should include discussion of all referrals include their appropriate timeliness which should be directed by the facility Medical Director.

17. This patient was ordered and provided two long-acting beta agonist medications which is dangerous. When patients are referred to consultants, a list of all their medications needs to be sent to the specialist.

18. Consultant reports were not reviewed by a provider with the patient. Therefore, care was not informed. This is required by the Consent Decree.

19. On 7/14/22, a physician sent a patient, who that same day had a severe exacerbation of COPD post-bronchoscopy, back to general population housing. This is one of many unsafe and clinically inappropriate actions by this physician who is not qualified to practice in IDOC based on Consent Decree requirements.

20. The patient had two "red flag" presentations which did not result in appropriate action or referral. These included on 5/31/22, the patient having oxygen saturation as low as 77% without referral to a hospital for presumptive pneumonia. On 7/18/22, a nurse practitioner discharged a patient from the infirmary with an oxygen saturation of 75%. The patient should have been sent to a hospital or treatment should have occurred to improve hypoxemia to a safer level. Long-term oxygen therapy should also have been initiated.

21. Laboratory tests were not integrated into the therapeutic plan. The patient had A1c indicative of diabetes, significant hyponatremia (121 & 130), and mild anemia all which

were unrecognized and which were not integrated into the patient's plan of care. All of the laboratory tests were initialed as reviewed.

22. On 4/4/22 a nurse practitioner reviewed a chest x-ray from 3/29/22 and initiated treatment for pneumonia by phone order without seeing the patient. Patients with a serious condition, such as pneumonia, should be evaluated in person.

23. The patient through an apparent series of errors resulted in the patient being on two long-acting beta agonists simultaneously. IDOC should investigate how the pharmacy vendor permitted this combination of medications.

24. IDOC also needs a thorough process analysis of medication management to ensure it is safe. This needs to include the use of nurse hand-written medication administration records that are not reviewed by the pharmacy, communication with specialists about current prescriptions of the patient, and ensuring that a pharmacist approves dispensed medication as safe to use.