**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| LATOYA HUGHES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT FOR CONTINUATION OF PROVISIONS OF THE CONSENT**
**DECREE PURSUANT TO SECTION IX.B.5**

I.    **Introduction and Background**

1.       The Consent Decree was approved and entered by this Court on May 9, 2019. Dkt 1238. The Decree provides for the selection of a Court-appointed Monitor—an "independent and impartial" individual who is "knowledgeable about the management and oversight of correctional medical and dental programs," to whom the Decree commits the performance of "the responsibilities enumerated in this Decree." *Id.* at 19 (§ V.A); *see also* Dkt. 1557 at 19 (§ V.A).[1] With agreement of the parties, the Court appointed Dr. John Raba as Monitor of this Decree. Dkt. 1108.

2.       Among the "Duties" conferred on the Monitor by the Decree is that of judging Defendants' compliance with its provisions. Section V of the Decree ("Monitoring and Compliance") states in subsection 5 that "The Monitor shall [] evaluate Defendants' compliance

---

[1] The parties amended the Decree in 2022, but the provisions relevant here are identical to the original Decree at Dkt. 1238. For ease of reference, the operative, amended Decree, Dkt. 1557, will be referenced throughout.

with this Decree, including identifying actual and potential areas of substantial compliance, partial compliance and non-compliance . . ." Dkt. 1557 at 20 (§ V.E).

3.      Findings of "substantial compliance" (as well as partial compliance and non-compliance) are explicitly committed to the Monitor: "The Monitor may find that the Defendants have substantially complied, partially complied, or are not in compliance with the Decree." *Id*. at 23 (§V.J. "Compliance"); *see also id*. at 20 (§ V.E) (the Monitor's evaluations shall "include[e] identifying actual and potential areas of substantial compliance, partial compliance and noncompliance . . .").

4.      Under the Decree, Defendants have an obligation to provide information to the Monitor to enable him to make these determinations. Section V.G of the Decree provides that "Every six (6) months for the first two (2) years and yearly thereafter, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance . . ." Dkt. 1557 at 21 (§ V.G). Thus Defendants' proof of their progress towards compliance is in their own hands, and it is their responsibility to provide this regular "detailed report" of "data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance." *Id*.

5.      The Decree requires the Monitor to report his compliance evaluations twice annually in a written report to the parties and the Court. Dkt. 1557 at 20 (§ V.E) (twice yearly, the Monitor will report to the Parties and the Court regarding compliance with the Decree). Once the report has been submitted, it remains under seal for thirty days. Dkt. 1557 at 20 (§ V.E). During this period, the parties may respond to the report, hence Defendants have a final opportunity to

intervene as to the Monitor's findings of compliance. *Id*. Only after the response period has ended does the report with its compliance findings go into the public docket. *Id*.

6.      In short, the Decree, by its terms and by agreement of the Parties, establishes the Monitor as the evaluator of Defendants' compliance with the Decree, including whether Defendants have achieved "substantial compliance." The Decree also provides that the Monitor's reports may be used as evidence in this case, and that the Monitor may opine on the "ultimate issues:"

> In any court proceeding related to this Decree, the information gathered by the Monitor during the life of this Decree, the Monitor's reports, including all reports and materials supplied by Defendants, may be used, and the Monitor and his or her consultants may testify and opine upon ultimate issues in this case.

Dkt. 1557 at 27-28.

7.      Since the Decree was entered, the Monitor and his team have issued seven reports evaluating Defendants' efforts towards compliance with the Decree. These reports are based on the information provided to them by Defendants as well as their own site visits, discussions with facility staff, meetings with IDOC leadership, and record reviews. Dkt. 1276 (Monitor's First Report); Dkt. 1335 (Monitor's Second Report); Dkt. 1403 (Monitor's Third Report); Dkt. 1463 (Monitor's Fourth Report); Dkt 1579 (Monitor's Fifth Report); Dkt. 1661 (Monitor's Sixth Report); Dkt. 1725 (Monitor's Corrected Seventh Report).

8.      In the past five years, the Monitor has found Defendants in substantial compliance with only five provisions of the Consent Decree: § III.A.1, § III.A.5, § III.A.8, § III.H.5, and § III.M.1.d. *See* Dkt. 1463, Fourth Report, at 140 (finding substantial compliance with § III.H.5 for the first time); Dkt. 1579, Fifth Report, at 4, fn.1 (agreeing with Defendants' self-assessment of substantial compliance only with respect to § III.A.1, § III.A.5, and § III.A.8); 122 (reiterating substantial compliance finding as to § III.H.5); Dkt. 1725, Seventh Report, at 133 (reiterating

substantial compliance as to § III.H.5), 155 (finding substantial compliance with § III.M.1.d for the first time).

9. The Monitor has not found Defendants to be in substantial compliance with any other provision of the Decree. Moreover, in response to Plaintiffs' motion to continue those terms of the Decree for which the Monitor has not found substantial compliance (Dkt. 1727), Defendants did not assert that they were in substantial compliance with any additional terms of the Consent Decree (Dkt. 1747). Accordingly, there is no reason for the Court not to accept the Monitor's determinations of lack of substantial compliance as to the provisions listed in Section II below.

10. Regarding its duration, the Decree contains the following language:

> This Decree and the Court's jurisdiction over the Decree and underlying case shall terminate five (5) years after the Effective Date, with respect to any provisions of the Decree for which there is no outstanding determination that Defendants are not in substantial compliance. **If the Court determines that Defendants are not in substantial compliance with any provisions of the Decree at any time during the five (5) year period of the Decree, the Court's jurisdiction with respect to such provisions shall continue for the remainder of the five (5) year period or for a period to be determined by the Court of not more than three (3) years from the date of the Court's finding the Defendants are not in substantial compliance.** If after eight (8) years, the Court determines that the Defendants have failed to come into substantial compliance with respect to one or all provisions of the Decree, the Court's jurisdiction with respect to such provisions shall continue for a period of not more than two (2) additional years for that particular provision(s). In any event, this Decree shall terminate no later than ten (10) years after its Effective Date.

Dkt. 1557 at 26 (§IX.5) (emphasis added).

11. The Effective Date of the Decree is May 9, 2019. As such, the initial five-year period of the Decree is set to expire on May 9, 2024, and the Court must now determine whether Defendants have achieved substantial compliance with any provisions of the Decree and, for any provisions with which Defendants have not achieved substantial compliance, this Court's

jurisdiction "with respect to such provisions shall continue" for a period of not more than 3 years.

12.     In the Sixth Report, the Monitor noted that "[a]fter nearly four years, few of the major deficiencies and fewer of the essential elements that resulted in the Consent Decree have been corrected and some have worsened." Dkt. 1661 at 4. In both of the last two reports, the Monitor has summarized the current state of affairs as "a failure by the State to establish the foundations of an adequate medical program in the IDOC" and has cautioned that the Department "will not attain compliance with this decree … unless significant changes occur." Dkt. 1661, Sixth Report, at 5; Dkt. 1725, Seventh Report, at 7. These comments make clear that the Department is not likely to achieve compliance with the Decree prior to May 9, 2024.

13.     In accordance with the above, the Court now finds that Defendants have not achieved substantial compliance with the following provisions of the Consent Decree and that those provisions must be extended for a period of three years—to May 9, 2027—as follows:

## II.     Provisions Not in Substantial Compliance

### Section II.A (General Statement)

14.     Section II.A of the Consent Decree states "Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs." Dkt. 1557 at 5.

15.     The Monitor has never found Defendants to be substantially complaint with this term. *See* Dkt. 1725, Seventh Report, at 117, 128, 134, 166 (rating Defendants noncompliant), 92, 100, 108, 111, 179 (rating Defendants only "partially complaint"); Dkt. 1661, Sixth Report,

at 79, 89, 100, 104-5, 113, 119, 122-23, 140 (rating Defendants "noncompliant") and 73, 83-84, 91, 154-55 (rating Defendants only "partially" compliant); *see also* (Dkt. 1579, Fifth Report, at 4, 75-76, 81, 83, 91-92, 95-96, 105-06, 118-19, 123, 139-40, 152; Dkt. 1463, Fourth Report, at 92, 97, 100-01, 109-10, 114, 120-21, 136, 145, 157, 166-67; Dkt. 1403, Third Report, at, 57, 61, 68, 77, 85-86, 91, 99-100, 111, 120, 131; Dkt. 1335, Second Report, at 79, 83-84, 89, 93-94, 100-01, 108, 116-17, 118-19, 124-25; Dkt. 1256, First Report, at 11).

16.     The Court finds, based on the Monitor's reporting, that Defendants have not provided "sufficient measures" to "ensure adequate medical and dental care is being provided" to Class Members. The electronic medical record that was to be implemented by September of 2022 still has not been implemented (though the Court notes that Defendants entered into a contract with a new EMR vendor on April 10, 2024, after Plaintiffs filed a motion to hold Defendants in contempt). The Monitor finds that, from the date of EMR contract, "it will likely take an additional two or more years to effectively implement the electronic record." Dkt. 1661, Sixth Report, at 4; *see also* Dkt. 1725 at 6-7.

