# Health Care Monitor
# 8th Report Lippert v. Jeffreys
### November 8, 2024

Prepared by Lippert Monitor
Dr. John Raba
Monitor's Consultants
Michael Puisis, D.O.
Catherine Knox, MN, RN, CCHP-RN
Nicholas S. Makrides, DMD, MA, MPH

# Table of Contents

EXECUTIVE SUMMARY ....................................................................................................... 5

STATEWIDE ISSUES: LEADERSHIP AND ORGANIZATION LEADERSHIP STAFFING .................... 7

STAFFING ANALYSIS AND IMPLEMENTATION PLAN ...................................................... 19

Staffing Analysis and Workload Analysis ............................................................. 19
Implementation Plan ............................................................................................. 21

STAFFING ....................................................................................................................... 22

Staffing ................................................................................................................. 22
Staffing through Academic Centers ..................................................................... 25

OVERSIGHT OVER MEDICAL, DENTAL, AND NURSING STAFF ........................................ 27

Credentialing of Physicians .................................................................................. 27
Oversight over Medical Staff ................................................................................ 34
Oversight over Dental Staff .................................................................................. 41
Oversight over Nursing Staff ................................................................................ 43

INTERNAL MONITORING AND QUALITY IMPROVEMENT ................................................. 49

Statewide Quality ................................................................................................. 49
Audits .................................................................................................................... 54
Performance and Outcome Measure Results ........................................................ 55
Adverse Event and Incident Reporting Systems ................................................... 61
Vendor Monitoring ................................................................................................ 72
Mortality Review ................................................................................................... 76

MEDICAL RECORDS ........................................................................................................ 83

POLICIES AND PROCEDURES ............................................................................................ 87

OPERATIONS ................................................................................................................... 92

Clinical Space ....................................................................................................... 92
Equipment and Supplies ....................................................................................... 103
Sanitation .............................................................................................................. 106
Onsite Laboratory and Diagnostics ...................................................................... 110
Dietary .................................................................................................................. 113

**INTRASYSTEM TRANSFERS** ...................................................................................... **116**

**MEDICAL RECEPTION** .............................................................................................. **126**

Nurse Intake Screening and Health Assessment ............................................... 126

**NURSING SICK CALL** .............................................................................................. **142**

**CHRONIC CARE** ....................................................................................................... **152**

**URGENT AND EMERGENT CARE** ........................................................................ **156**

**INFIRMARY CARE** .................................................................................................... **161**

**SPECIALTY CONSULTATION** .............................................................................. **178**

Specialty Referral Oversight Review .................................................................. 187

**HOSPITAL CARE** ...................................................................................................... **187**

**PREVENTIVE SERVICES** ........................................................................................ **188**

Influenza Vaccinations ........................................................................................ 189
Adult Immunizations ........................................................................................... 191

**CANCER AND ROUTINE HEALTH MAINTENANCE SCREENING** ................ **199**

Colorectal Cancer Screening .............................................................................. 199
Prostate Cancer Screening .................................................................................. 204
Mammography Screening .................................................................................... 206
Cervical Cancer Screening .................................................................................. 207
Lung Cancer and Abdominal Aortic Aneurysm (AAA) Screening .................... 209
Hepatocellular Cancer (HCC) Screening ........................................................... 210

**PHARMACY AND MEDICATION ADMINISTRATION** .................................... **213**

**DISCHARGE PLANNING** ......................................................................................... **226**

**INFECTION CONTROL** ............................................................................................ **232**

**DENTAL CARE** .......................................................................................................... **246**

Dental Staffing .................................................................................................... 246

DENTAL DOCUMENTATION ........................................................................................................ 250
DENTAL EXTRACTIONS ........................................................................................................... 253
DENTAL SUPPORT .................................................................................................................. 255
DENTAL ACCESS .................................................................................................................... 260
DENTAL INTAKE ..................................................................................................................... 262
COMPREHENSIVE DENTAL CARE .............................................................................................. 270
APPENDIX A ........................................................................................................................... 273
APPENDIX B ........................................................................................................................... 275
APPENDIX C ........................................................................................................................... 281

# Executive Summary

*Addresses items II.A;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

IDOC has made progress. Hepatitis C treatments have continued to increase. There is improving verification of the provision of nationally recommended adult vaccinations and screenings for cancers. IDOC has initiated a program of medication-assisted treatment (MAT) that will help addicted persons on to recovery; this is mostly at the Logan and Decatur facilities. IDOC has promulgated a set of policies which are not yet comprehensive and which need some revision but which are a good set of initial policies and form a sound basis to move forward. The UIC Medical Center's diabetes telehealth project has been expanded to serve all IDOC facilities. IDOC has also initiated an additional collaboration for UIC specialists to provide both in-person and telehealth consultations in Geriatrics, Cardiology, Endocrinology, Gastroenterology, and Pulmonary for patients in the northern regions using Joliet Inpatient Treatment Center (JITC) as a base. The Monitor strongly supports any initiative that will improve access to specialty services. IDOC is in process of implementing an electronic record.

Despite this progress, much remains to be done.

Staffing is the key barrier to forward progress toward compliance. This report will demonstrate that on every level from facility supervisory staff, physicians, dentists, and nursing staff, IDOC has been unable to increase staffing and instead have less staff based on their own staffing analysis than in 2019. Physician staffing is now at 50% vacancy and has become dangerous as is evident in mortality reviews which are an attachment to this report. These mortality reviews demonstrate a linkage between facilities with physician shortages and increased morbidity and decreased quality of care. Lack of supervisory staff and line staff hampers the ability to implement the array of new policies and procedures. Lack of nursing, clerical, and data staff impair the ability of IDOC to collect and analyze data necessary to demonstrate compliance with the Consent Decree. Lack of quality improvement and supervisory staff result in inability of IDOC to undertake corrective actions. Infection control, quality improvement, and chronic care programs are all impaired due to staffing deficiencies. The Monitor cannot emphasize enough that staffing needs to improve dramatically and as soon as possible. The increasing use of locum tenens physicians and agency nursing staff has an associated set of problems including lack of familiarity with policy and procedure and abbreviated tenure. Staffing must improve for IDOC to move forward.

IDOC medical facilities are a significant barrier to recruitment and adequate performance. A consultant performed a systemwide evaluation of the IDOC's facilities[1] which identified a massive amount of structural and space deficiencies. The consultant's report documented that only three of 27 facilities were "fully operational" with 21 facilities with "impaired operations" and three that were "approaching an inoperable" state.[2] One of those "inoperable" facilities, Stateville, is in the process of closure. This consultant report noted that, generally, clinical service space was almost universally undersized but it did not contain a detailed or thorough evaluation of medical space including medical housing for the disabled,

---

[1] Facility Master Plan, Illinois Department of Corrections Final Report – May 2023 by CGL.
[2] Stateville, Logan, and Pontiac

aged, cognitively impaired, and infirm. The negative impact of poorly maintained and inadequate clinical space on the recruitment and retention of health care staff should not be underestimated.

There has been no major improvements to medical and dental physical spaces for decades. Dental and medical physical spaces are not conducive to adequate medical care yet the plans, provided by a second consultant, to renovate or improve medical space in six southern region facilities were primarily based on input from wardens and facility staff and had limited if any consultation with the clinical leadership of the Office of Health Services (OHS). Nor were they based on a strategic statewide medical plan[3] or expected population numbers. IDOC has committed to but has not yet conducted a survey of its medical facilities with respect to medical and dental work spaces and equipment or medical housing for disabled, infirm, and aged and equipment needed to care for this population. A comprehensive and detailed survey of the medical facilities and the special housing needs of high risk population must be done before IDOC starts to construct new health care facilities as this is a once-in-a-generation opportunity to plan and construct new health care facilities.

IDOC has yet to provide a detailed report (V. G.) of data and information necessary to evaluate their compliance. This was to have been done every six months for two years and then annually since the beginning of the Consent Decree but meaningful reports have yet to be produced.[4]

In addition, IDOC is required with assistance of the Monitor to create an audit function for the quality assurance program which provides an independent audit of all facilities quality assurance programs. The Monitor's opinion of this audit is that it should be a comprehensive audit of the medical program to evaluate Consent Decree requirements. IDOC has not initiated this audit function and has yet to develop a methodology to perform such an audit. The opinion of the Monitor is that this audit function would contribute data to the IDOC V.G. report and ultimately provide independent verification of compliance with the Consent Decree.

The Consent Decree requires the Monitor to evaluate Defendant's compliance with the Consent Decree. For that purpose, the Monitor needs the information that is specified to be provided in the V.G. report and results of the audit (II.B.9.) which are to be completed by IDOC. This information has not been provided to the Monitor. Lacking IDOC's contribution to verify its compliance, the Monitor requests data and documents in order to fulfill the duties of the Consent Decree to provide reports of compliance every six months. This is done without the benefit of a V.G. report or a comprehensive audit. Requested data arrives piecemeal and unanalyzed; some documents are not provided timely. Lacking any contribution from IDOC in the V.G. report and the comprehensive audit, the Monitor's evaluation has become more extensive than it might be if IDOC provided acceptable V.G. reports and comprehensive audits.

Final conclusions of compliance cannot be made unless all facilities are evaluated and when IDOC fails to provide a V.G. report or a comprehensive audit of each facility, the Monitor will need to do this. Current

---

[3] This should be based on Consent Decree requirements, initiatives of OHS; space needs related to new policies; and where IDOC intends to house patients with significant medical illness, cognitive disorders, aged, and disabilities.

[4] IDOC produced several V.G. reports in the first few years of the Consent Decree but these reports ended 6/1/22. The reports were not detailed reports containing data and information sufficient to evaluate Defendant's compliance with the Consent Decree. Instead, they contained lists of provisions the IDOC believed they were compliant and partially compliant with. They provided little to no data or information to verify that compliance. Data and information for these reports was not agreed upon, before submission of the reports, by Plaintiffs or the Monitor which is a requirement of the Consent Decree. Since 6/1/22 the Monitor has not received a V.G. report though two reports should have been received.

Monitor reports only evaluate selected facilities. These currently all show problems but over time, unless IDOC does a comprehensive audit and V.G. report, the Monitor will be required to evaluate all 30 facilities before conclusions of compliance can be reached.

IDOC has begun preparing to implement the electronic record. It has committed to a November 2025 implementation date. This will be a challenge. The Monitor remains concerned that sufficient devices to utilize the record will not be available and that work space for use of these devices will not be conducive to effective work. Staffing for training, a help desk, and for data retrieval and analysis have not been hired and no plans have been provided that these staff will be hired.

Sections of this report will demonstrate progress in many central office functions that include: designing immunization, sick call, and colorectal cancer screening initiatives, initiating a much needed clinical leadership infrastructure within OHS, and writing policy even though there is very little progress at the facility level for implementing and standardizing any initiatives or policies. The chain of command is still not aligned so that OHS is fully directing the medical program. The facility health care unit administrators (HCUA) are still under operational supervision of the Wardens. The Monitor has repeatedly recommended that the HCUA positions should report to OHS leadership while maintaining a working relationship with the correctional leadership at each facility. Dedicated staff for quality improvement, chronic care and infection control are not in place. Facility staffing is so low that staff have too many assignments and none can be performed effectively.

The Compliance Unit is still citing facility medical programs for not adhering to administrative directives which contradict OHS policy and their corrective actions consist of "educating" staff on the requirements of administrative directives. Initial corrective actions are directed towards the work behavior of staff. But IDOC misses the root cause of most of the existing deficiencies which is lack of staff, lack of equipment, lack of sufficient medical housing and medical work space, lack of a reasonable medical record, and very little supervisory staff. The real root cause lies in the State of Illinois' inability to provide the health workers the space, equipment, supplies, and staff to conduct business in an effective manner. Until the State is able to correct these deficiencies, there is unlikely to be persistent improvement.

## Statewide Issues: Leadership and Organization Leadership Staffing

***Addresses item II.B.2; II.B.3; III.A.1; III.A.8; III.A.9***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.1** *The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, below. The Deputy Chiefs of Health Services shall either be board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, below.*

**III.A.8.** *Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-*

7

*employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.*

**III.A.9.** *Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The organizational and leadership structure of the IDOC medical program was evaluated using multiple documents and interviews.[5]

Three levels of leadership staff were examined:
1. Office of Health Services (OHS) and SIU staff;
2. IDOC and vendor regional staff; and
3. Leadership positions at facilities including supervisory staff (HCUAs, facility Medical Directors, Directors of Nursing, and Nursing Supervisors), and staff to manage major programs at the facility (Quality Improvement Coordinators, Infection Control Nurses, and Chronic Care Nurses).

OHS does not track its own staffing. IDOC provided a table of organization for this purpose. OHS staffing, supplemented by SIU staffing, has expanded. IDOC added Deputy Chiefs, but vendor and State regional leadership staffing remain essentially unchanged. Facility staffing, which is largely vendor-supplied has deteriorated.

IDOC has increased allocation of OHS leadership staff with the exception of adding data staff. However, nine (35%) of 26 allocated OHS positions are vacant.[6] Of the OHS positions, four (67%) of six clerical/administrative positions are vacant.[7] Five (25%) of twenty non-clerical OHS positions are vacant.[8] The Electronic Health Records Project Manager is currently filled with a consultant and the Policy Project Manager has been hired through SIU. Notably, data staff, which IDOC previously committed to, are notably absent which will be an issue with respect to organizing and using electronic data to verify

---

[5] Documents included: tables of organization of OHS; tables of organization of the IDOC medical staff for northern region facilities; SIU current staffing; list of HCUAs; 16 facility State and vendor staffing documents from IDOC; OHS position descriptions for leadership positions (Chief, Deputy Chiefs, Medical Coordinator, Agency CQI Coordinator, Regional Coordinator, and HCUA); and position descriptions of vendor facility Medical Director and vendor Regional Medical Director. Interviews included ones with the SIU program director, chief OHS, a warden and assistant warden from one facility, the agency CQI coordinator, two regional coordinators, HCUAs from two facilities, and medical directors at two facilities.

[6] IDOC has not provided allocated and filled OHS positions in a table. Instead, the Monitor was asked to use the table of organization for the purpose of determining staffing. This table had the electronic medical record project manager and the implementation plan project manager as vacant. The Monitor was told several months ago that the electronic record project manager had been hired. Very recently, IDOC said the Implementation Project Manager was hired.

[7] One executive secretary, an administrative assistant, and two office staff are vacant. There are six position in this category.

[8] The filled positions include chief of health services, three deputy chiefs, the electronic records project manager, the medical coordinator, the agency director of nursing, chief of oral health, regional coordinators, the implementation project manager, dietician, a public health educator, and the infection control coordinator. The Implementation project manager position was just filled. Vacant positions include the food service program manager, HIV coordinator, two public health educators, and a risk manager.

8

compliance with the Consent Decree.[9]  The Monitor has encouraged IDOC staff to visit Cermak Health Services at the Cook County Jail to see how data staff can help in managing and using data to effectively monitor and track clinical care.

Addition of SIU staff has been the largest contribution to OHS leadership staffing since the inception of the Consent Decree.  SIU has three vacancies (8%) out of 34.85 budgeted positions.  Their contribution has been a significant help in promoting progress towards compliance.[10]  Appendix A lists their current staffing.

Regional staff is a mix of IDOC and vendor staff and is essentially unchanged since the last report.  IDOC has three Regional Coordinators positions, one of which is vacant.  Each Regional Coordinator covers approximately 10 facilities; one of the coordinators covers fewer facilities with less total population but also covers mental health.  The number of facilities covered by this group is too high, in the Monitor's opinion, and reduces the effectiveness of their performance.  The Monitor recommends adding three additional Regional Coordinator positions.  The three IDOC Deputy Chief positions are all filled; their position description describes their original responsibilities which were mainly central office responsibilities.  Additional responsibilities were added more recently but these responsibilities are not included in their position description which should be corrected.  Regional staff for IDOC is counted in the OHS staffing numbers.

The vendor regional staffing is larger than IDOC's; 11 vendor regional staff versus six for IDOC.[11]  There are six vendor Regional Managers each covering approximately five facilities which is half the number of facilities covered by the IDOC Regional Coordinators.   There are three Regional Medical Directors; and two Regional Directors of Nursing.  Two (18%) the 11 vendor regional staff are vacant.[12]

Facility leadership is the weakest component of leadership staffing.  It has deteriorated since the beginning of the Consent Decree and cripples the ability of IDOC to implement its policies and the Consent Decree.

IDOC provided documentation[13] that IDOC has 30 HCUA positions, 24 of which are filled (20% vacancy rate).[14]  In 2019, 27 of the positions were filled.

The Medical Director position designation is currently meaningless as facility Medical Directors do not functionally fulfill Medical Director responsibilities.  Because of the scarcity of physician positions,

---

[9] SIU has two data positions but these positions are for managing and entering data into REDCap, the SIU database which is used for mortality review and adverse events.  While REDCap theoretically could be used to interface with the electronic record, it would still require additional data resources and would likely not give IDOC the flexibility and robustness of having its own staff manage the data.

[10] It appears easier for SIU to hire staff than it is for IDOC.  IDOC may consider utilizing SIU to fill vacancies in the OHS positions.

[11] The vendor was not asked to send a document of allocated and filled regional staff.  These numbers were obtained from a table of organization effective August 2023.  Vacancies may be inaccurate.

[12] One Director of Nursing and one Regional Medical Director

[13] We note that a 2nd document request for document #10 (allocated and vacant staffing) documented that there were only 29 HCUA positions with 6 vacancies.  The staffing document did not contain information from JITC.  This reinforces the Monitor's recommendation that IDOC needs to maintain a single staffing document that includes all medical staff including vendors at all facilities.

[14] This is from Master FACILITY LISTING updated  04/10/24 provided in response to document request #61 for a list of contact information on all HCUAs and any vacancies in HCUA positions.

9

clinical duties consume all physician time[15] and at some facilities clinical duties are not all addressed.[16] In 2019 there were 37.675 physician positions and 33.675 were filled.[17] The most recent data shows 34.53 physician positions with 16.92 (51%) filled.[18] This is a 50% reduction in physician staff since the first Staffing Analysis document at the beginning of the Consent Decree. There is considerable turnover and filling of Medical Director positions with locum tenens physicians. Eleven different locums or contract physicians served as Medical Directors over a recent three month period. One locum qualified as "Medical Director" working only 5 hours a week; another locum "Medical Director" worked only 10 hours a week; two other locum "Medical Directors" work 30 hour weeks. The position of Medical Director is not treated as a full time responsibility by the vendor who only considers the hours served in that position not whether the responsibility of the position is accomplished. It is the Monitor's position that the budgeted physician number needs to increase and the working physicians must increase to prevent the ongoing risk to patients.

Nurse supervision has decreased by 52% since 2019 and the absolute number of supervisory nurses has plummeted. The number of Director of Nursing positions has increased slightly since 2019 but remains at an unacceptably high vacancy rate. Only 10 of 30 facilities have supervisory nurses aside from a Director of Nursing. Supervisory staff is shown in the table below. At these levels of supervision, the Monitor believes the IDOC will be unable to implement its policies or the Consent Decree.

| Supervisory Staff at Facilities 2019 vs 2024* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 Allocated | 2019 Filled | Vacancy Rate | 2024 Allocated | 2024 Filled | Vacancy Rate | Change From 2019 |
| HCUA | 30 | 27 | 10% | 30 | 24 | 20% | -11% |
| Physicians | 37.675 | 33.675 | 11% | 34.53** | 16.91 | 51% | -50% |
| Supervisory Nurse | 26 | 20 | 23% | 29 | 9.67 | 67% | -52% |
| Directors of Nursing | 28 | 20 | 29% | 28 | 20.87 | 26% | 4% |
| * Data from March 2024 OHS Allocated and Filled positions provided by IDOC and Facility Reconciliation Worksheets - Q3'24- Lippert provided by IDOC | | | | | | | |

**The allocated and filled physician positions includes the 1.06 gynecologist serving Logan and Decatur. Allocated primary care physicians totaled 33.47 with 16.49 filled and 16.98 vacant for a vacancy rate of 51%

The Monitor has recommended that in order to effectively implement the Consent Decree that each facility have dedicated Quality Improvement Coordinators, Infection Control Nurses, and Chronic Care Nurses. No facility has a dedicated Quality Improvement Coordinator. Seventeen Quality Improvement Coordinators are filled by HCUAs, eight are Directors of Nursing, four are medical records staff, and *one is an Assistant Warden of Programs*. HCUAs, Directors of Nursing, medical records staff, and assistant wardens, given their responsibilities, cannot effectively accomplish quality duties, nor do they have training for this position. Assistant Wardens should not be responsible for directly managing a patient care activity. Information on nurses assigned as infection control or chronic care nurses was incomplete; only data from facilities with vendor nurses was provided. Illinois River CC was the only facility with a

---

[15] This is based on conversations with facility physicians at the prior three facilities visited and on review of quality improvement meeting minutes which demonstrate virtually no participation of Medical Directors in quality improvement.
[16] This is based on mortality records reviewed for this report.
[17] Staffing Analysis Illinois Department of Corrections Office of Health Services 11-23-19 provided by IDOC
[18] From Facility Reconciliation Worksheets -Q3 2024 provided by IDOC. The Gynecologist at Logan was included.

dedicated Infection Control Coordinator and Danville was the only facility having a dedicated Chronic Care Nurse but that nurse is an LPN. This position should be filled with a RN.[19] Lack of these positions makes implementation of quality improvement, infection control, and chronic care difficult to impossible.

The IDOC regional and facility table of organization has changed since 2019. One change is that the Regional Director of Nursing now supervises the Regional Coordinators instead of the Medical Coordinator as was the case in 2019 and the Regional Coordinators now "clinically" supervise the HCUAs. Another change is that Deputy Chiefs are now assigned to cover regions that are similar to the regions covered by Regional Coordinators. The position descriptions of the Deputy Chiefs do not include their regional supervision responsibilities so it is unclear what the expectation is.

The three Regional Coordinators are the only link in the chain of command from OHS to the facilities. The Regional Coordinators provide "clinical" supervision through the HCUA[20] over operations and nursing practice. Their position description, however, is mostly operational.[21] Despite their position description being mostly operational, the regional coordinators report to the Agency Director of Nursing. The Monitor continues to recommend[22] that the HCUAs report to the Medical Coordinator. Vendor Directors of Nursing report to their Regional Directors of Nursing for whom there is no report to OHS. These arrangements results in the following. 1) The facility IDOC Directors of Nursing being two steps removed from the Agency Director of Nursing (Directors of Nursing to HCUA to Regional Coordinator to Agency Director of Nursing) and the vendor facility Directors of Nursing having uncertain reporting relationship to the Agency Director of Nursing. This reduces the effectiveness of nursing supervision. 2) The Medical Coordinator is responsible for directing statewide policy and its implementation but has no direct supervisory link in doing so. 3) The Agency Director of Nursing is responsible for supervision over IDOC nurses and HCUAs and therefore is responsible for supervising State nurse employees and the operational program of IDOC. The Monitor believes this is flawed. The span of control is too large for the Agency Director of Nursing and is impossible to manage and likely is contributing to the inability to implement policies, initiatives and directives. It also detracts from nursing supervision.

An additional feature of the IDOC organizational structure is that the Wardens through Assistant Wardens of Programs supervise the HCUA. On facility tables of organization, the medical program is at a level similar to other programs including chaplaincy, identification supervisor, education administrator, leisure activity specialist, clinical services supervisor, and records office. In the Pontiac table of organization, the Assistant Warden of Programs supervises the HCUA, the vendor Medical Director, and the Mental Health Services Director who are on the same level as the Chaplain, Programs Clerk, Education Administrator, and the Clinical Services Supervisor. In this arrangement, the vendor facility Medical Director is not only supervised by the Warden through the Assistant Warden of Programs but the facility Medical Director supervises the Director of Nursing, nursing supervisors and the Director of Medical Records. This means

---

[19] The allocated positions are not classified as dedicated positions in staffing documents. This information is based on a document request for assignments of nursing personnel to CQI coordinator, infection control, and chronic care duties. IDOC provided only the vendor assignments not IDOC nursing duties.

[20] When a Regional Coordinator was asked what a Regional Coordinator did on a day to day basis, she said it varies from day to day and a list she had made was five pages long. Both Regional Coordinators who were interviewed downplayed the word supervision to describe their relationship to the HCUA; preferring instead words like give guidance and help coordinate and thought that the concept of supervision was semantics.

[21] Their position description describes nursing supervision as promoting safe and effective nurse practice; to develop training and educational programs for nursing personnel; and to assist in recruitment of nursing personnel.

[22] This was initially recommended in the Monitor's 6th Report.

11

that the Assistant Warden of Programs is responsible for nursing care and clinical care at the facility.[23] This placement of the health program in the facility hierarchy is determined by the Warden who reports to the Chief of Operations while the Chief OHS reports to the Chief of Programs and Support Services,[24] which may also result in conflicting direction. In January 2021, the position descriptions of the Regional Coordinators and HCUAs were modified to add a clinical supervision relationship to their respective position descriptions. The Monitor was informed that this arrangement had always existed. Yet, prior to the Consent Decree, the Regional Coordinators had no supervisory role over the HCUAs or the facility operations; their role was mainly to act as a resource to the facility on implementation and interpretation of Administrative Directives and to monitor practices at the facility.[25] It appears that this prior arrangement has continued in spite of the introduction of the "clinical supervision" role.

IDOC does not agree with the Monitor's position that custody supervision of the HCUAs impairs the ability of the Chief OHS to direct and manage medical programs and processes.[26] The Monitor continues to find examples of inability of OHS to direct medical programs. In one mortality review[27] a patient with dementia had aggressive behavior and should have been managed medically; instead, custody declared him on "staff assaulter status" despite having advanced dementia. His behavior, a result of his dementia, was treated by custody with Mace and use of a tactical team for shackling in order to shower him. His dementia should have been medically managed instead of being managed as if he were a normal person. Another example was in NRC CQI minutes. Since the 2nd Court Expert Report[28] at NRC, HIV opt-out testing has been recommended because it is the standard of care in correctional facilities.[29] Instead, nurses at reception centers routinely consent patients for HIV testing which an opt-in not opt-out testing. The Monitor has continued to recommend opt-out screening. At a June 2024 NRC quality improvement meeting, the minutes document a discussion in the "Medical" Section which stated:

> "There was recent confusion with HIV testing upon intake. Lippert monitors highly suggested all individuals be tested for HIV as a routine test. We removed the HIV consent form (DOC 0215) from our intake packet for a few days. A 434[30] was written by a LT[31] because this is not stated in the AD. We have resumed using the consent form until the AD is updated."

That the HCUA immediately complied without Regional Coordinator approval demonstrates custody is in charge of medical reception medical screening tests. The Administrative Directive 04.03.101 Offender

---

[23] This is from the Pontiac facility table of organization provided by IDOC.
[24] This means that two different custody Chiefs (one operations and the other program services) supervise two different sections of the medical program.
[25] See filed Report of Second Court Expert Case 1:10-cv-04603 Document #: 767 Filed 11/14/18 which states on page 16 paragraphs two and three: "Each HCUA reports to the assistant warden of programs of the facility. Each facility medical program is therefore under the operational management responsibility of the Warden of the facility, not the Agency Medical Director…………These individuals [regional coordinators] act mostly as regional resources to facility staff with respect to interpretation and implementation of the Administrative Directives and clinical guidelines. They also provide a monitoring function. Because they do not have authority to change operational practices, their monitoring function lacks authority to direct operational changes, even if they disagree with how practices are being managed".
[26] In an interview with two regional coordinators, one of the coordinators called the issue of OHS supervision of the facilities a matter of semantics.
[27] Patient #4 Mortality Reviews attachment to this report.
[28] See Northern Reception and Classification Center 2nd Court Appointed Expert Report Lippert v Godinez February 2018.
[29] See Sexually Transmitted Infections Treatment Guidelines, 2021 Centers for Disease Control section on Persons in Correctional Facilities as found at https://www.cdc.gov/std/treatment-guidelines/correctional.htm
[30] A 434 is an incident report.
[31] A lieutenant.

Physical Examination indeed states that consent is to be obtained for an HIV test. Procedure II.G.2.a.(3) (a) states:

> "HIV testing unless the offender opts to not receive the test. Consent for testing, or refusal, shall be documented on the Offender HIV Counseling and Education, DOC 0215, and shall be retained in the offender's medical record."[32]

In this case the administrative directive gives bad advice. The medical program made a change to improve reception screening but it was countermanded by a custody supervisor. A lieutenant should not be directing how intake laboratory screening is to occur nor should they enforce how medical care is conducted.

Another example was in the IRCC January 2024[33] quality improvement minutes. In the section on Internal-External Audit Findings, related to administrative directive 04.03.101, a custody compliance officer found IRCC non-compliant for not performing rectal examinations which, according to the existing administrative directive, are required (along with stool guaiac testing) for colo-rectal cancer screening. The vendor regional Medical Director asked if there was a specific provider implying that he would counsel the provider. The HCUA was assigned to perform a corrective action plan. For at least two years, OHS has directed that colorectal cancer screening *not* include guaiac testing nor include a rectal examination. The OHS directive has been to use FIT testing. In quarter four of 2023 and quarters 1 and 2 of 2024, IRCC scored 0% on this performance and outcome measure decreasing from a 60% score in the 3rd quarter of 2023. Custody supervision of this process appears responsible for that decline. Custody has no business supervising the medical program and it is still occurring. HCUAs should be supervised and take direction from Regional Coordinators not the Warden.

In interviews, the Regional Coordinators viewed their supervisory responsibility akin to coordination, helping, facilitating, supporting and guiding and not as traditional supervision. This is in line with the roles that existed prior to the Consent Decree. In interviews, HCUAs confirm this type of relationship. During the Graham visit, which was made prior to our last report, the HCUA said that she reports to the Assistant Warden of Programs and takes "guidance" from OHS. At NRC, the HCUA said that the Assistant Warden of Operations was her boss.[34] She described no other supervisors and when asked whether she would characterize her official relationship with OHS as supervisory, consultative or collegial, she responded consultative. When asked if anyone from OHS was supervisory to her she didn't know but said that the regional coordinator helped her which is consistent with comments from the regional coordinators.

Though Wardens are the line supervisors of the HCUAs typically through Assistant Wardens of Programs, the position description of the HCUA contains no assignments supervised by the wardens including implementation of policies and procedures. Nor would wardens be capable of supervising implementation of policies or any operational aspect of health care. In interviews with a warden and assistant warden, they described supervision as more of a collaboration than supervisory relationship.[35] In the interview,

---

[32] Administrative Directive 04.03.101 Offender Physical Examination effective 5/1/21

[33] These minutes were the IRCC January, 2024 CQI minutes but the document sent to us was titled February 2924 CQI IRCC. This incident was mentioned in the Internal/External audit findings.

[34] The Assistant Warden of Programs position was vacant and the Assistant Warden of Operations was acting as her boss temporarily.

[35] Based on an interview with the warden and assistant warden at Stateville/NRC supervision consisted of coordination of movement of inmates to clinics, ensure security staff is present for health care activities, coordinate Department of

the warden and assistant warden made clear that they do not supervise any clinical matters even though the position description of the HCUAs is all clinically related assignments. One area of direct involvement with the medical program is that wardens do control posting of all medical positions for their facilities which should be under control of the medical program.

Implementation of policy and procedure is an example of how this organizational structure works. In order to implement policies, initiatives and directives, there needs to be someone ultimately responsible for the implementation with a direct line of supervision from OHS to the facilities which does not now exist. The wardens who supervise the HCUAs do not supervise clinical operations and could not and probably would not supervise implementation of policy and procedure. When two Regional Coordinators were asked how implementation of policies would occur, one answered that it's a team approach and she "facilitates" the implementation and helps with barriers. The Chief OHS agreed adding that OHS makes the announcement of a policy change and the facilities and vendor staff "do it" with everyone having a role. This diffuse assignment of responsibility appears to ultimately rest with the HCUA[36] who is supervised by the Warden and helped by the Regional Coordinator but without a direct line of reporting to someone who can address barriers to implementation. This leaves the HCUA without supervision. When asked what were the barriers to implementation of policies, both regional coordinators said staffing is a key issue. One of the Regional Coordinators added that vendor compliance, education of physicians, equipment, and supplies were barriers. These types of problems require higher level involvement above the capacity of the HCUA which is not currently apparent.

Current supervisory relationships should be revised and position descriptions should be revised accordingly. The Medical Coordinator should supervise *operations* of the health care program and act in the capacity of a statewide health care administrator and continue to report to the Chief OHS. This would be consistent with the current responsibilities of the Medical Coordinator in the position description which are to implement policies *and* medical services *and* direct statewide programs to ensure health needs are met. The Regional Coordinators should report to the Medical Coordinator as was the case several years ago. The Regional Coordinators should have their position description modified to eliminate oversight over clinical nursing services; their responsibilities should be concerned with operational and administrative management of the medical program which includes implementation of policies and initiatives of OHS and all operational aspects of the program. The current span of control of the Regional Coordinators is currently too large. Three additional regional coordinator positions should be created to ensure a more realistic span of control. The Monitor recommends that the Warden not supervise the HCUA. The position description of the HCUAs should be revised to include supervision by Regional Coordinators and to ensure that the HCUA adheres to all security regulations. The HCUA's position description should include the intended expectation of the HCUA with respect to responsibility toward the Warden.[37] The Monitor agrees with policy A.02.01, which states,

---

Corrections equipment for health care, assist in transfers of inmates, collaborate on health care crises, ensure clinic movement is efficient, ensure schedule of clinics made by HCUA is carried out, makes sure inmates do not leave the intake area until all health and dental evaluations are completed, and discuss off-site appointment movement to reduce backlogs. These are not health care responsibilities of the HCUA and are related to coordination of medical services with custody than supervision.

[36] The position description of the HCUA states that the HCUA ensures "that patient care and services comply with medical, professional, departmental, and facility policies and procedures".

[37] The Chief of Programs and Support Services which is a custody position reporting to the Director supervises the Chief OHS. Wardens are supervised by the Chief of Operations. Supervision by the Chief of Programs and Support Services can be sufficient custody control over medical operations. If not then two different Chiefs will supervise different aspects of the

"The Health Care Unit Administrator (HCUA) is the responsible administrative authority for ensuring the coordinated delivery of health care within the facility and ***maintains communication*** with the Warden. HCUAs ***report*** to the Office of Health Services through their Regional Coordinators".

The Agency Director of Nursing should have a dotted line of supervision over all facility Directors of Nursing with respect to nursing practice. Facility Directors of Nursing would still report to the HCUA for operational issues. Whether regional directors of nursing are necessary is something that should be determined in a staffing analysis.

In the Adult Immunization section of this report, the Monitor also recommends that Infection Control nurses at the facilities should have a dotted line of supervision to the Statewide Infection Control Coordinator. The direct supervision is to the HCUA.

The vendor has not effectively contributed to efforts in advancing IDOC's compliance with the Consent Decree. The problems with vendor Regional Medical Directors was documented in the Monitor's 7th Report. The most significant vendor failure is in hiring staff, especially physician staffing statewide as explained above. In addition, they provide no evident oversight over the clinical performance of the facility physicians and mid-level providers. In interviews, facility physicians are unaware of policies, initiatives, and directives; do not participate in quality improvement; and do not address deficiencies identified in the Monitor's mortality reviews or in SIU's performance and outcome measures or mortality reviews. Vendor Regional Managers and Directors of Nursing share responsibility for implementation of policies, initiatives and directives which have not been effectively implemented. Current methods to hold the vendor accountable and to monitor their performance have not been adequate or effective.

IDOC policy A.02.01 Responsible Health Authority states that the Agency Medical Director is the ultimate responsible health authority for the IDOC health system but this position has no effective way to enforce that authority because the vendor facility Medical Directors report to vendor Regional Medical Directors who have no reporting relationship to the Agency Medical Director. The Agency Medical Director depends on vendor Regional Medical Directors to implement IDOC policies and directives but this is not currently effectively done. An example of this is that for two years the Agency Medical Director has stated that colorectal cancer screening is to be conducted using a FIT test. This directive has not yet been fully implemented by vendor staff.

Policy A.02.01 also assigns the facility Medical Director as the "designated responsible medical authority" at each facility. Policy A.02.01 also states that the Agency Medical Director reviews and approves in writing the vendor's job description of the facility Medical Director. There is no evidence that this has been done. The Agency Medical Director should ensure that the position descriptions of the vendor's facility and regional Medical Directors clearly state what IDOC's expectations are for these positions.

The vendor currently fills Medical Director vacancies with part-time, coverage, or locum tenens physicians who do not fulfill the duties of the Medical Director position. Lack of fulfilling Medical Director duties is due to insufficient facility physician staffing and to ineffective supervision by the vendor Regional Medical Directors. The facility Medical Directors should be full time and functionally fulfill

---

medical program. The Chief of Programs and Support Services will supervise the Chief OHS and the Chief of Operations will ultimately supervise the HCUAs. This can create conflicts in medical operations.

the IDOC expectations of the facility Medical Director position,[38] as described in the position description. The vendor should not be credited with Medical Director hours unless the position is functionally fulfilled. The Monitor does not believe that there are sufficient allocated physician staffing hours to accomplish the requirements of IDOC policy or of the Consent Decree and those few physicians who work are unsupervised.

To increase OHS supervision over the vendor and of OHS regional leadership, the Monitor recommends regular meetings. On a weekly basis the vendor Regional Managers should meet (in person or via teleconference) with the Regional Coordinators and Medical Coordinator to ensure the vendor is performing in accordance with OHS directives to include:

- Providing supplies, pharmaceuticals, and equipment necessary to conduct care and implement policies;
- Update staffing including what is being done to ensure adequate staffing is in place;
- Updating the vendor and State contributions in policy implementation, directives, and initiatives; and
- Any other items that are recent priorities of OHS.

A checklist type review can help make meetings more efficient and contribute to vendor monitoring.

The Agency Director of Nursing should conduct regular meetings with facility Directors of Nursing to discuss nurse practice issues and policies. Regular discussions about programs such as implementation of nurse sick call should take place with follow up guidance from the Agency Director of Nursing. Vendor Regional Nurses should meet regularly with the Agency Director of Nursing to coordinate and ensure that nursing practice is standardized and that all nursing staff are cooperating at all facilities. Opportunities for improvement identified in mortality reviews should be discussed.

Deputy Chiefs should meet weekly with their respective vendor Regional Medical Director and use a checklist to ensure that facility Medical Directors are performing in accordance with their position description. Staffing should be discussed. Vendor Regional Medical Directors should respond to deficiencies in their respective facilities' performance and outcome audits that are not at goal and mortality review opportunities for improvement for the facilities they supervise. They should be asked what they are doing to prevent deficiencies from occurring; how they have monitored performance of their staff; and what their physicians are contributing in the quality improvement meetings. A checklist format can be helpful when conducting these meetings.

By having the Deputy Chiefs, Medical Coordinator, and Agency Director of Nursing meet with vendor Regional staff, it enhances the ability to ensure operational and clinical control over administrative, nursing and medical care and increases oversight over the vendor. To accomplish this recommendation, several position descriptions, including the Medical Coordinator, Deputy Chief, Regional Coordinator, Agency Director of Nursing, HUCA, and vendor facility Medical Director will need revision.

---

[38] This should include appropriate credentials required by the Consent Decree; clinical medical oversight of clinical care at the facility; ensuring subordinates implement policies, initiatives, and directives of IDOC; ensuring that the specialty care process is effective and timely; be an active participant in quality improvement including in responding to mortality reviews and other audits by SIU for their facility; and provide leadership to ensure the clinical aspects of care are being addressed at their facility to ensure compliance with the Consent Decree.

16

Last year, GCL performed a survey of IDOC facilities. In their report, they included a strategic plan for IDOC that did not include a medical strategic plan. The Monitor was told that OHS is working on a medical strategic plan but it is still incomplete.

Past reports have provided details of the problems with having vendor and State staff working side by side but lacking supervision because State staff are not allowed to supervise vendor staff and vice versa. Examples of problems with this were present in the "Communication From" section of the February, 2024 CQI minutes from JTC, it states that the Regional Coordinator stated, "Concerned that Wexford Staff is being told they do not take direction from the HCU". Presumably, this means that vendor staff will not take direction from a State supervisor. There are union rules regarding discipline, but routine day to day practice must include supervision by a responsible authority. IDOC must correct the vendor-State employee supervisory issue as it is not safe.

In summary, OHS has increased its allocation of leadership positions mostly through SIU though it still needs to ensure it will have the data staff necessary to use data from the electronic record. The leadership staff, and in particular regional staff, should be reorganized to more effectively oversee medical care in the facilities. This supervision is necessary to gain compliance with the Consent Decree and to implement policies. Facility leadership positions are dangerously low and impair implementation of policies and the Consent Decree. The vendor has not effectively improved staffing or supervision of their staff to contribute to effective implementation of policies and adequate clinical care. Recommendations to improve oversight of the vendor are included below. This provision continues to warrant a partial compliance rating.


**RECOMMENDATIONS:**
1. Revise IDOC position descriptions of Deputy Chiefs, Medical Coordinator, Agency Director of Nursing, Regional Coordinators, HCUAs, and facility Directors of Nursing to clarify expectations and ensure appropriate lines of authority.
2. When revising the position description of the Regional Coordinators eliminate supervision of nurse practice responsibilities and focus on operational administrative functions. Make the position of Regional Coordinators report to the Medical Coordinator.
3. Increase the number of Regional Coordinators. The Monitor suggests six, but IDOC should depend on a staffing analysis to determine a more precise number.
4. Identify a DON at each facility who is accountable to the Statewide DON in a dotted line relationship for clinical nursing practice and quality. Line authority would remain with the HCUA for daily operations
5. In the staffing analysis, consider whether IDOC Regional Directors of Nursing are needed.
6. The Monitor recommends that the HCUA reports to the Regional Coordinator. If this occurs the position description of the HCUA should be revised to include the expectations of adherence to all security rules and adherence to all responsibilities to the Warden and expectations of OHS. If IDOC continues to want to have the Warden supervise the HCUA, the position description of the HCUA should include specifically for what responsibilities the HCUA reports to the Warden and for what responsibilities the HCUA reports to the Regional Coordinators. The supervision of HCUAs by OHS staff must not be just guidance or consultative but actual supervisory responsibility.
7. Review and revise the vendor position descriptions for Regional Manager, Regional Medical

Director, Regional Director of Nursing, facility Medical Director, and facility Director of Nursing to ensure they are consistent with expectations of IDOC.

8. When reviewing and revising the facility Medical Director position description ensure that the position is filled by a qualified physician position as described in II.A.2. of the Consent Decree. This position should be full time, and include expectations of acting as the facility clinical authority, appropriately supervising and monitoring the clinical performance of subordinate medical personnel in accordance with the Consent Decree, providing clinical leadership in implementation of policies, initiatives, directives of OHS, and in participation in quality. Facility Medical Directors need to take responsibility for addressing results of SIU audits and mortality reviews for their facility. These responsibilities presume additional physician staffing is indicated.

9. IDOC should review its policies and position descriptions to ensure that there is order in the health unit and that all staff obey custody rules and clinical orders and take clinical supervision from an appropriate supervisor regardless who the superior's employer is. This must be worked out and described in policy so that all staff understand that they are on the same team[39].

10. The OHS Deputy Chiefs should each meet with the respective vendor Regional Medical Director weekly (in person or via video conference) to discuss 1) physician and mid-level provider staffing and what the vendor Regional Medical Director is doing to improve the staffing, 2) how the vendor Regional Medical Director is reviewing the performance of facility Medical Directors, including the Regional Medical Director's evaluation of their performance, 2) response of the Regional Medical Directors at the facility to the most recent SIU audits and opportunities for improvement found on mortality reviews for the facilities they manage and what they will do to correct deficiencies, 3) what they are doing to ensure facility Medical Directors are contributing in the quality improvement meetings, and 4) what the vendor Regional Medical Directors are doing to ensure successful implementation of OHS policies and procedures, directives, and initiatives.

11. On a weekly basis, the Medical Coordinator should meet with the vendor Regional Managers and the OHS Regional Coordinators to ensure the vendor is performing in accordance with OHS directives to include: 1) are they providing supplies, pharmaceuticals, and equipment necessary to conduct care and implement policies, 2) update staffing including what the Regional Manager is doing to ensure adequate staffing is in place, 3) review what the Regional Manager is doing to ensure IDOC policies, initiatives, and directives are implemented, and 4) any other items that are priorities of OHS. This can be in person or via teleconference.

12. On a weekly basis, the Medical Coordinator should meet individually with the Regional Coordinators to discuss similar items as described in item 11 above and include: 1) custody issues at their respective facilities, 2) progress towards implementation of policies, 3) issues with the vendor that need to be addressed, 4) other operational problems that are barriers to advancement towards compliance with the Consent Decree.

13. The Agency Director of Nursing should conduct regular meetings with all Directors of Nursing to discuss nurse practice issues and implementation of policies, initiatives, and directives. Regular feedback on progress of programs such as the implementation of nurse sick call should be obtained with follow up guidance from the Agency Director of Nursing.

14. The Agency Director of Nursing should meet regularly with vendor Regional Directors of Nursing to discuss: 1) what they are doing to ensure that nursing practice is standardized and appropriate; 2) to discuss vendor nurse staffing and what the Regional Nurse Directors are doing about it, 3) what they are doing to ensure annual performance evaluations are completed and to review copies

---

[39] This is meant to address the situation at Dixon where IDOC registered nurses would not supervise vendor nurse assistants for their clinical duties.

of these, and 4) what they are doing to address nursing opportunities for improvement identified in mortality reviews or SIU audits. These meetings can be in person or via video conference.

15. For all meetings listed above, a checklist format will help focus the meeting.

16. For purposes of monitoring, IDOC should not count as "filled" a facility Medical Director position unless the position is functionally filled which should be defined as a full time position[40] that provides the required leadership as described in recommendation 9 above.

17. The IDOC staffing and particularly the leadership staffing (Medical Directors, DONs, HCUAs, Dentists, supervisory nurses) is critically low. The facility Medical Director positions are dangerously low. The vendor and the State must expeditiously intensify their recruiting efforts.

18. Fulfill the IDOC stated intention of hiring data staff.

19. IDOC is requested to provide quarterly up-to-date vacancy reports that include OHS and HCUA positions.

# Staffing Analysis and Implementation Plan

*Addresses items IV.A.1-2; IV.B;*

**IV.A; IV.A.1; and IV.A.2.** *The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum: (1) Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree; and (2) Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.*

**IV.B.** *Within 120 days [July 1, 2019] from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis. Within sixty (60) days after submission of the staffing analysis, Defendants shall draft an Implementation Plan. In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

**Staffing Analysis and Workload Analysis**

IDOC promulgated policy C.06.01 Staffing Levels in February of 2024. This policy has not been implemented and the Monitor has received no plans on how the policy will be implemented.

IDOC accepted many of the Monitor's suggestions including the following:

- Stipulates that a written staffing plan based upon a comprehensive workload analysis will be established for each position type.
- Staffing plan will be developed to provide adequate staff and will list all positions allocated with the number of hours to be on site.
- The staffing plan will allocate positions to post assignments (infection control, infirmary, etc.) with relief hours.

---

[40] Exceptions can be made but should not be made if the individual cannot fulfill expectations of the position.

- Each HCUA will maintain a spreadsheet documenting the incumbent for each position and the date any position becomes vacant.  These are submitted to regional coordinators monthly

IDOC did not accept suggestions for a methodology to conduct a workload analysis stating that a methodology should not be dictated in OHS policy.  Nor did IDOC accept monitoring staffing to a benchmark of 15% vacancy rate.   They stated that a policy is not the appropriate place for these requirements to be inserted as these are worked out with the vendor.  The Monitor looks forward to the vendor contract regarding how vacancies are addressed. IDOC did not address in its comment how IDOC will address its own vacancy rate.

The Monitor requested two documents for this section.

1. Document request #10 was "A list of allocated/budgeted medical and dental positions (also noting FTE) vacancies for each position at each facility to include IDOC and Wexford positions.  These should be separated by position type.  Aggregate positions statewide should be included".
2. Document request #16 was "Progress on workload analysis including any analysis or other measures used to determine the number of staff positions required.  Provide whatever information is available for this item"

With respect to the first document request, OHS does not track aggregate staffing of State and vendor employees.  The vendor and IDOC each maintain information on their own employees and IDOC does not provide  combined staffing data.  IDOC provided 24 files with staffing data mostly from the vendor.  This requires the Monitor to perform numerous calculations using multiple documents to determine staffing in IDOC facilities. Staffing documents do not always include similar staffing numbers.[41]

With respect to the second document request IDOC provided no report containing a workload analysis.  There is no plan to complete a workload analysis though it is now the policy of the IDOC.

In 2019 IDOC presented a staffing analysis based on surveys of its HCUAs and presented its Staffing Analysis which recommended 373 additional positions.[42]  The Monitor has consistently stated that IDOC's analysis was not an analysis and recommended a workload analysis to more accurately describe IDOC's need for staffing but this has not been done. There have been minor modifications to this recommended number over the subsequent years but IDOC has not performed any further analysis.   For over two years, IDOC did not allocate all of its recommended positions in their staffing analysis.  When IDOC finally allocated all positions in 2022, the Monitor recommended that IDOC hire all positions.[43]  This has not occurred.  As of this report, IDOC has 60 less working staff  than it did in 2019 and 679 vacancies based on their 2019 staffing analysis.  There is no dispute that additional staff are needed but the numbers of vacant position is staggering and has been present since the IDOC staffing analysis positions were allocated.  In interviews with IDOC Regional Coordinators, they mentioned staffing as a key barrier to implementation of policies.  The HCUA at NRC named lack of staffing as the key barrier to implementation of the sick call policy.  Lack of staffing is impeding movement towards compliance with the Consent Decree.  The Monitor continues to recommend hiring all staff as soon as possible.

---

[41] See the discussion of physician staffing in the Staffing section of this report.
[42] Staffing Analysis Illinois Department of Corrections -11-23-19
[43] Health Care Monitor 5th Report, Lippert v. Jeffreys June 22, 2022

The Monitor has had issues with the latest Staffing Analysis in 2021. On 10/28/20, the Monitor wrote a letter to IDOC which was sent by email (attached as Appendix B to this report) and provided comments on the Staffing Analysis and suggested that the Staffing Analysis either did not include staffing that should be present or suggested areas where additional staffing should be added to the Staffing Analysis proposal of IDOC. These areas included:

- An audit team, process improvement staff, information technology staff and data staff;
- Dental hygienists;
- Dentists;
- Physicians;
- Optometrists;
- Physical therapists; and
- Support staff;

By policy, IDOC will now conduct their own workload analysis on these services. Lacking any movement on the workload analysis, the Monitor team will deliberate whether it can give workload recommendations with the next report for these and perhaps other area of services to move this process along.

The Monitor also suggests that IDOC implement immediately, for all new hires, policy statement III in policy C.06.01 which states:

> The staffing plan shall allocate all positions to posts (assignments such as infirmary, infection control, etc.) and shifts.

This is the same suggestion the Monitor made in the letter in Appendix B (item 14 on page two of the letter) which states:

> "The facility nurse positions should be broken down by function (infirmary, administration, clinics, infection control, quality improvement, etc.) and by site/shift to determine adequacy of nurse staffing to ensure that there are sufficient nurses based on assignment."

IDOC currently has 217 vacant RN positions. As these positions are hired, they should be hired into functional positions. This will make the position more attractive and will increase the ability of IDOC to make progress towards compliance. If, for example, new RNs were hired as infection control nurses, given that there is a statewide infection control coordinator, it is more likely that IDOC will move toward compliance with vaccination and preventive screening issues.

Pending completion of a workload analysis, IDOC should hire all of the staff it recommended in its own staffing analysis and do so as soon as possible. IDOC should strongly consider hiring the additional staff recommended by the Monitor as soon as possible. The Monitor has concerns whether any progress toward compliance with the Consent Decree or implementation of IDOC policies can occur without significant increases in staffing.

**Implementation Plan**

The Monitor requested one document for this section. In document request #19 the Monitor asks:

> "Provide a table with the percent completion of each task of the Implementation Plan. A separate document should be provided with data supporting the level/percentage of completion of a task.

21

If unavailable, any document that provides verification for progress made on all implementation plan items can be provided".

The Monitor was told that no such document exists but will be developed after onboarding of the implementation plan project manager.

In response to the Monitor's 7th Report, IDOC said that this provision should be partially compliant because there is a Court-Ordered Implementation Plan. While the Court has ordered an Implementation Plan, IDOC has provided no information that any of the Implementation Plan is being implemented. IDOC has just hired an Implementation Plan project manager who has yet to meet with the Monitor. The Implementation Plan is connected to the Staffing Analysis because implementation requires staff to succeed. IDOC staffing is basically unchanged to slightly worse than it was in 2019 so IDOC will be significantly challenged to implement any changes at the facility level. The Monitor looks forward to working with the project manager for the Implementation Plan.

In summary, IDOC has not provided a workload or other analysis of the need for positions and there is no current plan to do so. IDOC has developed a policy on staffing that acknowledges Consent Decree requirements. However, staffing is worse now than it was in 2019 and IDOC has 679 vacancies out of 1593 positions. IDOC is unable to implement any of its policies and aside from hiring an Implementation Plan project manager has not shown evidence of progress with the Implementation Plan. This status warrants a partial compliant rating on the basis of development of a policy but considerable work remains to be done.

# Staffing

*Addresses items II.B.2; II.B.3; III.A.10;*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**Staffing**

**FINDINGS:**

IDOC promulgated policy A.06.01 Staffing Levels in February of 2023, but the policy has not had any effect on how IDOC hires or tracks staffing. Its implementation is not evident in any staffing documents provided.

The Monitor requested two documents for this section.

1. Document request #10: a list of allocated/budgeted medical and dental positions (also noting FTE) vacancies for each position at each facility to include IDOC and Wexford positions. These should be separated by position type. Aggregate positions statewide should be included.

2. Document request #12: the number of hours worked by staff employed by a staffing agency or locum tenens at each facility by job title from March 2023 to March 2024 (to include dental hygienists and dentists).

The Monitor received 24 staffing documents which will be discussed below. The agency hours were for 2023 through February of 2024. The dates did not correspond to staffing data which was provided for March 2024 and June 2024 so the two sets of data were not comparable.

Multiple requests, at considerable effort, are necessary to obtain staffing numbers. IDOC provided 24 separate documents, each presumably used for a different purpose. But none provide aggregate staffing numbers for State and vendor employees in a single document. The Monitor spends considerable time evaluating staffing information from various documents to determine accurate staffing of vendor and State employees. Some staffing data[44] consisted of tables of organization with questionable reliability. IDOC, the vendor and SIU each maintains its own lists of staff including vacancies and there is no combined tally of staffing. The Monitor believes that staffing numbers in this report are accurate enough to use but caution that data sources provided did not always provide complete or consistent data. The Monitor strongly recommends that IDOC develop a standardized methodology to report staffing that includes OHS, SIU, and all State and vendor employees who work at the facilities. Staffing data was also not provided timely which delayed the report.

Overall staffing has worsened over the five years since the inception of the Consent Decree as can be seen in the table below. Since 2019 State employees increased by 38 positions while the vendor employees have decreased by 97.4 for a net decrease in staffing of 60 since just after the inception of the Consent Decree in 2019.

| Staffing 2019 to 2024* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date of Staffing Data | IDOC population** | Allocated or Budgeted Positions* | Vacant Positions | Vacancy rate | Working Staff **** | Percent Increase of Working Staff since 2019 | Recommended Positions in Staffing Analysis**** | Total Positions |
| Nov-19 | 38139 | 1210 | 236 | 20% | 974 | | 373 | 1583 |
| Jun-20 | 32048 | 1209 | 275 | 23% | 934 | | 357 | 1566 |
| May-21 | 27299 | 1277 | 282 | 22% | 995 | 2% | 308 | 1584 |
| Mar-22 | 27601 | 1591 | 727 | 46% | 864 | -11% | 0 | 1591 |
| Sep-22 | 29525 | 1591 | 727 | 46% | 864 | -11% | 0 | 1591 |
| Jun-24 | 28956 | 1593 | 679 | 43% | 914 | -6% | 0 | 1593 |

---

[44] For OHS staff and for vendor Regional Staff.

| |
|---|
| * These data come from the OHS facility staffing spreadsheet; 4CJ2930-BATES 5959-5985 Lippert Medical Staffing Report 5-7-2024; 4CJ2978-BATES 5986-5987 Lippert Nurse Vacancies May 2024; 4CJ3067-BATES 5988 Lippert Provider Vacancies May 2024; and Facility Reconciliation Worksheets - Q3'24 - LIPPERT . Most staffing is from June of 2024 but Wexford did not include Director of Nursing or dental assistants in May and so that data was used from the 3rd quarter 2024. |
| ** These numbers are from the IDOC prison population data sets as found at https://idoc.illinois.gov/reportsandstatistics/prison-population-data-sets.html |
| ***These are positions that are able to be hired |
| ****Working staff = total staff - (vacant +recommended). This is 1 off due to rounding |
| *****These are the positions recommended in the Staffing Analysis. As allocated positions increase, the number of recommended should correspondingly decrease unless the number of positions was changed in the Staffing Analysis. |

Though overall vendor staffing has slightly deteriorated since 2019, IDOC gave notice of award of the contract for comprehensive health care to Wexford in January of 2024 even though Wexford has been consistently unable to provide staffing at the contracted level. Contract terms are not yet negotiated and a signed contract is not yet in place.

After the last report, IDOC responded that comparing working staff from 2019 to 2024 is misleading because the population of IDOC has decreased. [45] Despite the decrease in staffing, IDOC's own staff including HCUAs and Regional Coordinators have recently stated that a major problem with implementation of IDOC policies is lack of staffing, apparently even given the lower population numbers. Even given the lower population, IDOC has neither implemented the Consent Decree nor its own policies and the Monitor's opinion is that staffing is a key barrier in implementing requirements of the Consent Decree.

Physician staffing is dangerously low.[46] Pending a workload analysis, the Monitor advises IDOC to increase budgeted physician staffing. Stateville is closing and has two physicians. One physician can remain at Stateville to manage the infirmary and additionally help at NRC. One of the physicians from Stateville should be transferred to Dixon. A second physician should additionally be added to Dixon. The rationale is the population (1449), the extremely high offsite specialty care, and the high burden of elderly and disabled patients. Additional physicians should be added to Menard, Pinckneyville, Western, IRCC, Graham, Hill, and BMRCC. The rationale is high population, high death rate, and high numbers of specialty care patients.

A workload analysis would effectively answer whether IDOC has an appropriate staffing plan but IDOC has not performed a workload analysis. Given the Monitor's opinion, along with IDOC's own leadership staff, that there are serious staffing deficiencies in multiple areas of service, the safest way forward is for IDOC to undertake the recommendation nine below to add staff as soon as possible based on their own recommended staffing levels until they complete a staffing analysis or reasonable analysis that shows that a staffing reduction is needed.

As can be seen in the table below, some facilities have so few nurses that it is difficult to understand how they can function. Illinois River, Logan and Western had no RN positions filled. Southwestern had no

---

[45] On 12/20/18 there were 39,805 inmates; in March of 2024 there were 28409 inmates a difference of 11,396.
[46] Multiple mortality reviews in an attachment to this report include facilities without a physician or with less than budgeted physician staffing and show serious deficiencies as a result of lack of staffing.

LPN positions filled. Vacancies were supplemented with agency staff but no facilities were 100% staffed for RNs and only one facility had 100% LPN staffing.

| June 2024 Select Facilities with Dangerous Nurse Staffing* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | RN allocated | RN filled | % vacancy | RN FTE Agency | LPN allocated | LPN filled | % vacancy | LPN FTE Agency | Nurse Assistant Allocated | Nurse Assistant filled |
| Hill | 14 | 2 | 14% | 5.9 | 15 | 7 | 47% | 5.9 | 6 | 3 |
| IRCC | 12 | 0 | 0% | 6.6 | 12 | 2 | 17% | 5 | 6 | 3 |
| Lawrence | 13 | 7 | 54% | 3 | 21 | 3 | 14% | 2.9 | 6 | 5 |
| Lincoln | 8 | 1 | 13% | 4 | 10 | 1 | 10% | 6 | 4 | 4 |
| Logan | 22 | 0 | 0% | 14.6 | 18 | 4 | 22% | 10.6 | 6 | 3.5 |
| PNK | 14 | 2 | 14% | 10 | 17 | 6 | 35% | 11.6 | 6 | 1 |
| Shawnee | 12 | 2 | 17% | 4 | 13 | 9 | 69% | 2 | 6 | 2 |
| SWCC | 9 | 2 | 22% | 1 | 6 | 0 | 0% | 3 | 0 | 0 |
| Western | 11 | 0 | 0% | 10 | 17 | 1 | 6% | 11 | 6 | 0 |
| *Data from 4CN8559-BATES 6016 Lippert Nurse Vacancies June 2024 from IDOC | | | | | | | | | | |

Physician staffing is a particularly disturbing problem. Staffing data for physicians is not provided timely and is difficult to verify. The Medical Staffing Report,[47] a vendor document, lists 22.388 FTE working physicians for a budgeted staff of 33.47 physicians yielding a 33% vacancy rate. This report excludes the budgeted 1.06 gynecologist from Decatur and Logan. IDOC sent its own Reconciliation Worksheet[48] for the same time period and showed that including the gynecologist's hours there were only 16.91 working physicians out of 34.53 budgeted physicians for a 51% vacancy rate. The Monitor used the Reconciliation Worksheet because it was hours of the vendor verified by IDOC. This indicates that staffing data provided to the Monitor is inconsistent and subject to error. Using the Reconciliation Worksheet data, the vendor has almost 17 fewer physicians working today than were present in 2019 when care was unsafe and warranted a Consent Decree.[49] Many current physicians are locum tenens physicians who will not work long-term. There is no plan for how to obtain qualified physician candidates and it is uncertain if the current vendor can obtain qualified physicians. IDOC has increased access to UIC endocrinology to manage diabetes patients, but IDOC needs a source of qualified primary care physicians. Avenues to obtain qualified primary care physicians must be explored and undertaken.

**Staffing through Academic Centers**

IDOC continues the relationship with UIC with respect to provision of HIV and hepatitis C treatment via telemedicine. It has also initiated a telemedicine diabetic treatment program at facilities in the northern region. The HIV and hepatitis C programs are excellent. The Monitor has not yet been able to evaluate the diabetes telemedicine program thoroughly but encourages IDOC to continue and expand this program. IDOC has not pursued obtaining primary care with a university programs since its initiative with SIU

---

[47] 4CN8510-BATES 5999-6015 Lippert Medical Staffing Report June 2024
[48] Facility Reconciliation Worksheets- Q3'24 - LIPPERT
[49] A table of physician changes over time is present in the Leadership Staffing section of the report.

failed several years ago. There are no plans for a university-based primary care initiative.

IDOC has no plans to hire a training coordinator despite the need for one. IDOC has not informed the Monitor of its plans for training with respect to policies, the electronic record, staff, new employee training, training on clinical issues.

In summary, IDOC has less staff today than it had in 2019. There are no plans to develop a workload analysis. There is no evidence that there is a plan to hire additional staff. Nursing and dentists staffing levels are at a level that makes it impossible to provide adequate services and physician staffing is at a dangerous level. There is no plan to improve physician staffing. There is no progress toward developing a training program. It is not surprising that IDOC has yet to be able to implement any policies. This makes a continued noncompliance rating warranted.

**RECOMMENDATIONS:**
1. Develop a recruitment plan with the explicit mission to reduce the rate of vacancies. Responsible parties include OHS, Wexford, Human Resources, and the Office of Budget and Management. The recruitment plan needs to include clearly defined benchmarks to monitor progress toward specific objectives set out in the plan. In addition to vacancy, turnover and retention rates suggested metrics to evaluate progress include: the number and outcome of recruitment activities, time from inquiry to first contact, and time from job offer to start date.
1. A recruitment priority should be to recruit and hire into vacant DON and Nurse Supervisor positions to increase accountability for performance improvement.
2. Prioritize recruitment of nursing positions at the facilities with the lowest ratio of RNs and the lowest actual nurse staffing.
3. The number of mandatory overtime assignments should be reported to OHS by each facility monthly.
4. Monitor patient care quality and health outcomes more closely at facilities with the most turnover, highest vacancy rates and largest number of mandatory overtime assignments.
5. Develop job descriptions that define the training and experience necessary for each position and provide them to the Monitor for input before finalization. Establish positions at each facility responsible for Infection Control and Quality Improvement.
6. Establish a database that includes the number of nursing positions by type, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.
7. Identify performance and health outcome measures to compare with staff mix and staffing levels to identify desirable staffing ratios and patterns. Measures to evaluate staffing adequacy include quality patient care parameters (numbers of emergencies, patient falls, acquired infection etc.), risk management information (deaths, grievances, errors etc.), time taken to fill vacant positions and retention in registered nurse positions as well as compliance with items III.A.10, III.I.1, III.I.2 and III.I.3 of the Consent Decree.
8. Move one of the physician positions from Stateville (because it is closing) to Dixon. Add an additional physician to Dixon. Add additional physicians to Menard, Pinckneyville, Western, IRCC, Graham, Hill, and BMRCC. The basis is deaths, specialty care needs, and population. The workload analysis of physician needs to be accomplished.
9. IDOC needs to hire positions in their staffing analysis as soon as possible.

26

10. Facility positions should be officially titled by responsibility (quality improvement coordinator, infection control nurse, etc.) and label nursing positions by assignment so that workload can be properly assigned.
11. All state, vendor and contract position descriptions for OHS and facility positions need to be provided
12. IDOC should respond to the Monitor's recommendations on staffing.
13. IDOC needs to consider all of the Monitor's recommendations for the Implementation Plan and respond why they believe a recommendation is unnecessary.
14. The IDOC audit, related to provision II.B.9., should include an evaluation of staffing.
15. Staffing vacancies by position type should be tracked on a monthly or quarterly dashboard and sent to key leaders of IDOC and the State (e.g., CMS, Attorney General, the Governor's counsel assigned to IDOC) until vacancy rates are 12%.
16. Budgeted and vacant State, vendor, and OHS positions, separated by type of position, need to be provided quarterly and in the document request. This needs to be provided by facility and with cumulative regional and systemwide aggregate numbers.
17. Implement policy A.06.01.


# Oversight over Medical, Dental, and Nursing Staff


**Credentialing of Physicians**

*Addresses items II.B.6.r; III.A.2-7*
**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*
**III.A.2.** *All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.*
**III.A.5.** *Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 6, below.*
**III.A.6-7** *Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department. The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a*

*particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities*

**OVERALL COMPLIANCE RATING:** Partial Compliance

The continued rating of partial compliance was based on IDOC's consistent efforts to hire only physicians who meet the credential criteria detailed in III.A.2 and communicating with the Monitor as noted in III.A.6-7 when they are considering physician candidates who do not meet the credentialing requirements. Since the start of the Consent Decree in 2019 only one physician who was not Board Certified or had not completed a 3 year primary care residency in Family Medicine, Internal Medicine, or Emergency Medicine has been hired.

**FINDINGS:**

IDOC has promulgated policy C.01.01 Licensure and Credential Verification. This policy was provided to the Monitor for comments which were returned to IDOC in September 2023. IDOC accepted almost all comments and promulgated the policy in February of 2024. There is no evidence that this policy has been implemented.

One recommendation of the Monitor was not accepted. The Monitor recommended that the vendor procedure for credentialing be attached as an appendix to the policy. This was not accepted and the vendor's credentialing procedure is still unknown to the Monitor.

The IDOC policy requires the vendor to:

1. Have clear assignment of responsibility for review and verification of credentials;
2. Place all credential documents in the employee's file including date of verification and person verifying the credential;
3. Review and verify:
   a. Primary source verification:
      i. Graduation from medical school;
      ii. Completion of residency training; and
      iii. Board certification.[50]
   b. Review references;
   c. Ensure completion of educational programs relevant to position include post-graduate programs;
4. Include in the credential file a National Practitioner Databank report.
5. **All credentialing information** is to be kept in a file maintained securely under lock by the HCUA
6. Requires that employees without current licensure and/or credentials are ineligible for employment and may not work until deficiencies are rectified. This means that physicians can't work until their credentials are approved.

The Monitor agrees with IDOC's requirements of the vendor but there is no evidence that the vendor adheres to this policy. IDOC allows hiring of individuals without sending credentialing documents to the Monitor. The Monitor has asked to be advised of all new hires and to be presented with their credential information ideally before starting work or immediately upon starting work but this has not been done and

---

[50] An AMA profile is acceptable if it verifies residency training and board certification.

28

there are typically several physicians whose credentials are unknown to the Monitor. Currently there are six physicians who are working whose credentials have not yet been provided to the Monitor. The vendor's credentialing procedure is not attached to this policy. IDOC must engage the vendor to ensure it adheres to this policy. Current credential information received by the Monitor is not consistent with credential information required by this policy[51]. Furthermore, the untimely communication and presentation of credential information to the Monitor is so late that it is difficult for the Monitor to timely act on III.A.2. of the Consent Decree.

On further review of this policy the Monitor has three additional recommendations for IDOC to consider in its next revision of the policy. The policy requires the HCUA to keep a credential file of physicians in their employee file at each facility. This file can contain extremely confidential information and because it is maintained by the facility HCUA it will be difficult to manage and very difficult to maintain in a confidential manner. The Monitor recommends that this file be maintained centrally as is the case in larger organizations and in hospitals. The credential files should be securely stored in the OHS office. The HCUA should maintain a truncated version of the file to include the license and DEA registration. The central office should maintain the complete file with National Practitioner Data Bank, certificates, diplomas, curriculum vitae, sanctions, etc. In doing so, it will facilitate the providers changing facilities; it make it easier for a physician to work at multiple sites, be easier for a single person to communicate credentialing information with the vendor and credentialing information; will be easier to access for the Chief and Deputy Chiefs who are responsible for oversight over physicians; and will be a more secure storage of sensitive material. A second recommended addition to policy is that IDOC include a requirement that locum tenens physicians have credentials that satisfy the requirements of the Consent Decree. This would enforce a requirement to adhere to III.A.2. of the Consent Decree. A third recommendation to policy is to make clearer that a physician is not to start practice until the credential file is complete and reviewed. Many organizations have a temporary start process but doing so should be carefully thought out. The Monitor asks that these suggestions be considered in the next revision of the policy.

The Monitor requested and received two documents for the Credentialing of Physicians section.

The first document request was the Physician Training and Credentials spreadsheet, a document prepared by the medical vendor listing all physicians with name, facility, highest level of post-graduate education, residency type completed, date residency completed, internship/residency training sites, license expiration date, DEA expiration date, board certification type, board certification date, re-certification date, and expiration date of board certification. Of the 33 physicians on the credentials worksheet, nine have expired DEA licenses, an additional seven physicians have an entry of "########" marked as the entry for their DEA expiration date, and an additional physician had a blank space for expiration for their DEA license. Therefore, 17 physicians did not have verification of an active DEA license.

The second document request was primary source verification of all facility physician credentials. Primary source verification packets are to include:
- Copies of official documents from the original source (medical school diploma, residency training program or specialty fellowship certificates, etc.) verifying completion of training or board

---

[51] The Monitor does not receive National Practitioner Databank reports, seldom receives primary source verification of credentials.

certification status,[52]
- Any prior disciplinary reports, or actions including sanctions by state licensing agencies,
- AMA Profiles, and
- A recent CV.

The Monitor has recommended that the National Practitioner Data Bank (NPDB) report be included in the packet, but this has not been done. IDOC policy requires the NPDB to be obtained and filed in the credential file of the employee but does not release it to the Monitor. Primary source documents are absolutely necessary to verify that IDOC and its vendor are complying with the Consent Decree III.A.2

| Physicians with Primary Care Credentials in IDOC | | | | |
|---|---|---|---|---|
| Year | 11/24/19* | 2/1/20 | 7/31/23 | 6/13/24 |
| Credential | | | | |
| Board Certified | 13 (37%) | 15 (42%) | 16 (57%) | 22 (67%) |
| Not Board Certified; Completed 3 Year Primary Care Residency | 10 (29%) | 10 (27%) | 8 (29%) | 7 (21%) |
| Total Qualified | 23 (66%) | 25 (69%) | 24 (86%) | 29(88%) |
| | | | | |
| Not Board Certified; Did Not Complete 3-Year Primary Care Residency | 12 (34%) | 11 (31%) | 4 (14%) | 4 (12%) |
| Total physicians** | 35 | 36 | 28 | 33 |
| * From Data in 1st Court Report | | | | |
| **Includes employed and contracted physicians whether fulltime or parttime but excludes the vendor's Regional Medical Directors who are intermittently assigned to provide coverage for vacant positions. | | | | |

We do note that though 33 physicians are credentialed the Monitor has not been provided with credentials for six additional physicians for a total of 39 physicians. These 39 physicians are currently providing 16.49 FTEs of work for the 33.47 budgeted primary care positions.[53] IDOC provides hours and FTEs worked per time period, but does not include physician names with the hours worked so it is not possible to determine the number of hours worked, the location or the actual provider who worked. For this reason, the actual hours worked by credential of physicians per time period cannot be determined. This is important because of the 33 physicians on the current list, 12 are locums tenens physicians who work short-term. We also did not include gynecology in the physician table as the gynecologist is not currently included on the vendor Physician Training and Credential worksheet.

As noted in the table above, since the initiation of the Consent Decree in 2019 the percentage of IDOC

---

[52] The AMA Profile does not commonly include information on the Board Certification of physicians who are have been certified in Osteopathic Medicine. Applicants must provide a copy of their certificate of Board Certification by the American Board of Osteopathic Medicine
[53] Based on the Facility Reconciliation Worksheets – Q3-24 – LIPPERT as provided by IDOC.

physicians who meet the primary care credentials criteria has increased from 66 percent to 88 percent and the number (percentage) of physicians who do not have the qualifying credentials has decreased from twelve (34%) to four (14%) of the total IDOC physicians. The steady increase in the percentage of physicians who have completed primary care residency programs is directly attributed to the credentialing requirements in Consent Decree III.A.2 and the cooperation of the IDOC clinical leadership. The increased hiring of qualified physicians along with the enhanced monitoring of acute and chronic care and reviews of mortality charts by the monitor team and by the review and critique of mortalities by SIU, in collaboration with OHS, is a necessary step toward improving the quality of care provided to the IDOC patient population (see Oversight of Care Section). It should be noted that 38%[54] of credentialed physicians are locum tenens which means that there is significant turnover in this group.

The Monitor has repeatedly asked that an updated Training and Credentials report provided to the Monitor every quarter or sooner if new physicians are hired and when physicians leave the IDOC. Timely notification should be automatically provided when physicians leave employment in IDOC and when new physicians are hired. This has not been done. The most recent Training and Credentials document provided for this report was dated 3/18/24 with additional information provided on 5/24/24 and 6/26/24 pursuant to the Monitor's request.[55] The Monitor has also repeatedly requested that individual credentials packets be routinely provided at the time each new physician is hired. To date, these primary source verification documents are only provided upon written request, at times only after repeated requests by the Monitor.

An example of the difficulties the Monitor experiences when requesting information is a physician who was already working in September of 2023 when the Monitor received a credential spreadsheet in preparation for the Monitor's 7th report. The credential spreadsheet of April of 2023, documented that this physician was board certified in pathology but included a comment that she had completed a primary care residency but no verification of this was provided. The primary source verification of her credentials had not been received. The Monitor had not been notified of this person's hire and began inquiries regarding her credentials which included making a special request for an AMA profile which indeed verified that she had a lifetime specialty board certification in pathology. The Monitor had to question IDOC again asking for verification that she had finished a primary care residency. In January of 2024, the Monitor requested IDOC to send copies of her certificates of transitional residency at Cook County Hospital and her certificate of completion of a three year Family Medicine Residency at UIC. IDOC responded instead by sending the Monitor a second AMA profile which listed that she completed a residency in Family Practice at UIC but also that she was board certified in pathology. The Monitor was concerned that there was an error in the AMA report and in May of 2024 again specifically requested the vendor send a copy of her certificate from UIC verifying completion of her residency in Family Medicine and in Pathology. This was not sent. Instead, the AMA profile listing both pathology and Family Medicine were re-sent with a comment that "The reference to Dr. [redacted]'s residency in Pathology is an error on the AMA report -that is how they reported it. Dr. [redacted] has never taken a residency in Pathology". This presumes that IDOC knows why the AMA report is in error. The Monitor has still not received a certificate that this physician has completed residency in a primary care field and continues to request primary source verification of completion of her primary care residency.

---

[54] Eleven of 29 physicians who have completed residency and/or are board certified are locums tenens physicians.
[55] Additional requests were primarily for missing credential packets or to ascertain whether a physician on the 3/18/24 Training and Credentials report but whose name did not appear on a subsequent staffing list was still employed.

Since the 3/18/24 Training and Credentials report, the 6/13/24 vendor-generated Medical Staffing Report[56] identified that eight physicians were no longer providing care in IDOC and 11 new providers had been employed or contracted (locum tenens) by the medical vendor.[57]  The Monitor has not received Primary Source verification packets on six of these 11 physicians.  The need for timely notification on the entry and exit of physicians from employment in IDOC facilities is not only essential to ensure that only physicians meeting the qualifications in III.A.2 are hired. This information is also critical in monitoring the adequacy of physician staffing throughout IDOC's thirty facilities.

Another four new physicians were listed on the 6/13/24 vendor Medical Staffing Report as "Locum Tenens, Candidate" and three physician were listed as just "Candidate".  IDOC has been asked to clarify these two physician categories. It is not clear if any of these physicians are actually providing care in the IDOC. It is difficult to interpret whether staff are actually working in a budgeted position based on this report.  The report is misleading if these physicians are not yet hired and not working in IDOC facilities. If these seven physician "candidates" are not working they should not be included on a staffing report. The Monitor has also not received primary source verification packets on these seven physicians.   The Monitor was not notified when any of these seven physicians had either left or joined the IDOC.

Since the enactment of the Consent Decree and in accord with III.A.6-7, IDOC leadership has contacted the Monitor about three physician applicants who had not completed residency in Internal Medicine, Family Medicine, or Emergency Medicine and did not meet the credentialing criteria in III.A.2. The Monitor reviewed their credentials and interviewed the applicants by phone. The Monitor advised the IDOC that two applicants did not meet the criteria of the Consent Decree and their candidacies were not supported by the Monitor. Neither of these two providers were hired. Based on a review of training and an in depth interview of the third candidate, the Monitor determined not to withhold approval of hiring this physician.[58]  IDOC was advised that this decision was the exception and did not indicate any shift in the Monitor's firm support of the Consent Decree's mandate that "all physicians providing direct care in the IDOC"  be board certified or had completed a three year residency in a primary care field. Since the initiation of the Consent Decree in 2019, this is first and only physician hired who is not board certified or has not completed a three year residency in family medicine, internal medicine, of emergency medicine.

Given the high turnover rate of physicians, it has not been possible to identify how many physicians are working in IDOC based solely on review of the infrequently received Training and Credentials spreadsheet.  To verify credentials and to evaluate physician staffing and coverage of all thirty facilities, the Monitor has asked for no less than quarterly updates of the physician list (Training and Credentials spreadsheet) and whenever there is a change in staffing.  This is not done timely and as a result both the physician assignments and vendor's credentials spreadsheet are frequently not in sync.  This makes timely verification of new physician credentialing impossible. Frequently, the Monitor becomes aware that a new physician has been hired only when their name appears on the facility assignment or on the Training and Credentials spreadsheet.

---

[56] 4CN8510-BATES 5999-6015 Lippert Medical Staffing Report June 2024
[57] This data was determined by comparing the physician names on the 3/18/24 Training and Credentials report with a 6/13/24 facility medical staffing report.
[58] The third candidate did not complete a 3-year residency. However, this physician did complete 4 years of consecutive training in primary care, two years in a family medicine program and two years in an internal medicine at different medical centers.  If this training had been completed at a single medical center, it is likely that it would have qualified for board certification in a Primary Care Residency or possibly Medicine-Pediatric Residency.

**RECOMMENDATIONS**:

1.  IDOC needs to provide for the initial credentials review by the Monitor the same credentials packet that the vendor has provided to the IDOC/OHS. This initial credentials packet must include copies of the physician's medical school diploma, internship, residency and fellowship certificates, State license, DEA license, privilege sheet, curriculum vitae, and a current AMA profile.
    a.  The medical vendor should not refer physician candidates to OHS unless a candidate's complete credentials packet accompanies the referral. This needs to include diplomas, certificates, State license, DEA license, curriculum vitae, National Practitioner Databank report, and AMA profile.
2.  IDOC needs to routinely provide the following information quarterly and three months prior to the due date of each upcoming Monitor report.
    a.  A table of current physicians in a spreadsheet format with physician name, facility assignment, internship and residency completed, date internship or residency completed, board certification, date of board certification, current status of board certification, State license expiration date, and DEA expiration date.
    b.  All peer reviews including any disciplinary peer review or actions taken with respect to privileges.
    c.  Annual professional performance evaluations for all physicians, nurse practitioners, and physician assistants
    d.  Current assignment(s) list of all physicians with hours/day worked at each site of assignment.
    e.  Timely notification when a physician is hired and when a physician leaves employment with the State or the contracted medical vendor.
    f.  Any monitoring being provided for any physician, nurse practitioner, physician assistant.
3.  When AMA profiles are being used to verify credentials, the AMA profile should be current.
4.  Any sanctions on a license and a report detailing the plan for monitoring should be reported to both OHS and the Monitor
5.  IDOC's health care vendor should continue to hire only physicians who are Board Certified and/or have completed a residency in a primary care field.
6.  All physicians need to be required to use a stamp that contains their name which needs to be used for all of their paper medical record notes and orders so that their medical record entry can be verified as theirs. This practice should continue until the EMR is fully installed.[59]
7.  IDOC should vigorously explore opportunities to expand affiliations with academic medical centers in Illinois to include the recruitment and hiring of physicians.

**Oversight Over Medical, Dental, and Nursing Staff**
*Addresses II.B.6.q; II.B.6.r;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and, as to any vendor effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

---

[59] This is recommended due to extensive illegibility in the paper record. Neither the Monitor nor SIU, in mortality reviews, can identify providers or nurses due to illegibility.

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**III.A. 3.** *Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter*

**III.A.4.** *If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.*

**III.K.9.** *Within twenty-one (21) months of the Preliminary Approval Date of this Decree [October 2020], IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

**<u>Oversight over Medical Staff</u>**

There was miscommunication in the document request for annual performance reviews and peer reviews. In response to a document request[60] to provide annual performance reviews, IDOC provided no information related to physicians. In response to a document request for peer reviews for significant adverse events[61] IDOC sent 13 annual performance evaluations conducted in 2022. These annual performance reviews were not peer reviews related to significant adverse events. In relation to a document request[62] for peer reviews related to mortality review IDOC sent 13 peer reviews triggered by potentially egregious care. The distinction between peer review and performance evaluation needs clarification. Performance evaluations are annual evaluations of physician performance but peer review is an official review of a physician triggered by a specific potential egregious clinical action that reviews whether physician privileges should be modified or corrective action taken in relation to the specific potential egregious action. Peer reviews can be initiated as a result of mortality review or via any other method (e.g., adverse event reporting) that identifies egregious care. Annual performance reviews should be done routinely on all physicians.

The Consent Decree requires that IDOC perform monitoring to determine how well the system is

---

[60] Document request 70 was "Annual physician, nurse practitioner, physician assistant, dentist, dental hygienist, dental assistant, and nursing clinical performance reviews over the past year".

[61] Document request #71 was "Peer reviews for physicians to date (evaluations of privileges connected with a significant adverse clinical practice event). This includes follow up action".

[62] Document request #50 was "All peer reviews performed as a result of mortality review. Include the peer review".

34

providing care and that monitoring is to include **meaningful** performance measurement. The Consent Decree also requires **annual** assessment of medical performance. There were no reviews in 2023. Older reviews from 2022 were submitted but only for some physicians.

There is no policy on annual performance evaluation of medical, dental and nursing staff but there should be because it is an important aspect of the Consent Decree.[63] Not having guidance from IDOC, the vendor performs its own review of its physicians and creates their own performance review methodology.

The vendor provided annual performance reviews of 13 physicians completed by a contract physician who does not provide care in the IDOC.[64] The reviews were performed on work done in July to December of 2022 about one and a half years ago which indicates that recent annual reviews were not being done. As of June of 2024, there were 33 physicians positions credentialed to work in primary care in IDOC. This excludes the gynecology positions at Decatur and Logan which should be included. Of these 33 physicians who have undergone credentialing, 10 are locum tenens physicians. Of the 23 non-locum tenens physicians, performance evaluations were only done on 13. Ten current physicians were not evaluated and there is also no evaluation of the 10 locum physicians. So, for 20 (61%) of the 33 physicians there was no performance evaluation. IDOC should decide and document in policy how locum tenens physicians should be evaluated. The amount of time any of these 33 physicians worked is unclear. Many physicians work only a few hours a week.

The methodology of the performance evaluation has not been provided including chart selection methodology, description of what precisely is evaluated, and whether more than a single episode of care is evaluated. A final review of these performance evaluations can't be provided unless the methodology and records reviewed are included in document production.

The scoring sheets show that four areas are evaluated: sick call, chronic care, infirmary care, and laboratory/radiology utilization. Formatted questions are asked for each of these four clinical areas. Six questions are asked for laboratory/radiologic utilization; seven for chronic care clinics; seven for infirmary admissions; and eight for sick call. The answers are binary yes/no with a third non-applicable answer. For 13 physicians, there was a total of 2458 questions asked, 1769 (72%) were answered yes; 575 (23%) were answered not applicable; and 114(5%) were answered no. These results are not comparable to physician performance in mortality reviews by either SIU or the Monitor and suggest that the performance evaluations are not well designed to obtain a reasonable evaluation of performance.

Twelve of the 28 questions were not meaningful in evaluating a physician's clinical performance; these are listed below.
1. Lab question: Was the lab test received in 24 hours and x-ray result received within 72 hours? *This is not a question of physician performance but of management performance in ensuring timeliness in producing diagnostic test results.*
2. Sick Call question: Was patient seen within 72 hours. *This is an appointment scheduling issue*

---

[63] Annual performance evaluation is required by B.2 "monitoring must include meaningful performance measurement"; II.B.6.q., "IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance"; and III.K. 9., "Within twenty-one (21) months of the Preliminary Approval Date of this Decree, IDOC shall establish a peer review system for all dentists and annual performance evaluation of dental assistants". There should be a policy delineating how these Consent Decree items will be addressed.

[64] This information was provided in a personal communication by IDOC counsel. A list of contractors included Jubilee Medical who provide peer review.

*that is related to management of scheduling, physician staffing, and custody ability to transport patients to their appointments. It is not a meaningful physician performance metric.*

3. Lab question: Was the lab test/X-ray initialed and dated by a physician within 72 hours of receipt? *This can be related to the physician not receiving a test result timely. Also, timely review of the diagnostic test is important but more important is to determine if the laboratory test was appropriately addressed with follow up diagnostic testing or other follow up when the laboratory test was abnormal. More than timeliness should be addressed.*

4. Sick Call question: Were laboratory and diagnostic tests documented and addressed? *Typically, laboratory tests are not done before a sick call clinical evaluation for a problem but are ordered after the evaluation. Even if the appointment was scheduled to review a laboratory test,, the question should ask whether the laboratory and diagnostic tests were **appropriately** addressed not whether they were just addressed.*

5. Chronic Care question: Does the clinic include pertinent vital signs? *The issue related to clinical performance is whether abnormal vital signs were appropriately addressed, which is not asked.*

6. Chronic Care question: Was the level of disease delineated? *This does not answer whether the assessment was accurate and appropriate only whether an assessment was noted. This will not evaluate physician performance.*

7. Infirmary Admission question: Is MD response to significant nursing entries evident? *The question should ask if the physician's response to nursing entries was appropriate not just whether the physician documented a response.*

8. Lab question: Were clinically significant findings documented in the progress notes? *This question is valid only if a larger section of prior medical record notes are evaluated otherwise how would anyone know that there were significant findings which were not documented? One could document significant finding but did they act on them appropriately.*

9. Lab question: Was plan as indicated carried out? *This can't be judged unless a significant time frame of the medical record is reviewed. The methodology is not provided but the Monitor presumes based on prior vendor performance evaluations that only a single episode of care was evaluated. Single episodes of care cannot determine whether a plan was carried out appropriately.*

10. Sick Call question: Is the recorded history comprehensive and relevant for the patient's chief complaint? *Based on the Monitor's record reviews the history is seldom appropriate and merely restates the patient's complaint. However, virtually all answers were "yes" giving the Monitor concerns about validity of these performance evaluations.*

11. Chronic Care question: Was appropriate education for this encounter documented? *Though this had the highest deficiency rate (about 28 deficiencies out of hundreds of questions) the Monitor has found in evaluation of chronic care notes that very few notes contain any documentation of education. Typically, providers check a box titled education but this does not document what education was provided. The reviewer should be challenged to document what education was given to the patient. The methodology to answer this question is important.*

12. Infirmary Admission question: Is the plan of care appropriate for admission diagnosis? *The plan of care should be appropriate for all of the patient's conditions not just the admission diagnosis. Typically, infirmary care does not include management of the patient's chronic conditions. All of the patient's problems should be addressed appropriately.*

The Monitor's mortality and other record reviews, and SIU's mortality reviews and performance and outcome measure audits identify numerous serious deficiencies often reflecting on physician performance. The difference between SIU audits, Monitor record reviews, and the vendor's submitted performance

reviews is significant. The multiple problems identified, for example, in this Report's mortality reviews does not correspond to scoring in these performance evaluations. The scoring results of the vendor's performance reviews, therefore, do not appear to meaningfully reflect the actual practice of the vendor physicians. The Monitor does not believe that correction of the performance deficiencies in these questions would appreciably move the IDOC any closer to compliance with the Consent Decree. This speaks to the lack of meaningfulness of the questions. The Monitor suggests that IDOC attempt to use the performance and outcome measures and mortality reviews to measure physician performance or to have an independent reviewer hired by OHS perform these reviews[65].

With respect to peer review, IDOC promulged policy A.06.03 QM: Clinical Peer Review in February 2024. The Monitor was given a draft of this policy and provided comments. But the final policy was different from the draft and included material which the Monitor has not had an opportunity to comment on. Several comments on this new document are given below and additional comments will be provided to IDOC.

Policy A.06.03 should clearly state that the policy refers to "for-cause" peer review as opposed to annual performance reviews which are sometimes be referred to as peer reviews.

In the policy, three reasons are given for initiating a peer review. These are:
- Policy statement II states that peer reviews are to be conducted "to evaluate compliance with IDOC policies and procedures and the accepted standard of care".
- Policy statement IV states[66] that the peer review process addresses performance or conduct that is below the "applicable legal standard".
- Policy statement V states, "Medical providers and clinical staff with known or suspected substandard clinical practices and/or clinical misconduct, including acts, demeanor, or conduct reasonably likely to be detrimental to patient safety or the delivery of medical care shall be referred for a Clinical Peer Review".

Policy statement II is overly broad. On any given day there are likely hundreds of infractions of not complying with policy or standards of care[67]. This can lead to a very high number of peer reviews. Infractions of policy and standards of care should not all be referred for peer review. Most of these infractions are best addressed in annual performance evaluations and corrected through the quality improvement process and not in a peer review process. Policy statement II should be used in a policy on annual performance evaluations instead of in the peer review policy.

Policy statement IV is unclear because "applicable legal standard" is undefined. This statement should be removed unless applicable legal standard is defined. The policy statement leads to speculation when it should be clear.

---

[65]  The vendor has provided no evidence of disciplinary actions against any physician for clinical reasons and has independently identified no problems in clinical care while the mortality review process by SIU has identified hundreds of deficiencies.

[66] Statement IV states, "The Clinical Peer Review process immediately addresses clinical performance or conduct issues of medical and dental providers including clinical staff who provide care below the applicable legal standard and/or may result in imminent danger to the health and/or safety of patient(s) and/or staff".

[67] See Monitor's mortality reviews, SIU mortality reviews, and performance and outcome measure data collection as a basis for this statement.

Consent Decree provision II.B.6.r of the Consent Decree is not referenced in this policy but its intent should be present in this policy. It states:

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

The original draft of the peer review policy sent to the Monitor stated in a policy statement,

"The Peer Review Committee is managed and run by the SIU Clinical Quality Group and comprised of professionals not engaged in practice in IDOC who have similar training as the role of the employee under review".

This policy statement was removed and a new procedure statement III states the following: "

"The Peer Review Committee is managed by the OCM[68]. The Committee is comprised of professionals assigned by the OCM Executive Director or designee:

A. …who has the same professional specialty of the healthcare professional role being reviewed.

B. Representatives of IDOC Office of Health Services or ***Vendor***, who are not associated with the peer under review; and

C. Person(s) assigned by the Agency Medical Director or designee to participate in the review, when applicable.

Having the vendor participate on the peer review committee is unacceptable to the Monitor based on past behavior of the vendor which has demonstrated failure to engage in effectively reviewing clinical care of its employees even when clinical behavior has been egregious, substandard, dangerous and harmful to patients and failure to take action to prevent reoccurrence of that behavior.[69] There is potential for bias in having the vendor evaluate its own staff. At the current time, peer reviews should be performed by independent reviewers. The vendor has not shown it can be an independent reviewer.

Another comment on the policy is that the practitioner or staff member who is the subject of the peer review is notified of being under peer review only if the peer review demonstrates that the employee acted appropriately. However, the employee should be notified whenever a peer review has been initiated. Because the peer review subject may be disciplined up to and including termination, the subject of the peer review should be notified when the peer review is initiated, should be told why he or she is subject of a peer review, and should be given the particular reasons the peer review was initiated. The subject should also be asked to respond to the allegations in the peer review that is the subject of the peer review. There are likely systemic reasons that account for much of the questionable care that is the subject of the peer review and the subject of the peer review should be interviewed to learn their perspective of the care provided.

Typically, a Peer Review Committee makes an assessment of the infraction; determines the final ruling and recommends disciplinary action, if any, that should be taken as a result of the infraction. The IDOC policy A.06.03 requires the Agency Medical Director to decide on a course of action. This places a

---

[68] OCM is the Office of Correctional Medicine, the group from SIU that provides support to IDOC.

[69] This statement is based on the Monitor's mortality reviews and mortality reviews of the two Court Experts whose reports anteceded the Consent Decree and the finding that the vendor initiated no actions to correct the dangerous and substandard care.

considerable burden on the Agency Medical Director and IDOC should reconsider whether this is an appropriate assignment.

Another comment is procedure statement VII of the A.06.03 policy which states,
> "To satisfy legally required reporting obligations, the Agency Medical Director **may** report a licensed professional to their respective licensing board and/or the National Practitioner Data Bank.

The Federal and State regulations and NPDB rules guiding any requirement to report should be referenced in the policy. Because such reporting affects future employment of the licensed professional, IDOC should ensure legal counsel has reviewed this statement carefully to ensure reporting requirements of the State licensing board and NPDB are accurately adhered to and are pertinent. The Monitor suggests IDOC legal counsel review state regulation regarding reporting to the state medical board and contact NPDB for an interpretation of their requirements regarding actions by the IDOC peer review committee or Agency Medical Director before further implementation of this policy.

In response to the document request for peer reviews performed as a result of SIU mortality reviews, IDOC provided the twelve peer reviews initiated for nine separate physicians; one physician was referred twice and another physician three times for peer reviews. All nine physicians were Medical Directors. Excluding the four Medical Directors that filled by locum tenens physicians, (which are temporary assignments) and the seven Medical Director positions which are vacant there are 16 full time working Medical Directors for which nine (56%) are under peer review. This means that the majority of medical leadership (who are not locum tenens) are under peer review and were referred for practicing in an apparent unsafe and substandard manner.

All reviews included the reason for referral by the peer review committee and a summary discussion by each of the physician peer review committee members who participated in the peer review. In none of the twelve cases was care deemed adequate and all have been referred to the Agency Medical Director to make an assessment and decision on disciplinary action. The peer review case summaries are only a brief one or two paragraphs by each physician peer reviewers. While policy A.06.03 states the purpose of peer reviews is to ensure an objective process for evaluation of licensed medical providers and staff for instances of suspected substandard clinical performance, all of the summaries of these 12 cases included multiple episodes of multiple different staff participating in the poor care. Multiple systemic problems were also identified. Typically, hospital peer reviews are focused on a single provider for acts specifically by that provider that resulted in egregious care. Typically, peer reviews presume that the systems of care are properly functioning. In IDOC, the systems of care are dysfunctional and do not perform adequately.[70] The peer review summaries presented in these peer review summaries are not focused specifically on the acts of a single provider but encompass and include details of surrounding systemic events that all contribute to the death of the patient. Though the Medical Directors are specifically named as the focus of the peer review the Monitor found only one case that warranted disciplinary action against a single physician. The remainder may not require actions against individuals but call for systemic change[71] of

---

[70] Some examples include: the process of specialty care scheduling, follow up, obtaining reports, and review of reports are all dysfunctional. Patients are not timely referred for care often due to multiple systemic issues and often involve multiple providers. There are a lack of physicians and nurses so many expectations of care delivery are not performed. There is insufficient medical housing for certain types of patients that affects the process of care.

[71] Increasing staffing, training, improved access to offsite specialty care, improved policies, etc.

various kinds.

The Agency Medical Director has not taken action on any of these peer reviews. Five of the 12 peer reviews underwent peer review on 6/12/24. The other seven peer reviews had no dates of completion. The Monitor will review action steps and discuss further in the next report.

The Monitor has several comments on this process.

1. The peer review committee not the Agency Medical Director typically would make the recommendation for disciplinary action for the individual in question. If this is unacceptable to IDOC, then a group of the Deputy Chiefs should review the case and make a recommendation for discipline which would require a detailed review of the case.
2. The individual who is the focus of the peer review should be interviewed to give their perspective on the case details.
3. The mortality reviewers should be more selective in referrals to peer review. Almost all Monitor mortality reviews contain significant systemic problems many of which in combination are egregious and shock the sensibilities of readers. But it is often difficult to assign responsibility to one individual when most responsibility lies with systemic dysfunction of various types. Care should be taken to ensure that when referring a single individual to peer review, that the event is the responsibility solely of that individual.
4. The mortality review process should focus more on systemic issues that adversely affect care (not getting reports, lack of physicians, lack of appropriate housing, pharmacy and medication administration irregularities, shortage of nursing, etc.). Otherwise, it will be difficult to improve.
5. There should be a separation of annual performance evaluation and peer review. Policies should exist for both. The mortality reviews by SIU can result in both annual performance reviews and peer reviews but further refinement of the process needs to occur.
6. The mortality reviewers and the peer reviewers appear to lack information about systemic issues that exist within IDOC. More information about these issues would improve identification of root causes that can help in their analyses.

In addressing Consent Decree **III.A.3**. the Monitor has previously referred three physicians to the IDOC Medical Director who did not meet the credentialing criteria and, based on medical record review, whose performance was questionable, potentially problematic and/or their quality of care was not consistent with the delivery of safe and clinically appropriate health care. All three are no longer working in the IDOC. The Monitor has verbally advised IDOC on several occasions about another physician without credentials who is not performing in a safe or clinically appropriate manner. IDOC provided no evidence that they independently reviewed the quality of care of this provider. IDOC reported to the Monitor that the employment of this provider is under discussion with the vendor. However, to date, this physician continues to work without any oversight. The Monitor will continue to communicate to OHS any data gathered by the monitor team that indicates a physician's quality of work may be putting patients at risk consistent with III.A.3. and II.6.r. The Monitor is hopeful that IDOC's development of its quality program, an adverse event reporting process, and the mortality reviews by SIU Office of Correctional Medicine will identify opportunities to improve the quality of clinical care provided in the IDOC and improve monitoring physicians with respect to III.A.3. and II.6.r.

Currently, there are four physicians who are practicing who do not meet credentialing requirements of the Consent Decree (III.A.2.). Consent Decree provisions III.A.3. and III.A.4. require focused monitoring of

40

physicians who do not meet credentialing requirements. IDOC has not yet developed a methodology or practice of doing this and has not codified this process in policy. OHS has yet to develop its own method of reviewing these physicians. The Monitor will continue to identify properly credentialed and noncredentialled problematic physicians to OHS.

In summary, IDOC has no policy for annual performance evaluation. IDOC has promulgated a policy on peer review but the Monitor has some concerns which have been mentioned with the recommendation they be considered in the next policy revision. Meaningful annual performance evaluations are not yet being conducted. Several individuals have been referred for peer review, the peer review committee has completed its work, but there is no evidence that decisions have been made regarding action. A partial compliance is warranted on the basis of promulgation of the policy which is not deemed adequate yet and the initiation of a peer review process. Much work remains on performance evaluation.

## Oversight over Dental Staff

*Dentists*
The Monitor reviewed 24 dentist peer reviews conducted from 08/30/23 to 11/07/23. One peer review was missing.[72] Wexford dentists conducted all peer reviews on each other. One dentist who received a "Poor" evaluation the previous year and in 2023 was selected as a peer reviewer for the dentist at Stateville Correctional Center.

As mentioned in the previous report submitted by the Monitor, the standardization methodology regarding peer reviews is absent. Moreover, there is no evidence that the dentists received training before performing the peer reviews. Therefore, there are inconsistencies in how data is collected and eventually reported.

During the site visit at NCR, the Monitor discussed the peer review process and inconsistencies with the Chief of Oral Health Programs. According to the Chief of Oral Health Services, the peer review process will be transitioned to SIU. A third-party review by independent contractors (dentists) is encouraged and would resolve the issues of calibration and bias.[73]

The Monitor noted that most reviews were performed remotely, so dentists could not entirely review the record. This is problematic, particularly if trying to review whether appropriate X-rays were made. While on-site, the Monitor noted that many X-rays were inadequate due to distortion, cone cuts, and totally missing the intended tooth. The dentist conducting the review remotely cannot determine if a radiograph is adequate unless they are looking at the physical or digital radiograph.

Many providers had repeat findings from previous reviews, including illegible clinical notes, failure to review medical health history, and not using SOAP notes for urgent care. There is no evidence of corrective action plans or performance improvement discussions to address these issues. It is strongly recommended that the Chief of Oral Health Services review and initiate a performance improvement plan for "Fair" and "Poor" reviews.

*Dental Hygienists and Dental Assistants.*

---

[72] Robinson Correctional Center
[73] Implementation Plan 78 part 2. Train independent contracted or consultant staff on provider peer review process.

The Monitor requested annual evaluations for dental hygienists and dental assistants. Data was collated from June 2024.[74] The numbers of dental hygienists and dental assistants by employer is provided below.

| Clinician | IDOC | Wexford |
|---|---|---|
| Dental Hygienist | 2 | 21.75 |
| Dental Assistant | 8 | 36.9 |

The document request of the Monitor for performance evaluation of dental assistants and dental hygienists included no data or information for vendor dental hygienists or assistants; the Monitor presumes that no performance evaluations were done for these positions.

The State conducted five performance evaluations: one for a dental hygienist and four for dental assistants. Only one of two full-time dental hygienist positions had an evaluation. For the hygienists, a Central Management Services evaluation form (CMS201 (Ver 6/15)) was used. This form was related to administrative directive requirements which are compliance-related without any evidence of evaluation of the clinical performance of the hygienist.

The four dental assistants each from a different facility were each evaluated using different appraisal objectives. Most were meaningless questions for a clinical performance evaluation of a dental assistant (key control, signing in on timekeeping sheets, dress code, attendance, checking outlook messages each shift, participation in staff meetings, etc.). One form[75] for a dental assistant used appraisal objectives that were for a dentist including performing admission examinations of inmates, performing restorations, examining teeth in need of replacement, etc. This evaluation for a dental assistant using dentist evaluation questions scored the dental assistant for all these dentist obligations as "exceeded". The reason for using different questions on these forms and different forms for each facility was unclear but is consistent with each facility managing its own operation and not under control of a central clinical authority. None of the forms addressed the clinical performance of a dental assistant employee. One of the forms contained an evaluation question stating *"Assisting Fax & Fill Pharmacy in recording and dispensing medical prescriptions as evidenced by direct observation of a supervisor and review of records."*[76] Dental assistants are not licensed to dispense medication and this question is inappropriate. If this is actually a question for a dental assistant it reflects the dental assistant being responsible for dispensing medication from an onsite dental medication cabinet. This is outside the scope of the dental assistant's license and is something the dentist needs to do when using an dental office medication cabinet. This type of assignment should be referred to the SIU pharmacist who is conducting a process analysis of medication management. All evaluation forms were completed by HCUAs but a HCUA is not licensed appropriately or competent to evaluate dental staff for their clinical performance. These evaluations are meaningless clinical performance evaluations for the employee type, and are not honest attempts to evaluate dental hygienists or dental assistants. The Dental Chief OHS must develop an appropriate performance evaluation for hygienists and dental assistants.

[74] We note that 4CN8510-BATES 5999-6015 Lippert Medical Staffing Report June 2024, the vendor staffing for June and Facility Reconciliation Worksheets - Q3'24 - LIPPERT (1) the State staffing that included dental hygienists and dental assistants for the vendor had different numbers for the number of dental hygienists. The vendor had 21.75 dental hygienists and the State had 20.25 dental hygienists on their schedule E. The difference was that the State had 0.5 hygienist at Hill while the vendor had 1 and the State had 0 hygienist at Western whereas the vendor had 1. This is an example of IDOC providing multiple staffing documents that do not provide the same data. We used the vendor's numbers for this example.
[75] This was for the Stateville dental assistant in the Stateville folder in document request #70.
[76] Dixon

**Oversight over Nursing Staff**
The Monitor requested the following documents to review oversight of nursing practice:
- Tables of organization for Northern Region facilities medical programs including HCUAs, Medical Director, state and vendor medical employees and site leadership.
- A list of allocated/budgeted medical and dental positions (also noting FTE) vacancies for each position at each facility to include IDOC and Wexford positions. These should be separated by position type. Aggregate positions statewide should be included.
- List of corrective actions or process analyses initiated due to mortality reviews, performance and outcome measures, adverse event reports, or any other reason.
- Annual nursing clinical performance reviews over the past year.
- Nursing disciplinary actions over the past year (including both vendor and state employed personnel).
- List training completed in the last 12 months for any nurses employed by either the state or the vendor at NRC, Graham, Menard, Logan, Stateville, Illinois River, and Pontiac.

**Capacity to supervise nursing practice**
Compliance with the provisions of the Consent Decree requires change in the delivery of nursing care and the customs and practices of nursing staff in the IDOC.[77] These changes will not occur spontaneously. Directors of nursing and nursing supervisors with clear lines of authority are essential if these changes are to be achieved and patient outcomes improved.

The organizational charts of eight facilities in the Northern region were reviewed.[78] At Dixon the director of nursing reports to the HCUA. The facility has four nursing supervisor positions, and all were vacant in the last staffing report received.[79] The facility has allocations of 50 registered nurse positions. The vendor is allocated 12 LPN and 14 nursing assistant positions. This is a total of 76 nursing positions who are supervised by the director of nursing.

Statewide there are 29 nursing supervisor positions allocated, however only a third of these positions are filled.[80] The nursing supervisors should be doing the bulk of daily supervision of nursing staff, but IDOC only has a third of the capacity it has determined it needs. The problem of supervision is exacerbated when there are also high vacancy rates among nursing staff because the nurse supervisor and director of nursing have their time diverted from supervision to scheduling, onboarding new or temporary staff, and providing direct patient care. The HCUA certainly assists with supervision but even then, this is insufficient oversight to implement changes that must be made in the delivery nursing care safely.

Five of the facilities organizational charts that were reviewed show an appropriate line of accountability for leadership and supervision of all nursing positions, including those allocated to the vendor. Pontiac's organizational chart was problematic in that the facility director of nursing reports to the vendor's medical director, not the HCUA. Two of three nursing supervisor positions are vacant, so the 43 nursing positions

---

[77] Notably these changes affect the delivery of medication, the assessment of patients' health conditions, the ways that care is ordered and provided, and documentation. The term nursing staff is inclusive of registered nurses, licensed practical nurses, and nursing assistants.

[78] East Moline was the only facility in the Northern Region that did not respond to the Monitor's documentation request #5.

[79] Information received from IDOC in response to the Monitor's documentation request #10 as dated 5/28/24.

[80] There are a total of 29 nursing supervisors allocated of which 9.67 FTE are filled (33%).

employed by the state are supervised by one nurse supervisor and the director of nursing. The vendor's allocation of 17 LPNs and nursing assistants are not recognized as reporting through any nursing chain of command. Accountability for nursing practice is not sufficient at Pontiac. At Sheridan state employed nursing staff report to the director of nursing who reports to the HCUA. The Assistant Warden for Programs supervises the vendor's staff.[81] There is no line of accountability for the supervision and practice of the six nursing assistants to the director of nursing, which leads to discontinuity of patient care. The absence of nursing direction and supervision of tasks delegated to nursing assistants may also violate State regulations regarding nursing assistants. Stateville's organization chart does not include a line of accountability for the practice of the 51 nursing positions allocated to the vendor.

**Training Provided**

None of the position descriptions reviewed thus far require any sort of annual demonstration of competency as required by II.B.6.q.[82] Training documents provided by the requested facilities in response to the Monitor's documentation request #76 vary greatly. Pontiac, NRC, Menard, and IRCC provided what appears to be a file that keeps track of employees completion of required training. Only CPR certification and crisis training have any particular emphasis on health care delivery otherwise the training is solely about factors important to institutional operations. Pontiac provided a more extensive list of required trainings to include several topics relevant to nursing practice and could be considered the fundamental criteria for maintaining a training record.[83]

Among these records were various checklists, "read and sign" memos, and in-service credits for attendance at various meetings such as the restrictive housing committee, and health care unit staff meetings. There were records of only two trainings that related to any change or improvement in service delivery. One was a memo instructing nursing staff to read and sign the policy E.06.01 regarding sick call. The memo included no instruction to implement the new policy. The second was an attestation that staff had viewed a recorded training on medically assisted treatment, a program to treat addiction. Neither of these required any test of knowledge or competency demonstration.

The medical vendor sent 851 pages of various training documents. These included a new employee orientation checklist, an attestation that the clinical skills binder had been reviewed, the checklist for the one day orientation of agency nurses, a read and sign memo concerning the eight rights of medication administration, and documentation of completion of IDOC Cycle Training and New Employee Orientation. Among these were a few instances of testing staff knowledge after training but no evidence of competency demonstration. Finally, there was documentation that nursing staff request privileges annually which are granted by a supervisor, but again, there is no test of knowledge or demonstration of competency that are documented as part of this process.

Nurses are to receive training from the facility medical director upon hiring and annually thereafter. There is no standardized curriculum or expectations established for this training. Several facilities were found noncompliant with the AD for treatment protocols because this training did not take place annually.[84] See more discussion about this in the section on Sick Call.

---

[81] In this instance, if the organizational chart is accurate, OHS has no effective supervision of the health care vendor.
[82] Health Care Monitor 7th Report, December 27, 2023, page 66.
[83] The record sent by Pontiac tracked completion of training in HIV, life support, negative air pressure checks, OSHA and BBP, treatment protocols, and confidentiality.
[84] These were Centralia, East Moline, and Lawrence.

The Implementation Plan includes several items that address the training and competency of nursing staff.[85] It does not appear that any of these have been initiated. Furthermore, there is no *prioritization* or a *plan* for the training of the nearly 1,000 nursing positions in the IDOC. IDOC should consider adding Unit-based Nurse Educators at the large facilities. These positions add capacity because they take the training burden off of the Director of Nursing and Nurse Supervisors. Unit-based Nurse Educators excel at teaching and coaching acquisition of new skills and develop nurses' critical thinking by working alongside staff. These positions can be key to identifying process improvements that eliminate barriers to desired practices. The Unit-based Nurse Educator would also have primary responsibility for the annual evaluation of nursing competencies.

The Executive Director of the Office of Correctional Medicine stated that a position was recently filled which is responsible for development and coordination of clinical training.[86] She also stated that they have initiated Grands Rounds, which is available to IDOC staff. While the Monitor supports this effort, it does not appear to have penetrated nursing services, since no evidence of training participation or completion was provided. A more organized and structured training program needs to be developed to achieve compliance with II.B.6.q.

**Performance evaluation**

The Monitor received 177 performance evaluations of state employed RNs and LPNs from 12 facilities.[87] Performance appraisals from Jacksonville, Graham, and East Moline had no employee self-evaluation and no signatures or dates so it is not possible to know if the appraisal was reviewed with the employee. Pontiac and Menard stood out due to the number of untimely performance appraisals.[88] It is unclear why the majority of performance appraisals were completed late. A registered nurse, either the HCUA, Director of Nursing, or Nursing Supervisor completed the performance evaluations of nursing staff in all the appraisals reviewed.

The appraisal consists of an evaluation whether the employee met their objectives since the last appraisal, then a ranking of the employee's performance against eight generic criteria, general remarks by the supervisor, and objectives for the next reporting period. The objectives tend to be very task and rule oriented and focus on attendance and compatibility with other employees. The content of the performance evaluation do differ from one facility to another but all the evaluations of employees at a single facility differ very little from one to another. There was no evidence of coaching to improve performance. There were a few objectives for the development of individuals, such as participation in crisis training. The performance appraisals of RNs and LPNs make no mention of supervision of nursing assistants performing delegated tasks or RN supervision of LPNs when an independent clinical judgement is necessary. The performance appraisals are silent with regard to any program goals, projects, or initiatives, such as vaccination programs, colorectal cancer screening, and infection control or refer to any of the changes called for in the Consent Decree. There is no evidence that actual proficiency in nursing practice is evaluated.

---

[85] See Implementation Plan items 7 (3), 28 (4), 40 (9), 53 (6 & 8), and 94 (1 & 2).
[86] Interview of Executive Director, Office of Correctional Medicine, SIU on 6/27/2024. The title of this position is Health Matters Program Director.
[87] Decatur and Sheridan each have state employed nurses but did not respond to the Monitor's documentation request #70.
[88] Pontiac: five of seven performances were done late; Menard had 12/19 that were late.

Vienna did not send performance appraisals of nursing employees. Instead, an annual request for privileges, a skills inventory, and skills checklist for vaccine administration was sent. Of these documents, only the checklist for vaccine administration has been instituted as a result of a program improvement effort to increase vaccination as a preventive health measure. All of the other tasks appear unchanged to reflect any new expectations with regard to the work done by nursing staff. There were a few tasks that an employee indicated on self-assessment they were unprepared to do, and the supervisor reviewed it with the employee until they were competent. No employee was denied privileges to perform nursing tasks based upon an evaluation of their clinical performance. There are no expectations for nurses to supervise nursing assistants to whom tasks are delegated nor RN responsibility to supervise LPNs using treatment protocols that require a judgement based upon a patient assessment.

The vendor is also responsible for supervising the performance of nurses they employ. They provided the instructions for evaluating their employees' performance. The purpose of the assessment is to determine if an employee merits an increase in pay. Performance Indicators are extremely generic and consists of the vendor's core values, key traits, and clinical competence. There are no instructions or criteria listed to evaluate clinical competence. If the person responsible for completing the evaluation is not considered the clinical resource at the site someone at the regional level is to be contacted to evaluate clinical competence. An individual's performance in meeting the indicators is then identified as a single x on a scale from high to low with no description of how the employee's performance was ranked on any of the indicators. This is an absolutely meaningless. The list of performance reviews for RNs and LPNs is dated 2022, which is two years ago. This was the same document that was provided to the Monitor for the 7th Report.[89] This information indicates that the vendor does not evaluate the performance of employees on a regular basis and that the evaluation itself is meaningless as a measure of performance and clinical competency.

**Discipline**
The Monitor requested disciplinary actions of nursing staff over the past year (including both vendor and state employed personnel) to evaluate compliance with II.B.6.r. *that Defendants and the vendor shall timely seek discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk.* The vendor sent 26 records of discipline involving nursing staff. Of these 20 were discipline for poor attendance, one was for leaving keys out, one for inappropriate comments about staff and patients, one was for hostile behavior in the workplace, and one was for refusal to work a mandatory overtime shift. Only two disciplinary actions concerned clinical practice; these both involved a single employee. There are numerous adverse events reported, mortality review findings, pharmacy inspections, treatment protocol review findings, and read and sign training memos that identify problems with nursing practice and yet only twice, with one nurse was disciplinary action taken? The Monitor is not aware of any nurse referred for peer review as a result of mortality review.[90]

Many times, poor performance can be attributed to system deficiencies. For example, if nurses are rushed to complete medication administration because of unrealistic time constraints it may be that documentation on the MAR is missed. The organization has an obligation to address workplace factors that cause employees to take risks and make unintentional errors. However, employee discipline may be

---

[89] See the material provided in response to item #47 of the Monitor's request for documentation for the 7th report. This was disingenuous on the part of the vendor.
[90] Monitor's documentation request dated 8/4/2023, item 32, for a list of all peer reviews performed as a result of mortality reviews. No information was provided by IDOC.

warranted when an employee's actions are reckless[91], there is evidence of impairment, or the action is malicious. Sufficient evidence was not provided to the Monitor that indicates timely discipline is sought when nursing practice is impaired, reckless, grossly negligent, malicious and puts patients at risk.

The documentation received in response to the Monitor's request for information to evaluate the oversight of nursing staff demonstrates no change in existing practices as described in II. B. 6.q and r. with regard to assessment of nursing competency and performance review or timely disciplinary action and removal of nursing personnel whose practice pattern puts patients at risk of harm.

**Summary of Medical, Dental, and Nursing Oversight**
This section was raised to a partial compliance by virtue of IDOC having written a policy on peer review for physicians, having initiated peer reviews even though the peer reviews have not been completed, and hiring a contracted outside entity to do performance evaluations on a portion of the vendor's medical physicians.  In all other respects this section would be noncompliant.  Oversight of all clinical staff at facilities barely occurs due to the significant lack of supervisory staff.  Vendor regional Medical Directors provide virtually no oversight over physician and mid-level provider practice based on Monitor record reviews, SIU mortality reviews, and interviews with physicians during site visits.  Accountability for nursing practice is insufficient because reporting relationships do not recognize a single nursing authority.  There is no policy on annual performance evaluation of medical, dental, or nursing staff competency and performance.  Data for performance evaluations of physicians was from 2022 which was the wrong year for this report and only 13 physicians were evaluated using a methodology the Monitor considers ineffective.  Dentists evaluated one another using non-standardized methodology and included dentists who previously have performed poorly to evaluate other dentists.  Performance evaluations of dental hygienists and dental assistants were completed by the HCUAs who are unqualified to perform these dental clinical evaluations. Nursing performance evaluation data provided by the state reflected no change in performance expectations to carry out any of IDOC initiatives (i.e., vaccination program or colorectal cancer screening), no expectations for delegation and supervision of other nursing staff, and no expectations regarding competency.  The performance data provided by the vendor for nursing positions was the same data presented for the last report and was for 2022 which was a meaningless submission with respect to an annual review.  For the vendor to submit *annual* performance data from 2022 for 2024 and to submit the same nursing performance evaluations from the prior report is deceptive or indifferent.  Competency was not evaluated for any professional group.  IDOC does not monitor physicians without credentials.  A partial compliance was given only on the basis of the initial policy on peer review and beginning work on peer reviews but other aspects of this section are noncompliant and need much work.

Recommendations for medical, dental and nursing oversight were combined below.

**RECOMMENDATIONS:**
1. Standardize evaluation formats so that all clinical staff of the same type are evaluated in the same manner.

---

[91] Applicable examples are not using the MAR when administering medication or not accounting for keys or controlled substances. For more discussion of how to determine when disciplinary action should be considered in patient safety please see: Just Culture: A Foundation for Balanced Accountability and Patient Safety - PMC (nih.gov)

2. An independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation. This requires a physician, dentist and nurse independent reviewer.

3. Clinical professional performance evaluations should be shared with the employee who should sign the review after discussion with the reviewer.

4. Involve the Chief of Dental Services and the SIU audit teams in the re-assessment of the existing dentist, dental hygienist, and dental assistant annual evaluations so as to include metrics that evaluate the quality of dental care and clinical skills of the dental team.

5. The Chief of Dental Services should establish clear guidelines concerning antibiotic prophylaxis for dental procedures, obtaining x-rays prior to dental extractions to ensure the utilization of x-rays meets existing dental standards of care, and for signed consent forms prior to dental care. These guidelines would also allow for more objectivity in the dentists' peer review evaluations.

6. Expand Peer Review Criteria: Recommend expanding the dental peer review instrument to include an evaluation of clinical care quality and performance. This extension will provide a more comprehensive assessment of staff competency, and the quality of dental care delivered.

7. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all dental staff including dental hygienists and dental assistants.

8. Annual peer reviews, not Salary Compensation Calibration, of the onsite Medical Director, staff physicians, nurse practitioners, physician assistants, Directors of Nursing, Nurse Supervisors, and Nurses (RN and LPN) should be provided to the Monitor.

9. Implement policy C.02.01 Licensure and Credential Verification.

10. The facility DON or nursing supervisor must demonstrate clinical supervision of all nursing personnel assigned to work at the facility (state and vendor employed staff). Clinical supervision is demonstrated by completion of an annual competency evaluation which is considered in the annual performance evaluation, written documentation of performance improvement expectations, and evidence of timely disciplinary action for clinical performance deficiencies.

11. The position descriptions for registered nurse and licensed practical nurse should be revised to include the explicit expectation that competency to practice nursing is evaluated by a nursing supervisor annually.

12. Address the training and competency evaluation items that are included in the Implementation Plan; these are items 7 (3), 28 (4), 40 (9), 53 (6 & 8), and 94 (1 & 2).

13. Develop a policy and performance evaluations.

14. Shift the dental peer review process to engage independent third-party contractors for reviews onsite. This approach will allow for a more thorough assessment of clinical records, including the evaluation of physical radiographs, and help mitigate the issues associated with remote reviews.

15. For providers with repeat deficiencies or poor evaluations, implement corrective action plans and performance improvement discussions. The Chief of Oral Health Services should oversee these plans to ensure that issues such as illegible notes, incomplete health history reviews, and improper use of SOAP notes are addressed and corrected.

16. All dental assistant evaluations (IDOC) should be specific to their scope of employment and include relevant dental appraisal objectives. If a dental assistant is assigned tasks outside their typical role, such as assisting with pharmacy duties, the evaluation should clearly document the rationale and ensure that the individual is qualified and licensed for these responsibilities.

48

17. To accurately assess clinical competency, evaluations for dental assistants and hygienists should include input from a supervising dentist. This collaboration will provide a more comprehensive evaluation, ensuring that clinical skills and competencies are adequately assessed.

18. Ensure that the Monitor receives detailed, individual evaluations for dental hygienists and dental assistants from the vendor. These evaluations should include specific appraisal objectives related to clinical care.

# Internal Monitoring and Quality Improvement

*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*

**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*

**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**<u>Statewide Quality</u>**
**FINDINGS:**

IDOC has promulgated its quality improvement policy A.06.01. The Monitor did review the draft of this policy. Several items recommended by the Monitor were not included in the final version of the policy. These are as follows.

1. The policy does not address a comprehensive audit (II.B.9).
2. IDOC does not assign a separate individual to manage the adverse event reporting system which the Monitor recommemnded. Instead the Agency CQI coordinator is assigned this task in addition to other duties. This may require additional help.
3. The Monitor recommended more detailed analysis of grievances by type of grievance to identify where problems exist. IDOC will ensure grievance trends are obtained from custody but does not perform analysis of grievances. This is a lost opportunity to identify correctable problems.
4. The Monitor recommended that the Chief OHS or designee approve the hiring of each quality improvement coordinator, but this was not done and there apparently is no change in the current arrangements that the CQI coordinator is an Warden-appointed function and is still not a dedicated position. IDOC did add that the Chief OHS approves the position description of this position but if the position is not a dedicated position, it is unclear what this means as a part time employee

would have insufficient time to develop a quality program. The Monitor continues to recommend dedicated facility CQI coordinators.

5. The Monitor recommended that each facility has a CQI plan that included recommended corrective actions initiated from deficiencies identified through the comprehensive audit (when it is initiated), mortality reviews, adverse events, and performance and outcome measures. This was not included in the policy. Instead, each facility is to implement the statewide CQI policy. Without a facility specific plan, the facilities will lack direction.

6. The Monitor recommended that the Chief OHS or designee attend an annual facility CQI meeting to approve their annual CQI plan, and review quality findings from audits, performance and outcome data, mortality reviews, and adverse events and discuss how the facility intends to address these in their upcoming annual CQI plan. This was eliminated in the policy. Addendance by the Chief or designee can be via teleconference to reduce travel. However, actually visiting the facilities does increase exposure to actual conditions at each facility.

The policy references that the CQI manual[92] is to define the quality management system but the manual is not completed yet. The policy also references the CQI plan which the Monitor was told is an annual plan that gives the goals of the program and is described in the policy as the approach to conducting CQI[93]. The annual plan is also not completed yet and the fiscal year is over.

The Monitor requested a document[94] that describes the detailed responsibilities of SIU with respect to the IDOC medical programs including CQI. IDOC provided no specific document that describes the responsibilities of SIU except the original contract which does not describe what SIU currently does. The original contract with SIU was to provide physician services at four IDOC facilities. That contract was not implemented. Instead, IDOC changed the requirements but did not memorialize the changed responsibilities, which should be done. The responsibilities of SIU have changed over time. IDOC states that responsibilities of SIU are evident in medical policies and procedures and said that they don't have anything documented at this time but the are working on it. The Monitor believes that a document memorializing expectations for SIU is appropriate.

The Monitor requested the system wide Annual CQI Plan and any facility level CQI annual plan that has been developed.[95] An annual CQI Plan is being drafted but the year is almost over so IDOC is drafting next year's plan. Facility CQI plans are not yet developed.

The Monitor requested IDOC to provide any policy, procedure, or document to define a standardized data glossary for use in CQI at facilities (e.g., what standardized data is to be provided in CQI meetings and how is that data defined).[96] A data glossary for use by facilities to define how data is to be presented in CQI minutes is being drafted.

---

[92] The policy defines the Quality Management Program Manual as: "A document that defines the quality management system that clearly outlines and describes the structure of our organization".

[93] The policy defines the Quality Improvement Plan as: "The plan identifies the health system's approach to improving and sustaining its performance through prioritization, design, implementation, monitoring, and analysis of performance improvement initiatives".

[94] Document request 22

[95] Document request 25

[96] Document request 27

The Monitor requested training procedures, plans, and training accomplishments of the statewide CQI program with respect to facility CQI programs and OHS from July 2023 through March of 2024.[97] Training on quality improvement was provided to selected OHS staff and HCUAs. A WebEx presentation on quality management occurred. A recording of the meeting was provided for use by facilities , but the Monitor was not provided the recording. An email about the presentation describes the updating of policies and development of a quality improvement manual. Apparently, this WebEx was intended for all staff but it is not clear if all staff viewed the WebEx. This training is provided to facility leadership staff.

IDOC provided the Monitor a CQI quick reference guide document. It appears that it was given to HCUAs. It desribes the following:

- Lists various policies and ongoing existing activities related to CQI (performance and outcome measures and mortality reviews).
- Describes how often performance and outcome measures are conducted and describes the measures.
- Describes how SIU will collect information used in the measures.
- Describes how to use the clinical adverse event reporting system.
- Describes documents SIU requires in order to perform a mortality review, describes the process of the mortality review committee; and describes identification of opportunities for improvement. However, the role of facilities, with respect to how to take action of identified deficiencies was as unclear as the current policy. It is not surprising that there is no evidence of actions taken on identified deficiencies as IDOC has not yet figured out how to do this. This is an area that needs further attention. Better analysis of deficiencies to identify patterns of deficiencies may help.
- The reference guide introduces infection control issues that are to be discussed at CQI meetings but no guidance was given on data reporting requirements or how facilities are to use infection control data in their CQI meetings.
- Typical dental issues (appointment cancellations, adverse events, non-compliance with standards, audit findings, backlogs, sterilization issues, and policies) were listed but how facilities are expected to obtain this data or what they are expected to do with this data was not presented.
- The reference document states that facilities are to create a CQI plan consistent with audits, mortality reviews, adverse events and other findings. Details on how this is to occur were lacking. The challenge for OHS is how to instruct staff on how to do this. It may be worthwhile to pick a site and walk them through development of a plan to gain experience in the difficulties and challenges is writing a facility CQI plan.
- The reference document ended with an announcement that a structured template for CQI meeting will be provided and discussed proposed elements.

It is unclear to whom this reference document was disseminated or what follow up occurred. The document is a reasonable explanation of the status of the CQI program. It demonstrates the difficulty of OHS in developing a mechanism to understand and use identified deficiencies to help correct problems. More work needs to be done in this area. But IDOC is providing HCUAs information on the program.

The Monitor requested any policy or procedure for process analysis including any used by SIU, Office of Correctional Medicine.[98] IDOC does not have a policy on process analysis. No one is specifically assigned

---

[97] Document request 28
[98] Document request 30

to conduct process analysis. IDOC has not provided any process analyses. IDOC would benefit from process analysis of key processes: intake, chronic care, specialty care, discharge planning, and medication management that would inform policies and would help IDOC to standardize the process. This is useful because each facility conducts business differently which is difficult to manage. Standardizing practice will promote progress toward compliance with the Consent Decree.

The Monitor requested a list of process analyses initiated during mortality reviews, performance and outcome measures, adverse event reports or for any other reason.[99] No process analyses have been initiated based on mortality reviews, performance and outcome measures or adverse event.

The Monitor requested evidence of inclusion of dental services and care in quality improvement activity.[100] IDOC submitted several documents to demonstrate quality improvement work being done for the dental program. These documents included request #34 which was for any documentation of progress in development of statewide performance and outcome measures and a dashboard. Two files related to the performance and outcome data were provided. These included one measure for dental care. Another request was document request #29 which was an Excel spreadsheet of Dental Quality Performance Data. Both files in document request #34 and #29 were SIU data for the same dental measures for the same dates yet the data was entirely different. The Monitor can't accept this data until an explanation is provided to explain why the same measure appears to report different data for the same dates.

IDOC also provided three other documents in document request #29. These include a blank REDCap form for a Dental Performance Review. There was no explanation for what this form will be used for. The second document is an apparent record review of dental care of infirmary patients who died. A third form is a blank form titled Dental Unit Overview which is a one page document with a series of questions about dental care. IDOC provided these three document without any explanation. The Monitor cannot evaluate the forms until IDOC informs the Monitor regarding the methodology of the study, purpose of the forms, who will complete the form, which facilities will be reviewed, how often the form will be used, and how the information will be used.

The dental performance and outcome measure and the Dental Quality Performance Data require explanation as they appear to capture the same data for the same dates but present different results. The remaining forms and Excel spreadsheet on analysis of dental care on infirmaries needs explanation as well. This data is insufficient as the basis for a dental quality improvement program. A recommendation was added on dental quality improvement.

Status of quality programs since the last report are as follows.
- The System Leadership Council is still directing the quality program. Meeting are quarterly and minutes are completed.
- There has been no progress on the comprehensive audit. At the meeting with IDOC in July of 2023, IDOC was to schedule a follow up meeting to discuss the audit but this has yet to be accomplished.
- There has been no evident progress on a patient safety program.
- SIU has completed over 190 mortality reviews. Data is maintained in the REDCap software systems but the Monitor does not have access to use this data for analysis. Mortality reviews are useful documents. SIU has added a pharmacist to the reviewer group which the Monitor believes will be

---

[99] Document request 52
[100] Document request 29

helpful. Reviews have been done consistently but the information obtained is not yet being used effectively to improve care at the facility level. Data analysis has not yet been done. In interviews, vendor Regional Medical Directors do not closely evaluate these documents and do not use them to monitor care. Facility providers do not read these reviews and discussion at CQI meetings, when they occur, is superficial and not meaningful. No corrective actions have been initiated through the mortality review process.

- IDOC has committed to process analysis but no analyses have yet been completed and no process analysts have been hired. Adverse event, and mortality deficiencies have not resulted in any process analyses. IDOC stated that a colorectal cancer process analysis was done but this was not an analysis; it was an initiative that did not include a process analysis. This will be discussed later in this section of the Report. IDOC has committed to a medication administration process analysis. The Monitor has supported this process analysis for several years. A proposed charter for this project was provided. This project was started over a year ago, paused and is now re-starting. The Monitor has received no progress reports on this project.

- An adverse event reporting system was started. SIU said there were 82 adverse events reported to date. However, the list of adverse events provided to the Monitor contains only 52 entries. This program will be discussed in a following section.

- Perfomance and Outcome Measures: One measure (COVID vaccination) was dropped and three measures were added: cervical cancer screening, fasting lipids, and prostate screening. Two measures (smoking history screening and weight measurement) are being considered as new measures. Of the 12 prior measures colorectal cancer screening was suspended temporarily as an initiative until a project to improve screening is completed. This implementation is just starting. Of the remaining 11 measures one (breast cancer screening) is at goal; one (nephropathy screening and treatment) is near goal; none of the remaining nine measures are at goal with two slightly improving, four remaining about the same, and two deteriorating.

- A colorectal cancer screening initiative is being initiated based on data obtained from the performance and outcome measure showing low rates of cancer screening. A memo to HCUAs, DONs, and providers was distributed 4/2/24 detailing the plan which will be discussed in the performance and outcome section of this report.

- The Quality Improvement Program Manual is not completed.

- The FY24 Quality Improvement Plan is not completed. If this document is delayed any longer, IDOC should focus on the FY25 Quality Improvement Plan.

- The patient safety program has not been initiated.

Facility quality improvement programs are not well developed. No facility has a dedicated Quality Improvement Coordinator. All facility quality improvement coordinators have other assignments. One Quality Improvement Coordinator assignment is filled by an Assistant Warden. Wardens still appear to be assigning quality improvement coordinators. Physicians, including Medical Directors do not play a significant role in quality improvement. During recent tours, the Stateville Medical Director was not involved in quality improvement activity and attended meeting if she had time. No corrective actions have yet been undertaken at the facility level. Though policy A.06.01 requires HCUAs to receive and initiate corrective action and to initiate plan to accomplish tasks as a result of facility audits, mortality review, or adverse event analyses, there is still no evidence of this occurring.

Successes at the level of statewide leadership has been augmented by 33 filled SIU positions and additional OHS positions (Agency CQI coordinator, Deputy Chief assigned to CQI, and Regional Coordinators who

give guidance on CQI). The effect of central office quality work is not yet evident at the facility level, which has not had the staffing support that is evident in the central office. The net staffing at the facility level is a negative since the beginning of the Consent Decree. Because of the 50% physician staffing vacancies, is not surprising that on tours, facility Medical Directors aren't aware of quality projects, don't actively participate in quality programs, and none we have talked to have even read mortality reviews for their facilities. Quality improvement coordinators all perform quality work as an additional assignment to their regular assigned position. Those quality improvement coordinators we have spoken with aren't aware or haven't read the CQI plan or policy and several knew little to nothing about quality improvement. Most of the CQI coordinators are HCUAs and their positions leave little to no time for quality work. Staffing deficiencies are a major reason for difficulty in implementation of any programs at the facility level. It is the Monitor's strong opinion that management has not provided facilities with sufficient staffing, space, equipment, and supplies to succeed in implementation of the quality programs that are being designed and this will continue until staffing is corrected.

In summary, IDOC has continued existing mortality review and performance and outcome quality programs. They have initiated the adverse event program but the comprehensive audit and patient safety programs have not been started. None of the programs has effectively implemented corrective actions based on identified deficiencies. Initiatives are planned for three poorly performing performance and outcome measures. The quality improvement policy has been promulgated but is not implemented at the facilities. The Quality Management Program Manual and Quality Improvement Plan are not completed. Staffing for OHS and SIU are improved and commendable but facility staffing to support quality efforts including efforts to conduct the expected improvements is so poor that the Monitor doubts whether there can be effective implementation. A partial compliance rating is warranted.

**RECOMMENDATIONS**:

1. The quality program implementation plan needs to include assistance and input from the Monitor to include a current focus on:
   a. Development of an audit instrument;
   b. Implementation of the audit function;
   c. Integrating audit findings into the quality program;
   d. Discussion of standardized data and how IDOC will obtain and utilize data; and
   e. Discussion of how to use process analysis.
2. SIU should memorialize a statement of work with IDOC and update that statement as their responsibilities change.
3. The quality improvement policy should consider recommendations of the Monitor in amending the recently promulgated policy.
4. The Monitor needs access to the REDCap mortality data.
5. IDOC needs to develop a dental quality improvement program with input from the Monitor.

**Audits**
***Addresses item II.B.9***
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested the following two documents for this section.

- Any reports or audits related to Consent Decree item II.B.9 (Design of Audit Function).
- Any draft audit instrument developed by defendants to self-monitor performance with respect to II.B.9 (Design of Audit Function).

For both requests, IDOC stated that these are works in progress and would be provided when they are ready for the Monitor to review.

There is no policy on an audit (II.B.9). Policy A.06.01 Quality Improvement Program does not address the comprehensive audit (II.B.6.). The Monitor recommended adding a procedure to policy A.06.01. that a comprehensive audit would be established and when completed would result in a report that would incorporate findings of the comprehensive audit, mortality review, performance and outcome measures, and adverse events. IDOC states that all comments to policies will be considered at the time of the annual policy review and revision.

In response to the last report[101], IDOC requested that the rating of noncompliance regarding provision II.B.9. be raised to partial compliance because of strides outlined in the report. IDOC has no procedure for a comprehensive audit. The staff intended to conduct a comprehensive audit were re-assigned to conduct performance and outcome measures so there are no staff currently assigned to a comprehensive audit. IDOC has not developed a comprehensive audit instrument. IDOC has not defined what a comprehensive audit is yet nor has it determined its content. The Monitor had a meeting in July, 2023 to discuss the comprehensive audit and IDOC was going to schedule another meeting but has not done so. The Monitor has requested any reports, audits, and any draft audit instrument related to Consent Decree item II.B.9 and was told that this remains a work in progress. Given that no progress has been reported on this provision, it remains in noncompliance.

**RECOMMENDATIONS:**

1. Expedite a meeting between OHS, SIU and the Monitor on the audit.
2. Develop a comprehensive medical and dental audit.

**Performance and Outcome Measure Results**

*Addresses items II.B.7*

**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

There is no policy on performance and outcome measures but there should be.

---

[101] Email communication to the Monitor on 1/25/24.

The Monitor requested two documents for this provision.

- Any documentation of progress in development of statewide performance and outcome measures and a dashboard.
- Performance and outcome measure results from July 2023 to March 2024.

The IDOC dashboard is a paper document. The Monitor has suggested that this presentation be made electronic for ease of use and so that it will be easier to add additional performance and outcome measures. The performance measures from July, 2023 to March, 2024 were provided.

Beginning in the first quarter of 2023, OHS in conjunction with SIU, began obtaining 12 performance and outcome measures. These were continued to be obtained every quarter. Four additional measures[102] were intended to be added in 2024 but only two were added (cervical cancer screening and lipid screening). An additional measure (prostate cancer screening) was added in January of 2024 but the Monitor has not been informed regarding the definition of that measure. One measure on COVID vaccination has been dropped.

A dashboard was provided listing results of the scores for these measures for six quarters which is described below.

1. **Sick Call[103]:** This measure has slightly improved but the overall result is poor. In January, 2023 four facilities were at goal and two facilities were near goal. In the 2nd quarter of 2024, four facilities were at goal and four facilities were near goal. The average score in January, 2023 was 38% and 43% in the 2nd quarter of 2024.

2. **Breast cancer screening:** This measure has slightly improved. This only involves the three facilities (Decatur, Logan, and JTC) where females are housed. In January, 2023 one facility was at goal. In the 2nd quarter 2024 two of three facilities were at goal and the third was near goal. The overall average score improved from 80% in January, 2023 to 93% in the 2ndf quarter 2024. This measure has the best scores.

3. **Colorectal cancer screening**: Scoring of this measure was suspended in the 2nd quarter of 2024 because IDOC has implemented an initiative to remedy poor scores. The Monitor disagrees with suspending the measure as the results would be useful to determine if the initiative has had an effect. In both January, 2023 and the 2nd quarter 2024, no facility had a score at goal. The average scores for five quarters is 22% with the 1st quarter of 2024 showing a 25% score. Very little progress has been made on this measure.

---

[102] These four new measures were to be: 1) assessing whether **cervical cancer screening** was offered and received on persons with a cervix between 22-65 years of age at least once in the past three years; 2) that a **fasting lipid panel** is offered and received within 30 days of incarceration for all individuals between ages of 35-75 years of age; 3) a smoking history measure which has not yet been implemented and methodology yet to be determined; and 4) a **weight measure** that would calculate the percentage of patients who had annual weight measurements during the past 24 months with documented follow-up when appropriate.

[103] This measures the percent of patients who have timely nurse sick call and timely follow up. This measure does not distinguish whether the nurse sick call or physician sick call or both are timely but mixes the two. This makes it difficult to isolate the deficiency. Also, the benchmark for timeliness uses the IDOC AD standard and not the National Commission on Correctional Health Care standard. This permits a greater length of time to be seen which the Monitor believes is inappropriate.

4. **Dental visit** In response to the document request #34 for any documentation of a statewide performance and outcome dashboard, IDOC sent a spreadsheet titled By Quarter Dashboard that included a dental tab that included performance and outcome scores from 1ˢᵗ quarter 2023 up to the 2ⁿᵈ quarter 2024. In document request #29 the Monitor asked for evidence of inclusion of dental services in quality improvement activity, IDOC included a spreadsheet titled IDOC Dental Quality Performance Data- run date 05172024 OCM. There are three spreadsheets in this file one for cleanings, one for examinations, and one for combined. Cleaning and examination data for both document request #29 and #34 were based on the same criteria but the data for the same year and quarter were completely different. IDOC is asked to provide the methodology used to obtain dental data and to explain these four tables with different data in them for the same time period. The Monitor has no opinion of compliance on this because the data needs explanation as the same metric produced different results.

5. **Blood pressure not controlled:** This measure has deteriorated over six quarters. In January of 2023 nine facilities were at goal and four facilities were near goal but in the 2ⁿᵈ quarter of 2024, only two facilities were at goal and three facilities were near goal. In January, 2023, 72% of persons with hypertension tested were in control compared to only 50% of persons being in control in the 2ⁿᵈ quarter of 2024.

6. **A1C[104] < 8%**[105]: This measure improved. In January, 2023 five facilities were at goal and seven facilities were near goal. In the 2ⁿᵈ quarter 2024 six facilities were at goal and eight facilities were near goal. The latest quarter showed slight improvement from 68% in January, 2023 to 71% in the 2ⁿᵈ quarter of 2024.

7. **Blood pressure control in diabetes**[106]: This measure has deteriorated over six quarters from five facilities at goal and 10 facilities near goal in January of 2023 to four facilities at goal and four facilities near goal in the 2ⁿᵈ quarter of 2024. The average score decreased from 73% in January of 2023 to 64% in the 2ⁿᵈ quarter of 2024.

8. **Screening and treating for diabetic nephropathy:**[107] This measure has deteriorated slightly

---

[104] A1C is a test showing the degree of blood sugar control that is used to measure control in diabetes.

[105] IDOC states that an A1C of 8 is "in control" but this is inaccurate. The American Diabetes Association and the community standard is that an A1C of 7 is considered "in control". For elderly and those with certain complications subjecting them to risk from severe hypoglycemia, the goal of care is often reset to 8. The Agency for Healthcare Research and Quality uses a metric of 8 as a desirable measure of control but it should not be confused with control. The danger here is that clinicians will set patient goals at 8 when it is inappropriate. The results of this measure should be considered an overestimate of the average degree of control for diabetes. The Monitor suggests that IDOC track both 7 and 8 as to give clinicians a better view of their performance.

[106] The goal blood pressure for diabetes is not agreed upon. The American Diabetes Association and American College of Cardiology/American Heart Association recommend a goal blood pressure of 130/80 in persons with diabetes. The Joint National Committee (JNC) recommend a blood pressure of 140/90. All three organizations used randomized trials and meta-analyses in making their recommendation. As a practical matter, provided a patient does not become symptomatic, the lower blood pressure will not cause harm. Caution should be used in the elderly. Use of 140/90 may overestimate the numbers of individuals in good control.

[107] This means testing the urine for protein with what is called a microalbumin test. When persons with diabetes have an elevated urine microalbumin test they are to be treated with medication called an angiotensin-converting enzyme (ACE)

over six quarters but overall results are near goal. In January of 2023, 20 facilities were at goal and four facilities were near goal. In the 2nd quarter of 2024, only 17 facilities were at goal and four facilities were near goal. The average score in January, 2023 was 88% and 87% in the 2nd quarter of 2024.

9. **Diabetic retinopathy[108] screening**: This measure has deteriorated slightly over six quarters. In January, 2023, nine facilities were at goal and six facilities were near goal with an average score of 70%. In the 2nd quarter of 2024, seven facilities were at goal and six facilities were near goal with an average score of 61%.

10. **Influenza vaccination:** This measure has improved. In January 2023, only two facilities were at goal with two facilities near goal. In the 2nd quarter of 2024, 15 facilities were at goal and no facilities were near goal. The average score improved from 45% in January 2023 to 71% in the 2nd quarter of 2024.

11. **Pneumococcal vaccination:** This measure improved slightly but remains very poor overall. In January, 2023, no facilities were at goal with only one facility near goal. In the 2nd quarter 2024, three facilities were at goal and two facilities were near goal but the average score improved only slightly from 47% in January 2023 to 48% in the 2nd quarter 2024.

Over six quarters, overall scores were poor at six facilities, mediocre at four, and good at one. Scores improved at two facilities, slightly improved at three, deteriorated at three, slightly deteriorated at two and were unchanged at one facility. These scores show, on average, an unchanged poor status.

SIU does not include NRC in performance measures but NRC needs to be studied. Every measure is meaningful to study at NRC. The performance and outcome measures are incomplete without studying this population. There were 970 individuals (approximately 4% of the IDOC population) housed at NRC during our recent facility visit. This population cannot be ignored.

As a result of initial poor scores in the first few quarters, IDOC planned three initiatives to improve scores. These initiatives were for sick call timeliness, pneumococcal vaccination, and colorectal cancer screening. The Monitor does not have information on the pneumococcal initiatives.

The sick call initiative began in November, 2023 with a trial of facilities having inmates use either a sign-up sheet or filling out a paper form to request sick call. There were problems with the sign-up sheet process and in February of 2024 a new sick call policy was promulgated that standardized the process to require all sites to make a sick call request form available to all inmates, to keep all health requests on file and to place a copy in the medical record. On our visit to NRC, we were told that this was the only policy in process of being implemented. The comments were that there were a "lot" of health requests, implying that there was more work than anticipated. There was a shortage of officers to bring people to their

---

inhibitor. In practice, most persons with diabetes and hypertension are treated with this medication for their hypertension. If the reviewers score this measure as positive whenever someone is on an ACE inhibitor, then scores for persons screened with microalbumin will be overestimated. The Monitor says this because record reviews of persons diabetes screened with microalbumin do not indicate the scores that are represented here. The Monitor suggests separating treatment of nephropathy from screening for it.

[108] This is diabetic eye disease which can result in blindness if not treated.

appointments and scheduling conflicts when nurse sick call interferes with "count"; these problems resulted in patients not being brought for their appointments. We were also told that there were insufficient nursing staff to conduct all sick call. The Monitor has not received further information on this initiative.

The colorectal cancer screening initiative was introduced on 4/2/24 with a memo to all HCUAs, DONs, and providers.

1. The memo gives directions to the facilities that a "Colorectal Cancer Awareness" month will occur in March of every year. It is unclear who is to conduct the awareness month and what it is to consist of.
2. A new screening process is described in which nurses conduct a "pre-screening" questionnaire in conjunction with every patient's annual physical examination. The memo directs that based on responses to the questions a provider is to consider four options: 1) no action will be required, 2) a fecal occult blood test (FOBT) or 3) a fecal immunochemical test (FIT) or 4) a colonoscopy is recommended by a provider reviewing the questionnaire.
3. Education is to be provided to all staff on standards of care, the proposed screening and assessment process, and instructions on how the FIT test is to be used by the patient.
4. Education is provided to all inmates on "colon health" and individual instructions are provided to all eligible inmates on the process and how to perform the FIT.
5. All questionnaires and FIT test results are to be filed in the medical record.
6. The preventive screening encounters "will be documented" on an excel spreadsheet which is issued by OHS to the facilities. Preventive screening is tracked on this spreadsheet to include any pathological reports, presumably if a colonoscopy is done.
7. Each facility is to institute its own process for how these steps are to occur.

No evidence has been provided regarding how well implementation is proceeding at the facility level. Collection of colorectal cancer screening performance and outcome data should continue to be obtained during this initiative to judge its efficacy.

The Monitor has a few suggestions for colorectal cancer screening based on observations on tour and from record reviews.

1. IDOC already has three expected opportunities to offer colorectal cancer screening: the intake process, the annual health evaluation, and chronic care visits. IDOC might evaluate each of these processes to determine why so many opportunities to screen fail to occur.
2. The current physical examination form is a problem. It contains a section on rectal examination that includes a prompt to perform a digital rectal examination and a guaiac test. A provider we have spoken with stated that these prompts led him to perform digital rectal exam with guaiac testing for colorectal cancer screening. These prompts should be eliminated. While it is difficult to make this change now when the electronic medical record is implemented within the next year, IDOC must eliminate this prompt.
3. It came to the attention of the Monitor that, at one facility[109], the compliance officer cited medical for not acting in accordance with administrative directive that required digital rectal examination and stool guaiac testing. The administrative directive is contrary to current OHS direction on colorectal cancer screening. This should not occur and the compliance officer should not be using compliance monitoring that is inconsistent with OHS recommendations.
4. All cancer prevention expectations based on policy (breast, cervical, colon, and lung) should be

---

[109] IRCC as found in the February 2024 Quality Improvement minutes in the section on Internal/External audit findings.

ordered when indicated before the intake assessment is considered completed.

5. The vendor Regional Medical Directors must ensure that they have spoken with each provider they supervise to ensure that each provider understands the current process for cancer screening and that screening tests for each cancer are ordered, when indicated, at the end of the intake assessment and in conjunction with periodic physical examination and chronic care clinics. IDOC should consider establishing a performance and outcome measure that includes an interview by SIU of each provider individually to assess whether they are aware of the cancer screening expectations for breast, cervix, colon and lung and whether they know at what encounters they are to accomplish the screening. Each Regional Medical Director should be held accountable for these scores.

6. The patient Pre-Screening Questionnaire contains questions that may be related to colon cancer (rectal bleeding, black stools, unexplained weight loss). These are in a check box format. The provider response on the bottom of the questionnaire is to be reviewed by a provider and indicates whether the patient accepts or rejects colorectal screening. This may lead to a provider ordering FIT for a person with weight loss or blood in their stool when instead a colonoscopy and/or an upper endoscopy should be immediately ordered. The form should be clarified that if symptoms of current colorectal cancer are present the provider is to promptly refer for appropriate endoscopic examination.

7. IDOC instructs that each facility will institute their own process of implementing this initiative. This will encourage a proliferation of procedures that may be counterproductive and will be extremely difficult for OHS to control.

8. IDOC should consider staffing, existing forms, and procedures, or lack thereof, in this process. Do providers have sufficient patient-time to conduct cancer prevention evaluations? Are there sufficient nursing staff to assist in ensuring that patient who are due for a screening test are offered one? Do existing forms give correct guidance? Are supplies readily available?

9. IDOC should ensure that administrative directives are consistent with IDOC directives, policy and procedure. The example given in the Leadership section of this report describing a custody compliance officer citing medical staff for not performing a rectal exam and guaiac test should never happen.

Data for performance measures is still collected manually. This is a very cumbersome data management process that significantly impairs IDOC's ability to evaluate its performance and to add additional measures based on information. The performance and outcome measures cannot yet be demonstrated on a shared electronic service. The Monitor has recommended and continues to recommend that many more performance and outcome measure be obtained which is unrealistic when data for these measures is collected manually. IDOC is engaged, as part of the electronic record process, to develop a data team to enhance its data and information collection and management ability. IDOC does plan to visit Cermak Health Services to inspect their data system and has had discussions with the California Department of Corrections on how they manage and use data from their electronic medical record. The Monitor is encouraged by these OHS plans and hopefully an enhanced data program will allow IDOC to increase the number of performance measures.

In summary, OHS has continued to obtain and has added three performance and outcome measures. Results show generally poor performance and taking action to correct the poor performance has been difficult and is significantly impaired by staffing deficiencies, a variety of procedural defects, and leadership in training providers on management consistent with new IDOC policy. Initiatives to improve scores on two measures have been started but are not fully implemented. Barriers to implementation

include staffing, analysis of staffing needs, ensuring administrative directives are consistent with clinical directives, supplies, equipment, and training necessary to ensure success. This provision still warrants a partial compliance.

**RECOMMENDATIONS**:

1. The performance and outcome measures should be centralized and based on obtaining data automatically from the electronic record, laboratory, and other sources.
2. Develop a written plan for the dashboard to include:
    a. Who will maintain this dashboard?
    b. How will data be displayed to staff and how OHS intends staff to use the dashboard?
    c. How will data be obtained?
    d. Development of a glossary of definitions including
        i. A narrative definition of the metric
        ii. Numerator and denominator
        iii. How the metric is calculated
        iv. The data source
        v. Reporting frequency
        vi. A goal.
    e. How will measures be integrated into the quality program.
3. IDOC, in preparation of implementation of an electronic medical record should anticipate how it will be able to capture data for its dashboard electronically from the medical record.
4. Additional performance and outcome measures should be provided as IDOC increases capacity to do so. Non-clinical measures pertinent to the Consent Decree should be added such as vacancy rates.

**Adverse Event and Incident Reporting Systems**

***Addresses Items II.B.6.m; II.B.6.n***
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING**: Partial Compliance

**FINDINGS:**
The Monitor requested four documents related to this provision.
- The Monitor requested any procedure to collect and analyze adverse events.[110] The Monitor was referred to policy A.06.02
- The Monitor requested any documentation of progress toward an adverse event reporting system used by the facilities.[111] The Monitor was referred to policy A.06.02

---

[110] Document request 41
[111] Document request 42

- The Monitor requested a list by facility of all adverse events and incidents reported to include name, # and facility and details of adverse event or incident.[112] These lists were provided.
- The Monitor requested a list of corrective actions initiated due to adverse event reports, or any other reason.[113] A group of corrective action plans were provided for adverse events. These will be discussed below.

The policy on Mortality and Morbidity sent to and reviewed by the Monitor last year included no mention of adverse event reporting. The Monitor sent comments on this policy. When the final policy on Morbidity and Mortality was promulgated in February, 2024, it was changed and included a brief procedural section on adverse event reporting that was new and had not been reviewed previously by the Monitor. The policy title was changed from A.06.02 QI: Mortality and Morbidity to A.06.02 QM: Adverse Clinical Event Reporting, Morbidity and Mortality Review. The document has no policy statement addressing adverse events. There are definitions and four procedural statements that describe what an adverse event is; who is to report adverse events; how to file a concomitant incident report; how to report the adverse event to SIU; and finally, that the Agency Quality Improvement Coordinator reviews the adverse event. The policy states that when SIU receives communication about an adverse event, they complete a form.[114] The form is sent to the Agency Quality Improvement Coordinator who is assigned by the policy to conduct a review. At this step in policy A.06.02, the procedures for managing adverse events end and the remainder of expectations are not present in the policy. This includes: how the data is maintained; how adverse events are analyzed; who tracks adverse events and how are they tracked; and how corrective actions are assigned and tracked to completion.[115] The policy is therefore incomplete. Moreover, adverse event reporting and management is sufficiently distinct from morbidity and mortality review that it should be a separate policy. The Monitor has not had an opportunity to comment on this changed policy but recommends that IDOC create a separate policy rather than modifying the mortality review policy. Patient safety should be included in an adverse event policy.

IDOC did not provide documentation of its progress on adverse events but information was obtained from an interview with the OHS Quality Improvement Coordinator and from the list of adverse events which was sufficient to understand IDOC's progress.

The promulgated policy A.06.02 defines adverse event differently in three separate areas in the document. In the definitions section of Policy A.06.02 IDOC uses a definition of adverse event that is typical of hospital systems. Policy A.06.02 defines an adverse event as follows:

"An event in which care resulted in an undesirable clinical outcome-an outcome not caused by underlying disease *that prolonged the patient stay,* caused patient harm, required life-saving intervention or contributed to death".

This definition is *identical* to the Health and Human Services (HHS) definition[116] of an adverse events which is used to characterize adverse events in hospitals. IDOC is not a hospital and the adverse event

---

[112] Document request 43
[113] Document request 52
[114] DOC Adverse Clinical Event/Near Miss/Sentinel Event Report template. This is documented as Attachment A to the policy but the document was not attached to the policy and the Monitor was unable to review this document at this time.
[115] The policy was formulated before IDOC had a developed a concept of how the process would work and it appears that development of the procedure will be iterative and will be developed as IDOC progresses.
[116] The HHS and IDOC definitions of adverse event are word for word identical.

definition should be appropriate for outpatient medicine and consistent with requirements of the Consent Decree (II.B.6 m. and II.B.6.n.).

A later definition, also in the definition section of the policy, defines a "patient safety event": as follows: "Any type of healthcare-related error, mistake, or incident, regardless of whether it results in patient harm".

This definition is in line with a Monitor suggestion to uses a systems approach to ameliorate adverse events[117] even when they did not cause harm as it would accelerate the ability of IDOC to move towards compliance.
IDOC already does this when they report medication errors in their quality meeting minutes. Not all medication errors result in harm to the patients but by informed analysis of these events the process of care is improved. The Monitor still recommends this approach which is consistent with the Consent Decree **II.B.6.n.** to implement change with action on reported errors including near misses which does not require that harm occur.

A third definition of adverse events is in procedural statement A of policy A.06.02 which describes what is to be reported in the adverse event reporting system as follows:
"For all Adverse Clinical events that did not result in a patient death, including an incident report of a "near miss", a sentinel event, or an unsafe health care practice, shall be reported through the Adverse Event Reporting System".

Use of these three different definitions may cause confusion as to the purpose of adverse event reporting. Serious events that caused death, were near misses, or that were just errors that are risks to patients should be included in the definition of adverse event. This is consistent with the Consent Decree which recommends (II.B.6.n.) action to be taken on reported errors. IDOC already reports medication errors that do not cause harm and this can be used as a general guide as to what constitutes an adverse event short of harm to the patient. This can include staffing concerns that cause errors that cause risk to patients.

Preventable adverse event reporting in an outpatient correctional medical program like IDOC must be different from preventable adverse event reporting in a hospital because the setting is different and therefore the types of adverse events are different.[118] The Agency for Healthcare Research and Quality (AHRQ) give guidance on outpatient safety events and gives examples including the following:[119]

- Coordination of care especially when a patient sees multiple providers and communication amongst these providers is suboptimal. *This problem commonly occurs in IDOC.*
- Poorly handled transitions from the hospital or when care is transferred from one physician to another. *This problem commonly occurs in IDOC.*
- Unavailability of a physician. *This problem, especially the physician vacancy issue, is*

---

[117] A discussion of this can be found in the Agency for Healthcare Research and Quality at https://psnet.ahrq.gov/primer/adverse-events-near-misses-and-errors and at https://psnet.ahrq.gov/primer/systems-approach.
[118] The adverse event spreadsheet had columns with reportable adverse events types that included "wrong site surgical procedure", "additional procedures were performed", problems with "blood transfusion" which are hospital based concerns and unrelated to outpatient medicine.
[119] These are taken from Ambulatory Care Safety from the Agency for Healthcare Research and Quality (AHRQ) as found at https://psnet.ahrq.gov/primer/ambulatory-care-safety.

*paramount in IDOC and is a fundamental barrier to adequate care.*

- Medication errors including prescribing errors, dosing errors, poor patient education about medication, polypharmacy. *These are commonly found in IDOC, are currently reported in CQI minutes, and, in IDOC, include medication administration errors.*
- Untimely information as a consequence of the fragmentation of care and paper records including following up on test results. *This is a common problem in IDOC.*
- Physician burnout. *The Monitor believes both physician and nursing burnout is a significant problem in IDOC because staffing is so low and staff cannot manage the given workload.*

Some additional patient adverse events found in the Monitor's record reviews and found during tours include the following.[120]

- Documentation errors and failures to continue care[121] occurring when patient transfers between correctional facilities.
- Patients with high medical risks being broadly dispersed in general population housing leading to adverse events. This includes adverse health outcomes from placement of cognitively impaired elderly in general population.
- Falls and injuries of those with disabilities due to lack of preventive equipment and strategies for housing the elderly and disabled.
- Failures to appropriately monitor infirmary patients.
- Failure to identify or manage malnutrition.
- A number of security related patient safety issues including
  a. Inappropriate application of custody restraints in high risk patients. [122]
  b. Lack of security making inmates available for care and inability to complete medical tasks (e.g., medication administration) due to lock downs
  c. Lack of access to ADA vans that either prevent transport for appointments or place the disabled person in a regular vehicle without appropriate safety equipment.
  d. Security rules that interfere with appropriate medical care.[123]

While there are innumerable patient safety events documented in the Monitor's record reviews, should IDOC desire to explore how to identify patient safety issues in their facilities, the AHRQ provides a survey that can be used to identify potential safety risks.[124]

In an interview, the Agency CQI Coordinator did not list adverse event reporting as something she has been working on, though it appears that some work has been done to create tracking spreadsheets which were provided in response to document request #43 for all adverse events and incidents reported to include name, # and facility and details of adverse event or incident. One Excel spreadsheet had two worksheets

---

[120] Numerous other adverse events can be found in reviewing past and current Monitor mortality reviews.

[121] See mortality patient #7 and several examples given in the Intrasystem Transfer section of this report.

[122] See mortality patient #4.

[123] For example, the rule that if someone in segregation collapses, the cell cannot be opened for immediate medical attention until the shift commander arrives which may be after the patient expires, or meals that are served at times that make safe administration of insulin difficult.

[124] The AHRQ produces a Medical Office Survey on Patient Safety Culture which is a survey that can be used on medical staff to identify potential patient safety concerns. It can be located at https://www.ahrq.gov/sops/surveys/medical-office/index.html

and an additional spreadsheet was a single worksheet that used "Numbers" software.[125] The Monitor had previously recommended an option of purchasing off-the-shelf adverse event software. The alternative chosen by IDOC is to design their own software which is entirely acceptable. However, IDOC could improve management of adverse events by having an experienced data and software expert assist with software design. The Monitor has recommended hiring data and software support personnel and continues to believe these personnel are necessary in a complex and large organization such as OHS.

The two spreadsheets have different numbers of entries. The purpose of each spreadsheet is unclear and undefined in policy. The Excel spreadsheet has two worksheets. One worksheet titled Incoming Report Data had 39 columns with 57 rows. The rows corresponded to individual adverse events. Each adverse event could apply to one or more persons. A second worksheet titled Type of Report Data had 52 rows corresponding to individual adverse events and 105 columns with 89 of these describing different types of encounters. The first worksheet had text entries describing the event. One of the columns titled "encounter/event details" gave a detailed description of the adverse event. The second worksheet had a top row with encounter descriptors (encounter type, encounter date, encounter category, and a long list of variety of types of events) Data in these cells were filled with text, dates "yes" or "no", numbers, or an "x". It was hard to understand how the entries on the spreadsheet could be tabulated or used. The design of this convenience spreadsheet will result in unusable data as the spreadsheet grows.

A second Numbers table had 26 rows each corresponding to an adverse event and 51 columns with various data including demographic data, dates, types of encounters, different outcomes, and contributing factors. The purpose of the three worksheets was unclear. Some information was duplicative. It appeared that these worksheets are preliminary efforts to categorize data but it is unclear how any conclusions can be drawn from the data that is presented. An experience data expert should assist as IDOC moves forward. These spreadsheets do not provide a way to categorize root causes of the problems or corrective actions which should be identified with respect to gaining compliance with II.B.6.m. and II.B.6.n.

In document request 52, the Monitor asked for a list of corrective actions initiated due to adverse event reports, or any other reason. Corrective actions were provided only for adverse events. For this document request IDOC provided 48 adverse events[126] reports and these included only five unique corrective actions. Four of these were based on the custody Compliance Unit reports of violations of administrative directives. The corrective actions for the Compliance Unit adverse event reports were the same as described in the Monitor's 6th Report and have been shown to be ineffective.[127] These corrective actions consisted of education of staff on their error. No analysis was completed as to why the errors were occurring. The corrective actions consisted of "education" when other more serious process problems are likely present that need correction. Also, there are multiple examples of the compliance unit audits contradicting current OHS policy and detrimental to forward progress toward compliance.[128] This raises the concern as to

---

[125] This is an Apple product which also has a Windows version which is a spreadsheet that is less robust that Excel. The software used in presenting this data should be standardized. This is a project for a data person.
[126] Most of these adverse events were not on the list of 52 adverse events provided to the monitor on a spreadsheet in document request
[127] See the discussion of compliance unit audits on page 24-25 of the 6th Report. The Compliance Unit was described as having continuously audited IDOC when IDOC entered into the Consent Decree.
[128] One adverse event report by the Compliance Unit was for 04.03.120. The standard used by the Compliance Unit stated: "When the infirmary is used for crisis care placement, there is no need to follow the infirmary admission requirements unless major medical issues require infirmary placement". The Monitor disagrees with this standard. All mental health patients should undergo a physical evaluation upon admission to the infirmary regardless of whether they are admitted for mental

whether the Compliance Unit citations should be used in the medical CQI program.

One adverse event reported in the IDOC adverse event list is used as an example of how IDOC might construct corrective actions.

The adverse event details for this event were different in the two spreadsheets. One spreadsheet focused on the resuscitation response when the patient died. The second spreadsheet event focused on a sick call event that preceded the resuscitation four days before the death. The Monitor addresses both events.

The sick call event involves a 58 year old man[129] housed at the Hill facility who was evaluated by an LPN for chest pain on 2/18/24. Preceding medical care failed to effectively manage this patient's problems so the LPN evaluation was conducted at a starting point of poorly delivered health care.[130] The LPN completed the chest pain nurse protocol at 3:40 pm on 2/18/24. Only the first page of the protocol was present so vital signs were missing. Also, the LPN only documented the history questions but included no assessment or plan. The pain was described as present for 6 hours and was constant and stabbing like in the middle of the chest. The patient denied any associated symptoms. Pain occurred watching TV. The nurse did not ask if movement made the pain worse. The note was incomplete. An EKG from 3:12 pm the same day had an automated reading of acute myocardial infarction. This EKG was not signed as reviewed. The record included a flowsheet dated 2/18/24 with one entry timed at 4 pm that stated "per [on-call doctor name] check BP x 1 on PM shift due to having increased B/P on 2/18/24". Another entry in the same note documented blood pressure "160/110 gave clonidine 0.2 x 1 per [on-call doctor]". The follow up blood pressure at 5:05 pm was documented as 150/98 and a blood pressure of 142/84 was documented on 2/19/24 at 4:05 pm. The initials of the nurses conducting these evaluations was documented but the signature, names, and titles were not provided. There is no information regarding what information was communicated to the doctor nor was the doctor's communication to the nurse documented.

The description of this event in the adverse event spreadsheet includes information that the EKG was placed in the record and flagged to be reviewed but apparently it was not reviewed. This information was not documented in the record.

A code 3 occurred on 2/23/24 and the only documentation in the record of this event was a note by a nurse practitioner dated 2/23/24 and timed at 12:41 but am or pm was not documented. This note documented that a code 3 was called at 11:47 (apparently am but morning or afternoon time not designated). The nurse practitioner documented being notified by the HCUA that staff were calling an ambulance. On arrival the nurse practitioner noted that the patient was lying outside of the cell and "chest compressions were started immediately with rescue breaths". But a timeline was not provided. The note abruptly ends and it appears

---

health or medical reasons. Another example at NRC was an infraction cited by the Compliance Unit for using opt-out HIV screening during intake phlebotomy which is the standard established by OHS. Another example was at IRCC where a Compliance Unit officer cited a provider for *not* performing a digital rectal examination with guaiac testing. In all these cases the administrative directive was contradicted recently promulgated OHS medical policy.

[129] Adverse Event patient #1

[130] Cardiac risk factors were not documented in the record, persistent elevations of blood pressure did not result in treatment for high blood pressure, a statin was discontinued in 2023 without explanation and when restarted a couple weeks before the patient's death, a statin was started at a lower dose than recommended for his 10 year cardiovascular risk, and the patient was on a nonsteroidal medication that the FDA give a black box warning for that includes thrombosis and potential for myocardial infarction which the patient experienced.

a second page was missing.

An autopsy of the patient documented a cause of death as cardiac tamponade[131] caused by an acute myocardial infarction with rupture due to coronary artery thrombosis.

IDOC did not complete an analysis of this case. The Monitor recommends using a six sigma technique of asking why the error occurred and to ask the question repeatedly until a presumed root cause is obtained.[132] The root cause should be the foundation of an attempted corrective action. The Monitor identified six errors with the sick call encounter:

1. Documentation was deficient. The second page of the chest pain protocol was missing.
2. The miscommunication between the LPN and the on-call physician was egregious and likely resulted in the patient's death. The LPN failed to document what was communicated to the on-call physician. The documentation of the on-call physician was nil.
3. An LPN used a protocol in conducting an independent evaluation which was outside scope of the LPN license.
4. The EKG presumably was completed as directed by the nurse protocol, but it is unclear if the physician was told about the EKG and it was not documented as reviewed.
5. The response of the physician to a patient with chest pain was clinically inappropriate but it is unclear what was communicated to the physician.
6. Risk factors for cardiovascular events (including myocardial infarction) were not documented by the LPN and the physician was not made aware of these.

The Monitor suggests that the contributing root cause to the 1st error above is the use of the paper record which because of poor filing results in lost paperwork. This is commonly seen by the Monitor in record reviews and is cited by SIU in their mortality reviews. The root cause appears to be lack of medical staff in maintaining the record. The corrective action would be to complete a workload analysis of medical record staff. However, because an electronic record is planned, IDOC should ensure that the on-call communication between nurse and physician is included as a module in the electronic record.

A 2nd error was the apparent miscommunication or lack of communication between the on-call physician and nurse which resulted in documentation that failed to address key elements of the patient's care including an EKG that recorded myocardial infarction and that the nurse was evaluating the patient for chest pain which was not addressed by the physician on-call. When asking why this communication failed, a root cause is that there is no existing procedures that define what this communication is to consist of. When a nurse is asked to communicate with a physician about a clinical matter it appears to be determined ad hoc and without guidance. The corrective action, in the Monitor's opinion, is to develop a procedure for how nurses are to communicate with providers for on-call services. This should be a separate policy that governs all nurse-to-provider phone communication. It should be a separate policy because nurse-to-provider on-call communication occurs in a variety of settings including sick call, post consultation visits, infirmary care, return from hospitalization, etc. The Monitor recommends that the

---

[131] Cardiac tamponade is fluid that accumulates in the pericardial lining that surrounds the heart and eventually accumulates to a degree that can cause impairment of cardiac contractility via compression. In this case, the myocardial infarction resulted in a rupture of the heart muscle and that rupture resulted in blood flow into the pericardial sac.
[132] There is a robust literature on using five whys. One example is found in the Agency for Healthcare Research and Quality (AHRQ) at https://www.ahrq.gov/sites/default/files/wysiwyg/ncepcr/resources/job-aid-5-whys.pdf

nurse communication to providers on-call be structured similar to the SBAR template.[133]  The procedure should describe what documentation is required by the nurse including what was communicated to the provider.   If IDOC elects to use the SBAR form to document their communication to the provider, its use should be described.  If it is not used, the data necessary for the nurse to provide to the provider and the elements the nurse needs to communicate to the provider must be addressed in the procedure.  Regarding provider documentation, there currently is none.   The advent of the electronic record presents an opportunity to develop a corrective action for this error.  Because access to the electronic record can be via remote access, all physicians on-call should document their note in the electronic record when accepting an on-call encounter.  IDOC should ensure that the electronic record is formatted to have a way to perform this documentation and to title the note as an on-call evaluation.  Until this occurs the corrective action should be to require that providers on call document their interaction with the nurse on a progress note and this should be filed in the medical record.  This should be evident in a policy and procedure which can be the same policy used to define nurse communication.

The 3rd error was that an LPN evaluated the patient which should have been conducted by an RN.  Further questioning should be done to determine why this occurred.  Staffing or inappropriate assignment may have been root causes, each of which would lead to a different corrective action.  The Monitor's analysis of the sick call event did not focus on the errors made by the LPN because the LPN should not have been evaluating the patient.

The 4th error was that the EKG showing myocardial infarction was not evaluated. Identifying a root cause of this problem is complicated by the record not documenting who ordered the EKG, whether the doctor evaluated the EKG and why would an EKG indicating a myocardial infarction be merely placed in the medical record and flagged for a routine review when absent a review the patient could die (which occurred).  Asking why this occurred must associate the EKG with the reason for the sick call  which was chest pain.  The SBAR template requires the nurse to present to the on-call physician results of any pertinent testing which in this case included the EKG.  Policy should state test results that should be presented to the on-call physician.  In this case the EKG was one of those tests.  A further why question is to ask why the doctor did not review the EKG and an answer is that there is no current methodology to transmit an EKG tracing to an on-call physician.  A corrective action could be to assign to the Medical Coordinator the assignment of developing a methodology to transmit EKG tracings to on-call providers.  This may be possible if all EKG tracings are automatically uploaded to the electronic record so that on-call physicians can see them real time.

A 5th error was the clinical mistakes made by the on-call physician.  It is uncertain what information was presented to this provider but the reason for the call was chest pain and the physician did not appear to address chest pain instead focusing only on the elevated blood pressure.  Given these caveats, the Monitor determined that the root cause of these mistakes (unless other evidence is made available) is that the physician was not credentialed for primary care (III.A.2) and possibly didn't know how to evaluate the condition. Unless other evidence is forthcoming, the corrective action is to enforce the requirement of the Consent Decree in provision III.A.2.  A second contributing root cause is that there may be insufficient

---

[133] SBAR stands for Situation-Background-Assessment-Recommendation which was developed in Kaiser Permanente.  A hospital version can be found in a document of the Institute for Healthcare Improvement website at https://www.mhanet.com/mhaimages/SQI/3_IHI%20SBAR%20tool.pdf   While this template is developed for hospital practice it can be modified slightly for use in outpatient setting such as IDOC.  SBAR is a structured way for nurses to organize data in order to present it to a provider.

physicians working which results in using unqualified physicians to work resulting in the accompanying errors associated with using unqualified physicians. A second corrective action is to perform a workload analysis of on-call physicians to determine if lack of physician staffing results in unacceptable on-call physician staffing.

A 6th error of the sick call evaluation is the lack of appreciation of cardiac risk when evaluating for chest pain in IDOC. This is a common error evident in Monitor record reviews. The chest pain protocol form has a space to document cardiac risk factors but it was blank. It is uncertain whether the nurse knew what a cardiovascular risk factor is. The Centers for Disease Control (CDC) identifies cardiac risk factors as high blood pressure, high blood cholesterol, smoking, diabetes, and obesity as risk factors. Family history of heart disease is another risk. Age is a consideration but not identified as a specific risk factor. By asking nurses to memorize all cardiac risk factors increases the probability that one or more risk factors will be missed. This patient had elevated cholesterol that was improperly treated, had a prior history of smoking, and had likely hypertension (elevated blood pressure for several months) that was untreated and was 58 years old none of which were acknowledged. One corrective action should be to modify the chest pain protocol to list all cardiac risk factors so the nurses can see them, ask about them and check boxes if they have them. A second corrective action is to conduct training on cardiac risk factors for all provider and nursing staff in all facilities.

The key error in the code 3 was that there was no timeline and documentation in progress notes provided no evidence that the code was properly conducted. IDOC policy E.09.01 Facility Emergency Response, includes policy statement IV that provision of emergency medical care is to be documented in the medical record. Procedure III.B. states:

> Any emergency medical response is to include real time documentation of all medical interactions. The timeline documents the initial arrival, scene assessment, physical assessment, and what was done, by whom, when, how, and the result until the patient either recovers or is taken to the hospital. The timeline is subsequently documented in the medical record or in the case of a staff, visitor, or official in the incident report.

There was no timeline of events which violates IDOC policy. The policy was promulgated sometime in February, 2024 likely shortly before this event so implementation of the policy was not yet done. The corrective action would be to effectively implement this policy. The HCUA at this facility should be made aware of the error and made aware of the existing policy. The Monitor believes there are insufficient staff to implement policies and would add an additional corrective action to notify OHS that lack of staffing to train and properly implement policies affects care because policies cannot be implemented.

The Monitor identified six additional errors[134] that could have been analyzed with corrective actions. The

---

[134] These included: 1) the patient was on a statin in 2023 but it was discontinued without explanation. 2) A statin eventually started shortly before the patient died but it was started based on phone order without an evaluation of the patient or review of the record and it was a lower dose than should have been started based on the patient's calculated 10 year cardiovascular risk. 3) The patient had elevated blood pressure for months before his death including at the prior chronic care clinic but was not started on antihypertension medication. 4) Stat clonidine was used for a blood pressure of 160/110 without starting a routine medication dose especially given it was the first time blood pressure medication was initiated. 5) The patient was on long-term non-steroidal medication which have black box FDA warning for risk of thrombosis including myocardial infarction. This was unrecognized for years. 6) The patient was apparently scheduled for follow up of his chest pain but the appointment was cancelled- apparently because custody had a lock down. This was an appointment for a serious concern and should not have been cancelled despite the lockdown.

IDOC CQI coordinator can contact the Monitor if further analysis of these is desired.

The Monitor has the following suggestions on how to evaluate and/or address certain types of adverse events.

1. IDOC has committed in the Implementation Plan to process analyses of medication administration, sick call, specialty care, and chronic care processes. The Monitor has recommended an analysis of intake. IDOC has initiated an analysis of the entire medication management process. When the adverse event coordinator obtains adverse events relevant to these issues they should be referred to the process analyst responsible for analysis of that area of concern if one has been assigned. SIU has hired a pharmacy group that is going to conduct an analysis of medication management. All adverse events regarding medication should be sent to this group to inform them of identified problems. If the adverse event is not referred to a process analyst, then it should be analyzed and managed as described above.

2. The Agency CQI Coordinator should find out how to obtain all incident reports initiated by medical staff from each facility and include these in the adverse event reporting system. The Monitor believes that these incident reports are adverse events. Falls, as an example, are reported as incident reports and these should be included in adverse event reporting.

3. Falls should be queried further regarding where the fall occurred, if the patient was appropriately housed, if a proper accommodation was provided, and what may have caused the fall. Aggregate evaluation of fall data should be undertaken to identify common causes in order to create systemic fall prevention measures.

4. The Monitor suggests tracking the number of errors related to staffing vacancies at each facility. Staffing deficiencies should be used as a metric in vendor monitoring report as this is a result of failure to fill positions. These should be tracked as the number of adverse events reports due to staffing.

5. The Monitor suggests that at once a year, the Agency Quality Coordinator with the assigned Regional Coordinator should interview the DON, Medical Director and HCUA at each site where adverse events have occurred to review all adverse events, assess staffing, and any processes that may have promoted the errors. The facility leadership group should offer explanations as to why the errors occurred. These should be tabulated.

6. The tracking spreadsheet needs to be revised by a data expert who is has software and data management experience. Errors should be tabulated by error type. Once a year, aggregate statistics by error type and facility should be reviewed. Common error types suggest a process analysis may be helpful. Additional work needs to be done to classify error types.

7. Because only 12 (40%) of 30 facilities reported adverse events, the Agency CQI Coordinator should congratulate the leadership team and staff of those facilities who report errors and reward them if possible. Time should be spent attempting to identify structural (staffing, equipment, supplies) issues that may have resulted in errors. The facility leadership's ideas of how to correct the deficiency should be obtained and discussed when indicated. Facility leadership should be made aware of any OHS initiatives to solve the problems that caused the errors. Local corrective actions that they have attempted to fix the problems should be discussed. Those facilities that have not submitted any adverse events should be instructed how the system works.

8. Half of the errors in the 50 reported events resulted in a chart review sufficient to gather more details. In many of these chart reviews a cascade or errors was identified. This demonstrates the benefit of record review for as many charts as possible.

9. Reports, such as a fall due to a broken grab bar, etc., should be immediately remediated by a call

70

to the HCUA to fix the problem. This can be documented and tracked and followed up with an email to see whether the problem was fixed.

10. Reports that are repetitive, such as negative air pressure not working, for more than three episodes, needs to be escalated up the administrative chain.

11. Frequent adverse events should be the basis for initiating a patient safety initiative. One suggestion is for Regional Coordinators to meet with a group of HCUAs where frequent adverse events occur and to discuss how the events could be prevented. With that information, initiatives can be developed for trial.

12. Data from adverse events, including numbers and types of adverse events, corrective actions developed by type, and the number of corrective actions successfully accomplished should be tabulated and used in every annual comprehensive audit as a measure of facility's progress.

13. The Monitor has consistently recommended, including in the Implementation Plan, that a dedicated person be responsible for the adverse event system. Currently, the Agency CQI Coordinator manages this program but has other responsibilities. As this program exists, the workload exceeds the capacity of the Agency CQI Coordinator. The Agency CQI Coordinator is currently unable to manage adverse events.

14. Four of the five corrective actions initiated as a result of adverse events were initiated by the Compliance Unit. The corrective actions initiated generally conform to the Compliance Unit's typical methodology which has been to "educate" the staff. The process is typically the problem and the focus of the Compliance Unit on staff behavior will result in inability to make forward progress. Also, the Monitor has concerns of the participation of the Compliance Unit in the quality program as their participation is not governed by policy. The data they gather can be useful, but it must be consistent with OHS policy and procedure. It appears that they are initiating corrective actions which is also not governed by policy.

In summary, the policy for adverse events is not appropriate. It should be a separate policy and should include all expected steps in the process. Adverse events are being collected. Categorizing and analyzing these events is in its initial phase and needs additional work. Descriptions of events, though not completed for all events, is reasonable. Corrective actions need to focus on the root cause of the adverse event in order to develop an appropriate corrective action. Certain repetitive adverse events, such as medication management issues, should be forwarded to the pharmacists engaged in the process analysis of medication management. Data support needs to be provided to make data collection and analysis more effective. A partial compliance rating is warranted.

**RECOMMENDATIONS:**

1. Adverse event reporting needs to have capacity to allow anonymous reports. Staff need to be encouraged to reports errors and believe that report of errors will not result in discipline.

2. Hire data staff with expertise in software design and data management who can assist with the design and management of the adverse event software.

3. Develop a policy on nurse to provider communication that includes documentation requirements of both the nurse and provider. All on-call provider communication should result in documentation of the call in the medical record.

4. Assign a dedicated individual to manage the adverse event reporting system.

5. Begin performing corrective actions.

**Vendor Monitoring**
*Addresses II.B.2.*
**II.B.2.**   *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care.  This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**:  Noncompliance

**FINDINGS:**

Two documents were requested to evaluate this provision. Document request #38 was to provide any procedure (and instrument) used to monitor performance of vendor.  IDOC stated that an updated audit tool to monitor performance of the vendor is being established.   Document request #39 was to provide any statewide and facility vendor monitoring reports. These monitoring reports were provided.

IDOC provided current vendor monitoring reports for the twelve months from June of 2023 to May of 2024.  Each month averaged 17 facilities being monitored and mostly the same facilities were monitored every month.  At least 13 facilities did not provide monitoring reports. The monitoring instrument consisted of 317 questions in a "yes" "no" "N/A not applicable" format.  Most questionnaires were filled out by HCUAs but at least one was filled out by an assistant warden.  No data or record review was provided in answering any questions except for the hours worked by position category in the schedule E staffing requirement and it isn't clear what information the reporter used in giving answers.  The number of questions is significant and an HCUA could not reasonably perform this contract monitoring alone for all questions. Multiple sections related to provider and dental care and the HCUA lacks training to evaluate provider and dental care.

Questions are grouped by areas including: ***the contract***; ***administrative directives*** sorted by topic (medical, hunger strike, report of death, disability, etc.); and lastly ***staffing***.

**Contract issues**
Questions on contract issues seldom address performance. Clinical medical care is addressed in section 2.2.  Questions on chronic illness include only five questions.  None of the questions addresses whether the patient's chronic conditions were managed appropriately and there is no question whether all of the patient's chronic conditions were managed consistent with standards of care.

There are no questions on specialty care referral and whether it is appropriately ordered when necessary nor whether it is timely.  The only question  the Monitor could find for specialty care was related to reporting to IDOC that someone went to see a consultant.  This question (2.9.3.2.1.2) is described as follows,

> All outpatient referrals, including i) offender name, ii) birth date, iii) Offender IDOC number, iv) facility name, v) Diagnosis with Primary Diagnosis Code, vi) Treatment received, vii) Referring physician, viii) referral physician; ix) Hospital or non-hospital based

This question is not meaningful as it does not address whether patients with specialty care needs had timely access.

At Dixon, where specialty care is inadequate with considerable backlogs, the score for this question was "yes". Dixon has considerable issues with patient not getting referred who need referral, considerable dangerous backlogs for specialty care, and problems with communication with specialists and with follow up of specialty consultations. None of these problems are addressed with this monitoring tool.

Most of the questions for clinical care, which are in the contract section of this instrument are meaningless and will not portray the real conditions at facilities nor the performance of the vendor.

**Administrative Directives**
The six sections on administrative directive monitoring are based on Administrative Directives which are dated and not based on current IDOC policy and monitoring would not be meaningful if done. Facilities also do not evaluate all administrative directives. In March, 2024 Graham evaluated two items in the "medical administrative directives and clinical performance" tab; Graham evaluated two, and Lawrence evaluated three, and Hill evaluated 26. It appears that evaluation of adherence to administrative directives is elective. Most questions on performance issues in this administrative section only ask whether an event occurred not whether the performance was adequate. As examples, these questions are:

- Question related to AD 0403101.G.2.b (2).(c) asks "Annually, offenders who have had a positive test [TB skin test] shall be provided education on the signs and symptoms of active disease". *The question should focus on whether the patient has been treated with prophylaxis or whether the patient needs a chest x-ray to evaluate for active disease.*
- Question related to AD 0403103.F.6.c asks "When an offender for non-emergency medical attention results in referral to a primary care physician by the screening health care staff, the primary care evaluation shall take place within 72 hours or upon the next scheduled visit by a primary care physician". *This question does not address whether the referral was timely based on the findings of the nurse nor whether the primary care provider evaluation was adequate.*

Both the contract section and the administrative section are not meaningful measures with respect to the Consent Decree because they do not address clinical performance nor do they meaningfully address requirements of the Consent Decree.

**Staffing**
The third area of vendor monitoring is staffing. The Monitor was provided approximately only half of facility monitoring reports and no aggregate statewide staffing data was provided. It appears that only half of facilities track staffing vacancies.

For facilities that complete the monitoring report, vacancies and hours worked seemed accurate but some discrepancies were noted. For example, in March of 2024, the vendor sent the Monitor information that the Taylorville Medical Director was 0.125 filled but the IDOC monitoring report, reported a vacancy which was accurate. Apparently, the vendor has a fill-in physician who works five hours a week and counts that as a Medical Director, which is inaccurate and inappropriate. IDOC did not give credit on its

73

monitoring report for the 0.125 physician hours worked.[135]  If a locum tenens physician or coverage physician is providing service, the Medical Director position should not be credited but a physician position should be credited unless the locum position is filled for more than six months by a single physician and the physician fulfills expectations of a Medical Director position.

All IDOC facilities should track the vendor hours worked and vacancies and IDOC should report these regularly to OHS.  This would inform OHS management of the status of vendor and IDOC staffing[136]. The Monitor was provided a Facility Reconciliation Worksheet-Q3'24-Lippert, which was one of the better staffing documents provided to the Monitor.

For all three areas of vendor monitoring (contract monitoring, monitoring against administrative directives, and staffing) the Monitor was not provided with any corrective actions related to specific deficiencies.  IDOC sent only nine communications to the vendor since 2021 that were related to contract monitoring.  These deficiencies are only a fraction of the deficiencies the Monitor has identified.  Staffing, in particular is widespread and dangerous, particularly with respect to physician staffing.  Based on these communications, there does not appear an effective corrective action methodology to address contract and performance deficiencies of the vendor.  A summary of the letters is given below.

1. On 9/14/21, IDOC sent the vendor a letter, documenting staffing deficiencies at Western Illinois Correctional Center that were also apparent statewide.  The letter stated that 23% of RN hours, 34% of LPN hours, and 35% of Nurse Assistant hours were not filled with an overall vacancy rate of 39% at the facility.  The letter mentioned that on one day there was no RN working on the day shift.  Because of the low staffing level, IDOC security was asked to move infirmary patients elsewhere.  In addition to infirmary care, medication administration was also affected adversely. IDOC stated that agency staffing would not be reimbursable and detailed monetary credits to IDOC for these vacancies.  In June of 2024, information the Monitor has received about staffing at this facility showed 11 RN positions all of which are vacant; 17 LPNs all but one being vacant; the only nurse supervisor position is vacant; and six nurse assistant positions all of which are vacant.  This is an overall staffing vacancy of 97% as compared to a 39% vacancy documented in 2021.  Aside from the monetary penalties no follow up corrective action was noted.
2. On 1/13/23, IDOC sent the vendor a letter documenting eight infractions of administrative directives at Western Illinois Correctional Center that were not effectively accomplished due to lack of staffing.  The letter documented a meeting that occurred early in 2023 about the deficiencies and presumably staffing and noted that follow up would occur.  There was no documentation of the result of follow up.
3. On 2/8/23, IDOC sent another letter to Western Illinois Correctional Center.  It stated that a new nurse arrived for work at the facility without any advance notice but without appropriate training the nurse could not be assigned for work which resulted in delay in care.
4. A complaint was sent to the vendor on 1/30/23 about a backlog of 150 individuals for orthopedic care at one facility.  A plan to address it was requested.  But that plan was not sent to the Monitor

---

[135] The Monitor is actually uncertain regarding the accuracy of this discrepancy.  But it demonstrates the discrepancy between vendor and IDOC reporting, lack of standardized definitions of vacancies, and potential for mis-reporting information, including to the Monitor.

[136] On monthly calls with OHS, staffing numbers in certain areas are questioned and OHS has a difficult time responding with any precision and cannot refer to a staffing document that can give this information.

but on a recent visit on 6/4/24 to the same facility, the Monitor was told that orthopedic appointments take a year and a half to schedule so apparently nothing has been accomplished.

5. On 4/21/22 a letter was sent to the vendor about a provider working at Menard who refused to perform intake evaluations for three individuals resulting in an administrative directive violation. The provider refused to evaluate the patients because he was the only provider onsite and didn't have time to do the evaluations and his other work. There was no follow up to this report. This facility has two physician and three mid-level provider positions. A physician position is vacant and another is filled with a locum physician but at the time of this letter, the may have been two physician vacancies.

6. On 6/28/22, a letter was sent to the vendor about a dentist vacancy since November of 2021at the Hill facility. This position had been vacant since seven months prior to the letter. The letter detailed the number of backlogs which were considerable. The vendor was asked to respond to the complaint within five days. A document sent to the Monitor to verify staffing, dated 6/30/23, showed that the position was still vacant. A document, sent to the Monitor to verify staffing, from March of 2024 showed the facility had a half time dentist.

7. On 7/15/22 a letter was sent to the vendor about inability to order controlled substances at Graham due to a Medical Director vacancy. The Regional Medical Director was contacted but, according to back and forth emails, the Regional Medical Director's response was not effective in maintaining sufficient supply. IDOC requested a vendor response by 7/22/22. Staffing information as of 6/30/23 provided for the Monitor's 7th report indicate that the Medical Director position at this facility was still vacant. One document provided for the Monitor's 8th report in May, 2024 indicated the position was not filled but another document provided for the 8th report in June, 2024 documented the Medical Director at this facility was filled with a 30 hour a week locum tenens position.

8. Another letter sent on 7/29/22 regarded staffing shortages at Illinois River Correctional Center and mentioned that this was a statewide issue. The facility vendor staffing had a 68% staffing vacancy of registered nursing (RN) and licensed practical nursing (LPN). As part of the impact of the staffing deficiency, the letter detailed backlogs of 486 physicals, 231 chronic clinic visits, 23 physician sick calls and about 260 medical furloughs. No follow up was suggested. Based on data received for the Monitor's 8th report about two years later in June of 2024, the current registered nurse and licensed practical nurse staffing is dramatically worse than it was in July of 2022 (92% vacancy in June of 2024 versus 68% vacancy in July of 2022).

9. On 1/19/24, IDOC sent a Notice of Complaint to Vendor listing the HCUA from Centralia as the contact person stating that the vendor failed to properly provide RN training, oversight, conduct audits of treatment protocols, failure to conduct nurse credentials and privileges and failure to complete physician referral all related to administrative directive 04.03.12: treatment protocols. There was no follow up.

If these letters represent all communications about corrective actions, IDOC has only infrequently notified the vendor about problems. However, they do demonstrate an inability or unwillingness of the vendor to change.[137] Given that only two companies bid on the recent contract it is unclear if a willing capable vendor is available. Under these circumstances, IDOC must develop an alternative strategy if it wants to make progress in compliance with the Consent Decree.

---

[137137] See particularly letters 1-3 which showed a deterioration in staffing rather than an improvement.

We do note that certain aspects of a functional health program relate to leadership in quality, implementation of policy, and in engaging in corrective actions. These areas of service are not evaluated at all. Currently, vendor physicians, during Monitor tours, are typically unaware of OHS clinical initiatives, do not participate in quality improvement, do not read or know what the new policies are, and appear disengaged from initiatives OHS is attempting to do to move forward toward compliance. These leadership areas are also not evident in the vendor's regional leadership. This leadership issue is absent from current IDOC vendor monitoring but is essential if IDOC is to move forward.

In summary, the current IDOC vendor monitoring methodology does not meaningfully evaluate performance or adequacy of the vendor. Vendor staffing is effectively tracked by some facilities but the information is not collated or used effectively to describe the performance of the vendor with respect to staffing. The Monitor has been told by IDOC that they are developing an updated vendor monitoring tool related to the new contract with the vendor. The Monitor was not given a draft of this instrument and the contract is not yet completed. However, the Consent Decree requires an audit process (II.B.9) and since the Monitor's 2nd Report, the Monitor has recommended that vendor monitoring use a comprehensive audit (II.B.9.) that covers all aspects of the Consent Decree to monitor the vendor's performance as required in II.B.2. If this is not done, IDOC would still need to develop an adequate vendor monitoring instrument that is comprehensive and consistent with Consent Decree requirements. Because meaningful monitoring is not performed and an instrument to do so is not completed this provision continues to warrant noncompliance.

**RECOMMENDATIONS**:
1. IDOC needs to develop a meaningful vendor monitoring system that monitors quality of care, physician quality, and ability to hire contracted staff against contract requirements. This can be joined with the comprehensive audit process that would include mortality review, performance and outcome measurements, adverse event reporting and staffing. Monitoring should be standardized across facilities so comparisons can be made. The Monitor's recommendation is to provide this service through the audit team.

**Mortality Review**
*Addresses items II.B.6.i; III.M.2;*
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
Multiple documents were requested. In document request #44, the Monitor asked for a current mortality list up to March 2024. The mortality list should include the name, IDOC #, date of death, date of birth, age, date of incarceration, facility at time of death, category of death (natural, accidental, homicide, suicide), cause of death (presumptive if autopsy not done), death expected or unexpected, autopsy done Y/N, date of autopsy, mortality review completed. **This list should be provided quarterly**. The mortality list was provided. It is not provided quarterly and does not include the cause of death.

Copies of the mortality review committee meeting minutes to date and copies of death summaries completed by the Responsible Facility Healthcare Provider as they are generated were provided.

IDOC has given access to a link to access the death charts, mortality reviews, autopsies that are done, and SIU REDCap mortality reviews.[138]  This shared folder has worked well.  Real time access to REDCap to obtain data from it would be useful to the Monitor.

The Monitor requested a list of corrective actions or process analyses initiated due to mortality reviews, performance and outcome measures, adverse event reports, or any other reason and  any report that identifies corrective action sent to facility quality improvement committees along with any follow up of corrective actions issued by the System Leadership Council.[139]  However, no corrective actions have been initiated through mortality reviews.

Before the Monitor's 7th Report, IDOC sent the Monitor draft policy A.06.02 QI: Mortality and Morbidity.  The Monitor reviewed the policy and returned comments to IDOC.  The final policy promulgated in February, 2024 was titled A.06.02 QM: Adverse Clinical Event Reporting, Morbidity and Mortality Review.  New material was added and there were multiple changes to the document.  Areas where the Monitor has concerns on the final policy include:

1.  The policy provided to the Monitor for review was altered by including procedures for adverse events into the mortality policy.  This is discussed above in the Adverse Event section of this report.  These are separate areas of service that should be discussed in separate policies.
2.  The Monitor recommended in the IDOC draft policy that procedures for obtaining an autopsy be under medical direction.  This  policy does not discuss autopsy but a different policy (A.10.01) assigns this responsibility to the Warden.  Ordering an autopsy should be under medical control.
3.  A major deficiency in the new policy is that policy and procedure statements do not give clear or effective instructions for how deficiencies are to be addressed, specifically how corrective actions are developed, assigned, and monitored.  The procedure seems to state that a final mortality review is provided to facilities for them to figure out what corrective actions need to take place but the facility CQI programs and CQI staff are not equipped at this time to undertake this responsibility and it is likely this is why no progress has been made to date on corrective actions.
4.  There are no procedural steps that include who does what and what role is expected of each of the staff who participate in the mortality review.[140]
5.  The policy includes a definition of the Morbidity and Mortality Review Committee (M&M) as a "Group of academic medical providers who review all IDOC deaths" but in procedure section II.B., this committee is defined as including the Agency Medical Director, Agency Deputy Chiefs, Agency CQI Coordinator, Agency Director of Nursing, and Office of Correctional Medicine Physician chair, additional physicians, RN, and pharmacist as needed.  The definition of the Morbidity and Mortality Review Committee should be internally consistent.
6.  The Agency Medical Coordinator should participate on the Morbidity and Mortality Review

---

[138] These are document requests 47, 48, 49, and 51.

[139] Document requests 52 and 53.

[140] The policy states that after a death the Office of Correctional Medicine will complete a mortality review.  But who does what, and what expectations are is not stated.  In practice a physician, nurse practitioner and/or a nurse and a pharmacist perform the review.  The responsibility to fill out the REDCap data form and the roles and responsibilities of the RN, advanced practice nurse, pharmacist and physician in the process are not stated.

Committee[141].

7. The policy does not give any details of the responsibilities of the Morbidity and Mortality Review Committee except that they listen to a presentation of the findings of the mortality review.[142]

8. After the Morbidity and Mortality Committee meeting, the Agency Quality Improvement Coordinator provides findings of the committee[143] to multiple individuals including the vendor and facility clinical leadership. No one has responsibility for assigning corrective action and facilities, apparently, are expected to determine what to do with the findings. This has not been effective as no corrective actions are evident.

9. Procedure item II.G. defines the role of the System Leadership Quality Council.[144] The System Leadership Quality Council's role is defined solely as identifying root causes for deficiencies which may be amenable to staffing or policy changes. This is a significantly limited responsibility. The Monitor had recommended that the Morbidity and Mortality Review Committee recommend corrective actions and that the System Leadership Quality Council analyze those recommendation and assign facility specific corrective actions, assign further root cause systemic analyses, or specific systemic corrective actions. This is not what IDOC chose to do. Instead, the policy gives the Morbidity and Mortality Review Committee no responsibility and gives the System Leadership Quality Council limited responsibility to review findings and identify root causes that might result in policy or staffing changes. Facilities are responsible for reviewing the mortality review and enacting corrective actions. This practice which has been in place for some time has been ineffective. Facilities have taken no responsibility to act on mortality reviews and do not have authority to make some of the changes necessary to correct the identified problems. The policy should be revised to give effective direction.

10. Procedure II.H. states that the System Leadership Quality Council's final "determination" after review of the mortality review is sent to each facility's Quality Improvement Coordinator to establish corrective actions. It is unclear how "determination" is defined. The statement is vague and needs clarification. Minutes of the System Leadership Quality Council do not document any determination with respect to mortality reviews. Facilities and especially facility QI coordinators are not currently capable of developing corrective actions.[145]

---

[141] Many deficiencies in mortality reviews are non-clinical or operational including medical record issues, supply issues, inability to send or receive appropriate reports or communications between providers, lack of staffing, etc. These operational issues are essential support for clinical staff and must be evaluated with respect to actionable changes. In the draft document, the Agency Director of Nursing was, in effect, the chief operation officer and the Monitor recommended she be part of the Morbidity and Mortality Committee. The Monitor has since recommended that the Medical Coordinator be in charge of operations and the Director of Nurses in charge of nursing. For this reason, the Monitor recommends both the Medical Coordinator and Agency Director of Nursing be part of the Morbidity and Mortality Review Committee.

[142] Procedure II.E. describes what the Morbidity and Mortality Committee does. "Upon completion of the mortality review, the case is presented to the Mortality and Morbidity Committee within thirty (30) days after the completion of the mortality review. The presentation will include the case summary, findings of each case reviewed, factors that may have prevented or contributed to the death, and other information that will assist in improving the quality of healthcare of IDOC patients in the future". This does not describe any responsibility.

[143] Based on the procedure, it is not clear what the finding are. Presumably, they are the REDCap mortality review but it is unclear.

[144] Section II.G. states, "The System Leadership Quality Council shall review all pertinent findings from the Mortality and Morbidity Committee to identify root causes or issues that could contribute to the findings, which may be amenable to policy or staffing changes, or may require a plan of action to mitigate the situation, including referring the case to OCM for process evaluation and revision."

[145] One facility has an Assistant Warden who is the CQI Coordinator. How can an Assistant Warden of Programs supervise or construct a corrective action for a mortality review?

In past reports, the Monitor has repeatedly stated that IDOC does not provide death charts to the Monitor. SIU reviews all deaths and collects the death charts for those reviews. IDOC has now provided the Monitor a link to a secure site containing the SIU death charts,[146] This link has worked well with respect to receiving records as long as IDOC understands the resultant time delay in mortality reviews.[147]

The tracking log of deaths provided to the Monitor does not include date of incarceration, cause of death or whether or when a mortality review was completed. The cause of death needs to be included in tracking deaths as it is a significant factor in mortality review. The date mortality review is completed should also be documented on the tracking document.

The Monitor has recommended that an autopsy be done so that cause of death is more likely to be identified which will assist in identification of deficiencies. It is important that autopsies be done for unexpected deaths as their cause of death is more likely to be uncertain. Policy A.10.01 Procedures in the Event of an Individual in Custody Death[148] calls for the Warden to request an autopsy which is consistent with Administrative Directive 01.12.111.[149] This is unchanged from past practices. IDOC provided two sources of autopsy data. One was provided in the REDCap data tab "Autopsy".[150] This data did not give the date range of deaths but stated that the number of deaths was 163. The autopsy data tab documented that of the 163 deaths, 10 had missing data. Of the remaining 153 deaths, 56 had autopsy, 54 did not have autopsy and in the remaining 43 it was unknown if an autopsy was performed.[151] The second source of data on autopsies was a mortality list[152] for deaths from 1/1/22 to 5/15/24. This mortality list had 179 deaths. It documented that 91 (50.8%) had autopsies. Thirty-seven (20.7% of all deaths) did not have autopsies and for 51 (28.5% of all deaths) it was unknown whether the patient had an autopsy.[153] Of the 88 deaths without autopsy, 44 were unexpected deaths and eight did not give information of whether the death was expected or not. Autopsies are not being done consistently even when the patient was not

---

[146] For example, mortality patient #1in the Mortality Review addendum died in November of 2023. He appears in the link in the month of April, 2024. checked in August it only provided information as of May 2024. Also, a death in Menard was announced in the quality improvement minutes in June of 2023 but appeared on the secure site when the Morbidity and Mortality committee reviewed the death in March of 2024, approximately nine months later. Thus the secure

[147] The deaths charts are provided in the month when the Morbidity and Mortality review occurs. This is typically many months after the death. IDOC should be aware then that mortality reviews by the Monitor will be for events that occurred at least a year or longer before the date of reports which is a result of the manner of providing data. The Monitor has no objection to this method as it has been the most effective way, to date, of providing records. This will presumably not be a problem after the electronic record is implemented. However, it does mean that mortality reviews occur for deaths about a year to a year and a half prior to reports of the Monitor.

[148] Policy A.10.01 Procedure in the Event of an Individual in Custody Death in procedure II.B. states, "At the time of death, the Shift Supervisor or DAO shall immediately notify the CAO or back up DAO, who shall notify the Agency Medical Director and request
a medical autopsy". This direct the Warden or duty administrative officer to request the autopsy

[149] Administrative Directive 01.12.111 Reporting Deaths effective 12/1/22 states that the "Chief Administrator [warden] shall immediately notify the Agency Medical Director, who may recommend an autopsy". This slightly different from the policy which states, At the time of death, the Shift Supervisor or DAO shall immediately notify the CAO [warden] or back up DAO, who shall notify the Agency Medical Director and request a medical autopsy".

[150] This was in document request #51 and was labeled OCM-REDCap IDOC Clinical Mortality Review Data Compilation Samples July 1-2022-March 19, 2024.

[151] It is unclear how IDOC could not know whether an autopsy was done.

[152] This was data request #44 and the document produced was labeled Mortality Data Report – January 1, 2022 to May 15, 2024.

[153] Again, it is unclear how IDOC could not know whether an autopsy was done.

expected to die which occurs in about half the deaths. Even when autopsies are done, the results are sometimes not included in the death record. The Monitor only receives autopsies that SIU obtains and places in the mortality review folder.

By policy, the Warden is to order an autopsy but in practice Wardens do not appear to make this decision. The 1st data set, that included 163 deaths, was from REDCap and listed only 12 deaths for which it was known who disapproved the autopsy. In seven of the 12 cases, the determination was made by a local coroner and in five determination not to perform the autopsy was made by "others". The 2nd data set from IDOC included 179 deaths. For these 179 deaths 37 deaths were known not to have an autopsy. For these 37, the decision to not perform the autopsy was made by local coroners in 24 (65%) of cases, or by physicians, including a facility physician, in 12 (32%) of deaths[154]. IDOC does not know whether an autopsy was performed in a significant percent of deaths (26% in one dataset and 29% in a 2nd dataset). It also appears that the Wardens, in many of these cases, are not making the decisions about performing an autopsy[155] and autopsies are not consistently done when the cause of death is unknown or when unexpected deaths occur. The decision to order an autopsy should be a medical one not a custody one, with the exception of potential violations of security rules or potential custody involvement in the cause of death (homicide, use of force, etc.). The current practice assigns the warden the responsibility to order autopsies but the wardens do not assume that responsibility and the decision appears left mostly to persons not associated with IDOC. That IDOC does not know whether an autopsy is done in a large percent of deaths speaks to indifference to this issue.

The Monitor recommends that the cause of death, even if presumptive, be listed for all deaths. This helps to track cause of death which helps IDOC determine where it needs to focus to prevent future deaths. The SIU REDCap mortality reviews include cause of death as a data entry value. However, the mortality list provided by IDOC does not include cause of death. This makes mortality review less effective in identifying ways to prevent future deaths. The cause of death should be tracked for all deaths and should be represented on the mortality list.

The Monitor has been told that all deaths are now undergoing death review. SIU told the Monitor that approximately 190 mortality reviews have been done as of June 2024. The Consent Decree requires that mortality reviews are meant to identify deficiencies so that corrective actions based on deficiencies can improve care. Currently, deficiencies are identified but recommendations for corrective actions have not yet been initiated.[156] In the last report, the Monitor suggested that the categorization of deficiencies did not promote actionable recommendations for corrective actions. No information has been provided that any changes have been made.

Much of the mortality review is collection of data. The REDCap data form used by SIU for mortality review has been modified since it was initially provided to the Monitor in May of 2022. Pharmacy and vaccine data questions have been added and a few other changes made to other questions. Much of the data is quantitative data in a yes/no format. Policy does not describe who collects the quantitative data.

---

[154] In one case it was not known who made the decision.
[155] The Monitor believes OHS should make this decision.
[156] The Morbidity and Mortality Committee minutes document the list of opportunities for improvement (deficiencies) but the committee discussion section typically states that the opportunities for improvement were discussed and the committee "agreed with the reviewer's recommendations". No recommendations are provided and it appears that IDOC considers the deficiency findings as recommendations. A finding of deficiency is not a recommendation. A recommendation is a proposed course of action related to the identified deficiency in order to correct the deficiency. There is no evidence that this occurs.

Qualitative data, presented in a narrative format, is mostly identification of deficiencies conducted at the end of the REDCap form in the opportunities for improvement section. Based on information in the REDCap report, qualitative data collection is completed separately by nursing or advance practice nurses, physicians, and a pharmacist. No evidence has been provided that the qualitative data has been analyzed or used to inform corrective actions or follow up. The Monitor has not been given permission to access REDCap for the purpose of analyzing data entries. IDOC should permit this access so that deficiencies can be analyzed.

IDOC has provided[157] a summary of REDCap data. This document consists of a spreadsheet with six tabs[158] Four of the tabs used data from 163 deaths. One tab used data from 154 deaths. A sixth tab used an unknown number of deaths to generate the data. The last tab, (S8 Improvement) is the qualitative narrative data. The data in this tab is not self-explanatory. The numbers provided for each of the individual nine opportunities for improvement do not add up to the total count of all opportunities for improvement and percentages of each of the nine categories added up are 324%. There is no explanation of the meaning of the numbers in this tab. These qualitative narrative data would be the most useful in developing corrective actions because it is the only section that exclusively identifies deficiencies and identifies almost all of the deficiencies. More work needs to be done to subcategorize and analyze this qualitative data in order to develop recommendations for corrective action. Some suggestions were provided in the Monitor's 7th Report.

The chronic illness (S4) section of SIU's REDCap quantitative data form is based on a legacy administrative directive.[159] The IDOC has promulgated new policies in February of 2024 but the quantitative data questions are not based on these new policies. The Monitor sees numerous opportunities to develop additional data questions that qualitatively evaluate performance using the newly promulgated policies as the basis of the data question. The Monitor gave suggestions in the last report on ways to analyze the current deficiencies identified in the opportunity for improvement section of the REDCap mortality review. But there is still no analysis of the data obtained in the mortality reviews that has resulted in a corrective action. Data elements should be modified and categorized in a manner to ensure that they contribute to identification of corrective action and promote forward progress towards compliance with IDOC policy and with the Consent Decree. Much work needs to be done to create qualitative questions in REDCap that would more accurately judge adherence to current IDOC policy and Consent Decree requirements.

When a death occurs, SIU begins the process of obtaining the medical record and associated documents needed for the death review. When the chart is obtained, the SIU team conducts a review. The reviews

---

[157] This was in response to document request #51. IDOC provided "OCM – REDCap IDOC Clinical Mortality Review Data Compilation Samples July 1, 2022 – March 19, 2024".

[158] These tabs include: 1) Patient information which is mostly demographic data; 2) Incident which are questions about the incidents surrounding the death; 3)Medical history which is about the chronic illnesses of the patient with some data on how chronic care was addressed and associated chronic conditions; 4) Mental health which has data questions on mental health; 5) Autopsy which has questions about whether an autopsy was done and the category of death; and 6) Opportunities for Improvement which are narrative entries identifying deficiencies by a nurse and/or advanced practice nurse, a physician and a pharmacist.

[159] The REDCap question C1 asks whether chronic illness patients were seen at appropriate intervals. But the intervals are ones used in the old Administrative Directive 04.03.105 Chronic Illnesses which describes seeing patients in separate clinics for every individual disease. New OHS policy was promulgated in February of 2024 but the REDCap data questions have not been correspondingly modified to match new OHS policy.

consist of gathering dozens of data facts.[160]  Up to four individuals, a nurse and or a nurse practitioner, a pharmacist, and a physician, conduct a qualitative review of the medical record using the REDCap data form as described above.   Each of these reviewers list deficiencies as opportunities for improvement which are provided in narrative format in item S8 of the REDCap form.  Only rarely is a recommendation included in their narrative and, as a routine,  recommendations  and corrective actions are not provided. The results of the death review are then sent to and reviewed by a Morbidity and Mortality Committee. As described above, policy does not define what the Morbidity and Mortality Committee does and minutes of the Committee do not describe any actions.  Meeting minutes of the Morbidity and Mortality Committee meetings provide a brief presentation of the details of the case then list the deficiency findings but do not include recommendations on actions to be taken to correct deficiencies.   No final analysis with recommendations is documented in meeting minutes except for typically agreeing with the deficiencies noted by the mortality reviewers.   After the Morbidity and Mortality Committee meeting the final mortality review is sent to facilities by the Agency CQI Coordinator for the facilities to determine corrective actions.  The results of the Morbidity and Mortality Committee review are also sent to the System Leadership Quality Committee.  Policy A.06.02 assigns limited responsibility to the SLQC. Meeting minutes of the SLQC also do not include any discussion of analysis or recommendations to be taken either by OHS or by facilities.  The SLQC  meeting minutes often conclude with a statement stating, "Committee discussed proposed OFIs and agreed with reviewers' recommendations".   This statement references "reviewers recommendations" but there are no recommendations in the SIU mortality reviews, Morbidity and Mortality Committee minutes, or SLQC meeting minutes.  So, a key requirement of the Consent Decree to undertake corrective action based on deficiencies is not being done in practice and a means to undertake corrective actions based on analysis of deficiencies is not established in policy.

Both policy and existing practice mirror what IDOC has been able to accomplish to date. Both stop at the identification of deficiencies.  Policy does not describe how to analyze deficiencies, who is to analyze deficiencies or how the analysis of deficiencies is to result in corrective action and how it is determined whether deficiencies are systemic or facility specific. In practice, there is no evidence of analysis of findings in the Morbidity and Mortality Review Committee, no development of corrective actions, and no tracking of corrective actions assigned.   There have been no root cause or other analyses of systemic findings, and no facility specific corrective actions that have been assigned.

Within five days of the conclusion of the Morbidity and Mortality Committee meeting the  Agency CQI Coordinator is assigned to deliver mortality reviews to the Facility Medical Director, Facility CQI Coordinator, and HCUA and is to present findings at the next scheduled System Leadership Quality Council. Policy is not clear regarding what document is actually sent to the facilities.[161]  The Monitor was told by the Agency Quality Improvement Coordinator that facilities are provided the mortality reviews and that some facilities have created corrective actions based on the opportunities for improvement. However,  there is no evidence in facility quality improvement meeting minutes of facilities that have initiated corrective actions based on mortality reviews.  The only reference we could find of discussion at CQI meeting was in the April 2024 CQI meeting minutes from Vandalia.  The statement said:
> "Reviewed the death of [inmate #] on 3/22/23. Discussed the opportunities to improve. Not fully sure on those opportunities. Waiting to get more guidance from OHS, IDOC, & WHS."

---

[160] It is unclear in policy who collects or fills out the REDCap data form.
[161] Presumably this is the REDCap mortality review that the Monitor receives, but the Monitor is unclear and the policy does not state what document is sent to the facilities.

This demonstrates that facilities are unprepared to address these opportunities for improvement. Because no corrective actions have been assigned or initiated no forward progress is being made. Facilities are expected to develop their corrective actions but apparently are unprepared to do so.

When recently at NRC and Stateville, the NRC CQI Coordinator was unaware of the mortality review process and had not reviewed any mortality reviews. The Medical Director recalled one death since becoming Medical Director and had no comments on the mortality review. At the Stateville facility, the HCUA was unaware of SIU mortality reviews and didn't know who decided to temporarily assign the CQI Coordinator. There was no CQI Coordinator and the Medical Record Director was given this as a temporary responsibility, apparently by the Warden. The Medical Director was unaware of any SIU audits and wasn't involved in the quality program but goes to meetings when she can.

In summary, it is positive that all deaths apparently are reviewed and IDOC established a link for the Monitor to obtain mortality records. The newly promulgated policy needs revision. The Monitor will send comments in the usual manner. While Wardens are responsible for ordering autopsy, for a significant number of deaths it isn't even known whether an autopsy was done. Many autopsies are not done based on orders by non-IDOC persons (coroners, hospital physicians, and even a facility physician). Autopsies should be under OHS control. The cause of death is not tracked on the current mortality list but this needs to be done. The SIU REDCap database has been modified over time and will need further revisions. IDOC should give the Monitor access to the REDCap database. The Monitor strongly recommends development of qualitative questions based on new IDOC policies and Consent Decree requirements and development of a methodology to analyze qualitative narrative data entry in order to develop appropriate corrective actions. The purpose of the Morbidity and Mortality Committee and System Leadership Quality Council need to be defined in policy with respect to identification of corrective actions, assignment of corrective actions, monitoring of corrective actions and determining whether deficiencies are systemic or facility specific and how these should be addressed. Facilities are not yet advanced enough nor do they have sufficient staffing, at this time, to develop corrective actions. The vendor Regional Managers and Regional Medical and Nursing Directors play no role in corrective actions but should be held accountable for correcting operational issues[162] and clinical ones.[163] The System Leadership Quality Council should be responsible for this assignment. This provision still warrants a partial compliance.

**RECOMMENDATIONS**:

1. IDOC needs to make REDCap accessible to the Monitor and his team.
2. The mortality review committee meetings should be open to the Monitor and his team.
3. IDOC needs to consider comments to the policy on mortality review at their next policy revision.

# Medical Records

### Addresses item II.B.4; III.E.3; III.E.4; III.G.3
**II.B. 4.** *No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities. Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract.*

---

[162] Scheduling appointments, staffing, communication between consultants and IDOC providers, getting reports, etc.

[163] Provider and nursing clinical errors, not acting consistent with standard of care, not communicating with consultants, not following up on consultant recommendations, delays in initiating offsite diagnostic testing or consultation, etc.

**III.E.3.** *IDOC shall abandon "drop-filing".*
**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*
**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**OVERALL COMPLIANCE RATING:**  Partial Compliance

**FINDINGS:**

IDOC promulgated policy H.01.01 Organization, Maintenance and Governance of Health Records in February of 2024.  The Monitor's comments were submitted at the time IDOC promulgated the policy and the Monitor's comments were not addressed and IDOC has said they would address these comments in the next annual policy revision.

This policy had several references to documentation in the electronic record (e.g., cut and paste, copy forward, cloning, etc.) but procedures for use of the electronic record were not included in this policy and should be established in advance of the implementation of the electronic record.  Items not included were:

- The Monitor recommends that a health record be initiated on the day of arrival to IDOC.  Currently, at NRC, patients have a folder in which medical record documents are maintained until before the patient leaves for a permanent institution.  This results in lost paperwork and is a patient safety risk.  In the past the reason for this practice was lack of staffing, lack of space, and lack of maintenance of a secure record.[164]
- The Monitor recommended to maintain preventive screening data  but this is not in the policy.
- IDOC implies but does not state that progress notes must be maintained.

- IDOC does not include a statement to maintain advanced directives, physician orders for life sustaining treatment (POLST), and health care power of attorney documents in the medical record.  This has been a significant problem identified both in SIU and the Monitor's mortality reviews.
- IDOC wrote in the policy that notes are to be completed the same day that the care was provided.  The Monitor recommends that the note be documented contemporaneously or at least by the end of shift when the service was provided.
- In the policy, IDOC does not specifically state that the DOC 0090 form is not to be used for transfers for specialty care or hospital care.

Five documents were requested:
1. *Policy and procedure for the electronic medical record.*  This has not yet been developed and will be developed after implementation of the EMR.

---

[164] See Northern Reception and Classification Center, 2nd Court Appointed Expert Report Lippert v. Godinez January 29-February 1, 2018; pages 22-27.  Paperwork was not filed in a medical jacket but loose paperwork was stapled or kept loose in a folder.  There was insufficient staff to perform the work, Any staff member could remove a single piece of paperwork at any time by entering "medical records" and removing the document, and records did not initially combine medical, mental health and dental.  All of these problems resulted in lost paperwork and an incomplete record to review with respect to care.  While the Monitor has not specifically examined medical records again at NRC, the policy should contain language to prevent this from occurring again.

2. An update on the EMR project manager. This position was hired in April of 2024 and a CV has been provided.
3. A survey or report on the needed devices including point of care devices. This has not yet been done. IDOC stated that this was in process in conjunction with the EMR vendor but this is not part of the statement of work of the vendor. No information was provided that this has been accomplished.
4. An implementation schedule for the electronic record. This was provided and will be discussed.
5. A plan for training. This was not provided but is in process of being developed with the EMR vendor.

The IDOC has a contract with Fusion for implementation of an electronic record. This contract has not yet been received from IDOC. A draft statement of work with Fusion was provided.

The Monitor notes several challenges in this implementation plan.

No documented plan was provided to the Monitor to migrate electronic prescription data from persons on diabetes, HIV, or hepatitis C medications from UIC to Boswell and to the EMR so that a unified medication profile is available in the vendor's pharmacy or in the EMR. Also, nurses take verbal or written orders for medication and handwrite prescriptions on medication administration records that do not always result in a pharmacy produced MAR. This means that the medication administration records are the most accurate medication profiles but the pharmacy medication profile should be the most accurate. The Monitor has concerns about verbal order entry issues that can lead to unsafe medication practices.

The vendor is not responsible for acquisition of devices including point of care devices and their interfaces. Based on prior information from IDOC, it isn't clear if IDOC has sufficient devices and IDOC has not provided information regarding device surveys, how devices are obtained, and how devices are maintained. This was previously assigned to the Department of Information Technology (DoIT) but the procedures for device acquisition and maintenance need to be provided now that the electronic record is being implemented.

The Monitor has questions regarding whether wiring to support the record is completed. IDOC stated in its Implementation Plan that all wiring for the EMR has been in place since 2021. IDOC meant by this that wiring in the health care units is complete. As documented in the prior report, not all health care is provided in health care units. Medication administration in some facilities (e.g., Logan) is completed on living units. At Graham, intake is completed in the gymnasium. Nurse sick call occasionally occurs outside the health care unit in satellite clinic spaces. IDOC needs to be clear that wiring needs need to ensure that wherever the electronic record will be needed that there will be a capacity to do so. This has not been accomplished.

Both wiring and device needs were initially determined for existing staff in existing health care units. The Monitor has concerns that there will be insufficient devices and wiring as new staff are brought on. Also, IDOC has provided no information with respect to plans for anticipating new device needs or interfaces with the electronic record to blood pressure equipment, glucometers, other point of care devices, thermometers, scales, etc.

IDOC has not provided procedures for requesting new equipment, replacing defective equipment, or

requesting DoIT for new equipment, devices, or wiring.

The Implementation and Project Management Plan allows for three months to develop workflows[165] and software changes to accommodate workflows. This is a very aggressive timeline. Design of medical record screens and formatting is intimately connected with workflows of the organization which is dependent on policies and especially procedures of the organization and the way each of the 27 facilities operates. When workflows are not properly analyzed and software not modified according to an expected workflow, work-arounds or staff self-created solutions to a dysfunctional system occur that can lead to unexpected and unwanted practices in use of the electronic record. IDOC is in the midst of implementing new policies and procedures for all of the processes in their organization. Some policies are pending comments from the Monitor. Some policies have not yet been written. For the medication management policy, the Monitor recommended a process analysis on medication management be completed prior to development of policy. Workflows have not been created for any of the 88 promulgated policies and none of these policies has yet been successfully implemented. It will be extremely challenging, therefore, for IDOC to develop workflows for the entire organization by an expected 11/8/24 timeline especially when the expected workflows were completed in relation to the recently promulgated policies. For these reasons, the software and workflows may need modification in the future. The Monitor repeats a recommendation made several years ago to hire personnel who can perform process analysis and software modification to make modifications to the electronic record at a later date when workflow expectations are changed or finalized in policy.

The Court-filed Implementation Plan documents that the electronic record will be fully implemented by November of 2025.[166] This will be challenging and is aggressive. The Monitor's concern is whether the software will be able to adequately provide data needed to verify compliance status with Consent Decree requirements.

It appears that data from the electronic medical records at Decatur and Logan (the female facilities) will be electronically migrated based on a protocol of the vendor. Paper records apparently will be migrated as scanned paper records. Based on review of the mortality records, it is very difficult to locate particular documents in the medical record. When multiple volumes of records are combined very large documents will be produced. We urge IDOC to consider ways to scan each patient's record into categories that make it easier to locate a particular document. If the entire record is scanned to a single document it will make it difficult to locate a particular piece of information that a user may need making use of legacy records difficult if not impossible to use.

IDOC did not provide a specific document related to document request #59 regarding the plan for initial and ongoing training for use of the record. The Monitor was told that this was "in process with Fusion". The Fusion Statement of Work states that it will produce a training plan.

IDOC has stated that its policy on the electronic record will be developed after the electronic record is implemented but should consider completion of this policy before implementation to avoid potential legal and operational issues.

The vendor Statement of Work does not include development of a help desk. It does state that one of its

---

[165] Workflows are the manner in which a process is expected to be conducted step by step.
[166] Lipper Implementation Plan Dkt 1688

responsibilities is "Training Client System Administrators and Client help desk staff on support and system administration". The Monitor is not aware of IDOC plans for a help desk and asks that any such plans be provided.

The Monitor has been told that a contract with Fusion has been completed; based on this a partial compliance is warranted. Much work remains to be done.

IDOC has stated that wiring is completed; the Monitor asks that DoIT provide verification or a statement that the wiring is completed. In the past, facilities have stated that device counts did not include new expectations for staff nor new policies. IDOC should provide their device count for implementation of the record. The timeline for complete implementation is aggressive (2/28/25). The Monitor continues to recommend to hire personnel who can perform process analysis and software modification to make modifications to the electronic record format at a later date. A help desk should be established.

**RECOMMENDATIONS:**
1. Provide a copy of the Fusion contract to the Monitor.
2. Provide the training plan to the Monitor when it is developed.
3. Base the roll out and device needs on expected numbers of employees and expected workflows and not on current employee numbers or existing workflows.
4. Modify the Staffing Analysis and Implementation Plan to include staff to manage and support the electronic medical records including initial and ongoing training for users and a help desk function.
5. Ensure that point-of-care[167] devices are integrated into the electronic medical record.
6. Ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record.
7. Ensure that the new electronic medical record has the capability to track and report clinical and operations data that is needed to assess IDOC's compliance with the Consent Decree and data that is vital to IDOC's ongoing efforts to track and improve the delivery of quality care.

# Policies and Procedures
**Medical & Dental Policy Development**

*Addresses item II.B.8; III.K.4; III.K.5*

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*
**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
.

---

[167] Point-of-care devices are small devices that provide a diagnostic test locally and which can be used by nursing or provider staff where care is delivered. These devices include glucometers to test blood glucose, or devices to test blood to determine whether anticoagulation (INR) is sufficient. Electronic vital sign machines are similar to point-of-care devices in so far that they can be connected to the electronic medical record and the testing results can be automatically directed to the appropriate place in the electronic medical record.

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested the following documents specifically to review for compliance with the items from the Consent Decree listed above.[168]

1. Meeting minutes of statewide Systems Leadership Council from July 2023 until March 2024.
2. Provide the plan to provide standardized training of staff to the policies and procedures that were effective February 2024.
3. Provide a report of training completed on IDOC Medical Policies and Procedures.
4. Identify the person responsible for coordinating and managing the process of maintaining a comprehensive set of medical policies and procedures that were made effective in February 2024.
5. Provide the schedule for review and revision of the IDOC Medical Policies and Procedures.

IDOC was successful in developing the 1st edition of the IDOC Medical Policies and Procedures. The manual was distributed to the facility HCUAs in February 2024. The table of contents from the Manual is included with this report as Appendix C. There are 88 different policies and procedures in the areas of governance and administration of the health care program; health promotion, safety, and disease prevention; personnel and training; health care services; patient care and treatment; special needs and services; infection control; health record; and medicolegal issues.

IDOC was receptive to many of the Monitor's comments during the process of developing and reviewing drafts. IDOC informed the Monitor on 1/25/24 that they would be moving forward to distribute the policy and procedure manual even though the Monitor had not finished reviewing the remaining drafts received.[169] At the monthly meeting with OHS on 2/29/24 the Monitor was informed that the policy and procedure manual had been distributed to the facility HCUAs and others responsible for implementation. The Agency Medical Director explained that it was important to get the document out because they had been informing the field it was coming for a long time. He also indicated that the documents were viewed as dynamic and would be continuously modified. Twenty-one of the policies and procedures in the manual do not include consideration of the Monitor's review and comments. This is because the comments were received too late to be considered before publication and distribution of the 1st edition.[170] IDOC indicated that comments on policies and procedures provided by the Monitor in late January and February 2024 will be considered when the policy and procedure is next revised.[171]

The Monitor considers the IDOC Medical Policy and Procedure Manual a significant first effort but not comprehensive. IDOC committed to developing a *comprehensive* set of policies and procedures that addressed all the provisions of the Consent Decree in its Implementation Plan.[172] The Monitor has found that not all the provisions in the Consent Decree are addressed by the IDOC Medical Policy and Procedure Manual. As a way of accomplishing this the Monitor suggested in feedback to IDOC that the relevant Consent Decree items be cited in each of the policies, but IDOC elected to not to do this. IDOC has provided no reconciliation that all the provisions of the Consent Decree have been addressed. Feedback

---

[168] Monitor's documentation request dated 2/29/24, items 24, 77-80.
[169] OHS – Monitor Monthly meeting 1/25/2024. After this discussion the Monitor had returned nine policies with comments and suggested revisions by 2/2/2024 and the final 12 on 2/19/2024.
[170] These are D.02.01, E.04.01, E.05.01, E.06.01, G.10.01 – G.18.11, H.01.01, I.0101, and I.05.01.
[171] OHS Monitor Monthly meeting 2/29/2024.
[172] Implementation Plan narrative page 1, Item #40, step 2, Item #83.

provided in the Monitor's 7th report was that the list of policies to be developed did not appear to address every provision in the Consent Decree as well as every NCCHC accreditation standard.[173] There are also a number of topics that are not adequately addressed in the 1st edition. These include radiology procedures and laboratory procedures, cleaning and supply of linen in the infirmary, inventory and control of pharmaceuticals, etc. While there are a number of dental procedures, all but one address infection control in the dental area. There is, for example, no policy and procedure concerning dental extraction or prostheses or other dental procedures.[174] The Monitor's review of specific policies and procedures in the 1st edition, including where the provisions of the Consent Decree were not addressed, is articulated throughout the remainder of this report.

The Medical Compliance Administrator coordinated the process for policy and procedure development. Later she transferred to OHS into the position of Medical Coordinator and has retained responsibility for coordinating the development of the medical policies and procedures. The Monitor was informed in May 2024 that SIU had identified a person on staff to assume the role of project manager for policies and procedures and the Medical Coordinator was transitioning this responsibility.[175] The Monitor has not seen evidence yet of any work being performed by the project manager for policies and procedures. The Administrative Directives concerning delivery of health care remain unchanged and in many instances are not consistent with the new policies and procedures. Facilities have been cited as noncompliant with the Administrative Directives which thwarts implementation of change. OHS has indicated that they are working to obtain variances to the Administrative Directives where there is conflict with the new policies and procedures.[176] Eventually the ADs will be revised to be consistent with the medical policies, but this is a lengthy process, hence the need for variances. Other steps necessary to support implementation of the 1st edition are standardization of forms, contract negotiations with the Department's selected medical vendor, and informing other parts of IDOC about changes that affect them.[177]

IDOC policy and procedure A.05.01[178] establishes a policy and procedure committee whose members are appointed by the Agency Medical Director every two years. The committee is responsible for reviewing the policies and procedures annually and for the development of additional policies as necessary. The Agency Medical Director also appoints the person responsible for managing the policies and procedures. The facility HCUA is responsible for making the health services policies accessible to staff, training and/or coordinating training in the new policy and procedure. Proposals for new policies or revisions to existing ones may be made by any IDOC employee or vendor. The Medical Compliance Administrator is responsible for receiving final version of a policy and procedure from the committee, ensuring its review by the IDOC Director and Agency Medical Director, and the notification and distribution of new or revised policies and procedures. The Monitor had substantial input and agreed with the final draft with the understanding that the next revision would address the subparts 8-12, in Item 40 of the Implementation

---

[173] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, pages 50-51.
[174] Implementation Plan item # 83 explicitly states that a comprehensive set of dental policies and procedures will be developed with input from the Monitor.
[175] OHS-Monitor Monthly Meeting May 16, 2024
[176] Changes in personnel responsible for IDOC Administrative Directives have contributed to delays in obtaining the necessary variances. OHS-Monitor Monthly Meeting August 22, 2024 and September 19, 2024.
[177] HCUA Meeting P &P power point 2/22/2024.
[178] A.05.01 Policies and Procedures.

Plan.[179]

OHS has sought assistance from experts affiliated with SIU to assist with the revision and refinement of infection control policy and procedure.[180] A similar effort is underway with a pharmacy initiative sponsored by SIU and IDOC and is expected to result in a manual of pharmacy procedures.[181] The use of subject matter experts to refine and improve the initial set of policies and procedures is applauded.[182]

The Monitor requested but received no schedule for review and revision of the IDOC Medical Policies and Procedures. Instead, we were told that the Medical Coordinator was reviewing a quarter of the policies each quarter beginning in July 2024. Notes were being taken as staff are being trained in the policies and procedures of areas that need clarification or revision. Ultimately the SIU policy project manager is expected to manage the schedule and review/updates.[183] A.05.01 Procedure: VI. states that the annual review of policies and procedures takes place according to a schedule. This part of the policy and procedure has apparently not been implemented yet. The Monitor looks forward to knowing the schedule and contributing to the annual review.

**Implementation**
OHS has stated that implementation is expected to be a long process. The new policy and procedure manual and its implementation were discussed with the HCUAs at a meeting on 2/22/2024. The direction given to the HCUAs was that the policies and procedures were in effect, and they were expected to begin implementing them.[184] The Medical Coordinator has subsequently met with the HCUAs to review different sections of the new policy and procedure manual. She employs subject matter experts, such as the statewide Quality Coordinator and Infectious Disease Coordinators, to deliver the training content in their area of expertise. [185] The Monitor was told that these meetings have continued each month. However, no list of topics, attendance or other evidence has been provided about the training.[186]

Item #40 step 9 of the Implementation is to "Establish a plan to provide standardized training and centralized reporting of training completion and subject knowledge in the set of comprehensive medical policies and procedures. (Completion date: November 2023)". It appears that training is taking place but there is no record that could be provided of training completion or demonstration of subject knowledge. This should be part of the policy project manager responsibilities.

During the Monitor's site visit to NRC and Stateville[187] the HCUAs were asked about the new manual of policies and procedures. Both HCUAs were aware of the new policy and procedure manual. One reported being familiar with E.06.01 because it had been implemented at the facility. This HCUA also reported

---

[179] Issues to be addressed in the next revision are standardized training in policies and procedures, reporting of completed training, the method for the Agency Medical Director to consider requests for exceptions to policy and procedure, timeframes and expectations for policy implementation by facilities. Monitor's comments on second draft of A.05.01 dated 6/13/2023.
[180] Interview with the Agency Infectious Diseases Coordinator July 17, 2024.
[181] OCM/IDOC Initiative Charter dated 11/28/2024 provided in response to the Monitor's documentation request # 31.
[182] Use of subject matter experts is consistent with the process called for in the Implementation Plan, Item 40, step 4.
[183] Response from IDOC Special Litigation Counsel dated 6/28/24 to the Monitor's documentation request for the 8th report.
[184] OHS-Monitor Monthly Meeting February 29, 2024.
[185] OHS-Monitor Monthly Meeting March 21, 2024.
[186] OHS-Monitor Monthly Meeting May 16, 2024. No report was provided in response to the Monitor's request #78. IDOC response in the document request itself was " Currently doing monthly policy and procedure manual training with staff. Specifically, with HCUAs and DONs but others will be/are added when relevant to the policies being discussed."
[187] June 3-5, 2024.

familiarity with the procedure in the event of death.[188] The other HCUA reported receiving the new policies and procedures but had not read them thoroughly. Neither of the facility medical directors expressed familiarity with any of the policies and procedures. One medical director commented that they had been mentioned at a quarterly meeting and could be accessed online. It is remarkable how little penetration there is into the leadership and operation at these two facilities regarding the implementation of the 1st edition of the policies and procedures three months after their distribution.

The Regional Coordinators for the North and Central regions were also interviewed about the implementation of the 1st edition Medical Policy and Procedure Manual.[189] They were quite clear that they have no direct responsibility for implementation; stating instead that it is up to the HCUA and the vendor to make it happen. They described their role as being there to support them in implementation. The Regional Coordinators stated that the policies and procedures were effective when distributed in February but there was no specified timeline for implementation. Neither of the Regional Coordinators are involved in evaluating the performance of the HCUAs. HCUAs performance is evaluated by the facility Chief Administrative Officer who has no responsibility for implementation of the Medical Policy and Procedure Manual. When asked what the barriers were to implementation of the policies and procedures both Regional Coordinators stated that the primary barrier was staffing. Other barriers were getting the vendor to perform and assistance from operations in making the necessary changes.

The Monitor has observed IDOC's inability to achieve compliance with directives that were issued previously. As the reader will see later in this report there is still little evidence that changes with regard to immunization and colorectal cancer screening have been implemented. We commented in the last report that these prior experiences should underscore the importance of planning for implementation of the policies and procedures as described in item 40 (subparts 8 and 11) of the Implementation Plan.[190]

In summary, IDOC has succeeded in finalizing the 1st edition of the Medical Policy and Procedure Manual. IDOC collaborated with the Monitor during the development of the policies and procedures. This accomplishment includes policy, A.05.01 which establishes the structure for review of current policy and development of new policy as well as responsibility to distribute new and revised policy and to train staff in these. A project manager for policies has been identified. The work of managing the updating and review of the 1st edition is transitioning to the project manager now. The Medical Coordinator has provided monthly training for HCUAs and directors of nursing on the new policies and procedures.

No documentation was provided about training received and when. Three months after distribution of the new policy and procedure manual, two HCUAs interviewed during this report period did not describe any training that had been received. They were familiar with very little of the new policy and procedure manual. With the exception of the policy on sick call, these two HCUAs had not implemented the new policies and procedures. No expectation as to a timeframe for implementation has been set forth. The Monitor did not find evidence of the implementation of the new policies and procedures among records reviewed and documentation received for this report.

---

[188] It is unclear if this refers to A.08.01 Notification Requirements Regarding Critically Ill Patients or A.10.01 Procedure in the Event of an Individual in Custody Death.
[189] June 27, 2024.
[190] Records reviewed for this report consistently document digital rectal exams as part of the physical exam when they are no longer considered the standard of practice and persistent failure to offer recommended vaccination and preventive health screening despite directives to do so issued in 2021.

The Monitor understands that IDOC is still in the preliminary stages of implementing the new policies and procedures. A major focus of implementation must be the identification and resolution of barriers to implementation, such as those listed by the Regional Coordinators. The addition of the policy project manager should increase the capacity of the IDOC to ensure that every provision of the Consent Decree is addressed in policy, use of subject matter experts and process mapping in development and revision of policy, development of standardized training and centralized reporting of training provided, development of tools and methodology to measure whether actual practice is in conformance with policy.

**RECOMMENDATIONS:**

1. Consider and incorporate the Monitor's comments on policies and procedures that were returned to IDOC in late January and February 2024 when the policy and procedure is next revised.
2. Ensure that policies address all of the items in the Consent Decree.
3. Identify additional policies that need to be developed (dental, infection control, radiology, pharmacy etc.) and obtain subject matter experts to draft these for review by the Monitor.
4. Ensure that the policy project manager understands the scope of work and work product expected.
5. Follow the Implementation Plan with respect to training at the facility level for all newly developed policies.[191]  This should result in a standardized methodology for implementing policies and procedures that ensures all employees are properly trained for those procedures that they will need to fulfill their job responsibilities.
6. Implement A.05.01 Policies and Procedures and establish the schedule for review and revision of the 1st edition as well as the additional policies that are being developed.
7. Establish and distribute a schedule for review and revision of the IDOC Medical Policies and Procedures as per A.05.01.
8. Establish expectations for resolution of barriers and timelines for implementation of the new policies and procedures.

# Operations

## Clinical Space

***Addresses item II.B.2 in part; III.B.1; III.C.2; III.F.1;***

**II.B.2.**  *IDOC shall require, inter alia, adequate qualified staff**, adequate facilities**, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care.  This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**III.B.1.** *IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*

**III.C.2.** *IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational*

---

[191] See the Implementation Plan narrative pages 1, 3-4, and items 7, 8a., 40 subpart 9.

*concerns and security needs of IDOC including, but not limited to, a lockdown.*
**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**OVERALL COMPLIANCE RATING Partial Compliance**

**FINDINGS:**

**Documents Requested for Clinical Space**

The following documents and information[192] were requested and were, for the most part, received from the IDOC to evaluate progress toward compliance with the items in the clinical space section of the Consent Decree:

- An inventory for each facility of the rooms used by health care personnel for patient examination. This information did not change from the 7th Report in which variable data for fourteen facilities was utilized. Only nine facilities provided adequate data to evaluate the adequacy of clinical space. Data for one additional site was provided for this report.
- Any progress on a consultation to evaluate medical and dental physical plant issues statewide and by facility to include analysis of existing medical space. Updated draft designs for new and renovated health care spaces at six facilities in the Southern IDOC region were provided.
- Report of physical space consultant's analysis of existing space with respect to health care. No actual analysis by consultants of existing health care space was provided.
- Copy of renovation plan as described in the Implementation Plan. IDOC communicated that it "has nothing additional to provide."
- List of construction, remodeling, or physical plant improvements for any of the health care units. The activities reported were primarily HVAC, electrical, roofing and routine maintenance repairs. Only one facility reported any physical plant remodeling that expanded clinical health space converting existing health staff offices into a triage room and a dedicated optometry exam room.[193]

**Stateville Closure**

The Monitor team was also provided with monthly updates on the closure of Stateville CC. Although the decision to close and rebuild Stateville was primarily based on unacceptable housing conditions for the inmate population in this aging and deteriorating facility, during previous and recent site visits,[194] the monitor team has identified notable delivery deficiencies in the health care spaces at Stateville including inadequate exam rooms to provide primary care services, insufficient space for the medical records department, defective negative pressure units in the medical isolation rooms, poor lines of sight from the infirmary nursing station, repetitive infestations of bugs, insects and flies in the infirmary rooms, lack of sinks in satellite nurse clinics in housing units, a cramped dialysis unit lacking a dedicated station for patients infected with hepatitis B, grossly inadequate storage space in the dialysis unit, birds flying and

---

[192] Monitor document requests for 8th Court Report #s 81, 82, 83, and 84.
[193] Lincoln CC. The previous optometry space was cramped and shared by the parttime optometrist and by the nurse doing intake screening histories and physicals for new admissions and transfers-in. The renovation also created separate offices for the DON and the HCUA and a new office for the Medical Records Director. In spite of these modifications, the Monitor stands by their previous recommendation that the Lincoln HCU is significantly undersized and needs to be replaced or fully renovated.
[194] Most recent inspection of Stateville CC by monitor team was on 6/5/2024.

nesting in the inmate cafeteria and food serving areas, an undersized physical therapy treatment room, and the lack of an onsite x-ray unit. The infirmary unit at Stateville is unfit for housing medical patients and should also be closed, but the Court's order did not include the infirmary. Due to the verified deficiencies in the aging physical plant and in the outdated and inadequate health care spaces, the Monitor is fully supportive of the closure of Stateville and construction of the new facility at the site. The Monitor also strongly recommends that other aging facilities[195] in the IDOC be closed and replaced.

## NRC Site Inspection

The monitor team inspected the health care areas of the Northern Reception and Classification center (NRC) in June, 2024.[196] The Intake Center is adequately sized and is currently analyzing and streamlining the patient flow through the multiple steps of the screening process.

Since a pre-consent decree visit to NRC in 2018, the infirmary nursing station has now been appropriately relocated from a tiny, cramped room to an amply sized, open location in the main corridor adjacent to the isolation rooms and the entrance to the mental health crisis rooms. One two-bed infirmary room was not operational. Unbeknownst to the infirmary staff, both negative pressure isolation rooms in the infirmary were not operational. All of the crisis rooms had chipped and frayed paint on the walls. The one vacant mental health crisis room had a non-functional toilet that was full of fecal material. This was unacceptable and created an infectious disease risk. There was no open area or dayroom in the infirmary for use by long-stay patients. There isn't an exam room in the infirmary; this results in cumbersome and inefficient exams being done at the bedside or the patient has to be transported to the clinic. The NRC nursing leadership rounded with the Monitor and was directly informed of these issues. The engineering staff was called about the defective negative pressure units.

The NRC clinic has three exam rooms across from the clinic's nursing station. The rooms and the hallway in the clinic has chipped and missing floor tiles that creates a safety hazard for the patients and staff. The exam tables were non-adjustable, fixed orthopedic tables that had torn upholstery and lacked paper barriers. There was not even a single multi-position electric table that would be needed for examination of patients with complex medical problems. The desks, cabinets, and other surfaces had frayed edges and chipped surfaces which cannot be adequately cleaned and sanitized. The sinks in the exam rooms were crusted with calcium deposits. Three exam rooms were insufficient to accommodate the 1.6 FTE physicians, 4 nurse practitioners/physician assistants, and telehealth sessions. Due to the shortage of exam rooms, nurse sick call is provided in the evening when there isn't an onsite physician to readily provide consultation with the nurses. The physical therapist has a therapy room in the K wing, which is rarely used because of a lack of correctional staff to provide coverage. The therapist is forced to do evaluations and treatments in the clinic exam rooms between scheduled patients being seen by the other providers. The dental clinic has only a single dental chair.[197]

## Systemwide Inventory of Clinical Exam Rooms

---

[195] With the closure of Stateville, the oldest facilities in the IDOC are Dixon, Logan, Pontiac, and Menard CC's.

[196] NRC site inspection was done on June 3-4, 2024.

[197] Data for dental staff at NRC provided by IDOC included 1.6 dentists. There is a chair in intake and another chair in the clinic. A dentist works in the clinic. NRC does not have a hygienist but needs one as it has a population of long-term workers. With a hygienist, NRC will have insufficient chairs. A workload analysis has not been provided for how much dental time in the dental clinic is needed.

The Monitor was able to evaluate data from ten facilities[198] to provide an inventory of rooms used for patient examination. The Monitor has received no information that there has been any new construction or renovation that expanded the number of exam rooms since the 1st report in 2019.   There was no discernable change in the assessment of the room inventories compared to the data provided for the 6th and 7th Court Reports. The data provided for the 8th Report from the one additional site[199] identified that its six exam rooms[200] had to be juggled between as many as nine to ten different providers including 2 physicians, 4 nurse practitioners and physician assistants, 1 halftime obstetrician gynecologist, 2 sick call nurses, 1 clinic nurse doing vital signs, and intermittently for unscheduled urgent care services. One other former exam room in this facility  has been permanently converted to a dental hygienist room because there was insufficient space for this provider in the two chair dental clinic staffed by two dentists.

As noted in previous reports, there continues to be insufficient numbers of examination rooms to ensure private and confidential examinations and evaluations and to allow adequate access to clinical care. In almost all of the ten facilities reporting exam room inventories it is apparent that there are more budgeted clinical staff including physicians, nurse practitioners, physician assistants, sick call nurses, and chronic care nurses who need to use examination rooms than there are examination rooms. This results in clinicians having to see patients in poorly equipped spaces without examination tables and lacking privacy.

The data provided noted that of the thirty-four rooms labeled as examination rooms, eighteen  were shared by other staff or used for other activities including physician office space, phlebotomy, treatments, telehealth, storage, vital signs, physical therapy treatments, and injury assessments. In almost all facilities urgent care rooms are also frequently used to provide routine care. This results in the cancellation or truncation of scheduled visits when this room is needed to address urgent or emergent situations.  The lack of sufficient number of examination rooms continues to be a barrier to access to care in IDOC's correctional centers.

**Inadequate Clinical Space**
As noted in the 7th report, the Monitor team has identified existing space needs at multiple site visits that hampered the delivery of health care services to the incarcerated population. The deficiencies observed have included insufficient number of examination rooms to accommodate the number of clinical staff at the facility, the lack of adequate workspace for nursing staff, the lack of sufficient dental chairs to accommodate dentists and dental hygienists, the inadequate space to provide needed services and programs for infirmary patients, undersized waiting rooms, inadequate space to house physical therapy services, cramped and undersized onsite dialysis centers, inappropriately designed, located and jerry-rigged intake screening spaces, insufficient and inadequate telemedicine space, insufficient space to store and manage medications, and insufficient conference room space for the purpose of meetings and training. Consideration must also be given to the increasing demand for telehealth rooms and the need for expanded and/or additional workstations and counter space to accommodate devices for the upcoming electronic medical record. There is limited evidence these and other future space demands have been fully assessed and/or addressed.

---

[198] Data utilized included the nine sites in the 7th Report and one additional site provided for the 8th Report.
[199] Logan CC room inventory 2024 provided for the 8th Report.
[200] Logan's space inventory list a seventh exam room labeled "electrolysis exam room"; it was not reported if this room is shared for other clinical services.

As detailed in the 7th Report, some clinical care is conducted in locations not designed or intended for clinical care. At a previous site visit,[201] it was noted that intake screening at Graham was being performed in the middle of a gymnasium which has to be vacated on days that new admissions arrive. This space lacks adequate audio and visual privacy. It also results in a disjointed and inefficient intake process. The same gymnasium was also used by the physical therapy assistant for daily physical therapy sessions and intermittently by the physical therapist who performs the initial assessments. This open space in the corner of the gym also lacks audio and visual privacy. The therapy provided is very restricted due to inadequate space to secure larger exercise apparatuses. The Introba space designs for a new/renovated Graham CC include dedicated Physical Therapy space but doesn't address the need for appropriate space for intake screening at this Reception and Classification center.

## CGL Facility Master Plan Report

As noted in the 7th Report, the Capital Development Board (CDB) of the State of Illinois hired CGL, a consultant group, who was "tasked with developing a correctional system master plan that would prioritize physical plant needs for the next five years and beyond". CGL did a thorough evaluation of existing IDOC facility buildings and infrastructure.[202] The monitor team supported a number of the consultants' general and specific recommendations. However, this was not expected to be and was not a detailed survey of the present and future space and equipment needs of the medical and dental services in **all** IDOC facilities needed to provide adequate medical and dental care as required in the Consent Decree and the Court approved Implementation Plan.

As noted in the 7th Report, CGL did not thoroughly evaluate the medical and dental spaces and equipment as required by the Consent Decree and Implementation Plan. CGL reported that the "aging units used for the geriatric population are not designed to support their needs and that health care units (HCU) did not have sufficient geriatric, ADA, and infirmary beds to meet the needs of the facilities" and recommended that IDOC consider dedicated housing and services for the elderly population. Their recommendation for a 200 bed dedicated geriatric unit was made without first quantifying the number of elderly or to assess the needs of this population as required in the Implementation Plan.[203] IDOC has not yet hired a subject-matter expert consultant to evaluate and determine the space, housing, health care, and programmatic needs of the aged, infirm, demented, and disabled housed in the IDOC.

In summary, the CGL report was not intended to and did not specifically address medical and dental space and equipment at all IDOC facilities and IDOC has not performed an analysis of the infirm, aged, and disabled population to determine their needs.

## Introba, Inc. New and Renovated Health Care Spaces in Southern Region

In April, 2023, the CDB contracted with Introba Inc., a building engineering firm, to provide input on the space and design options to address the need for permanent medical office space at six facilities in IDOC's

---

[201] Graham Correctional Center and Reception and Classification Center 7/17-19/23.
[202] CGL "IDOC Facility Master Final Report" May 2023 noted that 20% of IDOC capacity housed in facilities built prior to 1926, most facilities were built prior to the American with Disabilities Act (ADA), deferred maintenance has reached a "critical point", medical units at 22 of the 30 facilities were undersized or small, HCU (*primarily infirmary*) beds were filled with long term inmates who need geriatric care, and Stateville, Pontiac, Dixon, and Menard have the highest deferred maintenance costs, ADA inadequacies, and infrastructure that have "passed end of life".
[203] See Implementation Plan narrative pages 2 and 6; items 64, 65, 66, 69 and 70.

southern region including the Graham Reception and Classification Center. [204] The Introba report developed "program health care standards"[205] and algorithms based on an institution's population to calculate the number and square footage of various types of medical, dental, and mental health clinical rooms and support spaces.[206] Between April 4, 2023 and July 17, 2023, Introba produced initial Program Analysis Reports for six sites.[207] The Monitor voiced concerns that there appeared to be insufficient input from clinical leadership on these initial    reports. The Monitor provided preliminary feedback to these reports that was shared with IDOC who stated that this information would be forwarded to Introba via the Capital Development Board. For the 8th Report, more detailed and updated Program Analysis Reports were received by the Monitor.[208] A limited comparison of the recommended exam rooms, dental chairs, infirmary beds, long-term-care beds, and medical telehealth rooms in the initial and revised versions reports is noted in the table below. There was no rationale provided for the changes in the revised reports.

---

[204] The six Southern region IDOC facilities studied were BMR, Danville, Graham, Pinckneyville, Shawnee and Taylorville. The contract was reported to have been issued in response to mental health and medical litigations.

[205] The initial program health care standards were developed by Introba in conjunction with IDOC but some are inconsistent with realistic or comprehensive care needs of the patients.  These standards are space design standards to be used in their report.  Examples included the following.  1) Chronic care and dialysis would not be provided onsite.  2) Long-term care for the elderly would not be provided onsite (this was determined without a definition of who would qualify for long-term care or identification of where long-term care will be provided). 3) Patient examination rooms are based on a formula of one examination room for every 300 inmates, irrespective of the tasks necessary to accomplish at any given facility. 4) One infirmary bed for every 100 inmates regardless of the acuity of patients at the facility.

[206] Number of rooms and spaces and square footage standards were provided for clinical examination and treatment rooms, emergency/urgent rooms, dental suites, telehealth rooms, physical therapy areas, optometry and audiology spaces, various types of storage rooms, patient waiting areas, infirmary patient rooms and infirmary support services, pharmacy and medication distribution spaces, staff and administrative support areas (offices, workstations, supply rooms).  There are separate standards for the adjacent mental health unit.

[207] For additional information on the CGL  and  Introba reports see the 7th Court Report, Operations, Clinical Space, pages 71-76.

[208] The updated and revised Introba reports were produced on these dates:  BMR 9/8/23, Pinckneyville 11/28/23, Shawnee 12/18/23, Danville 1/19/24, Taylorville 1/26/24, and Graham 1/26/24.

| | | # Exam Rooms* | | # Dental Chairs | | # Infirmary Beds** | | # Long-Term Care Beds*** | | Telehealth Medical Rooms**** | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Conceptual Plans and Program Analysis of Introba, Inc.** | | | | | | | | | | | |
| **1st and 2nd Versions** | | | | | | | | | | | |
| | **Version** | **1st** | **2nd** | **1st** | **2nd** | **1st** | **2nd** | **1st** | **2nd** | **1st** | **2nd** |
| **Facility** | | | | | | | | | | | |
| **BMR** | | 7 | 7 | 3 | 3 | 17 | 18 | 0 | 0 | 2 | 2 |
| population | 1337 | | | | | | | | | | |
| capacity | 1882 | | | | | | | | | | |
| **Danville** | | 7 | 6 | 3 | 3 | 17 | 18 | 0 | 5 | 2 | 2 |
| population | 1188 | | | | | | | | | | |
| capacity | 1752 | | | | | | | | | | |
| **Graham** | | 7 | 7 | 3 | 5 | 17 | 23 | 0 | 0 | 2 | 2 |
| population | 1632 | | | | | | | | | | |
| capacity | 2000 | | | | | | | | | | |
| **Pinckneyville** | | 7 | 7 | 3 | 3 | 17 | 23 | 0 | 0 | 2 | 2 |
| population | 1862 | | | | | | | | | | |
| capacity | 2000 | | | | | | | | | | |
| **Shawnee** | | 7 | 6 | 3 | 3 | 17 | 17-18 | 0 | 0 | 2 | 2 |
| population | 1447 | | | | | | | | | | |
| capacity | 1859 | | | | | | | | | | |
| **Taylorville** | | 7 | 5 | 3 | 3 | 17 | 16-19 | 0 | 0 | 2 | 1-2 |
| population | 1090 | | | | | | | | | | |
| capacity | 1180 | | | | | | | | | | |
| **Total** | | **42** | **38** | **18** | **20** | **102** | **111-115** | **0** | **5** | **12** | **11-12** |

*Current total exam rooms in these six facilities: 17. (There were 6 satellite NSC spaces in housing units at two facilities, 4 at BMR and 2 at Pinckneyville. No data was provided to determine if these would qualify to be called exam rooms.)

** Current system infirmary beds = 92

***Danville conceptual plan 2nd version shows 5 long-term-care beds, Graham's 2nd version, p.33 notes that Long -Term-Care beds will be included in Option 2 "Build Addition and Renovation of Existing Medical Space" but there are no long-term care beds in the Graham conceptual sketches.

****Each of the six facilities currently have one medical telehealth room but most are shared spaces.

It is unclear if the increases or decreases in allotted rooms were based on each facility's current population or its rated capacity or on input from IDOC clinical leadership.

As noted in the 7th Report, the Introba reports created template designs to be used in the six newly constructed replacement medical and dental health care and mental health units. The Monitor is not opposed to use of preliminary template designs, provided that unique needs of every facility are modified accordingly. The Monitor team's comments and critique on the revised reports and templates designs include the following:

- Introba states in the program analyses for the medical buildings:

> "The development of the IDOC Healthcare Architectural Standards, deficiencies identified in the Rasho and Lippert settlements… were considered to best meet the IDOC healthcare needs[209]…In determining the facility's needs for the new building, the design team met with [the] warden, medical staff and leadership and examined the provided program document developed by the design team, outlining the previously requested needs.… the design team discussed with [the facility's] health care professionals to help understand the facilities current medical departments and operational procedures and needs for each."[210]

> The Monitor did not receive a "program document" in conjunction with the document request. No evidence was provided regarding deficiencies identified by the architects that were used to create their designs. Also, this statement is consistent with the IDOC practice of each Warden being responsible for health care operations in their facility and neglects the statewide responsibility of OHS to place each facility into a strategic design and to ensure that all policy and clinical responsibilities, as defined by OHS, are being covered and that the needs of the Consent Decree are met. These designs have multiple issues as detailed below.

- Introba's Executive Summary in its first report stated that "Healthcare programs deemed most feasible to be provided off-site…include ….chronic care, and dialysis."[211] The Monitor strongly disagreed and these recommendations appear to be reversed in the revised reports with dialysis units now placed in the facility designs at Graham and Danville and no mention being made of chronic care (primary and select specialty care for chronic medical conditions) being removed from the facilities.

- Introba's report also initially indicated that long-term-care also could be moved offsite. The Monitor concurs that individuals in custody who are irreversibly frail, demented, disabled, or having an advanced terminal illness requiring skilled nursing care or hospice care should receive compassionate release (Joe Coleman legislation) or be placed in nursing homes in the community. The current shortage of infirmary beds in the IDOC is in large part due to the use of these beds for patients with long-term-care and terminal care conditions. Even though compassionate release and other community based care is optimal, the Monitor also recognizes that IDOC will continue to be responsible for the care of some patients who are aged and infirm and require appropriate long term care.

- The schematic drawings for Danville CC now contain five long-term-care beds separate from the infirmary beds. Although the creation of long-term-care beds in facilities' health care units, might very minimally address this growing health care issue in the IDOC, it is not a feasible long-term solution. Plans to build long-term care units should not occur until IDOC has obtained a report from a consultant to quantify the numbers of aged, infirm and disabled, to include their medical housing and medical care needs because this information is necessary to make an informed decision about how to care for this population. The Monitor concurs with a recent article in a

---

[209] This statement is in the introduction of the reports.
[210] This statement was in the New Medical Department Programming section of the reports.
[211] Introba's Executive Summary to the Capital Development Board, 4/4/23, page 2.

Chicago newspaper that stated, "But I don't think it makes sense -financially or practically – to try to turn prisons into nursing homes or to try to imagine that we're going to provide end-of-life palliative care for people going through very painful deaths."[212]

- There were no criteria or design options presented for the development of a comprehensive intake screening center at Graham.[213]

- The six facilities evaluated by Introba currently have a total of 17 exam rooms in their HCUs; the revised design options would increase the number of exam rooms to 38. The Monitor agrees that additional exams are needed.  No analysis accompanied the recommendations and there is no evidence that the increase in beds adjusted for a strategic medical plan for these six facilities or the expected medical plan for who would be housed at these facilities. Without that analysis, it is not possible to determine if the increased number of exam rooms is sufficient.

- Fixed and portable equipment needs at these facilities was not discussed.

- The six facilities currently have 92 infirmary beds; the revised Introba design options would increase the number of beds to 111-115.  This would help to address the systemwide shortage of infirmary beds, but this recommendation is not based on any analysis or survey of the need.

- The revised drawings include two dedicated medical telehealth rooms in all six facilities  (one Option for Taylorville has only one telehealth room); most of the facilities currently have only one shared telehealth room. Depending on the design option selected, the medical telehealth rooms at five sites could have square footages ranging from 44-60 SF which is insufficient space to accommodate both the patient and the mandated accompanying nurse.[214] With the increased utilization of primary care and specialty telehealth services, almost all IDOC HCU's should have at least two adequately sized medical telehealth rooms. IDOC is in the planning phase of increasing specialty care via telemedicine with UIC.  Strategic planning with respect to telehealth has not occurred and should precede facility-specific design planning.

- Radiology suites were absent in the initial designs but are now in all six facilities.

- The infirmary designs continue to be problematic. The infirmary rooms in all of the options presented are single bed rooms. The location and design of the nurse stations need to be reviewed to ensure that the nurses have adequate work space and optimal lines of sight into the patient rooms. Easily accessible nurse call devices must be installed but it has been the Monitor's experience that nurse call systems are commonly found to be non-functioning and require frequent repair and maintenance. Rooms closest to and within the sight and sound of nursing stations must be prioritized to house high risk patients.

- For the near and likely distant future, the infirmaries will continue to house aged, infirm, disabled, and dementia patients. None of the infirmary design options have communal activity and program rooms with card/reading/game tables, dining tables, TVs, or limited exercise equipment. This infirmary design will result in chronically ill, long term infirmary residents being housed in what is the equivalent of "solitary confinement".

- There is one designated security observation station in each infirmary. Five of the six stations are situated at the entrance to the infirmary. If the officers are assigned to the "open" nurse stations,

---

[212] Chicago Sun Times, October 21, 2024: K. Washburn, Can Prison Cause Dementia? New Northwestern Study Explores How Incarceration Impacts Health: Quote by Maria Burnett, Illinois Prison Project, Page 7.

[213] Graham's Reception Center is currently performed in the center court of the gymnasium. It lacks audio and visual privacy and does not allow the timely and efficient completion of the intake health screenings.

[214] There are three different Design Options for each facility and 5 of the 6 facilities had varying square footage for the medical telehealth rooms for each option.

these stations will be dominated by correctional staff. Consideration should be given to placing designated security sub-posts in the center of the infirmaries.

- Consideration should be given to having an exam room/treatment room in the infirmary in facilities where the medical clinic exam rooms are not immediately proximate to the infirmary.

- A number of the Emergency/Urgent Care Treatment room design options have a second exit door that opens directly to the outside; this option is not practical, would create a temperature control problem, and is an obvious security risk.

- The lack of sub-waiting rooms for medical clinics (laboratory, radiology, physical therapy, optometry, nurse sick call, provider clinics) will result in waiting chairs being placed in the corridors.

- The dental clinic has an area labeled as "dental hygienist workstations". It is not defined how this space would be utilized and whether the dental hygienist chair will be in this space for cleanings and assessments.

- All six facilities met the algorithmic prerequisite census to have onsite physical therapy evaluation and treatment spaces. Introba's algorithm states that only correctional centers with 900 or more residents are eligible to have onsite PT services. This would bar the provision of onsite PT services to fourteen facilities housing approximately six thousand men and women. The Monitor disagrees with this restrictive guideline. When another tranche of new construction and renovation of medical care units are initiated, space should be designed to accommodate onsite PT services at all facilities with 300 or more residents. Transportation to offsite specialty appointments, treatments, and diagnostic testing is currently a logistical problem for the correctional staff and it will be an additional burden to move individuals to offsite PT services which could be readily provided onsite.

- The designs of the Graham and Danville hemodialysis units do **not** indicate the number of individual hemodialysis chairs/stations and some of the options do not identify a separate designated dialysis room for patients with Hepatitis B or other contagious conditions.

- Staff work flows and patient flows in the health care units and in and out of a number of clinical service areas are cumbersome and needs to be carefully re-analyzed by facility and system clinical leadership.

- Introba's inmate population-based algorithms should use the rated capacity not the actual census data which can fluctuate and would result in some facilities being undersized. The algorithms should be used as a baseline estimate that should be adjusted to account for the number of staff who need to use the area to provide care, the complexity and ages of a facility's population, and the intricacies of the facility's physical plant.

As also noted in the 7th Report, the Introba engineering report includes adjustments for the number, type, and size of certain rooms and spaces based on the population housed in the facility. This continues the risk of promulgating cookie-cutter correctional facility designs in the IDOC that do not meet the needs of varied populations served in a facility. IDOC needs to ensure that newly designed and constructed facilities have built-in space flexibility to meet both the current and future service needs of the incarcerated patient population.

**Summary**
The CGL Facility Master Plan and the revised Introba report on the replacement and/or renovation of health care facilities in six correctional centers have started a long overdue campaign to upgrade aging and outdated correctional facilities and health care centers in the IDOC. This is to be applauded. Before

they finalize their recommendations and physical plant designs, CGL and Introba should coordinate their work with the subject-matter expert hired to assess the aged, infirm, and disabled, seek more input from the IDOC clinical and correctional leadership, and be guided by a strategic plan for medical and dental care. Where appropriate both consulting reports should align their plans with the Consent Decree and Implementation Plan.

However these significant physical plant activities do not address all the items in the Consent Decree and Implementation Plan including hiring a subject-matter expert to assess the population and needs of the aged, infirm, and disabled, evaluating the medical and dental equipment for **all** clinical areas, developing a standardized list of equipment in **all** health care spaces, evaluating clinical and support spaces in **all** facilities, and using a staffing analysis to estimate current and future space and equipment needs. [215]

IDOC has a once in a generation opportunity to address the existing physical plant deficiencies in clinical space and clinical care related housing of the aged, infirm, disabled, demented and memory deficient patients. The two reports provided should be thoroughly vetted by health care and correctional leadership before extensive remodeling, renovation, and construction is initiated.

The CGL report and the monitor's site inspections concur in that the majority of IDOC health care spaces are small and/or undersized. Many of the existing health care units are outdated and poorly designed for changing health care standards. Infirmaries are crowded, exam rooms are insufficient, nursing stations and workspaces are deficient, appropriate telehealth rooms are lacking, dental clinics need more space, medical records offices are cramped, and storage rooms are inadequate in number and size throughout the system. The monitor team has inspected twelve correctional centers and all have been readily found to have inadequate space to provide needed services and programs. IDOC's decision to renovate and/replace health care centers for six facilities in the Southern Region needs to be expanded to include requirements for each facility based on an IDOC strategic health care renovation plan. However, similar evaluations of the remaining 23 facilities must also be done and include requirements in an IDOC strategic health plan. The strategic plan should include the types of services anticipated at the facility, requirements as defined by IDOC policy and the Consent Decree and expected population numbers. Some, if not all, of the aging facilities will need to be closed.

IDOC should link the evaluations of all the health care service spaces to include engaging a subject-matter expert to carefully the assess the specialized housing, program space, and equipment needed to care for the growing number of aged, infirm, disabled, and demented. It would be a much regretted, missed opportunity not to simultaneously study and plan for any physical plant modifications that are needed to adequately and safely house and care for this population.

**RECOMMENDATIONS:**

1. Develop structural space and fixed equipment requirements for all clinical activities necessary to provide adequate medical and dental care.
2. Hire a qualified architectural/engineering consultant to do a comprehensive review to determine whether adequate physical clinical space and equipment relative to useful life determination is available at **all** facilities initially focusing on the twenty-three facilities that were not included in

---

[215] See 7th Report for more details on elements of the Consent Decree and Implementation Plan that need to be addressed.

the Introba, Inc, contract. The consultant will develop a plan to address existing and future physical plant and equipment deficiencies identified. Facility specific documents should focus on the types of patients expected to be housed, the requirements specified in an IDOC health care-specific strategic plan, requirements of IDOC policy and the Consent Decree.

3. Hire a subject-expert consultant or agency to evaluate the health care, special housing, and programmatic needs of the aged, infirm, disabled, dementia and memory deficit incarcerated persons, quantify the numbers of this patient population, and provide recommendations on the clinical care needs and related housing required for this population. This analysis should precede completion of the physical plant analysis.

4. Thoroughly review and provide additional input on the engineering and clinical report space design and preliminary drawings of Introba and CGL, or other consultants as chosen by the CDB. CDB should also provide a process for the Monitor to provide input.

5. Perform hemodialysis onsite in the IDOC facilities where the renal failure patients are housed.[216]

6. Perform primary and select specialty care onsite facilitated by telemedicine and e-consults.

7. Consider revising the contracts with CGL and Introba to ensure that the medical and dental physical plant analysis is consistent with Consent Decree and Implementation Plan requirements and occurs after completion of the analysis of the aged and development of an IDOC strategic medical plan that defines the purpose and requirements of each facility. If CGL can obtain a gerontologist to complete the analysis of the aged, it may expedite the process.

8. OHS needs development of a strategic plan to address classification by medical acuity including disabilities, consideration of classification housing locations based on hospitals and specialty care proximity to the housing locations, and facility medical and dental design considerations based on clinical needs based on medical classification acuity needs.

**Equipment and Supplies**
*Addresses items II.B.6.p. and III.B.2.*
**II.B.6. p.** *IDOC agrees to implement changes in the following areas: Adequately equipped infirmaries;*
**III.B.2.** *These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
The Monitor requested two data and informational reports from IDOC for this section of the report. IDOC has provided documents for both requests.[217] The request for lists of durable equipment was provided in a variety of tabulations for most facilities. The second request for information on the dates of calibration was also responded to with a mix of standardized and non-standardized lists.

Information for durable equipment was not standardized and varied in the number and type of equipment reported. Two facilities did not provide any information. However, fifteen (54%) of the 28 responding

---

[216] Given the limited number of females with chronic renal failure, it would currently be reasonable for residents of female facilities to receive hemodialysis services at an offsite dialysis center.
[217] Document requests: #85 asked for a list of equipment mostly 2024 Annual Certification of Inventory reports and #86 requested list of equipment requiring calibration and the most recent calibration reports.

sites provided copies of the standardized, State-required DOC Annual Certification of Inventory survey; others submitted non-standardized lists of some equipment.[218] The equipment was listed in differing orders from site to site making it difficult to compare equipment in IDOC facilities.

Information of the status of required calibration inspections was provided by fourteen (50%) of the responding 28 facilities. Eleven (39%) provided copies of Preventive Maintenance reports on individual equipment and three (11%) additional sites provided a letter/note confirming the date of the most recent calibration inspections. Calibrations were performed by two biomedical service companies and corrective actions documented.[219] Most of the calibration inspections were done in 2023 and 2024. However, one report was dated 2021 and another 2022 and a few other were undated.

The IDOC Clinical Space, Equipment and Supplies policy[220] states that "Each facility shall have at least one automated external defibrillator (AED) and a backup, for a minimum of two per facility." Review of the varied types of inventory lists from twenty-five facilities revealed that sixteen facilities (64%) had two or more AEDs. One facility did not have even a single AED and eight facilities (32%)[221] had only a single defibrillator (AED) with no backup device. The Monitor has strongly recommended in previous reports that each IDOC facility should have at least two AEDs to ensure the availability of a functional AED for emergencies.

The Monitor again recommends that almost every infirmary should have at least one fully electric hospital-grade bed and almost every medical clinic should have a fully electric examination table. An attempt made to audit the presence of this type of bed was hampered by the lack of a standardized nomenclature[222] for the beds utilized in the infirmaries and examination tables. IEMA donated a number of modest-grade electric hospital beds which replaced all fixed position and aged beds in the IDOC infirmaries. Based on the review of the equipment inventory, it appears that Stateville may have a few high grade bariatric and electric hospital beds. Dixon, Menard, and Pinckneyville also provided data that that indicates that each may have an electric exam table in its medical clinics. This information is welcomed but will need to be confirmed.

The inventories for the ten facilities with sixteen or more infirmary beds and Pontiac which has twelve beds were audited to assess the presence of electric Hoyer lifts needed to safely transfer patients to and

---

[218] The non-standardized lists of equipment varied from tallies of patient names using personal assistive aides (canes, crutches, walkers, braces, etc.), two reports on the calibration of two centrifuges, short lists of a few equipment, lengthy lists of equipment, a blank equipment survey form, a daily equipment and supplies count log from one facility, one IEMA report, and others.

[219] Denham Biomedical Services and Clintech Corporation. (Reports by Clintech Corp. on the Electrical Safety Inspections of equipment for five facilities were also provided to the Monitor: BMR, Lawrence, Robinson, Southwestern, and Vienna CC's.)

[220] IDOC Medical Policy and Procedure Manual, February 2024, D.03.01 Procedure VIII, Clinical Space, Equipment and Supplies.

[221] Lincoln did not have any AEDs on their equipment list. The following sites noted only one AED on their standardized or non-standardized lists : Danville, Decatur, East Moline, Hill, Kewanee, Robinson, Southwestern, and Western.

[222] The various inventory lists provided for the 8th Report described infirmary beds as hospital bed, therapeutic bed, patient hospital bed, manual hi/low hospital bed, bed standard hi/low manual, electric pan hospital bed, bariatric bed, and bed hospital electric with rails and clinic examination tables as exam table, table examining electric, table exam power/Ritter 75 evolution, exam table Ritter, exam table UMF, and table exam medical.

from their bed to gurneys, wheelchairs, exam and x-ray tables and into/out of bathing tubs. Only five[223] of eleven reported that they have Hoyer lifts. IDOC medical and nursing leadership need to investigate the need for Hoyer lifts in all IDOC's facilities with large infirmaries and high-risk populations.

As noted in the 6th and 7th Court Reports, the equipment lists provided have limited value without having a systemwide standardized list of equipment that is expected to be available in each of the different clinical rooms and areas in all IDOC facilities. The number of pieces of equipment would, of course, vary based on the number of examination rooms, urgent care rooms, dental suites, infirmary beds, specialized treatment services (dialysis, physical therapy), special equipment needed to support disabled and infirm patients, and whether the facility is an intake center. IDOC has previously committed to ensuring that there is adequate fixed, mobile, medical, and dental equipment. Developing a standardized list of expected equipment is the first step necessary to accomplish this goal. The hiring of a qualified consultant to evaluate equipment relative to useful life determination[224] and to develop a standardized facility-specific list of equipment and a plan to address equipment deficiencies[225] would expedite the completion of these essential tasks.

The increased provision of the equipment and calibration reports including Annual Certification of Inventory, Electrical Safety Inspections (of clinical equipment), and the Preventive Maintenance were useful in assessing the existing types and numbers of durable equipment and equipment that requires annual calibration. The review and auditing of these reports was cumbersome to analyze and difficult to tabulate but would be facilitated if there was standardized nomenclature used to describe the equipment being audited.

There has been essentially no change in the status of this item since the Monitor's 4th report. IDOC does not yet have a standardized equipment list required for each facility including for the infirmary. The Monitor has previously provided input on drafts of a list of emergency supplies, an equipment survey checklist, and a list medical equipment by facility. No further information about these drafts or any efforts to standardize other equipment has been provided by IDOC. The Monitor's recommendation from previous reports remains the same.

**RECOMMENDATIONS:**

1. See recommendations that jointly refer to space and equipment in the above Clinical Space section.[226]
2. Establish a systemwide standardized list with uniform nomenclature of equipment (including high-grade electric hospital beds and electric exam tables) that must be available and maintained in each of the different clinical service rooms (examination rooms, telemedicine rooms, urgent care, infirmary, dental suites, specialty rooms, etc.) at all correctional centers.
3. Monitor systemwide annual calibration and evaluation of the clinical equipment and incorporate a replacement or repair plan to ensure that all sites have functional equipment at all times.
4. Utilize the consultant who IDOC hired to survey clinical space to provide consultation on required

---

[223] Dixon, Logan, Pontiac, NRC and Stateville have Hoyer lifts. Menard (28 beds), Graham (21 beds), BMR (18 beds), Centralia (18 beds), Hill (16 beds), and East Moline (16 beds) did not have Hoyer lifts on their inventory lists.
[224] Implementation Plan item 95.
[225] Implementation Plan item 98.
[226] These recommendations reflect the intent of Implementation Plan narrative p5 and items 95, 96, 97, 98, and 99.

equipment that is needed in all health care service rooms and areas in the IDOC.

5. Ensure that all IDOC facilities have at least two functional AEDs.
6. Investigate the need for Hoyer lifts in IDOC's infirmaries.


**Sanitation**
*Addresses item III.J.3*
**III.J.3.** *Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Two documents were requested for this report and a third document was provided by IDOC.

- Calendar year 2024 1st and 2nd quarterly reports containing Safety and Sanitation reports were provided.
- Cleaning and sanitation schedule for Decatur's and Kewanee's health care areas were requested but only Kewanee's general cleaning process was provided.
- The Environmental Services Program Coordinator's inspection reports from three IDOC facilities in 2024 were provided although they were not formally requested. [227]

Results and/or reports of monthly safety and sanitation inspection reports continue to be provided to the Monitor on a quarterly basis for most facilities. Twenty-two safety and sanitation reports for the 2nd quarter of calendar 2024 were reviewed.[228] Eleven reported inspections of both housing units (HU) and the Health Care Units (HCU), nine inspected just the HCU, and two reported on just the HUs. Some inspections also included the kitchens and dietary areas.

The reports of environmental health and safety inspections done by the Environmental Services Program Coordinator in 2024 of Centralia, Menard, and Western correctional centers were provided to the monitor team. The reports are detailed and accompanied by photographic documentation. The findings are supported by citations of pertinent national and local standards including OSHA and IDPH Food Service Sanitation Rules and Regulations. The Coordinator's findings document safety, sanitation, infectious disease, and food safety risks. These findings align with findings of the monitor team and their efforts to identify health and safety risks that can be prevented by timely repair and maintenance of the physical plant and equipment and the implementation and enforcement of sanitation standards. The Coordinator has developed a Corrective Action Tracker to monitor IDOC's completion of work orders. The monitor team is pleased that these inspections also include some elements of the HCU, the housing units, and the kitchen. As in previous reports the deficiencies identified in non-medical areas included the following as shown in the table below.

---

[227] These reports were provided to the Monitor at his request after a discussion about the reports produced by newly appointed Safety and Sanitation Coordinator at the OHS-Monitor monthly meeting on 1/25/2024.
[228] Western's Safety and Sanitation report (CQI minutes) for the 2nd quarter could not be opened.

| Safety and Sanitation Findings in Non-Medical Areas | | |
|---|---|---|
| Broken, leaking, or non-functional toilets, sinks, faucets, or showers | Mold in showers | Non-functional lights |
| Missing or broken light bulbs | Cracked windows | Peeling paint |
| Missing tiles or cracked floors | Holes in walls | Rusty vents |
| Vents clogged with debris | Missing or damaged ceiling tiles | Lack of hot or cold water in showers |
| Non-functioning HVAC units | Broken washing machines or dryers | Roof leaks |

Almost all of these deficiencies were continually reported for the three consecutive months that were audited. Physical plant consultants[229] have documented that there were a growing amount of deferred maintenance and significant repair needs in many IDOC facilities. This is placing a burden on the maintenance team at many facilities.[230] Many of the physical plant deficiencies noted in the non-medical areas especially the congregated housing units have the potential to put the incarcerated population at risk for injuries and exposure to infectious material. This is especially true for individuals who have chronic medical conditions and who are aged infirmed, frail, disabled, or with mental deficits. Two facilities mentioned crumbling and cracked concrete steps and sidewalks[231] that put both incarcerated persons and staff at risk for injury.[232] The recent CGL Facility Master Plan noted that "walk ways …are in very poor condition creating trip hazards…" and are barriers to accessibility in a number of facilities.[233] This same report also discusses many physical plant issues which have resulted in a recommendation to replace many buildings within the IDOC system. Deterioration of structures is magnified due to deferred maintenance.

Twenty (91%) of the twenty-two reporting sites reported in varying detail on conditions in the HCU, infirmaries, and mental health units. Three facilities reported that were no issues in the HCU. Deficiencies documented in the inspections of the health care areas were similar to the findings in many of the non-medical areas and included:

| Safety and Sanitation Health Care Unit Findings | | |
|---|---|---|
| Mineral crusted and/or leaking sinks | Deficient air conditioning systems | Sinks and showers with no hot water |
| Rusty and dirty vents | Broken windows | Mold on shower walls |
| Non-working showers | Peeling paint | Missing ceiling tiles |
| Leaking/broken toilets | Rusted metal doors | Water leakage in ceilings |
| Non-functional ceiling lights in hallways and bathrooms | Broken/burned out lights | Missing and/or cracked tiles in showers/rooms/hallways |

---

[229] CGL Master Facility Plan May 2023.
[230] From April to June 2024, Menard CC reported their maintenance team completed 385 work orders, yet they still had 382 outstanding word orders at the end of June 2024.
[231] Jacksonville and Menard CCs.
[232] The monitor team has previously reported on the dangerous and hazardous conditions of sidewalks at Logan CC and Dixon CC and deteriorated stairs and loose railings at the ramp to the HCU entrance at Pontiac CC.
[233] CGL IDOC Facility Master Plan, May 2023.

The reports also documented a number of deficiencies that were specific to the health care units as shown in the table below.

| Safety and Sanitation Findings Specific to Health Care Units | | |
|---|---|---|
| Inoperable sinks | Nurse call lights broken | No over-bed tables in infirmary |
| Rusted out ramp to Health care unit* | Rusty tub in infirmary | Infirmary beds need replacement |
| Countertops and exam room desks and cabinets with chipped/frayed/stripped edges and Formica tops | Showers not accessible for wheelchairs or bariatric chairs | Negative pressure units didn't pass tissue paper test or didn't have a backup alarm |
| Examination tables with torn/frayed upholstery | Absence of non-slip surfaces in the infirmary showers | Unsecured oxygen tanks |
| *This is a barrier to access to care. | | |

As noted in a previous paragraph on deficiencies in the non-medical areas, almost all of the deficiencies in the health care areas also had been repeatedly reported but had not been corrected for at least the last three months. The health care area inspections almost exclusively focused on physical plant issues. These reports place less emphasis on clinical space, equipment function and calibration, handling of medical waste, functioning of infirmary beds, and safety features in the patient showers and bathrooms, functionality of negative pressure units, readiness of emergency bags, dental and radiology equipment, functioning of negative pressure units, outcome of sterilization testing (spore test), etc.[234]

Work orders placed to repair deficiencies are slowly if at all addressed.[235]  Only a few logs from IDOC facilities track work orders or dates of correction of deficiencies identified on the safety and sanitation rounds.

There continues to be notable variation in what is reported. Most safety and sanitation reports do not contain the detail necessary to adequately evaluate the space, equipment, safety, and sanitation of the medical areas. The monitor identified eight different check lists used to do monthly Safety and Sanitation inspections of health care units that were in use as of June 2024. Only the five of the eight sites listed any health care area-specific inspection items to be checked during the monthly rounds. See the table below:

---

[234]  Aside from the limited reporting of negative pressure units and spore testing of autoclaves, only two facilities reported on clinical issues. Centralia CC noted for three months that multi-dose insulin vials were not being dated when initially opened and the facility needed additional oxygen tanks from the vendor. Dixon CC noted that a dental ultrasound was broken and that a dental hygiene chair needed to be purchased.

[235]  This is consistent with the CGL report which gives extensive detail on the excessive deferred maintenance that exists within IDOC. One facility with missing floor tiles, cracked glass windows, and a rusted exterior door with large holes commented in the safety and sanitation report that "many issues cannot be repaired due to budget restraints".

| Safety and Sanitation Monthly Inspections | | |
|---|---|---|
| Existing Health Care Area Inspection Tools | | |
| Facility | Total Items | Healthcare-Specific items |
| Centralia | 42 | 19 |
| Kewanee | 16 | 3 |
| Pinckneyville | 32 | 19 |
| Shawnee | 44 | 7 |
| Sheridan | 32 | 19 |

There was some limited overlap of the health care-specific items among the five sites. The check lists of three facilities included monitoring of negative pressure units, two listed nurse call devices, two listed non-slip surfaces and safety grab bars in showers/toilets, and one listed instrument sterilization testing (spore test).

Negative pressure unit inspections were only reported by four (20%) of the twenty reporting facilities with infirmaries.[236] Documentation of spore testing of autoclaves was reported by only one (5.3%) of the nineteen reporting facilities with dental suites.[237] Two (10%) facilities reported their infirmary nurse call devices were not functioning.[238]

The safety and sanitation presentations documented in the monthly CQI minutes are not standardized and have significant variation regarding what is audited, documented, and reported. Based on the variation of data reported, it is evident that IDOC has either not developed a systemwide inspection tool or has not trained staff on the use of a systemwide inspection tool.

IDOC is committed to the development of a tool to inspect the safety of the physical plant and sanitation of clinical spaces. The Safety and Sanitation tools used by Centralia, Pinckneyville, and Sheridan would be a good starting point in developing a standardized inspection tool. The tool will need to be reviewed by the Monitor and tested at multiple facilities to ensure its efficacy. The current safety and sanitation rounds do not adequately and consistently review and document the condition or operability of clinical equipment, AEDs, condition of furniture including upholstery of chairs and exam/treatment tables, emergency response bags, negative pressure units, instrument sterilization, and infirmary beds in the health care unit (HCU) and in satellite clinical spaces in the housing units.

Physical plant deficiencies in the housing units and medical service areas were identified with similar prevalence as cited in previous Monitor reports.[239] IDOC has made only limited progress on improvements to sanitation or inspections. It is a significant concern that the majority of physical plant deficiencies noted in the 2nd Quarter 2024 had been repeatedly reported without correction for three

---

[236] Centralia (no backup alarm), Jacksonville (failed tissue paper test), Pinckneyville (OK), and Sheridan (OK) reported on the inspection of negative pressure units in the safety and sanitation reports.
[237] Only Sheridan's safety and sanitation report noted performance on spore testing (passed) of the autoclave that sterilizes instruments.
[238] Centralia and Sheridan CC's documented in their safety and sanitation reports that their nurse call devices were not operational.
[239] Health Care Monitor 2nd to 7th Reports Lippert v. Jeffreys, Lippert v Hughes.

months and likely much longer. This is unacceptable and creates potential health and safety risks for the incarcerated population and staff. It also creates an unprofessional work environment that hinders the recruitment and retention of the health care and correctional staff.

**RECOMMENDATIONS:**
1. Revise and expand the current health care unit safety and sanitation policy[240] to include specific aspects of the clinical space and equipment that are to be inspected during monthly safety and sanitation rounds (see recommendation #2).
2. Finalize, with input from the Environmental Services Program Coordinator and the Monitor, the health care area safety and sanitation inspection tool to include a more detailed evaluation of the HCU and all other clinical treatment areas and satellite clinics. The tool needs to address the functioning and calibration of medical, dental, and radiology equipment, the condition of gurneys, examination tables, chairs, furniture, and infirmary beds, the contents and security of emergency response bags, the readiness of AEDS, the logs of instrument sterilization testing (spore test), functionality of the negative pressure rooms, the sanitation and orderliness of all clinical spaces, and the health care physical plant including the lighting, infirmary showers, toilets floors, ventilation, etc.
3. Collaborate with the Environmental Services Program Coordinator to develop a separate non-medical-area safety and sanitation inspection tool to ensure that potential health and safety related deficiencies are inspected during monthly safety and sanitation rounds and reported to the monthly facility CQI committee for review and analysis.[241]
4. Track the progress of corrective actions to address deficiencies noted in safety and sanitation reports prioritizing those work orders that have an impact on preventing disease and injury to inmates and staff. Optimally the monthly facility safety and sanitation inspection rounds would also inspect any corrective actions generated by the Environmental Services Program Coordinator.
5. Analyze results of safety and sanitation inspections done by the facility and Environmental Services Program Coordinator to identify systemic issues concerning patient safety or that impede the delivery of timely, adequate health care.
6. Proceed with the plan to move the remaining individuals from the decrepit Stateville infirmary that is not sufficiently safe to house incapacitated and infirm individuals.

**Onsite Laboratory and Diagnostics**

***Addresses item II.B.6.g;***
**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
The Monitor requested and received IEMA documents from most but not all facilities with onsite

---

[240] IDOC Policy Manual, G.22.01 Healthcare Unit Safety and Sanitation (Environmental Inspections).
[241] The Environmental Services Program Coordinator only has the capacity to do safety and environmental inspection on an annual (at best) basis. Facility safety and sanitation inspections are performed on a monthly basis and should including follow-up of corrective actions generated by the Coordinator inspections.

radiology units.

IDOC currently has functioning onsite radiology units at twenty-five facilities.[242] All of these units perform plain film non-contrast x-rays. Films are transported offsite for radiologist evaluations and readings; the only exception is at NRC where a radiologist reads films onsite. With exception of one digital dental x-ray unit, all of the radiology units in the IDOC are non-digital devices.

Based on Illinois Emergency Management Agency (IEMA) codes the IDOC radiology units are considered Class B Illinois radiation installations[243] and should be inspected approximately every two years. The table below reflects the documents provided to verify biannual IEMA safety inspections of the medical x-ray units.

| Illinois Emergency Management Agency (IEMA) | | | | |
|---|---|---|---|---|
| Radiation Safety Inspection | | | | |
| Totals for 27 Facilities with X-ray Units | | | | |
| Inspection Date | Compliance with Inspection | Non-Compliance with Inspection | | Reason for Non-Compliance |
| 2022-2024 | 18 (67%) | | | |
| 2021 | | 1 (4%) | | Outdated certificate |
| 2020 | | 1 (4%) | | Outdated certificate |
| 2019 | | 1 (4%) | | Outdated certificate |
| Undated | | 2 (7%) | | Certificate not dated |
| No Letter or Certificate Provided | | 4 (15%) | | No letter |
| Totals | 18 (67%) | 9 (33%) | 27 | |

Of the 27 facilities[244] with onsite radiology units IDOC provided IEMA radiation safety inspection data for 23 facilities. Eighteen facilities (67%) had passed inspections within the last two years.[245] Three facilities provided data that indicated that their radiology unit had not been inspected in the last 3 ½ to 5 ½ years.[246] IEMA schedules these biannual inspections, so it is very unlikely that these inspections were not performed. It has been the monitor's experience the certificates (undated) and accompanying dated letter from IEMA are not consistently posted in the IDOC's radiology units. A copy of the IEMA letter

---

[242] Stateville closed its x-ray unit sometime in 2024; films are taken at the nearby NRC unit. Centralia's unit has been broken since at least late 2023 and may not be repairable; a mobile radiology company is now contracted to provide x-ray services. Elgin/JITC, JTC, and Murphysboro have never had onsite x-ray units.

[243] IEMA, Illinois Code 320.10 subchapter b: Class B radiation installations include units that are used solely for diagnosis should be inspected by IEMA approximately every two years.

[244] The two closed units (Stateville and Centralia) had been inspected in 2023 or 2024 before these units were shut down. Both sites were counted in the audit of IEMA inspections.

[245] Credit was given if the IEMA dated certificate or letter documented safety inspections in 2022-2024.

[246] Menard, Jacksonville, and Lincoln CCs provided outdated documentation of inspections. Three other facilities did not provide any documentation and one facility only submitted emergency repair invoices.

and certificate should be posted in each of the units and copies maintained in the facilities' administrative offices. This is standard practice in the community.

The monitor team visited NRC on June 3-4, 2024. The NRC radiology unit covers both NRC and Stateville and is open Monday-Friday, 7am-3pm. Approximately eight to ten patients from NRC are seen in the morning and the same number from Stateville in the afternoon. Non-urgent requests for x-rays are scheduled in one to three days. Scheduling logs and x-ray reports of ten patients were reviewed. Eight patients with non-urgent conditions had x-rays taken within 2 days of the requests. All ten x-rays requests had radiologist's reports completed within six days, seven were read within two days. A contracted radiologist comes to NRC every Wednesday to read and to complete a hand written report. NRC is the only site visited by the monitor team at which a radiologist comes into the facility to read films.

IDOC's ultimate goal should be to replace all medical and dental radiology services with digital units that would improve access to diagnostic testing and reports, decrease the time between taking a film and having the radiologist's review and report, eliminate unnecessary developing work for the radiology technician, eliminate the time and cost to transport films offsite and to other IDOC facilities, and enable all facilities to have immediate access to radiologic studies done upon a patient's transfer to another correctional center or even for offsite health care centers. Replacing this equipment would also facilitate recruitment of radiology technicians who have declined job offers because lack of familiarity with operating outdated non-digital equipment.

The Monitor has requested all contracts but the laboratory contract with UIC has not been provided. However, the Monitor is aware that technicians employed by UIC Medical Center provide phlebotomy services at some facilities, lab test preparation, and transport packaging. Specimens are sent to the UIC medical center laboratory with reports on routine testing returned to the originating facility within twenty-four hours. The current laboratory testing and reporting processes are well established and functional. There is no policy on laboratory testing but there should be. Laboratory policy should include critical value monitoring and procedures for follow up of laboratory tests in general. This has been a consistent problem including in current mortality reviews.[247] There is no auditing of follow up of laboratory tests to ensure timely evaluation.

Limited point-of-care testing including FIT testing, fingerstick capillary blood glucose, urine pregnancy tests, rapid COVID and flu testing, and tuberculosis skin tests are performed onsite by facility staff. CLIA certificates or certificates of waiver were not evaluated but must be present.

The UIC lab requisition form, Alphabetical Test List, states that "labs not listed on the requisition form need pre-approval by the corporate/regional medical director. A signed non-formulary form is Mandatory. It must include the test, date, and be attached to the requisition. If one is not attached the testing will not be performed". It was communicated that the most frequently ordered tests that require pre-approval are prostate-specific antigen (PSA), vitamin D level, and hepatitis C RNA quantitative (unless requested by the UIC telehealth hepatitis C clinic). This pre-approval is required even if the non-formulary test was recommended after specialty consultation. This restrictive non-formulary test list creates a potential barrier to care and seems to be a remnant of the medical vendor's collegial review process that has been discontinued. IDOC clinical leadership should carefully investigate this process which has the potential to being a barrier to care.

---

[247] Mortality review patients # 1, 2, 3, 7, 9, 10, and 12.

The Monitor continues to strongly recommend that tuberculosis skin testing (TST) be eliminated and replaced by interferon gamma release assay (IGRA) testing in all IDOC facilities. IGRA is currently only available in the four reception and classification centers. Systemwide use of IGRA to screen for tuberculosis would minimize human error, diminish the risk of accidental finger sticks, and free up nursing staff for other clinical responsibilities.

**RECOMMENDATIONS:**

1. Begin the process to convert all of the non-digital medical and dental radiology units to digital equipment.
2. Expand tuberculosis skin testing (TST) with interferon-gamma release assays (IGRA) blood testing to all facilities.
3. Continue to evaluate the need for radiation exposure monitoring badges in all facilities providing radiology services and, in addition, investigate and implement any needed safety measures for the panorex units at Logan CC and Menard CC.
4. Create a standardized paper and ultimately electronic log to track the results of point-of-care colorectal cancer screening and report this data on a regular basis to the facility's CQI committee meeting (see section in this report on Cancer Screening).
5. Post biannual IEMA radiation safety inspection letters (dated) and certificate (not dated) in all radiology suites and maintain copies in the health care unit administrator's office.
6. Review and investigate the tests on the existing non-formulary laboratory test list and evaluate the need for facility providers to obtain pre-approval from the medical vendor for non-formulary tests.
7. Develop a policy on laboratory testing to include critical value follow up and follow up of routine laboratory tests.

**Dietary**

***Addresses item II.B.6.j.***
***II.B.6.j.*** *IDOC agrees to implement changes in the following areas: Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
IDOC has no policy on nutrition, timing of meals and insulin administration for diabetics, or for consultations for those whose medical conditions warrant nutrition counseling. A policy on this is needed.

IDOC has recently hired a dietician. The position description has been reviewed. Essential functions of this position as described in the position description include development of dietary plans and specialized diets of populations but does not include any responsibility for consultations with individual patients with specific dietary needs based on their chronic medical conditions. Nor does it address timing of meals for those on insulin. Currently, this individual is not performing individual consultations. This position reports to the Chief OHS. An SIU consultant dietician has provided 120 hours of consultation to IDOC for the 12 month period from 5/1/23 to 4/30/24 none of which were individual consultations whose serious medical needs warrant doing so.

The Monitor asked for dietary plans for all northern region facilities including nutritional content. Kewanee sent meal plans used for the last year but nutritional content was not included. Another sample five-week meal plan with a vegan option was sent; these two plans also did not include nutritional content. A letter, apparently from the SIU dietician consultant, written in 2022 documented that the five week meal plan meets national and industry standards. This letter stated that it excluded therapeutic diet needs. A therapeutic diet manual was provided that was written in FY 2000, twenty four years ago. Information provided did not include information whether the meal plan was used for all of the northern region facilities.

The Monitor asked for the number of individual and group dietary consultations. IDOC stated that this information is not generally tracked. Only five facilities responded to the request. Instead of sending persons who had individual dietician consultations Danville, Shawnee, and Taylorville, sent a list of persons on therapeutic diets and Vandalia sent a list of persons on diabetic diets. These responses were non-responsive. Kewanee sent a paper stating that Kewanee does not have formal dietary consultations and stated "Proper diets are discussed at each individual clinic". There remains no evidence that any individual consultations with a dietician occur for any IDOC patients. On mortality reviews, multiple patients[248] with significant medical issues that warranted dietician consultation which was not made available. During the Stateville visit, a group of three individuals with diabetes were interviewed including two on insulin. Insulin administration is at two in the morning. The inmates said that they seldom ate in the chow hall and mostly ate commissary. For breakfast, they said they typically ate commissary oatmeal. Neither of the two individuals on insulin experienced hypoglycemia because they had access to their own commissary food when they needed it. None of the three persons with diabetes had received any education on their diabetes and none were aware of availability of a dietician but all three said they would appreciate ability to consult with a dietician. All three expressed considerable use of commissary and complained about lack of diabetic choices. IDOC does not evaluate the commissary nutritional content. For people with type 1 diabetes counting carbohydrates[249] is recommended but the dietary options for diabetes do not include information on carbohydrate content that can be used for this purpose. For type 2 diabetes, weight loss, calorie intake and exercise options are important. For type 1 or 2 diabetes who use insulin therapy, timing of meals based on insulin use is important. IDOC offers no educational information to persons with diabetes based on discussions with persons with diabetes. The timing of meals does not promote meal participation and affects behavior of persons with medical conditions such as diabetes.

Meal times for the northern region facilities are listed below.

---

[248] Mortality review patients 2, 4, 5, 7, and 8
[249] Carbohydrate counting is a practice of estimating the amount of carbohydrate one is eating which should be matched to the insulin used and the expected physical activity over the period until the next meal.

| Insulin and Meal Times at Northern Facilities | | | | | | |
|---|---|---|---|---|---|---|
| Facility | Insulin | Breakfast | Insulin | Lunch | Insulin | Dinner |
| Dixon | 4:45 AM | 5:00 AM | 11:00 AM | 11:00 AM | 4:15 PM | 4:15 PM |
| East Moline | 5:00 AM | 5:00 AM | | 10:30 AM | 4:00 PM | 4:00 PM |
| JITC | 4:00 AM | 4:00 AM | 11:00 AM | 11:00 AM | 5:00 PM | 5:00 PM |
| JTC | 4:00 AM | 4:00 AM | 10:00 AM | 10:30 AM | 4:00 PM | 4:30 PM |
| Kewanee | 4:30 AM | 5:15-6:15 AM | | 10:30-12:30 | 3:45 PM | 4-6 PM |
| NRC | 2:00 AM | 2:30 AM | 9:00 AM | 9:30 AM | 4:30 PM | 4:30 PM |
| Pontiac | 3:30-4 AM | 3:30-4PM | | 9:30-10 AM | 3:30-4 PM | 3:30-4 PM |
| Sheridan | 4:15 AM | 4:30-6:30 AM | | 9:30-11:30 AM | | 4-6 PM |
| Stateville | 3:00 AM | 2:15-3:00 AM | 10:00 AM | 9:45-10:30 AM | 4:00 PM | 4:45-5:30 PM |

East Moline, Kewanee, Pontiac, and Sheridan did not provide times of insulin for lunch and dinner.  It is unclear if patients needing mealtime insulin are housed there or not.

The custody purpose of 2 to 3 am mealtimes is unclear.   Based on prior interviews, inmates do not participate in many meals, preferring instead to use commissary options which may not have appropriate nutritional content.  It would be useful for IDOC to determine meal participation to assess how many inmates actually eat the meals that are served.  Based on discussions with inmates and dietary staff during a past tour, it is very low.  Because commissary options for meals may be high, the quality of food provided in commissary should be evaluated. Insulin should be given when patients eat and the Kewanee and NRC insulin times should be adjusted to be closer to mealtimes.

In summary, IDOC has recently hired a dietician who has just started work.   There is no current evaluation of therapeutic diets.  Actual meals provided to inmates are not evaluated as to whether the actual meals are what they are designed to be.  Nutritional content of meals is not provided.  This should be done for those individuals who, for medical reasons, need to manage the content of certain nutrients (e.g., carbohydrates) for medical reasons.  Individual dietician consultation for certain medically ill patients is still unavailable.  General dietary education is not provided for persons with diabetes including how to manage their disease within the meal options that are served.  This provision is partially compliant based the recent hire of a dietician.  Much work remains to be done.

**RECOMMENDATIONS:**
1. The percentage of fat, protein, carbohydrates and sodium in diets should be calculated and documented for all master menus.
2. Inmates should have access to information on food components, (e.g., carbohydrates and fats) in their meals so that those inmates who must choose components based on their medical conditions can do so.  This is especially true for diabetics but is also true for those with hypertension and high blood lipids.
3. Diet managers at facilities need supervision by and consultation access to a registered

115

nutritionist/dietician.

4. Access to dietician/nutritionists can be by telemedicine or in person (individual and group) via hiring registered nutritionists/dieticians.

5. The therapeutic diet manual should be rewritten to include all therapeutic diets.

6. Mealtimes should be adjusted reasonably so as not to be a barrier to participation in meals.

7. IDOC should track meal participation by meal.

8. The commissary food and snack panels must be evaluated and adjusted to include healthy choices appropriate for all inmates including those with diabetes.

9. The extremely low participation in eating meals and high use of commissary should be studied to evaluate how to improve consumption of healthy food. IDOC should analyze timing of meals, behavior, recipes, and preparation factors that may be resulting in the extremely low participation in meals.[250] Reasonable adjustments should be made to encourage healthy dietary patterns. This must be done in a manner that permits both a secure environment and nutritious meals that are eaten.

10. Policy, procedure, and practice should be established to ensure persons with diabetes have access to a registered nutritionist/dietician consistent with American Diabetes Association guidelines.

11. Policy, procedure and practice for all chronic care conditions should include evaluation of diet and access to appropriate referral to a registered dietician/nutritionist when indicated.

# Intrasystem Transfers

*Addresses item III.D.1; III.D.2*

**III.D.1.** *With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.*

**III.D.2.** *When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The Monitor requested the following information from IDOC to aid in evaluation of compliance with III. D. 1 and 2 for this report:

- List of persons placed on transfer hold from September 2023 through February 2024 to include the date the medical hold was placed and the reason.[251]
- A blank copy of the revised form or documentation template for transfer screening at the sending and receiving facilities.

---

[250] An example of how this was done, albeit for schoolchildren, is the Centers for Disease Control  School Health Guidelines to Promote Healthy Eating and Physical Activity found in Morbidity and Mortality Weekly Report Sept 16, 2011 as found at https://www.cdc.gov/healthyschools/npao/pdf/mmwr-school-health-guidelines.pdf.  This document shows how behavior, food preparation and presentation promoted healthy eating.

[251] Monitor's document request dated 2/29/2024, item # 111.

- The medical records of up to 20 incoming transfers who arrived at Menard, Logan, Stateville, Lawrence, Illinois River, and Pontiac during the 2nd and 3rd week of February 2024 to include the intrasystem transfer form, nurse reception note, documentation of what documents were received by the facility (medical record, problem list, MAR, health summary, active medications, and any referrals to chronic care clinic). If the patient was referred directly to a physician by the receiving nurse, the physician's note should be provided as well.
- Copies of the intrasystem transfer audits completed by receiving facilities.[252]

Other material reviewed included adverse events, mortality reviews, and a transfer summary report provided by SIU from the data entered into REDcap Mortality Reviews.

With regard to III.D.1, OHS has finalized a policy and procedure on medical holds[253] which incorporated many of the Monitor's suggested revisions on the initial draft. The policy also includes a method for the Agency Medical Director to override a medical hold when it is detrimental or impedes access to other necessary services. The procedure provides sufficient detail about how medical holds are established and removed, who is responsible for each task, the timeliness expected in completing each step, and that a log of medical holds is kept at each facility that includes the date the hold was placed and when the hold will expire.

During the site visit to Northern Reception Center (NRC)[254] the Monitor had the opportunity to observe how medical holds were entered into the electronic program called the 0360 used by facilities to manage placement of individuals in custody. If an individual has a medical hold, their individual profile in the system has a flag prominently indicating the hold on the screen.

Seventeen facilities provided a list of medical holds responsive to the Monitor's request (#111).[255] Eleven of these facilities provided a report that obviously was downloaded from the 0360 system which included the date the hold was placed, the reason for the hold, and an expiration date, if there was one. The six other responding facilities provided a spreadsheet or a list that also included the same information. OHS should follow up with each of the nonresponsive facilities to ascertain their ability to use the 0360 system and that medical holds are placed as necessary.

Vandalia reported findings of a CQI study completed on medical holds. Of 159 transfer holds in place, 70 (44%) should have been removed because the offsite specialty service had been accomplished more than 30 days earlier. There were 10 patients who had specialty appointments pending, had not been placed on medical hold and should have been. The recommendation from the study was to develop a system to track and monitor the placement and removal of medical holds.[256] This is an excellent study which provided information to the program rather than simply to demonstrate compliance.

---

[252] Monitor's document request dated 2/29/2024, items # 98 -100.
[253] E.10.01 Medical Holds effective February 2024.
[254] June 3-4, 2024.
[255] Responding facilities included Big Muddy, Centralia, Dixon, Graham, Hill, Illinois River, Kewanee, Lawrence, Lincoln, Menard, Pinckneyville, Pontiac, Robinson, Shawnee, Sheridan, Vandalia, Vienna, and Western. Nine facilities provided no information (Danville, Decatur, JTC, Logan, Murphysboro, Southwestern, Stateville, and Taylorville). Three facilities sent the off-site log but there was no information about medical holds (East Moline, Jacksonville, NRC).
[256] Vandalia Quality Improvement Meeting for February 2024.

The Monitor noted one near miss that was reported during this report period of a patient who had transferred inappropriately and did not have a medical hold in place. The error was identified and corrected within a day of the incident. This incident was reviewed as part of the CQI program. The review of transfer charts indicate that intended specialty care is missed frequently when patients are transferred from one facility to another.  The Monitor suggests that transfer errors be one of the categories trended in the review of adverse events, near misses, and sentinel events.

Fifty-one records of transfers were reviewed for this report.[257] There were 11 individuals who were under care of a specialist or pending specialty care at the time of the transfer (22%).  There were only four who received or are scheduled to receive the specialty service at the receiving institution.[258]  Missed specialty care included referrals for gastroenterology (2), hematology, orthopedic, dermatology, and audiology (2). Also missed by the receiving facility was scheduling regular optometric follow up for one patient.[259]

IDOC is partially compliant with III.D.1. The policy and procedure is satisfactory but does not yet appear to be fully implemented. It is not clear that all facility health care programs are placing medical holds when medically necessary. OHS has yet to develop an audit or other evidence of compliance with III.D.1.

Steps to compliance with III.D.1 suggested by the Monitor are that OHS follow up to ensure that all Health Care Units have the capacity to use the 0360 system to place medical holds and to implement E.10.1 Medical Holds. OHS should also investigate whether the medical hold report could be a standard report used by individual sites as well as the entire system. Existing Excel or Word documents that some sites are using could be eliminated if there were a standard report.  The last suggestion is to evaluate as part of Mortality Review whether a medical hold was or should have been in place for any patient referred for specialty care and to place this information in REDcap.

A policy and procedure for intra-system transfers has been finalized by OHS and was made effective in February 2024.[260]  Many of the Monitor's suggestions on the draft reviewed in April of 2023 were incorporated into the final product. The final policy and procedure satisfactorily addressed two of the recommendations made in previous reports.[261]

The Monitor strongly disagrees with the policy decision to use the Health Status Transfer Summary (HSTS) (DOC form 0900) for the purpose of screening and receipt of individuals going to the community for off-site care and discharges from the infirmary back to general population. OHS is urged to move these events to another policy and procedure in the next revision and to devise different forms.  The purpose and content of communication with specialists in the community is completely different and better guidance needs to be provided to health care staff than is present in E.03.01. Findings reported in the

---

[257] Records reviewed were from Illinois River (N =11), Lawrence (N=12, Menard (N=19) and Pontiac (N=9). Records received from Logan and Stateville were not responsive to the request.

[258] Transfer patients # 24, 28, 44, 47.

[259] Transfer patients # 12, 16, 31, 32, 35, 38, 45.

[260] E.03.01 Intrasystem (Transfers Within IDOC) Receiving, Transfer and Continuity of Care.

[261] Health Care Monitor 7th Report, Lippert v. Jeffry's, December 27, 2023 page 91. Recommendation 1 was to finish the policy and procedure and ensure the steps the sending facility is to take in documenting pending referrals, identifying tasks not yet completed, reconciliation of medication lists, and detailing current medical and mental health problems are well defined. The receiving facility's obligation to verify the transfer information, examine the patient and document actions taken to continue ongoing care and address new problems also needs to be described. Recommendation 4 about what is to take place when someone refuses receiving screening was also addressed. These are deleted from the recommendations in this report.

Transfer Summary Report by SIU support the Monitor's opinion that the information provided on the HSTS is not adequate for specialty care purposes.[262] Upon closer review, E.03.01 includes absolutely no guidance about what is to be done to ensure continuity of the plan of care when patients are discharged from an infirmary. This subject is already addressed in F.04.01 Infirmary Level Care and can easily be enhanced if it needs to better describe what screening and review is done after a patient has been discharged from infirmary care. These subjects and the relevant policy are addressed further in this report in the sections on off-site care and infirmary services. The Monitor will submit this comment and other suggested revisions to E.03.01 and hopes these will be considered by OHS upon annual review.

The transfer audit tool discussed in previous reports has not been revised yet as has been recommended. This tool should be expanded to evaluate *continuity of care* as called out in III.D.2.[263] We have suggested the tool evaluate the timeliness of sending and receiving screening, accuracy of the clinical information (diagnoses and medications) entered on the HSTS DOC form 0090, whether the MAR was transferred concurrently, and that care was continued without interruption (medications, pending appointments and completion of referrals).

We were not provided with any intrasystem transfer audits completed by receiving facilities as requested.[264] OHS provided instead, a report completed by SIU.[265] It lists 23 intrasystem transfers and whether or not the HSTS included sufficient and relevant clinical information. Twelve of the transfer summaries (52%) were considered sufficient. This information is collected during the mortality review process. This is a fairly crude measure because it does not lead to any conclusions about possible process improvements. Perhaps the data collected could be revised slightly to include identification of the sending and receiving facility, some indication of what was insufficient or not relevant in the transfer summary and finally whether there was any interruption in care. With these additions the REDcap data could be used to report on compliance with III.D.2.

Fifty-two records documenting transfer screening and continuity of care of transfers received the 2nd and 3rd week of February 2024 were reviewed.[266] Records were received from all the requested facilities but in some cases were nonresponsive or incomplete.[267] There continues to be a great deal of variation in the documentation of transfers.

A HSTS (DOC form 0900) was completed by the sending facility in 49 of 52 records reviewed (94%). While it is not common for the sending facility to fail to complete a HSTS, important care can be disrupted when the person is transferred. An example of this is a patient who transferred from Menard to Pontiac on 2/16/24.[268] The HSTS was not received at Pontiac until 2/26/24 or ten days later. The only chronic

---

[262] Transfer Summary Report - data source: Office of Correctional Medicine @ SIU REDCap Mortality Reviews - January 1, 2022 - May 1, 2024 provided in response to the Monitor's request # 111. for audit results regarding intrasystem transfers.
[263] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, pages 78-79, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 57, Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 92, Health Care Monitor 5th Report, Lippert v. Jeffreys, June 22,2022, page 73, Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, page 69, Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, pages 88 & 91.
[264] Monitor's document request dated 2/29/2024, item #100.
[265] Transfer Summary Report - data source: Office of Correctional Medicine @ SIU REDCap Mortality Reviews - January 1, 2022 - May 1, 2024
[266] Thirty records of transfers to Decatur, East Moline, Hill, Jacksonville, Murphysboro, Stateville, and Taylorville
[267] Logan and Stateville each sent only one record neither had an intrasystem transfer in February 2024. Pontiac was the only facility which sent a copy of the February MAR from both the sending and receiving facility.
[268] Transfer patient # 46.

119

condition noted was the need for mental health services. On the line for significant medical history the words psych and glaucoma are listed. No other information was provided. This patient did not receive medications for glaucoma until 2/29/24 or two weeks after transfer.

We have commented before that documentation on the receiving portion of the HSTS, form 0090, appears to be voluntary.[269] OHS policy and procedure E.03.01 states that documentation of receiving screening is done in the progress notes.[270] Only two of four receiving facilities document the receiving screening on the bottom half of the 0900. Each of the four receiving facilities also document a progress note that has pre-printed questions. Each of these pre-printed progress notes differ in the information to be documented. The documentation for receiving screening needs to be standardized. The Monitor was informed that SIU is working with OHS to revise the documentation of transfer screening.[271] The revised form needs to include the date and time the person was received at the facility as well as the date and time receiving screening began. We recommend that the variation in current documentation be reviewed and considered in revising the form.

---

[269] Health Care Monitor 5th Report, Lippert v. Jeffreys, June 22, 2022, page 73, Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 88.
[270] E.03.01 Intrasystem (Transfers Within IDOC) Receiving, Transfer and Continuity of Care, Procedure I. 5.
[271] IDOC response to the Monitor's Documentation Request Item # 98, dated 6/28/24.

HSTS forms were completed at sending facilities a day or two before the transfer.[272] There were no examples of HSTS being completed months before the date of transfer. LPNs completed receiving screening at three of four facilities reviewed.[273] Receiving screening requires independent assessment and clinical decision and is therefore outside the scope of practice for LPNs.E.03.01 states that the Medical Director at the sending facility is to communicate with the Medical Director at the receiving facility to hand off care when patients transfer from an infirmary or are otherwise seriously ill.[274] One of the records reviewed was a patient transferred directly from NRC to the Pontiac inpatient unit on crisis watch.[275] There was no documentation of direct communication between sending and receiving providers. The same was true of another patient this time transferred from Lawrence to Menard while on crisis watch.[276] No information was provided by the sending facility about this patient. Among the mortality records reviewed was a patient transferred from JTC to the NRC infirmary.[277] This was so the patient could receive supportive end of life care. He had metastatic breast cancer and difficulty achieving adequate pain control. He also had significant mental illness. There was no documentation of direct communication between the sending and receiving providers to ensure his care was uninterrupted. This patient experienced discontinuity in care as a result of this transfer. Another mortality patient reviewed had liver failure with ascites and esophageal varices. He was transferred from Pinckneyville to the infirmary at Shawnee on 8/18/23.[278] There is evidence of direct communication between HCUAs at both sending and receiving facilities as well as the Regional Medical Coordinator. The Medical Director at the receiving facility was eventually included in the communication but there is no evidence of provider involvement at the sending facility. This same patient was transferred back to Pinckneyville ten days later but this time there was no evidence of direct communication between providers to transfer responsibility for care.

During the site visit to NRC[279] the Assistant Warden described a concerted effort to find appropriate housing at other facilities for patients at NRC who have medical problems or disabilities but are otherwise able to care for themselves. By meeting regularly with the facility Medical Director, Regional Medical Coordinator and Transfer Coordinator a number of patients have been transferred from NRC to other facilities with appropriate services. This has reduced backlogs at NRC and freed up critical inpatient beds and specialty housing. The Monitor was impressed with this effort and urged formal adoption of this process at other facilities in the system.

---

[272] The range was 0 to 23 days.
[273] At Illinois River LPNs completed all 11 of the records received. At Menard and Pontiac LPNs completed receiving screening in some but not all of the records reviewed. Only RNs completed receiving screening in the records reviewed from Lawrence.
[274] Procedure, I. C.
[275] Transfer patient # 52.
[276] Transfer patient # 26.
[277] Transfer patient # 53.
[278] Transfer patient # 54.
[279] June 3-4, 2024.

121

Critical information was missing on the HSTS in several of the charts reviewed. An example is a 35 year old patient who was transferred from NRC to Illinois River 2/6/24.[280] The sending facility noted that he had chronic conditions including colitis, HIV, and thrombosis. Thirteen medications were listed. The HSTS listed no acute or current problems. The problem list included a DVT experienced by the patient in 2023. The HSTS does not include that he had bilateral lower leg edema and oral thrush, both acute conditions relevant to his diagnoses. It also does not indicate that he had a positive RPR, a test for syphilis, and that he should have been referred for consideration of treatment. Another patient reviewed had HIV disease and mental health follow up (no diagnoses) on the problem list.[281] The HSTS completed at NRC indicates that he has no acute or chronic problems. The only medications listed are ibuprofen, paroxetine, and prazosin. The HSTS does not indicate that he was seen in chronic clinic nor that he is prescribed Biktarvy, a medication to treat HIV disease.[282] The patient missed receiving doses of this medication the day of transfer.

Only half of the records reviewed had complete information in the sending facility section of the HSTS. Missing information included allergies[283], durable medical equipment[284], current treatment[285], diagnoses[286], and medications[287]. Sometimes information is so vague that it's not meaningful. For example, one transfer summary notes that the patient has ankle support but there is no information about any acute or chronic condition that explains the need for ankle support.[288] The transfer summary should have indicated that the patient had an injury to his right ankle which was swollen.

With the exception of Pontiac, it appears that individuals are seen by health care staff in the Health Care Unit or other appropriate location within hours of arrival. This encounter involves an interview of the person, limited observation of their condition, vital signs, and a few questions about any health complaints. It also includes a review of the patient record and documentation of arrangements for chronic clinic and/or referrals to mental health as necessary.

---

[280] Transfer patient #10.
[281] Transfer patient # 48.
[282] Doses of Biktarvy should not be missed.
[283] Transfer patient # Y20069
[284] Transfer patients # 17, 18, 37, 39.
[285] Transfer patients # 7, 10, 15, 26.
[286] Transfer patients # 2, 16, 17, 20, 22, 23, 35, 37, 38 – 40, 42, 46, 49, 50.
[287] Transfer patients # 6, 12, 14, 15, 19, 20, 26, 27, 29, 30, 33-35, 37, 39, 44, 46 – 48, 50, 51.
[288] Transfer patient # 6.

Three of the nine transfer records reviewed from Pontiac document that the individual was seen in the holding tank.[289] One of the transfer records reviewed from Pontiac did not have the receiving screening portion of the HSTS completed until the day after arrival at the receiving facility.[290] It is not acceptable to complete receiving screening with the individual in the holding tank. III.B.1of the Consent Decree requires IDOC to provide sufficient private and confidential areas for all types of medical evaluations and examinations. This provision may be limited for extraordinary reasons.[291] Three of the four transferred to Pontiac and discussed in this paragraph were received on 2/14/24. One individual was received at Pontiac on 2/16/24. When receiving screening was done in the holding cell or delayed by a day there is no documentation that there was an extraordinary reason. OHS should further review this finding to ensure that receiving screening takes place in a private and confidential setting and if not the reason for the exception.

Another practice noted at Pontiac was that the dates of the receiving portion of the HSTS and dates of chart review do not correlate. It appears that on some occasions the HSTS is not completed on the day of arrival. For example, transfer patient # 48 had the chart review documented on 2/14/24 but the HSTS was not completed until 2/16/24. This would indicate that the person was not seen for a screening evaluation until two days after arrival.  This was found in two additional records reviewed.[292]  In six of the records documentation of chart review did not take place within 12 hours of arrival as required by E.03.01.[293] The delay in chart review varied from 13 hours to as much as seven days later.[294] These two findings should be reviewed to ensure that the HSTS and documentation of record review occurs within 12 hours of arrival at the receiving facility as required by E.03.01.

Discontinuity of patient care upon transfer was evident in the records reviewed. Pontiac was the only facility that sent MARs for the month of transfer from both the sending and receiving facility. This allowed review of the continuity of medications upon transfer. Of eight patients on medications, only one person had no missed doses. Another person received four medications KOP while at the sending facility[295]. From review of the MAR the patient was not taking amlodipine, a medication for hypertension, correctly. This was not recognized by the nurse completing receiving screening. E.03.01 is silent on how KOP medications are handled when patients transfer. The remaining six individuals each experienced interrupted dosing. These patients experienced delays of 1 to 10 days before medications at the receiving facility were provided.[296]  Medication discontinuity upon transfer is surely not limited to Pontiac; it was just that this was the only facility which provided the records requested by the Monitor to evaluate medication continuity.

---

[289] Transfer patients # 46 – 48.

[290] Transfer patient # 51.

[291] The exact language is "…subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown."

[292] Transfer patient # 47, 51.

[293] Procedure, II. A. This is also an NCCHC requirement P-E-03 Transfer Screening, Compliance Indicator 1.

[294] Transfer patients # 46 (13 hours), 44 (1 day), 45 (7 days), 46 (next day), 50 (3 days), 52 ( 7 days).

[295] Transfer patient # 51.

[296] Transfer patients # 44,46, 48, 51, 52.

There also was discontinuity in other care ordered for these patients. These disruptions include not being assigned low bunk/low gallery[297], not being provided a permit for a cane or wheelchair[298], not noting the patient had glasses[299], not noting that the patient was currently under treatment[300], and not enrolling in chronic clinic[301]. Several patients should have been referred to mental health and there is no documentation of having done so.[302] There were five of the 52 transfer records reviewed that the receiving nurse should have done a more complete assessment. Three patients had elevated blood pressure.[303] A repeat blood pressure should have been obtained or the patient scheduled for serial blood pressure readings. Two patients had inhalers prescribed but were not followed in chronic clinic. The nurse should have obtained or scheduled a peak flow with a provider visit to follow. In three additional records the patient had a condition that the nurse should have contacted a provider about or scheduled a provider appointment.[304]

Every time a patient is transferred from one facility to another there is significant risk that the sequence of care and treatment will be delayed or stalled. Two patients whose deaths were reviewed during the time period covered by this report emphasize the importance of steps to ensure patient safety when transferring to another facility.

The first was a 41 year old man who arrived at Menard on 1/13/23 as a parole violator.[305] He gave a history of alcohol use disorder with inpatient care, he was a 20 pack year smoker, having quit three years earlier. A nurse practitioner completed his physical exam on 1/19/23. He had abnormal labs, in particular the alkaline phosphate was 430, nearly four times the reference range (40-125). There is a handwritten notation on 1/19/24 to repeat the CMP. The repeat lab sample was obtained from the patient on 1/24/23. Three days later he was transferred to Vienna (1/27/24). The HSTS has no documentation that the patient had an abnormal lab result and needed follow up nor did it document that repeat labs were drawn but not yet resulted. There is a typewritten note on another copy of the initial lab report, dated 1/28/23, by the vendor's Regional Medical Director noting the abnormal result. He asked the site to pull the chart and schedule the patient for a review and evaluation by the on-site provider. This must have been sent to Menard because the word "Transferred" is handwritten on the bottom of the page. The page is also date stamped as received 3/2/23. In the meantime, a part time coverage physician saw the patient on 1/31/23. The note consists of the following statements "Complaint: review labs. S: Follow up abnormal labs. O: Repeat labs not back. A: Abnormal labs. P: Awaiting repeat lab." The physician took no history and did not examine the patient. The repeat lab results drawn 1/24/23 were not in the patient record and there never was an appropriate evaluation of the patient. This patient should not have been transferred until the elevated alkaline phosphate had been evaluated with an exam, thorough history, additional labs, and other diagnostics obtained. Seven months later colon cancer was diagnosed with liver and pulmonary metastases. He died a month later. The need to follow up on the abnormal lab results was lost when this patient was transferred and contributed to a delay in the diagnosis.

---

[297] Transfer patients # 6, 28.

[298] Transfer patients # 20, 28.

[299] Transfer patients # 15, 32, 38.

[300] Transfer patients # 10, 15.

[301] Transfer patients # 17, 19, 29, 31, 33, 37, 40.

[302] Transfer patients # 22, 23, 29, 35, 52.

[303] Transfer patients # 7, 8, 45.

[304] Transfer patients # 30 (had a positive IGRA and should have been referred for follow up and possible treatment), #32 (taking hydrochlorothiazide and should have referred for chronic clinic enrollment), and #46 (should have been referred urgently to continue treatment for glaucoma).

[305] Transfer patient # 55.

The second patient was a 46 year old man who was received at Graham on 10/12/23.[306] He gave a history of hypertension and alcohol and substance misuse with hospitalization for withdrawal. At the initial physical exam 10/23/23 he complained of an issue with his left shoulder, headaches, and back pain. The provider did not ask any further questions to elaborate on these complaints. This patient also had a pulse of 109. From 10/31/23 through 11/15/23, or a two week period, he was seen five times for progressively worsening complaints of shoulder pain, chest pain, and difficulty breathing. On 11/13/23 a code 3 was called in response to the patient's complaint of two days of right shoulder pain with shortness of breath. An x-ray was ordered. Two days later at 5:15 am the patient was seen by a nurse for chest pain using the chest pain protocol. He was tachycardic with a pulse of 113. An EKG done at 6:12 am showed sinus tachycardia of 114 but was otherwise normal. No provider referral was made despite instructions to do so in the protocol. That day the patient was transferred to Southwestern. The sending facility portion of the HSTS has no documentation of the repeated complaints of right shoulder pain, chest pain, or difficulty breathing the last 15 days. Nor does it document that there was a code 3 two days earlier, does not note that an x-ray was ordered but not yet done, and does not indicate that he was evaluated that morning for chest pain.

Southwestern completed receiving transfer screening at 8:45 pm on 11/15/23. The patient's  pulse was 128 and he was described as "Fidgety but polite". The disposition was routine sick call. No referral was made for a provider evaluation given the episode of chest pain that morning before he was transferred. The next morning at 8:45 am a nurse documented responding to a code 3. The patient reported arm pain, "his whole body hurts, even the right side of my chest a little bit". The nurse did not use a protocol to guide the assessment during this encounter. He was noted to have bruises and an abrasion on the right rib cage and reported falling out of bed twice during the night. An EKG showed tachycardia but otherwise was normal. The nurse did not note the repeated complaints made recently and did not refer the patient for evaluation by a provider. A referral to mental health was made.

This patient should not have been transferred in the first place until his acute symptoms had been evaluated and addressed. A medical hold should have been placed no later than 11/13/23, the x-ray obtained as ordered, and the patient seen in follow up. The HSTS completed by Graham was unsatisfactory because it did not convey the pending x-ray or the multiple worsening complaints of pain and shortness of breath, or the persistent tachycardia. Five days after transfer to Southwestern, the patient was hospitalized where he was diagnosed with widespread metastatic disease. Valuable time was lost before the receiving facility recognized the need for higher level care and this was at least in part due to the failure by Graham to communicate the recent change in the patient's health status.

IDOC is partially compliant with III.D.2. The recently finalized policy and procedure has not been fully implemented. SIU demonstrated capacity to evaluate and report on the sufficiency of communication between sending and receiving facilities as part of the mortality review process. This report showed that half of the time communication between facilities was insufficient. The Monitor's review of records for this report came to the same conclusion. Other findings from the Monitor's record review were that receiving screening was not completed timely and at times the encounter was not in a private setting that provided confidentiality, and that there was discontinuity in patients care more often than not. Several examples were given of intrasystem transfers that resulted in adverse patient outcomes. Recommendations are made to suggest steps to bring IDOC practices into compliance with the Consent Decree.

---

[306] Transfer patient # 56.

125

**RECOMMENDATIONS:**

1. OHS follow up to ensure that all Health Care Units have the capacity to use the 0360 system to place medical holds and to implement E.10.1 Medical Holds.

2. OHS should investigate whether the medical hold report could be a standard report used by individual sites as well as the entire system.

3. Evaluate as part of Mortality Review whether a medical hold was or should have been in place for any patient referred for specialty care and to place this information in REDcap.

4. Revise E.03.01 and put the guidance about transfers for offsite care and discharge from the infirmary elsewhere. Also add guidance about how medication (both KOP and nurse administered) is to be managed when patients transfer with expectations for timeliness of the first dose at the receiving facility.

5. Do not assign LPNs to complete the assessment or determine the disposition of receiving screening as this is outside scope of practice.

6. Monitor implementation of E.03.01 to ensure completion of receiving screening timely and in a setting that is private.

7. Patients should have a medical hold placed whenever there is an acute change in their condition (worsening of symptoms or new symptoms) or undergoing diagnostic work up (abnormal labs, radiography, or other testing) until the patient's condition has been diagnosed and a plan of care developed.

8. Complete revision of the receiving screening form to coincide with the revised policy and procedure on intrasystem transfers. We have suggested the form include the time the person arrived at the receiving facility in addition to the time the nurse reviewed the record. Standardize any other documentation of receiving screening.

9. Revise the data collected during mortality review to include identification of the sending and receiving facility each time the patient transfers, an indication of what was insufficient or not relevant in the transfer summary and finally whether there was any interruption in care after arrival at the receiving facility.

10. Inappropriate transfers and any interruption in patient care after transfer is a patient safety error and should be reported. Transfer errors should be one of the categories trended in the review of adverse events, near misses, and sentinel events.

# Medical Reception

## Nurse Intake Screening and Health Assessment[307]

*Addresses Items II.A; II.B.1; II.B.6.a; III.C.1*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

---

[307] Dental intake screening is addressed in the dental section of the report.

**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment*
**III.C.1.** *IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.*
**III.C.3.** *IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.*
**III.C.4.** *If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested the following information to evaluate the items in the Consent Decree related to Medical Reception.

1. For providers, the documentation of assignments for intake health assessments for the month of February 2024.
2. Provide copies of health records for 20 new admissions to NRC and 10 new admissions for each of Menard, Logan, and Graham for the month of January 2024. Records to be sent include the problem list, data base, intake screening forms (including vaccine history and any RHM screenings), medical history, physical examination, dental exam and instruction on oral hygiene, health assessments, and corresponding progress notes, orders, results of diagnostic testing, and any patient refusals for the first 45 days following the reception date.
3. Progress report on the re-design of the initial intake screening and health assessment, including a blank copy of any form or documentation templates. [308]

The Monitor visited Northern Reception and Center June 3-4, 2024, to tour the physical facility and review health records of persons newly admitted to the IDOC. The Monitor has previously visited Logan and Graham Correctional Centers, both reception and classification centers.

The only performance measure IDOC monitors that concerns medical reception is that individuals aged 36 to 75 years of age would be offered and receive a screening test for hyperlipemia *within 30 days of incarceration.* A threshold of 90% was set by IDOC. Actual performance for the first two quarters reported for fiscal year 2024 was 23% and 22%.[309] However no interventions or corrective action has been implemented to improve performance on this measure.

The Monitor's evaluation of compliance with II.B.6.a, II.C.1-4 is based upon conclusions drawn from this material as well as review of mortality records and institution monthly reports. IDOC attained partial

---

[308] Monitor's documentation request dated 2/29/2024, items #60, #101and #102. Each of the reception centers sent provider assignments in response to item #60 and copies of health records as requested in response to item #101. IDOC provided the Monitor with a draft of a documentation template for a comprehensive physical examination in response to item #102 and stated that the intake screening form was being worked on. OHS informed the Monitor that no further forms development was underway currently as they consider using forms already included in the vendor's electronic health record. Email from them Special Litigation Counsel dated 8/6/2024.
[309] Office of Correctional Medicine, Clinical Quality Performance Review: Summary, FY 24, provided in response to the Monitor's document request # 34.

compliance with these items in the Consent Decree in 2022 because a policy and procedure for medical reception had been drafted, increased positions were allocated to the intake centers, and IGRA testing to screen for tuberculosis infection had been initiated.[310] As of this report IDOC has made some forward progress as described in the following paragraphs with much work yet to be done.

**Policy**

A policy on medical reception was finalized by OHS in February 2024. This policy improves on the previous administrative directives by providing the rationale for receiving screening and the health appraisal.[311] The policy also lists expectations for the content of these health appraisals. These include the identification of patients with special health care and housing needs, those who appear frail or otherwise vulnerable, and anyone who will need orders for medical services or nursing care before the full health evaluation is completed. Screening shall a include full set of vital signs, vision and hearing screening, actual height and weight (rather than self-report), and additional screening or diagnostic tests based upon the medical history. The findings from intake screening are reviewed by a provider in person or by phone within 12 hours of the patient's arrival and orders obtained, as necessary, for additional diagnostic studies, medications, diet, housing restrictions, nursing and medical care.

The policy states that each patient receives a full physical assessment as early as possible but in all cases not later than the 7th day after arrival. This assessment also includes obtaining a full set of vital signs, a complete history of all the problems identified at intake screening, and any other conditions which have been identified as a problem since screening. The provider is to review lab and radiology results that are available and perform a physical examination. The extent of the physical exam is determined by the problems identified, the patient's functional capacity, and the protocols for preventative health care. A subsequent plan of care is ordered to avoid lapses in continuity and anyone with a condition in which a lapse in care may result in a negative outcome is to be enrolled in chronic clinic and seen within the next 30 days. Recommended preventive care and vaccines are to be identified and offered by the provider at the full physical assessment and scheduled when due. The problem list is to be updated and reflect all problems requiring follow up or with historical significance.

A draft of this policy, E.05.01 Intersystem Receiving Screening, was provided to the Monitor for review on 8/23/23. The Monitor provided OHS with an extensive revision to the draft on 1/25/24. However, OHS was in the process of finalizing the 8/23/23 draft so consideration of the Monitor's comments were not addressed in the policy that has been distributed for implementation in February 2024. We have been assured that during OHS's upcoming annual review of the policy that the Monitor's comments will be considered. Some of the modifications suggested by the Monitor include:

- Adding procedural direction for implementation of the policy. This includes direction for requesting a patient's records of health care in the community and criteria for determining the urgency with which the patient is seen by a medical provider. Timeframes for early preliminary provider evaluations for those individuals with acute, out-of-control, or complex serious conditions needs to be included.
- Stipulate that intake screening, the history and physical exam take place in an area that provides visual and auditory privacy and provides direction as to accommodations for individuals with

---

[310] Health Care Monitor 5th Report, June 22, 2022, page 75.
[311] …"to ensure that patients' needs are addressed." E.05.01 Intersystem Receiving Screening, Medical Policy and Procedure Manual, Issued 2/1/24, pages.108-110 .

disabilities (speech and hearing) as well those whose primary language is not English.
- The results of diagnostics (lab, x-ray, EKG, etc.) ordered at intake screening must be available for the provider to review at the time of the full physical assessment.
- Labs, vaccinations, and the A & B preventive health care screening recommended by the United States Preventive Health Services Task Force (USPSTF) should be accomplished by nurses via protocol. Current policy has these ordered individually by a provider which is cumbersome and likely to result in omissions. Providers will still need to be consulted so that any specific lab or diagnostic work not already included in the protocol is ordered when necessary.
- The full physical assessment needs to be completed before, rather than after, classification so that any ADA, durable medical equipment, or other special needs are known when facility, programming, and housing assignments are made.
- The goal of the health assessment is to evaluate all acute and chronic medical conditions (not just those identified in nurse screening) with a history and examination pertinent to those problems. This concludes in an assessment of each problem with a baseline therapeutic plan for all problems which includes updating immunization and preventive health measures.[312]
- IDPH should be consulted to provide recommendations for screening of communicable diseases based upon disease prevalence in the community and these included in the policy.
- Persons 50 years of age and older should be screened for cognitive impairment using a standardized tool, such as the Montreal Cognitive Assessment (MoCA) test.
- Evaluation of the need for physician orders for life-sustaining treatment (POLST) when indicated.
- Specifying timeframes for continuation of care after intake (i.e., time to first dose of medication for patient with a chronic condition, availability of keep on person rescue inhalers, canes, crutches, wheelchairs, oxygen therapy for those on continuous oxygen therapy, continuous positive airway pressure (CPAP) device, housing orders for persons with movement disabilities or for those with cognitive deficiencies, etc.)
- Guidance needs to be given regarding what is to be on the problem list and who is responsible for maintaining the problem list.

**Record Review**

The review of patient intake records does not reflect any change in performance from previous reports.[313] Forty-six records were reviewed of intakes received in January 2024. There were 20 patient records from NRC, ten each from Graham and Logan, and six from Menard.[314] Five patients were 51 years of age or older or 11% of the sample.[315]

| Age Distribution of Sample | NRC | Graham | Menard | Logan | Total | Percent |
|---|---|---|---|---|---|---|
| ≤30 years of age | 2 | 6 | 1 | 2 | 11 | 24% |
| 31 to 50 years of age | 15 | 3 | 5 | 7 | 30 | 65% |
| 51 to 70 years of age | 3 | 1 | 0 | 1 | 5 | 11% |
| **Grand Total** | **20** | **10** | **6** | **10** | **46** | **100%** |

---

[312] These are the A and B recommendations of the United States Preventive Health Services Task Force.
[313] Health Care Monitor 7th Report, December 27, 2023, pages 91 – 100, Health Care Monitor 6th Report, March 13, 2023, pages 73-83.
[314] Menard sent 10 records but four did not have a health assessment completed and were not used.
[315] Persons 50 years of age and older represent 22% of the population incarcerated in the IDOC as of December 2023. https://idoc.illinois.gov/content/dam/soi/en/web/idoc/reportsandstatistics/documents/factsheets/CY23-50-plus-Fact-Sheet.pdf

An essential component of the reception process is to identify conditions that require follow up for a short period of time (fractures, prophylactic tuberculosis treatment, syphilis, abnormal PAP smears, etc.) as well as conditions that require long-term follow up. All of these temporary and long-term conditions should have an order for scheduled follow up. IDOC elects to schedule all chronic care problems and temporary problems together to reduce the number of appointments. A table of the acute or chronic care problems identified in the 46 records reviewed is shown below. Sixteen (35%) patients did not have an acute or chronic care problem. The remaining 30 (65%) of the 46 patients reviewed had a total of 74 acute or chronic problems which needed scheduled follow up. Only seven[316] of the 30 patients with problems were ordered to be scheduled for chronic clinic or other appointments for follow up; some of seven were scheduled for more than one chronic clinic appointment. We consider obesity a chronic medical condition which is consistent with current standards of care[317]. IDOC does not currently treat obesity as a chronic medical condition.

| Acute and Chronic Conditions identified in Intake | | | | | |
|---|---|---|---|---|---|
| | **Logan** | **NRC** | **Menard** | **Graham** | **Total** |
| Obesity | 5 | 9 | | 2 | 16 |
| Asthma | 1 | 4 | | 1 | 6 |
| HTN | 3 | 1 | | 1 | 5 |
| Hepatitis C | 3 | 1 | 1 | | 5 |
| GERD | 3 | 1 | | | 4 |
| Hyperlipidemia | 3 | 1 | | | 4 |
| Abnormal PAP | 2 | | | | 2 |
| Anemia | 2 | | | | 2 |
| Diabetes | | 1 | | 1 | 2 |
| Eczema | 1 | | | 1 | 2 |
| Hypothyroidism | 1 | 1 | | | 2 |
| Osteoarthritis | 2 | | | | 2 |
| Positive IGRA | 1 | | 1 | | 2 |
| Seizure disorder | 1 | | | 1 | 2 |
| Sickle cell anemia | 1 | 1 | | | 2 |
| Syphilis | 1 | | 1 | | 2 |
| Active fracture | | 1 | | | 1 |

[316] Two of these were at Graham and four were at Logan and one was at NRC. The one from NRC had a chronic clinic completed about two months after reception screening but this was not ordered at the health assessment. It is unclear when it was ordered. Credit was given nonetheless.

[317] See link https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6179496/ and link https://www.cdc.gov/obesity/php/about/index.html/

| | | | | | |
|---|---|---|---|---|---|
| Alcohol withdrawal* | | | | 1 | 1 |
| Allergic Rhinitis | | 1 | | | 1 |
| Atrial fibrillation | | 1 | | | 1 |
| Cancer with colostomy | | 1 | | | 1 |
| Elevated liver functions no diagnosis | | | 1 | | 1 |
| Heart failure | | 1 | | | 1 |
| Hypotension requiring medication to control | | 1 | | | 1 |
| Osteogenesis Imperfecta | | | | 1 | 1 |
| Ovarian Cyst | 1 | | | | 1 |
| Pulmonary embolism on anticoagulation | 1 | | | | 1 |
| Sleep apnea | | 1 | | | 1 |
| Spinal stenosis | 1 | | | | 1 |
| Venous insufficiency | | 1 | | | 1 |
| **Total** | | | | | 74 |
| *This patient was a parole violator who was initially incarcerated at Taylorville and was transferred to Graham. There was no health assessment at Taylorville, but a nurse evaluated the patient at Taylorville and started withdrawal monitoring but did not address his other medical conditions for the week he was at Taylorville. | | | | | |

## Initial Intake Screening

The following table lists the criteria and results of the review of initial intake screening records. These results do not indicate compliance with II. B. 6.a, III. C. 1, III. C.3. Each result is discussed in more detail in the following paragraphs.

| Initial Intake Screening | Results |
|---|---|
| 1. A complete set of vital signs was taken at medical reception | 43% |
| 2. A complete smoking history was taken | 0% |
| 3. A vaccine history was documented | 83% |
| 4. The patient's previous medical records were requested | 54% |
| 5. Additional labs were ordered | 38% |
| 6. Urgent medications were ordered | 59% |
| 7. Point of care testing was done | 42% |
| 8. Urgent referrals were seen by a provider no later than the next day | 50% |

There is considerable variation in performance among the reception and classification centers. Menard was the only facility to consistently document a full set of vital signs.[318] Logan did not document a full set of vital signs in nine of ten of the records reviewed. NRC was missing temperature twice, blood pressure twice, visual acuity six times and respiratory rate seven times. Only eight of 20 charts reviewed at NRC had a full set of vitals (40%). Graham was missing vital signs in 5 of the 10 records provided for

---

[318] Temperature, heart rate, respirations, blood pressure, height, weight and visual acuity.

review (usually visual acuity was missing). When the health assessment is not on the same day as the nurse intake screening, the vitals need to be repeated. All of the Graham health assessments were done on a later date than the nurse screening but none had a complete set of vital signs. Failure to consistently obtain vital signs, a simple task, is likely the result of chaotic, disorganized work processes rather than misconduct or lack of skill.

Inquiry about smoking is made of newly admitted patients in most cases however no attempt is made to identify patients who have quit smoking and if so, how many years ago they stopped. The intake screening should document the patient's history of smoking, the number of pack-years smoked, and if the patient has quit smoking, the year that smoking stopped. Without this information on tobacco use, it is impossible to determine which individuals should be screened for lung cancer.

The vaccine history is documented more often than in previous reports. However rarely are the dates vaccines received documented on the vaccine history. The only ICARE results are those included in health records accompanying persons sent from the Cook County Jail. There is no evidence that IDOC staff access ICARE to verify vaccine history as part of medical reception.

Thirteen patients gave a history or had a condition for which previous records of treatment should have been requested and yet only 53% had the previous record present or evidence that it was requested. The new policy on receiving screening leaves this decision entirely to the provider to request. The Monitor recommends that the policy be revised so that any patient with a complicated medical history (on chemotherapy, recent hospitalization, pregnant females, etc.) is asked by the receiving screening nurse to consent for release of records from the patient's civilian provider.

There were 16 patients[319] who would have benefited from additional lab or diagnostic testing. However additional diagnostic work was only ordered six times (38%). Nurses should, as a function of protocols or a brief preliminary provider evaluation[320] obtain labs and complete other diagnostic testing in advance of the health assessment by the provider. If possible records from community providers should also be obtained in advance of the health assessment as well.

Urgent medications should have been initiated for 17 patients in the sample. Ten of these patients received an order for urgent medication (59%). For example, one patient[321] was received on parole violation and was in alcohol and barbiturate withdrawal. He did not receive medication to manage withdrawal symptoms for three days. Another patient [322] reported a history of treatment for non-insulin dependent diabetes and hypertension. He did not receive metformin for 18 days after admission to the facility. These were disruptions in continuity of care that should not happen.

Point of care testing and symptom monitoring are also part of reception screening. When a patient reports having been treated for diabetes, reception screening should include a capillary blood glucose test. A report of asthma should include peak flow testing, a report of hypertension should result in repeat blood

---

[319] The majority of these were from Logan for sexually transmitted disease screening, for which results were not present in the medical record.
[320] See the Monitor's input on E.05.01 Intersystem Receiving Screening, Medical Policy and Procedure Manual provided to OHS on 1/25/24.
[321] Intake patient # 31
[322] Intake patient #24

pressure checks. Other than a urine pregnancy test for women, point of care testing and system monitoring is not initiated consistently when it should be. There were 24 conditions identified in which additional objective data should have been collected by the nurse during reception screening but was done only in 10 of those instances (42%).

In-depth inquiry and assessment of positive findings is often not done by nurses during receiving screening. In two thirds of the charts reviewed nurses did not identify all of the patients' problems. For example, a nurse screening a patient taking coumadin failed to find out that the patient had been hospitalized two months earlier and treated for pulmonary embolism .[323] Another nurse described a patient as having red spots on her face. There is no further description of these spots and no inquiry of the patient about them.[324] Another patient gave a history of hypertension with a myocardial infarction and a stent placed in 2016. The patient was also taking medication for hyperlipidemia and asthma but neither of these problems were elicited by the nurse's screening assessment. No blood pressure was taken despite being actively treated for hypertension.[325] Another patient arrived at the reception center on crutches after recently being treated for gunshot wounds to his left leg.[326] There was no documentation of when the patient was wounded, no description of the wounds, no description of treatment received, and no effort taken to obtain records of his treatment in the community. There was no attempt to find out if he had completed antibiotic treatment, what medication he was taking or if he had seen the orthopedist in follow up before he was incarcerated. One purpose of receiving screening is to "Establish the baseline health condition at the time of arrival."[327] Clearly, nurses have yet to understand their role in documenting the patient's baseline condition.

There were eight patients referred urgently to a provider by the nurse at reception screening. All of these were at NRC. However only four of the urgent referrals were seen no later than the next day. One of those not seen timely by a provider was 70 years old[328] and gave a history of COPD, colon cancer treated surgically, hypotension (BP 90/50), blood clots in the head and neck with fainting. He had been hospitalized in 2023 after fainting. This man walked with a cane and wore glasses. He was not seen by a provider for four days after receiving screening. In the meantime, no orders were obtained for colostomy care, further diagnostic tests (EKG, labs ) or medications. A peak flow was not done and there were no further blood pressure readings. Another person said he had last used heroin the day before arrival at NRC and was experiencing withdrawal symptoms (abdominal cramps, nausea, body aches, and generalized weakness).[329] He also gave a history of asthma, HCV, and a fractured right foot. He also was illiterate. Although telephone orders for withdrawal medication were obtained, the urgent referral was not seen for 3 days.

One patient should have been referred urgently but was instead a routine referral.[330] This patient was at Graham Correctional Center. He was 41 years old and had a history of diabetes and hypertension. He was also taking medication for hyperlipidemia, and gastroesophageal reflux disease (GERD). An on call provider gave telephone orders for glargine insulin, sliding scale regular insulin and lisinopril with an end

---

[323] Intake patient # 5
[324] Intake patient # 7
[325] Intake patient # 8
[326] Intake patient # 30
[327] E.05.01 Intersystem Receiving Screening, I. G., Medical Policy and Procedure Manual page 108.
[328] Intake patient # 19
[329] Intake patient # 14
[330] Intake patient # 34

date of 12 months. No provider saw this patient for the initial health appraisal for 41 days.

**Initial Health Assessment**

Of the 46 charts of new intakes provided for review only 27 had the medical evaluation completed within seven (7) days of admission (59%).[331] The range of days before this is completed was as long as 45 days at Graham. At Menard this took as long as 21 days and at Logan it took as long as 13 days. At NRC the medical evaluation was completed within a range of 1 to 8 days. IDOC performance is not compliant with III.C.1.

All four of the Reception and Classification Centers sent the physician assignment sheets for the month of February 2024. At Graham and NRC, all the physician's assistants and nurse practitioners are responsible for intake, with no one specifically assigned. At NRC these same providers are also responsible for urgent care. At Logan a specific nurse practitioner is assigned responsibility for intake. At Menard a specific nurse practitioner is responsible for intake but does chronic clinic, infirmary rounds, and urgent care as well. Of the 46 charts reviewed all but one of the health assessments were completed by a nurse practitioner or physician's assistant. The assignment sheets verify record review findings that physician involvement in the initial health assessment and plan of care is minimal to non-existent. There was no indication that the one assessment completed by the physician was because of patient acuity.

The policy F.02.01 Chronic Care specifically calls out requirements for intake health assessment[332] which requires the following.

- Providers performing intake health assessments for chronic illnesses *or other active problems* document a history and physical examination for all diagnosed illnesses and to include a plan of care for each problem.
- Providers are to enroll patients with *acute or chronic illnesses* into chronic care and the HCUA is to ensure that a process is in place to ensure these orders are carried out.
- Providers are to amend the problem list to add patients so enrolled.
- When temporary problems are resolved, those patients are discharged from chronic care unless they have other illnesses requiring chronic care management.
- Patients with inactive chronic care (childhood epilepsy no longer requiring treatment, or childhood asthma no longer requiring medication) are discharged from chronic care management.

Most of the records reviewed for this report were dated from January of 2024 which is prior to the promulgation of policy F.02.01, and therefore represent legacy practice. These intake record reviews treat chronic disease as an episodic visit which does not address all chronic conditions comprehensively and does not address preventive health treatment and screening. During a visit to NRC, in June 2024, the Medical Director was asked what direction she had been given regarding what is necessary with respect to the provider responsibility for the initial physical examination. She responded that the intake physical

---

[331] E.05.01 Intersystem Receiving Screening IX, Medical Policy and Procedure Manual, page 109.

[332] Procedure IV. "Providers performing intake health assessments for those with chronic illness or other active problems will document a history and physical examinations for all diagnosed illnesses. The intake note is to include an assessment that is comprised of all chronic, temporary, and potential illnesses needing work-up that is to include the current status of each problem with a plan of care for each problem. The provider is to enter all chronic diseases, latent diseases, and significant familial cancer history on the official problem list form (DOC 0088)." Procedure item IX, "Whenever a patient is evaluated for a chronic illness, including at the intake assessment, the provider is to order a follow up appointment".

examination is similar to "ER triage". This was based on her belief that there is insufficient time before transfer to do anything more than a triage. This Medical Director had not read the recently promulgated policies nor had an in-service on the policies. The practice of "ER triage" as the basis for intake health assessments is clearly all that current staff can manage which speaks to the need for staffing analysis of provider staff at intake facilities.

Based on record reviews, providers do not elaborate or follow up on problems in the physical assessment that were identified by nurse receiving screening. None of the health assessments for persons with chronic medical conditions or acute problems included any history of problems of the patient; occasionally the provider would document the complaint or state the disease. This is consistent with legacy administrative directive 04.03.101 Offender Physical Examination. This directive requires physicians to perform only a physical examination at intake. This is also consistent with the health assessment form DOC 0099 titled Offender Physical Examination which has a box to check whether the history of the nurse was reviewed but no clear direction on taking a history. New policy of IDOC on intake screening (E.05.01) and on chronic care (F.02.01) both require that providers take a history of the patients. The charts reviewed for this report were from January and new policy was not yet implemented. Yet, this review establishes a baseline for the practice of taking history on the intake health assessment.

Only four facilities conduct reception screening. However, in the records sent for review, one person[333] was a parole violator who was received at Taylorville, which is not a reception center. The nurse at this facility completed receiving screening but failed to identify that the patient was on approximately his third day of alcohol withdrawal . It was not until an hour later that another nurse who was obtaining intake lab samples noted that the patient had tremors and obtained a history of recent treatment for alcohol withdrawal while he was in jail before transfer to Taylorville.

At receiving screening, the patient gave a history of hyperlipidemia for which he took simvastatin and "brittle bone syndrome". This was later identified as osteogenesis imperfecta (a genetic condition characterized by bones that break easily and other sequelae depending on the type of osteogenesis imperfecta that the patient has). This patient reported having experienced numerous fractures to date. No further assessment was completed while this patient was at Taylorville and no treatment was initiated for his hyperlipidemia.

Five days later he was transferred to Graham. Receiving screening was repeated. Problems identified were osteogenesis imperfecta, psoriasis, eczema, and hyperlipidemia and "breathing problems" not further specified. The patient's recent alcohol withdrawal was not identified. Graham repeated the intake lab work. It is not clear if this is because the labs were not transferred, or the record was not reviewed at Graham before labs were re-drawn.

The health assessment was not completed for more than a month after reception at Taylorville and three weeks after transfer to Graham. The health assessment had no history documented, and did not mention any of the patient's problems, including the recent alcohol withdrawal. Old medical records regarding his osteogenesis imperfecta should have been obtained and were not. The problem list was completed by a nurse and failed to include hyperlipidemia. The patient's hyperlipidemia appeared lost to follow up. The provider's health assessment contained no therapeutic plans for any of this patient's conditions. This

---

[333] Intake patient #31

example highlights a lack of policy describing where parole violators are to have their reception screening and how information transfer is to be managed.

Another patient had a history of headaches and was twice wounded by gunshot.[334] The patient gave a history of head trauma with hospitalization in 2015. The patient had been seen the day before at nursing sick call for chest pain and headache using the Non Specific Discomfort Protocol and given analgesics. When seen for the health assessment the provider did not have the patient describe the headaches, their frequency, the impact on the patient's abilities, and performed no neurological exam. The patient's history of head injury was not evaluated. On physical exam the Head, Neck, Face and Scalp are checked off as normal and neurologic DTRs are checked as normal with no comment. He was seen by the same provider five days later and prescribed 1 -2 tabs Tylenol 500 mg twice a day as needed (presumably for the headache) without any further work up or examination of headache.

Another provider saw a 41 year old patient with a history of diabetes and hypertension.[335] This patient was also taking medications for gastroesophageal reflux (GERD), hyperlipidemia, and neuropathy. Except for documenting that the patient had diabetes, there was no history. There was no diabetic foot exam or test for neuropathy. There was no assessment for any of his chronic conditions. There was no plan other than ordering labs (limited to a HbA1c and lipid panel; microalbumin was not included). There is no inquiry about diabetic retinopathy or when the patient last had his eyes examined and there was no referral to have this done. There was no evaluation of cardiac risk factors even though this patient had a BMI of 35.3.

Another patient was 39 years old, and the provider documented a history of intermittent asthma. The patient was currently using an inhaler.[336] This patient is documented to have had an exacerbation of his asthma sufficient to be hospitalized in 2023 which is inconsistent with a diagnosis of intermittent asthma. The provider took no history to further elucidate the status of the patient's asthma. Medication history including frequency of rescue inhaler use, frequency of hospitalization, associated symptoms were unknown. No peak flow readings were taken as part of the full physical assessment. His chest and lungs are documented as clear. The patient was ordered a short acting beta agonist inhaler and was not put on a controller medication despite having a recent prior hospitalization.

Not all conditions are identified during the full physical assessment. One 32 year old patient complained to the nurse during receiving screening of a cyst on his left neck.[337] However the physical exam documents that the Head, Neck, Face, & Scalp are normal, with the explanation "normocephalic, neck supple". There is no documentation of the complaint of a cyst on the left neck in the full physical assessment.

Plans of care are equally incomplete with no patient having a thorough plan of care that addressed all acute and chronic problems. Only 12 (16%) of the 74 acute or chronic problems documented in the table above were documented as scheduled for follow up. This results in the episodic care. The patient with osteogenesis imperfecta described above was never enrolled in chronic clinic for hyperlipidemia or osteogenesis imperfecta.[338] The patient with diabetes and hypertension was enrolled in these chronic

---

[334] Intake patient #12
[335] Intake patient # 34
[336] Intake patient # 16
[337] Intake patient # 38
[338] Patient #31

136

clinics but was not enrolled in clinic for hyperlipidemia.[339] He was not referred for an eye exam and an EKG was not obtained. The problem list was never updated to include the diagnosis of GERD or hyperlipidemia.

Labs were reviewed as part of the full physical assessment only one third of the time even though they were available that day in almost half the charts reviewed. It is the standard of practice at NRC to perform the physical assessment without review of labs (19 of 20 charts did not document review of labs before or on the day of the physical assessment). In nine of these charts labs were available but not provided for review at the time of the physical assessment. The problem of treating patients without reviewing labs is illustrated by this patient who was received at NRC on 1/12/24. He was 41 years old and reported being diabetic and having hypertension at receiving screening.[340] The nurse did not obtain a capillary blood glucose reading but referred the patient urgently. He was seen the same day by a provider who ordered a HgbA1c. He was referred to see a provider again on 2/2/24 for abnormal labs. The HbA1c ordered 18 days earlier was 11.7 which is poor control. The patient had not been treated for his diabetes for the past two weeks so a provider ordered diabetic medications. Another HgA1c was obtained and resulted 2/17/24. It was now 11.9. When the patient was seen in chronic clinic on 2/21/24 the provider only looked at the first lab result and determined the patient's condition was fair and improving. In fact, the patient's condition as indicated by the results from the second HbA1c was essentially unchanged and still reflected poor control.[341] Treatment provided this patient was uninformed and careless and placed the patient at risk.

All of the charts from Menard and all but one from Graham documented results and were reviewed prior to or on the day of the physical assessment. It should be noted however, that neither Graham nor Menard were timely in completing the full physical assessment. Logan did not include actual labs ordered nor were the results in the charts provided for review.

We were told while on the site visit to NRC that the lab technicians leave at 3 pm and any labs not yet completed are delayed until the next day. This seemed early in the day since there were many individuals still waiting for lab work at 3 pm. We noted at Graham that in half the charts reviewed lab results were not available for five to 13 days. This delay in obtaining specimens is a problem since the full physical assessment is is to be completed within seven (7) days as required by the Consent Decree. Completing the full physical assessment before labs are completed or delaying the timeliness of this assessment until labs can be obtained are most likely legacy practices that should be reconsidered in light of the expectations contained in the OHS policy on Intersystem Receiving Screening. The problem with synchronizing laboratory testing to the health assessment is only one of the reasons the Monitor has suggested mapping the desired intake process to accomplish receiving screening and then making changes in existing practices to achieve the desired outcome. This is also an example of the changes II.B.6.a. calls for in initial intake screening, and initial health care assessment.

IDOC should reconsider what laboratory tests are necessary for routine intake laboratory screening. Minimum labs drawn appear to include syphilis, tuberculosis, a complete metabolic panel, and HIV and HCV unless the patient has opted out. The Monitor does not find a rationale for routinely obtaining a

---

[339] Intake patient # 34
[340] Intake patient # 24
[341] HgbA1c testing is generally done every 3-4 months because it takes time for a HgbA1c to improve or worsen. The test may have been done simply to verify the initial abnormal result. HgbA1c's of 11.7 and 11.9 are essentially the same.

metabolic panel as listed above. Additionally, sexually transmitted disease screening should be based on recommendations by IDPH for the incarcerated population.[342]

The Monitor recommends using AHRQ A and B recommendations for screening based upon age and sex of the individual which include pre-diabetes and diabetes screening in adults 35-70 years of age who are overweight or obese and lipid screening for adults ages 40-75. IDOC does not screen obese adults for diabetes or prediabetes. The Administrative Directive 04.03.101 Offender Physical Exams calls for a fasting lipid panel for patients aged 35 years and older. Four patients at Menard met the age criteria and had a fasting lipid panel completed. However, at NRC only one of nine eligible patients had a fasting lipid panel and none of the six eligible patients at Graham.

In the 7th report the Monitor recommended universal hepatitis B screening (HBsAg, antibody to HBsAg, and total antibody to hepatitis B core antigen) to aid in the vaccination program.[343] This is because the Centers for Disease Control (CDC) recommends universal screening of adults ages 18 and older. The CDC also identified incarcerated persons as at increased risk and recommended initial and periodic screening for hepatitis B for persons with long sentences.[344] Currently IDOC does not screen for hepatitis B.

Receiving screening is to include an assessment of the patient's needs for preventive health care and vaccines which when identified are to be offered at the time of the provider's evaluation or scheduled as they become due.[345] The Monitor suggested in feedback on this policy that this assessment be completed by nursing and recommendations implemented by protocol rather than as orders by individual providers.[346]

We noted before that vaccine histories are incomplete particularly that the date any vaccine was reported as received is not documented. We also noted that there were no vaccines histories from ICARE other than those included in patient records from Cook County Jail. Logan provides patients a list of vaccines they recommend the patient receive and the patient can indicate whether they wish to receive the vaccine. This is a good method to document the assessment of vaccine needs.

| Vaccines offered and accepted | | |
|---|---|---|
| Type of Vaccine | Offered | Accepted |
| Covid | 21 | 0 |
| Flu | 22 | 2 |
| Hepatitis A | 2 | 0 |
| Hepatitis B | 2 | 0 |
| Tdap | 2 | 1 |
| HPV | 1 | 0 |

---

[342] The Monitor suggests that this be a topic addressed by the Congregate Care Settings Group established by the IDPH.
[343] Health Care Monitor 7th Report, December 27, 2023, pages 99 -100.
[344] Conners EE, Panagiotakopoulos l, Hofmeister MG, et.al., Screening and Testing for Hepatitis B Virus Infection: CDC Recommendations – United States, 2023. MMWR Recomm Rep 2023; 72 (No.RR-1) DOI Morbidity and Mortality Weekly Report (MMWR). DOI: http://dx.doi.org/10.15585/mmwr.rr7201a1
[345] E.05.01 Intersystem Receiving Screening, IX, Medical Policy and Procedure Manual, page 110.
[346] Email to Special Litigation Counsel dated 1/27/2024 with comments on E.05.01.

The number of vaccines offered as a routine part of intersystem receiving screening is very low. Further the uptake of those vaccines offered is also very low. Of this group of 46 patients who were received in January 2024 only three vaccines were given, 2 for influenza and one Tdap. Covid vaccine was not offered to intakes at Menard. Flu vaccine was offered some patients at each facility but not as a routine to *all* patients received. No patients were offered pneumococcal, RSV, Zoster or meningococcal vaccines even when eligible by age or condition. It appears that vaccines are emphasized by certain individuals, but that vaccine review and recommendation is by no means a universal effort by the health care program at the reception and classification centers.

We have already commented that smoking history is not gathered consistently and that there is no effort to ascertain when former smokers quit so that people who should be screened for lung cancer are identified. There were however three patients in the sample who are current smokers, are 50 years or age or older, and have a 20 pack year smoking history. None of the three had low dose computed tomography (CT) recommended nor was the recommendation discussed with them during receiving screening.[347]

Seven patients qualified based upon age alone for colon cancer screening. None of these patients were offered this screening nor was the recommendation that they be screened for colon cancer discussed with them during receiving screening.[348]

There were 16 persons in the sample who had a BMI greater than 30, which is considered obese.[349] Only one of these persons were identified as obese.[350] Many of these patients had medical problems related to obesity such as sleep apnea, hypertension, and low back pain or other musculoskeletal disorder. Only one of these patients had an HgA1c. Obesity is classified as a chronic disease and should be addressed as part of the patient's plan of care. As stated earlier only about one in five eligible persons are screened for hyperlipidemia at medical reception in fiscal year 2024.[351]

Each of the women in the sample were offered cervical cancer screening and screening for chlamydia and gonorrhea, of which six accepted. Mammography was not offered as part of the full physical assessment but is scheduled periodically at the facility independent of the intake process.

Finally, the Administrative Directive requires that persons under 40 years of age receive, a visual examination of the anus and if 40 years of age or older, a digital rectal exam with guaiac testing. The Monitor has been told that this is no longer a requirement, and that OHS distributed a directive to the facilities regarding this. Records reviewed show that this practice is still prevalent in that 34 of 46 records documented whether the exam of the rectum was normal, N/A because the patient was under 40, visualized, or refused. OHS needs to obtain a variance from the Administrative Directive before staff are authorized not to perform this unnecessary exam.[352]

---

[347] Intake patients # 8, 9, 27.

[348] Intake patients # 8, 9, 19, 21, 27, 31, 44.

[349] Intake patients #2, 6, 8, 9, 10, 13, 14, 15, 17, 22, 25, 27, 28, 29, 34, 39.

[350] Intake patient # 8.

[351] Office of Correctional Medicine, Clinical Quality Performance Review: Summary, FY 24, provided in response to the Monitor's document request # 34.

[352] This demonstrates that new OHS policies or directives sometimes contradict Administrative Directives. The Administrative Directives appear to take priority when this occurs. Another example of this is the opt-out screening for HIV which is discussed in the Leadership Staffing section of this report. This occurred at NRC when a lieutenant directed the manner of HIV testing to be consistent with the Administrative Directive even when this was contrary to OHS direction.

Compliance with III.C.4 for follow up on all pertinent findings and provision of appropriate care and treatment has not been achieved.

**Conclusion**

Findings from record review indicate that practices with regard to medical reception have not changed. The result is that:

- Nursing histories fail to gather all necessary information about the patient;
- Providers do not complete a history for all acute and chronic conditions in the health assessment;
- Recommendations for immunization and preventive health screenings are seldom or inconsistently offered;
- Providers do not maintain an accurate and complete problem list;
- Providers do not consistently address the immediate medical needs of the patient within a day of reception; and
- A comprehensive assessment and plan of care responsive to all acute and chronic problems and conditions identified is not developed.

These charts represent the receiving screening and related health care newly arrived patients were provided in January 2024 before the Medical Policy and Procedure Manual was distributed to the facilities. However, the site visit to NRC was completed in June 2024 after the new policy was established. It was clear from touring the receiving screening area, interviewing staff, including the facility medical director and HCUA, as well as charts reviewed while at the site, that the new procedure has yet to be implemented at NRC.

The Monitor has recommended that IDOC engage each of the reception and classification centers in a process by which the desired outcome of receiving screening is discussed and the sequence of steps necessary to achieve that outcome are mapped out.[353] The Monitor made that suggestion again during the discussion at NRC after touring the intake area. OHS needs to be clear with reception and classification centers what changes are necessary to ensure that patients' needs are addressed when they arrive at IDOC consistent with E.05.01 Intersystem Receiving Screening and F.02.01 Chronic Care.

Other than the one performance and outcome measure screening for hyperlipidemia within 30 days of admission there is no clinical quality review of medical reception. No changes have been made to initial intake screening or the initial health care assessment yet. Staffing of reception centers is insufficient as measured by the lack of timeliness and inadequacy of the initial intake screening and health care assessment and initiation of plans for subsequent health care. A policy and procedure for receiving screening has been developed but it is clear that it has yet to be implemented by the Reception & Classification Centers.

**RECOMMENDATIONS:**

1. Redesign the medical reception process so that it ensures:
   a. All findings and treatments from nurse intake health screening are evaluated by providers.

---

[353] Implementation Plan Task # 88.

b. Prior records are requested and available to providers as needed during the initial health care assessment.

c. An immunization history is obtained as part of the information gathered by nurses. By protocol, immunizations are updated, and vaccines given by nursing staff based on the Advisory Committee on Immunization Practice (ACIP) and Center for Disease Control (CDC).

d. Nurses, as part of their information gathering, identify what cancer screenings are necessary based on USPSTF A & B recommendations. This information is used by providers to order cancer screening as part of the comprehensive treatment plan.

e. All patients receive recommendations for preventive measures updated based on the A & B recommendations of the USPSTF.

f. All medical problems are identified and entered onto the problem list by providers.

g. For every medical problem there is an adequate history, focused physical examination, assessment, and therapeutic plan. The assessment of chronic conditions includes documentation of complications, including hospitalizations, with chronic disease markers, documentation of the most recent civilian therapeutic plan, and medication history.

h. All intake laboratory and other diagnostic tests are evaluated at the full physical assessment by providers as part of the intake process, and

i. Patients are enrolled in chronic clinic for all of their active acute and chronic medical conditions.

2. Revise E.05.01 Intersystem Receiving Screening in accordance with the Monitor's comments provided 1/25/2024 and implement it and the portions of the policy F.02.01 Chronic Care that pertain to intake.

3. Develop a staffing standard for receiving screening that is workload driven.

4. The Monitor acknowledges that IGRA testing is now established at all Reception Centers and recommends that IDOC adopts IGRA testing for tuberculosis screening of all incarcerated individuals.

5. Confer with IDPH about which lab tests for communicable disease screening are recommended for the incarcerated population. Initiate universal screening for hepatitis B and eliminate obtaining a routine metabolic panel.

6. The intake screening should document the patient's history of smoking, the number of pack-years smoked, and if the patient has quit smoking, the year that smoking was stopped. Without this information on tobacco use, it will be impossible to determine which individuals require screening for lung cancer. This information is also useful as a cardiac risk assessment.

7. IDOC should add universal hepatitis B screening (HBsAg, antibody to HBsAg, and total antibody to hepatitis B core antigen) to the routine laboratory testing performed at intake screening in conjunction with a hepatitis B vaccination program.

8. Develop a clinical audit tool that evaluates the appropriateness, quality, and continuity of health care during medical reception as well as compliance with the policy and procedure. Audit medical reception with this tool (s) at least quarterly until performance is better than 90% on each criteria for three successive quarters.

9. Expand metrics on the timeliness and thoroughness of medical reception and report performance results to CQI on a regular basis.

10. To implement these redesigned recommendations, the Monitor recommends that IDOC map a process of how they expect intake to occur in IDOC facilities integrating all these recommendations. This mapping should consider staffing, equipment, and organizational needs (laboratory support, pharmacy support, custody support with respect to classification, and

information technology support with respect to the medical record and interfaces with IDPH ICARE and other Illinois jails with information systems).

# Nursing Sick Call

*Addresses Items II.A; II.B.1; III.A.10; III.E.2; III.F.1; III.F.2;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**III.E.2.** *Lists and treatment plans will be amended pursuant to the order of a clinician only.*

**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**III.F.2.** *There shall be no set restrictions on the number of complaints addressed during a specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

The following information[354] was requested from IDOC to evaluate progress towards compliance with the items of the Consent Decree listed immediately above:

**Request 6:** Northern region facilities to provide times at each facility designated for sick call. [355]

**Request 64:** The name and credential (RN, LPN, NA) of every individual assigned to perform sick call for any 7 day period in February 2024 at NRC, Graham, Menard, Logan, Stateville, Lawrence, Illinois River, Pinckneyville, and Pontiac. The list must include nursing staff employed by the State and the vendor.

**Request 76:** Training completed in the last 12 months for any nurses employed by either the state or the vendor at NRC, Graham, Menard, Logan, Stateville, Illinois River, and Pontiac.[356]

**Request 103:** Any update of the Nursing Treatment Protocol Progress Notes since 9/2022. Any written guidelines other than AD 04.03.121 on the use of nursing protocols.[357]

---

[354] This list corresponds to items 6, 64, 76, 103, and 104 in the Monitor's document request for the 8th report, dated 2/29/24.

[355] This information was received from East Moline, Joliet Treatment Center, Kewanee Life Skills Center, Pontiac, Sheridan, and NRC. Stateville did not respond.

[356] All except Stateville responded to this request.

[357] IDOC provided no information responsive to the specific request regarding an update of the Nursing Treatment Protocol Notes. The IDOC Special Litigation Counsel reported in response to the request that the protocols are being updated based on feedback. A memo from the Agency Director of Nursing about training and implementation of the policy and procedure on nurse sick call was submitted in response to this request.

**Request 104:**  Identify the process analyst responsible for the process improvement project on sick call, and provide any revised forms or templates being developed to document sick call encounters, and logs proposed or being used to manage sick call. Logs need to include the reason for each no shows  and refusals.[358]

In addition to the material received from the list above, CQI minutes were reviewed as well as the performance and outcome measures completed by SIU on responsiveness to health care requests. During the site visit to NRC and Stateville the areas where sick call takes place were observed and staffing for sick call reviewed. The Agency Director of Nursing was interviewed about sick call processes on 6/12/24. Death records received during this report period were also reviewed.

**Implementation Plan**

The Defendants' Implementation Plan included the use of a process analyst to complete a process improvement project for the sick call process. The completion date for this project was March 2024 and the expected results were listed as:

1.  Policy and procedure for sick call,
2.  Clear definitions of the staffing and resource requirements needed to conduct sick call,
3.  Training and supervision of nurses to ensure appropriate clinical assessment and decision making using the nursing protocols,
4.  Limits on the use of protocols in patient populations requiring monitoring by clinicians, and
5.  Audit methods to monitor and account for compliance with the Consent Decree, procedures and protocol.

IDOC informed the Monitor that as of June 2024 they were consulting with SIU on how to accomplish the process improvement project prior to EMR implementation.[359]  IDOC has adopted a policy on sick call, in the absence of information to be gained from a process improvement project.   The draft policy concerning sick call was provided to the Monitor for review on 6/23/23. The Monitor returned the draft with extensive comments on 2/2/2024.  IDOC decided to distribute a final set of policies and procedures in February 2024. Therefore E.06.01 Non-Emergency Health Care Requests and Services does not represent the most recent input from the Monitor. OHS has indicated that the comments submitted by the Monitor in February 2024 will be considered during the annual review and revision of this policy.

E.06.01 provides more direction for health care staff than the Administrative Directive in that the method of receiving requests has been standardized. The policy also gives guidance as to which requests are to receive immediate attention, establishes the documentation in the health record required for sick call visits, establishes requirements for retention of sick call requests, and defines and limits the use of written responses to sick call requests.

The new policy does not incorporate or otherwise establish the means or methods to comply with the Consent Decree. This was a missed opportunity.  The policy does not directly address III.A.10 that registered nurses conduct sick call or that LPNs may do so only until the staffing plan for registered nurses is achieved and only if supervised. It does not address III.I.F.1. that sick call is only conducted

---

[358] No information was provided in response to this request. However, the Special Litigation Counsel commented on the request that IDOC was currently in consultation with SIU on how to accomplish this prior to EMR implementation.
[359] IDOC Responses to the Monitor's document request dated 6.28.24.

in clinical areas that provide for privacy and confidentiality. Lastly it does not address III.F.2. prohibiting any restriction on the number of complaints addressed during a sick call appointment. The policy also does not meet the NCCHC standards for timeliness of nursing encounters after receipt and triage of a request. The policy also does not cite AD 04.03.121 which defines the use of nursing protocols and limits the authority of nurses to initiate medical treatment as a reference. The Monitor strongly suggests that these observations and the feedback provided in February 2024 be considered and a revised policy with procedures be written and distributed.

The revised sick call policy and use of the log was first reviewed with facility leadership at the quarterly meeting on June 13, 2024. Following this meeting the Agency Director of Nursing distributed by memo dated May 29, 2024, to HCUAs and the vendor's Director of Operations copies of E.06.01 Non-Emergency Health Care Requests and Services, the Nurse Sick Call Log, and a nurse sick call training form. The memo set forth expectations that staff that will handle sick call requests and the tracking log[360] are to be trained in the procedure and use of the log by June 30, 2024, with implementation on July 1, 2024. During the site visit to NRC the HCUA was interviewed and reported that the only policy and procedure implemented since distribution in February was the one on sick call. She commented that the health care unit received "a lot" of requests; that the sick call schedule "interferes" with the count and patients aren't always brought over to the health care unit because they were short officers. She also commented that the health care program did not have enough staff for the services they needed to provide and specifically mentioned intake and sick call. Other work to be completed included getting the necessary variances from the Administrative Directive 04.03.103 on health care services so that facilities were not penalized for noncompliance with the AD during internal and external audits.

The results of internal/external audits, the SIU performance and outcome measures, and facility quality improvement studies completed through June 30, 2024, use benchmarks that differ from those in the new policy. The benchmarks used by these tools are derived from Administrative Directive 04.03.103 which is more lenient than that of the new IDOC policy. The performance and outcome data through December 2023 provided for this report show only three facilities met the benchmark of 90% or greater on the sick call measures; these were Big Muddy, East Moline, and JITC. This is one more facility than met the benchmarks in the Monitor's 7th report.

These tools all need revision to reflect the changes in sick call that were implemented July 1, 2024. The Monitor has several suggestions for improvements to the performance and outcome measure on sick call and looks forward to sharing these when the tool is being revised. Data collected after July 1, 2024, will not be comparable to prior reports because the performance measures have changed. A new baseline needs to be established for sick call performance.

## Staffing Nurse Sick Call
Staffing continues to be a major barrier in access to primary care as required by II.B.1. In the last report the Monitor correlated poor performance meeting standards for responsiveness to sick call requests with high vacancy rates among registered nurse and provider positions.[361] As of June 2024 the vendor had 67% of its registered nurse positions vacant. The state had only 19% of its registered nurse positions vacant. The state vacancy rate is approaching the goal of less than 15% of allocated positions set forth in the

---

[360] Staff was defined at a minimum to include the HCUA, facility director of nursing, nursing supervisors, registered nurses, LPNs, and office support staff who work for either IDOC or the vendor.
[361] Ibid

Implementation Plan.[362] However the combined vacancy rate for registered nurse positions is 40% which is well below target.  Eight facilities scored 0% in compliance with the sick call performance and outcome measure for Fiscal Year 2024 Quarter 2 ending December 2023. At these facilities the vacancy rate for registered nurses is 44%; at three facilities vacancies are 50% or more of allocated positions.

The sick call performance and outcome measure also evaluates whether patients are seen timely by a primary care provider[363] when they have been referred from nurse sick call. According to the Facility Reconciliation Worksheets for FY 2024 ending March 30, 2024, the vacancy rate for primary care providers is 38%.[364] However of the eight facilities which had 0% compliance with the sick call performance and outcome measure for Fiscal Year 2024 Quarter 2 ending December 2023 the vacancy rate for primary care providers is 44%; at four of the eight facilities vacancies exceed 50% of allocated positions.

| Comparison of the Sick Call Performance Measure to Vacancy Rates | | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | Sick Call Performance | % RN Vacant | % PCP[365] Vacant | Facility | Sick Call Performance | % RN Vacant | % PCP Vacant |
| Shawnee | 0% | 83% | 16% | Logan | 40% | 100% | 51% |
| Sheridan | 0% | 16% | 20% | Southwestern | 60% | 78% | 10% |
| IL. River | 0% | 100% | 27% | Vandalia | 60% | 11% | 60% |
| Dixon | 0% | 30% | 45% | Decatur | 70% | 25% | 6% |
| Taylorville | 0% | 44% | 55% | Vienna | 70% | 0% | 40% |
| Centralia | 0% | 50% | 60% | Joliet | 70% | 45% | 50% |
| Lawrence | 0% | 46% | 60% | Pinckneyville | 80% | 86% | 7% |
| Robinson | 0% | 39% | | Stateville | 80% | 45% | 23% |
| Danville | 10% | 60% | 20% | Kewanee | 80% | 0% | 59% |
| Menard | 10% | 33% | 40% | Pontiac | 80% | 48% | 74% |
| Western | 10% | 100% | 67% | Big Muddy | 100% | 55% | 7% |
| Lincoln | 20% | 88% | 15% | Murphysboro | 100% | 0% | 71% |
| Jacksonville | 30% | 0% | 10% | East Moline | 100% | 0% | 80% |
| Graham | 30% | 20% | 30% | Stateville NRC | | 0% | 23% |
| Hill | 40% | 86% | 23% | | | | |

There is no uniform measure used by IDOC to document that only registered nurses conduct sick call per III.A.10 and this item of the Consent Decree remains noncompliant. The National Commission on Correctional Health Care states that better decisions about patient care result when the most experienced staff are assigned to sick call.[366] It is not possible to staff sick call with experienced nurses when vacancies

---

[362] Defendants' Implementation Plan, Narrative page 7 and Task 2.d, page 9.
[363] Physician, physicians' assistant, nurse practitioner.
[364] One of several reports provided by IDOC in response to the Monitor's documentation request #10.
[365] This is primary care providers not physicians.  Primary care providers includes physicians, nurse practitioners and physician assistants.
[366] Standards for Health Services in Prisons (2018) page 99.

are this great. This means that LPNs and nurses employed temporarily by staffing agencies are assigned to conduct sick call. Patient outcomes are compromised as a result of delays in timely response to sick call requests and use of less experienced staff.

Staffing of sick call for a one week period in February 2024 was requested and received from nine facilities. At Menard sick call did not take place on one of the seven days because no staff were assigned.[367] Graham provided documentation that only registered nurses were assigned sick call.[368] At Lawrence, LPNs were the only staff assigned on the day shift, five out of a possible seven shifts. Similarly at Logan five, out of a possible seven day shifts had only LPNs assigned to sick call. On the 3pm to 11pm shift an LPN was assigned alone to sick call two out of a possible seven shifts and on 11pm to 7am three of a possible seven shifts. Similarly, Pontiac and Pinckneyville had patterns of assigning only LPNs to sick call for a majority of the shifts.

| | Number of times during a seven day period LPNs were assigned sick call | | |
|---|---|---|---|
| | 7 am-- 3 pm | 3 pm-- 11 pm | 11 pm-- 7 am |
| Lawrence | 5/7 shifts | 1/7 shifts | |
| Graham | None | | |
| IRCC | 1/7 shifts | | |
| Logan | 5/7 shifts | 2/7 shifts | 3/7 shifts |
| Menard | 5/6 shifts | | |
| Pontiac | 5/7 shifts | | |
| Pinckneyville | 6/7 shifts | 3/7 shifts | |

At NRC nurses are assigned to sick call on both the day and night shifts. The HCUA commented that the shortage of correctional officers affected whether patients were escorted to the clinic for sick call.[369] The assignments for the two weeks immediately preceding the Monitor's site visit were reviewed.[370] During this period 17 of a possible 28 shifts had two registered nurses assigned to sick call. Three shifts had only one nurse assigned. The remaining shifts had three nurses assigned. Only three nurses worked overtime on these assignments. The nurses are assisted by a nursing assistant on most shifts. LPNs were not assigned to sick call during the period in May that was reviewed during the site visit. In NRC's response to the Monitor's request for assignments during a one week period in February 2024 one or more LPNs were assigned sick call on three of a possible 14 shifts. [371] The HCUA stated that nurses see patients only in the evening because there are not enough exam rooms and providers use them during the day. Apparently nurses assigned sick call triage and address patient requests that do not require use of the exam room when the rooms are being used by providers.

At Stateville sick call takes place seven days a week on the 7am to 3pm shift. Nurses see patients in the housing units. The Director of Nursing tries to assign four nurses to sick call. During the two week period

---

[367] 2/5/24.
[368] This documentation is consistent with the observations made during the Monitor's site visit to Graham in July 2023.
[369] Interview with NRC HCUA on June 3, 2024.
[370] May 20 – June 2, 2024.
[371] Response to documentation request # 64. LPNs were assigned sick call on the 5:45 am to 6:15 pm shift on 2/6 – 2/8/2024.

just prior to the Monitor's site visit four nurses were assigned to sick call only four out of 14 possible days.[372] Only registered nurses were assigned sick call duties during this time period. However, the material provided by Stateville in response to the Monitor's documentation request for staffing for a one week period in February 2024 lists ten different LPNs who were assigned sick call during that time.[373]

While the Consent Decree allows LPNs to conduct sick call it is only until IDOC has achieved substantial compliance with the nursing provisions of the staffing plan and only with appropriate supervision. IDOC provides no guidance as to what appropriate supervision is in its policy on sick call and no proof that LPNs performing this work are appropriately supervised. In the Monitor's opinion it is outside the LPN scope of practice to conduct sick call because it requires independent judgement, and the range of complaints presented at sick call require more advanced knowledge and clinical assessment skill to make these judgements.

As an example, one of the charts reviewed for this report documented an LPN treating a 66 year old man for shortness of breath on 4/29/23.[374] The documentation does not reflect that the nurse was cognizant of the possible relationship between the patient's presenting complaint and his chronic conditions (dyslipidemia, hypertension, diabetes, hypothyroidism, obesity and a history of smoking). The documentation on the protocol notes that he has chest pain and shortness of breath when moving. The medications he took were not reviewed. Peak flow readings were low, his blood pressure was 154/94, pulse was 125 and oxygen saturation was 96%. The protocol clearly directed the nurse to evaluate the patient using the chest pain protocol. Instead, the nurse has marked a zero through the statement. The LPN made an independent judgement that no further assessment or intervention was necessary, and that the patient would be seen later in the week at a previously scheduled appointment. The LPN did not seek guidance from any more senior clinician in making this decision. Sixteen days passed and the patient was not seen by a provider. He was found unresponsive in his cell on 5/9/2023 and was not able to be resuscitated.

The Monitor has suggested that a workload driven metric be developed based upon how much time on average it takes to address a sick call request.[375] This metric would then be used to determine the number of registered nurse positions that are necessary at each facility. IDOC has not conducted a staffing analysis that would achieve a workload driven formula to calculate the resources needed to respond in a timely and clinically appropriate manner to requests for health care attention.

**Clinical Space, Privacy and Confidentiality to Conduct Sick Call**
The Monitor has raised concerns about the adequacy of space to conduct sick call in a manner that affords the patient privacy and confidentiality in every report and at every facility that has been visited.[376] The findings from the site visit to NRC and Stateville were that there are not enough exam

---

[372] May 20 – June 2, 2024.
[373] Response to documentation request # 64.
[374] Mortality review patient 13.
[375] Ten experienced correctional nurses (over 300 years' experience) were asked how many patients a proficient registered nurse should be able to see in sick call per hour. The consensus was on average, seven patients per hour. Factors that contribute to individual variation include patients' gender and health status, as well as the location of the encounter. Improving productivity of sick call. Essentials of Correctional Nursing, 12/23/14 downloaded 10/7/24 at Sick Call | Essentials of Correctional Nursing (wordpress.com)
[376] Health Care Monitor 2nd Report Lippert v Jeffreys (August 6, 2020) pages 87-88; Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, page 87, Health Care Monitor 7th Report, December 27, 2023, page 106.

rooms for the providers alone. This results in nurses conducting sick call in non-clinical areas such as multi-purpose rooms that don't have examination equipment or are not hygienic. One of the sick call records reviewed for this report was a patient seen for a urinary tract infection.[377] He was seen on the yard, so no vital signs were taken nor was a urine sample obtained. Nothing was accomplished with this encounter.

Those examination rooms that do exist at NRC and Stateville do not have adjustable exam tables and the upholstery was cracked and had no paper covering for use between patients. The cabinets and other surfaces are frayed on the edges and have chipped surfaces which cannot be adequately cleaned or sanitized. The Illinois Department of Corrections Facility Master Plan noted Stateville's medical/mental health space as needing significant renovation and that NRC had significant lack of office space for medical and mental health staff throughout the campus.[378] The existing space for sick call at these two facilities is not compliant with III.F.1.

**Nursing Treatment Protocols and Training**
The authority of nurses to treat patients' health complaints is outlined in AD 04.03.121 Treatment Protocols. Treatment protocols used in IDOC facilities may only be issued by the Agency Medical Director. If clinically appropriate, a nurse may treat a patient with over-the-counter medications that are specified within the protocol itself. Nurses must be trained initially and annually thereafter in the use of treatment protocols by the facility medical director. This training is to be verified as part of the credentialing and privileging process at the facility. In addition to training, the facility medical director is to audit two medical records of each staff member who have used treatment protocols each month and report the findings of this audit to the Quality Improvement Committee.

In February 2024 the Agency Medical Director approved continued use of the Nursing Treatment Protocols, last revised in 2019 and the protocol for COVID.[379] The Monitor requested any update of the Nursing Treatment Protocol Progress Notes but was not provided with any information in response to this request. OHS did begin reviewing protocols for possible revision but has decided to wait to review any templates that may already be part of the electronic health record.[380] The Monitor has expressed concern about the use of the nursing treatment protocols since 2021, specifically that some protocols are based upon a diagnosis rather than symptom or system complaint, the inappropriate and dangerous protocol for non-specific discomfort, use of protocols while patients are in the infirmary, and there are a number of protocols which should be eliminated because they are seldom used or have no nursing intervention.[381] These concerns have not been addressed by IDOC.

From our review of the documentation of 29 sick call encounters the protocol for nonspecific discomfort was used seven times.[382] In all cases it appeared that this protocol was used in order to access pain relief medication and involved minimal assessment. One of these was an LPN who saw a patient for edema of

---

[377] Sick call patient 10.
[378] Illinois Department of Corrections Facility Master Plan – Final Report May 2023, page 92.
[379] Memo dated 2/23/2024 sent to HCUAs and DONs.
[380] Interview with the Agency Director of Nursing on June 12, 2024.
[381] See a thorough discussion in the Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, pages 10, 72-75, 77. Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, pages 15, 106-109; Health Care Monitor 5th Report Lippert v Jeffreys (July 27, 2022) pages 12, 87-89, 91; Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, page 91-93, Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, pages 106-107.
[382] Sick call patients 5, 9, 12, 13, 20, 21, 29.

the lower eyelid. No vital signs were taken which might have indicated soft tissue infection, no visual acuity test was done, and the eye was not examined except by observation and palpation. The eye injury or skin and soft tissue protocols would have provided more appropriate guidance. There was a more appropriate protocol which should have been used in another five of these encounters. Only one, a complaint of neck pain, did not have a more appropriate protocol to use. The Monitor has suggested that a protocol for the assessment of musculoskeletal conditions would be useful since these are one of the more common complaints made at sick call.

Among the mortality records reviewed for this report there are several patients who were treated using the protocol for nonspecific discomfort when another protocol would have provided more clinically appropriate guidance.[383] One of these was an 83 year old patient with chronic obstructive lung disease (COPD), hypertension, sleep apnea, osteoarthritis, heart failure, and cognitive disorder (dementia).[384] This patient's general condition was slowly deteriorating. He had difficulty with activities of daily living, ambulation, and nutrition. This patient was seen on 9/5/23 for edema of the legs and shortness of breath using the nonspecific discomfort protocol when another protocol would have been more appropriate.[385] The patient was next seen a month later (10/2/23) by a nurse because he felt weak, his stomach was upset, and he was having trouble eating. Once again the nurse evaluated the complaint using the protocol for nonspecific discomfort when there were more appropriate protocols to have used.[386] The patient's blood pressure was documented as 96/53. The nurse gave the patient Pepto-Bismol which is not on the protocol for nonspecific discomfort. The nurse did not complete an adequate assessment of this 83 year old man in declining health and did not confer with a provider about his deteriorating symptoms. The patient was hospitalized later in the evening because he had not eaten or drank anything for two days, was unable to stand, and was hypotensive. This is also a good example of the type of patient whose symptoms and complaints should not be addressed by a nursing protocol.[387]

Among the review of 29 sick call patients are encounters where the assessment was incomplete.[388]  As examples, one patient was seen urgently for chest pain. The nurse documented that he had cardiac risk factors but did not list what they were. The nurse also did not document the nature or description of the patient's chest pain.  Another patient was seen for earache. The nurse documented that the inside of the patient's ear was abnormal but gave no further description. These one word assessments are not communicative to other providers who see the patient later and they are not specific enough to identify how the nurse arrived at a conclusion about treating the patient.

One of the encounters reviewed was a patient who was seen with a sore throat. The nurse used the upper respiratory infection protocol. He had asthma. The protocol clearly states that a provider is to be contacted if the patient has asthma. The nurse gave him acetaminophen and ibuprofen and told him to increase his

---

[383] Mortality review patients 1, 2, 6, 8.

[384] Mortality review patient 1.

[385] Either or both the protocols for shortness of breath and venous insufficiency would have been more appropriate.

[386] Could have used Indigestion or Nausea/Vomiting protocols for upset stomach.

[387] Mortality patient 5 is another patient who should not have been seen with nursing protocols. He was a 51 year old man with metastatic cancer who was undergoing chemotherapy when on 8/19/23 he was seen on sick call for dizziness using the dizziness/vertigo protocol. This patient had a temperature of 102.8, pulse of 113, and blood pressure of 94/60. The nurse by protocol should have conferred with a provider about his care and did not do so. According to the oncology appointment on 8/22/23 this patient was anemic and was transfused a few days later.

[388] Sick call patients 7,  8,  9, 10, 11, 14, 15, 29.

fluid intake. The nurse did not take a peak flow or review his use of inhalers which would have been appropriate given the asthma condition. The nurse did not contact a provider as instructed by the protocol.

Incomplete vital signs were present in six of the encounters reviewed.[389] Four patients had abnormal vital signs, none of which were commented on, no action was taken to address them, or they were not followed up by the nurse during the encounter.[390] The failure to recognize abnormalities in vital signs has been identified frequently as an opportunity for improvement in the mortality reviews completed by SIU.

Among the mortality records reviewed for this report were several examples of nurses treating patients inconsistent with the protocol or not using a protocol at all.[391] One patient was in the infirmary and complained of skin breakdown. The nurse documented a 1 centimeter ulcer on his foot and treated it with triple antibiotic cream. The nurse did not use a treatment protocol to guide the assessment and did not contact a provider to determine the follow up care that was indicated.[392] When he was admitted to the infirmary the provider ordered oxygen, but the order did not include the duration (continuous, PRN or time specified) or the mode of delivery. Additionally, parameters for escalation to the MD or modification of flow were not specified. Nurses adjusted the patient's oxygen several times without provider orders.[393]

Poor practices with regard to sick call and use of the treatment protocols are a result of the lack of effective nurse supervision (vacant supervisory positions), the necessity that supervisors provide direct patient care when positions are vacant, and the lack of physician presence (vacancies) and engagement in the health care program at facilities.

Monthly CQI minutes were received from 29 facilities. Sick call and nursing treatment protocols are regularly discussed at 26 facilities. The results of the monthly audit by the facility medical director is reflected in the minutes from 16 facilities. Another nine facilities do document periodic results but not every month.[394] Four facilities documented annual training was provided to the nurses by the medical director. Four facilities document whether there are backlogs in sick call, which is useful operational information.[395] Twelve CQI studies were reported and all but one related to an aspect of the administrative directives (i.e., Were patients referred from sick call seen by a provider timely?). One facility studied whether there was documentation that the patient should return to sick call if the problem did not improve.

These monitoring activities have identified that the protocols are not used appropriately. However, these tools do not identify if a protocol was not used when it should have been. These reviews could be improved by developing the clinical knowledge and decision making skills nurses use to make their decisions. At present corrective action focuses on documentation completeness and policy compliance rather than the

---

[389] Sick call patients 4, 16, 17, 22, 23, 28.

[390] Sick call patients 15, 18, 19, 30.

[391] Mortality review patients 1, 3, 8, 9, 13. These are all records that document instances of nurses practicing outside of their scope of practice.

[392] Mortality patient 3. There also was an order written for Triamcinolone cream applied to affected areas (0.1% cream) for one month for psoriasis. The order was never countersigned by a PCP.

[393] Nurses can initiate O2 only in an emergency and it is expected that further use of O2 is via physician order. Some health care systems allow nurses to manage O2 after the initial order but within a set of parameters and only under a standing order. Nursing Reference Center Plus: Administering Oxygen Therapy, May 30, 2023.

[394] Whether the audit gets done or not seems to depend upon physician availability and that the physician was provided the records to review. The audit of nurses' use of treatment protocols could be improved but at this point the most effort should go into implementation of the policy and procedure.

[395] Hill, Robinson, Shawnee, and Sheridan.

nursing assessment process. Corrective action most often is telling the nurse what was wrong as though it is a simple task to correct. Corrective action could be improved by periodic observation[396] of nurses conducting sick call and a discussion about the relationship between the complaint, objective and subjective data and other factors that contribute to the nurse's clinical decisions. IDOC is partially compliant with III.E.2. *Lists and treatment plans will be amended pursuant to the order of a clinician only.*

**Patients are not limited to a single complaint when seen in sick call**
Among the sick call encounters reviewed for this report we found several examples of patients who had multiple complaints addressed in a single sick call encounter.[397] The new policy on sick call has no language that prohibits limitations on the number of complaints to be addressed during a sick call appointment.[398] The Monitor suggests that such language be added during the annual review and revision of the policy. When this change is accomplished and without other evidence to the contrary, IDOC would be considered compliant with III. F.2. *There shall be* **no set restrictions on the number of complaints** *addressed during a specific sick call appointment.*

The Monitor's recommendations have been revised so as not to duplicate those that are now part of the Defendants' Implementation Plan.

**RECOMMENDATIONS:**
1. Revise E.06.01 Non-Emergency Health Requests to incorporate the requirements of the consent decree specifically limitations on the assignment and necessary supervision of LPNs, specify that sick call may only be conducted in a clinical setting, and prohibit any restriction on the number of complaints to be addressed in a single sick call encounter. The policy also needs to have the timeframe from receipt of a sick call request to the sick call encounter changed to be consistent with the NCCHC standard of one day. The Monitor's comments on the draft policy and procedure sent to IDOC on 2/2/24 should also be considered during the review and revision of this policy and procedure.
2. Revise the performance and outcome measure for responsiveness to sick call requests to be consistent with E.06.01. The reporting methodology needs to separate out the different timeframes that are being measured and report these separately. These are the time the request is received until it is triaged (the same day), the time the request is triaged until seen by a nurse, whether seen by a registered nurse or LPN, and the time from referral to a provider from sick call and when the patient is seen by the provider. Finally, the 10 charts that are reviewed for this measure need to be selected from complaints that may indicate a serious underlying problem or for which multiple complaints have been received (i.e., infection, chest pain, abdominal pain, nausea/vomiting, back pain, indigestion, glycemic episodes, shortness of breath, depression).
3. The Internal/External audit tool also needs to be revised so that it is consistent with E.06.01.
4. IDOC needs to fill vacant nursing leadership positions (Director of Nursing and Nurse Supervisors). Further the Agency Director of Nursing should receive the resources to establish

---

[396] The Monitor recommends that observation of the nurse conducting sick call take place over a three day period as part of new employee training and a briefer period of observation as part of annual credentialing and privileging. Observation should be done by a primary care provider interested in teaching nurses these skills.
[397] Sick call patients 1-5.
[398] E.06.01.

the means to provide clinical direction and supervision of nursing at facilities.[399]

5. The vendor needs to functionally fill registered nurse and primary care provider positions and be held accountable for excessive vacancies at a facility and by type of position regionally. The vendor should also be accountable for delays in filling any individual position beyond 45 days.

6. Complete item 53 of the Implementation Plan, the process improvement project for sick call which includes identification of barriers to access (or barriers to the implementation of E.06.01), delineating the resources needed to conduct sick call (staffing as well as the designation of clinical space and equipment), revision of the Nursing Treatment Protocols, and improving the quality and focus of the training nurses receive in the clinical assessment of sick call requests.

7. Develop more robust training and monitoring of nurses' use of the treatment protocols. Facility medical directors should be canvassed to find out what they think needs to be done to improve in this area. Additional training that is clinically meaningful about the assessment of complaints and nurses' decision making needs to be provided.

# Chronic Care

*Addresses Items II.A; II.B.1; II.B.6.f; III.E.1*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.f.** *IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia*

**III.E.1.** *IDOC shall maintain a list of prisoners' current medical issues in their medical charts.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

In February of 2023, IDOC promulgated policy F.02.01 Chronic Care. This policy was provided to the Monitor for comments and IDOC accepted almost all comments from the Monitor. Though this policy was promulgated in February of 2024, it is not yet implemented. IDOC has not provided any plan for how to implement its policy statewide. IDOC has not initiated a process analysis of this program and does not provided evidence that it understands the staffing and other support needed to implement this program. IDOC will be challenged in this implementation.

There was one key disagreement with IDOC's policy. Policy F.02.01 Chronic Care included procedure statement XVIII.

"The rationale for deviation from established clinical practice and/or guidelines shall be documented in the patient's chart".

---

[399] At a minimum this would be regular meetings to monitor the implementation of policies and practices that nurses are primarily responsible for. It should also include authority to set and monitor standards of nursing practice, establish criteria and priorities for continuing education and competency development, and peer review.

This statement was deleted by the Monitor but retained by IDOC. A requirement for providers to document any deviation from IDOC guidelines is something that is extremely unlikely to be done because of the complexity in doing so. Facility Medical Directors and vendor Regional Medical Directors should ensure that *standards of care* are being followed. When mortality reviews, comprehensive audits, and Monitor record reviews show that national standards are not being followed, IDOC through its Regional Medical Directors should initiate counseling and training as needed to correct the deficiencies.

A second problem with this statement is that IDOC is writing its own guidelines.[400] The Monitor strongly recommends that IDOC utilize national standards and guidelines instead of writing their own. This can be accomplished by including a link to UpToDate in the new electronic record that can be accessed at any IDOC desktop or remotely using the electronic record login. IDOC does not have capacity to write standards for disease management. Almost all of the clinical guidelines developed by IDOC are referenced and appear borrowed from UpToDate or other sources. Whether IDOC has accurately translated information from UpToDate into their guideline would take considerable effort to determine. UpToDate updates each of their sections with a literature review and topic update typically within the prior year. IDOC will not be able to perform updates and since they used UpToDate as a reference for their guidance they should just make UpToDate available in their electronic record. There were several guidelines that utilized clinical guidelines from the Texas Department of Corrections and the Bureau of Prisons but it is unclear what material is used from these organizations and some of the material is dated. For example, in the type 2 diabetes and hypertension clinical guidelines, IDOC uses material that is copied or adapted from the Bureau of Prisons, but the last type 2 diabetes guideline from the Bureau of Prisons is from 2017 and the most recent hypertension guideline is from 2015. Developing IDOC guidelines, even if they are copied and adapted from other sources, will take time and risks intended or unintended modifications of a national guideline. IDOC does not have the staff, resources or expertise to develop a guideline and should focus on other urgent issues.[401]

National guidelines produced specifically for corrections (e.g., Recommendations for Management of Tuberculosis in Correctional Facilities or sexually transmitted disease guidelines produced by the Centers for Disease Control) are exceptions that IDOC should reference in the appropriate document (e.g., the IDOC Infection Control Plan). There is no need to reproduce a guideline that already exists to address the clinical need within IDOC.

With respect to judging compliance with chronic care within IDOC, the following have occurred since the last report.

IDOC has provided no evidence that their policy for chronic care has been implemented at any of its facilities. During recent visits to NRC and Stateville the chronic care policy was not implemented.

IDOC has not provided any information demonstrating its status with respect to compliance with chronic care.

---

[400] IDOC sent the Monitor 38 IDOC clinical guidelines.
[401] The National Commission on Correctional Health Care (NCCHC) says as much. In the late 1980s the NCCHC attempted to develop clinical guidelines and published these on their website. In 2003 and updated in 2022, NCCHC stated on their website, "The standards are revised periodically, usually every three to five years. In contrast, clinical guidelines must be timely, reflecting the latest developments in the field and current treatment recommendations. NCCHC no longer publishes clinical guidelines. Please refer to nationally recognized clinical guidelines published by independent medical organizations". From *Correct Care* volume 17, issue 2 Spring 2003; updated April 4,2022".

The System Leadership Council January, 2024 meeting minutes document an effort to initiate a program called "Health Matters" that will include obtaining up to 40 education videos and which will also include access to a production studio to be use for health literacy and training and to get information to the facilities. Evidence of implementation of this training has not been provided.

IDOC has initiated a collaboration with the UIC Department of Endocrinology to provide telemedicine for diabetes care. This was initiated in the Northern Region but is expanding throughout IDOC. In review of records, a few of these encounters were evaluated and they were very good quality. A PharmD[402] visit alternated with a provider (physician or mid-level provider) in providing thorough and comprehensive diabetes care. Because it is over telemedicine, physical examinations are not performed and for this UIC depends on IDOC. This is a problem because IDOC providers, seldom, if ever, perform adequate foot examinations on persons with diabetes and though UIC recommends obtaining foot examinations they are not completed. The vendor should conduct training on a proper foot examination. Videos are available on-line and the American Diabetes Association and UpToDate have information on the diabetic foot examination.[403] The American Diabetes Association guidelines are freely available on the Internet.[404] If the facilities do not carry out the recommendations of the UIC consultants, they should document why they do not do so. If the vendor providers do not cooperate with UIC recommendations, it will make the project ineffective. We note that a CQI study completed at Dixon reported that 16 of 22 patients enrolled in the UIC telemedicine diabetes clinic had a significant reduction in hemoglobin A1c after at least six months of care.[405] Fifty patients were enrolled in this clinic. The Monitor supports this effort and IDOC's intent to take this program statewide. IDOC must monitor the effectiveness of its providers in implementing recommendations.

The medical reception section of this report documents that many chronic illnesses are not identified at intake and are not enrolled in chronic care. On record reviews thirty patients had a total of 74 acute or chronic problems that needed scheduled follow up. Only seven of the 30 patients with problems were ordered to be scheduled for chronic clinic or other appointments for follow up; This appears to be due to failure to include in chronic care conditions that are not one of the named eight chronic illness clinics.[406] The new policy F.02.01 Chronic Care does dictate that all acute and chronic medical conditions are to be followed in chronic care clinics, but there is no evidence of implementation of this policy.

The Monitor continues to find problems with the quality and frequency of chronic care visits on mortality reviews. Existing physician staffing deficiencies, evident in those reviews, remains a significant problem that does not permit patients to be timely or adequately evaluated for their chronic conditions.[407]

IDOC does not specifically assign nurses for chronic care support. The only information provided was by the vendor for 10 facilities. Of those ten facilities only one nurse was dedicated to chronic care and

---

[402] A PharmD is a PhD pharmacist. In Illinois, PharmDs are licensed to prescribe medications on a limited basis.
[403] Evaluation of the diabetic foot in UpToDate updated January, 2024
[404] American Diabetes Association Retinopathy, Neuropathy, and Foot Care: *Standards of Care in Diabetes – 2024* In Standards of Care December 11, 2023 as found at https://diabetesjournals.org/care/article/47/Supplement_1/S231/153941/12-Retinopathy-Neuropathy-and-Foot-Care-Standards
[405] Dixon CQI minutes May 2023.
[406] TB prophylaxis, HIV telemed, diabetes, asthma/pulmonary, hypertension/cardiovascular, seizure, general medicine, and hepatitis c.
[407] Mortality review patients #1, #2, #3, #4, #5, #7, #9, #10, #11, and #12

that nurse was an LPN.  All the remaining nine nurses assigned to chronic care have other duties.

The Monitor reviewed records for 21 patients who had 61 chronic clinic visits.  Review of these records continue to demonstrate that chronic care is task-oriented with providers merely ensuring that the patient is seen.  Quality of these visits is not good or consistent with standard of care.   Only one of the histories was minimally adequate.  Eighteen of 21 records were for diabetes.  Two patients were also evaluated by UIC clinicians.  The histories present in the UIC evaluations can be compared with the histories taken by IDOC providers for examples of deficiencies in IDOC care.  For persons with diabetes, there was typically no history regarding episodes of hypo or hyperglycemia since the last visit nor for other symptoms of diabetes.  The medication history was mostly documented with the statement "see MAR".  There was no discussion regarding whether the patient was receiving medication; was having side effects of the medication; or whether the medication was effective.  Laboratory results were often documented but abnormal tests were often not included in the assessment.  For example, patients with hypertension and GFR below 60 or with elevated microalbumin indicating likely chronic kidney disease did not have the abnormality acknowledged in the IDOC assessment, nor was follow up for possible chronic kidney disease conducted in chronic care.[408]  In the 18 charts reviewed for diabetes retinal examination was performed in 14 (78%) of patients.  However, microalbumin was annually performed in only one patient and none of the 18 patients had an adequate foot examination to include checking for neuropathy.  Assessments and plans did not include all diseases.  The complete lack of evaluation for neuropathy and an annual diabetic foot examination calls for training.

In summary, IDOC has promulgated but has not yet implemented a chronic care policy.  It will be challenged to do so because it has not analyzed its current program, does not understand the scope of changes that need to be undertaken, and has not analyzed the staffing needs related to this program including physician, mid-level provider, nursing, and support staff necessary to undertake the necessary changes.  Some improvements are notable particularly the initiative to have UIC manage diabetes care over telemedicine.  IDOC's attempt in drafting clinical guidelines is not recommended by the Monitor because of lack of expertise in guideline development.  Because IDOC must use the guidelines of others, the Monitor recommends creating a direct linkage to UpToDate into the electronic record.  For these reasons, a partial compliance is still warranted.

**RECOMMENDATIONS:**

1. Use national standards as guidelines for care instead of writing guidelines for all common health conditions.  The Monitor strongly recommends creating a link to UpToDate in the new electronic record so that this service can be accessed at any device that can access the medical record.
2. Support for chronic disease management needs to improve as soon as possible.
3. For physicians without appropriate credentials based on Consent Decree requirements, monitoring should be done to ensure that they are capable of managing patients according to contemporary standards.
4. When any provider does not know specifically how to manage a patient's condition, the provider should refer to a higher level provider or refer the patient to an appropriate specialist for management consultation, including for gerontology.

---

[408] Chronic care patient #1, #6, #7, #8, #12, #16, #18, #20

5. Discontinue prescribing sliding scale Regular Insulin with 70/30 insulin for insulin requiring diabetics[409].
6. A team approach to chronic care needs to be instituted. Daily and weekly huddles need to be instituted to improve communication amongst staff. Huddles should include nursing, schedulers, and a pharmacist.
7. The Monitor encourages the expansion of the UIC diabetes program.

# Urgent and Emergent Care

*Addresses Items II.A; II.B.1; II.B.6.b; III.E.4; III.G.1; III.G.2; III.G.3; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.b.** *IDOC agrees to implement changes in the following areas: Urgent care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical provider" reports and*

**III.G.1.** *Each facility HCUA shall track all emergent/urgent services in a logbook, preferably electronic.*

**III.G.2.** *Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

The following documents were requested by the Monitor for this report:

- List of all emergency medical response bags from Graham, Pinckneyville, Big Muddy, Lawrence, and Decatur. The list should identify the facility, the location of the bag, the contents of the bag including medication, and whether the bag is sealed and if so, how.
- Documentation from *each facility* of inspections of emergency response equipment and supplies. Typically, this would be a copy of the inspection logs for the emergency equipment.
- Log of persons seen for an emergency onsite but who were not sent to a hospital for Q4 2023 and Q1 2024.
- The date, time, location, and subject of any medical emergency response drills conducted at each facility during Q4 2023 and Q1 2024, including the debriefing and review documents.[410]

---

[409] This is not discussed in this report but has been discussed in prior reports. If IDOC has any questions about this recommendation, they should contact the Monitor for explanation.
[410] Monitor's documentation request dated 2/29/2024, items 76, 88, 89, 105, 106.

The last report described updates to Administrative Directive 04.03.108 Response to Medical Emergencies and the effort by OHS to establish policy and procedure regarding the medical response during emergencies.[411] Three policies and procedures regarding emergency services have been finalized and were distributed for implementation at the facilities 2/1/24. These are D.01.01 Emergency Plans and Drills, E.08.01 Emergency Services, and E.09.01 Facility Emergency Response. These policies and procedures establish expectations for changes in emergent/urgent services that are consistent with II.B6.b, III.E4, III.G.1-4 of the Consent Decree. The Monitor recommends that more direction be given in D.01.01 Emergency Plans and Drills on the subjects that must be addressed in the emergency response plans.[412] Also in the procedure, section CC, appears to have left out the duties of the facility medical director in managing care during a medical emergency. The Monitor's recommended language on the draft should be added to this section to address III.G.2 of the Consent Decree about the obligations of medical staff in determining the urgency of medical response.[413]

From review of the facility Quality Improvement Minutes, it is clear that implementation of the policy changes in emergency services has yet to be accomplished.[414] None of the 30 facilities reporting provided logs of requests for urgent or emergent health care attention with information about the response.[415] During the site visit to NRC we observed that the HCUA was piloting a log to track onsite emergency responses. Ten facilities do not appear to keep a log of emergencies sent to the emergency room.[416] Thirteen of 20 facilities which keep a log, track whether a report was received from the emergency room about the patient's evaluation, care and further treatment recommendations and only 11 track whether the patient was seen by a provider upon return. There is no evidence that facility medical directors review the records of a sample of patients receiving emergency care to identify opportunities to improve and that these are discussed at facility quality council meetings.[417]

Nineteen of 30 facilities reported on emergency response at quality meetings during the period reviewed.[418] We also reviewed the report of emergency response drills and critiques of mass casualty drills submitted by 18 of 30 IDOC facilities.[419] Only seven facilities include any substantive critique or discussion of areas to improve. Four of these sites only critique whether the response was timely, and the proper equipment was brought to the site and do not include any demonstration of knowledge or skills

---

[411] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27,2023 page 112.

[412] Administrative Directive 04.03.108 Response to Medical Emergencies does not require a *plan* for emergency medical response. NCCHC D-07, Compliance Indicator # 3 lists the subjects to be included in the emergency response plan. This is also consistent with OHS stated goal of standardization.

[413] The Monitor suggested the addition of these statements to this section of the procedure…" 1. Existing patients with health conditions are safely managed and transported safely to secure locations as required. 2. Infection control measures are enacted if the emergency includes infectious or communicable disease agents. 3. Appropriate triaging of injured occurs with follow up staging of injured into cohorts with referrals for higher level of care needs as required. 4. Management of medical aspects of the emergency including exposures, inhalation injuries, traumatic injuries, etc. 5.Coordination with local area hospitals or public health partners as needed.

[414] The minutes of quality improvement meetings and logs from January 2024 through June 2024 were reviewed for this report. This is the period before during and after the Medical Policy and Procedure Manual was finalized and distributed for implementation.

[415] Medical Policy and Procedure Manual E.09.01 Facility Emergency Response, Procedure II. E.

[416] Big Muddy, Danville, Dixon, IRCC, JITC, Lincoln, Logan, Pinckneyville, Southwestern and Taylorville. Documents provided by Western would not open.

[417] Medical Policy and Procedure Manual E.09.01 Facility Emergency Response, Procedure III. C.-E.

[418] January 2024 – June 2024.

[419] Monitor's documentation request dated 2/29/2024, #106.

157

competency in delivering medical care in an emergency.[420] The recently distributed policy and procedure D.01.01 Emergency Plans and Drills now stipulates that drills are to include:

- a medical assessment of any patient identified with a medical emergency,
- the determination of medical interventions and the sequence with which they are to take place,
- use of equipment and supplies, and
- practice determining the need for EMS and summoning such help as well as notification of the chain of command.

Full implementation of this policy will demonstrate staff proficiency in the clinical response to medical emergencies.[421] Eight facilities reported having a mass casualty drill during the time period of this report. Five facilities reported a critique of the drill and three identified strengths and weaknesses in the response.[422] These critiques should be reviewed by OHS to determine statewide training and development plans.

Previous reports have discussed the variation from facility to facility in emergency supplies and equipment.[423] The list of the contents of emergency bags provided for this report evidences continued variation.[424] Of four facilities which responded to the Monitor's document request, only Decatur, used the standardized list attached to E.09.01 that was made effective October 2023. The contents listed by Big Muddy differ from the standardized list in that it does not include ammonia inhalant, regular and large blood pressure cuffs, cervical collar, Coban (self-adherent bandage), eye wash solution, glucometer, strips, lancets, instant ice pack, normal saline, oval eye pads, pulse oximeter, stethoscope or tongue depressors. The list from Big Muddy includes several items that are not on the standardized list (splint, endotracheal tube, etc.). The same was found with the lists provided by Graham and Pinckneyville as well. It may be that these items are available in the health care unit but not in the emergency response bag. However, this variation defeats the purpose of standardization which is to facilitate timely and effective clinical response to an emergency.

The emergency bag at Northern Reception Center was observed during the site visit June 3-4, 2024, and was not consistent with the standardized list. We were told that there have been delays in getting the bags made by Corrections Industries and therefore standardization of the equipment and supplies has also been delayed. During the site visit one finished bag was delivered to the facility and stocked consistent with the standardized list attached to E.09.01. The plan is to provide each facility with one bag each. Additional bags would be made available as they are manufactured.

[420] Critiques limited to timeliness and equipment were reported by Big Muddy, Graham, Menard, and Vandalia.
[421] Consent Decree II.B.3 trained clinical staff…and oversight by qualified professionals and II.B.6q assessment of staff competency and performance.
[422] Mass casualty drills were reported in CQI minutes reviewed by Big Muddy, Centralia, Hill, Menard, Murphysboro, and Vienna. Both NRC and Stateville completed mass casualty drills which were reviewed as part of the Monitor's site visit June 3-5, 2024. The critique by NRC was written by a Major; there was no input by medical staff. The documentation of the mass casualty drill at Stateville was well done and critiqued by the medical director. The description and critique of mass casualty drills were also received from Lawrence, Southwestern, Dixon, Lincoln, Robinson, and Sheridan. The critique was not discussed at the quality improvement meeting. The most common area identified for improvement was that no member of the responding health care staff took charge to direct the response. It is important to review these critiques to identify training and development needs.
[423] Health Care Monitor 4th Report, Lippert v Jeffreys, September 16, 2021, page 118, Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, page 93, Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 113.
[424] A list of the contents of emergency medical response bags were received from Graham, Pinckneyville, Big Muddy, and Decatur. Lawrence sent the list of contents in the first aid kits which was not responsive to the request.

158

Most facilities provided documentation of the inspections of emergency response equipment and supplies.[425] However there is no standard or consistent pattern as to when the inspections are done, what is included, and how the inspection is documented. Policy and procedure E.09.01 establishes expectations for inspection of emergency equipment[426] which have not been implemented by facilities. Inspections are completed each shift only at Kewanee and Robinson. Other sites inspect daily or monthly, which is not as frequent as required by the policy and procedure. Some sites only require the initial of the person completing the inspection when the new procedure requires date, time, signature and credentials.

Eleven facilities track the date the patient is seen by a provider upon return to the facility after being sent to the emergency department. The Consent Decree requires patients to be seen within 48 hours of return. These logs were reviewed to evaluate the extent of compliance with this requirement and the findings are in the following table. Not quite half the patients sent out for an emergency from 11 facilities which report this information are seen within 48 hours of return to the facility.

| Facility | # reviewed on log | # seen by provider within 48 hours | % met 48 hour expectation |
|---|---|---|---|
| Menard | 30 | 29 | 97% |
| East Moline | 17 | 14 | 82% |
| Vandalia | 24 | 16 | 67% |
| Kewanee | 5 | 3 | 60% |
| Murphysboro | 5 | 2 | 40% |
| Vienna | 13 | 5 | 38% |
| Decatur | 9 | 3 | 33% |
| Lawrence | 36 | 10 | 28% |
| Stateville | 54 | 11 | 20% |
| JTC | 38 | 6 | 16% |
| Sheridan | 15 | 2 | 13% |
| Total | 246 | 101 | 41% |

Eight mortality records were reviewed for this section of the Monitor's report because each included one or more emergency response episodes. Each of these deaths preceded implementation of the new policies and procedures. In two of the records documentation of the response included a timeline.[427] Three of the records reviewed had no documentation by the staff who responded to the emergency.[428] In two of the deaths cardiopulmonary resuscitation was not started promptly.[429] Clinically inappropriate decisions were

---

[425] Facilities that did not respond or the information provided was not responsive to the Monitor's documentation request # 89 were Danville, Dixon, Jacksonville, Lawrence, Murphysboro, Pontiac, and Southwestern. Actual practices at these sites should be reviewed to ensure that at least some sort of inspection of emergency equipment is taking place.
[426] Procedure section I. D- F. Two inspections are required one that takes place at the beginning of each shift to verify that equipment and supplies are available and in working order. The second inspection is done monthly and includes an inventory of the first aid kits and emergency bags, exchange of expired medications and supplies as well as verification that all life support equipment is operable.
[427] Urgent/Emergent services patients # 5 and 6.
[428] Urgent/Emergent services patients # 3, 7 and 8.
[429] Urgent/Emergent services patients # 1 and 5.

made in the response to two of these patients. One was a patient with cancer who was refusing further work up and treatment and had signed a do not resuscitate order six days earlier who was found in his cell unresponsive to verbal stimuli. His blood glucose was 23, which is very low. He was treated for hypoglycemia for four hours at the facility without improvement. He was then sent to the emergency room. The patient's wishes for comfort measures at end of life were not honored.[430] Another patient was only 21 years old and had been recently diagnosed with angioedema. He had been treated on numerous occasions for allergic symptoms prior to his death, including hospitalization less than a month earlier for swollen tonsils and difficulty swallowing. The day of his death he had been seen at 8:45 am for swollen tonsils. The facility physician was contacted and directed the nurse to place him in the infirmary for observation. At no time in the next few hours did the physician evaluate the patient nor were the staff prepared to initiate airway support. He should have been sent to the emergency room when the physician was first contacted. The physician failed to identify the urgency of the patient's condition.[431]

Since the last report IDOC has established in policy and procedure the following expectations:

- The response to medical emergencies and documentation thereof has been standardized.[432]
- The emergency equipment and supplies for urgent/emergent medical response have been standardized.[433]
- Information about delivery of urgent/emergent care will be tracked.
- The type of documentation and reports to be requested from offsite service providers has been clarified.
- Urgent/emergent responses will be reviewed to identify the follow up needed by patients, any problems with the response, and opportunities to improve primary care.[434]

There is little evidence yet that facilities have implemented the changes required by these policies. OHS has not evaluated the need for staffing and training necessary to ensure urgent/emergent services are delivered consistent with the policies nor how competency in clinical response to medical emergencies will be evaluated.[435]

**RECOMMENDATIONS:**

1. Prioritize implementation of D.01.01 Emergency Plans and Drills, E.08.01 Emergency Services and E.09.01 Emergency Response on the Facility.
2. Address and implement other improvements in urgent emergent heath care that are in the Implementation Plan, Items 72 and 94. [436]
3. Use the opportunities identified by the Morbidity and Mortality Committee to build the staff training program for emergency response and competency evaluation.
4. The accuracy of the information documented in the logs need to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.
5. Follow up appointments after patient's return from offsite emergency services or hospitalization

---

[430] Urgent/Emergent services patient # 6.
[431] Urgent/Emergent services patient #2.
[432] Implementation plan task 94, item 1.
[433] Implementation plan task 72, items 1 and 2.
[434] Implementation plan task 94, items 3-5.
[435] Implementation plan task 72, items 2 and 4; task 94, items 1, 2, 6.
[436] These are training staff and validating competency in emergency response and determining the staffing necessary to implement the requirements of the new policies and procedures.

should include the patient to review the findings and discuss any updates to the treatment plan. Consider using telehealth technology to accomplish these encounters especially on weekends and at smaller facilities with relatively healthy populations and less frequent onsite provider presence. A review of records without seeing the patient is not sufficient.

# Infirmary Care

**Addresses Items II.A.; II.B.1; II.B.6.k; III.I.1-5**

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.k.** *IDOC agrees to implement changes in the following areas: Appropriate staffing, physical conditions, and scope of services for infirmary care;*

**III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.*

**III.I.2.** *At every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.*

**III.I.3.** *All facilities shall employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital.*

**III.I.4.** *All infirmaries shall have necessary access to security staff at all times.*

**III.I.5.** *All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested the following information from IDOC to review for this report:

- List any new contracted consultants including the expert to evaluate the needs of the aged and infirm.
- A list of allocated/budgeted medical positions (also noting FTE) vacancies for each position at each facility to include IDOC and Wexford positions.
- For providers, the documentation of assignments for intake health assessments, infirmary rounds, urgent care clinic and chronic clinic for the month of February 2024.
- List the name and credential (RN, LPN, NA) of every individual assigned to work in the infirmary for any 7 day period in February 2024 at NRC, Graham, Menard, Logan, Stateville, Lawrence, Illinois River, Pinckneyville, and Pontiac. The list must include nursing staff employed by the State and the vendor.
- Provide the job description or post assignment of any correctional officer posts regularly assigned to cover the infirmary at NRC, Graham, Menard, Logan, Stateville, Lawrence, Illinois River, Pinckneyville, and Pontiac.
- For each facility, a list of patients in the infirmary on 2/29/24, to include the name, age, DOC#, diagnoses, and date of admission to the infirmary.

- A description of any training or consultation provided to personnel responsible for infirmary care concerning dementia care, dysphagia, mobility impairment, fall prevention, skin care, aging, and safety and sanitation on the inpatient unit.
- Any assessment completed on the utilization of infirmary beds or barriers to access infirmary level care.[437]

In addition to the above, the Monitor reviewed information that pertained to infirmary services with regard to new arrangements with academic centers, adverse events and corresponding corrective action, death records and mortality reviews, and quarterly quality improvement reports.

## II.B.6.k.  Infirmary Care: Appropriate Staffing, Physical Conditions, and Scope of Services

IDOC distributed a policy and procedure on Infirmary Care (F.04.01) in February 2024 which defines the scope of services as interdisciplinary services appropriate to *maximize the quality of life and functional status of individual patients* and to reduce morbidity and mortality. The infirmary may also be used to prepare patients for diagnostic testing or follow up after hospitalization when greater access to nursing attention is needed than can be provided in general population.

The policy and procedure defines the responsibilities of the facility medical director to monitor the quality and continuity of care and the HCUA's responsibilities to ensure that sufficient resources are available to meet patient's needs. The staffing specified is consistent with III.L.1-4 of the Consent Decree. Procedures for the admission, continued stay, and discharge from the infirmary are established. In addition, reporting requirements have been established that include use of infirmary beds for non-medical reasons, utilization statistics, staffing available, adverse event reporting, backlogs, etc. There was no evidence from the site visits to Stateville and NRC in June 2024 that the policy and procedure had been implemented. OHS informed the Monitor that these new policies and procedures are being reviewed with site leadership and the facilities are expected to implement them as they are able.

The completion of F.04.01 Infirmary Care accomplishes items 3, 6 and 8 included as part of part of task #71 in the Implementation Plan. Part of item 10 is accomplished with the new reporting requirements for infirmary services. However, performance monitoring tool(s) have yet to be developed.[438]  Assessment of non-medical reasons for use of infirmary beds has not been completed.[439] Nor has information on reasons for backlogs in access to infirmary beds and the number of infirmary beds needed has not been established.[440] There has not been any evaluation of the staffing or other resources needed to deliver infirmary care consistent with the IDOC policy and procedure. No particular education has been provided to enhance staff performance in areas that are especially important in the care of infirmary patients, such as fall prevention, mobility impairment, dysphagia, geriatrics or cognitive impairment, etc.[441] It does not appear that any additional resources have been allocated to improve infirmary services.

Charts reviewed in preparation of the  8th Report depict the same problems with clinical care and support

---

[437] Monitor's documentation request dated 3/4/2024, items 8, 10, 60, 63, 65, 107 – 109. With the exception of 108 and 109, at least a partial response to each request was received.
[438] IDOC does have a tool to monitor adherence to the Administrative Directive 04.03.120 on infirmary services, but nothing has been developed to coincide with the policy and procedure F.04.01.
[439] Item 1 of Task #71.
[440] Items 2 and 4 of Task #71.
[441] Items 5 and 7 of Task #71.

services for patients needing infirmary care that have been discussed in previous reports.[442] These problems include failure to provide clinical care that is appropriate and responsive to the patient's medical needs[443] and unsafe practices that put patients at risk of adverse events.

The Monitor reviewed the information provided by facilities about patients in the infirmary on 2/29/24, which included the name, age, DOC#, diagnoses, and date of admission to the infirmary.[444] On that day 65% of the infirmary beds available statewide were filled, however eight facilities were more than 80% filled with five having no beds available.[445] Forty percent of the available infirmary beds had been occupied by the same patient for more than 30 days. Twenty-six percent of the infirmary beds were occupied that day by patients who had been in the infirmary more than three months and of these 40 patients had been in the infirmary for more than one year.

[442] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) pages 123-130; Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) pages 111-112; Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, pages 104 – 108; Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, pages 120-121 .

[443] Infirmary patients # 1 – 7, 9, 12.

[444] Decatur (15 beds) and Southwestern (5 beds) did not respond. Taylorville and Western provided information but did not include the patients date of admission. These facilities were excluded from the analysis. JITC was also excluded from the analysis. No additional information has been provided about the scope of services and structure of the new facility planned for Joliet, Illinois despite repeated inquiries from the Monitor. This facility was originally to have included 50-52 new medical beds. It had only one patient in the infirmary on 2/29/2024. It does not appear to be running at full capacity yet and its mission remains unclear.

[445] Facilities with more than 80% of the infirmary beds filled on that day were Big Muddy, Hill, Lincoln, NRC, Pinckneyville, Robinson, Shawnee, and Vandalia.

| Infirmary Census and Patient Length of Stay on 2/29/2024 | | | | | | | |
|---|---|---|---|---|---|---|---|
| FACILITY | Capacity | Census | % Infirmary beds occupied | Available beds | More than 1 month | More than 90 days | More than 1 year |
| BIG MUDDY | 18 | 15 | 83% | 3 | 1 | 1 | 3 |
| CENTRALIA | 18 | 11 | 61% | 7 | 2 | 4 | 0 |
| DANVILLE | 15 | 10 | 67% | 5 | 2 | 5 | 2 |
| DIXON | 28 | 17 | 61% | 11 | 2 | 0 | 8 |
| EAST MOLINE | 16 | 3 | 19% | 13 | 0 | 0 | 2 |
| GRAHAM | 21 | 6 | 29% | 15 | 0 | 3 | 0 |
| HILL | 16 | 16 | 100% | 0 | 0 | 2 | 2 |
| JACKSONVILLE | 8 | 1 | 13% | 7 | 5 | 0 | 1 |
| KEWANEE | 4 | 2 | 50% | 2 | 0 | 0 | 1 |
| LAWRENCE | 14 | 9 | 64% | 5 | 0 | 0 | 4 |
| LINCOLN | 8 | 7 | 88% | 1 | 2 | 2 | 0 |
| LOGAN | 15 | 11 | 73% | 4 | 0 | 0 | 2 |
| MENARD | 26 | 12 | 46% | 14 | 1 | 3 | 0 |
| NRC | 20 | 20 | 100% | 0 | 14 | 3 | 2 |
| PINCKNEYVILLE | 12 | 12 | 100% | 0 | 1 | 4 | 4 |
| PONTIAC | 12 | 7 | 58% | 5 | 2 | 1 | 1 |
| ROBINSON | 8 | 7 | 88% | 1 | 2 | 0 | 1 |
| SHAWNEE | 15 | 15 | 100% | 0 | 2 | 5 | 4 |
| SHERIDAN | 10 | 5 | 50% | 5 | 2 | 0 | 2 |
| STATEVILLE | 25 | 13 | 52% | 12 | 1 | 9 | 1 |
| VANDALIA | 9 | 9 | 100% | 0 | 4 | 2 | 0 |
| Totals | 318 | 208 | 65% | 110 | 43 | 44 | 40 |
| Percent of all beds | | | | | 14% | 14% | 13% |
| Percent beds occupied by patient 3 months or more | | | | | 26% | | |

The Assistant Warden at NRC initiated a weekly meeting with the facility medical director and the Northern Region Medical Coordinator to identify persons who were in the infirmary only because of a disability that prohibited their assignment elsewhere. They work with the Transfer Coordinators Office to find other facilities which have acceptable beds and coordinate the transfer. This is an excellent example of managing infirmary bed utilization.[446] Both the Regional Coordinator and Medical Director reported that they spend considerable time each working day attempting to find facilities who will accept patients with disabilities or who require use of medical devices (CPAP machines, oxygen, wheelchairs etc.). The Monitor recommends that OHS examine what can be done to facilitate the identification of appropriate housing and safe transfer of these individuals. It appears that the Regional Coordinators would benefit from access to the offender management system, 0360, and that facilities should not have the ability to electively refuse to take individuals identified for transfer.

---

[446] The new policy and procedure has several tasks and reports that should assist with monitoring of utilization by the facility medical director, HCUA, and Regional Medical Coordinators.

The Monitor rounded on patients in the 20 bed infirmary at NRC during the site visit in June.[447] Six of these patients were on watch and another was on a hunger strike. Three patients had long standing conditions that required more extensive nursing care (complete nursing care, wound care, oxygen etc.). Three patients were undergoing specialty care and required closer medical supervision. Rounds were also completed on 18 patients in the 25 bed infirmary at Stateville. Eight of these patients had requested early release under the Joe Coleman act.[448] One patient had recently been denied his request for release. Ten patients were receiving care from specialists in the nearby area. Seven patients needed primarily nursing care and sheltered living. Only one patient was ready for discharge. At these two facilities 20 percent of the infirmary beds are occupied by patients with long term debilitating conditions requiring access to nursing care, physical therapy, and sheltered living. There were no patients inappropriately housed or in an infirmary bed for "security reasons" at Stateville or NRC.

The monthly CQI minutes from Menard, Pontiac, and Centralia document the use of infirmary beds for what appear to be non-medical reasons. From January through May 2024 the CQI minutes from Menard document an average of 10 persons placed in the infirmary on "Security Hold" each month. Centralia appears to place persons in the infirmary on "Security Hold" when on hunger strike. It may be appropriate to admit someone to the infirmary when for medical reasons that level of monitoring and care is medically necessary but not by security as a routine practice. Pontiac provided an infirmary log that captures the date of admission, date of discharge, type of admission and an explanation of every person in an infirmary bed each month. This shows that the infirmary is used to house parole violators.[449] F.04.01 Infirmary Level Care Policy VII. states "The infirmary shall not be used for placement of patients who are not admitted for medical or mental health reasons." IDOC will need to address inappropriate use of infirmary beds for non-medical reasons once sufficient time has been allowed for the field to implement the new policy and procedure. The implementation of the new policy and procedure needs to be monitored by the Regional Medical Coordinators and Deputy Chiefs so that inappropriate practices are identified and alternatives to use of infirmary beds exercised.

We note that the QI minutes from JITC reflect discussion in April and May 2024 of plans to expand capacity of the infirmary.[450] Apparently the inability to secure nursing staff is preventing this expansion currently. OHS has been working with interested parties at UIC to re-purpose JITC as a telehealth specialty hub to increase access to specialty care, especially in the Northern region. It is not yet clear what role infirmary services will have at JITC and whether there will be any increase in access to this level of care.[451]

**Appropriate Physical Conditions for Infirmary Care**

The Monitor has found the space to provide needed services and programs for infirmary patients to be inadequate at all facilities site visited so far.[452] The Facility Master Plan completed by CGL in May 2023

---

[447] Site visits were June 3-5, 2024.

[448] F.04.01 Infirmary Level Care instructs staff to develop and submit requests for early release for any infirmary patient who is expected to live less than six months.

[449] For the months January through the middle of March 2024 there were 5 people admitted to the infirmary as parole violators and 1 was a "writ guest".

[450] Original plans for JITC included a 50-52 bed medical infirmary- Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 121.

[451] Notes from the monthly teleconference with OHS on April 18, May 16, and June 19, 2024.

[452] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 120. These are Dixon, Lincoln, Logan, Robinson, Shawnee, and Graham.

documented that the health care area was undersized or poorly designed in 23 of IDOC's 30 prisons. Even though this was not a study of the specific needs of the incarcerated population for access to health care it does point to the magnitude of the problem in achieving appropriate physical conditions for delivery of care in the infirmary setting.

In the spring of 2024 Stateville was slated for closure as part of the broader initiative to address the aged and deteriorating infrastructure of IDOC prison facilities. Since the Governor announced these plans, a federal judge issued an order that all incarcerated persons be transferred elsewhere by 9/30/24. The only exception are those housed in the health care unit.[453]

The Monitor considers the infirmary at Stateville uninhabitable due to ongoing maintenance issues that are infection control and patient safety concerns and the lack of programming space for long-stay patients.[454] During the visit to the infirmary at Stateville we noted additionally that the negative pressure rooms were not functional for several months this year and that the nursing station does not offer direct line of sight into the patient rooms. One of the provider's interviewed reported that examinations of patients were done at the bedside because there was no exam room available and that there was no working ophthalmoscope on the unit.

NRC's infirmary has 20 beds. Eight of these are single rooms used for mental health or crisis watch. The medical beds consist of six two-person rooms and no single rooms. When a patient requires a single room the infirmary capacity is reduced by one because the other bed is not accessible. On the day the infirmary at NRC was toured one of these rooms was not operational, two rooms each housed only one patient for clinical reasons. Therefore, the infirmary capacity was reduced by four or 8 patients total. This infirmary has a large open nurses station but only the mental health rooms have visual access from the nurses station. There is no open area or dayroom for use by long-stay patients. There is no exam room in the infirmary. If patients are examined it is at bedside or they are scheduled in the clinic.[455] This is cumbersome and inefficient and is an obvious barrier to good clinical practice based upon review of documentation that seldom includes any examination.

**Appropriate Staffing for Infirmary Care**

**Physician Staffing**

Provider staffing practices have not changed since the prior report. There has been no workload analysis to determine the number of physicians needed to adequately care for patients needing infirmary level care.[456] Since 2019 the total number of physician positions have been decreased by three, with no analysis or rationale to support their elimination. Compounding the problem, a number of the positions are unfilled or filled with temporary providers. Seven facilities with larger infirmaries have a physician position in

---

[453] The building housing the health care unit was deemed as habitable because it was not at risk of falling concrete during the demolition of the general housing units on the Stateville campus. However, the CGL Facility Master Plan Report by CGL – May 2023 found that this area would need significant renovation, and the campus had significant accessibility issues, page 92.
[454] Infestation by rodents, insects and birds, the presence of legionella in the water, unsanitary conditions for personal hygiene, and poor ventilation.
[455] The number of exam rooms in the clinic is insufficient already so its use for examination of infirmary patients is unrealistic.
[456] Step 5 of item 71 in the Implementation Plan with an expected end date of February 2024.

addition to the medical director. None of these positions are functionally filled.[457] The total number of working physicians have decreased from 33.75 to 21.255 (a 37% decrease) since 2019.[458] Three of the four facilities which were found noncompliant with AD 04.03.120 Infirmary Services the first six months of 2024 were without a regular on-site physician and the fourth has a physician who covers several facilities.[459] Eight facilities with infirmaries have no functionally filled medical director and four of these have infirmaries greater than 15 beds.  Over 30% of the infirmary beds available within the IDOC are without a medical director position that is functionally filled.

| Infirmaries at Facilities without Medical Directors[460] | | | | | |
|---|---|---|---|---|---|
| **FACILITY** | **Capacity** | **Census** | **% Infirmary beds occupied** | **Medical Director** | **% Nursing Vacancies** |
| CENTRALIA | 18 | 11 | 61% | Locums | 46% |
| EAST MOLINE | 16 | 3 | 19% | Vacant | 28% |
| GRAHAM | 21 | 6 | 29% | Locums | 26% |
| KEWANEE | 4 | 2 | 50% | Locums | 0% |
| LAWRENCE | 14 | 9 | 64% | Vacant | 65% |
| MENARD | 26 | 12 | 46% | Locums | 42% |
| ROBINSON | 8 | 7 | 88% | Vacant | 45% |
| VANDALIA | 9 | 9 | 100% | Locums | 25% |
| Total | 116 | 59 | 51% | | |

Each of the medical directors at Stateville and NRC were interviewed during the site visit in June 2024.[461] One said that she did infirmary rounds when she was told; another physician, who works part time, did infirmary rounds twice a month. The other medical director works 30 hours a week, rather than full time. She had no knowledge of the new policies and procedures, including the one on infirmary care. She reported spending the majority of her time attempting to find appropriate placements at other IDOC facilities for disabled and medically needy patients.  At neither Stateville or NRC is there a physician with primary responsibility for the ongoing care of patients in the infirmary, or for the quality and continuity of services provided by the infirmary. Instead, individual providers are assigned or appointed to make rounds and address any immediate issues. The result is episodic care without management of underlying chronic conditions to achieve maximum possible improvement.

As an example, one of the patient records reviewed during the site visit was a 62 year old who was a long-

---

[457] These facilities are Centralia, Dixon, Logan, Menard, NRC, Pontiac, and Stateville.
[458] These data come from the Staffing Analysis 11/23/19 provided by IDOC and from the vendor's staffing data provided in June of 2024.
[459] CQI minutes January through June 2024 were reviewed. Locums providers were not counted as functionally filling the physician position. These facilities were Centralia, Lawrence, and Sheridan. The fourth facility was Pinckneyville which is staffed by a physician who was covering several facilities at the same time.
[460] The infirmary census is from the information sent in response to the Monitor's documentation request  #107, the census in each facility's infirmary on 2/29/2024. The staffing information is from what was provided in response to the Monitor's documentation request #10 for a list of allocated/budgeted medical and dental positions (also noting FTE) vacancies for each position at each facility to include IDOC and Wexford positions.   Medical director vacancies was from the June 2024 Medical Staffing Report provided by the vendor.
[461] June 3-5, 2024.

stay infirmary patient.[462] His problem list noted ALS v primary lateral sclerosis. He had a history of a cardiovascular accident with right-sided muscle weakness. He also had back surgery with nerve pain. He had garbled speech, repeated falls and used a CPAP machine. He was prescribed simvastatin, atenolol, Lasix, and potassium, although the reason for each of these medications in this patient's care is not indicated. In the six months between January and June 2024 the patient fell four times. A physician was involved only in the most recent fall which resulted in an emergency room visit to treat a head injury.[463] During this six month period he was seen multiple times by four different providers. No provider had primary responsibility for his plan of care.

While the providers' notes were generally legible and included some elements of a physical exam they focused only on the most immediate troublesome symptoms (i.e., lower extremity edema) not an evaluation of the underlying condition(s). While the patient had poor balance, clumsy movement, weakness of legs, arms, tongue and over time had increasing difficulty chewing, swallowing, and speaking there is no documentation of a neurology consultation to determine if the patient had ALS or the more slowly progressing primary lateral sclerosis and no plan to manage the patient's care consistent with a diagnosis and its prognosis. His cardiac condition and radiculopathy complicate the picture and may contribute to some of the patient's symptoms, making the need for a patient specific plan of care even more important. Instead, he was treated symptomatically (use of atenolol, Lasix and KCL). The four falls he had were each adverse events and the first fall should have resulted in a more vigilant fall prevention plan. This did not happen and after the fourth fall he was just treated episodically for the scalp laceration and possible head injury.

The mortality reviews provided with this report provide other examples of episodic and uniformed provider care of patients needing infirmary services. A good example is Mortality Review Patient #1 who was housed at a facility without a medical director. This patient was hospitalized on 10/2/23 and diagnosed with acute kidney injury and obstructive uropathy. He was placed in the infirmary upon his return to the facility on 10/5/23. There was no admission evaluation by a physician and no rounds were completed. Post hospitalization orders were obtained by phone. He was sent to the hospital on 10/8/23 and 11/22/23 and each time returned to the infirmary. He was in the infirmary for 54 days before his death on 12/5/23 and was never seen in-person by a provider. The last in-person evaluation he had by a provider was on 8/29/23.

The Monitor continues to recommend that UpToDate® be available in each of the exam rooms. Additional decision support material should be considered in the development of the standardized list of equipment to be available in every health care unit.[464]

The Monitor has found that patients in the infirmary were poorly managed by providers in every report so far. IDOC does not have appropriate physician staffing for infirmary care. As a result, infirmary patients are still being cared for by nurse practitioners or physician assistants, which the Monitor believes is inappropriate.

## Registered Nurse Staffing

There has been no staffing analysis to establish the number and types of nursing positions that are

---

[462] Infirmary services patient #1.
[463] At the ED the patient's laceration of the scalp was sutured and head/spine CTs were negative.
[464] Implementation Plan, item #54.

necessary to provide nursing care for patients in the infirmaries at IDOC facilities.[465] The Monitor has information on the nursing coverage for 12 of the IDOC infirmaries.[466] The size of the infirmary at these facilities ranges from 8 to 26 beds. All but two facilities staff the infirmary with one RN each shift 7 days a week.[467] This means while the nurse is providing services to persons in another area, the infirmary is not covered. Registered nurse staffing allocated at these facilities is not based upon any analysis of patient acuity, nursing interventions required, physical layout, or available support services. Recent QI minutes from Logan document concern that one nurse position for the infirmary is not sufficient to properly care for the needs of the patients on the infirmary.[468] Every facility reviewed also has nurse assistant positions but only Stateville specifically assigns one of their positions to the infirmary. It is not clear if nurse assistants are assigned to assist in the infirmaries at the other facilities.[469]

In previous reports the Monitor has commented that facilities do not have enough filled positions to cover the infirmary without use of overtime or agency personnel.[470] The State has filled more than 80% of allocated RN positions; an improvement from previous reports.[471] Over the last year the vendor has made some progress but still reports vacancy rates of more than 65% for registered nurse and LPN positions.[472]

---

[465] Step 5 of item 71 in the Implementation Plan with an expected end date of February 2024.
[466] This information is derived from site visits to NRC, Stateville, Graham, Dixon, Shawnee, Logan, Lincoln and from the nurse assignment sheets provided by Stateville, NRC, Lawrence, Graham, IRCC, Logan, Menard, Pinckneyville, and Pontiac from February 2024 in response to document request #63.
[467] NRC with a 20 bed infirmary staffs the infirmary with 2 RNs. Lincoln with an eight bed infirmary does not assign a nurse but the nurses in the clinic cover the infirmary.
[468] May and June 2024. There is no indication in the minutes of an effort to complete an analysis of what is needed; just to request more help.
[469] The assignments sheets from Stateville are the only ones that indicate one nurse assistant is assigned to the infirmary each shift. See the Monitor's 6th report Dixon also assigns one nurse assistant to the infirmary each shift, page 109.
[470] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 103, Health Care Monitor 3nd Report Lippert v Jeffreys, February 15, 2021, page 96; Health Care Monitor 4th Report, Lippert v Jeffreys, September 16, 2021, page 131; Health Care Monitor 5th Report, Lippert v Jeffreys, June 22, 2022, page 114; Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, page 109; Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 123.
[471] Staffing data provided effective June 2024 in response to the Monitor's document request # 10.
[472] On 6/30/2023 the vendor reported of 263 LPN positions, 199 were vacant (76%). Of 221.4 registered nurse positions 161.4 were vacant (73%). The data for June 2024 has 66% of registered nurse positions vacant and 67% of LPN positions vacant. While this is an improvement over the last 12 months; the vendor is still not incapable of providing safe levels of nursing personnel.

| Total Nursing Positions Filled | |
|---|---|
| Vendor | State |
| RN | |
| 33% | 81% |
| LPN | |
| 34% | 49% |
| NA | |
| 44% | No data |
| | |
| Total Nursing FTE | |
| 624.4 | 368 |
| Total Nursing Filled | |
| 223 | 277 |
| % Filled | |
| 36% | 75% |

Eleven of 15 facilities where the vendor provides all of the nursing positions have nursing vacancies exceeding 50%. All but one of these facilities have infirmaries with a total of 148 infirmary beds.[473]

| Facilities with Only Wexford Nursing Positions | | | |
|---|---|---|---|
| | Allocated FTE | Vacant Positions | % of Total Positions Vacant | Number of infirmary beds |
| Western | 34 | 33.0 | 97% | 15 |
| Southwestern | 15 | 13.0 | 87% | 5 |
| Logan | 46 | 38.5 | 84% | 15 |
| IL. River | 30 | 25.0 | 83% | 15 |
| Pinckneyville | 37 | 28.0 | 76% | 12 |
| Lincoln | 22 | 16.0 | 73% | 8 |
| Danville | 29 | 21.0 | 72% | 15 |
| Hill | 35 | 23.0 | 66% | 16 |
| Lawrence | 40 | 25.0 | 63% | 14 |
| Shawnee | 31 | 18.0 | 58% | 15 |
| Big Muddy | 33 | 17.0 | 52% | 18 |
| Robinson | 19 | 8.5 | 45% | 8 |
| Taylorville | 20.4 | 7.4 | 36% | 7 |
| Kewanee | 10 | 0.0 | 0% | 4 |
| Murphysboro | 1 | 0.0 | 0% | NA |
| | 402.4 | 273.4 | 68% | 167 |

---

[473] Four facilities in which more than 50% of the nursing positions filled are Robinson, Taylorville, Kewanee, and Murphysboro (no infirmary) which have a total of 19 infirmary beds.

Adequate nursing coverage in the infirmary is a function of having the right type of positions, in quantities sufficient to meet patient needs and the ability to recruit and retain qualified personnel to fill at least 85% of these positions. While some coverage has been obtained through the use of "as needed" and agency contract nurses, these temporary personnel do not have the training, experience, or commitment to the organization to ensure patient care quality and safety. IDOC does not have a *appropriate nurse staffing for infirmary care.*

Menard, IRCC, and Lawrence are each designated as housing maximum security prisoners and document the nurse assigned the infirmary also is responsible for another area. At Lawrence, with 14 infirmary beds, this additional responsibility is for restricted housing. At Menard, with the largest infirmary in the system, the nurse assigned the infirmary is also responsible for LW[474] on the 3p – 11p and 11p – 7a shifts. At Lawrence the infirmary nurse is assigned PREA evaluations on the 7a to 3p shift and to help with sick call on the 3p to 11p shift. This practice is not compliant with III.I.2 of the Consent Decree which requires *at least one registered nurse assigned to the infirmary <u>at all times</u>, twenty-four (24) hours a day, seven (7) days a week.* Further, it was noted at IRCC on 2/6/24 no RN was on duty in the infirmary on the 3p to 11p shift.[475] No registered nurse on site at the facility was also reported as a problem by Lincoln in the QI minutes reviewed for this report period.[476] This is not compliant with III.I.1 and III.I.3 of the Consent Decree.[477]

IDOC has yet to provide evidence of compliance with the staffing requirements of the Consent Decree for infirmary services. The recently enacted policy and procedure for infirmary services does include establishment of a daily log or roster of staff assigned to the infirmary which once implemented by the facilities could be audited to establish compliance with these requirements.[478]

**Access to Physical Therapy**
Staffing information provided for this report show an allocation of 4.7 FTE Physical Therapists in June 2024 compared to 5.45 FTE included in the staffing information provided for the 7th report. The reduced allocation appears to have taken place at Big Muddy and Hill CC. Each of these facilities was allocated 0.5 FTE physical therapists (PT) in June 2023 and a year later are allocated as 0.1 FTE. We could find no documentation of the rationale for reducing the number of these positions. The number of physical therapy assistant (PTA) positions allocated has remained the same at 10.7 FTE physical therapy assistants allocated.

PT services are available at 10 of the IDOC facilities which have a total of 195 infirmary beds. Of the allocated positions, 71% are filled. As of June 2024, Big Muddy had a vacant PT position (0.1 FTE) and Lawrence had only filled 4 hours of a 20 hour a week PT position. There were vacant physical therapy assistant positions at five facilities in June 2024.[479]

---

[474] We believe LW refers to a housing unit.
[475] Information provided in response to the Monitor's document request # 63 List the name and credential (RN, LPN, NA) of every individual assigned to work in the infirmary for any 7 day period in February 2024 at NRC, Graham, Menard, Logan, Stateville, Lawrence, Illinois River, Pinckneyville, and Pontiac.
[476] QI minutes from January 2024.
[477] **III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.* **III.I.3.** *All facilities shall employ at least one registered nurse on each shift.*
[478] F.04.01 Infirmary Level Care Procedure VIII. C.
[479] Graham had 1.0 FTE vacant, Lawrence had 0.5 FTE vacant, Pinckneyville had 0.5 FTE vacant, Stateville had 1.0 FTE vacant, and NRC had 1.0 FTE vacant.

Only four of the 10 facilities with PT services provide any report of utilization.[480]  Of these, only NRC reports how many encounters were infirmary patients.[481]  Nearly a third of all PT encounters are with infirmary patients at this facility. The Monitor strongly recommends that the number and type of PT services provided be reported by facilities monthly. The NRC report should be used as the template.

The space for physical therapy was reviewed during the Monitor's site visits to NRC and Stateville in June 2024. Neither area was found to be of sufficient size and equipment. See comments in the section on clinical space earlier in this report.

There are still 16 facilities with a total of 170 infirmary beds which do not have any allocated physical therapy positions. One of these, East Moline, with a 16 bed infirmary, documents an average of 42 off-site PT encounters a month. An ASR was submitted for on-site PT in January 2024 and six months later had yet to receive a response.  The population in the infirmary on February 29, 2024, was reviewed and two facilities stand out as having concentrations of patients with long stays who would likely benefit from access to PT services.[482] These are Danville where half of the patients in the 15 bed infirmary had been for more than 90 days (two more than one year) and Shawnee which had nine patients in the 15 bed infirmary more than 90 days (four more than one year). The Monitor recommended IDOC assess the actual need of patients for access to physical therapy, particularly at facilities with populations of 900 or more.[483] Both Danville and Shawnee have populations greater than 900.[484] First discussed in the 5th Report, there are still many facilities where patients do not have access to this service.[485]

---

[480] Facilities which report PT service statistics include Dixon, Hill, NRC, and Stateville.

[481] Each month an average of 31 PT encounters are with infirmary patients

[482] Information provided in response to the Monitor's documentation request #107.

[483] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 124. The Monitor recommended that the needs of patients at *all facilities* be assessed but emphasized those with populations greater than 900.

[484] Illinois River, Taylorville, and Western did not respond to the request for information or sent incomplete information. They each have populations greater than 900 and may have concentrations of long-stay patients in the infirmary but were not considered in this review as a result of the lack of information.

[485] Health Care Monitor 5th Report Lippert v Jeffreys (July 22, 2022) pages 114-115. As of  May 31, 2024, there are more than 10,000 individuals in IDOC facilities who do not have access to onsite physical therapy services by virtue of their facility assignment. IDOC Quarterly Report, July 1, 2024.

| Facilities with Infirmaries without Physical Therapy Services | | | | | |
|---|---|---|---|---|---|
| | Population 5/31/24 | Infirmary Census | LOS more than a month | LOS more than 90 days | LOS more than 1 year |
| Centralia | 1160 | 18 | 2 | 4 | 0 |
| Danville | 1648 | 15 | 2 | 5 | 2 |
| Decatur | 331 | 5 | No information provided | | |
| East Moline | 469 | 16 | 0 | 0 | 2 |
| IL River | 1712 | 15 | No dates provided | | |
| Jacksonville | 491 | 8 | 5 | 0 | 1 |
| Kewanee | | 4 | 0 | 0 | 1 |
| Lincoln | 784 | 8 | 2 | 2 | 0 |
| Pontiac | 587 | 12 | 2 | 1 | 1 |
| Robinson | 1134 | 8 | 2 | 0 | 1 |
| Shawnee | 1423 | 15 | 2 | 5 | 4 |
| Sheridan | 1245 | 10 | 2 | 0 | 2 |
| Southwestern | 510 | 5 | No information provided | | |
| Taylorville | 1128 | 7 | No dates provided | | |
| Vandalia | 507 | 9 | 4 | 2 | 0 |
| Western | 1478 | 15 | No information provided | | |
| Total | 14607 | 170 | 23 | 19 | 14 |

There were two patients among those included in the Monitor's mortality reviews for whom access to physical therapy was problematic. Both were housed in facilities which do not have on-site PT staff.[486] The Monitor recommends that a guideline be established for referrals to physical therapy. The guideline should specify that any patient who is not receiving end of life care but is likely to be in an infirmary longer than 30 days receive an evaluation by a physical therapist for fall risk and a plan to prevent deconditioning and loss of function.

### III.I.4 Access to Security Staff in the Infirmary

The Monitor's suggestion that a log be used to document security staff assigned to the infirmary was incorporated into IDOC F.04.01 Infirmary Level Care. When this documentation can be provided it will serve as evidence of compliance with III.I.4 of the Consent Decree. Each of nine facilities provided the requested descriptions of correctional officer posts assigned to the infirmary and HCU more generally. Each of these facilities has at least one post dedicated to the infirmary at all times. Usually, a second post is assigned to the clinic area as well.

---

[486] Mortality review patients #1 and 12. The facilities were Centralia and Pontiac.

| Correctional Officer Posts Assigned to the Infirmary and HCU | | | |
|---|---|---|---|
| Facility | Post name | Post # | Shift |
| Logan | Health Care Unit #1 and #2 Officer | 1960 | All |
| | | | |
| Graham | Medical Officers 1-- 4 | 635 | All |
| | | | |
| IL River | Health Care Unit Officer | 170 | 7a-3p |
| | | 140 | 3p-11p |
| | Infirmary Officer | 335 | 11p-7a |
| | | | |
| Lawrence | Infirmary Officer | 1350 | All |
| | | | |
| Menard | Hospital 2nd and 3rd Floor Officers | 1105 | All |
| | | 1110 | |
| | North II Infirmary Officer | 3200 | 7a-3p |
| | | 3201 | 7a-3p |
| | | | |
| Pinckneyville | HCU Officer | 29 | All |
| | Infirmary Officer | 30 | All |
| | | | |
| Pontiac | HCU officer #1, 2, 3 | 1604 | All |
| | | 1608 | All |
| | | 1610 | All |
| | HCU Clinics Officer | 1616 | All |
| | | | |
| Stateville | HCU Infirmary Officer | 485 | All |
| | HCU Clinic Officer | 492 | 7 a-3p |
| | | | |
| Stateville NRC | NRC Infirmary C/0 | 1375 | All |
| | | 1376 | All |
| | NRC HCU Officer | 1370 | 7a-- 3p |

At each of the sites visited by the Monitor so far, the infirmary has had necessary access to security staff.[487] The Assistant Warden for NRC/Stateville stated that even though both facilities experience significant vacancies among correctional officer positions that movement to the health care unit and off-site specialty care are given priority.

Lack of appropriate health care positions has resulted in patient care situations that are left to security staff to address. Mortality patient #4 is an apt illustration of this problem. This was a 64 year old man with dementia who was described by a physician as having no decisional capacity. As is common with dementia, this patient exhibited confusion, agitation, hallucinations, and disinhibition. He was verbally

---

[487] Limited access has been experienced elsewhere such as transport for specialty medical appointments, escort to sick call, or medication pass.

aggressive and occasionally physically aggressive when non-cooperative with care. The aggression was not dealt with as a medical problem. In the absence of a medical plan for his care, he was given "staff assaulter status" and custody restraints, mace, and the tactical team employed to control his behavior and to perform hygiene. The patient was also shackled when transferred for emergency care for a seizure and again when he was found unconscious and nonresponsive. Alternatives to routine use of these methods were not sought and medically ordered restraint was not employed when it would have been clinically more appropriate. A policy and procedure on medical restraints was issued by OHS before the Monitor's comments on it could be considered. The Monitor considers I.05.01 Medical Restraints unacceptable and urges OHS to consider the comments provided on 2/6/24 in the next review and revision.[488]

We have commented in this, and previous reports that long-stay infirmary patients do not have sufficient privacy or access to dayroom, recreation, and outdoor space. This limitation is primarily because of physical plant but as more appropriate space is made available, especially for frail and elderly patients, allocation of correctional officer posts will need to be adjusted.

### III.I.5 Bedding and Linens
In the last report the Monitor recommended that OHS develop a policy and procedure on sanitizing and handling of bedding and linens used in the infirmary.[489] This feedback was also provided in the Monitor's comments on the daft of the infirmary policy and procedure.[490] Instead, the final policy and procedure simply states, "The inventory and handling of linens and bedding used in the infirmary shall be in conformance with Environmental Services."[491] No further direction is given about where or in what form this information can be obtained from Environmental Services. This is not sufficient to comply with the Consent Decree. Sanitizing and handling of linen used in the infirmary is an infection control and prevention measure *specific to the operation of the health care program*, not Environmental Services.

The IDOC health care program needs to define processes and procedures required by III.I.5 to ensure all infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens. References from the Centers for Disease Control and Prevention for handing linens in health care settings were suggested in the last report and are repeated here as resources to assist in development of a procedure for the inventory, storage, handling, and laundering of all linens used in the health care setting.[492]

### II.B.1. *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
The mortality reviews completed by the Monitor for this report identified four patients who should have been but were not cared for in an infirmary setting when the need for a higher level of care was evident.[493]

---

[488] The Monitor received the draft of this policy and procedure on 8/23/2023. It was not until after the 7th report had been completed that the Monitor was able to review the draft. In the meantime, OHS determined that it would issue the new policies and procedures all at one time, even if not all reviewed by the Monitor and elected to do so on 2/9/2024.

[489] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, pages 124-125.

[490] Monitor's comments on F.04.01 Infirmary Level Care sent to OHS 9/12/2023.

[491] Environmental Services is not defined and no guidance could be found about sanitizing linens used in the infirmary and health care unit distributed by Environmental Services. Facility written directives on laundry were discussed in the Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, page 111. These were deficient because the amount of clean linen to have on hand, how it is transported and received, how it is stored, or how laundry is handled once it has been used, if not contaminated with blood or other body fluids, how it is laundered etc. was not addressed.

[492] Laundry | Background | Environmental Guidelines | Guidelines Library | Infection Control | CDC and Appendix D: Linen and Laundry Management | Environmental Cleaning in Resource Limited Settings (RLS) | Healthcare-Associated Infections (HAI) | CDC. Search on the CDC website for each of these items for guidance.

[493] Mortality review patients #1, 2, 7, and 9.

175

One of these was a patient who had been diagnosed with a cancer of the bile duct earlier in the month and had been referred to oncology for palliative chemotherapy which had not yet begun. Security notified a nurse that the patient was too weak to come for his morning medication because he had been vomiting. The nurse evaluated the patient and advised him to come to the health unit as needed.[494] If a patient with cancer is too weak to come for medication he needs to be in the infirmary to ensure he receives prescribed care. At a minimum, the nurse should have placed him on 23-hour observation and completed a more thorough evaluation of his needs for assistance.

Another of these patients was diagnosed with metastatic colon cancer after being admitted to the hospital for abdominal pain.[495] When released he was returned to a facility without an infirmary. He had several follow up specialty care appointments, including placement of a port and oncology which were poorly executed resulting in delays in treatment and deterioration of his condition. After a second hospitalization the patient returned to the facility and was placed in an observation cell. He was tachycardic, had elevated blood pressure and was weak. He had lost 23 pounds in less than a month since diagnosis. Nurses did not regularly monitor his condition while he was held in the observation cell. After he complained of dizziness and shortness of breath, nurses found him with an oxygen saturation of 77-84%, respirations 32, and a heart rate of 138 – all abnormally high. A provider ordered him sent to the hospital where he died four days later.

These mortality reviews also identified continued confusion and lack of clarity about end of life decision making, palliative and hospice care.[496] A policy and procedure to clarify processes for medical decision making when patients are and are not competent to do so was issued by OHS effective 2/9/24. This is another policy that was issued without the Monitor's review.[497] As written Policy and Procedure I.01.01 Patients' Rights to Treatment and IDOC Authority to Treat is considered unacceptable by the Monitor. OHS is urged to consider the comments provided by the Monitor on 2/6/24 in the next review and revision. There is considerable confusion in the plan of care ordered by providers for "comfort care" and clinical management of the end of life. There were mortality reviews of patients on "comfort care" who continued to receive medications for chronic conditions and specialty care appointments. There also were patients whose treatment orders were ineffective and sometimes dangerous in managing pain and other end of life symptoms. A policy and procedure or clinical guideline will not be sufficient to address these clinical practice issues. Geriatric and end of life care should be considered specialties and patients needing these services cohorted at facilities with capacity to deliver this level of service. IDOC made a significant commitment several years ago in the first draft of the Implementation Plan to address the needs of the aged, infirm, and disabled populations for appropriate housing, programming, and health care. Through subsequent drafts this intention remained unchanged and became more specific in the final Implementation Plan.

This commitment included hiring a qualified consultant to determine the size of the population and the gradations of their needs for more appropriate housing and management.[498] The plan further states that

---

[494] Mortality review patient #2.

[495] Mortality review patient #7.

[496] See mortality review patients #1, 2, 4, 5, 6, 7, and 9.

[497] The Monitor received the draft of this policy and procedure on 6/23/23. It was not until after the 7th report had been completed that the Monitor was able to review the draft. Extensive revisions by the Monitor to draft were provided to OHS on 2/6/23. In the meantime, OHS determined that it would issue the new policies and procedures all at one time, even if not all reviewed by the Monitor and elected to do so on 2/9/24.

[498] Implementation Plan narrative page 2.

the Department will develop options and recommendations to address the gaps in need for clinical care and housing and then take action to correct these gaps.[499] The analysis and development of the action plan are to be performed in consultation with the Monitor."[500]

This work was to have begun in December 2023 with the identification and hiring of the consultant[501] and proceed through a series of four more tasks [502] until a report was completed which described the population of aging and infirm persons incarcerated in the IDOC, a description of subpopulations with varying needs and the development of housing and programming options for each of these groups modeled on patterns of civilian care by at the end of October 2024. IDOC has not initiated work on this part of the Implementation Plan.

The Monitor was made aware that the Department has engaged in some facility planning initiated to address the needs for space to care for the mental health needs of the population and these plans do consider ADA provisions. However, none of this facility planning has been done specifically based upon an analysis of the needs of frail, infirm and/or elderly persons who have been incarcerated.

The Department is to develop a comprehensive response to the consultant's report that includes modifications to the existing housing and the classification system, development of training, programming and specialty consultation as well as equipment to serve the needs of the aged, infirm, and disabled people in prison as well as provision of end-of-life services consistent with contemporary standards for this stage of life by December 2025. Since the Department has yet to make any progress in this area, it will be years before care of elderly, infirm and/or disabled persons in IDOC will be any appreciably different than what brought this Consent Decree to be in the first place.

OHS has shared with the Monitor plans to make specialty consultation with medical experts from UIC in the care of geriatric patients available via telehealth technology at JITC. This will be initiated as a pilot program and if feasible will be expanded to other patients housed at facilities in the Northern Region. This program is just in the beginning phases of planning and has no outcomes to show for it at this time. The Monitor supports OHS's efforts to improve access to specialty care generally and appreciate that OHS sees the need specifically for access to geriatrics. OHS is also attempting to initiate a project to screen incoming persons at NRC for dementia but this project has yet to materialize.

**RECOMMENDATIONS:**
1. Initiate the project to develop recommendations for housing and programming for the elderly, frail and infirm populations that are the focus of tasks #64-67 and 69 in the Implementation Plan and the accompanying narrative.
2. Use the experience and knowledge gained by the Northern Regional Coordinator and facilitate further efforts to find appropriate housing for the disabled and to manage the utilization of infirmary beds statewide.
3. Establish an expectation for when implementation of F.04.01 Infirmary Care is to be accomplished.
4. Complete the remainder of Task #71, items 1, 2, 4-7 and 10. This includes quantifying the number

---

[499] Implementation Plan narrative page 5.
[500] Implementation Plan narrative page 6.
[501] Implementation Plan Task #64.
[502] Implementation Plan Tasks 65-67, and 69.

and type of positions that are necessary to comply with F.04.01.

5. Identify alternative means to obtain stable physician leadership when the vendor is unable to fill allocated positions.

6. Establish the means and methods to hold the vendor accountable for filling other clinical and support positions.

7. Evaluate the need for physical therapy services at each institution with an infirmary. The Monitor continues to recommend that physical therapy services be provided at all facilities with infirmaries that house over 900 incarcerated persons.

8. Develop guidelines for referral to physical therapy including the evaluation of patients with long infirmary stays to prevent falls and deconditioning.

9. Clarify the infirmary care that will be provided at the renovated Joliet Inpatient Treatment Center.

10. Increase access to Up-To-Date®. Additional decision support material should be considered in the development of the standardized list of equipment to be available in every health care unit.

11. Ensure that falls, decubiti, and accidental ingestion of non-food products are reported as adverse events.

12. Develop procedures to establish inventory control of linen for the infirmary, direct the conditions and practices for transport and storage of clean linen, and the handling and laundering of dirty linen that are in accordance with contemporary standards for control of transmissible diseases.

13. Continue to explore use of resources available at SIU and UIC to educate providers and nursing staff about managing the care of geriatric patients, palliative and end of life care, and preventing injury in the inpatient setting (fall prevention, skin care, infection associated with urinary catheters, PICC line care etc.).

# Specialty Consultation

*Addresses Items II.A; II.B.1; II.B.6.e; II.B.6.g; III.E.4; III.H.1-4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.e.** *IDOC agrees to implement changes in the following areas: Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;*

**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical provider" reports and ensure they are filed in the correct prisoner's medical records.*

**III.H.1.** *Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite visit, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.*

**III.H.2.** *Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.*

**III.H.3.** *If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is*

178

*not possible to obtain such documentation, staff shall record why it could not be obtained.*
**III.H.4.** *Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
In February of 2024, IDOC promulgated policy D.04.01 Offsite Clinical Care. The Monitor has given comments to IDOC. Most comments were accepted. There were several key comments by the Monitor that were not accepted. They are as follows.

1. In newly promulgated policy A.02.01 Responsible Health Authority, policy statement V. states that the HCUA is the administrative authority responsible for ensuring the coordinated delivery of healthcare. In policy D.04.01 Offsite Clinical Care, IDOC eliminated a procedure suggested by the Monitor for the HCUA to have sufficient staff to schedule, manage and track offsite appointments; personnel to ensure information to and from the consultants is coordinated and accurately transmitted; and nursing staff to ensure patients are properly prepared for offsite appointments. If the HCUA is the administrative authority, why isn't the HCUA given responsibility to add staff to better coordinate offsite care? As described below and in mortality reviews, scheduling and tracking of offsite specialty visits is dysfunctional and additional staffing appears necessary. The Monitor draws this conclusion based on interviews with scheduling clerks during site visits and review of records. IDOC has not performed a workload analysis. The Monitor recommends that the HCUA be responsible to determine and to hire the number of staff necessary to perform this function.

2. The Monitor recommended that requirements for log entries on the offsite specialty tracking log be standardized to include 10 items. IDOC did not include this change. Each item, in an accurately maintained log, could contribute to verify one or more Consent Decree items. These suggested log entries are included below along with the Consent Decree item whose compliance would be verified.

    a. Date of request: II.B.1.; II.B.6.g.; III.H.1
    b. Date and time that the appointment was arranged: II.B.1.; II.B.6.g.; III.H.1.;
    c. The location of the appointment: II.B.1
    d. Date and time the specialty clinic appointment occurred: II.B.1.; II.B.6.g.; III.H.1.;
    e. Reason that an appointment did not occur (e.g., offsite clinic cancellation, lack of security transportation, patient refusal, etc.): II.B.1.; II.B.6.g.;
    f. Date and time a missed appointment was rescheduled: II.B.1.; II.B.6.g.;
    g. Date and time provider follow up was scheduled by the receiving nurse: II.B.1.; III.H.2.;
    h. Date and time the specialty consultation report was received: II.B.1.; III.E.4.
    i. Date and time that the report was given to the facility provider for review: II.B.1.; III.E.4.; III.H.2.; and
    j. Date and time the post-offsite care visit with the facility provider occurred: II.B.1.; II.B.6.e.; III.H.2.; III.H.4.

    Every facility tracks specialty care differently and what is recorded is optional for each site. This lack of standardization makes these logs unusable for the purpose of establishing compliance.

Logs have been reported as inaccurate since the Monitor's 2nd Report.[503] and do not reflect all care nor all intended care. The only procedural statement on the log in policy D.04.01 Offsite Clinical Care is procedural statement V. which states:

> The facility maintains a log of all ambulatory specialty care requests and diagnostic testing, treatment, and procedures in an electronic format.

This gives no further guidance on how to maintain the log, who will maintain the log, or what is to be in the log. As written, current practices can continue unabated and specialty care will not be tracked accurately. Given the introduction of the electronic record, IDOC should ensure that data described in the steps above be incorporated as data elements in the electronic record so that is information can be obtained automatically. The data elements cited above should be captured and how they are captured should be included in the policy and procedure.

3. IDOC eliminated suggestions for a huddle to include the facility Medical Director, the scheduling clerks, nurses who work with specialty care patients, and the medical records administrator. The purpose of the huddle recommendation is for the facility Medical Director, providers, scheduling clerk, and nurses who assist with offsite care to review all new referrals, recently returned consultations, outstanding reports and newly arrived reports, and pending consultations with expected timeframes to completion.[504] The purpose is to identify and resolve issues that impede timely patient care including ensuring timely appointments, getting reports, improving communication with consultants, etc. Alternate specialty care appointments are sought when timeframes for current appointments exceed expectations. While IDOC eliminated this recommended change to the policy , there is ample evidence of its need.[505] If the IDOC does not use something like a huddle, it will have to develop an alternate standardized method to ensure that specialty care is organized and effective.

4. The Monitor included a procedural step that gathers information about missed and delayed appointments and with compliance with the policy and presents it at the quality meeting. This ensures that IDOC gathers sufficient data for compliance consistent with requirements of provision V.G. of the Consent Decree.

The Consent Decree requires the HCUA maintains the offsite specialty tracking log but vendor staff currently perform and supervise this function. The current policy only stipulates that the HCUA is to have oversight over this but the Monitor has not seen evidence of this during any site visit. The current position description of the HCUA does not address this responsibility.

Currently, IDOC produces no V.G. report; conducts no comprehensive audit (II.B.9); and provides no verification that specialty care requirements in the Consent Decree are accomplished. IDOC has not provided information to verify adequate access to timely secondary care (II.B.1. and IIB.6.g.); tracking receipt of consultation reports and referrals for offsite care (III.E.4. and III.H.1.); ensuring a provider review of the report and follow up with the patient to discuss the consultation report and provide informed care (III.H.2. and II.B.6.e.); documentation of why consultation reports could not be obtained (III.H.3.);

---

[503] See Health Care Monitor's 2nd Report, July 6, 2020 pp108-109.
[504] Huddles can be used for any purpose but this particular recommendation is for specialty care. The Agency for Healthcare Research and Quality gives guidance on huddles at https://psnet.ahrq.gov/primer/improving-patient-safety-and-team-communication-through-daily-huddle and literature shows that huddles reduce readmissions to hospitals as found at https://pubmed.ncbi.nlm.nih.gov/27902576/
[505] Almost every mortality review conducted by the Monitor for this report had problems with coordinating specialty reviews. Particular attention should be paid to mortality review patients #5, #6, and #7

and that all appointments between a consultant and the patient are documented in the medical record (III.H.4.).

In northern facilities, access to care and timeliness of secondary care is still affected by economic reasons specifically the arrangement for free care at UIC. Through a prior arrangement, IDOC has access to 512 free offsite visits. The vendor is responsible for scheduling all offsite care and steers all care from northern facilities toward UIC even when this extends beyond the assigned number of spots or when care cannot be scheduled for months. Some specialty care at Dixon and Stateville, for example, is significantly delayed. At Stateville, orthopedic appointments take 1.5 years to schedule. New gastroenterology appointments take 4-5 months to schedule even for urgent matters.

In a central region facility, significant backlogs are occurring. In the "open discussion" section of the IRCC February 2024 CQI minutes, there is a comment:
> "Discussed "urgent" backlog-down to 4 – 83 urgent in January and 32 urgent for February so far. Non urgent backlog over 500 – dating back to March 2023"

This is a significant backlog indicating that routine appointments are delayed for over a year.

IDOC does not track delays in specialty care and their offsite specialty tracking logs do not consistently track the date of referral so the extent of delays and lack of access cannot be determined from information and data provided to the Monitor because it is not accurately tracked.

Though IDOC has not provided information verifying its compliance, the Monitor has conducted 13 mortality reviews and identified multiple problems with specialty care related to the Consent Decree in those 13 records including the following.

1. Referral documents are not consistently present in the medical record.[506]
2. Patients who should be referred for specialty consultation or diagnostic testing are not referred.[507]
3. Patient who are referred for specialty care often do not go for their appointment or go on a date that is not the scheduled date.[508]
4. Referrals are not consistently placed onto the offsite specialty tracking log or entries are inaccurate.[509]
5. There is evidence of many provider referrals or recommendations for return follow up with a consultant that are not entered onto the log and/or do not occur.[510] Ten of 13 records reviewed showed underutilization[511]. Additional training is necessary to ensure that patients are appropriately referred when necessary.
6. Reports of specialty consultations are often not obtained and when not obtained there is no documented effort to obtain the report.[512]
7. Providers do not consistently timely review offsite consultation reports or do not consistently document findings of the consultant. Providers seldom provide informed feedback to the patient

---

[506] Mortality patients, #1, #2. #5, #7
[507] Mortality patients #1, #2, #3, #4, #5, #6, #7, #9, #10, #13
[508] Mortality patients #2, #5, #7, #9, #11, #12, #13
[509] Mortality patients #1, #2, #5, #6, #7, #8, #9, #10, #11
[510] Mortality patient #1, #2, #6, #7
[511] By underutilization, the Monitor means that a patient should, based on community standards, be referred for specialty care but is not.
[512] Mortality patient #1, #2, #5, #6

about the consultation and how the consultation will change the therapeutic plan or why certain recommendations of the consultant will not be undertaken.[513]

8. Some patients are at some facilities not placed on the tracking log until after they complete their specialty care visit.[514]

9. Referrals that are ordered for specialty care or diagnostic care often do not occur timely.[515]

10. Communication with specialist is often problematic.[516]

The Monitor's mortality reviews demonstrate that specialty care remains extremely disorganized. This disorganization results in harm to patients. Several deaths occurred as a result of or were hastened by failure to refer a patient for specialty care or diagnostic evaluation or failure of a referral to occur timely[517].

One outstanding example of harm showing the dysfunction of the specialty care process is a patient[518] who was diagnosed with lung cancer. He required radiation therapy and had multiple visits for radiation treatment. He was seen four times by a radiation oncologist (11/30/23; 12/6/23; 12/8/23; and 12/11/23) who recommended at three of the appointments to have ultrasound of the leg to rule out a deep vein thrombosis. The 11/30/23 recommendation was signed as reviewed about a month after the visit; the referral form (also with consultant comments on it) was not signed as reviewed; and there was no visit with the patient. After the 12/6/23 consultation, a nurse practitioner saw the patient post-consultation but failed to evaluate the leg that may have had the deep vein thrombosis. The nurse practitioner documented in the progress note ordering an urgent ultrasound. The referral for this consultation was type written without documentation of the urgency and was not signed or dated by a provider giving the impression that it was written by the scheduling clerk. An order date was not present on the referral and the rationale for the referral included a type-written comment that the ultrasound technician would be at the facility on 12/12/23[519]. If a deep vein thrombosis is suspected an immediate ultrasound should be done not an urgent evaluation within two weeks. On 12/7/23, the facility Medical Director participated in what he called "collegial review" and discussed the urgent ultrasound request and documented that the ultrasound would be scheduled. This should have been an immediate referral to an emergency room for an ultrasound. The 12/8/23 consultation included no provider follow up. On 12/11/23, the patient again returned to radiation oncologist who again recommended ultrasound to rule out deep vein thrombosis. This report was not signed as reviewed. On 12/12/23, an ultrasound was finally done at the facility. Apparently, instead of sending the patient offsite for an ultrasound immediately when the deep vein thrombosis was suspected, the program waited until the ultrasound technician visited the facility. The patient was noted to have a deep vein thrombosis. The facility Medical Director started the wrong dose of the anticoagulant. Later that day, the patient vomited blood and was sent to the hospital and was diagnosed with deep vein thrombosis and pulmonary embolism.[520] The patient spent two weeks hospitalized with complications of the pulmonary embolism. A full discharge summary from the hospital was not included in the record. The patient subsequently died of complications of his embolism. Though the patient had lung cancer with

---

[513] Mortality patient #1, #2, #5, #6, #7, #10, #12

[514] Mortality patients #1, #2, #5,

[515] Mortality patients #1, #5, #7, #9, #10

[516] Mortality patients #1, #5, #7, #10

[517] Mortality patients #2, #3, #5, #6, #9, #10, #12, and #13

[518] Mortality review patient #6

[519] This referral appeared written by the scheduling clerk. Whoever wrote the consult did not appreciate the urgency of the test. A huddle can correct this type of miscommunication.

[520] Pulmonary embolism is a complication of deep vein thrombosis. A reason for the need for immediate ultrasound to rule out deep vein thrombosis is to prevent pulmonary embolism that this patient developed.

very poor prognosis, the pulmonary embolism which resulted from a delayed diagnosis of the deep vein thrombosis, hastened his death.

It is the Monitor's belief that lack of sufficient physicians is a root cause of many of the problem with specialty care because physicians do not appear to have sufficient patient-time to manage complex patients and to ensure that care occurs and is coordinated with consultants. The Monitor has recommended a workload analysis to determine staffing needs. IDOC has not yet accepted this recommendation. With respect to physician needs for specialty care, a workload analysis would include the following. There is a requirement (II.B.6.c. and III.H.2.) that after each offsite visit a provider is to provide informed care to the patient that in the Monitor's opinion requires reading the report carefully, contacting the consultant for questions, evaluating the patient, updating the problem list and therapeutic plan, and discussing all the diagnoses and changes to the plan with the patient. Based on prior experience in managing physician care, the Monitor believes this will take approximately twenty minutes during a post consultation visit. If Dixon is used as an example, the scheduling clerk estimates that 300 new referrals are generated a month. If a physician is expected to conduct this evaluation and if 20 minutes is allotted per post-consultation visit, then 6000 minutes per month are needed to complete this task. That is 100 hours or 0.625 FTE physician to complete this task. One can easily understand why current offsite post visits are so poorly performed and why many are not even completed. There are simply not enough physician hours to accomplish this task. A similar analysis can be made for the scheduling clerks which the Monitor believes would also show insufficient staffing.

IDOC has not undertaken the recommendations of the Monitor to analyze the process of offsite consultation with an aim to improve the process.[521] The offsite consultation process is still dysfunctional and still causes patient harm. In the last report,[522] the Monitor described that the third highest number of opportunities for improvement in SIU mortality reviews was the failure to communicate between providers during points of transfer.[523] One of these points of transfer is the communication to the specialist and a second is the communication from the specialist back to the primary care physician at the facility. These points of transfer are complicated in IDOC by the involvement of additional parties or processes: the medical record clerk at the IDOC facility, the process necessary to obtain an authorization number to guarantee payment for the consultation, the office staff in the specialist's office, and multiple providers at the prison facility who did not refer the patient for specialty care but may see the patient to provide continuity of care after the specialty visit. None of these were considered in the IDOC policy. This process should be mapped out with expectations and timelines for each step in order to find opportunities to improve services. After this process analysis is completed, the policy should be revised.

The authorization process of the vendor is ignored in the current IDOC policy D.04.01. The Monitor has concerns that some form of utilization management is still being conducted. In record reviews, a collegial review process was mentioned multiple times.[524] In one of these episodes, the physician documented that nurses should check with the scheduling clerk to see if a collegial review was necessary.[525] Of 28 facilities,

---

[521] See item 52 in the Implementation Plan including items 4: "Analysis of receipt and timeliness of consultant reports, and whether facility providers take appropriate action, if necessary, on those reports."; and item 5: "Analysis of scheduling and tracking of specialty care to ensure whether scheduling is timely".
[522] Health Care Monitor 7th Report Lippert v Jeffreys, December 27, 2023.
[523] See Monitor's 7th report p 37 and p 41-42.
[524] Mortality review patients #1, #5, #6,
[525] Mortality review patient #1 on 8/29/23 when the doctor asked after hospitalization whether the patient would need collegial review prior to a referral for cardiology.

22 (79%) continue to track the date of collegial review on the offsite specialty tracking log. If a collegial review process is not occurring, the vendor should explain what is being conducted when the tracking log lists a "collegial review" date on the tracking log. Authorization and "collegial review" should be addressed in policy. Policy D.04.01 Offsite Clinical Care, in policy statement II states that the HCUA is to maintain a list of hospitals, medical centers and specialists who are to provide care. If the established network of offsite providers is known, it is unclear what "authorization" is needed. This should be described in the procedure of policy D.04.01.

Also ignored in IDOC policy D.04.01 is any reference to the scheduling clerk. In IDOC, once a provider orders a specialty consultation, their role ceases and the scheduling clerk then assumes control and directs the specialty care. The provider should maintain continuous participation in this process but does not. The Monitor has previously recommended in prior reports that IDOC initiate huddles that include the scheduling clerk and providers to ensure that all referrals are properly processed as directed by the ordering provider, reports are obtained and reviewed, follow up consultations are addressed, and that patients are scheduled for follow up visits. This is still an ongoing recommendation that IDOC has not undertaken.

In the IRCC February 2024 CQI minutes in the "open discussion" section, it states that the vendor Regional Medical Director states that all NP referrals are to go to the facility Medical Director for approval. This process is not included in the specialty care policy and if IDOC adopts this procedure then the process should be in policy and the Medical Director's decision and rationale should be documented in the medical record. IDOC communicated to the Monitor that nurse practitioners and physician assistants do not require the facility Medical Director's review or co-signature to order offsite referrals.[526]

IDOC also does not include any reference in policy D.04.01 to the forms that are to be used to communicate to the specialist. Two forms are currently used. One is the Health Status Transfer Summary (HSTS) (DOC form 0090) and the second is the Medical Special Services Referral and Report (DOC form 0254). Though these forms continue to be used, neither is mentioned in the new policy and neither fully satisfies the needs required.

The HSTS (DOC form 0090) is a form used for a sending facility to communicate to a receiving facility the information needed to be transferred when an inmate is transferred between IDOC facilities (e.g., from NRC to Sheridan). This information is different than the information needed to be provided to a consultant conducting a specialty consultation. The Monitor strongly recommends that the HSTS form be discontinued when sending patients to their offsite appointment.

The 0254 form should be revised. This form should be facility specific and not a generalized statewide form. The 0254 form should communicate to the specialist what facility the patient is coming from and include contact information to the facility for purposes of sending the report and a direct line contact information for the provider. The terminology on the heading of the bottom half of this form should state

---

[526] OHS-Monitor monthly conference call, 8,22,2024. OHS stated that one of the vendor Regional Medical Directors had been contacted and had verified that NP/PAs can refer patients for offsite specialty care and diagnostic testing without a physician's review and signature.

"Short-form comments and recommendations" instead of the existing statement, "Report of referral". This should be done to emphasize that a full typewritten report is expected and that comments on the form should not substitute for a full report. Somewhere on the form a statement should be included to state that a full typewritten report is expected within three business days with contact information on where to send the report. This cannot be done if the form is used as a statewide form. IDOC needs to consider whether offsite referrals will be ordered in the electronic record or whether a paper process will continue to be used. The benefit of an electronic medical record process is that facility information can be automatically inserted, that dates of referral and expectations of dates of service can be easily tracked, and that certain information included in the electronic record can be included (e.g., laboratory or imaging results, problem lists, medication lists, and reports from other consultants or discharge summaries).

Whether a paper or electronic process is used, a scheduler or other assistant will need to print the referral form and accompanying information and include it in a confidential folder which is provided to the consultant. This information can be electronically transmitted depending on the consultant. The referral form itself should include:
1. The purpose of the consultation, specifically what is requested of the consultant.
2. The urgency of the consultation.
3. The contact information of the referring provider and facility contact information for purposes of sending the report.
4. A space to write short-form comments and recommendations.
5. A space for the facility Medical Director to sign as reviewed the short-form comments and recommendations.

Additional information that should accompany the referral form should include:
1. The patient's current medical problems.
2. The patient's current medications.
3. Any recent imaging, diagnostic studies, recent laboratory tests, recent specialty consultation reports or hospital discharge summaries that are needed by the specialist to conduct the requested consultation.
4. Any additional provider notes necessary for the consultant to evaluate the patient.
5. IDOC provider contact information in the event the consultant wants to contact the provider.
6. A request that a typewritten copy of the consultant's report is requested to be sent to the facility as soon as possible but no later than three days. This should include email and fax contact information.

The current policy D.04.01 Offsite Care is silent on information transfer to the specialist but this needs to be included in the policy.

IDOC has initiated a new plan to augment specialty care services through UIC utilizing telemedicine. Though the Monitor is not aware of all details of this plan, it will be an initial small project with placement of a telemedicine point of service and some face-to-face specialty consultation at the JITC facility. IDOC proposed increased funding in this fiscal year budget in order to fund this plan. The Monitor is supportive of this plan and is eager to learn more about it.

In summary, IDOC has promulgated but has not yet implemented a policy on offsite clinical care although the Monitor has further comments for IDOC to consider. Additional modifications may be needed after a

process analysis is done. Specialty care is still dysfunctional and inmates do not have adequate access to secondary care. The degree of lack of access cannot be determine because IDOC does not track specialty care in a standardized manner that accurately reflects steps of the process. Lack of staffing (physicians and support staff) appears responsible for operational issues and provider follow up. Mortality reviews show many preventable deaths as a result of problems with specialty care. A partial compliance is warranted on the basis of promulgation of a policy but access to specialty services still has significant problems..

## RECOMMENDATIONS:

1. Opportunities for Improvement (OFIs) related to specialty care and the Monitor's mortality reviews should be used to analyze and correct deficiencies in specialty care.
2. The workload analysis of physicians, scheduling staff, nurses, and correctional staff should include whether the number of budgeted physicians, schedulers, nurses, and correctional officers are sufficient to address clinical needs including coordinating, managing, and transporting patients with specialty care needs.
3. IDOC needs to closely examine those OFIs in mortality reviews that result in failing to timely work up significant symptoms and signs to the extent that these failures are the result of utilization practices.
4. A root cause analysis needs to be done to identify why existing practices result in communication errors with consultants. Corrective actions to streamline and reduce errors in communication between consultants and practitioners should be established in policy and procedure.
5. Institute a required huddle between providers, the offsite scheduling clerk and the chronic disease nurse to discuss all new referrals with expected timelines; recently returned consultations to include follow up; discuss report availability and review; and update on all pending reports, pending consults that exceed expected timeframes, and any other specialty care question impacting clinical care.
6. IDOC should evaluate adequacy of transportation vehicles and transportation officers to ensure that sufficient officers and vehicles are available to ensure inmates have access to timely specialty care appointments.
7. When specialty care appointments to UIC or any other consultant are delayed, alternate local appointments must be used.
8. Reimbursement rates for specialty care should be evaluated to determine if the rates are a barrier for the delays in care.
9. IDOC should consider using a primary care medical home model of care as a methodology to improve coordination of care.
10. IDOC should expand the utilization of telehealth with UIC or other academic centers to increase access to specialty care.[527]
11. IDOC should also begin to explore initiation of specialty e-consults[528] and advice without the need for appointments.
12. IDOC should evaluate data on delayed specialty care to assess why delays occur. For northern facilities, delays related to use of UIC for free care should be particularly examined.

---

[527] UIC currently provides telehealth care and consultation for HIV, Hepatitis B and C, and the management of uncontrolled and difficult to control diabetes.
[528] E-consults are emails to a specialist for advice or a brief consultation.

13. IDOC should configure the electronic record so that data needed to be presented on a log or on referral forms can be captured automatically.

**Specialty Referral Oversight Review**

*Addresses III.H.5*

**III.H.5.** *Within six (6) months after the Preliminary Approval Date of this Decree [July 2019]or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendations or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph. (see Specialty Care Section)*

**OVERALL COMPLIANCE RATING:** Substantial Compliance

**FINDINGS:**

IDOC no longer requires a utilization review of specialty referrals. Therefore, this provision is found compliant. However, the Monitor has significant concerns that "collegial review" still includes a form of utilization review. This will be monitored in subsequent reports.

**RECOMMENDATIONS:**

1. The termination of the collegial review must also pertain to referrals for subcontracted onsite ultrasonography services.
2. IDOC must immediately develop a tracking system to ensure that the vendor's demand for a summary of clinical information on the Special Services Referral and Report form does not result in administrative denials of providers' referrals for specialty consultation, diagnostic testing, and procedures.
3. The IDOC must conduct a review of the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the Monitor, those guidelines that restrict access to medically necessary clinical services. Examples of current restrictive vendor practices have includes limiting cataract surgery to only one eye, categorizing ostomy reversal surgery as an elective, and others.

# Hospital Care

*Addresses Items II.A; II.B.1; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of*

*Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

IDOC provided no V.G. report and no information that tertiary care was acceptable. The Monitor's mortality reviews on only 13 records showed multiple problems with ineffective or absent post-hospitalization evaluations;[529] failure to obtain a hospital report or to obtain it timely;[530] delayed care resulting in hospitalization;[531] and needed hospitalization not being timely ordered.[532] Examples of these problems can be found in the mortality reviews. The lack of a V.G. report documenting status with tertiary care and continued problems identified in record reviews warrants a continued noncompliance.

**RECOMMENDATIONS:**
1. IDOC should analyze why providers fail to effectively perform post-hospital evaluation of the patient. The Monitor believes this is due to failure to have reports and failure to have sufficient physicians and providers on staff. Providers must continue orders promptly after hospitalization or document why recommendations will not be continued. Immediately upon return from hospitalization, nurses must consult with providers regarding recommended hospital orders. Within 2 days a provider must revise the therapeutic plan of the patient consistent with the hospital findings and recommendations. The provider must discuss the revised plan and how it will be implemented with the patient.
2. As part of the audit system, IDOC needs to evaluate whether the process of chronic care management results in preventable hospitalization. The audit system must also evaluate all provisions of the Consent Decree including II.A., II.B.1., and III.G.4. If systemic problems are identified these should be corrected through the quality improvement programs.
3. The statewide quality unit should perform a process analysis to determine why hospitalization is delayed for patients found in mortality reviews. Problems identified need to be corrected through the quality improvement program.

# Preventive Services

*Addresses items III.M.1.a-d*
**III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination.*

---

[529] Mortality patients #1, #2, #3, #4, #5, #6, #7, #8, #9, #10
[530] Mortality patients #1, #4, #6
[531] Mortality patient #1, #2, #3, #4, #5, #6, #7, #9
[532] Mortality patients #2, #3, #8, #9

**III. M.1.b.** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*
**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**Findings:**
Since the 7th Report[533], the IDOC has finalized its Prevention Services and Periodic Health and Immunization policies[534] and provided facility logs[535] on the offering of colorectal cancer screening for a number of facilities. Screening for breast and cervical cancers and HPV vaccination in the female facilities continues to be consistently provided. Data on hepatocellular cancer screening in hepatitis C patients with cirrhosis or advanced fibrosis was presented for the first time from multiple (six) facilities. Cervical cancer screening and fasting lipid panel (hyperlipidemia) screening were added to the performance and clinical outcome measures in the first quarter of fiscal year 2024 (July to September 2023). IDOC has also communicated that it will add annual weight monitoring, smoking history screening, and prostate cancer screening to its list of quarterly performance and outcome measures in late 2024 or 2025.[536]

Additional efforts are needed to ensure and report that all eligible individuals in IDOC are offered colorectal cancer screening, prostate cancer, lung cancer, hepatocellular cancer, and abdominal aortic aneurysm screening. Continued focus is required to track the offering and provision of all nationally recommended immunizations to all eligible patients.

The Monitor requested thirteen documents for the 8th Report's section on Preventive Services. Nine of these documents were either completely or partially received. Information on two requests about the training of staff on the new policies and procedures is not being tracked. Another two requests for, respectively, COVID-19 vaccinations and breast cancer screening are no longer tracked.[537]

The Consent Decree requires that IDOC is to produce an annual report based on data and information sufficient to verify compliance. This has not been accomplished. As previously reported there continues to be very limited data tracking of immunizations and RHM/cancer screenings. IDOC must provide comprehensive data to demonstrate its compliance with this and other elements of the Consent Decree.

<u>**Influenza Vaccinations**</u>

**Overall Compliance**: Partial Compliance

---

[533] 7th Court Report was submitted on 12/27/2023.
[534] IDOC Medical Policy and Procedure: B.01.01 Preventive Services and Periodic Health Assessment and G.08.01 Immunization.
[535] Colorectal cancer screening logs were provided from nine facilities: BMR, Dixon, East Moline, Hill, Kewanee, Lawrence, Shawnee, Sheridan, and Vienna.
[536] Data on these three new measures are either preliminary or not yet being audited.
[537] The Monitor was advised that III.M.1.d (mammography screening) is no longer a reportable provision of the Consent Decree.

**Findings:** IDOC clinical staff has communicated that mass influenza vaccination days are generally scheduled annually in September and October at all IDOC facilities.[538] There has been previous documentation of the volume of influenza vaccines that were delivered by the Boswell Pharmacy to all IDOC sites. However, for this Report, none of the thirty facilities' monthly quality improvement committee minutes documented the offering of influenza vaccines in September-December 2023. The quantities of influenza vaccines sent by Boswell Pharmacy in the fall of 2023 were also not provided to the Monitor for this report.

Southern Illinois University Office of Correctional Medicine (SIU) provided quarterly data on performance and outcome results for influenza vaccination based on review of ten randomly selected charts at twenty-nine correctional facilities.[539] SIU expanded the criteria in the Fall of 2023 to include the cumulative number of vaccinations administered and refused.[540] Results reported by SIU[541] revealed that 50% or fewer patients lacked documentation of being offered influenza vaccinations in thirteen facilities in the 1st quarter of FY 2024 and ten facilities in the 2nd quarter.

For this report the monitor reviewed sixty medical records from ten facilities to evaluate the offering and administration of 2023-2024 seasonal flu vaccine (see table below).

| Number and Percent of Influenza Vaccination Offered and Administered at 10 Facilities*     60 Record Reviews     Fall 2023 to Winter 2024 | | | | |
|---|---|---|---|---|
| # Eligible | # Offered | | # No Documentation of Offer or Refusal | |
| 60 | 31 (52%) | | 29 (48%) | |
| | # Administered | # Refused | | |
| | 25 (42%) | 6 (10%) | | |
| *BMRCC, Decatur, East Moline, Hill, Jacksonville, Lawrence, Lincoln, Pinckneyville, Shawnee, Taylorville | | | | |

Review of these sixty medical records showed that 48% of the individual patient records did not have documentation in the database sheets, immunization histories, or chronic care progress notes (if provided) that they had been offered influenza vaccination in the Fall of 2023.[542]

Both the Monitor's chart reviews and the SIU quarterly performance and outcome review identified that approximately 50% of the medical records lacked documentation that influenza vaccine had been offered. In order to comply with III.M.1.a, IDOC must have documentation that they are offering annual influenza vaccination to all individuals in the custody of IDOC. The current data indicates that IDOC is not documenting or not offering the flu shot to half of the IDOC population. Because of the historically high

[538] Flu Vaccination days are extended into November and December as needed.
[539] SIU does not audit NRC due to the high turnover of its population.
[540] OHS-Monitor Monthly Call 10/19/23: The measuring of influenza vaccination by IDOC's partner SIU Office of Correctional Medicine was expanded to include both the refusal and administration. In future audits, the Monitor recommends that SIU report separately the number offered, administered, refused, and not offered (no shows at flu vaccine events).
[541] 1st Quarter 2024: July to September 2023, 2nd Quarter 2024: October to December 2023.
[542] At the time of writing this Report, it was too early to have received any data from any influenza vaccine events in the Fall of 2024.

rate of refusal of vaccination IDOC needs to focus on educational efforts to increase the acceptance rate of influenza vaccine.

The Monitor recommends that the SIU performance and outcome measure for influenza vaccine display the number of vaccines offered, not offered, administered, and refused. In addition, IDOC must ensure that this same data is reported by each facility on a regular basis (monthly during the flu season) and not wait for implementation of the electronic record.

**Recommendations:**
1. IDOC must manually or electronically track and report annual influenza vaccinations including the number and percentage of eligible patients who are offered, administered, refused, and not offered (no shows).
2. IDOC needs address the high rate of patients who lack documentation of not being offered annual influenza vaccination.
   IDOC should institute an annual health information campaign to educate the incarcerated population about the health benefits of the annual influenza vaccine and the COVID-19 vaccine.

## Adult Immunizations

**Overall Compliance:** Partial Compliance

**Findings:**
The Monitor has been informed that the immunization program is a responsibility of the Infection Control program.[543] However, neither IDOC policy G.01.01 Infection Control Program nor policy G.08.01 Immunization specifically state who is to direct the immunization program. The OHS table of organization does not demonstrate a direct or dotted line authority between the Agency Infection Control Coordinator[544] and the facility infection control nurses who report to the facility Director of Nursing and the facility HCUA. In order to standardize the immunization program OHS needs to clearly define the authority of the Infection Control Coordinator over the infection control nurses as it applies to infectious disease issues and vaccinations.

The Infection Control Program policy G.01.01 notes that the Agency Infection Control Coordinator is to develop nurse protocols for vaccination and a process to track immunizations and the facility infection control nurses are to train and oversee the nurses who administer vaccinations. Procedures that detail vaccine storage, vaccine administration, precautions, assessing patients' vaccination histories, and adverse reactions have been developed.[545] Data has not been provided that facility infection control nurses have trained and oversee the nurses who administer vaccinations. To date, few IDOC facilities have a fulltime infection control nurse and some do not even have a dedicated parttime infection control nurse who can oversee the management of the immunization program.

At this time, the majority of facility Infection Control nurses have other clinical and administrative duties and are only allotted a limited amount of time to address multiple infection control responsibilities

---

[543] Interview with Infection Control Coordinator, 9/13/2023
[544] The OHS Table of Organization uses the title of Agency Infection Control Coordinator. This position has also been listed as Infectious Disease Coordinator. The section will use "Agency Infection Control Coordinator".
[545] IDOC Medical Policy and Procedure Manual, February 2024, G.08.01, Immunization

including the adult immunization program.[546] In order to fulfill their duties, facility Infection Control nurses will need to be fully dedicated to infection control activities at almost all but the smallest IDOC facilities.

IDOC finalized an Immunization Policy in February 2024.[547] The policy states that IDOC will administer vaccines to individuals in custody nineteen years of age and older in accord with the Center for Disease Control and Prevention (CDC) Recommended Adult Immunization Schedule. Vaccination history is to be assessed by nurses during intake receiving screening. Vaccine status is to be subsequently reviewed "each clinic visit"[548] and any vaccine that is due should be offered and administered at that time. However, based on medical records provided for this Court Report, the Monitor has noted that immunizations histories are not consistently documented and immunizations[549] are inconsistently offered and ordered during annual periodic health assessments and are rarely offered at chronic care visits. There is notable facility to facility variation in the completion of the immunization histories at chronic care visits and during intake screenings. IDOC was not able to provide documentation of training of the facility nursing staff concerning either the Infection Control Program or the Immunization policies.[550]

The IDOC has developed an Immunization History form that is to be completed during intake screening to identify previous vaccinations and any gaps in the receipt of recommended adult vaccinations and updated at subsequent clinical and periodic health visits. Except for influenza and COVID-19 vaccines, no other needed immunizations are offered or administered during the intake screening. Predictably most patients being admitted to the IDOC do not sufficiently recall their previous immunization histories. For this reason, IDOC's Immunization policy states "The Illinois Comprehensive Automated Immunization Registry Exchange (I-CARE) should be consulted as needed to identify a patient's immunization history"[551] and "…properly documented ….previous immunizations should be transcribed to the Abstract of Immunizations in the patient's medical record"[552]. During a recent site to the NRC Reception and Classification Center,[553] ten intake histories were reviewed and the only useful information on previous vaccinations were on the four I-CARE print-outs provided by individuals whose transfer records from Cermak Health Services at Cook County Jail included the I-CARE print-outs. Zero previous vaccinations, including those with I-CARE forms, were transcribed on the ten immunization histories completed as part of the intake screening process. It is the Monitor's recommendation that IDOC take the required steps necessary to access and print or scan I-CARE reports for each and every new admission to IDOC and enter the information in the medical record. This would identify needed adult vaccines and avoid costly and time-consuming administration of duplicate vaccinations.

---

[546] See this Report's section on Infection Control

[547] IDOC Medical Policy and Procedure Manual, February 2024, G.08.01 Immunization

[548] The Monitor recommends that vaccine status should be reviewed, offered, and administered at each chronic care and annual/biannual health assessment visit. It would be a lower priority to review and offer vaccinations at nurse and physician sick calls and at other brief clinical encounters.

[549] Recombinant Zoster Vaccine (shingles, Pneumococcal vaccine, and Diphtheria Tetanus (DT)/tetanus Diphtheria Acellular Pertussis (Tdap) were occasionally ordered during annual health assessments. HPV is offered at the female facilities during mass vaccine events. HPV is rarely offered at male facilities to eligible men ≤26 years of age.

[550] IDOC communicated that there have been some training concerning the new policies and procedures but the training is not tracked.

[551] IDOC Medical Policy and Procedure February 2024, G.08.01 IV.B. Immunization.

[552] IDOC Medical Policy and Procedure February 2024, G.08.01 IV.C. Immunization, Assessing Patients' Vaccination Histories.

[553] Monitor team site visit to Stateville NRC, June 3-4, 2024

IDOC has communicated that a systemwide mechanism to track immunizations is being developed. IDOC has created a Monthly Communicable Disease, Immunization, and Screening form that is to be compiled by the facility infection control nurse and forwarded to the Agency Infection Control Coordinator. This monthly form is still in the process of being fully implemented. IDOC has stated that, at the current time, it only tracks the number of individual patient and stock vaccine orders dispensed by its vendor subcontract pharmacy (see table below).

**Patient Specific Orders Combined with Stock Orders***

**Vendor Subcontract Pharmacy Report**

| 1/1/24 to 3/31/24 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Facility | Hep A | Hep B | HPV | MMR | TD/Tdap | P-20 | P-23** | RSV | RZV |
| BMR | 28 | 27 | 0 | 0 | 40 | 14 | 0 | 10 | 12 |
| Centralia | 1 | 2 | 0 | 0 | 0 | 10 | 0 | 0 | 3 |
| Danville | 1 | 1 | 0 | 0 | 40 | 0 | 0 | 1 | 6 |
| Decatur | 31 | 58 | 2 | 0 | 10 | 1 | 0 | 0 | 20 |
| Dixon | 1 | 40 | 1 | 0 | 40 | 1 | 0 | 1 | 9 |
| East Moline | 0 | 90 | 0 | 6 | 20 | 11 | 0 | 0 | 13 |
| Graham | 9 | 40 | 0 | 0 | 40 | 1 | 0 | 0 | 7 |
| Hill | 3 | 45 | 0 | 0 | 40 | 27 | 0 | 4 | 42 |
| IRCC | 2 | 6 | 3 | 0 | 0 | 12 | 0 | 2 | 5 |
| Jacksonville | 14 | 106 | 0 | 0 | 10 | 19 | 0 | 0 | 0 |
| JTC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kewanee | 0 | 77 | 0 | 29 | 10 | 2 | 0 | 0 | 7 |
| Lawrence | 20 | 20 | 0 | 0 | 10 | 0 | 0 | 1 | 3 |
| Lincoln | 17 | 38 | 0 | 0 | 20 | 0 | 1 | 0 | 6 |
| Logan | 26 | 56 | 3 | 0 | 10 | 0 | 0 | 0 | 21 |
| Menard | 48 | 47 | 0 | 0 | 40 | 0 | 0 | 1 | 27 |
| Murphysboro | 10 | 10 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| Pinckneyville | 296 | 365 | 0 | 0 | 170 | 2 | 0 | 34 | 101 |
| Pontiac | 0 | 30 | 0 | 0 | 10 | 0 | 0 | 1 | 6 |
| Robinson | 5 | 13 | 0 | 0 | 10 | 0 | 0 | 0 | 40 |
| Shawnee | 22 | 42 | 0 | 0 | 20 | 0 | 20 | 0 | 8 |
| Sheridan | 2 | 73 | 0 | 0 | 0 | 20 | 0 | 1 | 4 |
| Southwestern | 23 | 23 | 0 | 0 | 10 | 0 | 0 | 0 | 0 |
| Stateville | 0 | 2 | 0 | 0 | 0 | 5 | 2 | 1 | 3 |
| Stateville NRC | 31 | 33 | 0 | 0 | 30 | 0 | 0 | 0 | 1 |
| Taylorville | 3 | 12 | 0 | 0 | 0 | 1 | 0 | 0 | 8 |
| Vandalia | 4 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vienna | 42 | 42 | 0 | 0 | 10 | 3 | 0 | 0 | 10 |
| Western | 0 | 20 | 0 | 0 | 0 | 16 | 0 | 0 | 7 |
| Totals | 639 | 1342 | 9 | 35 | 590 | 145 | 23 | 58 | 321 |

**Vaccine Glossary**: **HPV** = human papilloma virus; **MMR**= measles, mumps, rubella; **TD** = tetanus, diphtheria; **Tdap** = tetanus, diphtheria, pertussis; **P-20** = pneumococcal-20;  **P-23** = pneumococcal-23; **RSV** = respiratory syncytial virus; **RZV** = recombinant zoster vaccine (shingles)

*No data was provided on the ordering of meningococcal or haemophilus influenzae type B (HiB) vaccines

** Pneumococcal-23 vaccine is no longer recommended by the CDC

The gross volume of pharmacy vaccine orders especially stock orders does not definitively equate to the volume of vaccines actually administered. The pharmacy data also does not provide any indication of the

actual unmet need for adult vaccinations in the IDOC and how many vaccines are actually administered, refused, or simply not offered. As also noted in the above Pharmacy table, there is a wide variation in the ordering of a number of the different vaccines between the thirty IDOC facilities. IDOC needs to investigate the reasons for this variation.

However, based on the dispensing data from the 34 month period (November 2019-August 2023) reported in the 7th Report and from the 3 months of data (January-March 2024) provided in the Pharmacy table (see above), there are indications that some vaccinations are becoming more accessible in the IDOC.

From November 2019 to August 2023 (34 month period), only seven IDOC correctional centers ordered a total of 82 doses of **Hepatitis A vaccine;** while in the 3 month period from January to March 2024, twenty-four facilities ordered 639 doses. IDOC has taken heed of IDPH's website that declared "individuals in correctional settings…are at risk for becoming sick with Hepatitis A due to the close living quarters" and recommended that all inmates and correctional staff be vaccinated with hepatitis A vaccine. IDPH made special mention of the need to vaccinate kitchen staff and food handlers in correctional facilities because they can cause and further spread outbreaks of hepatitis A.[554] The Monitor has previously recommended[555] that IDOC mandate Hepatitis A vaccine for porters (inmate workers) and hospice workers who assist infirmary patients with the activities of daily living, change soiled bed linens in the infirmary, clean infirmary beds, and sanitize and clean floors and walls of mental health crisis rooms that have been smeared with fecal material.[556] The Monitor fully supports increased vaccination of all individuals residing in the correctional facilities but IDOC should prioritize porters to receive this vaccine.

During the aforementioned 34 months (November 2019-August 2023) only eleven facilities ordered 61 doses of Hepatitis B vaccine as compared to the 3 month period (January-March 2024) when all thirty IDOC facilities ordered a total of 1,342 doses. IDOC had previously only offered **Hepatitis B vaccination** to porters (and hospice workers)[557] as directed in an established administrative directive. The Monitor supports Hepatitis B vaccination of porters and hospice workers because the potential of accidental needle sticks in the infirmaries and other health care areas. The CDC has also recommended onetime universal hepatitis B screening of all adults aged 18 years and older[558] and routine hepatitis B vaccination for all individuals 19 years through 59 years and for individuals with known risk factors (which include chronic liver disease, HIV infection, sexual exposure risk, current or recent injection drug use, **and incarceration**) regardless of age.[559] As shown in the Boswell pharmacy data in the table above, Hepatitis B vaccines are now being ordered more frequently and this is "a major step toward reducing chronic hepatitis B-related morbidity and mortality" in the IDOC and ultimately in the State of Illinois.[560]

---

[554] IDPH website: Preventing Hepatitis A Outbreaks in Jails
[555] This recommendation has been made by the Monitor in the 2nd, 3rd, 4th, 5th, 6th, and 7th Court Reports
[556] This increase in offering Hepatitis A is occurring even though IDOC deleted specific language in the penultimate draft of the Immunization Policy which had stated: "2: Hepatitis A vaccine will be offered to all porters and hospice workers who have risk of exposure to fecal wastes" was not included in the final version of the Immunization policy.
[557] IDOC Administrative Directive 04.03.116, Bloodborne Pathogens. (IDOC does offer Hepatitis B vaccination to individuals with liver disease.)
[558] Conn EE, et al. Screening and testing for hepatitis B virus infection, CDC Recommendations 2023, *MMWR* published online March 10, 2023
[559] CDC Recommended Adult Immunization Schedule, United States, 2024
[560] CDC Adult Immunizations 2024 Hepatitis B vaccination and So Samuel et al, Universal Adult Hepatitis B Screening and Vaccination as the Path to Elimination. JAMA, May 16,2023 Volume 329 No.19, p 1639-40.

Based on the vendor subcontract pharmacy data in the first quarter of calendar year 2024, it also appears the IDOC providers have begun to order newly available and recommended Pneumococcal-20 and Respiratory Syncytial Virus vaccines and have continued to order and offer Recombinant Zoster Vaccine (Shingles) to at risk individuals.

However, the Pharmacy report (see table above) shows that only two of the twenty-eight male correctional centers ordered **Human Papilloma Virus (HPV)** vaccines. [561] To assess the provision of HPV vaccine, the Monitor reviewed 30 medical records from five male facilities and twenty medical records from IDOC's two female facilities (see HPV table below).

| Human Papilloma Virus Vaccination | | | | | | |
|---|---|---|---|---|---|---|
| Individuals 26 Years of Age or Younger | | | | | | |
| 50 Records Reviewed* | | | | | | |
| Male Facilities | Records Reviewed | Previously Vaccinated** | Eligible but Not Offered** | Eligible and Offered | Accepted | Refused |
| BMRCC | 5 | 2 | 3*** | 0 | N/A | N/A |
| Centralia | 10 | 0 | 10 | 0 | N/A | N/A |
| Danville | 5 | 0 | 5**** | 0 | N/A | N/A |
| Sheridan | 5 | 0 | 4 | 1 | 0 | 1 |
| Western | 5 | 0 | 5 | 0 | N/A | N/A |
| Totals | 30 | 2 | 27/28 (96%) | 1/28 (4%) | 0/1 (0%) | 1/1 (100%) |
| Female Facilities | Records Reviewed | Previously Vaccinated | Eligible but Not Offered | Eligible and Offered | Accepted | Refused |
| Decatur | 10 | 4 | 0 | 6 | 2 | 4 |
| Logan | 10 | 0 | 0 | 10***** | 10 | 0 |
| Totals | 20 | 4 | 0/16 (0%) | 16/16 (100%) | 12/16 (75%) | 4/16 (25%) |
| *Database, immunization history, and I-CARE records reviewed when provided | | | | | | |
| **Previously vaccinated patient not included in denominator in 4 columns to the right. | | | | | | |
| ***2 individuals had not completed the 3-dose regimen but were not offered the 2nd or 3rd doses | | | | | | |
| ****1 individual had not completed the 3 dose regimen but was not offered the missing 3rd dose. | | | | | | |
| ***** 5 completed the 3 dose regimen and 5 were due for the 3rd dose on 6/25/24 | | | | | | |

Beginning with the 2nd Court Report[562], the Monitor has identified that the two female facilities had established HPV vaccination programs. The continuation of these HPV vaccination programs are reflected

---

[561] Both two female facilities, Decatur and Logan, have established HPV vaccine programs that have ordered approximately 675 HPV vaccines over the last few years which is sufficient number of doses to full vaccinate 227 women against HPV.

[562] 2nd Court Report, August 6, 2020: Preventive Services section noted that Logan CC had already received an initial 130 doses of HPV vaccine.

in the 100% documented offering of HPV vaccines to patients at these two female sites (see HPV Vaccination table above). The male facilities have lagged behind in offering HPV vaccines to men twenty-six years old or younger. The HPV vaccination table (see above) detailed that HPV vaccination had not been offered to twenty-seven (96%) of twenty-eight eligible young men. IDOC currently houses an estimated 3,000 men 26 years of age or younger but since 11/1/2019 through 3/31/2024[563] male facilities have only received individual and stock orders totaling 32 doses of HPV vaccine. This meager quantity is only enough doses to fully vaccinate ten individuals. This is a significant missed opportunity to prevent future cancers in men and ultimately in their sexual partners in the prisons and ultimately in the community. IDOC should institute immunization programs that are modeled after the functioning HPV program at Decatur and Logan CCs.

The Monitor reviewed the databases, problem lists, immunization histories, and annual health assessments of sixty males with chronic illnesses and/or 65 years or older to identify the documentation of the offering, administration, and refusal of **other adult immunizations**. The results of this audit are shown below.

| Selected Immunizations | | | |
|---|---|---|---|
| Individuals 65 Years of Age and Older | | | |
| 60 Records Reviewed* | | | |
| Vaccine | # Eligible | Up to Date or Accepted** | Refused | Incomplete Database or Not Offered |
| Pneumococcal | 54 | 17 (31.5%) | 0 (0%) | 37 (69%) |
| RSV (respiratory syncytial virus) | 38 | 2 (5%) | 0 (0%) | 36 (95%) |
| RZV (recombinant zoster vaccine-shingles) | 53 | 19 (36%) | 0 (0%) | 34 (64%) |
| Tdap/ Tetanus | 60 | 26 (43%) | 1 (2%) | 33 (55%) |
| Total | 205 | 64 (31%) | 1 (0.5%) | 140 (68%) |
| * BMRCC, Decatur, East Moline, Hill, Jacksonville, Lawrence, Lincoln, Pinckneyville, Shawnee, and Taylorville. | | | |
| An offer of vaccination was accepted if there was any documentation in the record that the vaccine was offered, refused or administered. | | | |

The data in the above Immunization table verifies that a large number of male individuals in IDOC have not been offered adult immunizations that are nationally recommended for older or at-risk individuals. Fifty percent of the patient charts reviewed by SIU[564] in the 2nd quarter of FY 2024 documented that 18 of the 29 facilities had failed to offer pneumococcal vaccination to eligible patients. The Monitor team

---

[563] The Boswell Pharmacy report for 9/1/23 -12/31/23 has not been received by the Monitor.
[564] SIU Office of Correctional Health nurses review ten charts at 29 IDOC facilities on a quarterly basis to assess selected performance and outcome measures including the offering of pneumococcal vaccines to at risk patients.

similarly identified that 68.5% of 54 individuals who were candidates for pneumococcal vaccine lacked documentation that they had ever been offered this nationally recommended immunization (see Immunization table above). It is a significant concern to the Monitor that large numbers of the individuals in custody are not being offered vaccines that are now readily available in the IDOC.

The monitor team has noted that indicated vaccines are not being offered during the intake screening at the four reception centers or during chronic care clinics in many facilities. It appears that indicated vaccinations are not addressed until an individual is seen for annual or biannual periodic health assessment visits and even then they are not consistently offered.

Although a few facilities have initiated logs of patients receiving or scheduled to receive specific vaccinations, none of these logs track the number of individuals who are eligible to receive vaccines.[565] SIU worked with IDOC to initiate performance and outcome measures for influenza and pneumococcal vaccinations. Each quarter ten medical records are reviewed at each facility for each of these two measures. SIU has only recently begun to cumulatively report both the offering and the acceptance data for these two performance measures. The actual percentage of eligible patients at each facility who are offered and receive these vaccines and tests is not yet being measured.

The Immunization policy (G.08.01) states that "Vaccines will only be given on the order of an appropriately licensed health provider **or under the guidelines of approved treatment protocols**". The IDOC has not yet developed systemwide guidelines giving nurses the ability to immunize patients. IDOC has voiced support in previous reports[566] for this modification of nursing responsibilities.[567] The Monitor has repeatedly recommended to IDOC that the management of the immunization program at facilities be placed under the control of nursing with a single manager at each site who directs and manages the program under standing orders approved by IDOC physician leaders and the Agency Infection Control Coordinator and overseen by the facility infection control nurse. Placing the immunization program under the umbrella of nurse leadership offers IDOC the best option for successfully providing recommended adult immunizations to the IDOC population. No recent information about progress toward systemwide implementation of this modification has been provided to the Monitor. IDOC needs to create treatment guidelines codifying that nurses can immunize patients based on protocols that could be modeled on the current practices of nurses vaccinating for HPV prevention at Logan and Decatur CCs, the annual influenza vaccine events, and the ongoing provision of COVID vaccination. Recommendation number 10 in the Staffing section of this report recommends that facility positions should be titled by responsibility and assignment so that workload can be properly assigned. Twenty-eight[568] of the 217 vacant RN positions should be re-titled Infection Control Coordinator and posted to that title so that nurses are hired into a designated position for this purpose.

As noted in the 5th, 6th, and 7th Reports, vaccination practice in the IDOC currently varies from site to site. There is not a standardized method to document immunizations in the paper medical record. Some vaccinations are documented on the Database, some are documented on progress notes, and some are

---

[565] Logs of HPV vaccination have been presented in the past from the female facilities Decatur CC and Logan CC.
[566] 6th Court Report 3/13/2023 and 7th Court Report 12/27/2023
[567] In accord with practice guidelines and protocol, outpatient nurses in public community centers commonly coordinate and administer adult vaccinations and IDOC facility nurses currently manage annual influenza events, intake influenza and COVID vaccinations, and, at the two female correctional centers, HPV vaccination programs. Implementation Plan #28.1.c also states P+P will include: "Modification that allows nurses, acting under protocol, to immunize patients."
[568] Some of the smaller facilities may not need a dedicated infection control nurse. We chose 28 but that number may be decreased slightly depending on criteria chosen by IDOC.

documented on orders. The Monitor has noted that the initial steps have been taken to standardize the immunization program including revision of the Immunization policy and development of forms that track and report the offering of vaccines in the facilities. Staff training on the revised policies and the new immunization tracking forms are still needed. IDOC must ensure that there is adequate staffing to implement, oversee, and administer immunizations at all facilities.[569]

Failure to provide nationally recommended vaccines to the incarcerated population is a missed opportunity to prevent infection and cancers in the IDOC and ultimately in all communities in Illinois.

**Recommendations:** (see Infection Control recommendations which are integrated with the Immunization Program)

1. Offer all individuals housed in the IDOC with adult vaccinations recommended by the continually updated Center for Disease Control and Prevention (CDC) Adult Vaccination guidelines.
2. The IDOC immunization guidelines must be reviewed and updated as needed to assure that updates to Center for Disease Control recommendations for adult immunizations are expeditiously incorporated into the IDOC guidelines.
3. Institute an Immunization Program that has standardized practices, staffing, equipment, supplies, and training with a standardized vaccination recording, tracking and reporting process.
4. Institute statewide training of nurses on safe immunization practices and updated immunization procedures.
5. Place the Immunization Program under the umbrella of nursing leadership overseen by the Agency Infection Control Coordinator and each facility's infection control nurse using approved standing orders to administer recommended adult immunizations.
6. Ensure that the new EMR vendor incorporates data points and clinical prompts which electronically remind, record, track, and report the number and percentage of eligible candidates for each adult vaccine and all immunizations offered, not offered, administered, refused and the identified clinical indication (age, clinical condition, etc.).
7. Offer HPV vaccination to all incarcerated women **and men** 26 years of age or younger or as recommended by the CDC adult vaccination. Special emphasis is to be focused on increasing the offering of HPV vaccination of eligible males. HPV is one of the few vaccines that can prevent cancer in women and men.
8. Initiate a universal Hepatitis B screening and vaccination program preferably in conjunction with a triple panel (HBsAg, antibody to HBsAg, and total antibody to hepatitis B core antigen).[570] Hepatitis B is also one of the few vaccines that can prevent chronic hepatitis that can progress to advanced fibrosis and cirrhosis, ultimately causing hepatocellular cancer.
9. Provide Hepatitis A immunization to all porters, hospice workers, and staff lacking immunity who are exposed by their duties to fecal-oral pathogens, and to kitchen workers who prepare and handle food.

---

[569] "Adequate" staffing includes a dedicated facility infection control nurse, sufficient facility nurses to administer immunizations, and additional systemwide Infection Control Program support staff. There also may a role for the newly hired Implementation Plan Coordinator to track and report on the progress of the immunization program.

[570] IDOC Medical Policy and Procedure Manual: B.01.01.VI.4 Preventive Service and Periodic Health Assessment states that "Screening for Hepatitis B… is required. The patient should receive hepatitis B vaccination, if negative for both antigen and antibody".

10. Pending the implementation of the EMR, standardize the interval tracking methodology in the **paper** medical record so that there is uniform and accurate documentation of all vaccinations that are offered, not offered, administered and refused.
11. Take necessary steps to access I-CARE immunization report for all new admissions to the IDOC and to assure that the I-CARE report is placed, transcribed or scanned into the medical record. Ultimately IDOC's EMR and I-CARE should establish a bidirectional data link.

# Cancer and Routine Health Maintenance Screening

**OVERALL COMPLIANCE RATING:** Partial Compliance

**Findings**:
The rating of partial compliance continues to be based on provision of logs and data noting the measurement and offering of nationally recommended colorectal cancer screening tests and the provision of FIT testing logs from ten IDOC facilities. Data, albeit limited, was also provided for the first time from multiple facilities on hepatocellular cancer screening on hepatitis C patients with advanced fibrosis and cirrhosis. It is encouraging that IDOC has indicated that four additional performance and clinical outcome measures that have the potential of increasing the early detection of cancer have been added in FY 2024 or will be added in FY 2025.[571] These additional measures are cervical cancer screening, prostate cancer screening, annual weight monitoring, and smoking history screening.  However, the persistent lack of any data that screening for prostate cancer, lung cancer, and abdominal aortic aneurysm are being performed continues to put IDOC in jeopardy of being non-compliant with Consent Decree III.M.1.c.  IDOC has also not provided data that education on Policy B.01.01, Preventive Service and Periodic Health Assessment, has been given to staff.[572] The lack of facility data on the percentage of individuals eligible for immunizations and cancer and routine health maintenance screenings who have actually been offered vaccinations and screenings is a gap that needs to be addressed.

**Recommendations:** See General Recommendations at the start of Preventive Services section

**Colorectal Cancer Screening**

**Overall Compliance Rating:** Partial Compliance

**Findings:**
As previously noted in the 7th Court Report, since the Consent Decree was signed the United States Preventive Services Task Force (USPSTF) has lowered the age when annual colorectal screening should begin for asymptomatic, low risk individuals from 50 years to 45 years of age. In its Preventive Service

---

[571] Cervical cancer screening was initiated in early FY 2024 and prostate cancer screening, annual weight monitoring, and smoking history screen will be added in late FY 2024 or FY 2025
[572] The new IDOC Policy and Procedure Manual was finalized and began to be disseminated in February 2024. IDOC has communicated that there have been some training sessions on the new policies but participation and attendance has not been tracked.

and Periodic Health Assessment Policy, IDOC has appropriately modified the age to begin colorectal cancer screening to 45 years.[573]

The table below contains the data from colorectal cancer screening logs at ten IDOC facilities.

| Data from Colorectal Cancer Screening Logs | | | | |
|---|---|---|---|---|
| Fecal Immunochemical Stool Testing (FIT) | | | | |
| Facility | Dates of Screening | # FIT Offered | # Refused | # Accepted FIT |
| BMRCC | 9/4/23 to 2/4/24 | 265 | 118 (44.5%) | 147 (55.5%) |
| Dixon | 11/13/23 to 2/6/24 | 107 | 40 (37%) | 67 (63%) |
| East Moline | 5/23/23 to 4/8/24 | 102 | 40 (39%) | 62 (61%) |
| Hill | 8/17/23 to 3/1/24 | 255 | 11 (4%) | 244 (96%) |
| Jacksonville | 2/29/24 | 8 | 6 (75%) | 2 (25%) |
| Kewanee | 10/31/22 to 3/13/24 | 115 | 57 (50%) | 58 (50%) |
| Lawrence | 9/4/23 to 3/13/24 | 55 | 0 (0%) | 55 (100%) |
| Shawnee | 11/2023 to 1/2024 | 432 | 339 (78.5%) | 93 (21.5%) |
| Sheridan | 11/15/22 to 2/16/24 | 192 | 25 (13%) | 167 (87%) |
| Vienna | 7/26/23 to 12/25/23 | 61 | 46 (75%) | 15 (25%) |
| Totals | | 1592 | 682 (43%) | 910 (57%) |

This is first time that IDOC provided the Monitor with logs from multiple facilities documenting the colon cancer screening activities utilizing the Fecal Immunochemical Test (FIT).[574] These logs demonstrate that the USPSTF-approved FIT screening is now being increasingly used in the IDOC to screen for colorectal cancer.

The ten logs used different nomenclature and gathered varying types of data. This may impact on the accuracy of the data provided. The ten facilities reported on FIT screening data for periods of time that varied from to 3 to 17 months. Some logs did not list the age or date of birth of the patients. Some noted the date the specimen kit was accepted and the date the specimen was returned and tested; most did not.

---

[573] IDOC Medical Policy and Procedure B.01.01.VI.A.1: Preventive Service and Periodic Assessment February 2024. "All patients aged 45-75 will be screened for colon cancer using a Fecal Immunochemical Test (FIT), which is approved as a screening method by the USPSTF."
[574] In the past colorectal cancer screening logs had only been provided for Logan CC (Oct-Dec 2021 Facility CQI minutes), East Moline (2022 data), and Kewanee (7th Report 12/27/23).

Only three of the ten facilities' logs documented the results of the screening test.[575] None of these three sites documented on the log whether individuals with abnormal tests were referred for the diagnostic colonoscopy procedure.[576] Two facilities[577] appeared to have only reported tests that were completed and not the total number offered.  In preparation for the electronic medical record (EMR), IDOC needs to implement a standardized colorectal cancer screening log or database that can readily be adapted in the EMR.

On August 1, 2023, the Agency Medical Director distributed a letter to all health care providers and the medical vendor formally stating that, effective immediately, digital rectal examination (DRE) for colorectal cancer screening was no longer the standard of care. However, one facility's[578] colorectal cancer screening testing log continued to offer both FIT screening and digital rectal exams from 8/28/23 through 12/10/23 or even longer. During these four months after the ban on DRE as a screening modality for colorectal cancer was distributed, 54 men at this facility were offered DRE, 47 refused and 7 accepted this outdated screening test for colorectal cancer (and prostate cancer).  The IDOC needs to vigorously re-inform providers that DRE is no longer recommended for colorectal cancer screening and it is also not a nationally approved screening test for prostate cancer.  At one facility, a compliance officer cited IRCC for not performing a digital rectal examination in accordance with administrative directive 04.03.101.[579]

Sixty-four individual medical records of patients 45 to 75 years of age or older from eleven IDOC facilities were reviewed to evaluate screening for colorectal cancer. The results of the Monitor's audit are shown in the table below.

---

[575] Hill CC: 3 positive FIT results (1.2% of 244 tests), Shawnee CC: 2 positives (5.1% of 39 tests), and Sheridan: 13 positives (7.8% of 166 tests)

[576] The monitor was not provided with information on referrals of positive (abnormal) screening tests for further diagnostic testing.

[577] The high percentages of FIT test acceptance rates on the logs of two facilities, Hill (96%), Lawrence (100%), suggest that these two sites were primarily reporting on patients who had accepted testing.  On the individual chart reviews, Hill (9/9, 100% acceptance) and Pinckneyville (9/9, 100% acceptance) also likely selected only charts that had been offered FIT testing.

[578] Vienna CC: Annual Physical and Colorectal Tracking/Year 2023-2024, Digital Rectal Exam column

[579] See also the example at IRCC, as cited in their January, 2024 CQI minutes (titled February 2024 CQI IRCC in the document sent) in which a compliance officer cited the IRCC medical program for **not** performing digital rectal examination consistent with administrative directive 04.03.115.  This is discussed further in the Leadership section of this report.

| Colorectal Screening | | | | | |
|---|---|---|---|---|---|
| FIT testing | | | | | |
| 64 Record Reviews* | | | | | |
| Facility | Eligible Patient | FIT Not Offered or Not Documented | FIT Offered | FIT Accepted | FIT Refused |
| Decatur | 7 | 0 | 7 | 6 | 1 |
| East Moline | 1 | 0 | 1 | 1 | 0 |
| Hill | 9 | 0 | 9 | 9 | 0 |
| Lawrence | 10 | 9 | 1 | 1 | 0 |
| Logan | 5 | 2** | 3 | 2 | 1*** |
| Lincoln | 8 | 8 | 0 | 0 | N/A |
| PNK | 9 | 0 | 9 | 9 | 0 |
| Shawnee | 3 | 0 | 3 | 2 | 1 |
| Stateville | 1 | 1 | 0 | N/A | N/A |
| Stateville NRC | 2 | 2 | 0 | N/A | N/A |
| Taylorville | 9 | 6 | 3 | 3 | 0 |
| Total | 64 | 28 (44%) | 36 (56%) | 33/36 (92%) | 3/36 (8%) |

*The chart review consisted of the database, problem list, and clinic notes. Credit was given if a colonoscopy occurred in the last 10 years in individuals 45-75 years of age.

** One patient had a single negative guaiac test. This methodology is not a recommended screening test for colorectal cancer.

*** This patient refused screening in 9/2022 but was not re-offered screening in 2023 or so far in 2024.

In the above table, 36 (56%) of the 64 patients eligible[580] for colorectal cancer screening were offered testing and 28 (44%) eligible patients were not offered this annual screening. Thirty-three (92%) of those

---

[580] USPSTF 2023 recommends screening for colorectal cancer in adults aged 45 to 49 years (Grade B) and aged 50-75 years (Grade A recommendation)

offered testing were screened using a nationally recommended screening test (fecal immunochemical test (FIT) or had colonoscopy within the last ten years. Only one patient was reported as being screened by testing a single stool hemoccult card for the presence of blood; this screening modality is no longer recommended by the USPSTF or IDOC.

Eighteen of these sixty-four persons who were offered FIT testing were also offered to have a digital rectal exam to gather a fecal sample for a single hemoccult test and to perform a prostate exam. As recently as May 3, 2024, patients were identified who continue to be offered DRE as a screening for colorectal cancer and likely prostate cancer. Some patients were offered both a DRE and a FIT test. Sixteen men refused the rectal exam and eight accepted FIT screening. Performing a rectal exam and testing a single stool specimen for blood has been not recommended as a screening test for colorectal cancer for the last 15-20 years. Digital rectal examination is also no longer a recommended screening test for prostate cancer (see Prostate Cancer Screening section). There is no clinical justification for doing a digital rectal examination as a screening test for any cancer.

On a quarterly basis since July of 2022, IDOC in collaboration with SIUOCM[581] has reviewed ten medical records from each of twenty-eight[582] facilities to assess the delivery of colorectal cancer screening using the FIT methodology. In Spring/early Summer of 2023, the audit was modified to include documentation of both acceptance and refusal of this screening. After reviewing the data for the initial four quarters, IDOC's System Quality Council initiated a focused action to increase the offering of colorectal cancer screening to the incarcerated men and women. The SIU data in the first quarter of FY 2024 (July-September 2023) revealed that only 50% or less of the patients records reviewed at twenty of twenty-seven facilities had evidence that these individuals had been offered colorectal cancer screening. This is in line with the Monitor's recent audit of 64 charts of eligible patients (see above Individual Chart Reviews table) which indicated that 44% lacked documentation of being offered colorectal cancer screening. Data from the 2nd Quarter FY 2024 has not yet been provided.

The IDOC has appropriately recommended and promulgated FIT testing as the screening test for colorectal cancer in all of its facilities.[583] The provision of colorectal cancer screening logs demonstrates that colorectal cancer screening using a nationally recommended modality is increasingly being offered. However, the above chart audits document that a significant percentage of eligible individuals are still not being offered annual colorectal cancer screening or at longer intervals based on the results of colonoscopy studies.[584] Colorectal cancer is a potentially preventable and curable malignancy. IDOC must offer annual screening for colorectal cancer to all eligible individuals in custody. The current data shows that a significant percentage of eligible individuals have not been offered this important screening.

**Recommendations:**
1. Monitor and report the offering, provision, and refusal of colorectal cancer screening to the facility Quality Improvement Committees.
2. Track and report the number and percentage of the eligible incarcerated population offered annual colorectal cancer screening (and at longer intervals for individuals having received colonoscopies).

---

[581] Southern Illinois University Office of Correctional Medicine.
[582] Stateville NRC is an intake center with a high turnover of its population and JITC has only a handful of patients.
[583] IDOC Medical Policy and Procedure Manual, Policy B.01.01: Preventive Services and Periodic Health Assessment, February 2024.
[584] Based on the result of diagnostic colonoscopies, patients may not need to have repeat procedures or screenings for 3-10 years.

3. Continue to monitor whether digital rectal examination is being offered as a screening test for colorectal cancer until this out of date, non-recommended procedure is verifiably discontinued in the IDOC.

4. Eliminate Administrative Directive 04.03.101 Physical Examination statement G.2.(f).v.[585] which states "If 40 years of age or older, a digital rectal exam with guaiac testing" is to be done. This should be revised to be in accordance with current OHS directives on cancer screening. Compliance officers must be told not to audit against this statement as it adversely affects compliance with the Consent Decree and is clinically inappropriate.

**Prostate Cancer Screening**

**Overall Compliance Rating:** Non-Compliance

**Findings**

IDOC's Preventive Services and Periodic Health Assessment Policy[586] states that "(for) men aged 55-69 the decision to undergo periodic prostate-specific antigen (PSA) based screening for prostate cancer screening should be an individual one, per USPSTF guidelines." This policy is fully aligned with the current national recommendation (C Grade)[587] of the USPSTF for prostate cancer screening.[588]

Forty-seven medical records of men aged 55-69 years from nine IDOC facilities were reviewed to evaluate whether there was documentation that IDOC policy and the USPSTF (C grade) recommendation concerning prostate cancer screening were being followed. Results of this review are in the table below.

---

[585] This is the current administrative directive as found on the IDOC Internet site at
https://idoc.illinois.gov/content/dam/soi/en/web/idoc/aboutus/policies/policies/programs-and-services/403101-individual-in-custody-physical-examinations.pdf.

[586] IDOC Medical Policy and Procedure Manual, Preventive Services and Periodic Health Assessment, Policy B.01.01.VI.B.ii.

[587] USPSTF Grade C definition" "The USPSTF recommends selective offering or providing this service to individual patients based on professional judgement and patient preferences. There is at least moderate certainty that the new benefit is small."

[588] USPSTF Prostate Cancer Screening recommendations 2018. Reviewed 2024. This is a "C Grade" recommendation

| Prostate Cancer Screening | | | | | | |
|---|---|---|---|---|---|---|
| Individual Chart Reviews (2023-2024) | | | | | | |
| Males 55-69 Years of Age | | | | | | |
| Facility | # Eligible Patients | Documented Discussion of Pros/Cons of PSA* Testing | PSA Done | DRE Offered** | DRE Done | DRE Refused |
| BMRCC | 2 | 0 | N/A | 2 | 0 | 2 |
| East Moline | 1 | 0 | N/A | 1 | 0 | 1 |
| Hill | 7 | 0 | N/A | 6 | 1 | 5 |
| Jacksonville | 3 | 0 | N/A | 3 | 0 | 3 |
| Lawrence | 5 | 0 | N/A | 2 | 0 | 2 |
| Lincoln | 8 | 0 | N/A | 2 | 1 | 1 |
| PNK | 10 | 0 | N/A | 8 | 0 | 8 |
| Shawnee | 2 | 0 | N/A | 1 | 0 | 1 |
| Taylorville | 9 | 0 | N/A | 7 | 3 | 4 |
| Totals | 47 | 0 (0%) | N/A | 32 (68%) | 5/32 (15%) | 27/32 (85%) |
| *PSA = prostate specific antigen, a test used to evaluate for prostate cancer | | | | | | |
| **DRE = digital rectal examination | | | | | | |

Audits of 47 medical records revealed that none had documentation that the harms and benefits of PSA screening had been discussed with patients by their providers. Although the performance of a digital rectal exam (DRE) is no longer a recommended screening test for prostate cancer, 32 (68%) of the 47 men were offered digital rectal exams; 5 received a rectal exam and 27 refused this exam. The Monitor was not provided with laboratory data indicating if prostate-specific antigen (PSA) had or had not been offered to any of these 47 men.

IDOC's System Quality Council has recently determined that prostate cancer screening will be a systemwide performance and clinical outcome measure beginning in either late 2024 or early 2025.[589] IDOC has not yet developed the definition of what will be reviewed for this new measure. The Monitor is supportive of this decision to monitor the provision of prostate cancer screening that is in accord with Policy B.01.01 and USPSTF prostate cancer screening guidelines (Grade C).

Since 2021, IDOC has communicated that providers are to discuss the benefit and potential harms PSA screening with men who are eligible for prostate cancer screening.[590] The Monitor has found no evidence or been provided any data that IDOC providers are adhering to the IDOC policy B.01.01 or USPSTF guidelines (Grade C) concerning prostate cancer screening. IDOC must vigorously stop the offering of digital rectal examination to screen for prostate cancer. A first step is to immediately change administrative directive 04.03.101, which requires rectal examination. This ineffective screening method has not been

---

[589] OHS-Monitor Monthly Conference Calls: 7/18/24, 9/19/24
[590] IDOC Administrative Directive Immunization and Cancer/Preventive Screening Programs, January 2021

nationally recommended for many years. As was done for colorectal cancer screening,[591] OHS should issue a communication to all providers and the medical vendor in the IDOC advising them to immediately stop offering DRE for both colorectal and prostate cancer screening.

IDOC is not compliant with the prostate cancer screening element of Consent Decree, III.M.1.c.

**Recommendations:**
1. Educate providers on the 2024 USPSTF (C Grade) recommendation and IDOC policy B.01.01VI.Bii to discuss with eligible patients the benefits and harms of prostate specific antigen (PSA) testing.
2. Continue with the plan to review Prostate Cancer Screening as a new performance and clinical outcome measure in 2025 and create a definition of specifically what will be measured.
3. In collaboration with SIU Office of Correctional Medicine report and analyze the quarterly results of this new performance and outcome measure.
4. Clearly communicate to providers that digital rectal exam is not a recommended screening test for prostate cancer.
5. See recommendation 4 in Colorectal Cancer Screening section above.

## Mammography Screening

**Overall Compliance rating:** Substantial compliance

**Findings:**
Based on the Monitor's previous reports and findings that IDOC was in substantial compliance with Consent Decree III.M.1.d Mammogram Screen, the Court has ruled that mammography screening for breast cancer is no longer required to be monitored. However, IDOC provided fourteen medical records for the 8th report with data concerning breast cancer screening in the IDOC.

| Breast Cancer Screening | | | | |
|---|---|---|---|---|
| Biannual Mammogram | | | | |
| Decatur CC and Logan CC | | | | |
| Facility | Eligible Patients* | Mammogram Done in 2022-23 | Mammogram Last Done in 2021 | Mammogram Refused |
| Decatur | 10 | 9 | 1 | 0 |
| Logan | 4 | 2 | 2 | 0 |
| Totals | 14 | 11 (73%) | 3 (20%) | 0 (0%) |

*All women met breast cancer screening age criteria of USPSTF (50-74 years) and/or IDOC standard (45-74 years).

---

[591] Agency Medical Director, Memorandum to the OHS, HCUAs, Wexford Health Services, all Agency Health Providers. Memo stated that digital rectal exam with stool guaiac testing is no longer the standard of care (for colorectal cancer screening. August 1, 2023

Eleven (73%) of fourteen medical records had evidence that mammograms had been performed in the last two years. However, three (20%) of this limited sample had not received mammogram screening since 2021. No information was provided for the reason that mammogram screening had not been done as per the nationally recommended two year interval. Even though IDOC has been declared to be in substantial compliance with the breast cancer screening item (III.M.1.d) of the Consent Decree, IDOC is encouraged to continue to monitor, track, and report the provision of mammogram screening to eligible individuals. Since the submission of 7th Report the USPSTF has revised its guidelines and now "recommends biennial screening mammography for women aged **40** to 74 years."[592] The previous guidelines recommended that mammography screening should routinely start in women at the age of 50 years. IDOC will need to revise the age criteria in its Breast Cancer Screening section of Policy B.01.01.VI.B,2.i so as to be aligned with this updated USPSTF recommendation.

**Recommendations:**
1. Monitor and report the offering, provision, and refusal of breast cancer screening to the facility Quality Improvement Committees.
2. Report data on the percentage of eligible incarcerated women who receive breast cancer screening screenings within the nationally established time intervals.
3. Revise the IDOC Policy B.01.01: Preventive Services and Periodic Health Assessment, Breast Cancer Screening to be in align with the updated April 2024 USPSTF guideline that lowered the starting age to **age 40** for screening mammography in normal risk individuals.

## Cervical Cancer Screening

**Overall Compliance Rating**: Partial compliance

**Findings:**
Cervical cancer screening using the Papanicolaou test is recommended to be performed every 3-5 years in females between 21 and 65 years of aged based on age and the results of HPV cultures.[593] Abnormal PAP smears require more frequent imaging and testing.

| Cervical Cancer Screening | | | | | |
|---|---|---|---|---|---|
| ThinPrep Pap Testing | | | | | |
| Decatur CC and Logan CC | | | | | |
| Charts Reviewed | Eligible Patients* | Pap Offered | Pap Done in Last 3 years | Test Refused ** | HPV Result Provided |
| 25 | 16 | 16 (100%) | 14 (88%) | 2 (12%) | 4/14 (29%) |
| * Patients with total hysterectomies and/or 66 years of age or older are not candidates for cervical cancer screening and were excluded from this review. | | | | | |
| ** One refused the screening, another with a history of partial hysterectomy stopped the testing due to discomfort. | | | | | |

The Monitor requested and received three documents that were reviewed to assess the provision of cervical

---

[592] United States Preventive Services Task Force (USPSTF) Breast Cancer Screening was revised in April 2024 and now recommends that biennial screening mammography begin at the age of 40 years.
[593] USPSTF 2024 and IDOC Policy, Preventive Services and Periodic Health Assessment, B.01.01, February 2024.

cancer screening at Decatur CC and Logan CC (see above Cervical Cancer Screening table). A total of twenty-five records were reviewed;[594] 20 medical records from Decatur and five records from Logan were provided to the Monitor. Sixteen of 25 were eligible for screening. All 16 (100%) eligible females were offered pap smear testing and 14 (88%) accepted this screening test.[595] All 14 individuals who accepted the test had been screened in the last three years; this was in accordance with the national guidelines. Although the data provided noted that only eleven tests performed used ThinPrep PAP methodology (which allows combined testing for cytological and HPV testing), the Monitor is aware that this methodology is utilized for all cervical cancer screenings in the IDOC. Although it was likely done on most of the tests,[596] HPV results are returned on a separate form and were only provided for four of the fourteen tests. HPV results were not transcribed on any of the ten periodic health assessment visits at Decatur CC. A negative HPV test would increase the PAP testing frequency from every three years to every five years. Extending cervical cancer screening to every five years is enthusiastically accepted by the women in the community and would be welcomed by women in custody. Increasing the screening interval would free up staff for other clinical duties.

In addition, SIU reviewed 46 medical records at Decatur and Logan[597]; which revealed that 37 (80%) of the 46 patients had accepted PAP testing and 2 (4%) had refused the screening. Thirty-nine of 46 patients (85%) had been offered cervical cancer screening. Seven (16%) of the charts lacked evidence that cervical cancer screening had been offered to the patients.

As noted in previous Reports, randomly chosen chart reviews during site visits and non-randomly selected medical records provided to the Monitor for previous Court Reports revealed that women were being regularly screened for cervical cancers.[598]

IDOC needs to track cervical cancer screening based on the percentage of eligible women who are offered, received, and refused testing within the established timeframes. This data should be reported to the CQI committees and corrective action taken as indicated. There is evidence PAP tests are being regularly performed at both female institutions. However, more robust data and tracking to assure that all eligible women are being testing in accord with nationally cancer screening standards needs to be established.

**Recommendations:**
1. Monitor and report the offering, provision, and refusal cervical cancer screening to the facility Quality Improvement Committees.
2. Report data on the number and percentage of eligible incarcerated women who receive cervical cancer screenings within the nationally established time intervals.
3. Audit the results of HPV cervical screenings to ensure that HPV results are being transcribed into the database and women with negative HPV tests are scheduled for "every 5 year" cervical cancer screening appointments.

---

[594] 11 documents provided the results of PAP smears (6 from Decatur and 5 from Logan). Another 14 annual periodic health assessment visits from Decatur identified whether PAP tests were offered, completed, or refused.

[595] Nine of the 11 eligible women at Decatur and all five eligible women at Logan agreed to PAP testing. Two patients at Decatur were not tested; one refused and one asked that the speculum be removed due to pain.

[596] USPSTF recommends cytology testing alone every 3 years for women aged 21-29 year, but for women 30-65 years a negative HPV test would allow testing every 5 years.

[597] 26 charts were reviewed by SIU in the 1st quarter FY 2023 (July-September) and 20 charts in the 2nd quarter 2024 (October- December 2023) for evidence that PAP test had been offered or refused.

[598] 4th, 5th, 6th, and 7th Court Reports

## Lung Cancer and Abdominal Aortic Aneurysm (AAA) Screening

**Overall Compliance Rating:** Non-compliance

**Findings:**

As previously reported, reviews of medical records, intake screening forms, annual medical histories, chronic care visits from multiple medical records identified a consistent lack of adequate documentation of a history of tobacco use, the years of smoking, the packs/day history, the pack years smoked, and whether the patient had stopped smoking for 15 years or longer. Absence of this comprehensive data on tobacco usage is a barrier to identifying which individuals should be screened for lung cancer[599] and abdominal aortic aneurysm (AAA).[600] IDOC needs to address this gap in gathering pertinent medical histories so that the IDOC Preventive Service and Periodic Health Assessment[601] policy for identifying eligible candidates for lung cancer and AAA screening can be implemented. To date the Monitor has not identified any individuals in IDOC who has been screened for lung cancer and/or AAA.

Sixteen medical records from seven correctional centers of individuals with a documented history of tobacco use who met the age criteria for eligibility for either lung cancer screening and/or AAA screening were reviewed. The results of this review are noted in the table below.

| Tobacco Usage Documentation in 16 Record Reviews* | | | | | | |
|---|---|---|---|---|---|---|
| Lung Cancer** and Abdominal Aortic Aneurysm (AAA)*** Screening Completed | | | | | | |
| Facilities*** | # Eligible Smokers | Packs/Day/Years Smoked Recorded | Met Criteria for Lung Cancer Screening | Screened for Lung Cancer | Met Criteria for AAA Screening | Screened for AAA |
| 7 | 16 | 5 (31%) | 4 (25%)**** | 0 (0%) | 8 (50%) | 0 (0%) |
| * BMRCC, Hill, Jacksonville, Lawrence, Shawnee, Stateville, and Taylorville | | | | | | |
| **The USPSTF recommends annual screening for lung cancer with low-dose computed tomography (LDCT) in adults aged 55 to 80 years who have a 20 pack-year smoking history and currently smoke or have quit within the past 15 years. | | | | | | |
| ***The USPSTF recommends one-time screening for abdominal aortic aneurysm (AAA) by ultrasonography in men aged 65-75 who have ever smoked. | | | | | | |
| ****Three additional charts noted either packs per day smoked or years of smoking but not both. These patients were not included in this table. | | | | | | |

Of the sixteen medical charts individuals with a documented history of tobacco use, only five (31%) had documentation of both the number of packs of cigarettes smoked per day and the number of years that the patient had smoked which would enable pack years to be calculated. Zero (0%) clearly identified whether the patient had stopped smoking for 15 years or longer. None of the four patients who met the criteria for

---

[599] USPSTF Annual Lung Cancer Screening criteria (low dose lung CT): Age 50-80, 20 pack year history, and had not smoked for at least the last 15 years. The "15 years without smoking" exclusion criteria is currently under national discussion and maybe be deleted in the near future.

[600] USPSTF One-time AAA Screening criteria (abdominal ultrasound): Age 65-74, positive history of smoking

[601] IDOC Policy B.01.01 Preventive Service and Periodic Health Assessment February 2024 is consistent with USPSTF guidelines.

209

lung cancer screening and the eight patients who were candidates for AAA screening had documentation that they had been respectively referred for either or both of these two diagnostic tests.

As previously reported, the lack of comprehensive data on the use of tobacco is a significant barrier to the identification of individuals who qualify for screening and early detection of lung cancer and AAA. Moreover, smoking is a major cardiovascular and pulmonary health risk and is important to identify with respect to primary and secondary cardiovascular prevention and pulmonary illness prevention and management. The Monitor found no evidence nor was provided any data that IDOC providers are adhering to the IDOC policy B.01.01 or USPSTF guidelines for screening at risk individuals for lung cancer and AAA. The Monitor supports the decision of the OHS to initiate "Smoking history screening" as a performance and outcome measure in 2025 as long as it measures whether a patient ever smoked, the number of packs per week, the number of years smoked, the calculated pack years, and, if appropriate, the calendar year (or the number of years) that the patient stopped smoking.[602]

**Recommendations:**
1. Revise the medical history form to facilitate the accurate solicitation of data on the use of tobacco that would identify men and women (ages 50-80 years) eligible for ongoing lung cancer screening and/or men (ages 65-75 years) eligible for one-time abdominal aortic aneurysm (AAA) screening. Data should be documented in the database and would include age, smoker (Yes, No), packs per day, years smoked, calculated pack-years of tobacco use, and calendar year (or number of years) that individual stopped smoking. For the electronic record implementation, smoking history needs to be included using these criteria.
2. All patients who meet the age and smoking criteria should be offered annual lung cancer screening and one time screening for AAA.
3. Train nurses and providers on the comprehensive gathering and documentation of data on tobacco use and its importance in identifying individuals eligible for lung cancer screening and AAA screening.

## Hepatocellular Cancer (HCC) Screening

**Overall Compliance Rating:** Partial compliance

**Findings:**

As communicated in the previous reports[603], the standard of care in the United States for early detection of hepatocellular (primary liver) cancer continues to be performing semiannual ultrasound liver screening with or without alpha fetoprotein testing in patients with cirrhosis or at high risk for cirrhosis and HCC.[604] UpToDate also suggests "surveillance screening for patients with chronic hepatitis C and advanced liver fibrosis (F3) in the absence of cirrhosis."[605] It also appears to be the practice of the UIC Telehealth Hepatitis Clinic to recommend semiannual ultrasound screening of hepatitis C patients in the IDOC with

---

[602] The current guidelines recommend that smokers who have stopped smoking for the last fifteen year or more are not candidates for lung cancer screening. Medical experts are discussing whether the 15 year without smoking disqualification should be eliminated.

[603] 5th, 6th, and 7th Court Reports

[604] Singal AG et al. Diagnosis, Staging, and Management of Hepatocellular Carcinoma: 2023 Practice Guidance by the American Association of the Study of Liver Diseases. Hepatology: 2023; 78(6): 1922-1965. doi:10.1097/HEP.0000000000000466

[605] UpToDate, Colombo M, Sirlin B. Surveillance for hepatocellular cancer in adults, Topic updated February 2, 2024

fibrosis scores of F2 (less liver scarring than F3).[606]  There are data that indicates HCC screening in patients with any type of cirrhosis, including hepatitis C patients with sustained viral response to antiviral treatment, leads to earlier detection, curative interventions, and improved overall survival.[607]

Data was received from the medical records of nineteen hepatitis C patients who were being jointly followed in the UIC Telehealth Hepatitis Clinic and in six facility Hepatitis Clinics (see table below).

| Hepatocellular Cancer (HCC) Screening | | | |
|---|---|---|---|
| Facility | # Records Reviewed* | Eligible for Semiannual Liver US or MRI** | Regularly Screened with Liver US or MRI** |
| BMRCC | 4 | 4 | 3 |
| Dixon | 5 | 4 | 3 |
| IRCC | 2 | 0 | |
| Jacksonville | 1 | 1 | 1 |
| Stateville | 3 | 3 | 2 |
| Vienna | 4 | 2 | 0 |
| Total | 19 | 14 | 9 (64%) |

* Some records provided were incomplete lacking diagnostic reports including fibroscan and ultrasound reports making it difficult to assess the eligibility for screening including the frequency of screening.

**Patients with liver fibrosis scores of F2-4, clinical documentation of cirrhosis, UIC specialist orders to do ongoing liver scans, and focal liver lesions or masses on initial studies are to have liver US screening (or MRI) every six months.

*** Credit given if liver US (or MRI) were performed (or offered and refused) every 6-8 months or there was documentation that a repeat study was scheduled in 2024.

Fourteen individuals were deemed to be candidates for ongoing screening for hepatocellular cancer (HCC). Each was to receive liver ultrasonography every six months. Nine (64%) of the 14 eligible individuals were screened in alignment with the national standards. The documents received for the other five (36%) eligible patients indicated that HCC screening had not been done in the last 10 to 26 months.[608] One of the 14 individuals screened was found to have hepatocellular cancer that has been successfully treated with ablation therapy.[609]

---

[606] Hepatis C (F2) patients #3 and #5 at Dixon are being screened semiannually for HCC.
[607] Park S, Davis A, Pillar A. AASLD Prevention, Diagnosis, and Treatment of Hepatocellular Cancer. JAMA (Clinical Guidelines Synopsis). September 24, 2024; 332 (12), 1013-14
[608] Documents were provided to the Monitor in May and August 2024 and should have included reports into at least March 2024:  Last Screening: BMR patient #3: 5/19/23, Dixon pt. #2: 3/14/23, S-Ville: pt. #1: 10/2021, Vienna: pt.# 3 11/2022 and pt.#4 3/2023.
[609] Ablation of the HCC was performed in May 2022. Repeat MRI in November 2022 revealed no residual or new lesions. However, no data or reports were provided since the November 2022 MRI, a period of 17 months.

This is the first report that IDOC has provided HCC screening data from multiple facilities. Although this data is still limited, it suggests that HCC screening is being offered to hepatitis C patients with cirrhosis or advanced fibrosis. IDOC needs to establish a process that prompts, tracks and reports on the offering, ordering, and completion of semiannual screening for HCC in at risk patients. The failure to adhere to the current 6 months intervals for repeat HCC screening put the eligible individuals and the institution at risk.

**Recommendations:**
1. Track the number of individuals eligible for semiannual HCC screening and the percentage who were offered, accepted, refused, or not offered. This data should be reported to the facility Quality Improvement committee at least every six months.    This screening should be done for all those with cirrhosis, advanced liver fibrosis, and other high risk liver conditions.
2. Add Hepatocellular Cancer (HCC) screening to the Preventive Service and Periodic Health Assessment policy B.01.01 as a recommended liver cancer screening for individuals with advanced liver fibrosis/cirrhosis.

Lung cancer, colorectal cancer, hepatocellular cancer, and prostate cancer are among the leading causes of cancer mortality in the IDOC.[610] These four cancers can be diagnosed and treated at an earlier stage with effective screening programs and can even be prevented or cured if detected in an early or precancerous stage.  IDOC needs to more aggressively develop and track the effectiveness of its cancer/preventive screening program. Effective cancer and RHM screening in the IDOC for at-risk incarcerated persons has the potential to positively impact on avoidable morbidity and mortality in the IDOC and ultimately in the community.

**General Recommendations: (**Specific recommendations are noted as needed in separate categories of Preventive Service and Periodic Health Assessment see above)
1. Ensure all adult immunizations and routine health maintenance (RHM)/cancer screenings, as respectively recommended by Center for Disease Control and Prevention (CDC) and the USPSTF (A and B recommendations), are being offered to all at-risk patients. (The USPSTF Prostate Cancer Screening (C recommendation) is also currently recommended in the IDOC Policy B.01.01, Preventive Services and Periodic Health Assessment.)
2. The IDOC Cancer and Routine Health Maintenance (RHM) screening program guidelines must be reviewed and revised as needed to assure that updates to United States Preventive Services Taskforce A and B recommendations for routine health maintenance and cancer screening and Adult Immunization guidelines of the CDC are expeditiously incorporated into the IDOC guidelines.
3. Monitor and report adult immunizations and RHM/cancer screenings by facility, tracking number of eligible candidates, number and percent offered, number and percent accepted, and number and percent refused.
4. Ensure that the implementation of the electronic medical record (EMR) includes requirements to prompt, record, track and automatically report immunization and RHM/cancer screening data listed above in recommendation number 3.
5. Develop and implement an interval immunization and RHM/cancer tracking solution, optimally

---

[610] 2017-2022 IDOC mortality spread sheets: Total Cancer deaths **1)**Lung cancer-25, **2)**Colorectal cancer-14,      **3)** Hepatocellular cancer-14, **4)** Metastatic cancer unknown origin-12**, 5)** Pancreatic cancer-11, **6)** Prostate cancer-6. The mortality data is incomplete; the cause of death is commonly not reported and very few autopsies are performed.

an electronic database, until the EMR is fully developed and functional.

6. Establish statewide training of providers and nurses on IDOC Policies and Procedures that provide guidance and direction on adult immunizations and RHM/cancer screenings and on the national standards as recommended and updated by the and by the United Preventive Services Task Force (USPSTF).

7. Immediately discontinue the outdated and not recommended use of digital rectal exams screening tests for prostate cancer and colorectal cancer. IDOC should delete "rectal exam" from the physical examination form and educate providers on when a rectal examination is indicated.

8. Proceed with auditing a)Annual weight monitoring, b)Smoking history screening, c)Cervical cancer screening, d)Prostate cancer screening to the performance and clinical outcome measures that will be audited quarterly in collaboration with SIU Office of Correctional Medicine. Each of these four additional measures have the potential to increase the early detection and even the prevention and treatability of cancers.[611]

# Pharmacy and Medication Administration

***Addresses items II.A; II.B.1; II.B.6.c; II.B.6.d;***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care.*

**II.B.6.c.** *IDOC agrees to implement changes in the following areas: Medication administration records-both for directly administered medications and KOP.*

**II.B.6.d.** *IDOC agrees to implement changes in the following areas: Medication refusals;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The following documents were requested by the Monitor to evaluate compliance with the Consent Decree concerning medications.

- For northern region facilities provide 1) times at each facility designated for medication administration, 2) times at each facility designated for insulin administration.
- List training completed in the last 12 months for any nurses employed by either the state or the vendor at NRC, Graham, Menard, Logan, Stateville, Illinois River, and Pontiac.
- Provide all pharmacy inspection reports and medication administration audits with documented corrective action for non-performance. These are completed by the consulting pharmacist for each facility.
- Provide a copy of the findings and recommendations of the evaluation of medication management at the facilities initiated by SIU in June 2021.
- Summarize any recommendations the SIU/OCM Director of Pharmacy Standards & Operations has made to the OCM/QMOE or IDOC, Office of Health Services.[612]

---

[611] Data on initial audits of cervical cancer screening and fasting lipids (also a new measure) have been reported for the 1st Fiscal Quarter of 2024

[612] Monitor's document request 2/29/2024, items 6, 76, 127-129. IDOC did not provide the Pharmacy inspection reports, and MAR audits as requested (item 127). These are provided to each facility monthly by the pharmacist who conducts the

The Monitor also reviewed the morbidity and mortality reports completed by SIU, reported adverse events, and the monthly quality improvement minutes. The Monitor also reviewed the records of individuals who died during this report period and examined medication orders, documentation of medication administered, and its effect on the patient.

The Defendants Implementation Plan[613] includes two process improvement projects, one on medication management that lists eight targets and another on chronic disease management which supports providers' evaluation of medication compliance and current medications at chronic clinic visits.[614]  Monitoring of medication adherence is one of the Implementation Plan items in the implementation of the electronic health record.[615] Finally the Implementation Plan addresses medication safety as part of several additional items (adverse event reporting, training, and process improvement projects).[616]

**Progress toward compliance with II.B.6.c. since the last report**
There has been some forward progress but by no means have the changes called for in medication administration and refusals been realized as yet. The Department's first policy and procedure manual includes two policies specific to pharmacy and medication management. These are C.05.01 Medication Administration/Delivery, Count Process, and Training and D.02.01 Pharmaceutical Operations. The Monitor suggested on two occasions that the previous drafts of any policy on pharmaceutical operations would benefit from the review and expert advice of an experienced pharmacist who is familiar with Illinois state and federal law.[617] Even though SIU Office of Correctional Medicine has had a pharmacist on staff since June 2022, there is no evidence that this input was sought in the development of either of these policies and procedures.

**Development of Policy C.06.01 Medication Administration/Delivery, Count Process, and Training**
In comments sent to OHS on 2/22/2024 the Monitor recommended that IDOC not move forward with the draft of Policy C.06.01 Medication Administration/Delivery, Count Process, and Training until the process improvement project outlined in item 55 of the Implementation Plan had been completed. OHS elected to distribute all of the drafted policies and procedures effective 2/9/2024 without doing this work. The Monitor's comments on IDOC's current policy C.06.01 include:

1. The pharmacy subcontractor's manual of policies and procedures should be reviewed, and a determination made as to whether each is sufficiently thorough for adoption by IDOC. Those that are not, should be addressed in an IDOC policy and procedure (see the next recommendation). For example, the pharmacy subcontractor's policy on medication orders provides no guidance about

---

inspection. Some facilities attached these reports to the Quality Improvement Minutes and were reviewed for this report. These documents would be relatively simple for IDOC to obtain from facilities at the same time the QI minutes are collected. Minimal information was provided in response to the Monitor's request for information about SIU's efforts to assist IDOC in pharmacy operations.

[613] Defendant's Implementation Plan, Lippert Consent Decree, Case: 1:10 -cv-04603,  Document #:1688 Filed 8/1/23.

[614] Items 54 (subpart 14) (completion date March 2024), 55 (completion date February 2024).

[615] Item 29 (completion date August 2024).

[616] Items 7 (3) (completion date September 2023), 36 (completion date November 2023), 50 (completion date December 2023), 51 (completion date January 2024).

[617] Email from Monitor to Janette Candido dated 2/25/2022. OHS-Monitor Monthly Call, 10/18/2023. The Monitor provided feedback on two earlier policies in February 2022.  See page 146 of the Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023.

legibility of the order, where the order is filed, what the order form looks like, who is responsible for implementing an order and by when, etc.

2. Consideration should be given to other policies and procedures that need to be established regarding pharmacy services. These should include, for example, implementing medication orders, verbal and telephone orders, use of PRN or "as needed" medication, formulary management, medication errors, medication reconciliation, use of stock medication, polypharmacy, pharmacy consultation, etc.

3. The section on medication adherence should refer to F.02.01 the Chronic Care policy since it provides more specific guidance.

**Development of Policy D.02.01 Pharmaceutical Operations**

The Monitor's feedback to IDOC on this draft was that it needed more work to address the operational complexities in pharmacy procurement, delivery and inventory management in the IDOC currently. The policy and procedure failed to address the following:

1. The medical vendor has arranged for a "fax and fill" pharmacy subcontractor to send individual packaged medication and stock medication. IDOC also has arrangements with the pharmacy at UIC for HIV, hepatitis C, and diabetic medications prescribed by the endocrinology specialists at UIC. Which entity is responsible for the patient's medication profile and how do these pharmacies share information with each other and with the prescribing provider when dispensing medications?

2. The policy and procedure does not identify what state and federal authorities (statutes or regulations) govern how IDOC stores, maintains, dispenses and monitors medications, including control substances in its facilities? This includes after hours onsite dispensing.

3. The pharmacy subcontractor's policies and procedures manual appears to be an internal manual for how their fax and fill operations work. It does not discuss IDOC or UIC at all and is insufficient as a policy manual to describe how pharmaceuticals are managed within IDOC. The manual does describe how it dispenses medication it is responsible for supplying but does not address items A-K as listed in the policy.

The complexities of pharmaceutical operations are portrayed well in mortality review patient #10 who was on kidney dialysis and was treated with intravenous antibiotics for an infected fistula. There are only passive references to this in the progress notes; there are no orders or documentation of its administration anywhere in the patient's medical record.[618] Without an order it is unclear what antibiotic was administered, or when, or for how long. There was no apparent pharmacy involvement in the dispensing of the antibiotic. Policy and procedure D.02.01 on pharmaceutical operations needs to include the responsibilities of all the parties treating patients with medication at IDOC facilities.

Eleven facilities reported results of internal audits of AD 04.03.110 Control of Medications and Medical Instruments between January and June 2024. Seven of these facilities were cited as compliant with the AD and four were not.[619] The AD establishes that correctional facilities are to regulate the dispensing and handling of medications used within the facility in accordance with State and federal law. The facility Chief Administrative Officer is responsible for developing procedures for the regulation of medications within the facility. These include storage, inventory, supply, record keeping, prescription and dispensing of drugs. No guidance is provided about what State and federal regulations apply and no pharmacy expert

---

[618] See mortality review attachment: mortality review patient 10, page 72-74.
[619] Facilities reporting compliance were Dixon, Jacksonville, Kewanee, Lincoln, Menard, Murphysboro, and Shawnee. Facilities reporting noncompliance were Big Muddy, Centralia, JTC, and Pinckneyville.

was involved in developing the administrative directive. Neither the Chief Administrative Officer nor HCUA have the expertise or knowledge sufficient to develop informed procedures for the procurement, receipt, storage, inventory, and dispersal of pharmaceuticals consistent with State and federal regulations. The audit of compliance with the AD provides no assurance whatsoever that the control of medications within the IDOC correctional facilities is in accordance with regulations governing pharmaceuticals.

**Medication error reporting**

Adverse event reporting has been initiated and does include receipt of some reports of medication errors. Several of these have had corrective action plans developed. However, there are many more medication errors documented as reviewed in facility quality improvement minutes. Further, many medication errors have been identified in mortality reviews that were not identified during the process of care or in the facility quality meetings. The processes used now in IDOC to order, fill, dispense, and administer or deliver medications are associated with risks for errors that are well known in the patient safety literature.

**Program expansion**

Two years ago OHS engaged the endocrinology department at UIC in a pilot project to consult and recommend treatment plans for diabetics in poor control.[620] The project has since expanded statewide and has resulted in the introduction of newer, more effective forms of insulin therapy, access to 340b drug pricing, and the expertise of clinical pharmacists.[621] The project has required adjustments to the IDOC formulary as well as in the practices at facilities, such as proper storage and inventory management of insulin pens. The successful expansion and changes brought about by this collaboration with UIC demonstrate the Department's ability to change long standing practices and should be considered a bellwether for the future.

The Monitor's 6th report noted that SIU had initiated an evaluation of medication management which included visits to two facilities and development of a survey questionnaire.[622] This project was apparently never completed since no results or recommendations have ever been made. In November 2023 IDOC and SIU established a project charter to recommend best pharmaceutical practices, conduct polypharmacy reviews, develop pharmacy performance measures, provide training, and collect and analyze medication errors and data on medication usage.[623] The charter lists the Lippert Implementation plan tasks 29, 50, and 55 so the resulting project deliverables should provide some evidence of progress toward achievement of these tasks. The following actions and timelines are listed:

| Actions/Milestones | Target Date |
|---|---|
| Recruit and hire five (5) PharmDs | 4/1/2024 |
| Collect and analyze medication error data | 7/1/2024 |
| Create industry standard process for reporting medication errors | 9/1/2024 |
| Review and draft recommendations for pharmaceutical administration manual | 12/1/2024 |
| Create a minimum of ten (10) training modules for IDOC | 12/30/2024 |
| Polypharmacy and medication usage review and report | TBD |

In May 2024 facility HCUAs were informed that a team of pharmacists with the Office of Correctional

---

[620] Defined as diabetics whose hemoglobin A1c was 8 or above.
[621] This project is in line with item 55 of the Implementation plan task 8.
[622] Health Care Monitor 6th Report Lippert v. Jeffreys, March 13, 2023, page 146.
[623] Proposed OCM/IDOC Initiative Charter, dated 11/28/2023.

Medicine would be visiting facilities, requesting documentation, and conducting surveys.[624]  The team is reported to have visited several facilities, but no work product had been made available to the Monitor for review at the time this report was written.[625]

Since the last report the Department has entered into a contract with Fusion Health for an electronic health record which should address many of the error prone and inefficient practices in medication management that take place currently. Both computerized provider order entry (CPOE) and an electronic medication administration record (eMAR) are core components of Fusion's project.[626] Workflows for pharmacy services must achieve tasks 1-4 of Implementation Plan item #55. The Monitor has recommended the use of a process analyst to organize this effort.[627] Implementation of the electronic record is scheduled to begin with a pilot in January 2025 with complete roll out statewide by the end of February 2025.[628]

**Staff training regarding changes to medication administration and delivery.**
The records of training received by nurses the last 12 months at seven facilities were reviewed. There was no evidence among these records that nurses have been trained in the new procedures for medication management or operations. Four facilities had nurses read and sign an acknowledgement of a document entitled Illinois Department of Corrections, Eight Rights of Medication Administration.[629] The material was up to date and a good reference but there is no explanation or instructions about what nurses are expected to do with the information. It states that nurses are to complete it upon initial hire, annual training, and as needed. There is no test of knowledge or demonstration of competency so it's purpose and application is unclear. This training was not among the material provided by Graham or Menard, so it appears that not all facilities have incorporated it into nurses' continuing education and training.

Menard documented training on use of insulin pens, apparently in relation to the expansion of the UIC endocrinology project. Graham provided documentation that nurses read and signed memos from the HCUA about medication refusals, signing MARs, and accountability for insulin syringes and lancets. Staff receive training credit for each of these "read and sign" memos.  Nursing staff also receive training credit for attendance at meetings and nearly every staff meeting at Pontiac includes some reminder about compliance with long standing practices for medication management. Errors and omissions in medication management continue despite this training and reminders given to nursing staff at staff meetings, which indicates unresolved systemic issues[630] that make compliance with expected practice not possible. This is why the Monitor has recommended the process improvement project that is task #55 in the Implementation Plan.

The SIU/OHS charter for the pharmacy project includes the development of ten training modules by the

---

[624] Memo dated 5/14/2024 regarding Statewide Pharmaceutical Administration Review provided in response to the Monitor's documentation request #127.

[625] OHS-Monitor Monthly Meeting September 19, 2024.

[626] Task 2 of item #29 in the Implementation Plan is to establish a process within the electronic health record to accomplish notification and documentation of provider actions in response to notification of medication nonadherence. The development of EHR process flows needs to include the steps listed for this item in the implementation plan.

[627] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 171.

[628] Project: IDOC High Level Gantt, 5/10/2024. Provided in response to the Monitor's documentation request # 56.

[629] Facilities which had nurses sign the handout on the Eight Rights of Medication Administration were IRCC, Logan, Pontiac, and Stateville.  Menard, Graham, and NRC did not provide documentation of training on this subject.

[630] These could be staffing, the amount of time available to complete tasks, the conditions in which the work is done, antiquated or outdated equipment and so forth.

217

end of December 2024. We suggested in the last report and repeat here that the findings from mortality and morbidity reviews, adverse event reporting of medication errors, as well the pharmacy inspection reports inform the development of the curriculum to train nurses and providers about medication management. We suggest emphasis be placed on patient safety and advocacy, medication reconciliation, standards of practice for "as needed" medication, communication with providers regarding orders and order clarification, patient education about medications, factors that influence adherence, and techniques to support patient adherence with medications.[631]

**Findings from self-monitoring**
The QI minutes of 26 facilities discuss the results of the monthly pharmacy inspection and 24 facilities discuss the results of the pharmacists' audit of 20 medication administration records. The findings from the inspections and audit of the MAR are no different from prior reports. Findings from inspections include incorrect counts of controlled substances, expired medications kept in use, vials of medication opened and not dated or expired, improper refrigerator temperatures or the refrigerator temperature was not checked, and licenses or permits that are not posted. Findings from the MAR audits include most often failure to document doses or the date "keep on person" medication was delivered to the patient was not documented. Other findings were failure to document allergies, not signing the MAR, errors in the handwritten transcription of the order onto the MAR, medications administered to the patient don't match the prescription on the MAR, medications were continued after the order was discontinued or expired.

Twenty-one facilities report medication errors as part of the quality improvement meeting. A small number of facilities actually discuss the error during the meeting. Common errors include incorrect MARs printed by the pharmacy subcontractor, the wrong medication or dose was dispensed by the pharmacy subcontractor or there was a delay in filling the order because the medication was "out of stock". Other errors include failure to reconcile prescribed medication upon return to the facility from hospitalization, duplicate prescriptions (from UIC and IDOC), failure to act on prescriptions, giving medication to the wrong patient, or the wrong dose, or at the wrong time. Proper implementation of the electronic record has the potential to eliminate many of these errors.

The errors reported as taking place at the dispensing pharmacy are worth commenting on. Dispensing practices should be near perfect and there should be redundant checks and balances to prevent errors from leaving the dispensing facility. The most frequent error reported is that the printed MAR is incorrect. The reason MARs print incorrectly needs to be examined more closely. The printed MAR should match exactly what the dispensing pharmacy has on file in the patient profile as the current prescriptions. The same with the labels printed on the card stock used to administer medication from. Other errors associated with the subcontract pharmacy include packaging the wrong medication or wrong dose. All medications should be reviewed by a pharmacist to ensure they are correct before leaving the packaging facility. One of the medication errors reported during the time period of this report was irbesartan, a medication used to treat hypertension was dispensed instead of isoniazid used to treat tuberculosis infection.[632] The patient received two doses of the wrong medication in a higher than normal dose. Another patient was prescribed a type of medication that he had a documented allergy to. This contraindication was not caught by the dispensing pharmacist when the prescription was reviewed against the patient profile.[633] The pharmacy

---

[631] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 172-173. Training of nurses, including medication administration is part of item 7 in the Implementation Plan.
[632] Big Muddy quality improvement committee minutes April 2024.
[633] Centralia quality improvement committee meeting minutes May 2024. This patient experienced an adverse reaction.

218

subcontractor should be expected to provide documentation of an investigation and corrective action when errors like these reach the health care unit. OHS and it's leadership need to be sure that the vendor addresses these issues with the subcontracting pharmacy in a manner that will prevent future occurrences.

Since the last report a pharmacist has participated in morbidity and mortality review and contributes substantively to the review of deaths and identifies opportunities to improve. The findings regarding pharmaceutical therapy reported in the morbidity and mortality reviews are consistent with those reported in the facility quality improvement meetings.[634] These include confusion and duplication of orders because both brand and generic drug names are used in orders and on the MAR, incomplete documentation on the MAR, failure to document medications administered or delivered, incomplete or unclear orders, duplicate types of medication, delays starting medication, the failure to document medications dispensed as part of dental care, and use of medication without a corresponding reason. The opportunities for improvement identified in these reviews concerning medication delivery do not provide much guidance with regard to actionable steps that can be taken to improve. An in-depth analysis of these findings by the SIU pharmacy team would yield more actionable recommendations for improvement.

**Findings regarding medication administration and delivery**

In the 7th Report the Monitor commented that the primary objection raised by facilities about administering medication directly from patient specific packages and contemporaneous charting was that the availability of custody staff to provide security limited the amount of time that nurses could spend administering medication to patients. Because of this limitation nurses have defaulted to unsafe practices that fit the amount of time that has been made available.[635] This is a prime example of a barrier in access to an appropriate level of primary care as required by II.B.1. While custody staffing is not a part of the Consent Decree, custody staffing can impair ability of the medical program to function appropriately.[636]

Currently, the Chief Administrative Officer determines the times that medication is administered. The times medications are scheduled at each of the facilities in the Northern Region were requested and are displayed in the table below. There is considerable variation between facilities in the scheduling of medication administration. The first comment is that none of the facilities separate the administration of evening medications from those to be given at the hour of sleep (HS). This means that the evening medication time needs to be late enough so that incarcerated individuals are preparing for sleep. Incarcerated persons are reluctant to take medications which make them feel sleepy or groggy (often these are medications for mental health conditions) if the day room, recreation or other movement is still permitted. The times for evening medication administration at JITC, JTC, Kewanee and Sheridan are late enough to be acceptable for HS medications; the others are not.

---

[634] For the period of 7/1/22 through 3/19/24 the M&M Committee has identified over 100 opportunities for improvement in medication delivery. These were errors that resulted in delay of patient care or potential for an adverse patient safety event. SIU REDCap IDOC Clinical Mortality Review Data Compilation provided in response to the Monitor's documentation request #51.

[635] Item #55 of the Implementation Plan is to develop safer methods to administer and document medication delivered. The reason a process improvement project format was selected was to ensure that all effected parties had input into the development of new processes that all stakeholders agree with and support.

[636] This is the case for medication administration and for bringing patients for onsite and offsite appointments.

| FACILITY | AM Medication | | Noon Medication | Evening Medication | Medication at the Hour of Sleep |
|---|---|---|---|---|---|
| DIXON (ADP 1,012) | 7 am–- 8 am STC 8:15am–- 9:15 am GP | | 12:00 PM | 5:30 pm–- 6:30 pm GP 6 pm–- 7 pm | |
| EAST MOLINE (ADP 469) | 9:00 AM | | 12:30 pm KOP only | 7:00 PM | |
| JITC (ADP 73) | 4:00 AM | 8:00 AM | 1:00 PM | 8:00 PM | |
| JTC (ADP 132) | 8am | | 1:00 PM | 8:00 PM | |
| KEWANEE (ADP 191) | 7:45 AM | | | 7:45 PM | |
| NRC (ADP 966) | 8 am–- 9 am | | | 6 pm–- 7 pm | |
| PONTIAC (ADP 587) | Anytime between 11 pm and 7 am | | | Anytime between 3 PM and 11 PM | |
| SHERIDAN (ADP 945) | 8:00 AM | | | 8:00 PM | |
| STATEVILLE (ADP 429 ) | 6:00 AM | | 1:00 PM | 6:00 PM | |

The second comment has been made before; medication times need to be spaced to maintain consistent therapeutic effectiveness. If medication is given twice a day; it should be taken at intervals of 12 hours between doses. The schedules for administration at JTC, Kewanee, Sheridan, and Stateville accomplish this. The times for administration of BID medications at Dixon, East Moline, NRC, and Pontiac need to be adjusted to ensure the proper spacing between doses. If the 8 am medication time at JITC is used for all twice a day medication this is also acceptable. The reason for the 4 am dosing schedule at JITC is unknown; twice a day medications should not be given at 4 am. Pontiac's response is unacceptable because there is no reasonable way to ensure dosing is at the correct interval to be therapeutic.  Only three facilities schedule a midday time for medication administration, which is necessary for any medication ordered three times a day. The other facilities have to have arrangements in place to provide medication when it is

ordered more than twice a day.[637] The Monitor had the same comment in the last report about inappropriate times for medication administration at Graham.[638]

With regard to insulin, we have already commented in the section on Dietary that schedules for insulin must coincide with the timing of meals and that the timing will vary dependent upon the type of insulin needed to treat the patient. Both Kewanee and Stateville should adjust the timing of meals and insulin to protect against hypoglycemia and the effects of non-compliance. Health care staff and custody operations staff must collaborate better in devising operational schedules that are not contradictory to the purpose of treatment orders.[639]

We observed preparation for medication administration at NRC and found it unchanged from that which was reported in the 2nd Court Appointed Expert Report in 2018.[640] Nurses remove medication to be administered from the patient specific blister pack and put it into envelopes with the patient's name, number and the name of the medication handwritten on the envelope. This practice is unhygienic and completely defeats the purpose of patient specific, unit dose packaging. Documentation of administration does not take place at the time the medication is administered. Failure to document on the MAR is discussed monthly at the quality improvement meetings at NRC. Increased audits of the MARs were initiated to identify specific nurses who were making these errors. The same process for medication administration is in place at many of the other IDOC facilities. Medication delivery errors are the result of systemic deficiencies such as these and need correction before any substantive improvement will be achieved in the safety of medication administration.[641]

**Continuity of care findings**

Medication discontinuity continues to be a problem in the care of patients in IDOC facilities.[642]  As an example, one of the mortality records reviewed was a patient who returned from the hospital on 8/28/23 following treatment for worsening heart failure.[643] While at the hospital he was placed on new medications. These were metoprolol, Entresto, Jardiance, and spironolactone.  At the facility these medications were initiated but the patient only received them for 30 days. Two of these medications were non-formulary which may have contributed to the discontinuity in this patient's care. When the order ran out, no one identified these medications as needing to be reordered. The hospital also recommended a reduced dose of another drug, furosemide. After the patient's return to the facility on 8/28/23 he received this medication at the reduced dose the remainder of August. He went without the medication until 9/5/23

---

[637] Dosing schedules more frequent than twice a day are relatively infrequent but nevertheless, when medically necessary must be provided.

[638] Health Care Monitor 7th Report Lippert v. Jeffreys, December 27, 2023, page 168. At Graham CC medication is administered at 4 am, 1 pm, and 7 pm. Medication times should be based upon the dosing needed to maintain an appropriate concentration of the drug in the body, not convenience. The 4 am and 7 pm times are too far apart and too close for twice a day doses. The 1 pm and 7 pm times are too close for three times a day doses.

[639] https://www.ismp.org/resources/guidelines-timely-medication-administration-response-cms-30-minute-rule#:~:text=Medications%20administered%20more%20frequently%20than%20every%204%20hours%20(e.g.%2C%20q1h,for%20every%203%20hours%20dosing).

[640] NRC, 2nd Court Appointed Expert Report, Lippert v Godinez, 2018 pages 65-66.

[641] It is appropriate to take progressive discipline when nursing actions are intentional and egregious but the vast majority of these errors are a result of a faulty process not individual misconduct.

[642] Step 6 of item 55 in the Implementation Plan is to eliminate medication discontinuity that occurs as a result of the non-formulary request and prescription renewal processes.

[643] Mortality review patient 1.

221

when it started again but at the previous higher dose.  There were several other instances of medication discontinuity among records reviewed for this report.[644]

**Failure to address pain and care at the end of life appropriately**

Another problem identified in records reviewed during this report period is failure to provide appropriate medication for pain and end of life care. Three patients were diagnosed with cancer.[645]  Two of the patients were prescribed pain medication at lower doses than had been recommended by the hospital.[646] Mortality review patients 5 and 8 had unclear orders for morphine and one of these had duplicate orders for both morphine and fentanyl.[647]  In addition a nurse practitioner ordered a patient's existing dose of MS Contin to be crushed and placed sublingually. There is an FDA warning not to crush this drug as it could lead to a fatal overdose. The patient received nine doses of crushed MS Contin over the next five days and during this time fell.[648] For mortality review patient 8 the hospital recommended a total of 210 mg of morphine a day in divided doses, including both immediate release and extended release morphine.   The prescriptions written upon his return to the facility were not consistent with the hospital recommendations, the prescriptions were inaccurately transcribed to the MAR, and the medications were not offered to the patient as ordered.[649]  Mortality review patients 5 and 9 had orders for fentanyl patches but went without because it was not received from the subcontract pharmacy vendor timely.[650] The same two patients were noted as receiving comfort care or were in hospice but had other non-hospice medications continued.[651] IDOC does not have clear policy on end of life care, and this is reflected in the records of these three patients.

**Inappropriate prescriptions and lack of meaningful pharmacy consultation**

Record reviews found instances of medications prescribed inappropriately and without effective communication with a pharmacist.[652] These include a starting dose of an anticoagulant that was too low for a patient just diagnosed with deep vein thrombosis.[653] Failure by the pharmacy to directly communicate with a prescribing provider about the need to monitor the patient for dehydration when using Jardiance.[654] The quality improvement minutes from Dixon also report another instance of a potential drug-drug interaction identified by the dispensing pharmacy but not being effectively communicated to the provider for two weeks.[655] Prescribing a corticosteroid without any corresponding documentation of a reason.[656] Among the adverse events is a report of an inappropriate referral to mental health and delay in follow up of a patient who was prescribed the medication nortriptyline without indicating that it was for a medical reason (nerve pain) not to treat a mental illness.[657] Use of 70/30

---

[644] See mortality review patients 2, 12, 13.
[645] See mortality review patients 5, 8, 9.
[646] Mortality review patients 8 pages 65-66 and mortality review patient 9, page 68.
[647] Mortality review attachment pages 59-60.
[648] Mortality review attachment page 45.
[649] Mortality review attachment pages 60-61.
[650] Mortality review attachment pages 45-46, 68, 70.
[651] Mortality patient 5 continued to receive magnesium, phosphorus, and iron supplements. Mortality patient 9 continued to receive omeprazole, amlodipine, preparation H, and Colace.
[652] The Monitor suggests consultation on psychotropic medications, geriatric patients, and other patients with complex comorbidities.
[653] Mortality review patient 6.
[654] Mortality review patient 1.
[655] February 2024 Quality improvement Committee minutes.
[656] Mortality review patient 9.
[657] IDOC Adverse Event Report date 5/30/24. Provided in response to the Monitor's documentation request #41.

insulin sliding scale in addition to regular insulin when another type of insulin would be more likely effective and safer in managing a patient's diabetes.[658]

Mortality review patient 4 was a 64 year old man with cognitive impairment, and several long standing chronic conditions including coronary artery disease, heart failure, diabetes, and erosive gastritis with GI bleed. From 7/5/22 to 3/8/23 there were 53 prescriptions written for his care, however only five were written by a provider as a result of an encounter. Twenty-one orders were given to nursing staff as verbal or telephone orders. The provider could be identified for only 31 of the 53 prescriptions due to legibility or in a few cases, absence of a signature. In February 2023 there were 14 different active medication orders for the patient. Of these, two had no corresponding diagnosis or indication.[659] Several of the medications alone and in combination posed risk for the patient yet he was not monitored for these. [660] Elderly, frail patients like this need to have their medications carefully reviewed to achieve maximum benefit without unnecessary risk of adverse effects.[661]

Other parts of this report have made the point that providers treat patients episodically rather than completing a thorough work up of a patient's condition to determine and treat the underlying problem. This practice often involves prescribing medication for symptomatic relief which completely miss what could be a treatable condition or preventable injury. Mortality review patient 11 is an example of such. This 20 year old man had undiagnosed angioedema and was seen four times for episodes of edema over a 30 day period.  The physician who saw the patient after the fourth episode, this time for a swollen right arm and hand, took no history. The physician prescribed a diuretic, an antibiotic, and a non-steroidal anti-inflammatory medication. None of these were indicated based upon the patient's presenting condition. This was a missed opportunity to identify the possibility of angioedema and to develop a plan to timely and appropriately respond to future episodes.

### II.B.6.d.  Implementation of changes in medication refusals

Policy and procedure C.05.01 Medication Administration/Delivery, Count Process, and Training provides direction for when patients refuse medication and how it is to be documented. It also identifies which high risk medications require prompt provider notification if one or more doses are missed in a seven day period. If the patient's reason for nonadherence is because of side effects or the patient disagrees with the plan of care, a visit with a provider is necessary.  F.02.01 Chronic Care directs the HCUA to ensure that copies of the current and prior month MARs are copied and provided to the provider conducting a chronic care appointment. It also directs the provider to adjust the plan of care to address barriers or obstacles to adherence cited by the patient to gain their agreement with the plan.[662]

---

[658] Mortality patient 13.

[659] Albuterol and allopurinol.

[660] Lorazepam, donepezil, carvedilol, clopidogrel, and ranolazine.

[661] The IDOC/SIU Office of Correctional Medicine charter lists polypharmacy and medication usage repots as an action but has no timeframe for initiation. A pharmacist does review the charts of patients who have died as part of mortality review and is an opportunity to identify improvements in medication management. The Monitor has advocated proactive clinical pharmacology collaboration in patient care since the 3rd report in 2021, pages 125-126. It has been included in Implementation Plan Item 55, step 8, which had a completion date of February 2024.

[662] The Monitor was not in agreement that C.05.01 was ready for final distribution primarily because there had been no input from pharmacy experts. The Monitor had no disagreement with the language regarding adherence monitoring in F.02.01.  The policy and procedures providing guidance regarding adherence monitoring are consistent with item 54 (step 14) of the Implementation Plan: Ensure the availability of providers to review medication compliance and current medications at chronic care visits.

There is no evidence as of the time this report was written that either of these policies and procedures have been implemented. No processes are yet in place to notify providers of nonadherence as defined by C.05.01 or that providers consistently monitor nonadherence. More recently, a facility medical director stated in a quality improvement meeting that she was unable to look at the patient's current MAR because it was locked in the medication room and she did not have a key to open.[663] There was no solution to this problem documented in the meeting minutes, so it is unclear if this obstacle was resolved. Another reason the MAR may not be available for review is that it has not been filed in the patient's record yet.

The review of records for this report show that medication adherence is not effectively addressed when providers see patients.[664] Three of the records reviewed by the Monitor during the site visit to NRC in June 2024 found no evidence that provider's reviewed patient adherence with medication during scheduled encounters that took place as recently as June 2024.[665] One of these was a 65 year old with a 20 year history of seizure disorder treated with Dilantin.[666] At the time of admission his Dilantin level was subtherapeutic. At the admission history and physical the provider did not review the patient's adherence with medication provided by the sending facility and did not adjust the dose of medication. When seen for the baseline chronic care visit six weeks later a repeat lab value for Dilantin was subtherapeutic for a second time. The provider did not document review of the patient's MAR or inquire about the patient's adherence taking the medication.

Though taking place before the policies and procedures were distributed the following three mortality reviews done for this report provide examples of problems with medication adherence that still need to be addressed. Mortality review patient 6 was seen in chronic clinic for asthma. He was prescribed albuterol and Alvesco in January 2023. He complained about chronic cough for over a year and had a weight loss of more than 10 pounds. His peak flow readings were low. The provider ordered the addition of montelukast. He was seen by the facility medical director in a subsequent chronic clinic visit in July 2023 and pre and post hospitalization in November 2023. At none of these encounters was the patient identified as not having received montelukast although it was an active order (last receipt of this medication was March 2023).

Mortality review patient 13 was 66 years old and had diabetes, hypertension, and hypothyroidism. When seen in chronic clinic in May 2022 his blood pressure was 143/74 which is not at goal for diabetes. The MARs were not reviewed. If they had been reviewed it would have been discovered that the patient last received the hypertensive medications, lisinopril and hydrochlorothiazide, the end of February. He had been without these two medications for more than a month. He was seen next by a provider in June 2022 because of elevated blood pressure. On this visit it was 160/102. In the interim he had been seen and evaluated twice by LPNs using the nursing protocol for indigestion. The provider wrote that the patient had run out of his medication. If the provider had reviewed the patient's MARs it would have been evident that he had not received amlodipine since mid-April and had not received the other two medications since February.

---

[663] NRC Quality Improvement Committee Minutes April 2024.
[664] See item 54 (step 14) of the Implementation Plan: Ensure the availability of providers to review medication compliance and current medications at chronic care visits.
[665] Pharmacy services patients 1-3. These encounters took place as much as three months after the policies and procedures C.05.01 Medication Administration/Delivery, Count Process, and Training and F.02.01 Chronic Care were considered by OHS as in effect.
[666] Pharmacy services patient 2.

Mortality review patient 12 was 49 years old. He had a major mental illness, hypertension, diabetes, and was obese. He was prescribed amlodipine, gabapentin, glipizide, hydrochlorothiazide, metformin, methocarbamol, metoprolol, simvastatin, tamsulosin, and tramadol. In the vendor's death summary, he was described as very compliant with medication, particularly insulin. From a review of the MARs this patient refused 28% of the morning doses (given at 3:30am) and 15% of the evening doses (given at 3:30pm). He was seen by a nurse practitioner in November 2022 for noncompliance with medications. He explained to the provider that he did not take the morning insulin (given at 3:30am) because he was asleep. The provider made no attempt to adjust the time of insulin or the type of insulin to accommodate the patient's difficulty taking insulin so early in the morning. This patient who also had a serious mental health disorder and more rigorous effort to work out a plan of care that the patient agrees with is important and might require consultation with mental health staff.[667]

There also was a lack of documentation that mortality patient 12 was even offered insulin 9% of the time. As late as June 2023 the endocrinologist documented that he was only receiving five of 14 doses each week due to a nursing shortage. Absence of documentation by nursing that patients were offered medication is a persistent system wide problem. Another reason for conducting the process analysis in Implementation Plan item #55 is to discover the root causes for this so that corrective action realistically can correct the problem.

In summary, IDOC has initiated some improvements that should address changes called for by the Consent Decree and Implementation Plan. The compliance rating has been changed to partial. However, no change in practice or patient outcomes is evident yet. The Monitor hopes that some concrete results are produced in time for the next report which show progress toward compliance. For now, the Monitor has the following recommendations which have been modified from the last report to acknowledge items which are now in the Implementation Plan or were incorporated into the new IDOC health care policies and procedures.

**RECOMMENDATIONS:**

1. Move forward with the Implementation Plan items 7 (step 3), 29, 36, 51, 54 (step 14), and 55 pertaining to medication management that are discussed in this section.
2. The process improvement project called out in item 55 of the Implementation Plan should include representatives of prison operations and map out responsibilities for custody assistance and maintenance of the equipment and the physical plant.
3. The pharmacist employed by the Office of Correctional Medicine should be engaged to provide substantive expertise in addressing the tasks in the Implementation Plan relating to pharmaceutical operations and medication management.
4. Establish expectations for the vendor's pharmacy to identify, communicate directly and document this communication of drug-drug interactions, medication combinations to avoid, drug warnings and contraindications with prescribing providers. The pharmacy should also assist providers in evaluating polypharmacy.

---

[667] See also mortality review patient 9 who was seen by a provider 8/7/23 for medication noncompliance when he had physical problems swallowing and was expressing paranoid and delusional thoughts. These are significant symptoms which were not addressed by the provider at this encounter and should have been in an effort to increase his ability to take ordered medications.

5. Identify additional topics related to pharmaceutical management that need to be addressed in policy and procedure. Most state correctional systems have more than two directives on this subject. Examples of topics to consider are provider orders, controlled substance accountability, maintenance of the formulary and nonformulary requests, inventory control etc.

6. Develop a workload driven staffing standard to account for the nursing staff necessary to carry out orders for medication treatment.

7. Analyze medication error reports and identify recurrent types of errors. Conduct root cause analysis to understand systemic causes and develop solutions to eliminate these.

8. Implement computerized physician order entry (CPOE) and automate the MAR early in the implementation of the electronic health record. Develop automated reports of patients with medication orders which expire in the next seven days and provide notification to prescribing providers of non-adherence.

9. Establish the expectation that each medication order include the reason the medication was prescribed.

10. Provide a copy of the current and preceding month of medication records (MARs) to the provider to review at any chronic care or scheduled follow up appointment.

11. Establish an observational tool to be used by nursing supervisors to monitor compliance with medication administration procedures and include this study on the CQI calendar.

# Discharge Planning

***Addresses Items II.B.5; II.B.6.s; II.B.6.t;***

**II.B.5.** *Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.*

**II.B.6.s.** *IDOC agrees to implement changes in the following areas: Summarizing essential health information for patient and anticipated community providers; and*

**II.B.6.t.** *IDOC agrees to implement changes in the following areas: Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested discharge planning records for 10 individuals in chronic care clinics, released from Illinois River, Dixon, Jacksonville, Logan, Decatur, Menard, Pinckneyville, Robinson, and Stateville in the month of February 2024. Discharge documents requested include pre-discharge planning notes, discharge summary, receipt for medication, prescription for refill of medication, any documents accompanying the discharge summary, progress notes by physician or other health care staff related to the discharge. Specific information on individuals with contagious diseases (workup in process, refusal of treatment, active treatment, post-treatment follow-up required in the community, communication to IDPH) should be provided.[668] The Monitor reviewed six additional records of persons discharged during a site visit to Northern Reception Center (NRC) on June 2-3, 2024.

---

[668] Monitor's documentation request dated 2/29/24, item 130. Discharge planning records were provided by Illinois River (10), Jacksonville (1), Decatur (10), Dixon (10), Logan (10), Menard (7), Robinson (1), and Stateville (10).

Finally, the Monitor reviewed OHS Policy and Procedure E.01.01 Health Care Discharge Planning which was issued and made effective in February 2024. Many of the Monitor's suggested revisions to earlier drafts of this policy were incorporated in the final version. Importantly, responsibility for medical providers to assist with the discharge plan is now expected when the patient's plan of care needs review, orders need to be obtained, or coordination with providers in the community is needed.

OHS elected not to require by policy reporting of how many patients were seen for discharge planning or how many received discharge medication.[669] This capability will be needed to demonstrate compliance with the Consent Decree.  The Monitor strongly suggests that the need for this information be identified to the vendor responsible for the electronic health record and this be one of the reports the system is capable of generating. Lastly, the Monitor offered alternative language to acknowledge that sometimes notice of release is insufficient to accomplish discharge planning as described in policy. These comments will be forwarded to OHS with the request that they be considered in the annual review and revision of E.01.01.

Over a year ago the Monitor provided IDOC with examples of what an audit of discharge planning should include to evaluate compliance with the Consent Decree as part of the comprehensive audit described in II.B.9 of the Consent Decree. There has been no further progress reported on the development of any tool to monitor discharge planning.

The Monitor reviewed a total of 59 records of patients who were discharged from seven facilities.[670] Virtually all patients received a discharge summary upon release with medications listed and signed a receipt for the medications they were provided. These are the only two areas of consistent performance. The majority of these discharges occurred at the same time that OHS distributed the final set of policies and procedures to the facilities for implementation. Therefore, the findings represent practices that preceded implementation of E.01.01.

Discharge planning was evident in records received from Decatur and Stateville. At Decatur all but one of the discharge plans were completed two days to two weeks in advance of the release date. All the discharge planning documents from Stateville were completed the day of release and as such, do not serve the purpose of "planning".[671] Neither facility completed release planning in the time frame called for in E.01.01 of 60 days before release. Documentation of discharge planning differed at Decatur and Stateville. The pre-printed DOC 0084 used at Stateville provides more guidance about what is to be covered in discharge planning than the documentation from Decatur.[672] In previous reports the Monitor has suggested

---

[669] These metrics were identified as needed in the Implementation Plan, task 31, subtask 5.

[670] Ten records each from Illinois River, Decatur, Dixon, and Logan, 12 records from Stateville and one record from Jacksonville. Records received from Robinson and Menard were incomplete and could not be used to evaluate discharge planning at these two facilities.  Six discharge records were reviewed while at the site visit to NRC June 2-3, 2024.

[671] D.01.01 The purpose of discharge planning is to assess the patient's needs for continuation of care upon release and to identify and refer patients to a provider when review of their treatment plan is necessary, orders need written, or their care needs to be coordinated with a provider in the community.

[672] This form also closely matches the requirements of the Consent Decree.

that the discharge planning worksheet used at Lawrence was also a good tool and should be considered for adoption statewide.[673]  Five facilities provided no evidence of discharge planning.[674]

Only 25% of patients on medication were provided with a prescription obtained from a provider in advance of release.[675]  Other than this, provider participation in discharge planning was nil. Among the charts reviewed there were nine where a medical or mental health provider's involvement in discharge planning would have been appropriate.[676] One of these was a 73 year old man with multiple chronic conditions, who was taking 23 different medications, had a number of follow up appointments at UIC, and was considered severely mentally ill. There is no documentation among the records sent of any discussion with a medical provider about the patient's continuation of care after release or assessment of his ability to follow the plan of care or manage his medication.[677]

The information on the discharge summaries reviewed was so general that it is not helpful to the patient in following up with a provider in the community. Only 58% of the records reviewed included all the patient's diagnoses. Eleven of the records reviewed were patients without a chronic medical problem.[678] The remainder, or 42 patients had chronic illnesses but the information on the discharge summary was not specific about the illness or the patient's status. Patients were described as having asthma without any information about severity, last exacerbation, triggers, peak flow etc. or as being a diabetic without specifying the type, last available HbA1c, eye exam etc. There were five patients listed on the discharge summary as having hepatitis C.[679] None of the discharge summaries included information about patients' fibrosis scores, lab tests, etc. Two patients were identified as having been treated but no details were provided as to when treatment was completed, or any further follow up. The other four patients have no specific recommendations for treatment, nor information about why treatment was not provided, nor disease status.

As an example of the lack of complete and relevant information on the discharge summaries is a patient who was 66 years old and had COPD, seizure disorder, cirrhosis, pyloric stenosis, vitamin B & D deficiency, iron deficient anemia, and benign prostatic hypertrophy listed on his discharge summary.[680] He had also been treated for hepatitis C. He was being seen by specialists in wound care, cardiology, orthopedics, and hematology/oncology. He was discharged with 36 different medications. There is a progress note by a nurse that the patient's sister would be helping him make follow up appointments in the community. The nurse informed the patient that the case manager for UIC endocrinology might contact him to assist with diabetes management. Among the medications he was discharged with were the diabetic medications liraglutide and Novolin 70/30. Diabetes is not mentioned in the discharge summary. No

[673] Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 130. This worksheet has a place for physician and psychiatry review and entry of information into the Offender Tracking System (OTS) about release needs.  Use of this worksheet could initiate a referral to the responsible medical and mental health clinician to review the patient chart and see the person as necessary to make determinations about medical and mental health referrals to the community.
[674] Illinois River, Jacksonville, Dixon, Logan, and NRC.
[675] Discharge planning patients 11, 13, 15-20, 23, 27, 48.  The discharge script written for patient #20 was for levetiracetam, prazosin, and paroxetine none of which was she on at the time of discharge. This appears to be a prescribing error.
[676] Discharge patients # 2, 6, 11, 16, 23, 24, 32, 48, 56.
[677] Discharge patient # 23.
[678] The Monitor requested information relevant to the discharge of patients who been cared for in chronic clinics while in prison and would therefore need ongoing care in the community. The eleven individuals who were not enrolled in chronic clinic but whose records were received were included in this analysis.
[679] Discharge patients # 15, 17, 18, 20, 27, 49.
[680] Discharge patient # 27.

information is provided about his diabetic condition, except the medications. Since he was not going to be followed by UIC and would be making his own follow up appointments he needed more information to inform the next provider.[681] This was not documented as provided nor was he asked to sign a request to release information. There is no documentation of contact with the sister to inform her about his needs or to assess her capability to help him make arrangements to continue his care in the community. In addition to this example, there were 13 others who were on medications for conditions which should have been listed on the discharge summary and were not.[682] Several of these were patients taking medication for mental health conditions. Others were for either chronic conditions or conditions which would resolve once the prescription was completed (i.e., conjunctivitis). The discharge summaries are inaccurate and incomplete.

Correct documentation of the results of tuberculin testing (date of the test and results in millimeters) was present in only 12 of 48 discharge summaries that included this information (25%).[683] Four patients were positive for TB screening; no further information was provided about three of them (chest x-ray, symptom screening, last CC note, whether prophylaxis was considered).[684] One of these patients was listed on the problem list as testing positive on tuberculosis screening but the discharge summary states that the PPD was negative.[685] Another patient was released in the midst of completing prophylaxis. No referral was made to the local health department to follow the patient until treatment was complete.[686]

Neither a complete vaccination history nor recommendations for future vaccines were documented on any of the discharge summaries. Stateville provided copies of Covid vaccinations and boosters to two of the six patients whose records were sent in response to the Monitor's request. This is a good practice which should be expanded. Several of the patients, based upon their age and condition should have received preventive screening (EKG, colorectal cancer screening, eye exam). Only one patient had this documented in the discharge summary and there were no recommendations for preventative health care in the discharge summaries. When this information is not provided on the discharge summary it results in a poor hand off to the next provider.

The discharge summaries of seven patients in the sample documented referrals for ongoing care in the community or 16%. These were patients with existing specialty appointments. There were 14 additional patients in the sample who should have had some description of arrangements for ongoing care documented in the discharge summary.[687] These include patients with HCV infection, HIV, diabetes, and mental health conditions.

Four patients were included in the sample of records sent for review who appear to have been picked up by law enforcement on a new charge or transferred directly to a jail or prison outside the IDOC. Two of these patients did not have a discharge summary completed but a Health Status Transfer form was filled

---

[681] The discharge summary should have noted his last HbA1C and other pertinent labs, the date of the most recent eye exam, and vaccinations received. He should have been provided with copies of the last chronic clinic notes, any recent specialty reports, labs, and vaccine record.
[682] Discharge planning patients # 2,5, 10-12, 15, 18, 19, 36 -39, 48.
[683] Nurses at Dixon recorded TST in millimeters more consistently than other facilities whose records were reviewed.
[684] Discharge planning patients # 16, 49, 51.
[685] Discharge planning patient # 16.
[686] Discharge planning patient #19.
[687] Discharge patients # 7, 9, 10, 15, 17, 18, 20, 24, 32-34, 37, 39, 49.

out instead and the MAR noted as sent.[688] One patient had both a Health Status Transfer form and a discharge summary completed.[689] The fourth patient had a discharge summary completed which stated that he was going to a specific county jail.[690] These are mentioned because this type of discharge is not addressed E.01.01 and it is unclear what steps are to be taken in communicating the patient's health status and need for ongoing care to the next provider responsible for the patient's health care.

Patients leaving IDOC do receive a discharge summary, but it is not an accurate and complete summary of the patient's condition, care provided, and recommendations for ongoing care therefore II.B.6s remains partially compliant.

There were a total of 30 records which included information about medications the patient was prescribed and also documented the medications provided to the patient upon release.[691] Half of these patients received at least two weeks supply of all of the medications prescribed.[692] Dosing information was not always included on the medication receipt or discharge summary so in some records it was not possible to calculate the number of days covered.[693] The Monitor recommends the dose, frequency, and route of each medication provided be documented on these forms.

Decatur also provided a prescription with refill to every patient in the sample on medication at the time of release, in addition to at least a one month supply of medication. Illinois River, Dixon, and Stateville do not routinely provide a prescription.[694]

The quantity of release medication some patients receive raises questions about the process and clinical oversight. For example, one patient was released with a blister pack of 226 tablets of buspirone, a medication typically prescribed for anxiety.[695] The list of current medications states that two 10 mg. tablets are to be taken twice a day or a total of four tablets a day. The number of tablets she received was enough for 56 days of treatment. More concerning was the release of another patient who is prescribed suboxone 8 mg-2 mg and to take two films a day.[696] She received 95 films upon release or enough for 47 days.[697] Releasing patients to the community with quantities of medication like this puts them at risk of coercion by others, if not harm to themselves. Only the treating provider can decide if it is in the best interest of a patient to release a patient with this quantity of medication. The records reviewed for this

---

[688] Discharge patients # 25, 57.

[689] Discharge patient # 59.

[690] Discharge patient # 50.

[691] Logan provided no information about the medications patients received at release or prescriptions that may have been provided.

[692] The following patients did not receive one or more prescribed medications upon release  # 1, 3, 5, 6, 7, 9, 11-13,  15,16, 27, 50, 56.

[693] For example, the medication receipt in five of eight discharge records provided by Dixon did not include the quantity of medication that was given.

[694] IRCC provided no prescriptions to the 10 patients who were released, Dixon provided prescriptions for two, and Stateville provided one.  Jacksonville provided a prescription to the one patient whose record was sent but because there was only one record it is not possible to evaluate the facility on this measure.

[695] Discharge patient # 15. This patient had no condition listed on the discharge summary which corresponded with use of this medication for treatment.

[696] Discharge patient # 17.

[697] To reduce risk of diversion providers should inquire about safe, locked storage, limit the amount to that  needed until the next appointment, do not supply additional "just in case" doses. Buprenorphine Quick Start Guide, Substance Abuse and Mental Health Services Administration (SAMHSA) https://www.samhsa.gov/sites/default/files/quick-start-guide.pdf

report show that IDOC providers have minimal to no involvement in decisions about the quantity of release medication appropriate for a patient to receive. Another patient whose record was reviewed during the site visit to NRC in June was released on 3/29/24, without any of his medications (albuterol, buspirone, mirtazapine, and naproxen). When brought to the nurse's attention during the site visit she stated that she remembered giving it to the patient but just did not document it.[698]

Accountability and oversight of the process to provide release medication needs improvement. Some patients are released without any medication, others receive part but not all of the medications prescribed, dosing information is not clear or precise on the discharge summary or receipt for medication, not all facilities provide patients with a script, the quantity of medication patients receive varies without explanation or rationale, documentation of medication provided upon release is at times missing.

Compliance with II.B.6t has not yet been demonstrated by IDOC. While a new policy and procedure on discharge planning has been distributed it has not been implemented yet based upon the records reviewed from seven facilities.

There is considerable variation among facilities in the practice and documentation of discharge planning. There is almost no evidence of provider [699] involvement in discharge planning or clinical review of need for medications or referral. Medical summaries are incomplete or inaccurate, information about tuberculosis screening is incomplete, vaccination status or risk/age-based health screenings or recommendations, and the status and control of chronic disease and other information from the most recent chronic disease clinic is not included in the discharge summary. While medication is provided to many persons being released, these practices lack consistency and there is no assessment of individuals' knowledge and ability to manage the medication regime that is prescribed at discharge.

The implementation plan had two tasks to accomplish changes necessary to ensure continuity of care and medication from the community and back to the community called out in II.B.5. The IDOC has elected to accomplish these changes with development of policy and procedure which was part of each of the two items.[700] In addition to implementation of E.01.01, the IDOC needs to establish metrics for reporting discharge planning and develop a tool to audit compliance with the Consent Decree.

The Monitor noted that both Jacksonville and Decatur document providing Narcan to patients when they discharge. This is good practice. As other facilities adopt this practice it should be documented as part of the discharge paperwork.

**RECOMMENDATIONS:**

1. Provide more guidance for nursing staff on how to conduct discharge planning than is present in the policy and procedure. This guidance could be in the development of screen templates to address the subjects that should be covered with the patient and or other caregivers.
2. Nurses also need training in discharge planning with patients and caregivers including how to assess their capability to provide for themselves in accordance with the recommended plan of care. They also need more guidance about which patient conditions or circumstances define patients

---

[698] Discharge patient #56.
[699] Specifically, physician, nurse practitioner, or physician's assistant.
[700] Implementation Plan Item 31, task 4 and Item 32, task 2.

who need to be seen by a provider before release.

3. Providers need to be informed of their role in discharge planning, have the opportunity to discuss their concerns and have questions answered. HCUAs and the facility Medical Director need to determine how this workload will be accomplished and provide direction to providers.

4. Standardize the documentation of discharge planning and the discharge summary. Standardize what material in addition to the discharge summary and medication instructions needs to be included (vaccine history, most recent chronic clinic notes, most recent labs etc.).

5. Request assistance from the Director of Pharmacy Standards and Operations to develop guidelines for determining which medications and amounts are appropriate to be provided at discharge and to recommend best practices for documentation of discharge medication.

6. Clarify and establish policy on transferring responsibility for patient care to a jail or another prison system outside the IDOC when individuals are released from IDOC custody.

# Infection Control

*Addresses items II.A; III.J.1; III.J.2*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.J.1.** *IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree [June 2020].*

**III.J.2.** *Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested eleven documents concerning aspects of the Infection Control Program and IDOC provided, in whole or part, information on nine requests and brief comments on two requests concerning training on policies and procedures. The Monitor team also obtained updated information and filled in data not provided in the document request about the infection control program during an informative conference call with the OHS Infectious Disease Coordinator.[701] During the June 3-5, 2024, site visits to Stateville CC and Northern Reception Center, the monitor team interviewed the infection control nurses at both of these facilities.

**Status of the Development of the Infection Control Program**

As noted in the 7th Court Report an infection control program is an essential component of any correctional medical program and will be necessary for IDOC to establish in order to comply with II.A and II.B.3 of

---

[701] 7/17/24 Interview with Infectious Diseases Coordinator

the Consent Decree.[702] IDOC has communicated to the Monitor their desire and willingness to establish an Infection Control Program.[703]

IDOC has made progress addressing some of the infrastructure and activities of an infection control program. The position of Infectious Diseases Coordinator has been permanently filled. IDOC has established and maintained a consulting relationship with IDPH. IDOC has finalized Infection Control and Immunization policies and developed forms to standardize the immunization and infectious disease histories and the reporting of infectious diseases in the IDOC. The Infectious Diseases Coordinator has begun development of an Infection Control Manual and gives presentations at the quarterly statewide meetings of OHS leadership on infection control related topics.[704] In conjunction with the UIC HCV Telehealth Clinic, in the last three years IDOC has quadrupled the number individuals with active Hepatitis C infection treated annually.

However key aspects of the infection control program have not yet been addressed or fully implemented. As of yet there is no standardized training in infection control for the facility infection control nurses and there are no systemwide meetings of the infection control nurses. A plan to establish an Agency Infection Control Committee has not yet been initiated. The assigned responsibilities of infection control nurses vary from facility to facility with few if any of these nurses performing all the duties as outlined in Medical Policy and Procedure Manual.[705] Many of the facility infection control nurses are assigned to other duties which limits the amount of time they have available to address their infection control responsibilities. The Infectious Diseases Coordinator lacks support staff to assist with the supervision and training of infection control nurses and the monitoring or analysis of infection control and preventive data. IDOC has not yet established a relationship with an infectious disease specialist or specialty group that would be able to provide outpatient consultation for individual patients with infectious diseases.

IDOC received a significant grant from the Department of Justice/Center for Disease Control (CDC) to enhance pandemic staffing, plan for response to future pandemics, and potentially strengthen IDOC's infection control efforts.[706] The Monitor initially understood that might be an opportunity to use some of these grant resources to establish a systemwide, functioning infection control program that would protect the health of the incarcerated population and the IDOC staff. [707] However, based on subsequent discussions with IDOC it is unlikely that this grant funding will be available to hire additional staff and instead will be used to purchase supplies and equipment. The monitor has received no additional information since the 7th Court Report on how this grant funding is being utilized.

---

[702] The National Commission on Correctional Health Care (NCCHC) standard P-B-02 Infectious Disease Prevention and Control is an essential standard. It states, "There is a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease".

[703] Implementation Plan Narrative pages 2 and 4, and item 30.

[704] Infectious Disease Coordinator OHS presentations: 12/22/22: HCV Treatment, COVID update and Booster Vaccination, 3/29/23: Update on COVID policy based on revised CDC Guidelines, 6/28/23: HCV medication, tracking, and pill count. 2/28/24: IGRA TB testing, Diagnosis and Treatment of TB, and IDOC Immunization Program.

[705] Medical Policy and Procedure 2/9/24, Infection Control, G0.01 Infection Control Program, G.02.01 Disease Reporting, and G.03.01 Facility Infection Control.

[706] IDOC was awarded a $7 million grant from the Department of Justice/ Centers for Disease Control to enhance pandemic staffing, plan for response to future pandemics, and strengthen IDOC's infection control efforts. Monitor's 5th Report, Lippert v Jeffreys (June 22, 2022) page 154.

[707] At a minimum, IDOC should use funds to hire an infectious disease physician who would have dual responsibilities for infection control in IDOC yet be on staff with IDPH. This person should guide development of an infection control manual, assist in development of policy, develop surveillance strategies, and lead the infection control program.

233

To date there has been no action to add or assign additional personnel sufficient to provide agency wide direction on infection prevention and control and to reliably carry out these directions at the facility level.

**Position of Infectious Diseases Coordinator**
In May of 2020 IDOC temporarily filled the position of Infectious Diseases Coordinator with a registered nurse (RN) who was the Health Care Unit Administrator at Stateville CC. On June 1, 2023, the acting coordinator was chosen to permanently fill the position. In alignment with the recommendation of the Monitor team and with the Central Management position description preference [708] that the Infectious Diseases Coordinator be certified in Infection Prevention and Control, the coordinator has completed a 26 week online program offered by the Association for Professionals in Infection Control and Epidemiology. As a result he is now eligible to take the examination to be Certified in Infection Control and Prevention (CIC).[709] The Infectious Disease Coordinator has advised the Monitor that he has postponed taking the certification test until October 2024.[710] With his experience in infection control to date and the future certification in Infection Control and Epidemiology, the current Infectious Diseases Coordinator will be prepared and trained sufficiently to develop and lead the IDOC infection control program. IDOC is compliant with Consent Decree II.J.1.

**Relationship with Illinois Department of Public Health (IDPH)**
In early response to the COVID-19 pandemic, Illinois Department of Public Health (IDPH) assigned a public health physician to serve as IDPH's liaison with the OHS/IDOC. It has been recently communicated to the Monitor[711] that a new physician has been assigned as IDPH's liaison with OHS/IDOC. This physician is in charge of infection control issues in Illinois's congregate living sites which **include all IDOC facilities.** IDPH has divided Illinois into seven regions each staffed by an IDPH infection control RN (preventionist) who will provide consultation concerning infection control issues, address gaps in processes and preventive measures, and assist with management of infectious disease outbreaks.[712] The OHS Infectious Diseases Coordinator and other IDOC health care leaders have monthly meetings with the IDPH physician liaison and the regional infection control preventionists.

The Monitor has been advised that IDOC has completed a written agreement with IDPH which formalizes the public health relationship between IDPH and OHS/IDOC. However, this agreement has not yet been shared with the Monitor.[713]

The IDPH relationship is a valuable prevention and public health consultative resource. However, it is the responsibility of IDOC to build and maintain the infrastructure of its internal infection control program.

**Development of a Relationship with Infectious Disease Specialty Service for Outpatient**

---

[708] The Central Management Services, Position Description, Infectious Diseases Coordinator, No. 37015-29-02-800-41-01 listed as a "preferred" qualification that the coordinator have "certification in Infection Prevention and Control or eligibility for certification at the time of hire."
[709] The Certification examination is offered by the Certification Board of the Infection Control and Epidemiology.
[710] The Infectious Diseases Coordinator provided this information during the 7/17/24 interview with the monitor team.
[711] Infectious Diseases Coordinator-Monitor Interview 7/17/24
[712] IDPH recently contacted an IDOC facility about an individual-in-custody who had a fungal infection that was resistant to most anti-fungal medication. IDPH provided valuable guidance on screening all close contacts of this infected patient. All contacts tested negative.
[713] OHS-Monitor monthly call 9/21/23.

**Consultation on Individual Patients**

As previously noted in this section, it continues to be the Monitor's recommendation that IDOC also establish a consultative relationship with an academic center for infectious disease specialty consultation to advise facility physicians as needed on the treatment of individual patients with complicated infectious diseases.

The Monitor has been advised that OHS may consider formalizing a relationship with SIU's Division of Infectious Diseases to provide outpatient consultations to IDOC facility physicians on the treatment of individual patients with infections.[714]

**Infection Control Policy and Procedure**

In February 2024, IDOC finalized and disseminated the IDOC Medical Policy and Procedure Manual which contained seventeen policies that guide the operations of the Infection Control Program and an additional fifteen policies that address infection control and sanitation issues in the dental operatories.[715] It has not been communicated to the Monitor whether training of all pertinent staff on these infection control related policies has been completed in all IDOC facilities.

The Monitor team provided input on the vast majority of the policy drafts. IDOC communicated that any additional input from the monitor on infection control and other policies will be reviewed and taken into consideration during the annual review of all policies.

**Infection Control Program Support Staff**

The Infectious Diseases Coordinator is currently the only OHS employee in the Infection Control Program. This individual is fully focused on addressing infection control issues and identifying the needed infrastructure for an Infection Control Program.. However much more needs to be done to establish a functioning and effective program that would adequately serve IDOC's 27,000 incarcerated individuals and staff at its thirty facilities.[716] Additional personnel being considered include three regional infection control coordinators, data analysts, infection control training expert(s), and an infectious disease consulting physician (see above).

As noted in the 7th Court Report, IDOC should consider adding regional infection control coordinators to provide systemwide wide direction at the facility level and interact with the IDPH's regional infection control nurses. IDOC Regional Infection Control Coordinators would be certified in Infection Control and report to the OHS Infectious Diseases Coordinator. Initially one of the regional infection control coordinators or a budgeted or contracted infection control trainer will be needed to orient and train the existing nurses in the performance of infection control activities. Given the turnover of nursing staff, it is likely that there will be an ongoing need for a dedicated infection control trainer.

A successful infection control program will need data analysts to collect, manage and analyze surveillance and incidence health data for a functioning infection control program. Data analysts will be

---

[714] 7/17/24 Interview with OHS Infectious Diseases Coordinator.

[715] Implementation Plan, item 30.2 "Develop written guidelines on all operational aspects of the infection control in facilities….

[716] Implementation Plan item 30.1 states that IDOC will provide "sufficient personnel who are appropriately trained in communicable diseases and infection control to provide agency wide direction and to carry out these directions at the facility level."

invaluable in mining infectious disease and infection control data from the forthcoming electronic medical record for surveillance but also for quality improvement activities.

**Facility Infection Control Nurses**

The bread and butter of the Infection Control Program are the infection control nurses at each of the IDOC facilities. Currently there are no infection-control-trained nurses assigned to infection control positions in any of the thirty correctional facilities.

Based on data provided in response to the Monitor's request   13 (72%) of the 18 facilities [717] staffed by vendor nurses had positions with infection control responsibilities that were either vacant (3 positions), temporarily covered by a Director of Nursing (DON 1 position) or HCUAs (2 positions) or staffed only "as needed" or less than 25% of their assigned time (7 positions).[718]  This undermines the capability of the IDOC to implement a comprehensive systemwide Infection Control program.

Both registered nurses (RN) and licensed practical nurses (LPN) are currently assigned to infection control duties; however, a number of the responsibilities of the infection control nurses require independent judgement, assessment, and decision making. These positions should be filled by RNs.

IDOC has committed to having dedicated infection control nurses at each facility.[719] As noted in the 7th Report, staffing analyses and staffing documents submitted to date have not documented infection control nursing positions at the institutions.[720] This is in spite of recommendations from the Monitor to do so since the 2nd report.[721] As noted in the table below,[722] only  five (28%) of the 18 facilities staffed by vendor nurses have an infection control nurse who estimates that at least estimated 80% of their workday is dedicated to infection control activities.[723]

| Time Dedicated to Infection Control Nursing | | |
|---|---|---|
| **Vendor-Only Nurses** | | |
| **Facility** | **License/Title** | **Percent Time Assigned to Infection Control Duties** |
| **BMRCC** | RN | 20% |
| **Centralia** | RN | 10% |

---

[717] 8th Report Document request #66 Wexford Nursing Assignments (see table in the Facility Infection Control Nurses section of this report).

[718] Only two of the uncovered or less than 25% FTE infection control nurses were at small facilities, Kewanee and Murphysboro.

[719] Implementation Plan Item 8, Proposed End Date January 2024.

[720] Staffing Analysis and staffing documents, Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/19, 6/18/20, 12/15/20, 5/3/21, 7/7/202, 8/17/21, 3/12/22, 9/22/22, 3/23/24 (date received), 5/15/24 (date received).

[721] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 131.

[722] 8th Report Document Request #66 Nursing Assignments (only vendor nurses provided).

[723] At the time of finalizing this Report, IDOC was not able to provide information on the Infection Control nurse staffing and FTE dedicated to infection control activities at State staffed nursing facilities.

| | | |
|---|---|---|
| **Danville** | HCUA (State position) | When available |
| **Hill** | LPN | 5% |
| **IRCC** | RN | 100% |
| **JTC** | 2 RNs (shared) | When available |
| **Kewanee** | HCUA (State position) | When available |
| **Lawrence** | LPN | 90% |
| **Lincoln** | None Assigned | 0% |
| **Logan** | None Assigned | 0% |
| **Murphysboro** | RN | 25% |
| **Pinckneyville** | Vacant | 0% |
| **Robinson** | RN | 80-90% |
| **Shawnee** | LPN | 10% |
| **Southwestern** | RN | 10% |
| **Stateville** | RN | 100% |
| **Taylorville** | Director of Nursing | 5% |
| **Western** | LPN | 100% |

| Infection Control Nurses By Position: Totals 18 Facilities | | |
|---|---|---|
| By Title | | |
| RN | 8 (44%) | |
| LPN | 4 (22%) | |
| DON | 1 (6%) | |
| HCUA | 2 (11%) | |
| Vacant/ Unassigned | 3 (17%) | |

| Time Allocated for Infection Control Duties at 18 Facilities | | |
|---|---|---|
| Zero | 3 (17%) | |
| When available | 3 (17%) | |
| < 25% FTE | 7 (39%) | |
| 80-90% FTE | 3 (17%) | |
| 100% | 2 (11%) | |

Data on infection control nurses at eleven facilities staffed by State nurses noted that ten of the eleven facilities had infection control nurses, but the percentage of time dedicated to these duties was not

provided.[724] All of the infection control nurses at the ten State staffed facilities are Registered Nurses. Almost all nurses assigned to infection control responsibilities are also assigned to other non-infection control duties. IDOC currently assigns general duty nurses to perform infection control duties.

There are currently no specific qualifications required of RNs or LPNs assigned to infection control tasks. These nurses receive only on-the-job training in infection control for which there is no curriculum or clinical oversight. The Agency Infectious Diseases Coordinator reported that a power point presentation would be used for initial and ongoing infection control training and is being prepared in conjunction with the IDPH. The presentation, to date, has seventy slides. Once completed, this infection control training tool will be available on the Internet but will not replace the need for ongoing in-person training by an infection control certified trainer. Without properly trained facility infection control nurses, IDOC will only have a piecemeal and inadequate infection control program.

The Facility Infection Control Policy[725] lists twenty separate duties of the dedicated Infection Control nurse at an IDOC facility.  For example, some of these duties include:

- Perform intake screenings for communicable diseases.
- Complete annual TB screening.
- Complete the required workup and submit referrals to UIC Telehealth  for individuals with HIV, active Hepatitis B and C, and TB.
- Liaison with UIC specialists during HCV, HBV, and HIV Telehealth sessions.
- Monitor and track MRSA infections.
- Participate in Safety and Sanitation rounds to monitor and address infection control matters including availability of personal protective equipment (PPE), appropriate handling and laundering of contaminated linens, monitoring negative pressure rooms and spore testing, and identifying unsanitary infirmary beds, exam tables, and dental chairs.
- Train and oversee staffing the vaccine program, track data on vaccinations provided.
- Ensure that individuals in custody workers/porters are appropriately vaccinated and trained concerning infectious exposures.
- Implement the IDOC Exposure Control Plan and transmission-control precautions for persons requiring isolation.
- Interact with Regional IDPH preventionist as needed.
- Prepare the monthly facility infection control report and Illinois Reportable Diseases report.

Even though this is not the entire list, it is clear that the duties of the facility Infection Control nurse are extensive and will require fulltime assignment at all IDOC facilities with the exception of the small facilities that do not have infirmaries.

The infection control nurses at NRC and Stateville CC were interviewed during recent site visits.[726] The infection control nurse at NRC is assigned fulltime to infection control tasks and was performing a number of the expected duties including monitoring availability of PPE, coordinating the workup of newly admitted men with active HCV and sitting in all HIV and HCV Telehealth visits, assisting with the determination if a patient requires contact or respiratory isolation, ensuring that contaminated infirmary laundry are washed at higher temperature, and preparing the monthly Illinois reportable disease report. She is aware that there is a regional IDPH preventionist but, to date, has not had the need to contact the

---

[724] 8/15/24 email communication from IDOC. Decatur CC did not have an assigned infection Control Nurse. (Information on infection control staffing at JITC was not reported.  JITC has a very small population and likely does not currently have an infection control nurse.)

[725] IDOC Medical Policy and Procedure Manual 2/8/24, G.03.01 Facility Infection Control. Procedure I.A-CC, p 184-85.

[726] June 3-5, 2024

preventionist. Her contact with the Agency Infectious Diseases Coordinator is primarily via e-mail. The NRC nurse does not monitor the testing of the negative pressure rooms in the infirmary and is not involved with the vaccination program. The Stateville CC acting infection control nurse has only been in this role for the 2 ½ months and was listed as being 100% assigned to infection control.[727] Her only duties are to assist with the HIV and HCV Telehealth sessions. She was not aware of the other duties noted in the Facility Infection Control Policy and Procedure and did not know that there was an Agency Infectious Diseases Coordinator nor a Regional IDPH preventionist. Both of these two infection control nurses have not received any formal training in infection control.

As of the writing of this report, there have been no regularly scheduled systemwide meetings during which the Infectious Diseases Coordinator would update facility infection control nurses on infection control issues or for discussion among facilities about infection control activities.[728]

The reporting relationship between the Infectious Diseases Coordinator and the facility infection control nurses also needs to be clearly defined. The OHS table of organization does not but should document, at a minimum, a dotted line reporting relationship between the Infectious Diseases Coordinator and facility infection control nurses. A clear infection control chain of command is important to the development of standardized Infection Control program in the IDOC.[729]

**Safety and Sanitation Rounds**

As detailed in the IDOC Medical Policy and Procedure Manual, the facility Infection Control nurse is to participate in the monthly Safety and Sanitation rounds and monitor and track eight infectious control related matters.[730] However the monitor has previously recommended that the rounds also include inspection of potential risks for exposure of inmates and staff to infectious diseases. These risks include mold in showers, vermin/roaches/flea infestations, non-functioning washers and dryers in the housing units, birds in cafeterias and housing areas, and the testing of water for legionella bacteria. The Infection Control Program needs to work with the IDOC leadership to expand the monthly Safety and Sanitation inspection tool/check list to include these and other preventable infectious disease risks.[731] This recommendation has not yet been acted upon.

**Immunization Program (also see RHM/Adult Immunizations Section)**

The immunization program is now a responsibility of the Infection Control Program.[732] The Monitor has repeatedly recommended that it be placed under the umbrella of nursing and be managed by the facility infection control nurse. Nurses trained in immunizations and guided by treatment guidelines, standing orders, or protocols offer IDOC the optimal opportunity to administer indicated immunizations to the incarcerated population. Nurse led immunization programs have shown to be effective with IDOC's annual influenza vaccination events, with the ongoing provision of COVID-19 immunizations and pilot programs to administer Human Papilloma Virus (HPV) vaccine to eligible females at the Decatur and Logan Correctional Centers. The Monitor supports the OHS decision to place responsibility for the

---

[727] 8th Report Document Request #66 Nursing Assignments (only vendor nurses provided).

[728] Implementation Plan 30.6 recommends that IDOC "establish statewide infection control meetings of the infection control personnel."

[729] 8th Report Document Request No #139 OHS Infection Control Table of Organization does not indicate a direct or dotted line reporting relationship of the "Agency Infection Control Coordinator" to the facility Infection Control nurses.

[730] IDOC Policy and Procedure, Infection Control, G.03.01 Facility Infection Control. Procedure: I.Q.A-H.

[731] The IDOC Environmental Engineer inspects facilities for a number of these infectious disease and safety risks, however at best, the environmental engineer inspections are only performed annually or semi-annually.

[732] IDOC Policy and Procedure, Infection Control Program G.01.01 and Facility Infection Control G.03.01.

provision of routine immunizations under the management of each facility's infection control nurse in collaboration with the facility's HCUA and Director of Nursing (DON).

IDOC has reported that custody workers/porters with potential risk of exposure to fecal pathogens and blood borne infections will now be vaccinated against both Hepatitis A and Hepatitis B or have proof of immunity to these viruses.[733] This is an appropriate decision that protects the health of the incarcerated population and the staff.

**Monthly Infection Control Report**
As reported in the 7th Report, IDOC has developed a Monthly Infection Control Report[734]that was implemented in March 2023 at all facilities. The form is to be completed by each facility and sent to the Infectious Diseases Coordinator. The report contains data on new infectious cases,[735] the evaluation and treatment of select infections, and utilization data for the Hepatitis C clinic. The data gathered was described as "raw data" that would not meet the definition of surveillance data. Initially the reports were inconsistently completed but the Monitor has been informed that 90% of them are now being completed and forwarded to the Agency Infectious Diseases Coordinator.[736] The Monitor only received facility CQI meetings for January-March 2024 at the time this report was written and is unable to verify the completion and standardized reporting of infection control activities at more recent facility and Agency CQI meetings

**Agency Infection Control Committee**
IDOC has plans to create an Agency Infection Control Committee to oversee the system's Infection Control Program but as of the writing of this report it has not been formed. [737] The policy outlines the multi-disciplinary membership of this committee that will meet no less than quarterly to provide direction to the Infection Control Program, establish annual goals and objectives endorsed by the System Quality Council, review and analyze monthly facility reports on infection control data, plan for response to public health emergencies and disasters, and other activities.

**Tuberculosis Screening Program**
In October 2021, IDOC appropriately replaced tuberculosis skin test (TST) with the Interferon Gamma Release Assay (IGRA) blood test to screen for tuberculosis in the four Reception and Classification Centers.[738] The conversion to IGRA increased diagnostic accuracy, eliminated human error in the reading the TST, minimized the risk of accidental needle sticks, and freed up valuable nursing time for other clinical duties. Apart from the intake centers, IDOC has not instituted IGRA screening in any of its facilities where age-based recurrent physical exams include TST screening. The monitor has been

[733] IDOC Medical Policy and Procedure 2/9/2024, G.01.01 Infection Control, Procedure IV. "Facility infection control coordinators maintain documentation of Hepatitis B vaccination status and Hepatitis A vaccination for those at risk for exposure to fecal pathogens and blood exposure…"
[734] Implementation Plan item 30.3 "Establish surveillance report format to be used to analyze and report on infection control in CQI meetings at the facility and agency level" .
[735] New cases to be reported on the Monthly Infection Control Report include tuberculosis (active and latent), HIV/AIDS disease, hepatitis A, B, and C, STDs, MRSA, hygiene related conditions (fleas, lice, fungal infections, scabies, etc.), bloodborne exposures of staff and incarcerated persons, influenza, and COVID-19.
[736] 7/17/24 Interview with Infectious Diseases Coordinator.
[737] IDOC Medical Policy and Procedure, Infection Control Committee, G.04.01 was finalized and disseminated on February 9, 2024.
[738] Graham CC, Logan CC, Menard CC and NRC.

240

repeatedly advised that TST be replaced with IGRA testing for all individuals-in-custody (IIC) at all IDOC facilities. IDOC nursing staff also use TSTs to perform annual TB screening of IDOC correctional employees and has raised concerns about the logistics and costs of replacing TST with IGRA for employees. IDOC also voiced concerns about union opposition to IGRA testing which requires blood drawing phlebotomy.

If the barriers to converting TB screening for employees are insurmountable, the Monitor has recommended that OHS/IDOC continue to use TST for employees and institute IGRA for the entire incarcerated population. The Monitor was informed in September 2023 that IDOC has been in communication with UIC medical center about increasing the use of IGRA TB testing at all the other IDOC facilities.[739] To date no further updates have been provided to the Monitor about expanding IGRA TB screening to include all individuals housed in the IDOC.

### Monitoring of Negative Pressure Respiratory Isolation Units

IDOC has negative pressure units in all 26 facilities with infirmaries. The Infection Control Program now has responsibility for ensuring that the functionality of negative pressure isolation units is monitored and tracked.[740] IDOC facilities have poorly and inconsistently reported on the testing of negative pressure rooms. During ten separate audits of CQI reports from June 2020 to March 2024, the reporting of air pressure test results ranged from 13 (50%) to 19 (73%) of the 26 infirmaries. In the most recent review of CQI minutes dated March 2024 only 15 (58%) of the facilities reported on the operationality of their negative pressure units. During the eleven site visits, the monitor team's inspection of the isolation rooms at nine facilities identified non-functional negative pressure units at five (56%) facilities.[741] The most recent identification of non-functional negative pressure units was on June 3-4, 2024.[742] The nursing staff and facility leadership at all five facilities were not aware of this significant infection control problem. The repeated flaw at these five sites was that the staff solely relied on the readings on air pressure gauge and did not verify the gauge's reading using the tissue paper methodology. IDOC Medical Policy and Procedure 2/9/2024 now mandates that isolation rooms occupied by patients under respiratory isolation precautions must be tested using the tissue method daily and weekly if the negative pressure is unoccupied or houses a patient that does not require respiratory isolation. The policy also mandates the use an infirmary log which records the results of tissue testing and is reported at the monthly CQI meeting.[743]

The Monitor strongly supports the involvement of the Infection Control Program and facility infection control nurses in the monitoring and proper testing of negative pressure units to ensure that patients requiring respiratory isolation do not expose other patients and staff.

### Recommendations:
1. Continue the development of a comprehensive, statewide Infection Control Program.

---

[739] Interview with Communicable and Infectious Diseases Coordinator 9/13/23.
[740] IDOC Medical Policy Procedure Manual 2/9/24, G.01.0, Policy VIII. Infection Control Committee is to establish standardized methodology to regularly monitor negative air pressure in respiratory isolation rooms and reporting these results monthly, Procedure I.P.5 Infection Control Coordinators (facility nurses) participate in monthly Safety and Sanitation rounds "monitoring negative pressure rooms" and Y. "monitor negative pressure rooms" and G.03.01 Facility Infection Control: Procedure Q.E and Q.Z, during Safety and Sanitation round facility infection control nurses are to monitor negative pressure rooms.
[741] Dixon, Logan, Graham, Robinson and most recently at NRC during the 6/3-4/2024 site inspection.
[742] NRC site visit 6/3-4/2024.
[743] IDOC Medical Policy and Procedure 2/9/24, G.10.01 Transmission Based Precautions, Procedure V. 2-4.

2. Ensure that the Agency Infectious Diseases Coordinator obtains and maintains certification in the infection prevention and control through the Certification Board of Infection Control and Epidemiology.

3. Continue to maintain the IDOC relationship with the Illinois Department of Public Health for consultation and advice on preventive and public health issues.

4. Hire or contract with an infectious disease physician consultant or academic program to provide access to outpatient consultation on patients with complicated infections.

5. Take steps to ensure that facility infection control nurses are allotted sufficient time to be able to manage the infection control duties outlined in Policy G.03.01. In all but the smallest correction centers the infection control nurse is a fulltime job.

6. Develop an effective and ongoing infection control training process for all infection control nurses and document annual updated training sessions.

7. Initiate quarterly statewide infection control meetings of infection control personnel.

8. Complete the collaborative development of an Infection Control Manual (with assistance of SIU) and the Infection Control power point presentation (with assistance of IDPH) that will serve as a reference guide and training tool for infection control staff and other clinicians.

9. Establish the Agency Infection Control Committee to provide oversight and guidance to the Infection Control Program.

10. Standardize the monitoring of negative pressure units to include results of tissue test results and reporting of these results to the monthly facility CQI committee meetings.

11. Replace tuberculosis skin testing (TST) with IGRA blood testing for all individuals-in-custody (IIC) in the IDOC.

12. Require that all custody workers/porters at risk for fecal borne and bloodborne infections be vaccinated for Hepatitis A and Hepatitis B or have documented proof of immunity.

13. Track and report on the Infection Control Program's compliance with infection control-related elements of the Consent Decree and items in the Implementation Plan.

**Hepatitis C Treatment Program**

As noted in the 7th Court Report, since June 2021 the annual volume of IDOC patients treated for active Hepatitis C virus (HCV) has nearly quadrupled (see the table below). The improved access to Hepatitis C therapy in the IDOC is due to the expansion of treatment eligibility to include all levels of liver fibrosis, the revision and streamlining of the Screening and Treatment of Hepatitis C Guidelines in March 2021, the close collaboration with the UIC Hepatitis C Telehealth clinic, and the initiation of the Infection Control program. This accomplishment puts IDOC in alignment with the National Hepatitis C Elimination Program.[744] IDOC continues to be on a path to nearly eliminate active hepatitis C infection for infected individuals currently housed in the IDOC. The Office of Health Services (OHS) reported that there were only 510 men and women pending treatment in March 2024;[745] this is notable decrease from data in 2019 to 2021 that, on any given month, estimated 1000 to 1600 individuals were awaiting HCV treatment. It is not unreasonable that soon the system will be primarily focused on the identification and expedited treatment of active Hepatitis C infections in men and women who are new admissions to the IDOC. The curative treatment of active hepatitis C has a positive impact on the present and future health of the incarcerated population and

---

[744] Fleurence RL, Collins F, A National Hepatitis Elimination Program in the United States, A Historic Opportunity: JAMA. April 18, 2023; 329 (15): 1251-52.
[745] IDOC Hepatitis C Clinic Report Per Facility (Q1 2024) noted that 510 individuals were "pending treatment" and 49 "refused treatment" in the IDOC.

will decrease the risk of transmission of hepatitis C in the IDOC and ultimately in the communities of Illinois.

| IDOC Hepatitis C Treatment | |
|---|---|
| February 2018 through 4/19/24 | |
| Year | # Treated |
| 2018 | 79 |
| 2019 | 82 |
| 2020 | 98 |
| 2021 | 246 |
| 2022 | 348 |
| 2023 | 334 |
| 2024 | 114 |
| Total | 1301 |

With the initiation of the Monthly Infection Control Report IDOC has taken steps to develop a systemwide, standardized internal surveillance system to track infectious diseases including HCV infection and treatment. The utilization of this new report has now been mostly implemented in all facilities. It is anticipated that this revised report will standardize data and make it possible to know the true number and percentage of untreated HCV patients as well as the number of HCV patients who have been treated at each facility and in the IDOC system.

IDOC still needs to develop and implement a protocol or guideline to direct and track ongoing liver ultrasound screening for hepatocellular cancer of treated or untreated HCV patients with advanced liver fibrosis and cirrhosis. This screening is currently recommended to be performed every 6 months for patients with higher levels of liver fibrosis.

The recently implemented Monthly Infection Control Report lists six data points that facilities are to track and report on the Hepatitis C Virus (HCV) clinic:

1. Total number of HCV patients in the HCV clinic,
2. Number currently receiving treatment,
3. Number completed treatment,
4. Number pending treatment,
5. Number refusing treatment, and
6. Number of patients with contraindication for treatment (liver cirrhosis/adenocarcinoma/liver transplant).

IDOC currently lists the number of patients in the "pending" category as "untreated." The Monitor recommends that the Infectious Disease Coordinator consider modifying the HCV section of the Monthly Infection Control Report by replacing the "pending" category with two categories "facility workup in progress" and "submitted to UIC".  This would differentiate backlogs at the facility level and/or delays at UIC HCV Telehealth Clinic.  IDOC also should begin to track the number of monthly admissions to

243

their four intake centers with reactive hepatitis C antibodies and hepatitis C viral loads. This will better prepare IDOC for the logistics of expeditiously initiating the required workup for newly incarcerated individuals with active hepatitis C.

Optimally the new electronic health record will automatically report on the data needed by the Infection Control Program to identify, monitor, track and treat HCV in the IDOC.

As also noted in the 7th Court Report, the contraindications to HCV treatment listed in sub-item f. of the Monthly Infection Control Report are not in alignment with current standards of care which indicate that successful treatment of HCV has improved morbidity and mortality of patients with compensated and decompensated liver failure, liver cancer (HCC), liver cancer awaiting liver transplantation, and post-liver transplantation.[746] Besides the logistical contraindication of an out-date of less than six months required to complete the requisite lab and diagnostic workup, referral to UIC HCV Telehealth for their evaluation and decision to treat, and the completion of the 12 week course of treatment, there are few absolute contraindication to HCV treatment. IDOC should rewrite item 6 in the list above in consultation with the UIC HCV specialists.

As noted in the 7th Court Report the Monitor continues to recommend performance measures and an outcomes dashboard to measure hepatitis C treatment. This dashboard or its equivalent should include the number of HCV patients treated over a specified time period in the numerator and the total number of untreated HCV patients over the same time period in the denominator. The number of untreated HCV patients should be separately tracked on a dashboard and would permit staff to see whether the number decreases consistently over time. IDOC has yet to develop performance measures and outcome studies that are fully satisfactory to the Monitor.[747]

The IDOC Infection Control program regularly reviews the UIC telehealth HCV treatment spread sheet which lists the date treatment started, name, IDOC number, DOB, facility, fibrosis level, and medications for each patient approved by UIC and started on HCV treatment. The Infectious Diseases Coordinator continues to intermittently provide the Monitor with updates on the volume of patients initiating HCV treatment and the percentage of each level of fibrosis for these newly treated patients.

However, there are notable variations in the number of patients treated in different facilities. There are a number of large facilities that appear to have treated a disproportionately low number of active HCV individuals.[748] This may be due to inadequate staffing, lack of staff education, or the absence of a facility infection control program. It is again the Monitor's firm opinion that the lack of dedicated infection control nurses at each facility significantly contributes to the failure of many sites to refer efficiently complete the prerequisite workup and to expeditiously submit HCV patients to the UIC Hepatitis C Telehealth Clinic for prioritization and treatment. This concern needs to be monitored and addressed by the Infection Control Program.

---

[746] Colombo M, Sirin CB, Chopra S, Robson KM. Patient Evaluation and Selection for Antiviral Therapy for Chronic hepatitis C Infection, Special Situations. UpToDate, 10/31/22 with literature review current through October 2023.

[747] Monitor's Letter on IDOC Quality Audit and Outcomes and Performance Measures sent by email 11/19/2022. See also the discussion of Outcome and Performance Measurement Results in this report.

[748] IDOC Infection Control Program Quarter 1 2024 Hepatitis C report, BMR: 29 pending treatment/census 1337, Centralia: 27 pending treatment/census 1188, Taylorville: 58 pending treatment/census 1090. There is also concern that the Pinckneyville and Graham statistics need to be reviewed.

| Hepatitis C Treated Patients by Facility Ranked by Number Treated | | | | | | | |
|---|---|---|---|---|---|---|---|

| Hepatitis C Treated Patients by Facility Ranked by Number Treated | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2021 to 2024 (through 4/19/24) | | | | | | | |
| Ranking | Facility | Tx'd in 2021 | Tx'd in 2022 | Tx'd in2023 | Tx'd in2024* | Total Treated | Population |
| 1 | Shawnee | 42 | 41 | 26 | 6 | 115 | 1447 |
| 2 | Sheridan | 37 | 37 | 28 | 6 | 108 | 1295 |
| 3 | Logan | 7 | 28 | 30 | 16 | 81 | 1156 |
| 4 | Lincoln | 11 | 28 | 28 | 2 | 69 | 778 |
| 4 | Decatur | 25 | 22 | 13 | 9 | 69 | 349 |
| 5 | Jacksonville | 7 | 29 | 24 | 7 | 67 | 612 |
| 6 | Menard | 18 | 12 | 15 | 8 | 53 | 1182 |
| 7 | Danville | 2 | 25 | 15 | 4 | 46 | 1617 |
| 7 | Graham | 8 | 5 | 16 | 17 | 46 | 1632 |
| 8 | Dixon | 28 | 4 | 7 | 1 | 40 | 1028 |
| 8 | Vandalia | 9 | 15 | 12 | 4 | 40 | 528 |
| 9 | Robinson | 8 | 18 | 8 | 2 | 36 | 1146 |
| 10 | IRCC | 1 | 12 | 22 | 0 | 35 | 2008 |
| 11 | Vienna | 0 | 6 | 24 | 3 | 33 | 707 |
| 12 | Lawrence | 6 | 11 | 9 | 4 | 30 | 871 |
| 13 | BMRCC | 0 | 6 | 14 | 7 | 27 | 1337 |
| 14 | East Moline | 11 | 8 | 7 | 0 | 26 | 477 |
| 15 | Western | 2 | 4 | 11 | 8 | 25 | 1642 |
| 16 | Centralia | 12 | 2 | 1 | 0 | 15 | 1188 |
| 17 | Hill | 4 | 4 | 4 | 2 | 14 | 1177 |
| 17 | Taylorville | 1 | 0 | 7 | 6 | 14 | 1090 |
| 18 | Stateville | 1 | 11 | 1 | 0 | 13 | 437 |
| 19 | Southwestern | 1 | 5 | 6 | 0 | 12 | 532 |
| 20 | Kewanee | 2 | 7 | 1 | 0 | 10 | 153 |
| 21 | Pontiac | 2 | 3 | 2 | 0 | 7 | 630 |
| 22 | JTC | 0 | 1 | 2 | 1 | 4 | 192 |
| 23 | NRC | 1 | 1 | 0 | 1 | 3 | 970 |
| 24 | Pinckneyville | 0 | 2 | 1 | 0 | 3 | 1862 |
| | JITC/Elgin | 0 | 0 | 0 | 0 | 0 | unavailable |
| | Murphysboro | 0 | 0 | 0 | 0 | 0 | unavailable |
| | | 246 | 347 | 334 | 114 | 1041 | 28043 |

*Treatment was until 4/19/24

**Recommendations:**
1. Continue to track and report the number of patients in the HCV Clinic, the number who completed treatment, the number currently in treatment, the number refused, and the number not eligible for treatment (short length of stay) but refine the data that identifies the number of untreated patients

245

in the facilities' HCV Clinics by separating the "pending treatment" into two categories: "facility workup in progress" and "submitted to UIC HCV Clinic".

2. IDOC needs to track and report liver ultrasound screening for hepatocellular cancer (HCC) in individuals with treated or untreated HCV advanced liver fibrosis. The current national recommendation is to perform liver US every six months on all patients (HCV and other liver conditions) with advanced liver fibrosis.

3. IDOC should begin to track the number of new admissions to the four Reception and Classification Centers that are identified having active HCV infections.

4. The data requests in these three recommendations should be gathered and reported electronically in the new electronic medical record (EMR).

# Dental Care

**Dental Staffing**

*Addresses II.B.3*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
*Chief of Oral Health Services*

As noted in the 6th and 7th Monitor's Report, IDOC hired an administrative dentist responsible for the statewide program. In February 2021, a Chief of Oral Health Services was appointed. This addition has been valuable in advancing the Decree's initiatives.

*Site Visit*

During the site visit, the Monitor assessed the dental staffing at NRC and Stateville. NRC had 1.6 full-time equivalent (FTE) dentists for its current mission. Stateville, with a reduced inmate population of fewer than 500, operates with two FTE dentists.[749]

Dental hygiene services are available to inmates at Stateville, but none are provided at NRC. Although most NRC inmates are expected to transfer to other facilities, some are part of the work cadre at the neighboring Stateville Minimum Security Unit (MSU). During the visit, dental leadership from Wexford and IDOC confirmed that the Stateville dental hygienist would visit NRC several times a month to provide hygiene care to MSU inmates. Given the current reassignment of Stateville's population, this arrangement is considered a reasonable solution.

*Dental Staffing (Dentists and Hygienists)[750]*

---

[749] One of two full time budgeted dentist at Stateville is a State employee but the Monitor was told IDOC does not intend to fill the position. This position will be removed from our reports when it is officially removed from the Stateville budget.
[750] Dentist and dental hygienists are from the Lippert Medical Staffing Report June 2024 sent to the Monitor 6/28/24.

As of June 2024, twenty-eight DOC correctional centers had onsite dental suites and services. There were 36.15 FTE dental positions budgeted, with 18.06 filled, resulting in a 50% vacancy rate. During the site visit, there was a discussion with the Chief of Oral Health Services and Wexford's lead dentist about staffing shortages. Wexford's lead dentist indicated that he and other dentists provide coverage at various facilities. Wexford has contracted a mobile dental clinic (Jet Dental) to provide care at Danville, Menard, Graham, and Southwestern.[751] However, it remains unclear how much full-time equivalent (FTE) support is provided to these and other facilities without a permanent dentist.

There were 23.75 full-time equivalent budgeted dental hygienist positions across 28 facilities. Most of these positions (21.25) are filled, resulting in a vacancy of approximately 11%.[752] Since the Monitor's 7th Report, Western Correctional Center has been allocated a dental hygienist for its program. Vienna remains the only facility without a budgeted dental hygienist.

---

[751] Monthly Backlog Report provided by Jet Dental

[752] Facility Reconciliation Worksheet – Q3'24 – LIPPERT and OHS Facility.xlsx. Notably fill rates on these two documents are different though they appear to be for the same time period. The Monitor used the one with the lesser amount of filled staff. Also, the number of FTEs filled appears to be different between the vendor Staffing Report and the State reconciliation worksheet which apparently used to pay the vendor.

| Budgeted FTE Dentists and Hygienists with Vacancies* | | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | Population | Dentist Budgeted | Dentist Filled | Dentist Budgeted per 1000 | Hygienists Budgeted | Hygienists Filled | Hygienists budgeted per 1000 |
| BMRCC | 1337 | 1 | 0 | 0.75 | 1 | 1 | 0.75 |
| Centralia | 1188 | 1.05 | 0 | 0.88 | 1 | 1 | 0.84 |
| Danville | 1617 | 1 | 0.76 | 0.62 | 1 | 1 | 0.62 |
| Decatur | 349 | 1 | 0.75 | 2.87 | 0.5 | 0.5 | 1.43 |
| Dixon | 1028 | 1.4 | 0.4 | 1.36 | 1 | 1 | 0.97 |
| East Moline | 477 | 1 | 1 | 2.1 | 0.5 | 0 | 1.05 |
| Graham | 1632 | 1.6 | 1 | 0.98 | 1 | 1 | 0.61 |
| Hill | 1177 | 1 | 0.5 | 0.85 | 1 | 1 | 0.85 |
| IRCC | 2008 | 1 | 0.9 | 0.5 | 1 | 0.5 | 0.5 |
| Jacksonville | 612 | 1 | 0 | 1.63 | 1 | 1 | 1.63 |
| JTC | 192 | 0.5 | 0.5 | 2.6 | 0.25 | 0.25 | 1.3 |
| Kewanee | 153 | 0.25 | 0 | 1.63 | 0.5 | 0.5 | 3.27 |
| Lawrence | 871 | 1.5 | 1 | 1.7 | 1 | 1 | 1.48 |
| Lincoln | 778 | 1 | 0 | 1.29 | 1 | 1 | 1.29 |
| Logan | 1156 | 2 | 0 | 1.73 | 2 | 2 | 1.73 |
| Menard | 1182 | 3 | 0 | 2.54 | 1 | 1 | 0.85 |
| Pinckneyville | 1862 | 2.25 | 1 | 1.21 | 1 | 1 | 0.54 |
| Pontiac | 581 | 1.6 | 1.6 | 2.75 | 1 | 1 | 1.7 |
| Robinson | 1146 | 1 | 0.5 | 0.87 | 0.5 | 0.5 | 0.44 |
| Shawnee | 1447 | 1.4 | 0.9 | 0.97 | 1 | 1 | 0.69 |
| Sheridan | 1295 | 1.5 | 1.25 | 1.16 | 0.5 | 0 | 0.39 |
| Southwestern | 532 | 1 | 1 | 1.89 | 1 | 1 | 1.89 |
| Stateville/NRC | 1822 | 3.6 | 2.8 | 1.98 | 1 | 1 | 0.55 |
| Taylorville | 1090 | 1 | 1 | 0.92 | 1 | 1 | 0.92 |
| Vandalia | 528 | 1.5 | 0.2 | 2.84 | 1 | 1 | 1.89 |
| Vienna | 707 | 1 | 1 | 1.4 | 0 | 0 | 0 |
| Western | 1642 | 1 | 0 | 0.61 | 1 | 0 | 0.61 |
| Totals | 28409 | 36.15 | 18.06 | 1.24 | 23.75 | 21.25 | 0.84 |
| * Vendor employee data from 4CN8510-BATES 5999-6015 Lippert Medical Staffing Report June 2024; IDOC employee data from OHS facility spreadsheet | | | | | | | |

*Dental Assistants*

The number of budgeted FTE positions for dental assistants has stayed the same. IDOC maintains 8 FTE positions, while Wexford Health Sources provides 36.9 FTE positions. Out of the 44.9 combined state and vendor dental assistants, 34.33 are filled for a 24% vacancy rate[753].

According to a Wexford document, the company lists 43 dental assistants,[754] but these 43 employees fill the 36.9 FTE positions. Overall, budgeted dental assistant staffing levels are adequate for IDOC and Wexford but the vacancy rate remains high.

Below is a table showing the allocation of FTE positions for dental assistants and their respective employers.[755,756]

| Budgeted Dental Assistant FTEs | | | |
|---|---|---|---|
| Facility | Population | Wexford DA FTEs | IDOC. DA FTEs |
| BMRCC | 1337 | 2 | 0 |
| Centralia | 1188 | 1 | 0 |
| Danville | 1617 | 1 | 0 |
| Decatur | 349 | 1 | 0 |
| Dixon | 1028 | 1 | 1 |
| East Moline | 477 | 1 | 0 |
| Graham | 1632 | 0 | 2 |
| Hill | 1177 | 2 | 0 |
| IRCC | 2008 | 2 | 0 |
| Jacksonville | 612 | 0 | 1 |
| JTC | 192 | 1 | 0 |
| Kewanee | 153 | 0.4 | 0 |
| Lawrence | 871 | 2 | 0 |
| Lincoln | 778 | 0 | 1 |
| Logan | 1156 | 3 | 0 |
| Menard | 1182 | 2 | 1 |
| Pinckneyville | 1862 | 2 | 0 |
| Pontiac | 581 | 2 | 0 |
| Robinson | 1146 | 1 | 0 |
| Shawnee | 1447 | 1.5 | 0 |
| Sheridan | 1295 | 2 | 0 |
| Southwestern | 532 | 1 | 0 |
| Stateville/NRC | 1822 | 3 | 1 |
| Taylorville | 1090 | 1 | 0 |
| Vandalia | 528 | 1 | 1 |
| Vienna | 707 | 1 | 0 |
| Western | 1642 | 2 | 0 |
| Total | 28409 | 36.9 | 8 |

---

[753] Facility Reconciliation Worksheet – Q3'24 – LIPPERT and OHS Facility.xlsx
[754] 4C42963-BATES 3739-3740 IDOC Dental Assistants and Hygienists 2-28-24.PDF
[755] Dental Assistant FTEs from Facility Reconciliation Work sheets Q3'24 LIPPERT
[756] OHS Facility.xlsx

**RECOMMENDATIONS:**

1. A statewide workload analysis needs to be accomplished to address discrepancies in dental care staffing across the state. A workload analysis would ensure equitable distribution of dental hygienists and dentists based on facility needs and population size.
2. Staff ratios (e.g., inmate-to-dental ratio) should be established after completing a workload analysis. This ratio should be designed to ensure compliance with the consent decree and the overall needs of the population.
3. All facilities should have a budgeted hygienist. A workload (staffing) analysis should be used to redistribute hygiene support based on population size and facility need.
4. Expeditiously recruit and hire dentists to fill all current and ongoing dentist vacancies.
5. Conduct a thorough analysis to identify the root causes of attrition and vacancies among dental personnel (Dentists).
6. Continue to provide emergency dental services and those essential dental services during this staffing shortage.

Notes: The Monitor has consolidated recommendations from the 7th Report and made one recommendation to include staffing (workload) analysis for all dental personnel instead of two recommendations (one for dentists and one for hygienists).

**Dental Documentation**

**Addresses item III.K.1; III.K.11; III.K.12**
**III.K.1.** *All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.*
**III.K.11.** *Each prisoner shall have a documented dental health history section in their dental record.*
**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
The Monitor assessed this section using data collected at the NRC/Stateville site visit, dental peer reviews, and urgent care dental records. IDOC provided no information to verify its compliance with issues in this section.

*Use of SOAP Format*

During the site review from June 3-5, 2024, the Monitor reviewed 14 urgent care dental entries from NRC and Stateville. All 14 records used the SOAP (Subjective, Objective, Assessment, Plan) format; three providers did not use it correctly. One dentist incorrectly used the SOAP format for treatment planning, and a hygienist at Stateville used SOAP notes for routine dental cleanings, contrary to the Consent Decree, which states that SOAP notes are for urgent care notation only.

Nineteen dental records were reviewed to determine if the SOAP format was used for urgent care clinical notation. Five out of 19 records did not use the SOAP format, resulting in a 74% compliance rate. This

rate is consistent with the findings from the dentists' peer reviews, which revealed a moderate level of compliance, with 76% (19 out of 25) of the dentists adhering to the SOAP format.

Several dentists consistently failed to comply with the SOAP format in the 2024 peer reviews compared to the previous year's. Repeat discrepancies need to be addressed, as peer reviews are conducted to ensure the quality and consistency of care. Counseling is necessary, as there should be no repeat findings. This may change, given that IDOC has provided guidance about the SOAP format in the new Dental Policy E.04.01.

*Documented Health History*

All records reviewed during the site visit had completed dental and medical health history sections. However, only 2 out of the 14 records (14%) of patients receiving subsequent dental care showed that the dentist reviewed the health history before treatment was provided.

At NRC, three patients who reported hypertension in their dental history had no blood pressure readings recorded before their procedures. This suggests that the dentist may not have thoroughly reviewed their health records. The standard of care in the profession requires a thorough health history review before administering dental anesthetics or prescribing medications.

On a statewide basis, peer reviews revealed that four out of 24 providers (17%) failed to perform an adequate health history. Dentists should review health histories to ensure comprehensive and safe patient care. Understanding a patient's overall health is crucial because many systemic conditions can impact oral health and vice versa. By reviewing health histories, dentists gain awareness of any medications that patients take, some of which can affect dental treatment, such as anticoagulants that increase bleeding risk or drugs that cause dry mouth. Additionally, health histories help identify allergies to medications, materials, or anesthetics commonly used in dental procedures, allowing dentists to avoid potentially dangerous allergic reactions. Chronic conditions like diabetes, cardiovascular diseases, and autoimmune disorders also play a significant role in dental treatment planning, as they can affect healing times and increase the risk of infections.

The current health history section on the IDOC dental form is inadequate and fails to collect sufficient information. The Monitor recommends that the Chief of Oral Services consider utilizing a more comprehensive health history from established sources such as the Federal Bureau of Prisons, Department of Defense, Veterans Administration, or a standard oral surgery office. These organizations have developed thorough and effective health history forms that could serve as a valuable template for creating a more robust and informative questionnaire.

*Document Dental Problems and Plan Care*

During the site visit at NRC, the Monitor noted that four out of 14 records (28%) did not include the inmate's original request for urgent dental care.[757] The remaining ten records showed evidence of the request, notation in the record, and timely follow-up care. All records at Stateville were 100% compliant, showing evidence of an inmate request, documentation in the record, and subsequent follow-up care based on acuity.

---

[757] The problem of documentation and filing requests appeared to be associated with one provider at NRC.

A record review of 18 records from four institutions revealed inconsistent compliance with documenting the patient's request and scheduling an appointment. Ten out of eighteen records (55%) demonstrated that dental problems were documented, with the request filed into the record, a notation made in the chart, and follow-up care scheduled.

**Recommendations:**

1. All dental providers should adhere to the SOAP (Subjective, Objective, Assessment, Plan) format to ensure consistent and structured documentation. Conduct training sessions to ensure all dental staff are proficiently using the SOAP format correctly, emphasizing its exclusive use for urgent care notation as required by the Consent Decree. Implement regular audits to monitor compliance and identify areas needing improvement.
2. The Chief of Oral Health Services and the lead dentist from Wexford should counsel providers who repeatedly fail to use the SOAP format correctly, providing additional training and support as needed.
3. Reinforce the importance of reviewing patient health histories before treatment and documenting that a review was performed in the clinical note. This process should be consistent among all dentists. Ensure that health histories are updated, particularly when planning comprehensive care. Regularly audit records to ensure compliance.
4. Ensure that all requests for urgent dental care are documented and included in the patient record. Establish a consistent process across all facilities for recording patient requests, making notations in charts, and scheduling follow-up care. Regular audits should be conducted to ensure adherence to these procedures.
5. Develop a policy on requirements for dental documentation and placement of dental documents and X-rays in the dental record. IDOC should consider how this will occur in the electronic medical record.
6. A more comprehensive health history questionnaire can be achieved by reviewing health history questionnaires from established sources such as the Federal Bureau of Prisons, Department of Defense, Veterans Administration, or a standard oral surgery office.

Notes:

The Monitor's 7th Report recommended addressing the authorship of clinical notes. This was noted at the Logan facility. It is not clear if the practice has ceased or resolved. The dental staff wrote the clinical notes for the dentist. However, the recommendation was removed from this report as it did not arise during the record review. If evidence of this practice occurs, the Monitor will revisit the practice.

The recommendation for Education and Training in the Monitor's 7th Report (which focused on SOAP documentation) was consolidated into the recommendation to Enhance and Standardize SOAP Format Compliance.

A new recommendation was added to identify a patient's dental issue and whether dental personnel provided proper dental care and treatment (III.K.12). There was not sufficient data for the Monitor to evaluate this properly in the last report. However, the site visit and review of dental records provided the Monitor with enough data to assess this aspect of the Decree.

**Dental Extractions**

**Addresses item III.K.10.a; III.K.10.b; III.K.10.c**
**III.K.10.a.** *Diagnostic radiographs shall be taken before every extraction*
**III.K.10.b.** *The diagnosis and reason for extraction shall be fully documented prior to the extraction*
**III.K.10.c.** *A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity, the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
In this section, the Monitor assessed site visit findings at NRC and Stateville, dental records of patients with dental extractions, and peer review findings.[758] IDOC has not provided the monitoring team with information relevant to the compliance status.

During this evaluation, the Monitor accepted panoramic and intraoral films taken up to three months before the extraction, as long as the teeth had already been treatment-planned for removal. However, if the patient had experienced trauma or a non-treatment-planned tooth required extraction, a new periapical radiograph was required before every extraction.

*Site Visits*

X-rays
The Monitor's onsite evaluation of seven patient records revealed that two dental records out of seven, 28%, did not have X-rays made within three months of the extractions. The remaining records utilized panoramic films made at NRC. These radiographs were of questionable quality for a comprehensive treatment plan but were appropriate for the teeth removed.

The panoramic X-ray machines produce poor-quality images, limiting their effectiveness for diagnostic purposes. The Monitor observed panoramic X-rays to be blurred or excessively dark at the inferior borders of the mandible. In many cases, a white streak or band obscured the anterior teeth. New panoramic X-ray machines are needed at NRC. It is strongly recommended that new X-ray equipment use digital technology rather than film-based radiography, as the radiographs will eventually be integrated into an Electronic Health Record.

Diagnosis and Reason for Extraction
Of the seven records reviewed, three (43%) had a documented diagnosis and reason for extraction in the clinical notes. The Monitor also examined consent forms to determine whether the reason for extraction was noted. While credit was given when the reason was found on the consent form, the diagnosis and reason for extraction must be documented in the progress notes.

---

[758] NRC and Stateville Site Visits June 3-5, 2024

Four out of seven records (57%) at NRC indicated that dental staff had obtained consent for extractions, but consent forms were filed in various sections of the medical record. This raises the possibility that some missing consent forms were obtained but needed to be correctly filed. Regardless, the dentists did not consistently document that consent was obtained. As highlighted in the Monitor's 7th Report, it is critical for clinicians to document informed consent, especially when dealing with paper records, which can easily become separated from the dental record, potentially compromising the accuracy and completeness of patient histories.

*Record Review*
Ten dental records, apart from the site visit, were reviewed. Four out of ten records (40%) showed evidence that a recent X-ray was taken before extractions. Six of ten records (60%) documented a reason or diagnosis. Nine out of ten records (90%) showed that consent was obtained before extractions.

A review of 24 dentist peer review records conducted by Wexford dentists showed that most providers obtained consent before extracting teeth. Only two providers out of 24 did not obtain consent before extractions. This is a relatively high level of compliance that could not be verified because medical records were not included with the review data sent by the vendor.

Illinois Health Care Surrogate Act

The Monitor has yet to encounter instances where a prisoner lacks decision-making capacity, in which the Department will follow the Illinois Health Care Surrogate Act. If this occurs, the Monitor will report on it.

**RECOMMENDATIONS:**

1. The analysis clearly shows a low level of compliance with conducting preoperative X-rays before dental extractions. Preoperative X-rays must be taken for patient safety and treatment planning. IDOC should monitor this practice to ensure provider compliance.
2. The Monitor recommends better documentation practices to ensure that X-rays are taken, reviewed, and considered in the extraction procedure. Dentists must document in their clinical notes that they have made or reviewed a current X-ray. IDOC should monitor this practice to ensure provider compliance.
3. It is essential to consistently document that informed consent was obtained in the patient's record. The lead Dentist of Wexford and the Chief of Oral Health Services can develop a standardized stamp that guides the provider through the extraction process.
4. IDOC should establish guidelines concerning the timing requirements for X-rays, especially regarding extractions. This guidance can help ensure dental staff have clear protocols for determining when to take X-rays in preparation for various dental procedures. A policy addressing X-rays should be included in Oral Health Services (E.04.01).
5. IDOC needs to conduct an audit that reviews whether X-rays were taken for dental procedures (e.g., extractions). The audit should also assess whether health histories were thoroughly obtained and utilized and whether consent forms and other documents were correctly placed in the patient's record. This should be part of the comprehensive dental audit which is given as recommendation 2 in the Audit subsection of the Quality Improvement section of this report. This is relevant to

provision II.B.9 of the Consent Decree. Multiple other dental areas should be included in this comprehensive dental audit which has yet to be developed .

**Dental Support** **(Equipment and Policies)**

**Addresses items II.B.8, III.K.4-5; III.K.13**
**II.B.8** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies, within eighteen (18) months of the Preliminary Approval Date. These policies shall be consistent throughout IDOC, and cover all aspects of a Health care program.*
**III.K.4.** *shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
**III.K.13.** *shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
*Dental Policies*

IDOC has submitted 12 policies, eleven for dental infection control and one for comprehensive treatment planning. The Monitor has submitted comments, but the policies were promulgated before IDOC responded to the Monitor's remarks. IDOC has stated it will review the comments before next year's policy revision. As mentioned in the section on Policies in this report, IDOC dental policies consist mostly of dental infection control policies but are not comprehensive and do not cover all areas of dental care including most of the dental sections in this report. The Monitor is available to the Dental Chief to discuss areas for which policies should be developed and to provide assistance in developing these policies.

E.04.01
An early version of policy E.04.01 Comprehensive Dental Treatment Planning was submitted to the Monitor for comments on 6/23/23 and returned to IDOC with comments on 9/5/23. IDOC then promulgated policy E.04.01 Oral Health Services in February 2024. IDOC has indicated they will review comments for the next policy revision.

G.18.01-11 (Submitted to Monitor as G.19.01- 11)
IDOC has made significant progress in addressing disinfection and infection control. The Monitor reviewed all submitted documents and provided comments for each of the eleven sections submitted.

Pending consideration of those comments, IDOC should consider several of the Monitor's comments that are important to remedy as soon as possible. These include:
1. While IDOC encourages waterline safety, they do not monitor or test the waterlines. Waterlines in dental clinics should be tested to ensure that the microbial contamination levels do not exceed 500 colony-forming units (CFU) per milliliter of water. The CDC set a limit of ≤500 CFU/mL

255

of heterotrophic water bacteria. This is particularly important in facilities that have medically compromised patients. This should be addressed (G.18.04).

2. There are no established instructions for disinfection and handling protocols when using X-ray daylight loaders. The Monitor has provided a protocol for minimizing contaminants during dental film processing (G.18.10).

3. IDOC has not established a protocol for processing or disinfecting Phosphor Plates (CCD and CMOS Receptors). An FDA-approved plastic barrier is recommended to protect the sensor against contamination. Using a plastic barrier reduced the likelihood of sensor contamination from 44 percent to 6 percent when this method was utilized (G.18.10).[759]

4. IDOC still needs to establish a protocol for disinfecting panoramic machines or handling film cassettes during processing. The Monitor provided IDOC with a protocol for disinfecting and sterilizing panoramic equipment and properly handling the cassettes (G.18.10).

5. The Instrument Sterilization policy (G.17.01) on the new promulgated policy (page 227) refers the reader to G.18.02 Maintenance of Dental Handpieces, but no such policy exists.

6. The references in the submitted documents (G.18.01-11) frequently lacked current sources or led to dead links. The Monitor reviewed each policy and updated the links and references accordingly. These references should be incorporated and updated.

Although IDOC's policy submission on infection control policies is a good start, further work is needed on these policies to address existing deficits and ensure comprehensive infection control practices.

*Thyroid Collars*

IDOC is making significant progress in ensuring all facilities have adequate thyroid shielding. During a recent site visit to the NRC, the dental clinic was observed to have both a leaded apron and a thyroid collar. Both devices were intact, with no rips or tears.

At the Stateville facility, three X-ray shields with attached thyroid collars were inspected. However, the plastic exterior of the thyroid collars on these shields was torn. The dental officer at the facility mentioned that the aprons had been X-rayed to check for leaks, but no report was available for review.

Initially, it was unclear whether the thyroid collars were serviceable. Upon further investigation, it was found that a torn plastic exterior could expose the lead inside the shield, posing a risk of lead contamination. This exposure can be hazardous to patients and staff if lead particles are inhaled or come into contact with skin. Additionally, a tear in the plastic covering compromises the shield's integrity, potentially allowing radiation to penetrate through the exposed area, thereby reducing its effectiveness in protecting against radiation. Finally, a damaged shield is more challenging to clean and disinfect properly, increasing the risk of infection and contamination as it can harbor bacteria and other pathogens, making it unsuitable for use in a clinical setting. The Stateville facility must order new X-ray shields to replace the damaged ones.

It is recommended that the Chief of Oral Health Services implement quality assurance projects that align with Consent Decree requirements. Although the Chief of Oral Health Services has opined that all facilities have thyroid collars, an audit of all facilities should be conducted to verify that each one has a serviceable collar/shield (intact integrity).

---

[759] Logan and Dixon both have digital radiography. Future X-ray units will most likely be digital.

*Radiological Hazard Signs*

During the site visit to NRC, the Monitor inspected all areas with X-ray machines to verify the presence of radiation hazard signage in the vicinity where X-rays are conducted. The Monitor noted the absence of X-ray signage in the Reception processing area of NRC. Given that two panoramic X-ray units are used in this area, it is essential to prominently display a sign with the radiation symbol and the words "Caution: X-rays."

The dental clinic at Stateville had three X-ray units, each with small radiation hazard signs (tags) posted on each unit. A larger sign should be placed at the clinic's entrance to alert all patients and staff entering the area that X-rays are performed.

No other information was provided about radiological hazard signage in dental clinics to warn individuals that they are entering an area where X-rays are being performed. The status of radiological hazard signs statewide remains to be determined, as IDOC has not provided information regarding other facilities. To ensure adherence to what should be a straightforward fix, it is recommended that compliance with this requirement be incorporated into a comprehensive audit.

*Dental Equipment*

During the site visit to Stateville, the Monitor asked the Health Care Unit Administrator (HCUA) and the facility dentist for an annual survey of dental equipment. The facility's dental staff indicated that service companies only visit the clinic to address specific problems. No annual surveys by an outside vendor have been performed. The Monitor showed the Decree requirement to the HCUA and spoke with the HCUA to outline the necessary steps for compliance.

The Monitor made a document request for this report to "*list all dental equipment with the date of most recent calibration or inspection by an authorized dental equipment vendor. The list would identify any defective equipment that needs repair or replacement with the date of that repair or replacement.*" The institutional data provided to the Monitor was varied. Eleven facilities did not submit a survey or report from a professional vendor.[760] Some facilities submitted equipment lists without documentation of problems or a professional evaluation. Below is the complete report (inadequate) from the Vienna facility for the dental clinic equipment.

  1. *Midmark Autoclave gets spore checks done weekly with results reports being sent to us quarterly and there are no defects or repairs at this time. Last report received 12/31/23.*

Too many facilities, such as Vienna, conduct inspections and submit inadequate reports. All inspections ought to be performed by qualified health technicians; otherwise, it is not clear if the equipment is safe to operate.

The annual surveys and preventative maintenance aim to ensure patient and staff safety by verifying that all devices are operating correctly and meeting safety standards. These routine checks maintain the performance and accuracy of the equipment, ensuring high-quality outcomes for diagnostic and treatment procedures. Regular maintenance is essential for compliance with regulatory requirements. By identifying potential issues early, these checks extend the lifespan of the equipment, reduce the need for costly emergency repairs, and support the efficient operation of the practice. Furthermore, they play a vital role in managing costs, reducing downtime, fulfilling insurance requirements, enhancing the overall quality of patient care, and minimizing risks associated with equipment malfunctions.

---

[760] Dixon, Graham, Vienna, Vandalia, Taylorville, Stateville, Robinson, Pontiac, Lincoln, Joliet, Hill and Illinois Rivers

As noted in the Monitor's 7th Report, many facilities have contracted with external vendors for equipment maintenance and inspection; however, the equipment surveyed varies between vendors.[761] For example, some vendors inspect compressors and vacuums, while others do not. This variability exists even when using the same vendor. It is clear that Clintech Corporation provides the most robust, thorough inspection statewide.

As of this report, there is no established standard for which equipment will be surveyed, nor is there a policy to address this issue. To be compliant with the Decree, dental equipment must be inspected annually. The response to the Monitor's document request on equipment confirms that dental equipment lists should be standardized, and the process of surveying and maintaining equipment should also be standardized and described in policy and procedure. The Monitor is willing to work with IDOC to develop a standardized list of equipment and a policy.

All X-ray equipment must be inspected in accordance with the Illinois Radiation Protection Act of 1990. State agencies like the Illinois Emergency Management Agency (IEMA), Certified Health Physicists and Radiation Safety Officers, Private Inspection Companies, or Dental Equipment Manufacturers and Service Providers may conduct this inspection. For the next report, the facilities will need to present radiation reports from the state to demonstrate that all X-ray units are functioning correctly.

*Dental Space*
In the Monitor's 6th and 7th Reports, it was noted that there is no evidence of standardized, comprehensive, yearly surveys being conducted to assess dental facilities and equipment across the organization. The initiation of such a survey should not be delayed while waiting for IDOC to bring in consultants for a broader evaluation of clinical spaces.

The Monitor requested that the Chief of Oral Health Programs provide the total number of dental chairs available within the IDOC.[762] The Chief of Oral Health Programs indicated that this information would be forthcoming. This data, along with additional survey findings, will be valuable for the effective operation of the dental program.

*Spore Testing*
Quarter 1, 2024 CQI (Continuous Quality Improvement) reports were reviewed to assess whether facilities were spore-testing autoclaves. Twenty-seven CQI meeting minutes were reviewed; one was omitted due to missing evidence of dental presence or corrupted files.[763] Forty-seven percent of the facilities (15 out of 28) did not document spore testing results in their CQI minutes. Spore testing, as all items in this report, should be part of a comprehensive audit (II.B.9), but IDOC has not made progress on this audit.

Of the facilities that recorded spore testing, two indicated that it was conducted on a weekly basis.[764] According to the Centers for Disease Control, spore testing should be conducted on each sterilizer at least weekly.

---

[761] Denman Biomedical Services, Henry Schein Services and Repairs, ClinTech, and IEMA
[762] September 26, 2024, meeting with the Chief of Oral Health Services
[763] Murphysboro does not have a dental clinic. Files from the Western Correctional Center were corrupt and unreadable.
[764] Graham and Taylorville

*"A spore test should be used on each sterilizer at least weekly. Users should follow the manufacturer's directions for how to place the biological indicator in the sterilizer. A spore test should also be used for every load with an implantable device. Ideally, implantable items should not be used until they test negative."[765]*

The minimum elements for reporting spore testing should include the date of the test, an indication of whether a control was run, and the test's disposition (positive/negative). Any deviation from weekly testing should be explained. IDOC has provided this instruction in the new policy Instrument Sterilization G.17.01. However, running controls are not mentioned as part of the process.

When facilities neglect to report spore testing, a zero-tolerance approach to non-compliance should be adopted. All facilities must submit statistical data on sterilization because a malfunctioning autoclave poses a public health risk. The Monitor strongly advises the Chief of Oral Health Services to directly contact these facilities and ensure that any outstanding questions are addressed to the satisfaction of the SIU performance and outcome data team.

**RECOMMENDATIONS:**
1. A comprehensive assessment of radiological hazard signs should be conducted in all dental clinics across IDOC to ensure compliance with safety regulations. This assessment should involve verifying the presence, visibility, and condition of Radiological Hazard Signs in each clinic and implementing necessary corrective actions to ensure clear and effective signage statewide.
2. IDOC must implement standardized protocols and reporting procedures for dental equipment monitoring across all facilities. This should include uniform reporting templates and guidelines for documenting equipment defects, repair orders, and replacements. Templates should include the date when broken dental equipment is identified, the work order submitted, the work order, the purchase order approved, and the date equipment is repaired or replaced.
3. To ensure compliance and improve the maintenance of dental equipment, it is essential to standardize the list of equipment requiring annual inspections, including, but not limited to, vacuum machines, dental compressors, chairs, sterilizers, and X-ray processors. All facilities must contract with qualified vendors for comprehensive annual equipment surveys.
4. Ensure that all dental autoclaves undergo spore testing per the recommended frequency, at least weekly, by the Centers for Disease Control (CDC) guidelines.
5. Establish precise documentation requirements for spore testing reports, including the testing date, whether controls were run, and the test results (positive/negative). Explanations should accompany any deviations from weekly testing.
6. Encourage facilities to incorporate spore testing and equipment monitoring into their CQI processes, ensuring that these essential aspects of infection control and equipment functionality are regularly reviewed and improved.
7. Intact shields prevent lead exposure and ensure proper radiation protection and hygiene. Stateville will order new X-ray Shields. Establish regular inspections for the integrity of all X-ray shields and thyroid collars across all facilities.
8. IDOC must seek the assistance of the Monitor's Dental Consultant to ensure that IDOC has a comprehensive set of dental policies.

---

[765] https://www.cdc.gov/oralhealth/infectioncontrol/faqs/monitoring.html

Notes: A new recommendation was added after the Monitor's site visit to NRC. The X-ray apron with thyroid collar was compromised (torn and cracked). These are not considered serviceable protective devices; all devices must be intact.

**Dental Access**

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and, as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**III.K.2.** *Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility*
**II.B.6.h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care.*


**OVERALL COMPLIANCE RATING:  Partial Compliance**

**FINDINGS:**

*Access to Care*

Staffing
Access to care within the IDOC is influenced by several factors, with adequate staffing being the most critical. The current shortage of personnel has had a profound impact on the provision of dental services. A review of Continuous Quality Improvement (CQI) minutes from reporting facilities revealed widespread backlogs throughout the system. Given the 50% vacancy rate for dentist positions, it is not surprising that many facilities are experiencing delays in dental services.

An analysis of backlog data was attempted to assess the effect of staffing shortages on productivity. Only half of the facilities provided backlog data.  Data that was provided was backlog data maintained by the vendor for extractions, fillings, dentures, and cleanings. However, this data was inconsistent with the backlog statistics noted in the CQI reports reviewed by the Monitor. IDOC should standardize backlog data and include definitions for backlogs for each type of backlog category. The Monitor does not have confidence in the reliability of backlog data systemwide.

Despite the inability to reconcile backlog data between Wexford and the CQI minutes, it is clear that many facilities face significant delays in dental services. IDOC has not provided comprehensive and reliable dental backlog data for all facilities across the system.[766]

Personnel per 1000 Inmates

---

[766] II.B.2. IDOC *shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care . . .*

An analysis of the data reveals significant variability in staffing ratios. As shown in Table 1 under the Staffing Section, Western Correctional Center has one dentist for 1,642 inmates, resulting in a ratio of 0.61 dentists per 1,000 inmates. In contrast, Southwestern Correctional Center, with 532 inmates and one dentist, has a much higher ratio of 1.89 dentists per 1,000 inmates. This indicates that one facility may be understaffed while another may be overstaffed. A similar pattern was observed in the staffing of dental hygienists. A workload analysis would help in developing appropriate staffing levels. Some facilities (e.g., Pontiac) may have increased staffing needs based on maximum security status and increased lockdown status.

The Monitor's 7th report highlighted discrepancies in dental hygiene staffing.[767] The following was stated in the 7th report.

> *"Hygiene support is not evenly distributed throughout the entire enterprise. The existing staffing arrangement creates significant gaps in the program, occasionally resulting in facilities being overstaffed. It is recommended that IDOC conduct a statewide analysis of dental hygiene assets to assess staffing levels at different facility types. A staffing ratio should be established for IDOC dental clinics that will ensure compliance with the Decree…"*

There is no evidence that a workload analysis was conducted for each facility to determine appropriate staffing levels. A workload analysis would consider factors such as the physical plant (clinical operatories), security levels, inmate population (size), scheduling constraints, and inmate turnover.

Productivity

While the need for adequate staffing is clear, the Monitor found that dental hygiene productivity is unusually low in several staffed facilities.[768] One possible reason is the absence of a dentist to order this care. However, it was also noted that even when both a dentist and hygienist are present, some facilities still report low dental hygiene productivity.[769] At Big Muddy, a full-time hygienist saw only 25 preventive/hygiene services in February. This is an extremely low number and indicates a significant process problem. In evaluating productivity, IDOC should consider the number of available chairs, the inability of custody to present patients for their appointments, and the failure to have a dentist onsite to supervise the hygienist as required by state regulation.

*Orientation Manual*

During the review of the NRC and Stateville facilities, the Monitor requested each institution's orientation manual. A review of the NRC orientation manual revealed no information regarding access to dental services . While many of these patients are transient and will be referred to a parent facility, it is important to note that the MSU has a working cadre (NRC grounds, food service, and janitorial needs).

The Stateville facility orientation manual provided clear directions to the inmate population regarding sick call services. The Monitor showed these directions to the Chief of Oral Health Services and advised him that this would be a great template for every facility. Each orientation manual should include

---

[767] Health Care Monitor 8th Report Lippert v. Jeffreys. Page 195
[768] In February 2024, the dental hygienists at Big Muddy and Jacksonville performed 25 and 20 dental hygiene procedures, respectively.
[769] In February 2024, the dental hygienist at Danville performed 26 dental hygiene procedures for the month.

information on the dental services provided in the IDOC, directions on how to submit requests for routine and urgent dental care, including dental cleanings, and education on dental hygiene and dental self-care.[770]

This should be a very easy improvement for all the facilities. A proposed end date for compliance was November 2023. No other orientation manuals were provided to the Monitor for review, so a statewide assessment cannot be made. Moving forward, the Monitor will request the orientation manuals of ten facilities to ensure compliance.

**RECOMMENDATIONS:**

1. Continue developing plans to prioritize and address the dental care backlog amid current staff shortages. The use of Jet Dental Mobile units is one example of effectively managing the backlog.
2. Standardize the data on the waiting times and backlogs for dental services and report this data in the CQI meeting minutes at all IDOC facilities with dental suites.
3. Implement a standardized template for orientation manuals that includes clear information on accessing dental services, directions on submitting requests for routine and urgent dental care, and education on dental hygiene and self-care.
4. To ensure compliance with the Decree, orientation manuals at all facilities should be regularly audited.

Notes: Two recommendations from the Monitor's 7th Report were consolidated.[771] A new recommendation was made to audit the progress and ensure that all orientation manuals include a section on access to dental care.

**Dental Intake**

**Addresses items III.K.3**
**III.K.3.** *IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.*

**III.K.11.** *Each prisoner shall have a documented dental history section in their dental record.*

**OVERALL COMPLIANCE RATING:** Partial Compliant

**FINDINGS:**
The Decree mandates that IDOC implement a dental screening examination that includes and documents intraoral and extraoral soft tissue assessments. The Monitor acknowledges that IDOC has published a policy on intake screening examinations that incorporates these required assessments.

---

[770] **Implementation Plan item 87**: *Review and revise the orientation manual for individuals in custody on access to dental care. The orientation manual should include information on the dental services provided in the IDOC, directions on how to submit requests for routine and urgent dental care, including dental cleanings, education on dental hygiene and dental self-care.* ***Proposed End Date: November 2023***

[771] Orientation Manuals and Expand Current Orientation Manuals were consolidated.

For this review, the Monitor evaluated dental intake records and observations from the NRC site visit. However, IDOC has not provided sufficient information to verify compliance with dental intake screening requirements.

*Site Visit*

During the site visit at NRC, the Monitor observed inmates being processed into the facility. The Monitor checked for the following elements of a screening examination: intraoral and extraoral soft tissue examination, hard tissue examination, classification assignment, panoramic X-ray, periodontal assessment, completion of a medical/dental history form, and oral hygiene instructions.

The Monitor observed the intake screening (initial examination), where the NRC clinic team reviewed health histories with the patients.[772] Hard and soft tissue examinations (intraoral and extraoral) were performed, and the dentist categorized the patient's treatment needs using the American Public Health Association's (APHA) classification framework.[773] No periodontal assessments were conducted.[774]

Panoramic films were made for inmates; however, the films were found to be non-diagnostic. Their limited quality rendered them of little value and only occasionally useful for extractions (when teeth were not obstructed).

The Monitor observed that hygiene instructions were not provided to inmates during intake. Upon inquiry, it was explained that this was typically done but had been overlooked due to a visiting dentist from Stateville temporarily filling in. A supply of pre-printed hygiene instructions was available for distribution, but they had not been provided during this period. The Monitor recommended that these instructions be made available in Spanish, given the number of Spanish-speaking inmates.

Record Review at NRC

A review of NRC's documentation revealed that intraoral soft tissue oral examinations were not recorded in nine (90%) out of ten dental records. There was no evidence, 0 out of 10 records, that an extraoral examination was conducted.

Five out of ten records (50%) had an APHA classification. It was noted that there was a lack of standardization when applying the APHA Classification System. The Administrative Directive for Oral Health, 04.03.102, did not offer meaningful instruction on how to complete IDOC form 0422.

Ten out of 10 records (100%) showed that panoramic films were made for patients, but these films had limited diagnostic quality. The distortion is excessive, with areas magnified and out of proportion and the inferior border of the mandible blocked out. In several films, white opaque bands obliterate the front teeth, obscuring any anatomy in the anterior sextant of the mouth.

---

[772] Health histories are not comprehensive and do not provide the dentists an adequate overview of a patient's health.
[773] Administrative Directive 04.03.102
[774] Since the intent is for the Reception Centers to develop a preliminary treatment plan, a periodontal assessment should be made.

A periodontal assessment was not part of the screening examination, but it is a critical component of an intake examination. As long as the reception center is expected to assess treatment needs, a periodontal assessment or examination must be performed.

All medical/health histories were completed. However, as previously reported, the medical history utilized by the IDOC is insufficient. The questions do not provide the provider with adequate information, a concern raised in the Monitors 7th Report.

*Record Review of All Reception Centers*

Twelve intake records were reviewed. Two out of twelve records (16%) were not processed within ten days of arrival; these records were at Graham and Logan, where the inmates were processed in 11 days and 22 days, respectively.

All reviewed records included a screening exam. However, the screening examinations are lacking. As previously mentioned, screening examinations did not include a periodontal component. Moreover, medical and dental histories are scant and do not provide enough information.

A review of intake dental records from the NRC, Logan, Menard, and Graham facilities revealed that nine out of twelve charts (75%) documented completing an intraoral soft tissue exam. Similarly, nine out of twelve records (75%) indicated that an extraoral examination was performed. Of the nine records documenting an extraoral soft tissue exam, four only noted that an oral cancer screening had been conducted.[775] None of the records reviewed documented a broader extraoral examination, meaning there was no indication that the dentist evaluated additional structures, such as the temporomandibular joint (TMJ), beyond the oral cancer assessment.

Eight of 12 reviewed records (67%) contained documentation of a hard tissue examination. It remains unclear whether the remaining patients underwent this examination, as no corresponding entries were found. The absence of documented decay or hard tissue irregularities could suggest the patients were in good oral health. However, to ensure clarity and compliance with best practices, dentists should explicitly document the completion of both hard and soft tissue examinations in the patient records.

Seven of the twelve dental intake records reviewed (58%) did not indicate that a panoramic film had been taken. It is unclear whether these films were performed but not documented. Without recorded evidence of a radiograph, the facilities cannot be credited with completing this essential component of the intake process.

Nine out of twelve records (75%) had an APHA classification assigned. As previously mentioned, the Monitor is unclear how this classification will be recorded, given the different ways dentists record it. The Chief of Oral Health Services and the Lead Dentist for Wexford must clearly direct the field dentists.

Nine out of twelve records (75%) revealed that oral hygiene instructions were provided at intake. Two patients were edentulous (lacking teeth), so instructions were not provided.

---

[775] An oral cancer screening examination evaluates both intraoral and extraoral tissues as they relate to oral cancer. However, IDOC has expanded in their policy E.04.01 for extraoral examinations to include asymmetries and an evaluation of the TMJ.

264

*Discussion*

APHA

It is not clear if IDOC intends to continue to use APHA prioritization of treatment needs. It was not mentioned in the new dental policy E.04.01. The current form (DOC 0422) utilized by IDOC requires the dentist to place a patient into an APHA treatment category. Category I -Emergency Treatment to Category VI -No Dental Treatment Needed. Below is a screenshot of the APHA section of the current dental form (DOC 0422).

Receiving Institution: _____
Dentist: _____
Date: _____

| Public Health Classification | Screening Date | | Pathology |
|---|---|---|---|
| Endodontics | | | |
| Oral Surgery | | | |
| Periodontics | | | |
| Operative | | | |
| Prosthetic | | | |

The intent of the APHA classification is to assign a single overall classification for the patient based on all the data collected. There is no clear guidance on properly completing this section of the form, which often results in it being left blank. Some dentists use this section to list the patient's dental treatment needs as a preliminary treatment plan. Others have made an APHA classification for specific areas, such as endodontics, oral surgery, periodontics, operative, and prosthetics. Sometimes, this has resulted in several classifications instead of one.

Periodontal Assessments

The new dental policy, E.04.01, addresses the elements of a dental screening. However, it does not include a periodontal assessment. The Screening Examination should at least provide a periodontal assessment, as the expectation is to assess the treatment needs and document them on the problem list.[776] Moreover, if the intent is to continue to use the APHA classification system, an accurate assessment of a patient's periodontal status will assist in the determination of an APHA category.

Dental/Medical Histories

Although dental histories are recorded, the medical and dental history documentation on DOC 0422 is insufficient. It does not provide the dentist with enough information about the patient's oral and overall health condition. As was previously discussed in the Monitor's 7th Report, standardized templates are utilized within the profession, such as those in private offices, dental schools, the Department of Defense, the Veterans Administration, and the Federal Bureau of Prisons.

**RECOMMENDATIONS:**

1. Monitor, report, and document key elements of the dental intake screening processes in the facilities' monthly CQI meeting. IDOC should collect and analyze data to determine how well the system is providing care.

---

[776] The quote is taken from E.04.01 page 1.D. page 102

2. Ensure that panoramic X-rays are consistently taken during the initial dental examination for all inmates at Reception Centers and documented in the record. IDOC should establish protocols and processes to ensure the consistent recording and maintenance of these X-rays.

3. During dental screenings, implement a standardized periodontal assessment protocol, such as the Community Periodontal Index (CPI) or Periodontal Screening and Recording (PSR), for all inmates. This will ensure a comprehensive evaluation of their dental treatment needs.

4. Ensure that all dental professionals conduct a thorough intraoral soft tissue examination and an extraoral soft tissue examination. The extraoral examinations should include an examination of the TMJ and evaluate asymmetries as required by the new policy (E.04.01).

5. Ensure that all dental professionals complete the APHA classification section on form DOC 0422 and assign patients APHA prioritization. Every patient requires a classification, even if they are healthy (Category VI). IDOC should train dental staff on using the Classification System.

6. Review and upgrade imaging equipment to ensure that panoramic films are diagnostic and meet the standard of care. In cases where films are substandard, corrective actions should be taken promptly.

7. Ensure oral hygiene instructions are available in multiple languages, including Spanish, to accommodate the diverse patient population.

Notes: Two additional recommendations were made in the Monitor's 7th Report. The first (#6) was to upgrade the panoramic X-ray equipment, as the Monitoring team found the current X-rays to be of limited diagnostic quality. The second recommendation (#7) was to expand the written materials provided to inmate patients to include Spanish, as the Monitor observed that many inmates were Hispanic and had limited proficiency in English.

**Dental Hygiene**
**Addresses III.K.7; II.B.6.h; III.K.8**
**III.K.7.** *Dental hygiene care and oral health instructions shall be provided as part of the treatment process.*
**II.B.6.h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care*
**III.K.8.** *Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

A review of IDOC's revised dental policy, E.04.01, indicates that it lacks a dedicated section addressing dental hygiene services. Dental hygiene is briefly referenced in Section II(E), which states that cleanings will be provided annually, superseding the Decree's requirement of biennial cleanings. Additionally, Section II(H) allows for more frequent cleanings based on age and dental needs, or at the discretion of the facility dentist. The Monitor recommends that future policy revisions include a dedicated section on hygiene services, incorporating the Decree's language to ensure "medically indicated" patient cleanings are addressed.

**Review Methodology**

266

This section was reviewed using performance and outcome data collected by SIU and observations from one site visit by the Monitor team.[777] Records of inmates receiving comprehensive dental care, partial dentures, and initial examinations were also examined.

*Site Visit*

During the site visit to NRC and Stateville, it was observed that NRC did not have a dental hygienist on staff. While the lack of hygiene support at a classification center like NRC is understandable, it remains essential for the work cadre at the Stateville Minimum Security Unit (MSU) to receive appropriate hygiene care. At the time of the visit, approximately 200 inmates were assigned to the MSU, many of whom had not yet received hygiene services. The Wexford Lead Dentist proposed that the dental hygienist from the Stateville High-Security Unit provide services at the NRC Clinic several days per month. The Monitor agrees that this is a reasonable solution, considering the declining population at Stateville due to the planned closure of the facility.

The Monitor also observed dental hygiene appointments at Stateville, where the hygienist was providing timely care. At the time of the site visit, the hygienist-to-patient ratio was 1 to 400. Inmate patients were seen receiving oral hygiene instructions as part of their appointments.

*Record Review*

Twelve patient records were reviewed for those who had received routine dental care.[778] Six patients did not receive a 2-year hygiene cleaning before restorative and prosthetic care was started. Four patients from Western had prosthetics completed without a periodontal evaluation and hygiene appointment. One patient at Western had dental care started in February 2014 and, to date, has never had their teeth cleaned despite having received restorative and prosthetic care. While it is understood that a hygienist was not present, a dentist could have performed a routine dental cleaning.

A review of three patient records from Pontiac revealed that patients were scheduled for dental cleanings every two years, with one patient receiving appointments every six months due to Dilantin-induced hyperplasia. Recalling medically compromised patients for regular monitoring and care is considered the standard of care, and the Monitor would like to commend this good practice.

Eight out of twelve patient records (67%) documented that Oral Hygiene Instructions (OHI) were provided. The Monitor has observed that OHI is typically given during hygiene appointments, biennial exams, and intake screenings.

*SIU Quality Improvement Data*

SIU reviewed 29 facilities based on three dental performance and outcome measures, with data spanning three-quarters of FY24.[779] The Monitor focused on one of these measures, specifically III.K.8., which assesses whether dental cleanings are provided every two years.

---

[777] IDOC Dental Quality Performance Data - run date 05172024 OCMXLSX
[778] Western (four patients), Taylorsville (four patients), Pontiac (3 patients), and Pinckneyville (one patient)
[779] IDOC Dental Quality Performance Data - run date 05172024 OCM

Twenty-eight facilities were evaluated, as the Joliet Treatment Center does not provide hygiene care. Data from SIU shows that the overall compliance rates for these facilities were 56% in FY24 Q1, 63% in FY24 Q2, and 54% in FY24 Q3. While IDOC is not fully compliant with the Decree, three facilities met the program's goal of providing a hygiene appointment within two years. Decatur achieved 100% compliance in the SIU review, while Sheridan and Stateville both reached 90% compliance.

This is discussed further above in the Performance and Outcome section of this report.

*Discussion*

Periodontal Evaluation

During the record review, it was noted that periodontal evaluations were not performed, which is clearly outside community standards. Dentists are expected to adhere to the standard of care, which includes thorough examinations and evaluations before providing treatment. Restorations and prosthetics must be placed on a stable periodontium. A periodontal evaluation is critical to ensure that the underlying gums and bone are healthy and capable of supporting a prosthetic.

In the Final Report of the Court Appointed Expert in Lippert v. Godinez (December 2014), the dental expert highlighted that periodontal assessments were not being performed. A subsequent expert also raised concerns about the lack of periodontal assessments, stating, "Examinations are inadequate, and routine care is provided without intraoral x-rays, a documented periodontal assessment, and a treatment plan. Periodontal disease is rarely diagnosed and treated."[780]

Discussions between the Monitor and the Chief of Oral Health have occurred regarding implementing periodontal assessments at intake and during routine care. Although IDOC has proposed Policy E.04.01, it is imperative that these periodontal examinations be conducted promptly.

SIU Evaluations

Southern Illinois University (SIU) provided two documents related to dental metrics. The first document, *IDOC Dental Quality Performance Data*, reports on the percentages of dental cleanings and examinations and a composite metric reflecting the percentage of patients receiving both services.[781] The second document, *Statewide Quarterly Summary*, combines dental metrics with medical data and measures the percentage of patients who were offered and received a dental visit (including an examination and cleaning) within the past two years.[782]

IDOC Dental Quality Performance Data

In the *IDOC Dental Quality Performance Data* document, a combined metric was created to track the percentage of patients who received both a dental cleaning and an examination. However,

---

[780] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services Report of the 2nd Court Appointed Expert Lippert v. Godinez October 2018. Page 11.
[781] IDOC Dental Quality Performance Data - run date 05172024 OCM
[782] STATEWIDE - CQPR Quarterly Summary-OCM-QI.FRM.1047C.3(2-2024) v3 2.6.24PDF

inconsistencies were found when the Monitor compared this combined percentage to the individual percentages for cleanings and exams. Specifically, for FY24 Q1, the combined percentage of patients receiving both services was reported as 64%. Yet, the individual percentages for cleanings and exams were 56% and 66%, respectively. Based on these figures, the combined percentage should have been 61%, not 64%, raising concerns about the accuracy of the reported data.

Additionally, there is a lack of clarity about what is being measured. It is unclear whether SIU is tracking whether a patient has received a dental cleaning at any point during their incarceration or whether it is ensuring that cleanings are provided every two years, as required. Similarly, it is not clear if the dental examinations being reported meet all the Decree's requirements, such as the inclusion of a treatment plan. Clarification of the methodology used to calculate these metrics is needed to fully understand the data being presented.

Statewide Quarterly Summary

The dental metric in the *Statewide Quarterly Summary* tracks the percentage of patients who were offered and received a dental visit, which includes both an examination and a cleaning, within the last two years. Since this document reports a composite percentage for both examinations and cleanings, it is expected that these figures will align with those in the *IDOC Dental Quality Performance Data*. However, they do not.

For instance, in the second quarter of FY24, the *Dental Performance Data* indicates that 66% of inmates received both a dental examination and a cleaning. In contrast, the *Statewide Quarterly Summary* for the same period reports that only 48% of patients had a dental visit that included either a cleaning or an examination. This discrepancy suggests that the data is not being consistently or accurately reported across documents, which raises concerns about the reliability of the reported metrics.

**RECOMMENDATIONS:**
1. Implement a comprehensive treatment planning process that follows the phases of dental care, including Systemic, Acute, Disease Control, Definitive Treatment, and Maintenance. This approach ensures that periodontal health is assessed before initiating restorative and prosthetic treatments.
2. Ensure that the periodontal condition of patients is consistently assessed through probing before proceeding with prosthetic or restorative care. Periodontal health is a critical factor in the success of these treatments.
3. Establish a protocol where hygiene appointments must occur before any definitive dental treatments, including restorations and prosthetics.
4. Increase efforts to achieve the goal of biennial dental cleanings across all facilities, with a particular focus on those currently below average.
5. Ensure that Oral Hygiene Instructions (OHI) are consistently given during hygiene appointments, annual exams, and intake screenings to educate and maintain inmate oral health.
6. The Chief of Oral Health Services should inquire with the State Dental Board about obtaining a waiver allowing dental hygienists to perform specific procedures without direct supervision or collaboration with a dentist. This could help enhance efficiency in dental care delivery.

7. The current metrics reveal inconsistencies in how data is reported. SIU needs to standardize its data collection process to ensure consistency and accuracy between data sets.
8. IDOC needs to establish an audit on the metric that tracks biennial oral hygiene cleanings.

Notes:

The dental hygiene staffing recommendation in the Monitor's 7th report remains but has been moved to the Staffing section of this document.

**Comprehensive Dental Care**

*Addresses item III.K.6*

**III.K.6.** *Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.*

**OVERALL COMPLIANCE RATING:** Non-Compliance

**FINDINGS:**

*Policy*

Policy E.04.01, titled "Comprehensive Dental Treatment Planning," was submitted to the Monitor for review on June 23, 2023, and returned to the IDOC with recommendations on September 5, 2023. Subsequently, IDOC published the updated policy E.04.01, "Oral Health Services," in February 2024, which encompasses comprehensive dental treatment planning. An analysis of the treatment planning section indicates that the Monitor's recommendations were incorporated into the new policy, notably the inclusion of periodontal evaluations as part of the examination process for treatment planning.

*Monitor Review of Dental Records*

The Monitor reviewed 37 dental records to assess whether comprehensive or biennial examinations resulted in the development of a treatment plan. Comprehensive examinations are required to include a periodontal assessment (probing and classification), a soft tissue examination, a hard tissue examination, bitewing X-rays, and either full-mouth or panoramic films prior to establishing a treatment plan.

Of the 37 patient records reviewed, none contained evidence of an intentional comprehensive examination. In the 35 records of dentate patients, no formal periodontal assessment was performed, meaning there was no documented use of a periodontal probe to assess attachment loss or assign a periodontal classification, resulting in 0% compliance. Additionally, there was no documentation of soft tissue examinations being conducted.

Nine of the 37 records (24%) indicated that a treatment plan had been developed but without the benefit of a periodontal assessment or soft tissue examination. In these cases, dentists typically created abbreviated treatment plans following the required biennial examination.

Only three of the records reviewed (8%) showed evidence of intraoral radiographs taken as part of the treatment planning process. Seven records (19%) indicated that recent panoramic films were made, while

270

29 records (81%) lacked evidence of a panoramic X-ray, and one record revealed an outdated panoramic film.[783]

In most cases, dental hygiene was not included as part of the treatment plan. Of the nine patient records with treatment plans, only three indicated that oral hygiene was part of the planned care.

Patients were generally scheduled for biennial exams, which varied in thoroughness. Some patients were fortunate to have a dental hygiene appointment and a biennial exam performed concurrently.

*Discussion*

There is no continuity in which providers perform examinations or develop treatment plans. The only comprehensive examination and thorough treatment plans the Monitor observed were for edentulous patients because there were no periodontal considerations, and the patient's teeth had already been extracted.

Despite introducing a new dental policy, there seems to be a lack of consistency in how examinations and treatment plans are formulated across the system. It is unclear whether dentists have received proper communication or guidance regarding the requirements for conducting examinations and structuring treatment plans. The Monitor recommends developing annual and new-hire orientation training for dental staff to standardize the process of examinations and treatment planning throughout the enterprise.[784]

The Monitor finds that examinations and treatment plans in this review of records were insufficient. This will most likely improve when dentists adhere to the new policy E.04.01.

**RECOMMENDATIONS:**

1   Establish a standardized format for treatment plan documentation within the dental records. Whether it's a new form like DOC 0422 or an enhanced comprehensive treatment plan form, ensure consistency across all facilities. This form should explicitly require a comprehensive dental examination before treatment planning.
2   Emphasize the importance of comprehensive dental examinations before formulating treatment plans. Ensure that all comprehensive examinations include the required elements: periodontal assessment, soft tissue examination, hard tissue examination, bitewing X-rays, and full-mouth or panoramic films. Develop a protocol to guarantee intentional comprehensive examinations are performed on all patients receiving dental care.
3   Ensure that all comprehensive dental patient examinations include a periodontal assessment. Periodontal probes are needed to assess attachment loss and make periodontal classifications.
4   Ensure that intraoral radiographs are consistently made as part of the treatment planning process. Standardize the use of recent panoramic films in patient records and avoid reliance on outdated films.
5   Incorporate oral hygiene as a regular component of treatment plans for all applicable patients.

---

[783] Panoramic films are outdated if they are more than 5 years old
[784] Implementation Plan task 92 Develop annual and new hire orientation training for dental staff. Training to include: 1. Dental records with comprehensive examinations, X-Rays (sic), and treatment plans.

6   Introduce annual and new hire orientation training for dental staff, focusing on the importance of comprehensive examinations, consistent documentation, and treatment planning. Provide ongoing education to address provider training gaps, particularly in periodontal assessments and radiographic procedures. Task 92 of the Implementation Plan speaks to how this can be achieved.

## Appendix A

| Appendix A: OCM Budgeted/Filled Staff as of 5/1/2024 | | | |
|---|---|---|---|
| Category | Budgeted | Filled | Explanation |
| **Management and Admin** | | | |
| Executive Director | 1 | 1 | |
| Business Admin Associate | 1 | 0 | Part time and unfilled; funding to be used for pharmacists |
| Chief Medical Director. | 1 | 1 | |
| Administrative Support | 4 | 4 | |
| Medical Office Coordinator | 1 | 1 | |
| Fiscal Officer/Accountant | 0.6 | 0.6 | Does financial book keeping for the project |
| Director of Expansion. | 1 | 1 | Initiates new programs and modifies existing programs to fit IDOC needs |
| **Support Programs for IDOC** | | | |
| Project Manager | 1 | 1 | Just hired; SIU hired the policy project manager for IDOC |
| Health Matters Program Director | 1 | 1 | Just hired. This position coordinates educational, literacy, and clinical training to support implementation of initiatives. There will be a significant focus of patient health education and literacy. Different staff within IDOC will identify training needs and then refer to Health Matters who will locate a trainer. Trainers will be from IDOC or through OCM. |
| Obstetrician/Gynecologist (Medical Director of Women's Correctional Health) | 1 | 1 | Works in Carbondale, consults with Maternal Fetal Medicine department on high-risk OB patients who are seen from Logan. |
| **Quality Improvement Programs** | | | |
| Director of Quality Management & Operational Excellence | 1 | 1 | Quality Program Director |
| Board-certified Primary Care Physician | 1 | 1 | 6 internist from SIU work part time which equates to 1 FTE. They work on mostly mortality reviews, develop opportunities for improvement, identify adverse events, serve on peer review committee, are working on a Geriatric tool, educational materials, or anything Dr. Bowman asks for. |
| Advanced Practice Nurse | 1 | 1 | Assists in mortality reviews |
| Quality Specialist RN | 6 | 3 | Gathers performance and outcome data and assists in mortality reviews |
| Quality Specialist Non-clinical | 4 | 4 | Assists in gathering performance and outcome data. |
| Data Scientist | 1 | 1 | Money paid to a Center for Clinical Research staff member to manage data entered into REDCap equivalent to 1 FTE. |
| Senior Quality Specialist | 2 | 2 | Coordinates data collection from performance reviews into REDCap. If one of these becomes vacant a person in Center for Clinical Research fills in. |
| Clinical Data Specialist Analyst | 1 | 1 | This position is currently vacant. This position responsibility is to take data collected from record reviews and performance and outcome audits and enters it into REDCap with ability to transfer onto spreadsheets. When the assigned person is unavailable, as is the case currently, various staff from Center for Clinical Research take on this responsibility. Currently there are 4 individual in CCR who do this for the total equivalent of 1 FTE. |
| Director of Pharmacy Standards & Operations - PharmD | 1 | 1 | Directs evaluation of pharmacy services and administration to provide OHS with "best practice" recommendations. |
| PharmD | 5 | 4 | Review pharmaceutical management within IDOC. Develop and recommend best practices in pharmacy. Assist in mortality reviews on items related to pharmacy and drug use practices. Will evaluate pharmacy and medication administration practices system wide. Assigned to regions. |
| Deputy Director Quality Integration | 1 | 1 | This program is just starting. Serves to integrate quality findings into changes at the facility level. |
| Quality Integrator RN (1 FTE - 4 posted) | 5 | 1 | This program is just starting. These positions are assigned to specific regions. Serves to integrate quality findings into changes at the facility level working with CQI coordinator. |

| Consultants | | | |
|---|---|---|---|
| Dentist (SIUE consultant) | 0.25 | 0.25 | This position just hired. Drafted a manual for Dr. Austin. Currently evaluating dental program. The ultimate intention is to have 3 FTE dentists with 1 FTE dental director to perform audits. |
| Dietitian (consultant) | | | Worked 90 hours over the past year. Does not provide consulting with individual patients. Worked on diet menu plans for IDOC. |
| **Totals** | **41.85** | **32.85** | |

**Appendix B**

October 28, 2020
*VIA EMAIL*

Kelly Pressley
Illinois Department of Correction

Based on a dispute resolution meeting, Plaintiffs informed the Monitor that IDOC was awaiting our comments on the Staffing Plan and Implementation Plan. The Monitor believes that the Second Report contained information regarding our thoughts on the Staffing Analysis and Implementation Plan. At our recent call the Monitor stated that we would reiterate the opinions described in the Second Report and confirm that these are our conclusions based on the IDOC Staffing Analysis of 6/18/20 and Implementation Plan of 6/12/20. The following is a summary of comments on the most recent Staffing Analysis and Implementation Plan. The Monitor retains the right to modify the comments below based on any additional information and data.

Staffing Analysis

Areas of the staffing analysis that need to be addressed by IDOC:

1. A standardized methodology of analyzing workload should be developed to determine position needs. Although there were some workload standards used to determine nursing staffing, it was not done for all IDOC's varying sites and services including nursing assignments, dental, clinical providers, optometry, physical therapy

2. It has been the Monitor's position that all positions need to be allocated in the current year's budget. In a recent call with OHS and IDOC, the Monitor was advised that allocated positions are the equivalent of budgeted positions and that all allocated positions can be immediately hired.

3. The Monitor has been advised that State budget has sufficient funds to hire all vacant positions and the newly recommended positions in the 6/18/20 staffing analysis. With the exception of the newly created positions of Quality Improvement Director and Infection Control Coordinator, virtually all the newly recommended positions have not yet been allocated. The Staffing Analysis and the Implementation Plan needs to state which positions and when all newly recommended positions will be allocated.

4. Multiple key consulting positions (audit teams, quality improvement consultants, process improvement staff, and information technology data teams) are not allocated. Three IT tech positions are listed in the Staffing Analysis but there are no quality improvement consultants, process improvement staff, or audit team positions listed in the Staffing Analysis. These positions must be incorporated into the Staffing Analysis and the Implementation Plan needs to describe how and when these positions will be allocated and hired.

5. The Monist remains concerned that lack of the delay in filling positions is affecting multiple areas of the Consent Decree and is making it difficult to develop and implement the Implementation Plan. This is particularly true for OHS and consulting positions (QI consultants, audit teams, process improvement, and data and other IT personnel). These key positions should be filled immediately. All remaining vacant and unfilled allocated positions need to be filled as soon as possible.

6. The Monitor has recommended that a recruitment task force be established with an explicit goal of reducing the vacancy rate to less than 12%. This is described in the 2nd Report.

7. The Monitor has recommended that methodology for staffing infirmaries include perspectives from skilled nursing and nursing home experience as appropriate for the patient panel and acuity of each infirmary.

8. The Staffing Analysis contains has no positions dedicated to an audit team.  In the Implementation Plan the IDOC notes that either OHS or another disinterested auditor will perform this function but IDOC stated that it plans to hire staff to manage the audit process.  In the Implementation Plan, IDOC proposed a single team of three to four individuals to perform this function which would entail auditing all facilities, performing mortality reviews, perform preventable adverse event auditing, and identify from these opportunities for improvement.  The Monitor recommended that the Staffing Analysis contain 5.5 members for each of two teams (11 total positions).  Each team would consist of a team leader, a physician, a nurse practitioner or physician assistant, two nurses, and a half time dentist.  The Monitor also has communicated that a single audit team could be hired in the first year and the second team in the next year.

9. As stated in the 2nd Report, the Monitor disagrees with the number of Information Technology members the IDOC proposes in its Staffing Analysis.  IDOC, in its staffing analysis, states it will provide a Health Information Technology Coordinator, an Electronic Health Record Administrator, and a Health Information Analyst.  In 2nd Report the Monitor recommended that IDOC hire 12 individuals.  The responsibilities for these individuals are outlined in the section on Medical Records.

10. The OHS Director of Nursing should be on the same level as the Deputy Chiefs and Medical Coordinator not reporting to the Medical Coordinator.

11. The HCUAs should report through the Chief OHS and not through the Wardens.  This was agreed to but is not evident in policy or table of organization.

12. The table of organization should reflect that Wexford staff report through OHS and audit, quality improvement, process improvement, and data positions should be reflected in the table of organization.  The table of organization does not show these relationships.

13. A "relief factor" needs to be calculated into nurse staffing at facilities.

14. The facility nurse positions should be broken down by function (infirmary, administration, clinics, infection control, quality improvement, etc.) and by site/shift to determine adequacy of nurse staffing to ensure that there are sufficient nurses based on assignment.

15. Excluding 2 small sites without onsite dental services, ten facilities of 28 IDOC facilities with onsite dental suites currently do not have a dental hygienist position.  IDOC proposed adding dental hygienist positions in the 6/18/20 staffing analysis at seven of the ten facilities but NRC, Vienna, and Western still have no hygienist positions. In the Implementation Plan IDOC commits to every facility having dental hygienists to meet facility needs without explanation for how facilities without a hygienist will obtain that service.

16. The 6/18/20 Staffing Analysis augments dentist staffing at five facilities but the methodology used to determine dentist staffing has not yet been provided to the Monitor. For example,  Vandalia (1,222) population will have 1.5 FTE dentists while Dixon (2,051) population and Hill (1,698 population) will have only 1.0 FTE dentists. The Monitor understands that the number of dental chairs may currently be a limiting factor at some IDOC facilities.

17. The Monitor asked for the IDOC methodology of determining an appropriate number of physicians, physician assistants and nurse practitioners based on acuity, population, and facility function.  This was not yet been provided.

18. Optometry services did not appear standardized with some facilities not appearing to have appropriate number of optometry hours.  Optometrists per 1000 patient-inmates at maximum

security facilities varied from 0.07 at NRC and 0.17 at Pontiac to 0.38 at Menard, at medium facilities from 0.07 at Centralia and Danville to 0.23 at Lawrence, and at minimum sites from 0.075 at Lincoln to 0.21 at Robinson. The 6/18/20 Staffing Analysis increased Optometry staffing by 1.6 full time equivalents (FTE) but some of the facilities of concern still had no changes to the optometry hours and had lengthy waiting times and backlogs.

19. Excluding four smaller sites, physical therapy services were only provided at 8 of IDOC's 26 large correctional centers in 2019. The 6/18/20 Staffing Analysis proposed adding physical therapy at two additional sites but this will leave sixteen facilities housing nearly twenty thousand men of whom approximately 4,000 are 50 years of age or older without onsite access to physical therapy. The 6/12/20 revised Implementation Plan does commit to evaluating the need for physical therapy services at all twenty-six IDOC facilities with infirmary beds[785], but as of yet the Monitor has not received any information related to this evaluation.

20. The 6/18/20 Staffing Analysis appropriately recommends increased physician staffing at three facilities and additional NP/PA staffing at twenty-one facilities; however, four sites (Southwestern, Robinson, Decatur, and JTC) still will have an NP/PA position. The Monitor strongly advises that all of these sites have at least one NP/PA.

21. Joliet Treatment Center is being renovated to accommodate a number of medical beds and services. The Monitor has been advised that the renovation of JTC will be completed in late 2020 or early 2021. To date the Monitor has not been informed of the expanded scope of clinical services at JTC but the IDOC has agreed to arrange a call between the JTC project manager and the Monitor in the near future. A contracted consultant has projected that the renovated JTC will need a large number of additional clinical positions: however, 6/18/20 the Staffing Analysis only recommends eight additional positions at JTC. The Staffing Analysis needs to be modified to reflect the any additional positions required to support the expanded services at JTC.

22. The Monitor has asked for the methodology of determining phlebotomy, medication room assistants, medical record staff, and office staff but has not yet received this information.

23. Some facilities have a Wexford site manager and some do not. What is the role of this position and does this position have any clinical or operational responsibilities? This question was not addressed in the Staffing Analysis. IDOC added 8 site manager positions. The Monitor views these positions as not contributory to clinical services at the facility and do not understand the responsibilities of this position.

24. The Monitor has requested for job descriptions for all positions and has received most position descriptions for only the Office of Health Services.

25. Quality improvement consultant and process improvement positions that had been discussed with UIC and mentioned in the 6/12/20 Implementation Plan are not included in the Staffing Analysis. If these positions will be contract consultant positions, the IDOC, as of yet, has not mentioned who will hire these individuals.

Implementation Plan

With respect to the Implementation Plan, in my report I acknowledge and agree with the seven goals that the IDOC described in their 6/12/20 Implementation Plan. However, those goals lack any tasks, detailed plans or timetables that inform how these goals will be accomplished or who will perform these goals. It is difficult to comment on a plan that only consists of goals without a plan for how to enact those goals. For that reason, it will be difficult to comment on a plan until the plan is completed.

---

[785] Elgin, JTC, Murphysboro, and Vienna do not have infirmaries

277

The Monitor has the following comments on the IDOC 6/12/20 Implementation Plan;

1. As discussed in 2nd report, the Implementation Plan does not include a plan for dental care except to increase hygienists and ensure that dental equipment is surveyed. The Implementation Plan needs to include its plan to implement improvements to the dental program.

2. As discussed in 2nd Report, there is also no plan for addressing physician quality or how IDOC will obtain qualified physicians with the exception of the agreement with SIU to provide physicians at four facilities. The role of SIU at these four sites remains unclear as the contract with Wexford is still in place and at our only meeting with SIU and IDOC, it wasn't clear whether the Wexford Medical Director or the SIU physician would be in charge and whether SIU would participate in all clinical activities. At the remaining IDOC facilities the Implementation Plan does not address how qualified physicians will be provided at the remaining sites.

3. Training on and implementation of policies or a timetable for completion of policies is not addressed in the Implementation Plan. In a letter from Nicholas Staley to Harold Hirshman on May 6. 2020, IDOC stated that policy development would be delayed until the World Health Organization no longer considers COVID-19 a pandemic. This could be a year or longer into the future which is an unrealistic delay to continue policy development. Since the IDOC can hire all the allocated staff, necessary staff should be hired to permit the development of policies to move forward.

4. IDOC acknowledges in the Implementation Plan that the Chief of the Office of Health Services will be the Health Authority yet provides no formal acknowledgement of this and no current administrative directive or IDOC table of organization which establishes this. Because this is a change from prior practice, it is not clear how this will be implemented. This should be addressed in the Implementation Plan.

5. Telemedicine services will be key to enhancing access to qualified physicians including specialists within IDOC but telemedicine equipment, physical locations of equipment, and procedures for telemedicine are not addressed.

6. E-consultation would provide valuable and likely cost-effective clinical advice and guidance to the clinical providers in the IDOC. This needs to be addressed in an Implementation Plan.

7. The 6/12/20 Implementation Plan stated that the IDOC is exploring expanding UIC's involvement in "….the provision of Hepatitis C…services." The IDOC needs to develop and include a comprehensive plan to increase access to Hepatitis C treatment for the IDOC population.

8. IDOC Implementation Plan noted that the functions of the audit team includes assuring that all data elements will be in the medical record and compiling and providing data to verify compliance with the Consent Decree and that the IT team will have the training and equipment to extract data from the EMR and provide data for the QI program and to verify compliance with the Consent Decree. However, the EMR has been significantly delayed, the IT team will not be hired for 12-24 months, and the no timeline for hiring the audit team(s) has been presented to the Monitor. IDOC must expeditiously develop an interim plan to gather data needed to verify compliance with the Consent Decree until the audit and the IT team are fully operational.

9. The Consent Decree required that UICCON is to advise IDOC on implementation of a

comprehensive quality improvement plan with input from the Monitor. IDOC accepted a final quality improvement plan from UIC without input from the Monitor. After the plan was submitted, the Monitor team met with UICCON to give input. This occurred at meetings with OHS and UIC. UIC was in process of revising their plan when arrangements between UIC and IDOC ended. The Implementation Plan stated that IDOC was developing a phase 2 quality program giving only a general outline that did not entirely match discussions that had occurred between UIC, IDOC and the Monitor. Specifically, audit team size was different, relationships between data teams and the quality and process teams were not described. The different quality and process consultants (engineering consultants and quality training consultants) were not described. The interactions between an OHS quality improvement team and facility quality improvement teams were not fully discussed. The audit team duties were quite extensive and would likely not be able to be performed by one or possibly two audit teams. Some of the team's described duties and tasks will need to be assigned to the data team and the quality and process improvement consultants and staff. These issues need to be clarified and details of this program need to be augmented in the Implementation Plan.

10. IDOC suggested in the Implementation Plan that SIU may assume the role that UIC was discussing taking responsibility for, with respect to quality improvement. For these reasons, the Monitor is requesting more information with respect to the IDOC relationship with SIU and look forward to meeting with the SIU representatives responsible for the quality improvement project as soon as possible and before an agreement is expanded and a proposal finalized.

11. The IDOC does not address statewide quality improvement efforts to coordinate facility quality improvement efforts. While there is a statewide quality improvement coordinator, the responsibilities and role of this person and the responsibility of statewide quality efforts is not evident in the implementation plan. These issues were discussed OHS at prior meetings (with UICCON)
but agreements at those meeting were not present in the Implementation Plan.

12. In the Implementation Plan, IDOC stated a goal of performing an equipment and physical space survey but IDOC has not provided details of how this will be done. IDOC indicated that they would survey all physical spaces and equipment statewide. The Monitor would like to discuss with IDOC how this will be done prior to performance of this survey so that they can provide input on what should be evaluated and who should perform this audit. The Implementation Plan also needs to include a timeline for the survey and how and when it will implement recommendations of this survey in order to improve deficient clinical spaces and equipment needs.

13. The Implementation Plan states IDOC is working with the Illinois Department of Aging to perform a survey of the elderly in order to develop a basis for obtaining appropriate resources, programming, and housing for the aged who may be disabled or need assistance with activities of daily living. The Monitor asks that prior to initiation of any survey that the Monitor has an opportunity to weigh in and evaluate the proposed survey and any plans based on information gained in that survey. The Implementation Plan also needs to include how it will implement recommendations of this survey.

14. In the Implementation Plan, IDOC stated that it would collaborate with the Illinois Department of Public Health (IDPH) to provide guidance to IDOC on infection control matters. Specific details of this arrangement were not stated. The Monitor asks to be provided with any specific details of these arrangements. These details need to be included in the Implementation Plan.

The Monitor will also ask to meet with the representative of IDPH who is planning future coordination on guidance to IDOC.

15. The Implementation Plan needs to describe how quickly vacant and newly created positions will be hired. As stated in the 2nd comment in the Staffing Analysis section, key positions need to be hired immediately.

16. The Implementation Plan states a desire to improve academic relationships. The Monitor agrees with this goal. If SIU is to replace UIC with respect to the quality improvement program, audit teams and data teams, these plans should be included in the IDOC Implementation Plan. As noted above the Monitor is looking forward to the proposed meeting with the SIU representative who is responsible for negotiating and developing this service.

17. IDOC has stated that the COVID-19 pandemic will delay implementation of seven Consent Decree items. It is opinion of the Monitor that prompt hiring of staff, especially of OHS and key positions, will allow implementation of the Consent Decree to proceed. For that reason, staff should be promptly hired in order that implementation of the Consent Decree can proceed.

We look forward to further discussions on the Staffing Analysis and Implementation Plan.

Sincerely,

Jack Raba, MD
Medical Monitor
Lippert v Jeffreys Consent Decree

## Appendix C

Medical Policy and Procedure Manual
Table of Contents

## Section A: Governance and Administration

A.01.01     Access to Care
A.02.01     Responsible Health Authority
A.03.01     Medical Autonomy
A.04.01     Administrative Meetings and Reports
A.05.01     Policies and Procedures
A.06.01     Quality Management Program
A.06.02     QM: Adverse Clinical Event Reporting, Morbidity and Mortality Review
A.06.03     QM: Clinical Peer Review
A.07.01     Privacy of Care
A.08.01     Notification Requirements Regarding Clinically Ill Patients
A.09.01     Grievance Mechanism
A.10.01     Procedure in the Event of an Individual in Custody Death

## Section B: Health Promotion, Safety, and Disease Prevention

B.01.01     Preventive Services and Periodic Health Assessment
B.02.01     Health Education and Promotion
B.03.01     Staff Safety

## Section C: Personnel and Training

C.01.01     Licensure and Credential Verification
C.02.01     Professional Development
C.03.01     Medical Training for Correctional Officers
C.04.01     Individuals in Custody Working in the Medical Department
C.05.01     Medication Administration/Delivery, Count Process and Training
C.06.01     Staffing Levels
C.07.01     New Employee Orientation for Health Care Staff

## Section D: Health Care Services

D.01.01     Emergency Plans and Drills
D.02.01     Pharmaceutical Operations

D.03.01    Clinic Space, Equipment, and Supplies
D.04.01    Offsite Clinical Care
D.05.01    Therapeutic Diets
D.06.01    On-Site Diagnostic Services
D.07.01    Patient Escort

## Section E: Patient Care and Treatment

E.01.01    Health Care Discharge Planning
E.02.01    Counseling and Effective Clinical Communication
E.03.01    Intra-system (Transfers within IDOC) Receiving, Transfer and Continuity of
           Care Screening
E.04.01    Oral Health Services
E.05.01    Intersystem Receiving Screening
E.06.01    Non-Emergency Health Care Requests and Services
E.07.01    Information of Health Services
E.08.01    Emergency Services
E.09.01    Facility Emergency Response
E.10.01    Medical Holds

## Section F: Special Needs and Services

F.01.01    Transport of Patients with Acute Conditions
F.02.01    Chronic Care
F.03.01    Care of the Pregnant Patients
F.04.01    Infirmary Level Care
F.05.01    Medically Supervised Withdrawal and Treatment
F.06.01    Medical Permits

## Section G: Infection Control

G.01.01    Infection Control Program
G.02.01    Disease Reporting
G.03.01    Facility Infection Control
G.03.02    Facility Infection Control Notifications
G.04.01    Infection Control Committee
G.05.01    Employee TB Testing
G.06.01    Prevention of Hepatitis B in Employees
G.07.01    Medical Management of Infectious Exposures
G.08.01    Immunization

G.09.01      Standard Precautions
G.10.01      Transmission Based Precautions
G.11.01      Handwashing
G.12.01      Cleaning and Disinfection of Reusable Medical Instruments/Devices
G.13.01      Disposal of Instruments, Needles, and Syringes (Sharps)
G.14.01      Potentially Infectious Medical Waste Management
G.15.01      Patient Bloodborne Infections Exposure
G.16.01      Personal Protective Equipment (PPE) and Other Supplies
G.17.01      Instrument Sterilization
G.18.01      Infection Control in Dental Clinics and Dental Laboratories
G.18.02      Dental PPE
G.18.03      Dental Occupational Exposure
G.18.04      Dental Operational Infection Control Procedures
G.18.05      Dental Hand Hygiene
G.18.06      Dental Barrier Techniques for Semi-Critical Pathways
G.18.07      Dental Microbial Aerosol Control
G.18.08      Dental Sharps and Biohazards
G.18.09      Dental Barrier Techniques for Non-Critical Pathways
G.18.10      Dental Radiology
G.18.11      Dental Laboratory
G.19.01      Barber/Beauty Shop Personnel (Health and Hygiene)
G.20.01      Food Handlers
G.21.01      Housing and Job Restrictions
G.22.01      Health Care Unit Environmental Inspections

## Section H: Health Records

H.01.01      Organization, Maintenance and Governance of Health Records
H.02.01      Health Services Forms Control and Design
H.03.01      Confidentiality and Release of Protected Health Information
H.04.01      Transfer of Health Records
H.05.01      Retention or Destruction of Health Records

## Section I: Medicolegal Issues

I.01.01      Patient's Right to Refuse Treatment and the Department's Right to Compel
             Treatment
I.02.01      Health Evaluation of Patients in Restrictive Housing
I.03.01      Medical and Other Research
I.04.01      Therapeutic Relationship, Forensic Information, and Disciplinary Action

I.05.01        Medical Restraints

Attachments
None were provided

Monitor's 8th Report
Lippert v. Jeffreys
Mortality Reviews

## Patient #1

Problem List and Advanced Directives
This was a 83 year-old man. His problem list was inaccurate. The problem list documented chronic obstructive lung disease (COPD) and hypertension, but the patient additionally had sleep apnea and osteoarthritis. The problem list documented he was "do not resuscitate" status though the patient signed a power of attorney in 2018 as a civilian and the document was in the medical record. There was no evidence that the power of attorney had been contacted about the patient by prison personnel even when, later in his life, he had cognitive decline. There was also no effort by IDOC to determine if the patient had capacity to make an informed medical decision. On 8/29/23 the patient signed a physician order for life sustaining treatment (POLST) that was discussed with the patient by a prison physician that documented the patient wanted full treatment. The power of attorney signed prior to incarceration did not participate in this decision making. During a final hospitalization, the hospital contacted the power of attorney who asked that the patient be placed in hospice. For years, IDOC failed to contact the power of attorney even when it may have been indicated to do so.

Chronic Care
While the record that was provided to us contained progress notes from February, 2023 until the patient's death on 12/5/23, it did contain the chronic clinic notes from prior years. The patient was evaluated in chronic disease clinic only once in each year of 2020, 2021, and 2022. The chronic care encounters from 2020, 2021, and 2022 demonstrated substandard chronic care. His sleep apnea and osteoarthritis were not addressed at any clinic visit. The patient had osteoarthritis yet, despite the patient stating he was told he needed knee replacement, there was no evaluation of the status of the osteoarthritis or consideration of knee replacement. At all visits, the patient was documented as having chronic obstructive pulmonary disease (COPD) but was assessed as if he had asthma.

In 2023, the patient had no chronic clinic visits and none of his chronic illnesses were addressed. The patient had multiple hospitalizations and when new diagnoses were made (atrial fibrillation, heart failure, obstructive uropathy with acute kidney injury, adrenal adenomas, anemia, aortic aneurysm, and NSTEMI-2[1]) none of the newly diagnosed conditions were monitored, evaluated or even acknowledged.

Dental and Diet
The patient was incarcerated on 8/4/20 and was noted on intake as having only three teeth left. No plan of care was initiated. There was no assessment of the condition of the teeth. The patient wasn't seen again by dental until 7/24/21 almost a year after intake. The dentist again documented that the patient had only three teeth and wanted them pulled. The dentist noted poor periodontal condition. The patient was scheduled for extractions which didn't take place until 12/3/21 about

---

[1] This is a type of heart attack.

1

16 months after intake and over four months since the patient was initially seen at the "home" facility.  After 2021, the patient had no teeth.  This delay was likely related to the COVID pandemic.  An impression for the prosthetic was not made until 4/8/22 and the patient did not receive a dental prosthetic until 7/6/22. Almost a year and a half later, on 11/13/23, the dentist saw the patient for "ill-fitting" dentures.  Because the dentures were loose, the patient wasn't able to use them.  The dentist scheduled the patient for an appointment to fix the dentures but the patient expired in December of 2023 before a follow up visit was completed.

Because the patient had difficulty eating due to no teeth or ill-fitting dentures, the patient had been on a dental soft diet since 7/24/21.  Yet, there was no dietary consultation to determine if he was getting sufficient nutrition nor was it ever determined what the patient was eating at any chronic clinic visit.  Weights were infrequently taken.  The medical record cover lists his intake at NRC on 8/4/20.  He was transferred to Centralia on 9/8/2020 and weighed 220 pounds at a chronic clinic on 9/30/20.  He gained 28 pounds to 248 pounds when seen in a chronic clinic encounter on 4/20/22 but then began losing weight.  The last weight we could find in the record was on 11/29/23 when he was in the hospital and weighed 200 pounds which is a 48 pound weight loss over a year and a half earlier.  There was no effort to address the cause or remedy for this weight loss.  Because the patient gained weight at a time when he had no teeth, the weight loss was likely attributable to other causes including possible cognitive or mobility issues.  In any case, the weight loss and diet weren't being monitored.

<u>Physician Coverage</u>

Documents from July 2023 show that the Medical Director position was vacant.  In the Monitor's opinion, the root cause of the problem of vacant physician positions is the inability of the vendor to attract, recruit and retain qualified physicians.  For this patient, there were only five in-person physician encounters by two physicians in 2023; none of them was thorough or consistent with standards of care.   Both of the physicians lack credentials required by the Consent Decree (III.A.2).  One was a physician whose care the Monitor has thoroughly reviewed  and advised IDOC that he should not be practicing as he practices in an unsafe and clinically appropriate manner.  The 2nd physician has not been monitored by either IDOC or the Monitor.  This physician is moved around to fill in and finding representative records of care he has provided is difficult.  This record demonstrates that he should also not be practicing because of unsafe and clinically inappropriate practice.  Physicians without appropriate credentials required by the Consent Decree should not continue to practice.

There was very little physician or mid-level provider contact with this patient.  The patient complained about this to a psychiatrist on 2/16/23.  The psychiatrist documented that the patient was frustrated about lack of medical care.  Though, no details were provided, the patient's concern was valid.

On 2/25/23, a nurse responded to an emergency noting that the patient had difficulty speaking and left sided weakness and thought the patient was having a stroke.  There was no evidence that a physician was available for consultation and the nurse did not document speaking with a physician.

The patient was admitted to a local hospital and was promptly treated with de-clotting[2] medication (TPA) on suspicion of a stroke and referred to a tertiary care hospital. At that hospital the patient had no evidence of a stroke, central nervous system mass, or bleeding. He was oriented and aware, but a physical therapist noted that he had decreased awareness of the need for assistance and difficulty with activities of daily living. He needed assistance with transfers and needed verbal cues for safety and transferring from sitting to standing. He had limitations with movement and decreased functional balance and endurance. He was short of breath with activity and developed low oxygen while sitting which improved with activity.[3] He described one fall in the past 6 months. This picture describes a frail elderly man with functional movement disability who might have early dementia though he did not have a cognitive study in the hospital. He did not have a stroke but was diagnosed with a transient ischemic attack (TIA)[4]. The hospital documented his sleep apnea and hypertension as problems but did no investigations of these conditions except for routine blood pressure checks. He had mild anemia on blood tests in the hospital but this was unrecognized at the prison.

On 2/27/23, the patient returned from the hospital and a nurse placed the patient on the infirmary and gave him a walker. Coverage-physician-1 saw the patient two days later. This was the first of two in-person physician visits during 2023 by coverage-physician-1. This first physician note was written on an infirmary discharge summary form. The patient had been admitted to the infirmary by nurses but when the physician saw the patient he immediately discharged him without any examination. The patient had a recent TIA and had no prior physician monitoring of his COPD, osteoarthritis, sleep apnea, abdominal hernia, and hypertension for a year. The note was 32 words long as shown below.

> Admitting Diagnosis: "Post [cerebrovascular accident][5] [with] TPA[6]"
> Discharge Diagnosis: "Stable post-CVA
> Infirmary Course: [illegible word] stable, ambulating [with] a cane.
> Infirmary Discharge Orders: [continue] current meds; encourage to wear his abdominal binder; issue walker
> Follow Up Plan: will [follow up] [after] [appointment] [with] neurology.[7]

Problems with this note were as follows.
- There was no history of any of the patient's problems.
- There was no physical examination concerning problems related to the hospitalization or to the patient's chronic illnesses.

---

[2] The standard of care for a stroke is for a hospital on suspicion of a stroke to give a medication to dissolve the clot causing a stroke and to refer to a stroke center or regional hospital better equipped to manage strokes.

[3] His oxygen saturation was 83-86% when sitting and rose to 91% when walking and 92% post-exercise. All of these numbers demonstrate low oxygen in his system.

[4] A transient ischemic attack (TIA) is a presentation with symptoms consistent with a stroke but which resolve. A TIA is so classified when the symptoms are related to brief blockages of blood flow to the brain. These episodes don't cause long-term damage and resolve but portend a future stroke which occurs in about one in three people who have a TIA. This patient left the hospital with a diagnosis of TIA.

[5] Cerebrovascular (CVA) refers to a stroke.

[6] TPA is the de-clotting medication

[7] The words in brackets were all abbreviation but written out for clarity.

- The physician's understanding of the hospital diagnosis was inaccurate; the patient did not have a CVA he had a TIA,
- The hospital record was not documented as reviewed.
- There was no follow up post-hospitalization and review of hospital findings to provide informed care to the patient.
- Anemia identified in the hospital was not recognized. A blood count from 2/25/23 showing mild anemia was in the record but not acknowledged.
- The problem list was not documented as updated.
- None of the patient's current chronic diseases (sleep apnea, hypertension, hyperlipidemia, osteoarthritis of the knee, abdominal hernia, and COPD), which had not been evaluated for a year, were evaluated nor were the patient's current medications reviewed after the hospitalization.
- Use of an abdominal binder was referenced but the abdominal hernia management was not updated.[8]
- The MRI and CT scan from the hospital were not reviewed. The brain atrophy and small vessel disease suggested possible early senility or dementia which should have been noted in the event there were further episodes of altered mental status. The patient should have had his cognitive status determined.
- Without history, examination, or review of the hospital record, this physician made a housing decision to discharge the patient to general population without consideration of whether this was safe.
- The plan to only provide a walker and cane failed to consider the patient's functional ability. No review of the hospital physical therapy note occurred which gave details on his need for assistance with transfers, prompting for transfers, etc., and implied future need to monitor and manage these disabilities.
- There was no plan to send the MRI and CT scan and hospital discharge summary to the neurologist so that effective communication about the patient's condition could be accomplished.
- Though a referral to neurology was documented in the note, a referral was not on the offsite specialty care log. The physician had written a referral form but the information was inaccurate. The request stated that the patient had recent cerebrovascular accident but the patient actually had a transient ischemic attack. This referral was not timely and occurred over two months later.

This evaluation continued the practice of episodic care, only responding superficially to the most immediate need. Almost none of the patient needs were addressed which is particularly important when coverage doctors are seeing patients.

Within a week of discharge from the infirmary, on 3/8/23, a nurse scheduled the patient to see coverage-physician-1 for his 2nd encounter with this patient. The nurse documented an introduction to the visit stating that the patient needed to be seen as to whether he needed a wheelchair due to his legs being weak from his TIA and said "do not cancel per HCUA".

---

[8] A May, 2022 ultrasound showed loops of bowel in the hernia. This should have been confirmed with CT and if accurate the patient should have been referred to a surgeon for repair

Apparently, the HCUA became aware of some type of functional difficulty and wanted the patient examined.  Coverage-physician-1 saw the patient and his note was very brief as shown below.

> S: Have a walker [and] a cane.  Used the [wheelchair] [after] discharge from the [infirmary].  Is OK [without] a [wheelchair].
> O: ambulating well [with] the walker.
> A: Discussed that if a time arrives when he can't go to the pill line / chow then we can address leg weakness then.
> P: No current need for a [wheelchair].

This note was episodic and the many of the same criticisms given above are present in this note.  However, key problems are:

- There was no history or examination that may have elucidated the activity of daily living and functional problems that the patient was clearly having in general population for which infirmary housing or additional disability aids were indicated.
- This patient had a prior recommendation for a knee replacement but his significant degenerative arthritis was not addressed nor was an appropriate accommodation made for his disability.  Orthopedic referral was indicated but not done.
- The patient had a fall history but this was not inquired about or evaluated.
- Again, the patient's chronic illnesses had not been evaluated in a year and any opportunity to do so should have been taken.
- The denial of a reasonable accommodation for his disability was unsafe,  clinically inadequate,  and bordered on cruelty.

About two weeks after coverage-physician-1 discharged the patient from the infirmary, on 3/10/23, a nurse evaluated the patient for knee pain documented as constant.  The patient asked for a different walker.  The nurse did not refer the patient.  On 3/16/23, coverage-physician-2 was asked to see a patient to review ultrasound results that occurred on 5/31/22 to evaluate an abdominal hernia.  The test documented that the hernia may contain loops of bowel which could place the patient at risk of incarceration of the hernia.  CT scan was recommended for further evaluation.  When coverage-physician-2 saw the patient, the ultrasound result was not addressed.  The entire note consisted of 18 words as shown below.

> S: Patient is [with] [chief complaint] right knee pain
> O: states walking with walker
> A: Arthritis
> P: X-ray [right] knee; referral orthopedic[9]

Problems with this encounter were as follows.

- The purpose of the visit (to evaluate an ultrasound result) was not accomplished.
- Coverage-physician-2 took no history of the pain nor did he complete an examination or functional assessment related to the knee pain.  On 3/14/23, a psychiatrist documented that the patient continued to "slur his words" so a better examination was called for, particularly in light of the recent hospitalization.

---

[9] This patient was not found on the Centralia 1st and 2nd quarter offsite tracking log so the referral was not documented as in process of being completed.

- This person had been inappropriately discharged from the infirmary to general population a couple weeks previous and whether the knee pain affected his ability to function was not addressed. Coverage-physician-2 failed to evaluate the patient sufficiently to determine whether an appropriate accommodation for his disability was accomplished.
- The patient described, in prior a chronic disease clinic, a recommendation for knee replacement which was not investigated.
- Coverage-physician-2 did order an x-ray but no one followed up on the results. The x-ray result was available the following day and showed moderate to severe joint space narrowing and degenerative changes. There was near obliteration of the medial compartment with osteophytes. MRI follow up should have been done but was not. Orthopedic follow up was indicated but not apparently ordered.
- Coverage-physician-2 also documented he would refer the patient to orthopedic surgery but no referral was found.
- Similar to the practice of coverage-physician-1, the patient's chronic illnesses had not been monitored in almost a year yet no action was taken to do this.
- The recent hospitalization was not acknowledged nor did coverage-physician-2 inquire whether the patient was doing OK since discharge.

This was an unsafe and clinically inappropriate visit because the abnormal test result for which the patient was scheduled was not addressed. The patient's stated complaint was not adequately addressed. Moreover, the patient's chronic illnesses were not attended to.

The inmate was in general population and assigned an ADA[10] helper. It wasn't clear who initially ordered the inmate helper.[11] This verified that the inmate could not function safely on his own. On 3/21/23 the inmate ADA helper brought the patient to the clinic and told the nurse that the patient was falling frequently. The nurse documented the patient's walker was only helpful indoors. So, the nurse , with the ADA inmate, called coverage-physician-1 who gave a telephone order for a wheelchair any time he is going long distances or leaves his housing to go between buildings. This after-the-fact management still did not address the patient's needs because the physician still did not take any history or conduct any examination to determine why the patient was falling. Other factors that may have affected his falls (e.g., current acute illness, cognitive decline or additional functional disabilities) were not addressed. Coverage-physician-1 did not schedule an appointment to follow up on the patient falls and took no other diagnostic measures or change of housing (e.g., infirmary placement) to protect the patient. This was an episodic manner of addressing the patient's disability that was unsafe and clinically inappropriate practice because without determining why the patient was falling potentially placed the patient at risk of future harm.

---

[10] ADA refers to inmates who are assigned to assist elderly or severely disabled inmates. This is not intended to supplant medical care but the Monitor believes the ADA attendant does, at times, substitute for medical supervision. In this case, the inmate likely had severe degenerative arthritis necessitating knee replacement which was not done. He also likely had early dementia and should have been housed with some medical supervision but was placed in general population with an inmate ADA.

[11] There are no formal rules statewide on who is to order ADA helpers nor is there policy or procedure governing use of these services.

6

Later that same evening on 3/21/23 a nurse evaluated the patient again for a "possible TIA" and severe headache. The nurse wrote that the patient was confused when trying to make a phone call and was unable to remember the phone number he was trying to call. Though oriented to person, place, and time he appeared otherwise confused to the nurse. This may have been early cognitive decline attributable to the brain atrophy and small vessel disease in his brain seen on CT scan or something else. The nurse called on-call coverage-doctor-3 who ordered that the patient be sent to a hospital.

The patient was sent to a local hospital on 3/21/23 and a CT scan showed no mass or acute bleeding in his brain but did show mild brain atrophy and small vessel disease consistent with aging and early cognitive changes and dementia in the elderly. The failure to conduct standard cognitive evaluation at the prison ultimately resulted in this hospitalization that was likely preventable. After a CT scan was done, the local hospital immediately sent the patient to a tertiary care reference hospital in Evansville, Indiana for neurological evaluation. The patient returned from the hospital on 3/23/23. The record from the hospital in Evansville was not obtained and was not in the record. The only information about this hospitalization is what the nurse at Centralia wrote when the patient arrived back to the prison on 3/23/23 which was that the patient didn't have a stroke or TIA; instead had a migraine for which Depakote was prescribed. The nurse did not mention whether neurology follow up was recommended. On arrival at the facility, the nurse called coverage-doctor-3 again who ordered the medication and also ordered an inmate ADA attendant and use of a wheelchair when leaving the housing unit. This plan was developed without evaluation of the patient or review of the hospital records and there was no post-hospital evaluation of the patient. This patient's cognitive difficulties and functional disabilities appeared to be more likely a result of early dementia or cognitive decline and the housing assignment did not appear appropriate. In this instance, the assignment of the inmate ADA helper appeared to be a substitute for medical care which is an inappropriate use of inmate workers.

In the meantime, the neurology referral ordered by coverage-physician-1 on 3/1/23 took place on 4/3/23. The neurology report was incomplete and only the first page was available in the medical record. On page one, the neurologist wrote that the patient had functional impairments but no cognitive impairment. The remainder of the note was missing. The referral form that went with the patient for the visit had comments by the neurologist that said,

> 83 year old [with] history of headache. He is doing better [with] Depakote. He has a shuffling gait. [one sentence illegible]. Alert. Oriented. Plan: continue with current dose of Depakote.

Someone wrote on this form "Dr. office will fax order for Sinemet when they fax paperwork back". Sinemet is a drug used for Parkinson's disease and shuffling gait is a manifestation of Parkinson's disease. Someone also wrote that a 3 month follow up was requested to be scheduled sometime around 5/10/23. Coverage-physician-1 signed this referral form as reviewed but another referral back to the neurologist was not written until 5/10/23 about five weeks after return from the hospital. This referral from 5/10/23 was not found on the 2nd quarter offsite specialty log. Because the neurologist's note was not present, it was unclear whether the neurologist diagnosed Parkinson's disease. The problem list was not updated to include migraine or Parkinson's disease and the medical record is uninformed as to what the neurological status of the patient was. When the referral to this neurologist was made by coverage-physician-1, the hospital record including

MRI and CT scan results were not sent with the patient so it was likely difficult for the neurologist to make an accurate diagnosis.

Three days after the neurology consultation, the HCUA confirmed on-call-coverage-physician-3's phone order that the patient was permitted to have a walker, a low bunk, and ADA inmate attendant, and a wheelchair. The HCUA also arranged for the patient to be housed in a unit closer to the health unit. A provider should have completed an in person evaluation to determine the patient's functional capacity and determine whether he was appropriately housed. Instead, this evaluation occurred by phone.

Coverage-physician-2 saw the patient in follow up of the neurology visit on 4/11/23. The patient had not been evaluated by a provider after the 3/21/23 hospitalization, so coverage-physician-2 should have done that evaluation as well. Though the purpose of the 4/11/23 visit was to evaluate the patient post-neurology referral, the only history was that the patient lost his hearing aids and had no further headache. The visit note as written is given below.

> S: Patient states that his hearing aids were lost in transfer from Indiana
> O:[illegible word] states has no headaches since Depakote 500 BID
> A: Parkinson [disease]
> P: Continue Depakote as prescribed. Hearing testing for hearing aids

There was no other history and no examination. The assessment was Parkinson's disease. Because the neurologist's report was incomplete, it wasn't clear that this was a diagnosis of the consultant. The only plan was to send the patient for hearing aids and to continue Depakote. Problems with this encounter were the following.

- If the assessment was Parkinson's disease, the doctor should have confirmed findings of the neurologist, ordered the medication for the patient and ensured that the functional disabilities related to the Parkinson's were addressed with appropriate housing and support. No evaluation took place and the patient's needs were not met.
- This evaluation also did not review the past hospitalization which was only 19 days earlier. The patient had not been evaluated post-hospitalization. The hospital record was not reviewed and the problem list and therapeutic plan of the patient was not updated.
- None of the patient's chronic diseases which had not been evaluated for about a year were evaluated including the newly identified problems from the 2/25/23 hospital admission.
- The neurology full report was not documented as reviewed.
- A follow up neurology referral form was not made. It was written on 5/10/23 about five weeks later but it wasn't found on the 2nd quarter offsite tracking log.
- The physician did not discuss the consultant's findings and recommendations with the patient and did not update the therapeutic plan based on the consultation. The patient was therefore uninformed about his care plan.

This was another episodic encounter that did not address the needs of the patient.

The patient had no further in-person physician evaluations until 8/2/23, about four months later. In the meantime, the following clinical events took place.

- On 4/18/23, a laboratory test confirmed mild anemia (hemoglobin 13) which was not acknowledged.
- On 5/3/23, the family called about the patient having "increased confusion". This resulted in a nurse evaluation who noted that the patient did get confused about who he was approved to call and on what day he was approved to call. A nurse found the patient oriented to person, place, and time, but no further clinical evaluation or history occurred and the patient was not referred to a provider. A mini-cognitive test should have been done but was not.
- On 5/6/23 a psychiatrist documented that the patient was more confused but the patient was not referred to a provider for evaluation.
- On 5/10/23, a nurse emergently saw the patient who had fast heart rate (120), fast respiratory rate (26), and low oxygen saturation (89%) and was shaking and coughing. An unnamed physician was called who recommended sending the patient to the hospital. When the patient arrived at the hospital, he was short of breath and weak and was only able to respond to yes or no questions. The patient spent four days In the hospital and was diagnosed with acute respiratory failure, pneumonia, cellulitis, acute on chronic heart failure, a type 2 non-ST-segment elevation myocardial infarction (NSTEMI-2), [12] and atrial fibrillation. He was started on a blood thinner, an antibiotic for the pneumonia, a medication to control his heart rhythm and a diuretic and discharged with a recommendation to follow up with a cardiologist.
- Upon return to the prison on 5/19/23, a provider didn't see the patient and the recommended antibiotic wasn't stocked so it was ordered. The following day, the three days of antibiotic were given to the patient as ordered but these were given for the patient to administer to himself. Given the recent confusion of the patient, he should have been kept on the infirmary to monitor. Instead, he was sent back to general population and given his medications to handle on his own. The blood thinner was unavailable for eight days and the patient received no medication during this time. These developments were all unsafe and placed the patient at risk of harm.
- On 5/21/23 a nurse documented that the patient said he wasn't wearing his CPAP mask and that he was "slightly confused". A better evaluation of his mental status wasn't performed and the patient was left in general population. He should have been referred to be evaluated by a provider but this did not occur. This patient was housed inappropriately. He should have been housed on the infirmary.
- On 5/26/23 at 11:30 am, a nurse using a non-specific discomfort protocol evaluated the patient for right leg pain. The patient needed assistance to stand. He had 4+ (very large) pitting edema of the right leg extending from above the knee to the toes. The nurse did not document evaluation of the left leg. The nurse called on-call-coverage-physician-4 who ordered a stat D-dimer test. This is a test to evaluate whether a clot was present in the leg. If the doctor thought a deep vein thrombosis was present, the patient should have been sent to a hospital urgently for evaluation. The test result returned at 5 pm and was normal. On-call-coverage-physician-4 ordered the patient back to general population housing despite prior confusion. An in-person provider evaluation was called for. The left leg should have

---

[12] This is a heart attack not caused by blockage of a coronary artery but by lack of oxygen to the heart muscle which was likely caused by his heart failure and pneumonia.

been evaluated for edema. If both legs were swollen, the edema was likely due to his recent diagnosis of heart failure and his medication likely needed readjustment.

- Eight days after the 5/19/23 discharge from the hospital, on 5/27/23, coverage-physician-1 wrote a referral to cardiology as recommended on the 5/19/23 hospital discharge summary. Coverage-physician-1 did not examine the patient or document review of the record. It wasn't clear if he was onsite. The patient's status since hospitalization for heart attack, heart failure, atrial fibrillation, pneumonia and cellulitis was not being monitored. There was no examination post-hospitalization, no update of the therapeutic plan, and the patient remained uninformed about the facility's plan of care. This placed the patient at serious risk of harm.

- On 5/29/23, a psychiatrist documented that the patient was recently hospitalized secondary to confusion. The patient expressed frustration about his case and had problems with his CPAP machine and had fluid retention. The psychiatrist wrote, "He worries about getting out before he passes away".

Finally, on 8/2/23 coverage-physician-1 saw the patient for the first provider visit since the 5/15/23 hospitalization, 79 days after the hospitalization. He ostensibly saw the patient based on nursing referrals for a debilitating right knee pain, review of laboratory results and a toenail evaluation. The following was the doctor's entire note.

S: Has had knee pain for year, ∅ lab work. Has long toenails.
O: ∅ labs. Long toenails
A: Will order toenails cut
P: To the treatment line- soak toenails + clip same

The problems with this encounter is the following.
- This note is episodic. In this case, the patient hadn't been seen in months and the status of his medical conditions should have been updated but there was no update of any of the patient's conditions.
- This patient had a significant recent hospitalization for myocardial infarction, atrial fibrillation, pneumonia, cellulitis, acute on chronic heart failure which were new diagnoses but which had not been monitored for three months. These conditions should have been monitored to protect the patient from risk of harm.
- The new diagnoses were not entered into the problem list, nor was the therapeutic plan of the patient updated with his new conditions.
- None of the patient's new medications were monitored. Though the patient had recent leg edema, the physician did not address whether the heart failure was appropriately controlled with diuretic medication. The physician did not evaluate whether the patient was receiving his medications. He was receiving furosemide, potassium, diltiazem, and Tylenol as keep-on-person medication but given this patient's intermittent confusion and large medication panel (he was on 14 different medications) he should have been on directly administered medication. The MAR did not provide evidence that the patient had received atorvastatin in July.
- This patient also had multiple chronic conditions (sleep apnea, COPD, hypertension, osteoarthritis, hyperlipidemia, and abdominal hernia) which had not been monitored in a year and a half and should have been monitored.

10

- The patient had known osteoarthritis of the knee for which knee replacement had previously been recommended. His current knee pain wasn't evaluated with history or physical examination. Further work up was not accomplished. Coverage-physician-2 documented he would refer this patient to an orthopedic surgeon which never occurred. This patient's complaint and need was not addressed appropriately.
- Though one of the documented purposes of the physician visit was to review laboratory results, the physician did not even discuss what laboratory result was to have been reviewed.

On 8/10/23 a test result showing low potassium level was present and initialed as reviewed by coverage-physician-1. The patient was on a diuretic that can cause low potassium but there was no evidence of follow up monitoring. The MAR shows that the patient did not receive keep-on-person potassium in April, May, or June and received a 30 day supply on 7/2/23. Also, he may not have been taking his medication as instructed because of his age and intermittent confusion. He should not have been responsible for taking his own medication and should have received his medication but did not.

On 8/15/23, the patient returned to the neurologist who previously evaluated the patient on 4/3/23. This appointment was not listed on the 3rd quarter Centralia offsite specialty log. Though Centralia staff had documented on the 4/3/23 referral that the patient was to be started on Sinemet, a drug for Parkinson's disease, at this visit the neurologist made no mention of Parkinson's disease. Based on the referral information provided to the neurologist that the patient had a prior stroke, the patient's leg weakness was attributed to the stroke. The neurologist recommended continuing the Depakote for migraine. Prior hospital records including brain MRI and CT scans should have been sent to the neurologist but were not and the patient appeared to not have been appropriately evaluated. This type of miscommunication with specialists is a frequent occurrence and can cause misdirected medical care. There was no documented review of this consultation and a provider did not meet with the patient to discuss findings.

On 8/21/23, a nurse called on-call-coverage-physician-3 for bilateral leg edema and he recommended sending the patient to a hospital. Since the last hospitalization for myocardial infarction, heart failure, pneumonia and leg cellulitis, a physician had not seen the patient for the purposes of monitoring these conditions. There was only one provider evaluation over the three month period and the heart failure was not being monitored. For this hospitalization, the patient had acute on chronic heart failure; the atrial fibrillation had reverted to normal rhythm. The cardiology appointment recommended on 5/19/23 had not been completed before this hospitalization. An echocardiogram at the hospital showed worsening heart failure. The patient was treated for exacerbation of heart failure. An enlarged aortic aneurysm was also found on echocardiogram. The cardiologist ordered a follow up CT scan which showed a 3.9 cm thoracic aortic aneurysm that the radiologist recommended should be followed up in a year. Cardiology notes in the hospital recommended follow up with cardiology upon discharge but specific cardiology follow up was not in the discharge summary. There was no evidence of a referral to cardiology on the 3rd quarter offsite specialty log. The aortic aneurysm should have been noted especially the need for a follow up CT scan. Diltiazem was discontinued and new medications

were started: metoprolol, Entresto, Jardiance, and spironolactone.  He was treated with Keflex to complete treatment of urinary tract infection.[13]

The patient returned to the prison at 5 pm on 8/26/23.  The nurse noted new medications and wrote that the hospital nurse had endorsed that the oxygen saturation was low and he was on 3 liters of oxygen until 3 pm of the day of discharge and that the saturation was at least 94%.  At the prison at 7 pm, the oxygen saturation decreased to 88%, the blood pressure was 88/42 (which is very low) and the heart rate was documented as 29 (which is extremely low).  The patient was described as "in and out of alertness".  The nurse called on-call-coverage -physician-4 who ordered that the patient return to the hospital.

At the hospital the vital signs were normal and oxygen saturation was normal.  The patient was sent back to the prison by 10:30 pm the same day and was returned to the infirmary by a nurse.

The nurse in the infirmary called on-call-coverage-physician-4.  The nurse identified that the pulse was now irregular, indicating possible atrial fibrillation but an EKG several hours earlier in the emergency room showed atrial bigeminy, typically a non-serious arrythmia.  The on-call physician ordered "fall precautions", fluid restriction to 1.5 liters daily with daily weights and to call the provider for a weight gain of more than 2-3 pounds daily or 4-5 pounds over a week.  The patient was to wear his CPAP mask.

Two days later on 8/29/23, coverage-physician-1 saw the patient because the patient was requesting a podiatry referral and because the patient had a recent hospitalization and ER visit. The entirety of the note was as follows.

> S: [illegible word] post ER
> O: Stable post ER
> A: Stable post ER.  Discussed DNR [do not resuscitate] + He wants to be revived.
> P: 1) Pt. to sign sheet-DNR 2) Will need [follow up] [with] cardiology check[name of a clerk] to see if he needs collegial.  ***Discharge from infirmary.[14]***

Problems with this visit are the following.
- The doctor specifically documented that the patient might need "collegial" review.  This implies that the collegial review process is still active.  IDOC should explain this documentation.[15]
- This patient had recent hospitalization for worsening heart failure, and was re-hospitalized for unstable vital signs.  He was recently started on multiple new medications for his heart failure.  A better history should have been obtained and a physical examination performed.

---

[13] The pharmacy wrote on the non-formulary approval for Jardiance to monitor the patient and labs for adverse effects.  Dehydration is a side effect of this medication especially in the elderly.  This patient was also taking a diuretic.  A significant adverse reaction is also acute kidney injury which this patient subsequently developed without any monitoring.

[14] This is our emphasis.  To discharge the patient from the infirmary without any history or examination is not standard of care.

[15] Patients #1, #5, and #6 in these mortality reviews had references to collegial review.  It appears that some form of collegial review still exists which should be explained.

- An updated therapeutic plan should have been documented noting the changes in his heart failure medication.
- The new identification of aortic aneurysm should have been noted and a referral for a repeat CT scan in a year should have been made.
- The problem list should have been updated.
- Because of the patient's age, intermittent confusion, and serious medical conditions infirmary care should have been provided.
- The patient had not had chronic care monitoring of his original medical conditions (COPD, sleep apnea, osteoarthritis, hypertension, and abdominal hernia) for a year and a half and these should have been evaluated. He also did not have his newly diagnosed conditions of myocardial infarction, atrial fibrillation, and heart failure monitored since the prior hospitalization and the therapeutic plan for these should have been updated.
- The patient's intermittent confusion and CT scan evidence of brain atrophy and small vessel disease should have resulted in a mini-cognitive test to assess for the potential for dementia.
- Though the doctor discussed end-of-life issues, this patient had a person named as power-of-attorney that was filed in the medical record and was dated 6/12/18. The person so named should have been contacted in the discussion of the physician orders for life sustaining treatment (POLST).
- To discharge this patient from the infirmary, given his age, history of intermittent confusion, movement disability due to severe osteoarthritis, fall history, and multiple serious cardio-pulmonary conditions was cruel. He needed some type of medically monitored housing. This placed the patient at risk of harm.
- The nurse, but not the doctor, wrote a formal infirmary discharge summary which is not consistent with current administrative directives.[16] The nursing discharge summary continued on-call-coverage-physician-4's orders for fall precautions, fluid restrictions with daily weights without indicating how this was to occur in general population. Coverage-physician-1 did not clarify those orders.

This 8/29/23 physician encounter was the last in-person encounter with a provider for this patient until he died on 12/5/23. Significant subsequent medical issues occurred that warranted in-person provider intervention.

On 9/5/23, a nurse saw the patient, who was now living in general population using a non-specific discomfort protocol because the patient had edema of the legs with shortness of breath which indicated a worsening of his heart failure. This may have been due to not receiving ordered medication. Furosemide was recommended changed to 20 mg twice a day and was given at this dose from 8/27/23 until 8/30/23. Then in September the furosemide wasn't given for 4 days and on September 5th it started again at its previous dosage of 40 mg daily instead of 20 mg twice a day. There was no order found for this change. On 9/5/23, coverage-physician-4 ordered the nurse, by phone, to instruct the ADA inmate helper to educate the patient related to appropriate

---

[16] Administrative Directive 04.03.120 G.5., requires that physicians, psychiatrists, or dentists can discharge a patient from the infirmary and that a discharge note by the physician, psychiatrist or dentist is to be in the medical record. The discharge note shall include a summary of the reasons for admission, the course in the infirmary, and the discharge diagnosis and plans. This physician note did not accomplish these directions.

sodium and water intake. The inmate was not trained and should not have been instructed to provide patient care. This patient should have been placed on the infirmary but was not.

When the patient returned from the hospital 8/27/23 there were provider orders to start six new medications recommended by the hospital but on 9/27/23 three medication orders for Entresto, Jardiance, and Toprol expired without anyone noticing. New orders were not obtained. Orders for Eliquis also expired in September and new orders were not obtained.

Laboratory tests returned on 9/21/23 showing a BUN of 40 which is very high and may indicate significant dehydration and a creatinine of 2.13 which indicated acute kidney injury. Though someone initialed these results no action was taken. The pharmacy had previously advised monitoring for side-effects of Jardiance. Both acute kidney injury and dehydration are known adverse effects of Jardiance but these were not acknowledged. The possibility of significant adverse reaction to a medication was unacknowledged.

On 9/26/23 a nurse was checking the patient and noted a bruise on his shoulder which appeared to be a few days old. No referral was made. There was no provider available. The nurse did not question whether the patient fell.

On 10/2/23 at noon a nurse saw the patient because he felt weak, his stomach was upset, and he had not been eating. The nurse used the non-specific discomfort protocol when a more appropriate protocol should have been used.[17] The patient's blood pressure was 96/53. The nurse gave the patient Pepto Bismol, which is not listed as a possible intervention on the non-specific discomfort protocol. The nurse was practicing outside of scope and should have completed a more thorough assessment and contacted a provider for direction. That same evening, at 8 pm, another nurse saw the patient who complained of vomiting. He was unable to stand and was hypotensive with blood pressure 89/55. On-call-coverage-physician-4 was called who ordered the patient to the ER. A subsequent note by a nurse noted that the patient hadn't eaten or drank for two days. A repeat blood pressure was 80/58. The nurse documented a report was given to the emergency medical responders.

The patient was hospitalized for three days. He had urinary retention relieved by catheterization. He had anemia, severe dehydration, and renal failure (BUN 72 and creatinine 3.79). An indwelling catheter was placed with a recommendation to see a urologist which did not occur at the prison.[18] At the hospital the Apixaban, the blood thinner, was stopped for unclear reasons[19]. The patient returned to the prison on 10/5/23. On the day he returned, a psychiatrist saw the patient and noted he had significant decline since the last visit. He was disoriented to time and place. The patient was admitted to the infirmary but was not examined by a provider.

The following day, 10/6/23 the patient was able to follow commands but was unable to support his own weight and move himself in the bed or chair.

---

[17] Indigestion or Nausea/Vomiting protocols would have been more appropriate.
[18] We note that the Centralia 4th quarter offsite tracking log did not include this referral and a provider did not evaluate the hospital record in follow up.
[19] It may have been stopped due to falls and cognitive disorder which are a risk for significant bleeding if the patient experienced a fall.

Two days later, on 10/8/23, at 5:30 the patient became incontinent when transferring and became unresponsive with low blood pressure. The nurse called on-call-coverage-physician-4 who ordered the patient transferred to the hospital. At the hospital, the patient received IV fluid and was returned to the prison the same day without any new orders. On return to the prison, a decubitus ulcer was noted. He was placed on the infirmary.

On 10/11/23, on-call-coverage-physician-3 gave an order for the dressing change. On-call-coverage-physician-3 told the nurse that coverage-physician-1 would see the patient that evening but this did not occur.

On 10/14/23 on-call-coverage-physician-4 was called about the patient's decubitus wounds.

On 10/15/23, on-call-coverage-physician-4 conducted a telemedicine visit which was typed by a nurse and signed by the physician. The nurse was unable to bring the patient to the telemedicine room and the examination was conducted in a separate room by a nurse not visualized by the physician. On-call-coverage-physician-4 said that coverage-physician-1 would evaluate the patient and ordered a special cushion and to turn the patient every two hours. This visit was no better than a phone call. Coverage-physician-1 did not see the patient as recommended by on-call-coverage-physician-4.

On 10/15/23 a nurse attempted to call on-call-coverage-physician-4 but there was no answer. About two hours later the nurse was able to reach the physician and medications for the decubitus wound were clarified. The physician was making wound care decisions without having seen the wounds.

The patient was still not evaluated by a provider when on 10/27/23 on-call-coverage-physician-4 apparently did a telemedicine evaluation but the note was written by a nurse. The evaluation was extremely limited; the entire note stated,

> LCTA [lungs clear to auscultation], HR [heart rate] regular + rhythm seen by [Dr. X] via telemed. Orders to follow.

This was an inadequate note given the condition of the patient.

On 11/22/23 without any intervening provider visits, a nurse called on-call-coverage-physician-4 for hypoxia (oxygen saturation of 87%) who ordered the patient sent to the hospital.

In the hospital the patient appeared to have an infection, the CT scan showed profound brain atrophy with senescent changes with an old infarct. The patient was lethargic but opened his eyes to painful stimuli. He had spontaneous movements of his left upper extremity. He had acute respiratory failure with sepsis and acute metabolic encephalopathy. The patient's power of attorney was finally reached by the hospital and the agreed patient goal was to keep the patient comfortable and transition to hospice. The patient was sent back to the prison on 11/29/23.

A nurse admitted the patient to the infirmary on 11/29/23. Nurses called coverage-physician-1 for orders for medications recommended by the hospital. The patient died on 12/5/23. The patient

had not been seen in person by a provider since 8/27/23. None of the in-person physician visits during 2023 were adequate or served the needs of the patient. This patient was basically without physician care for the entire year during which time he had two specialty consultations and six hospitalizations. He was not being monitored during this time for any of his medical conditions. The two coverage physicians who provided the five in-person evaluations are not credentialed based on Consent Decree requirements (II.A.2) and should not be providing primary care in IDOC facilities.

This patient did not receive adequate physician care for the entire year of this record review. His problems were not monitored or evaluated and sometimes not even acknowledged. There was no autopsy. The death certificate lists the cause of death as hypoxic respiratory failure. Though the patient had COPD, he had not been monitored for this disease and the death might have been preventable if the heart failure and COPD had been managed appropriately. Importantly, the patient's cognitive status declined over time but was never diagnosed. If the patient had dementia, palliative care might have been indicated earlier than when determined by a hospitalist about two weeks before he died.


## Patient #2

The patient was transferred to Centralia on 5/4/22 with a history of hepatitis C, hypertension, hyperlipidemia and gastroesophageal reflux disease (GERD). The patient was transferred to Centralia on Protonix, a medicine for GERD, Norvasc, Lipitor, and Colace. There was no physician at Centralia. When he arrived at Centralia, the Protonix was not provided as a non-formulary form needed to be filled out. Protonix or its equivalent is extremely common and there was no reasonable excuse for not providing this medication or an equivalent. About three weeks after arrival at Centralia, the patient complained about his "heartburn" and asked for the Protonix that had been ordered. The nurse documented that a new order had been written. The patient had not been informed about how to pick up medication ordered as keep on person until seeing the nurse for this request and received the Protonix that had been ordered.

On 7/5/22, a nurse saw the patient for indigestion. The order for Protonix ran out on 6/11/2024. There was an order for Pepcid 20 mg daily that was to start when the order for Protonix ran out but no documentation was in the record that he received this medication. The nurse circled the line on the form that said, "call MD or refer urgently". This did not occur About three weeks later on 7/25/22 a nurse was to see the patient for a complaint of heartburn but the nurse wrote that the patient was already on the wait list. The absence of a physician at this facility was resulting in not addressing this patient's medical needs.

Finally, on 8/5/22, three months after arrival, at Centralia, the patient saw a provider who prescribed Prilosec. The patient was 55 years old and had not yet had colorectal cancer screening. Because of his abdominal complaint, a blood count and colonoscopy and/or FIT testing should have been done. For the complaint of repeated heartburn, an upper endoscopy and/or imaging study (e.g., CT scan) would have been indicated depending on the symptoms which were not obtained. These symptoms appeared to be present for some time as the patient had already been prescribed medication.

On 8/31/22 a nurse wrote on a progress note that the patient complained that the medication was ineffective but added that the patient was already seen for this problem and the patient was not seen. The nurse did not evaluate the patient. Because of the patient's repeated complaints, upper endoscopy should have been done but there was no physician at this site and he was not evaluated.

On 11/24/22 the patient complained of back pain and was referred to a physician but was not seen. On 12/4/22 the patient complained of back pain. A nurse saw the patient and gave acetaminophen by protocol without referral. On 12/29/22 a nurse saw the patient again for back pain and made a check on a box stating to refer to a physician if no improvement after 48 hours of trial of the treatment protocol. This referral did not occur until 4/12/23, four months later. On 2/8/23 the patient again complained of back pain. The patient's blood pressure was 160/91. The nurse did not retake the blood pressure or look to see if there were other elevated readings and despite the protocol's direction again did not refer the patient. The lack of a physician at this facility was significantly affecting care for this patient. Repeated back with abdominal pain should have resulted in a CT scan and possibly an upper endoscopy. These tests would have depended on specific symptoms but the patient did not see a provider.

A coverage physician, who does not meet Consent Decree credentialing requirements, saw the patient for back pain on 4/12/23, apparently based on the nurse referral from 12/29/23. The only history was that the patient had back pain for two weeks which is inaccurate. The patient had back pain for at least five months. The only examination was to document "weight stable". In fact, the patient had lost ten pounds the last two months. The assessment only repeated the patient's complaint of back and abdominal pain and the plan was an abdominal x-ray which is not an effective test to evaluate the patient's problems. A CT scan or MRI should have been done if an imaging study was deemed necessary; an endoscopy may also have been indicated depending on the history. But the history only repeated a chief complaint. This evaluation was not competently performed. The entire note is shown below.

> S: Patient is [with] c/o [chief complaint of] back pain. States [something illegible] past two weeks
> O: weight stable
> A: Back and abdominal pain
> P: KUB/lumbar

Two weeks later, on 4/20/23, a nurse again saw the patient for back pain which started when the patient had "stomach issues". The nurse wrote that the patient had recently seen a physician who had addressed the problem. The nurse used the non-specific discomfort protocol to give the patient acetaminophen when another protocol would have provided more appropriate guidance. The patient had complained of difficulty digesting food and the nurse noted a six pound weight loss since the physician visit. Despite documenting the loss of weight, the nurse's assessment was no weight loss. There was no referral to a provider. The lack of a physician at this facility was a barrier to appropriate care.

On 5/4/23 a nurse saw the patient for complaints of black/green soft stool which had been present for about a month. The patient also complained of loss of appetite. The patient weighed 189

pounds and had weighed 209 pounds on 2/8/23. The nurse noted the weight loss and also documented that the patient was unable to eat but wanted to. The patient was referred to a provider but had not been seen when three days later, on 5/7/23, the patient complained of abdominal pain in all quadrants with green loose stools. The patient also had nausea. The weight was 182 pounds which was a 27 pound weight loss. The nurse who saw the patient took no history of the patient's abdominal complaints and did not review the record. The nurse noted abdominal distention which by protocol requires contacting a provider but no referral was made. This patient should have been sent to a hospital.

On 5/10/23, a doctor saw the patient for inability to eat and weight loss. The patient had fever (100.5) and was tachycardic (104). The patient said he had diarrhea of light green stool if he ate. He had jaundice. There was no further examination. There was no assessment. An urgent consult for colonoscopy was made and multiple labs were ordered. The patient had weight loss, almost a year of abdominal pain, jaundice and fever. He should have been admitted to a hospital. Two days later, a nurse saw the patient for flank pain for a month. The patient had weight loss and fever. An on-call doctor ordered the patient sent to a hospital.

After arrival at the local hospital the patient was found to have significant CT scan findings as well as significantly abnormal laboratory tests and was transferred to a reference hospital where he was diagnosed with cholangiocarcinoma, a cancer of the bile duct. A stent was placed in the bile duct and the patient was discharged with a recommendation to see a cancer specialist within 1-2 weeks and for colonoscopy. It was unclear when this patient was referred to the specialist.[20]

When the patient returned to the prison, on 5/19/23, the nurse did not document receipt of a hospital report. A hospital report was present. An on-call doctor ordered Prilosec and the patient was sent to general population. The patient now weighed 177 pounds over a 30 pound weight loss. There was no evidence of a physician review of the hospital report within two days. Four days after return from the hospital a coverage doctor ordered a routine referral for colonoscopy but there was no authorization document for this referral although an authorization number was documented on the referral. This referral never occurred and was not present on the 1st and 2nd quarter offsite specialty care tracking log.[21] There was no provider referral to oncology but there was an authorization document that documented a referral to oncology was made 5/22/23 and was authorized on 5/23/23. Since there was no referral and no progress note documenting review of the hospital record by a provider, it appeared that this referral was made by the scheduling clerk. This referral was the only referral that was on the 2nd quarter specialty tracking log because it occurred. At Centralia only completed referrals are tracked. On 5/23/23 a coverage physician wrote a referral for colonoscopy but there was no associated progress note. There was an authorization number on the referral form but no authorization document from the vendor. This referral was not present on the 2nd quarter offsite specialty referral log likely because it was never completed.

---

[20] Even though this patient went to the oncologist on 5/24/23, the tracking log did not include a referral date so the tracking log is incomplete. The tracking log at Centralia changed over time. In the past it included when a patient was referred but the current log only tracks completed consultations and not referrals that never are completed. This is not a tracking log.
[21] Centralia, apparently, only tracks completed appointments which is inappropriate.

On 5/25/23 a nurse saw the patient and documented on a "return from furlough" form. This was apparently a consultation with the oncologist. In effect, a nurse was now providing post consultation review with assistance from phone calls with a coverage provider. There was no report but an after-visit summary documented "port placement needed please". The consultant's report was not present and the recommendations of the consultant were not documented in progress notes. The nurse did document receiving orders from the consultant for Zofran (an antiemetic), Ultram and Naprosyn (pain medication) stopping oxycodone, avoiding Tylenol, and a referral for a port for chemotherapy. There must have been some communication from the specialist but it could not be found in the medical record. The nurse documented going over the orders with the facility physician who was a coverage doctor. This apparently occurred over the phone. On the same day a coverage doctor wrote a referral to oncology for palliative chemotherapy and to surgical oncology for a port. Both documents had authorization numbers written on the referrals but neither had an authorization document. Neither the referral to surgical oncology for the port nor the referral back to oncology for palliative chemotherapy were on the 2nd quarter specialty tracking log[22] but the oncology appointment was on the 5/21/23 tracking log because it was the only one that occurred. This verifies that only completed consultations are placed on this log. A provider did not see the patient post consultation to review recommendations of the consultant with the patient or to update a plan of care. Nor was there a provider progress note to document review of the consultant's report.

The patient had yet to see a provider after hospitalization when on 5/27/23 security told a nurse that the patient was too weak to come for his medication due to vomiting. A nurse evaluated the patient who had "generalized weakness". There was no provider at this facility and the nurse's plan was to have the patient come to the health unit as needed. If the patient was too weak to come for medications how would he come to the health unit "as needed". This did not consider that a patient who had terminal cancer and was housed in general population was too weak to come to the health unit for his medication. This patient did not appear appropriately housed. The MAR had no documentation that the patient was offered Zofran, the antiemetic or Naprosyn, the pain medication. The Ultram was provided twice on 5/27 but there was no documentation of offering the medication on the 25th, 26th, or 28th. The following day, 5/28/23, a nurse evaluated the patient for jaundice. The nurse called an on-call physician who ordered the patient to a local hospital. The patient returned from the hospital on 5/31/23 on palliative care. The patient was confused. There was one brief nursing note on 6/1/23 stating that the mother was called to approve a procedure to withdraw fluid from the abdomen. There were no notes documenting care of the patient. On 6/5/23 the patient died, apparently in the hospital, although there were no facility progress note documenting where he died.

An autopsy was not performed. Symptoms of the patient's cholangiocarcinoma were present about a year before it was ultimately diagnosed. Despite long-standing complaint of both abdominal pain and back pain, there was no provider review of systems or history to attempt to identify the source of the complaint. Earlier intervention should have been done. While earlier intervention may not have resulted in a cure, five-year survival would have been improved. This patient likely died earlier than he otherwise would have, had timely intervention occurred. The lack of care provided to this patient appeared directly related to the lack of physician coverage at this facility.

---

[22] This was a combined log but had no information for specialty care for this time period. It does not appear that an accurate log was sent.

**Patient #3**

This was another patient from Centralia who was a 69 year-old man who was incarcerated in April 2022. At NRC the patient was identified with COPD and hepatitis C infection. Laboratory tests were abnormal including low albumin (3.2), an elevated liver enzyme (AST 58), a large quantitative hepatitis C virus, and elevated bilirubin (1.8). A fibroscan showed F4 fibrosis which is equivalent to cirrhosis. The laboratory tests added confirmation to a diagnosis of cirrhosis. On 5/3/22, a physician at NRC documented in a progress note that the patient was to be transferred to an emergency room for a work up for his hepatitis C; this didn't occur. The patient had criteria for cirrhosis and needed referrals for ultrasound to evaluate for hepatocellular carcinoma, and endoscopy to evaluate for varices and further treatment for hepatitis C and cirrhosis but urgent hospitalization did not appear necessary.

Nevertheless, the patient was transferred to Centralia where there was no full time physician. The only problem on the problem list was chronic obstructive pulmonary disease (COPD); hepatitis C and cirrhosis were not added. The hepatitis C and cirrhosis were unnoticed on the transfer likely to not being on the problem list. The patient with likely decompensated cirrhosis was not scheduled to be seen by a provider.

On 5/22/22, a nurse evaluated the patient using a venous insufficiency protocol likely because the patient had 3+ edema of the legs. This was likely a result of the patient's cirrhosis although heart failure would have to be ruled out. There was no evidence of kidney disease. The nurse referred to a provider and a physician assistant saw the patient on 5/25/22. The history was extremely brief and repeated the complaint of swollen feet with an added comment that the patient had not had swollen feet before. Except for documenting no cardiac history there was no review of systems relevant to swollen feet and the physician assistant did not review laboratory results which clearly indicated cirrhosis. The examination only included looking at the patient's ears which was related to another complaint of hearing difficulty. Ear wax was noted. The only assessment, based on listening to the complaint was COPD and foot swelling. Medication for his ear wax was given but the only plan for the swollen feet was to elevate the feet. This patient with cirrhosis had swelling likely due to his cirrhosis. The patient's abdomen should have been examined to assess for enlarged liver, enlarged spleen, and for ascites. A diuretic and beta blocker should have been prescribed. Referrals should have been made for hepatitis C treatment, ultrasound of the abdomen to assess for ascites and to evaluate the liver and spleen and to evaluate for hepatocellular carcinoma, and referral for upper endoscopy to assess for varices. None of these were done and the patient remained lost to follow up.

On 6/15/22 a non-credentialed coverage physician saw the patient in follow up of a hearing test but the physician documented that the patient was in clinic for follow up of treatment for his ear wax. This physician did not address any of the patient's other problems despite the lack of a physician at this facility. He noted persistent ear wax and ordered follow up in five days again after continued use of medication to dissolve the ear wax.

On 6/16/22 an optometrist referred the patient for cataract removal; this referral was authorized on 6/24/22. Another coverage physician saw the patient on 7/8/22 for the follow for his ear wax made on 6/15/22. Only the ear wax was addressed.

On 8/1/22 a nurse admitted the patient to the infirmary for 23 hours observation due to 3+ leg edema. An on-call physician ordered multiple labs, an EKG, and a chest x-ray. The EKG showed first degree heart block and was signed as reviewed by an on-call physician but was not dated when reviewed. By 8/2/22 the x-ray had not been completed and a physician had not seen the patient. The vendor Regional Medical Director was called who directed that the x-ray be read stat and if this couldn't be done that the patient be sent to an emergency room. The x-ray wasn't done. The patient was sent to an ER early in the day on 8/2/22. It didn't appear that the patient was evaluated at the hospital because an after-care summary documented that labs, an x-ray and EKG were done with a recommendation to follow up with a hospital physician in a day which did not occur. A nurse called the on-call doctor later on 8/2/22 who gave a telephone order for oxygen and a diuretic for seven days and the patient was admitted to the infirmary. The order for oxygen was incomplete and should have included the duration, mode of delivery and parameters for escalation.

At this point the patient was short of breath; the oxygen saturation was 88%[23] which warranted transfer to a hospital. There was no examination of the patient. The patient was not sent to the hospital-based primary care physician as recommended by the hospital despite there being no physician at this facility. The on-call physician made no diagnosis. A physician did not evaluate the patient; nor did nursing staff document daily evaluations while the patient was on the infirmary. Nursing notes were completed weekly or longer with the next documented evaluation on 8/7/22 when the oxygen saturation was 87%. The nurse did not call a physician. The next nursing evaluation was on 8/14/22 with an oxygen saturation of 86%. The next nurse visit was on 8/28/22 and the oxygen saturation had risen to 93%. This patient was not appropriately housed because the patient was on an infirmary without a physician present at the facility. During much of the month the patient needed hospitalization or transfer to another infirmary for physician care.

The stat chest x-ray ordered 8/1/22 was signed as reviewed by a coverage physician on 8/22/22 and showed chronic interstitial edema, COPD with volume loss in the right upper lung. The non-credentialed coverage doctor did not document seeing the patient. It was still unclear if the patient's edema was due to heart failure or cirrhosis and there was no evaluation of the patient. Laboratory tests ordered on 8/1/22 showed hypothyroidism (TSH 6.98), very low albumin (2.9), an elevated liver test (AST 49) and elevated bilirubin (2.2); the latter three tests indicating cirrhosis. A d-dimer test was high at 1.2 (normal 0..1-0.5); this test is used to exclude pulmonary embolism and when positive pulmonary embolism should be ruled out. These tests indicate that the patient needed higher level diagnostic intervention, but the patient was not referred to a hospital or for immediate diagnostic testing.

The patient continued to remain on the infirmary and was seen only by nurses intermittently and infrequently. This was contrary to IDOC administrative directive 04.03.120 that requires a physician to write an admission note to the infirmary and write weekly notes at a minimum. On

---

[23] The oxygen saturation value is dependent on the cause and personal history of the patient. This patient only had a diagnosis of COPD without history of prior exacerbations. With this history, hospitalization would be indicated particularly because there was no physician at this facility to evaluate or manage the patient.

9/4/22 a nurse documented that the patient's oxygen saturation decreased to 91% when walking. There was still no physician examination. The patient still had edema and was without a diagnosis for it. On 10/16/22 a nurse wrote in the plan to increase oxygen flow as needed with activity to keep oxygen saturation above 95%. The following week another nurse wrote in the plan to maintain oxygen saturation between 93-95%. Nurses are not legally authorized to adjust oxygen unless it is in the order. There was no such order.

On 10/5/22 the patient had a cataract removed. On 11/6/22 at one of the weekly nursing visits, the nurse documented that the patient had a blood pressure of 86/48 with an oxygen saturation of 93%. The nurse's plan was to increase water and salt intake to increase the blood pressure. If this patient's edema was due to his cirrhosis, this would likely make the edema worse. There was still no physician evaluation. Nurses were managing the patient's problems; these plans were beyond their scope of practice. The patient's blood pressure was at shock value and should have been evaluated by a provider promptly.

On 11/13/22 the oxygen saturation was 89% on three liters of oxygen. The nurse made no referral stating that his blood pressure had improved. The patient had been in the infirmary now for three months and had yet to see a provider. Patient outcomes are compromised when nurses are expected to manage patient care by telephone order only.

A coverage physician who is non-credentialed[24] finally saw the patient on 11/16/22 for follow up of COPD. The note was brief and did not include review of the record to identify abnormal laboratory tests including the prior chest x-ray and EKG. The entire note stated:
  "S: COPD
  O: no change in breathing status. Patient poor vision; bilateral cataracts
  A: COPD, cataracts
  P: Patient has scheduled treatments for eyes . No change in meds.

At this visit, the physician should have initiated a prompt diagnostic evaluation of the patient to include: 1) early referral for hepatitis C treatment, 2) a CT scan of chest (for COPD) and ultrasound of the abdomen to screen for cirrhosis and ascites; 3) spirometry and staging of his COPD; 4) testing for need for continuous oxygen therapy, 5) echocardiogram to eliminate heart failure as the cause of his edema, 6) monitoring of electrolytes since he was on Lasix without potassium, 7) upper endoscopy to evaluate for varices, 8) vaccinations for hepatitis B; 9) monitor the CBC, platelets, sodium, creatinine, regularly; and 10) monitor regularly for signs of encephalopathy and treat with lactulose as indicated. This physician failed to do any of these. He should not be practicing in IDOC as he doesn't have required credentials and practices in an unsafe and clinically inappropriate manner.

Another examination, this time an annual health assessment was by a non-credentialed physician on 12/7/22. The provider documented that the patient had no teeth but did not refer the patient to a dentist. The patient was not questioned about his ability to eat. The COPD was not evaluated, prior abnormal laboratory and diagnostic tests were not reviewed. There was no history and the only examination was that the patient had no teeth, had wax in his ears, and one illegible word

---

[24] The Consent Decree requires physicians to have completed training in a primary care residency which this physician did not have.

regarding his pupils. The COPD, cirrhosis, and hepatitis C which were paramount were not included in this pro-forma evaluation.

On 1/5/23 the patient had his second cataract surgery. The patient was admitted after the surgery to the infirmary. The admission note was completed by a non-credentialed coverage physician who took no history and conducted no physical examination. The only assessment was COPD and recent eye surgery. The plan was to continue oxygen intermittently at 2 liters but no directions were given for when to give the oxygen. The plan of care includes no post-surgical eye care directions, including medication. This again was unsafe and clinically inappropriate physician practice as none of the patients serious medical conditions were appropriately evaluated or managed.

On 1/27/23, a nurse called a physician at another facility about the patient's leg edema. The physician said he was "really behind" and to educate the patient to cut back on salt, and to elevate his legs. He also asked to have one of the non-credentialed physicians who were covering the facility see the patient in a few days. The patient wasn't evaluated for two weeks.

When the non-credentialed coverage physician saw the patient on 2/15/23 the history was swelling of his feet. There was no review of systems to identify why the patient may have had leg edema. The entire note was as follows:
> "S: has feet swelling for [about] 3-4 weeks. Had swelling in the past and given diuretics.
> O: 2+ edema bilateral legs
> A: Discussed diuresis and stockings
> P: Weekly weights, compression stockings, Lasix 40 mg po for five days; Labs: UA [culture and sensitivity], CMP [complete metabolic panel, a blood test]

It wasn't clear if the patient's edema was caused by COPD or cirrhosis and further diagnostic efforts were needed. Also, the patient should have been referred for treatment of his hepatitis C. This was an unsafe and clinically inappropriate evaluation.

Laboratory test results were abnormal and on 2/23/23, a nurse called an on-all physician who gave orders for potassium, a repeat urine culture and Tylenol. Three days later, the patient complained that he had skin broken down. The nurse noted a one centimeter ulcer on the bottom of the patient's foot. The patient's blood pressure was 87/49. His low blood pressure had not been evaluated by a provider. The nurse treated the wound with triple antibiotic ointment without an order or directions from a protocol. This is another example of a nurse acting outside their scope of practice in the absence of physician direction.

On 3/2/23 a nurse saw the patient for shortness of breath. The oxygen saturation was low (92%) and the nurse identified abnormal lung sounds. An on-call physician ordered the patient sent to an ER. At a local hospital the patient had pancytopenia with an extremely low white count (2.2), anemia (Hgb 13.3), low platelets (47,000), low albumin, and elevated liver function tests including bilirubin. A COVID test was positive. A CT scan of the abdomen showed ascites, splenomegaly, a lung nodule and possible cirrhosis. The patient was treated with prednisone and released two days later with recommendations to see an oncologist due to the pancytopenia and to see a

gastroenterologist (likely for his hepatitis C and cirrhosis) and for a follow up CT scan in six months. These referrals were not present on the 1st quarter offsite specialty log.

The patient returned to Centralia on 3/4/23 and the nurse accepting the patient did not document the hospital diagnoses did note the referral to oncology but not the referral to gastroenterology, or the follow up CT scan. There was no physician or provider admission evaluation. On 3/5/23 a nurse documented an oxygen saturation of 80% even after increasing the supplemental oxygen rate to three liters. The patient also had a fever of 102. An on-call doctor was contacted and advised sending the patient back to the hospital.

At the hospital, the bilirubin rose to 4.2 indicating worsening liver failure; heart failure was newly diagnosed. The patient became disoriented. A discharge summary written on 3/17/23 documented that both the patient and security staff told the hospitalist that the oxygen concentrator that the patient used needed maintenance for quite some time, implying that it was not working. The patient's diagnoses were COPD, decompensated hepatitis C cirrhosis, abdominal ascites, encephalopathy due to cirrhosis, chronic low white count and platelets, and COVID. The patient had completed a course of antibiotics and prednisone. The hospital identified a power of attorney (apparently a family member) who elected to transition the patient to palliative care due to his end-stage disease. The patient died prior to discharge from the hospital.

This patient was never seen in chronic clinic. He was cared for by nurses in the infirmary and was only seen by a provider four times in the eight months before his death. The four times he was seen, the encounter was inconsequential and did not address the patient's underlying clinical disease.

This patient did not have an autopsy. However, he appeared to have decompensated cirrhosis for almost a year without having been referred for treatment of his hepatitis C and without a therapeutic plan for his cirrhosis despite deterioration of his condition. The patient might have survived longer and would have suffered less if appropriate treatment had been provided.

## Patient #4

*Failure to manage the patient's dementia including appropriate housing .*

This patient was housed on the infirmary at NRC. This patient appeared to be incarcerated at NRC on 2/25/22. Intake records and medical records from February of 2022 until June of 2022 are absent. The patient was 64 years old. It was unclear, due to lack of records, when the patient initially began experiencing dementia. But the patient had dementia and was incontinent of urine and stool, combative at times, and was described on 7/1/22 by a physician as having, "no capacity to make decisions to protect his interests". Because the patient was under custody of IDOC, they were responsible for this patient. According to Illinois regulation[25] such a person requires assignment of a surrogate, consistent with the Surrogate Act, or for the Court to name a guardian. This did not occur. As a result, the patient was treated as if he were capable of decisional capacity

---

[25] (755 ILCS 40/) Health Care Surrogate Act

when he did not have that capacity. This was a significant failure to adhere to state regulation and to recognize the need of the patient to have someone make medical decisions for him.

IDOC consistently documented that the patient "refused" care including: eating, taking showers, cleaning feces off his body, and cooperating with evaluations. Though the patient at times didn't know where he was, thought it was 1923[26], hallucinated[27], talked to himself or people who were not present, he was treated as someone who had capacity to give a refusal. Examples include the following.

- A physical therapist did not perform an evaluation or give therapy because the patient "refused" service.
- Meals, medications, and hygiene services were often documented as "refused" and refusal forms were completed as if the person had capacity to make a decision to refuse. Sometimes, the refusal was documented as the patient "refused to sign"[28]
- In some cases, staff completing the refusal form knew that the patient was cognitively impaired and unable to make a decision yet would complete the refusal form as if the patient had capacity to do so. For example:
  - The patient was said to have refused evaluation of a pressure wound on 12/22/22 and a nurse documented that the "individual in custody unable to write or sign name or make an X due to cognitive decline".
  - On 8/22/22 a nurse documented the patient saying, "Get out of here. No get out of here… alligators" when attempting to clean the patient. He was described as having formed stool on the floor next to his bed and "smashed stool" on the mattress and ledge of the metal bed frame. The nurse documented that the patient, "will not sit up or consent to cuffing up to administer medications prescribed or to get into the room clean up feces". The nurse notified the medical provider of the patient's worsening "**noncompliance with care**". The "noncompliance" did not appear intentional and misrepresented the status of the patient.
  - On 12/21/22, the patient was described as having feces all over him. A nurse assistant cleaned the right hand and arm and the left foot but the patient refused further cleaning. Later, the patient refused a bath to clean the feces off and the nurse assistant documented on the refusal form that the "ind. In cust (individual in custody) unable to follow simple directions at this time" and "unable to sign [refusal] due to ↓ cognitive ability"[29]

This patient may have not cooperated with care or indeed said he didn't want care, but he had dementia and should have been treated in a manner to protect him, ensure his dignity, ensure he was safe, and provided assistance in a manner to accommodate his disability. IDOC needed to identify a surrogate so that safe and appropriate care could be provided. This was not done.

---

[26] The histories in the prison were not thorough, this history was obtained by a hospitalist during an 8/23/22 admission.

[27] The patient was described as having auditory and visual hallucinations and pressing a door bell that was not there on 9/21/22 by a nurse.

[28] As on 9/30/22 when staff offered medications and meals.

[29] 12/22/22 refusal for medical intervention and bathing in medical record.

IDOC does not have a medical classification[30] system that guides appropriate assignment of housing based on the patient's disability. This patient with dementia was housed in the NRC infirmary in isolation in a single cell with apparently a single window on the door. Based on the 2nd Court Expert's report in 2017, NRC had a 20 bed infirmary with 12 beds assigned to medical and eight beds assigned to mental health. At that time, the infirmary beds were nonadjustable and fixed to the floor. For most of the time during this record review, this patient's mattress was on the floor next to the bedframe and he slept on the floor. Nurses do not have direct visualization of patients on this infirmary. Although there is a call button next to the bed to alert the nurse of a problem, this patient may have been incapable of using this device due to his dementia. The result was that this patient was unobserved and kept in an isolated room, the equivalent of unobserved solitary confinement. Typically, isolation is known to promote advancement of dementia[31] and there is no literature supporting isolation as treatment for dementia. Yet, this patient was held in isolation for the entire nine months of record review without consideration that it may have affected his status adversely. Contact with other humans, as documented in the medical record was a few times a day when nurses provided medications or attempted to bathe or carry out ordered care. Food was provided several times a day but those encounters are not documented. The medical record documents two to three encounters a day. It is our opinion, supported by medical literature[32], that this type of structural isolation adversely affected this individual. IDOC has not developed safe housing for patients with dementia and the results are evident in the care of this patient. The Monitor has recommended, including in the Implementation Plan (items 64-70 of Implementation Plan) that a consultant evaluate and make recommendations to determine the needs of those with dementia, memory impairment, the aged, and other disabilities to determine their needs and provide recommendation for how their housing and programming can be improved. This has not been done.

Patients with dementia can have neuropsychiatric symptoms related to their disease including agitation, aggression, delusions, hallucinations, paranoia, wandering, disinhibition, and sleep disturbances which are observed in 60-90 percent of patients with dementia.[33] This patient appeared to have all of these symptoms. The reaction to these symptoms did not result in a medical intervention and in the absence of a medical plan of care was responded to with custody practices which was misplaced and unnecessarily cruel.

On 8/31/22, a nurse documented the patient saying "I'm going to break both your legs N…..! O: [objective section of note] patient standing at door threatening officer for no apparent reason. Cell door + chuck hole remain closed @ present. Unable to admin prescribed meds due to ↑ed agitation w/ aggression". This patient's aggression, which was likely due to his dementia and beyond his control, was addressed by isolation and solitary confinement.

---

[30] IDOC has no medical classification system. Medical classification is used in some corrections systems to identify classes of individuals to ensure housing and assignments are commensurate with their medical condition.

[31] Centers for Disease Control webpage "Loneliness and Social Isolation Linked to Serious Health Conditions". This page states that social isolation was associated with about a 50% increased risk for dementia and social isolation significantly increased a person's risk of premature death from all causes.

[32] The UpToDate section on Risk Factors for Cognitive Decline and Dementia, states that "social isolation may be a prodromal symptom of dementia, but growing evidence suggests that it may also be a risk factor for dementia".

[33] See UpToDate section on Management of neuropsychiatric symptoms of dementia.

On 1/19/23, a nurse documented that the patient, "occasionally come[s] to the window, yell and bang the window, urinate in the toilet, then go back to sleep".

The patient exhibited aggression which was overwhelmingly verbal and less frequently physically threatening.  There were a few documented reports in the record of attempted and actual hitting of staff[34].  This is consistent with reports of aggression by elderly patients  towards nursing home staff which are mostly verbal but can be physical[35]. This aggression is real and needs to be addressed for the safety of the staff.  This patient's aggression was a result of his dementia which is a medical condition, and any restraint should have been addressed through medical authorization.  Instead, restraints used for this patient were applied by  custody and monitored by custody in response to a perceived  security issue for which the patient was held personally responsible.  The basis for the custody restraints was what a nurse described as "staff assaulter status".  The management of this patient's aggression resulted in excessive use of custody restraints.  Custody use of restraints for medical reasons violates National Commission in Correctional Health Care (NCCHC) standards and medical standards of care.  When medical restraints are used, they must be authorized by medical providers, renewed daily, monitored frequently, used in the least restrictive manner, documented in the medical record each time they are used, and have clinical indications.   With respect to medical restraints in dementia, UpToDate[36] states,

> "physical restraints are rarely indicated in the care of patients with dementia and should be used only for patients who pose an imminent risk of physical harm to themselves or others, with frequent evaluation of continued need. Reasons for the use of physical restraints must be documented adequately.  …….. Before resorting to restraints, we refer patients to in-patient geriatric psychiatry programs."

IDOC completed a policy on medical restraints (I.05.01 Medical Restraints).  The Monitor received the draft of this policy and procedure 8/23/23 and returned extensive comments and revisions to IDOC on 2/6/2024. IDOC elected to send out a manual of final policies and procedures, which included I.05.01 Medical Restraints on 2/9/2024. Therefore, the IDOC policy and procedure on medical restraints did not have any input from the Monitor. IDOC needs to consider the extensive comments that were provided on the draft during the annual review of this policy and procedure.  Problems with use of custody restraint for medical purposes will continue.  Examples of relying on custody restraint for medical purposes in the care of this patient include the following.

On 8/3/22 an emergency room doctor documented in his note that:

---

[34] The patient did apparently take a swing at a physician on 9/27/22.  On 9/20/22, a nurse documented that the patient attempted to attack staff who were monitoring him.  On 10/14/22, a nurse did document that the patient hit a nurse who was performing an evaluation.  On 11/21/22, a physician wrote that he saw the patient in the presence of a custody staff and that he slapped the doctor's hand instead of shaking it.  There is no question the patient's verbal aggression and actions (throwing food and trays as example) frightened staff and that there was verbal aggression and a couple of physical assaults.

[35] Lachs MS, Rosen T, Teresi JA, Eimicke JP, Ramirez M, Silver S, Pillemer K; Verbal and Physical Aggression Directed at Nursing Home Staff by Residents.  J Gen Intern Med 2013 May: 28(5): 660-667

[36] UpToDate is a web based software that is a point of care evidence-based clinical resource used in many hospitals, HMOs and physician practices in the United States.

"per guards at bedside, patient seems to be at his baseline status. They do note that he has episodes of intermittent agitation and today required physical restraint **as well as Mace spray several hours ago**" (our emphasis).

On 8/17/22, a nurse documented that the patient asked to have handcuffs taken off. Apparently, the patient was shackled with cuffs behind his back for purposes of showering. The patient agreed to being cuffed with hands in front. The nursing plan on this date documented to continue under "staff assaulter status". The patient was treated as a cognitively intact prisoner who assaults staff (custody procedures) instead of as a patient with dementia who is aggressive (requiring medical management). There are no acceptable medical procedures for addressing aggression in demented patients, so custody practices prevailed. Medical providers conducted no evaluation to determine the appropriateness of this form of restraint. This was inappropriate, unethical, contrary to correctional and medical standards, and abusive.

On 8/31/22, the patient fell and the nurse went to the cell window to look at the patient. The nurse asked a lieutenant and the infirmary officer to open the door. This was done and the lieutenant directed the patient to sit down several times. The patient approached with clenched fists and the officers closed the door and no evaluation of his status after the fall occurred. The patient was left in his locked cell alone, after a fall with no clinical evaluation of injury.

On 12/22/22, a nurse documented that a tactical team came to the cell and shackled the inmate's hands and legs and placed the patient on a shower chair so the patient could be washed.

On 1/14/23, a porter witnessed the patient falling backward in his cell. The patient had an arm wound but when medical staff sat the patient up, he began having a seizure and he was laid back down. When assessed later, the patient began seizing again. A nurse called a provider who ordered the patient to the hospital. The patient was transferred to the hospital with leg irons and waist chains. This was present as a verbal order in the medical record. It is dangerous to shackle a patient who is at high risk for seizure as serious harm can occur.[37]

On 3/16/23, the patient was found unconscious with fixed pinpoint pupils. He was not responsive. He was transferred to the hospital in waist chains and leg irons. He was found to have massive brain bleeds and subsequently died. This use of restraints was also approved by a verbal order of a physician. The patient was unconscious after a head injury and to shackle him was clinically inappropriate.

Though the patient's dementia was considered a problem, the plan of action regarding dementia was not clearly documented and was ineffective. The patient should have had a neurocognitive evaluation by a neurologist who is trained to evaluate neurocognitive disorders. This was not done. One physician's notes typically included, as a plan, "if not better or any problem to notify nursing staff". This doctor had already identified that the patient was incapable of making medical

---

[37] In this case and the one that follows, medical staff agreed to shackling a person who may have been harmed by the shackling. IDOC must develop procedures for appropriate restraint of medical patients. Patients who have gran mal seizures have uncontrolled movements that are sudden and forceful. Shackling can result in harm- see Shackling in Hospitals from the Journal of General Internal Medicine at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8971251/

decisions due to severe dementia yet, the doctor's typical plan was for the patient to notify nursing staff of his problems. The patient was incapable of doing this.

Providers attempted to consult with psychiatry to develop a management strategy for this patient's dementia, aggressive behavior and agitation but there was no evidence in the record of this occurring for nine months until shortly before the inmate's death. Current policy and procedure provides no guidance on how to care for a person with dementia. Providers did not know how to manage this patient and attempted on two occasions to get help from psychiatry who did not provide consultation as requested. This facility did not have the capacity to manage this patient.

In one note on 8/9/22, a physician described consulting senior psychiatry staff regarding management of the patient. He stated,

> "I need direction from MH [mental health] Department how to manage this pt [patient] when he lost mental capacity to make decision to protect his own health and safety and safety of others because of uncontrollable violent aggressive behavior".

The doctor documented that mental health could not evaluate the patient because the patient could not give consent but noted that the mental health advice was not to use benzodiazepines because of "reciprocal agitation" and not to use haloperidol as well. The doctor explained to the mental health team that the patient was on clopidogrel and aspirin and the possibility of severe injury to his head existed and that he needed to either chemically or physically restrain the patient because of the risk of injury. The doctor did not have a plan for management of this demented patient's aggression, confusion, and agitation and saw the only solution as asking mental health for advice on chemical restraint.

There was no note by mental health based on the physician's request. But a day later, on 8/10/22, the same physician documented that care of the patient was discussed with mental health. A plan of care was not documented.

On 8/11/22 the same physician documented that a conference call with "regional" [presumably the regional Medical Director and administrator] and the Director of Nursing [unclear if this was the regional director of nursing or the facility director of nursing]. The doctor wrote the discussion was about, "IDOC [with] regard to proper safe placement. This placement [illegible word] will be addressed by IDOC". This appears to indicate that the plan was to place the patient in another facility or in a nursing home but the plan was not specifically documented and no such placement ever occurred. It is not even clear if IDOC was notified of this patient.

Seven months later, a psychiatrist eventually evaluated the patient on 3/14/23, at the request of a nurse after a fall to evaluate for the need of medication and programming. This was three days before the patient sustained an intracranial bleed after a fall that caused his death. The psychiatrist wrote,

> "It is appreciated that he is on a variety of medications including, but not limited to, Trazadone, PRN Ativan, and Donepezil. It appears that 12 of 56 available doses (last 14 days) were provided thus far of the PRN Ativan. Nursing notes are unclear for the circumstances that arose to result in the use of PRN treatment. However, nursing notes are clear in their indication of him having numerous falls including injuries to his head,

repeated bouts of incontinence and persisting cognitive impairment. Per my review of documentation, I saw an event on 2/11/23 where he kicked out at a nurse after becoming verbally aggressive and attempted to hit an officer as related to being put on a medical writ. He was subsequently taken by ambulance after a fall. On 2/4/23 he threw his empty tray to the ground after refusing to provide it to security. Though there was no report of further incident as he later complied to allow his room to be cleaned (to prevent falling). He is also noted to be experiencing poor oral intake and exhibiting poor hygiene despite attempts to help him. Primary care documentation suggests that reversible causes of neurocognitive impairment were ruled out to indicate this is likely an irreversible chronic disease process."

The psychiatrist noted no psychiatric problems and that psychiatry had no further recommendations except to state,

"infrequency of aggressive events as documented suggest that additional use of medications [the patient was on a benzodiazepine] to manage agitation are more likely to contribute to the worsening of his condition (cardiac risks, falls, etc.) and less likely to completely resolve all agitation. Ultimately, Mr. [deleted]appears to suffer from a chronic, irreversible condition that is likely to only worsen with time. He would most benefit from a higher level of care such as a nursing home placement with especially trained staff to manage his condition. The limits of a correctional setting and potentially worsening for cognitively impaired patients suggests ongoing residence here will likely only lead to worsening. At this point, psychiatry will move to PRN status and allow the primary care team to manage [patient's name] medical conditions and sequelae"

This was the same conclusion drawn previously in August 2022 but not acted on. Two days later, on 3/17/23, the patient fell again and sustained an intraparenchymal brain bleed and an acute on a chronic subdural hematoma. The dating of the initial subdural was uncertain. The patient was discharged back to the facility on 3/28/23 on comfort care only and died two days later.

*Hygiene and Toileting*

This patient, as early as 7/5/22, was documented as having disinhibition and problems with toileting. On that day a nurse documented that the patient had an accident going to the toilet with feces on the floor next to the toilet. There were numerous examples how this typical problem with hygiene in persons with dementia was handled in IDOC. The patient was frequently found with feces on his person and needed bathing. A scientific paper on bathing the aggressive nursing home patient states, "20-40% of residents [of nursing homes] with dementia exhibit aggressive or agitated behavior such as hitting, kicking, and screaming while bathing. Moreover, many residents remain upset for hours after the bath"[38]. While there are strategies for addressing this in nursing homes (as evidenced in the above cited article), in IDOC this behavior was viewed as a refusal to comply with a custody rule by a responsible and rational inmate. The response was to cuff, shackle, and force the patient to bathe by use of the tactical team or the patient was left soiled because he

---

[38] Gonzalo P, Prakash S, Qato DM, Sloane PD, Mor V; Effect of the Bathing Without a Battle Training Intervention on Bathing-Associated Physical and Verbal Outcomes in Nursing Home Residents with Dementia: A Randomized Crossover Diffusion Study, J Am Geriatr Soc 2014 May; 62(5): 797-804

refused to comply. This misapplied use of force redirects medical care to custody staff and is inappropriate.

On 8/22/22, a nurse noted that "cell covered [with] feces. Will attempt + encourage shower [with] security staff". A later note documented that the patient was confused and there was feces "all over the cell, toilet clogged with food and paper objects".

On 10/17/22, a nurse documented, "had a large BM on the floor. Feces seen on legs. Attempt made to clean him get a shower. He refused. Was combative with security. Refused to cooperate". The patient was left with feces in his room and on his person.

On 12/20/22, a nurse assistant documented, "remained in soiled pants from yesterday. Did not respond much to verbal req[uest]" and "cell still 2 mess c/o swept and removed trash. Will attempt H2O later & cleaning, total hygiene deferred, refused".

Later, on 12/20/22, a nurse documented the patient saying, "leave me alone, I'm showering on Christmas". Then the nurse added, " Tried multiple time with tact[ical][39] team to encourage patient to get in shower to remove stool that has been on him and he refuses to clean himself".

On 12/21/22 a nurse wrote that with unsteady gait the patient walked to the toilet and "dropped extra-large packed firm hard round ball of feces + additional soft stool + diarrhea runny type stool around top of toilet". On 12/22/22, a nurse documented that a tactical team came to the cell and shackled the inmate's hands and placed leg restraints and moved the inmate to a shower chair and the patient was washed.

On 12/29/22, a nurse documented that the patient refused a shower and the tactical team was called four times but they were busy. The nurse said the patient would be showered when the tactical team came.

On 12/30/22, a nurse documented that the patient had a shower with the emergency response and tactical team assistance through the commander in chief.

On 1/3/23, a nurse documented that the inmate was brought to the shower by an officer. The inmate had feces all over his back and hair.

On 2/1/23 at 2 am, a nurse assistant documented that the patient was "covered in his own bowel movement at arrival on shift. No vitals taken **per H.C.U. [health care unit] Sgt [sergeant]** due to security risk. No shower given **per Major**".[40] This patient remained covered in feces until twelve hours later when at 2:15 pm a nurse documented that the patient "was covered in feces with foul-odor". The nurse documented notifying the Major to activate the tactical team for the patient to be showered. The patient was removed and showered.

---

[39] Tactical teams are specialized units of custody staff used to typically resolve situations with high risk offenders related to searches or dangerous interactions with a violent inmate. In this case the tactical team was involved in getting the inmate to bathe which appeared to involve cuffing and shackling to enforce bathing.

[40] For a medical patient, custody must not be in control of hygiene issues, nor must custody be responsible for directing when vitals or hygiene are to be done.

This patient's care for hygiene and toileting qualifies as abuse and neglect based upon criteria in state regulation for the elderly.[41]

*Nutrition, and Feeding*

This patient had no upper teeth. On 10/14/22, a nurse documented that his teeth were in the toilet. The nurse did not describe retrieving the dentures. On 12/26/22 at 3 pm, a nurse documented that the patient refused his lunch tray as it was too difficult to chew with his upper false teeth. The nurse added in the plan section of the note, "have not seen dentures + pt does not take teeth out nor ever witnessed by this reporting nurse". It appeared that the patient no longer had his dentures. The patient attempted to chew a sausage link and threw it back on the Styrofoam tray. The nurse believed this was due to having a casing that was difficult to chew. The patient took his liquid boost supplement and the nurse documented that he had no food intake recorded except for the boost for five days. It would not have been difficult to have the patient open his mouth to assess whether he indeed had his dentures. Dental status is an important risk factor in community dwelling older adults for weight loss[42]. A referral to the dentist was not made.

The Consent Decree requires, "analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so"[43] but there was no effort to determine the nutritional status of the patient. Though OHS has told the Monitor that consultation by a dietician is available, no such consultation took place for this individual for the entire year of his incarceration. This patient should have seen a dietician to evaluate his eating pattern and nutritional status. Neither did providers order laboratory tests to evaluate the patient's nutritional status.

The patient's weight was not well tracked on the infirmary flow sheets. There were only three documented weights during this time period. The first weight was on 7/5/22 when the infirmary flowsheet documented a weight of 171 pounds. On that same day a nurse documented that since admission to NRC five months ago the patient lost 67 pounds. The nurse initiated an order for boost, a liquid nutritional supplement. The order was one can with each breakfast, lunch and dinner for 3 months.

The next weight was on 8/25/22 when the patient gained weight to 187 pounds. But mostly, the patient "refused" weights and no further weights were documented until 2/24/23 when a weight of 155 was recorded. The refusals of weights were sometimes accompanied by statements that the patient was unable or refuses to sign the refusal. An admission history and physical examination during the patient's final hospitalization on 3/17/23 documented a weight of 72.23 kilograms or approximately 159 pounds. If the patient had lost 67 pounds at a weight of 171 pounds, then from admission to NRC on 2/25/22 until 3/17/23, about 13 months, the patient lost 79 pounds.

---

[41] 720 ILCS 5/12-4.4a. This regulation addresses criminal abuse or neglect of an elderly person or persons with a disability and includes actions that cause a resident's life to be endangered, health to be injured, or pre-existing physical or mental condition to deteriorate or fails to perform acts that he or she knows or reasonably should know are necessary to maintain or preserve the life or health of a resident.

[42] Ritchie CS, Joshipura K, Siliman RA, Miller B, Douglas CW, Oral health problems and significant weight loss among community-dwelling older adults. J Gerontol A Biol Sci Med Sci 2000 Jul; 55)7): M366-71

[43] II.6.j of the Consent Decree.

Despite this degree of weight loss, there was no evaluation of his nutritional status. There were orders for liquid nutritional supplement beginning in July of 2022 and on 2/27/23 there was an order for a high protein, high calorie diet for weight loss with boost nutritional supplement - a can with each meal. And on 3/15/23, several days before the patient died, a physician ordered high protein diet to be pureed with shakes for each meal. Yet during the time period from July of 2022 until the patient's death in March of 2023 the patient appeared to have been fed like any other rational adult inmate with breakfast at 3:30 am, lunch at 9 am and dinner at 3 pm with an expectation that the patient could feed himself. Trays were apparently placed on the floor of the patient's room. These trays were frequently scattered about on the floor with food strewn about. Because this patient had significant dementia with confusion, hallucinations, delusions and aggressive behavior, feeding by placing food tray on the floor was likely to result in what actually happened which is the patient did not eat well.

On 12/19/22 a doctor documented that the patient had fallen while bending over presumably to pick up his food tray. On that day a nurse placed a table inside the patient's cell so that food trays could be placed on the table instead of the floor to prevent the patient from reaching to the floor to pick up his tray. The patient eventually threw the bedside table upside down. Yet the manner of serving meals as if the patient was rational continued and food continued to be found all over the patient's room. Nurses continued to document that the patient ate very little of the food served. No one considered, given the patient's dementia, whether a different pattern of feeding, including different timing of meals, was needed.

This patient lost approximately 67 pounds over 13 months of incarceration. Health care staff were unable to develop an effective plan to provide nutrition to the patient especially in light of the patient's dementia and concomitant disabilities. No nutritional consultation was obtained. Not providing appropriate nutrition also qualifies as neglect and abuse.

*The patient was not evaluated or monitored by providers for his medical conditions.*

The available record provided for this patient began in late June of 2022 about four months after incarceration. During the nine month period of provided record, the patient had no chronic clinic appointments. Though current policy requires chronic infirmary patients to be seen weekly, this did not consistently occur. Physician notes were documented weekly from 6/21/22 to 8/11/22. Then not for two weeks. Physicians saw the patient three times in September. The patient wasn't seen in October. The patient was seen three times in November and four times in December. From 12/28/22, when a nurse practitioner saw the patient, until 2/14/23 the patient was not seen despite two hospitalizations and three falls. The 2/14/23 provider note was related to seeing the patient post-hospitalization after a fall. After the 2/14/23 provider note, a provider didn't see the patient again until the patient fell on 2/24/23. The last time a provider saw the patient was 2/27/23. A provider did not see the patient again despite a fall on 3/1/23 and an unwitnessed fall on 3/6/23 during which the patient sustained a black eye. The patient had another fall on 3/17/23 after which the patient was found prone on the floor and was hospitalized with diagnosis of multiple brain hemorrhage likely from a fall. The patient died three days after return from the hospital. In total, the patient had twelve falls that were documented for the six months from 6/29/22 until 3/6/23.

For four of these falls, the patient was sent to a hospital. For only three of the remaining eight falls did a provider evaluate the patient. There was no specific documented fall prevention plan.

None of the provider notes included evaluations that monitored all of the patient's medical conditions. A doctor's note from 6/29/22 documented that the patient had coronary artery disease with prior stents, heart failure, cardiomyopathy and dementia. There was no problem list. On 11/15/22, a physician documented that the patient had coronary artery disease with multiple stents, heart failure, atrial fibrillation not on anticoagulation, hypertension, diabetes, gout and recent development of dementia. There was no objective evidence of gout. Another doctor evaluated the patient on 11/21/22 and documented coronary artery disease with stents, cardiomyopathy, atrial fibrillation, type 2 diabetes, hypertension, COPD and recent GI bleed and UTI. Despite acknowledging these conditions, there was no meaningful monitoring with an updated assessment of each of these medical conditions by these providers. Only episodic concerns were noted and evaluated.

Much of the information related to the patient's medical conditions came from hospital notes. On 1/3/23 the patient was hospitalized and diagnoses listed at the hospital included:
1. Erosive gastritis with GI bleed
2. Dementia
3. Prior stroke
4. Coronary artery disease with stents
5. Hypertension
6. Atrial fibrillation
7. Anemia
8. Hyperlipidemia
9. GERD
10. Diabetes
11. Ischemic cardiomyopathy with heart failure.

Through the entire nine months of record available, there was minimal monitoring of these conditions except when the patient went to a hospital. The dementia was noted regularly by nurses and even providers, but there was no effective plan of care for the patient's daily needs. The patient's diabetes was not monitored at any clinic visit. A hemoglobin A1c was 5.9 on 7/6/22 and the patient was on 1000 mg of metformin twice a day, an antidiabetic agent. Providers should have considered decreasing the dose because the A1c was low but this was not done until more than five months later on 12/19/22 when the dose was decreased to 500 mg twice a day. There was no repeat A1c or evaluation of status of his diabetes.

From June, 2022 to 3/16/23, the patient was sent to the hospital eight times. Of these eight hospitalizations, there were only three full reports. An additional hospitalization had an emergency room note. For five hospitalizations there was no provider review after return from the hospital. For one hospitalization a provider saw the patient on return but the hospital report was not in the record and there was no documentation of review. In a final hospitalization, there was no documentation of the review of the hospital report.

*Failure to manage medications*

This patient's medications were typically managed without evaluation of the patient. From 7/5/22 until 3/8/23, 53 prescriptions were written. Forty-four were for medications and nine for other orders. Some of these were for the same medication at different doses. For only seven of the 53 prescriptions was a progress note present when the provider ordered the medication with only five of these seven being conducted when the patient was evaluated. It appeared based on the writing on the prescription that 21 of the 53 prescriptions were written by nurses. In only 31 of 53 prescriptions could the provider be identified due to illegibility or, in a few cases, absence of a signature. In summary, this demonstrates that providers take no responsibility for ensuring prescriptions are appropriate.[44]

In February of 2023, the patient was on 14 medications. Avoiding adverse drug effects is important in caring for the elderly and particularly in persons with dementia. A key aspect of dementia management is to acknowledge the adverse effects that medications can contribute to cognitive impairment. It is recommended to periodically review the patient's drug regimen, use the minimal dose required to obtain the necessary clinical benefit, discontinue unnecessary therapies, and consider adverse effects as a cause of symptoms before prescribing another drug[45]. This did not occur. The patient was on multiple medications which in combination can cause adverse effects which mirrored some of the patient's symptoms. For this reason, all of the patient's medications should have been reviewed (with adverse drug reaction software or ideally with a clinical pharmacist) following which the primary care provider should have discussed medication benefits and risks with the surrogate and discontinued unnecessary medications.

Paramount in this discussion is that a goal of care was not defined for this patient. This patient had advanced dementia and was confused, sometimes knew who he was but was otherwise not oriented to time or place. He could not communicate rationally any longer. It was unsafe for the patient to be alone or to walk alone. The patient was totally dependent on others for eating dressing and grooming. And, the patient had severe anxiety, aggression, confusion, and agitation. Perhaps he should have been considered for hospice? If so this should have been discussed with his surrogate. However, IDOC never identified a surrogate and failed to have any discussion about what plan of care would offer the most benefit and least harm in his remaining life.

For two medications, there was no clear indication. From June of 2022 through March of 2023 providers prescribed albuterol but there was no evidence on the medication administration record (MAR) that the patient ever received albuterol. The reason for a prescription for the albuterol was unclear as the patient had no medical conditions that warranted this medication. Though this medication was continuously prescribed and was on the medication administration record, no one recognized for nine months that the patient hadn't used the medication nor had it been offered to him.

---

[44] IDOC has multiple providers including coverage doctors who are not typically assigned to a facility. Some of the providers giving phone orders are unfamiliar with the patient and this can result in errors. In this patient, he was on medications without indication, was on several medications that were potentially harmful, and on combinations of medications that resulted in potential for adverse reactions.
[45] This is taken from UpToDate Management of the patient with dementia.

The patient was on allopurinol, presumably for gout, but there was no clinical evidence for gout and the patient was not being monitored for gout. Allopurinol has an FDA indication for gout but not for asymptomatic hyperuricemia[46] which this patient had. The patient had a uric acid of 9.2 on 7/6/22. This qualified as asymptomatic hyperuricemia. The patient did not have evidence of gout, had no monitoring of the serum uric acid, and no evaluations of joints to assess whether he had gout. It was unclear why this patient was receiving allopurinol.

The patient was on an anticoagulant drug, clopidogrel. However, given the patient's dementia and fall risks, use of this drug was risky as it can cause serious intracranial bleeding if the patient falls and the patient had fallen 12 times. The risk of bleeding from falls should have been weighed against the risk of thrombosis and myocardial infarction and the use of this medication should have been discussed with a cardiologist and with the surrogate. The patient ultimately died of multiple (subarachnoid and intracerebral) bleeds after falls.

Lorazepam has many adverse reactions, including amnesia, drowsiness, and sedation. It has a potential to cause disinhibitory reactions that include sleep disturbance, hostility, rage, agitation or **aggressive behavior.** It is advised to use with caution in debilitated patients. Older patients have increased risk of death *with the risk highest within the first four months of use in older adult dementia patients. It also carries a fall risk. Extreme caution is urged when used in patient who are at risk of falls. Benzodiazepines have been associated with falls and traumatic injury.*[47] This patient appeared to be on lorazepam for agitation and aggressive behavior. The risks to the patient were exacerbation of agitation and aggressive behavior,[48] and falls. This patient had 12 falls from 6/29/22 to 3/16/23 with the last fall causing his death. Use of this medication was not carefully monitored. Lorazepam should not have been prescribed.

This patient was in a facility that did not have appropriate space, staffing, equipment, or expertise to house this patient. There are currently no policies, procedures or programs to manage persons who need total care and/or have dementia. The facility failed to identify a surrogate to ensure someone could make a medical decision regarding his care. Nurses did not have medical direction with respect to how to bathe and feed the patient and defaulted by seeking custody's help that resulted in use of tactical teams who used cuffing and shackling to wash the patient. Custody probably did the best they could, but the patient should not have been managed by these practices. The patient should have been managed medically, but there are no procedures for the care of this type of patient. The intent to move this patient to another facility was never acted on but would have been appropriate. Placement in a nursing home would be an acceptable option for this patient. If IDOC intends to care for these types of patient in the prisons, appropriate space, procedures, programming and staffing must be available to provide medically acceptable care. The Monitor has previously recommended and continues to recommend that in order to identify the appropriate space, procedures, programming and staffing necessary to care for this population, that IDOC consult with a gerontologist and retain a consultant to evaluate the needs of the aged, infirm and disabled and develop a report to include findings and recommendations. Based on those

---

[46] Typically, gout is diagnosed when a patient has an elevated serum uric acid level and symptoms of gout (painful swollen joints typically the joints in the feet). This patient had apparently asymptomatic elevated uric acid which did not warrant treatment. Notably, the condition wasn't even monitored.

[47] These warnings are taken from UpToDate medication profile for lorazepam.

[48] Notably, this was the reasons that psychiatrists at NRC recommended not using the drug.

consultation recommendations, IDOC must develop a plan to address those needs. The Monitor is willing to provide recommendations for a gerontologist and consultant if the IDOC desires.

## Patient #5

This 51 year-old man with history of diabetes, hypertension, and high blood lipids was housed at the Hill facility. When he was incarcerated in 2004, he was five foot seven inches tall and weighed 267 pounds. On 6/14/22 a nurse practitioner saw the patient for a syncopal episode that occurred 5/30/22. An EKG was not obtained. At this time, the patient had 37 pound weight loss which was unrecognized. A CBC was ordered and was 10.4 which is significant anemia. Because the patient was 51 years old, endoscopies should have been ordered urgently but were not. Instead, when seen in follow up on 6/28/22, the nurse practitioner assessed anemia and ordered omeprazole and three stool guaiac tests. This was substandard care because regardless of the three stool guaiac tests, endoscopies should have been ordered. The patient had history of fatigue and dizziness for five months with heartburn and weight loss. While guaiac testing was indicated, upper and lower endoscopy should have been ordered as urgent tests.

On 8/12/22 a nurse practitioner saw the patient and noted that he had negative hemoccult tests. The nurse practitioner still did not refer for endoscopy but ordered iron studies and a metabolic panel. Iron studies confirmed iron deficiency which indicates blood loss and a kidney function test suggested chronic kidney disease (GFR 58 and creatinine 1.48). No further action was taken.

The patient wasn't evaluated again until a chronic clinic on 9/19/22. The provider documented weight loss ( 33 pound loss since the last chronic clinic visit). Though the patient had a GFR test that indicated chronic kidney disease, this was unrecognized. There was no assessment or plan for the weight loss or possible chronic kidney disease. The iron deficiency anemia was not addressed. Endoscopies and a CT abdomen should have been ordered.

On 9/23/22 a nurse practitioner saw the patient in follow up of the iron studies which were not evaluated at the recent chronic care visit. The nurse practitioner remarkably assessed iron deficiency anemia but only reordered iron therapy with a recheck of the CBC and iron panel in three months. This is substandard care. There was no ongoing physician oversight at this facility for the entirety of this patient's care.

At a subsequent chronic clinic visit on 12/7/22, a 48 pound weight loss was unrecognized. Though the patient's incarceration weight was 267, his weight of 219 was likely not perceived as abnormal. The anemia was not addressed and the abnormal renal function was still unrecognized. A follow up blood count on 12/28/22 still showed iron deficiency anemia and was signed as reviewed by a nurse practitioner but no action was taken. This is below standard of care.

On 2/19/23 a nurse saw the patient for abdominal pain. The patient complained of abdominal pain for a year and hadn't had a bowel movement in two days. The weight was now 202 or a 65 pound weight loss. The nurse noted a palpable lump in the patient's abdomen. The nurse referred to a provider but the patient was not seen for unstated reasons and was rescheduled on a second occasion. This rescheduled visit never occurred.

On 3/20/23, a code 3 emergency was called because the patient felt like he was going to pass out. A nurse called a nurse practitioner who ordered blood tests. The following day a nurse practitioner saw the patient and, finally, nine months after the patient developed anemia, after a year of abdominal pain, development of an abdominal mass, and considerable weight loss, ordered an urgent endoscopy and colonoscopy.

This review tracked referrals from 3/21/23 to 8/25/23 during the time period from when his diagnosis was made until he received the 1st cycle of chemotherapy. There were 22 completed offsite visits over this period of time. These 22 visits were completed in the first three quarters of 2023. The 1st, 2nd, and 3rd quarter offsite specialty care tracking logs were examined and only four (18%) of the 22 appointments were on the logs. Referrals are not entered into the log when the referral is requested but only when they are completed. Appointments that are never completed or referred but not scheduled do not show up on the log. This section of log shows how disorganized the log is at this facility.

Of these 22 referrals, there was a referral form found in the medical record for 16 of the 22 referrals. Referrals for a total of six visits had no name for the referring provider; this gave the appearance of the medical record scheduler scheduling patients without a referral from a provider. This suggests that medical records is managing referrals. There were full consultant reports for only six (27%) of 22 referrals; five (23%) referrals had no report except for a patient instruction after-visit summary; three (14%) referrals had no report except for comments by the consultant on the referral form; and eight (36%) referrals had no report. There was no documentation of any efforts made to obtain the reports. Of the six reports received, none was initialed or signed as reviewed. The tracking log does not track whether the provider evaluated the patient post visit and had an informed discussion about the consultation with an update of the therapeutic plan. Of the 22 completed referrals, seven (22%) had no provider visit with the provider mentioning the offsite visit. Post-visit provider encounters did not consistently provide informed care. The results of the consultation were inconsistently discussed and providers inconsistently documented an assessment of the patient's ongoing problems at that visit with respect to his overall care and therapeutic plan. At none of the visits were all of the patient's problems documented and addressed.

This patient had multiple referrals documented as being approved in collegial review which the Monitor has been told no longer exists. For a referral on 7/19/23, a physician documented that collegial review approved multiple oncology appointments. For another referral, on 8/3/23, a physician wrote that the iron infusion treatments were approved in collegial review. On 10/12/23, the same physician documented that a CT scan was approved in collegial review. On 11/2/23, the same physician documented that a follow up oncology appointment was approved in collegial review. On 11/9/23, the same physician documented that an MRI of the shoulder was approved in collegial review. On 11/30/23, the same physician documented multiple appointments were approved in collegial review. IDOC needs to clarify why physicians still refer to collegial review if it is not supposed to exist.

Reports were often not reviewed and essential information not obtained. After the patient had initial colonoscopy, the report and biopsy results were not obtained. The colonoscopy showed colon cancer and the biopsy suggested mucinous colon cancer. In the absence of a report one nurse

practitioner documented the patient had gastric cancer for three consecutive months when the patient actually had colon cancer. Almost two months after the diagnostic colonoscopy, the Medical Director also documented gastric cancer.

Documentation of post-specialty visits often merely noted that the patient went for a scheduled appointment but not important issues related to the patient's care. On 8/10/23, two days after the 1st chemotherapy session on 8/8/23, a nurse practitioner saw the patient . Two day before, nursing notes describe the patient complaining of dark brown vomit and blood in his stool. An earlier note on 8/7/23 documented that the patient had decreased appetite and hadn't eaten in four days except for his boost supplement. Yet the nurse practitioner did not address the patient's recent vomiting and the decreased food intake with respect to the possible additional effects of chemotherapy. Prognosis and "do not resuscitate" status were discussed but there was no discussion about the effect of the chemotherapy on his well-being and the add on effect of chemotherapy to his recent vomiting.

This patient's specialty care was notable for failure to refer the patient when he had anemia for about a year. The specialty referral process was disorganized and chaotic. Referrals were not found. Referrals are not tracked. Key consultations (e.g., for initial colonoscopy) were not reviewed and resulted in providers not knowing the actual diagnosis of the patient for months. Chemotherapy did not begin for four months after diagnosis in part due to necessity to obtain higher level consultation but there were some delays in scheduling. It appeared that the medical records scheduling clerk was actually managing the patient's care. Providers did not appear to be directing the scheduling of appointments.

The provider notes, which were almost exclusively by nurse practitioners, did not include a thorough assessment with a plan of care for each of the patient's problems. The diagnosis of the patient wasn't known by facility staff for a couple months because no one obtained the pathology reports. Updates from the oncologist were not documented in the progress notes of providers.

On 8/19/23, during the time when the patient was receiving chemotherapy, a nurse saw the patient using a dizziness/vertigo protocol. The patient had fever (102.8), tachycardia (113) and low blood pressure (94/60) and the nurse described him as "unsteady" when walking. This was at 6:55 pm. Given that the patient was on chemotherapy, a provider should have evaluated the patient and a white count should have been obtained and the patient examined for signs of infection. The blood pressure was very low, given his history of hypertension, and combined with fever, he should have gone to an emergency room for evaluation. Instead, the nurse didn't contact a provider, and the patient was instructed to limit activity if dizzy, avoid standing quickly, and to eat properly with adequate fluid intake.

On 10/13/23 a nurse practitioner documented that DNR was discussed with the patient but that the patient was apprehensive about signing because his sister was health care power of attorney and was telling him not to sign. The patient's pain was not controlled and the nurse practitioner documented willingness to increase morphine but that the patient must be DNR first due to risk of respiratory depression. The nurse practitioner should have consulted a pharmacist and the Medical Director as the patient had been on this dose for approximately six weeks without problem and incremental increases in dose would typically be safe. It gave the appearance that the nurse

practitioner was steering the patient to sign a "do not resuscitate" order using additional pain medication as a benefit. Because the patient said his sister was a health care power of attorney there should have been some attempt to contact her as this patient had a poor prognosis. This was not done. Health care power of attorney issues are recurrent.

On 10/17/23 the oncologist saw the patient and the plan was to continue with chemotherapy. The oncologist documented that the patient had pain intensity of 10 and ordered multiple x-rays to assess the cervical spine and left shoulder to assess for metastatic disease and to evaluate the pain. The same day but after the oncologist visit, a facility nurse practitioner witnessed a physician order for life sustaining treatment (POLST) in which the patient elected only comfort care This is the equivalent of hospice and means that further care except to give comfort is not provided. Despite signing a comfort-only POLST, full care continued to be provided as the patient was rescheduled for oncology and chemotherapy. The oncologist was not made aware of this decision of the POLST. Pain medication was increased for the patient by doubling the dose. The medication should have been gradually increased and titrated to the pain. Doubling the dose suddenly placed the patient at risk for overdose.

On 10/31/23, the oncologist saw the patient as verified by a report in the record. This visit was not recorded on the 4th quarter tracking log. The oncologist documented that chemotherapy was held due to low blood counts. The oncologist documented the disorganized facility scheduling saying, "incidentally, CT that was ordered to have been done before cycle 9 (11/14/23) was scheduled by the facility and done on 10/18/23. We will give them a call, request they pay closer attention to dates and times". At this visit and at subsequent visits until 12/19/23, the oncologist was unaware that the patient had signed a POLST as the facility did not communicate the POLST to the oncologist. The POLST was signed without contacting the power of attorney. End of life care remains problematic.

On 12/5/23, the patient vomited waiting for transfer for his oncology appointment and, after consulting with the oncologist, the patient was admitted to a local hospital but then transferred to a regional hospital. The weight at the facility while waiting to transfer was documented as 163 pounds or almost 100 pound weight loss. At the hospital, the patient had bowel obstruction that was not deemed to be not surgically correctible. The patient was started on hospice. The patient had already signed a POLST for comfort-care-only which is equivalent to hospice with respect to not desiring further care not related to pain and comfort management. The facility agreed to accept the patient back to the prison. This was the second time that the patient was made comfort-care only. The patient was sent back to the prison on 12/12/23.

On 12/11/23, the facility Medical Director gave a verbal order for a 50 microgram fentanyl patch every 72 hours and "morphine injectable I.V. 1 mg [every] 4 [hours] [as needed]".

On the following day, 12/12/23, the facility Medical Director wrote another prescription for "morphine concentrated SL 473 ml (four hundred seventy three ml) 4 mg/ml, 4 ml [every ] 4 [hours] as needed breakthrough pain x 30 [days]". This prescription was confusing as the precise dose desired was unclear. Because it was morphine, it should have been questioned. . The Medical Director wrote no accompanying progress note. The pharmacy did not document a problem with this prescription which is shown below.



Also, on 12/12/23, the facility Medical Director signed a verbal order documented by a nurse for a 50 mcg fentanyl patch to be changed every 72 hours and for morphine sulphate 4 mg/ml inject 1 mg every 4 hours. This was the 2nd prescription for a fentanyl patch. The medical record should clearly document when a medication is ordered, discontinued, or when a duplicate prescription is to be ignored. This did not occur. There were two active prescriptions for fentanyl patch.

On 12/12/23 a nurse practitioner also wrote a prescription for morphine 100 mg/5ml: 1 ml every four hours prn until morphine comes in. The order was unclear because the patient already had multiple active morphine prescriptions and it was not clear which morphine prescription was being waited for.

On 12/13/23 the facility Medical Director wrote a prescription to discontinue the injectable morphine, (there were two active injectable morphine orders) and to start morphine 100 mg/5 ml: 1 ml orally as needed. This was the second prescription for the morphine 100mg /5ml. The Medical Director left out the frequency of the medication and a nurse later added every 4 hours to make the order sensible. The was no documentation in progress notes or in prescriptions as to how these duplicate prescriptions orders were corrected.

On 12/15/23 the facility Medical Director wrote a prescription for MS Contin 60 mg extended release twice a day.

There were no orders to discontinue these medications except the injectable morphine. The pharmacy should have asked for clarification on all of what appear to be duplicate orders. The narcotic orders on the MAR were handwritten. There were no pharmacy labels for the morphine prescriptions so the handwritten MAR was the only verification of active prescriptions for this patient. There was no documentation in the provider progress notes that described the plan with respect to how much morphine was expected to be given. Provider notes did not include all of

patient's medication.  The duplicate prescription orders without stop orders and absence of clarification documented in subsequent orders or in progress notes speaks to a significant communication problem between providers, nurses, and pharmacy. This is a patient safety risk.  In the electronic record, the pharmacy profile should be the document that is the active list of medications.  The MAR should accurately reflect the pharmacy record.  No medication should be on the MAR that has not been approved by a pharmacist. The pharmacy must be able to promptly review prescriptions and indicate whether the medication can be administered. Nurses initiation of medications on the MAR must be eliminated.  Errors in the current medication process need to be corrected before the electronic record goes live. The consulting pharmacists at SIU should be involved in making these corrections.  .

On 12/13/23 the patient was described as having 10/10 pain and was upset at having his oral pain medications discontinued after he returned to the infirmary  post hospitalization.  On 12/15/23 the patient described 8/10 pain; the nurse told the doctor and nurse practitioner about his uncontrolled pain.  After this point the patient was less communicative but there were no references to pain. The patient fell on 12/17/23.  The facility Medical Director was notified but there was no provider follow up.

Although this patient was in hospice he was sent back to the oncologist on 12/19/23.  If the patient was in hospice why was an oncology visit necessary?  The oncologist documented that the patient wanted a compassionate release from prison to be with his family.  He was very anemic and the oncologist recommended a transfusion to make the patient strong enough so as to see his family. The transfusion was ordered and completed.  The oncologist documented the patient's pain was reasonably well controlled but said that the medication list sent with the patient did not appear up to date.

On 1/5/24 a nurse practitioner discussed medications with the patient due to "some confusion".  The nurse practitioner did not list the medications nor was the "confusion" explained .  On this date the medication administration record documents that the patient was on magnesium, phosphorus, iron supplements, a variety of anti-nausea and antacid or gastric reflux medications, fentanyl patch, lorazepam, morphine sulfate 20 mg every four hours  and MS Contin.  The total dose of morphine was approximately 360 mg a day which is a high dose.  It was not clear from documentation whether this dosage was intended.  Provider notes do not include a list of medications with doses, so the multiple providers caring for the patient would not know the total panel of pain medications.

On 1/10/24 the patient fell in the bathroom but was not examined by a provider.  On 1/15/24, the patient asked why he couldn't call his family.  There was no effort to accommodate his request to communicate with family.

On 1/15/24, the patient fell again.  The facility Medical Director didn't respond to a call so  the nurse called the Regional Medical Director who recommended "fall prevention" and to monitor the patient.  It was unclear what fall prevention meant.  Later that day, the patient told a nurse how hard it was for his family and that he didn't understand why he couldn't call his family.  There was no effort to enable the patient to have a telephone call with his family.  This seems unnecessarily cruel.

The Medical Director wrote a renewal for the fentanyl patch on 1/16/24. However, the MAR documents that the patch was not changed as scheduled on the 16th because the backup pharmacy was out of stock.

The facility Medical Director saw the patient that day and documents that the patient's abdomen was firm and tender but that the patient's pain was controlled. It does not appear that the Medical Director was informed that a new patch could not be obtained and the problem with pain medication was not addressed.

On 1/19/24, a nurse practitioner wrote that the patient was struggling to swallow pills even with water. Instead of giving IV medication, the nurse practitioner wrote in the progress note to change MS Contin order to crush and place sublingually and to give the morphine sulphate liquid every two hours. This should have been reviewed with a pharmacist but was administered for five days without any pharmacy oversight and the order was handwritten on the MAR. A Food and Drug Administration (FDA) alert warns in bold capital letters

> MS CONTIN TABLETS ARE TO BE SWALLOWED WHOLE AND ARE NOT TO BE BROKEN, CHEWED, DISSOLVED, OR CRUSHED. TAKING BROKEN, CHEWED, DISSOLVED, OR CRUSHED MS CONTIN TABLETS LEADS TO RAPID RELEASE AND ABSORPTION OF A POTENTITIALLY FATAL DOSE OF MORPINE.[49]

The patient was given nine doses of crushed MS Contin between 1/19/24 and 1/24/24. At 4:20 pm on 1/19/24, the patient fell and was found sitting on the floor after attempting to go to the bathroom.

On 1/23/24, at 8 am, a nurse documented still giving the crushed medication and described the patient as lethargic. On 1/22/24, the patient was described as incontinent of urine and nonverbal. The HCUA documented that the patient was declining and notified the family and a family visit was approved by the Warden but at this point the patient was not able to effectively communicate. A fentanyl patch was received 1/24/24. The patient died on 1/26/24.

This patient was 45 years old on 9/17/17. The IDOC had promulgated cancer screening recommendations in January of 2021. The Monitor's 4th report, issued 9/16/21, documented that the USPSTF recommended that patients should start colorectal cancer screening at age 45. Despite the USPSTF recommendations and promulgation of a IDOC policy on colon cancer screening in 2021, the patient was not screened for colon cancer. He was identified on 6/28/22 with anemia (Hgb 10.4) and had an unrecognized 37 pound weight loss. Yet, he didn't have a definitive biopsy identifying colon cancer until 3/28/23. The delay in work up of this patient makes this a preventable death.

**Patient #6**

---

[49] FDA Alert as found at https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/019516s034lbl.pdf

This patient was 52 years old when he received an annual periodic history and examination on 11/8/22 at Hill Correctional Center. He smoked two packs per day for forty years; thus, he had an 80 pack year of smoking. Lung cancer screening, based on USPSTF guidelines and IDOC guidelines[50], was indicated but not performed. At the annual periodic history, he complained of a chronic cough which was not followed up by any history. The patient had underlying asthma. His weight was 209 pounds and had been 221 pounds at a chronic clinic 5/26/22 only six months earlier. There was no assessment or plan for the cough.

On 12/23/22 an LPN saw the patient using a cough protocol. The patient's weight was 195 pounds or a 26 pound weight loss since 5/26/22. The blood pressure was 149/88 but the LPN did not retake it or put the patient on blood pressure checks. The weight loss was not identified. The elevated blood pressure was ignored. LPNs should not be performing sick call evaluations.

On 1/5/23, the patient was evaluated in chronic care clinic for asthma. He complained of a chronic dry hacking cough and using his albuterol inhaler more frequently because he didn't have his Alvesco inhaler. The patient also weighed 209 which was a 12 pound weight loss since his chronic clinic in May of 2022. No further history of taken of this complaint even though cough is a symptom of asthma. No history was taken regarding frequency of inhaler use either. PEFRs were 270 and 260 and the assessment was intermittent asthma which is inconsistent with the PEFR values or with being on two inhalers. A history was not taken sufficient to make an assessment of intermittent asthma. The nurse practitioner seeing the patient started Singulair, a third asthma drug but this third drug did not appear indicated if his Alvesco was renewed. The weight loss and chronic cough were not addressed.

On 4/13/2023 the patient was seen by a nurse using the protocol for upper respiratory infection. The 22 pound weight loss the last 12 months was not identified as a problem by the nurse at this encounter. On 4/17/23 a nurse evaluated the patient using a cough protocol. The patient had cough for at least six months. The blood pressure was 155/92. For both of these nursing protocol visits, the second page was missing. However, there did not appear to be a referral to a provider as there was no subsequent provider note.

On 7/10/23, the Medical Director saw the patient in chronic care clinic. The history was that the patient denied shortness of breath or dyspnea on exertion but complained of chronic cough for a year that was non-productive. No further history was taken. The PEFRs were 250/300/350. Blood pressure was 133/90 with pulse of 107. The patient was documented as mild persistent asthma in fair control though the patient was on two inhalers and montelukast (Singulair). Being on three asthma drugs is consistent with moderate asthma not mild persistent asthma. The MAR for July shows that the patient hadn't been provided montelukast since March 16th which meant that the patient was not using montelukast for the past three months. This was unnoticed. Notably, the patient didn't receive montelukast again until January of 2024 even though it remained an active prescription. This drug may have been unnecessary but was not being monitored. The PEFR tests were inconsistent with the diagnosis. Spirometry should probably have been done given the persistently low PEFR tests. The weight was 174.8, a 37 pound weight loss over approximately 14 months. Neither the persistent cough nor the weight loss were investigated; the weight loss

---

[50] The Monitor's 4th Report, on 9/16/21, noted that OHS developed a draft guidance on preventive screening that included lung cancer screening in line with the USPSTF.

wasn't even acknowledged. Though the patient was 53 years old he was not screened for lung cancer. A 6-month follow up was ordered. A chest x-ray was ordered, but there was no evidence that the chest x-ray was done. There was no follow up to check on the failed x-ray.

On 10/12/23, a nurse evaluated the patient using a cough protocol. The nurse documented that the patient had the cough for over a year. The weight was documented as 194 which still indicated weight loss of 36 pounds since incarceration. ***The patient told the nurse that he wanted cancer testing regularly and hadn't had labs or a checkup in 10 years***. He stated his memory is bad and he forgets his glasses . He asked to be checked for forgetting things but the nurse did not evaluate this concern. Instead, the nurse "educated" the patient on "getting older / Δ in memory". No referral was made for a year-long complaint of a cough with weight loss which would have been evident if the nurse had reviewed the patient's record. The nurse did not respond appropriately to the patient's request to be screened for cancer, or his memory loss and refer for evaluation.

On 10/16/23, the patient fell and hit his head and a nurse evaluated the patient using a non-specific discomfort protocol. The nurse documented that the patient fell on the steps and the nurse presumed it was due to not having his glasses. A provider did not evaluate the patient after the fall. Falls are not normal and a better history and assessment should have been done. This was especially true since only four days previously, the patient had complained of memory issues. The non-specific discomfort protocol should be discontinued; its continued use is dangerous.

On 10/19/23, a nurse evaluated the patient using a cough protocol. The nurse noted that the patient complained of 2-3 years of cough since the COVID epidemic. The blood pressure was 143/93 and the weight was 192 which was a 32 pound weight loss since incarcerated and 29 pound weight loss since May of 2022. Though this patient had multiple episodes of complaints of cough, the nurse did not refer to a provider and gave cough syrup based on protocol. ***A week later on 10/26/23, the patient requested a "full physical".*** A nurse told him that this would be done around his birthday without asking why he wanted a physical examination.

On 11/1/23 a nurse evaluated the patient using a non-specific discomfort protocol for right leg and shoulder pain. The patient had the pain described as 6-7/10 for several weeks. The blood pressure was 147/55, which is elevated, and the weight was recorded as 187. The nurse documented the patient as limping, stuttering and slow to answer. He had to be asked 4 times to obtain his weight and had a blank look on his face and described significant memory issues lately. The patient thought he was in Chicago. Though the patient had new onset of altered mental status and symptoms of stroke the nurse scheduled the patient for a physician follow up the following day. But after the examination the nurse brought the patient into the nurse practitioner's clinic room because of stuttering and dragging his leg. The nurse practitioner documented that the patient was speaking normally, had facial symmetry, no drift and normal straight leg raising. Based on this brief and incomplete neurologic examination the NP concluded that the examination was "normal" and wrote to follow up PRN. The NP took no additional history.

The next day, on 11/2/23, at 12:53 pm the facility Medical Director evaluated the patient for "stroke like symptoms". The patient was confused and had symptoms of decreased sensation in his right leg for 2-3 weeks. The doctor noted confusion and difficulty speaking. The patient had difficulty ambulating. The doctor sent the patient to the ER in an ambulance. Higher level

attention was provided a year after the patient complained of chronic cough. This cough may have been present for a longer period of time because only a year of medical record was provided. The weight was 192 pounds so the patient had lost 29 pounds since May of 2022.

The hospital diagnosed lung cancer metastatic to his brain and locally to lymph nodes, to the adrenal gland, and to areas around the lung. A large brain metastatic tumor was resected. The patient was confused and had expressive aphasia before leaving the hospital. Before the patient left the hospital, he had a signed a power of attorney.

Hospital instructions documented medications as Tylenol, dexamethasone, Voltaren, docusate, Norco 1 every 6 hours, loratadine, montelukast, pantoprazole, and senna. A follow up with neurosurgery was scheduled for 11/27/23 for suture removal and a post-op follow up on 12/8/23. Dexamethasone was a new order to reduce brain swelling after the surgery.

On 11/14/23, the patient returned from the hospital. The Medical Director at the facility wrote the infirmary admission note. The only history was post craniotomy for a tumor. This was an inadequate history. There was no explanation of what kind of tumor the patient had, how it affected the patient, the hospital course, the current status of the patient, or the follow up plan for the patient except for a follow up with the surgeon and to take sutures out. The only neurologic examination was that the patient was alert and oriented and had normal eye movements. The confusion noted the day before at the hospital wasn't confirmed or mentioned. The current condition was documented as "stable". The admitting diagnosis was "S/P craniotomy", and the only plan was regular diet, to ambulate as tolerated, and refer for suture removal and surgical FU. There was no review of the hospital record; no indication whether the patient needed radiation therapy or oncology follow up; no mention of prognosis and advanced directives nor of the power of attorney signed at the hospital; and no history related to current pain status or mention of a plan for pain. This was not an informed note.

The referral system was dysfunctional. There were eight completed offsite specialty visits after hospitalization and one duplicate referral. The duplicate referral was documented on the referral log as completed twice to the same consultant. Of the nine visits documented on the log the date of referral was accurate only for one referral. For seven of the referrals, the dates of referral were when the patient was in the hospital. Three of the referral forms used to request the referral were sent to the wrong consultant. One referral form meant for a radiation oncologist was sent to the medical oncologist. Another referral for the medical oncologist was sent to the radiation oncologist. Another referral for a PET CT scan was sent to the radiation oncologist. The log was disorganized and inaccurate and handling of referral forms was disorganized.

Only four of the eight unique appointments included a full report. Two appointments had no report but did have brief comments on the referral form. One appointment had no report but had an after-visit summary. One appointment had no report and no information.

Post visit evaluations by a provider with the patient were not thorough and demonstrate the episodic nature of IDOC follow up and its dangers. The first appointment was on 11/27/23 with the surgeon. This was reviewed by a nurse practitioner at Hill with the patient on 11/29/23 and the biopsy report was discussed. This was an informed follow up. However, the therapeutic plan with

46

future appointments were not documented or discussed with the patient. All of the patient's problems were not listed in the follow up encounter note.

The second visit was on 11/30/23 with the radiation oncologist. There was no report but there were comments on the referral form which was not signed as reviewed. The radiation oncologist recommended an ultrasound to rule out a deep vein thrombosis and a staging PET CT scan. There was no post-visit evaluation and the recommendations for a PET CT scan and ultrasound were unnoticed.

The third visit on 11/30/23 was with a medical oncologist. There was a report which also included recommendations for a PET CT scan. This report was signed by the Medical Director as reviewed on 12/27/23, about a month after the consultation. There was no post-visit evaluation by a provider. The recommendation for a PET CT scan went unnoticed. On 12/1/23, a medical records clerk documented that the PET CT scan was cancelled because a CT scan had already been done on 11/31/23. This was inaccurate.

The fourth visit was on 12/4/23 with radiation oncology. This consultation included a report. Notably, the referral form for this visit was for a combined 11/30/23 oncology visit and for a PET CT scan which was requested to be scheduled for 12/4/23. The referral form had comments from the radiation oncologist that were not signed as reviewed. The radiation oncologist again asked for a PET CT scan and an ultrasound to rule out a deep vein thrombosis. There was a full report that was not signed as reviewed but it recommended an ultrasound to rule out deep vein thrombosis and a PET CT scan. A nurse practitioner saw the patient 12/6/23 in the morning on infirmary rounds and documented making a referral for an urgent ultrasound to rule out DVT but a referral form was not found in the record. At this appointment the nurse practitioner did not examine the patient's leg to assess whether it was swollen. This should have been done and if there was evidence of a deep vein thrombosis the patient should have been sent to an emergency room immediately. The nurse practitioner also documented a referral for a PET CT scan but this referral was not found. The nurse practitioner did not list all problems in the assessment nor was there a plan for all problems. This was an ineffective post-consultation visit that placed the patient at significant risk because the nurse practitioner did not examine the patient's leg or refer the patient immediately to an emergency room.

The fifth visit was to radiation therapy on 12/6/23 but there was no report. There were comments on the referral form again asking for an ultrasound and PET CT scan. There was no in-person provider follow up to this visit. But on 12/7/23, the urgent ultrasound referral was discussed in collegial review. The Monitor has been assured that collegial review has ended but this episode makes it appear as if it is still continuing in some fashion.[51]

The Medical Director documented that a PET CT and ultrasound would be scheduled but details weren't given regarding when they would be scheduled. The recommendation for DVT was initially made on 11/30/23. A 7-day delay in evaluating for a deep vein thrombosis in a patient with cancer is dangerous. The Medical Director did not see the patient and no one from the facility

---

[51] Also, on 11/16/23, a physician documented that an oncology appointment was approved in collegial review. If collegial review has ended, the vendor should explain these repeated documented references to collegial review.

evaluated the leg for deep vein thrombosis since the recommendation was made. This was a major error in follow up. If the patient needed an ultrasound to rule out deep vein thrombosis, it should have been done immediately and to go through collegial review and schedule this electively was incompetent care.

The sixth and seventh visits were on 12/8/23. The patient had two appointments; one with the radiation oncologist and one with the neurosurgeon. There were no reports for either appointment, but there was an after-visit summary for the neurosurgeon and there were comments on the referral form to the radiation oncologist. The neurosurgeon recommended an MRI in follow up. The after-visit summary also included appointments apparently scheduled at the hospital for a PET CT scan on 12/21/23 and an ultrasound scheduled for 1/16/23. Someone unknown scheduled urgent appointments for two weeks later for the PET CT scan and a month and a half later for the ultrasound. The PET CT scan should been done a week ago and the ultrasound should have been done on 11/30/23 so a 1/16/23 appointment was dangerous. These scheduled appointments were not on the offsite tracking log. There was no provider follow up of this visit. The level of disorganization with tracking, scheduling and following up of offsite appointments is chaotic and dangerous.

The second appointment on 12/8/23 (seventh visit) was with the radiation oncologist. There was no report for this visit but there were comments on the referral form. Those comments stated that the patient had his 3rd radiation session. There was no provider follow up of this visit.

The eighth visit was on 12/11/23 to the radiation oncologist. There was a report but there was no referral form. The report recommended again the PET CT scan and the ultrasound. There were three copies of this report in the record but only one was signed as reviewed on 12/12/23.

On 12/12/23, a technician performed an onsite ultrasound; this was about two weeks after it was recommended by radiation oncology. This was an urgent test that should have been done on 11/30/23 the day of the consultation. At 2:09 pm a nurse practitioner documented that the technician said there was a deep vein thrombosis. The nurse practitioner called the Medical Director who gave a phone order for Eliquis 5 mg BID. This is not a standard starting dose and was an error. The patient began vomiting at 4 pm and by 8 pm vomited bright red blood. The nurse tried to call the facility Medical Director who did not respond and voicemails were left. After several more attempts the nurse called the vendor Regional Medical Director who ordered the patient sent to an ER.

At the hospital, the patient was diagnosed with deep vein thrombosis and pulmonary embolism. The patient was sent to a higher level hospital and remained hospitalized for two weeks developing atrial fibrillation and sepsis. When the patient was discharged the hospital recommended a palliative care consultation for hospice. IDOC does not have a consultant who provides palliative care consultation. A formal discharge summary was not in the medical record.

When the patient arrived back at Hill on 12/26/23, there was no summary of the hospital course or expected plan of care. A nurse documented that the Medical Director would see the patient the following day, which did not happen. Instead, a nurse practitioner saw the patient on infirmary rounds on 12/27/23. The nurse practitioner did not document that the patient had just spent two

weeks in the hospital. The hospital record was not reviewed and problems were not identified which included: opacification of the left lung with deviation of the trachea, anemia, deep vein thrombosis and pulmonary emboli, non-small cell lung cancer with brain metastases, hypokalemia, atrial fibrillation, and difficulty swallowing. There was no assessment of pain. There was no acknowledgement that the hospital recommended a palliative care consult for hospice. The nurse practitioner documented a plan that reflected the plan before the hospitalization which was to schedule a follow up with oncology and to await the completion of the PET scan. A palliative care consultation should have been ordered. There was one further nurse practitioner evaluation while he was incarcerated which similarly failed to appreciate the futility of further treatment and failed to initiate palliative care.

The patient had a power of attorney in the record, but provider never contacted the person to establish a plan for the patient.

On 1/4/23 the patient had seizures and was unresponsive and was sent to a hospital. The hospital called a nurse practitioner at the facility to ask about a power of attorney. The HCUA told the nurse practitioner to call the Warden but the Warden didn't answer. The HCUA told the nurse practitioner to fax the power of attorney that had been previously filled out during an earlier hospitalization. The patient apparently died in the hospital.

This patient was over 50 with significant smoking history that warranted lung cancer screening. He did not receive this even though he had an annual checkup on 11/8/22. He had multiple episodes over the next year complaining of cough; only once was a chest x-ray ordered but it was not completed. He also was gradually losing weight so that over the course of a year he lost 36 pounds. He was not sent for a diagnostic evaluation until he couldn't walk, had central nervous system symptoms of inability to articulate speech correctly and was confused. Widely metastatic lung cancer was identified. This death was potentially preventable with early screening. The failure to act on the radiation oncologist's recommendation for ultrasound demonstrated a broken specialty care program and resulted in harm to the patient that hastened death.

## Patient #7

This patient was a parole violator initially incarcerated at Menard on 1/13/23. He had initial blood tests done four days after intake that included an alkaline phosphatase that was very high (430 with normal 40-125). This test is significant and requires follow up with diagnostic testing that if done likely would have resulted in earlier diagnosis. A provider documented review of the test with a note to repeat it. On 1/27/23 the patient was transferred to Vienna.

The vendor Regional Medical Director reviewed the laboratory test and documented on the laboratory result that the patient should be scheduled to see an on-site provider. But there was no regularly assigned provider at Vienna since the Medical Director position was vacant.

On 1/31/23, a coverage physician, who is not credentialed, saw the patient and documented that the patient was to be seen for an abnormal lab result. He took no history and performed no examination. He noted that the laboratory test had not returned. The plan was "awaiting repeat lab". The laboratory results should have been obtained from UIC. A history should have been

taken related to possible reasons for an elevated alkaline phosphatase. A follow up clinic visit to evaluate the laboratory test at a later date was not done. This was unsafe and clinically unacceptable care and resulted in a significant delay in diagnostic follow up of this abnormal laboratory test.

On 4/21/23 the patient was diagnosed with COVID and had consistent tachycardia for six days when monitoring stopped. A coverage doctor was called and discharged the patient from quarantine. The six days of tachycardia were unrecognized and not followed up.

Six months after transfer to Vienna, on 7/15/23, security sent the patient to the medical unit for evaluation for leg swelling. A nurse evaluated the patient using an abdominal pain protocol. The pulse was high at 115, the blood pressure was high at 159/97 and the patient had bilateral leg edema with a distended abdomen with emaciated face and arms. The nurse called a provider who sent the patient to an emergency room.

The local emergency room sent the patient to a higher level hospital. The reference hospital diagnosed adenocarcinoma in the colon with metastases to the lung and liver. Ascites was present. The cancer was far advanced and only palliative chemotherapy was planned. The patient had very low serum sodium. The hospital recommended oncology follow up in a week. The discharge summary noted, "Patient is currently incarcerated in Illinois which will make some of his follow up difficult and will need to be done prior to getting out. Needs follow up with local oncologist at discharge".

On the last day of hospitalization on 7/20/23, the Director of Nursing became involved in coordinating and apparently referring the patient for specialty care. At 2:30 pm on the day of discharge from the hospital, the DON from Vienna talked to a nurse at Deaconess oncology. The original plan for the patient was for interventional radiology follow-up on 7/24/23 to insert a chemotherapy port and with an oncology appointment on 7/26/23. The DON added that she "followed case closely and established pt outpatient visit to F/U and initiate treatment plan on July 26th at 11:30 am at Deaconess Oncology Center Will advise of this furlough appt." This involvement of the Director of Nursing in directing referral for specialty care was likely due to an absence of a physician at this facility.

On the same day, a nurse practitioner from Vienna CC talked to a nurse practitioner from the hospital oncology service. The hospital nurse practitioner said that the patient couldn't get a port because the pathology report wasn't completed. The nurse practitioner from Vienna said she would arrange cancer follow up at SIH Cancer Center, which is in Illinois and close to Vienna CC. The nurse practitioner made a referral to SIH on this date. There appeared to be two different oncology plans for the patient.

Neither the Director of Nursing referral nor the nurse practitioner referral was in the July offsite specialty tracking log. On 7/20/23 the patient returned to Vienna where there is no infirmary and no physician. This was an unsafe placement for this patient. This patient needed a higher level of care than could be provided at Vienna CC.

50

The first provider visit after return from the hospital was on 7/21/23. The nurse practitioner took little history; only that the patient had abdominal pain. The hospital discharge diagnoses were metastatic colon cancer, liver metastases, lung nodules, ascites, anasarca, tachycardia, and non-sustained ventricular tachycardia. The patient was discharged on Vantin, an antibiotic for presumptive subacute bacterial peritonitis and furosemide 40 mg daily for ascites and anasarca. But the provider at Vienna did not acknowledge any of the problems identified at the hospital and the only assessment was "hospital follow up" which is a task, not an assessment. The provider did not document what medications the patient was on and did not have a plan for any of the hospital diagnoses except the cancer for which the nurse practitioner documented a referral to SIH cancer center. Baseline laboratory tests should have been ordered.

A coverage physician, without credentials, evaluated the patient on 7/24/23. The note was extremely brief. The pulse was **140** which was not acknowledged as abnormal. The only history was "Had liver bx + colonoscopy". The objective examination portion of the note documented. "was to get a port but it has been rescheduled". This is not an examination. There was no review of the hospital note. The physician's assessment was post-hospitalization with a diagnosis of cancer with metastases. None of the other diagnoses were documented or reviewed. None of the patient's medications were noted. The plan was to continue observation care. There was no documentation of a specific therapeutic plan for this patient. Follow up labs were not ordered. The physician also should have investigated when the port would be placed and should have ensured the patient was referred for oncology consultation. The port should have been placed urgently. This note was devoid of any assessment or plan for any of the patient's problems.

The Director of Nursing arranged with the furlough officers to take the patient to Deaconess Hospital on 7/24/23 for the port placement. When the furlough officers arrived, they were told that no appointment was scheduled. The hospital then offered to reschedule the patient but the Director of Nursing after discussion with the nurse practitioner at Vienna wrote, "decision was made to continue with local care at SIH Cancer Center". The Director of Nursing contacted Deaconess and cancelled the existing appointment with the oncologist at Deaconess. It appeared that the Director of Nursing was directing specialty care. The coverage physician who was present at the facility that day was not involved. Clearly, the role of coverage physicians is not to act as a Medical Director.

There is documentation in progress notes on 7/26/23 that the patient had another appointment at Deaconess on 8/1/23 at 8:45 am with oncology and a second appointment at 9:30 am with interventional radiology. The documentation is not signed.

On 7/26/23, a nurse described the patient as emaciated which term was used in several other notes. There was no indication what diet the patient was on and a dietician consultation was not obtained.

A non-credentialed coverage doctor saw the patient again on 7/31/23. The note was extremely brief, did not address all of the patient's problems and focused on the patient signing a do not resuscitate form. The note read:
"S: "OK considering the circumstances. Eating. + emesis, + nausea.
O: has extensive metastatic cancer,
A: Will need to sign a DNR.

51

P: DNR has been signed"

Given all that had occurred with this patient and the flurry of failed offsite appointments, this physician should have written a more comprehensive note. The patient had requested a Joe Coleman release earlier that day with the HCUA but the doctor did not discuss this with the patient. The POLST form, signed by the patient and physician, documented that the patient requested to be resuscitated and asked for full treatment. The physician's labeling this POLST as a "DNR" is misleading. None of the patient's problems were addressed. Nor was any attention given to offsite scheduling and the physician did not document an oncology plan of care.

The patient went to Deaconess on 8/1/23 and saw an oncologist. There was no documentation of a referral from Vienna providers to oncology, only to interventional radiology for a port placement. The oncology visit was not on the offsite specialty tracking log. At this visit, the patient was tachycardic and had elevated white count so the oncologist sent the patient to the ER and from there he was admitted to the hospital. He spent a week in the hospital and received the first cycle of chemotherapy. The after-visit summary documented that a follow up appointment for chemotherapy was scheduled for 8/23/23. The patient was discharged from the hospital on 8/8/23.

Remarkably, on 8/2/23, when the patient was still in the hospital, a nurse practitioner from Vienna wrote a referral to the oncologist at Deaconess for chemotherapy. This was the same nurse practitioner who referred the patient to SIH oncology. The scheduled appointments for this patient were not clearly documented in either the offsite specialty tracking log or in progress notes of providers. Care was episodic and specialty care scheduling was chaotic and dysfunctional.

When the patient returned to Vienna from the hospital on 8/8/23, he was placed in an observation cell. Vienna had no physician and no infirmary and should not have been used to house this patient as he was bedridden and dying of cancer. . It appeared that an error occurred with respect to discharge medications from the hospital. The discharge medications included levothyroxine but there was no evidence that could be found in the hospital record that the patient had hypothyroidism. In fact, the patient had nearly continuous tachycardia which is an adverse effect of levothyroxine. When the patient returned to the prison, he started to receive levothyroxine despite no clear diagnosis of hypothyroidism. The order for the levothyroxine was made by phone without the physician seeing the patient and without acknowledgement of tachycardia (118) which levothyroxine can exacerbate. This order did not apparently go through the pharmacy as the MAR was hand written and without pharmacy labels. This event should be brought to the attention of the SIU medication process group to evaluate how the patient could be on a medication without a diagnosis. This patient had multiple episodes of subsequent tachycardia but the association with the levothyroxine was not examined.

The first provider note after return to Vienna from the hospital was on 8/9/23. The nurse practitioner did not review the hospital notes nor was a plan of care initiated based upon what had occurred at the hospital. The nurse practitioner documented that the pain was "the same" but didn't document an assessment of pain control. No additional pain medication was ordered. No labs were ordered. The nurse practitioner did not question why the patient was on levothyroxine which was a newly recommended medication by the hospital nor was the patient's rapid pulse (108) noted. The nurse practitioner did not even mention that the patient had been hospitalized for a

week. The hospital discharge paperwork, including the discharge summary was initialed as reviewed by the same nurse practitioner but the findings or recommendations from the hospital were not documented in a progress note. There was no assessment of the patient and the only plan was to elevate his legs for his edema. There was no documented plan for the patient's oncology care.

On 8/11/23, the patient went to the SIH Cancer Center. This was the only referral listed on the Vienna offsite specialty tracking log. The oncologist noted what had occurred at Deaconess Hospital and discussed options for the patient. The patient elected to receive further palliative chemotherapy and this was planned. A specific appointment day was not given. The patient's blood pressure was 146/102 and the oncologist recommended lisinopril.

On 8/11/23 the patient was allowed to call his father in the HCUA's office and was tearful. This appears to have been the only contact the patient had with his family in the time between his diagnosis and death.

By 8/16/23 the patient's weight had decreased to 162 pounds a 23 pound weight loss. A nurse called an on-call physician and got an order for boost, a nutritional supplement. A nutritional consultation would have been appropriate.

On 8/20/23 the patient complained of dizziness and being short of breath. His pulse was 138, respirations 32 and the oxygen saturation 77-84%. An on-call physician was called and ordered the patient sent to the emergency room.

At the hospital, the patient's status was changed to palliative care and the patient died in the hospital on 8/24/23.

This patient had an abnormal laboratory result that was unrecognized for seven months. The laboratory result implied that the patient likely had metastatic liver disease. It is uncertain what effect earlier diagnosis would have had on survival. However, the patient was only 40 years old and wanted aggressive care. This was not provided to him because of the delay in diagnosing his cancer. The referral process at Vienna is dysfunctional and chaotic. The documentation of referral and specialty care is extremely difficult to follow in the record and contributes to the fragmentation of patient care. The tracking log is completely unreliable and does not track referrals or appointments. Physicians play no part in managing patient referrals. The nurse practitioner and Director of Nursing appeared to be managing referrals but were not coordinating their efforts. The absence of an engaged, responsible physician was evident.

## Patient #8

This 46 year old man was incarcerated at Graham on 10/12/23 and gave the screening nurse a history of right shoulder issues, headaches, and back pain. The provider performing the health assessment took no history. The second page of the health assessment was missing. The problem list includes hypertension not on medication, a right shoulder "issue" which was not further clarified, headache and neck pain.

On 10/31/23 a nurse saw the patient for shoulder pain and used the non-specific discomfort protocol. The patient weighed 148 pounds and was 5 foot 10 inches tall. The nursing note was not understandable; it stated that the patient had a facial grimace and "S/R dislocated shoulder MC [with] 1/2 ago". Other than noting there was no edema or discoloration the nurse did not check the patient's range of motion, strength, or alignment. The nurse did not inquire about any impact on activities of daily living or elaborate on the relationship between the reported dislocated shoulder and the discomfort he presented to sick call with. The nurse gave ibuprofen by protocol.

On 11/1/23 a physician assistant wrote an illegible note.

On 11/9/23 a registered nurse issued the patient 10 tablets of 400 mg ibuprofen without documenting an examination or use of a protocol. This nurse was practicing outside of scope.

On 11/12/23 a registered nurse responded to a code 3 at 4:30 in the afternoon and evaluated the patient using a non-specific discomfort protocol. The patient had intermittent right shoulder and chest pain (8 out 10) the entire day. The patient said it was hard to breathe. There was no swelling, bruising, or redness. Once again the evaluation of the patient was incomplete and more appropriate guidance would have been provided if the nurse used the chest pain or short of breath protocols. The nurse gave the patient a three day supply of ibuprofen and acetaminophen by protocol.

The next day a second code 3 was called and a nurse practitioner saw the patient for shortness of breath and shoulder pain. Limited history was taken. The range of motion was normal and the nurse practitioner documented "normal exam of the right upper extremity". The nurse practitioner ordered an x-ray of the shoulder. Though the patient had pain the nurse practitioner documented, "no Tylenol or ibuprofen given because of abuse of previous blister pack". Apparently all the pain medication that he received the day before had been taken. This indicates that the patient is experiencing more pain than can be relieved by over the counter pain medication. The practitioner was cynical to attribute this to abuse. The patient's pain needed more thorough evaluation and higher level treatment.

On 11/15/23, the patient complained of pain that awoke him during sleep. The nurse used the chest pain protocol and the pulse was documented as 113. The nurse did not note that this was the fourth complaint for the same symptom in the last two weeks and that two of these were code 3s and did not refer the patient. Later that day the patient was transferred to SWCC. He told the nurse completing transfer screening that he had hurt his ribs but the nurse did not evaluate the complaint.

On 11/16/23, a nurse documented a code 3 for arm pain including right chest pain. The pulse was 110 and 124. An EKG was documented as sinus rhythm. There was bruising on the right chest with an abrasion. The patient said he fell out of bed twice during the night. Despite the recent fall, tachycardia and the repetitiveness of the complaint the patient was not referred for a medical evaluation. The patient was referred to mental health.

The psychiatrist who saw the patient on 11/17/2023 elicited a history of the patient being in a fight a couple weeks ago and dislocating his shoulder. Since then, he had worsening pain down his entire right arm, and stated "On my God, my arm is on fire." He was unable to sleep without taking ibuprofen every four hours. He couldn't do anything because of the injury and hadn't been eating

because of the pain. During the interview he was grimacing, breathing heavily and had a pulse rate of 123. The psychiatrist documented referring the patient for a medical evaluation.

On 11/20/23 security staff brought the patient to the HCU from chow hall because he couldn't breathe. A registered nurse evaluated the patent and documented a pulse rate of 102-127 with the respiratory rate 22-30. The nurse failed to recognize the severity and cascading nature of this complaint and only recommended breathing through pursed lips. No protocol was used to guide this evaluation. At a minimum the patient should have been referred promptly to a provider due to the abnormal vitals but this was not done. The nurse returned the patient to his housing. The nurse's actions were negligent and put the patient at risk.

The next day, on 11/21/23, custody staff again brought the patient to the health unit. The patient said he couldn't breathe and his shoulder, back and arm hurt. The nurse evaluation was extremely brief documenting, "Patient seen, assessed, noted wheezing and hyperventilating." The nurse had the doctor who was onsite see the patient. He advised sending the patient to an emergency room.

The patient was sent to a reference hospital in Missouri and diagnosed with widely metastatic non-small lung cancer. The cancer was extensive with an upper lobe lung mass that extended beyond the lung to encase two major arteries and was so large it forced the center part of the chest to one side. The patient had brain metastases, abdominal , liver, lymph node, and bone metastases. Radiation therapy was initiated as was chemotherapy which was recommended to be continued as an outpatient. While hospitalized, the patient filed a medical release request form.

After nearly a month of hospitalization, the patient returned to SWCC on 12/12/23. He weighed 113 pounds, a loss of 35 pounds. His widely metastatic cancer encased several major arteries, locally extended to the abdomen and chest, caused a pathologic fracture of a rib. The laryngeal nerve was encased causing difficulty speaking. The hospital recommended oncology follow up, multiple medications, including acetaminophen for fever, albuterol inhaler, alprazolam (a benzodiazepam), dexamethasone, guaifenesin-dextromethorphan, ipratropium-albuterol nebulization, morphine extended release 75 mg twice a day, morphine immediate release 15 mg every four hours as needed for pain, naloxogel 12.5 mg once, naloxone spray as needed for opiate reversal, ondansetron 4 mg every 4 hours, pantoprazole daily, nicotine patch daily and nicotine gum.

On 12/12/23, the physician infirmary admission note documented adenocarcinoma of the lung which was inaccurate. The physician didn't document a therapeutic plan for the patient other than ordering morphine and even though the patient had difficulty swallowing the diet order was "as tolerated". The admitting physician made no referral to oncology.

It didn't appear that the physician reviewed the hospital report because besides using the wrong diagnosis, the order for morphine differed from that recommended by the hospital. The hospital recommended 75 mg extended release every 12 hours and 15 mg immediate release every four hours as needed for pain. The doctor's infirmary admission note documented "morphine 60 ER [extended release] BID [twice a day]" and "morphine 15 mg [every] 6 prn". This order wasn't precise and translated onto a MAR handwritten by the nurse as morphine sulphate ER 60 mg every 12 hours and morphine sulphate immediate release 15 mg every 4 hours as needed for pain. This

was a reduction in pain medication without assessment of pain or explanation of why the hospital order wasn't honored.

The patient's pain medication prescription was reduced by 30 mg of morphine a day from what was recommended by the hospital. Further there was no evidence that the 15 mg immediate release morphine was offered every four hours. There was documentation on one MAR of offering immediate release morphine only three times from 12/12/23 to 12/15/23 when it should have been offered 18 times over that time period. The patient remained in pain as documented 12/13/23; 12/14/23; and 12/15/23. On 12/15/23 the patient said he hurt all over. Despite the patient saying he "hurt all over" the nurse documented, "Pt [patient] voiced no concerns today". The nurse took no action regarding the patient's pain.

On 12/14/23, the facility Medical Director saw the patient and documented he had intermittent pain in his lower abdomen but did not pursue the status of pain control and no additional pain medication was prescribed. The patient continued to complain of pain in nursing notes. On 12/15/23, the vendor Regional Medical Director wrote another morphine order for 60 mg morphine extended release every 12 hours and 15 mg morphine immediate release every 12 hours but to space the morphine doses so that the extended release alternated with the immediate release. Both of these prescriptions were less than recommended at the hospital. There was no explanation for either prescription and the patient remained in pain.

There were four prescriptions in the medical record dated 12/15/23, written by the Regional Medical Director. These included 1) 60 mg extended release morphine every 12 hours *for seven days*; 2) 60 mg extended release morphine every 12 hours *for 30 days*; 3) 15 mg immediate release morphine every 12 hours *for seven days*; and 4) 15 mg immediate release morphine every 12 hour *for 30 days*. Each of the two immediate release prescriptions were to stagger with the extended release morphine. This appeared to imply that the patient was to receive seven days of 120 mg extended release morphine every 12 hours with 30 mg of immediate release every 12 hours 6 hours after the extended release morphine. This was to be followed by 23 days of 60 mg extended release morphine twice a day with 15 mg of immediate release morphine every twelve hours with the immediate release morphine doses six hours after the extended release morphine. There was no progress note explaining this prescription so it appeared to be an order conducted by phone. This effectively would double the dosage prescribed by the hospital for seven days and reduce the dosage prescribed by the hospital for the next 23 days. There was no explanation in progress notes.

The medication administration records do not reflect these prescriptions. There was one entry on the MAR for 60 mg extended release morphine twice a day and 15 mg immediate release morphine every four hours. This prescription was dated 12/12/23 until 12/26/23. The patient was documented as receiving the extended release morphine from 12/12/23 to the morning of 12/17/23. The immediate release morphine was documented as offered only three times. A second entry on the MAR dated for 12/12/23 to 12/26/23 documented 60 mg extended release morphine twice a day and 15 mg immediate release morphine every six hours as needed. This MAR documented receipt of the extended release on the evening of 12/17/23 to 12/19/23 after the morning dose. The immediate release morphine was documented as offered and given twice on 12/16/23, three times on 12/17/23; and twice on 12/18/23.

The hospital recommended a total of 210 mg of morphine a day in divided doses including both immediate release and extended release morphine. The MARs, prescriptions and other documentation in the record were disorganized. The prescriptions were not consistent with the hospital recommendations, were inaccurately represented on the MAR, and were not given to the patient as ordered.

While the hospital recommended 210 mg of morphine a day, the patient received
12/13/23 =135 mg.   documented as complaining of pain
12/14/23 = 135 mg.   documented as complaining of pain on five occasions
12/15/23 = 135 mg.  documented as complaining of pain twice
12/16/23 = 150 mg.  documented as complaining of pain once
12/17/23 = 225 mg. documented as complaining of pain twice
12/18/23 = 120 mg  documented as complaining of pain once
12/19/23 = 90 mg with one refusal. Expired.

The pain medication management for this patient had numerous errors with respect to the MARs, prescriptions, and monitoring that need to be corrected as they were dangerous especially since dealing with narcotic medication.  This information and record should be given to the SIU pharmacist performing a process analysis of medication management.

The hospital recommended referral to an oncologist but it wasn't identified until 12/19/23 when there was a referral form written to the oncologist.  This referral was not found on the offsite schedule log. The patient died on the same day.

The evaluation of the patient's shoulder pain was not timely.  Nurses' evaluations of the patient's complaints were not driven by use of appropriate protocols and some nurses made clinical decisions that were outside their scope of practice. Though he was not referred to oncology, it did not appear to alter his prognosis.

**Patient #9**

This 56 year-old man was incarcerated in 2007 and was at Joliet Treatment Center.  His problem list documented hypertension, high blood lipids, anti-social personality disorder, depression with psychotic features and schizoaffective disorder.

He also was followed in chronic care clinic for hypertension and seen on 8/11/22, 9/2/22, and 7/11/23.  Notable deficiencies in these encounters were as follows.
- In the 8/11/22 visit the patient had a 24 pound weight loss since 1/27/22 which was unrecognized.  Neither was colorectal cancer screening offered.
- At the 9/2/22 chronic clinic, no history was taken.  The weight loss since 1/27/22 was now 35 pounds which was also unrecognized.  Preventive measures including colorectal cancer screening were not offered.
- The 7/11/23 chronic clinic is discussed in detail later in this chronology.

On 5/16/23, a nurse saw the patient for chest pain and referred him to a provider.  A physician saw the patient on 5/17/23.  The patient was noted to have right breast swelling and pain with deformity

of the breast. The patient was not checked for discharge, dimpling or firmness of the swelling. An EKG and an ultrasound of both breasts was ordered. This referral was not found in the 2nd quarter specialty tracking log and the test was never done. The provider did not order a subsequent appointment to review the test results and the patient was lost to follow up.

On 5/22/23 a nurse saw the patient for constant right breast pain. The nurse documented swelling. No referral was made but the nurse gave ibuprofen to the patient by protocol.

On 5/23/23, a nurse again saw the patient for constant chest pain. The nurse contacted a physician by phone who ordered an EKG in the morning. On 5/24/23, a physician saw the patient for the chest pain. The patient was concerned about right nipple enlargement. The doctor assured the patient that an ultrasound and work up were in progress. However, the scheduling clerk had not apparently received the referral and it wasn't scheduled. The provider did not order a follow up appointment. It would have been reasonable to refer the patient to a surgeon because unilateral breast swelling in a male is suspicious for cancer. The physician did order a CRP, CBC, thyroid study and a prolactin level.

On 5/30/23 the prolactin level returned as normal but the patient had anemia (Hgb 12.3). Anemia in a 56 year old warrants a colonoscopy. A normal prolactin level eliminates gynecomastia and breast cancer should be ruled out. Though someone initialed the labs as reviewed, no action was taken and there was no progress note about the laboratory results. The patient should have been referred for colonoscopy and to a surgeon to biopsy the breast.

On 6/10/23 a nurse saw the patient for chest pain. The pain felt like "it's closing in on my heart". Pain medicine had not helped. The nurse documented tenderness over a right chest mass and "tremors" in the right arm and hand and left leg. Despite significant findings the nurse did not refer the patient to a provider.

On 6/14/23, a nurse noted that the patient was reported to have a shuffling gait in the dorm and had to stop on his way to chow. The nurse documented that she would follow up with a physician for a slow walk pass.

On 6/19/23, someone wrote a health request for the patient stating that his toenails were extremely long and it took him 10 minutes to walk to chow and it appeared that his feet were in pain. A nurse documented on the request that a slow walk pass was given and a nurse assistant trimmed his toenails. There was no thought as to why the patient was walking slow.

On 6/21/23, a nurse practitioner saw the patient. Vital signs were not done. The nurse practitioner took a history of low back pain that was constant, buttock pain, bilateral leg pain, foot pain, anal pain all for several weeks. The patient was documented as having a shuffling gait. The plan was to order a urinalysis, stool for occult blood, a low back x-ray, Naprosyn 500 mg BID and Colace BID. No follow up was ordered. The weight loss and breast mass were not considered as problems and tragically ignored.

On 6/27/23, laboratory results showed anemia again. The laboratory results were signed as reviewed but again no action was taken.

On 7/5/23, a nurse was called to the dorm because the patient had chest pain. The patient was having trouble moving. The patient said he had the chest pain for four months. The nurse documented that the patient had a mass on the R nipple area and said he couldn't move due to left leg numbness. The nurse called the Medical Director of the facility who apparently was aware of the patient and said that the patient was currently being worked up for a right nipple mass. The nurse wrote that there would be follow up during afternoon medication pass. It wasn't clear what the follow up was going to be. The breast ultrasound was ordered 5/17/23, 49 days ago and there was not yet any evidence of the ultrasound being scheduled; it wasn't on the offsite scheduling log. A nurse documented during medication pass that the pain had resolved.

On 7/11/23, a periodic annual history and chronic clinic evaluation were conducted. The periodic history documented use of use of a wheelchair for long distances and for fall prevention. He was described as having delusional behavior. A brief physical examination was documented of left leg weakness with a limp and unsteady gait. The weight was documented as 145.8 pound and the assessment was "noted weight loss [with] malnutrition. LLE weakness [with] shuffling gait, + delusional ideas. Otherwise, normal adult exam". This is not a normal examination and further diagnostic evaluation was indicated but not initiated.

On the same day, the same provider conducting the periodic history documented a chronic clinic visit for hypertension. The patient complained of rectal pain and left anterior thigh pain and weakness. The labs from 7/7/23 were noted. The patient had poor hygiene and appeared "malnourished. The nurse practitioner wrote that the patient had delusional behavior speaking of "unrealistic things"- that he is part of a secret testing group at JTC. Though the patient complained of leg weakness, the examination did not include a neurologic examination of the lower extremities. The only assessment was that the hypertension was in good control. The delusional behavior was not addressed. The leg weakness was not addressed. The nurse practitioner wrote a therapeutic diet order for a high protein, high calorie diet documenting that the patient was underweight (145 pounds) and had malnutrition. The patient was 198 pounds in January of 2023 so he had a 54 pound weight loss over less than seven months; this is not just malnutrition. An evaluation for the severe weight loss, anemia, and breast mass was indicated. The breast mass not discussed at this visit and was likely associated with the weight loss. The nurse practitioner also ordered boost for a 42 pound weight loss over two years without ordering a diagnostic work up for the weight loss or anemia. This encounter was unsafe and clinically inappropriate.

On 7/17/23, a physician ordered a CT scan for guaiac + stool, rectal discomfort and a 42 pound weight loss. This was apparently ordered as a routine test but should have been urgent or the patient should have been sent to a hospital for a work up. Someone wrote on the top of the referral form that the appointment was cancelled without explanation. This appointment was logged into the offsite tracking log as referred on 7/17/23 but was documented as cancelled by a physician who documented that the appointment was not needed. It was not clear when the appointment was cancelled. It was scheduled for 9/15/23. Given guaiac + stool and a 42 pound weight loss, urgent colonoscopy was indicated which was not done.

On 8/6/23, the patient placed a health request stating, "I am very sick and in great pain. I need a doctor and to go to the hospital. I have not been able to get the doctor to see me since I was last

treated. I have lost a lot of weight". The patient was right. He needed hospitalization. The nurse wrote on the referral form, "This individual in custody needs pain management and to go to doctor immediately". This was signed by the nurse on 8/5/23 which was a day before the health request was dated.

On 8/7/23, a nurse practitioner saw the patient for weight loss and "***medication non-compliance***". Less than a month ago, the patient was described as having delusional behavior; how could this patient's behavior be framed as non-compliance when he was delusional? The patient's weight was 132 pounds but the weight loss was not quantified. Since January 2023 the patient had lost 66 pounds. The patient was having difficulty swallowing food. The patient was talking nonsensically saying, "the marina rina kidneys hurt" and "the corporation is changing my medication and that's why I don't take them". The nurse practitioner documented that the patient had stopped taking the medication since July; yet this was not perceived as related to his current mental status. The patient apparently told a nurse that he had chronic pain in the abdomen. The patient had poor hygiene. The examination was brief and documented as normal. The breast mass was not acknowledged or evaluated. This patient needed urgent admission to a hospital for altered mental status, severe weight loss, a breast mass and abdominal pain. Instead, the plan was to order boost three times a day and a high calorie diet. The nurse practitioner documented that the patient was "awaiting appointments for WRITS". These would be the breast ultrasound ordered 83 days ago and a CT scan of the abdomen for guaiac + stool and weight loss ordered about three weeks ago. The tests or reasons for the test were not acknowledged. This was not timely access to secondary or tertiary care and was unsafe and inappropriate care.

On 8/13/23, a custody officer reported to a nurse that the patient was incontinent and was too weak to stand and clean himself. The nurse went to the housing unit. The patient was sitting on a stationary stool with his pants pulled down which were soiled with stool to his feet. The patient said he couldn't make it to the toilet because his legs didn't work. The nurse described the patient as cachectic with temporal wasting and visible bony prominences. The patient had a raspy whisper-like voice. He said he had no strength to walk and complained of pain all over. He had a "strong body odor". The officer said that he was too weak to shower and the officer knew that he hadn't showered in "30+ days". The nurse documented that a NP had been made aware prior to the current episode that the patient had weakness and weight loss and saw the patient on 8/7/23. The officers assisted the nurse who gave the patient a chair bath except for his hair. The nurse documented that because of his weight loss would advocate for a double mattress. The patient was assisted into clean clothes and a porter assisted the patient into bed. The nurse documented a weight loss of 55 pounds over two years, when in fact the patient had had lost 66 pounds in the last eight months. The nurse tried to call the facility Medical Director three times but could not reach her and then called the vendor Regional Medical Director. ***The vendor Regional Medical Director ordered that the patient be placed on medical watch and the facility Medical Director to follow up with the patient in the morning.*** This patient was incontinent with severe weight loss and possible altered mental status, an undiagnosed breast mass and recent onset anemia. He should have been immediately hospitalized. Also, this patient should, at a minimum been sent to an infirmary. Instead, further "monitoring" was ordered.

On 8/14/23, the facility Medical Director evaluated the patient at the bedside and sent the patient to a hospital by 911. She wrote that the patient was sent to the hospital for "failure to thrive"

documenting a 17 pound weight loss (which was grossly inaccurate). The facility Medical Director documented a firm irregular right breast mass which had enlarged since the last evaluation and she documented "awaiting mammo and US at UIC". She documented that the patient had difficulty swallowing both solids and liquids. She documented occult blood positive stools in June with a Hgb of 10. She wrote that the patient needed a work up and was unable to do this at the DOC facility.

The patient was confused upon admission to the hospital. Initial tests showed significant hypercalcemia[52] (14.4 on admission) which explained the patient's confusion (which was likely present at least as of 8/7/23). The CT of the chest showed multiple lytic bony metastases, pulmonary metastatic disease, suggestion of thyroid and renal metastatic disease, and a right chest wall lesion suggestive of breast neoplasm. The patient had multiple bone metastases to the cranium and face. The patient refused a breast biopsy and wanted a second opinion. The prognosis was poor. The patient was discharged on tramadol 50 mg Q 6 hours for pain and had received Zometa, a monthly injection for hypercalcemia before he left the hospital. Because the patient refused treatment he was sent back to JTC.

On 8/17/23, the patient returned to the prison at 5:20 pm. The physician was not available and the call went to voicemail. Later that day, (time not documented) a nurse called a nurse practitioner who ordered the tramadol. This patient had end-stage cancer with hypercalcemia, needed close monitoring and hospice but was sent back to JTC which does not even have an infirmary. He was placed in dorm 1 apparently in a cell. This facility was incapable of monitoring the patient.

At 1:04 pm the day after return to the facility a nurse practitioner saw the patient "cell side". The patient said he was waiting to go to another hospital and the nurse practitioner thought he was confused. A stat calcium should have been obtained since the patient had recent hypercalcemia. The nurse practitioner did not acknowledge the hypercalcemia or that the patient was given Zometa at the hospital. Given the patient's confusion the calcium should have been obtained stat to obtain a baseline and to ensure the patient was not hypercalcemic. The nurse practitioner noted that the patient had metastatic disease (primary unknown) but hospitalists documented this was likely breast cancer. The nurse practitioner documented that the patient refused further workup and told the patient to "notify medical" if pain became an issue. The nurse practitioner documented that he would discuss the case with the medical director and that "Pt stable at this time". The plan of care for this patient did not include all diagnoses. Pain medication was reduced from what had been recommended by the hospital (50 mg tramadol every 6 hours at the hospital versus 50 mg three times a day for pain). Furthermore, this patient had serious mental illness and the medical providers should have conferenced with the mental health team to determine how to care for him. This was especially true because the patient had hypercalcemia which can cause confusion and would make it difficult to differentiate his mental health condition from his medical condition.

On 8/21/23, a physician reviewed the chart and saw the patient in his cell while he was in bed. He wrote "By history pt's mental status has been waxing and waning". The patient remembered the doctor and said he had cancer all over. The patient wanted to be a full code until he knew more about the disease. The doctor told the patient he would need to go to UIC to see an oncologist for

---

[52] Hypercalcemia is often a result of cancer. In this case it was. A calcium above 14 calls for immediate treatment. Hypercalcemia can cause confusion and altered mental status.

a work up. Patient agreed to this. The patient said he did not need additional pain medication. No examination was done. There was no assessment. The doctor documented she would write a referral to UIC for a breast biopsy and for an oncology consultation. These two referrals forms were in the medical record but there was no evidence that they had been added to the specialty tracking log so they were not scheduled. Clearly, the specialty tracking log is being managed ineffectively. CMP was ordered in 2 weeks. A same day calcium would have been appropriate given the recent confusion and history of hypercalcemia. The physician did not mention that the patient was treated with Zometa. This patient should have been transferred to a facility with an infirmary and an urgent mental health consultation ordered to assess the mental status of the patient.

On 8/23/23, the physician ordered mammography, but this referral was also not found in the 3rd quarter specialty tracking log for JTC. This was the fourth referral made that was not entered onto the log. On 8/24/23, a nurse practitioner referred the patient for bilateral breast ultrasounds. This became the 5th referral that was not entered onto the specialty tracking log. There was no progress note associated with this referral.

On 8/28/24 the patient was still bed-ridden in his cell with an end-stage malignancy and intermittent confusion. Blood tests for calcium had not been done since hospitalization and pain was difficult to monitor because of his mental status. Mental health had not yet documented seeing the patient. On this date, a nurse saw him cell front and observed him having a hard time sitting up. This patient should clearly have been transferred to a higher level of care ( i.e., to a facility with an infirmary or to a higher level skilled unit). The nurse noted facial grimacing and the patient received tramadol. This should have prompted a better plan for managing pain.

On 9/4/23 when a nurse was passing medications, she noticed that the patient was grimacing when trying to sit up. The nurse did not make the patient come to the door for meds but said she would come to him. The nurse noted a [something illegible] on the ischial tuberosity and recommended that the patient lie on his side to relieve pressure. This patient should have been transferred to a facility with an infirmary and a proper pressure-relieving bed or sent to a skilled nursing unit. Medical watch housing should be restricted to patients who are independent with regard to feeding, hygiene, and transfers. This patient was not.

On 9/6/23, the patient refused a writ to UIC; he said that he only wanted treatment offered at the prison. Whatever this appointment was, it was not being tracked on the specialty tracking log, as there was no appointment listed for this patient on this day. Also, the note on 9/6/23 at 11:30 am demonstrated that he was confused about his care, thinking he was going back to the hospital. His decision to refuse a specialty care appointment did not appear rational. The patient needed to be evaluated for capacity to make a medical decision. That this patient was housed in a mental health facility and did not have a mental health professional consulting on his mental status and refusals is a significant problem.

On 9/12/23 a nurse documented that the patient was observed getting off the toilet and was very weak and having a hard time getting from sitting to standing position. The patient also had facial grimacing. At 13:45 a nurse obtained a verbal order to increase tramadol to 100 mg every 6 hours. A palliative care evaluation had not yet been done. The nurse offered to wash the patient up as he

had "strong body odor" but the patient refused.  It did not appear that the patient was capable of caring for his needs yet he was not transferred to a higher level of care.  This patient was improperly housed and not provided higher level care.

On 9/13/23, a doctor noted that "he is comfortable, content, peaceful at this time".  This was inconsistent with prior nursing notes.  The patient re-affirmed that he did not want to go to UIC.  The doctor said she would review the POLST form with the patient the following week.  The patient was accepting of additional pain medication.  The patient did not want to talk to his family but said he was thinking of someone who could be a surrogate decision maker.  The doctor did not assess the patient's pain symptoms, nor were laboratory tests reviewed.  No new labs were ordered.  Though no pain assessment was done, the physician ordered dexamethasone 4 mg daily for 20 days for his bone pain.  None of the patient's other problems were assessed in this note.

On 9/20/23, a nurse documented that she obtained "reports" of patient trying to flush his toilet and hearing a pop in his left shoulder.  The left scapula was sticking out and the patient had pain.  A physician was called and the physician ordered transfer to a hospital. The patient refused to go to the hospital.  An x-ray was not ordered. Mental health was not consulted.

On 9/27/23, a physician saw the patient and noted "he had pain all over".  The POLST form was discussed.  The patient expressed concern about signing it.  The patient was described as frail and cachectic.  The doctor then said,

> "We talked about POLST form & what it is for.  He seems concerned [about] signing this form.  I advised him we will talk about it again later today.  Denies SOB, N, V, F, C.  Pt is frail & cachectic.  We talked about better pain management [with] a pain patch.  We also talked [about] the pain meds should not be too sedating for him & he agreed he did not want to be groggy with meds.  See orders.  Addendum.  See POLST form- Pt is DNR".

The patient did sign a POLST form requesting no excessive measures and comfort care only.
In addition, over the six weeks since diagnosis, nurses documented poorly controlled pain.  There was inadequate provider pain assessment.   At this visit, the doctor started a fentanyl patch (25 mcg) and 20 mg morphine sulphate immediate-release every four hours for pain.  This was an appropriate change but the fentanyl patch never arrived from the pharmacy and was discontinued.

On 9/29/23, the physician transferred the patient to the NRC infirmary for "supportive end of life care".  The plan of care focused around providing pain medication.  .  Though the patient had signed a POLST for comfort care only, the patient continued to receive medication for his high blood pressure.  It isn't clear how IDOC defines comfort care.

With respect to pain, the hospital recommended tramadol 50 mg four times a day but this was reduced on 8/18/24, the day after return to the prison, to 50 mg three times a day (30 mg morphine equivalent) without an adequate pain assessment or rationale.   The patient continued to have pain but was not adequately assessed periodically for pain.  The tramadol was increased on 9/12/23 to 100 mg four times a day or a morphine equivalent of 80 mg a day.   On 9/29/23 when transferring the patient to the infirmary and noting pain all over, the doctor changed medications to fentanyl 25 mcg patch to change every 72 hours and morphine sulphate 20 mg/ml. to give 0.2 ml (4 mg) every 4 hours as needed for pain.  This was a morphine equivalent of 84 mg which is essentially

the same morphine equivalent of the tramadol (80 mg morphine equivalent). This patient was not receiving sufficient pain medication. The provider should have sought assistance from a pharmacist.

On 9/29/23, on the infirmary unit at NRC, the doctor documented that the patient asked for a liquid diet and the doctor ordered it. On 9/30/23, the patient said he had no pain but then told the nurse that he had pain when he moved. Later, on 9/30/23, the patient asked for a regular diet. The patient started refusing tramadol for unclear reasons. The patient did not appear to be acting rationally. Still a mental health consultation was not sought.

On 10/2/23, a nurse practitioner attempted to see the patient who was agitated and yelling that he didn't want enforced meds. The patient was resistant to any evaluation and appeared delusional. The nurse practitioner requested mental health nursing to tell the patient he was not on enforced medication. This patient may have been having a psychotic episode or may have had altered mental status due to his condition (metastases or hypercalcemia). Neither was evaluated. A psychiatrist should have seen the patient. It was not clear that the patient was competent to make informed decisions. This should have been investigated because the patient was likely in pain but was refusing medications believing they were enforced psychotropic medication. This was not acceptable comfort care as the patient was not made comfortable.

Later the same day, on 10/2/23, the patient asked for his pain pill and when asked what hurts, he responded "everything". The patient had refused the 3 prior doses of pain medication that day. He did not appear to be acting rationally. The nurse documented "brown substance noticed on socks and shoes" and the patient said it was chocolate. The patient refused help to clean himself and was not cleaned. This patient was clearly unable to act rationally. A psychiatrist should have evaluated the patient for competency to make a medical decision. The Medical Director should have considered identifying a surrogate for the patient. It was clear that NRC could not manage this patient either and he should have been transferred to a facility capable of caring humanely for him.

Over the next month there is documentation of multiple encounters with the patient who demonstrated irrational behavior, poor hygiene, incontinence, and persistent pain. The patient also refused care intermittently. The patient was referred to mental health but this referral was not accomplished. This patient did not appear to have adequate access to mental health care.

On 11/8/23, a nurse documented the patient was repositioned and had facial grimacing and moaning when turned. He was given morphine. His pain was clearly not controlled. Later, on 11/8/23, a nurse documented the patient needed assistance with meals and hydration and was unable to use the straw. There was no documented plan of care for managing the patient inability to eat or drink. The patient continued to remove his clothes and diapers, bed linens and pillow.

The patient's pain was not adequately addressed. A fentanyl patch ordered over a month ago was never supplied by the pharmacy. A physician who saw the patient on 11/8/23, noted he was in pain. The physician noted that the patient didn't want to take his tramadol and that after discussion he would take his morphine. The patient was on both morphine sulphate and tramadol. The patient was only receiving about 25% of the doses ordered or about 29 mg of morphine equivalent a day. All of the medication was "as needed" and about 75% of the expected doses were not documented

as offered. The physician did not document review of the MAR that would have shown that the patient wasn't receiving the medication as ordered. The physician increased the morphine sulphate dose to every two hours instead of every four hours and this resulted in a small increase in the ordered dose. Between 11/8/23 to 11/11/23 the patient received 38 mg morphine equivalents a day. This is a small dose of morphine given his condition and it is not surprising that the patient was documented to be in pain most days. Also, because of the patient's mental status, it would have been better to have ordered a fentanyl patch which would have administered a consistent dose of morphine without intervention. However, the prior fentanyl order was not delivered by the pharmacy. The inability to obtain the fentanyl patch contributed to poor pain control for this patient. Because nurses don't document that they offer medication as ordered, it is unclear if the patient doesn't want doses, refuses doses, or isn't offered doses.

On both 11/9/23 and 11/10/23 the nurse documented that the patient was in pain. The patient died on 11/11/23.

This patient had a weight loss for at least a year without evaluation. When a breast mass was identified, it wasn't evaluated until the patient became so ill he was hospitalized three months after identification of the breast mass. The specialty tracking log is not maintained accurately, and specialty care appointments did not occur. The patient was housed in a facility that couldn't care for him and he needed higher level care. Pain medication was not managed well and the patient remained in pain throughout his last months. Mental health should have been involved in the management of this individual and even when he was at JTC, a mental health facility, he was not documented as evaluated. If the patient's weight loss was due to cancer this death was likely preventable but there was insufficient medical record provided to make that determination.

## Patient #10

This patient was 52 years old with hypertension and end-stage kidney disease on dialysis listed on the problem list. On 7/23/21, the patient was admitted to the hospital for a hemoglobin of 5.4. The patient had a CT scan showing polycystic kidney disease, a pleural plaque from asbestos, and renal osteodystrophy. None of these diagnoses were in the problem list. Though the patient was undergoing dialysis and had very low anemia he was not on erythropoietin[53]. The hospital recommended erythropoietin on discharge but when the patient returned to Stateville there was no evidence that the hospital recommendation to start erythropoietin was acted on. A frequent problem in IDOC is that physicians do not carefully review hospital records to understand what occurred at the hospital. The vendor's Regional Medical Directors should correct this practice.

This patient had repeated elevated blood pressure over two years. MARs from October of 2021 to October of 2023 show that there was no change in his blood pressure medications which were minoxidil 10 mg daily and 50 mg of metoprolol four times a week. There were **no chronic clinic visits for the entire two years** of available medical record. The blood pressure did not appear to be monitored despite the patient having end-stage renal disease.

---

[53] Patients on renal dialysis typically have anemia. The treatment for anemia in patients on dialysis is a drug called erythropoietin.

There were multiple COVID tests in the medical record but only one non-COVID laboratory test completed on 6/16/21 showing a hemoglobin of 5.4. The only other laboratory tests were those included in consultant and hospital reports. The patient had anemia as low as 5.4 and mostly below 10. There was no evidence that the patient was treated with iron replacement or with erythropoietin. This is not standard of care. Dialysis notes need to be evident in the medical record, especially since it is conducted onsite. At a minimum, laboratory tests, medications provided and nephrology notes must be present.

On 8/23/22 a revision of the patient's dialysis fistula was done at UIC. The surgeon recommended follow up with vascular surgery on 9/7/22. IDOC did not provide a specialty log for the 3rd quarter, 2022 but the 1st quarter of 2023 had prior referrals on it. The specialty log did document follow up on 9/7/22 and a UIC surgeon documented that the fistula had healed and that it could be used in a month. The patient returned to the facility with a dressing. The nurse documented that the dressing was to be removed the following day.

The in-person review by a provider with the patient didn't occur for three weeks after the consultation. On 9/8/22, a nurse evaluated the wound and noted no swelling, redness or drainage. A dressing was placed on the wound. On 9/10/22, a nurse documented the incision site was red, warm with copious green drainage on the dressing. The patient had fever (100.5), elevated blood pressure (161/96) and fast pulse (110). The nurse applied a new dressing but large amounts of pus extruded from the wound and saturated the new dressing material. A physician was notified and ordered Bactrim for 14 days. A provider did not see the patient and the surgeons at UIC were not notified. The pus was not cultured. A white count was not done. The MAR showed that the patient received KOP medication on 9/10/22. There was a daily dressing change order written on 8/31/22. The order was discontinued on 10/5/22.

On 9/11/22, the wound was still draining copious amounts of pus and sutures were still visible. The nurse did not notify a provider. The surgeon at UIC should have been contacted for further instructions. Though a daily dressing was ordered; it was not done. The next progress note was 9/15/22, four days later. Pus was still draining from the wound. The next progress note was 9/17/22 and the wound was still draining purulent material. A provider was not notified. On 9/18/22, a nurse documented that the fistula was hard. The fistula is filled with flowing blood and is not supposed to be hard. If it was hard it was possibly clotted and needed prompt evaluation.

The patient wasn't seen by a provider until 9/27/22, a month after the fistula revision. The physician documented that the patient was getting intravenous antibiotics during dialysis but because dialysis notes were not present in the record, it wasn't clear when intravenous antibiotics were started. The dialysis records need to be in the IDOC medical record. The physician noted that the wound had opened and blood and pus came out when the dressing was removed. The physician also noted that the wound was open but healing and that sutures were still in place. The doctor documented that antibiotics should be continued but there was no evidence on the MAR of ordered antibiotics. If the nephrologist in the dialysis unit had ordered antibiotics, the order and subsequent administration should be documented in the IDOC medical record and was not. No follow up was ordered including with the vascular surgeon despite the patient having an infected surgical wound; the physician should have promptly called the vascular surgeon. The documentation of communication between facility providers, the nephrologist in the dialysis unit

66

at Stateville, and the vascular surgeon was nonexistent and placed the patient at significant risk. Did the sutures need removal? There was no scheduled follow up of the wound to ensure it healed.

A nurse practitioner saw the patient for a writ return visit on 9/30/22, five weeks after the procedure that occurred on 8/25/22. The nurse practitioner didn't document the subsequent abscess, the need for antibiotics, but did mention a pencil eraser sized wound without signs of infection. It was unclear if there was any plan to let the vascular surgeon know about the infection. The nurse practitioner did not schedule follow up to ensure the wound healed. ***Treatment was episodic.***

An ***urgent*** CT ordered on 7/20/22 for abdominal and back pain was not done until 10/5/22. The specialty tracking log did not note that the request was urgent and to be done within 14 days. Instead, it was done 77 days later. The CT scan showed pleural calcifications likely due to asbestos exposure, enlarged heart, extensive calcification of abdominal aorta, innumerable bilateral renal cysts (MRI recommended to assess a complex cyst in one kidney), a focal dilation of the pancreatic duct (MRI recommended in follow up), The CT scan wasn't documented as reviewed in progress notes. Someone reviewed the CT report but did not date the review. On 11/12/22, over a month after the CT scan, a physician ordered an MRI. The MRI was listed on the offsite tracking log but had no referral date and no schedule date. On 1/30/22 someone wrote on the referral form that the patient refused the test. This is not timely scheduling and inadequate tracking; the urgency of the referral needs to be included on the log..

Finally, on 10/24/22 the nephrologist referred the patient to the vascular surgeon due to the regrowth of the pseudoaneurysm. This was requested as an urgent consult but did not take place for over two months. This consult was requested urgently ( less than two weeks) but occurred 65 five days later. There does not appear to be any monitoring of referrals which is why the Monitor continues to recommend a weekly specialty care huddle that includes the facility Medical Director and scheduling clerk.

Meanwhile on 11/5/22, a nurse documented the patient saying that the wound on his arm never healed and it formed into a boil and then popped while getting dialyzed. He was coming to the health unit for a dressing change. There were no dialysis notes and this history was hearsay. The nurse noted a dressing in place that was purulent with greenish drainage. The left arm had an open wound that was draining pus. The nurse dressed the wound and the plan was to follow up as needed. There apparently was no order for dressing changes. Notably, this care was occurring without intervention of a provider. It did not appear that there was a provider at this facility. A provider should have promptly contacted the vascular surgeon.

On 12/17/22, the patient complained to a nurse that his arm wound wouldn't heal. The urgent referral to vascular surgery had not occurred. The nurse noted purulent drainage and referred the patient to a provider.

A nurse practitioner saw the patient on 12/19/22 apparently as a referral from the nurse for the arm wound. The patient didn't know why he was being seen. The provider documented that the patient was being seen for follow up of CT scan results and low back pain with sciatica. The CT scan was done on 10/5/22 or 76 days ago. The nurse practitioner "educated pt on writ return process". The nurse practitioner didn't apparently know that the patient was referred by a nurse because of the

wound on his arm. The nurse practitioner didn't evaluate the infected fistula, listened to the patient's lungs and documented that he was ambulating without assistance before assessing chronic low back pain with sciatica. There was no plan. This was a failed referral. It is unclear why the reason for the referral is not known to the person seeing the patient.

On 12/28/22, 65 days after an "urgent" referral the patient went to vascular surgery. The surgeon said that the patient had an ulcer over the fistula graft from which pus could be expressed. The surgeon noted that the patient "requires excision and exclusion of this portion of the graft to prevent blowout and possible death".[54] The blood pressure at this visit was 171/89 which is poor control. The patient was admitted from the clinic and had the surgical procedure to excise the infected graft on 12/30/22. The after-visit summary documented a recommendation to be on Augmentin (an antibiotic) and tramadol (pain medication). Wound care instructions were to pack the upper extremity wound with wet gauze and place an overlying dry bandage on top twice daily. A new catheter was inserted at this visit for purposes of dialysis. Apparently the patient had been dialyzed using the fistula with the draining wound which could cause blood stream infection.

The patient was discharged on 12/31/21. The prison nurse called a physician for verbal orders for medication. Follow up with the surgeon was not noted and a complete discharge summary was not present. Though dressing changes were recommended twice a day, they were ordered only once a day. Progress notes document the first dressing change on 1/2/23, the third day after the patient was received back at the facility. The nurse did not document how the dressing was applied. The patient was seen daily from 1/2 to 1/5 for dressing changes but then not again until 1/7/23. 1/6/23 was a Friday. After seeing the patient on 1/7/23 the patient wasn't seen again until 1/9/23.

On 1/9/23, an LPN saw the patient using an abdominal pain protocol. The temperature was 100.4, with pulse 111 and BP 113/69 which was very low for his usual blood pressures which were elevated. The patient had sharp lower abdominal pain that was constant. The patient had loss of appetite. The nurse noted the fever and called a physician who ordered the patient sent out to a hospital

The patient was evaluated in the emergency room for abdominal and pubic pain with diarrhea over the last 24 hours. He was still on antibiotics from his recent surgery. The white count was only 4.6 with Hgb 8.8 and platelets of 213. A CT scan was done that showed no acute obstruction with similar findings to his prior CT scan. He was discharged back to the prison.

The patient wasn't seen again until 1/11/23 when he presented for a dressing change. There was serosanguinous drainage. A new dressing was applied.

Another dressing change wasn't done until 1/15/23. This nurse was cleaning the wound with normal saline and placing an iodoform strip which was not recommended. It is not clear if the nurse made up this change; no order for iodoform dressing was found. The next time the patient's dressing was changed was not until 1/24/23 using the same iodoform dressing. The wound care instructions from the vascular surgeon were to pack the wound with wet gauze and cover it with a

---

[54] The graft is an artificial connection between an artery and vein in the arm for the purposes of access for the purpose of dialysis. Were this connection to be severed or opened, the blood from the artery would flow freely from the connection and the patient could bleed to death.

dry dressing. The facility physician's order did not specify the type of dressing only that it be done daily until healed. Nurses were outside their scope of practice when using the iodoform dressing and should have had the facility physician clarify the wound care order.

On 1/20/23, a physician saw the patient and documented that he had been to UIC. A provider had not evaluated the patient since 12/31/22, three weeks ago. The physician apparently did not review the surgeon report or notice that the patient was not receiving recommended dressing changes. She noted that there was no evidence of infection. The physician referred the patient to UIC vascular surgery for follow up from the 12/28/22 surgery. This referral was made on 1/20/23 which was three weeks after the surgery. This referral was not on the 1st quarter 2023 specialty tracking log and the patient wasn't seen for three more months (3/1/23) when the AVG was noted as open and useable for dialysis. The specialty care tracking log is inadequately tracking as required by the Consent Decree and seems to be filled out after the appointment occurs.

The patient presented for dressing change on 1/26/23 and the nurse noted an open ulcer with light bleeding that the patient said began two days ago. The nurse referred the patient to a provider. A nurse practitioner saw the patient and noted a small purulent discharge at the AV fistula site in the upper forearm. The nurse practitioner discussed the case with the facility Medical Director who advised a nurse to notify the nephrologist of the situation and for further instructions. After discussion with the nephrologist, the patient was referred back to UIC emergency room.

The patient was evaluated on 1/26/23 in the emergency room for wound dehiscence. A 5/6 systolic murmur was present radiating to carotids. The patient had been recommended during a 6/16/21 hospitalization to FU with cardiology for a murmur but this was never done. This was particularly pertinent because this patient had a long-standing pustular wound that could have resulted in systemic contamination and endocarditis. An ultrasound demonstrated that the fluid collection was proximal to the recent surgery (the previous surgical incision with stitches were present without erythema, edema or drainage suggesting an overlying abscess). The patient was diagnosed with a non-healing wound. The white count was 5.4 and Hgb 9.5. A vascular surgeon saw the patient. There was low suspicion of an infected graft, local wound care was recommended, and follow up in vascular surgery clinic were recommended. The emergency room report wasn't documented as reviewed and there was no progress note documenting review. The offsite tracking log for the 1st quarter 2023 had no referral to vascular surgery.

The patient had progress note documentation of a dressing change on 1/27/23 and 1/28/23 but then there were no progress notes documenting dressing change until 2/6/23, eight days later. There was a small amount of purulent drainage. There was one further dressing change documented in progress notes on 2/11/23.

The patient returned to the vascular surgery clinic on 3/1/23. This visit was not present on the 1st quarter 2023 offsite specialty tracking log. At this visit the sutures from the surgery were removed and the shunt was open with a strong and continuous flow. The open wound had healed and there was no evidence of infection. When the access was reliably used the dialysis catheter could be removed.

A nurse practitioner did a follow up of this vascular surgery appointment on 4/4/23 about five weeks after the appointment. The blood pressure at this visit was 166/79 which is elevated but was not addressed. The plan was to see the patient "as needed". Care was episodic. This patient had not had a chronic clinic visit in over two years. Nephrology notes were not in the record. No one appeared to address consistently elevated blood pressure. The heart was not auscultated and the murmur which had been present since 2021 had not yet been acknowledged or evaluated.

On 5/1/23, the nephrologist referred the patient for removal of the dialysis catheter used to temporarily dialyze the patient while the new graft healed. This referral was on the 2nd quarter May specialty referral tracking log as completed on 5/25/23.

On 5/19/23 the nephrologist again referred the patient for an MRI of the abdomen to evaluate the complex mass on one of the patient's kidneys. The patient had apparently refused the test on 1/30/23. This 5/19/23 referral was not on the 2nd quarter May 2023 offsite specialty tracking log.

On 6/25/23, a nurse noted the patient was seen inquiring about the CT scan results which were back from 10/5/22, eight months ago. No one had ever reviewed the results with the patient. This is not informed care. The nurse looked up the results but was unable to explain the meaning of the test results to the patient and scheduled the patient to see a provider.

On 7/11/23, a provider saw the patient but only discussed the removal on 5/25/23 of the temporary dialysis catheter. The provider did not discuss the CT scan result that the patient was interested in learning about. The blood pressure was 185/96. The patient said he didn't receive minoxidil and was concerned about his blood pressure. The provider did not review the MAR or determine whether the patient was receiving medication as the blood pressure had been consistently elevated since 2021. The patient was given his dose of minoxidil but his blood pressure therapy wasn't adjusted. The patient had received a KOP packet of metoprolol on 6/27/23 so he had this medication. The MAR documents that minoxidil was provided all days in June. This patient had received medication but had not had it adjusted for two years despite ongoing intermittent elevations of blood pressure. This was serious given his renal disease.

On 7/28/23 the facility Medical Director referred the patient for the MRI that was recommended on 10/5/22. There was a referral for an MRI on the 3rd quarter offsite specialty care tracking log, but there was no referral date and the referral was not completed. There was a comment on the tracking log that the patient was claustrophobic and the test was rescheduled but there was no rescheduled date.

On 8/11/23 a nurse saw the patient using a cough protocol. The patient just developed the cough and said he had lost 5-6 pounds though the nurse did not obtain a weight. The blood pressure was elevated at 156/70 but not acknowledged as abnormal. The patient was afebrile. The nurse gave the patient cough medication and acetaminophen but no referral. The stated complaint of weight loss wasn't addressed.

On 8/16/23, a nurse saw the patient using a cough protocol. The blood pressure was 158/60 which is elevated. The weight was 146 pounds and the patient was afebrile. This was the 2nd complaint

of cough in a week. The nurse appeared to refer the patient to provider sick call but the patient wasn't seen in follow up. Neither the blood pressure nor the cough were addressed.

On 9/6/23, a nurse saw the patient using a laceration protocol. The patient did not have a laceration but had a chronic non-healing ulcer. The BP was elevated at 140/99. The nurse did not document referral to a provider but the patient was seen that day by a provider for his non-healing arm wound. Vital signs were not done. The nurse practitioner noted a 1.5 open lesion with some bleeding but no discharge. There was a dried scab on part of the wound. The assessment was an old non-healing ulcer and the wound was cleaned and dressed with orders to continue dressings until healed. The frequency of dressing changes was not mentioned. The nurse practitioner documented that the patient had a pending vascular appointment. A follow up on Friday was scheduled. The cough and elevated blood pressure were not addressed.

A nurse practitioner saw the patient in follow up on 9/8/23. The blood pressure was 178/87. There was an ulcer on the arm with some serous drainage. A wound culture was done. The nurse practitioner noted a vascular appointment was pending. Some of the note is illegible.

One dressing change was documented on 9/9/23 in progress notes but no further dressing changes were documented.

On 9/13/23 the patient was documented as refusing a UIC vascular surgery appointment. The 3rd quarter offsite specialty tracking log had a vascular appointment but there was no referral date and no appointment date. Apparently these are filled in after the appointment occurs, which is not appropriate. The tracking log documented that the patient refusal was because he had dialysis. This was a scheduling error not a refusal. Scheduling needs to accommodate dialysis sessions which should not be missed.

On 9/13/23 the patient was admitted to the infirmary as an administrative hold and remained there for over a month without indication. There were no clinical notes regarding monitoring of the patient.

On 10/23/23 an Emergency Reporting Form documented that the patient had a fever of 103.9 with a blood pressure of 80/54, pulse of 123 and respiratory rate of 24. These vitals are consistent with shock. Yet, the patient had been on the infirmary for over a month without anyone noticing. The patient was sent to a hospital where he died.

On autopsy, the cause of death was bronchopneumonia with a right lung abscess.

There were so many operational problems at this facility (lack of physician staffing, dysfunctional specialty care process, nursing gaps likely due to staffing, lack of appropriate wound care, etc.) that care at this facility is unsafe. There was no chronic care provided for this patient. He had consistently elevated blood pressure for two year without any modification of his blood pressure medication. He was on dialysis and had significant anemia yet was not on erythropoietin which is standard of care. He had a cardiac murmur that was never evaluated or even acknowledged as a problem.

The patient died of a lung abscess which is typically caused by aspiration but can be caused by hematogenous seeding via catheter which for this patient was the most likely source. The patient had a long-standing abscess near a dialysis fistula. That fistula infection was the likely source of hematogenous spread but was not timely addressed and because of this his death may have been preventable. Of note, there was no evidence of dialysis notes in the medical record.

## Patient #11

This patient was 20 years old with a history of asthma and allergy to penicillin. He was incarcerated on 2/16/23 and transferred to Lincoln on 3/13/23.

On 3/27/23, a provider referred the patient to a urologist for scrotal swelling but only part of this note was present in the medical record. The referral was present in the offsite specialty tracking log. The following day on 3/28/23 he developed swelling of the right hand and left foot. An LPN contacted a physician who ordered an injection of Benadryl and observation for 45 minutes. The patient was then allowed to return to his housing unit and directed to return if the swelling reoccurred.

On 3/31/23, a nurse practitioner documented that the patient had episodes of swelling over the past 3-4 years and that it typically resolved over two days. The provider documented no swelling on either the hand or foot and documented "spontaneous swelling" likely due to salt. This was not a reasonable clinical conclusion as too much salt is not a reason for contralateral hand and feet swelling. Decreased salt intake was recommended. A better history was indicated but not done. The nurse practitioner did not take further history of allergies, the frequency of these episodes, when they tended to occur, if he had ever seen a physician for these episodes, or whether he took any medication for the problem. Consultation with a physician may have identified an allergic basis for this swelling.

On 4/10/23, an LPN evaluated the patient for hand swelling using a fracture, dislocation, and sprain protocol. The left hand was grossly edematous from the hand to wrist and the palm of the hand was red. The patient said he didn't know how the swelling occurred. The nurse gave ibuprofen by protocol and called a physician who recommended an x-ray of the affected hand with a provider follow up. Spontaneous edema without injury in a 20 year old should rule out angioedema[55]. This was not done.

On 4/22/23 the patient was brought to the health unit for right hand/arm swelling. The nurse documented that the patient was previously seen for a similar problem on the opposite arm on 4/11/23. An on-call physician was called and ordered IM solumedrol 125 mg with Benadryl 25 mg followed by daily Benadryl for three days. The doctor recommended scheduling to see a physician on 4/24/23 which was Monday. The use of steroids was reasonable, but no diagnosis was made and a history of his condition was not taken. The physician appropriately treated the patient for angioedema but no diagnosis was made and the problem list was not updated.

---

[55] Angioedema is self-limiting swelling of the skin or mucosa often due to allergies and can be accompanied by anaphylaxis. From UpToDate An overview of angioedema.

On 4/24/23, a different physician saw the patient for arm swelling. The only history was swollen right forearm and hand with no known injury. The assessment was right arm extremity edema. The plan was Lasix, a diuretic, for 10 days, ibuprofen for 3 days, and doxycycline, an antibiotic, for 10 days none of which appeared appropriate. This was a shotgun approach and the physician apparently wasn't sure what was wrong. Lasix for unilateral arm edema did not appear to be indicated. There was no evidence of infection so an antibiotic did not appear indicated. The swelling was described in the physical examination as "nontender" so it was unclear why the ibuprofen was indicated. Due to history of asthma and allergies, angioedema should have been considered but it was not. Notably angioedema is a possible adverse reaction of ibuprofen.

On 5/30/23 the patient developed a rash on arms and hands and was given hydrocortisone cream by a nurse.

On 6/8/23 a doctor saw the patient for scrotal swelling. The doctor assessed scrotal hernia and referred the patient to a general surgeon. This referral was present on the 2nd quarter 2023 offsite specialty tracking log with a date of appointment on 6/30/23.

On 6/30/23 the patient went to the urologist as referred on 3/27/23 for scrotal swelling but there was no scrotal swelling identified by the urologist. On 7/10/23 a coverage physician saw the patient in follow up of the urology consult. On examination the patient still had scrotal swelling and the physician told the patient that a general surgeon would see him soon. That appointment was scheduled for 7/14/23.

On 7/11/23 a nurse evaluated the patient for hand and foot swelling using the protocol for non-specific discomfort. The patient again said that the pattern the swelling resolved in a few days. The nurse did document swelling in the foot but failed to document any assessment of the hand. The nurse did nothing about the patient's symptoms and made no referral.

On 7/14/23 the patient went to the general surgeon who did not identify scrotal swelling and did not identify a hernia but noticed a couple of cutaneous lesions and offered to take them off. A nurse practitioner saw the patient the same day of the surgical consult and documented that the patient reported right hand and left foot swelling that comes and goes. The nurse practitioner confirmed current right hand non-pitting edema without ecchymosis and attributed it to an unknown etiology. The only plan was to elevate the hands and feet when swollen, refer for an ultrasound or the right hand and foot, and come back to the health care unit if it reoccurs. The nurse practitioner did not know how to diagnose the patient's problem and the patient should have been referred for a higher level primary care provider evaluation. The ultrasound of the right hand was done on 7/31/23 and was normal.

On 9/20/23 a code 3 was called for difficulty swallowing. The patient said he woke up and his throat was swollen which worsened during the day. The patient's tonsils were touching the uvula. The patient was breathing without distress. The patient reported that this had never happened before. He said he was allergic to penicillin but was unaware of any other allergies. The nurse called an on-call physician who sent the patient to an emergency room. This was appropriate because difficulty swallowing in the context of an allergic type reaction needs immediate attention by someone who can intubate the patient.

The hospital summary did not include their examination of the throat but they documented that a strep test was negative and a chest x-ray was negative. When the patient was waiting for discharge, the patient sustained a seizure. He had a negative CT of his brain, was medicated and sent back to the prison.

On 9/21/23, a nurse practitioner saw the patient after the ER visit and noted that the patient had sore throat, edematous tonsils- strep negative with unremarkable labs and toxicology screen negative. The nurse practitioner noted that the patient had a seizure in the emergency room but the CT of brain was negative. The emergency physician recommended a neurology consult. The patient felt much better and the nurse practitioner documented an assessment of "?idiopathic angioedema", which was an accurate diagnosis and the first accurate documented diagnosis of the patient's problem. The nurse practitioner referred to neurology as recommended; added Zyrtec; and referred the patient to an allergy specialist. Neither the neurology nor the allergist referral were entered into the 3rd quarter 2023 offsite specialty log. He encouraged the patient to keep a food and environmental log and avoid known irritants. The diagnosis of idiopathic angioedema appeared accurate but was not added to the problem list. There was no Medical Director at this time, but the nurse practitioner should have consulted a physician to develop a plan for what to do if this occurred again as throat swelling in the context of angioedema is life threatening. The Monitor has consistently recommended adding UpToDate to all clinical examination rooms. This case illustrates the benefit of this. When the electronic record is installed, there should be a link to UpToDate in the record that gives all practitioners real time access to this important service. In this case because the was no facility Medical Director the nurse practitioner had no one to consult.

On 10/9/23, at 8:45 am, a LPN documented that the patient presented to the health unit for swollen tonsils with difficulty talking and feels like his throat was swollen. An on-call physician was contacted and said to admit the patient to 23 hour observation. The patient should have been sent to an emergency room as intubation may have been indicated. This set of symptoms is potentially life threatening and further questions should have been asked including past history. If angioedema were on the problem list and this information given to the on-call physician, a different result likely would have occurred. No medication was ordered.

On 10/9/23 at 12:15 pm a nurse documented that the patient complained of increased shortness of breath and throat tightness. Vital signs were normal. The same on-call doctor was contacted and gave a telephone order for 50 mg of IM Benadryl and to monitor. This appeared to be a mistake. If the physician believed that the shortness of breath and throat tightness was related to allergic symptoms, the patient should have been promptly sent to an emergency room. It was unclear if the diagnosis of angioedema was known to the on-call physician. Nevertheless, any patient with suspected angioedema involving any organ near the airway (tongue, uvula, soft palate, or larynx) must be immediately assessed for signs of airway obstruction.[56] This is because intubation may be necessary.

Thirty five minutes later at 12:50 pm the patient told the nurse he was having increased difficulty breathing and tried to grab the nurse. The nurse asked the patient "to try to calm down" so he could be assessed. The patient took off running to the front of the health care unit and the nurse called

---

[56] UpToDate - Overview of Angioedema)

for a sergeant to help.  The sergeant ran after the patient and got him to sit down. The patient appeared to stop breathing and slumped to the floor.  The patient had a pulse but periods of apnea. The patient was bagged with oxygen and given epinephrine.  911 was called.  At approximately 13:11 or 21 minutes  later the EMS took over.  No other medications were administered nor was a physician involved in the care.  A physician was not called.

The cause of death was asphyxia due to obstructive laryngitis, epiglottitis and tonsilitis.  This patient died from angioedema which was recognized but not appropriately treated and was a preventable death.


## Patient #12

This patient was 49 years old and transferred to Pontiac on 8/28/22.  The problem list documented a mental health disorder, hypertension, diabetes and benign prostatic hypertrophy.  He was five foot, eight inches tall and on 9/28/22 he weighed 240 pound with a BMI of 36.5 which is obese. Obesity was not on the problem list but was likely contributory to his hypertension and diabetes. On transfer to Pontiac, the patient was on amlodipine, antacids, gabapentin, glipizide, HCTZ, metformin, methocarbamol, metoprolol, simvastatin, tamsulosin and tramadol. Simvastatin, antacids, and gabapentin indicated hyperlipidemia, gastric reflux, and diabetic neuropathy, but there was no associated diagnosis on the problem list.  The tramadol was a long-term medication but there was no associated problem indicating pain relief.  It was discontinued in October at Pontiac.

The Death Summary by the vendor documented that this patient was "very non-compliant" with medication, especially insulin, and that he was being followed by the diabetic clinic at UIC for his diabetes.  With respect to compliance, the patient refused morning insulin 28% of the doses which were at 3:30 am and 15% of evening doses which were at 3:30 pm.  No one ever questioned why the patient refused, yet at least for the morning dose, getting up at 3:30 am is a distinct disincentive in taking medication.  Also, about 9% of insulin doses were not documented whether they were given or not.  A 9% rate of not offering patients their medication is something OHS should evaluate as to why it is occurring.  The Monitor believes a key factor is staffing.

Over the year that the patient was housed at Pontiac, his blood sugar was continuously poorly controlled.   The patient was evaluated by a nurse practitioner on five occasions and three different physicians on five occasions.  All but one provider visit was episodic and related only to a current complaint.    There was no Medical Director for part of the time period of this review which appeared to affect his care.

The first provider visit on 9/7/22 was a referral from an LPN because the patient complained of insulin allergy.  The only history was that the patient complained of allergic reaction at insulin injection sites. This is not a history but merely repeated the reason the patient was to be seen.  The nurse practitioner took no other history and performed a brief examination documenting edema of the knee.   The assessment of the visit was "water on the knee" and the plan was to obtain a left knee x-ray and to decrease the amount of food he ate.  The patient had a recent A1c of 10.7 which

is very high but this wasn't acknowledged.  None of the other patient problems were addressed.
The patient's complaint of insulin allergy was not addressed at all.

On 10/17/22, at 3:15 am a nurse obtained a blood sugar reading of "HI" which is more than 500.
This is an extremely high blood sugar.  He refused to take insulin saying he was allergic to insulin.
A series of negotiations between the patient and an on-call physician resulted in admission to the
infirmary with a mental health consult.

On admission to the infirmary on 10/18/22,  the patient's blood pressure was 170/101 with a heart
rate of 122.  The patient refused all interventions that day including blood glucose checks.
The second provider visit was on 10/18/22 at about noon when the facility Medical Director
evaluated the patient for a blood sugar of 393.  Ketones were not checked.  The physician
documented that the patient just received 40 units of 70/30 insulin but the MAR documented that
the patient had refused insulin that morning and afternoon and moreover was on 50 units of 70/30
in the morning.  The doctor documented frequent refusals of 70/30.  The assessment was
hyperglycemia with frequent refusals.  The plan was to recheck the blood glucose tonight and to
record all refusals of insulin.  The following day, the facility Medical Director gave a phone order
for 8 units of regular insulin twice a day if the blood sugar was greater than 200.

The next morning on 10/19/22 the nurse documented that the doctor gave a new verbal order to
give regular insulin 8 units twice a day if the blood glucose was greater than 200.  In carrying out
this order, the nurse transcribed the order to a prescription.  The insulin MAR for October was
handwritten and the 70/30 insulin entry had the same start and stop dates of 4/25/22 which is
clearly an error.  Prior MARs had a stop date of 4/25/23.  On 10/19/22 a nurse documented on the
MAR that the 70/30 insulin had expired.  There was no order to discontinue this medication and
no documented effort to renew the prescription.  Seventy units of 70/30 NPH insulin was abruptly
stopped in a patient with out of control diabetes.  This appeared to be a significant medication error
due to faulty nurse-provider communication and use of handwritten MARs and reflects a
significant patient safety risk.  This type of error should be reported in the adverse event system.
The Monitor hopes that the SIU pharmacy management process analysis evaluates these types of
errors.

The patient had spent two days on the infirmary and had not been evaluated by a provider.  Notably
on discharge, the patient's insulin had been inadvertently reduced from 70 units daily of 70/30
insulin to 16 units of regular insulin but only if the blood sugar was above 200.  This was such a
dramatic reduction that it was certain to cause deterioration in status.

On 10/28/22, a nurse documented the patient saying his blood sugar was high.  The patient said he
doesn't take insulin because it makes him feel like electricity is running through his body.  Notably,
the mental health consultation ordered on 10/18/22 had not occurred but clearly the patient's
mental health condition was affecting his physical status.  Mental health needed to evaluate the
patient as requested.  The blood sugar was recorded as "HI" and the patient accepted the 8 units of
insulin.  The discontinuation of 70/30 insulin was still unrecognized.  The facility Medical
Director, apparently still not onsite, gave a phone order for the inmate to sit in the holding tank
and recheck the blood glucose in an hour.  Apparently, the facility Medical Director was unaware
of the patient's medication.  It may be useful for IDOC to require that when providers are called

76

after hours for a blood glucose problem that nurses report what insulin they are on[57].    At 6 pm on 10/28/22 the blood sugar was 541.  Ketones for DKA were not checked.[58]  The facility Medical Director was called and ordered 10 units of regular insulin.  At 6:30 pm the patient felt better but without checking the blood glucose the patient was discharged back to his housing unit by the nurse.  There was also no follow up ordered.

The third provider face-to-face visit was a Medical Director evaluation on 11/1/22 because the gabapentin needed to be renewed.  The only history was that the patient had a history of multiple joint pains and was "here for Neurontin renewal".  Neurontin does not have an FDA indication for joint pain. The physician did not discuss what the patient's current symptoms were.  The examination documented "neuro- intact".   The only assessments were hyperglycemia and Neurontin renewal.   The blood glucose was 366, blood pressure was 162/110 which was significantly elevated and the pulse was 112 which was also elevated.  The blood pressure and pulse were not acknowledged or addressed.  The patient was on KOP blood pressure medication but the provider did not assess whether the patient was taking his medication.  The physician did not increase the blood pressure medication to lower the blood pressure.  The blood sugar  was addressed by a stat order of 8 units of regular insulin. The gabapentin was renewed without providing an indication or assessing whether it was effective for its intended purpose or even to document what it was being used for. It was unclear in review of this record why the patient was on this medication and it appeared that the physician didn't know either.   This visit accomplished little except to renew a medication that had no clear indication.

The fourth provider visit was by the facility Medical Director two days later on 11/3/22.  The purpose of the visit was "noncompliance" with medication.  The doctor wrote that the patient was unable to take insulin in the morning because he was asleep.  The patient's latest A1c was 11.1 which is extremely high and out of control..    The physical examination for this episode of care included a blood pressure of 201/107 which is a hypertensive emergency.  The patient had recently received all of his blood pressure medications, but there was no questioning the patient with respect to whether he was taking medication as ordered.  The physician did not assess for symptoms or signs of end-organ damage seen in hypertensive emergency.[59]  Nor were any diagnostic tests conducted typically done in hypertensive emergencies.[60]  Instead, the conclusion was to assess hypertension and hyperglycemia with type 2 diabetes. The documented plan was add clonidine 0.1 mg twice a day for three months; to stop all prior insulin orders and to start Lantus insulin at 35 units in the evening for 21 days and to follow up in 2 weeks.  This was still a significant reduction in insulin from a month earlier.  The patient had been on 70 units of 70/30 insulin which was now substituted by 35 units of Lantus which is approximately a half of the prior dose during which the blood sugar was not controlled.  Ordering Lantus in the evening was a benefit as it was more likely to result in compliance.  This episodic visit resulted in addition of medication for hypertension and

---

[57] It would be extremely useful when on-called physicians are called after hours that they document their understanding of what is explained to them and their assessment and plan.  This is something that is able to be done when the electronic record is implemented.

[58] Ketoacidosis can be present with a serum glucose as low as 250 but is often between 350-500.  Glucose levels at these elevations should prompt a check for urine ketones which initially can be with a urine point-of-care dipstick.

[59] Signs of neurologic symptoms such as agitation, delirium, etc.; focal neurologic signs of stroke; flame hemorrhages in the retina; nausea or vomiting; chest pain; signs of aortic dissection; shortness of breath; on any drugs that can cause hyperadrenergic state.

[60] EKG, chest film, urinalysis; electrolytes; creatinine; and depending on CNS symptoms CT of brain.

a continued significant net reduction in insulin. The provider didn't take history of prior insulin dosages. Notably the two week follow up ordered by the physician never occurred and the consequences of the new orders were not reviewed but became apparent in subsequent episodic care.

For the 23 days from 11/3/22 to 11/26/22, the blood sugar should have been checked 47 times up until mid-day of 11/26/22. It was checked 37 times. Morning checks were done 15 times and showed on no occasions when blood sugar was below 200. Blood sugar was above 300 on four occasions, above 400 three times, and above 500 three times. Evening blood sugar checks were worse. On none of the 22 checks was blood sugar below 200. Blood sugar was above 300 on three occasions; above 400 on six occasions; and above 500 on seven occasions. The episodes above 300 were not brought to any provider's attention. This is significantly out of control diabetes yet, the glucose record did not result in a provider referral. There apparently is no standard or requirement for when a nurse is to notify a provider for out of control blood glucose.

On 11/4/22, a nurse progress note documented a blood sugar of "HI". This episode is not recorded on the blood sugar MAR. A nurse called a physician-on-call and was given an order for 10 units of regular insulin and water to drink. Urine ketones were not checked which should have been done. A recheck of the blood sugar was ordered with instructions to admit to the infirmary for blood sugar over 350. The blood sugar didn't come down and the patient was placed on the infirmary. The following morning at 5 am, a RN documented receiving a ***report from a nurse for a new order of 20 units of Lantus insulin. There was no prescription for this order*** nor was there a progress note by a provider documenting the new order. This order was entered in a hand written fashion on the MAR for the am dose starting on 11/4/22. The total insulin dose was now 55 units of Lantus (20 units am and 35 units pm) which is still a reduction from the 70 units of 70/30 insulin previously ordered. This irregular and undocumented medication ordering transmitted by anecdotal verbal communication is dangerous and needs investigation by the process group undertaking medication management process analysis. At 10 am on 11/5/22, the patient accepted insulin and was discharged back to his housing unit without verifying a discharge blood glucose. No follow up was ordered which typifies the episodic nature of care.

Subsequent blood sugars for November remained very high. On 11/26/22 at 5 pm a blood sugar of 586 was noted and an on-call physician was called and ordered 15 units of insulin. At 6:30 pm the blood glucose was "HI" and the on-call physician again ordered 15 units of insulin. For neither of these episodes were ketones checked. A follow up blood sugar was unable to be checked due to "security". Anyone with a dangerously high blood sugar must be able to have their blood sugar checked without custody intervening. The nurse documented that the blood sugar would be checked in the morning. The following morning the blood sugar was documented as refused. There was no follow up for this episode.

On 12/1/22, without seeing the patient a nurse practitioner renewed 20 units of Lantus in the morning and 35 units of Lantus in the evening for a year. This episodic type of chronic care is dangerous. The nurse practitioner renewed the medication without reviewing the blood glucose log. This existing dose of insulin was insufficient. For unclear reasons the same provider who renewed the medication on 12/1/22 wrote another prescription for the same medication at the same dose, but this time changed the length to six months. Medication renewals should be completed

by seeing the patient or by review of the record. This did not occur and typically does not occur in IDOC. In this case, the patient had continuously dangerous blood glucose levels and the medication was renewed without considering other medications, changing the times of insulin administration, or increasing dosages. Insulin was also renewed without any attention to blood glucose levels. This is dangerous.

On 1/4/23 a fifth provider visit was conducted by a nurse practitioner who saw the patient after a UIC orthopedic consultation. The patient had been seen on 12/6/22 at UIC about a month earlier which is not consistent with requirements of provision III.H.2. The orthopedic consultant diagnosed a paroxysmal atraumatic left knee pain with effusion and recommended a course of physical therapy with follow up as needed. The orthopedic consultant did document that the patient reported generalized decrease in sensation in both feet secondary to diabetes. There was no foot examination documented in the record reviewed at Pontiac. The report was not signed as reviewed until 1/4/23 or 29 days later. The nurse practitioner seeing the patient did not document the findings or recommendations of the orthopedic consultant. The nurse practitioner did not document a physical examination nor were new symptoms solicited. The orders included pain medication and physical therapy two times a week for 8 weeks. The referral to physical therapy did not specify the directions for therapy or the length of time for therapy. When seen by the physical therapist on 2/10/23, the therapist documented left knee effusion and wrote "This patient will likely be seen 1x visit only" and gave recommendations to ice the knee and decrease use of stairs. No further physical therapy was provided.

On 1/30/23 a nurse practitioner documented that the patient was not receiving medications as ordered. The nurse practitioner checked with pharmacy who had no order for renewal of clonidine. The nurse practitioner documented giving an order to pharmacy but a prescription was not found. The nurse practitioner scheduled a chronic care visit which hadn't occurred since 7/6/21, over a year and a half ago.

On 2/1/23, there was a note that a diabetes telemedicine clinic was to be rescheduled due to "security issue". Chronic clinic appointments should not be cancelled except for extreme security issues. At this clinic there was other documentation that there were insufficient officers to manage the facility which is dangerous and makes normal operations impossible to conduct.

On 2/9/23 laboratory results returned showing an A1c of 15.3 which is an extremely high blood sugar. The routine glucose was 434. These results were consistent with diabetic ketoacidosis but the laboratory tests weren't even noticed and the laboratory test was signed as reviewed on 3/1/23 about three weeks after the test was reported. When signed as reviewed nothing was done to expedite an evaluation. This was substandard care and it appeared that there was insufficient provider staff at this facility.

On 2/13/23 a nurse documented a blood sugar of 581. Ketones were not checked nor was the patient evaluated for diabetic ketoacidosis. The nurse called an on-call physician who ordered 10 units of regular insulin. No follow up was ordered.

On 2/16/23 a LPN documented a blood sugar of 509. The patient didn't have ketones checked and was not evaluated for symptoms or signs of diabetic ketoacidosis. The LPN called an on-call

physician who ordered 10 units of regular insulin. The blood glucose was rechecked and was 345. No follow up was ordered.

On 2/17/23, a LPN called an on-call provider for a blood sugar of 512. The patient didn't have ketones checked and was not evaluated for symptoms or signs of diabetic ketoacidosis. An on-call physician ordered 10 units of regular insulin. Follow up blood glucose was 405. No follow up was ordered.

On 3/23/23, a nurse noted that the vendor Regional Medical Director gave a phone order that the glipizide and metformin should be changed to directly observed therapy; that a nurse practitioner was to evaluate the patient on 3/27/23 and that the patient was to be referred to the endocrinologist. The endocrinology consultation was found on the offsite scheduling log.

On 3/28/23 a mental health clinic visit was cancelled for unstated reasons. It was documented as rescheduled but the date was not given. Mental health saw the patient on 3/31/23 but the note was not in the medical record.

On 4/3/23, a nurse practitioner evaluated the patient because he was only taking insulin once a day and thought he needed regular insulin. For March, the patient refused am insulin seven times and refused pm insulin eight times. On three occasions, nurses did not document whether they gave the insulin or not. The patient was ordered and received insulin about 75% of the time. More importantly, the most recent A1 c was extremely high at 15.3 and the patient was on inadequate amounts of insulin. While the patient did refuse 25% of insulin doses, the dose was insufficient. Also, it was unclear if there was a mental health contribution to his status. The nurse practitioner said the patient was "educated in depth on insulin / need for continuity". The nurse practitioner noted that the patient had a pending appointment with endocrine. Care was substandard. The patient's diabetic medications should have been adjusted.

Mental health saw the patient on 4/12/23 but there was no note of the evaluation in the medical record. On 4/13/23, security documented that the patient was on crisis watch and the not seen by a nurse.

On 4/19/23 the patient was brought to the health unit because security said that the inmate felt he was hyperglycemic. The blood sugar was 399 which was high. The nurse documented that the patient had been refusing insulin for several days stating he was allergic. The MAR showed that the patient accepted insulin 4/15/23 and 4/16/23. On 4/17/23 both am and pm and on 4/18/23 am there was no documentation by nurses regarding insulin administration so the nurses statement was inaccurate. It appeared that the patient was taking medication and the nursing staff failed to document what occurred for the prior two days. The nurse called the new facility Medical Director who ordered Benadryl. The patient's insulin was not adjusted.

On 5/6/23, a lieutenant asked a nurse to see the patient because he had not received his insulin in the morning. The nurse saw the patient. The nurse documented that the patient received 10 units of regular and half of his regular dose of Lantus insulin.

On 5/11/23 a nurse practitioner saw the patient for follow up of the physical therapy appointment. The patient was to have received 8 weeks of therapy but due to miscommunication, the patient received only one therapy consultation. The patient reported intermittent swelling and pain. There was no current edema. The nurse practitioner didn't order physical therapy and only follow up as needed.

On 5/21/23, a nurse documented a blood sugar of 470 and that the patient was refusing insulin. The new facility Medical Director was notified. He ordered a one-time dose of glipizide. Typically, an oral medication is not given as a stat dose. This patient's blood glucose was continuously elevated for the past year and management of his diabetes was episodic and only addressed emergent blood sugar levels. The patient's last A1c was 15.3. An increase of his medication would have been appropriate but was not done. This patient had not received a chronic care visit over the past year in which all of his problems were addressed. This patient's care is characteristic of the episodic management of chronic illness which, for this patient, resulted in poorly controlled diseases. The MAR showed that there was no documentation of offering patient medication for the last dose that morning and the blood glucose the prior evening was 213. The physician ordered a follow up on 5/22/23 but the patient wasn't seen that day nor was the appointment rescheduled.

On 6/1/23, the inmate's blood glucose was 446. The facility Medical Director was called to ask whether insulin should be given but the Medical Director told them to hold the insulin for this evening.

On 6/7/23 a nurse practitioner evaluated the patient for an elevated blood sugar. The nurse practitioner raised the insulin to 40 am and 30 pm. A follow up was ordered in three weeks to check the blood sugar response to the increased insulin.

On 6/28/23, the patient was evaluated at UIC endocrinology. The endocrinologist documented that the patient doesn't receive about five of 14 doses per week due to a nursing shortage. This self-report is consistent with MAR documentation that include multiple days when insulin is not documented as offered or given. The CBG values were in the 400-500 range. The consultant noted no retinopathy or nephropathy checks but documented the patient checked his feet daily. The recommendation was to decrease the glargine to 30 units BID; start Victoza 0.6 mg daily and increase in 0.6 mg increments once weekly as tolerated until a goal dose of 3 mg; perform a microalbumin test for the next visit; consider a SGlLT2 inhibitor next visit; do blood glucose checks 3-4 times daily including fasting, pre-meals and bedtime; and see ophthalmology for a retinal evaluation and podiatry presumably for a neuropathy check and foot examination. The recommendations by the endocrinologist documented all the deficiencies in the care of this diabetic person.

On 6/30/23, the patient was admitted to the infirmary on crisis watch.

On 7/4/23, an officer told a nurse to evaluate the patient for chest pain. A nurse saw the patient in the cell. The patient said he didn't currently have chest pain but wanted his blood pressure medication. The patient's blood pressure was156/98. His medication was given.

The only chronic clinic visit was on 7/18/23.  The patient was documented as seen for hypertension, hyperlipidemia, diabetes, benign prostatic hypertrophy and asthma.  The patient did not have asthma and was not on medication for asthma.  The only history was that the patient had bilateral lower extremity pain.  The only labs documented were A1c 13.2, cholesterol 219, HDL 47and triglycerides 332.  The blood pressure was 147/98.  The examination included the heart, lung, abdomen and that the patient had normal gait.  There was no history of any of the patient's chronic illnesses. The patient had an eye examination on 10/4/22 and the optometrist did not complete the diabetic screening wanting first to obtain an A1c level.  The optometrist recommended an A1c and to return in a month to complete the retinal examination.  This didn't occur and the provider failed to note it.  Microalbumin had not been tested in the past year.  There was no foot exam including screening for neuropathy.  The patient was on gabapentin for unstated reason.  So, there was no retinopathy, nephropathy or neuropathy screening.  The patient had blood pressure that was elevated and the A1c was most recently 13.2 which is extremely high.  The provider made no changes to the patient's medication.  The patient had a 10 year risk of cardiovascular event but was only on a low dose of simvastatin.  He should have been on a high intensity statin. Just three weeks earlier, the patient had been to the UIC endocrine clinic.  The UIC consultant recommended decreasing glargine insulin to 30 units twice a day and start Victoza and to increase in 0.6 mg increments to 3 mg per day.  Also recommended was to increase capillary blood glucose testing 3-4 times daily; to refer to ophthalmology, to follow up with podiatry for a foot examination and to check the A1c in 3 months.  The provider didn't document review of this consultation, failed to note that the glargine insulin had not been modified or that the Victoza had not yet been obtained.  The same nurse practitioner who completed the chronic care visit wrote another progress note ordering Victoza 0.6 mg weekly to increase by 0.6 mg weekly to a goal of 3 mg.  The nurse practitioner apparently reviewed the consultation sheet but did not decrease glargine, did not order microalbumin, retinal screen podiatry evaluation, and did not increase CBG screening.  The nurse practitioner wrote a referral back to endocrinology.

The Victoza was not obtained by the vendor pharmacy and the patient never received it.

On 8/3/23 the patient complained to an LPN about tingling numbness in fingers and toes.  The LPN referred to a nurse practitioner.

The facility Medical Director wrote a note on 8/16/23 for a medical emergency that took place on 8/8/23.  The late entry was due to the medical record being unavailable.  The physician documented history of noncompliance and uncontrolled diabetes, hypertension, high blood lipids and depression and bipolar disorder.   The physician stated that on arrival, cardiopulmonary resuscitation was being undertaken on the patient.   The patient was taken to a local ER where he was pronounced dead.

There were numerous problems with this patient's care as cited above.   The preliminary postmortem findings included:  pulmonary congestion and edema, cerebral edema, mild coronary artery atherosclerosis, diabetes without ketones or significant glucose in urine or vitreous humor, enlarged fatty liver.  The cause of death was arrhythmia and hypertensive cardiovascular disease.  The patient's blood pressure and diabetes were uncontrolled throughout the entire span of this record review (since 2021), yet medication was not appropriately adjusted.  The only change of

blood pressure medication over the year was the addition of a small dose of clonidine. His death may have been prevented if his blood pressure was better controlled.


## Patient #13

This patient was 66 years old. Problems included dyslipidemia since 1999, hypertension since 2012, obesity, smoker, diabetes since at least 2012, and hypothyroidism. The patient had five modifiable major risk factors for cardiovascular disease: dyslipidemia, hypertension, obesity, smoking, and diabetes.

On 4/29/21, at a chronic clinic visit the provider documented the patient had sharp chest pain when he ate sauce or laid down. No further history was taken. An EKG was not done. No assessment was made but omeprazole, a medication used for gastric reflux was prescribed.

On 10/25/21, the patient transferred to Hill CC.

Within a month of transferring to Hill, on 11/22/21, a registered nurse saw the patient using an indigestion protocol. The pain was described as lasting 20 minutes in the sternum area. The pain was sometimes related to food intake. The nurse gave antacids without referring the patient. The pain description was suggestive of anginal pain but the history wasn't in depth. Referral to a provider should have been considered.

On 12/20/21 a registered nurse evaluated the patient again using an indigestion protocol. Pain was described in his chest. It lasted 5-6 minutes and was relieve by rest. He did say eating chili or pizza gave pain. The pain description was similar to angina but was not associated with coronary heart disease. The patient was given antacids without a referral; no EKG was done. This patient should have been referred to a provider as symptoms were consistent with angina.

On 12/30/21, an LPN saw the patient using the indigestion protocol. This pain was described as located in the stomach or esophagus and was related to food. The protocol asks if the patient has cardiovascular disease or hypertension. It does not include a question whether the patient has cardiovascular risk factors but should. This patient was only given antacid and Pepcid by protocol. This was the third consecutive complaint of "indigestion" and the patient should have been referred to a provider and was not. The independent clinical judgement required when conducting a sick call encounter is not within the scope of practice for LPNs.

On 3/11/22, a nurse, who did not document their title or name, saw the patient again using an indigestion protocol. The nurse described the pain as on and off and burning in nature. The patient said the Prilosec didn't help but TUMs did. There was a question that asked whether the pain continues despite treatment protocol implementation which the nurse checked as "no" but it had continued over 6 months and four nurse visits for "indigestion". This patient should have been referred to a provider.

On 3/30/22, an LPN saw the patient using an indigestion protocol. The patient's pain was getting worse despite use of Pepcid and TUMs. His blood pressure was 153/97, which is elevated and he

had a fast heart rate (102). The nurse referred the patient to a provider that day. The provider did not characterize the pain as indigestion but as chest pain. The pain was described as crushing and was worse with activity or lying down. When the patient stopped the activity the pain resolves. When he sits up the pain improves. He had mild shortness of breath with activity. The nurse practitioner noted no family history of heart attack. The history was strongly suggestive of angina. The nurse practitioner's plan was an order for an EKG and a stress test. This was a reasonable plan except that nitroglycerin and an antianginal drug should have been considered. An EGD should have been ordered after the stress test if the stress test was normal. The stress test should have been done without delay. The EKG tracing was too light to see clearly but the reading included non-specific T wave changes which can be consistent with coronary vascular disease. Also, because the patient had proteinuria and diabetes, the blood pressure should have been controlled better and his medication usage should have been reviewed. Based on the MAR the patient last received his three blood pressure medications on 2/25/22 so he would have been out of his medications at this point. The provider should have ensured that he was receiving his medication.

The stress test wasn't approved until 4/21/22 about three weeks later.

On 5/4/22, a provider conducted a chronic disease clinic for diabetes, hyperlipidemia, and hypothyroidism. The weight was 253 pounds. The blood pressure was 143/74 which is not at goal and the pulse was elevated at 110. The patient was not being seen for hypertension and the mildly elevated blood pressure was ignored. Notably, based on MARs, the patient last received lisinopril and HCTZ, two of his three blood pressure medications on 2/25/22 so the patient was out of these medications. This should have been identified and the medication provided. Also ignored was the pulse of 110 despite the patient being on Synthroid (for hypothyroidism) which has a number of cardiovascular side effects including elevation of the pulse. The only laboratory tests documented were related to the conditions being monitored: A1c 11; TC 224; LDL 112; TSH 4.5 Though the patient was being evaluated for diabetes there was no foot exam and no check for neuropathy, nephropathy, or retinopathy. Though the patient had a recent test for microalbumin which was very high (896), this was not acknowledged and a follow up microalbumin was not ordered. A prior urinalysis was positive for gross proteinuria. This would be consistent with chronic kidney disease despite a normal creatinine and glomerular filtration rate. Because of this, the hypertension goal should have been lowered to 130/80 and additional medication should have been ordered. The blood sugar was very high (A1c 11) and 70/30 insulin with sliding scale was added. This combination is not appropriate due to the use of regular insulin in the 70/30 mix and as a single agent used in addition to the 70/30 insulin. A GLP-1 drug might have been considered. There was no follow up or mention of the repeated chest pain nor mention of the stress test which had not been done over the past month. This was a very poor chronic clinic visit. A follow up in a month was ordered which was appropriate but the follow up clinic did not occur.

On 5/21/22, an LPN evaluated the patient using an indigestion protocol. It was described as a chest pain that comes and goes and occurs sometimes after eating. The patient described the pain as: "feels like someone is trying to break out my chest". The blood pressure was 161/94 which is not in control. Although this was the 6th episode of "indigestion" or chest pain the nurse did not refer to a provider and only gave the patient Pepcid and antacids, which had previously been stated as not helpful. The elevated blood pressure was not acknowledged or addressed. The nurse made

an assessment error as this was unlikely to be indigestion; the pain should have been evaluated as chest pain. Independent clinical judgement is outside the LPN scope of practice.

On 6/2/22, an LPN evaluated the patient for "indigestion" which was described as "not better". The pain was described as "epigastric, like food is stuck in throat". The nurse referred the patient to a provider. This was the 7th episode of evaluating for indigestion or chest pain.

A physician saw the patient on 6/6/22. The blood pressure was 160/102 and the pulse 108. The physician presumed that the patient had chronic indigestion for which he was taking Prilosec and antacids with relief. There was no further history and unawareness that this patient had six prior episodes of the same complaint without resolution. The provider was unaware that previously a somewhat better history was done characterizing the pain as consistent with angina and that a stress test was ordered. The prior EKG showing non-specific STT wave changes was not reviewed. A cardiovascular risk history was not taken. The assessment was 1) heartburn and 2) increased blood pressure due to noncompliance. The assessment was made without any history, review of prior visits, and review of the EKG. The plan was to increase Prilosec. This was a poor evaluation as it did not evaluate prior diagnostic tests, history, or pending diagnostic tests.

The doctor wrote that the patient had run out of his blood pressure medication. Review of the MAR showed that the lisinopril and HCTZ blood pressure medications were last given as KOP medication on 2/25/22 and amlodipine was last given on 4/19/22. Lisinopril and amlodipine expired on 4/21/22 and HCTZ expired on 4/22/22. None had been timely renewed. Designating the patient as noncompliant was degrading particularly since the lapse was not identified earlier by nurses administering medication and that the prescriptions expired without notice by the pharmacy to the provider. The doctor did not document that the medications expired but he did sign a verbal order for expired medications on this date. The provider should have scheduled a follow up to assess whether the patient's blood pressure was under control.

On 8/12/22, the same physician wrote a note saying that a stress test was ordered on 3/30/22 but there was "no cardiac indication at this time". This is not accurate. This patient had cardiac equivalent chest pain on seven occasions over the past five months with multiple risk factors for cardiovascular disease including diabetes, hypertension, hyperlipidemia, ex-smoker, obesity, and male sex. The stress test should have been done in March of 2022 shortly after it was ordered. To cancel the test was an egregious error.

On 9/29/22, a nurse practitioner conducted a chronic clinic for diabetes, hypothyroidism, hyperlipidemia, and hypertension. The only history was that the patient was taking all of his medications except his lipid medication. The pulse for this patient had been repeatedly elevated and was 110 at this visit. The patient was on Synthroid for his hypothyroidism, which can cause a variety of cardiovascular side effects, including tachycardia. This should have been evaluated but was not. There was no check for retinopathy, neuropathy or nephropathy. The blood pressure was now normal and the patient was now receiving his blood pressure medication. The prior elevated urine protein tests were not acknowledged and because the patient had both diabetes and hypertension this chronic kidney disease should have been monitored more closely and included in his problem list . The patient wasn't taking his atorvastatin and given his multiple cardiac risks, taking this medication should have been emphasized and a LDL goal of 70 should have been set.

On 10/4/22, an LPN saw the patient using a chest pain protocol. The pain started when he was walking to the clinic. The blood pressure was 136/86 which is high due to his diagnosis of diabetes. In response to the protocol question "identify cardiac risk factors", the LPN wrote "states pain goes away when at rest". This patient had multiple cardiac risk factors. The LPN performed an EKG and showed the EKG to a nurse practitioner. There were two EKGs. One showed non-specific STT wave changes with slight T wave inversion in V6. This can be consistent with angina. Another EKG showed T wave abnormality consistent with lateral ischemia. The nurse practitioner sent the patient back to his housing unit without any orders. Given the risk factor history, past history of "indigestion" or chest pain on 8 separate occasions over the past seven months, current history consistent with angina, and given an EKG consistent with lateral ischemia, this was another egregious error. The nurse practitioner did not pay sufficient attention to the history and EKG results. The patient should have been referred to an emergency room to evaluate acute coronary symptoms.

On 12/5/22, a RN evaluated the patient using a chest pain protocol. This was the 9th episode of a health request with a cardiac equivalent for angina (six with "indigestion" and three with chest pain). The patient describe sharp chest pain at rest for about a year. The only identified risk was increased blood pressure but the patient also had diabetes, obesity, was an ex-smoker, had hyperlipidemia and was a male. Clearly, risk factor identification should be a training issue and this protocol would be improved by including all possible risk factors for the nurse to assess instead of requiring nurses to know them. The blood pressure was 174/98 and the pulse was 104. The MAR showed that patient received a month supply of his blood pressure medications on 10/24/22 and then not until 12/1/22 so some doses were missed in November. This was not noted. But the nurse did document that the patient hadn't taken his medications in four days; the patient had just received medication on 12/1/22. An EKG was done and was read as non-specific STT wave changes but lateral leads were suspicious for acute coronary syndrome. The nurse documented that a physician was called and was aware of the EKG and instructed that the patient should go back to the housing unit with a follow up the following day. A better history should have been taken specifically where the pain was located, referred pain, nausea, shortness of breath, and relation to exertion and rest. Given prior history and the EKG, this patient should have been referred to an emergency room.

The next day, on 12/6/22, a nurse practitioner evaluated the patient in chronic clinic for diabetes, hypertension, hypothyroidism and hyperlipidemia. The history was that the patient took his Synthroid with breakfast and the other medications as recommended and that he had occasional chest pain with an EKG showing STT wave changes. This was not a very good history for chest pain. Laboratory tests were documented except that prior proteinuria was not acknowledged. The blood pressure was 106/76 which was now controlled. The pulse was 108 which was still elevated but not acknowledged as abnormal. There was no foot examination, no evaluation for neuropathy, no documentation of the last retinopathy check and lack of acknowledgement or follow up his nephropathy. Hypertension was not assessed. Diabetes, hyperlipidemia and hypothyroidism were assessed as in fair control which was reasonable. The chest pain was not addressed and there was no comment about the EKG. This was a very poor evaluation of chest pain as there was no history, no risk factor assessment, no prior history of angina or equivalent complaints which had been ongoing for nine months.

On 4/23/22, a nurse evaluated the patient without use of a protocol for "sternal chest pain". The pain was described as grinding like something trying to come out of his chest. He said it was ongoing for seven months or more and was seen numerous times for it. He said he quit taking TUMs because they didn't help, when he stands up and does nothing the pain stops. He asked to have his housing changed because the pain was worse when he walked. The blood pressure was 145/70 and pulse 111. Though the patient had continued tachycardia, it was unacknowledged, and neither was the elevated blood pressure noted. There was no nursing assessment or plan. This were classic symptoms of angina yet the condition was unrecognized. This was the 10th episode of angina-equivalent pain that was inadequately managed. This patient should have been referred to a provider.

On 4/20/23, a nurse evaluated the patient using an indigestion protocol. Pain was described as in the sternal area, occurred in multiple episodes and the patient added that he had difficulty with strenuous activity and walking long distances. The patient added that Prilosec and TUMS didn't help the pain. This was the 11th cardiac-equivalent pain episode, but was not recognized as such by the nurse. The nurse referred the patient to the next nurse practitioner clinic scheduled for 4/25/23.

On 4/25/23, a nurse practitioner evaluated the patient for "sternal chest pain". The only cardiac risk mentioned in the note was smoking. The nurse practitioner did not acknowledge or consider his hypertension, diabetes, hyperlipidemia, or obesity as risk factors for cardiovascular disease. The history documented shortness of breath with activity but no further history relevant to angina was taken including location of pain, referral of pain, related nausea, relationship to exertion and rest. The patient did say he was scared he was going to have a heart attack and asked for a different housing location with a slow walk permit because "I don't want to die on the walk". The prior EKG was not reviewed and another EKG was not done. The only assessments were shortness of breath and chest pain. The nurse practitioner's plan was a chest x-ray, a blood count, and a metabolic panel. Follow up in two weeks was ordered. The nurse practitioner documented that no permits (for slow walk apparently or change of housing apparently) were necessary. This was another failed evaluation demonstrating that there is an absence of knowledge in multiple providers at this facility with respect to coronary artery disease, including acute coronary syndrome.

On 4/29/23, an LPN evaluated the patient using a shortness of breath protocol. This was the 12th angina-equivalent symptom that was evaluated over the past year. The only history was that the patient had shortness of breath when moving. The pulse was 125 and had been elevated for months without anyone acknowledging the abnormality. The protocol requires peak expiratory flow rates which were all abnormally low 450/300/300 despite no history of asthma or COPD. The nurse noted that the patient was scheduled to see a provider this week in follow up of getting a chest x-ray. The patient then told the nurse that he panics when feeling short of breath. The nurse referred the patient to mental health. The LPN failed to acknowledge that the pulse of 125 was abnormal. The history taken was insufficient with respect to shortness of breath with moving. Was there concomitant chest pain, cough, productive sputum, or fever? Though there was tachycardia and abnormal peak expiratory flow rates the LPN did not consult a RN or provider. Independent assessments and clinical judgement are not within the scope of practice of LPNs.

On 5/9/23, at 10:15 pm, a nurse documented responding to a code 3 in which the patient was unresponsive. The patient was transported to a hospital but died at 3 am the next morning.

Amongst multiple findings, the autopsy showed 100% occlusion of the right coronary and circumflex coronary arteries; 95% occlusion of the left anterior descending coronary artery; 90% occlusion of the oblique marginal coronary artery and 75% occlusion of the diagonal coronary artery. There was a remote myocardial infarct in the septum. The preliminary opinion was that the patient died from coronary artery disease. A final autopsy was not provided. This patient had long-standing complaints of angina-equivalent symptoms. He was inappropriately evaluated. A physician cancelled a stress test five months after it was ordered because there were no cardiac indications yet this patient had multiple bona fide indications for cardiac stress testing. This patient's cardiac symptoms were ignored or misdiagnosed for over a year and a half. His death of coronary artery disease was preventable.

**Monitor's 8th Report**
**Lippert v. Jeffreys**
**Mortality Reviews**

## Patient #1

Problem List and Advanced Directives

This was a 83 year-old man. His problem list was inaccurate. The problem list documented chronic obstructive lung disease (COPD) and hypertension, but the patient additionally had sleep apnea and osteoarthritis. The problem list documented he was "do not resuscitate" status though the patient signed a power of attorney in 2018 as a civilian and the document was in the medical record. There was no evidence that the power of attorney had been contacted about the patient by prison personnel even when, later in his life, he had cognitive decline. There was also no effort for IDOC to determine if the patient had capacity to make an informed medical decision. On 8/29/23 the patient signed a physician order for life sustaining treatment (POLST) that was discussed with the patient by a prison physician that documented the patient wanted full treatment. The power of attorney signed prior to incarceration did not participate in this decision making. During a final hospitalization, the hospital contacted the power of attorney who asked that the patient be placed in hospice. For years, IDOC failed to contact the power of attorney even when it may have been indicated to do so.

Chronic Care

While the record that was provided to us contained progress notes from February, 2023 until the patient's death on 12/5/23, it did contain the chronic clinic notes from prior years. The patient was evaluated in chronic disease clinic only once in each year of 2020, 2021, and 2022. The chronic care encounters from 2020, 2021, and 2022 demonstrated substandard chronic care. His sleep apnea and osteoarthritis were not addressed at any clinic visit. The patient had osteoarthritis yet, despite the patient stating he was told he needed knee replacement, there was no evaluation of the status of the osteoarthritis or consideration of knee replacement. At all visits, the patient was documented as having chronic obstructive pulmonary disease (COPD) but was assessed as if he had asthma.

In 2023, the patient had no chronic clinic visits and none of his chronic illnesses were addressed. The patient had multiple hospitalizations and when new diagnoses were made (atrial fibrillation, heart failure, obstructive uropathy with acute kidney injury, adrenal adenomas, anemia, aortic aneurysm, and NSTEMI-2[1]) none of the newly diagnosed conditions were monitored, evaluated or even acknowledged.

Dental and Diet

The patient was incarcerated on 8/4/20 and was noted on intake as having only three teeth left. No plan of care was initiated. There was no assessment of the condition of the teeth. The patient wasn't seen again by dental until 7/24/21 almost a year after intake. The dentist again documented that the patient had only three teeth and wanted them pulled. The dentist noted poor periodontal condition. The patient was scheduled for extractions which didn't take place until 12/3/21 about

---

[1] This is a type of heart attack.

16 months after intake and over four months since the patient was initially seen at the "home" facility. After 2021, the patient had no teeth. This delay was likely related to the COVID pandemic. An impression for the prosthetic was not made until 4/8/22 and the patient did not receive a dental prosthetic until 7/6/22. Almost a year and a half later, on 11/13/23, the dentist saw the patient for "ill-fitting" dentures. Because the dentures were loose, the patient wasn't able to use them. The dentist scheduled the patient for an appointment to fix the dentures but the patient expired in December of 2023 before a follow up visit was completed.

Because the patient had difficulty eating due to no teeth or ill-fitting dentures, the patient had been on a dental soft diet since 7/24/21. Yet, there was no dietary consultation to determine if he was getting sufficient nutrition nor was it ever determined what the patient was eating at any chronic clinic visit. Weights were infrequently taken. The medical record cover lists his intake at NRC on 8/4/20. He was transferred to Centralia on 9/8/2020 and weighed 220 pounds at a chronic clinic on 9/30/20. He gained 28 pounds to 248 pounds when seen in a chronic clinic encounter on 4/20/22 but then began losing weight. The last weight we could find in the record was on 11/29/23 when he was in the hospital and weighed 200 pounds which is a 48 pound weight loss over a year and a half earlier. There was no effort to address the cause or remedy for this weight loss. Because the patient gained weight at a time when he had no teeth, the weight loss was likely attributable to other causes including possible cognitive or mobility issues. In any case, the weight loss and diet weren't being monitored.

Physician Coverage

Documents from July 2023 show that the Medical Director position was vacant. In the Monitor's opinion, the root cause of the problem of vacant physician positions is the inability of the vendor to attract, recruit and retain qualified physicians. For this patient, there were only five in-person physician encounters by two physicians in 2023; none of them was thorough or consistent with standards of care. Both of the physicians lack credentials required by the Consent Decree (III.A.2). One was a physician whose care the Monitor has thoroughly reviewed and advised IDOC that he should not be practicing as he practices in an unsafe and clinically appropriate manner. The 2nd physician has not been monitored by either IDOC or the Monitor. This physician is moved around to fill in and finding representative records of care he has provided is difficult. This record demonstrates that he should also not be practicing because of unsafe and clinically inappropriate practice. Physicians without appropriate credentials required by the Consent Decree should not continue to practice.

There was very little physician or mid-level provider contact with this patient. The patient complained about this to a psychiatrist on 2/16/23. The psychiatrist documented that the patient was frustrated about lack of medical care. Though, no details were provided, the patient's concern was valid.

On 2/25/23, a nurse responded to an emergency noting that the patient had difficulty speaking and left sided weakness and thought the patient was having a stroke. There was no evidence that a physician was available for consultation and the nurse did not document speaking with a physician.

The patient was admitted to a local hospital and was promptly treated with de-clotting[2] medication (TPA) on suspicion of a stroke and referred to a tertiary care hospital. At that hospital the patient had no evidence of a stroke, central nervous system mass, or bleeding. He was oriented and aware, but a physical therapist noted that he had decreased awareness of the need for assistance and difficulty with activities of daily living. He needed assistance with transfers and needed verbal cues for safety and transferring from sitting to standing. He had limitations with movement and decreased functional balance and endurance. He was short of breath with activity and developed low oxygen while sitting which improved with activity.[3] He described one fall in the past 6 months. This picture describes a frail elderly man with functional movement disability who might have early dementia though he did not have a cognitive study in the hospital. He did not have a stroke but was diagnosed with a transient ischemic attack (TIA)[4]. The hospital documented his sleep apnea and hypertension as problems but did no investigations of these conditions except for routine blood pressure checks. He had mild anemia on blood tests in the hospital but this was unrecognized at the prison.

On 2/27/23, the patient returned from the hospital and a nurse placed the patient on the infirmary and gave him a walker. Coverage-physician-1 saw the patient two days later. This was the first of two in-person physician visits during 2023 by coverage-physician-1. This first physician note was written on an infirmary discharge summary form. The patient had been admitted to the infirmary by nurses but when the physician saw the patient he immediately discharged him without any examination. The patient had a recent TIA and had no prior physician monitoring of his COPD, osteoarthritis, sleep apnea, abdominal hernia, and hypertension for a year. The note was 32 words long as shown below.

> Admitting Diagnosis: "Post [cerebrovascular accident][5] [with] TPA[6]"
> Discharge Diagnosis: "Stable post-CVA
> Infirmary Course: [illegible word] stable, ambulating [with] a cane.
> Infirmary Discharge Orders: [continue] current meds; encourage to wear his abdominal binder; issue walker
> Follow Up Plan: will [follow up] [after] [appointment] [with] neurology.[7]

Problems with this note were as follows.
- There was no history of any of the patient's problems.
- There was no physical examination concerning problems related to the hospitalization or to the patient's chronic illnesses.

---

[2] The standard of care for a stroke is for a hospital on suspicion of a stroke to give a medication to dissolve the clot causing a stroke and to refer to a stroke center or regional hospital better equipped to manage strokes.
[3] His oxygen saturation was 83-86% when sitting and rose to 91% when walking and 92% post-exercise. All of these numbers demonstrate low oxygen in his system.
[4] A transient ischemic attack (TIA) is a presentation with symptoms consistent with a stroke but which resolve. A TIA is so classified when the symptoms are related to brief blockages of blood flow to the brain. These episodes don't cause long-term damage and resolve but portend a future stroke which occurs in about one in three people who have a TIA. This patient left the hospital with a diagnosis of TIA.
[5] Cerebrovascular (CVA) refers to a stroke.
[6] TPA is the de-clotting medication
[7] The words in brackets were all abbreviation but written out for clarity.

- The physician's understanding of the hospital diagnosis was inaccurate; the patient did not have a CVA he had a TIA,
- The hospital record was not documented as reviewed.
- There was no follow up post-hospitalization and review of hospital findings to provide informed care to the patient.
- Anemia identified in the hospital was not recognized. A blood count from 2/25/23 showing mild anemia was in the record but not acknowledged.
- The problem list was not documented as updated.
- None of the patient's current chronic diseases (sleep apnea, hypertension, hyperlipidemia, osteoarthritis of the knee, abdominal hernia, and COPD), which had not been evaluated for a year, were evaluated nor were the patient's current medications reviewed after the hospitalization.
- Use of an abdominal binder was referenced but the abdominal hernia management was not updated.[8]
- The MRI and CT scan from the hospital were not reviewed. The brain atrophy and small vessel disease suggested possible early senility or dementia which should have been noted in the event there were further episodes of altered mental status. The patient should have had his cognitive status determined.
- Without history, examination, or review of the hospital record, this physician made a housing decision to discharge the patient to general population without consideration of whether this was safe.
- The plan to only provide a walker and cane failed to consider the patient's functional ability. No review of the hospital physical therapy note occurred which gave details on his need for assistance with transfers, prompting for transfers, etc., and implied future need to monitor and manage these disabilities.
- There was no plan to send the MRI and CT scan and hospital discharge summary to the neurologist so that effective communication about the patient's condition could be accomplished.
- Though a referral to neurology was documented in the note, a referral was not on the offsite specialty care log. The physician had written a referral form but the information was inaccurate. The request stated that the patient had recent cerebrovascular accident but the patient actually had a transient ischemic attack. This referral was not timely and occurred over two months later.

This evaluation continued the practice of episodic care, only responding superficially to the most immediate need. Almost none of the patient needs were addressed which is particularly important when coverage doctors are seeing patients.

Within a week of discharge from the infirmary, on 3/8/23, a nurse scheduled the patient to see coverage-physician-1 for his 2nd encounter with this patient. The nurse documented an introduction to the visit stating that the patient needed to be seen as to whether he needed a wheelchair due to his legs being weak from his TIA and said "do not cancel per HCUA".

---

[8] A May, 2022 ultrasound showed loops of bowel in the hernia. This should have been confirmed with CT and if accurate the patient should have been referred to a surgeon for repair

Apparently, the HCUA became aware of some type of functional difficulty and wanted the patient examined. Coverage-physician-1 saw the patient and his note was very brief as shown below.

S: Have a walker [and] a cane. Used the [wheelchair] [after] discharge from the [infirmary]. Is OK [without] a [wheelchair].

O: ambulating well [with] the walker.

A: Discussed that if a time arrives when he can't go to the pill line / chow then we can address leg weakness then.

P: No current need for a [wheelchair].

This note was episodic and the many of the same criticisms given above are present in this note. However, key problems are:

- There was no history or examination that may have elucidated the activity of daily living and functional problems that the patient was clearly having in general population for which infirmary housing or additional disability aids were indicated.
- This patient had a prior recommendation for a knee replacement but his significant degenerative arthritis was not addressed nor was an appropriate accommodation made for his disability. Orthopedic referral was indicated but not done.
- The patient had a fall history but this was not inquired about or evaluated.
- Again, the patient's chronic illnesses had not been evaluated in a year and any opportunity to do so should have been taken.
- The denial of a reasonable accommodation for his disability was unsafe, clinically inadequate, and bordered on cruelty.

About two weeks after coverage-physician-1 discharged the patient from the infirmary, on 3/10/23, a nurse evaluated the patient for knee pain documented as constant. The patient asked for a different walker. The nurse did not refer the patient. On 3/16/23, coverage-physician-2 was asked to see a patient to review ultrasound results that occurred on 5/31/22 to evaluate an abdominal hernia. The test documented that the hernia may contain loops of bowel which could place the patient at risk of incarceration of the hernia. CT scan was recommended for further evaluation. When coverage-physician-2 saw the patient, the ultrasound result was not addressed. The entire note consisted of 18 words as shown below.

S: Patient is [with] [chief complaint] right knee pain

O: states walking with walker

A: Arthritis

P: X-ray [right] knee; referral orthopedic[9]

Problems with this encounter were as follows.

- The purpose of the visit (to evaluate an ultrasound result) was not accomplished.
- Coverage-physician-2 took no history of the pain nor did he complete an examination or functional assessment related to the knee pain. On 3/14/23, a psychiatrist documented that the patient continued to "slur his words" so a better examination was called for, particularly in light of the recent hospitalization.

---

[9] This patient was not found on the Centralia 1st and 2nd quarter offsite tracking log so the referral was not documented as in process of being completed.

- This person had been inappropriately discharged from the infirmary to general population a couple weeks previous and whether the knee pain affected his ability to function was not addressed. Coverage-physician-2 failed to evaluate the patient sufficiently to determine whether an appropriate accommodation for his disability was accomplished.
- The patient described, in prior a chronic disease clinic, a recommendation for knee replacement which was not investigated.
- Coverage-physician-2 did order an x-ray but no one followed up on the results. The x-ray result was available the following day and showed moderate to severe joint space narrowing and degenerative changes. There was near obliteration of the medial compartment with osteophytes. MRI follow up should have been done but was not. Orthopedic follow up was indicated but not apparently ordered.
- Coverage-physician-2 also documented he would refer the patient to orthopedic surgery but no referral was found.
- Similar to the practice of coverage-physician-1, the patient's chronic illnesses had not been monitored in almost a year yet no action was taken to do this.
- The recent hospitalization was not acknowledged nor did coverage-physician-2 inquire whether the patient was doing OK since discharge.

This was an unsafe and clinically inappropriate visit because the abnormal test result for which the patient was scheduled was not addressed. The patient's stated complaint was not adequately addressed. Moreover, the patient's chronic illnesses were not attended to.

The inmate was in general population and assigned an ADA[10] helper. It wasn't clear who initially ordered the inmate helper.[11] This verified that the inmate could not function safely on his own. On 3/21/23 the inmate ADA helper brought the patient to the clinic and told the nurse that the patient was falling frequently. The nurse documented the patient's walker was only helpful indoors. So, the nurse , with the ADA inmate, called coverage-physician-1 who gave a telephone order for a wheelchair any time he is going long distances or leaves his housing to go between buildings. This after-the-fact management still did not address the patient's needs because the physician still did not take any history or conduct any examination to determine why the patient was falling. Other factors that may have affected his falls (e.g., current acute illness, cognitive decline or additional functional disabilities) were not addressed. Coverage-physician-1 did not schedule an appointment to follow up on the patient falls and took no other diagnostic measures or change of housing (e.g., infirmary placement) to protect the patient. This was an episodic manner of addressing the patient's disability that was unsafe and clinically inappropriate practice because without determining why the patient was falling potentially placed the patient at risk of future harm.

---

[10] ADA refers to inmates who are assigned to assist elderly or severely disabled inmates. This is not intended to supplant medical care but the Monitor believes the ADA attendant does, at times, substitute for medical supervision. In this case, the inmate likely had severe degenerative arthritis necessitating knee replacement which was not done. He also likely had early dementia and should have been housed with some medical supervision but was placed in general population with an inmate ADA.

[11] There are no formal rules statewide on who is to order ADA helpers nor is there policy or procedure governing use of these services.

Later that same evening on 3/21/23 a nurse evaluated the patient again for a "possible TIA" and severe headache. The nurse wrote that the patient was confused when trying to make a phone call and was unable to remember the phone number he was trying to call. Though oriented to person, place, and time he appeared otherwise confused to the nurse. This may have been early cognitive decline attributable to the brain atrophy and small vessel disease in his brain seen on CT scan or something else. The nurse called on-call coverage-doctor-3 who ordered that the patient be sent to a hospital.

The patient was sent to a local hospital on 3/21/23 and a CT scan showed no mass or acute bleeding in his brain but did show mild brain atrophy and small vessel disease consistent with aging and early cognitive changes and dementia in the elderly. The failure to conduct standard cognitive evaluation at the prison ultimately resulted in this hospitalization that was likely preventable. After a CT scan was done, the local hospital immediately sent the patient to a tertiary care reference hospital in Evansville, Indiana for neurological evaluation. The patient returned from the hospital on 3/23/23. The record from the hospital in Evansville was not obtained and was not in the record. The only information about this hospitalization is what the nurse at Centralia wrote when the patient arrived back to the prison on 3/23/23 which was that the patient didn't have a stroke or TIA; instead had a migraine for which Depakote was prescribed. The nurse did not mention whether neurology follow up was recommended. On arrival at the facility, the nurse called coverage-doctor-3 again who ordered the medication and also ordered an inmate ADA attendant and use of a wheelchair when leaving the housing unit. This plan was developed without evaluation of the patient or review of the hospital records and there was no post-hospital evaluation of the patient. This patient's cognitive difficulties and functional disabilities appeared to be more likely a result of early dementia or cognitive decline and the housing assignment did not appear appropriate. In this instance, the assignment of the inmate ADA helper appeared to be a substitute for medical care which is an inappropriate use of inmate workers.

In the meantime, the neurology referral ordered by coverage-physician-1 on 3/1/23 took place on 4/3/23. The neurology report was incomplete and only the first page was available in the medical record. On page one, the neurologist wrote that the patient had functional impairments but no cognitive impairment. The remainder of the note was missing. The referral form that went with the patient for the visit had comments by the neurologist that said,

> 83 year old [with] history of headache. He is doing better [with] Depakote. He has a shuffling gait. [one sentence illegible]. Alert. Oriented. Plan: continue with current dose of Depakote.

Someone wrote on this form "Dr. office will fax order for Sinemet when they fax paperwork back". Sinemet is a drug used for Parkinson's disease and shuffling gait is a manifestation of Parkinson's disease. Someone also wrote that a 3 month follow up was requested to be scheduled sometime around 5/10/23. Coverage-physician-1 signed this referral form as reviewed but another referral back to the neurologist was not written until 5/10/23 about five weeks after return from the hospital. This referral from 5/10/23 was not found on the 2nd quarter offsite specialty log. Because the neurologist's note was not present, it was unclear whether the neurologist diagnosed Parkinson's disease. The problem list was not updated to include migraine or Parkinson's disease and the medical record is uninformed as to what the neurological status of the patient was. When the referral to this neurologist was made by coverage-physician-1, the hospital record including

MRI and CT scan results were not sent with the patient so it was likely difficult for the neurologist to make an accurate diagnosis.

Three days after the neurology consultation, the HCUA confirmed on-call-coverage-physician-3's phone order that the patient was permitted to have a walker, a low bunk, and ADA inmate attendant, and a wheelchair. The HCUA also arranged for the patient to be housed in a unit closer to the health unit. A provider should have completed an in person evaluation to determine the patient's functional capacity and determine whether he was appropriately housed. Instead, this evaluation occurred by phone.

Coverage-physician-2 saw the patient in follow up of the neurology visit on 4/11/23. The patient had not been evaluated by a provider after the 3/21/23 hospitalization, so coverage-physician-2 should have done that evaluation as well. Though the purpose of the 4/11/23 visit was to evaluate the patient post-neurology referral, the only history was that the patient lost his hearing aids and had no further headache. The visit note as written is given below.

> S: Patient states that his hearing aids were lost in transfer from Indiana
> O:[illegible word] states has no headaches since Depakote 500 BID
> A: Parkinson [disease]
> P: Continue Depakote as prescribed. Hearing testing for hearing aids

There was no other history and no examination. The assessment was Parkinson's disease. Because the neurologist's report was incomplete, it wasn't clear that this was a diagnosis of the consultant. The only plan was to send the patient for hearing aids and to continue Depakote. Problems with this encounter were the following.

- If the assessment was Parkinson's disease, the doctor should have confirmed findings of the neurologist, ordered the medication for the patient and ensured that the functional disabilities related to the Parkinson's were addressed with appropriate housing and support. No evaluation took place and the patient's needs were not met.
- This evaluation also did not review the past hospitalization which was only 19 days earlier. The patient had not been evaluated post-hospitalization. The hospital record was not reviewed and the problem list and therapeutic plan of the patient was not updated.
- None of the patient's chronic diseases which had not been evaluated for about a year were evaluated including the newly identified problems from the 2/25/23 hospital admission.
- The neurology full report was not documented as reviewed.
- A follow up neurology referral form was not made. It was written on 5/10/23 about five weeks later but it wasn't found on the 2nd quarter offsite tracking log.
- The physician did not discuss the consultant's findings and recommendations with the patient and did not update the therapeutic plan based on the consultation. The patient was therefore uninformed about his care plan.

This was another episodic encounter that did not address the needs of the patient.

The patient had no further in-person physician evaluations until 8/2/23, about four months later. In the meantime, the following clinical events took place.

- On 4/18/23, a laboratory test confirmed mild anemia (hemoglobin 13) which was not acknowledged.
- On 5/3/23, the family called about the patient having "increased confusion". This resulted in a nurse evaluation who noted that the patient did get confused about who he was approved to call and on what day he was approved to call. A nurse found the patient oriented to person, place, and time, but no further clinical evaluation or history occurred and the patient was not referred to a provider. A mini-cognitive test should have been done but was not.
- On 5/6/23 a psychiatrist documented that the patient was more confused but the patient was not referred to a provider for evaluation.
- On 5/10/23, a nurse emergently saw the patient who had fast heart rate (120), fast respiratory rate (26), and low oxygen saturation (89%) and was shaking and coughing. An unnamed physician was called who recommended sending the patient to the hospital. When the patient arrived at the hospital, he was short of breath and weak and was only able to respond to yes or no questions. The patient spent four days In the hospital and was diagnosed with acute respiratory failure, pneumonia, cellulitis, acute on chronic heart failure, a type 2 non-ST-segment elevation myocardial infarction (NSTEMI-2),[12] and atrial fibrillation. He was started on a blood thinner, an antibiotic for the pneumonia, a medication to control his heart rhythm and a diuretic and discharged with a recommendation to follow up with a cardiologist.
- Upon return to the prison on 5/19/23, a provider didn't see the patient and the recommended antibiotic wasn't stocked so it was ordered. The following day, the three days of antibiotic were given to the patient as ordered but these were given for the patient to administer to himself. Given the recent confusion of the patient, he should have been kept on the infirmary to monitor. Instead, he was sent back to general population and given his medications to handle on his own. The blood thinner was unavailable for eight days and the patient received no medication during this time. These developments were all unsafe and placed the patient at risk of harm.
- On 5/21/23 a nurse documented that the patient said he wasn't wearing his CPAP mask and that he was "slightly confused". A better evaluation of his mental status wasn't performed and the patient was left in general population. He should have been referred to be evaluated by a provider but this did not occur. This patient was housed inappropriately. He should have been housed on the infirmary.
- On 5/26/23 at 11:30 am, a nurse using a non-specific discomfort protocol evaluated the patient for right leg pain. The patient needed assistance to stand. He had 4+ (very large) pitting edema of the right leg extending from above the knee to the toes. The nurse did not document evaluation of the left leg. The nurse called on-call-coverage-physician-4 who ordered a stat D-dimer test. This is a test to evaluate whether a clot was present in the leg. If the doctor thought a deep vein thrombosis was present, the patient should have been sent to a hospital urgently for evaluation. The test result returned at 5 pm and was normal. On-call-coverage-physician-4 ordered the patient back to general population housing despite prior confusion. An in-person provider evaluation was called for. The left leg should have

---

[12] This is a heart attack not caused by blockage of a coronary artery but by lack of oxygen to the heart muscle which was likely caused by his heart failure and pneumonia.

been evaluated for edema. If both legs were swollen, the edema was likely due to his recent diagnosis of heart failure and his medication likely needed readjustment.

- Eight days after the 5/19/23 discharge from the hospital, on 5/27/23, coverage-physician-1 wrote a referral to cardiology as recommended on the 5/19/23 hospital discharge summary. Coverage-physician-1 did not examine the patient or document review of the record. It wasn't clear if he was onsite. The patient's status since hospitalization for heart attack, heart failure, atrial fibrillation, pneumonia and cellulitis was not being monitored. There was no examination post-hospitalization, no update of the therapeutic plan, and the patient remained uninformed about the facility's plan of care. This placed the patient at serious risk of harm.

- On 5/29/23, a psychiatrist documented that the patient was recently hospitalized secondary to confusion. The patient expressed frustration about his case and had problems with his CPAP machine and had fluid retention. The psychiatrist wrote, "He worries about getting out before he passes away".

Finally, on 8/2/23 coverage-physician-1 saw the patient for the first provider visit since the 5/15/23 hospitalization, 79 days after the hospitalization. He ostensibly saw the patient based on nursing referrals for a debilitating right knee pain, review of laboratory results and a toenail evaluation. The following was the doctor's entire note.

S: Has had knee pain for year, ∅ lab work. Has long toenails.
O: ∅ labs. Long toenails
A: Will order toenails cut
P: To the treatment line- soak toenails + clip same

The problems with this encounter is the following.
- This note is episodic. In this case, the patient hadn't been seen in months and the status of his medical conditions should have been updated but there was no update of any of the patient's conditions.
- This patient had a significant recent hospitalization for myocardial infarction, atrial fibrillation, pneumonia, cellulitis, acute on chronic heart failure which were new diagnoses but which had not been monitored for three months. These conditions should have been monitored to protect the patient from risk of harm.
- The new diagnoses were not entered into the problem list, nor was the therapeutic plan of the patient updated with his new conditions.
- None of the patient's new medications were monitored. Though the patient had recent leg edema, the physician did not address whether the heart failure was appropriately controlled with diuretic medication. The physician did not evaluate whether the patient was receiving his medications. He was receiving furosemide, potassium, diltiazem, and Tylenol as keep-on-person medication but given this patient's intermittent confusion and large medication panel (he was on 14 different medications) he should have been on directly administered medication. The MAR did not provide evidence that the patient had received atorvastatin in July.
- This patient also had multiple chronic conditions (sleep apnea, COPD, hypertension, osteoarthritis, hyperlipidemia, and abdominal hernia) which had not been monitored in a year and a half and should have been monitored.

- The patient had known osteoarthritis of the knee for which knee replacement had previously been recommended. His current knee pain wasn't evaluated with history or physical examination. Further work up was not accomplished. Coverage-physician-2 documented he would refer this patient to an orthopedic surgeon which never occurred. This patient's complaint and need was not addressed appropriately.
- Though one of the documented purposes of the physician visit was to review laboratory results, the physician did not even discuss what laboratory result was to have been reviewed.

On 8/10/23 a test result showing low potassium level was present and initialed as reviewed by coverage-physician-1. The patient was on a diuretic that can cause low potassium but there was no evidence of follow up monitoring. The MAR shows that the patient did not receive keep-on-person potassium in April, May, or June and received a 30 day supply on 7/2/23. Also, he may not have been taking his medication as instructed because of his age and intermittent confusion. He should not have been responsible for taking his own medication and should have received his medication but did not.

On 8/15/23, the patient returned to the neurologist who previously evaluated the patient on 4/3/23. This appointment was not listed on the 3rd quarter Centralia offsite specialty log. Though Centralia staff had documented on the 4/3/23 referral that the patient was to be started on Sinemet, a drug for Parkinson's disease, at this visit the neurologist made no mention of Parkinson's disease. Based on the referral information provided to the neurologist that the patient had a prior stroke, the patient's leg weakness was attributed to the stroke. The neurologist recommended continuing the Depakote for migraine. Prior hospital records including brain MRI and CT scans should have been sent to the neurologist but were not and the patient appeared to not have been appropriately evaluated. This type of miscommunication with specialists is a frequent occurrence and can cause misdirected medical care. There was no documented review of this consultation and a provider did not meet with the patient to discuss findings.

On 8/21/23, a nurse called on-call-coverage-physician-3 for bilateral leg edema and he recommended sending the patient to a hospital. Since the last hospitalization for myocardial infarction, heart failure, pneumonia and leg cellulitis, a physician had not seen the patient for the purposes of monitoring these conditions. There was only one provider evaluation over the three month period and the heart failure was not being monitored. For this hospitalization, the patient had acute on chronic heart failure; the atrial fibrillation had reverted to normal rhythm. The cardiology appointment recommended on 5/19/23 had not been completed before this hospitalization. An echocardiogram at the hospital showed worsening heart failure. The patient was treated for exacerbation of heart failure. An enlarged aortic aneurysm was also found on echocardiogram. The cardiologist ordered a follow up CT scan which showed a 3.9 cm thoracic aortic aneurysm that the radiologist recommended should be followed up in a year. Cardiology notes in the hospital recommended follow up with cardiology upon discharge but specific cardiology follow up was not in the discharge summary. There was no evidence of a referral to cardiology on the 3rd quarter offsite specialty log. The aortic aneurysm should have been noted especially the need for a follow up CT scan. Diltiazem was discontinued and new medications

were started: metoprolol, Entresto, Jardiance, and spironolactone. He was treated with Keflex to complete treatment of urinary tract infection.[13]

The patient returned to the prison at 5 pm on 8/26/23. The nurse noted new medications and wrote that the hospital nurse had endorsed that the oxygen saturation was low and he was on 3 liters of oxygen until 3 pm of the day of discharge and that the saturation was at least 94%. At the prison at 7 pm, the oxygen saturation decreased to 88%, the blood pressure was 88/42 (which is very low) and the heart rate was documented as 29 (which is extremely low). The patient was described as "in and out of alertness". The nurse called on-call-coverage -physician-4 who ordered that the patient return to the hospital.

At the hospital the vital signs were normal and oxygen saturation was normal. The patient was sent back to the prison by 10:30 pm the same day and was returned to the infirmary by a nurse.

The nurse in the infirmary called on-call-coverage-physician-4. The nurse identified that the pulse was now irregular, indicating possible atrial fibrillation but an EKG several hours earlier in the emergency room showed atrial bigeminy, typically a non-serious arrythmia. The on-call physician ordered "fall precautions", fluid restriction to 1.5 liters daily with daily weights and to call the provider for a weight gain of more than 2-3 pounds daily or 4-5 pounds over a week. The patient was to wear his CPAP mask.

Two days later on 8/29/23, coverage-physician-1 saw the patient because the patient was requesting a podiatry referral and because the patient had a recent hospitalization and ER visit. The entirety of the note was as follows.

> S: [illegible word] post ER
> O: Stable post ER
> A: Stable post ER. Discussed DNR [do not resuscitate] + He wants to be revived.
> P: 1) Pt. to sign sheet-DNR 2) Will need [follow up] [with] cardiology check[name of a clerk] to see if he needs collegial. ***Discharge from infirmary.[14]***

Problems with this visit are the following.
- The doctor specifically documented that the patient might need "collegial" review. This implies that the collegial review process is still active. IDOC should explain this documentation.[15]
- This patient had recent hospitalization for worsening heart failure, and was re-hospitalized for unstable vital signs. He was recently started on multiple new medications for his heart failure. A better history should have been obtained and a physical examination performed.

---

[13] The pharmacy wrote on the non-formulary approval for Jardiance to monitor the patient and labs for adverse effects. Dehydration is a side effect of this medication especially in the elderly. This patient was also taking a diuretic. A significant adverse reaction is also acute kidney injury which this patient subsequently developed without any monitoring.

[14] This is our emphasis. To discharge the patient from the infirmary without any history or examination is not standard of care.

[15] Patients #1, #5, and #6 in these mortality reviews had references to collegial review. It appears that some form of collegial review still exists which should be explained.

- An updated therapeutic plan should have been documented noting the changes in his heart failure medication.
- The new identification of aortic aneurysm should have been noted and a referral for a repeat CT scan in a year should have been made.
- The problem list should have been updated.
- Because of the patient's age, intermittent confusion, and serious medical conditions infirmary care should have been provided.
- The patient had not had chronic care monitoring of his original medical conditions (COPD, sleep apnea, osteoarthritis, hypertension, and abdominal hernia) for a year and a half and these should have been evaluated. He also did not have his newly diagnosed conditions of myocardial infarction, atrial fibrillation, and heart failure monitored since the prior hospitalization and the therapeutic plan for these should have been updated.
- The patient's intermittent confusion and CT scan evidence of brain atrophy and small vessel disease should have resulted in a mini-cognitive test to assess for the potential for dementia.
- Though the doctor discussed end-of-life issues, this patient had a person named as power-of-attorney that was filed in the medical record and was dated 6/12/18. The person so named should have been contacted in the discussion of the physician orders for life sustaining treatment (POLST).
- To discharge this patient from the infirmary, given his age, history of intermittent confusion, movement disability due to severe osteoarthritis, fall history, and multiple serious cardio-pulmonary conditions was cruel. He needed some type of medically monitored housing. This placed the patient at risk of harm.
- The nurse, but not the doctor, wrote a formal infirmary discharge summary which is not consistent with current administrative directives.[16] The nursing discharge summary continued on-call-coverage-physician-4's orders for fall precautions, fluid restrictions with daily weights without indicating how this was to occur in general population. Coverage-physician-1 did not clarify those orders.

This 8/29/23 physician encounter was the last in-person encounter with a provider for this patient until he died on 12/5/23. Significant subsequent medical issues occurred that warranted in-person provider intervention.

On 9/5/23, a nurse saw the patient, who was now living in general population using a non-specific discomfort protocol because the patient had edema of the legs with shortness of breath which indicated a worsening of his heart failure. This may have been due to not receiving ordered medication. Furosemide was recommended changed to 20 mg twice a day and was given at this dose from 8/27/23 until 8/30/23. Then in September the furosemide wasn't given for 4 days and on September 5th it started again at its previous dosage of 40 mg daily instead of 20 mg twice a day. There was no order found for this change. On 9/5/23, coverage-physician-4 ordered the nurse, by phone, to instruct the ADA inmate helper to educate the patient related to appropriate

---

[16] Administrative Directive 04.03.120 G.5., requires that physicians, psychiatrists, or dentists can discharge a patient from the infirmary and that a discharge note by the physician, psychiatrist or dentist is to be in the medical record. The discharge note shall include a summary of the reasons for admission, the course in the infirmary, and the discharge diagnosis and plans. This physician note did not accomplish these directions.

sodium and water intake. The inmate was not trained and should not have been instructed to provide patient care. This patient should have been placed on the infirmary but was not.

When the patient returned from the hospital 8/27/23 there were provider orders to start six new medications recommended by the hospital but on 9/27/23 three medication orders for Entresto, Jardiance, and Toprol expired without anyone noticing. New orders were not obtained. Orders for Eliquis also expired in September and new orders were not obtained.

Laboratory tests returned on 9/21/23 showing a BUN of 40 which is very high and may indicate significant dehydration and a creatinine of 2.13 which indicated acute kidney injury. Though someone initialed these results no action was taken. The pharmacy had previously advised monitoring for side-effects of Jardiance. Both acute kidney injury and dehydration are known adverse effects of Jardiance but these were not acknowledged. The possibility of significant adverse reaction to a medication was unacknowledged.

On 9/26/23 a nurse was checking the patient and noted a bruise on his shoulder which appeared to be a few days old. No referral was made. There was no provider available. The nurse did not question whether the patient fell.

On 10/2/23 at noon a nurse saw the patient because he felt weak, his stomach was upset, and he had not been eating. The nurse used the non-specific discomfort protocol when a more appropriate protocol should have been used.[17] The patient's blood pressure was 96/53. The nurse gave the patient Pepto Bismol, which is not listed as a possible intervention on the non-specific discomfort protocol. The nurse was practicing outside of scope and should have completed a more thorough assessment and contacted a provider for direction. That same evening, at 8 pm, another nurse saw the patient who complained of vomiting. He was unable to stand and was hypotensive with blood pressure 89/55. On-call-coverage-physician-4 was called who ordered the patient to the ER. A subsequent note by a nurse noted that the patient hadn't eaten or drank for two days. A repeat blood pressure was 80/58. The nurse documented a report was given to the emergency medical responders.

The patient was hospitalized for three days. He had urinary retention relieved by catheterization. He had anemia, severe dehydration, and renal failure (BUN 72 and creatinine 3.79). An indwelling catheter was placed with a recommendation to see a urologist which did not occur at the prison.[18] At the hospital the Apixaban, the blood thinner, was stopped for unclear reasons[19]. The patient returned to the prison on 10/5/23. On the day he returned, a psychiatrist saw the patient and noted he had significant decline since the last visit. He was disoriented to time and place. The patient was admitted to the infirmary but was not examined by a provider.

The following day, 10/6/23 the patient was able to follow commands but was unable to support his own weight and move himself in the bed or chair.

---

[17] Indigestion or Nausea/Vomiting protocols would have been more appropriate.
[18] We note that the Centralia 4th quarter offsite tracking log did not include this referral and a provider did not evaluate the hospital record in follow up.
[19] It may have been stopped due to falls and cognitive disorder which are a risk for significant bleeding if the patient experienced a fall.

Two days later, on 10/8/23, at 5:30 the patient became incontinent when transferring and became unresponsive with low blood pressure. The nurse called on-call-coverage-physician-4 who ordered the patient transferred to the hospital. At the hospital, the patient received IV fluid and was returned to the prison the same day without any new orders. On return to the prison, a decubitus ulcer was noted. He was placed on the infirmary.

On 10/11/23, on-call-coverage-physician-3 gave an order for the dressing change. On-call-coverage-physician-3 told the nurse that coverage-physician-1 would see the patient that evening but this did not occur.

On 10/14/23 on-call-coverage-physician-4 was called about the patient's decubitus wounds.

On 10/15/23, on-call-coverage-physician-4 conducted a telemedicine visit which was typed by a nurse and signed by the physician. The nurse was unable to bring the patient to the telemedicine room and the examination was conducted in a separate room by a nurse not visualized by the physician. On-call-coverage-physician-4 said that coverage-physician-1 would evaluate the patient and ordered a special cushion and to turn the patient every two hours. This visit was no better than a phone call. Coverage-physician-1 did not see the patient as recommended by on-call-coverage-physician-4.

On 10/15/23 a nurse attempted to call on-call-coverage-physician-4 but there was no answer. About two hours later the nurse was able to reach the physician and medications for the decubitus wound were clarified. The physician was making wound care decisions without having seen the wounds.

The patient was still not evaluated by a provider when on 10/27/23 on-call-coverage-physician-4 apparently did a telemedicine evaluation but the note was written by a nurse. The evaluation was extremely limited; the entire note stated,
> LCTA [lungs clear to auscultation], HR [heart rate] regular + rhythm seen by [Dr. X] via telemed. Orders to follow.

This was an inadequate note given the condition of the patient.

On 11/22/23 without any intervening provider visits, a nurse called on-call-coverage-physician-4 for hypoxia (oxygen saturation of 87%) who ordered the patient sent to the hospital.

In the hospital the patient appeared to have an infection, the CT scan showed profound brain atrophy with senescent changes with an old infarct. The patient was lethargic but opened his eyes to painful stimuli. He had spontaneous movements of his left upper extremity. He had acute respiratory failure with sepsis and acute metabolic encephalopathy. The patient's power of attorney was finally reached by the hospital and the agreed patient goal was to keep the patient comfortable and transition to hospice. The patient was sent back to the prison on 11/29/23.

A nurse admitted the patient to the infirmary on 11/29/23. Nurses called coverage-physician-1 for orders for medications recommended by the hospital. The patient died on 12/5/23. The patient

had not been seen in person by a provider since 8/27/23. None of the in-person physician visits during 2023 were adequate or served the needs of the patient. This patient was basically without physician care for the entire year during which time he had two specialty consultations and six hospitalizations. He was not being monitored during this time for any of his medical conditions. The two coverage physicians who provided the five in-person evaluations are not credentialed based on Consent Decree requirements (II.A.2) and should not be providing primary care in IDOC facilities.

This patient did not receive adequate physician care for the entire year of this record review. His problems were not monitored or evaluated and sometimes not even acknowledged. There was no autopsy. The death certificate lists the cause of death as hypoxic respiratory failure. Though the patient had COPD, he had not been monitored for this disease and the death might have been preventable if the heart failure and COPD had been managed appropriately. Importantly, the patient's cognitive status declined over time but was never diagnosed. If the patient had dementia, palliative care might have been indicated earlier than when determined by a hospitalist about two weeks before he died.


## Patient #2

The patient was transferred to Centralia on 5/4/22 with a history of hepatitis C, hypertension, hyperlipidemia and gastroesophageal reflux disease (GERD). The patient was transferred to Centralia on Protonix, a medicine for GERD, Norvasc, Lipitor, and Colace. There was no physician at Centralia. When he arrived at Centralia, the Protonix was not provided as a non-formulary form needed to be filled out. Protonix or its equivalent is extremely common and there was no reasonable excuse for not providing this medication or an equivalent. About three weeks after arrival at Centralia, the patient complained about his "heartburn" and asked for the Protonix that had been ordered. The nurse documented that a new order had been written. The patient had not been informed about how to pick up medication ordered as keep on person until seeing the nurse for this request and received the Protonix that had been ordered.

On 7/5/22, a nurse saw the patient for indigestion. The order for Protonix ran out on 6/11/2024. There was an order for Pepcid 20 mg daily that was to start when the order for Protonix ran out but no documentation was in the record that he received this medication. The nurse circled the line on the form that said, "call MD or refer urgently". This did not occur About three weeks later on 7/25/22 a nurse was to see the patient for a complaint of heartburn but the nurse wrote that the patient was already on the wait list. The absence of a physician at this facility was resulting in not addressing this patient's medical needs.

Finally, on 8/5/22, three months after arrival, at Centralia, the patient saw a provider who prescribed Prilosec. The patient was 55 years old and had not yet had colorectal cancer screening. Because of his abdominal complaint, a blood count and colonoscopy and/or FIT testing should have been done. For the complaint of repeated heartburn, an upper endoscopy and/or imaging study (e.g., CT scan) would have been indicated depending on the symptoms which were not obtained. These symptoms appeared to be present for some time as the patient had already been prescribed medication.

16

On 8/31/22 a nurse wrote on a progress note that the patient complained that the medication was ineffective but added that the patient was already seen for this problem and the patient was not seen. The nurse did not evaluate the patient. Because of the patient's repeated complaints, upper endoscopy should have been done but there was no physician at this site and he was not evaluated.

On 11/24/22 the patient complained of back pain and was referred to a physician but was not seen. On 12/4/22 the patient complained of back pain. A nurse saw the patient and gave acetaminophen by protocol without referral. On 12/29/22 a nurse saw the patient again for back pain and made a check on a box stating to refer to a physician if no improvement after 48 hours of trial of the treatment protocol. This referral did not occur until 4/12/23, four months later. On 2/8/23 the patient again complained of back pain. The patient's blood pressure was 160/91. The nurse did not retake the blood pressure or look to see if there were other elevated readings and despite the protocol's direction again did not refer the patient. The lack of a physician at this facility was significantly affecting care for this patient. Repeated back with abdominal pain should have resulted in a CT scan and possibly an upper endoscopy. These tests would have depended on specific symptoms but the patient did not see a provider.

A coverage physician, who does not meet Consent Decree credentialing requirements, saw the patient for back pain on 4/12/23, apparently based on the nurse referral from 12/29/23. The only history was that the patient had back pain for two weeks which is inaccurate. The patient had back pain for at least five months. The only examination was to document "weight stable". In fact, the patient had lost ten pounds the last two months. The assessment only repeated the patient's complaint of back and abdominal pain and the plan was an abdominal x-ray which is not an effective test to evaluate the patient's problems. A CT scan or MRI should have been done if an imaging study was deemed necessary; an endoscopy may also have been indicated depending on the history. But the history only repeated a chief complaint. This evaluation was not competently performed. The entire note is shown below.

> S: Patient is [with] c/o [chief complaint of] back pain. States [something illegible] past two weeks
> O: weight stable
> A: Back and abdominal pain
> P: KUB/lumbar

Two weeks later, on 4/20/23, a nurse again saw the patient for back pain which started when the patient had "stomach issues". The nurse wrote that the patient had recently seen a physician who had addressed the problem. The nurse used the non-specific discomfort protocol to give the patient acetaminophen when another protocol would have provided more appropriate guidance. The patient had complained of difficulty digesting food and the nurse noted a six pound weight loss since the physician visit. Despite documenting the loss of weight, the nurse's assessment was no weight loss. There was no referral to a provider. The lack of a physician at this facility was a barrier to appropriate care.

On 5/4/23 a nurse saw the patient for complaints of black/green soft stool which had been present for about a month. The patient also complained of loss of appetite. The patient weighed 189

pounds and had weighed 209 pounds on 2/8/23. The nurse noted the weight loss and also documented that the patient was unable to eat but wanted to. The patient was referred to a provider but had not been seen when three days later, on 5/7/23, the patient complained of abdominal pain in all quadrants with green loose stools. The patient also had nausea. The weight was 182 pounds which was a 27 pound weight loss. The nurse who saw the patient took no history of the patient's abdominal complaints and did not review the record. The nurse noted abdominal distention which by protocol requires contacting a provider but no referral was made. This patient should have been sent to a hospital.

On 5/10/23, a doctor saw the patient for inability to eat and weight loss. The patient had fever (100.5) and was tachycardic (104). The patient said he had diarrhea of light green stool if he ate. He had jaundice. There was no further examination. There was no assessment. An urgent consult for colonoscopy was made and multiple labs were ordered. The patient had weight loss, almost a year of abdominal pain, jaundice and fever. He should have been admitted to a hospital. Two days later, a nurse saw the patient for flank pain for a month. The patient had weight loss and fever. An on-call doctor ordered the patient sent to a hospital.

After arrival at the local hospital the patient was found to have significant CT scan findings as well as significantly abnormal laboratory tests and was transferred to a reference hospital where he was diagnosed with cholangiocarcinoma, a cancer of the bile duct. A stent was placed in the bile duct and the patient was discharged with a recommendation to see a cancer specialist within 1-2 weeks and for colonoscopy. It was unclear when this patient was referred to the specialist.[20]

When the patient returned to the prison, on 5/19/23, the nurse did not document receipt of a hospital report. A hospital report was present. An on-call doctor ordered Prilosec and the patient was sent to general population. The patient now weighed 177 pounds over a 30 pound weight loss. There was no evidence of a physician review of the hospital report within two days. Four days after return from the hospital a coverage doctor ordered a routine referral for colonoscopy but there was no authorization document for this referral although an authorization number was documented on the referral. This referral never occurred and was not present on the 1st and 2nd quarter offsite specialty care tracking log.[21] There was no provider referral to oncology but there was an authorization document that documented a referral to oncology was made 5/22/23 and was authorized on 5/23/23. Since there was no referral and no progress note documenting review of the hospital record by a provider, it appeared that this referral was made by the scheduling clerk. This referral was the only referral that was on the 2nd quarter specialty tracking log because it occurred. At Centralia only completed referrals are tracked. On 5/23/23 a coverage physician wrote a referral for colonoscopy but there was no associated progress note. There was an authorization number on the referral form but no authorization document from the vendor. This referral was not present on the 2nd quarter offsite specialty referral log likely because it was never completed.

---

[20] Even though this patient went to the oncologist on 5/24/23, the tracking log did not include a referral date so the tracking log is incomplete. The tracking log at Centralia changed over time. In the past it included when a patient was referred but the current log only tracks completed consultations and not referrals that never are completed. This is not a tracking log.

[21] Centralia, apparently, only tracks completed appointments which is inappropriate.

On 5/25/23 a nurse saw the patient and documented on a "return from furlough" form. This was apparently a consultation with the oncologist. In effect, a nurse was now providing post consultation review with assistance from phone calls with a coverage provider. There was no report but an after-visit summary documented "port placement needed please". The consultant's report was not present and the recommendations of the consultant were not documented in progress notes. The nurse did document receiving orders from the consultant for Zofran (an antiemetic), Ultram and Naprosyn (pain medication) stopping oxycodone, avoiding Tylenol, and a referral for a port for chemotherapy. There must have been some communication from the specialist but it could not be found in the medical record. The nurse documented going over the orders with the facility physician who was a coverage doctor. This apparently occurred over the phone. On the same day a coverage doctor wrote a referral to oncology for palliative chemotherapy and to surgical oncology for a port. Both documents had authorization numbers written on the referrals but neither had an authorization document. Neither the referral to surgical oncology for the port nor the referral back to oncology for palliative chemotherapy were on the 2nd quarter specialty tracking log[22] but the oncology appointment was on the 5/21/23 tracking log because it was the only one that occurred. This verifies that only completed consultations are placed on this log. A provider did not see the patient post consultation to review recommendations of the consultant with the patient or to update a plan of care. Nor was there a provider progress note to document review of the consultant's report.

The patient had yet to see a provider after hospitalization when on 5/27/23 security told a nurse that the patient was too weak to come for his medication due to vomiting. A nurse evaluated the patient who had "generalized weakness". There was no provider at this facility and the nurse's plan was to have the patient come to the health unit as needed. If the patient was too weak to come for medications how would he come to the health unit "as needed". This did not consider that a patient who had terminal cancer and was housed in general population was too weak to come to the health unit for his medication. This patient did not appear appropriately housed. The MAR had no documentation that the patient was offered Zofran, the antiemetic or Naprosyn, the pain medication. The Ultram was provided twice on 5/27 but there was no documentation of offering the medication on the 25th, 26th, or 28th. The following day, 5/28/23, a nurse evaluated the patient for jaundice. The nurse called an on-call physician who ordered the patient to a local hospital. The patient returned from the hospital on 5/31/23 on palliative care. The patient was confused. There was one brief nursing note on 6/1/23 stating that the mother was called to approve a procedure to withdraw fluid from the abdomen. There were no notes documenting care of the patient. On 6/5/23 the patient died, apparently in the hospital, although there were no facility progress note documenting where he died.

An autopsy was not performed. Symptoms of the patient's cholangiocarcinoma were present about a year before it was ultimately diagnosed. Despite long-standing complaint of both abdominal pain and back pain, there was no provider review of systems or history to attempt to identify the source of the complaint. Earlier intervention should have been done. While earlier intervention may not have resulted in a cure, five-year survival would have been improved. This patient likely died earlier than he otherwise would have, had timely intervention occurred. The lack of care provided to this patient appeared directly related to the lack of physician coverage at this facility.

---

[22] This was a combined log but had no information for specialty care for this time period. It does not appear that an accurate log was sent.

**Patient #3**

This was another patient from Centralia who was a 69 year-old man who was incarcerated in April 2022. At NRC the patient was identified with COPD and hepatitis C infection. Laboratory tests were abnormal including low albumin (3.2), an elevated liver enzyme (AST 58), a large quantitative hepatitis C virus, and elevated bilirubin (1.8). A fibroscan showed F4 fibrosis which is equivalent to cirrhosis. The laboratory tests added confirmation to a diagnosis of cirrhosis. On 5/3/22, a physician at NRC documented in a progress note that the patient was to be transferred to an emergency room for a work up for his hepatitis C; this didn't occur. The patient had criteria for cirrhosis and needed referrals for ultrasound to evaluate for hepatocellular carcinoma, and endoscopy to evaluate for varices and further treatment for hepatitis C and cirrhosis but urgent hospitalization did not appear necessary.

Nevertheless, the patient was transferred to Centralia where there was no full time physician. The only problem on the problem list was chronic obstructive pulmonary disease (COPD); hepatitis C and cirrhosis were not added. The hepatitis C and cirrhosis were unnoticed on the transfer likely to not being on the problem list. The patient with likely decompensated cirrhosis was not scheduled to be seen by a provider.

On 5/22/22, a nurse evaluated the patient using a venous insufficiency protocol likely because the patient had 3+ edema of the legs. This was likely a result of the patient's cirrhosis although heart failure would have to be ruled out. There was no evidence of kidney disease. The nurse referred to a provider and a physician assistant saw the patient on 5/25/22. The history was extremely brief and repeated the complaint of swollen feet with an added comment that the patient had not had swollen feet before. Except for documenting no cardiac history there was no review of systems relevant to swollen feet and the physician assistant did not review laboratory results which clearly indicated cirrhosis. The examination only included looking at the patient's ears which was related to another complaint of hearing difficulty. Ear wax was noted. The only assessment, based on listening to the complaint was COPD and foot swelling. Medication for his ear wax was given but the only plan for the swollen feet was to elevate the feet. This patient with cirrhosis had swelling likely due to his cirrhosis. The patient's abdomen should have been examined to assess for enlarged liver, enlarged spleen, and for ascites. A diuretic and beta blocker should have been prescribed. Referrals should have been made for hepatitis C treatment, ultrasound of the abdomen to assess for ascites and to evaluate the liver and spleen and to evaluate for hepatocellular carcinoma, and referral for upper endoscopy to assess for varices. None of these were done and the patient remained lost to follow up.

On 6/15/22 a non-credentialed coverage physician saw the patient in follow up of a hearing test but the physician documented that the patient was in clinic for follow up of treatment for his ear wax. This physician did not address any of the patient's other problems despite the lack of a physician at this facility. He noted persistent ear wax and ordered follow up in five days again after continued use of medication to dissolve the ear wax.

On 6/16/22 an optometrist referred the patient for cataract removal; this referral was authorized on 6/24/22. Another coverage physician saw the patient on 7/8/22 for the follow for his ear wax made on 6/15/22. Only the ear wax was addressed.

On 8/1/22 a nurse admitted the patient to the infirmary for 23 hours observation due to 3+ leg edema. An on-call physician ordered multiple labs, an EKG, and a chest x-ray. The EKG showed first degree heart block and was signed as reviewed by an on-call physician but was not dated when reviewed. By 8/2/22 the x-ray had not been completed and a physician had not seen the patient. The vendor Regional Medical Director was called who directed that the x-ray be read stat and if this couldn't be done that the patient be sent to an emergency room. The x-ray wasn't done. The patient was sent to an ER early in the day on 8/2/22. It didn't appear that the patient was evaluated at the hospital because an after-care summary documented that labs, an x-ray and EKG were done with a recommendation to follow up with a hospital physician in a day which did not occur. A nurse called the on-call doctor later on 8/2/22 who gave a telephone order for oxygen and a diuretic for seven days and the patient was admitted to the infirmary. The order for oxygen was incomplete and should have included the duration, mode of delivery and parameters for escalation.

At this point the patient was short of breath; the oxygen saturation was 88%[23] which warranted transfer to a hospital. There was no examination of the patient. The patient was not sent to the hospital-based primary care physician as recommended by the hospital despite there being no physician at this facility. The on-call physician made no diagnosis. A physician did not evaluate the patient; nor did nursing staff document daily evaluations while the patient was on the infirmary. Nursing notes were completed weekly or longer with the next documented evaluation on 8/7/22 when the oxygen saturation was 87%. The nurse did not call a physician. The next nursing evaluation was on 8/14/22 with an oxygen saturation of 86%. The next nurse visit was on 8/28/22 and the oxygen saturation had risen to 93%. This patient was not appropriately housed because the patient was on an infirmary without a physician present at the facility. During much of the month the patient needed hospitalization or transfer to another infirmary for physician care.

The stat chest x-ray ordered 8/1/22 was signed as reviewed by a coverage physician on 8/22/22 and showed chronic interstitial edema, COPD with volume loss in the right upper lung. The non-credentialed coverage doctor did not document seeing the patient. It was still unclear if the patient's edema was due to heart failure or cirrhosis and there was no evaluation of the patient. Laboratory tests ordered on 8/1/22 showed hypothyroidism (TSH 6.98), very low albumin (2.9), an elevated liver test (AST 49) and elevated bilirubin (2.2); the latter three tests indicating cirrhosis. A d-dimer test was high at 1.2 (normal 0..1-0.5); this test is used to exclude pulmonary embolism and when positive pulmonary embolism should be ruled out. These tests indicate that the patient needed higher level diagnostic intervention, but the patient was not referred to a hospital or for immediate diagnostic testing.

The patient continued to remain on the infirmary and was seen only by nurses intermittently and infrequently. This was contrary to IDOC administrative directive 04.03.120 that requires a physician to write an admission note to the infirmary and write weekly notes at a minimum. On

---

[23] The oxygen saturation value is dependent on the cause and personal history of the patient. This patient only had a diagnosis of COPD without history of prior exacerbations. With this history, hospitalization would be indicated particularly because there was no physician at this facility to evaluate or manage the patient.

9/4/22 a nurse documented that the patient's oxygen saturation decreased to 91% when walking. There was still no physician examination. The patient still had edema and was without a diagnosis for it. On 10/16/22 a nurse wrote in the plan to increase oxygen flow as needed with activity to keep oxygen saturation above 95%. The following week another nurse wrote in the plan to maintain oxygen saturation between 93-95%. Nurses are not legally authorized to adjust oxygen unless it is in the order. There was no such order.

On 10/5/22 the patient had a cataract removed. On 11/6/22 at one of the weekly nursing visits, the nurse documented that the patient had a blood pressure of 86/48 with an oxygen saturation of 93%. The nurse's plan was to increase water and salt intake to increase the blood pressure. If this patient's edema was due to his cirrhosis, this would likely make the edema worse. There was still no physician evaluation. Nurses were managing the patient's problems; these plans were beyond their scope of practice. The patient's blood pressure was at shock value and should have been evaluated by a provider promptly.

On 11/13/22 the oxygen saturation was 89% on three liters of oxygen. The nurse made no referral stating that his blood pressure had improved. The patient had been in the infirmary now for three months and had yet to see a provider. Patient outcomes are compromised when nurses are expected to manage patient care by telephone order only.

A coverage physician who is non-credentialed[24] finally saw the patient on 11/16/22 for follow up of COPD. The note was brief and did not include review of the record to identify abnormal laboratory tests including the prior chest x-ray and EKG. The entire note stated:
> "S: COPD
> O: no change in breathing status. Patient poor vision; bilateral cataracts
> A: COPD, cataracts
> P: Patient has scheduled treatments for eyes . No change in meds.

At this visit, the physician should have initiated a prompt diagnostic evaluation of the patient to include: 1) early referral for hepatitis C treatment, 2) a CT scan of chest (for COPD) and ultrasound of the abdomen to screen for cirrhosis and ascites; 3) spirometry and staging of his COPD; 4) testing for need for continuous oxygen therapy, 5) echocardiogram to eliminate heart failure as the cause of his edema, 6) monitoring of electrolytes since he was on Lasix without potassium, 7) upper endoscopy to evaluate for varices, 8) vaccinations for hepatitis B; 9) monitor the CBC, platelets, sodium, creatinine, regularly; and 10) monitor regularly for signs of encephalopathy and treat with lactulose as indicated. This physician failed to do any of these. He should not be practicing in IDOC as he doesn't have required credentials and practices in an unsafe and clinically inappropriate manner.

Another examination, this time an annual health assessment was by a non-credentialed physician on 12/7/22. The provider documented that the patient had no teeth but did not refer the patient to a dentist. The patient was not questioned about his ability to eat. The COPD was not evaluated, prior abnormal laboratory and diagnostic tests were not reviewed. There was no history and the only examination was that the patient had no teeth, had wax in his ears, and one illegible word

---

[24] The Consent Decree requires physicians to have completed training in a primary care residency which this physician did not have.

regarding his pupils. The COPD, cirrhosis, and hepatitis C which were paramount were not included in this pro-forma evaluation.

On 1/5/23 the patient had his second cataract surgery. The patient was admitted after the surgery to the infirmary. The admission note was completed by a non-credentialed coverage physician who took no history and conducted no physical examination. The only assessment was COPD and recent eye surgery. The plan was to continue oxygen intermittently at 2 liters but no directions were given for when to give the oxygen. The plan of care includes no post-surgical eye care directions, including medication. This again was unsafe and clinically inappropriate physician practice as none of the patients serious medical conditions were appropriately evaluated or managed.

On 1/27/23, a nurse called a physician at another facility about the patient's leg edema. The physician said he was "really behind" and to educate the patient to cut back on salt, and to elevate his legs. He also asked to have one of the non-credentialed physicians who were covering the facility see the patient in a few days. The patient wasn't evaluated for two weeks.

When the non-credentialed coverage physician saw the patient on 2/15/23 the history was swelling of his feet. There was no review of systems to identify why the patient may have had leg edema. The entire note was as follows:
"S: has feet swelling for [about] 3-4 weeks. Had swelling in the past and given diuretics.
O: 2+ edema bilateral legs
A: Discussed diuresis and stockings
P: Weekly weights, compression stockings, Lasix 40 mg po for five days; Labs: UA [culture and sensitivity], CMP [complete metabolic panel, a blood test]

It wasn't clear if the patient's edema was caused by COPD or cirrhosis and further diagnostic efforts were needed. Also, the patient should have been referred for treatment of his hepatitis C. This was an unsafe and clinically inappropriate evaluation.

Laboratory test results were abnormal and on 2/23/23, a nurse called an on-all physician who gave orders for potassium, a repeat urine culture and Tylenol. Three days later, the patient complained that he had skin broken down. The nurse noted a one centimeter ulcer on the bottom of the patient's foot. The patient's blood pressure was 87/49. His low blood pressure had not been evaluated by a provider. The nurse treated the wound with triple antibiotic ointment without an order or directions from a protocol. This is another example of a nurse acting outside their scope of practice in the absence of physician direction.

On 3/2/23 a nurse saw the patient for shortness of breath. The oxygen saturation was low (92%) and the nurse identified abnormal lung sounds. An on-call physician ordered the patient sent to an ER. At a local hospital the patient had pancytopenia with an extremely low white count (2.2), anemia (Hgb 13.3), low platelets (47,000), low albumin, and elevated liver function tests including bilirubin. A COVID test was positive. A CT scan of the abdomen showed ascites, splenomegaly, a lung nodule and possible cirrhosis. The patient was treated with prednisone and released two days later with recommendations to see an oncologist due to the pancytopenia and to see a

gastroenterologist (likely for his hepatitis C and cirrhosis) and for a follow up CT scan in six months. These referrals were not present on the 1st quarter offsite specialty log.

The patient returned to Centralia on 3/4/23 and the nurse accepting the patient did not document the hospital diagnoses did note the referral to oncology but not the referral to gastroenterology, or the follow up CT scan. There was no physician or provider admission evaluation. On 3/5/23 a nurse documented an oxygen saturation of 80% even after increasing the supplemental oxygen rate to three liters. The patient also had a fever of 102. An on-call doctor was contacted and advised sending the patient back to the hospital.

At the hospital, the bilirubin rose to 4.2 indicating worsening liver failure; heart failure was newly diagnosed. The patient became disoriented. A discharge summary written on 3/17/23 documented that both the patient and security staff told the hospitalist that the oxygen concentrator that the patient used needed maintenance for quite some time, implying that it was not working. The patient's diagnoses were COPD, decompensated hepatitis C cirrhosis, abdominal ascites, encephalopathy due to cirrhosis, chronic low white count and platelets, and COVID. The patient had completed a course of antibiotics and prednisone. The hospital identified a power of attorney (apparently a family member) who elected to transition the patient to palliative care due to his end-stage disease. The patient died prior to discharge from the hospital.

This patient was never seen in chronic clinic. He was cared for by nurses in the infirmary and was only seen by a provider four times in the eight months before his death. The four times he was seen, the encounter was inconsequential and did not address the patient's underlying clinical disease.

This patient did not have an autopsy. However, he appeared to have decompensated cirrhosis for almost a year without having been referred for treatment of his hepatitis C and without a therapeutic plan for his cirrhosis despite deterioration of his condition. The patient might have survived longer and would have suffered less if appropriate treatment had been provided.

## Patient #4

_Failure to manage the patient's dementia including appropriate housing ._

This patient was housed on the infirmary at NRC. This patient appeared to be incarcerated at NRC on 2/25/22. Intake records and medical records from February of 2022 until June of 2022 are absent. The patient was 64 years old. It was unclear, due to lack of records, when the patient initially began experiencing dementia. But the patient had dementia and was incontinent of urine and stool, combative at times, and was described on 7/1/22 by a physician as having, "no capacity to make decisions to protect his interests". Because the patient was under custody of IDOC, they were responsible for this patient. According to Illinois regulation[25] such a person requires assignment of a surrogate, consistent with the Surrogate Act, or for the Court to name a guardian. This did not occur. As a result, the patient was treated as if he were capable of decisional capacity

---

[25] (755 ILCS 40/) Health Care Surrogate Act

when he did not have that capacity. This was a significant failure to adhere to state regulation and to recognize the need of the patient to have someone make medical decisions for him.

IDOC consistently documented that the patient "refused" care including: eating, taking showers, cleaning feces off his body, and cooperating with evaluations. Though the patient at times didn't know where he was, thought it was 1923[26], hallucinated[27], talked to himself or people who were not present, he was treated as someone who had capacity to give a refusal. Examples include the following.

- A physical therapist did not perform an evaluation or give therapy because the patient "refused" service.
- Meals, medications, and hygiene services were often documented as "refused" and refusal forms were completed as if the person had capacity to make a decision to refuse. Sometimes, the refusal was documented as the patient "refused to sign"[28]
- In some cases, staff completing the refusal form knew that the patient was cognitively impaired and unable to make a decision yet would complete the refusal form as if the patient had capacity to do so. For example:
  - The patient was said to have refused evaluation of a pressure wound on 12/22/22 and a nurse documented that the "individual in custody unable to write or sign name or make an X due to cognitive decline".
  - On 8/22/22 a nurse documented the patient saying, "Get out of here. No get out of here… alligators" when attempting to clean the patient. He was described as having formed stool on the floor next to his bed and "smashed stool" on the mattress and ledge of the metal bed frame. The nurse documented that the patient, "will not sit up or consent to cuffing up to administer medications prescribed or to get into the room clean up feces". The nurse notified the medical provider of the patient's worsening "**noncompliance with care**". The "noncompliance" did not appear intentional and misrepresented the status of the patient.
  - On 12/21/22, the patient was described as having feces all over him. A nurse assistant cleaned the right hand and arm and the left foot but the patient refused further cleaning. Later, the patient refused a bath to clean the feces off and the nurse assistant documented on the refusal form that the "ind. In cust (individual in custody) unable to follow simple directions at this time" and "unable to sign [refusal] due to ↓ cognitive ability"[29]

This patient may have not cooperated with care or indeed said he didn't want care, but he had dementia and should have been treated in a manner to protect him, ensure his dignity, ensure he was safe, and provided assistance in a manner to accommodate his disability. IDOC needed to identify a surrogate so that safe and appropriate care could be provided. This was not done.

---

[26] The histories in the prison were not thorough, this history was obtained by a hospitalist during an 8/23/22 admission.
[27] The patient was described as having auditory and visual hallucinations and pressing a door bell that was not there on 9/21/22 by a nurse.
[28] As on 9/30/22 when staff offered medications and meals.
[29] 12/22/22 refusal for medical intervention and bathing in medical record.

IDOC does not have a medical classification[30] system that guides appropriate assignment of housing based on the patient's disability. This patient with dementia was housed in the NRC infirmary in isolation in a single cell with apparently a single window on the door. Based on the 2nd Court Expert's report in 2017, NRC had a 20 bed infirmary with 12 beds assigned to medical and eight beds assigned to mental health. At that time, the infirmary beds were nonadjustable and fixed to the floor. For most of the time during this record review, this patient's mattress was on the floor next to the bedframe and he slept on the floor. Nurses do not have direct visualization of patients on this infirmary. Although there is a call button next to the bed to alert the nurse of a problem, this patient may have been incapable of using this device due to his dementia. The result was that this patient was unobserved and kept in an isolated room, the equivalent of unobserved solitary confinement. Typically, isolation is known to promote advancement of dementia[31] and there is no literature supporting isolation as treatment for dementia. Yet, this patient was held in isolation for the entire nine months of record review without consideration that it may have affected his status adversely. Contact with other humans, as documented in the medical record was a few times a day when nurses provided medications or attempted to bathe or carry out ordered care. Food was provided several times a day but those encounters are not documented. The medical record documents two to three encounters a day. It is our opinion, supported by medical literature[32], that this type of structural isolation adversely affected this individual. IDOC has not developed safe housing for patients with dementia and the results are evident in the care of this patient. The Monitor has recommended, including in the Implementation Plan (items 64-70 of Implementation Plan) that a consultant evaluate and make recommendations to determine the needs of those with dementia, memory impairment, the aged, and other disabilities to determine their needs and provide recommendation for how their housing and programming can be improved. This has not been done.

Patients with dementia can have neuropsychiatric symptoms related to their disease including agitation, aggression, delusions, hallucinations, paranoia, wandering, disinhibition, and sleep disturbances which are observed in 60-90 percent of patients with dementia.[33] This patient appeared to have all of these symptoms. The reaction to these symptoms did not result in a medical intervention and in the absence of a medical plan of care was responded to with custody practices which was misplaced and unnecessarily cruel.

On 8/31/22, a nurse documented the patient saying "I'm going to break both your legs N…..! O: [objective section of note] patient standing at door threatening officer for no apparent reason. Cell door + chuck hole remain closed @ present. Unable to admin prescribed meds due to ↑ed agitation w/ aggression". This patient's aggression, which was likely due to his dementia and beyond his control, was addressed by isolation and solitary confinement.

---

[30] IDOC has no medical classification system. Medical classification is used in some corrections systems to identify classes of individuals to ensure housing and assignments are commensurate with their medical condition.

[31] Centers for Disease Control webpage "Loneliness and Social Isolation Linked to Serious Health Conditions". This page states that social isolation was associated with about a 50% increased risk for dementia and social isolation significantly increased a person's risk of premature death from all causes.

[32] The UpToDate section on Risk Factors for Cognitive Decline and Dementia, states that "social isolation may be a prodromal symptom of dementia, but growing evidence suggests that it may also be a risk factor for dementia".

[33] See UpToDate section on Management of neuropsychiatric symptoms of dementia.

On 1/19/23, a nurse documented that the patient, "occasionally come[s] to the window, yell and bang the window, urinate in the toilet, then go back to sleep".

The patient exhibited aggression which was overwhelmingly verbal and less frequently physically threatening. There were a few documented reports in the record of attempted and actual hitting of staff[34]. This is consistent with reports of aggression by elderly patients towards nursing home staff which are mostly verbal but can be physical[35]. This aggression is real and needs to be addressed for the safety of the staff. This patient's aggression was a result of his dementia which is a medical condition, and any restraint should have been addressed through medical authorization. Instead, restraints used for this patient were applied by custody and monitored by custody in response to a perceived security issue for which the patient was held personally responsible. The basis for the custody restraints was what a nurse described as "staff assaulter status". The management of this patient's aggression resulted in excessive use of custody restraints. Custody use of restraints for medical reasons violates National Commission in Correctional Health Care (NCCHC) standards and medical standards of care. When medical restraints are used, they must be authorized by medical providers, renewed daily, monitored frequently, used in the least restrictive manner, documented in the medical record each time they are used, and have clinical indications. With respect to medical restraints in dementia, UpToDate[36] states,

> "physical restraints are rarely indicated in the care of patients with dementia and should be used only for patients who pose an imminent risk of physical harm to themselves or others, with frequent evaluation of continued need. Reasons for the use of physical restraints must be documented adequately. …….. Before resorting to restraints, we refer patients to in-patient geriatric psychiatry programs."

IDOC completed a policy on medical restraints (I.05.01 Medical Restraints). The Monitor received the draft of this policy and procedure 8/23/23 and returned extensive comments and revisions to IDOC on 2/6/2024. IDOC elected to send out a manual of final policies and procedures, which included I.05.01 Medical Restraints on 2/9/2024. Therefore, the IDOC policy and procedure on medical restraints did not have any input from the Monitor. IDOC needs to consider the extensive comments that were provided on the draft during the annual review of this policy and procedure. Problems with use of custody restraint for medical purposes will continue. Examples of relying on custody restraint for medical purposes in the care of this patient include the following.

On 8/3/22 an emergency room doctor documented in his note that:

---

[34] The patient did apparently take a swing at a physician on 9/27/22. On 9/20/22, a nurse documented that the patient attempted to attack staff who were monitoring him. On 10/14/22, a nurse did document that the patient hit a nurse who was performing an evaluation. On 11/21/22, a physician wrote that he saw the patient in the presence of a custody staff and that he slapped the doctor's hand instead of shaking it. There is no question the patient's verbal aggression and actions (throwing food and trays as example) frightened staff and that there was verbal aggression and a couple of physical assaults.

[35] Lachs MS, Rosen T, Teresi JA, Eimicke JP, Ramirez M, Silver S, Pillemer K; Verbal and Physical Aggression Directed at Nursing Home Staff by Residents. J Gen Intern Med 2013 May: 28(5): 660-667

[36] UpToDate is a web based software that is a point of care evidence-based clinical resource used in many hospitals, HMOs and physician practices in the United States.

"per guards at bedside, patient seems to be at his baseline status. They do note that he has episodes of intermittent agitation and today required physical restraint **as well as Mace spray several hours ago**" (our emphasis).

On 8/17/22, a nurse documented that the patient asked to have handcuffs taken off. Apparently, the patient was shackled with cuffs behind his back for purposes of showering. The patient agreed to being cuffed with hands in front. The nursing plan on this date documented to continue under "staff assaulter status". The patient was treated as a cognitively intact prisoner who assaults staff (custody procedures) instead of as a patient with dementia who is aggressive (requiring medical management). There are no acceptable medical procedures for addressing aggression in demented patients, so custody practices prevailed. Medical providers conducted no evaluation to determine the appropriateness of this form of restraint. This was inappropriate, unethical, contrary to correctional and medical standards, and abusive.

On 8/31/22, the patient fell and the nurse went to the cell window to look at the patient. The nurse asked a lieutenant and the infirmary officer to open the door. This was done and the lieutenant directed the patient to sit down several times. The patient approached with clenched fists and the officers closed the door and no evaluation of his status after the fall occurred. The patient was left in his locked cell alone, after a fall with no clinical evaluation of injury.

On 12/22/22, a nurse documented that a tactical team came to the cell and shackled the inmate's hands and legs and placed the patient on a shower chair so the patient could be washed.

On 1/14/23, a porter witnessed the patient falling backward in his cell. The patient had an arm wound but when medical staff sat the patient up, he began having a seizure and he was laid back down. When assessed later, the patient began seizing again. A nurse called a provider who ordered the patient to the hospital. The patient was transferred to the hospital with leg irons and waist chains. This was present as a verbal order in the medical record. It is dangerous to shackle a patient who is at high risk for seizure as serious harm can occur.[37]

On 3/16/23, the patient was found unconscious with fixed pinpoint pupils. He was not responsive. He was transferred to the hospital in waist chains and leg irons. He was found to have massive brain bleeds and subsequently died. This use of restraints was also approved by a verbal order of a physician. The patient was unconscious after a head injury and to shackle him was clinically inappropriate.

Though the patient's dementia was considered a problem, the plan of action regarding dementia was not clearly documented and was ineffective. The patient should have had a neurocognitive evaluation by a neurologist who is trained to evaluate neurocognitive disorders. This was not done. One physician's notes typically included, as a plan, "if not better or any problem to notify nursing staff". This doctor had already identified that the patient was incapable of making medical

---

[37] In this case and the one that follows, medical staff agreed to shackling a person who may have been harmed by the shackling. IDOC must develop procedures for appropriate restraint of medical patients. Patients who have gran mal seizures have uncontrolled movements that are sudden and forceful. Shackling can result in harm- see Shackling in Hospitals from the Journal of General Internal Medicine at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8971251/

decisions due to severe dementia yet, the doctor's typical plan was for the patient to notify nursing staff of his problems. The patient was incapable of doing this.

Providers attempted to consult with psychiatry to develop a management strategy for this patient's dementia, aggressive behavior and agitation but there was no evidence in the record of this occurring for nine months until shortly before the inmate's death. Current policy and procedure provides no guidance on how to care for a person with dementia. Providers did not know how to manage this patient and attempted on two occasions to get help from psychiatry who did not provide consultation as requested. This facility did not have the capacity to manage this patient.

In one note on 8/9/22, a physician described consulting senior psychiatry staff regarding management of the patient. He stated,

> "I need direction from MH [mental health] Department how to manage this pt [patient] when he lost mental capacity to make decision to protect his own health and safety and safety of others because of uncontrollable violent aggressive behavior".

The doctor documented that mental health could not evaluate the patient because the patient could not give consent but noted that the mental health advice was not to use benzodiazepines because of "reciprocal agitation" and not to use haloperidol as well. The doctor explained to the mental health team that the patient was on clopidogrel and aspirin and the possibility of severe injury to his head existed and that he needed to either chemically or physically restrain the patient because of the risk of injury. The doctor did not have a plan for management of this demented patient's aggression, confusion, and agitation and saw the only solution as asking mental health for advice on chemical restraint.

There was no note by mental health based on the physician's request. But a day later, on 8/10/22, the same physician documented that care of the patient was discussed with mental health. A plan of care was not documented.

On 8/11/22 the same physician documented that a conference call with "regional" [presumably the regional Medical Director and administrator] and the Director of Nursing [unclear if this was the regional director of nursing or the facility director of nursing]. The doctor wrote the discussion was about, "IDOC [with] regard to proper safe placement. This placement [illegible word] will be addressed by IDOC". This appears to indicate that the plan was to place the patient in another facility or in a nursing home but the plan was not specifically documented and no such placement ever occurred. It is not even clear if IDOC was notified of this patient.

Seven months later, a psychiatrist eventually evaluated the patient on 3/14/23, at the request of a nurse after a fall to evaluate for the need of medication and programming. This was three days before the patient sustained an intracranial bleed after a fall that caused his death. The psychiatrist wrote,

> "It is appreciated that he is on a variety of medications including, but not limited to, Trazadone, PRN Ativan, and Donepezil. It appears that 12 of 56 available doses (last 14 days) were provided thus far of the PRN Ativan. Nursing notes are unclear for the circumstances that arose to result in the use of PRN treatment. However, nursing notes are clear in their indication of him having numerous falls including injuries to his head,

repeated bouts of incontinence and persisting cognitive impairment. Per my review of documentation, I saw an event on 2/11/23 where he kicked out at a nurse after becoming verbally aggressive and attempted to hit an officer as related to being put on a medical writ. He was subsequently taken by ambulance after a fall. On 2/4/23 he threw his empty tray to the ground after refusing to provide it to security. Though there was no report of further incident as he later complied to allow his room to be cleaned (to prevent falling). He is also noted to be experiencing poor oral intake and exhibiting poor hygiene despite attempts to help him. Primary care documentation suggests that reversible causes of neurocognitive impairment were ruled out to indicate this is likely an irreversible chronic disease process."

The psychiatrist noted no psychiatric problems and that psychiatry had no further recommendations except to state,

"infrequency of aggressive events as documented suggest that additional use of medications [the patient was on a benzodiazepine] to manage agitation are more likely to contribute to the worsening of his condition (cardiac risks, falls, etc.) and less likely to completely resolve all agitation. Ultimately, Mr. [deleted]appears to suffer from a chronic, irreversible condition that is likely to only worsen with time. He would most benefit from a higher level of care such as a nursing home placement with especially trained staff to manage his condition. The limits of a correctional setting and potentially worsening for cognitively impaired patients suggests ongoing residence here will likely only lead to worsening. At this point, psychiatry will move to PRN status and allow the primary care team to manage [patient's name] medical conditions and sequelae"

This was the same conclusion drawn previously in August 2022 but not acted on. Two days later, on 3/17/23, the patient fell again and sustained an intraparenchymal brain bleed and an acute on a chronic subdural hematoma. The dating of the initial subdural was uncertain. The patient was discharged back to the facility on 3/28/23 on comfort care only and died two days later.

*Hygiene and Toileting*

This patient, as early as 7/5/22, was documented as having disinhibition and problems with toileting. On that day a nurse documented that the patient had an accident going to the toilet with feces on the floor next to the toilet. There were numerous examples how this typical problem with hygiene in persons with dementia was handled in IDOC. The patient was frequently found with feces on his person and needed bathing. A scientific paper on bathing the aggressive nursing home patient states, "20-40% of residents [of nursing homes] with dementia exhibit aggressive or agitated behavior such as hitting, kicking, and screaming while bathing. Moreover, many residents remain upset for hours after the bath"[38]. While there are strategies for addressing this in nursing homes (as evidenced in the above cited article), in IDOC this behavior was viewed as a refusal to comply with a custody rule by a responsible and rational inmate. The response was to cuff, shackle, and force the patient to bathe by use of the tactical team or the patient was left soiled because he

---

[38] Gonzalo P, Prakash S, Qato DM, Sloane PD, Mor V; Effect of the Bathing Without a Battle Training Intervention on Bathing-Associated Physical and Verbal Outcomes in Nursing Home Residents with Dementia: A Randomized Crossover Diffusion Study, J Am Geriatr Soc 2014 May; 62(5): 797-804

refused to comply. This misapplied use of force redirects medical care to custody staff and is inappropriate.

On 8/22/22, a nurse noted that "cell covered [with] feces. Will attempt + encourage shower [with] security staff". A later note documented that the patient was confused and there was feces "all over the cell, toilet clogged with food and paper objects".

On 10/17/22, a nurse documented, "had a large BM on the floor. Feces seen on legs. Attempt made to clean him get a shower. He refused. Was combative with security. Refused to cooperate". The patient was left with feces in his room and on his person.

On 12/20/22, a nurse assistant documented, "remained in soiled pants from yesterday. Did not respond much to verbal req[uest]" and "cell still 2 mess c/o swept and removed trash. Will attempt H2O later & cleaning, total hygiene deferred, refused".

Later, on 12/20/22, a nurse documented the patient saying, "leave me alone, I'm showering on Christmas". Then the nurse added, " Tried multiple time with tact[ical][39] team to encourage patient to get in shower to remove stool that has been on him and he refuses to clean himself".

On 12/21/22 a nurse wrote that with unsteady gait the patient walked to the toilet and "dropped extra-large packed firm hard round ball of feces + additional soft stool + diarrhea runny type stool around top of toilet". On 12/22/22, a nurse documented that a tactical team came to the cell and shackled the inmate's hands and placed leg restraints and moved the inmate to a shower chair and the patient was washed.

On 12/29/22, a nurse documented that the patient refused a shower and the tactical team was called four times but they were busy. The nurse said the patient would be showered when the tactical team came.

On 12/30/22, a nurse documented that the patient had a shower with the emergency response and tactical team assistance through the commander in chief.

On 1/3/23, a nurse documented that the inmate was brought to the shower by an officer. The inmate had feces all over his back and hair.

On 2/1/23 at 2 am, a nurse assistant documented that the patient was "covered in his own bowel movement at arrival on shift. No vitals taken **per H.C.U. [health care unit] Sgt [sergeant]** due to security risk. No shower given **per Major**".[40] This patient remained covered in feces until twelve hours later when at 2:15 pm a nurse documented that the patient "was covered in feces with foul-odor". The nurse documented notifying the Major to activate the tactical team for the patient to be showered. The patient was removed and showered.

---

[39] Tactical teams are specialized units of custody staff used to typically resolve situations with high risk offenders related to searches or dangerous interactions with a violent inmate. In this case the tactical team was involved in getting the inmate to bathe which appeared to involve cuffing and shackling to enforce bathing.

[40] For a medical patient, custody must not be in control of hygiene issues, nor must custody be responsible for directing when vitals or hygiene are to be done.

This patient's care for hygiene and toileting qualifies as abuse and neglect based upon criteria in state regulation for the elderly.[41]

*Nutrition, and Feeding*

This patient had no upper teeth. On 10/14/22, a nurse documented that his teeth were in the toilet. The nurse did not describe retrieving the dentures. On 12/26/22 at 3 pm, a nurse documented that the patient refused his lunch tray as it was too difficult to chew with his upper false teeth. The nurse added in the plan section of the note, "have not seen dentures + pt does not take teeth out nor ever witnessed by this reporting nurse". It appeared that the patient no longer had his dentures. The patient attempted to chew a sausage link and threw it back on the Styrofoam tray. The nurse believed this was due to having a casing that was difficult to chew. The patient took his liquid boost supplement and the nurse documented that he had no food intake recorded except for the boost for five days. It would not have been difficult to have the patient open his mouth to assess whether he indeed had his dentures. Dental status is an important risk factor in community dwelling older adults for weight loss[42]. A referral to the dentist was not made.

The Consent Decree requires, "analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so"[43] but there was no effort to determine the nutritional status of the patient. Though OHS has told the Monitor that consultation by a dietician is available, no such consultation took place for this individual for the entire year of his incarceration. This patient should have seen a dietician to evaluate his eating pattern and nutritional status. Neither did providers order laboratory tests to evaluate the patient's nutritional status.

The patient's weight was not well tracked on the infirmary flow sheets. There were only three documented weights during this time period. The first weight was on 7/5/22 when the infirmary flowsheet documented a weight of 171 pounds. On that same day a nurse documented that since admission to NRC five months ago the patient lost 67 pounds. The nurse initiated an order for boost, a liquid nutritional supplement. The order was one can with each breakfast, lunch and dinner for 3 months.

The next weight was on 8/25/22 when the patient gained weight to 187 pounds. But mostly, the patient "refused" weights and no further weights were documented until 2/24/23 when a weight of 155 was recorded. The refusals of weights were sometimes accompanied by statements that the patient was unable or refuses to sign the refusal. An admission history and physical examination during the patient's final hospitalization on 3/17/23 documented a weight of 72.23 kilograms or approximately 159 pounds. If the patient had lost 67 pounds at a weight of 171 pounds, then from admission to NRC on 2/25/22 until 3/17/23, about 13 months, the patient lost 79 pounds.

---

[41] 720 ILCS 5/12-4.4a. This regulation addresses criminal abuse or neglect of an elderly person or persons with a disability and includes actions that cause a resident's life to be endangered, health to be injured, or pre-existing physical or mental condition to deteriorate or fails to perform acts that he or she knows or reasonably should know are necessary to maintain or preserve the life or health of a resident.

[42] Ritchie CS, Joshipura K, Siliman RA, Miller B, Douglas CW, Oral health problems and significant weight loss among community-dwelling older adults. J Gerontol A Biol Sci Med Sci 2000 Jul; 55)7): M366-71

[43] II.6.j of the Consent Decree.

Despite this degree of weight loss, there was no evaluation of his nutritional status. There were orders for liquid nutritional supplement beginning in July of 2022 and on 2/27/23 there was an order for a high protein, high calorie diet for weight loss with boost nutritional supplement - a can with each meal. And on 3/15/23, several days before the patient died, a physician ordered high protein diet to be pureed with shakes for each meal. Yet during the time period from July of 2022 until the patient's death in March of 2023 the patient appeared to have been fed like any other rational adult inmate with breakfast at 3:30 am, lunch at 9 am and dinner at 3 pm with an expectation that the patient could feed himself. Trays were apparently placed on the floor of the patient's room. These trays were frequently scattered about on the floor with food strewn about. Because this patient had significant dementia with confusion, hallucinations, delusions and aggressive behavior, feeding by placing food tray on the floor was likely to result in what actually happened which is the patient did not eat well.

On 12/19/22 a doctor documented that the patient had fallen while bending over presumably to pick up his food tray. On that day a nurse placed a table inside the patient's cell so that food trays could be placed on the table instead of the floor to prevent the patient from reaching to the floor to pick up his tray. The patient eventually threw the bedside table upside down. Yet the manner of serving meals as if the patient was rational continued and food continued to be found all over the patient's room. Nurses continued to document that the patient ate very little of the food served. No one considered, given the patient's dementia, whether a different pattern of feeding, including different timing of meals, was needed.

This patient lost approximately 67 pounds over 13 months of incarceration. Health care staff were unable to develop an effective plan to provide nutrition to the patient especially in light of the patient's dementia and concomitant disabilities. No nutritional consultation was obtained. Not providing appropriate nutrition also qualifies as neglect and abuse.

*The patient was not evaluated or monitored by providers for his medical conditions.*

The available record provided for this patient began in late June of 2022 about four months after incarceration. During the nine month period of provided record, the patient had no chronic clinic appointments. Though current policy requires chronic infirmary patients to be seen weekly, this did not consistently occur. Physician notes were documented weekly from 6/21/22 to 8/11/22. Then not for two weeks. Physicians saw the patient three times in September. The patient wasn't seen in October. The patient was seen three times in November and four times in December. From 12/28/22, when a nurse practitioner saw the patient, until 2/14/23 the patient was not seen despite two hospitalizations and three falls. The 2/14/23 provider note was related to seeing the patient post-hospitalization after a fall. After the 2/14/23 provider note, a provider didn't see the patient again until the patient fell on 2/24/23. The last time a provider saw the patient was 2/27/23. A provider did not see the patient again despite a fall on 3/1/23 and an unwitnessed fall on 3/6/23 during which the patient sustained a black eye. The patient had another fall on 3/17/23 after which the patient was found prone on the floor and was hospitalized with diagnosis of multiple brain hemorrhage likely from a fall. The patient died three days after return from the hospital. In total, the patient had twelve falls that were documented for the six months from 6/29/22 until 3/6/23.

For four of these falls, the patient was sent to a hospital. For only three of the remaining eight falls did a provider evaluate the patient. There was no specific documented fall prevention plan.

None of the provider notes included evaluations that monitored all of the patient's medical conditions. A doctor's note from 6/29/22 documented that the patient had coronary artery disease with prior stents, heart failure, cardiomyopathy and dementia. There was no problem list. On 11/15/22, a physician documented that the patient had coronary artery disease with multiple stents, heart failure, atrial fibrillation not on anticoagulation, hypertension, diabetes, gout and recent development of dementia. There was no objective evidence of gout. Another doctor evaluated the patient on 11/21/22 and documented coronary artery disease with stents, cardiomyopathy, atrial fibrillation, type 2 diabetes, hypertension, COPD and recent GI bleed and UTI. Despite acknowledging these conditions, there was no meaningful monitoring with an updated assessment of each of these medical conditions by these providers. Only episodic concerns were noted and evaluated.

Much of the information related to the patient's medical conditions came from hospital notes. On 1/3/23 the patient was hospitalized and diagnoses listed at the hospital included:
1. Erosive gastritis with GI bleed
2. Dementia
3. Prior stroke
4. Coronary artery disease with stents
5. Hypertension
6. Atrial fibrillation
7. Anemia
8. Hyperlipidemia
9. GERD
10. Diabetes
11. Ischemic cardiomyopathy with heart failure.

Through the entire nine months of record available, there was minimal monitoring of these conditions except when the patient went to a hospital. The dementia was noted regularly by nurses and even providers, but there was no effective plan of care for the patient's daily needs. The patient's diabetes was not monitored at any clinic visit. A hemoglobin A1c was 5.9 on 7/6/22 and the patient was on 1000 mg of metformin twice a day, an antidiabetic agent. Providers should have considered decreasing the dose because the A1c was low but this was not done until more than five months later on 12/19/22 when the dose was decreased to 500 mg twice a day. There was no repeat A1c or evaluation of status of his diabetes.

From June, 2022 to 3/16/23, the patient was sent to the hospital eight times. Of these eight hospitalizations, there were only three full reports. An additional hospitalization had an emergency room note. For five hospitalizations there was no provider review after return from the hospital. For one hospitalization a provider saw the patient on return but the hospital report was not in the record and there was no documentation of review. In a final hospitalization, there was no documentation of the review of the hospital report.

*Failure to manage medications*

This patient's medications were typically managed without evaluation of the patient. From 7/5/22 until 3/8/23, 53 prescriptions were written. Forty-four were for medications and nine for other orders. Some of these were for the same medication at different doses. For only seven of the 53 prescriptions was a progress note present when the provider ordered the medication with only five of these seven being conducted when the patient was evaluated. It appeared based on the writing on the prescription that 21 of the 53 prescriptions were written by nurses. In only 31 of 53 prescriptions could the provider be identified due to illegibility or, in a few cases, absence of a signature. In summary, this demonstrates that providers take no responsibility for ensuring prescriptions are appropriate.[44]

In February of 2023, the patient was on 14 medications. Avoiding adverse drug effects is important in caring for the elderly and particularly in persons with dementia. A key aspect of dementia management is to acknowledge the adverse effects that medications can contribute to cognitive impairment. It is recommended to periodically review the patient's drug regimen, use the minimal dose required to obtain the necessary clinical benefit, discontinue unnecessary therapies, and consider adverse effects as a cause of symptoms before prescribing another drug[45]. This did not occur. The patient was on multiple medications which in combination can cause adverse effects which mirrored some of the patient's symptoms. For this reason, all of the patient's medications should have been reviewed (with adverse drug reaction software or ideally with a clinical pharmacist) following which the primary care provider should have discussed medication benefits and risks with the surrogate and discontinued unnecessary medications.

Paramount in this discussion is that a goal of care was not defined for this patient. This patient had advanced dementia and was confused, sometimes knew who he was but was otherwise not oriented to time or place. He could not communicate rationally any longer. It was unsafe for the patient to be alone or to walk alone. The patient was totally dependent on others for eating dressing and grooming. And, the patient had severe anxiety, aggression, confusion, and agitation. Perhaps he should have been considered for hospice? If so this should have been discussed with his surrogate. However, IDOC never identified a surrogate and failed to have any discussion about what plan of care would offer the most benefit and least harm in his remaining life.

For two medications, there was no clear indication. From June of 2022 through March of 2023 providers prescribed albuterol but there was no evidence on the medication administration record (MAR) that the patient ever received albuterol. The reason for a prescription for the albuterol was unclear as the patient had no medical conditions that warranted this medication. Though this medication was continuously prescribed and was on the medication administration record, no one recognized for nine months that the patient hadn't used the medication nor had it been offered to him.

---

[44] IDOC has multiple providers including coverage doctors who are not typically assigned to a facility. Some of the providers giving phone orders are unfamiliar with the patient and this can result in errors. In this patient, he was on medications without indication, was on several medications that were potentially harmful, and on combinations of medications that resulted in potential for adverse reactions.

[45] This is taken from UpToDate Management of the patient with dementia.

The patient was on allopurinol, presumably for gout, but there was no clinical evidence for gout and the patient was not being monitored for gout. Allopurinol has an FDA indication for gout but not for asymptomatic hyperuricemia[46] which this patient had. The patient had a uric acid of 9.2 on 7/6/22. This qualified as asymptomatic hyperuricemia. The patient did not have evidence of gout, had no monitoring of the serum uric acid, and no evaluations of joints to assess whether he had gout. It was unclear why this patient was receiving allopurinol.

The patient was on an anticoagulant drug, clopidogrel. However, given the patient's dementia and fall risks, use of this drug was risky as it can cause serious intracranial bleeding if the patient falls and the patient had fallen 12 times. The risk of bleeding from falls should have been weighed against the risk of thrombosis and myocardial infarction and the use of this medication should have been discussed with a cardiologist and with the surrogate. The patient ultimately died of multiple (subarachnoid and intracerebral) bleeds after falls.

Lorazepam has many adverse reactions, including amnesia, drowsiness, and sedation. It has a potential to cause disinhibitory reactions that include sleep disturbance, hostility, rage, agitation or **aggressive behavior.** It is advised to use with caution in debilitated patients. Older patients have increased risk of death *with the risk highest within the first four months of use in older adult dementia patients. It also carries a fall risk. Extreme caution is urged when used in patient who are at risk of falls. Benzodiazepines have been associated with falls and traumatic injury.[47]* This patient appeared to be on lorazepam for agitation and aggressive behavior. The risks to the patient were exacerbation of agitation and aggressive behavior,[48] and falls. This patient had 12 falls from 6/29/22 to 3/16/23 with the last fall causing his death. Use of this medication was not carefully monitored. Lorazepam should not have been prescribed.

This patient was in a facility that did not have appropriate space, staffing, equipment, or expertise to house this patient. There are currently no policies, procedures or programs to manage persons who need total care and/or have dementia. The facility failed to identify a surrogate to ensure someone could make a medical decision regarding his care. Nurses did not have medical direction with respect to how to bathe and feed the patient and defaulted by seeking custody's help that resulted in use of tactical teams who used cuffing and shackling to wash the patient. Custody probably did the best they could, but the patient should not have been managed by these practices. The patient should have been managed medically, but there are no procedures for the care of this type of patient. The intent to move this patient to another facility was never acted on but would have been appropriate. Placement in a nursing home would be an acceptable option for this patient. If IDOC intends to care for these types of patient in the prisons, appropriate space, procedures, programming and staffing must be available to provide medically acceptable care. The Monitor has previously recommended and continues to recommend that in order to identify the appropriate space, procedures, programming and staffing necessary to care for this population, that IDOC consult with a gerontologist and retain a consultant to evaluate the needs of the aged, infirm and disabled and develop a report to include findings and recommendations. Based on those

---

[46] Typically, gout is diagnosed when a patient has an elevated serum uric acid level and symptoms of gout (painful swollen joints typically the joints in the feet). This patient had apparently asymptomatic elevated uric acid which did not warrant treatment. Notably, the condition wasn't even monitored.

[47] These warnings are taken from UpToDate medication profile for lorazepam.

[48] Notably, this was the reasons that psychiatrists at NRC recommended not using the drug.

consultation recommendations, IDOC must develop a plan to address those needs. The Monitor is willing to provide recommendations for a gerontologist and consultant if the IDOC desires.

## Patient #5

This 51 year-old man with history of diabetes, hypertension, and high blood lipids was housed at the Hill facility. When he was incarcerated in 2004, he was five foot seven inches tall and weighed 267 pounds. On 6/14/22 a nurse practitioner saw the patient for a syncopal episode that occurred 5/30/22. An EKG was not obtained. At this time, the patient had 37 pound weight loss which was unrecognized. A CBC was ordered and was 10.4 which is significant anemia. Because the patient was 51 years old, endoscopies should have been ordered urgently but were not. Instead, when seen in follow up on 6/28/22, the nurse practitioner assessed anemia and ordered omeprazole and three stool guaiac tests. This was substandard care because regardless of the three stool guaiac tests, endoscopies should have been ordered. The patient had history of fatigue and dizziness for five months with heartburn and weight loss. While guaiac testing was indicated, upper and lower endoscopy should have been ordered as urgent tests.

On 8/12/22 a nurse practitioner saw the patient and noted that he had negative hemoccult tests. The nurse practitioner still did not refer for endoscopy but ordered iron studies and a metabolic panel. Iron studies confirmed iron deficiency which indicates blood loss and a kidney function test suggested chronic kidney disease (GFR 58 and creatinine 1.48). No further action was taken.

The patient wasn't evaluated again until a chronic clinic on 9/19/22. The provider documented weight loss ( 33 pound  loss since the last chronic clinic visit). Though the patient had a GFR test that indicated chronic kidney disease, this was unrecognized. There was no assessment or plan for the weight loss or possible chronic kidney disease. The iron deficiency anemia was not addressed. Endoscopies and a CT abdomen should have been ordered.

On 9/23/22 a nurse practitioner saw the patient in follow up of the iron studies which were not evaluated at the recent chronic care visit. The nurse practitioner remarkably assessed iron deficiency anemia but only reordered iron therapy with a recheck of the CBC and iron panel in three months. This is substandard care. There was no ongoing physician oversight at this facility for the entirety of this patient's care.

At a subsequent chronic clinic visit on 12/7/22, a 48 pound weight loss was unrecognized. Though the patient's incarceration weight was 267, his weight of 219 was likely not perceived as abnormal. The anemia was not addressed and the abnormal renal function was still unrecognized. A follow up blood count on 12/28/22 still showed iron deficiency anemia and was signed as reviewed by a nurse practitioner but no action was taken. This is below standard of care.

On 2/19/23 a nurse saw the patient for abdominal pain. The patient complained of abdominal pain for a year and hadn't had a bowel movement in two days. The weight was now 202 or a 65 pound weight loss. The nurse noted a palpable lump in the patient's abdomen. The nurse referred to a provider but the patient was not seen for unstated reasons and was rescheduled on a second occasion. This rescheduled visit never occurred.

On 3/20/23, a code 3 emergency was called because the patient felt like he was going to pass out. A nurse called a nurse practitioner who ordered blood tests. The following day a nurse practitioner saw the patient and, finally, nine months after the patient developed anemia, after a year of abdominal pain, development of an abdominal mass, and considerable weight loss, ordered an urgent endoscopy and colonoscopy.

This review tracked referrals from 3/21/23 to 8/25/23 during the time period from when his diagnosis was made until he received the 1st cycle of chemotherapy. There were 22 completed offsite visits over this period of time. These 22 visits were completed in the first three quarters of 2023. The 1st, 2nd, and 3rd quarter offsite specialty care tracking logs were examined and only four (18%) of the 22 appointments were on the logs. Referrals are not entered into the log when the referral is requested but only when they are completed. Appointments that are never completed or referred but not scheduled do not show up on the log. This section of log shows how disorganized the log is at this facility.

Of these 22 referrals, there was a referral form found in the medical record for 16 of the 22 referrals. Referrals for a total of six visits had no name for the referring provider; this gave the appearance of the medical record scheduler scheduling patients without a referral from a provider. This suggests that medical records is managing referrals. There were full consultant reports for only six (27%) of 22 referrals; five (23%) referrals had no report except for a patient instruction after-visit summary; three (14%) referrals had no report except for comments by the consultant on the referral form; and eight (36%) referrals had no report. There was no documentation of any efforts made to obtain the reports. Of the six reports received, none was initialed or signed as reviewed. The tracking log does not track whether the provider evaluated the patient post visit and had an informed discussion about the consultation with an update of the therapeutic plan. Of the 22 completed referrals, seven (22%) had no provider visit with the provider mentioning the offsite visit. Post-visit provider encounters did not consistently provide informed care. The results of the consultation were inconsistently discussed and providers inconsistently documented an assessment of the patient's ongoing problems at that visit with respect to his overall care and therapeutic plan. At none of the visits were all of the patient's problems documented and addressed.

This patient had multiple referrals documented as being approved in collegial review which the Monitor has been told no longer exists. For a referral on 7/19/23, a physician documented that collegial review approved multiple oncology appointments. For another referral, on 8/3/23, a physician wrote that the iron infusion treatments were approved in collegial review. On 10/12/23, the same physician documented that a CT scan was approved in collegial review. On 11/2/23, the same physician documented that a follow up oncology appointment was approved in collegial review. On 11/9/23, the same physician documented that an MRI of the shoulder was approved in collegial review. On 11/30/23, the same physician documented multiple appointments were approved in collegial review. IDOC needs to clarify why physicians still refer to collegial review if it is not supposed to exist.

Reports were often not reviewed and essential information not obtained. After the patient had initial colonoscopy, the report and biopsy results were not obtained. The colonoscopy showed colon cancer and the biopsy suggested mucinous colon cancer. In the absence of a report one nurse

practitioner documented the patient had gastric cancer for three consecutive months when the patient actually had colon cancer. Almost two months after the diagnostic colonoscopy, the Medical Director also documented gastric cancer.

Documentation of post-specialty visits often merely noted that the patient went for a scheduled appointment but not important issues related to the patient's care. On 8/10/23, two days after the 1st chemotherapy session on 8/8/23, a nurse practitioner saw the patient . Two day before, nursing notes describe the patient complaining of dark brown vomit and blood in his stool. An earlier note on 8/7/23 documented that the patient had decreased appetite and hadn't eaten in four days except for his boost supplement. Yet the nurse practitioner did not address the patient's recent vomiting and the decreased food intake with respect to the possible additional effects of chemotherapy. Prognosis and "do not resuscitate" status were discussed but there was no discussion about the effect of the chemotherapy on his well-being and the add on effect of chemotherapy to his recent vomiting.

This patient's specialty care was notable for failure to refer the patient when he had anemia for about a year. The specialty referral process was disorganized and chaotic. Referrals were not found. Referrals are not tracked. Key consultations (e.g., for initial colonoscopy) were not reviewed and resulted in providers not knowing the actual diagnosis of the patient for months. Chemotherapy did not begin for four months after diagnosis in part due to necessity to obtain higher level consultation but there were some delays in scheduling. It appeared that the medical records scheduling clerk was actually managing the patient's care. Providers did not appear to be directing the scheduling of appointments.

The provider notes, which were almost exclusively by nurse practitioners, did not include a thorough assessment with a plan of care for each of the patient's problems. The diagnosis of the patient wasn't known by facility staff for a couple months because no one obtained the pathology reports. Updates from the oncologist were not documented in the progress notes of providers.

On 8/19/23, during the time when the patient was receiving chemotherapy, a nurse saw the patient using a dizziness/vertigo protocol. The patient had fever (102.8), tachycardia (113) and low blood pressure (94/60) and the nurse described him as "unsteady" when walking. This was at 6:55 pm. Given that the patient was on chemotherapy, a provider should have evaluated the patient and a white count should have been obtained and the patient examined for signs of infection. The blood pressure was very low, given his history of hypertension, and combined with fever, he should have gone to an emergency room for evaluation. Instead, the nurse didn't contact a provider, and the patient was instructed to limit activity if dizzy, avoid standing quickly, and to eat properly with adequate fluid intake.

On 10/13/23 a nurse practitioner documented that DNR was discussed with the patient but that the patient was apprehensive about signing because his sister was health care power of attorney and was telling him not to sign. The patient's pain was not controlled and the nurse practitioner documented willingness to increase morphine but that the patient must be DNR first due to risk of respiratory depression. The nurse practitioner should have consulted a pharmacist and the Medical Director as the patient had been on this dose for approximately six weeks without problem and incremental increases in dose would typically be safe. It gave the appearance that the nurse

practitioner was steering the patient to sign a "do not resuscitate" order using additional pain medication as a benefit. Because the patient said his sister was a health care power of attorney there should have been some attempt to contact her as this patient had a poor prognosis. This was not done. Health care power of attorney issues are recurrent.

On 10/17/23 the oncologist saw the patient and the plan was to continue with chemotherapy. The oncologist documented that the patient had pain intensity of 10 and ordered multiple x-rays to assess the cervical spine and left shoulder to assess for metastatic disease and to evaluate the pain. The same day but after the oncologist visit, a facility nurse practitioner witnessed a physician order for life sustaining treatment (POLST) in which the patient elected only comfort care This is the equivalent of hospice and means that further care except to give comfort is not provided. Despite signing a comfort-only POLST, full care continued to be provided as the patient was rescheduled for oncology and chemotherapy. The oncologist was not made aware of this decision of the POLST. Pain medication was increased for the patient by doubling the dose. The medication should have been gradually increased and titrated to the pain. Doubling the dose suddenly placed the patient at risk for overdose.

On 10/31/23, the oncologist saw the patient as verified by a report in the record. This visit was not recorded on the 4th quarter tracking log. The oncologist documented that chemotherapy was held due to low blood counts. The oncologist documented the disorganized facility scheduling saying, "incidentally, CT that was ordered to have been done before cycle 9 (11/14/23) was scheduled by the facility and done on 10/18/23. We will give them a call, request they pay closer attention to dates and times". At this visit and at subsequent visits until 12/19/23, the oncologist was unaware that the patient had signed a POLST as the facility did not communicate the POLST to the oncologist. The POLST was signed without contacting the power of attorney. End of life care remains problematic.

On 12/5/23, the patient vomited waiting for transfer for his oncology appointment and, after consulting with the oncologist, the patient was admitted to a local hospital but then transferred to a regional hospital. The weight at the facility while waiting to transfer was documented as 163 pounds or almost 100 pound weight loss. At the hospital, the patient had bowel obstruction that was not deemed to be not surgically correctible. The patient was started on hospice. The patient had already signed a POLST for comfort-care-only which is equivalent to hospice with respect to not desiring further care not related to pain and comfort management. The facility agreed to accept the patient back to the prison. This was the second time that the patient was made comfort-care only. The patient was sent back to the prison on 12/12/23.

On 12/11/23, the facility Medical Director gave a verbal order for a 50 microgram fentanyl patch every 72 hours and "morphine injectable I.V. 1 mg [every] 4 [hours] [as needed]".

On the following day, 12/12/23, the facility Medical Director wrote another prescription for "morphine concentrated SL 473 ml (four hundred seventy three ml) 4 mg/ml, 4 ml [every ] 4 [hours] as needed breakthrough pain x 30 [days]". This prescription was confusing as the precise dose desired was unclear. Because it was morphine, it should have been questioned. . The Medical Director wrote no accompanying progress note. The pharmacy did not document a problem with this prescription which is shown below.



Also, on 12/12/23, the facility Medical Director signed a verbal order documented by a nurse for a 50 mcg fentanyl patch to be changed every 72 hours and for morphine sulphate 4 mg/ml inject 1 mg every 4 hours. This was the 2nd prescription for a fentanyl patch. The medical record should clearly document when a medication is ordered, discontinued, or when a duplicate prescription is to be ignored. This did not occur. There were two active prescriptions for fentanyl patch.

On 12/12/23 a nurse practitioner also wrote a prescription for morphine 100 mg/5ml: 1 ml every four hours prn until morphine comes in. The order was unclear because the patient already had multiple active morphine prescriptions and it was not clear which morphine prescription was being waited for.

On 12/13/23 the facility Medical Director wrote a prescription to discontinue the injectable morphine, (there were two active injectable morphine orders) and to start morphine 100 mg/5 ml: 1 ml orally as needed. This was the second prescription for the morphine 100mg /5ml. The Medical Director left out the frequency of the medication and a nurse later added every 4 hours to make the order sensible. The was no documentation in progress notes or in prescriptions as to how these duplicate prescriptions orders were corrected.
On 12/15/23 the facility Medical Director wrote a prescription for MS Contin 60 mg extended release twice a day.

There were no orders to discontinue these medications except the injectable morphine. The pharmacy should have asked for clarification on all of what appear to be duplicate orders. The narcotic orders on the MAR were handwritten. There were  no pharmacy labels for the morphine prescriptions so the handwritten MAR was the only verification of active prescriptions for this patient. There was no documentation in the provider progress notes that described the plan with respect to how much morphine was expected to be given. Provider notes did not include all of

patient's medication. The duplicate prescription orders without stop orders and absence of clarification documented in subsequent orders or in progress notes speaks to a significant communication problem between providers, nurses, and pharmacy. This is a patient safety risk. In the electronic record, the pharmacy profile should be the document that is the active list of medications. The MAR should accurately reflect the pharmacy record. No medication should be on the MAR that has not been approved by a pharmacist. The pharmacy must be able to promptly review prescriptions and indicate whether the medication can be administered. Nurses initiation of medications on the MAR must be eliminated. Errors in the current medication process need to be corrected before the electronic record goes live. The consulting pharmacists at SIU should be involved in making these corrections. .

On 12/13/23 the patient was described as having 10/10 pain and was upset at having his oral pain medications discontinued after he returned to the infirmary post hospitalization. On 12/15/23 the patient described 8/10 pain; the nurse told the doctor and nurse practitioner about his uncontrolled pain. After this point the patient was less communicative but there were no references to pain. The patient fell on 12/17/23. The facility Medical Director was notified but there was no provider follow up.

Although this patient was in hospice he was sent back to the oncologist on 12/19/23. If the patient was in hospice why was an oncology visit necessary? The oncologist documented that the patient wanted a compassionate release from prison to be with his family. He was very anemic and the oncologist recommended a transfusion to make the patient strong enough so as to see his family. The transfusion was ordered and completed. The oncologist documented the patient's pain was reasonably well controlled but said that the medication list sent with the patient did not appear up to date.

On 1/5/24 a nurse practitioner discussed medications with the patient due to "some confusion". The nurse practitioner did not list the medications nor was the "confusion" explained . On this date the medication administration record documents that the patient was on magnesium, phosphorus, iron supplements, a variety of anti-nausea and antacid or gastric reflux medications, fentanyl patch, lorazepam, morphine sulfate 20 mg every four hours and MS Contin. The total dose of morphine was approximately 360 mg a day which is a high dose. It was not clear from documentation whether this dosage was intended. Provider notes do not include a list of medications with doses, so the multiple providers caring for the patient would not know the total panel of pain medications.

On 1/10/24 the patient fell in the bathroom but was not examined by a provider. On 1/15/24, the patient asked why he couldn't call his family. There was no effort to accommodate his request to communicate with family.

On 1/15/24, the patient fell again. The facility Medical Director didn't respond to a call so the nurse called the Regional Medical Director who recommended "fall prevention" and to monitor the patient. It was unclear what fall prevention meant. Later that day, the patient told a nurse how hard it was for his family and that he didn't understand why he couldn't call his family. There was no effort to enable the patient to have a telephone call with his family. This seems unnecessarily cruel.

The Medical Director wrote a renewal for the fentanyl patch on 1/16/24. However, the MAR documents that the patch was not changed as scheduled on the 16th because the backup pharmacy was out of stock.

The facility Medical Director saw the patient that day and documents that the patient's abdomen was firm and tender but that the patient's pain was controlled. It does not appear that the Medical Director was informed that a new patch could not be obtained and the problem with pain medication was not addressed.

On 1/19/24, a nurse practitioner wrote that the patient was struggling to swallow pills even with water. Instead of giving IV medication, the nurse practitioner wrote in the progress note to change MS Contin order to crush and place sublingually and to give the morphine sulphate liquid every two hours. This should have been reviewed with a pharmacist but was administered for five days without any pharmacy oversight and the order was handwritten on the MAR. A Food and Drug Administration (FDA) alert warns in bold capital letters

> MS CONTIN TABLETS ARE TO BE SWALLOWED WHOLE AND ARE NOT TO BE BROKEN, CHEWED, DISSOLVED, OR CRUSHED. TAKING BROKEN, CHEWED, DISSOLVED, OR CRUSHED MS CONTIN TABLETS LEADS TO RAPID RELEASE AND ABSORPTION OF A POTENTITIALY FATAL DOSE OF MORPINE.[49]

The patient was given nine doses of crushed MS Contin between 1/19/24 and 1/24/24. At 4:20 pm on 1/19/24, the patient fell and was found sitting on the floor after attempting to go to the bathroom.

On 1/23/24, at 8 am, a nurse documented still giving the crushed medication and described the patient as lethargic. On 1/22/24, the patient was described as incontinent of urine and nonverbal. The HCUA documented that the patient was declining and notified the family and a family visit was approved by the Warden but at this point the patient was not able to effectively communicate. A fentanyl patch was received 1/24/24. The patient died on 1/26/24.

This patient was 45 years old on 9/17/17. The IDOC had promulgated cancer screening recommendations in January of 2021. The Monitor's 4th report, issued 9/16/21, documented that the USPSTF recommended that patients should start colorectal cancer screening at age 45. Despite the USPSTF recommendations and promulgation of a IDOC policy on colon cancer screening in 2021, the patient was not screened for colon cancer. He was identified on 6/28/22 with anemia (Hgb 10.4) and had an unrecognized 37 pound weight loss. Yet, he didn't have a definitive biopsy identifying colon cancer until 3/28/23. The delay in work up of this patient makes this a preventable death.

**Patient #6**

---

[49] FDA Alert as found at https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/019516s034lbl.pdf

This patient was 52 years old when he received an annual periodic history and examination on 11/8/22 at Hill Correctional Center. He smoked two packs per day for forty years; thus, he had an 80 pack year of smoking. Lung cancer screening, based on USPSTF guidelines and IDOC guidelines[50], was indicated but not performed. At the annual periodic history, he complained of a chronic cough which was not followed up by any history. The patient had underlying asthma. His weight was 209 pounds and had been 221 pounds at a chronic clinic 5/26/22 only six months earlier. There was no assessment or plan for the cough.

On 12/23/22 an LPN saw the patient using a cough protocol. The patient's weight was 195 pounds or a 26 pound weight loss since 5/26/22. The blood pressure was 149/88 but the LPN did not retake it or put the patient on blood pressure checks. The weight loss was not identified. The elevated blood pressure was ignored. LPNs should not be performing sick call evaluations.

On 1/5/23, the patient was evaluated in chronic care clinic for asthma. He complained of a chronic dry hacking cough and using his albuterol inhaler more frequently because he didn't have his Alvesco inhaler. The patient also weighed 209 which was a 12 pound weight loss since his chronic clinic in May of 2022. No further history of taken of this complaint even though cough is a symptom of asthma. No history was taken regarding frequency of inhaler use either. PEFRs were 270 and 260 and the assessment was intermittent asthma which is inconsistent with the PEFR values or with being on two inhalers. A history was not taken sufficient to make an assessment of intermittent asthma. The nurse practitioner seeing the patient started Singulair, a third asthma drug but this third drug did not appear indicated if his Alvesco was renewed. The weight loss and chronic cough were not addressed.

On 4/13/2023 the patient was seen by a nurse using the protocol for upper respiratory infection. The 22 pound weight loss the last 12 months was not identified as a problem by the nurse at this encounter. On 4/17/23 a nurse evaluated the patient using a cough protocol. The patient had cough for at least six months. The blood pressure was 155/92. For both of these nursing protocol visits, the second page was missing. However, there did not appear to be a referral to a provider as there was no subsequent provider note.

On 7/10/23, the Medical Director saw the patient in chronic care clinic. The history was that the patient denied shortness of breath or dyspnea on exertion but complained of chronic cough for a year that was non-productive. No further history was taken. The PEFRs were 250/300/350. Blood pressure was 133/90 with pulse of 107. The patient was documented as mild persistent asthma in fair control though the patient was on two inhalers and montelukast (Singulair). Being on three asthma drugs is consistent with moderate asthma not mild persistent asthma. The MAR for July shows that the patient hadn't been provided montelukast since March 16th which meant that the patient was not using montelukast for the past three months. This was unnoticed. Notably, the patient didn't receive montelukast again until January of 2024 even though it remained an active prescription. This drug may have been unnecessary but was not being monitored. The PEFR tests were inconsistent with the diagnosis. Spirometry should probably have been done given the persistently low PEFR tests. The weight was 174.8, a 37 pound weight loss over approximately 14 months. Neither the persistent cough nor the weight loss were investigated; the weight loss

---

[50] The Monitor's 4th Report, on 9/16/21, noted that OHS developed a draft guidance on preventive screening that included lung cancer screening in line with the USPSTF.

wasn't even acknowledged. Though the patient was 53 years old he was not screened for lung cancer. A 6-month follow up was ordered. A chest x-ray was ordered, but there was no evidence that the chest x-ray was done. There was no follow up to check on the failed x-ray.

On 10/12/23, a nurse evaluated the patient using a cough protocol. The nurse documented that the patient had the cough for over a year. The weight was documented as 194 which still indicated weight loss of 36 pounds since incarceration. ***The patient told the nurse that he wanted cancer testing regularly and hadn't had labs or a checkup in 10 years***. He stated his memory is bad and he forgets his glasses . He asked to be checked for forgetting things but the nurse did not evaluate this concern. Instead, the nurse "educated" the patient on "getting older / △ in memory". No referral was made for a year-long complaint of a cough with weight loss which would have been evident if the nurse had reviewed the patient's record. The nurse did not respond appropriately to the patient's request to be screened for cancer, or his memory loss and refer for evaluation.

On 10/16/23, the patient fell and hit his head and a nurse evaluated the patient using a non-specific discomfort protocol. The nurse documented that the patient fell on the steps and the nurse presumed it was due to not having his glasses. A provider did not evaluate the patient after the fall. Falls are not normal and a better history and assessment should have been done. This was especially true since only four days previously, the patient had complained of memory issues. The non-specific discomfort protocol should be discontinued; its continued use is dangerous.

On 10/19/23, a nurse evaluated the patient using a cough protocol. The nurse noted that the patient complained of 2-3 years of cough since the COVID epidemic. The blood pressure was 143/93 and the weight was 192 which was a 32 pound weight loss since incarcerated and 29 pound weight loss since May of 2022. Though this patient had multiple episodes of complaints of cough, the nurse did not refer to a provider and gave cough syrup based on protocol. ***A week later on 10/26/23, the patient requested a "full physical"***. A nurse told him that this would be done around his birthday without asking why he wanted a physical examination.

On 11/1/23 a nurse evaluated the patient using a non-specific discomfort protocol for right leg and shoulder pain. The patient had the pain described as 6-7/10 for several weeks. The blood pressure was 147/55, which is elevated, and the weight was recorded as 187. The nurse documented the patient as limping, stuttering and slow to answer. He had to be asked 4 times to obtain his weight and had a blank look on his face and described significant memory issues lately. The patient thought he was in Chicago. Though the patient had new onset of altered mental status and symptoms of stroke the nurse scheduled the patient for a physician follow up the following day. But after the examination the nurse brought the patient into the nurse practitioner's clinic room because of stuttering and dragging his leg. The nurse practitioner documented that the patient was speaking normally, had facial symmetry, no drift and normal straight leg raising. Based on this brief and incomplete neurologic examination the NP concluded that the examination was "normal" and wrote to follow up PRN. The NP took no additional history.

The next day, on 11/2/23, at 12:53 pm the facility Medical Director evaluated the patient for "stroke like symptoms". The patient was confused and had symptoms of decreased sensation in his right leg for 2-3 weeks. The doctor noted confusion and difficulty speaking. The patient had difficulty ambulating. The doctor sent the patient to the ER in an ambulance. Higher level

attention was provided a year after the patient complained of chronic cough. This cough may have been present for a longer period of time because only a year of medical record was provided. The weight was 192 pounds so the patient had lost 29 pounds since May of 2022.

The hospital diagnosed lung cancer metastatic to his brain and locally to lymph nodes, to the adrenal gland, and to areas around the lung. A large brain metastatic tumor was resected. The patient was confused and had expressive aphasia before leaving the hospital. Before the patient left the hospital, he had a signed a power of attorney.

Hospital instructions documented medications as Tylenol, dexamethasone, Voltaren, docusate, Norco 1 every 6 hours, loratadine, montelukast, pantoprazole, and senna. A follow up with neurosurgery was scheduled for 11/27/23 for suture removal and a post-op follow up on 12/8/23. Dexamethasone was a new order to reduce brain swelling after the surgery.

On 11/14/23, the patient returned from the hospital. The Medical Director at the facility wrote the infirmary admission note. The only history was post craniotomy for a tumor. This was an inadequate history. There was no explanation of what kind of tumor the patient had, how it affected the patient, the hospital course, the current status of the patient, or the follow up plan for the patient except for a follow up with the surgeon and to take sutures out. The only neurologic examination was that the patient was alert and oriented and had normal eye movements. The confusion noted the day before at the hospital wasn't confirmed or mentioned. The current condition was documented as "stable". The admitting diagnosis was "S/P craniotomy", and the only plan was regular diet, to ambulate as tolerated, and refer for suture removal and surgical FU. There was no review of the hospital record; no indication whether the patient needed radiation therapy or oncology follow up; no mention of prognosis and advanced directives nor of the power of attorney signed at the hospital; and no history related to current pain status or mention of a plan for pain. This was not an informed note.

The referral system was dysfunctional. There were eight completed offsite specialty visits after hospitalization and one duplicate referral. The duplicate referral was documented on the referral log as completed twice to the same consultant. Of the nine visits documented on the log the date of referral was accurate only for one referral. For seven of the referrals, the dates of referral were when the patient was in the hospital. Three of the referral forms used to request the referral were sent to the wrong consultant. One referral form meant for a radiation oncologist was sent to the medical oncologist. Another referral for the medical oncologist was sent to the radiation oncologist. Another referral for a PET CT scan was sent to the radiation oncologist. The log was disorganized and inaccurate and handling of referral forms was disorganized.

Only four of the eight unique appointments included a full report. Two appointments had no report but did have brief comments on the referral form. One appointment had no report but had an after-visit summary. One appointment had no report and no information.

Post visit evaluations by a provider with the patient were not thorough and demonstrate the episodic nature of IDOC follow up and its dangers. The first appointment was on 11/27/23 with the surgeon. This was reviewed by a nurse practitioner at Hill with the patient on 11/29/23 and the biopsy report was discussed. This was an informed follow up. However, the therapeutic plan with

future appointments were not documented or discussed with the patient. All of the patient's problems were not listed in the follow up encounter note.

The second visit was on 11/30/23 with the radiation oncologist. There was no report but there were comments on the referral form which was not signed as reviewed. The radiation oncologist recommended an ultrasound to rule out a deep vein thrombosis and a staging PET CT scan. There was no post-visit evaluation and the recommendations for a PET CT scan and ultrasound were unnoticed.

The third visit on 11/30/23 was with a medical oncologist. There was a report which also included recommendations for a PET CT scan. This report was signed by the Medical Director as reviewed on 12/27/23, about a month after the consultation. There was no post-visit evaluation by a provider. The recommendation for a PET CT scan went unnoticed. On 12/1/23, a medical records clerk documented that the PET CT scan was cancelled because a CT scan had already been done on 11/31/23. This was inaccurate.

The fourth visit was on 12/4/23 with radiation oncology. This consultation included a report. Notably, the referral form for this visit was for a combined 11/30/23 oncology visit and for a PET CT scan which was requested to be scheduled for 12/4/23. The referral form had comments from the radiation oncologist that were not signed as reviewed. The radiation oncologist again asked for a PET CT scan and an ultrasound to rule out a deep vein thrombosis. There was a full report that was not signed as reviewed but it recommended an ultrasound to rule out deep vein thrombosis and a PET CT scan. A nurse practitioner saw the patient 12/6/23 in the morning on infirmary rounds and documented making a referral for an urgent ultrasound to rule out DVT but a referral form was not found in the record. At this appointment the nurse practitioner did not examine the patient's leg to assess whether it was swollen. This should have been done and if there was evidence of a deep vein thrombosis the patient should have been sent to an emergency room immediately. The nurse practitioner also documented a referral for a PET CT scan but this referral was not found. The nurse practitioner did not list all problems in the assessment nor was there a plan for all problems. This was an ineffective post-consultation visit that placed the patient at significant risk because the nurse practitioner did not examine the patient's leg or refer the patient immediately to an emergency room.

The fifth visit was to radiation therapy on 12/6/23 but there was no report. There were comments on the referral form again asking for an ultrasound and PET CT scan. There was no in-person provider follow up to this visit. But on 12/7/23, the urgent ultrasound referral was discussed in collegial review. The Monitor has been assured that collegial review has ended but this episode makes it appear as if it is still continuing in some fashion.[51]

The Medical Director documented that a PET CT and ultrasound would be scheduled but details weren't given regarding when they would be scheduled. The recommendation for DVT was initially made on 11/30/23. A 7-day delay in evaluating for a deep vein thrombosis in a patient with cancer is dangerous. The Medical Director did not see the patient and no one from the facility

[51] Also, on 11/16/23, a physician documented that an oncology appointment was approved in collegial review. If collegial review has ended, the vendor should explain these repeated documented references to collegial review.

evaluated the leg for deep vein thrombosis since the recommendation was made. This was a major error in follow up. If the patient needed an ultrasound to rule out deep vein thrombosis, it should have been done immediately and to go through collegial review and schedule this electively was incompetent care.

The sixth and seventh visits were on 12/8/23. The patient had two appointments; one with the radiation oncologist and one with the neurosurgeon. There were no reports for either appointment, but there was an after-visit summary for the neurosurgeon and there were comments on the referral form to the radiation oncologist. The neurosurgeon recommended an MRI in follow up. The after-visit summary also included appointments apparently scheduled at the hospital for a PET CT scan on 12/21/23 and an ultrasound scheduled for 1/16/23. Someone unknown scheduled urgent appointments for two weeks later for the PET CT scan and a month and a half later for the ultrasound. The PET CT scan should been done a week ago and the ultrasound should have been done on 11/30/23 so a 1/16/23 appointment was dangerous. These scheduled appointments were not on the offsite tracking log. There was no provider follow up of this visit. The level of disorganization with tracking, scheduling and following up of offsite appointments is chaotic and dangerous.

The second appointment on 12/8/23 (seventh visit) was with the radiation oncologist. There was no report for this visit but there were comments on the referral form. Those comments stated that the patient had his 3rd radiation session. There was no provider follow up of this visit.

The eighth visit was on 12/11/23 to the radiation oncologist. There was a report but there was no referral form. The report recommended again the PET CT scan and the ultrasound. There were three copies of this report in the record but only one was signed as reviewed on 12/12/23.

On 12/12/23, a technician performed an onsite ultrasound; this was about two weeks after it was recommended by radiation oncology. This was an urgent test that should have been done on 11/30/23 the day of the consultation. At 2:09 pm a nurse practitioner documented that the technician said there was a deep vein thrombosis. The nurse practitioner called the Medical Director who gave a phone order for Eliquis 5 mg BID. This is not a standard starting dose and was an error. The patient began vomiting at 4 pm and by 8 pm vomited bright red blood. The nurse tried to call the facility Medical Director who did not respond and voicemails were left. After several more attempts the nurse called the vendor Regional Medical Director who ordered the patient sent to an ER.

At the hospital, the patient was diagnosed with deep vein thrombosis and pulmonary embolism. The patient was sent to a higher level hospital and remained hospitalized for two weeks developing atrial fibrillation and sepsis. When the patient was discharged the hospital recommended a palliative care consultation for hospice. IDOC does not have a consultant who provides palliative care consultation. A formal discharge summary was not in the medical record.

When the patient arrived back at Hill on 12/26/23, there was no summary of the hospital course or expected plan of care. A nurse documented that the Medical Director would see the patient the following day, which did not happen. Instead, a nurse practitioner saw the patient on infirmary rounds on 12/27/23. The nurse practitioner did not document that the patient had just spent two

weeks in the hospital. The hospital record was not reviewed and problems were not identified which included: opacification of the left lung with deviation of the trachea, anemia, deep vein thrombosis and pulmonary emboli, non-small cell lung cancer with brain metastases, hypokalemia, atrial fibrillation, and difficulty swallowing. There was no assessment of pain. There was no acknowledgement that the hospital recommended a palliative care consult for hospice. The nurse practitioner documented a plan that reflected the plan before the hospitalization which was to schedule a follow up with oncology and to await the completion of the PET scan. A palliative care consultation should have been ordered. There was one further nurse practitioner evaluation while he was incarcerated which similarly failed to appreciate the futility of further treatment and failed to initiate palliative care.

The patient had a power of attorney in the record, but provider never contacted the person to establish a plan for the patient.

On 1/4/23 the patient had seizures and was unresponsive and was sent to a hospital. The hospital called a nurse practitioner at the facility to ask about a power of attorney. The HCUA told the nurse practitioner to call the Warden but the Warden didn't answer. The HCUA told the nurse practitioner to fax the power of attorney that had been previously filled out during an earlier hospitalization. The patient apparently died in the hospital.

This patient was over 50 with significant smoking history that warranted lung cancer screening. He did not receive this even though he had an annual checkup on 11/8/22. He had multiple episodes over the next year complaining of cough; only once was a chest x-ray ordered but it was not completed. He also was gradually losing weight so that over the course of a year he lost 36 pounds. He was not sent for a diagnostic evaluation until he couldn't walk, had central nervous system symptoms of inability to articulate speech correctly and was confused. Widely metastatic lung cancer was identified. This death was potentially preventable with early screening. The failure to act on the radiation oncologist's recommendation for ultrasound demonstrated a broken specialty care program and resulted in harm to the patient that hastened death.

## Patient #7

This patient was a parole violator initially incarcerated at Menard on 1/13/23. He had initial blood tests done four days after intake that included an alkaline phosphatase that was very high (430 with normal 40-125). This test is significant and requires follow up with diagnostic testing that if done likely would have resulted in earlier diagnosis. A provider documented review of the test with a note to repeat it. On 1/27/23 the patient was transferred to Vienna.

The vendor Regional Medical Director reviewed the laboratory test and documented on the laboratory result that the patient should be scheduled to see an on-site provider. But there was no regularly assigned provider at Vienna since the Medical Director position was vacant.

On 1/31/23, a coverage physician, who is not credentialed, saw the patient and documented that the patient was to be seen for an abnormal lab result. He took no history and performed no examination. He noted that the laboratory test had not returned. The plan was "awaiting repeat lab". The laboratory results should have been obtained from UIC. A history should have been

taken related to possible reasons for an elevated alkaline phosphatase. A follow up clinic visit to evaluate the laboratory test at a later date was not done. This was unsafe and clinically unacceptable care and resulted in a significant delay in diagnostic follow up of this abnormal laboratory test.

On 4/21/23 the patient was diagnosed with COVID and had consistent tachycardia for six days when monitoring stopped. A coverage doctor was called and discharged the patient from quarantine. The six days of tachycardia were unrecognized and not followed up.

Six months after transfer to Vienna, on 7/15/23, security sent the patient to the medical unit for evaluation for leg swelling. A nurse evaluated the patient using an abdominal pain protocol. The pulse was high at 115, the blood pressure was high at 159/97 and the patient had bilateral leg edema with a distended abdomen with emaciated face and arms. The nurse called a provider who sent the patient to an emergency room.

The local emergency room sent the patient to a higher level hospital. The reference hospital diagnosed adenocarcinoma in the colon with metastases to the lung and liver. Ascites was present. The cancer was far advanced and only palliative chemotherapy was planned. The patient had very low serum sodium. The hospital recommended oncology follow up in a week. The discharge summary noted, "Patient is currently incarcerated in Illinois which will make some of his follow up difficult and will need to be done prior to getting out. Needs follow up with local oncologist at discharge".

On the last day of hospitalization on 7/20/23, the Director of Nursing became involved in coordinating and apparently referring the patient for specialty care. At 2:30 pm on the day of discharge from the hospital, the DON from Vienna talked to a nurse at Deaconess oncology. The original plan for the patient was for interventional radiology follow-up on 7/24/23 to insert a chemotherapy port and with an oncology appointment on 7/26/23. The DON added that she "followed case closely and established pt outpatient visit to F/U and initiate treatment plan on July 26th at 11:30 am at Deaconess Oncology Center Will advise of this furlough appt." This involvement of the Director of Nursing in directing referral for specialty care was likely due to an absence of a physician at this facility.

On the same day, a nurse practitioner from Vienna CC talked to a nurse practitioner from the hospital oncology service. The hospital nurse practitioner said that the patient couldn't get a port because the pathology report wasn't completed. The nurse practitioner from Vienna said she would arrange cancer follow up at SIH Cancer Center, which is in Illinois and close to Vienna CC. The nurse practitioner made a referral to SIH on this date. There appeared to be two different oncology plans for the patient.

Neither the Director of Nursing referral nor the nurse practitioner referral was in the July offsite specialty tracking log. On 7/20/23 the patient returned to Vienna where there is no infirmary and no physician. This was an unsafe placement for this patient. This patient needed a higher level of care than could be provided at Vienna CC.

The first provider visit after return from the hospital was on 7/21/23. The nurse practitioner took little history; only that the patient had abdominal pain. The hospital discharge diagnoses were metastatic colon cancer, liver metastases, lung nodules, ascites, anasarca, tachycardia, and non-sustained ventricular tachycardia. The patient was discharged on Vantin, an antibiotic for presumptive subacute bacterial peritonitis and furosemide 40 mg daily for ascites and anasarca. But the provider at Vienna did not acknowledge any of the problems identified at the hospital and the only assessment was "hospital follow up" which is a task, not an assessment. The provider did not document what medications the patient was on and did not have a plan for any of the hospital diagnoses except the cancer for which the nurse practitioner documented a referral to SIH cancer center. Baseline laboratory tests should have been ordered.

A coverage physician, without credentials, evaluated the patient on 7/24/23. The note was extremely brief. The pulse was **140** which was not acknowledged as abnormal. The only history was "Had liver bx + colonoscopy". The objective examination portion of the note documented. "was to get a port but it has been rescheduled". This is not an examination. There was no review of the hospital note. The physician's assessment was post-hospitalization with a diagnosis of cancer with metastases. None of the other diagnoses were documented or reviewed. None of the patient's medications were noted. The plan was to continue observation care. There was no documentation of a specific therapeutic plan for this patient. Follow up labs were not ordered. The physician also should have investigated when the port would be placed and should have ensured the patient was referred for oncology consultation. The port should have been placed urgently. This note was devoid of any assessment or plan for any of the patient's problems.

The Director of Nursing arranged with the furlough officers to take the patient to Deaconess Hospital on 7/24/23 for the port placement. When the furlough officers arrived, they were told that no appointment was scheduled. The hospital then offered to reschedule the patient but the Director of Nursing after discussion with the nurse practitioner at Vienna wrote, "decision was made to continue with local care at SIH Cancer Center". The Director of Nursing contacted Deaconess and cancelled the existing appointment with the oncologist at Deaconess. It appeared that the Director of Nursing was directing specialty care. The coverage physician who was present at the facility that day was not involved. Clearly, the role of coverage physicians is not to act as a Medical Director.

There is documentation in progress notes on 7/26/23 that the patient had another appointment at Deaconess on 8/1/23 at 8:45 am with oncology and a second appointment at 9:30 am with interventional radiology. The documentation is not signed.

On 7/26/23, a nurse described the patient as emaciated which term was used in several other notes. There was no indication what diet the patient was on and a dietician consultation was not obtained.

A non-credentialed coverage doctor saw the patient again on 7/31/23. The note was extremely brief, did not address all of the patient's problems and focused on the patient signing a do not resuscitate form. The note read:
    "S: "OK considering the circumstances. Eating. + emesis, + nausea.
    O: has extensive metastatic cancer,
    A: Will need to sign a DNR.

P: DNR has been signed"

Given all that had occurred with this patient and the flurry of failed offsite appointments, this physician should have written a more comprehensive note. The patient had requested a Joe Coleman release earlier that day with the HCUA but the doctor did not discuss this with the patient. The POLST form, signed by the patient and physician, documented that the patient requested to be resuscitated and asked for full treatment. The physician's labeling this POLST as a "DNR" is misleading. None of the patient's problems were addressed. Nor was any attention given to offsite scheduling and the physician did not document an oncology plan of care.

The patient went to Deaconess on 8/1/23 and saw an oncologist. There was no documentation of a referral from Vienna providers to oncology, only to interventional radiology for a port placement. The oncology visit was not on the offsite specialty tracking log. At this visit, the patient was tachycardic and had elevated white count so the oncologist sent the patient to the ER and from there he was admitted to the hospital. He spent a week in the hospital and received the first cycle of chemotherapy. The after-visit summary documented that a follow up appointment for chemotherapy was scheduled for 8/23/23. The patient was discharged from the hospital on 8/8/23.

Remarkably, on 8/2/23, when the patient was still in the hospital, a nurse practitioner from Vienna wrote a referral to the oncologist at Deaconess for chemotherapy. This was the same nurse practitioner who referred the patient to SIH oncology. The scheduled appointments for this patient were not clearly documented in either the offsite specialty tracking log or in progress notes of providers. Care was episodic and specialty care scheduling was chaotic and dysfunctional.

When the patient returned to Vienna from the hospital on 8/8/23, he was placed in an observation cell. Vienna had no physician and no infirmary and should not have been used to house this patient as he was bedridden and dying of cancer. . It appeared that an error occurred with respect to discharge medications from the hospital. The discharge medications included levothyroxine but there was no evidence that could be found in the hospital record that the patient had hypothyroidism. In fact, the patient had nearly continuous tachycardia which is an adverse effect of levothyroxine. When the patient returned to the prison, he started to receive levothyroxine despite no clear diagnosis of hypothyroidism. The order for the levothyroxine was made by phone without the physician seeing the patient and without acknowledgement of tachycardia (118) which levothyroxine can exacerbate. This order did not apparently go through the pharmacy as the MAR was hand written and without pharmacy labels. This event should be brought to the attention of the SIU medication process group to evaluate how the patient could be on a medication without a diagnosis. This patient had multiple episodes of subsequent tachycardia but the association with the levothyroxine was not examined.

The first provider note after return to Vienna from the hospital was on 8/9/23. The nurse practitioner did not review the hospital notes nor was a plan of care initiated based upon what had occurred at the hospital. The nurse practitioner documented that the pain was "the same" but didn't document an assessment of pain control. No additional pain medication was ordered. No labs were ordered. The nurse practitioner did not question why the patient was on levothyroxine which was a newly recommended medication by the hospital nor was the patient's rapid pulse (108) noted. The nurse practitioner did not even mention that the patient had been hospitalized for a

week. The hospital discharge paperwork, including the discharge summary was initialed as reviewed by the same nurse practitioner but the findings or recommendations from the hospital were not documented in a progress note. There was no assessment of the patient and the only plan was to elevate his legs for his edema. There was no documented plan for the patient's oncology care.

On 8/11/23, the patient went to the SIH Cancer Center. This was the only referral listed on the Vienna offsite specialty tracking log. The oncologist noted what had occurred at Deaconess Hospital and discussed options for the patient. The patient elected to receive further palliative chemotherapy and this was planned. A specific appointment day was not given. The patient's blood pressure was 146/102 and the oncologist recommended lisinopril.

On 8/11/23 the patient was allowed to call his father in the HCUA's office and was tearful. This appears to have been the only contact the patient had with his family in the time between his diagnosis and death.

By 8/16/23 the patient's weight had decreased to 162 pounds a 23 pound weight loss. A nurse called an on-call physician and got an order for boost, a nutritional supplement. A nutritional consultation would have been appropriate.

On 8/20/23 the patient complained of dizziness and being short of breath. His pulse was 138, respirations 32 and the oxygen saturation 77-84%. An on-call physician was called and ordered the patient sent to the emergency room.

At the hospital, the patient's status was changed to palliative care and the patient died in the hospital on 8/24/23.

This patient had an abnormal laboratory result that was unrecognized for seven months. The laboratory result implied that the patient likely had metastatic liver disease. It is uncertain what effect earlier diagnosis would have had on survival. However, the patient was only 40 years old and wanted aggressive care. This was not provided to him because of the delay in diagnosing his cancer. The referral process at Vienna is dysfunctional and chaotic. The documentation of referral and specialty care is extremely difficult to follow in the record and contributes to the fragmentation of patient care. The tracking log is completely unreliable and does not track referrals or appointments. Physicians play no part in managing patient referrals. The nurse practitioner and Director of Nursing appeared to be managing referrals but were not coordinating their efforts. The absence of an engaged, responsible physician was evident.

## Patient #8

This 46 year old man was incarcerated at Graham on 10/12/23 and gave the screening nurse a history of right shoulder issues, headaches, and back pain. The provider performing the health assessment took no history. The second page of the health assessment was missing. The problem list includes hypertension not on medication, a right shoulder "issue" which was not further clarified, headache and neck pain.

On 10/31/23 a nurse saw the patient for shoulder pain and used the non-specific discomfort protocol. The patient weighed 148 pounds and was 5 foot 10 inches tall. The nursing note was not understandable; it stated that the patient had a facial grimace and "S/R dislocated shoulder MC [with] 1/2 ago". Other than noting there was no edema or discoloration the nurse did not check the patient's range of motion, strength, or alignment. The nurse did not inquire about any impact on activities of daily living or elaborate on the relationship between the reported dislocated shoulder and the discomfort he presented to sick call with. The nurse gave ibuprofen by protocol.

On 11/1/23 a physician assistant wrote an illegible note.

On 11/9/23 a registered nurse issued the patient 10 tablets of 400 mg ibuprofen without documenting an examination or use of a protocol. This nurse was practicing outside of scope.

On 11/12/23 a registered nurse responded to a code 3 at 4:30 in the afternoon and evaluated the patient using a non-specific discomfort protocol. The patient had intermittent right shoulder and chest pain (8 out 10) the entire day. The patient said it was hard to breathe. There was no swelling, bruising, or redness. Once again the evaluation of the patient was incomplete and more appropriate guidance would have been provided if the nurse used the chest pain or short of breath protocols. The nurse gave the patient a three day supply of ibuprofen and acetaminophen by protocol.

The next day a second code 3 was called and a nurse practitioner saw the patient for shortness of breath and shoulder pain. Limited history was taken. The range of motion was normal and the nurse practitioner documented "normal exam of the right upper extremity". The nurse practitioner ordered an x-ray of the shoulder. Though the patient had pain the nurse practitioner documented, "no Tylenol or ibuprofen given because of abuse of previous blister pack". Apparently all the pain medication that he received the day before had been taken. This indicates that the patient is experiencing more pain than can be relieved by over the counter pain medication. The practitioner was cynical to attribute this to abuse. The patient's pain needed more thorough evaluation and higher level treatment.

On 11/15/23, the patient complained of pain that awoke him during sleep. The nurse used the chest pain protocol and the pulse was documented as 113. The nurse did not note that this was the fourth complaint for the same symptom in the last two weeks and that two of these were code 3s and did not refer the patient. Later that day the patient was transferred to SWCC. He told the nurse completing transfer screening that he had hurt his ribs but the nurse did not evaluate the complaint.

On 11/16/23, a nurse documented a code 3 for arm pain including right chest pain. The pulse was 110 and 124. An EKG was documented as sinus rhythm. There was bruising on the right chest with an abrasion. The patient said he fell out of bed twice during the night. Despite the recent fall, tachycardia and the repetitiveness of the complaint the patient was not referred for a medical evaluation. The patient was referred to mental health.

The psychiatrist who saw the patient on 11/17/2023 elicited a history of the patient being in a fight a couple weeks ago and dislocating his shoulder. Since then, he had worsening pain down his entire right arm, and stated "On my God, my arm is on fire." He was unable to sleep without taking ibuprofen every four hours. He couldn't do anything because of the injury and hadn't been eating

54

because of the pain. During the interview he was grimacing, breathing heavily and had a pulse rate of 123. The psychiatrist documented referring the patient for a medical evaluation.

On 11/20/23 security staff brought the patient to the HCU from chow hall because he couldn't breathe. A registered nurse evaluated the patent and documented a pulse rate of 102-127 with the respiratory rate 22-30. The nurse failed to recognize the severity and cascading nature of this complaint and only recommended breathing through pursed lips. No protocol was used to guide this evaluation. At a minimum the patient should have been referred promptly to a provider due to the abnormal vitals but this was not done. The nurse returned the patient to his housing. The nurse's actions were negligent and put the patient at risk.

The next day, on 11/21/23, custody staff again brought the patient to the health unit. The patient said he couldn't breathe and his shoulder, back and arm hurt. The nurse evaluation was extremely brief documenting, "Patient seen, assessed, noted wheezing and hyperventilating." The nurse had the doctor who was onsite see the patient. He advised sending the patient to an emergency room.

The patient was sent to a reference hospital in Missouri and diagnosed with widely metastatic non-small lung cancer. The cancer was extensive with an upper lobe lung mass that extended beyond the lung to encase two major arteries and was so large it forced the center part of the chest to one side. The patient had brain metastases, abdominal , liver, lymph node, and bone metastases. Radiation therapy was initiated as was chemotherapy which was recommended to be continued as an outpatient. While hospitalized, the patient filed a medical release request form.

After nearly a month of hospitalization, the patient returned to SWCC on 12/12/23. He weighed 113 pounds, a loss of 35 pounds. His widely metastatic cancer encased several major arteries, locally extended to the abdomen and chest, caused a pathologic fracture of a rib. The laryngeal nerve was encased causing difficulty speaking. The hospital recommended oncology follow up, multiple medications, including acetaminophen for fever, albuterol inhaler, alprazolam (a benzodiazepam), dexamethasone, guaifenesin-dextromethorphan, ipratropium-albuterol nebulization, morphine extended release 75 mg twice a day, morphine immediate release 15 mg every four hours as needed for pain, naloxogel 12.5 mg once, naloxone spray as needed for opiate reversal, ondansetron 4 mg every 4 hours, pantoprazole daily, nicotine patch daily and nicotine gum.

On 12/12/23, the physician infirmary admission note documented adenocarcinoma of the lung which was inaccurate. The physician didn't document a therapeutic plan for the patient other than ordering morphine and even though the patient had difficulty swallowing the diet order was "as tolerated". The admitting physician made no referral to oncology.

It didn't appear that the physician reviewed the hospital report because besides using the wrong diagnosis, the order for morphine differed from that recommended by the hospital. The hospital recommended 75 mg extended release every 12 hours and 15 mg immediate release every four hours as needed for pain. The doctor's infirmary admission note documented "morphine 60 ER [extended release] BID [twice a day]" and "morphine 15 mg [every] 6 prn". This order wasn't precise and translated onto a MAR handwritten by the nurse as morphine sulphate ER 60 mg every 12 hours and morphine sulphate immediate release 15 mg every 4 hours as needed for pain. This

was a reduction in pain medication without assessment of pain or explanation of why the hospital order wasn't honored.

The patient's pain medication prescription was reduced by 30 mg of morphine a day from what was recommended by the hospital. Further there was no evidence that the 15 mg immediate release morphine was offered every four hours. There was documentation on one MAR of offering immediate release morphine only three times from 12/12/23 to 12/15/23 when it should have been offered 18 times over that time period. The patient remained in pain as documented 12/13/23; 12/14/23; and 12/15/23. On 12/15/23 the patient said he hurt all over. Despite the patient saying he "hurt all over" the nurse documented, "Pt [patient] voiced no concerns today". The nurse took no action regarding the patient's pain.

On 12/14/23, the facility Medical Director saw the patient and documented he had intermittent pain in his lower abdomen but did not pursue the status of pain control and no additional pain medication was prescribed. The patient continued to complain of pain in nursing notes. On 12/15/23, the vendor Regional Medical Director wrote another morphine order for 60 mg morphine extended release every 12 hours and 15 mg morphine immediate release every 12 hours but to space the morphine doses so that the extended release alternated with the immediate release. Both of these prescriptions were less than recommended at the hospital. There was no explanation for either prescription and the patient remained in pain.

There were four prescriptions in the medical record dated 12/15/23, written by the Regional Medical Director. These included 1) 60 mg extended release morphine every 12 hours *for seven days*; 2) 60 mg extended release morphine every 12 hours *for 30 days*; 3) 15 mg immediate release morphine every 12 hours *for seven days*; and 4) 15 mg immediate release morphine every 12 hour *for 30 days*. Each of the two immediate release prescriptions were to stagger with the extended release morphine. This appeared to imply that the patient was to receive seven days of 120 mg extended release morphine every 12 hours with 30 mg of immediate release every 12 hours 6 hours after the extended release morphine. This was to be followed by 23 days of 60 mg extended release morphine twice a day with 15 mg of immediate release morphine every twelve hours with the immediate release morphine doses six hours after the extended release morphine. There was no progress note explaining this prescription so it appeared to be an order conducted by phone. This effectively would double the dosage prescribed by the hospital for seven days and reduce the dosage prescribed by the hospital for the next 23 days. There was no explanation in progress notes.

The medication administration records do not reflect these prescriptions. There was one entry on the MAR for 60 mg extended release morphine twice a day and 15 mg immediate release morphine every four hours. This prescription was dated 12/12/23 until 12/26/23. The patient was documented as receiving the extended release morphine from 12/12/23 to the morning of 12/17/23. The immediate release morphine was documented as offered only three times. A second entry on the MAR dated for 12/12/23 to 12/26/23 documented 60 mg extended release morphine twice a day and 15 mg immediate release morphine every six hours as needed. This MAR documented receipt of the extended release on the evening of 12/17/23 to 12/19/23 after the morning dose. The immediate release morphine was documented as offered and given twice on 12/16/23, three times on 12/17/23; and twice on 12/18/23.

The hospital recommended a total of 210 mg of morphine a day in divided doses including both immediate release and extended release morphine. The MARs, prescriptions and other documentation in the record were disorganized. The prescriptions were not consistent with the hospital recommendations, were inaccurately represented on the MAR, and were not given to the patient as ordered.

While the hospital recommended 210 mg of morphine a day, the patient received
12/13/23 =135 mg. documented as complaining of pain
12/14/23 = 135 mg. documented as complaining of pain on five occasions
12/15/23 = 135 mg. documented as complaining of pain twice
12/16/23 = 150 mg. documented as complaining of pain once
12/17/23 = 225 mg. documented as complaining of pain twice
12/18/23 = 120 mg documented as complaining of pain once
12/19/23 = 90 mg with one refusal. Expired.

The pain medication management for this patient had numerous errors with respect to the MARs, prescriptions, and monitoring that need to be corrected as they were dangerous especially since dealing with narcotic medication. This information and record should be given to the SIU pharmacist performing a process analysis of medication management.

The hospital recommended referral to an oncologist but it wasn't identified until 12/19/23 when there was a referral form written to the oncologist. This referral was not found on the offsite schedule log. The patient died on the same day.

The evaluation of the patient's shoulder pain was not timely. Nurses' evaluations of the patient's complaints were not driven by use of appropriate protocols and some nurses made clinical decisions that were outside their scope of practice. Though he was not referred to oncology, it did not appear to alter his prognosis.

## Patient #9

This 56 year-old man was incarcerated in 2007 and was at Joliet Treatment Center. His problem list documented hypertension, high blood lipids, anti-social personality disorder, depression with psychotic features and schizoaffective disorder.

He also was followed in chronic care clinic for hypertension and seen on 8/11/22, 9/2/22, and 7/11/23. Notable deficiencies in these encounters were as follows.
- In the 8/11/22 visit the patient had a 24 pound weight loss since 1/27/22 which was unrecognized. Neither was colorectal cancer screening offered.
- At the 9/2/22 chronic clinic, no history was taken. The weight loss since 1/27/22 was now 35 pounds which was also unrecognized. Preventive measures including colorectal cancer screening were not offered.
- The 7/11/23 chronic clinic is discussed in detail later in this chronology.

On 5/16/23, a nurse saw the patient for chest pain and referred him to a provider. A physician saw the patient on 5/17/23. The patient was noted to have right breast swelling and pain with deformity

of the breast. The patient was not checked for discharge, dimpling or firmness of the swelling. An EKG and an ultrasound of both breasts was ordered. This referral was not found in the 2nd quarter specialty tracking log and the test was never done. The provider did not order a subsequent appointment to review the test results and the patient was lost to follow up.

On 5/22/23 a nurse saw the patient for constant right breast pain. The nurse documented swelling. No referral was made but the nurse gave ibuprofen to the patient by protocol.

On 5/23/23, a nurse again saw the patient for constant chest pain. The nurse contacted a physician by phone who ordered an EKG in the morning. On 5/24/23, a physician saw the patient for the chest pain. The patient was concerned about right nipple enlargement. The doctor assured the patient that an ultrasound and work up were in progress. However, the scheduling clerk had not apparently received the referral and it wasn't scheduled. The provider did not order a follow up appointment. It would have been reasonable to refer the patient to a surgeon because unilateral breast swelling in a male is suspicious for cancer. The physician did order a CRP, CBC, thyroid study and a prolactin level.

On 5/30/23 the prolactin level returned as normal but the patient had anemia (Hgb 12.3). Anemia in a 56 year old warrants a colonoscopy. A normal prolactin level eliminates gynecomastia and breast cancer should be ruled out. Though someone initialed the labs as reviewed, no action was taken and there was no progress note about the laboratory results. The patient should have been referred for colonoscopy and to a surgeon to biopsy the breast.

On 6/10/23 a nurse saw the patient for chest pain. The pain felt like "it's closing in on my heart". Pain medicine had not helped. The nurse documented tenderness over a right chest mass and "tremors" in the right arm and hand and left leg. Despite significant findings the nurse did not refer the patient to a provider.

On 6/14/23, a nurse noted that the patient was reported to have a shuffling gait in the dorm and had to stop on his way to chow. The nurse documented that she would follow up with a physician for a slow walk pass.

On 6/19/23, someone wrote a health request for the patient stating that his toenails were extremely long and it took him 10 minutes to walk to chow and it appeared that his feet were in pain. A nurse documented on the request that a slow walk pass was given and a nurse assistant trimmed his toenails. There was no thought as to why the patient was walking slow.

On 6/21/23, a nurse practitioner saw the patient. Vital signs were not done. The nurse practitioner took a history of low back pain that was constant, buttock pain, bilateral leg pain, foot pain, anal pain all for several weeks. The patient was documented as having a shuffling gait. The plan was to order a urinalysis, stool for occult blood, a low back x-ray, Naprosyn 500 mg BID and Colace BID. No follow up was ordered. The weight loss and breast mass were not considered as problems and tragically ignored.

On 6/27/23, laboratory results showed anemia again. The laboratory results were signed as reviewed but again no action was taken.

On 7/5/23, a nurse was called to the dorm because the patient had chest pain. The patient was having trouble moving. The patient said he had the chest pain for four months. The nurse documented that the patient had a mass on the R nipple area and said he couldn't move due to left leg numbness. The nurse called the Medical Director of the facility who apparently was aware of the patient and said that the patient was currently being worked up for a right nipple mass. The nurse wrote that there would be follow up during afternoon medication pass. It wasn't clear what the follow up was going to be. The breast ultrasound was ordered 5/17/23, 49 days ago and there was not yet any evidence of the ultrasound being scheduled; it wasn't on the offsite scheduling log. A nurse documented during medication pass that the pain had resolved.

On 7/11/23, a periodic annual history and chronic clinic evaluation were conducted. The periodic history documented use of use of a wheelchair for long distances and for fall prevention. He was described as having delusional behavior. A brief physical examination was documented of left leg weakness with a limp and unsteady gait. The weight was documented as 145.8 pound and the assessment was "noted weight loss [with] malnutrition. LLE weakness [with] shuffling gait, + delusional ideas. Otherwise, normal adult exam". This is not a normal examination and further diagnostic evaluation was indicated but not initiated.

On the same day, the same provider conducting the periodic history documented a chronic clinic visit for hypertension. The patient complained of rectal pain and left anterior thigh pain and weakness. The labs from 7/7/23 were noted. The patient had poor hygiene and appeared "malnourished. The nurse practitioner wrote that the patient had delusional behavior speaking of "unrealistic things"- that he is part of a secret testing group at JTC. Though the patient complained of leg weakness, the examination did not include a neurologic examination of the lower extremities. The only assessment was that the hypertension was in good control. The delusional behavior was not addressed. The leg weakness was not addressed. The nurse practitioner wrote a therapeutic diet order for a high protein, high calorie diet documenting that the patient was underweight (145 pounds) and had malnutrition. The patient was 198 pounds in January of 2023 so he had a 54 pound weight loss over less than seven months; this is not just malnutrition. An evaluation for the severe weight loss, anemia, and breast mass was indicated. The breast mass not discussed at this visit and was likely associated with the weight loss. The nurse practitioner also ordered boost for a 42 pound weight loss over two years without ordering a diagnostic work up for the weight loss or anemia. This encounter was unsafe and clinically inappropriate.

On 7/17/23, a physician ordered a CT scan for guaiac + stool, rectal discomfort and a 42 pound weight loss. This was apparently ordered as a routine test but should have been urgent or the patient should have been sent to a hospital for a work up. Someone wrote on the top of the referral form that the appointment was cancelled without explanation. This appointment was logged into the offsite tracking log as referred on 7/17/23 but was documented as cancelled by a physician who documented that the appointment was not needed. It was not clear when the appointment was cancelled. It was scheduled for 9/15/23. Given guaiac + stool and a 42 pound weight loss, urgent colonoscopy was indicated which was not done.

On 8/6/23, the patient placed a health request stating, "I am very sick and in great pain. I need a doctor and to go to the hospital. I have not been able to get the doctor to see me since I was last

treated. I have lost a lot of weight". The patient was right. He needed hospitalization. The nurse wrote on the referral form, "This individual in custody needs pain management and to go to doctor immediately". This was signed by the nurse on 8/5/23 which was a day before the health request was dated.

On 8/7/23, a nurse practitioner saw the patient for weight loss and "***medication non-compliance***". Less than a month ago, the patient was described as having delusional behavior; how could this patient's behavior be framed as non-compliance when he was delusional? The patient's weight was 132 pounds but the weight loss was not quantified. Since January 2023 the patient had lost 66 pounds. The patient was having difficulty swallowing food. The patient was talking nonsensically saying, "the marina rina kidneys hurt" and "the corporation is changing my medication and that's why I don't take them". The nurse practitioner documented that the patient had stopped taking the medication since July; yet this was not perceived as related to his current mental status. The patient apparently told a nurse that he had chronic pain in the abdomen. The patient had poor hygiene. The examination was brief and documented as normal. The breast mass was not acknowledged or evaluated. This patient needed urgent admission to a hospital for altered mental status, severe weight loss, a breast mass and abdominal pain. Instead, the plan was to order boost three times a day and a high calorie diet. The nurse practitioner documented that the patient was "awaiting appointments for WRITS". These would be the breast ultrasound ordered 83 days ago and a CT scan of the abdomen for guaiac + stool and weight loss ordered about three weeks ago. The tests or reasons for the test were not acknowledged. This was not timely access to secondary or tertiary care and was unsafe and inappropriate care.

On 8/13/23, a custody officer reported to a nurse that the patient was incontinent and was too weak to stand and clean himself. The nurse went to the housing unit. The patient was sitting on a stationary stool with his pants pulled down which were soiled with stool to his feet. The patient said he couldn't make it to the toilet because his legs didn't work. The nurse described the patient as cachectic with temporal wasting and visible bony prominences. The patient had a raspy whisper-like voice. He said he had no strength to walk and complained of pain all over. He had a "strong body odor". The officer said that he was too weak to shower and the officer knew that he hadn't showered in "30+ days". The nurse documented that a NP had been made aware prior to the current episode that the patient had weakness and weight loss and saw the patient on 8/7/23. The officers assisted the nurse who gave the patient a chair bath except for his hair. The nurse documented that because of his weight loss would advocate for a double mattress. The patient was assisted into clean clothes and a porter assisted the patient into bed. The nurse documented a weight loss of 55 pounds over two years, when in fact the patient had had lost 66 pounds in the last eight months. The nurse tried to call the facility Medical Director three times but could not reach her and then called the vendor Regional Medical Director. ***The vendor Regional Medical Director ordered that the patient be placed on medical watch and the facility Medical Director to follow up with the patient in the morning.*** This patient was incontinent with severe weight loss and possible altered mental status, an undiagnosed breast mass and recent onset anemia. He should have been immediately hospitalized. Also, this patient should, at a minimum been sent to an infirmary. Instead, further "monitoring" was ordered.

On 8/14/23, the facility Medical Director evaluated the patient at the bedside and sent the patient to a hospital by 911. She wrote that the patient was sent to the hospital for "failure to thrive"

documenting a 17 pound weight loss (which was grossly inaccurate). The facility Medical Director documented a firm irregular right breast mass which had enlarged since the last evaluation and she documented "awaiting mammo and US at UIC". She documented that the patient had difficulty swallowing both solids and liquids. She documented occult blood positive stools in June with a Hgb of 10. She wrote that the patient needed a work up and was unable to do this at the DOC facility.

The patient was confused upon admission to the hospital. Initial tests showed significant hypercalcemia[52] (14.4 on admission) which explained the patient's confusion (which was likely present at least as of 8/7/23). The CT of the chest showed multiple lytic bony metastases, pulmonary metastatic disease, suggestion of thyroid and renal metastatic disease, and a right chest wall lesion suggestive of breast neoplasm. The patient had multiple bone metastases to the cranium and face. The patient refused a breast biopsy and wanted a second opinion. The prognosis was poor. The patient was discharged on tramadol 50 mg Q 6 hours for pain and had received Zometa, a monthly injection for hypercalcemia before he left the hospital. Because the patient refused treatment he was sent back to JTC.

On 8/17/23, the patient returned to the prison at 5:20 pm. The physician was not available and the call went to voicemail. Later that day, (time not documented) a nurse called a nurse practitioner who ordered the tramadol. This patient had end-stage cancer with hypercalcemia, needed close monitoring and hospice but was sent back to JTC which does not even have an infirmary. He was placed in dorm 1 apparently in a cell. This facility was incapable of monitoring the patient.

At 1:04 pm the day after return to the facility a nurse practitioner saw the patient "cell side". The patient said he was waiting to go to another hospital and the nurse practitioner thought he was confused. A stat calcium should have been obtained since the patient had recent hypercalcemia. The nurse practitioner did not acknowledge the hypercalcemia or that the patient was given Zometa at the hospital. Given the patient's confusion the calcium should have been obtained stat to obtain a baseline and to ensure the patient was not hypercalcemic. The nurse practitioner noted that the patient had metastatic disease (primary unknown) but hospitalists documented this was likely breast cancer. The nurse practitioner documented that the patient refused further workup and told the patient to "notify medical" if pain became an issue. The nurse practitioner documented that he would discuss the case with the medical director and that "Pt stable at this time". The plan of care for this patient did not include all diagnoses. Pain medication was reduced from what had been recommended by the hospital (50 mg tramadol every 6 hours at the hospital versus 50 mg three times a day for pain). Furthermore, this patient had serious mental illness and the medical providers should have conferenced with the mental health team to determine how to care for him. This was especially true because the patient had hypercalcemia which can cause confusion and would make it difficult to differentiate his mental health condition from his medical condition.

On 8/21/23, a physician reviewed the chart and saw the patient in his cell while he was in bed. He wrote "By history pt's mental status has been waxing and waning". The patient remembered the doctor and said he had cancer all over. The patient wanted to be a full code until he knew more about the disease. The doctor told the patient he would need to go to UIC to see an oncologist for

---

[52] Hypercalcemia is often a result of cancer. In this case it was. A calcium above 14 calls for immediate treatment. Hypercalcemia can cause confusion and altered mental status.

a work up. Patient agreed to this. The patient said he did not need additional pain medication. No examination was done. There was no assessment. The doctor documented she would write a referral to UIC for a breast biopsy and for an oncology consultation. These two referrals forms were in the medical record but there was no evidence that they had been added to the specialty tracking log so they were not scheduled. Clearly, the specialty tracking log is being managed ineffectively. CMP was ordered in 2 weeks. A same day calcium would have been appropriate given the recent confusion and history of hypercalcemia. The physician did not mention that the patient was treated with Zometa. This patient should have been transferred to a facility with an infirmary and an urgent mental health consultation ordered to assess the mental status of the patient.

On 8/23/23, the physician ordered mammography, but this referral was also not found in the 3rd quarter specialty tracking log for JTC. This was the fourth referral made that was not entered onto the log. On 8/24/23, a nurse practitioner referred the patient for bilateral breast ultrasounds. This became the 5th referral that was not entered onto the specialty tracking log. There was no progress note associated with this referral.

On 8/28/24 the patient was still bed-ridden in his cell with an end-stage malignancy and intermittent confusion. Blood tests for calcium had not been done since hospitalization and pain was difficult to monitor because of his mental status. Mental health had not yet documented seeing the patient. On this date, a nurse saw him cell front and observed him having a hard time sitting up. This patient should clearly have been transferred to a higher level of care ( i.e., to a facility with an infirmary or to a higher level skilled unit). The nurse noted facial grimacing and the patient received tramadol. This should have prompted a better plan for managing pain.

On 9/4/23 when a nurse was passing medications, she noticed that the patient was grimacing when trying to sit up. The nurse did not make the patient come to the door for meds but said she would come to him. The nurse noted a [something illegible] on the ischial tuberosity and recommended that the patient lie on his side to relieve pressure. This patient should have been transferred to a facility with an infirmary and a proper pressure-relieving bed or sent to a skilled nursing unit. Medical watch housing should be restricted to patients who are independent with regard to feeding, hygiene, and transfers. This patient was not.

On 9/6/23, the patient refused a writ to UIC; he said that he only wanted treatment offered at the prison. Whatever this appointment was, it was not being tracked on the specialty tracking log, as there was no appointment listed for this patient on this day. Also, the note on 9/6/23 at 11:30 am demonstrated that he was confused about his care, thinking he was going back to the hospital. His decision to refuse a specialty care appointment did not appear rational. The patient needed to be evaluated for capacity to make a medical decision. That this patient was housed in a mental health facility and did not have a mental health professional consulting on his mental status and refusals is a significant problem.

On 9/12/23 a nurse documented that the patient was observed getting off the toilet and was very weak and having a hard time getting from sitting to standing position. The patient also had facial grimacing. At 13:45 a nurse obtained a verbal order to increase tramadol to 100 mg every 6 hours. A palliative care evaluation had not yet been done. The nurse offered to wash the patient up as he

had "strong body odor" but the patient refused. It did not appear that the patient was capable of caring for his needs yet he was not transferred to a higher level of care. This patient was improperly housed and not provided higher level care.

On 9/13/23, a doctor noted that "he is comfortable, content, peaceful at this time". This was inconsistent with prior nursing notes. The patient re-affirmed that he did not want to go to UIC. The doctor said she would review the POLST form with the patient the following week. The patient was accepting of additional pain medication. The patient did not want to talk to his family but said he was thinking of someone who could be a surrogate decision maker. The doctor did not assess the patient's pain symptoms, nor were laboratory tests reviewed. No new labs were ordered. Though no pain assessment was done, the physician ordered dexamethasone 4 mg daily for 20 days for his bone pain. None of the patient's other problems were assessed in this note.

On 9/20/23, a nurse documented that she obtained "reports" of patient trying to flush his toilet and hearing a pop in his left shoulder. The left scapula was sticking out and the patient had pain. A physician was called and the physician ordered transfer to a hospital. The patient refused to go to the hospital. An x-ray was not ordered. Mental health was not consulted.

On 9/27/23, a physician saw the patient and noted "he had pain all over". The POLST form was discussed. The patient expressed concern about signing it. The patient was described as frail and cachectic. The doctor then said,

> "We talked about POLST form & what it is for. He seems concerned [about] signing this form. I advised him we will talk about it again later today. Denies SOB, N, V, F, C. Pt is frail & cachectic. We talked about better pain management [with] a pain patch. We also talked [about] the pain meds should not be too sedating for him & he agreed he did not want to be groggy with meds. See orders. Addendum. See POLST form- Pt is DNR".

The patient did sign a POLST form requesting no excessive measures and comfort care only.
In addition, over the six weeks since diagnosis, nurses documented poorly controlled pain. There was inadequate provider pain assessment. At this visit, the doctor started a fentanyl patch (25 mcg) and 20 mg morphine sulphate immediate-release every four hours for pain. This was an appropriate change but the fentanyl patch never arrived from the pharmacy and was discontinued.

On 9/29/23, the physician transferred the patient to the NRC infirmary for "supportive end of life care". The plan of care focused around providing pain medication. . Though the patient had signed a POLST for comfort care only, the patient continued to receive medication for his high blood pressure. It isn't clear how IDOC defines comfort care.

With respect to pain, the hospital recommended tramadol 50 mg four times a day but this was reduced on 8/18/24, the day after return to the prison, to 50 mg three times a day (30 mg morphine equivalent) without an adequate pain assessment or rationale. The patient continued to have pain but was not adequately assessed periodically for pain. The tramadol was increased on 9/12/23 to 100 mg four times a day or a morphine equivalent of 80 mg a day. On 9/29/23 when transferring the patient to the infirmary and noting pain all over, the doctor changed medications to fentanyl 25 mcg patch to change every 72 hours and morphine sulphate 20 mg/ml. to give 0.2 ml (4 mg) every 4 hours as needed for pain. This was a morphine equivalent of 84 mg which is essentially

the same morphine equivalent of the tramadol (80 mg morphine equivalent). This patient was not receiving sufficient pain medication. The provider should have sought assistance from a pharmacist.

On 9/29/23, on the infirmary unit at NRC, the doctor documented that the patient asked for a liquid diet and the doctor ordered it. On 9/30/23, the patient said he had no pain but then told the nurse that he had pain when he moved. Later, on 9/30/23, the patient asked for a regular diet. The patient started refusing tramadol for unclear reasons. The patient did not appear to be acting rationally. Still a mental health consultation was not sought.

On 10/2/23, a nurse practitioner attempted to see the patient who was agitated and yelling that he didn't want enforced meds. The patient was resistant to any evaluation and appeared delusional. The nurse practitioner requested mental health nursing to tell the patient he was not on enforced medication. This patient may have been having a psychotic episode or may have had altered mental status due to his condition (metastases or hypercalcemia). Neither was evaluated. A psychiatrist should have seen the patient. It was not clear that the patient was competent to make informed decisions. This should have been investigated because the patient was likely in pain but was refusing medications believing they were enforced psychotropic medication. This was not acceptable comfort care as the patient was not made comfortable.

Later the same day, on 10/2/23, the patient asked for his pain pill and when asked what hurts, he responded "everything". The patient had refused the 3 prior doses of pain medication that day. He did not appear to be acting rationally. The nurse documented "brown substance noticed on socks and shoes" and the patient said it was chocolate. The patient refused help to clean himself and was not cleaned. This patient was clearly unable to act rationally. A psychiatrist should have evaluated the patient for competency to make a medical decision. The Medical Director should have considered identifying a surrogate for the patient. It was clear that NRC could not manage this patient either and he should have been transferred to a facility capable of caring humanely for him.

Over the next month there is documentation of multiple encounters with the patient who demonstrated irrational behavior, poor hygiene, incontinence, and persistent pain. The patient also refused care intermittently. The patient was referred to mental health but this referral was not accomplished. This patient did not appear to have adequate access to mental health care.

On 11/8/23, a nurse documented the patient was repositioned and had facial grimacing and moaning when turned. He was given morphine. His pain was clearly not controlled. Later, on 11/8/23, a nurse documented the patient needed assistance with meals and hydration and was unable to use the straw. There was no documented plan of care for managing the patient inability to eat or drink. The patient continued to remove his clothes and diapers, bed linens and pillow.

The patient's pain was not adequately addressed. A fentanyl patch ordered over a month ago was never supplied by the pharmacy. A physician who saw the patient on 11/8/23, noted he was in pain. The physician noted that the patient didn't want to take his tramadol and that after discussion he would take his morphine. The patient was on both morphine sulphate and tramadol. The patient was only receiving about 25% of the doses ordered or about 29 mg of morphine equivalent a day. All of the medication was "as needed" and about 75% of the expected doses were not documented

64

as offered. The physician did not document review of the MAR that would have shown that the patient wasn't receiving the medication as ordered. The physician increased the morphine sulphate dose to every two hours instead of every four hours and this resulted in a small increase in the ordered dose. Between 11/8/23 to 11/11/23 the patient received 38 mg morphine equivalents a day. This is a small dose of morphine given his condition and it is not surprising that the patient was documented to be in pain most days. Also, because of the patient's mental status, it would have been better to have ordered a fentanyl patch which would have administered a consistent dose of morphine without intervention. However, the prior fentanyl order was not delivered by the pharmacy. The inability to obtain the fentanyl patch contributed to poor pain control for this patient. Because nurses don't document that they offer medication as ordered, it is unclear if the patient doesn't want doses, refuses doses, or isn't offered doses.

On both 11/9/23 and 11/10/23 the nurse documented that the patient was in pain. The patient died on 11/11/23.

This patient had a weight loss for at least a year without evaluation. When a breast mass was identified, it wasn't evaluated until the patient became so ill he was hospitalized three months after identification of the breast mass. The specialty tracking log is not maintained accurately, and specialty care appointments did not occur. The patient was housed in a facility that couldn't care for him and he needed higher level care. Pain medication was not managed well and the patient remained in pain throughout his last months. Mental health should have been involved in the management of this individual and even when he was at JTC, a mental health facility, he was not documented as evaluated. If the patient's weight loss was due to cancer this death was likely preventable but there was insufficient medical record provided to make that determination.

## Patient #10

This patient was 52 years old with hypertension and end-stage kidney disease on dialysis listed on the problem list. On 7/23/21, the patient was admitted to the hospital for a hemoglobin of 5.4. The patient had a CT scan showing polycystic kidney disease, a pleural plaque from asbestos, and renal osteodystrophy. None of these diagnoses were in the problem list. Though the patient was undergoing dialysis and had very low anemia he was not on erythropoietin[53]. The hospital recommended erythropoietin on discharge but when the patient returned to Stateville there was no evidence that the hospital recommendation to start erythropoietin was acted on. A frequent problem in IDOC is that physicians do not carefully review hospital records to understand what occurred at the hospital. The vendor's Regional Medical Directors should correct this practice.

This patient had repeated elevated blood pressure over two years. MARs from October of 2021 to October of 2023 show that there was no change in his blood pressure medications which were minoxidil 10 mg daily and 50 mg of metoprolol four times a week. There were ***no chronic clinic visits for the entire two years*** of available medical record. The blood pressure did not appear to be monitored despite the patient having end-stage renal disease.

---

[53] Patients on renal dialysis typically have anemia. The treatment for anemia in patients on dialysis is a drug called erythropoietin.

There were multiple COVID tests in the medical record but only one non-COVID laboratory test completed on 6/16/21 showing a hemoglobin of 5.4. The only other laboratory tests were those included in consultant and hospital reports. The patient had anemia as low as 5.4 and mostly below 10. There was no evidence that the patient was treated with iron replacement or with erythropoietin. This is not standard of care. Dialysis notes need to be evident in the medical record, especially since it is conducted onsite. At a minimum, laboratory tests, medications provided and nephrology notes must be present.

On 8/23/22 a revision of the patient's dialysis fistula was done at UIC. The surgeon recommended follow up with vascular surgery on 9/7/22. IDOC did not provide a specialty log for the 3rd quarter, 2022 but the 1st quarter of 2023 had prior referrals on it. The specialty log did document follow up on 9/7/22 and a UIC surgeon documented that the fistula had healed and that it could be used in a month. The patient returned to the facility with a dressing. The nurse documented that the dressing was to be removed the following day.

The in-person review by a provider with the patient didn't occur for three weeks after the consultation. On 9/8/22, a nurse evaluated the wound and noted no swelling, redness or drainage. A dressing was placed on the wound. On 9/10/22, a nurse documented the incision site was red, warm with copious green drainage on the dressing. The patient had fever (100.5), elevated blood pressure (161/96) and fast pulse (110). The nurse applied a new dressing but large amounts of pus extruded from the wound and saturated the new dressing material. A physician was notified and ordered Bactrim for 14 days. A provider did not see the patient and the surgeons at UIC were not notified. The pus was not cultured. A white count was not done. The MAR showed that the patient received KOP medication on 9/10/22. There was a daily dressing change order written on 8/31/22. The order was discontinued on 10/5/22.

On 9/11/22, the wound was still draining copious amounts of pus and sutures were still visible. The nurse did not notify a provider. The surgeon at UIC should have been contacted for further instructions. Though a daily dressing was ordered; it was not done. The next progress note was 9/15/22, four days later. Pus was still draining from the wound. The next progress note was 9/17/22 and the wound was still draining purulent material. A provider was not notified. On 9/18/22, a nurse documented that the fistula was hard. The fistula is filled with flowing blood and is not supposed to be hard. If it was hard it was possibly clotted and needed prompt evaluation.

The patient wasn't seen by a provider until 9/27/22, a month after the fistula revision. The physician documented that the patient was getting intravenous antibiotics during dialysis but because dialysis notes were not present in the record, it wasn't clear when intravenous antibiotics were started. The dialysis records need to be in the IDOC medical record. The physician noted that the wound had opened and blood and pus came out when the dressing was removed. The physician also noted that the wound was open but healing and that sutures were still in place. The doctor documented that antibiotics should be continued but there was no evidence on the MAR of ordered antibiotics. If the nephrologist in the dialysis unit had ordered antibiotics, the order and subsequent administration should be documented in the IDOC medical record and was not. No follow up was ordered including with the vascular surgeon despite the patient having an infected surgical wound; the physician should have promptly called the vascular surgeon. The documentation of communication between facility providers, the nephrologist in the dialysis unit

at Stateville, and the vascular surgeon was nonexistent and placed the patient at significant risk. Did the sutures need removal? There was no scheduled follow up of the wound to ensure it healed.

A nurse practitioner saw the patient for a writ return visit on 9/30/22, five weeks after the procedure that occurred on 8/25/22. The nurse practitioner didn't document the subsequent abscess, the need for antibiotics, but did mention a pencil eraser sized wound without signs of infection. It was unclear if there was any plan to let the vascular surgeon know about the infection. The nurse practitioner did not schedule follow up to ensure the wound healed. ***Treatment was episodic.***

An ***urgent*** CT ordered on 7/20/22 for abdominal and back pain was not done until 10/5/22. The specialty tracking log did not note that the request was urgent and to be done within 14 days. Instead, it was done 77 days later. The CT scan showed pleural calcifications likely due to asbestos exposure, enlarged heart, extensive calcification of abdominal aorta, innumerable bilateral renal cysts (MRI recommended to assess a complex cyst in one kidney), a focal dilation of the pancreatic duct (MRI recommended in follow up), The CT scan wasn't documented as reviewed in progress notes. Someone reviewed the CT report but did not date the review. On 11/12/22, over a month after the CT scan, a physician ordered an MRI. The MRI was listed on the offsite tracking log but had no referral date and no schedule date. On 1/30/22 someone wrote on the referral form that the patient refused the test. This is not timely scheduling and inadequate tracking; the urgency of the referral needs to be included on the log..

Finally, on 10/24/22 the nephrologist referred the patient to the vascular surgeon due to the regrowth of the pseudoaneurysm. This was requested as an urgent consult but did not take place for over two months. This consult was requested urgently ( less than two weeks) but occurred 65 five days later. There does not appear to be any monitoring of referrals which is why the Monitor continues to recommend a weekly specialty care huddle that includes the facility Medical Director and scheduling clerk.

Meanwhile on 11/5/22, a nurse documented the patient saying that the wound on his arm never healed and it formed into a boil and then popped while getting dialyzed. He was coming to the health unit for a dressing change. There were no dialysis notes and this history was hearsay. The nurse noted a dressing in place that was purulent with greenish drainage. The left arm had an open wound that was draining pus. The nurse dressed the wound and the plan was to follow up as needed. There apparently was no order for dressing changes. Notably, this care was occurring without intervention of a provider. It did not appear that there was a provider at this facility. A provider should have promptly contacted the vascular surgeon.

On 12/17/22, the patient complained to a nurse that his arm wound wouldn't heal. The urgent referral to vascular surgery had not occurred. The nurse noted purulent drainage and referred the patient to a provider.

A nurse practitioner saw the patient on 12/19/22 apparently as a referral from the nurse for the arm wound. The patient didn't know why he was being seen. The provider documented that the patient was being seen for follow up of CT scan results and low back pain with sciatica. The CT scan was done on 10/5/22 or 76 days ago. The nurse practitioner "educated pt on writ return process". The nurse practitioner didn't apparently know that the patient was referred by a nurse because of the

wound on his arm. The nurse practitioner didn't evaluate the infected fistula, listened to the patient's lungs and documented that he was ambulating without assistance before assessing chronic low back pain with sciatica. There was no plan. This was a failed referral. It is unclear why the reason for the referral is not known to the person seeing the patient.

On 12/28/22, 65 days after an "urgent" referral the patient went to vascular surgery. The surgeon said that the patient had an ulcer over the fistula graft from which pus could be expressed. The surgeon noted that the patient "requires excision and exclusion of this portion of the graft to prevent blowout and possible death".[54] The blood pressure at this visit was 171/89 which is poor control. The patient was admitted from the clinic and had the surgical procedure to excise the infected graft on 12/30/22. The after-visit summary documented a recommendation to be on Augmentin (an antibiotic) and tramadol (pain medication). Wound care instructions were to pack the upper extremity wound with wet gauze and place an overlying dry bandage on top twice daily. A new catheter was inserted at this visit for purposes of dialysis. Apparently the patient had been dialyzed using the fistula with the draining wound which could cause blood stream infection.

The patient was discharged on 12/31/21. The prison nurse called a physician for verbal orders for medication. Follow up with the surgeon was not noted and a complete discharge summary was not present. Though dressing changes were recommended twice a day, they were ordered only once a day. Progress notes document the first dressing change on 1/2/23, the third day after the patient was received back at the facility. The nurse did not document how the dressing was applied. The patient was seen daily from 1/2 to 1/5 for dressing changes but then not again until 1/7/23. 1/6/23 was a Friday. After seeing the patient on 1/7/23 the patient wasn't seen again until 1/9/23.

On 1/9/23, an LPN saw the patient using an abdominal pain protocol. The temperature was 100.4, with pulse 111 and BP 113/69 which was very low for his usual blood pressures which were elevated. The patient had sharp lower abdominal pain that was constant. The patient had loss of appetite. The nurse noted the fever and called a physician who ordered the patient sent out to a hospital

The patient was evaluated in the emergency room for abdominal and pubic pain with diarrhea over the last 24 hours. He was still on antibiotics from his recent surgery. The white count was only 4.6 with Hgb 8.8 and platelets of 213. A CT scan was done that showed no acute obstruction with similar findings to his prior CT scan. He was discharged back to the prison.

The patient wasn't seen again until 1/11/23 when he presented for a dressing change. There was serosanguinous drainage. A new dressing was applied.

Another dressing change wasn't done until 1/15/23. This nurse was cleaning the wound with normal saline and placing an iodoform strip which was not recommended. It is not clear if the nurse made up this change; no order for iodoform dressing was found. The next time the patient's dressing was changed was not until 1/24/23 using the same iodoform dressing. The wound care instructions from the vascular surgeon were to pack the wound with wet gauze and cover it with a

---

[54] The graft is an artificial connection between an artery and vein in the arm for the purposes of access for the purpose of dialysis. Were this connection to be severed or opened, the blood from the artery would flow freely from the connection and the patient could bleed to death.

dry dressing. The facility physician's order did not specify the type of dressing only that it be done daily until healed. Nurses were outside their scope of practice when using the iodoform dressing and should have had the facility physician clarify the wound care order.

On 1/20/23, a physician saw the patient and documented that he had been to UIC. A provider had not evaluated the patient since 12/31/22, three weeks ago. The physician apparently did not review the surgeon report or notice that the patient was not receiving recommended dressing changes. She noted that there was no evidence of infection. The physician referred the patient to UIC vascular surgery for follow up from the 12/28/22 surgery. This referral was made on 1/20/23 which was three weeks after the surgery. This referral was not on the 1st quarter 2023 specialty tracking log and the patient wasn't seen for three more months (3/1/23) when the AVG was noted as open and useable for dialysis. The specialty care tracking log is inadequately tracking as required by the Consent Decree and seems to be filled out after the appointment occurs.

The patient presented for dressing change on 1/26/23 and the nurse noted an open ulcer with light bleeding that the patient said began two days ago. The nurse referred the patient to a provider. A nurse practitioner saw the patient and noted a small purulent discharge at the AV fistula site in the upper forearm. The nurse practitioner discussed the case with the facility Medical Director who advised a nurse to notify the nephrologist of the situation and for further instructions. After discussion with the nephrologist, the patient was referred back to UIC emergency room.

The patient was evaluated on 1/26/23 in the emergency room for wound dehiscence. A 5/6 systolic murmur was present radiating to carotids. The patient had been recommended during a 6/16/21 hospitalization to FU with cardiology for a murmur but this was never done. This was particularly pertinent because this patient had a long-standing pustular wound that could have resulted in systemic contamination and endocarditis. An ultrasound demonstrated that the fluid collection was proximal to the recent surgery (the previous surgical incision with stitches were present without erythema, edema or drainage suggesting an overlying abscess). The patient was diagnosed with a non-healing wound. The white count was 5.4 and Hgb 9.5. A vascular surgeon saw the patient. There was low suspicion of an infected graft, local wound care was recommended, and follow up in vascular surgery clinic were recommended. The emergency room report wasn't documented as reviewed and there was no progress note documenting review. The offsite tracking log for the 1st quarter 2023 had no referral to vascular surgery.

The patient had progress note documentation of a dressing change on 1/27/23 and 1/28/23 but then there were no progress notes documenting dressing change until 2/6/23, eight days later. There was a small amount of purulent drainage. There was one further dressing change documented in progress notes on 2/11/23.

The patient returned to the vascular surgery clinic on 3/1/23. This visit was not present on the 1st quarter 2023 offsite specialty tracking log. At this visit the sutures from the surgery were removed and the shunt was open with a strong and continuous flow. The open wound had healed and there was no evidence of infection. When the access was reliably used the dialysis catheter could be removed.

A nurse practitioner did a follow up of this vascular surgery appointment on 4/4/23 about five weeks after the appointment. The blood pressure at this visit was 166/79 which is elevated but was not addressed. The plan was to see the patient "as needed". Care was episodic. This patient had not had a chronic clinic visit in over two years. Nephrology notes were not in the record. No one appeared to address consistently elevated blood pressure. The heart was not auscultated and the murmur which had been present since 2021 had not yet been acknowledged or evaluated.

On 5/1/23, the nephrologist referred the patient for removal of the dialysis catheter used to temporarily dialyze the patient while the new graft healed. This referral was on the 2nd quarter May specialty referral tracking log as completed on 5/25/23.

On 5/19/23 the nephrologist again referred the patient for an MRI of the abdomen to evaluate the complex mass on one of the patient's kidneys. The patient had apparently refused the test on 1/30/23. This 5/19/23 referral was not on the 2nd quarter May 2023 offsite specialty tracking log.

On 6/25/23, a nurse noted the patient was seen inquiring about the CT scan results which were back from 10/5/22, eight months ago. No one had ever reviewed the results with the patient. This is not informed care. The nurse looked up the results but was unable to explain the meaning of the test results to the patient and scheduled the patient to see a provider.

On 7/11/23, a provider saw the patient but only discussed the removal on 5/25/23 of the temporary dialysis catheter. The provider did not discuss the CT scan result that the patient was interested in learning about. The blood pressure was 185/96. The patient said he didn't receive minoxidil and was concerned about his blood pressure. The provider did not review the MAR or determine whether the patient was receiving medication as the blood pressure had been consistently elevated since 2021. The patient was given his dose of minoxidil but his blood pressure therapy wasn't adjusted. The patient had received a KOP packet of metoprolol on 6/27/23 so he had this medication. The MAR documents that minoxidil was provided all days in June. This patient had received medication but had not had it adjusted for two years despite ongoing intermittent elevations of blood pressure. This was serious given his renal disease.

On 7/28/23 the facility Medical Director referred the patient for the MRI that was recommended on 10/5/22. There was a referral for an MRI on the 3rd quarter offsite specialty care tracking log, but there was no referral date and the referral was not completed. There was a comment on the tracking log that the patient was claustrophobic and the test was rescheduled but there was no rescheduled date.

On 8/11/23 a nurse saw the patient using a cough protocol. The patient just developed the cough and said he had lost 5-6 pounds though the nurse did not obtain a weight. The blood pressure was elevated at 156/70 but not acknowledged as abnormal. The patient was afebrile. The nurse gave the patient cough medication and acetaminophen but no referral. The stated complaint of weight loss wasn't addressed.

On 8/16/23, a nurse saw the patient using a cough protocol. The blood pressure was 158/60 which is elevated. The weight was 146 pounds and the patient was afebrile. This was the 2nd complaint

of cough in a week. The nurse appeared to refer the patient to provider sick call but the patient wasn't seen in follow up. Neither the blood pressure nor the cough were addressed.

On 9/6/23, a nurse saw the patient using a laceration protocol. The patient did not have a laceration but had a chronic non-healing ulcer. The BP was elevated at 140/99. The nurse did not document referral to a provider but the patient was seen that day by a provider for his non-healing arm wound. Vital signs were not done. The nurse practitioner noted a 1.5 open lesion with some bleeding but no discharge. There was a dried scab on part of the wound. The assessment was an old non-healing ulcer and the wound was cleaned and dressed with orders to continue dressings until healed. The frequency of dressing changes was not mentioned. The nurse practitioner documented that the patient had a pending vascular appointment. A follow up on Friday was scheduled. The cough and elevated blood pressure were not addressed.

A nurse practitioner saw the patient in follow up on 9/8/23. The blood pressure was 178/87. There was an ulcer on the arm with some serous drainage. A wound culture was done. The nurse practitioner noted a vascular appointment was pending. Some of the note is illegible.

One dressing change was documented on 9/9/23 in progress notes but no further dressing changes were documented.

On 9/13/23 the patient was documented as refusing a UIC vascular surgery appointment. The 3rd quarter offsite specialty tracking log had a vascular appointment but there was no referral date and no appointment date. Apparently these are filled in after the appointment occurs, which is not appropriate. The tracking log documented that the patient refusal was because he had dialysis. This was a scheduling error not a refusal. Scheduling needs to accommodate dialysis sessions which should not be missed.

On 9/13/23 the patient was admitted to the infirmary as an administrative hold and remained there for over a month without indication. There were no clinical notes regarding monitoring of the patient.

On 10/23/23 an Emergency Reporting Form documented that the patient had a fever of 103.9 with a blood pressure of 80/54, pulse of 123 and respiratory rate of 24. These vitals are consistent with shock. Yet, the patient had been on the infirmary for over a month without anyone noticing. The patient was sent to a hospital where he died.

On autopsy, the cause of death was bronchopneumonia with a right lung abscess.

There were so many operational problems at this facility (lack of physician staffing, dysfunctional specialty care process, nursing gaps likely due to staffing, lack of appropriate wound care, etc.) that care at this facility is unsafe. There was no chronic care provided for this patient. He had consistently elevated blood pressure for two year without any modification of his blood pressure medication. He was on dialysis and had significant anemia yet was not on erythropoietin which is standard of care. He had a cardiac murmur that was never evaluated or even acknowledged as a problem.

The patient died of a lung abscess which is typically caused by aspiration but can be caused by hematogenous seeding via catheter which for this patient was the most likely source. The patient had a long-standing abscess near a dialysis fistula. That fistula infection was the likely source of hematogenous spread but was not timely addressed and because of this his death may have been preventable. Of note, there was no evidence of dialysis notes in the medical record.

## Patient #11

This patient was 20 years old with a history of asthma and allergy to penicillin. He was incarcerated on 2/16/23 and transferred to Lincoln on 3/13/23.

On 3/27/23, a provider referred the patient to a urologist for scrotal swelling but only part of this note was present in the medical record. The referral was present in the offsite specialty tracking log. The following day on 3/28/23 he developed swelling of the right hand and left foot. An LPN contacted a physician who ordered an injection of Benadryl and observation for 45 minutes. The patient was then allowed to return to his housing unit and directed to return if the swelling reoccurred.

On 3/31/23, a nurse practitioner documented that the patient had episodes of swelling over the past 3-4 years and that it typically resolved over two days. The provider documented no swelling on either the hand or foot and documented "spontaneous swelling" likely due to salt. This was not a reasonable clinical conclusion as too much salt is not a reason for contralateral hand and feet swelling. Decreased salt intake was recommended. A better history was indicated but not done. The nurse practitioner did not take further history of allergies, the frequency of these episodes, when they tended to occur, if he had ever seen a physician for these episodes, or whether he took any medication for the problem. Consultation with a physician may have identified an allergic basis for this swelling.

On 4/10/23, an LPN evaluated the patient for hand swelling using a fracture, dislocation, and sprain protocol. The left hand was grossly edematous from the hand to wrist and the palm of the hand was red. The patient said he didn't know how the swelling occurred. The nurse gave ibuprofen by protocol and called a physician who recommended an x-ray of the affected hand with a provider follow up. Spontaneous edema without injury in a 20 year old should rule out angioedema[55]. This was not done.

On 4/22/23 the patient was brought to the health unit for right hand/arm swelling. The nurse documented that the patient was previously seen for a similar problem on the opposite arm on 4/11/23. An on-call physician was called and ordered IM solumedrol 125 mg with Benadryl 25 mg followed by daily Benadryl for three days. The doctor recommended scheduling to see a physician on 4/24/23 which was Monday. The use of steroids was reasonable, but no diagnosis was made and a history of his condition was not taken. The physician appropriately treated the patient for angioedema but no diagnosis was made and the problem list was not updated.

---

[55] Angioedema is self-limiting swelling of the skin or mucosa often due to allergies and can be accompanied by anaphylaxis. From UpToDate An overview of angioedema.

On 4/24/23, a different physician saw the patient for arm swelling.  The only history was swollen right forearm and hand with no known injury.  The assessment was right arm extremity edema.  The plan was Lasix, a diuretic, for 10 days, ibuprofen for 3 days, and doxycycline, an antibiotic, for 10 days none of which appeared appropriate.  This was a shotgun approach and the physician apparently wasn't sure what was wrong.  Lasix for unilateral arm edema did not appear to be indicated.  There was no evidence of infection so an antibiotic did not appear indicated.  The swelling was described in the physical examination as "nontender" so it was unclear why the ibuprofen was indicated.  Due to history of asthma and allergies, angioedema should have been considered but it was not.  Notably angioedema is a possible adverse reaction of ibuprofen.

On 5/30/23 the patient developed a rash on arms and hands and was given hydrocortisone cream by a nurse.

On 6/8/23 a doctor saw the patient for scrotal swelling.  The doctor assessed scrotal hernia and referred the patient to a general surgeon.  This referral was present on the 2nd quarter 2023 offsite specialty tracking log with a date of appointment on 6/30/23.

On 6/30/23 the patient went to the urologist as referred on 3/27/23 for scrotal swelling but there was no scrotal swelling identified by the urologist. On 7/10/23 a coverage physician saw the patient in follow up of the urology consult.  On examination the patient still had scrotal swelling and the physician told the patient that a general surgeon would see him soon.  That appointment was scheduled for 7/14/23.

On 7/11/23 a nurse evaluated the patient for hand and foot swelling using the protocol for non-specific discomfort.  The patient again said that the pattern the swelling resolved in a few days.  The nurse did document swelling in the foot but failed to document any assessment of the hand.  The nurse did nothing about the patient's symptoms and made no referral.

On 7/14/23 the patient went to the general surgeon who did not identify scrotal swelling and did not identify a hernia but noticed a couple of cutaneous lesions and offered to take them off.  A nurse practitioner saw the patient the same day of the surgical consult and documented that the patient reported right hand and left foot swelling that comes and goes.  The nurse practitioner confirmed current  right hand non-pitting edema without ecchymosis and attributed it to an unknown etiology. The only plan was to elevate the hands and feet when swollen, refer for an ultrasound or the right hand and foot, and come back to the health care unit if it reoccurs.  The nurse practitioner did not know how to diagnose the patient's problem and the patient should have been referred for a higher level primary care provider evaluation.  The ultrasound of the right hand was done on 7/31/23 and was normal.

On 9/20/23 a code 3 was called for difficulty swallowing.  The patient said he woke up and his throat was swollen which worsened during the day.  The patient's tonsils were touching the uvula.  The patient was breathing without distress. The patient reported that this had never happened before.  He said he was allergic to penicillin but was unaware of any other allergies.  The nurse called an on-call physician who sent the patient to an emergency room.  This was appropriate because difficulty swallowing in the context of an allergic type reaction needs immediate attention by someone who can intubate the patient.

73

The hospital summary did not include their examination of the throat but they documented that a strep test was negative and a chest x-ray was negative. When the patient was waiting for discharge, the patient sustained a seizure. He had a negative CT of his brain, was medicated and sent back to the prison.

On 9/21/23, a nurse practitioner saw the patient after the ER visit and noted that the patient had sore throat, edematous tonsils- strep negative with unremarkable labs and toxicology screen negative. The nurse practitioner noted that the patient had a seizure in the emergency room but the CT of brain was negative. The emergency physician recommended a neurology consult. The patient felt much better and the nurse practitioner documented an assessment of "?idiopathic angioedema", which was an accurate diagnosis and the first accurate documented diagnosis of the patient's problem. The nurse practitioner referred to neurology as recommended; added Zyrtec; and referred the patient to an allergy specialist. Neither the neurology nor the allergist referral were entered into the 3rd quarter 2023 offsite specialty log. He encouraged the patient to keep a food and environmental log and avoid known irritants. The diagnosis of idiopathic angioedema appeared accurate but was not added to the problem list. There was no Medical Director at this time, but the nurse practitioner should have consulted a physician to develop a plan for what to do if this occurred again as throat swelling in the context of angioedema is life threatening. The Monitor has consistently recommended adding UpToDate to all clinical examination rooms. This case illustrates the benefit of this. When the electronic record is installed, there should be a link to UpToDate in the record that gives all practitioners real time access to this important service. In this case because the was no facility Medical Director the nurse practitioner had no one to consult.

On 10/9/23, at 8:45 am, a LPN documented that the patient presented to the health unit for swollen tonsils with difficulty talking and feels like his throat was swollen. An on-call physician was contacted and said to admit the patient to 23 hour observation. The patient should have been sent to an emergency room as intubation may have been indicated. This set of symptoms is potentially life threatening and further questions should have been asked including past history. If angioedema were on the problem list and this information given to the on-call physician, a different result likely would have occurred. No medication was ordered.

On 10/9/23 at 12:15 pm a nurse documented that the patient complained of increased shortness of breath and throat tightness. Vital signs were normal. The same on-call doctor was contacted and gave a telephone order for 50 mg of IM Benadryl and to monitor. This appeared to be a mistake. If the physician believed that the shortness of breath and throat tightness was related to allergic symptoms, the patient should have been promptly sent to an emergency room. It was unclear if the diagnosis of angioedema was known to the on-call physician. Nevertheless, any patient with suspected angioedema involving any organ near the airway (tongue, uvula, soft palate, or larynx) must be immediately assessed for signs of airway obstruction.[56] This is because intubation may be necessary.

Thirty five minutes later at 12:50 pm the patient told the nurse he was having increased difficulty breathing and tried to grab the nurse. The nurse asked the patient "to try to calm down" so he could be assessed. The patient took off running to the front of the health care unit and the nurse called

---

[56] UpToDate - Overview of Angioedema)

for a sergeant to help. The sergeant ran after the patient and got him to sit down. The patient appeared to stop breathing and slumped to the floor. The patient had a pulse but periods of apnea. The patient was bagged with oxygen and given epinephrine. 911 was called. At approximately 13:11 or 21 minutes later the EMS took over. No other medications were administered nor was a physician involved in the care. A physician was not called.

The cause of death was asphyxia due to obstructive laryngitis, epiglottitis and tonsilitis. This patient died from angioedema which was recognized but not appropriately treated and was a preventable death.


## Patient #12

This patient was 49 years old and transferred to Pontiac on 8/28/22. The problem list documented a mental health disorder, hypertension, diabetes and benign prostatic hypertrophy. He was five foot, eight inches tall and on 9/28/22 he weighed 240 pound with a BMI of 36.5 which is obese. Obesity was not on the problem list but was likely contributory to his hypertension and diabetes. On transfer to Pontiac, the patient was on amlodipine, antacids, gabapentin, glipizide, HCTZ, metformin, methocarbamol, metoprolol, simvastatin, tamsulosin and tramadol. Simvastatin, antacids, and gabapentin indicated hyperlipidemia, gastric reflux, and diabetic neuropathy, but there was no associated diagnosis on the problem list. The tramadol was a long-term medication but there was no associated problem indicating pain relief. It was discontinued in October at Pontiac.

The Death Summary by the vendor documented that this patient was "very non-compliant" with medication, especially insulin, and that he was being followed by the diabetic clinic at UIC for his diabetes. With respect to compliance, the patient refused morning insulin 28% of the doses which were at 3:30 am and 15% of evening doses which were at 3:30 pm. No one ever questioned why the patient refused, yet at least for the morning dose, getting up at 3:30 am is a distinct disincentive in taking medication. Also, about 9% of insulin doses were not documented whether they were given or not. A 9% rate of not offering patients their medication is something OHS should evaluate as to why it is occurring. The Monitor believes a key factor is staffing.

Over the year that the patient was housed at Pontiac, his blood sugar was continuously poorly controlled. The patient was evaluated by a nurse practitioner on five occasions and three different physicians on five occasions. All but one provider visit was episodic and related only to a current complaint. There was no Medical Director for part of the time period of this review which appeared to affect his care.

The first provider visit on 9/7/22 was a referral from an LPN because the patient complained of insulin allergy. The only history was that the patient complained of allergic reaction at insulin injection sites. This is not a history but merely repeated the reason the patient was to be seen. The nurse practitioner took no other history and performed a brief examination documenting edema of the knee. The assessment of the visit was "water on the knee" and the plan was to obtain a left knee x-ray and to decrease the amount of food he ate. The patient had a recent A1c of 10.7 which

is very high but this wasn't acknowledged. None of the other patient problems were addressed. The patient's complaint of insulin allergy was not addressed at all.

On 10/17/22, at 3:15 am a nurse obtained a blood sugar reading of "HI" which is more than 500. This is an extremely high blood sugar. He refused to take insulin saying he was allergic to insulin. A series of negotiations between the patient and an on-call physician resulted in admission to the infirmary with a mental health consult.

On admission to the infirmary on 10/18/22, the patient's blood pressure was 170/101 with a heart rate of 122. The patient refused all interventions that day including blood glucose checks.
The second provider visit was on 10/18/22 at about noon when the facility Medical Director evaluated the patient for a blood sugar of 393. Ketones were not checked. The physician documented that the patient just received 40 units of 70/30 insulin but the MAR documented that the patient had refused insulin that morning and afternoon and moreover was on 50 units of 70/30 in the morning. The doctor documented frequent refusals of 70/30. The assessment was hyperglycemia with frequent refusals. The plan was to recheck the blood glucose tonight and to record all refusals of insulin. The following day, the facility Medical Director gave a phone order for 8 units of regular insulin twice a day if the blood sugar was greater than 200.

The next morning on 10/19/22 the nurse documented that the doctor gave a new verbal order to give regular insulin 8 units twice a day if the blood glucose was greater than 200. In carrying out this order, the nurse transcribed the order to a prescription. The insulin MAR for October was handwritten and the 70/30 insulin entry had the same start and stop dates of 4/25/22 which is clearly an error. Prior MARs had a stop date of 4/25/23. On 10/19/22 a nurse documented on the MAR that the 70/30 insulin had expired. There was no order to discontinue this medication and no documented effort to renew the prescription. Seventy units of 70/30 NPH insulin was abruptly stopped in a patient with out of control diabetes. This appeared to be a significant medication error due to faulty nurse-provider communication and use of handwritten MARs and reflects a significant patient safety risk. This type of error should be reported in the adverse event system. The Monitor hopes that the SIU pharmacy management process analysis evaluates these types of errors.

The patient had spent two days on the infirmary and had not been evaluated by a provider. Notably on discharge, the patient's insulin had been inadvertently reduced from 70 units daily of 70/30 insulin to 16 units of regular insulin but only if the blood sugar was above 200. This was such a dramatic reduction that it was certain to cause deterioration in status.

On 10/28/22, a nurse documented the patient saying his blood sugar was high. The patient said he doesn't take insulin because it makes him feel like electricity is running through his body. Notably, the mental health consultation ordered on 10/18/22 had not occurred but clearly the patient's mental health condition was affecting his physical status. Mental health needed to evaluate the patient as requested. The blood sugar was recorded as "HI" and the patient accepted the 8 units of insulin. The discontinuation of 70/30 insulin was still unrecognized. The facility Medical Director, apparently still not onsite, gave a phone order for the inmate to sit in the holding tank and recheck the blood glucose in an hour. Apparently, the facility Medical Director was unaware of the patient's medication. It may be useful for IDOC to require that when providers are called

after hours for a blood glucose problem that nurses report what insulin they are on[57].    At 6 pm on 10/28/22 the blood sugar was 541.  Ketones for DKA were not checked.[58]  The facility Medical Director was called and ordered 10 units of regular insulin.  At 6:30 pm the patient felt better but without checking the blood glucose the patient was discharged back to his housing unit by the nurse.  There was also no follow up ordered.

The third provider face-to-face visit was a Medical Director evaluation on 11/1/22 because the gabapentin needed to be renewed.  The only history was that the patient had a history of multiple joint pains and was "here for Neurontin renewal".  Neurontin does not have an FDA indication for joint pain. The physician did not discuss what the patient's current symptoms were.  The examination documented "neuro- intact".   The only assessments were hyperglycemia and Neurontin renewal.   The blood glucose was 366, blood pressure was 162/110 which was significantly elevated and the pulse was 112 which was also elevated.  The blood pressure and pulse were not acknowledged or addressed.  The patient was on KOP blood pressure medication but the provider did not assess whether the patient was taking his medication.  The physician did not increase the blood pressure medication to lower the blood pressure.  The blood sugar  was addressed by a stat order of 8 units of regular insulin. The gabapentin was renewed without providing an indication or assessing whether it was effective for its intended purpose or even to document what it was being used for. It was unclear in review of this record why the patient was on this medication and it appeared that the physician didn't know either.   This visit accomplished little except to renew a medication that had no clear indication.

The fourth provider visit was by the facility Medical Director two days later on 11/3/22.  The purpose of the visit was "noncompliance" with medication.  The doctor wrote that the patient was unable to take insulin in the morning because he was asleep.  The patient's latest A1c was 11.1 which is extremely high and out of control..    The physical examination for this episode of care included a blood pressure of 201/107 which is a hypertensive emergency.  The patient had recently received all of his blood pressure medications, but there was no questioning the patient with respect to whether he was taking medication as ordered.  The physician did not assess for symptoms or signs of end-organ damage seen in hypertensive emergency.[59]  Nor were any diagnostic tests conducted typically done in hypertensive emergencies.[60]  Instead, the conclusion was to assess hypertension and hyperglycemia with type 2 diabetes. The documented plan was add clonidine 0.1 mg twice a day for three months; to stop all prior insulin orders and to start Lantus insulin at 35 units in the evening for 21 days and to follow up in 2 weeks.  This was still a significant reduction in insulin from a month earlier.  The patient had been on 70 units of 70/30 insulin which was now substituted by 35 units of Lantus which is approximately a half of the prior dose during which the blood sugar was not controlled.  Ordering Lantus in the evening was a benefit as it was more likely to result in compliance.  This episodic visit resulted in addition of medication for hypertension and

---

[57] It would be extremely useful when on-called physicians are called after hours that they document their understanding of what is explained to them and their assessment and plan.  This is something that is able to be done when the electronic record is implemented.

[58] Ketoacidosis can be present with a serum glucose as low as 250 but is often between 350-500.  Glucose levels at these elevations should prompt a check for urine ketones which initially can be with a urine point-of-care dipstick.

[59] Signs of neurologic symptoms such as agitation, delirium, etc.; focal neurologic signs of stroke; flame hemorrhages in the retina; nausea or vomiting; chest pain; signs of aortic dissection; shortness of breath; on any drugs that can cause hyperadrenergic state.

[60] EKG, chest film, urinalysis; electrolytes; creatinine; and depending on CNS symptoms CT of brain.

a continued significant net reduction in insulin. The provider didn't take history of prior insulin dosages. Notably the two week follow up ordered by the physician never occurred and the consequences of the new orders were not reviewed but became apparent in subsequent episodic care.

For the 23 days from 11/3/22 to 11/26/22, the blood sugar should have been checked 47 times up until mid-day of 11/26/22. It was checked 37 times. Morning checks were done 15 times and showed on no occasions when blood sugar was below 200. Blood sugar was above 300 on four occasions, above 400 three times, and above 500 three times. Evening blood sugar checks were worse. On none of the 22 checks was blood sugar below 200. Blood sugar was above 300 on three occasions; above 400 on six occasions; and above 500 on seven occasions. The episodes above 300 were not brought to any provider's attention. This is significantly out of control diabetes yet, the glucose record did not result in a provider referral. There apparently is no standard or requirement for when a nurse is to notify a provider for out of control blood glucose.

On 11/4/22, a nurse progress note documented a blood sugar of "HI". This episode is not recorded on the blood sugar MAR. A nurse called a physician-on-call and was given an order for 10 units of regular insulin and water to drink. Urine ketones were not checked which should have been done. A recheck of the blood sugar was ordered with instructions to admit to the infirmary for blood sugar over 350. The blood sugar didn't come down and the patient was placed on the infirmary. The following morning at 5 am, a RN documented receiving a ***report from a nurse for a new order of 20 units of Lantus insulin. There was no prescription for this order*** nor was there a progress note by a provider documenting the new order. This order was entered in a hand written fashion on the MAR for the am dose starting on 11/4/22. The total insulin dose was now 55 units of Lantus (20 units am and 35 units pm) which is still a reduction from the 70 units of 70/30 insulin previously ordered. This irregular and undocumented medication ordering transmitted by anecdotal verbal communication is dangerous and needs investigation by the process group undertaking medication management process analysis. At 10 am on 11/5/22, the patient accepted insulin and was discharged back to his housing unit without verifying a discharge blood glucose. No follow up was ordered which typifies the episodic nature of care.

Subsequent blood sugars for November remained very high. On 11/26/22 at 5 pm a blood sugar of 586 was noted and an on-call physician was called and ordered 15 units of insulin. At 6:30 pm the blood glucose was "HI" and the on-call physician again ordered 15 units of insulin. For neither of these episodes were ketones checked. A follow up blood sugar was unable to be checked due to "security". Anyone with a dangerously high blood sugar must be able to have their blood sugar checked without custody intervening. The nurse documented that the blood sugar would be checked in the morning. The following morning the blood sugar was documented as refused. There was no follow up for this episode.

On 12/1/22, without seeing the patient a nurse practitioner renewed 20 units of Lantus in the morning and 35 units of Lantus in the evening for a year. This episodic type of chronic care is dangerous. The nurse practitioner renewed the medication without reviewing the blood glucose log. This existing dose of insulin was insufficient. For unclear reasons the same provider who renewed the medication on 12/1/22 wrote another prescription for the same medication at the same dose, but this time changed the length to six months. Medication renewals should be completed

by seeing the patient or by review of the record. This did not occur and typically does not occur in IDOC. In this case, the patient had continuously dangerous blood glucose levels and the medication was renewed without considering other medications, changing the times of insulin administration, or increasing dosages. Insulin was also renewed without any attention to blood glucose levels. This is dangerous.

On 1/4/23 a fifth provider visit was conducted by a nurse practitioner who saw the patient after a UIC orthopedic consultation. The patient had been seen on 12/6/22 at UIC about a month earlier which is not consistent with requirements of provision III.H.2. The orthopedic consultant diagnosed a paroxysmal atraumatic left knee pain with effusion and recommended a course of physical therapy with follow up as needed. The orthopedic consultant did document that the patient reported generalized decrease in sensation in both feet secondary to diabetes. There was no foot examination documented in the record reviewed at Pontiac. The report was not signed as reviewed until 1/4/23 or 29 days later. The nurse practitioner seeing the patient did not document the findings or recommendations of the orthopedic consultant. The nurse practitioner did not document a physical examination nor were new symptoms solicited. The orders included pain medication and physical therapy two times a week for 8 weeks. The referral to physical therapy did not specify the directions for therapy or the length of time for therapy. When seen by the physical therapist on 2/10/23, the therapist documented left knee effusion and wrote "This patient will likely be seen 1x visit only" and gave recommendations to ice the knee and decrease use of stairs. No further physical therapy was provided.

On 1/30/23 a nurse practitioner documented that the patient was not receiving medications as ordered. The nurse practitioner checked with pharmacy who had no order for renewal of clonidine. The nurse practitioner documented giving an order to pharmacy but a prescription was not found. The nurse practitioner scheduled a chronic care visit which hadn't occurred since 7/6/21, over a year and a half ago.

On 2/1/23, there was a note that a diabetes telemedicine clinic was to be rescheduled due to "security issue". Chronic clinic appointments should not be cancelled except for extreme security issues. At this clinic there was other documentation that there were insufficient officers to manage the facility which is dangerous and makes normal operations impossible to conduct.

On 2/9/23 laboratory results returned showing an A1c of 15.3 which is an extremely high blood sugar. The routine glucose was 434. These results were consistent with diabetic ketoacidosis but the laboratory tests weren't even noticed and the laboratory test was signed as reviewed on 3/1/23 about three weeks after the test was reported. When signed as reviewed nothing was done to expedite an evaluation. This was substandard care and it appeared that there was insufficient provider staff at this facility.

On 2/13/23 a nurse documented a blood sugar of 581. Ketones were not checked nor was the patient evaluated for diabetic ketoacidosis. The nurse called an on-call physician who ordered 10 units of regular insulin. No follow up was ordered.

On 2/16/23 a LPN documented a blood sugar of 509. The patient didn't have ketones checked and was not evaluated for symptoms or signs of diabetic ketoacidosis. The LPN called an on-call

physician who ordered 10 units of regular insulin. The blood glucose was rechecked and was 345. No follow up was ordered.

On 2/17/23, a LPN called an on-call provider for a blood sugar of 512. The patient didn't have ketones checked and was not evaluated for symptoms or signs of diabetic ketoacidosis. An on-call physician ordered 10 units of regular insulin. Follow up blood glucose was 405. No follow up was ordered.

On 3/23/23, a nurse noted that the vendor Regional Medical Director gave a phone order that the glipizide and metformin should be changed to directly observed therapy; that a nurse practitioner was to evaluate the patient on 3/27/23 and that the patient was to be referred to the endocrinologist. The endocrinology consultation was found on the offsite scheduling log.

On 3/28/23 a mental health clinic visit was cancelled for unstated reasons. It was documented as rescheduled but the date was not given. Mental health saw the patient on 3/31/23 but the note was not in the medical record.

On 4/3/23, a nurse practitioner evaluated the patient because he was only taking insulin once a day and thought he needed regular insulin. For March, the patient refused am insulin seven times and refused pm insulin eight times. On three occasions, nurses did not document whether they gave the insulin or not. The patient was ordered and received insulin about 75% of the time. More importantly, the most recent A1 c was extremely high at 15.3 and the patient was on inadequate amounts of insulin. While the patient did refuse 25% of insulin doses, the dose was insufficient. Also, it was unclear if there was a mental health contribution to his status. The nurse practitioner said the patient was "educated in depth on insulin / need for continuity". The nurse practitioner noted that the patient had a pending appointment with endocrine. Care was substandard. The patient's diabetic medications should have been adjusted.

Mental health saw the patient on 4/12/23 but there was no note of the evaluation in the medical record. On 4/13/23, security documented that the patient was on crisis watch and the not seen by a nurse.

On 4/19/23 the patient was brought to the health unit because security said that the inmate felt he was hyperglycemic. The blood sugar was 399 which was high. The nurse documented that the patient had been refusing insulin for several days stating he was allergic. The MAR showed that the patient accepted insulin 4/15/23 and 4/16/23. On 4/17/23 both am and pm and on 4/18/23 am there was no documentation by nurses regarding insulin administration so the nurses statement was inaccurate. It appeared that the patient was taking medication and the nursing staff failed to document what occurred for the prior two days. The nurse called the new facility Medical Director who ordered Benadryl. The patient's insulin was not adjusted.

On 5/6/23, a lieutenant asked a nurse to see the patient because he had not received his insulin in the morning. The nurse saw the patient. The nurse documented that the patient received 10 units of regular and half of his regular dose of Lantus insulin.

On 5/11/23 a nurse practitioner saw the patient for follow up of the physical therapy appointment. The patient was to have received 8 weeks of therapy but due to miscommunication, the patient received only one therapy consultation. The patient reported intermittent swelling and pain. There was no current edema. The nurse practitioner didn't order physical therapy and only follow up as needed.

On 5/21/23, a nurse documented a blood sugar of 470 and that the patient was refusing insulin. The new facility Medical Director was notified. He ordered a one-time dose of glipizide. Typically, an oral medication is not given as a stat dose. This patient's blood glucose was continuously elevated for the past year and management of his diabetes was episodic and only addressed emergent blood sugar levels. The patient's last A1c was 15.3. An increase of his medication would have been appropriate but was not done. This patient had not received a chronic care visit over the past year in which all of his problems were addressed. This patient's care is characteristic of the episodic management of chronic illness which, for this patient, resulted in poorly controlled diseases. The MAR showed that there was no documentation of offering patient medication for the last dose that morning and the blood glucose the prior evening was 213. The physician ordered a follow up on 5/22/23 but the patient wasn't seen that day nor was the appointment rescheduled.

On 6/1/23, the inmate's blood glucose was 446. The facility Medical Director was called to ask whether insulin should be given but the Medical Director told them to hold the insulin for this evening.

On 6/7/23 a nurse practitioner evaluated the patient for an elevated blood sugar. The nurse practitioner raised the insulin to 40 am and 30 pm. A follow up was ordered in three weeks to check the blood sugar response to the increased insulin.

On 6/28/23, the patient was evaluated at UIC endocrinology. The endocrinologist documented that the patient doesn't receive about five of 14 doses per week due to a nursing shortage. This self-report is consistent with MAR documentation that include multiple days when insulin is not documented as offered or given. The CBG values were in the 400-500 range. The consultant noted no retinopathy or nephropathy checks but documented the patient checked his feet daily. The recommendation was to decrease the glargine to 30 units BID; start Victoza 0.6 mg daily and increase in 0.6 mg increments once weekly as tolerated until a goal dose of 3 mg; perform a microalbumin test for the next visit; consider a SGlLT2 inhibitor next visit; do blood glucose checks 3-4 times daily including fasting, pre-meals and bedtime; and see ophthalmology for a retinal evaluation and podiatry presumably for a neuropathy check and foot examination. The recommendations by the endocrinologist documented all the deficiencies in the care of this diabetic person.

On 6/30/23, the patient was admitted to the infirmary on crisis watch.

On 7/4/23, an officer told a nurse to evaluate the patient for chest pain. A nurse saw the patient in the cell. The patient said he didn't currently have chest pain but wanted his blood pressure medication. The patient's blood pressure was156/98. His medication  was given.

The only chronic clinic visit was on 7/18/23. The patient was documented as seen for hypertension, hyperlipidemia, diabetes, benign prostatic hypertrophy and asthma. The patient did not have asthma and was not on medication for asthma. The only history was that the patient had bilateral lower extremity pain. The only labs documented were A1c 13.2, cholesterol 219, HDL 47and triglycerides 332. The blood pressure was 147/98. The examination included the heart, lung, abdomen and that the patient had normal gait. There was no history of any of the patient's chronic illnesses. The patient had an eye examination on 10/4/22 and the optometrist did not complete the diabetic screening wanting first to obtain an A1c level. The optometrist recommended an A1c and to return in a month to complete the retinal examination. This didn't occur and the provider failed to note it. Microalbumin had not been tested in the past year. There was no foot exam including screening for neuropathy. The patient was on gabapentin for unstated reason. So, there was no retinopathy, nephropathy or neuropathy screening. The patient had blood pressure that was elevated and the A1c was most recently 13.2 which is extremely high. The provider made no changes to the patient's medication. The patient had a 10 year risk of cardiovascular event but was only on a low dose of simvastatin. He should have been on a high intensity statin. Just three weeks earlier, the patient had been to the UIC endocrine clinic. The UIC consultant recommended decreasing glargine insulin to 30 units twice a day and start Victoza and to increase in 0.6 mg increments to 3 mg per day. Also recommended was to increase capillary blood glucose testing 3-4 times daily; to refer to ophthalmology, to follow up with podiatry for a foot examination and to check the A1c in 3 months. The provider didn't document review of this consultation, failed to note that the glargine insulin had not been modified or that the Victoza had not yet been obtained. The same nurse practitioner who completed the chronic care visit wrote another progress note ordering Victoza 0.6 mg weekly to increase by 0.6 mg weekly to a goal of 3 mg. The nurse practitioner apparently reviewed the consultation sheet but did not decrease glargine, did not order microalbumin, retinal screen podiatry evaluation, and did not increase CBG screening. The nurse practitioner wrote a referral back to endocrinology.

The Victoza was not obtained by the vendor pharmacy and the patient never received it.

On 8/3/23 the patient complained to an LPN about tingling numbness in fingers and toes. The LPN referred to a nurse practitioner.

The facility Medical Director wrote a note on 8/16/23 for a medical emergency that took place on 8/8/23. The late entry was due to the medical record being unavailable. The physician documented history of noncompliance and uncontrolled diabetes, hypertension, high blood lipids and depression and bipolar disorder. The physician stated that on arrival, cardiopulmonary resuscitation was being undertaken on the patient. The patient was taken to a local ER where he was pronounced dead.

There were numerous problems with this patient's care as cited above. The preliminary postmortem findings included: pulmonary congestion and edema, cerebral edema, mild coronary artery atherosclerosis, diabetes without ketones or significant glucose in urine or vitreous humor, enlarged fatty liver. The cause of death was arrhythmia and hypertensive cardiovascular disease. The patient's blood pressure and diabetes were uncontrolled throughout the entire span of this record review (since 2021), yet medication was not appropriately adjusted. The only change of

blood pressure medication over the year was the addition of a small dose of clonidine. His death may have been prevented if his blood pressure was better controlled.


## Patient #13

This patient was 66 years old. Problems included dyslipidemia since 1999, hypertension since 2012, obesity, smoker, diabetes since at least 2012, and hypothyroidism. The patient had five modifiable major risk factors for cardiovascular disease: dyslipidemia, hypertension, obesity, smoking, and diabetes.

On 4/29/21, at a chronic clinic visit the provider documented the patient had sharp chest pain when he ate sauce or laid down. No further history was taken. An EKG was not done. No assessment was made but omeprazole, a medication used for gastric reflux was prescribed.

On 10/25/21, the patient transferred to Hill CC.

Within a month of transferring to Hill, on 11/22/21, a registered nurse saw the patient using an indigestion protocol. The pain was described as lasting 20 minutes in the sternum area. The pain was sometimes related to food intake. The nurse gave antacids without referring the patient. The pain description was suggestive of anginal pain but the history wasn't in depth. Referral to a provider should have been considered.

On 12/20/21 a registered nurse evaluated the patient again using an indigestion protocol. Pain was described in his chest. It lasted 5-6 minutes and was relieve by rest. He did say eating chili or pizza gave pain. The pain description was similar to angina but was not associated with coronary heart disease. The patient was given antacids without a referral; no EKG was done. This patient should have been referred to a provider as symptoms were consistent with angina.

On 12/30/21, an LPN saw the patient using the indigestion protocol. This pain was described as located in the stomach or esophagus and was related to food. The protocol asks if the patient has cardiovascular disease or hypertension. It does not include a question whether the patient has cardiovascular risk factors but should. This patient was only given antacid and Pepcid by protocol. This was the third consecutive complaint of "indigestion" and the patient should have been referred to a provider and was not. The independent clinical judgement required when conducting a sick call encounter is not within the scope of practice for LPNs.

On 3/11/22, a nurse, who did not document their title or name, saw the patient again using an indigestion protocol. The nurse described the pain as on and off and burning in nature. The patient said the Prilosec didn't help but TUMs did. There was a question that asked whether the pain continues despite treatment protocol implementation which the nurse checked as "no" but it had continued over 6 months and four nurse visits for "indigestion". This patient should have been referred to a provider.

On 3/30/22, an LPN saw the patient using an indigestion protocol. The patient's pain was getting worse despite use of Pepcid and TUMs. His blood pressure was 153/97, which is elevated and he

had a fast heart rate (102). The nurse referred the patient to a provider that day. The provider did not characterize the pain as indigestion but as chest pain. The pain was described as crushing and was worse with activity or lying down. When the patient stopped the activity the pain resolves. When he sits up the pain improves. He had mild shortness of breath with activity. The nurse practitioner noted no family history of heart attack. The history was strongly suggestive of angina. The nurse practitioner's plan was an order for an EKG and a stress test. This was a reasonable plan except that nitroglycerin and an antianginal drug should have been considered. An EGD should have been ordered after the stress test if the stress test was normal. The stress test should have been done without delay. The EKG tracing was too light to see clearly but the reading included non-specific T wave changes which can be consistent with coronary vascular disease. Also, because the patient had proteinuria and diabetes, the blood pressure should have been controlled better and his medication usage should have been reviewed. Based on the MAR the patient last received his three blood pressure medications on 2/25/22 so he would have been out of his medications at this point. The provider should have ensured that he was receiving his medication.

The stress test wasn't approved until 4/21/22 about three weeks later.

On 5/4/22, a provider conducted a chronic disease clinic for diabetes, hyperlipidemia, and hypothyroidism. The weight was 253 pounds. The blood pressure was 143/74 which is not at goal and the pulse was elevated at 110. The patient was not being seen for hypertension and the mildly elevated blood pressure was ignored. Notably, based on MARs, the patient last received lisinopril and HCTZ, two of his three blood pressure medications on 2/25/22 so the patient was out of these medications. This should have been identified and the medication provided. Also ignored was the pulse of 110 despite the patient being on Synthroid (for hypothyroidism) which has a number of cardiovascular side effects including elevation of the pulse. The only laboratory tests documented were related to the conditions being monitored: A1c 11; TC 224; LDL 112; TSH 4.5  Though the patient was being evaluated for diabetes there was no  foot exam and no check for neuropathy, nephropathy,  or retinopathy. Though the patient had a recent test for microalbumin which was very high (896), this was not acknowledged and a follow up microalbumin was not ordered.  A prior urinalysis was positive for gross proteinuria.  This would be consistent with chronic kidney disease despite a normal creatinine and glomerular filtration rate. Because of this, the hypertension goal should have been lowered to 130/80 and additional medication should have been ordered. The blood sugar was very high (A1c 11) and  70/30 insulin with sliding scale was added.  This combination is not appropriate due to the use of regular insulin in the 70/30 mix and as a single agent used in addition to the 70/30 insulin.  A GLP-1 drug might have been considered.   There was no follow up or mention of the repeated chest pain nor mention of the stress test which had not been done over the past month.   This was a very poor chronic clinic visit.  A follow up in a month was ordered which was appropriate but the follow up clinic did not occur.

On 5/21/22, an LPN evaluated the patient using an indigestion protocol.  It was described as a chest pain that comes and goes and occurs sometimes after eating.  The patient described the pain as: "feels like someone is trying to break out my chest".  The blood pressure was 161/94 which is not in control.  Although this was the 6th episode of "indigestion" or chest pain the nurse did not refer to a provider and only gave the patient Pepcid and antacids, which had previously been stated as not helpful.  The elevated blood pressure was not acknowledged or addressed.  The nurse made

84

an assessment error as this was unlikely to be indigestion; the pain should have been evaluated as chest pain.  Independent clinical judgement is  outside the LPN scope of practice.

On 6/2/22, an LPN evaluated the patient for "indigestion" which was described as "not better". The pain was described as "epigastric, like food is stuck in throat".  The nurse referred the patient to a provider.  This was the 7th episode of evaluating for indigestion or chest pain.

A physician saw the patient on 6/6/22.  The blood pressure was 160/102 and the pulse 108.  The physician presumed that the patient had chronic indigestion for which he was taking Prilosec and antacids with relief.  There was no further history and unawareness that this patient had six prior episodes of the same complaint without resolution.  The provider was  unaware that previously a somewhat better history was done characterizing the pain as consistent with angina and that a stress test was ordered.  The prior EKG showing non-specific STT wave changes was not reviewed.  A cardiovascular risk history was not taken.  The assessment was 1) heartburn and 2) increased blood pressure due to noncompliance.  The assessment was made without any history, review of prior visits, and review of the EKG. The plan was to increase Prilosec.  This was a poor evaluation as it did not evaluate prior diagnostic tests, history, or pending diagnostic tests.

The doctor wrote that the patient had run out of his blood pressure medication.  Review of the MAR showed that the lisinopril and HCTZ blood pressure medications were last given as KOP medication on 2/25/22  and amlodipine was last given on 4/19/22.  Lisinopril and amlodipine expired on 4/21/22 and HCTZ expired on 4/22/22.   None had been timely renewed.  Designating the patient as noncompliant was degrading particularly since the lapse was not identified earlier by nurses administering medication and that the prescriptions expired without notice by the pharmacy to the provider. The doctor did not document that the medications expired but he did sign a verbal order for expired medications on this date.  The provider should have scheduled a follow up to assess whether the patient's blood pressure was under control.

On 8/12/22, the same physician wrote a note saying that a stress test was ordered on 3/30/22 but there was "no cardiac indication at this time".  This is not accurate.  This patient had cardiac equivalent chest pain on seven occasions over the past five months with multiple risk factors for cardiovascular disease including diabetes, hypertension, hyperlipidemia, ex-smoker, obesity, and male sex.  The stress test should have been done in March of 2022 shortly after it was ordered.  To cancel the test was an egregious error.

On 9/29/22, a nurse practitioner conducted a chronic clinic for diabetes, hypothyroidism, hyperlipidemia, and hypertension.  The only history was that the patient was taking all of his medications except his lipid medication.  The pulse for this patient had been repeatedly elevated and was 110 at this visit.  The patient was on Synthroid for his hypothyroidism, which can cause a variety of cardiovascular side effects, including tachycardia.  This should have been evaluated but was not.  There was no check for retinopathy, neuropathy or nephropathy. The blood pressure was now normal and the patient was now receiving his blood pressure medication.  The prior elevated urine protein tests were not acknowledged and because the patient had both diabetes and hypertension this chronic kidney disease should have been monitored more closely and included in his problem list . The patient wasn't taking his atorvastatin and given his multiple cardiac risks, taking this medication should have been emphasized and a LDL goal of 70 should have been set.

85

On 10/4/22, an LPN saw the patient using a chest pain protocol. The pain started when he was walking to the clinic. The blood pressure was 136/86 which is high due to his diagnosis of diabetes. In response to the protocol question "identify cardiac risk factors", the LPN wrote "states pain goes away when at rest". This patient had multiple cardiac risk factors. The LPN performed an EKG and showed the EKG to a nurse practitioner. There were two EKGs. One showed non-specific STT wave changes with slight T wave inversion in V6. This can be consistent with angina. Another EKG showed T wave abnormality consistent with lateral ischemia. The nurse practitioner sent the patient back to his housing unit without any orders. Given the risk factor history, past history of "indigestion" or chest pain on 8 separate occasions over the past seven months, current history consistent with angina, and given an EKG consistent with lateral ischemia, this was another egregious error. The nurse practitioner did not pay sufficient attention to the history and EKG results. The patient should have been referred to an emergency room to evaluate acute coronary symptoms.

On 12/5/22, a RN evaluated the patient using a chest pain protocol. This was the 9th episode of a health request with a cardiac equivalent for angina (six with "indigestion" and three with chest pain). The patient describe sharp chest pain at rest for about a year. The only identified risk was increased blood pressure but the patient also had diabetes, obesity, was an ex-smoker, had hyperlipidemia and was a male. Clearly, risk factor identification should be a training issue and this protocol would be improved by including all possible risk factors for the nurse to assess instead of requiring nurses to know them. The blood pressure was 174/98 and the pulse was 104. The MAR showed that patient received a month supply of his blood pressure medications on 10/24/22 and then not until 12/1/22 so some doses were missed in November. This was not noted. But the nurse did document that the patient hadn't taken his medications in four days; the patient had just received medication on 12/1/22. An EKG was done and was read as non-specific STT wave changes but lateral leads were suspicious for acute coronary syndrome. The nurse documented that a physician was called and was aware of the EKG and instructed that the patient should go back to the housing unit with a follow up the following day. A better history should have been taken specifically where the pain was located, referred pain, nausea, shortness of breath, and relation to exertion and rest. Given prior history and the EKG, this patient should have been referred to an emergency room.

The next day, on 12/6/22, a nurse practitioner evaluated the patient in chronic clinic for diabetes, hypertension, hypothyroidism and hyperlipidemia. The history was that the patient took his Synthroid with breakfast and the other medications as recommended and that he had occasional chest pain with an EKG showing STT wave changes. This was not a very good history for chest pain. Laboratory tests were documented except that prior proteinuria was not acknowledged. The blood pressure was 106/76 which was now controlled. The pulse was 108 which was still elevated but not acknowledged as abnormal. There was no foot examination, no evaluation for neuropathy, no documentation of the last retinopathy check and lack of acknowledgement or follow up his nephropathy. Hypertension was not assessed. Diabetes, hyperlipidemia and hypothyroidism were assessed as in fair control which was reasonable. The chest pain was not addressed and there was no comment about the EKG. This was a very poor evaluation of chest pain as there was no history, no risk factor assessment, no prior history of angina or equivalent complaints which had been ongoing for nine months.

On 4/23/22, a nurse evaluated the patient without use of a protocol for "sternal chest pain". The pain was described as grinding like something trying to come out of his chest. He said it was ongoing for seven months or more and was seen numerous times for it. He said he quit taking TUMs because they didn't help, when he stands up and does nothing the pain stops. He asked to have his housing changed because the pain was worse when he walked. The blood pressure was 145/70 and pulse 111. Though the patient had continued tachycardia, it was unacknowledged, and neither was the elevated blood pressure noted. There was no nursing assessment or plan. This were classic symptoms of angina yet the condition was unrecognized. This was the 10th episode of angina-equivalent pain that was inadequately managed. This patient should have been referred to a provider.

On 4/20/23, a nurse evaluated the patient using an indigestion protocol. Pain was described as in the sternal area, occurred in multiple episodes and the patient added that he had difficulty with strenuous activity and walking long distances. The patient added that Prilosec and TUMS didn't help the pain. This was the 11th cardiac-equivalent pain episode, but was not recognized as such by the nurse. The nurse referred the patient to the next nurse practitioner clinic scheduled for 4/25/23.

On 4/25/23, a nurse practitioner evaluated the patient for "sternal chest pain". The only cardiac risk mentioned in the note was smoking. The nurse practitioner did not acknowledge or consider his hypertension, diabetes, hyperlipidemia, or obesity as risk factors for cardiovascular disease. The history documented shortness of breath with activity but no further history relevant to angina was taken including location of pain, referral of pain, related nausea, relationship to exertion and rest. The patient did say he was scared he was going to have a heart attack and asked for a different housing location with a slow walk permit because "I don't want to die on the walk". The prior EKG was not reviewed and another EKG was not done. The only assessments were shortness of breath and chest pain. The nurse practitioner's plan was a chest x-ray, a blood count, and a metabolic panel. Follow up in two weeks was ordered. The nurse practitioner documented that no permits (for slow walk apparently or change of housing apparently) were necessary. This was another failed evaluation demonstrating that there is an absence of knowledge in multiple providers at this facility with respect to coronary artery disease, including acute coronary syndrome.

On 4/29/23, an LPN evaluated the patient using a shortness of breath protocol. This was the 12th angina-equivalent symptom that was evaluated over the past year. The only history was that the patient had shortness of breath when moving. The pulse was 125 and had been elevated for months without anyone acknowledging the abnormality. The protocol requires peak expiratory flow rates which were all abnormally low 450/300/300 despite no history of asthma or COPD. The nurse noted that the patient was scheduled to see a provider this week in follow up of getting a chest x-ray. The patient then told the nurse that he panics when feeling short of breath. The nurse referred the patient to mental health. The LPN failed to acknowledge that the pulse of 125 was abnormal. The history taken was insufficient with respect to shortness of breath with moving. Was there concomitant chest pain, cough, productive sputum, or fever? Though there was tachycardia and abnormal peak expiratory flow rates the LPN did not consult a RN or provider. Independent assessments and clinical judgement are not within the scope of practice of LPNs.

On 5/9/23, at 10:15 pm, a nurse documented responding to a code 3 in which the patient was unresponsive. The patient was transported to a hospital but died at 3 am the next morning.

Amongst multiple findings, the autopsy showed 100% occlusion of the right coronary and circumflex coronary arteries; 95% occlusion of the left anterior descending coronary artery; 90% occlusion of the oblique marginal coronary artery and 75% occlusion of the diagonal coronary artery. There was a remote myocardial infarct in the septum. The preliminary opinion was that the patient died from coronary artery disease. A final autopsy was not provided. This patient had long-standing complaints of angina-equivalent symptoms. He was inappropriately evaluated. A physician cancelled a stress test five months after it was ordered because there were no cardiac indications yet this patient had multiple bona fide indications for cardiac stress testing. This patient's cardiac symptoms were ignored or misdiagnosed for over a year and a half. His death of coronary artery disease was preventable.