**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DON LIPPERT, et al.,       )
      )
           Plaintiffs,       )   No.  10-cv-4603
      v.       )
      )   Judge Jorge L. Alonso
LATOYA HUGHES, et al.,       )
      )
           Defendants.       )

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE AND FOR AN**
**ORDER TO SHOW CAUSE FOR DEFENDANTS' PERSISTENT**
**<u>BREACH OF THE DECREE'S STAFFING AND RELATED PROVISIONS</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 3

1. The Consent Decree clearly and explicitly requires Defendants to have enough staff to implement the Decree and provide adequate medical and dental care .......................... 3

2. Defendants have the burden to show their compliance with all provisions of the Consent Decree, and they have never demonstrated that they have "adequate . . . staff" or are making progress towards that goal. ............................................................................... 4

3. Information on the number of off-site referrals to hospitalists, specialists, or diagnosticians proves nothing about the adequacy of Defendants' on-site staffing, nor does it prove anything about the quality of care Defendants provide to patients in need of such services. ................................................................................................................ 5

4. Contrary to Defendants' misleading assertions, the Monitor's "partial compliance" ratings in some areas does not prove that they are making diligent efforts towards compliance. ........................................................................................................................ 8

5. The Monitor's findings related to inadequate staffing are based on defendants' inability to implement the Decree's requirements and provide adequate care, not merely defendants' failure to fill their budgeted positions. ........................................................ 10

6. Defendants make a specious attack the Monitor's use of record samples and mortality reviews without any methodological support ................................................................. 10

7. Defendants' assertion that they have "succeeded at increasing staffing" is false. ............ 13

8. The staffing "ratios" generated by Defendants in their Response are meaningless and misleading, and demonstrate nothing about the adequacy of Defendants' staffing. ..... 15

9. Plaintiffs' request for this Court to find a violation (or "breach") of the Decree is not barred by (and does not even implicate) sovereign immunity ...................................... 18

10. A finding of "breach" (or violation, or failure to comply) is an appropriate first step in contempt proceedings under a Consent Decree. ........................................................... 20

11. Given the procedure outlined by this Court for making a finding of contempt, Defendants' arguments related to PLRA findings and contempt showings are premature ...................................................................................................................... 21

12. Plaintiffs have completed the dispute resolution process as to Defendants' persistent staffing deficiencies, and Defendants have continually refused to propose any plan to improve their staffing. ................................................................................................ 23

CONCLUSION .......................................................................................................................... 26

i

# TABLE OF AUTHORITIES

**Cases**

*Edwards v. Snyder*, 478 F.3d 827 (7th Cir. 2007). ........................................................................ 8

*Lewis v. Cain*, 701 F. Supp. 3d 361 (M.D. La. 2023) ........................................................... 12-13

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004) ................................................................. 19

*Holmes v. Godinez*, 991 F.3d 775 (7th Cir. 2021) ............................................................... 19-20

*Jensen v. Shinn*, 609 F. Supp. 3d 789 (D. Ariz. 2022), *amended*, No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022) ....................................................................... 12

*Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994)....................................... 20

*Local No. 93, International Assoc. of Firefighters, AFL-CIO C.L.C.,* 478 U.S. 501 (1986)..…....20

*McDonagh Assocs., Inc. v. Grunloh*, 722 F.3d 1043 (7th Cir. 2013) ........................................... 19

*Mon Ros Int'l for Gen. Trading & Contracting, W.L.L. v. Anesthesia USA, Inc.*, No. 17 C 7365, 2019 WL 132596 (N.D. Ill. Jan. 8, 2019) ........................................................................ 23

*Pennhurst State School & Hospital v. Halderman*, 485 U.S. 89 (1984)...................................... 19

*Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016), *as amended* (Aug. 25, 2016) .............................. 8

*Rasho v. Walker*, 22 F.4th 703, 706 (7th Cir. 2022)………………………………………...20

*United States v. Alshabkhoun*, 277 F.3d 930 (7th Cir. 2002)…………………………………20

## INTRODUCTION

Defendants' immense brief evades the core issues and willfully misunderstands the future course of proceedings here. If the Court concludes that plaintiffs' motion provides sufficient basis for a proceeding on contempt, it should (as plaintiffs explicitly requested), make a finding that defendants have breached the provisions of the Decree set out in Exhibit 1 and that the breaches are due in whole or in part to inadequate medical and dental staffing, and, at the upcoming June 18 status hearing, set a show cause hearing on contempt for a future date and enable the parties to prepare appropriately for this serious event. If the Court feels that an affidavit as set forth in Local Rule 37.1 or any other form of written presentation in advance of the hearing will be useful, it can order that as well. Thereafter, if the Court concludes, at the end of the evidentiary hearing on contempt, that an order for relief is warranted, it can direct a process for crafting such an order and submitting proposed findings—including findings under Section 3626(a) of the Prison Litigation Reform Act—to support the order.

Defendants' response does not, and cannot, demonstrate that they are in compliance with the clear and unambiguous staffing requirements of the Consent Decree, nor does it even attempt to refute the evidence that members of the plaintiff class are suffering ongoing, irreparable harm because of defendants' failure to comply with the staffing requirements of the Decree. In the course of two rounds of briefing on these issues, defendants have made no effort to demonstrate that they have hired, or even have a plan to hire, the staff required by their own "final" staffing analysis submitted in August 2021. Dkt. 1814-2. Rather, they now argue that they have never performed the analysis required by the Decree—an analysis of staff needed "to accomplish the obligations and objectives of this Decree," Dkt. 1557 at 18, § IV.A—and that their "final" staffing analysis therefore cannot be used by the Court or anyone else to determine how many or

what kind of medical and dental staff they actually might need. Dkt. 1934 at 6 (ECF 10).
Defendants have thus admitted to violating this clear and unambiguous command of the Decree.

Defendants also fail to respond in any meaningful way to the Monitor's repeated and ever
more urgent findings that, over the course of six years, they have failed to make any visible
progress—and failed to provide any proof of progress—on the core commitments to have
"adequate qualified staff," "enough trained clinical staff," or "oversight by qualified
professionals." Dkt. 1557 at 5, §§ II.B.2, 3. These too are clear and unambiguous obligations.
Defendants' failure to honor them has both breached the Decree and caused ongoing suffering, as
has their breach of the multiple other unambiguous Decree provisions raised by plaintiffs' motion
and supported by the Monitor's reports.

