# Exhibit 1

## (a revision to Dkt. 1924-3 to include references to the Monitor's findings from the Eighth Report)

|    | Provision in Breach | Requirement(s) of Provision | Monitor's Findings |
|----|---------------------|------------------------------|---------------------|
| 1. | II.A* | Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet these needs. | Various compliance ratings are given on this term as it applies to different care areas, but in the Executive Summary, the Monitor addresses this main purpose of the Decree by acknowledging that "IDOC has made progress" but that "[s]taffing is the key barrier to forward progress toward compliance." Dkt. 1893, Eighth Report, at 5.<br><br>He goes on to explain: "This report will demonstrate that on every level from facility supervisory staff, physicians, dentists, and nursing staff, IDOC has been unable to increase staffing and instead have less staff based on their own staffing analysis than in 2019. Physician staffing is now at 50% vacancy and has become dangerous as is evident in mortality reviews which are an attachment to this report. These mortality reviews demonstrate a linkage between facilities with physician shortages and increased morbidity and decreased quality of care. Lack of supervisory staff and line staff hampers the ability to implement the array of new policies and procedures. Lack of nursing, clerical, and data staff impair the ability of IDOC to collect and analyze data necessary to demonstrate compliance with the Consent Decree. Lack of quality improvement and supervisory staff result in inability of IDOC to undertake corrective actions. Infection control, quality improvement, and chronic care programs are all impaired due to staffing deficiencies. The Monitor cannot emphasize enough that staffing needs to improve dramatically and as soon as possible. The increasing use of locum tenens physicians and agency nursing |

| | | | |
|---|---|---|---|
| | | | staff has an associated set of problems including lack of familiarity with policy and procedure and abbreviated tenure. Staffing must improve for IDOC to move forward." *Id.* |
| 2. | II.B.1* | provide access to an appropriate level of primary, secondary, and tertiary care | Dkt. 1893 at 144 ("Staffing continues to be a major barrier in access to primary care as required by II.B.1."); *see also* 180 ("IDOC has not provided information to verify adequate access to timely secondary care (II.B.1)."<br><br>The Monitor gives a **noncompliance** rating to this provision as it relates to infirmary care, *id.* at 161, noting that "[t]he mortality reviews completed by the Monitor for this report identified four patients who should have been but were not cared for in an infirmary setting when the need for a higher level of care was evident." These included patients with terminal cancer who were not adequately monitored because they were not placed in the infirmary.<br><br>The Monitor also gives **a partial compliance** rating to a group of provisions, including but not limited to II.B.1, as they relate to Medical Reception, *id.* at 126-27; Nursing Sick Call, *id.* at 142; chronic care, *id.* at 152; urgent and emergent care, *id.* at 156; specialty consultation, at 178-79. |
| 3. | II.B.2* | requires "the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, [and] effective peer review | **Noncompliance** rating given as this provision applies to staffing, Dkt. 1893 at 22; as well as monitoring of the vendor, Dkt. 1893 at 72, 76. These are the two provisions most relevant to this motion to enforce the staffing provisions of the Decree.<br><br>**Partial compliance** rating given to groups of provisions, including this one, as they relate to statewide issues: leadership and organization leadership staffing, *id.* at 7. internal monitoring and quality |

| | | | |
|---|---|---|---|
| | | | improvement, *id*. at 49; clinical space, id. 92-92; infirmary equipment and supplies, *id*. at 103-104,<br><br>**Partial compliance** rating given to a group of provisions related to Dental Access, Dkt. 1893 at 260. However, the narrative section *on the very same page* states:<br><br>"Access to care within the IDOC is influenced by several factors, with adequate staffing being the most critical. The current shortage of personnel has had a profound impact on the provision of dental services. A review of Continuous Quality Improvement (CQI) minutes from reporting facilities revealed widespread backlogs throughout the system. Given the 50% vacancy rate for dentist positions, it is not surprising that many facilities are experiencing delays in dental services." The Monitor goes on to express a lack of confidence in the reliability of IDOC's backlog data, and states, "Despite the inability to reconcile backlog data between Wexford and the CQI minutes, it is clear that many facilities face significant delays in dental services. IDOC has not provided comprehensive and reliable dental backlog data for all facilities across the system." *Id*. |
| 4. | II.B.3* | IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff | **Noncompliance** as this provision relates to Staffing, Dkt. 1893 at 22-23, finding that "[o]verall staffing has worsened over the five years since the inception of the Consent Decree."<br><br>"After the last report, IDOC responded that comparing working staff from 2019 to 2024 is misleading because the population of IDOC has decreased. Despite the decrease in staffing, IDOC's own staff including HCUAs and Regional Coordinators have recently stated that a major problem with implementation of IDOC policies is lack of staffing, |