17.     The Monitor has been reporting that capital improvements to medical units and other spaces are necessary to facilitate adequate care but have not been completed. Dkt. 1661, Sixth Report, at 5-6, 60-61 (citing Dkt. 1335, Second Report, at 73; Dkt. 1403, Third Report, at 51-52; Dkt. 1463, Fourth Report, at 73; Dkt. 1579, Fifth Report, at 66-68); Dkt. 1725, Seventh Report, at 6, 81-83. The Monitor reports that "lack of sufficient number of exam rooms is a barrier to access to care in IDOC's correctional centers." Dkt. 1661 at 57. The Monitor reports ongoing physical plant issues, including pest infestations that extend to healthcare units, dirty and/or inoperable sinks, rusty and dirty vents, missing curtains around infirmary beds, absence of non-slip surfaces in the infirmary showers, missing and/or cracked tiles in showers and hallways,

examination tables with torn vinyl, broken toilets, and water leakage, to name a few. Dkt. 1725, Seventh Report, at 81-82. The Monitor's Seventh Report shares a medical note written by a nurse performing wound care who witnessed a cockroach exiting the abdominal folds of a confused and bed-ridden patient in the Stateville infirmary. Dkt. 1725, Seventh Report, at 82.

18.     Likewise, the Court finds, based on the Monitor's reporting, that Defendants have not ensured "the availability of necessary services, supports, and resources" to meet the needs of the Class. For example, healthcare staffing remains a serious problem and a barrier to providing necessary care. As of the filing of the Sixth Report, there were "fewer health care staff working … than before the Consent Decree was signed," and the Monitor found that the "staffing shortage is critical and results in patients not receiving adequate care." Dkt. 1661 at 4. As of the Seventh Report, Defendants' healthcare vendor Wexford Health Sources, Inc., was providing only 50% of the staff IDOC contracts with Wexford to provide, and IDOC could not provide any data on State positions filled and vacant for IDOC-employed medical staff, who constitute some 35-40% of medical and dental staff. Dkt. 1725 at 6, 56.

19.     For the reasons just stated in paragraphs 15-18, the Court finds that Defendants are not in substantial compliance with Section II.A.

## Section II.B (General Requirements)

20.     Much of the discussion under Section II.A, above, is also relevant to Defendants' lack of substantial compliance with the requirements of Sections II.B.1, II.B.2, and II.B.3. Section II.B.1 of the Decree requires generally that "IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care." Dkt. 1557 at 5. The Monitor finds a lack of substantial compliance with this provision. Dkt. 1725, Seventh Report, at 92, 100, 108, 111, 117, 128, 134, 166; Dkt. 1661, Sixth Report, at 73, 83-84, 89, 91, 100, 113, 122, 140; *see also* Dkt.

1579, Fifth Report, at 64, 75-76, 83, 91-92, 95-96, 105-06, 118-119, 123, 139-40; Dkt. 1463, Fourth Report, at 92, 100-01, 109-10, 114, 120-21, 136, 145, 157; Dkt. 1403, Third Report, at 57, 68, 77, 85, 91, 99-100, 111, 120; Dkt. 1335, Second Report, at 68-69, 79, 83-84, 93-94, 100-01, 108, 114, 118-19. Section II.B.2 requires that "IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care." The Monitor finds lack of substantial compliance with this provision in the Sixth Report at 5-6, 15, 31, 41-42, 51-52, 56, 187, 193. And Section II.B.3 requires that "IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff." The Monitor finds a lack of substantial compliance with this provision at Dkt. 1661 pages 5-6, 41-42, and 155. The Court finds that Defendants are not in substantial compliance with Sections II.B.1, II.B.2, or II.B.2.

21.     As discussed in paragraph 18 supra, the Court finds that Defendants have not reached substantial compliance with the requirement to provide "adequate staff" (§II.B.2), "enough trained clinical staff" (§II.B.3), or "oversight by qualified professionals (§II.B.3)." Dkt. 1661, Sixth Report, at 10-12, 41-47. As of the Sixth Report, the Monitor found that the combined healthcare staffing vacancy rate was 46% for IDOC and its vendor. Dkt. 1661 at 42. The Monitor summarized that "staffing is worse than at the start of the Consent Decree and it has become a crisis and is dangerous because the greatest deficiencies in staffing are at supervisory and higher skilled levels." Dkt. 1661 at 46; *see also* Dkt. 1725 at 103 ("A major barrier to access to primary care as required by II.B.1 is staffing."). The Monitor also has raised concerns in both the Sixth

and Seventh Reports that staff, including nurse practitioners and physician assistants, are not receiving appropriate clinical oversight. Dkt. 1661 at 53-54; Dkt. 1725 at 121. Likewise, as discussed in paragraph 17 supra, the Court finds Defendants are not in substantial compliance with the "adequate facilities" obligation in this provision.

22.     The Court finds that Defendants are not in substantial compliance with their obligation to "monitor[] health care by collecting and analyzing data to determine how well the system is providing care" including "meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care." (§II.B.2). Dkt. 1661, Sixth Report, at 5-6, 15, 31, 41-42, 51-52, 56, 187, 193.

23.     Section II.B.4 of the Decree requires that "No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities. Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract." Dkt. 1557 at 5-6. While Defendants have entered into a contract for EMR services, the EMR system has not yet been implemented and, as discussed in paragraph 16 supra, is unlikely to be implemented for at least two more years. The Court finds that Defendants are not in substantial compliance with this Section II.B.4.

24.     Section II.B.5, II.B.6.s, and II.B.6.t all relate to discharge planning. Section II.B.5 states that "Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care," while II.B.6.s. requires summarizing essential health information for patient and anticipated community providers and II.B.6.t requires that "Upon release, providing bridge medications for two weeks along with a prescription for two

more weeks and the option for one refill, if medically appropriate." The Monitor's Sixth Report finds that Defendants have not reached substantial compliance with these terms. Dkt. 1661, Sixth Report, at 148-154. The Monitor found that IDOC uses no standard format to document discharge planning and that, depending on the facility, discharge planning occurred one week, one month, or even several months prior to discharge. Dkt. 1661 at 150-51. More importantly, in a review of 30 charts for the Sixth Report, the Monitor found that the list of diagnoses was incorrect in 25 out of 30 discharge summaries, and only one person had a specific referral to a community provider. Dkt. 1661 at 151-52. The Monitor further found that facility practices varied with regard to supplying medication at discharge. *Id.* at 153. In sum, the Monitor finds that "The actual practice of discharge planning by the IDOC is not consistent with the language of the Consent Decree and there is no clinical oversight for continuity of care at discharge." Dkt. 1661 at 154. These findings remain unchanged in the Seventh Report. Dkt. 1725 at 178 ("the policy and practices of the IDOC with regard to discharge planning for the purposes of continuity of medical care upon return to the community are unchanged"). Based on these findings, this Court finds that Defendants are not in substantial compliance with Sections II.B.6.s or II.B.6.t.

25.     Section II.B.6 requires IDOC to implement changes in 19 different areas of care. Dkt. 1557 at 6-7. These areas of care coincide with other requirements in the Decree, and the Monitor tends to address them alongside those other requirements, so these subparts will similarly be addressed within these findings alongside their related provisions where appropriate. The 19 areas of care (and the paragraphs addressing them herein) include:

a.   Initial intake screening, and initial health care assessment (¶ 45);

b.   Urgent care (¶ 55);

c.   Medication administration records—both for directly administered medications and KOP (¶ 26);

d.   Medication refusal (¶ 26);

e.   Informed care for patients who return to IDOC facilities after being sent to an offsite service provider (¶ 60);

f.   Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease ("COPD"), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia (¶ 45);

g.   Timely access to diagnostic services and to appropriate specialty care (¶ 60);

h.   Dental care access and preventative dental care (¶ 68);

i.   Morbidity and mortality review with action plans and follow through (¶ 83);

j.   Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so (¶ 27);

k.   Appropriate staffing, physical conditions, and scope of services for infirmary care (¶ 64);

l.   Effective quality assurance review (¶ 79);

m.   Preventable adverse event reporting (¶ 81);

n.   Action taken on reported errors (including near misses) (¶ 81);

o.   Training on patient safety (¶ 80);

p.   Adequately equipped infirmaries (¶ 37);

q.   Annual assessment of medical, dental, and nursing staff competency and performance (¶ 28);

r.   That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk (¶ 28);

    s.   Summarizing essential health information for patient and anticipated community providers (¶ 24); and

    t.   Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate. (¶ 24).

Dkt. 1557 at 6-7.

26.    Section II.B.6.c requires IDOC to implement improvements in medication administration records—both for directly administered medications and KOP (which means "keep on person", per §I.C.9 of the Decree), while Section II.B.6.d requires IDOC to make improvements regarding medication refusals. Dkt. 1557 at 6. In the Sixth Report, the Monitor noted that IDOC had not provided much of the information requested by the monitoring team to evaluate compliance with this term. Dkt. 1661, Sixth Report, at 140-42. The Monitor's own review of CQI meeting minutes and patient records revealed that "contemporaneous documentation of patients' receipt of medication continues to be problematic." *Id.* at 142. The Monitor further documented errors including failure to document or delaying medication administration, transcription errors, continuing to administer a medication after an order was discontinued, and administering the wrong medication or the wrong dose of a medication. *Id.* at 142. Regarding medication refusals, the Monitor's chart review demonstrated that providers do not review medical records for medication adherence during important encounters, including chronic clinics or infirmary rounds and does not appear to have the most recent MAR available during these encounters. Dkt. 1661 at 146. These issues had not improved by the Seventh Report, where the Monitor noted that IDOC had proposed draft policies but, other than these, "there is no

significant forward progress with regard to compliance with II.B.6.c and II.B.6.d." Dkt. 1725 at

166. The Court finds that Defendants are not in substantial compliance with Section II.B.6.c.

27.     Section II.B.6.j requires IDOC to implement an "analysis of nutrition and timing

of meals for diabetics and other Class members whose serious medical needs warrant doing so."