Rather than engaging with these findings made by experts in the field who have
assiduously reviewed defendants' own data, defendants litter 62 pages with some handpicked
numbers (no native format documents provided), an accounting of how much is spent on outside
care (irrelevant here), and a "staffing ratio" based on chart in a 2017 report whose methodology
defendants do not even purport to follow. Even if their "staffing ratio" had a solid foundation, it
would be useless as a means to assess defendants' progress: nationwide ratios are "meaningless
without an analysis of [] the quality of care in the comparison states" and analysis of "patient
severity of illness [and] comorbid health problems," "physical plant," "operational factors [], and
adequacy of custody staffing," as well as "staff experience," "licensure level," and "degree of
training," among other factors. Affidavit of Dr. Marc Stern, Exhibit 2, at ¶¶ 5, 7.

Defendants ignore the Monitor's conclusions except to misrepresent the reports' findings
of "partial compliance"—defendants both misrepresent the Decree definition *and* the basis for
the Monitor's conclusions. Defendants provide no expert opinion of their own. They round out

2

their argumentation against contempt with a mystifying claim about sovereign immunity, unsupported by case law, and a now-familiar attack on plaintiffs' efforts to use the dispute resolution process to address the problems here—efforts which have been made, but yielded no results.

Plaintiffs have made a more than sufficient showing to warrant setting a proceeding on contempt. Given defendants' failure to present any evidence of their compliance with the Decree's terms cited above and in Exhibit 1, the Monitor's unrebutted findings may be used as evidence of ultimate issues in this case. Dkt. 1557 at 27-28, §X.D.

It is long past time for defendants to increase their medical and dental staff in meaningful and thoughtful ways, so that they can provide "adequate . . . care" to the prisoners in their charge and implement this Consent Decree before it expires. Defendants' arguments to the contrary are addressed below.

## ARGUMENT

1. **The Consent Decree clearly and explicitly requires Defendants to have enough staff to implement the Decree and provide adequate medical and dental care.**

The Decree affirmatively requires that defendants "shall require, *inter alia*, adequate qualified staff …". Dkt. 1557 at 5, § II.B.2. Multiple other sections of the Decree reinforce this requirement. Defendants have not done this, and rather than admitting their failure, they now argue that Plaintiffs are trying to impose duties that "do not appear in the decree." Dkt. 1934 at 38-39 (ECF 42-43). To the contrary, it is quite plain that the requirement to hire and maintain adequate staffing—to provide "enough trained clinical staff," to provide "sufficient administrative staff," and to provide "access to an appropriate level of primary, secondary, and tertiary care," which cannot be achieved without staff—are fundamental commitments of this negotiated Consent Decree. *Id*. at 5, §§ II.A, II.B.1-3.

3

Despite the numerous distortions and misrepresentations made by defendants throughout their Response, the Monitor's most recent report makes very plain that defendants simply have not complied with these obligations, and are not able to comply with the Decree due to lack of staffing which in some cases is flat-out "dangerous":

> **Staffing is the key barrier to forward progress toward compliance.** This report will demonstrate that on every level from facility supervisory staff, physicians, dentists, and nursing staff, IDOC has been unable to increase staffing and instead have less staff based on their own staffing analysis than in 2019. Physician staffing is now at 50% vacancy and has become dangerous as is evident in mortality reviews which are an attachment to this report. These mortality reviews demonstrate a linkage between facilities with physician shortages and increased morbidity and decreased quality of care. **Lack of supervisory staff and line staff hampers the ability to implement the array of new policies and procedures.** Lack of nursing, clerical, and data staff impair the ability of IDOC to collect and analyze data necessary to demonstrate compliance with the Consent Decree. Lack of quality improvement and supervisory staff result in inability of IDOC to undertake corrective actions. Infection control, quality improvement, and chronic care programs are all impaired due to staffing deficiencies. The Monitor cannot emphasize enough that staffing needs to improve dramatically and as soon as possible. . . Staffing must improve for IDOC to move forward.

Dkt. 1893, Eighth Report, at 5 (emphasis added). Rather than contending with these straightforward findings, made by a team of medical professionals with decades of clinical experience and over six years of monitoring IDOC's system and this Consent Decree, Defendants' brief seeks to rewrite the Monitor's findings and present irrelevant data and information in a smoke-and-mirrors effort to mask the fact that they do not have enough staff to implement the Decree or provide adequate care.

**2. Defendants have the burden to show their compliance with all provisions of the Consent Decree, and they have never demonstrated that they have "adequate . . . staff" or are making progress towards that goal.**

Defendants have the obligation under the Decree to present the "data and information" to show compliance with the Decree. Dkt. 1557 at 21, § V.G. In May 2024, the Court found that defendants had not achieved compliance with any of the provisions cited in Plaintiffs' motion, Dkt. 1791, and there is a reason for that: defendants have never provided the proof. As a result, the Monitor's reports have consistently demonstrated their failure to comply. **The Monitor's findings as to the provisions at issue are thoroughly detailed in the chart at Exhibit 1**. Defendants' Response still does not produce any evidence that their current staffing is adequate to implement the Decree or provide "appropriate" care. *Id*. at 5, § II.B.1. Tellingly, neither of the declarations that defendants provide in support of their Response—the declaration of their agency Chief of Healthcare Services, Dr. Steven Bowman (Dkt. 1934-1), and the declaration of their Chief Administrative Officer Jared Brunk (Dkt. 1934-5)—asserts that IDOC has adequate medical and dental staff for any purpose. What does speak volumes is the fact that, month after month, the Wexford "reconciliation" worksheets show that IDOC's principal vendor never provides the hours required by its contract. *See e.g.* Dkts. 1865, 1866, 1934-6, 1934-7. Mr. Brunk attested that these documents were "the most comprehensive measure of actually provided Wexford staffing." Dkt. 1842-6 at 3.

3. **Information on the number of off-site referrals to hospitalists, specialists, or diagnosticians proves nothing about the adequacy of Defendants' on-site staffing, nor does it prove anything about the quality of care Defendants provide to patients in need of such services.**

Mr. Brunk's declaration here concerns the amounts spent solely on "care provided to prisoners at *other* hospitals, clinics, and offices" (Dkt. 1934 at 21 (ECF 25), emphasis added), and the costs of same. Dkt. 1934-5. The information discussed in this declaration is entirely irrelevant to the question of whether defendants have enough on-site medical staffing to provide the "appropriate" care required by the Decree. The number of off-site providers is not part of

defendants' Staffing Analysis, nor is it part of the Consent Decree's staffing requirements. Plaintiffs' motion is concerned with the adequacy of defendants' on-site staff—it asserts that defendants have breached the Decree with regard to the provisions related to hospital services and off-site specialty and emergency care because IDOC's on-site staffing is inadequate to provide the care needed to facilitate and follow-up on off-site care. Dkt. 1924 at 13-15 (ECF 17-19).