4

|  |  |  | apparently even given the lower population numbers. Even given the lower population, IDOC has neither implemented the Consent Decree nor its own policies and the Monitor's opinion is that staffing is a key barrier in implementing requirements of the Consent Decree." "Physician staffing is dangerously low. Pending a workload analysis, the Monitor advises IDOC to increase budgeted physician staffing. ... One of the physicians from Stateville should be transferred to Dixon. A second physician should additionally be added to Dixon. The rationale is the population (1449), the extremely high offsite specialty care, and the high burden of elderly and disabled patients. Additional physicians should be added to Menard, Pinckneyville, Western, IRCC, Graham, Hill, and BMRCC. The rationale is high population, high death rate, and high numbers of specialty care patients." *Id.* at 24. As for nursing, the Monitor found that "some facilities have so few nurses that it is difficult to understand how they can function. Illinois River, Logan and Western had no RN positions filled. Southwestern had LPN positions filled. Vacancies were supplemented with agency staff but no facilities were 100% staffed for RNs and only one facility had 100% LPN staffing." *Id.* at 24-25. **Partial compliance** as it relates to dental care, *id.* at 246, but the Monitor said the following re dentist staffing: "There were 36.15 FTE dental positions budgeted, with 18.06 filled, resulting in a 50% vacancy rate. During the site visit, there was a discussion with the Chief of Oral Health Services and Wexford's lead dentist about staffing shortages. Wexford's lead dentist |

| | | | |
|---|---|---|---|
| | | | indicated that he and other dentists provide coverage at various facilities. Wexford has contracted a mobile dental clinic (Jet Dental) to provide care at Danville, Menard, Graham, and Southwestern. However, it remains unclear how much full-time equivalent (FTE) support is provided to these and other facilities without a permanent dentist."<br><br>Also given a **partial compliance** rating as this term applies to Statewide Issues/Leadership and Organization Leadership Staffing, Dkt. 1893 at 7-8; infection control, *id.* at 232. |
| 5. | II.B.6.e | [i]nformed care for patients who return to IDOC facilities after being sent to an offsite service provider | **Partial compliance,** along with group of provisions related to Specialty Care, Dkt. 1893, Eighth Report, at 178; *but see also id.* at 180, "IDOC has not provided information to verify … [that IDOC is] ensuring a provider review of the report and follow up with the patient to discuss the consultation report and provide informed care (III.H.2. and II.B.6.e.)".<br><br>On page 183 of the Eighth Report, the Monitor explains:<br><br>"It is the Monitor's belief that **lack of sufficient physicians is a root cause of many of the problem with specialty care** because physicians do not appear to have sufficient patient-time to manage complex patients and to ensure that care occurs and is coordinated with consultants." |
| 6. | II.B.6.g | requires defendants to implement changes to ensure "Timely access to diagnostic services and to appropriate specialty care." | Dkt. 1893, Eighth Report, at 178-79 gives a "**partial compliance**" rating to a group of provisions related to Specialty Care, but also states on page 180 that "IDOC has not provided information to verify adequate access to timely secondary care (II.B.1. and IIB.6.g.)." |

| | | | |
|---|---|---|---|
| | | | Importantly, the Monitor further explains on page 181 that "IDOC does not track delays in specialty care and their offsite specialty tracking logs do not consistently track the date of referral so the extent of delays and lack of access cannot be determined from information and data provided to the Monitor because it is not accurately tracked."<br><br>As quoted more thoroughly below, the Monitor finds at Dkt. 1893 at 186 that, with regards to specialty care, "**Lack of staffing (physicians and support staff) appears responsible for operational issues and provider follow up**." |
| 7. | II.B.6.i | requires implementation of "Morbidity and mortality review with action plans and follow-through" | A **partial compliance** rating is given for a collection of provisions related to mortality reviews, Dkt. 1893 at 76, because mortality reviews are conducted, but the Monitor further finds that, "no corrective actions have been initiated through mortality reviews." *Id.* at 77.<br><br>This is not surprising, given that, even under Defendants' new proposed policy on mortality reviews, "[n]o one has responsibility for assigning corrective action and facilities, apparently, are expected to determine what to do with the findings. This has not been effective as no corrective actions are evident." *Id.* at 78. And once again, inadequate staffing is a barrier to improvement in this area: "Facilities are not yet advanced enough nor do they have sufficient staffing, at this time, to develop corrective actions." *Id.* at 83. |
| 8. | II.B.6.k | requires IDOC to implement changes for "appropriate staffing, physical conditions, and scope of services for infirmary care." | Dkt. 1893, Eighth Report, at 161, awards a rating of "**noncompliance**" for a collection of provisions related to infirmary care, including II.B.6.k.<br><br>The Monitor acknowledges that "IDOC distributed a policy and procedure on Infirmary Care (F.04.01) in February 2024," |