Dkt. 1557 at 6.  In the Sixth Report, the Monitor found that Defendants had provided "no proof

of practice" to verify compliance and explained that, based on the monitoring team's record

review and interview at Dixon, it did not appear that nutritional consultation was available in

IDOC. Dkt 1661 at 64. In the Seventh Report, the Monitor acknowledged that IDOC had drafted

a general, therapeutic diet manual, but it was unclear how the manual "translates to actual meals

and hours of meals" at individual facilities. Dkt. 1725 at 85-86. IDOC still did not provide any

evidence that any individual dietary counseling occurs, and the Monitor's discussions with

diabetes patients at Graham revealed that "nutrition was a major problem" given the timing of

insulin administration at that facility. *Id.* Moreover, the SIU mortality reviews identified three

people who died with protein calorie malnutrition, demonstrating that "[m]uch work remains to

be done" with respect to dietary issues within IDOC. The Court finds that Defendants are not in

substantial compliance with Section II.B.6.j.

28.     Section II.B.6.q requires IDOC to implement "annual assessment of medical,

dental, and nursing staff competency and performance," while Section II.B.6.r requires that

"Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate

their respective health care staff that put patients at risk." Dkt. 1557 at 6. In the Sixth Report, the

Monitor found that IDOC had "not provided verification that it has established effective peer

review or monitoring of physician and mid-level provider staff," nor had IDOC produced "any

peer reviews or performance evaluations of any type for medical physicians, nurse practitioners,

physician assistants, dentists, and dental hygienists for calendar year 2022." Dkt 1661 at 51-52. The Monitor further noted that a new policy for peer review was made effective in October 2022, but it was "inadequate" because it failed to describe how peer review will be managed. Dkt. 1661 at 53. In the Seventh Report, the Monitor confirmed that a peer review policy was in process of being drafted but "meaningful performance evaluations of physicians is not yet occurring." Dkt. 1725 at 63. IDOC did not provide evaluations of dental hygienists or dental assistants for the Seventh Report. Dkt. 1725 at 65. While dental peer reviews are occurring, the Monitor found in the Sixth Report that they were done in a way that lacked objectivity, Dkt. 1661 at 173, and in the Seventh Report found that part-time and PRN/as-needed dentists were not being peer reviewed, which fails to meet the "primary purpose" of "ensur[ing] the quality of dental care" and addressing "concerns or disputes regarding a dentist's practice," Dkt. 1725 at 64. With regards to nursing staff, no information about performance reviews employed by IDOC or its vendor was provided to the Monitor for the Sixth or Seventh Reports. Dkt. 1661 at 54-55; Dkt. 1725 at 66. The Court finds that Defendants are not in substantial compliance with Section II.B.6.q.

29.     Section II.B.7 requires that "The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements." Dkt. 1557 at 7. As of the Monitor's Sixth Report, IDOC had "recently identified" twelve items as "Clinical Quality Measures," which the Monitor agreed could be "considered a starting point for a comprehensive set of performance and outcome measures." Dkt. 1661 at 191-92. For this reason, the Monitor gave the Department a "partial compliance" rating. *Id.* As of the Seventh Report, however, Defendants still had not reached substantial

14

compliance; as the Monitor explained, "development and full implementation of a set of health care performance and outcome measures has yet to be accomplished at the facility level." Dkt. 1725 at 228-29. The Court finds that Defendants are not in substantial compliance with Section II.B.7.

30.     Section II.B.8 requires that the Implementation of the Decree shall include "the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program." Dkt. 1557 at 7. These policies were not completed by the due date of July 1, 2020, *see* Dkt. 1335, Second Report, at 55-56, and still are not complete as of the Seventh Report, Dkt. 1725 at 54 (explaining that IDOC has made progress developing policies and procedures but "none of these documents has been finalized" and "no implementation has taken place at the facility level yet"). As the policies were not finalized by the date required in the Decree nor have they been implemented as required by the Decree, the Court finds that Defendants are not in substantial compliance with Section II.B.8.

31.     Section II.B.9 requires that the Implementation of the Decree shall include "the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor." Dkt. 1557 at 7-8. The Monitor has consistently found Defendants noncompliant with this term. Dkt. 1661 at 190-91 (explaining that IDOC and SIU had developed what they described as a "clinical quality audit," but the healthcare programs at each facility were "instructed to do nothing with the results of these audits as they are meant to establish a 'baseline'" and later, OHS stated that this was "not an audit but are performance and outcome measures instead"); Dkt. 1725 at 26-27 ("IDOC has

not yet initiated an audit function and so has no audit reports."). The Court finds that Defendants are not in substantial compliance with II.B.9.

### Section III.A (Staffing and Leadership)

32.     Sections III.A contains a number of subprovisions relating to physician credentialing that are interrelated and reference one another. Those include III.A.2, III.A.3, III.A.4, III.A.5, III.A.6, and III.A.7, recited together below for clarity.

    a.  Section III.A.2 requires all physicians providing direct care to "possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine." The Monitor does not find substantial compliance with this provision. Dkt. 1661 at 47-50; Dkt. 1725 at 58.

    b.  Section III.A.3 provides that physicians currently working in IDOC who do not meet the criteria of Section III.A.2 "shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter."

    c.  Section III.A.4 requires that "If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return."

    d.  Section III.A.5 provides that "Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph [6]."

    e.  Sections III.A.6 and 7 provide that "Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department.

16

> The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities."

Dkt. 1557 at 8-10.

33.     As of the Sixth Report, the Monitor found there were "at least three individuals who do not have credentials required by the Consent Decree," and advised that at least one of the three "has repeatedly been identified in the Monitor's mortality reviews as someone who is practicing in an unsafe and clinically inappropriate manner. IDOC has been verbally advised that this physician should not be practicing based on criteria of the Consent Decree. Mortality reviews have identified his unsafe and clinically inappropriate care." Dkt. 1661 at 50. The Monitor concluded that "IDOC provided no evidence that physicians without credentials are practicing in a safe and clinically appropriate manner as required by the Consent Decree (III.A.3. and III.A.4)." Dkt. 1661 at 50. This remained true in the Seventh Report. Dkt. 1725 at 60, *see also* 13 (noting that a medical director responsible for supervising a physician without appropriate credentials admitted he performed no monitoring of the individual because he believed that, because the inappropriately credentialed physician was hired prior to the entry of the Decree, the physician was "grandfathered in" and "the Consent Decree did not apply.").  In the Seventh Report, the Monitor also noted that IDOC has not consistently provided the credentialing packets for new hires to enable the Monitoring team to assess compliance. Dkt. 1725 at 60. The Monitor had previously found Defendants compliant with III.A.5, which allows

Defendants to hire physicians who do not meet the Decree's credentialing criteria "*only after* demonstrating to the Monitor that they were unable to find qualified physicians." Dkt. 1579, Fifth Report, at 4, fn.1.

34.     Section III.A.9 requires that "Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter." Dkt. 1557 at 10. In the Sixth Report, the Monitor reported that vacancies in HCUA positions have increased since November 2019, from 3 vacancies in 2019 to 6 vacancies in September 2022. Dkt. 1661 at 8. IDOC did not provide the Monitor with data on IDOC-employed positions for the Seventh Report. Dkt. 1725 at 56. The Court therefore finds that Defendants are not in substantial compliance with Section III.A.9.

35.     Section III.A.10 requires that "Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision." Dkt. 1557 at 10. In the Sixth Report, the Monitor documented that IDOC still did not have a uniform measure to document compliance with this obligation, and that the Monitor's record reviews revealed that LPNs (rather than registered nurses) were still conducting sick call. Dkt. 1661 at 86. The Seventh Report reiterated that the "vacancy rate for registered nurses precludes IDOC from compliance with III.A.10." Dkt. 1725 at 106. The Court finds that Defendants are not in substantial compliance with Section III.A.10.

**Section III.B (Clinical Space and Sanitation)**

18

36.     III.B.1 requires that "IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown." In the Sixth Report, the Monitor found IDOC noncompliant with III.B.1, citing an insufficient number of exam rooms to accommodate the number of clinical staff at the facility, lack of adequate workspace for nursing staff, lack of sufficient dental chairs to accommodate dentists and dental hygienists, inadequate space to provide needed services and programs for infirmary patients, undersized waiting rooms, and inadequate space to house physical therapy services. Dkt. 1661 at 57. These findings were no different in the Seventh Report, with the Monitor also noting that some clinical care is provided in locations "not designed or intended for clinical care," such as the gymnasium being used for intake screening at Graham. Dkt. 1725, Seventh Report, at 71 ("There was no discernable change in the assessment of the room inventories compared to the data provided for the 6th Court Report."). The Court finds that Defendants are not in substantial compliance with Section III.B.1.

37.     Section III.B.2 requires that the clinical areas described in III.B.1 "shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer." Dkt. 1557 at 10-11. Relatedly, Section II.B.6.p requires "adequately equipped infirmaries." The Monitor consistently reports that IDOC does not have a standardized equipment list or standardized information regarding the frequency with which it is serviced and checked, preventing the Monitor from evaluating compliance with these requirements and preventing IDOC from ensuring it is properly equipped "to fully address prisoner medical

needs." Dkt. 1661 at 59; Dkt. 1725 at 78. The Court finds that Defendants are not in substantial compliance with Section III.B.2 or II.B.6.p.