Moreover, while Mr. Brunk's declaration describes the money spent or costs accrued on off-site healthcare, it tells us nothing about the quality of that care, how it compares to the care that was needed by the current IDOC population, or whether that care satisfied any requirement of the Decree.[1] It is impossible to judge the quality of care provided, or measure the adequacy of the care provided, without knowing how the care provided compares to the need.[2] Moreover, the implication that defendants' increased expenditures on off-site care over the last decade equate to

---

[1] As the Monitor has found, it is impossible to know how many individuals needed off-site services but did not get them or were delayed in getting them, because "IDOC does not track delays in specialty care and their off-site specialty tracking logs do not consistently track the date of referral so the extent of delays and lack of access cannot be determined from information and data provided to the Monitor because it is not accurately tracked." Dkt. 1893 at 181. But mortality records demonstrated that patients who should be referred for specialty consultation or diagnostic testing are not referred; patients who are referred for specialty care often do not go for their appointment or go on a date that is not the scheduled date; referrals are not consistently placed onto the off-site specialty tracking log or entries are inaccurate; many provider referrals or recommendations for return follow up with a consultant that are not entered onto the log and/or do not occur; reports of specialty consultations are often not obtained and when not obtained there is no documented effort to obtain the report; providers do not consistently review off-site consultation reports in a timely manner, nor do they consistently document findings of the consultant; and providers seldom provide informed feedback to the patient. *Id.*, at 181-82.

[2] As the Monitor has repeatedly explained, IDOC does not appropriately track information about the need for off-site care in a way that would even allow for such analysis. Dkt. 1893 at 181-83. And even the Pew Report, cited by Defendants in their response, cautions comparison of spending variation per inmate because doing so requires "accounting for differences in the incidence of costly conditions, including chronic disease." Dkt. 1943-3 at 24.

*improvements* in the care provided is unsupported and ignores that increased expenditures may

be attributable to general increases in the cost of off-site services, an aging prison population,

and deficiencies in and deferments of preventative and chronic care, which require expensive

emergency and specialty services. [3]

     Plaintiffs' point as to off-site care (which falls into secondary and tertiary care) was that

defendants do not have the *on-site* staffing to timely refer people for off-site care or to implement

care suggested by the outside practitioners *after* outside care is received, breaching multiple

Decree provisions. Dkt. 1924 at 13-15 (ECF 17-19). "It is the Monitor's belief that lack of

sufficient physicians is a root cause of many of the problem with specialty care because

physicians do not appear to have sufficient patient-time to manage complex patients and to

ensure that care occurs and is coordinated with consultants." Dkt. 1893, Eighth Report, at 183.

"Lack of staffing (physicians and support staff) appears responsible for operational issues and

---

[3] Another Pew Report from 2018 (*State Prisons and the Delivery of Hospital Care*) notes that "[t]he average age of those behind bars is rising, and the health needs of these individuals—like older people outside of prison—are more extensive than those of younger cohorts, including more hospitalizations." Available at https://www.pew.org/fr/research-and-analysis/reports/2018/07/19/state-prisons-and-the-delivery-of-hospital-care. This is true in Illinois, where the population above age 60 has *increased* since 2018 (from 2,224 to 2,665), even as the overall population has decreased (from 40,757 to 29,029). *See* IDOC Population Data Sets from June 20, 2018 and March 31, 2025, available at: https://idoc.illinois.gov/reportsandstatistics/prison-population-data-sets.html. This Pew report also points out that, "[s]tate officials are also noting an increase in the amount of care required for all adults entering correctional facilities." In fact, the total national health expenditures rose from $3.92 trillion in 2015 to $4.87 trillion in 2023 (all figures adjusted to 2023 dollars), for a rise of 24%. Matthew McGough, et al., *How Has U.S. Spending on Healthcare Changed Over Time?,* Peterson-KFF Health System Tracker (Dec. 20, 2024), https://www.healthsystemtracker.org/chart-collection/u-s-spending-healthcare-changed-time/#Total%20national%20health%20expenditures,%201970-2023. Another point raised in the 2018 Pew Report linked above is that a rise in "preventable hospitalizations" can "indicate that a vendor or its staff at a facility is not providing timely, effective primary care or using prescription drugs effectively." Thus, the higher expenditures on hospitalizations and emergency services that defendants point to are not necessarily a good thing—they may actually indicate delayed access to appropriate primary care as well as inappropriate management of chronic conditions.

7

provider follow up. Mortality reviews show many preventable deaths as a result of problems with specialty care." *Id.* at 186. To date, defendants' steps towards compliance consisted only of "promulgation of a policy." *Id.*

Proof that some patients were sent off-site for hospitalizations, or to see specialists or diagnosticians, does not prove that those services were timely provided, or that adequate care was provided to them before they were sent off-site, or that appropriate care will be provided when they return to IDOC facilities. *Cf. Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (explaining that "repeatedly, we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment"); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (same). Indeed, if the care recommended by the specialist was never actually provided to the patient when they returned to the facility, or no appropriate treatment plan was developed in response to diagnostic results, defendants would not achieve adequate primary, secondary, and tertiary care as required by § II.A of the Decree or have met the other Decree requirements concerning on-site continuity of specialty care.

4. **Contrary to Defendants' misleading assertions, the Monitor's "partial compliance" ratings in some areas do not prove that they are making diligent efforts towards compliance.**

Since defendants have not achieved compliance with any of the provisions at issue here, they attempt to distort the Monitor's "partial compliance" ratings into some kind of proof of progress on staffing. Dkt. 1934 at 2 (ECF 6) (falsely representing that "partial compliance" ratings "are equivalent to findings that Defendants have made progress toward substantial compliance on most of the key components of the section"), 8 (ECF 12) (same), 46 (ECF 52). Those ratings prove nothing of the kind. Defendants conveniently cite only part of the Consent Decree's definition of "partial compliance;" the entire definition is as follows:

"Partial Compliance" occurs when the Defendants have achieved less than substantial compliance with all of the components of a particular section of the Decree, but have made some progress toward substantial compliance on most of the key components of the section. **A partial compliance rating encompasses a wide range of performance by the Defendants. Specifically, a partial compliance rating can signify that the Defendants are nearly in substantial compliance, or it can mean that the Defendants are only slightly above a non-compliance rating**.

Dkt. 1557 at 3-4, § I.C.15.