7

| | | | |
|---|---|---|---|
| | | | but further noted that "There has not been any evaluation of the staffing or other resources needed to deliver infirmary care consistent with the IDOC policy and procedure." *Id.* at 162. OHS had "informed the Monitor that these new policies and procedures are being reviewed with site leadership and the facilities are expected to implement them as they are able." *Id.* A review of actual infirmary care provided revealed "the same problems with clinical care and support services for patients needing infirmary care that have been discussed in previous reports." *Id.* at 162-63, citing Fourth Report at 123-30; Fifth Report at 111-23; Sixth Report at 104-108; and Seventh Report at 120-21. "These problems include failure to provide clinical care that is appropriate and responsive to the patient's medical needs and unsafe practices that put patients at risk of adverse events." Dkt. 1893 at 163.<br><br>Regarding the requirement to provide adequate staffing for infirmary care, the Monitor found that "Adequate nursing coverage in the infirmary is a function of having the right type of positions, in quantities sufficient to meet patient needs and the ability to recruit and retain qualified personnel to fill at least 85% of these positions. While some coverage has been obtained through the use of "as needed" and agency contract nurses, these temporary personnel do not have the training, experience, or commitment to the organization to ensure patient care quality and safety. IDOC does not have appropriate nurse staffing for infirmary care." Dkt. 1893 at 171. |
| 9. | II.B.7 | requires "the development and full implementation of a set of health care performance and outcome measurements" | A **partial compliance** rating is given, Dkt. 1893 at 55-56, because OHS had begun obtaining 12 performance and outcome measures with the help of SIU in the first quarter of 2023. The Monitor further noted |

8

| | | | that data for these performance measures "is still collected manually" and "is a very cumbersome data management process that significantly impairs IDOC's ability to evaluate its performance and to add additional measures based on information." *Id.* at 60. Results of these performance measures "show generally performance and taking action to correct the poor performance has been difficult and is **significantly impaired by staffing deficiencies**, a variety of procedural defects, and leadership in training providers on management consistent with new IDOC policy." *Id.* Moreover, "[i]nitiatives to improve scores on two measures have been started but are not fully implemented" due to barriers including staffing, analysis of staffing needs, ensuring administrative directives are consistent with clinical directives, supplies, equipment, and training necessary to ensure success." *Id.* at 60-61. |
|---|---|---|---|
| 10. | II.B.9 | requires the creation of "an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs" | **Noncompliance,** Dkt. 1893 at 54.<br><br>"Currently, IDOC produces no V.G. report [and] conducts no comprehensive audit (II.B.9)" Dkt. 1893 at 180; *see also id.* at 6:<br><br>"The Consent Decree requires the Monitor to evaluate Defendant's compliance with the Consent Decree. For that purpose, the Monitor needs the information that is specified to be provided in the V.G. report and results of the audit (II.B.9.) which are to be completed by IDOC. This information has not been provided to the Monitor. Lacking IDOC's contribution to verify its compliance, the Monitor requests data and documents in order to fulfill the duties of the Consent Decree to provide reports of compliance every six months. This is done without the benefit of a V.G. report or a comprehensive audit. Requested data arrives piecemeal and unanalyzed; some documents are not provided timely. |