### Section III.C (Reception)

38. Section III.C.1 requires IDOC to "provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers." Dkt. 1557 at 11. As discussed elsewhere in these findings, the Monitor continues to find that IDOC is understaffed, and the Monitor has consistently found that Defendants have not reached substantial compliance with this term. Dkt. 1661, Sixth Report, at 73 ("There has been no further forward progress by IDOC implementing … staffing sufficient to complete medical evaluations within seven days of admission."); *see also* Dkt. 1579, Fifth Report, at 75-76 (rating Defendants partially compliant); Dkt. 1463, Fourth Report, at 92 (rating Defendants noncompliant); Dkt. 1403, Third Report, at 57 (rating Defendants noncompliant); Dkt. 1335, Second Report, at 79 (rating Defendants noncompliant) Dkt. 1276, First Report, at 28 (compliance not yet rated)). In the Seventh Report, the Monitor explained that the IDOC reception and classification centers do not report whether the intake process is completed after 7 days, as required by the Decree, and that this metric is not monitored as part of IDOC's quality improvement. Dkt. 1725 at 93. The Court finds that Defendants are not in substantial compliance with Section III.C.1.

39. Section III.C.2 requires IDOC to "provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown." Dkt. 1557 at 11. As discussed with regards to Section III.B above, the Monitor has also found that one of the four reception centers, Graham, was using its gymnasium to conduct

intake. Dkt. 1725 at 71. The Court finds that Defendants are not in substantial compliance with III.C.2.

40.     Section III.C.3 requires IDOC to "ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner." Dkt. 1557 at 11. The Monitor finds noncompliance with this provision, noting in the Sixth Report that "[p]roblem lists vary widely in how they are completed and what problems are listed," "[t]here is no clear definition of what the problem list is used for and what content is to be listed," and that the "[p]roblem lists are wholly inaccurate for the purpose of summarizing of the person's health status." Dkt. 1661 at 80. These issues did not improve as of the Seventh Report, where the Monitor reports that "[t]here also has been no improvement in the accuracy or completeness of patient problem lists." Dkt. 1725 at 97. The Monitor further found that only 20% of the records he reviewed demonstrated a thorough history and examination. Dkt. 1725 at 97. The Court finds that Defendants are not in substantial compliance with Section III.C.3.

41.     Section III.C.4 requires that, "[i]f medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment." Dkt. 1557 at 11. The Monitor found in the Sixth Report that "providers failed to work up some problems that were identified in intake screening and did not routinely comment on abnormal lab results." Dkt. 1661 at 81. In the Seventh Report, the Monitor again found, based on a record review, that "the plan of care did not address all of the findings from initial screening and the health care assessment as required by III.C.4." Dkt. 1725 at 97. The Court finds that Defendants are not in substantial compliance with Section III.C.4.

42.     Section II.B.6.a requires IDOC to implement changes in the areas of initial intake screening, and initial health care assessment. Dkt. 1557 at 6. As discussed in the preceding

paragraphs, the Monitor finds that appropriate changes to intake screening and health care assessment are not taking place. Dkt. 1661, Sixth Report, at 78 ("OHS has yet to establish an improved process for intake screening and assessment or to sufficiently account for the staffing necessary to accomplish this work as called for in II.B.6.a. and III.C.1 of the Consent Decree.") In the Seventh Report, the Monitor concluded that "findings from record review indicate that medical reception has not changed during the course of the Consent Decree." Dkt. 1725 at 95, 99 (finding also that "There have been no improvements accomplished during this report period in medical reception"). "There still is no guidance as to which conditions reported during intake screening should prompt a request to obtain previous records," and "there is little to no documentation of follow up questions to elicit more information when patients report a significant physical or mental health condition." *Id.* at 96. The Court finds that Defendants are not in substantial compliance with Section II.B.6.a.

### Section III.D (Intra-System Transfers)

43.     Section III.D.1 requires that, "[w]ith the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC." Dkt. 1557 at 11. The Monitor reported in the Sixth Report that IDOC had "a mechanism to place medical holds as required by III.D.1 but has issued no guidance about their use" and that it was also "clear that medical holds are not placed when they should be, as evidenced by complaints of receiving patients on transfer who had pending referrals." Dkt. 1661 at 69. These concerns were

not addressed for all facilities as of the Seventh Report. Dkt. 1725 at 87-88. The Court finds that Defendants are not in substantial compliance with Section III.D.1

44.     Section III.D.2 requires that "[w]hen a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care." Dkt. 1557 at 11. The Monitor reported in the Sixth Report that while IDOC has an audit tool that is used by receiving facilities to "evaluate the condition of the record and whether the health status transfer summary was completed and sent with the record," that tool "does not address *continuity of care* as called out in III.D.2." Dkt. 1661 at 69 (emphasis in original). The Monitor reiterated comments made in the Fifth Report that the "receiving facility portion" of the Health Status Transfer Summary "appears to be voluntary and there is no standardized practice for documentation of receiving screening … ." Dkt. 1661 at 70. After a record review for the Seventh Report, the Monitor found "[d]iscontinuity of patient care was evident in several of the transfers." Dkt. 1725 at 89. The Court finds that Defendants are not in substantial compliance with Section III.D.2.

### Section III.E (Medical Records)

45.     Section III.E.1 requires that IDOC "shall maintain a list of prisoners' current medical issues in their medical charts." Dkt. 1557 at 12. Relatedly, Section II.B.6.f. requires IDOC to implement changes in the management of chronic disease care, including Chronic Obstructive Pulmonary Disease ("COPD"), asthma, HCV, HIV/AIDs, hypertension, and hyperlipidemia. Dkt. 1557 at 6. The Monitor's Sixth Report found noncompliance with both provisions, noting that IDOC had not produced any of the three items requested by the Monitor to assess compliance with terms related to chronic care. Dkt. 1661 at 89. The Monitor further noted that no changes had been made to the chronic care form, which "does not even have

sufficient space to document a history or physical examination" and "does not result in effective documentation of an adequate clinical note." *Id.* In the Seventh Report, the Monitor found that IDOC had not initiated any programmatic changes with regard to the chronic care program other than a telemedicine collaboration with UIC for diabetes care in the Northern Region, noting that ongoing physician staffing deficiencies are a "significant problem" that "does not permit patients to be timely or adequately evaluated for chronic conditions." Dkt. 1725 at 108. Further reporting about the insufficiencies of the problem lists are detailed in the paragraphs related to Section III.C.3, above. The Court finds that Defendants are not in substantial compliance with Section III.E.1 or Section II.B.6.f.

46.     Section III.E.2 relatedly requires that "lists and treatment plans will be amended pursuant to the order of a clinician only." Dkt. 1557 at 12. In the Seventh Report, the Monitor found that only one facility reviewed provided records that "consistently demonstrate the providers' development or use of the problem list," and that there was no improvement on the accuracy or completeness of patient problem lists since the Sixth Report. Dkt. 1725 at 97. When problem lists are used, the Monitor found that "diagnosed medical conditions are often not listed on the problem list;" patients wait, on average, 28 days to see a provider for an initial health assessment; and mortality reviews reveal that those assessments are often inadequate to develop a comprehensive plan of care. Dkt. 1725 at 97-98. In the Sixth Report, the Monitor found that "problem lists are wholly inaccurate for the purpose of summarizing of the person's health status" and that problems found during physical exams were not added to problem lists. Dkt. 1661 at 80. The Court finds that Defendants are not in substantial compliance with Section III.E.2.

47.     Section III.E.3 requires IDOC to abandon the practice of "drop-filing," which is defined elsewhere in the Decree (§I.C.14) as "the procedure of batch filing prisoner medical records in one file to sort out at a later date." Dkt. 1557 at 3, 12. The Monitor's Sixth Report assigns a rating of noncompliance to this provision and states that "IDOC has provided no evidence that 'drop-filing' has been eliminated." Dkt. 1661, at 37; Dkt. 1725, Seventh Report, at 47 ("With respect to "drop-filing", there is no evidence that IDOC tracks this Consent Decree requirement."). The Court finds that Defendants are not in substantial compliance with Section III.E.3.

48.     Section III.E.4 requires that "[t]he medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records." Dkt. 1557 at 12. For the Sixth Report, the Monitor's request for documentation related to this obligation was not responded to by IDOC. Dkt. 1661 at 37. In the Seventh Report, the Monitor reports that "facilities optionally track this item and the term consultation report is undefined and staff appear to count any communication, including brief handwritten comments on a transfer form as a consultant report." Dkt. 1725 at 47. The Monitor finds this insufficient to constitute compliance, noting "numerous episodes" of failure to obtain consultant or hospital reports in the mortality reviews. Dkt. 1725 at 47-48. The Court finds Defendants are not in substantial compliance with Section III.E.4.

### Section III.F (Nursing Sick Call)

49.     Section III.F.1 requires that "[s]ick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown." Dkt. 1557 at 12. As addressed in relation to Section III.B.1 above, the Monitor has

found there is insufficient clinical space to conduct sick call as required by this provision, as many facilities have "fewer exam rooms than there are medical staff" and facilities share exam rooms for multiple purposes including sick call, urgent care, tele-health, chronic care, and physician visits. Dkt. 1661, Sixth Report, at 57. In the Seventh Report, the Monitor noted that at least one facility, Graham, conducted sick call in a manner where privacy and confidentiality were compromised by leaving exam doors open while other patients sat in the hallway and could overhear conversation in the exam room. Dkt. 1725 at 106. At Pontiac, patients were seen cell front, so encounters were not confidential or private and a complete examination was not possible. *Id.* The Court finds that Defendants are not in substantial compliance with Section III.F.1.