Defendants omit the portion bolded above, Dkt. 1934 at 2 (ECF 6), 8 (ECF 12), 48 (ECF 52), attempting to mislead the Court about the significance of the Monitor's carefully awarded "partial compliance" assessments. The Monitor's reports make clear that a rating of "partial compliance" is not proof that Defendants have made any substantial progress towards implementation of the Decree's provisions at issue here.

Rather, the Monitor's justification for giving a "partial compliance" rating often is based on the creation of a written policy that, *if implemented*, would achieve the objectives of the Decree. But the Monitor has consistently found that Defendants cannot implement these policies (as required to move from "partial" to "substantial" compliance) *due to lack of staffing.* *See* Dkt. 1893, Eighth Report, at 5 ("Lack of supervisory staff and line staff hampers the ability to implement the array of new policies and procedures."); *id.* at 69 ("The Monitor believes there are insufficient staff to implement policies and would add an additional corrective action to notify OHS that lack of staffing to train and properly implement policies affects care because policies cannot be implemented.").

Exhibit 1, which contains a detailed examination of the Monitor's actual findings on each of the provisions at issue here, shows that:

- 7 provisions are rated completely noncompliant;

- Another 5 provisions are given ratings of noncompliant and partially compliant, as the provisions relate to different aspects of care; and
- 16 provisions are given partial compliance ratings due to creation of a policy or some other change, but the policies cannot be implemented and/or compliance cannot be reached without additional staffing.

To be quite clear, **not one** of the partial compliance findings on provisions referenced in Plaintiffs' enforcement motion was given because adequate staffing was in place.

5. **The Monitor's findings related to inadequate staffing are based on defendants' inability to implement the Decree's requirements and provide adequate care, not merely defendants' failure to fill their budgeted positions.**

Defendants repeatedly assert that the Monitor's findings related to staffing are based solely on defendants' failure to fill all budgeted-for medical staff positions. Dkt. 1934 at 9 (ECF 13) (asserting, without basis, that the Eighth Monitor Report "did not analyze the extent to which actual deployed staff was sufficient to meet the Decree's actual requirement—the constitutional minimum—for a population of about 29,000 individuals"). But throughout the Monitor's Eighth Report, as with past reports, he evaluates the adequacy of current staffing to implement the Decree's requirements—requirements that defendants agreed were necessary to meet the constitutional minimum—and finds that current staffing falls far short of what is needed. *See* Exhibit 1.

6. **Defendants make a specious attack the Monitor's use of record samples and mortality reviews without any methodological support.**

Defendants try to rely on the Monitor when it suits them but attack him when it does not. Rather than producing any evidence that they have sufficient staffing to implement the Decree or provide adequate care, defendants instead argue that the evidence plaintiffs rely on—primarily the Monitor's reports—is insufficient to demonstrate a significant or systemic violation of the Decree. Dkt. 1934 at 49 (ECF 53). Specifically, defendants criticize the Monitor's methodology, including the results of the review of dozens of medical records, arguing that the records the

Monitor chose to review do not constitute a representative sample of the medical care system as a whole and suffer from selection bias. *Id.* at 41-42. This criticism of the work of a team of correctional healthcare experts sits poorly coming from defendants, whose sources and methodology for the numeric claims that litter their Response are opaque at best, and who offer no expert opinion to support their assertions.

First, under the Decree, Plaintiffs are explicitly permitted to use the Monitor's reports and findings as evidence on ultimate issues, Dkt. 1557 at 27-28, § X.D. ("In any court proceeding related to this Decree, the information gathered by the Monitor during the life of this Decree, the Monitor's reports, including all reports and materials supplied by defendants, may be used, and the Monitor and his or her consultants may testify and opine upon ultimate issues in this case."). Plaintiffs are entitled to rely on the Monitor's findings to support their enforcement motion, and it is defendants' burden to rebut the Monitor's findings. They have not done so.

Second, the definition of selection bias quoted by defendants states that such bias may occur "when a researcher only selects data for a study that supports a given hypothesis" without ensuring that samples are "appropriately representative of the larger entity or population being measured." Dkt. 1934 at 42 (ECF 46). But here, the Monitor did not even select the sample used for the mortality review—he sourced them from defendants' own mortality reviews conducted by SIU. *See* Dkt. 1893, Eighth Report, at 76-83; Dkt. 1725, Seventh Report, at 128-133. Thus, the Monitor could not possibly have engaged in the "cherry picking" defendants allege. Moreover, the random sampling that defendants seem to prefer would not make sense here—it would include many prisoners who do not have significant medical problems, which would not allow for any evaluation of the quality of care provided. In contrast, mortality reviews allow the Monitor to assess systemic problems in the provision of medical care across IDOC.

Likewise, defendants have not produced any evidence that the Monitor's use of mortality reviews is designed to confirm any particular hypothesis—the fact of the patient's death does not mean ipso facto inadequate care was provided (though, of course, these mortality reviews *did* *"*demonstrate a linkage between facilities with physician shortages and increased morbidity and decreased quality of care," Dkt. 1893, Eighth Report, at 5).

Defendants ludicrously claim that mortality reviews and other medical records samples have "no validity" and are "universally rejected as inadmissible." *Id.* at 43. On the contrary, every hospital in the country engages in mortality reviews, as they are a standard method to examine the efficacy of medical care delivery and reveal problems across hospital systems. Dkt. 1864 at 18-19; s*ee also* Daniel M. Kobewka, et al., Quality Gaps Identified Through Mortality Review, 26 *BMJ Quality & Safety* 141 (2017) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC 5284344/) ("A natural step for hospitals tracking mortality rates is to create processes to investigate deaths and determine if care could be improved."); Kelvin Tran, et al., Review of the Utility of Routine Mortality Reviews Among Deaths on General Internal Medicine Wards in a Canadian Tertiary Care Hospital, 11(4) *BMJ Open Qual* e001933 (Nov 2022) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9644347/) ("Hospital morbidity and mortality reviews are common quality assurance activities, intended to uncover latent or unrecognized systemic issues that contribute to preventable adverse events and patient harm.").

Mortality reviews are also common in systemic reform litigation. *See, e.g., Jensen v. Shinn*, 609 F. Supp. 3d 789, 823 (D. Ariz. 2022), *amended*, No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022) (discussing medical expert analysis of mortality reviews and noting that they "do not simply evaluate each prisoner's final interaction" with the prison health care system but rather "show systemic failures as well"); *Lewis v. Cain*, 701 F. Supp. 3d

12

361, 416-17 (M.D. La. 2023) (finding lack of meaningful mortality review contributed to unconstitutional system of healthcare). Indeed, for the purpose of determining the quality and safety of hospital care, one study found that reviewing inpatient deaths was both sufficient and more efficient than reviewing all adverse events (such as prolonged hospital stays or disabilities). *See* Rebecca J. Baines, Maaike Langelaan, Martine C. de Bruijne, & Cordula Wagner, Is Researching Adverse Events in Hospital Deaths a Good Way to Describe Patient Safety in Hospitals: A Retrospective Patient Record Review Study, 5(7) *BMJ Open* e007380 (2015) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4499703/).