| | | | |
|---|---|---|---|
| | | | Lacking any contribution from IDOC in the V.G. report and the comprehensive audit, the Monitor's evaluation has become more extensive than it might be if IDOC provided acceptable V.G. reports and comprehensive audits." |
| 11. | III.A.10 | Each IDOC facility shall have registered nurses conducting all sick calls; "[u]ntil IDOC has achieved substantial compliance with [the] nursing provision of the staffing plan" facilities can "use licensed practical nurses in sick call, but only with appropriate supervision | Overall Compliance Rating of "**noncompliance**" at Dkt. 1893, Eighth Report, at 22; *id*. at 145 ("There is no uniform measure used by IDOC to document that only registered nurses conduct sick call per III.A.10 and this item of the Consent Decree remains noncompliant.")<br><br>*See also id*. at 143, giving "**partial compliance**" to group of provisions related to sick call due to new sick call policy but explaining, as relevant to provision III.A.10, that "The new policy does not incorporate or otherwise establish the means or methods to comply with the Consent Decree. This was a missed opportunity. The policy does not directly address III.A.10 that registered nurses conduct sick call or that LPNs may do so only until the staffing plan for registered nurses is achieved and only if supervised." |
| 12. | III.C.1 | provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers | "IDOC attained **partial compliance** with these items in the Consent Decree in 2022 because a policy and procedure for medical reception had been drafted, increased positions were allocated to the intake centers, and IGRA testing to screen for tuberculosis infection had been initiated. As of this report IDOC has made some forward progress as described in the following paragraphs **with much work yet to be done**." Dkt. 1893, Eighth Report, at 128, citing Dkt. 1579, Fifth Report, at 75; *see also* Dkt. 1893 at 134 ("IDOC performance is not compliant with III.C.1"); *id*. at 140 ("Staffing of reception centers is insufficient as measured by the lack of timeliness and inadequacy of the |

| | | | |
|---|---|---|---|
| | | | initial intake screening and health care assessment and initiation of plans for subsequent health care. A policy and procedure for receiving screening has been developed but it is clear that it has yet to be implemented by the Reception & Classification Centers." |
| 13. | III.C.3 | to ensure "that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner." | Same as above (partial compliance) |
| 14. | III.C.4 | IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment | Same as above (partial compliance) |
| 15. | III.G.1 | Each facility HCUA shall track all emergent/urgent services in a log book, preferably electronic | While the Eighth Report gives a rating of "**partial compliance**" to a collection of provisions related to Urgent and Emergent care, Dkt. 1893 at 156-57, this is due to the creation of a policy. But the Monitor finds that "[f]rom review of the facility Quality Improvement Minutes, it is clear that implementation of the policy changes in emergency services has yet to be accomplished." *Id*. at 157. With regards to this specific provision (III.G.1), the Monitor explains that "None of the 30 facilities reporting provided logs of requests for urgent or emergent health care attention with information about the response. During the site visit to NRC we observed that the HCUA was piloting a log to track onsite emergency responses. Ten facilities do not appear to keep a log of emergencies sent to the emergency room. Thirteen of 20 facilities which keep a log, track whether a report was received from the emergency room about the patient's evaluation, care and further treatment recommendations and only 11 track whether the patient was seen by a provider upon return." |
| 16. | III.G.3 | IDOC shall use best efforts to obtain emergency reports from offsite services | **Partial compliance** along with group of provisions on Medical Records, Dkt. 1893 at 83-84. As above, with regards to this |

11

|   |   |   |   |
|---|---|---|---|
|   |   | when a prisoner returns to the parent facility | provision, the Monitor found that "since the last report IDOC has established in policy and procedure the following expectations" including "The type of documentation and reports to be requested from offsite service providers has been clarified" and "Urgent/emergent responses will be reviewed to identify the follow up needed by patients, any problems with the response, and opportunities to improve primary care." Dkt. 1893, Eighth Report, at 160. But "[t]here is little evidence yet that facilities have implemented the changes required by these policies. OHS has not evaluated the need for staffing and training necessary to ensure urgent/emergent services are delivered consistent with the policies nor how competency in clinical response to medical emergencies will be evaluated." *Id*. |
| 17. | III.G.4 | [f]acility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment | Dkt. 1893, Eighth Report, at 187-88, given an overall rating of "**noncompliance**" for hospital care, stating "IDOC provided no V.G. report and no information that tertiary care was acceptable. The Monitor's mortality reviews on only 13 records showed multiple problems with ineffective or absent post-hospitalization evaluations; failure to obtain a hospital report or to obtain it timely; delayed care resulting in hospitalization; and needed hospitalization not being timely ordered."<br><br>Similarly, on page 159, the Monitor explained that, "The Consent Decree requires patients to be seen within 48 hours of return. These logs were reviewed to evaluate the extent of compliance with this requirement and the findings are in the following table. Not quite half the patients sent out for an emergency from 11 facilities which report this information are seen within 48 hours of return to the facility." While IDOC had developed policy and procedure related to emergency |