50.     Section III.F.2 mandates that "[t]here shall be no set restrictions on the number of complaints addressed during a specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering." Dkt. 1557 at 12. In the Sixth Report, the Monitor found "evidence of patients being treated for more than one complaint" but noted that "IDOC does not have a mechanism to offer proof of practice that this is so." Dkt. 1661 at 87. The Monitor has suggested in the Sixth and Seventh Reports that IDOC develop a mechanism for documenting patient's statement of why they want to be seen as the first entry on the treatment protocol, or to include the patient's written request in the treatment file, so that an audit tool can later evaluate whether all of the patient's concerns were addressed in the encounter. Dkt. 1661 at 87; Dkt. 1725 at 106. The Court finds that Defendants are not in substantial compliance with Section III.F.2.

**Section III.G (Urgent/Emergent Offsite Services)**

51.     Section III.G.1 requires that "[e]ach facility HCUA shall track all emergent/urgent services in a logbook, preferably electronic." Dkt. 1557 at 12. In the Sixth Report, the Monitor found that seven facilities did not use the electronic log described, and of the facilities that do keep the log, there is "considerable variation in how complete the log is." Dkt. 1661 at 94. The Monitor further found that, in addition to being incomplete, the log is also inaccurate, and that the electronic log was only used for offsite emergent/urgent services and therefore did not track those services if they were provided at the facility. Dkt. 1661 at 94-95. Similar findings were repeated in the Seventh Report. Dkt. 1725 at 114. The Court finds that Defendants are not in substantial compliance with Section III.G.1.

52.     Section III.G.2 requires that "[a]ppropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent." Dkt. 1557 at 12. The Monitor's Sixth Report explains that IDOC has an Administrative Directive that requires the Chief Administrative Officer (the warden) to designate an emergency response team, but the A.D. does not describe what the team does and how it performs. Dkt. 1661 at 96. The Monitor found "no evidence" that the teams were operational or any clear delineation of leadership in any of the records that the Monitor reviewed for the Sixth Report. *Id.* After sharing anecdotes from the record review of failed emergency responses, the Monitor concludes in the Sixth Report that the "medical program operated by IDOC does not demonstrate the ability to determine the urgency of a clinical situation and to take appropriate clinical action consistent with III.G.2 and has demonstrated no effort to address deficiencies identified in clinical care provided in urgent emergent situations." Dkt. 1661 at 97.  In the Seventh Report, the Monitor noted that the Administrative Directive had been revised, but found that "failure to recognize the urgency of medical situations continues to be a problem identified in records reviewed for this report." Dkt.

1725 at 115. The Court finds that Defendants are not in substantial compliance with Section III.G.2.

53.     Section III.G.3 requires that "IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained." Dkt. 1557 at 12-13. The Monitor's chart review for the Sixth Report revealed "several examples of patients whose offsite emergency room record was not obtained nor was there documentation of efforts to obtain the record." Dkt. 1661 at 97. The Monitor further found that there is no documentation or record kept as to "why these reports were not obtained," as required by the Decree. *Id.* In the Seventh Report, the Monitor finds that IDOC's practices regarding this obligation "remain unchanged." Dkt. 1725 at 116. The Court finds that Defendants are not in substantial compliance with Section III.G.3.

54.     Section III.G.4 requires that "[f]acility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment." Dkt. 1557 at 13. In the Sixth Report, the Monitor explained that only 11 of 23 sites document the date the patient is seen by a provider following emergent/urgent services, and only five of the 11 document that patients are seen within 48 hours of return. Dkt. 1661 at 98. Even worse compliance was reported in the Seventh Report, with only 19 sites providing the log, only 10 documenting the date the patient was seen following emergent/urgent services, and only *one* facility documenting patients being seen within 48 hours. Dkt. 1725 at 116. The Court finds that Defendants are not in substantial compliance with Section III.G.4.

55.    Relatedly, Section II.B.6.b requires changes in urgent care. Dkt. 1557 at 6. As the preceding paragraphs demonstrate, IDOC has not adequately resolved the Monitor's ongoing concerns with urgent care and problems persist. As the Monitor found in the Sixth Report, "There has been no forward progress with regard to improvements in the provision and documentation of urgent/emergent services since the last report and minimal progress was reported that time." Dkt. 1661 at 93. In the Seventh Report, the Monitor concluded that "Other than development of policy and standardizing emergency equipment and supplies the status of urgent/emergent services as discussed in the 6th report remains unchanged." Dkt. 1725 at 112. The Court finds that Defendants are not in substantial compliance with Section II.B.6.b.

### Section III.H (Scheduled Offsite Services)

56.    Section III.H.1 requires that "[m]edical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA." Dkt. 1557 at 13. The Monitor notes in the Sixth Report that IDOC has made no changes from previous reports regarding these logs. Dkt. 1661 at 116; *see also* Dkt. 1579, Fifth Report, at 119-21 (finding that offsite tracking log is not standardized and does not include many required components; Dkt. 1463, Fourth Report, at 136-37 (finding that offsite tracking log is not standardized, does not include many required components, and is inaccurate); Dkt. 1403, Third Report, at 100-01 (finding that "specialty tracking logs are not accurately maintained" and "do not track referrals which are denied or that have alternative treatment plans."); Dkt. 1335, Second Report, at 108 (finding that tracking logs are not standardized, and are incomplete); Dkt. 1276, First Report, at 33-34 (finding that logs are incomplete, inconsistent,

and not standardized). The logs are maintained by vendor staff, rather than the HCUA as required by the Decree, and are not maintained in a standardized manner. Dkt. 1661 at 116. The Seventh Report does not report any improvement to these problems. Dkt. 1725 at 129-30. The Court finds that Defendants are not in substantial compliance with Section III.H.1.

57.     Section III.H.2 requires that, "[w]ithin three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated." Dkt. 1557 at 13. In the Sixth Report, the Monitor stated that "IDOC provided no evidence to verify progress toward compliance of provisions III.H.2 []." Dkt. 1661 at 117. While the facility tracking logs have a column for documenting whether the outside consult was reviewed with a patient, the answer field is a binary "yes/no" that does not account for the number of days after return that any follow-up happens and "[m]any facilities opt to not even fill this question out." Dkt. 1661 at 117-18. The Seventh Report similarly concludes that "Review of the consultation within three days and a follow up with the patient within five days inconsistently occurs." Dkt. 1725 at 130. The Court finds that Defendants are not in substantial compliance with Section III.H.2.

58.     Section III.H.3 requires that "If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained." Dkt. 1557 at 13. As with other similar requirements, the Monitor's Sixth Report finds that IDOC "had no proof of practice related to III.H.3." Dkt. 1661 at 120. In the Seventh Report, the Monitor pointed out that the SIU mortality reviews "gave

examples of failure to obtain consultant reports" and there was "no evidence documented in the patient's record or on the log of any action taken to obtain the report." Dkt. 1725 at 130. The Court finds that Defendants are not in substantial compliance with Section III.H.3.

59.     Section III.H.4 requires that, "[p]rovided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments" Dkt. 1557 at 13. Again, the Monitor finds in the Sixth Report that "IDOC does not have a standardized procedure to document in the medical record that an offsite procedure has occurred" and IDOC has not "provided any proof of practice that III.H.4. is completed." Dkt. 1661 at 120. In the Seventh Report, the Monitor notes that the existing Administrative Directive for specialty care "does not require documentation of when a patient attends an offsite appointment" and notes that, in practice, documentation regarding specialty care "varies considerably and appears optional". Dkt. 1725 at 130. The Court finds that Defendants are not in substantial compliance with Section III.H.4. .

60.     Section II.B.6.e requires IDOC to implement changes related to "informed care for patients who return to IDOC facilities after being sent to an offsite service provider." Dkt. 1557 at 6. Relatedly, Section II.B.6.g requires IDOC to provide "timely access to diagnostic services and to appropriate specialty care." Dkt. 1557 at 6. In the Sixth Report, the Monitor explained that except for the tracking logs discussed above, "IDOC provided no data or information to verify their compliance with provisions related to specialty care." Dkt. 1661 at 119. The Monitor's review of those logs and patient records demonstrated that "patients are not consistently provided timely nor appropriate access to specialty care or specialty diagnostic testing," and DOC had provided no "proof of practice" that providers were reviewing

consultation reports within three days or having "effective and informed conversation" with the patient about it within five days. *Id.* In the Seventh Report, the Monitor similarly found that "provider follow up after specialty consultations were not timely or did not occur at all," and "timely access to diagnostic services or specialty care is not occurring." Dkt. 1725 at 129. The Court finds that Defendants are not in substantial compliance with Sections II.B.6.e or II.B.6.g.

## Section III.I (Infirmary)

61.     Sections III.I.1-3 of the Decree have to do with staffing of registered nurses. Section III.I.1 requires that a "registered nurse will be readily available whenever an infirmary is occupied in the IDOC system." Dkt. 1557 at 14-15. Section III.I.2 similarly requires that, "[a]t every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week." And Section III.I.3 requires that "[a]ll facilities shall employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to offsite provider/hospital." *Id.* In the Sixth Report, the Monitor explains that it is impossible to evaluate Defendants' compliance with these provisions because the assignment sheets IDOC produced do not list the employee's credentials to verify whether they are registered nurses or less credentialed staff. Dkt. 1661 at 108. For the Seventh Report, IDOC only provided information on nursing coverage for nine facilities, and the Monitor again concluded that IDOC had "provided no proof of practice to show compliance with III.I.1 … or III.I.3" and "the data provided by IDOC is not sufficient to consider III.I.2. compliant." Dkt. 1725 at 122-23. The Court finds that Defendants are not in substantial compliance with Section III.I.1, Section III.I.2, and Section III.I.3.