As for defendants' suggestion that the Monitor's findings are insufficient to show significant and systemic violations of the Decree, Dkt. 1934 at 41 (ECF 45), defendants again forget that it is *their* duty under the Decree to provide information sufficient for evaluating their compliance. Dkt. 1557 at 21, § V.G. If defendants believe that the Monitor needed to review other records, they should have provided them; instead, as the Monitor has found, defendants continue to fail to provide the requisite data and information required by the Decree, including proper V.G. reports or a comprehensive audit. *See* Dkt. 1893, Eighth Report, at 6.

Defendants' response likewise makes no attempt to provide the Court with evidence that contradicts the Monitor's findings. The evidence of ongoing, irreparable harm to the plaintiff class caused by inadequate staffing is unrebutted.

**7. Defendants' assertion that they have "succeeded at increasing staffing" is false.**

In asserting that they have "dramatically increased" internal staffing "since the entry of the Decree," defendants perplexingly cite to staffing and population data from 2015 and 2018. These dates are wholly irrelevant to an argument about how staffing has changed *during the life*

13

*of the Decree*, since the Decree was entered in May 2019.[4] Moreover, Defendants must use ratios rather than raw numbers to support this argument because the overall level of staffing has not changed much—rather, their claims are based on a drop in population, not a substantial increase in actual staff.

Most importantly, the Monitor has consistently found that defendants' staffing has declined over the life of the Decree, especially in key positions, and that current staffing levels remain insufficient to implement the Decree or provide safe and adequate care. Dkt. 1893, Eighth Report, at 22-23 ("Overall staffing has worsened over the five years since the inception of the Consent Decree"). The Monitor has responded directly to defendants' assertions about decreases in prison population, concluding that **"[e]ven given the lower population, IDOC has neither implemented the Consent Decree nor its own policies and the Monitor's opinion is that staffing is a key barrier in implementing requirements of the Consent Decree."** *Id.*

And even if overall staffing numbers have increased in recent months, key positions remain vacant, impeding the administration of adequate healthcare. The Monitor has warned for years that "physician staffing is dangerously low," (Dkt. 1893, Eighth Report, at 22-23; *see also* Dkt. 1725, Seventh Report, at 43 (noting that 33% of physician positions remained vacant); Dkt. 1661, Sixth Report, at 46 ("staffing is worse than at the start of the Consent Decree and it has become a crisis and is dangerous because the greatest deficiencies in staffing are at supervisory and higher skilled levels" and "[t]here are 17 fewer physicians working in IDOC now than in 2019"). In the latest Report, as with past reports, the Monitor has recommended that

---

[4] One example of the absurdity of using 2015 and 2018 data is that it does not reflect the population that existed at the time the Decree was signed. Defendants generate flawed staffing ratios based on prisoner populations of 46,240 in 2015 and 40,758 in 2018, but in June 2019, just after the Decree was signed, the IDOC population was 39,180. *See* IDOC 6-30-19 Data Set, available at https://idoc.illinois.gov/reportsandstatistics/prison-population-data-sets.html.

*additional* physicians be allocated at several facilities due to "high population, high death rate, and high numbers of specialty care patients." Dkt. 1893, Eighth Report, at 22-23; *see also* Dkt. 1661, Sixth Report, at 46 ("The Monitor recommends that the physician staffing budget be increased at several facilities.").

As the table below demonstrates, defendants have fewer people now in the very positions that they acknowledge are necessary to administer a functional healthcare system:

**Figure 1: Staffing in Key Positions, by Number of FTE Actually Filled**

| | Number of positions filled in May 2019 (when the Decree was entered) | Number of positions filled as of the August 2021 Staffing Analysis | Average number of positions filled in the last year (Q3 2024 through Q2 2025) |
|---|---|---|---|
| Medical Directors | 27 | 19.02 | 16.6 |
| Physicians | 7.1 | 3 | 1.6 |
| HCUAs | 26 | 26 | 23.3 |
| Dentists (WHS) | 24.45 | 24.4 | 16.8 |

Sources: Exhibit 4, 5.13.19 Staffing Vacancies; Dkt. 1276, First Report, at 26; Dkt. 1814-2, Staffing Analysis, at 50-51; Dkt. 1934-6, 1934-7.

And even for positions where the FTEs have increased as a matter of raw numbers, such as PA/NPs, as will be seen in Figure 2 below, the percentage of budgeted positions filled has *decreased* over the life of the Decree. *See* Exhibit 4, Dkt. 1814-2, and Dkt. 1934-7.

**8. The staffing "ratios" generated by Defendants in their Response are meaningless and misleading, and demonstrate nothing about the adequacy of Defendants' staffing.**

In a transparently desperate effort to mask their failure to improve meet the Decree's obligations and improve care over the past six years, defendants take one of their already questionable propositions (that the August 2021 "staffing analysis" relied on a lower population than the one listed on the face of the document) and combine it with 2015-16 information from a chart in a 2017 report on prison healthcare nationwide (*Prison Health Care: Costs and Quality*, issued by the Pew Charitable Trusts in October 2017) (the "Pew Report") to generate the

15

remarkable but completely unsupportable and totally irrelevant claim that they are now at the "median" of nationwide healthcare staffing based on "ratios." Dkt. 1934 at 1, 24-26, 43-44 (ECF 5, 28-30, 47-48).

Plaintiffs asked Dr. Mark Stern, a nationally recognized correctional healthcare expert,[5] to provide a short opinion on staffing ratios. His affidavit is attached as Exhibit 2, along with his current CV. As Dr. Stern explains, "[t]he adequacy of staffing (e.g., by describing staffing ratios) *cannot be determined without taking into account the specific context in which the staff operate*." *Id.* at ¶ 4 (emphasis added). In other words, staffing levels must be considered on a facility level, because that is how the medical care system is administered, by defendants' own description. Dkt. 1934 at 13 (ECF 17). Each facility is supposed to have its *own* healthcare leadership including a medical director and a healthcare unit administrator, to manage the other medical care staff. *Id.* If there is no physician at one facility, prisoners cannot leave their facility to obtain care at another facility, so looking at the system's staffing in the aggregate is of limited, if any, usefulness.