| | | | |
|---|---|---|---|
| | | | services, the Monitor found that **"[t]here is little evidence yet that facilities have implemented the changes required by these policies. OHS has not evaluated the need for staffing and training necessary to ensure urgent/emergent services are delivered consistent with the policies nor how competency in clinical response to medical emergencies will be evaluated."** Dkt. 1893 at 160. |
| 18. | III.H.1 | Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility | Among a collection of provisions related to specialty care that, as a group, were given a "**partial compliance**" rating. Dkt. 1893, Eighth Report, at 179. But this particular provision is not in compliance, per the narrative section of the Eighth Report at page 179-80, which reads:<br><br>"Every facility tracks specialty care differently and what is recorded is optional for each site. This lack of standardization makes these logs unusable for the purpose of establishing compliance. Logs have been reported as inaccurate since the Monitor's 2nd Report [Dkt. 1335 at 108-109] and do not reflect all care nor all intended care. The only procedural statement on the log in policy D.04.01 Offsite Clinical Care is procedural statement V. which states:<br>    The facility maintains a log of all ambulatory specialty care requests and diagnostic testing, treatment, and procedures in an electronic format.<br>This gives no further guidance on how to maintain the log, who will maintain the log, or what is to be in the log. As written, current practices can continue unabated and specialty care will not be tracked accurately." |

| 19. | III.H.2 | Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated | Among a collection of provisions related to specialty care that, as a group, were given a "**partial compliance**" rating. Dkt. 1893, Eighth Report, at 179. But at page 181 the Monitor noted that "Reports of specialty consultations are often not obtained and when not obtained there is no documented effort to obtain the report." *See also id.* at 181-82, "Providers do not consistently timely review offsite consultation reports or do not consistently document findings of the consultant. Providers seldom provide informed feedback to the patient about the consultation and how the consultation will change the therapeutic plan or why certain recommendations of the consultant will not be undertaken."<br><br>The Monitor has explicitly found that staffing is a barrier to compliance in the area of offsite services, and that Defendants remain resistant to necessary analysis and improvements to staffing that are necessary to provide appropriate care. On page 183 of the Eighth Report, the Monitor explains:<br><br>"It is the Monitor's belief that **lack of sufficient physicians is a root cause of many of the problem with specialty care** because physicians do not appear to have sufficient patient-time to manage complex patients and to ensure that care occurs and is coordinated with consultants. The Monitor has recommended a workload analysis to determine staffing needs. IDOC has not yet accepted this recommendation. With respect to physician needs for specialty care, a workload analysis would include the following. There is a requirement (II.B.6.c. and III.H.2.) that after each offsite visit a provider is to provide informed care to the patient that in the Monitor's opinion requires reading the report carefully, |

| | | | |
|---|---|---|---|
| | | | contacting the consultant for questions, evaluating the patient, updating the problem list and therapeutic plan, and discussing all the diagnoses and changes to the plan with the patient. Based on prior experience in managing physician care, the Monitor believes this will take approximately twenty minutes during a post consultation visit. If Dixon is used as an example, the scheduling clerk estimates that 300 new referrals are generated a month. If a physician is expected to conduct this evaluation and if 20 minutes is allotted per post-consultation visit, then 6000 minutes per month are needed to complete this task. That is 100 hours or 0.625 FTE physician to complete this task. One can easily understand why current offsite post visits are so poorly performed and why many are not even completed. **There are simply not enough physician hours to accomplish this task. A similar analysis can be made for the scheduling clerks which the Monitor believes would also show insufficient staffing**." <br><br> And finally, at Dkt. 1893 at 186, the Monitor summarizes that "**Lack of staffing (physicians and support staff) appears responsible for operational issues and provider follow up**. Mortality reviews show many preventable deaths as a result of problems with specialty care. A partial compliance is warranted on the basis of promulgation of a policy but access to specialty services still has significant problems." |
| 20. | III.H.3 | If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible | Among a collection of provisions related to specialty care that, as a group, were given a "**partial compliance**" rating. Dkt. 1893, Eighth Report, at 179. But at page 180 the Monitor noted that, "IDOC has not provided information to verify … documentation of why consultation reports could not be obtained (III.H.3.)" |