62.     Section III.I.4 requires that "All infirmaries shall have necessary access to security staff at all times." Dkt. 1557 at 15. While noting that security staff appear to be present during the Monitor's site visits, the Monitor has not yet had the opportunity to visit many sites, and has not found Defendants substantially compliant with this provision or described proof of practice that security staff are available "at all times," as required by the Decree. Dkt. 1661, Sixth Report, at 110; Dkt. 1725, Seventh Report, at 124; *but see* Dkt. 1579, Fifth Report, at 116. In both the Sixth and Seventh Reports, the Monitor noted that medication administration was interrupted due to lack of security staff. Dkt. 1661 at 144; Dkt. 1725 at 168-69. Likewise, sick call has been delayed due to inadequate security staff. Dkt. 104-105. The Court finds that Defendants are not in substantial compliance with Section III.I.4.

63.     Section III.I.5 requires that "All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens." Dkt. 1557 at 15. For the Sixth Report, only three facilities responded to the Monitor's "request for procedures from each facility for sanitizing infirmary bedding and linens as well as any drafts not yet finalized." Dkt. 1661 at 111. No standardized policy apparently exists, and the procedures that were produced described "only the handling of laundry soiled with blood or other body fluids" and did not "define[] the amount of clean linen to have on hand, how it is transported and received, how it is stored, or how laundry is handled once it has been used, if not contaminated with blood or other body fluids, how it is laundered etc." Dkt. 1661 at 111. The Decree obligation not only requires that bedding and linen be "properly sanitized," but that there be "sufficient" sanitized bedding and linen, so a policy that does not address the latter part of that requirement does not suggest substantial compliance. In the Seventh Report, the Monitor explained that IDOC still has not developed a comprehensive or

standardized policy and procedure in this regard. Dkt. 1725 at 124-25. The Court finds that

Defendants are not in substantial compliance with Section III.I.5.

64.     Relevant to the above provisions, Section II.B.6.k requires IDOC to implement

"appropriate staffing, physical conditions, and scope of services for infirmary care." Dkt. 1557 at

6. The Monitor's reports find that "there is no clarity or definition of the scope of care or service

to be provided in the infirmary" (Dkt. 1661, Sixth Report, at 104), and the care provided is

"perfunctory" and "without appropriate clinical focus on patients' needs." *Id*, at 101, *citing* Dkt.

1463, Fourth Report, at 134. In the Fifth Report, the Monitor found that conditions were

"unacceptable," including "patients who died from dehydration and malnutrition, who

experienced falls, and other injuries or were allowed to deteriorate without intervention," and in

the Sixth Report, the Monitor noted that these findings were "unchanged." Dkt. 1661 at 101. As

noted with regard to the nursing provisions above, infirmary staffing remains inadequate. Dkt.

1725, Seventh Report, 121-24. The Monitor likewise finds "the space to provide needed services

and programs for infirmary patients to be inadequate at all facilities site visited so far, with

problems including lack of sufficient bed space, inadequate workspace, lack of patient privacy,

lack of a call system, and inadequate social and leisure space for long stay patients. *Id.* at 120.

The Court finds that Defendants are not in substantial compliance with Section II.B.6.k.

### Section III.J (Infection Control)

65.     Section III.J.1 of the Decree requires that "IDOC shall create and staff a statewide

position of Communicable and Infectious Diseases Coordinator. This position shall be filled

within fifteen (15) months of the Preliminary Approval of this Decree [June 2020]." Dkt. 1557 at

15. The Monitor explains in the Sixth Report that IDOC created a position description for the

Infectious Disease Coordinator that describes this position as "point of authority and source of

knowledge for area expertise directing, coordinating and providing guidance to staff in all phases of the infection control process." Dkt. 1661 at 157. The Monitor notes that IDOC revised this description in March 2022, and the position no longer requires any training or certification in the area of infection control. *Id.* The Monitor fairly questions how someone without such training or certification can "serve as an authority and source of knowledge in all phases of infection control." *Id.* The Monitor goes on to explain that the position has been filled on an "acting" basis since 2020 with an individual who "did not meet even the minimum requirements of the position." Dkt. 1661 at 158. In the Seventh Report, the Monitor provides updates that the person in the "acting" position had been chosen to permanently fill the position and had enrolled in a 26-week online program in infectious disease control and was about halfway through that program. Dkt. 1725 at 180. It is too early to say that substantial compliance has been reached. The Court finds that Defendants are not in substantial compliance with Section III.J.1.

66. Section III.J.2 requires that "Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis." Dkt. 1557 at 15. With respect to this provision, the Monitor has found that IDOC has not provided any "proof of practice that negative pressure rooms are monitored, and steps taken to timely correct any malfunction identified" and has repeatedly suggested the creation of a log to monitor compliance with this provision. Dkt. 1661, Sixth Report, at 164 (citing Dkt. 1403, Third Report, at 144; Dkt. 1463, Fourth Report, at 184; Dkt. 1579, Fifth Report, at 167). In the Seventh Report, the Monitor noted that 17 out of 26 facilities reported on the status of negative pressure rooms in their CQI minutes, but the reporting done is "quite

limited and generally does not comment on the test used…". Dkt. 1725 at 191. The Monitor has

conducted his own inspection of the isolation rooms during eight separate facility tours and

identified "non-functional negative pressure units and/or defective monitoring gauges at four

facilities" that apparently were not known to staff at those facilities, demonstrating that the

facilities are not performing tests to "verify the functionality of their negative pressure units."

Dkt. 1725 at 191. The Court finds that Defendants are not in substantial compliance with Section

III.J.2.

67.     Section III.J.3 requires that "Facility medical staff shall conduct and document

safety and sanitation inspections of the medical areas of the facility on a monthly basis." Dkt.

1557 at 15. To assess compliance, the Monitor reviews monthly Safety and Sanitation reports

produced by the IDOC. Dkt. 1661 at 60. In the Sixth Report, the Monitor found that there

"continues to be notable variation in what is reported and most Safety and Sanitation Reports do

not contain the detail necessary to adequately evaluate the space, equipment, safety, and

sanitation of the medical areas." Dkt. 1661 at 60. The Monitor further noted that the reports

"commonly do not identify the presence of safety concerns that impact on the health and safety

of both the patient population and the health care and correctional staff throughout the IDOC."

*Id.* The Seventh Report documented similar concerns that have not been rectified. Dkt. 1725 at

82-83. The Court finds that Defendants are not in substantial compliance with Section III.J.3.

### Section III.K (Dental Program)

68.     Section III.K. and its subparts relate to dental care, as does Section II.B.6.h, which

requires IDOC to implement improvements to dental care access and preventative dental care.

Dkt. 1557 at 6. In the Sixth Report, the Monitor found wait times between 7 and 104 weeks for

dental fillings and up to 100 weeks for dental extractions at some facilities. Dkt. 1661 at 180.

Hundreds of patients remained on waiting lists for fillings and extractions. *Id.* In the Seventh Report, the Monitor noted "an absence of standardization in reporting dental statistics" throughout IDOC, Dkt. 1725, Seventh Report, at 208, 217, making it difficult to compare waiting lists and backlogs for dental services among facilities, but still found generally that "significant delays in routine care were reported at several facilities." *Id.* The Monitor concluded that the extensive dental needs of Class Members are "not consistently met in all correctional centers in the IDOC," primarily due to dentist vacancies. *Id.* at 210. The Court finds that Defendants are not in substantial compliance with Section II.B.6.h.

69.     Section III.K.1 requires that "all dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care." Dkt. 1557 at 15. Relatedly, Section III.K.11 requires that "Each prisoner shall have a documented dental health history section in their dental record," and Section III.K.12 requires that "Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment." Dkt. 1557 at 17. The Monitor has not found substantial compliance with any of these interrelated provisions. (Dkt. 1579 at 170 (despite some improvement, SOAP format not consistently used; history section and dental issues not consistently documented in records); Dkt. 1463 at 187 (SOAP format not consistently used); Dkt 1403 at 147 (SOAP format not consistently used); Dkt 1335 at 132 (SOAP format not consistently used); Dkt 1276 at 43 (compliance not yet rated)). In the Sixth Report and Seventh Reports, the Monitor noted that peer reviews seemed to document a high level of compliance with these requirements. Dkt. 1661, Sixth Report, at 175; Dkt. 1725 at 199. However, in the Sixth Report, the Monitor explained that an audit of dentist intake screening notes from mortality review charts showed a low level of compliance with the SOAP format

(Dkt. 1661 at 175), only 29% of reception center records reviewed showed use of SOAP notes (Dkt. 1661 at 183), and, in the Seventh Report, the Monitor similarly found a lower use of the format in his own review of urgent dental care records, Dkt. 1725 at 199. More importantly, only half of the records that used the SOAP format did so correctly. Dkt. 1725 at 199. Similarly, in the Seventh Report, the Monitor found that dental health histories generally are being obtained during intake, but these histories were only updated when treatment was planned in 35% of records reviewed by the monitoring team. Dkt. 1725 at 200-201. The Monitor has consistently found Defendants not in substantial compliance with Sections III.K.1, III.K.11, and III.K.12 (Dkt. 1579 at 170; Dkt. 1463 at 187; Dkt 1403 at 147; Dkt 1335 at 132; Dkt 1276 at 43). The Court finds that Defendants are not in substantial compliance with Sections III.K.1, III.K.11, and III.K.12.