Per Dr. Stern, ratios also fail to consider other crucial factors, including:

- patient severity of illness
- comorbid mental health problems, and patient ability to understand and participate in their own care
- physical plant (e.g., amount of usable clinic space in which the staff can see patients efficiently)
- operational factors (e.g., how much 'usable' time there is during the day for staff to see patients, which can be impacted by times of the day when resident movement is restricted or the need to separate certain residents from others); and
- adequacy of custody staffing responsible for escorting patients to and from health care appointments."

Exhibit 2, at ¶ 4. The Pew Report itself says that "there is no available one-size-fits-all template for staffing," because states must "weigh numerous factors when determining what size and

---

[5] Dr. Stern was plaintiffs' litigation expert in the earlier stages of this case.

composition is appropriate." Dkt. 1934-3 at 25. But defendants' systemwide "staffing ratio" deployed relentlessly throughout their Response provides no information about the relationship between their current staffing, the needs of their population, or whether any particular prison has the staff that it needs.

Defendants' use of their "ratio" is also methodologically suspect, to say the least. The Pew Report, from which defendants take their supposed benchmark, used information collected by Pew researchers in surveys issued in 2015-16; the requested staffing information was sought as of "fiscal 2015 or the most recent year possible." Dkt. 1934-3 at 61-63 (Report at 57-59). The methodology for the surveys is briefly described in the report, but included a "quality assurance" process, and some states' data was excluded from the staffing-level analysis as a result. *See id*. at 61-66 (Report at 57-62). Data from 2015-16 is hardly pertinent here, and even if it were, there is nothing in defendants' description of their use of this 2015-16 "ratio" information to defend themselves now, in 2025, that suggests that they attempted to re-survey themselves in accordance with the methodology used by the Pew researchers—and it is obvious that they did not attempt to re-survey the other states. They just took the nationwide 2015-2016 data, collected by a process that they made no apparent attempt to replicate, and mapped themselves onto it ten years later, using their own current data collected by a different method. Indeed, while the Pew Report states that, in 2015-16, Illinois provided staffing data as "a one-day snapshot of the number of health professional full-time equivalents" (Dkt. 1934-3 at (Report at 71), defendants would find it impossible to provide that "snapshot" currently. Dkt. 1814-2 at 5, ¶ 22.

Producing overall staffing ratios without regard to staffing type is likewise nonsensical. An abundance of administrative staff or LPNs cannot make up for the absence of a medical director, physician, or HCUA, no matter how effective they may be at their individual jobs. And

the actual percentages of vacancies in key positions is staggering, and has worsened over the life

of the Decree:

**Figure 2: Percentage of Key Positions Filled Over Time**

|  | Percent of allocated positions filled in May 2019 | Percent of allocated positions filled at the time the August 2021 Staffing Analysis was conducted | Percent of allocated positions filled in the last year (Q3 2024 through Q2 2025 |
|---|---|---|---|
| Medical Directors | 100% | 70% | 66% |
| Physicians | 74% | 58% | 27% |
| PA/NPs | 79% | 89% | 68% |
| HCUAs | 90% | 90% | 80% |
| Dentists (WHS) | 82% | 78% | 52% |

Sources: Exhibit 4, 5.13.19 Staffing Vacancies; Dkt. 1276, First Report, at 26; Dkt. 1814-2, Staffing Analysis, at 50-51; Dkt. 1934-6, 1934-7.

Finally, as Dr. Stern notes, comparing this flawed staffing ratio to  ratios in other states is

"meaningless without an analysis of (a) the quality of care in the comparison states and (b) the

factors described above." Exhibit 2, Stern Aff., at ¶5. As Dr. Stern points out, "California …

ranks higher than Illinois in defendants' table of staffing ratios" presented in defendants'

response, Dkt. 1942 at 29, "yet is currently under court receivership due to unconstitutional

levels of health care." *Id.*"[S]taffing levels (i.e., the raw number of bodies), by themselves, are

not dispositive of constitutionally adequate care." Exhibit 2, Stern. Aff., at ¶6.

**9. Plaintiffs' request for this Court to find a violation (or "breach") of the Decree is not barred by (and does not even implicate) sovereign immunity.**

Defendants are contemptuous of the idea that the Decree is a contract when they fear it

might actually bind them, so they also claim in their Response that sovereign immunity obviates

their voluntarily assumed contractual commitments. Dkt. 1934 at 3, 32-34 (ECF 7, 36-38).

Defendants pretend that this Court's dismissal of plaintiffs' breach of contract claim in the

supplemental complaint (a claim that sought financial compensation) means that they are now freed of their contractual obligations under the Decree.

Defendants' argument on this point, however, is hard to parse. The Court dismissed plaintiffs' breach of contract claim because it agreed with defendants that "they are immune from a common-law breach-of-contract suit for money damages . . ." Dkt. 1902 at 5-6. The enforcement orders sought here are not requests for damages, and as the Court noted, defendants seem to know that the Decree *can* be enforced against them (*see id*. at 6); moreover, in their Response here defendants acknowledge that the "'courts may enjoin ongoing behavior by state officials that violates federal law'" and "'[t]hey may also order state officials to act in a certain manner . . . that may cost the state money to implement.'" Dkt. 1934 at 32 (ECF 36), quoting *McDonagh Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1050-51 (7th Cir. 2013).[6]

Defendants also acknowledge that, as a matter of process, a contempt proceeding is an appropriate mode of decree enforcement (*see* Dkt. 1934 at 33-34 (ECF 37-38)); in the end, as best plaintiffs can make it out, their problem seems to boil down to the use of the word "breach." Defendants object that although "a consent decree is 'interpreted according to principles of state contract law,'" Dkt. 1934 at 33 (ECF 37), quoting *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021), "this does not mean that it can be enforced against a sovereign state through *breach* theories sounding in state law." *Id*. (emphasis added). This is completely beside the point for a

---

[6] Defendants do their best to obscure this point, however, by citing the wrong case, *Pennhurst State School & Hospital v. Halderman*, 485 U.S. 89 (1984), Dkt. 1934 at 32 (ECF 36), which is flatly inapposite. Defendants fail to mention *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004), where the Supreme Court decisively found that a consent decree that was "a federal court order and furthers the objectives of federal law"—like the Decree here—could be enforced against a state despite its plea of Eleventh Amendment immunity. *Id*. at 438-39. *Frew* held that the principles of *Pennhurst*—which involved state law claims—*do not apply* in cases involving federal consent decrees implementing federal law. *Id*.