| 21. | III.H.4 | Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical records, including any findings and proposed treatment. | Among a collection of provisions related to specialty care that, as a group, were given a "**partial compliance**" rating. Dkt. 1893, Eighth Report, at 179. But at pages 180-81 the Monitor explained that, with regards to this specific provision, "IDOC has not provided information to verify … that all appointments between a consultant and the patient are documented in the medical record (III.H.4.). |
|---|---|---|---|
| 22. | III.I.1 | requires that a registered nurse will be readily available whenever an infirmary is occupied in the IDOC system | **Noncompliance** rating, Dkt. 1893 at 161. |
| 23. | III.I.2 | requires that every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week | **Noncompliance** rating, Dkt. 1893 at 161. |
| 24. | III.I.3 | requires that all facilities employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital. | **Noncompliance** rating, Dkt. 1893 at 161. |
| 25. | III.K.6* | Requires routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts. | **Noncompliance** rating, Dkt. 1893 at 270. "Despite introducing a new dental policy, there seems to be a lack of consistency in how examinations and treatment plans are formulated across the system. It is unclear whether dentists have received proper communication or guidance regarding the requirements for conducting examinations and structuring treatment plans." |
| 26. | III.K.8* | Requires routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated. | **Partial compliance** rating, Dkt. 1893 at 266-67.<br><br>IDOC's revised dental policy says cleanings will be done annually, but "[d]ata from SIU shows that the overall compliance rates for these facilities were 56% in FY24 Q1, 63% in FY24 Q2, and 54% in FY24 Q3. While IDOC is not fully compliant with the Decree, three facilities met the program's goal of providing a |

| | | | |
|---|---|---|---|
| | | | hygiene appointment within two years. Decatur achieved 100% compliance in the SIU review, while Sheridan and Stateville both reached 90% compliance" *Id.* at 267-68. |
| 27. | III.L | requires "a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor." | A **partial compliance** rating was given to a group of provisions related in internal monitoring and quality improvement, Dkt. 1893 at 49, but the Monitor further explained that "[f]acility quality improvement programs are not well developed" because the appropriate staffing was not in place. *Id.* at 53 ("No facility has a dedicated Quality Improvement Coordinator. All facility quality improvement coordinators have other assignments."). <br><br> Without appropriate staffing, a quality improvement program cannot function. In the Seventh Report, the Monitor shared an anecdote from a recent site visit where "the coverage physician said he had no time to participate in quality improvement activity because he was overwhelmed with work." Dkt. 1725 at 43. |
| 28. | IV.A & B* | required that defendants "shall conduct a staffing analysis . . . to accomplish the obligations and objectives in this Decree") within 120 days from the Monitor being selected. | A **partial compliance** rating is given as to this provision, Dkt. 1893, at 19, because Defendants submitted the August 2021 document that they titled as their Staffing Analysis. However, "[t]he Monitor has consistently stated that IDOC's analysis was not an analysis and recommended a workload analysis to more accurately describe IDOC's need for staffing but this has not been done." *Id.* at 20. <br><br> As for updates to the original staffing analysis proposed to the Monitor in 2019 (which called for 373 additional positions, the Monitor notes that, "[t]here have been minor modifications to this recommended number over the subsequent years but IDOC has not performed any further analysis." *Id.* at 20. |

17

|   |   |   |   | The Monitor goes on to explain that drafting of the Staffing Analysis document has not resulted in a meaningful increase in staff:<br>"For over two years, IDOC did not allocate all of its recommended positions in their staffing analysis. When IDOC finally allocated all positions in 2022, the Monitor recommended that IDOC hire all positions.43 This has not occurred. As of this report, IDOC has 60 less working staff than it did in 2019 and 679 vacancies based on their 2019 staffing analysis. There is no dispute that additional staff are needed but the numbers of vacant position is staggering and has been present since the IDOC staffing analysis positions were allocated. In interviews with IDOC Regional Coordinators, they mentioned staffing as a key barrier to implementation of policies. The HCUA at NRC named lack of staffing as the key barrier to implementation of the sick call policy. Lack of staffing is impeding movement towards compliance with the Consent Decree. The Monitor continues to recommend hiring all staff as soon as possible." *Id*. at 20. |

*Explicitly cited and addressed in previous dispute resolution letters.