70.     Section III.K.2 requires that each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility. Dkt. 1557 at 15. Defendants did not provide the orientation manuals for the Monitor's review until the Seventh Report. Dkt. 1661, Sixth Report, at 181 ("To date the Monitor has not received IDOC's existing orientation manuals."); Dkt. 1725, Seventh Report, at 208. For the Seventh Report, only five facilities submitted orientation manuals for review, and the Monitor found that "only two provided instructions to patients on accessing dental care." Dkt. 1725 at 209. Thus, Defendants have not demonstrated substantial compliance with this term. The Court finds that Defendants are not in substantial compliance with Section III.K.2.

71.     Section III.K.3 requires that "IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination." Dkt. 1557 at 16. In the Seventh Report, to define what must be included

in a "screening dental examination," the Monitor looked to IDOC's own Administrative

Directive 04.03.102 as well as community and correctional dental standards and noted that "the

current practice among IDOC dentists does not align with the American Dental Association's

definition of a comprehensive dental examination." Dkt. 1725 at 211-212. For example, the

Monitor explains that a periodontal assessment is essential to creating a meaningful and effective

dental treatment plan and ought to be part of IDOC's initial dental screening but is not. *Id.* at

213. The Monitor's chart review further found that soft tissue examinations—explicitly required

by the Decree—were recorded in only a minority of cases (only 13%). *Id.* at 212. The Court

finds that Defendants are not in substantial compliance with Section III.K.3.

72.    Section III.K.4 requires that IDOC "shall implement policies that require routine

disinfection of all dental examination areas." Dkt. 1557. For the Sixth Report, the Monitor was

provided with the Administrative Directive on dental care for offenders, but "this policy did not

address the routine disinfection of all dental examination areas." Dkt. 1661 at 176. As of the

Seventh Report, IDOC had submitted a draft policy and the Monitor found that to be "significant

progress," but IDOC still has not finalized or implemented that policy. Dkt. 1725 at 204. The

Court finds that Defendants are not in substantial compliance with Section III.K.4.

73.    Section III.K.5 requires that "IDOC shall implement policies regarding proper

radiology hygiene including using a lead apron with thyroid collar, and posting radiological

hazard signs in the areas where x-rays are taken." Dkt. 1557 at 16. As of the Sixth Report, the

Monitor had verified that thyroid collars were present at four facilities, but IDOC had "not

provided the Monitor when any information on a systemwide survey that audits the facility-by-

facility presence of lead aprons with thyroid collars, posting of radiological hazard signs, and

evaluation of the presence and operational state of dental equipment." Dkt. 1661 at 176. In the

Seventh Report, the Monitor found that IDOC is "making strides" regarding the use of thyroid collars and was recently informed that all facilities have acquired thyroid collars. Dkt. 1725 at 204. The Monitor notes that guidance from the American Academy of Oral and Maxillofacial Radiology is changing, suggesting that thyroid collars may not be as necessary in future, but that the state Dental Board had not yet adopted such guidance. The Monitor's Seventh Report also states that IDOC did not provide any information regarding Radiological Hazard signage in dental clinics, and found that it was "unclear" what the status of the signage is. *Id.* The Court finds that Defendants are not in substantial compliance with Section III.K.5.

74.     Section III.K.6 requires "Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts." Dkt. 1557 at 16. In a review of 23 sets of dental records for the Seventh Report, the Monitor found that only about half (52%) indicated a treatment plan had been established, only 35% demonstrated updated health histories, and only 30.4% indicated an examination occurred before formulating a treatment plan. Dkt. 1725 at 220. The Monitor also noted difficulty finding patients' treatment plans within the record as the treatment plans are spread across different sections, and the Monitor further found that dental records were inconsistent among facilities, with different facilities using different forms. Dkt. 221. The Court finds that Defendants are not in substantial compliance with Section III.K.6.

75.     Sections III.K.7 requires "Dental hygiene care and oral health instructions shall be provided as part of the treatment process," and Section III.K.8 requires "Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated." Dkt. 1557 at 16. For the Sixth Report, the IDOC only provided logs on dental cleanings for four facilities. Dkt. 1661

at 184. The Monitor noted that three facilities had no dental hygienist allocated and five additional facilities had vacant dental hygienist positions, resulting in 5,547 Class Members not having access to dental hygiene services as required by the Decree. Dkt. 1661 at 184-85. In the Seventh Report, the Monitor similarly found that vacancies in dentist positions directly impacted the productivity of dental hygienists, and also found that IDOC's failure to provide dental cleaning logs or daily log reports made it impossible to determine how many patients' appointments were rescheduled, refused, or did not take place due to lack of escorts or no-shows. Dkt. 1725 at 215. In lieu of those logs, the Monitor used CQI meeting minutes and presentations, as well as a review of patient records, to determine compliance. *Id.* In a review of 17 records, the Monitor found that patients who did receive cleanings also received oral health instructions, but a significant number (7 of the 17 patients) were not given a dental cleaning before restorative or prosthetic services as would be clinically appropriate. Dkt. 216-17. The Monitor also found that IDOC's data, gathered by SIU, showed patients receiving dental hygienist appointments every two years in only 42% of cases. Dkt. 1725 at 218. Moreover, the Monitor cautioned that this data only reflected dental hygienist *appointments,* not necessarily dental *cleanings*, and made recommendations for collection of data and information to measure compliance with this requirement going forward. *Id.* at 218-19. The Court finds that Defendants are not in substantial compliance with Sections III.K.7 or III.K.8.

76.     Section III.K.9 requires Defendants to "establish a peer review system for all dentists and annual performance evaluations of dental assistants" within 21 months of the Preliminary Approval Date of this Decree (October 2020). Dkt. 1557 at 16. In the Sixth Report, the Monitor explained that annual peer reviews were performed for 27 dentists, but these were done by dentists working in IDOC system and "have the risk of lacking objectivity." Dkt. 1661 at

173. For the Seventh Report, Defendants provided the Monitor with 21 dentist peer reviews conducted between October 2022 and June 2023, and the Monitor discovered that several dentists were omitted from the peer review, including dentists who work part time or were designated as "PRN" (or "as needed). Dkt. 1725 at 64. Moreover, the peer reviews of dentists lacked a standardized methodology, lacked "consistency and completeness," and there was no evidence that the Chief of Oral Health Service had even reviewed any aspect of the peer review reports. *Id.* at 64-65. The Court finds that Defendants are not in substantial compliance with Section III.K.9.

77. Section III.K.10 contains three subparts having to do with dental extractions. Dkt. 1557 at 16-17. Section III.K.10.a requires "diagnostic radiographs shall be taken before every extraction;" Section III.K.10.b requires that "the diagnosis and reason for extraction shall be fully documented prior to the extraction;" and Section III.K.10.c requires that "A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record." With regards to radiographs prior to dental extraction (III.K.10.a), the Monitor expressed concern that a specific timeframe for the dental extraction is not delineated in the Decree, but found that in a review of 12 extraction records, only four records showed an x-ray had been completed within a year prior the extraction. Dkt. 1725 at 202. Another 5 records showed an x-ray more than a year prior the extraction, and three records did not have any documentation of an x-ray at all. *Id.* The Monitor did find a "high level of compliance in documenting the reasons for extraction. (III.K.10.b). Dkt. 1725 at 202. The Monitor likewise

found compliance with the requirement to obtain consent from patients prior to extraction in 100% of the files produced by IDOC for that purpose. Dkt. 1725 at 202. However, after extending the review to encompass patients whose files were produced for purposes of evaluating "comprehensive routine care," the Monitor found several instances of extractions where consent was not documented. Dkt. 1725 at 202-203. The Monitor concluded that it was "unclear whether the providers forgot to document that consent was obtained or if they failed to obtain it." *Id.* at 203. The Court finds that Defendants are not in substantial compliance with Section III.K.10.

78. Section III.K.13 requires IDOC to "conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. any equipment identified as needing repair or replacement will be repaired or replaced." Dkt. 1557 at 17. The Monitor finds in the Seventh Report that only 11 facilities perform yearly inspections of their dental equipment, and at least some of them use contractors to do so. Dkt. 1725 at 205. IDOC has not adopted a standardized method for surveying their dental equipment, and it is uncertain who in the facility is responsible for internal reviews of equipment. *Id.* The Monitor finds that the current audit done by SIU is "cursory" and does not go into depth about the equipment needed. *Id.* The Court finds that Defendants are not in substantial compliance with Section III.K.13.

## Section III.L (Continuous Quality Improvement)

79. Section III.L.1 requires that, "Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the

Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor." Dkt. 1557 at 17. Relatedly, Section II.B.6.l requires IDOC to implement changes in the area of effective quality assurance review. In the Sixth Report, the Monitor reported that Defendants had produced a "Quality Improvement Plan" that had been developed without any assistance or input from the Monitor, which is a violation of this Decree provision. Dkt. 1661 at 16.  The Monitor's Seventh Report explains that Defendants have drafted a policy, released a statewide quality improvement plan, established a statewide System Leadership Council, et cetera, but the program has not yet been implemented as required by the Decree. Dkt. 1725 at 22. The Court finds that Defendants are not in substantial compliance with Section III.L.1 or Section II.B.6.l.

80.     Section II.B.6.o requires IDOC to implement changes in the area of "training on patient safety." Dkt. 1557 at 7. In the Sixth Report, the Monitor noted that two trainings in quality had been provided at the OHS quarterly meeting, but no curriculum or training outline was provided to the monitoring team, nor was there any attendance list or evidence of participation. Dkt. 1661 at 188-89. As of the Seventh Report, IDOC has had discussions about training for its leadership and HCUAs and has discussed other training resources for facility staff, but no formal plans had been developed or provided to the Monitor. Dkt. 1725 at 24. There also is not a "written procedure for expections [sic] of training that include quality improvement or patient safety." *Id.* While a WebEx training on "quality" was done, the Monitor explains it as an introduction to CQI and a presentation of outcome measures for which attendance was not recorded, rather than a substantive training on patient safety as required by the Decree. *Id.* The Court finds that Defendants are not in substantial compliance with Section II.B.6.o.