federal consent decree based on federal constitutional rights. It is also black letter law that a consent decree is a hybrid of court order and contract, *see Local No. 93, International Assoc. of Firefighters, AFL-CIO C.L.C.,* 478 U.S. 501, 519 (1986); *see also Holmes*, 991 F.3d at 780, quoting *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002). "Breach" is descriptive: it is the normal way of describing a party's failure to perform its obligation under a contractual provision, and this would be true no matter which jurisdiction's contract law provided the rule of interpretation. Both the Supreme Court and the Seventh Circuit have used the term in reference to court orders entered by agreement. *See*, *e.g.*, *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994) (noting that "if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal . . . [in] that event, a breach of the agreement would be a violation of the order"); *Rasho v. Walker*, 22 F.4th 703, 706 (7th Cir. 2022) ("Under the terms of the agreement, [plaintiffs] needed to prove that the defendants' breach itself caused an Eighth Amendment violation"). The Court has already found that defendants have not complied with the provisions of the Decree at issue here (and many others; *see* Dkt. 1791)—it is hardly a stretch to say, now in the seventh year of the Decree, that these failures also constitute breaches of this contract, and defendants provide no good reason why the Court should not so find.

**10. A finding of "breach" (or violation, or failure to comply) is an appropriate first step in contempt proceedings under a Consent Decree.**

In previous enforcement proceedings, involving defendants' failure to draft the required Implementation Plan or to obtain a contract for a vendor to install an Electronic Medical Record (EMR) system, this Court has begun the process towards contempt by first finding that defendants had breached or violated the Decree. *See* Dkt 1527, 10/5/2021 Transcript, at 10-11 (regarding to the Implementation Plan, "I just want to make it clear that I agree with the monitor

and the plaintiffs that what has been submitted, what I have seen, is not near good enough and is not sufficient and does constitute a straightforward breach"); Dkt. 1781, 2/13/2024 Transcript, at 17-18 (finding, with regard to the EMR, that "[a]fter reviewing the record, it is my finding that there is a clear violation here, and if they aren't taking reasonable steps towards compliance, then they can be held in contempt and fines can be imposed").

As this Court has explained to the parties during the contempt proceedings related to the EMR contract, the process "typically plays out as follows:"

> If the plaintiff, the party obtaining the injunction, believes that the defendant, the enjoined party, is failing to comply with the injunction, the plaintiff moves the court to issue an order to show cause why the [defendant] should not be adjudged in civil contempt and sanctioned. The plaintiff's motion cites the relevant injunction provision and alleges that the defendant has refused to obey its mandate. If satisfied that the plaintiff's motion states a case of noncompliance, the court orders the defendant to show cause why he or she should not be held in contempt, and the court schedules a hearing for that purpose. At the hearing, if the plaintiff proves that he or she has -- if the plaintiff proves what he or she has alleged in the motion, the court hears from the defendant. The court then determines whether the defendant has complied with the injunction, and, if not, what sanctions are necessary to ensure compliance.

Dkt. 1781 at 19-20. Plaintiffs are merely asking this Court to follow this same procedure here, by first finding that defendants have not complied (or "breached") the Decree, and then holding further proceedings related to contempt.

**11. Given the procedure outlined by this Court for making a finding of contempt, Defendants' arguments related to PLRA findings and contempt showings are premature.**

While PLRA findings may be necessary to support an order for relief based on defendants' contempt, they are not yet necessary at this stage, where plaintiffs first seek a simple finding of breach (or noncompliance), to be followed by a hearing on whether defendants should be held in contempt. Plaintiffs' motion, Dkt. 1924, does not request that the Court formulate any

relief to remedy the alleged violations at this juncture. Rather, plaintiffs merely ask the Court to declare that defendants are in breach of the Decree and set up a contempt hearing.

Likewise, defendants' arguments regarding the required contempt showings are premature; these are subjects for a contempt hearing, not for an initial request for a finding of violation of the Decree. Nonetheless, plaintiffs will address these arguments briefly as follows:

First, Defendants' argument that the Decree's commands are not "unambiguous," Dkt. 1934 at 38-40 (ECF 42-44), is not credible. Defendants argue that the terms "adequate," "sufficient," and "appropriate" used by the Decree cannot be enforced because they are "indeterminate." But the Decree explicitly required *defendants* to give meaning to these terms through the Staffing Analysis, Dkt. 1557 at 18, §IV.A, which defendants did in August 2021, but now disclaim. Defendants cannot shirk their duty to analyze and produce an analysis of staffing adequate to implement the policies required by the Decree and then assert that the adequate number of staffing is unknown or unknowable. By defendants' logic, they can simply prevent plaintiffs from ever vindicating their rights under this Decree by simply refusing to conduct the analysis they promised in the Decree to do.

As for defendants' accusations that plaintiffs have somehow "cherry-picked" the Monitor's reports for evidence of their noncompliance, nothing could be further from reality. The Monitor's reports provide exactly the type of "clear and convincing" evidence that demonstrates that defendants' failures to hire and maintain adequate staffing are "substantial and significant"; indeed, the reports have consistently and thoroughly demonstrated Defendants' complete and utter failure to provide adequate staffing to achieve compliance with almost any provision of the Consent Decree. It is telling that defendants cannot and do not cite to competing findings or evidence in the Monitor's reports to refute plaintiffs' marshaling of evidence.

Defendants do not present *any* evidence that they are making "reasonable and diligent efforts to comply," other than their distorted reading of the Monitor's findings, as addressed above and in Exhibit 1.

As for defendants' assertion that Rule 37.1 requires an affidavit to provide notice of alleged contempt, Plaintiffs' motion thoroughly details the alleged contemptuous conduct. Courts have excused strict compliance with this local rule when "compliance would have been an exercise in otiosity." *Mon Ros Int'l for Gen. Trading & Contracting, W.L.L. v. Anesthesia USA, Inc.*, No. 17 C 7365, 2019 WL 132596, at *6 (N.D. Ill. Jan. 8, 2019) (citing *Murata Mfg. Co. v. Bel Fuse, Inc.,* 242 F.R.D. 470, 474 (N.D. Ill. 2007)). While the purpose of the rule appears satisfied by the current filings, plaintiffs will of course provide such an affidavit if the Court requires one to be filed prior to contempt proceedings.