81.     Section II.B.6.m. requires IDOC to implement changes in "preventable adverse event reporting," while Section II.B.6.n. requires changes in the area of "action taken on reported errors (including near misses)." Dkt. 1557 at 7. In the Sixth Report, the Monitor reported that "The IDOC FY23 Quality Improvement Plan called for the reporting of adverse, sentinel, and any process identified as increasing risk for a negative outcome by email to the Office of Correctional Medicine at SIU." Dkt. 1661 at 192. Additionally, the Monitor gleaned from meeting minutes of the System Leadership Council that the OHS Regional Coordinators would have responsibility to release a "Quality Manual" and policies to direct facilities on the process for reporting adverse events. *Id.* However, the Monitor had not received any further information regarding the adverse reporting system for the Sixth Report. *Id.* IDOC did not produce any of the requested information about their progress towards creating an adverse reporting system for the Seventh Report. Dkt. 1725 at 229. The Monitor was able to confirm through meeting minutes of the System Leadership Quality Council that SIU had set up a system of receiving adverse event reports through voicemail and email since October 2022, but implementation has not yet occurred and adverse event reporting has not yet started. *Id.* If reporting has not yet commenced, no action has been taken on those reported errors yet, either. The Court finds that Defendants are not in substantial compliance with Sections II.B.6.m or II.B.6.n.

## Section III.M (Miscellaneous Provisions)

82.     Section III.M.1 contains four subparts requiring Defendants or their contractor to offer certain immunizations or screenings. Dkt. 1557 at 17-18. Defendants are required to offer an annual influenza vaccine (III.M.1.a); ensure other required vaccinations are offered to prisoners with chronic diseases as established by the Bureau of Prisons (III.M.1.b); ensure all prisoners ages 50-75 are offered annual colorectal cancer screenings and PSA testing, unless the

Department and the Monitor determine that such testing is no longer recommended (III.M.1.c); and ensure that all female prisoners age 45 or older will be offered a baseline mammogram screen and then every 24 months thereafter, unless more frequent screening is clinically indicated or unless the Department and the Monitor determine that such testing is no longer recommended (III.M.1.d). In both the Sixth and the Seventh Report, the Monitor found evidence that some immunizations and screenings are occurring but could not find Defendants in substantial compliance with Sections III.M.1a, b, or c because Defendants have "very limited data tracking of immunizations and RHM/cancer screenings" making it "difficult to verify compliance." Dkt. 1725 at 138-41, 151-56; *see also* Dkt. 1661, Sixth Report, at 124-37. The Court finds that Defendants are not in substantial compliance with Section III.M.1.a, Section III.M.1.b, or III.M.1.c.

83.     Section III.M.2 requires that "Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review." Dkt. 1557 at 18. Section II.B.6.i similarly requires IDOC to implement a "morbidity and mortality review with action plans and follow through." Dkt. 1557 at 6. In the Sixth Report, the Monitor acknowledged that IDOC had partnered with SIU to initiate a mortality review process, but also explained that Defendants produced "no documentation of facility-specific corrective action or discussion regarding deaths" in response to the Monitor's requests. Dkt. 1661 at 194. In the Seventh Report, the Monitor notes that, while Defendants have implemented a mortality review process as of August 2023 with the help of SIU which appears to identify deficiencies in care, no process for following up on these findings has been developed. Dkt. 1725 at 36, 230. The identified deficiencies were not discussed at facility

CQI meetings, and no processes for corrective action and quality assurance based on the mortality review findings have yet been developed or implemented. Dkt. 1725 at 36, 230. The Court finds that Defendants are not in substantial compliance with Section III.M.2 or Section II.B.6.i.

### Section IV (Staffing Analysis and Implementation Plan)

84. Section IV of the Consent Decree contains both non-procedural (§ IV.A and § IV.B) and procedural (§ IV.C) provisions relating to the development of a Staffing Analysis and an Implementation Plan. While the Monitor does not assign a compliance rating to procedural provisions of the Decree, such as § IV.C, the Monitor's Sixth and Seventh Reports find Defendants not in substantial compliance with subparts § IV.A and § IV.B. Dkt. 1661, Sixth Report, at 9-15; Dkt. 1725, Seventh Report, at 15-20.

85. Section IV.A. requires that "Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree." Dkt. 1557 at 18. With regards to the Staffing Analysis, Section IV.B. states that Defendants "shall provide the Monitor with the results of their staffing analysis" within "120 days from the date the Monitor has been selected." *Id.* at 18-19. The Monitor was appointed by the Court on March 29, 2019, and Defendants did not submit a final Staffing Analysis until August 2021, making it more than two years late. Dkt. 1661 at 10. Even then, the Monitor found that the Staffing Analysis submitted by IDOC had "not utilized a meaningful methodology to determine staffing," and there was no evidence that the staffing was tied to what was needed to implement the Decree's requirements. *Id.* In the Seventh Report, the Monitor reiterated his finding of noncompliance, explaining that staffing remained insufficient: "In record reviews, it is clear that physician staffing is inadequate and is causing harm. It was

also apparent that support staff for scheduling specialty care appointments and obtaining records from local hospitals and consultants is deficient. These positions need to be included in the workflow analysis of staffing." Moreover, both Defendants and the Monitor acknowledge that the August 2021 Staffing Analysis "will need revision over time, especially as programs of the Implementation Plan are put into place and especially after IDOC acquires the capacity to adequately assess workload." Dkt. 1661 at 12. For these reasons, the Court finds that Defendants are not in substantial compliance with Section IV.A and Section IV.B as they pertain to the Staffing Analysis requirements.

86. With regards to the Implementation Plan, Section IV.A. requires that the IDOC must "establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies and protocols to ensure that Defendants fulfill the requirements of the Decree;" (§ IV.A.1) and must "Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree." (§ IV.A.2). Dkt. 1557 at 18. Section IV.B. contains a timing requirement for the Implementation Plan, which was to be drafted within 60 days of the submission of the Staffing Analysis (due July 2019); thus, the Implementation plan was due in September 2019. *Id.* at 18-19. Defendants first submitted a proposed Implementation Plan to the Court in November 2021 and another in December 2021. The Monitor disagreed with certain provisions of the December 2021 Plan, and the matter was submitted to the Court in accordance with the procedure laid out in Section IV.B.[2] Over Defendants' objections, the Court entered a final Implementation Plan on August 1, 2023, Dkt. 1688. Defendants continue to object to this Implementation Plan and, as reported by the Monitor

---

[2] "In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution."

in the Seventh Report, have not hired a project manager to oversee the Plan, nor have they provided the Monitor with any information about their status of completion of Implementation Plan tasks, leading to the Monitor's finding that Defendants were not in substantial compliance. Accordingly, the Court also finds that Defendants are not in substantial compliance with Section IV.A and Section IV.B as they pertain to the Implementation Plan.

87.     Subsection IV.C contains a procedural provision regarding the Implementation Plan, stating that "The Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable as part of this Decree." Dkt. 1557 at 19. As with the Decree's other procedural provisions discussed below, the Monitor does not provide a compliance rating for this provision. Defendants have moved to modify this provision and have argued generally that the Implementation Plan should not be "incorporated into" and "enforceable" as part of the Decree without independent PLRA findings. Defendants' request to modify Section IV.C is currently being briefed and remains under advisement. In the meantime, the Court will continue this provision as originally agreed to by the Parties, subject to any modification that may be made as a result of the pending motion or the Parties' future agreement.

**III.     Procedural Provisions**

**Section I**

88.     Section I of the Decree is titled "Introduction and Procedural Provisions," and includes statements on jurisdiction, class definition, definition of terms used throughout the Decree, identification of the Plaintiff Class and Defendants, the purpose and scope of the Decree,

the parties' stipulation that the Decree complies "in all respects" with the requirements of the PLRA (18 U.S.C. § 3626(a)), and Defendants' denial of wrongdoing. Dkt. 1557 at 2-5. As Defendants acknowledge, these provisions "relate to the general operation of the Decree" and "are not measured by the Department's level of substantial compliance." Dkt. 1779 at 6. The Court finds that these provisions are necessary for the Decree to function and are part of its contractual undertakings; therefore, they must continue along with the non-procedural provisions of the Decree.

### Section V through Section X

89.     Sections V through Section X of the Decree likewise contain procedural provisions for which the Monitor does not assess compliance, including Monitoring and Compliance (§ V), Attorneys' Fees and Costs (§ VI), Miscellaneous Provisions (§ VII), Reservation of Jurisdiction (§ VIII), Termination of the Decree (§ IX), and Dispute Resolution (§ X). Defendants "take[] no position on these provisions," other than their general position that no part of the Decree should be extended without the Court making PLRA findings. Dkt. 1779 at 61. As the Court already has found and explained on the record at the April 11, 2024 hearing, continuation of the Decree, pursuant to Section IX.B.5, "is a matter of simple enforcement" and does not require new PLRA findings. As with the provisions of Section I, the Court finds that the procedural provisions in Section V through Section X are necessary to the functioning of the Decree and, as part of the Decree's contractual undertakings, must be continued along with the non-procedural provisions discussed above.

**SO ORDERED.**                           **ENTERED:  May 9, 2024**


_____
**JORGE L. ALONSO**
**United States District Judge**