**12. Plaintiffs have completed the dispute resolution process as to defendants' persistent staffing deficiencies, and defendants have continually refused to propose any plan to improve their staffing.**

Defendants' last-ditch effort against the process here is to say that it cannot go forward because of the Decree's dispute resolution requirements, which are to be completed before either party can seek "relief from the Court." Dkt. 1557 at 27, § X.D. Plaintiffs completed not one but three rounds of dispute resolution with defendants about staffing under various Decree provisions between May 2022 and October 2023—one about physician staffing; the second about dentist and dental hygienists; and the third about all other medical and dental staffing vacancies. Dkt. 1814-9, 1814-10, and 1814-11. This correspondence cited the findings in the Monitor's reports, and referred to all of the overarching provisions of the Decree that concern the need for adequate staff, including Section II.A, which requires defendants to "implement sufficient measures . . . to provide adequate medical and dental care" and to "ensure the availability of necessary services, supports and other resources" to meet serious medical and

23

dental needs; Section II.B.2, which mandates "adequate qualified staff"; Section II.B.3, which requires "enough trained clinical staff [], oversight by qualified professionals, as well as sufficient administrative staff"; Section III.K, which requires "routine and comprehensive dental care" and "regular dental cleanings," *inter alia*; and Section II.B.1, which requires defendants to "provide access to an appropriate level of primary, secondary, and tertiary care." *See id*. The third round of correspondence also referred to the provisions of the Decree concerning the staffing analysis and its incorporation into the implementation plan, §§ IV.A.2 and IV.B. Dkt. 1814-11 at 3. At the time—late summer and fall 2023—defendants had not yet repudiated the implementation plan and the staffing analysis as they now do, Dkt. 1934 at 6 (ECF 10), and plaintiffs hoped that the plan would provide some impetus and structure for increased staff hiring as provided for in the analysis. This hope proved vain, and after subsequent meetings on the topic were fruitless, plaintiffs filed their first motion concerning staffing in June 2024. Dkt. 1814.

From defendants' responses, there is no doubt that plaintiffs' dispute resolution correspondence put defendants on notice of plaintiffs' concerns. Unlike defendants' current position—which asserts, against all evidence, that they *do* have enough staff—defendants urged in the dispute resolution process that hiring was difficult, that COVID had created a "critical shortage" of healthcare workers, and that they were "diligently working to increase staffing" and using "best efforts" towards same. Dkt. 1814-9 at 5-7, 9; Dkt. 1814-10 at 6, Dkt. 1814-11 at 5-7 and 11-12. Defendants nevertheless spend five pages of their massive brief complaining that plaintiffs have somehow failed to complete the Decree dispute process as to the sections explicitly mentioned in plaintiffs' letters—the overarching provisions concerning staffing and support for care that require adequate staffing. Dkt. 1934 at 27-32 (ECF 31-36). They falsely claim that plaintiffs did not even "initiate" dispute resolution. *Id*. at 27 (ECF 31).

24

This spurious argument does not warrant the Court's time.[7] Defendants mock plaintiffs' position that dispute resolution with them is "futile," but they are the ones who asked plaintiffs to consider, as "evidence" of their "diligent[]" physician hiring efforts during the first dispute resolution at issue here, a Wexford memo listing "Dinner/Wine Tasting event in Makonda, IL" and a Lake Michigan cruise, among other similar events. Dkt. 1814-9- at 12. During the third round of dispute correspondence (in October 2023), defendants provided another Wexford memo as their principal response, plus a slew of articles that included a June *2021* report that "Over the past year, three of the nine teachers at the Friends Preschool and Kindergarten in Milford, Mich., left their jobs" and three articles about nursing shortages in Western Pennsylvania and Pittsburgh (where Wexford is headquartered). *See* Exhibit 3; *see also* Dkt. 1814-11 at 16. These do not show good faith engagement with the process or the underlying problem. And of course, none of these rounds of dispute resolution efforts have led to improvements in defendants' performance.

When the problem is staffing, the staffing provisions of the Decree are the ones that should be raised in dispute resolution. Plaintiffs have done exactly that—dispute resolution on the issue of staffing is complete as to §§ II.A, II.B.1, II.B.2, II.B.3, III.K, IV.A.2 and IV.B. Those provisions are ripe for a finding of breach and a hearing on and remedy for contempt.[8]

---

[7] Indeed, the Court already granted Defendants *another* opportunity, at the last in-person status hearing, to present a plan to address Plaintiffs' concerns about staffing, as had been laid out in detail in Plaintiffs' June 2024 motion, Dkt. 1814, without need for plaintiffs' refiling of an enforcement motion, and Defendants declined, once again, to do so. Dkt. 1926, Transcript of 4-10-25 hearing, at 26-28 ("It's pretty clear that it would be a waste of time to invite the defense to make a proposal.").

[8] Defendants are correct that as to some of the less overarching provisions of the Decree raised in Plaintiffs' motion, where lack of staff has caused failure of compliance (*e.g.*, failure to have RNs complete sick call, or to complete timely medical intake evaluations), plaintiffs had not gone through the (futile) dispute resolution process. Plaintiffs have initiated that process as to those remaining provisions now, in case the Court has any doubt as to its ability to hold defendants responsible for violation of those provisions unless plaintiffs have completed this

## CONCLUSION

There can be no doubt that defendants' conduct as to staffing, and those provisions of the Decree most impacted by lack of staffing, amounts to contempt of a court order as well as deliberate indifference to the class members' medical and dental needs. Plaintiffs understand that this Court believes it must make findings of needs/narrowness/intrusiveness before ordering a remedy for that contempt, and Plaintiffs are prepared to submit proposed findings at the appropriate time, after discovery and a hearing on contempt. But first, Plaintiffs respectfully request that the Court take the following steps: (1) find that defendants have breached the provisions of the Decree set out in Exhibit 1 and that the breaches are due in whole or in part to inadequate medical and dental staffing, as the Monitor has repeatedly found; (2) direct defendants to show cause why they should not be held in civil contempt for these ongoing and longstanding breaches of a court order; (3) set a show cause hearing on contempt pursuant to Local Rule 37.1 and make a finding of contempt; (4) thereafter set a further schedule for briefing and an evidentiary hearing on remedy for contempt. The remedial order should include PLRA findings as needed.

DATED: June 4, 2025

Respectfully submitted,

DON LIPPERT, et al.

By: /s/Camille E. Bennett
*One of their attorneys*

---

useless formality. The process will be complete in time for the Court to find defendants in contempt of those provisions and issue any order by the time these proceedings run their course.

Alan Mills
Nicole R. Schult
Alyssa Meurer
Uptown People's Law Center
4413 North Sheridan
Chicago, IL 60640

Harold C. Hirshman
Diane O'Connell
Dentons US LLP
233 S. Wacker Drive, Ste. 5900
Chicago, IL 60606

Camille E. Bennett
Samantha Reed
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601